## EXHIBIT A

**Deed of Trust**

<u>ש ט ר    נ א מ נ ו ת</u>

<u>שנערך ונחתם בתל אביב ביום 19 בפברואר 2017</u>

ב י ן :

**All Year Holdings Limited**

חברה זרה מאיי הבתולה הבריטיים אשר משרדה הרשום באיי הבתולה הינו אצל :

Blenheim Trust (BVI) Limited, P.O. Box 3483, Road Town, Tortola, British Virgin Islands

ומענה בישראל לצורך שטר זה ולצורך המצאת כתבי בי דין הוא :

גבריאל דרנוב, אצל יו.אס.ריל אסטייט רפרזנט בע״מ,

אבא הלל 16, רמת גן, 5250608.

טל : 03-6123939

פקסימיליה : 03-6125030

(להלן : ״**החברה**״)

<u>מצד אחד</u> ;

ל ב י ן :

**משמרת חברה לשירותי נאמנות בע״מ**

דרך מנחם בגין 48, תל אביב

טלפון : 03-6374352

פקס : 03-6374344

(להלן : ״**הנאמן**״)

<u>מצד שני</u> ;

| עמוד | נושא | סעיף |
|---|---|---|
| | שטר הנאמנות | |
| 3 | מבוא ; פרשנות ; והגדרות | 1 |
| 5 | הנפקת אגרות החוב ; תנאי הנפקה ; דרגה שווה | 2 |
| 6 | רכישת אגרות חוב על ידי החברה ו/או אדם קשור ו/או ביצוע חלוקה | 3 |
| 6 | הנפקת אגרות חוב נוספות | 4 |
| 7 | התחייבויות החברה | 5 |
| 9 | הבטחת אגרות החוב | 6 |
| 16 | פדיון מוקדם | 7 |
| 28 | פדיון מוקדם ביוזמת הבורסה | 7.1 |
| 28 | פדיון מוקדם ביוזמת החברה | 7.2 |
| 28 | זכות להעמדה לפירעון מיידי | 8 |
| 30 | תביעות וחלוקים בידי הנאמן | 9 |
| 34 | נאמנות על התקבולים | 10 |
| 36 | סמכות לדרוש תשלום למחזיקים באמצעות הנאמן | 11 |
| 36 | סמכות לעכב חלוקת כספים | 12 |
| 36 | חודשה על חלוקה | 13 |
| 37 | הימנעות מתשלום מסיבה שאינה תלויה בחברה | 14 |
| 37 | קבלה מאת מחזיקי אגרות החוב ומאת הנאמן | 15 |
| 38 | הצגת אגרות חוב לנאמן ; רישום בקשר עם תשלום חלקי | 16 |
| 38 | השקעות כספים | 17 |
| 38 | התחייבויות החברה כלפי הנאמן | 18 |
| 39 | התחייבויות נוספות | 19 |
| 41 | באי כוח | 20 |
| 42 | הסכמים אחרים | 21 |
| 42 | דווחה על עניני הנאמנות | 22 |
| 42 | שכר וכיסוי הוצאות הנאמן | 23 |
| 42 | סמכויות מיוחדות | 24 |
| 42 | סמכות הנאמן להעסיק שלוחים | 25 |
| 43 | שיפוי לנאמן | 26 |
| 43 | הודעות | 27 |
| 46 | ויתור, פשרה ושינויים בשטר הנאמנות | 28 |
| 46 | מרשם המחזיקים באגרות החוב | 29 |
| 47 | שחרור | 30 |
| 47 | מינוי הנאמן, תפקידי הנאמן, סמכויות הנאמן ופקיעת כהונתו של הנאמן | 31 |
| 47 | אסיפות של מחזיקי אגרות החוב | 32 |
| 48 | תחולת הדין | 33 |
| 48 | סמכות ייחודית | 34 |
| 48 | כללי | 35 |
| 48 | אחריות הנאמן | 36 |
| 49 | מענים | 37 |
| 49 | הסמכה למגני"א | 38 |
| 49 | התחייבויות החברה המוצערת, חברת הבת, חברת הנכס | |
| 50 | תוספת ראשונה לשטר הנאמנות – תעודות אגרות (סדרה ג') | |
| 51 | התנאים הרשומים מעבר לדף | |
| 52 | כללי | 1 |
| 52 | אגרות החוב | 2 |
| 52 | תנאי אגרות החוב (סדרה ג') המוצעות על פי התשקיף | 3 |
| 52 | תשלומי הקרן והריבית של אגרות החוב (סדרה ג') | 4 |
| 53 | דחיית מועדים | 5 |
| 54 | הבטחת אגרות החוב | 6 |
| 54 | הימנעות מתשלום מסיבה שאינה תלויה בחברה | 7 |
| 54 | מרשם מחזיקי אגרות חוב | 8 |
| 54 | פיצול תעודות אגרות חוב | 9 |
| 54 | העברת אגרות החוב | 10 |
| 54 | פדיון מוקדם | 11 |
| 55 | רכישת אגרות החוב על ידי החברה ו/או אדם קשור | 12 |
| 55 | ויתורים ; פשרות ושינויים בשטר הנאמנות | 13 |
| 55 | אסיפות מחזיקי אגרות החוב | 14 |
| 55 | קבלה מאת מחזיקי אגרות החוב | 15 |
| 55 | פירעון מיידי | 16 |
| 55 | הודעות | 17 |
| 55 | הדין החל וסמכות שיפוט | 18 |
| 55 | סדר קדימויות | 19 |
| 55 | תוספת שניה לשטר הנאמנות – אסיפות מחזיקי אגרות החוב (סדרה ג') | |
| 57 | תוספת שלישית לשטר הנאמנות + נציגות דחופה למחזיקי אגרות החוב | |
| 63 | נספח 23 | |
| 65 | נספח א' – תיאור הנכס המשועבד | |
| 55 | נספח ב' – טיוטות מסמכי השעבוד | |
| 56 | | |

-3-

**הואיל:** ובכוונת החברה לפרסם דוח הצעת מדף על פיו תציע החברה לראשונה אגרות חוב (סדרה ג'), בכמות אשר תקבע בדוח הצעת מדף שעשויה לפרסם החברה, והכל בדרך, באופן ובתנאים שיקבעו בדוח ההצעה;

**והואיל:** וביום 7 בפברואר 2017, הודיעה מידרוג בע"מ (להלן: "**מידרוג**") על מתן דירוג (P) A2.il באופק יציב להנפקת אגרות החוב (סדרה ג'), בסך של עד 650 מיליון ש"ח ע.נ. ;

**והואיל:** ונכון למועד חתימת שטר זה החברה עומדת בכל התנאים של החברה המדרגת לצורך דירוגה של סדרת אגרות החוב (סדרה ג') בדירוג המפורט לעיל;

**והואיל:** והנאמן הינו חברת פרטית מוגבלת במניות שנתאגדה בישראל לפי חוק החברות, התשנ"ט-1999 (להלן: "**חוק החברות**") אשר מטרתה העיקרית הינה עיסוק בנאמנויות;

**והואיל:** והנאמן הצהיר כי אין מניעה על-פי חוק ניירות ערך, התשכ"ח-1968, או כל דין אחר, להתקשרותו עם החברה על-פי שטר נאמנות זה וכי הוא עונה על הדרישות ותנאי הכשירות הקבועים בחוק ניירות ערך לשמש נאמן להנפקת אגרות החוב (סדרה ג') המוצעות על פי דוח ההצעה ;

**והואיל:** ולנאמן אין כל עניין בחברה ולחברה אין כל עניין אישי בנאמן ;

**והואיל:** והחברה מצהירה כי אין מניעה על פי כל דין (בין בישראל ובין מחוץ לישראל, ו/או הסכם לבצע הנפקה של אגרות החוב ו/או להתקשרות עם הנאמן על פי שטר נאמנות זה;

**והואיל:** ואגרות החוב (סדרה ג') תירשמנה למסחר בבורסה לניירות ערך בתל-אביב בע"מ ;

**והואיל:** והחברה פנתה בבקשה אל הנאמן שישמש כנאמן למחזיקי אגרות החוב (סדרה ג') והנאמן הסכים לחתום על שטר נאמנות זה ולפעול כנאמן של מחזיקי אגרות החוב (כהגדרתן לעיל) והכל כפוף ובהתאם לתנאי שטר נאמנות זה ;

**לפיכך הוסכם, הוצהר והותנה בין הצדדים כדלקמן :**

1. **מבוא; פרשנות; והגדרות**

1.1 המבוא לשטר נאמנות זה והנספחים הרצופים לו מהווים חלק מהותי ובלתי נפרד הימנו.

1.2 חלוקת שטר נאמנות זה לסעיפים וכן מתן כותרות לסעיפים, נעשו מטעמי נוחות וכמראי מקום בלבד, ואין להשתמש בהם לשם פרשנותו.

1.3 כל האמור בשטר זה בלשון רבים אף יחיד במשמע וכן להפך, כל האמור במין זכר אף מין נקבה במשמע וכן להפך, וכל האמור באדם אף תאגיד במשמע, והכל כשאין בשטר זה הוראה אחרת מפורשת ו/או משתמעת ו/או אם תוכן הדברים או הקשרם אינו מחייב אחרת.

1.4 בכל עניין שלא נזכר בשטר זה וכן בכל מקרה של סתירה בין הוראות הדין לבין שטר זה, יפעלו הצדדים בהתאם להוראות הדין הישראלי. בכל מקרה של סתירה בין ההוראות המתוארות בדוח ההצעה בקשר לשטר זה ו/או אגרות החוב יגברו הוראות שטר זה, והכל בכפוף לתקנון והנחיות הבורסה.

1.5 בשטר נאמנות זה ובאגרות החוב, תהיה לביטויים הבאים המשמעות שלצידם, אלא אם משתמעת כוונה אחרת מתוכן הדברים או הקשרם:

1.5.1 "**שטר זה**" או "**שטר הנאמנות**": שטר נאמנות זה על תיקוניו כפי שיהיו מעת לעת לרבות הנספחים המצורפים אליו ומהווים חלק בלתי נפרד הימנו;

1.5.2 "**אגרות החוב (סדרה ג')**": אגרות חוב (סדרה ג') שתונפקנה על ידי החברה בהתאם לדוח הצעת המדף;

1.5.3 "**סדרת אגרות החוב**": אגרות חוב רשומות על שם, שתונפקנה יהיו בהתאם לשטר זה, לתעודת אגרת החוב (סדרה ג') ולדוח הצעת המדף, לפיהם הן תונפקנה;

1.5.4 "**התשקיף**" או "**תשקיף המדף**": תשקיף המדף של החברה שפורסם ביום 29 בנובמבר 2015, נושא תאריך 30 בנובמבר 2015 ;

1.5.5 "**דוח הצעת מדף**" - דוח/ות הצעת מדף אשר יפורסמו על-פי תשקיף המדף, בהתאם להוראות סעיף 23א(א) לחוק ניירות ערך, התשכ"ח-1968, בהם יושלמו כל הפרטים המיוחדים להצעת אגרות החוב (סדרה ג');

1.5.6 "**דוח ההצעה הראשון**" - דוח הצעת מדף אשר מכוחו תונפקה אגרות החוב (סדרה ג') לראשונה ;

-4-

1.5.7 "**הנאמן**" : משמרת חברה לשירותי נאמנות בע"מ ו/או כל מי שיכהן מדי פעם בפעם כנאמן של מחזיקי אגרות החוב לפי שטר זה ;

1.5.8 "**מרשם המחזיקים באגרות החוב**" ו/או "**המרשם**" : מרשם המחזיקים באגרות החוב כאמור בסעיף 29 לשטר זה ;

1.5.9 "**מחזיק**" ו/או "**מחזיק אגרות החוב**" : כהגדרת מונח זה בחוק ניירות ערך ;

1.5.10 "**תעודת אגרת החוב**" : תעודת איגרת חוב אשר תעודתה ונוסחה מצורפת <u>כתוספת ראשונה</u> לשטר זה ;

1.5.11 "**החוק**" או "**חוק ניירות ערך**" : חוק ניירות ערך, התשכ"ח-1968 והתקנות לפיו, כפי שיהיו מעת לעת ;

1.5.12 "**חוק החברות**" : חוק החברות, התשנ"ט-1999 והתקנות לפיו, כפי שיהיו מעת לעת ;

1.5.13 "**יום עסקים**" או "**יום עסקים בנקאי**" : כל יום בו פתוחים מסלקת הבורסה ורוב הבנקים בישראל לביצוע עסקאות ;

1.5.14 "**יום מסחר**" : יום בו מתבצעות עסקאות בבורסה ;

1.5.15 "**החברה לרישומים**" : מזרחי טפחות חברה לרישומים בע"מ או כל חברה לרישומים שתבוא בנעליה ובלבד שכל ניירות הערך של החברה הרשומים למסחר יהיו רשומים על שמה ;

1.5.16 "**סכום הקרן**" : סכום הערך הנקוב של אגרת החוב שטרם נפרע ;

1.5.17 "**הבורסה**" : הבורסה לניירות ערך בתל אביב בע"מ.

1.5.18 "**הבטוחות**" : השעבודים המתוארים בסעיף 6.2 להלן ;

1.5.19 "**החברה המועברת**" : YG WV LLC, אשר מחזיקה ב-50% מזכויות ההשתתפות בחברת הבת ;

1.5.20 "**חברת הבת**" : Wythe Berry Member LLC, המחזיקה במלוא זכויות ההשתתפות בחברת הנכס ;

1.5.21 "**חברת הנכס**" : Wythe Berry Fee Owner LLC, אשר תהיה בעלות זכויות הבעלות בנכס במועד הסגירה ;

1.5.22 "**תאגידי ההחזקה**" : החברה המועברת וחברת הבת ;

1.5.23 "**הנכס המשועבד**" : הנכס הידוע בשם William Vale Complex, אשר פרטיו מובאים <u>בנספח א'</u> לשטר הנאמנות ;

1.5.24 "**מועד הסגירה**" : המועד שבו תשתכלל העברת הנכס המשועבד לחברת הנכס ותושלמנה הבטוחות למחזיקי אגרות החוב, כמפורט בסעיף 6.2.3 להלן.

1.5.25 "**החלטה מיוחדת**"

החלטה שנתקבלה באסיפה כללית של מחזיקי אגרות החוב (סדרה ג'), בה נכחו בעצמם או על-ידי באי-כוחם מחזיקים באגרות החוב שלהם לפחות 50% מיתרת הערך הנקוב של אגרות החוב (סדרה ג'), או באסיפה נדחית שנכחו בה מחזיקים בעצמם או על-ידי באי-כוחם, שלהם לפחות 20% מיתרת הערך הנקוב כאמור, ואשר נתקבלה (בין בסיפה המקורית ובין באסיפה הנדחית) ברוב של לפחות שני שלישים (2/3) מיתרת הערך הנקוב של אגרות החוב (סדרה ג') המיוצג בהצבעה, למעט הנמנעים.

-5-

1.5.26 "**עניין מנוגד**" משמעו : כאמור בסעיף 9.3 לשטר זה;

1.5.27 "**החוזר המאוחד**" – החוזר המאוחד של הממונה על שוק ההון, ביטוח וחיסכון לגופים מוסדיים, כפי שיהיה בתוקף מעת לעת[1];

1.5.28 "**דירוג**" – דירוג על ידי חברת הדירוג, כהגדרתה להלן.

1.5.29 בשטר הנאמנות זה ובאגרות החוב תהיה לדירוג אגרות החוב המשמעות המפורטת בטבלה להלן :

| | |
|---|---|
| "**A**" | A2 בדירוג מעלות או ilA בדירוג מידרוג או דירוג מקביל לדירוגים אלה אשר ייקבע על ידי חברת דירוג אחרת המדרגת או שתדרג את אגרות החוב (סדרה ב'). |
| "**A מינוס**" | A3 בדירוג מעלות או ilA- בדירוג מידרוג או דירוג מקביל לדירוגים אלה אשר ייקבע על ידי חברת דירוג אחרת המדרגת או שתדרג את אגרות החוב (סדרה ג'). |
| "**BBB פלוס**" | Baa1 בדירוג מעלות או ilBBB+ בדירוג מידרוג או דירוג מקביל לדירוגים אלה אשר ייקבע על ידי חברת דירוג אחרת המדרגת או שתדרג את אגרות החוב (סדרה ג'). |
| "**BBB**" | Baa2 בדירוג מעלות או ilBBB בדירוג מידרוג או דירוג מקביל לדירוגים אלה אשר ייקבע על ידי חברת דירוג אחרת המדרגת או שתדרג את אגרות החוב (סדרה ג'). |
| "**BBB מינוס**" | Baa3 בדירוג מעלות או ilBBB- בדירוג מידרוג או דירוג מקביל לדירוגים אלה אשר ייקבע על ידי חברת דירוג אחרת המדרגת או שתדרג את אגרות החוב (סדרה ג'). |

1.5.30 "**חברת הדירוג**" : סטנדרט אנד פורס מעלות בע"מ (לעיל ולהלן : "**מעלות**"), מידרוג בע"מ (לעיל ולהלן : "**מידרוג**") או חברה מדרגת כהגדרתה בחוק להסדרת פעילות חברות דירוג האשראי, תשע"ד-2014.

1.5.31 "**תאגיד מדווח**" – כהגדרתו בחוק ניירות ערך או תאגיד אשר נסחר בבורסה מחוץ לישראל, כמפורט בתוספת השנייה או השלישית לחוק ניירות ערך.

1.5.32 "**בעל השליטה**" : מר יואל גולדמן, אשר פרטיו מפורטים בפרק 8 לתשקיף.

1.5.33 "**תקנות הדוחות**" – תקנות ניירות ערך (דוחות תקופתיים ומיידיים), התש"ל-1970.

1.5.34 "**דוחות כספיים**" – דוחות כספיים שנתיים או רבעוניים, מבוקרים או סקורים שעל החברה לפרסם בהתאם לחוק ניירות ערך ותקנותיו על פי.

1.6 כל עוד אגרות החוב רשומות למסחר בבורסה, בכל מקום בו כללי הבורסה חלים או יחולו על פעולה כלשהי על פי שטר נאמנות זה, מועדי הפעולה ואופן ביצועה יקבעו בהתאם לכללי הבורסה. מובהר, כי לא יהיה בביצוע פעולה כאמור (לרבות אם ישונו כללי הבורסה) כדי לגרוע מהסכמות הצדדים עפ"י שטר זה.

1.7 בכל מקרה של סתירה בין שטר הנאמנות למסמכים הנלווים לו, יגברו הוראות שטר הנאמנות. מובהר בזאת כי נכון למועד השטר, אין סתירה בין ההוראות המתוארות בדוח ההצעה בקשר להצעה לשטר זה ו/או אגרות החוב.

1.8 במקרה של ביטול הנפקת אגרות החוב, מכל סיבה שהיא, יסתיים תוקפו של שטר נאמנות זה.

-6-

| | |
|---|---|
| 1.9 | בכל הפניה בשטר זה למספר של סעיפים בחוק תותאם ההפניה, בשינויים המחויבים, לשינויים שיחולו בחוק, ככל שיחולו. |
| 1.10 | פעולותיו של נאמן זה נאמן הן בנות תוקף על אף פגם שנתגלה במינויו או בכשירותו. |
| 1.11 | אין בחתימת הנאמן על שטר הנאמנות הבעת דעה מצדו בדבר טיבם של ניירות הערך המוצעים או כדאיות ההשקעה בהם. |

## 2.    הנפקת אגרות החוב; תנאי הנפקה; תנאי ההצמדה; דרגה שווה

| | |
|---|---|
| 2.1 | החברה תנפיק את אגרות החוב (סדרה ג') כמתואר במבוא לשטר זה. אגרות החוב (סדרה ג'), שתונפקנה במסגרת דוח הצעת הראשון, תירשמנה למסחר בבורסה. |
| 2.2 | החברה רשאית להנפיק על פי התשקיף ובכפוף לפרסום דוח הצעת מדף ולפי שיקול דעתה הבלעדי, את אגרות החוב (סדרה ג') אשר תנאיהן יהיו כדלקמן: |

אגרות החוב (סדרה ג') תהיינה רשומות על שם, עומדות לפרעון בשנים עשר (12) תשלומים חצי שנתיים בימים 31 באוגוסט ו-28 בפברואר, החל מיום 31 באוגוסט 2018 ועד ליום 28 בפברואר 2024 (כולל), באופן שכל אחד מאחד עשר מהתשלומים הראשונים יהווה 1.25% מקרן הנקוב הכולל של אגרות החוב (סדרה ג') והתשלום האחרון יהווה 86.25% מקרן ערך הנקוב הכולל של אגרות החוב (סדרה ג'), נושאות ריבית שנתית בשיעור קבוע שיקבע במכרז (בכפוף להתאמות במקרה של שינוי בדירוג אגרות החוב (סדרה ג') ו/או אי עמידה בהתחייבויות פיננסיות בסעיפים 5.3 ו-5.4 להלן) וכן בכפוף להתאמות בגין ריבית פיגורים ככל שתהינה), אשר תשולם פעמיים בשנה, בימים 31 באוגוסט ו-28 בפברואר, החל מיום 31 באוגוסט 2017 ועד ליום 28 בפברואר 2024 (כולל). למעט תקופת הריבית הראשונה, כל תשלום ריבית ישולם בעד התקופה של שישה החודשים שנסתיימה ביום הקודם למועד התשלום (להלן: "תקופת הריבית"). שיעור הריבית שתשולם בעד תקופת ריבית מסוימת (למעט תקופת הריבית הראשונה) (קרי התקופה המתחילה ביום התשלום של תקופת הריבית הקודמת ומסתיימת ביום האחרון שלפני מועד התשלום הסמוך אחרי יום תחילתה) יחושב כשיעור הריבית השנתית חלקי שניים. תקופת הריבית הראשונה ישולם ביום 31 באוגוסט 2017 בגין התקופה המתחילה ביום המסחר הראשון שלאחר יום המכרז על אגרות החוב (סדרה ג') והמסתיימת ביום 30 באוגוסט 2017 (לעיל: "תקופת הריבית הראשונה"), מחושבת על בסיס של 365 יום בשנה לפי מספר הימים בתקופה זו ותשולם הריבית האחרון ישולם ביום 28 בפברואר 2024. אגרות החוב (סדרה ג') לא תהיינה צמודות (קרן וריבית) למדד או מטבע כלשהו.

| | |
|---|---|
| 2.3 | החברה שומרת לעצמה את הזכות, לבצע פדיון מוקדם לאגרות החוב בהתקיים התנאים המפורטים בסעיף 7 לשטר זה. |
| 2.4 | אגרות החוב (סדרה ג') תעמודנה כולן בדרגת בטחון שווה פרי פסו, בינן לבין עצמן בקשר עם התחייבויות החברה על-פי אגרות החוב, ובלי זכות או עדיפות של האחת על פני האחרת. |

## 3.    רכישת אגרות חוב על ידי החברה ו/או אדם קשור וביצוע חלוקה

| | |
|---|---|
| 3.1 | החברה שומרת לעצמה, בכפוף לכל דין, את הזכות לרכוש את אגרות החוב (סדרה ג') בכל עת ומעת לעת, בלי לפגוע בחובת הפירעון של אגרות החוב (סדרה ג') שבמחזור. במקרה של רכישה כאמור, החברה תודיע על כך לנאמן בכתב, מבלי לגרוע מחובת הדיווח המיידי החלה עליה. במקרה שאגרות החוב (סדרה ג') תירכשנה על-ידי החברה, החברה תפנה בבקשה למסלקת הבורסה למשיכת התעודות שנרכשו כאמור. |
| | במקרה של רכישה על ידי החברה כאמור לעיל יפקעו אגרות החוב (סדרה ג') הנרכשות ותמחקנה מהמסחר בבורסה ותבוטלנה ותמחקנה באופן אוטומטי, ובהתבטלותן לא תהיה רשאית החברה להנפיקן מחדש. אין באמור לעיל בכדי לפגוע בזכות החברה לפדות בפדיון מוקדם את אגרות החוב (סדרה ג') כאמור בסעיף 7 להלן. |
| 3.2 | בעל שליטה בחברה (כמשמעו בחוק ניירות ערך) ו/או בן משפחתו (בן זוג וכן אח, הורה, הורה הורה, צאצא וצאצא של בן הזוג, או בן זוגו של כל אחד מאלה) ו/או חברה |

-7-

בת של החברה ו/או חברה קשורה של החברה ו/או חברה כלולה של החברה ו/או
תאגיד בשליטתם של כל אחד מהם (במושרין, או בעקיפין) (למעט החברה עצמה
לגביה יחול האמור בסעיף 3.1 לעיל) (להלן: **"אדם קשור"**) יהיו רשאים לרכוש ו/או
למכור אגרות חוב (סדרה ג') על פי שיקול דעתם (ובכפוף לכל דין), בכל עת ומעת
לעת, לרבות בדרך של הנפקה על ידי החברה, אגרות חוב (סדרה ג') אשר יונפקו עפ"י
שטר הנאמנות. במקרה של רכישה ו/או מכירה כאמור על ידי חברת בת של החברה
ו/או תאגיד בשליטתה תמסור החברה על כך דיווח מיידי. אגרות חוב (סדרה ג')
אשר תוחזקנה כאמור על-ידי אדם קשור תיחשבנה ככנס של האדם הקשור, ואם הן
רשומות למסחר, הן לא תימחקנה מהמסחר בבורסה, וכן תהיינה ניתנות להעברה
כיתר אגרות החוב (סדרה ג'). אגרות חוב (סדרה ג') אשר בבעלות אדם קשור לא
יקנו לאדם הקשור זכויות הצבעה באסיפות של מחזיקי אגרות החוב (סדרה ג') ולא
יימנו לצורך קביעת קיומו של מניין חוקי התכנסות השנייה לפתיחת אסיפות אלה. אסיפות
מחזיקים ייערכו על פי הוראות התכנסות השנייה לשטר הנאמנות. אדם קשור ידווח
לחברה, בכל שהינו מחזיק על פי דין לעשות כן, על רכישת אגרות חוב (סדרה ג')
והחברה תמסור לנאמן, על פי דרישתו, את רשימת האנשים הקשורים ואת הכמויות
המוחזקות על ידיהם בתאריך שיבקש הנאמן וזאת על פי הדיווחים שהתקבלו
כאמור מאנשים קשורים ואשר בעניינם ידווח דיווח מיידי לנאמן לצורכי סעיף זה.

אין באמור בסעיף זה לעיל, כשלעצמו, כדי לחייב את החברה או אדם קשור או את | 3.3
מחזיקי אגרות החוב (סדרה ג') לקנות אגרות חוב ו/או למכור את אגרות החוב
(סדרה ג') שבידיהם.

נכון למועד החתימה על שטר זה לא חלה על החברה כל מגבלה שהיא ביחס לחלוקת | 3.4
דיבידנד או רכישת עצמית של מניותיה, למעט כמפורט בסעיף 6.5 להלן ולמעט
מגבלות שניטלו כמפורט בשטרי הנאמנות לאגרות החוב (סדרות א' ו-ב') של החברה.

## **הנפקת אגרות חוב נוספות** .4

החברה תהיה רשאית, מפעם לפעם, ללא צורך בקבלת אישור מהנאמן ו/או | 4.1
מהמחזיקים הקיימים באותה עת, להנפיק אגרות חוב נוספות (סדרה ג') (בין
בהצעה פרטית, בין במסגרת תשקיף ובין בכל דרך אחרת), לרבות לאדם קשור
(כהגדרתו בסעיף 3.2 לעיל), בתנאים כפי שתימצא לנכון (תנאי אגרות החוב הנוספות
המונפקות יהיו זהים לתנאי אגרות החוב (סדרה ג')) ואולם, במקרה כזה לנאמן
תהיה הזכות לדרוש את הגדלת שכר טרחתו השנתי באופן יחסי להגדלת הסדרה,
באופן קבוע עד לתום תקופת הנאמנות והחברה נותנת את הסכמתה מראש
בהתקשרותה בשטר זה להגדלת שכר טרחת הנאמן כאמור. אגרות החוב (סדרה ג')
הקיימות במועד הרחבת הסדרה הסדרה ואגרות החוב (סדרה ג') הנוספות (ממועד הנפקתן)
תהוונה סדרה אחת לכל דבר ועניין, וישאו הנאמנות של אגרות החוב (סדרה ג'),
יחול גם לגבי כל אגרות חוב נוספות מסדרה ג' כאמור. החברה תפנה לבורסה
בבקשה לרשום למסחר את אגרות החוב (סדרה ג') הנוספות כאמור, לכשיוצעו.

הרחבת הסדרה תוגבל עד להיקף סדרה מקסימאלי של 650 מיליון ש"ח, בניכוי
פרעון קרן שבוצע בפועל, דהיינו היקף הסדרה המקסימאלי לצורך הרחבת הסדרה
יפחת מעת לעת, בהתאם ללוא הסילוקין של קרן אגרות החוב (סדרה ג').

מבלי לגרוע מן האמור לעיל, הנפקה נוספת של אגרות חוב (סדרה ג') תבוצע בכפוף
לכך שיתקיימו כל התנאים המפורטים להלן: (א) ההנפקה הנוספת של אגרות חוב
(סדרה ג') כאמור לא תפגע בדירוג אגרות החוב (סדרה ג') אשר הונפקו לראשונה על
פי שטר זה, כפי שיהיה הדירוג באותו מועד (**קרי הדירוג ערב הרחבת הסדרה**);
לעניין סעיף זה יובהר כי כל עוד אגרות החוב (סדרה ג') מדורגות על ידי יותר
מחברת דירוג אחת, בחינת הדירוג לצורך סעיף זה תיעשה בכל עת, על פי הדירוג
הגבוה מביניהם; (ב) במועד ההנפקה הנוספת החברה עומדת בהתניות הפיננסיות
המפורטות בסעיף 6.4 לשטר זה; (ג) במועד ההנפקה הנוספת, מיד לאחר ביצוע
ההנפקה הנוספת יחס החלוואה לבטוחה (כהגדרתו בסעיף 6.4(2) להלן) לא יעלה על
66%; (ד) במועד ההנפקה הנוספת, בהתאם לדוחותיה הכספיים האחרונים
שפורסמו טרם מועד ההנפקה הנוספת, ולאחר שתובא בחשבון למפרע ביצוע
ההנפקה הנוספת עומדת החברה בכל אמות המידה הפיננסיות כאמור לעיל. החברה
תמסור לנאמן לפחות 7 ימים טרם ביצוע ההנפקה הנוספת בפועל אישור בכתב
בחתימת נושא המשרה הבכיר בתחום הכספים בחברה בדבר: (1) התקיימותם של

-8-

התנאים האמורים; (2) כי החברה אינה מפרה איזה מהתחייבויותיה למחזיקי אגרות החוב (סדרה ג') וכי לא מתקיימת עילה להעמדה לפירעון מיידי כמפורט בסעיף 8.1 להלן; ו-(3) כי הרחבת הסדרה לא תפגע ביכולת הפירעון של החברה את אגרות החוב (סדרה ג'). בכל מקרה של הנפקה נוספת כאמור, הגדלת הסדרה תיעשה בכפוף לקבלת אישור מראש מחברת הדירוג שהגדלת הסדרה כאמור לא תפגע בדירוג אגרות החוב (סדרה ג') כפי שיהיה באותה עת. אישור חברת הדירוג יפורסם על ידי החברה טרם הרחבת הסדרה וכן יצורף לאישור החברה לנאמן. החברה תודיע לנאמן בכתב וכן תפרסם דוח מיידי, עוד קודם לביצוע ההנפקה הנוספת, באם ההנפקה הנוספת עומדת (או לא עומדת, לפי העניין) בתנאים האמורים לעיל ותאשר לנאמן בכתב כי אין בהרחבה כאמור כדי לפגוע במחזיקי אגרות החוב (סדרה ג') וכן כי דירקטוריון החברה בחן את השפעת הרחבת הסדרה כאמור על יכולתה של החברה לעמוד בהתחייבויותיה למחזיקי אגרות החוב (סדרה ג') קודם לביצוע ההנפקה כאמור.

במקרה של הרחבת סדרת אגרות החוב במהלך המסחר בבורסה (ATM) תציין החברה את דבר עמידתה בתנאי סעיף זה בעת ההרחבה, קרי במועד הנפקת אגרות החוב הנוספות לחברה ו/או לחברת בת (יצירת "המחסניות"), ולא בעת ביצוע המכירות במהלך המסחר.

אין בזכות זאת של החברה, כדי לפטור את הנאמן מלבחון את ההנפקה כאמור, ככל שתהובא כזו מוטלת על הנאמן על פי דין, ואין בו כדי לגרוע מזכויותיו של הנאמן ושל מחזיקי אגרות החוב לפי שטר זה, לרבות מזכותם להעמיד לפירעון מיידי את אגרות החוב כאמור בסעיף 8 להלן.

אגרות חוב (סדרה ג') תעמודנה בדרגת בטחון שווה פרי פסו, בינן לבין עצמן, בלי זכות בכורה או עדיפות של האחת על פני האחרת.

היה שיעור הניכיון אשר יקבע לאגרות החוב (סדרה ג') הנוספות, ככל שיהיו כאלה, יהיה שונה משיעור הניכיון של אגרות החוב (סדרה ג') הקיימות במחזור באותה עת (לרבות היעדר ניכיון, ככל שרלבנטי), תפנה החברה לרשות המסים, לפני הגדלת סדרת אגרות החוב, על מנת לקבל את אישורה כי לעניין ניכוי המס במקור מדמי הניכיון בגין אגרות החוב (סדרה ג'), יקבע לאגרות החוב (סדרה ג') שיעור ניכיון אחיד לפי נוסחא המשקללת את שיעורי הניכיון השונים בסדרה, ככל שיהיו (להלן: "**שיעור הניכיון המשוקלל**").

במקרה של קבלת אישור כאמור, החברה תחשב את שיעור הניכיון המשוקלל בגין כל אגרות החוב (סדרה ג'), ותפרסם בדיווח מיידי בדבר תוצאות ההנפקה את שיעור הניכיון המשוקלל האחיד לכל הסדרה, לפני הגדלת הסדרה, וינוכה מס במועדי הפירעון של אגרות החוב (סדרה ג'), לפי שיעור הניכיון המשוקלל כאמור ובהתאם להוראות הדין. במקרה כאמור יחולו כל יתר הוראות הדין הנוגעות למיסוי דמי ניכיון. באם לא תתקבל אישור כאמור, החברה תודיע בדיווח מיידי, בסמוך לפני הנפקת אגרות החוב (סדרה ג') הנוספות בתוצאה מהגדלת הסדרה האמורה, על שיעור הניכיון הגבוה ביותר שנוצר בגין אותה הסדרה. מס במקור ינוכה בעת פירעון אגרות החוב (סדרה ג'), בהתאם לשיעור הניכיון שידווח כאמור.

לפיכך, ייתכנו מקרים בהם ינוכה מס במקור בגין דמי ניכיון בשיעור הגבוה מדמי הניכיון שנקבעו למי שהחזיק באגרות חוב (סדרה ג') טרם הגדלת הסדרה (להלן: "**דמי הניכיון העודפים**"), ויהא בכך כדי לחרע את מצבם וזאת בין אם תתקבל אישור מרשות המסים לקביעת שיעור ניכיון אחיד לאגרות החוב (סדרה ג') ובין אם לאו. במקרה זה נישום שהחזיק אגרות חוב (סדרה ג') אלו, יהיה זכאי להגיש דו"ח מס לרשות המסים ולקבל החזר מס בגובה המס שנוכה מדמי הניכיון העודפים, ככל שהינו זכאי להחזר כאמור על פי דין.

מבלי לגרוע מכלליות האמור לעיל, החברה שומרת לעצמה את הזכות, בכפוף להוראות כל דין, להנפיק בכל עת ומעת לעת (בין בהצעה פרטית, בין במסגרת תשקיף ובין בכל דרך אחרת) ומבלי להידרש להסכמת מחזיקי אגרות החוב (סדרה ג') ו/או להסכמת הנאמן, לפי העניין, ולרבות לאדם קשור (כהגדרתו בסעיף 3.2

4.2

-9-

לעיל, סדרות נוספות של אגרות חוב, כפי שהחברה תמצא לנכון, למעט אגרות חוב
שתנאיהן המסחריים (קרי - שיעור הקרן הנפרעת בכל מועד תשלום ומועדי פירעון
הקרן, שיעור הריבית ומועדי תשלומה, וכן היעדר ההצמדה של הקרן והריבית) יהיו
זהים לתנאי אגרות החוב (סדרה ג') וכן למעט סדרות אגרות חוב שלמרות
שאינן מגובות בבטוחות תהיינה עדיפות על פני אגרות החוב (סדרה ג') מבחינת דרגת
הפירעון במקרה של פירוק בלבד (קרי, ייתכן ותונפקנה סדרות אגרות חוב אשר
תהיינה מובטחות בבטוחות).

על אף האמור לעיל, הנפקת אגרות חוב כאמור בסעיף 4.2 זה לעיל (להלן בסעיף 4.2
זה בלבד : "ההנפקה הנוספת") תהא כפופה להתקיימות כל התנאים המפורטים
להלן: (א) ההנפקה הנוספת כאמור לא תפגע בדירוג אגרות החוב (סדרה ג') אשר
הונפקו לראשונה על פי שטר זה, כפי שיהיה דירוגן באותו מועד (קרי הדירוג ערב
ההנפקה הנוספת); לעניין סעיף זה יובחר כי כל עוד אגרות החוב (סדרה ג') מדורגות
על ידי יותר מחברת דירוג אחת, בחינת הדירוג לצורך סעיף זה תיעשה בכל עת, על
פי הדירוג הגבוה מביניהם ; (ב) במועד ההנפקה הנוספת החברה עומדת בהתניות
הפיננסיות המפורטות בסעיף 6.4 לשטר זה והחברה אינה מפרה איזה
מהתחייבויותיה למחזיקי אגרות החוב (סדרה ג') ולא מתקיימת עילה להעמדה
לפירעון מיידי כמפורט בסעיף 8.1 להלן. ו-(ג) במועד ההנפקה הנוספת, בהתאם
לדוחותיה הכספיים האחרונים שפורסמו טרם מועד ביצוע ההנפקה הנוספת, ולאחר
שתובא בחשבון למפרע ביצוע ההנפקה הנוספת החברה תעמוד באמות המידה
הפיננסיות כאמור בסעיף 6.4 לשטר זה.

טרם הנפקת אגרות חוב מסדרות נוספות תעביר החברה את האישורים הבאים
ותבצע פרסומים כמפורט להלן :

1.    החברה תמסור לנאמן אישור בכתב בחתימת נושא המשרה הבכיר בתחום
הכספים בחברה בדבר התקיימותם של התנאים האמורים לא יאוחר מ-7 ימים
קודם לביצוע ההנפקה הנוספת וכן אישור כי ההנפקה הנוספת אינה עדיפה על
תנאי אגרות החוב (סדרה ג') בפירוק.

2.    החברה תפרסם אישור מאת חברת הדירוג כי ההנפקה הנוספת כאמור לא
תפגע בדירוג איגרות החוב (סדרה ג') אשר הונפקו לראשונה על פי שטר זה, כפי
שיהיה הדירוג באותה עת.

3.    החברה תעביר לנאמן אישור של נושא המשרה הבכיר בתחום הכספים של
החברה ביחס לעמידת החברה בהתניות הפיננסיות (בלבד) המפורטות בסעיף
6.4 לשטר זה.

מבלי לגרוע מהאמור לעיל אין בזכויות האמורות של החברה, כדי למעט מזכות
הנאמן מלבחון את השלמות ההנפקה הנוספת כאמור, ואין בה כדי לגרוע מזכויותיו הנאמן
ו/או מחזיקי אגרות החוב לפי שטר זה, לרבות מזכותם להעמיד לפירעון מיידי את
אגרות החוב סדרה ג' כאמור בסעיף 8 להלן.

בכפוף להוראות כל דין, החברה תודיע לנאמן אודות הנפקת אגרות חוב נוספת
כאמור זמן סביר עובר לביצוע ההנפקה ותעביר אליו כל דיווח שתוציא בקשר לעניין
זה על פי כל דין.

5.    **התחייבויות החברה**

5.1    החברה מתחייבת בזה לשלם, במועדים הקבועים לכך, את כל סכומי הקרן והריבית
אשר משתלמים על-פי תנאי אגרות החוב (סדרה ג'), ולמלא אחר כל יתר התנאים
וההתחייבויות המוטלות עליה על-פי אגרות החוב (סדרה ג') ועל-פי שטר זה.

5.2    [נמחק].

5.3    **התאמת שיעור הריבית בגין שינוי בדירוג אגרות החוב (סדרה ג'):**

-10-

לעניין סעיף זה להלן יובהר כי כל עוד אגרות החוב (סדרה ג') מדורגות על ידי יותר
מחברת דירוג אחת, בחינת הדירוג לצורך התאמת שיעור הריבית לשינוי בדירוג
(אם וככל שיהא שינוי כאמור) תיעשה, בכל עת, על פי הדירוג הנמוך מביניהם.

שיעור הריבית שתישאנה אגרות החוב (סדרה ג'), יותאם בגין שינוי בדירוג של
אגרות החוב (סדרה ג'), כמפורט להלן בסעיף זה :

> יובהר כי, אם וככל שתידרש התאמה של ריבית בהתאם למנגנון המתואר בסעיף זה
> לעיל ולהלן וכן על פי המנגנון המתואר בסעיף 5.4 להלן, אזי בכל מקרה שיעור
> הריבית הנוסף המקסימאלי לא יעלה על 1% מעל שיעור הריבית שקבוע במכרז.
> ריבית פיגורים, ככל שתחול בהתאם לסעיף 4(א) לתנאים מעבר לדף תיתוספה
> לשיעור האמור ולא תהווה חלק ממנו.

לעניין סעיף 5.3 זה :

דירוג A, A מינוס, דירוג BBB פלוס, דירוג BBB ודירוג BBB מינוס– כהגדרתם
בטבלה בסעיף 1.5.29 לעיל.

**"דירוג הבסיס"** – דירוג 'A.

**"שיעור הריבית הנוסף"** - תוספת ריבית שתינתן למחזיקי אגרות החוב בשיעור של
0.25% לשנה, בגין כל דרגה (Notch) מתחת לדירוג הבסיס (קרי בגין ירידה מדירוג
הבסיס לדירוג A מינוס, בגין ירידה מדירוג A מינוס לדירוג BBB פלוס, בגין ירידה
מדירוג BBB פלוס לדירוג BBB ובגין ירידה מדירוג BBB לדירוג BBB מינוס), עד
לתוספת ריבית מקסימלית של 1% לשנה לכל היותר.

א. ככל שדירוג אגרות החוב (סדרה ג') על-ידי חברת הדירוג (במקרה של החלפת
חברת דירוג, תערוך חברת הנאמן השוואה בין סולם הדירוג של חברת
הדירוג המוחלפת לבין סולם הדירוג של חברת הדירוג החדשה) יעודכן במהלך
תקופת ריבית כלשהי, כך שהדירוג שייקבע לאגרות החוב (סדרה ג') יהיה נמוך
בדרגה אחת או יותר (להלן : **"הדירוג המופחת"**) מדירוג הבסיס, יעלה שיעור
הריבית השנתית שתישאנה יתרת הקרן הבלתי מסולקת של אגרות החוב (סדרה ג'),
בשיעור הריבית הנוסף או בחלקו (כאמור להלן), בהתאם למדרגות שנקבעו
כאמור, וזאת בגין התקופה שתתחיל ממועד פרסום הדירוג החדש על-ידי חברת
הדירוג ועד לפירעון מלא של יתרת הקרן הבלתי מסולקת של אגרות החוב (סדרה
ג'), או עד למועד העלאת הדירוג בהתאם להוראות סעיף 5.3(ה) להלן ולהוראות
סעיף 5.4 להלן. הועלה שיעור הריבית הקודם לכן בגין חריגה ממדה פיננסית
כאמור בסעיף 5.4 להלן, אזי עליית שיעור הריבית בגין ירידת דירוג כאמור תוגבל
באופן שתוספת הריבית השנתית לא תעלה בכל מקרה על 1%.

ב. לא יאוחר מתום יום עסקים אחד מקבלת הודעת חברת הדירוג בדבר הורדת
דירוג אגרות החוב (סדרה ג') לדירוג המופתח כהגדרתו בס"ק א(1) לעיל, תפרסם
החברה דיווח מיידי, בו תציין החברה: (א) את דבר הורדת הדירוג, ואת הדירוג
המופחת, את דוח הדירוג ואת מועד תחילת דירוג אגרות החוב (סדרה ג') בדירוג
המופחת (להלן: **"מועד הורדת הדירוג"**); (ב) עמידתה/אי עמידתה באמות המידה
הפיננסיות המתוארות בסעיף 5.4 להלן על פי דוח הכספי המאוחד המבוקר או
המבוקר האחרון של החברה שפורסם לפני מועד הדווח המיידי וכן האם חל שינוי
בריבית בגין עמידתה/אי עמידתה באמות המידה הפיננסיות כאמור; (ג) את
שיעור הריבית המדוייקת שתישאנה יתרת קרן אגרות החוב (סדרה ג') לתקופה
שמתחילת תקופת הריבית הנוכחית ועד למועד הורדת הדירוג (שיעור הריבית
יחושב לפי 365 ימים בשנה) (להלן: **"ריבית המקורי"** ו–**"תקופת ריבית המקורי"**,
בהתאמה); (ד) את שיעור הריבית שתישא יתרת קרן אגרות החוב (סדרה ג') החל
ממועד הורדת הדירוג ועד מועד תשלום הריבית הקרוב בפועל, דהיינו : ריבית
בתוספת שיעור הריבית הנוסף לשנה (שיעור הריבית יחושב לפי 365 ימים
בשנה) (להלן : **"הריבית המעודכנת"**), וזאת ככל ששיעור הריבית לא הועלה קודם
לכן, ככל שהועלה, בגין חריגה ממאמות המידה הפיננסיות כאמור בסעיף 5.4 להלן
ככל שארעה, שאז עליית שיעור הריבית בגין ירידת דירוג כאמור תוגבל באופן
שתוספת הריבית השנתית בגין ירידת דירוג ואי עמידה באמות מידה פיננסיות
לא תעלה בכל מקרה על 1%; (ה) את שיעור הריבית המשוקללת שתשלם החברה

-11-

למחזיקי אגרות החוב (סדרה ג') במועד תשלום הריבית הקרוב, הנובעת מן
האמור בס"ק (ג) ו- (ד) לעיל; (ו) את שיעור הריבית השנתית המשתקפת משיעור
הריבית המשוקללת; (ז) את שיעור הריבית השנתית ואת שיעור הריבית החצי
שנתית (הריבית החצי שנתית תחושב כריבית השנתית חלקי שתיים) לתקופות
הבאות.

ג.    היה ומועד תחילת דירוג אגרות החוב (סדרה ג') בדירוג המופחת יחול במהלך
הימים שתחילתם ארבעה ימים לפני המועד הקובע לתשלום ריבית וכלשהו
סיומם במועד תשלום הריבית הקרוב למועד הקובע הנ"ל (להלן: "**תקופת
הדחייה**"), תשלם החברה למחזיקי אגרות החוב (סדרה ג'), במועד תשלום
הריבית הקרוב, את ריבית המקור, טרם חישוני בלבד, ככל ששיעור הריבית לא
הועלה קודם לכן בגין חריגה מאמות המידה הפיננסיות כאמור בסעיף 5.4 להלן,
כאשר שיעור הריבית הנובע מתוספת הריבית בשיעור השווה לשיעור הריבית
הנוסף לשנה במשך תקופת הדחייה, ישולם במועד תשלום הריבית במועד תשלום
הריבית הבא. החברה תודיע בדוח מיידי את שיעור הריבית המדויק לתשלום במועד תשלום הריבית
הבא.

ד.    במקרה של עדכון הדירוג של אגרות החוב (סדרה ג') על-ידי חברת הדירוג, באופן
שישפיע על שיעור הריבית שתישאנה אגרות החוב (סדרה ג') כאמור בסעיף 5.3(א)(5)
לעיל או 5.3(ה) להלן, תודיע החברה על כך לנאמן בכתב תוך יום עסקים אחד
ממועד פרסום הדוח המיידי כאמור.

ה.    במקרה שלאחר הורדת הדירוג באופן שהשפיע על שיעור הריבית שתישאנה
אגרות החוב (סדרה ג') כאמור בסעיף 5.3(א)(5) לעיל, תעודכן חברת הדירוג את
הדירוג לאגרות החוב (סדרה ג') כלפי מעלה וככל ששיעור הריבית לא הועלה
קודם לכן בגין חריגה מאמות המידה הפיננסית כאמור בסעיף 5.4 להלן, יפחתת
שיעור הריבית במדרגות של 0.25% לשנה לכל Notch (בגין העלאה מדירוג BBB
מינוס לדירוג BBB, בגין העלאה מדירוג BBB לדירוג BBB פלוס, בגין העלאה
מדירוג BBB פלוס לדירוג A מינוס ובגין העלאה מדירוג A מינוס לדירוג
הבסיס) וככל שתעודכן חברת הדירוג את הדירוג לאגרות החוב (סדרה ג') כלפי
מעלה לדירוג הגבוה מדירוג הבסיס (**להלן: "הדירוג הגבוה"**), וככל ששיעור
הריבית לא הועלה קודם לכן בגין חריגה מאמות המידה הפיננסית כאמור בסעיף
5.4 להלן, אזי יקטן שיעור הריבית שישולם על-ידי החברה למחזיקי אגרות
החוב (סדרה ג'), במועד התשלום הרלוונטי של הריבית, וזאת בגין כל תקופתה בה אגרות
החוב (סדרה ג') דורגו בדירוג הגבוה בלבד, כך ששיעור הריבית שתישאנה היתרה
הבלתי מסולקת של קרן אגרות החוב (סדרה ג') יהיה שיעור הריבית שקבע
במכרז, כפי שהחברה תפרסם בדוח מיידי בדבר תוצאות ההנפקה, ללא כל
תוספת בגין הורדת הדירוג כאמור בסעיף 5.3 זה (ובכל מקרה, לא יפחת שיעור
הריבית שתישאנה אגרות החוב משיעור הריבית שיקבע במכרז). במקרה כאמור
תפעל החברה בהתאם להוראות בס"ק (ב) עד (ד) לעיל, בשינויים המחוייבים
הנובעים מהדירוג הגבוה במקום הדירוג המופחת.
מובהר, כי עדכון שיעור הריבית עקב שינוי בדירוג או עקב אי עמידה באמות מידה
פיננסית יובאו בנפרד כך שהאחד לא ישפיע על השני ובכפוף לכך שהריבית
המרבית המצטברת בגין ירידה בדירוג ובגין אי עמידה באמות מידה פיננסית לא
תעלה על שיעור של 1% לשנה. תוספת ריבית בגין אי עמידה במקרה באמות מידה
פיננסית, ככל שחלה בהתאם לסעיף 5.4 להלן, תשמש כך במקרה אף במקרה של עלייה
בדירוג. מובהר, כי ריבית פיגורים, ככל שתחול, תיתוסף לשיעורי הריבית
הנקובים לעיל.

ו.    ככל שאגרות החוב (סדרה ג') תפסקנה להיות מדורגות מסיבה התלויה בחברה
(כך לדוגמא, אך לא רק, בשל אי קיום התחייבויות החברה כלפי חברת הדירוג,
לרבות בשל אי מתן תשלומים ו/או דיווחים להם התחייבה החברה כלפי החברה
המדרגת) לתקופה העולה על 21 ימים, לפני פירעון הסופי, תיחשב הפסקת
הדירוג כהורדת דירוג של אגרות החוב (סדרה ג') באופן שיעור הריבית הנוסף
יסתכם ב-1%, וזאת אף אם שיעור הריבית הועלה קודם לכן בגין חריגה מאמות
המידה הפיננסיות כאמור בסעיף 5.4 להלן, והוראות ס"ק (ב)-(ה) להלן, יחולו בהתאם
וזאת מבלי לגרוע מהאמור בס"ק 8.1.27 להלן. למען הסר ספק יובהר, כי היה
ואגרות החוב (סדרה ג') יפסיקו להיות מדורגות, לפני פירעון הסופי, מסיבה
שאינה תלויה בחברה, הדבר לא ישפיע על שיעור הריבית כאמור בסעיף (א) לעיל
והוראות סעיף 5.3 זה לא יחולו.

-12-

ז. במקרה בו תוחלף חברת הדירוג (גם במקרה בו יש יותר מחברת דירוג אחת) או שאגרות החוב (סדרה ג') תפסקנה להיות מדורגות על ידי חברת דירוג, תפרסם החברה דוח מיידי, בתוך יום מסחר אחד ממועד השינוי ובו תודיע החברה על נסיבתו החלפת חברת הדירוג המדורגת או הפסקת הדירוג, בהתאמה.

ח. למען הסר ספק, מובהר כי: (1) שינוי אופק הדירוג של אגרות החוב (סדרה ג') לא יגרור שינוי בשיעור הריבית שתישאנה אגרות החוב (סדרה ג') כאמור בסעיף זה לעיל; (2) כל עוד אגרות החוב (סדרה ג') מדורגות על ידי יותר מחברת דירוג אחת, סייק (ו) לעיל לא יחול אלא במקרה שבו **כל חברות הדירוג יפסיקו לדרג את אגרות החוב (סדרה ג')**.

ט. במקרה של הורדת דירוג תופעל החברה על פי סעיפים 5.3(א) ו-(ב) לעיל. ככל שלפני מועד הורדת הדירוג חלה עליית בשיעור הריבית בגין חריגה מאחת או יותר מאמות המידה הפיננסיות על פי המנגנון המפורט בסעיף 5.4 להלן, **השינוי שיחול בריבית** בגין מנגנון ההתאמה המפורט בסעיף 5.3 זה לעיל יוגבל, באופן שבכל מקרה העלייה בשיעור הריבית (אם וככל שתהא עליה כאמור) לא תהא במצטבר יותר מ-1% מעל שיעור הריבית שיקבע במכרז. ריבית פיגורים ככל שתחול תתווסף לריבית האמורה.

י. החברה מתחייבת לפעול לכך, כי ככל שהדבר בשליטתה, אגרות החוב (סדרה ג') תהיינה מדורגות על ידי חברת הדירוג במשך כל תקופת אגרות החוב (סדרה ג') ולצורך כך החברה מתחייבת לשלם לחברת הדירוג את התשלומים אותם התחייבה לשלם לחברת הדירוג ולמסור לחברת הדירוג את הדיווחים והמידע הסבירים הנדרשים על ידה במסגרת ההתקשרות בין החברה לבין חברת הדירוג. לעניין זה יראו את אי ביצוע התשלומים שהתחייבה החברה לשלם לחברת המדרגת ואת אי מסירת הדיווחים והמידע הסבירים הנדרשים על ידי החברה המדרגת במסגרת ההתקשרות בין החברה לחברה המדרגת, כסיבות ונסיבתו שהינן בשליטת החברה. במקרה של הפסקת דירוג אגרות החוב (סדרה ג') או החלפת חברת דירוג, תפרסם החברה דוח מיידי על כך ותציין את הסיבות לשינויי חברת הדירוג. מובהר, כי אין באמור לעיל כדי לגרוע מזכות החברה להחליף בכל עת חברת דירוג, לפי שיקול דעתה הבלעדי ומכל סיבה שתמצא לנכון.

**החברה איננה מתחייבת שלא להחליף את החברה המדרגת או שלא לסיים התקשרותה עמה במשך תקופת איגרות החוב (סדרה ג'). במקרה בו החברה תחליף את החברה המדרגת אשר במועד ההחלפה הינה חברת הדירוג היחידה המדרגת את אגרות החוב (סדרה ג') ו/או תפסיק את עבודתה של חברת הדירוג (במקרה בו אינה חברת דירוג יחידה), מתחייבת החברה לדווח על כך בדיווח מיידי וכן תודיע על כך לנאמן ולמחזיקי אגרות החוב ותציין בהודעתה את הסיבות לשינוי החברה המדרגת וכל זאת לא יאוחר מיום מסחר אחד ממועד ההחלפה כאמור ו/או ממועד ההחלטה על הפסקת עבודתה של חברת הדירוג, לפי המוקדם. מובהר, כי אין באמור לעיל כדי לגרוע מזכותה של החברה להחליף בכל עת חברה מדרגת או להפסיק את עבודתה של חברת הדירוג (במקרה בו אינה חברת דירוג יחידה), לפי שיקול דעתה הבלעדי ומכל סיבה שתמצא לנכון.**

5.4   **התאמת שיעור הריבית כתוצאה מאי עמידה באמות מידה פיננסית:**

לעניין סעיף 5.4 זה :

שיעור הריבית שתישאנה אגרות החוב (סדרה ג') יותאם בגין חריגה מאמת המידה הפיננסית המפורטת להלן :

יחס החלוואה לבטוחות (כהגדרתו בסעיף 6.4(2) להלן) לא יעלה על 75% (בסעיף 5.4 זה ולעיל ולהלן : **"אמת המידה הפיננסית"**).

> יובהר כי אם ובכל שתידרש התאמה של ריבית בהתאם למנגנון המתואר בסעיף זה לעיל ולהלן וכן על פי המנגנון המתואר בסעיף 5.3 לעיל, אזי בכל מקרה שיעור הריבית הנוסף המקסימאלי לא יעלה על 1% מעל שיעור הריבית שיקבע במכרז. ריבית פיגורים, ככל שתחול בהתאם לסעיף 4(א) לתנאים מעבר לדף תיתוסף לשיעור האמור ולא תהווה חלק ממנו.

-13-

**"שיעור הריבית הנוסף"** – תוספת ריבית בשיעור של 0.5% בגין חריגה מאמת המידה הפיננסית. העלאת שיעור הריבית תיעשה רק פעם אחת בגין חריגה מאמת המידה הפיננסית, וכל שתהא חריגה כאמור, ושיעור הריבית לא יועלה פעם נוספת במקרה שהחריגה באמת המידה הפיננסית נמשכת. ידוע כי במקרה שבו בגין ירידה בדירוג אגרות החוב הועלה שיעור הריבית השנתית בהתאם להוראות סעיף 5.3 לעיל, אזי בכל מקרה שיעור הריבית הנוסף מכוח אותו סעיף ביחד עם שיעור הריבית הנוסף מכוח סעיף 5.4 זה, בגין החריגה מאמת המידה הפיננסית, לא יעלה על 1%.

**"מועד החריגה"** - מועד פרסום הדוחות הכספיים אשר מצביעים על החריגה.

א. ככל שתחרוג החברה מאמת המידה הפיננסית על פי דוחותיה הכספיים המאוחדים של החברה הסקורים או המבוקרים (להלן: **"החריגה"**), יעלה שיעור הריבית השנתית שתישא יתרת הקרן הבלתי מסולקת של אגרות החוב (סדרה ג'), בשיעור הריבית הנוסף בגין החריגה, מעל שיעור הריבית כפי שיהיה באותה עת, טרם השינוי, וזאת בגין התקופה שתתחיל ממועד החריגה ועד לפירעון מלא של יתרת הקרן הבלתי מסולקת של אגרות החוב (סדרה ג') או עד למועד פרסום דוחות כספיים של החברה לפיהם החברה עומדת באמת המידה הפיננסית, לפי המוקדם. העלאת שיעור הריבית הרי לכן בגין ירידת דירוג כאמור בסעיף 5.3 לעיל, אזי עליית שיעור הריבית בגין החריגה מאמת המידה הפיננסית נשוא סייק זה תוגבל באופן שתוספת הריבית השנתית בגין ירידת הדירוג ואי עמידה באמת מידה פיננסית לא תעלה בכל מקרה על 1%.

ב. היה ותתקיים חריגה כאמור, לא יאוחר מתום יום עסקים אחד מפרסום דוחותיה הכספיים של החברה, מבוקרים או סקורים (לפי העניין) תפרסם החברה דווח מיידי, בו תציין לכל הפחות את: (א) את אי העמידה בהתחייבות האמורה, תוך פירוט אמת המידה הפיננסית במועד פרסום הדוח הכספי; (ב) את הדירוג העדכני של אגרות החוב (סדרה ג') על פי דוח הדירוג האחרון שפורסם לפני מועד הדוח המיידי; (ג) את שיעור הריבית המדויקת שתישא קרן אגרות החוב (סדרה ג') לתקופה שמתחילת תקופת הריבית הנוכחית ועד למועד החריגה (שיעור ריבית היחושב לפי 365 ימים בשנה) (להלן: **"ריבית המקור"** ו-**"תקופת ריבית המקור"**, בהתאמה); (ד) את שיעור הריבית שתישא יתרת קרן אגרות החוב (סדרה ג') החל ממועד החריגה ועד למועד תשלום הריבית הקרוב בפועל, (שיעור הריבית יחושב לפי 365 ימים בשנה) (להלן: **"הריבית המעודכנת"**). הועלה שיעור הריבית הרי לכן בגין ירידת דירוג כאמור בסעיף 5.3 לעיל, אזי עליית שיעור הריבית בגין החריגה מאמת המידה הפיננסית בתוספת ריבית השנתית בגין ירידה בדירוג ואי עמידה באמת מידה פיננסית לא תעלה בכל מקרה על 1%; (ה) את שיעור הריבית המשוקללת שתשלם החברה למחזיקי אגרות החוב (סדרה ג') במועד תשלום הריבית הקרוב, הנובעת מן האמור בס"ק (ג) ו-(ד) לעיל; (ו) את שיעור הריבית השנתית המשתקפת משיעור הריבית המשוקללת; (ז) את שיעור הריבית השנתית ואת שיעור הריבית החצי שנתית (הריבית החצי שנתית תשומש בכריבית השנתית חלקי שתיים) לתקופות הבאות.

ג. היה ומועד החריגה יחול במהלך ארבעה ימים לפני המועד הקובע לתשלום ריבית כלשהו וסיומה במועד תשלום הריבית הקרוב למועד הקובע הנ"ל (להלן: **"תקופת הדחייה"**), תשלם החברה למחזיקי אגרות החוב (סדרה ג'), במועד תשלום הריבית הקרוב, את ריבית המקור בלבד, כאשר שיעור הריבית המקור הנובע מתוספת ריבית בשיעור השווה לשיעור ריבית בשל תקופת הדחייה, ישולם במועד תשלום הריבית הבא. החברה תודיע בדוח מיידי את שיעור הריבית המדויקת לתשלום במועד תשלום הריבית הבא.

ד. במקרה של חריגה מאמת מידה פיננסית, באופן שישפיע על שיעור הריבית שתישאנה אגרות החוב (סדרה ג') כאמור לעיל בסעיף 5.4(א) לעיל או בסעיף 5.4(ה) להלן, תודיע החברה על כך לנאמן בכתב תוך יום עסקים אחד ממועד פרסום הדוחות הכספיים כאמור.

ה. מובהר למען הסר ספק, כי במקרה שלאחר החריגה, תפרסם החברה את דוחותיה הכספיים מבוקרים או סקורים (לפי העניין), ועל פיהם תעמוד החברה באמת המידה הפיננסית, אזי יקטן שיעור הריבית שישולם על-ידי החברה למחזיקי אגרות החוב (סדרה ג'), במועד התשלום הרלוונטי של הריבית, וזאת

-14-

בגין התקופה בה החברה עמדה באמת המידה הפיננסית, אשר תחילתה במועד פרסום הדוחות הכספיים אשר מצביעים על עמידה באמת המידה הפיננסית, כך ששיעור הריבית שתישא היתרה הבלתי מסולקת של קרן אגרות החוב (סדרה ג') יהיה, ככל ששיעור הריבית על העלה לא קודם לכן בגין ירידה בדירוג אגרות החוב (סדרה ג') כאמור בסעיף 5.3 לעיל, שיעור הריבית שיקבע במכרז או שיעור ריבית אחר שנקבע עקב ירידה בדירוג אגרות החוב (סדרה ג') כאמור בסעיף 5.3 לעיל (ובכל מקרה/ה, לא יפחת שיעור הריבית שתישאאגרות החוב משיעור הריבית שיקבע במכרז). במקרה כאמור תפעל החברה בהתאם לאמור בס"ק (ב) עד (ד) לעיל, בשינויים המחוייבים, לפי העניין, הנובעים מעמידת החברה באמת המידה הפיננסית.

מובהר, כי עדכון שיעור הריביתעקב שינוי או עקב אי עמידה בדירוג אי עמידה באמת מידה פיננסית יבוצע בנפרד ללא שהאחד ישפיע על השני וזאת בכפוף לכך שהריבית המירבית המצטברת בגין ירידה בדירוג ובגין אי עמידה באמת מידה פיננסית לא תעלה על שיעור של 1% לשנה. תוספת ריבית בגין ירידה בדירוג, ככל שחלה בהתאם לסעיף 5.3 תמשיך לחול אף במקרה בו עמדה החברה באמת המידה הפיננסית. מובהר, כי ריבית פיגורים, ככל שתחול, תיתווסף לשיעורי הריבית הנקובים לעיל.

1.    הבדיקה בדבר עמידת החברה באמת המידה הפיננסית תתבצע ביום פרסום הדוחות הכספיים על ידי החברה וכל עוד אגרות חוב (סדרה ג') קיימות במחזור, ביחס לדוחות הכספיים הרבעוניים/השנתיים שהיה על החברה לפרסם עד לאותו מועד.
    החברה תפרט במסגרת דוח הדירקטוריון הרבעוני או השנתי, לפי העניין, את עמידתה או אי עמידתה באמת המידה הפיננסית.

    למען הסר ספק יובהר, כי בכפוף לאמור לעיל, תשלומי הריבית הנוספת כתוצאה מהורדת דירוג כאמור בסעיף 5.3 לעיל ו/או כתוצאה מאי עמידת החברה באמת מידה פיננסית כאמור בסעיף 5.4 זה לעיל הינם מצטברים. לפיכך, במקרה והתחול ירידה בדירוג, ובנוסף תחרוג החברה מאמת המידה הפיננסית, יהיו זכאים מחזיקי אגרות החוב (סדרה ג') להגדלה בשיעור הריבית כמפורט לעיל ובלבד שתוספת הריבית השנתית בגין ירידת דירוג ואי עמידה באמת מידה פיננסית לא תעלה על 1%. כן מובהר, כי ריבית פיגורים, ככל שתחול, תיתווסף לשיעורי הריבית הנקובים לעיל.

5.5    החברה מצהירה כי נכון למועד החתימה על שטר זה לא חלה על החברה כל מגבלה שהיא ביחס לביצוע חלוקה (כהגדרתה בחוק החברות), למעט כמפורט בסעיף 6.5 שלהלן ולמעט מגבלות שניטלו כמפורט בשטרי הנאמנות לאגרות החוב (סדרות א' ו-ב') של החברה.

5.6    עסקאות בעלי עניין

החברה מתחייבת כי עסקאות חריגות של החברה (כהגדרתן בחוק החברות) עם בעל השליטה בה, או עסקאות חריגות של החברה עם אדם אחר שלבעל השליטה יש בהן עניין אישי, או התקשרויות של החברה עם בעל השליטה או בעל קרובו, במישרין או בעקיפין לרבות באמצעות חברה בשליטתו, לעניין קבלת שירותים בידי החברה, וכן אם הוא גם נושא משרה בה – באשר לתנאי כהונתו והעסקתו, ואם הוא עובד החברה ואינו נושא משרה בה – באשר להעסקתו בחברה (להלן: "העסקאות המיוחדות"), תהיינה מותנות, בנוסף לאישורים לפי הוראות סעיף 275 לחוק החברות, ככל שיחול על החברה, בהסכמת מחזיקי אגרות החוב (סדרה ג') בהחלטה ברוב רגיל. החברה תמסור לנאמן מאת נושא המשרה הבכיר בתחום הכספים בחברה, בכל 15 לאפריל ו- 15 לספטמבר של כל שנה, כי לא בוצעו עסקאות מיוחדות כאמור בסעיף 5.6 זה מבלי שניתנה הסכמת מחזיקי אגרות החוב (סדרה ג') כאמור לעיל (להלן בס"ק זה: "אישור נושא המשרה"). אישור כאמור יינתן גם במסגרת דוח הדירקטוריון אשר יצורף לדוח רבעוני ו/או דוח תקופתי של החברה, לפי העניין. לעניין סעיף 5.6 זה יובהר כי למען הסר ספק כי העסקאות המפורטות להלן לא תיחשבנה "עסקאות מיוחדות" ולפיכך לא ידרש אישור המחזיקים כאמור בסעיף 5.6 זה לעיל: (1) העברת נכסים לחברה כנגד הקצאת

-15-

מניות בלבד (ללא תמורה כספית); (2) רכישת חלקם של השותפים של החברה בחברות בכלולות של החברה; (3) עדכון או חידוש הסכמי הניהול המפורטים בסעיף 9.2 לפרק 9 לתשקיף בגין שירותי ניהול המטה, ופיתוח עסקי כגון שירותי הנהלת חשבונות משרד, תקשורת, מחשבים, מזכירות וכן שירותי יו"ר דירקטוריון ושירותי מנכ"לית, באמצעות מר גולדמן ועובדי המטה של חברת הניהול, לרבות באמצעות נושאי המשרה בחברה ושירותי ניהול ובלבד שעדכון רכיב התמורה המפורט בסעיף 9.2 לתשקיף לא יעלה על 2.5% ביחס לתקופה של 12 חודשים שקדמו למועד העדכון או החידוש. החברה תמציא לנאמן, ביום 15 לאפריל של כל שנה, אישור מאת נושא המשרה הבכיר בתחום הכספים בחברה לפיו עדכון או חידוש הסכמי הניהול נעשה בהתאם לאמור בס"ק (3) זה לעיל. אישור כאמור יינתן על ידי החברה גם במסגרת דוח הדירקטוריון אשר יצורף לדוח רבעוני ו/או דוח תקופתי של החברה, לפי העניין; (4) העמדת ערבויות על ידי בעל השליטה לטובת גופים ממוניים עבור החברה ו/או לתאגידים בשליטת החברה; (5) עסקאות חריגות בהתאם לתקנות החברות (הקלות בעסקאות עם בעלי עניין), תש"ס-2000; (6) התקשרויות בפוליסות לביטוח נכסי החברה כנגד הסיכונים של החברה ביחד עם נכסיו של בעל השליטה ככל שיהיו (כאשר סכומי הפרמיה מוקצים על ידי חברת הביטוח לנכסים השונים); (7) העיקים על כתב שיפוי לבעל השליטה ו/או קרובו כמפורט בסעיף 9.3.1 לתשקיף וכן כתב שיפוי חדש כפי שיעודכן, ככל שיעודכן, בהתאם לחוק החברות והתקנות על פיו כפי שיהיו מעת לעת. באישור נושא המשרה שניתן בכל 15 באפריל כאמור, תודיע החברה לנאמן גם על ביצוע העסקאות המפורטות לעיל, ככל שבוצעו, אשר אינן דורשות את אישור האסיפה.

**5.7    כריית הוצאות**

מתוך תמורת ההנפקה יופקד סך של 300 אלפי דולר ארה"ב בחשבון הנאמנות (בהגדרתו להלן) אשר ישמש את הנאמן לצורך ביצוע הליכים על פי שטר נאמנות זה (כגון מינוי מומחים ויועצים וכדומה) (להלן: **"כריית ההוצאות"**). סכום כריית ההוצאות יוחזק בחשבון הנאמנות לצורך מחזיקי אגרות החוב עד למועד הפירעון הסופי והמלא של אגרות החוב (סדרה ג'). לאחר פירעון מלוא אגרות החוב (סדרה ג') תועבר כריית ההוצאות (בצירוף כל הפירות שנצברו בגינה), ככל שלא נעשה בה שימוש, לחברה בהתאם לפרטים שיימסרו על ידה.

במקרה בו סכום כריית ההוצאות לא יספיק לצורך כיסוי הוצאות הנאמן בקשר עם ביצוע הליכים על פי שטר נאמנות זה, יפעל הנאמן בהתאם לאמור בסעיף 26 להלן.

ככל שיעשה שימוש בסכום כריית ההוצאות, כולו או חלקו, תשלים החברה את סכום כריית ההוצאות לסכום המפורט בסעיף 5.7 זה לעיל וזאת בתוך 10 ימי עסקים מהמועד בו נדרשה להשלים את כריית ההוצאות כאמור.

**5.8    מינוי נציג לחברה בישראל**

כל עוד אגרות החוב (סדרה ג') במחזור, החברה מתחייבת כי ימונה נציג של החברה בישראל (להלן: **"נציג החברה בישראלי"**) אליו ניתן יהיה להמציא כתבי בי דין לחברה ו/או לנושאי המשרה בה. המצאה לנציג החברה בישראל תחשב כהמצאה תקפה ומחייבת בקשר לכל תביעה ו/או דרישה של הנאמן ו/או המחזיקים באגרות החוב (סדרה ג') על פי שטר נאמנות זה. במועד מינויו/החלפתו של נציג החברה בישראל, החברה תדווח את פרטיו בדיווח מיידי וכן תעביר הודעה לנאמן הכוללת את פרטיו של נציג החברה בישראל.

במקרה של מינוי נציג חדש, הדיווח המיידי וההודעה לנאמן יכללו בנוסף את המועד בו נכנס מינויו של הנציג החדש לתוקף.

החברה מתחייבת, כי במקרה של החלפת נציג החברה בישראל, החברה תמנה נציג של החברה בישראל בתוך תקופה שלא תעלה על תשעים (90) ימים. עד למינויו נציג חדש כאמור לעיל, מען החברה בישראל לצורך שטר זה ולצורך המצאת כתבי בי דין יהיה כתובתו הנציג המוחלף.

-16-

החברה מתחייבת כי יכהן נציג חברה בישראל עד למועד הסילוק המלא, הסופי
והמדויק של אגרות החוב (סדרה ג').

5.9 **התחייבויות החברה, בעל השליטה ונושאי המשרה בחברה**

החברה, בעל השליטה ונושאי המשרה בחברה, בהווה ובעתיד, מתחייבים באופן
בלתי חוזר ויתחייבו באופן בלתי חוזר (לפי העניין) כדלקמן:

א.   שלא להעלות טענות נגד תחולתו, תקפותו או אופן יישומו של סעיף 39א לחוק
     ניירות ערך;

ב.   שלא להעלות טענות כנגד סמכותו המקומית של בית המשפט בישראל בקשר
     עם הליכים שיוגשו על ידי הנאמן ו/או מחזיקי אגרות החוב (סדרה ג') של
     החברה;

ג.   שלא לעלות טענות כנגד זכות מחזיקי אגרות החוב (סדרה ג') להגיש תביעה נגזרת.

ד.   כי בכל הסכם בו תתקשר החברה, במישרין עם צד שלישי, לרבות עם עובדי
     החברה, ייקבע כי הליכי חדלות פירעון כנגד החברה ייפתחו רק בבית משפט
     בישראל ועל פי הדין הישראלי. לעניין זה יובהר כי התחייבות זו לא תחול על
     התקשרויות של החברה עם החברה עם צד שלישי, הכלונות להתקשרויות חברות מוחזקות
     (כהגדרת המונח בתקנות ניירות ערך (דוחות כספיים שנתיים), התשע"ע-2010
     של החברה, לרבות (מבלי לגרוע מכלליות האמור לעיל) העמדת ערבויות על ידי
     החברה, וכן לא תחול על הסכמי גידור בהם תתקשר החברה עם צד שלישי,
     אם וככל שתתקשר;

ה.   שלא להתנגד לבקשת הנאמן ו/או מחזיקי אגרות החוב (סדרה ג') אשר תוגש
     לבית משפט בישראל להחלת הדין הישראלי לעניין הסדר וחדלות
     פירעון, ככל שתוגש, שלא לפנות ביוזמתם לבית משפט מחוץ לישראל בכדי
     לקבל הגנה מפני הליך הננקט על ידי הנאמן ו/או מחזיקי אגרות החוב (סדרה
     ג') של החברה, שלא להתנגד אם בית משפט בישראל יבקש להחיל את הדין
     הישראלי לעניין הסדר וחדלות פירעון וכן שלא להעלות טענות כנגד
     סמכותו המקומית של בית המשפט בישראל בקשר עם הליכים שיוגשו על ידי
     הנאמן ו/או מחזיקי אגרות החוב (סדרה ג') של החברה;

ו.   שלא להניע ביוזמתם הליך של חדלות פירעון לפי דין זר או במסגרת שיפוט שאינו
     ישראל. לעניין זה יצוין כי ככל שייפתח הליך של חדלות פירעון, שלא על פי
     הדין הישראלי ובבית משפט מתברתו, הנובע מתביעה של נושה זה, החברה תעשה
     כמיטב יכולתה ותטען כי "פורום לא נאות" והכל בכפוף לכל דין והסכם;

ז.   שלא להעלות טענות כנגד סמכותה של רשות ניירות ערך ו/או ועדת האכיפה
     המינהלית בישראל בקשר עם עיצומים כספיים ו/או אמצעי אכיפה מינהליים
     שיוטלו עליהם על ידי רשות ניירות ערך ו/או ועדת האכיפה המינהלית
     בישראל, וזאת על פי פרק ח'3 ו/או פרק ח'4 לחוק ניירות ערך וכן לקיים את
     החלטותיה של רשות ניירות ערך ו/או ועדת האכיפה המינהלית בישראל ובכלל
     זה, מבלי לגרוע מכלליות האמור, לשלם את העיצומים הכספיים ו/או
     תשלומים לנפגעי הפרה אשר יוטלו עליהם (ככל שיוטלו) ולנקוט בפעולות
     לתיקון ההפרה ומניעת הישנותה.

-17-

ח.    בנוסף מתחייב בעל השליטה[2], כי לא ישנה את תקנון החברה בקשר עם אותם
סעיפים, אשר הוחלו בתקנון החברה על מנת לשקף את צו ניירות ערך (החלפת
התוספת הרביעית לחוק), התשע"ו – 2016;

ט.    מובהר בזאת כי ההתחייבויות שבסעיפים א', ב', ג', ה', ו'-ו-ז' לעיל יינטלו על
ידי כל אחד מבין החברה, בעל השליטה ונושאי המשרה בחברה בעוד
שההתחייבות שבסעיף ד' תינטל על ידי החברה בלבד.

י.    בהתאם ובכפוף לאמור בסעיף ט' לעיל, החברה תגרום לכך כי בעל השליטה
ונושאי המשרה בחברה נכון למועד חתימת שטר זה יחתמו על ההתחייבויות
בלתי חוזרות כמפורט בסעיף 5.9 זה לעיל טרם רישומן למסחר של אגרות
החוב (סדרה ג'). בנוסף, מתחייבת החברה לגרום לכך כי לא יאוחר מ 2 ימי
עסקים ממועד מינוי נושא משרה חדש בחברה ו/או ממועד שינוי שליטה
בחברה תיחתמנה ותמסרמנה ההתחייבויות כאמור על ידי נושא המשרה החדש
או בעל השליטה החדש, לפי העניין. החברה תמסור לנאמן את ההתחייבויות
האמורות, חתומות במקור, בתוך 14 ימי עסקים ממועד חתימתן.

### 5.10    יעוד תמורת ההנפקה – העמדת הלוואות מגובות במשכנתא ושטר חוב לחברת
הנכס והמחאה על דרך שעבוד של זכויות החברה מכוח המשכנתא ושטר החוב
לטובת הנאמן

א.    החברה מאשרת ומצהירה בזה, כי תמורת ההנפקה שתתקבל מאת מחזיקי אגרות
החוב (סדרה ג') במסגרת ההנפקה, תועמד על-ידה כהלוואה לחברת הנכס (להלן:
"ההלוואה המשכנתא") ותשמש ראשית לשם פרעון המשכנתא הקיימת על הנכס
המשועבד ושנית לשם פרעון ההון המומעדף שהועמד על ידי משקיעי ההון
המומעדפים, כמפורט בנספח א' לשטר הנאמנות, ובכל שתיוותר יתרה היא תשמש
לכיסוי הוצאות ההנפקה.

הלוואת המשכנתא תשא את אותם תנאי פירעון (גב אל גב לרבות סכומים ומועדים)
של אגרות החוב (סדרה ג'), זאת באמצעות שטר חוב (promissory note) שייחתם
כדין בין החברה לבין חברת הנכס, בנוסח שייערך על ידי עורך הדין האמריקאי
(כהגדרתו להלן) ויסכום עם הנאמן(להלן : "שטר החוב").

הלוואת המשכנתא שתועמד כאמור על ידי החברה לחברת הנכס תהיה מובטחת
במשכנתא ראשונה בדרגה, לטובת החברה, על מלוא זכויותיה של חברת הנכס בנכס
המשועבד, בסכום קרן אגרות החוב (סדרה ג') במועד ההנפקה, (להלן :
"המשכנתא").

להבטחת הקיום המלא והמדויק של כל התחייבויות החברה על-פי אגרות החוב
(סדרה ג') ושטר הנאמנות, תשעבד החברה את מלוא זכויות אגרות החוב
(סדרה ג') ))
והמשכנתא, לטובת הנאמן (כנאמן למחזיקי אגרות החוב (סדרה ג') ))
בהמחאה ראשונה בדרגה ויחידה על דרך השעבוד (collateral assignment), כפי
שיפורט בהרחבה בסעיף 6.2 להלן.

הנאמן יעביר לחברת הנכס את כספי הלוואת המשכנתא (תמורת ההנפקה בניכוי
עמלת ההתחייבות מוקדמת למשקיעים מסווגים וכרית הוצאות) מתוך חשבון
הנאמנות בהתאם להוראות סעיף 6.2.4 להלן. יובהר, כי חברת הנכס תישא
בהוצאות ההנפקה (לרבות עמלת ההתחייבות מוקדמת למשקיעים מסווגים וכרית

---

[2]    בנוסף מתחייב בעל השליטה כי אם ימכור את השליטה בחברה הוא מתחייב כי תנאי למכירה יהיה כי בעל שליטה חדש ייכנס בנעליו
להתחייבות זו.

2

-18-

ההוצאות) והן תתוספנה להלוואות המשכנתא כעמלת העמדת הלוואה אשר תקוזז
מהסכום שיועבר לחברת הבת בפועל באופן שסכום הלוואות המשכנתא בפועל יהיה
שווה לקרן אגרות החוב במועד ההנפקה.

המשכנתא ושטר החוב יתוקנו במקרה של הנפקה של אגרות חוב (סדרה ג') נוספות
באופן אשר יבטיח את החוב בגין אגרות החוב הנוספות שיונפקו.

על שטר החוב יחולו ההוראות שלהלן :

1. שטר החוב יהווה חוזה לטובת צד שלישי (הנאמן ומחזיקי אגרות החוב);

2. החברה לא תהיה רשאית למחול ו/או לשנות מתנאי שטר החוב והמשכנתא ללא
   הסכמת הנאמן מראש ובכתב;

3. חברת הנכס לא תהיה רשאית לעכב ו/או לקזז כל סכום אותו היא נדרשת לשלם
   על פי שטר החוב כנגד חוב כלשהוא של החברה כלפי חברת הנכס;

4. למעט לשם פרעון סכום המשכנתא הקיימת על הנכס המשועבד ופרעון מלא או
   חלקי של משקיעי החון הנוספים (עד גובה תמורת ההנפקה בפועל) אשר יבוצעו
   בסמוך למועד ההנפקה (או ההרחבה, לפי העניין), חברת הנכס לא תשלם דמי
   ניהול או תבצע חלוקה לבעליי מניותיה אלא רק לאחר ששילמה את כל
   התשלומים שהיה עליה לשלם מכח שטר החוב עד אותו מועד ולא יותר מהעודף
   תזרימי מפעילותו בגין אותה תקופה.

5. חברת הנכס והחברה לא תהיינה רשאיות למכור את הנכס המשועבד ללא
   הסכמת הנאמן מראש ובכתב, לרבות ביחס למכירת תאגידים המחזיקים בנכס
   המשועבד. מובהר, כי הנאמן ייתן את אישורו ככל שתנאי המכירה תואמים את
   דרישות שטר הנאמנות.

6. כל פירעון על חשבון החזר הלוואות המשכנתא ייחשב כשולם אם בוצע לחשבון
   הנאמנות בלבד, או לחשבון החברה לרישומים ישירות לצורך תשלום על חשבון
   קרן ו/או ריבית אגרות החוב (סדרה ג') ו/או לצורך ביצוע פידיון מוקדם של
   אגרות החוב (סדרה ג').

7. החברה תהיה רשאית להעמיד את הלוואות המשכנתא נשוא שטר החוב לפירעון
   מיידי בעת פדיון מוקדם של אגרות החוב ו/או העמדתן לפירעון מיידי.

ב. החברה מתחייבת שלא להסכים לשינוי הוראות הסכם השכירות המתואר בנספח
   א' לשטר הנאמנות, בין חברת הנכס לבין Wythe Berry, LLC, החברה המתפעלת
   את הנכס המשועבד (להלן בסעיף זה: "**חברת התפעולי**"), ללא קבלת הסכמה מראש
   של אסיפת מחזיקי אגרות החוב (סדרה ג') לכך בהחלטה מיוחדת, בעניינים אלה:
   (1) הפחתה בדמי השכירות שמשלמת חברת התפעול; (2) קביעת מועד תשלומי שכר
   דירה מראש לתקופה העולה על שנה; (3) כל הפחתה בערבויות בעלי מניות חברת
   התפעול.

6. **הבטחת אגרות החוב**

6.1 אגרות החוב (סדרה ג') תהיינה מובטחות בבטוחות כמפורט בסעיף זה להלן. לפרטים
    אודות התחייבות החברה בדבר התחייבותה לאי יצירת שעבוד שוטף כללי ראו סעיף 6.3
    להלן.

למען הסר ספק מובהר, כי על הנאמן לא חלה ולא תחול חובה לבחון, ובפועל הנאמן לא
בחן ולא יבחן, את הצורך בהעמדת בטוחות להבטחת התשלומים למחזיקי אגרות החוב
(סדרה ג'). הנאמן גם נתבקש לערוך, והנאמן בפועל לא ערך ולא יערוך בדיקת נאותות
(Due Diligence) כלכלית, חשבונאית או משפטית או משפטית באשר למצב עסקי החברה, תאגידי
החחזקה, חברת הנכס והנכס. בהתקשרותו בשטר נאמנות זה ובהסכמת הנאמן לשמש
כנאמן למחזיקי אגרות החוב (סדרה ג'), הנאמן אינו מחווה דעתו, באופן מפורש או
משתמע, באשר ליכולתה של החברה לעמוד בהתחייבויותיה כלפי מחזיקי אגרות החוב

-19-

(סדרה ג'). אין באמור כדי לגרוע מחובות הנאמן על פי כל דין ו/או שטר הנאמנות לרבות
אין בה כדי לגרוע מחובתו של הנאמן (ככל שחובה כזו חלה על הנאמן על פי כל דין) לבחון
השפעתם של שינויים בחברה מתאריך התשקיף ואילך ככל שיש בהם כדי להשפיע לרעה
על יכולתה של החברה לעמוד בהתחייבויותיה למחזיקי אגרות החוב (סדרה ג').

6.2    **שעבוד הנכסים המשועבדים**

6.2.1    כבטוחה להבטחת הקיום המלא והמדויק של כל התחייבויות החברה על-פי אגרות החוב
(סדרה ג') ו/או שטר הנאמנות, מתחייבת החברה לשעבד לטובת הנאמן (כנאמן למחזיקי
אגרות החוב (סדרה ג')) בהמחאה ראשונה בדרגה ויחידה על דרך השעבוד ( collateral
assignment), בין היתר את הזכויות המפורטות להלן, בהתאם לחוראות חוות דעת עורך
דין כמפורט בסעיף 6.2.2.1 להלן (להלן : **"הסכם השעבודי", "חוות דעת עורך הדין"**) :

6.2.1.1    מלוא זכויות החברה מכוח שטר החוב (כהגדרתו בסעיף 5.10 לעיל), בגובה
הלוואת המשכנתא.

6.2.1.2    מלוא זכויות החברה מכוח המשכנתא (כהגדרתו בסעיף 5.10 לעיל), בגובה
הלוואת המשכנתא.

6.2.1.3    במסגרת מסמכי השעבוד כאמור ( Security Agreement - Collateral
Assignment and Pledge of Secured Notes) תמחה חברת הנכס כמקובל,
לטובת הנאמן למחזיקי אגרות החוב (סדרה ג'), את כל זכויות חברת הנכס
לקבלת הכספים שיגיעו בגין או מכוח הנכס המשועבד, זכויות קדימה או
זכויות אחרות ו/או כל זכות לקבלת תזרים הנובע מהנכס המשועבד ו/או זכות
לקבלת כל תקבולי הביטוח, ככל שיתקבלו ו/או על הסכם אחר, אם קיים,
מקורתם ויקנו אותם מפעם לפעם לחברת הנכס בגין זכויותיה בנכס המשועבד.
ככל שלחברת הנכס זכויות לקבלת זכויות מכל מין ושוא שהוא ו/או לקבלת
כספים מכל גורם שהוא, חברת הנכס תמציא לחברה, עם העתק לנאמן, את
ההודעה שתועברה לאותם גופים בדבר המחאת זכויותיה לנאמן לאגרות החוב
(סדרה ג') בצירוף חתימתם על קבלת ההודעה ועדכון הרישומים אצלם. ככל
וקיימים גופים כאמור אליהם דרושה המצאת ההודעה כמפורט לעיל, תיתן
החברה הודעה על כך לנאמן ותפרט מהן הזכויות של חברת הנכס שהומחו
ואצל אילו גופים ותאשר את קבלת הודעות אותם גופים והכל עד למועד
הסגירה.

להלן יחד : **"השעבודים" ו-"הנכסים המשועבדים"** או **"הזכויות המשועבדות"**,
בהתאמה.

בקרות אחד האירועים המפורטים בהסכם השעבוד, ובכלל זה בקרות אירוע של הפרה של
שטר הנאמנות אשר מקנה לנאמן זכות להעמדה לפרעון מיידית של אגרות החוב ו/או
למימוש בטוחות וכן בקרות אירוע של הפרה של כל אחד ממסמכי הבטוחות האחרים
המבטיחים את הנאמן, הנאמן (אשר הינו הצד המובטח על פי הסכם השעבוד), יהיה
מוקדמת, בין שאר התרופות המוקנות לו במסגרת הסכם השעבוד, להכריז, ללא הודעה
רשאי, על העמדה לפרעון מיידי של כל חבות המובטחת תחת הסכם השעבוד, או
לפעול לשם מכירת את הנכסים המשועבדים או כל חלק מהם על פי שיקול דעתו, בהודעה
של 10 ימים מראש. **מובהר כי הליך מימוש השעבוד יבוצע בהתאם לדין האמריקאי
ובהתאם לייעוץ שיקבל הנאמן בסמוך למועד מימוש השעבוד.**

6.2.1.4    **מובהר בזאת כי:**

א.    במקרה בו תמורת ההנפקה תהיה נמוכה מהסכום הנדרש לפרעון החלוואה
הקיימת (כהגדרתו להלן), והחברה תעמיד ממקורותיה את ההפרש שידרש
לשם שלמשה הסכום הנדרש לפרעון החלוואה הקיימת (כהגדרתו להלן),
הסכם שיעמד על ידי החברה כאמור יפרע מהרחבות של סדרת
אגרות החוב.

-20-

ב. במקרה של הרחבת סדרת אגרות החוב (סדרה ג'), יתווספו השעבודים כך שישביעו גם את החוב שיצבר בגין הערך הנקוב של אגרות החוב (סדרה ג') הנוספות לטובת הנאמן (כנאמן למחזיקי אגרות החוב (סדרה ג').

6.2.1.5 בנוסף לאמור לעיל, במועד הסגירה תפקיד חברת הנכס בידי הנאמן ערבות לפי חברת הנכס ערבה באופן בלתי חוזר לקיום מלוא התחייבויות החברה כלפי מחזיקי אגרות החוב (סדרה ג').

6.2.1.6 החברה מצהירה, כי נכון למועד החתימה על שטר נאמנות זה, משועבד, משתעבד ושטר חוב בסכום של כ-96 מיליון דולרים, להבטחת הלוואות בסך כולל של כ-96 מיליון דולר, כמתואר בנספח א' לשטר הנאמנות. לשם יצירת השעבודים על פי סעיף זה לטובת הנאמן, יוסבו המשכנתא ושטר חוב הקיימים לטובת חברה כנגד העמדת הלוואת משכנתא לחברת הנכס ופרעון הלוואות הקיימת, ובו בעת החברה תמחה על דרך השעבוד את זכויותיה מכוח המשכנתא ושטר חוב לטובת הנאמן, ובמדת הצורך יוגדל סכום המשכנתא ושטר חוב כאמור לעיל, להבטחת התחייבויות החברה כלפי מחזיקי אגרות החוב (סדרה ג'), והכל בהתאם לחוות דעת עורך הדין.

6.2.1.7 הליך יצירת השעבודים וכלולים יבוצע בהתאם להוראות חוות דעת עורך דין כמפורט בסעיף 6.2.2 להלן (להלן : "חוות דעת עורך הדין") ובכפוף להוראות שטר זה.

> שעבוד זכויות החברה מכוח המשכנתא ושטר החוב לטובת הנאמן יווצרו וישוכללו כלפי צדדי ג' באופן המקובל במדינת ניו יורק ובאיי הבתולה וזאת בהתאם לחוות דעת עורך דין בעל רשיון לעריכת דין במדינת ניו יורק ובאיי הבתולה (בהתאמה) ויהיו כפופים לדינים החלים במקום רישום השעבודים. כן מובהר כי הבטוחות צפויים להיווצר במועד העברת תמורת הנפקת אגרות החוב לחברה ושכלולן (רישומן) צפוי בתקופה של עד כ-21 ימים לאחר מועד זה, אשר במהלכה יהיו זכויות מחזיקי אגרות החוב מובטחות באמצעות פוליסת ביטוח משכנתא כמפורט בסעיף 6.2.3.6 להלן.

כל עוד לא התקבלה החלטה בדבר העמדת אגרות החוב לפירעון מיידי ו/או מימוש בטוחות על פי תנאי שטר זה, לפי המוקדם (להלן : "אירוע מימוש"), בכפוף לשעבודים ולהתחייבויות בשטר זה, זכויות החברה בנכסים המשועבדים ובזכויות המשועבדות מכוח כל דין, הסכם או תקנון (אשר לא הוגבלו בשטר זה כאמור) לא תיפגענה ותהיינה בידיה באופן מלא ובלעדי.

6.2.2 **רישום ו/או יצירת השעבודים :**

רישומו ו/או יצירתו, לפי העניין, של השעבודים המפורטים בסעיף 6.2.1 לעיל, ייעשו בהתאם למזכר או חוות דעת עורך דין או עורכי דין המתמצאים בדין הרלוונטי בארה"ב, החל על הנכס המשועבד וחברת הנכס (להלן : **חוות דעת עורך דין באיי הבתולה**, החל על חברת החברה (להלן : **"עורך הדין האמריקאי"**, כמפורט בסעיף 6.2.2.1 להלן) אשר יסמכו בין השאר על חוות דעת עורך דין המתמצא בדין באיי הבתולה, החל על חברת החברה (להלן : **עורך הדין באיי הבתולה**), ועל-פי המסמכים הבאים, שעם המצאתם כולם לנאמן, בנוסף לשביעות רצונו של הנאמן, יראו את השעבוד כ-"נרשם" ו/או "נוצר", לפי העניין :

6.2.2.1 מזכר המופנה לנאמן (ובו יצוין כי החברה רשאית להעביר את המזכר לצדדים שלישיים בהתאם למגבלות המפורטות בו) בצירוף העתק לחברה מאת עורך הדין האמריקאי בדבר אופן יצירת השעבוד, ובו יפורטו מהם המסמכים הנדרשים, אשר יצורפו למזכר, וכן מהן ההחלטות הנדרשות לצורך יצירת השעבוד ורישומו על-פי דין החל על הנכסים המשועבדים, לפי העניין. המזכר יפרט גם את דרכי ואופני מימוש השעבוד על-פי דין הרלוונטי בארה"ב.

-21-

6.2.2.2 העתק המסמכים הנדרשים לצורך ביצוע ורישום השעבודים, אשר יצורפו למזכר של עורך הדין האמריקאי, כאמור בסעיף 6.2.2.1 לעיל, בנוסח המקובל על הנאמן.

6.2.2.3 חוות דעת מעורך הדין האמריקאי, המופנית לנאמן, כי חברת הנכס קיבלה את כל ההחלטות הנדרשות לצורך יצירת השעבודים, וכי המוסמכים לחתום בשמה חתמו על כל המסמכים הנדרשים לצורך יצירת השעבודים בקשר עם יצירת השעבודים ו/או רישומם.

6.2.2.4 מזכר המופנה לנאמן (ובו יצויין כי החברה רשאית להעביר את המזכר לצדדים שלישיים בהתאם להגבלות הממשלרות ב) עם העתק לחברה מאת עורך הדין באיי הבתולה בדבר אופן יצירת השעבוד, ובו יפורט מהם המסמכים הנדרשים, אשר יצורפו למזכר, וכן מהן ההחלטות הנדרשות לצורך יצירת השעבוד ורישומו על-פי הדין החל על הנכסים המשועבדים, לפי העניין. המזכר יפרט גם את דרכי ואופני מימוש השעבוד על-פי הדין הרלוונטי באיי הבתולה.

6.2.2.5 כל המסמכים הנדרשים לצורך ביצוע ורישום השעבודים, אשר יצורפו למזכר של עורך הדין באיי הבתולה, כאמור בסעיף 6.2.2.4 לעיל, בנוסח המקובל על הנאמן.

6.2.2.6 חוות דעת עורך הדין באיי הבתולה, כי החברה קיבלה את כל ההחלטות הנדרשות לצורך יצירת השעבודים, וכי המוסמכים לחתום בשמה חתמו על כל המסמכים הנדרשים לצורך יצירת השעבודים בקשר עם יצירת השעבודים ו/או רישומם.

6.2.2.7 אישור נושא משרה בחברה ובחברת הנכס (Officer's Certificate) , לפי העניין, המאשר כי התקבלו ההחלטות הנדרשות לשם רישום השעבודים ובדבר העדר התחייבויות סותרות של החברה ו/או חברת הנכס בקשר עם יצירת ו/או רישום השעבודים, וכן כי לפי דיני מדינת ניו יורק ו/או איי הבתולה (לפי העניין) הינם הדינים החלים על השעבודים וכי הנכס מבוטח כאמור בסעיף 6.2.8.18 להלן.

6.2.2.8 אישור מאת title insurance company (להלן: **"חברת הביטוח"**) כי השעבודים ו/או המשכנתא נרשמו.

6.2.2.9 חוות דעת מאת עורך הדין האמריקאי כי בכפוף לרישום השעבודים בהתאם לאמור במזכר עורך הדין האמריקאי, השעבודים הינם תקפים וברי אכיפה וכן אישור כי אישור רישום השעבודים על ידי חברת הביטוח כאמור תואם את הדרישות הנקובות במזכר עורך הדין האמריקאי כאמור לעיל.

6.2.2.10 חוות דעת מאת עורך הדין באיי הבתולה כי בהתאם לאמור במזכר עורך הדין באיי הבתולה, השעבודים הינם תקפים וברי אכיפה.

6.2.2.11 אישור מאת עורך הדין האמריקאי המסתמך בין השאר על אישורי נושא משרה בחברות הרלבנטיות (Officer's Certificate), כי הנכס מוחזק על ידי חברת הנכס במועד הסגירה, כי חברת הנכס מוחזקת (100%) על ידי חברת הבת, כי חברת הבת מוחזקת (50%) על ידי החברה המועברת וכי החברה המועברת מוחזקת (100%) על ידי החברה.

הסכמי השעבוד בגין השעבודים לטובת הנאמן, יהיו בנוסח שמקובל על הנאמן ולנאמן תהא הסמכות להסכים לכל שינוי בנוסח הסכמי השעבוד, באותם התנאים בהם רשאי הנאמן להסכים לשינויים בשטר הנאמנות לגופו, כמפורט בסעיף 28 לשטר הנאמנות, בשינויים המחוייבים. טיוטות מסמכי השעבוד מצורפת כ**נספח ב׳** לשטר הנאמנות.

מובהר בזאת, כי במועד הפירעון של התשלום האחרון בגין חקרן הריבית והריבית (לרבות ריבית הפיגורים) בגין אגרות החוב (סדרה ג׳) ובכפוף לפירעון המלא, או סילוק היתרה הבלתי מסולקת של אגרות החוב (סדרה ג׳) בכל דרך שהיא (לרבות בדרך של רכישה עצמית ו/או

-22-

פדיון מוקדם) ולתשלום כל שכר טרחת הנאמן והוצאותיו לרבות של שלוחיו, יפקעו
השעבודים הנוצרים על פי שטר נאמנות זה וייחשבו כבטלים מאליהם, ללא צורך בנקיטת
פעולה נוספת והנאמן יחתום על כל מסמך שיידרש לצורך ביטול השעבודים, ככל שתהיה
צורך בכך ו/או יחתום הנאמן על כל מסמך שיידרש על מנת לבטל את ההמחאה על דרך
השעבוד (collateral assignment) ו/או להעביר ו/או להמחות את המשכנתא ושטר חוב
לגורם אחר לפי הנחיות החברה וזאת מבלי שתהיה לנאמן אחריות כלשהי ביחס לתוקף
השעבודים הנ"ל שהועברו ו/או הומחו ו/או בוטלו.

החברה, תאגידי ההחזקה וחברת הנכס מתחייבות לחתום על כל מסמך שיידרש לשם
יצירת רישומם ומימושם של השעבודים.

6.2.3    __הסבת השעבודים הקיימים הרשומים על הנכס המשועבד__

6.2.3.1    החברה מצהירה, כי נכון למועד החתימה על שטר נאמנות זה, רשומים על
הנכס המשועבד משכנתא ושטר חוב בסכום של כ-96 מיליון דולרים, להבטחת
הלוואות בסך כולל של כ-96 מיליון דולר שהועמדו על ידי מלווה פיננסי ל-
Wythe Berry, LLC (להלן: "__הבעלים הקיים__"), כמתואר ב__נספח א'__ לשטר
הנאמנות (להלן: "__השעבוד הקיים__", "__ההלוואה הקיימת__" ו-"__המלווה
הפיננסי__", בהתאמה).

6.2.3.2    לצורך שחרור השעבוד הקיים תעמיד החברה לחברת הנכס את הלוואת
המשכנתא אשר תפרע את יתרת ההלוואה הקיימת, וזאת מתוך תמורת
ההנפקה. לשם כך, יעביר הנאמן בידיו בנאמנות כאמור לעיל מתוך תמורת
ההנפקה אשר תוחזק בידיו בנאמנות כמפורט בסעיף 6.2.4 להלן, סכומים
(Payoff Letter) (כהגדרתו להלן) בהתאם למכתב כוונות
(להלן: "__מכתב הכוונות__") מטעם המלווה הפיננסי אשר יועבר על-ידי החברה
אל הנאמן ובו יפורטו סכום הפרעון הנדרש להעברה לשם הסרת השעבודים
(את פרטי חשבון הבנק אליו יש להעביר את סכום הפרעון כאמור והכל בכפוף
למפורט בסעיפים 6.2.3.3 ו-6.2.3.4 להלן (להלן: "__הסכום הנדרש לפרעון
ההלוואה הקיימת__"). מכתב הכוונות יופנה לחברה ו/או לחברת הנכס ו/או
לבעלים הקיים ויציין כי כנגד העברת הסכום הנדרש לפרעון ההלוואה
הקיימת, אשר יהווה תשלום סופי של ההלוואה הקיימת, ישחרר המלווה
הפיננסי את השעבוד הקיים לטובתם על הנכס המשועבד ויסיר כל רישום בגין
שעבוד זה.

6.2.3.3    מבלי לגרוע מהאמור לעיל, עשויה החברה לפרוע את המשכנתא כאמור לעיל
ממקורותיה ולא מתוך תמורת הנפקת אגרות החוב (סדרה ג'). לעניין זה יובהר
כי במקרה בו הכספים אשר יועמדו על ידי חברת הנכס מתמורת
ההנפקה יהיו נמוכים מהסכום הנדרש לפרעון ההלוואה הקיימת, תעמיד
החברה ממקורותיה את ההפרש שידרש לשם השלמת הסכום הנדרש לפרעון
ההלוואה הקיימת (הכל בכפוף להשגת הסכום המינימאלי להנפקה, כפי שיקבע
בדו"ח הצעת המדף).

6.2.3.4    החברה תעביר את מכתב הכוונות לנאמן. הנאמן יעביר לחברת הביטוח (בכפוף
לאמור בסעיף 6.2.3.7 להלן) כספים מתוך תמורת ההנפקה אשר ישמשו ראשית
לפרעון הסכום הנדרש לפרעון ההלוואה הקיימת (כהגדרתו לעיל) בתוספת
פרמיית חברת הביטוח, והסבת השעבוד הקיים לטובת החברה; בו בעת,
החברה תמחה על דרך השעבוד את זכויותיה במשכנתא ובשטר חוב
(כהגדרתם בסעיף 5.10 לעיל) לטובת הנאמן, ובמידת הצורך יוגדל סכום
המשכנתא ושטר חוב כאמור לעיל, להבטחת התחייבויות החברה כלפי
מחזיקי אגרות החוב (סדרה ג') בגין מלוא סכום הלוואת המשכנתא (כהגדרתה
בסעיף 5.10 לעיל), והכל בהתאם לחוות דעת דין; לאחר מכן ישמשו
הכספים לשם ביצוע התשלום למשקיעי ההון המועדפים; וככל שתיוותר יתרה
היא תשמש לכיסוי הוצאות ההנפקה, בהתאם להוראות החברה.

-23-

6.2.3.5    במועד הסגירה, תשלים החברה את העברת הנכס לידי חברת הנכס.

6.2.3.6    במועד הסגירה, חברת הביטוח תמציא לנאמן פוליסת ביטוח משכנתא על שם
החברה והנאמן בגובה סכום הלוואת המשכנתא (להלן: **"פוליסת ביטוח
המשכנתא"**), בד בבד עם שחרור הכספים על ידי הנאמן כמפורט לעיל, כאשר
במועד הסגירה הנכס נמצא בבעלות חברת הנכס. לאחר מועד הסגירה תדאג
לרישום השעבודים, כאשר לעניין זה מובהר כי ביטוח המשכנתא יהיה בתוקף
ממועד שחרור הכספים על ידי הנאמן (ללא קשר לרישום השעבודים). פוליסת
ביטוח המשכנתא תבטח את מלוא סכום הלוואת המשכנתא, בגין כל פגם
שיתגלה בבעלות חברת הנכס בנכס המשועבד ו/או במשכנתא ו/או בשטר החוב
ו/או בשעבודים לטובת הנאמן ולרבות במקרים בהם ייינקטו הליכי חדלות
פירעון נגד החברה ו/או חברת הנכס.

6.2.3.7    ההליכים המפורטים לעיל יבוצעו באמצעות חברת הביטוח איתה ייחתם בין
היתר הסכם נאמנות עם הנאמן. כל ההליכים המפורטים להלן וכן העברת
הכספים לחברת הביטוח יבוצעו על ידי חברת הביטוח בד בבד ולאחר שחברת
הביטוח אישרה בכתב לנאמן (במסגרת הסכם הנאמנות) כי:

א.    מצויים בידיה כל המסמכים הנדרשים לשם הפעולות הבאות:

(1)    פירעון ההלוואה הקיימת;

(2)    העברת הנכס מהבעלים הקיים לחברת הנכס;

(3)    יצירת הלוואת המשכנתא אשר תהיה מובטחת במשכנתא ובשטר
החוב וזאת ביחס למלוא הסכום שיועבר לחברת הביטוח;

(4)    יצירת השעבודים לטובת הנאמן (המחאה בדרך של שעבוד).

(5)    ביצוע פירעון מלא או חלקי למשקיעי ההון המועדפים;

ב.    העתקים מהמסמכים לעיל ישלחו לנאמן בתוך 7 ימים ממועד הסגירה.

ג.    היא לא תעביר למלווה הפיננסי סכום כלשהו ללא קבלת הוראת הנאמן
בכתב;

ד.    התשלומים יבוצעו ראשית לשם פדיון ההלוואה הקיימת, העמדת הלוואת
המשכנתא, יצירת השעבודים לטובת הנאמן, ולאחר מכן לתשלום
למשקיעי ההון המועדפים והיתרה תשוחרר לחברה.

ה.    ככל שלא תתקבל הוראת הנאמן עד למועד שתורה חברת הביטוח, יושבו
הכספים שהופקדו על ידי הנאמן לחשבון ממנו הופקדו.

ו.    עם העברת הכספים לגוף הפיננסי תיכנס לתוקפה פוליסת ביטוח כמפורט
לעיל ותימסר לנאמן תעודת ביטוח המשכנתא בגין פוליסת ביטוח
המשכנתא כמפורט לעיל.

ז.    עם העברת הכספים היא תגיש לרישום את כל המסמכים לביצוע האמור
לעיל ותוודא את רישומם כדין.

6.2.3.8    בנוסף, במועד הסגירה ולפני העברת הכספים לחברת הביטוח תמציא החברה
לנאמן את מסמך ערבות של חברת הנכס כאמור בסעיף 6.2.1.4 לעיל ואת
הודעות חברת הנכס לחייבים כמפורט בסעיף 6.2.1.3 בצרוף הצהרת החברה
וחברת הנכס על כך שהודעות אלו הינן מאת כל אדם שקיימת לחברת הנכס
זכויות כלפיו.

6.2.3.9    מובהר כי הליך היצירה, ההסבה ורישום השעבודים ינוהל על ידי עורך דין
האמריקאי, עורך הדין באיי הבתולה וחברת הביטוח, לפי העניין.

-24-

6.2.4    **העברת תמורת ההנפקה לחברה**

6.2.4.1    עם קבלת אישור רכז ההנפקה על קבלת תמורת ההנפקה אצל רכז ההנפקה,
תעביר החברה מהמצעה לחשבון הנאמנות סך השווה להוצאות
(בניכוי עמלת התחייבות מוקדמת למשקיעים מסווגים), בהתאם לתחשיב
שיועבר לנאמן על ידי החברה (להלן בסעיף זה: "**הוצאות ההנפקה**"). לאחר
קבלת אישור הנאמן על כך שהוצאות ההנפקה הועברו לחשבון הנאמנות,
תמורת ההנפקה שתתקבל בידי רכז ההנפקה בגין הנפקת אגרות החוב (סדרה
ג'), בניכוי עמלת התחייבות מוקדמת למסווגים, תועבר על-ידי רכז
ההנפקה, על פירותיה, לחשבון הנאמנות (כהגדרתו להלן).

שחרור תמורת ההנפקה מחשבון הנאמנות יבוצע לחברת הביטוח בהתאם
להוראות סעיף 6.2.3 לעיל.

"**חשבון הנאמנות**" משמעו: חשבון שייפתח על-ידי הנאמן, על-שם הנאמן
בנאמנות עבור מחזיקי אגרות החוב (סדרה ג') באחד מחמשת הבנקים הגדולים
בישראל אשר זכויות התחתומים בו תהיינה של הנאמן בלבד. כל זכויות החברה
בו על תתי חשבונותיו, תשועבדנה על-ידי החברה לטובת הנאמן ככל הניתן
בתוך 30 יום ממועד ההנפקה, בהתאם להוראות חוות דעת עורך דין הבקיא
בדין הרלוונטי החל על החברה אשר תופנה לנאמן עם העתקו לחברה, בשעבוד
יחיד וקבוע, ראשון בדרגה, ללא הגבלה בסכום. זכויות החתומים בחשבון
הנאמנות יהיו של הנאמן בלבד. כל עלויות פתיחת החשבון, ניהולו וסגירתו
יחול על החברה. מדיניות ניהול הכספים בחשבון זה וביצועה תיקבע על-פי
שיקול דעתה הבלעדי של החברה, ובלבד שהשקעתם תהא בהתאם להוראות
סעיף 17 להלן.

**יובהר כי עד אשר ישועבד חשבון הנאמנות כמפורט לעיל, זכויות החברה (ככל
שישנן) ביחס לחשבון הנאמנות אינם משעובדות לטובת הנאמן (בעבור מחזיקי
אגרות החוב (סדרה ג')), ולפיכך ייתכן מצב בו צד ג' כלשהו (לרבות בעל
תפקיד מטעם בית משפט וכדומה) יטען כי לחברה זכויות בחשבון הנאמנות
וכי הכספים המופקדים בו שייכים לחברה ו/או לכלל נושיה ולא למחזיקי
אגרות החוב (סדרה ג') בלבד. אין באמור כדי לגרוע מהתחייבויות החברה,
בעלי השליטה ונושאי משרה בחברה כמפורט בסעיף 5.9 לעיל אשר, למען
הסר ספק, תחולנה גם בקשר עם חשבון הנאמנות.**

**החברה מתחייבת, כי עד להשלמת יצירת השעבודים ו/או רישומם, לפי
העניין, והעברת כל המסמכים המפורטים בסעיף 6.2.2 ו-6.2.3 לעיל, לפי
העניין, לנאמן, היא לא תתקשר בהסכמים ו/או תיטול התחייבות מכל מין
וסוג שהוא אשר יש בהן כדי ליצור לחברת הכנס נושים נוספים מלבד מחזיקי
אגרות החוב (סדרה ג'). מובהר כי נכון למועד החתימה על שטר זה, למיטב
ידיעת החברה לא קיימות התחייבויות כאמור.**

6.2.4.2    לצורך רישום אגרות החוב למסחר בלבד, החברה רואה בקבלת תמורת
ההנפקה אצל רכז ההנפקה, כקבלת התמורה בחברה, ולאור זאת תבקש את
רישום אגרות החוב (סדרה ג') למסחר בבורסה.

6.2.4.3    מוסכם, כי כל עוד לא התקיימו התנאים לשחרור תמורת ההנפקה לחברה לא
תהיה החברה זכאית לסכום כלשהו מתוך תמורת ההנפקה לגבי לא התקיים
התנאי לשחרורה.

6.2.4.4    החברה מתחייבת כי כל התנאים המפורטים בסעיפים 6.2.2 ו-6.2.3 לעיל
(יצירת השעבוד, רישומו וכו') יתקיימו בתוך תקופה של תשעים (90) ימים
ממועד הנפקת אגרות החוב (סדרה ג'). אסיפת מחזיקי אגרות החוב רשאית
לאשר להאריך את התקופה האמורה בהחלטה מיוחדת שתתקבל באסיפת
מחזיקי אגרות החוב (סדרה ג') (תקופת 90 הימים האמורה בצירוף כל ארכה
שתאושר כאמור, ככל שתאושר, תכונה להלן: "**תקופת הביניים**").

-25-

ככל שלא יתקיימו כל התנאים המפורטים בסעיפים 6.2.3-1 ו- 6.2.2.2 לעיל (יצירת
השעבוד, רישומו וכו') עד תום תקופת הביניים, תפעל החברה לביצוע פדיון
מוקדם מלא ומחזיקיה ממסחר של אגרות החוב לא לפני תום תקופת הביניים
(בסעיף זה: **"הפדיון המוקדם הכפוי"**). יום עסקים אחד לאחר תום תקופת
הביניים החברה תפרסם דוח מיידי עם העתק לנאמן ובו תודיע אודות ביצוע
הפדיון המוקדם הכפוי ומועדו. מועד הפדיון המוקדם הכפוי יהא לא פחות
משבעה-עשר (17) ימים ולא יותר מארבעים וחמישה (45) ימים לאחר דיווח
החברה אודות הפדיון המוקדם הכפוי למחזיקי אגרות החוב. בדוח המיידי
כאמור תפרסם החברה את סכום הקרן שייפרע בפדיון המוקדם הכפוי וכן את
הריבית שנצברה בגין סכום הקרן עד למועד הפדיון המוקדם הכפוי.

במקרה זה קרן אגרות החוב (סדרה ג') בצירוף ריבית שנתית על פי שיעור של
הריבית בגין אגרות החוב (סדרה ג') שנצברה ממועד הממכרז ועד למועד הפדיון
המוקדם הכפוי בפועל, ישולמו למחזיקי אגרות החוב (סדרה ג') בניכוי מס
כדין. לצורך ביצוע פדיון מוקדם כפוי לפי ס"ק זה ייעשה, בין היתר, שימוש
בכספים שנותרו בחשבון הנאמנות אשר יועברו על-ידי הנאמן ישירות מחשבון
הנאמנות לחברה לרישומים בניכוי עלויות פתיחת חשבון הנאמנות, ניהולו
וסגירתו, בניכוי עמלות נוספות לצדדים שלישיים ככל שיהיו, והחברה תשלים
כל סכום שיידרש לצורך ביצוע פדיון מוקדם כאמור.

יובהר כי במקרה בו יחול אירוע פדיון מוקדם כפוי כאמור בס"ק 6.2.4.4 לעיל,
תחולנה ההוראות המפורטות בסעיף 7.2 להלן (לפי העניין) למעט הוראות סעיף
7.2.9 לעיל לעניין קביעת הסכום שישולם למחזיקי אגרות החוב (סדרה ג'),
אשר יהא כמפורט בסעיף 6.2.4.4 זה לעיל.

למען הסר ספק ככל שהשעבודים כאמור בסעיף 6.2.1 לעיל טרם נרשמו במועד
ביצוע הפדיון המוקדם הכפוי במלואו לא תחול עוד חובה על החברה לרשום
את השעבודים לטובת מחזיקי אגרות החוב (סדרה ג'), ושטר נאמנות זה יפקע
ויהא חסר כל תוקף.

6.2.4.5    מבלי לגרוע מהאמור לעיל, מובהר כי כל עוד לא התקיימו התנאים להעברת
תמורת ההנפקה לחברה, תהיה תמורת ההנפקה אשר תוחזק בחשבון
הנאמנות, מיועדת להבטחת מלוא התחייבויות החברה בקשר עם אגרות החוב
(סדרה ג') בהתאם לשטר הנאמנות, והחברה לא תהיה זכאית לקבל לידיה את
תמורת ההנפקה אלא בכפוף להתקיימות כל התנאים המפורטים בסעיפים
6.2.2 ו-6.3.3 לעיל.

6.2.5    <u>מכירת הנכס המשועבד ופידיון מוקדם מלא של אגרות החוב (סדרה ג')</u>

החברה ו/או חברת הנכס תהיינה רשאיות, בהתאם לשיקול דעתן הבלעדי, למכור לצדדים
שלישיים את הנכס המשועבד (בין במישרין ובין באמצעות מכירת התאגידים המחזיקים
בנכס המשועבד), ללא קבלת אישור הנאמן ו/או אסיפת המחזיקים לכך, ובלבד שעם
מכירת הנכס המשועבד תעמודנה יתרת אגרות החוב שבמחזור לפדיון מוקדם מלא על ידי
החברה בהתאם להוראות סעיף 7.2 לשטר הנאמנות, ויחולו ההוראות כדלקמן:

6.2.5.1    החברה מתחייבת לדאוג לכך כי תמורת המכירה נטו, בתוספת כל סכום הנדרש
לביצוע הפדיון המוקדם המלא על ידי החברה, תופקד ישירות בחשבון
הנאמנות או יקבע מנגנון נאמנות דומה אשר יבטיח את קבלת הסכומים
הנדרשים לביצוע הפדיון המוקדם המלא בחשבון הנאמנות סימולטנית
להעברת הנכס לרוכש.

6.2.5.2    בכפוף לאמור בסעיף 6.2.5.1 לעיל, הנאמן יחתום על כל מסמך ו/או אישור
סבירים שיהיו נחוצים או מועילים לביצועה של המכירה, לצורך כך יחתום
הנאמן על כתב התחייבות לפיו הוא יסכים לסילוק ו/או הסבת השעבודים
הרשומים לטובתו כנגד ומבוטל ביצוע העברת הסכומים הנדרשים לביצוע
הפדיון המוקדם המלא לחשבון הנאמנות כקבוע בסעיף 6.2.5.1 לעיל.

-26-

6.2.5.3    יובהר כי על פדיון מוקדם מלא כאמור בסעיף 6.2.5 זה לעיל, תחולנה ההוראות
המפורטות בסעיף 7.2 להלן.

6.2.5.4    בנוסף, במקרה של פדיון מוקדם מלא כאמור בסעיף 6.2.5 זה לעיל, הסכומים
שיידרשו לשם ביצוע הפדיון המוקדם המלא ישולמו ישירות מתוך חשבון
הנאמנות על-ידי הנאמן והחברה תשלים כל סכום שידרש, ככל שידרש, לצורך
ביצוע הפדיון המוקדם המלא כאמור. מובהר כי כל הסכומים שיוותרו לאחר
הפרעון המוקדם המלא כאמור בסעיף 6.2.5 זה לעיל בחשבון הנאמנות יושבו
לחברה על-ידי הנאמן.

6.2.6    <u>תיקון השעבודים במקרה של הרחבת הסדרה</u>

כאמור לעיל, במקרה של הרחבת סדרת אגרות החוב (סדרה ג'), יתוקנו השעבודים כך
שיכטיחו גם את החוב שיוצר בגין הערך הנקוב של אגרת החוב (סדרה ג') הנוספות (להלן
בסעיף זה: "<u>תיקון השעבודים</u>") לטובת הנאמן כנאמן עבור מחזיקי אגרות החוב(סדרה
ג').

תמורת ההנפקה שתתקבל בידי רכז ההנפקה בגין הנפקת אגרות החוב (סדרה ג')
הנוספות, נטו, לאחר תשלום הוצאות ההנפקה, תועבר על-ידי רכז ההנפקה, על פירותיה,
לחשבון הנאמנות (כהגדרתו להלן) וזאת עד ליצירת השעבודים ורישומם בהתאם לחוות
הדעת של עורך הדין האמריקאי ועורך הדין באיי הבתולה כמפורט בסעיף 6.2.3 לעיל,
בשינויים המחוייבים.

6.2.7    <u>הסרת ו/או המחאת השעבודים</u>

6.2.7.1    עם קיום מלוא התחייבויות החברה בקשר עם אגרות החוב (סדרה ג'), לרבות
פירעון מלא וסופי של אגרות החוב (סדרה ג') (קרן, ריבית וריבית פיגורים ככל
שתחול) ולרבות פירעון כל סכום אחר הנדרש לפי תנאי שטר הנאמנות, הנאמן יתן
לחברה את הסכמתו להסיר ו/או להמחות את כל השעבודים שיהיו תקפים
באותו מועד וזאת בתוך שבעה (7) ימים ממועד קבלתו אצל הנאמן של אישור
חתום של נושא משרה הבכיר בחברה בתחום הכספים בחברה אודות הפירעון כאמור
לעיל. הסרת ו/או המחאת השעבודים בפועל תבוצע על ידי החברה (מובהר כי
עורך הדין האמריקאי של הנאמן יהיה רשאי לפעול לשם הסרת השעבודים
בתיאום עם החברה).

6.2.8    <u>הצהרות והתחייבויות בקשר עם הנכסים המשועבדים</u>

החברה, תאגידי ההחזקה וחברת הנכס מצהירים ומתחייבים כדלקמן :

6.2.8.1    לעשות שימוש בכוח הנובע מהחזקותיהם על מנת שחברת הנכס תחתום על כל
מסמך שיידרש בהתאם לשטר הנאמנות.

6.2.8.2    הסכמי התפעול של תאגידי ההחזקה וחברת הנכס או כל הסכם אחר שתאגידי
ההחזקה ו/או חברת הנכס צד לו אינם סותרים את הוראות שטר זה וכן לא
יסתרו בעתיד את כל הוראה מהוראות שטר זה.

6.2.8.3    לעשות שימוש בכוח הנובע מהחזקותיהם על מנת שחברת הנכס לא תשנה את
הסכם התפעול שלה או כל הסכם אחר בו היא מתקשרת, באופן שתחולנה
מגבלות כלשהן על הזכויות בנכס המשועבד, עבירותן או מימושן ו/או המחאת
הזכויות מכוחן ו/או תוקף ו/או מימוש השעבודים הנוצרים על-פי שטר
הנאמנות.

6.2.8.4    בכפוף להוראות שטר הנאמנות, להמנע מביצוע כל דיספוזיציה בחברת הנכס
ו/או בנכסים המשועבדים, לרבות להימנע מהקצאת זכויות נוספות בחברת
הנכס לכל אדם (כולל לחברה ותאגידי ההחזקה) ובכלל זאת לא להקנות לכל
אדם זכות כלשהי כלפי הנכסים המשועבדים וזאת כל עוד לא נפרעו כל

-27-

הסכמים המובטחים ולא מולאו כל התחייבויות החברה בגין, ללא קבלת אישור חתום ע"י הנאמן מראש לאחר שהתקבלה החלטת אסיפת מחזיקי אגרות החוב בנושא בהחלטה מיוחדת.

6.2.8.5 בכפוף להוראות שטר הנאמנות, לא לנקוט בהליכים כלשהם בגין השעבודים שיש בהם פגיעה ביכולתו של הנאמן לממש את השעבודים.

6.2.8.6 לא למשכן ולא לשעבד את הנכסים המשועבדים או כל חלק מהם לטובת צד שלישי כלשהו באיזה אופן שהוא.

6.2.8.7 בכפוף להוראות שטר הנאמנות ובפרט להוראות סעיף 6.2.5 לעיל, כל עוד הנכסים המשועבדים יהיו משועבדים, לא למכור, לא להעביר ולא להמחות ו/או לחתקנות לגורם כלשהו באיזה אופן שהוא את הנכסים המשועבדים או כל חלק מהם או כל זכות הנובעת מהם בין במישרין ובין בעקיפין.

6.2.8.8 לעשות ולהורות לתאגידי ההחזקה ו/או לחברת הנכס, על חשבונה של החברה או על חשבונם, לפי העניין, כל שיהיה דרוש בנסיבות העניין, על מנת שכוחם של השעבודים הנוצרים על-פי שטר נאמנות זה על הנכסים המשועבדים יהיה תקף כלפי צדדים שלישיים, לרבות נושים אחרים - קיימים או עתידיים - של החברה ושל תאגידי ההחזקה ושל חברת הנכס ויגבר על זכויותיהם בכל הנוגע לשעבודים.

6.2.8.9 בתוקף ממועד הסגירה, חברת הנכס נמצאת בבעלות המלאה של חברת הבת ולמעט במקרה של מכירת חברת הנכס בהתאם להוראות שטר זה היא תהיה בבעלות מלאה של חברת הבת עד לפירעונן של אגרות החוב (סדרה ג').

6.2.8.10 בתוקף ממועד הסגירה, חברת הבת נמצאת בבעלות 50% של החברה המועברת ולמעט במקרה של מכירת חברת הנכס בהתאם להוראות שטר זה היא תהיה בבעלות של לפחות 50% מחברת הבת עד לפירעונן של אגרות החוב (סדרה ג').

6.2.8.11 במועד ההתקשרות בשטר זה אין כל מניעה על-פי כל דין, הסכם או התחייבות, לרבות מסמכי ההתאגדות של מי מבין החברה ו/או תאגידי ההחזקה ו/או חברת הנכס לחתימתן על שטר הנאמנות או בשוליו (לפי העניין) ולביצוע כל התחייבויותיהן על-פי, וכי אין כל הגבלה או תנאי על-פי כל דין על יצירת השעבודים המפורטים בשטר זה ועל התחייבויותיהן בו, וכי ההתקשרות ותחתימתה של החברה על שטר זה אינן מהוות הפרה של התחייבות כלשהי שהחברה או תאגידי ההחזקה או חברת הנכס נטלו על עצמן, וכי המוסדות המוסמכים שלהן קיבלו החלטה כדין בדבר יצירת השעבודים ותחתימתם על שטר זה או בשוליו (לפי העניין) וכי לא נדרשת הסכמה ליצירת השעבודים מכל גורם שהוא. החברה מתחייבת בזאת להודיע לנאמן במקרה בו יחול שינוי האמור בס"ק זה.

6.2.8.12 בכפוף לאמור בסעיף 6.2 לעיל בדבר השעבוד הקיים ולשעבודים הנוצרים על פי שטר זה, זכויות חברת הנכס בנכס המשועבד נקיות וחופשיות מכל חוב, עיקול, שעבוד או זכות צד ג' כלשהי, ואין כל הגבלה או תנאי חלקם על פי דין או הסכם על העברת הבעלות בהם או או שעבודם ו/או מימושם ו/או העברת הבעלות בהם בעת מימוש.

6.2.8.13 במועד החתימה על שטר זה, החברה ו/או תאגידי ההחזקה ו/או חברת הנכס אינם מצויים בהליכי פירוק ו/או כינוס נכסים (זמני או קבוע) ו/או הקפאת הליכים (או כל הליך דומה בהתאם לדין החל עליהן) ו/או איום בהגשת בקשה או בנקיטת הליכים כאמור, והחברה ו/או תאגידי ההחזקה ו/או חברת הנכס לא קיבלו החלטת פירוק.

6.2.8.14 החברה ו/או תאגידי ההחזקה ו/או חברת הנכס לא קיבלו הודעה על תביעת כלשהו ביחס לזכויותיה של חברת הנכס בזכויות המשועבדות. החברה

-28-

מתחייבת בזאת להודיע לנאמן בכתב במקרה בו יחול שינוי באמור בס"ק זה
מיד כשייודע לה הדבר.

6.2.8.15 לא ידוע לחברה ו/או לתאגידי ההחזקה ו/או לחברת הנכס על כל פגם בזכויות
המשועבדות, וכי אם יתגלה פגם בזכויות המשועבדות הן תפעלנה לתיקון הפגם
בהקדם האפשרי מיד כשייודע להן על פגם כאמור.

6.2.8.16 בכפוף להוראות שטר זה, ללא קבלת אישור מחזיקי אגרות החוב (סדרה ג')
אשר יתקבל בהחלטה מיוחדת, חברת הנכס לא תמשכן, תשעבד, תעביר,
תמכור או תמסור את הזכויות המשועבדות ו/או כל חלק מהן לטובת צד שלישי
כלשהו באיזה אופן שהוא, ולא תנקוט בהליכים כלשהם (לרבות כריתה או
שינוי במסמכי ההתאגדות שלה) בין הזכויות המשועבדות, שיש בהם פגיעה
ביכולתו של הנאמן ו/או מחזיקי אגרות החוב (סדרה ג') לממש את השעבוד,
והכל כל עוד לא נפרעו כל אגרות החוב ולא מולאו כל ההתחייבויות החברה
בגינן.

6.2.8.17 מיד לאחר שיוודע על כך לחברה ו/או לתאגידי ההחזקה ו/או לחברת הנכס,
החברה תודיע לנאמן בכתב על כל מקרה של הטלת עיקול, נקיטת פעולת
הוצאה לפועל או הגשת בקשה למינוי כונס נכסים או בקשה למינוי ו/או מינוי
כל בעל תפקיד אחר על כל אחד מהנכסים המשעבדים ו/או על הזכויות
המשועבדות ו/או על חלקן, (או כל הליך דומה בהתאם לדין החל עליהם). כמו
כן, לאחר שנודע על כך לחברה ו/או לתאגידי ההחזקה ו/או לחברת הנכס, הן
תודענה מיד על דבר קיומו של שעבוד לטובת הנאמן לרשות שעיקולה או נקטה
פעולת הוצאה לפועל או שנתבקש למנות כונס נכסים או כל בעל תפקיד אחר
כאמור (או כל הליך דומה לדין החל עליהן) ו/או לצד שלישי שים או
ביקש את אלה או את חלק מאלה, וכן תנקוטנה מיד על חשבון בכל האמצעים
הסבירים הדרושים לשם ביטול העיקול, פעולת ההוצאה לפועל או מינוי כונס
הנכסים או המנהל המיוחד, לפי המקרה.

6.2.8.18 כל עוד תיוותרנה אגרות החוב (סדרה ג') במחזור, החברה מתחייבת לגרום לכך
כי הנכס המשועבד יהיה מבוטח, כמקובל. החברה מתחייבת להודיע לנאמן
בכתב מיד בכל מקרה בו נודע לה ו/או על שינוי לרעה בהקיף הכיסוי הביטוחי בגין
נכס המשועבד, או כי פקעו פוליסת הביטוח בגין הנכס המשועבד או במקרה
בו הודיע לה המבטח על פקיעת הפוליסה בגין הנכס המשועבד או על ביטולה.
החברה תכלול גילוי כאמור בדבר תקפותו של הביטוח במסגרת דוח
הדירקטוריון אשר יצורף לדוח התקופתי ו/או הרבעוני של החברה.

6.2.8.19 כל עוד תיוותרנה אגרות החוב (סדרה ג') במחזור, החברה מתחייבת לגרום לכך
כי תאגידי ההחזקה ו/או חברת הנכס לא יקבלו החלטה על פירוק מרצון או
החלטה דומה על פי דין החל עליהן.

6.2.8.20 כל עוד תיוותרנה אגרות החוב (סדרה ג') במחזור, החברה מתחייבת לגרום לכך
כי תאגידי ההחזקה ו/או חברת הנכס לא יעמידו ערבויות כלשהן (למעט ערבות
לטובת מחזיקי אגרות החוב (סדרה ג')) ו/או לא ייטלו חובות נוספות מעבר לחוב
הקיים.

**6.3 התחייבות לאי יצירת שעבוד שוטף**

6.3.1 החברה מתחייבת שלא לשעבד את כל רכושה (המוחזק על ידה במישרין בלבד) בשעבוד
שוטף כללי, ללא קבלת הסכמה מראש של אסיפת מחזיקי אגרות החוב (סדרה ג') לכך
בהחלטה מיוחדת. יודגש כי, החברה רשאית לשעבד את רכושה, כולו או מקצתו,
בשעבודים ספציפיים (וכן בשעבוד שוטף על נכסים ספציפיים), וכן לתת ערבויות ללא
צורך בקבלת הסכמת אסיפת מחזיקי אגרות החוב (סדרה ג') לכך.

6.3.2 תאגידי ההחזקה וחברת הנכס, בחתימתם בשולי שטר זה, מתחייבים שלא לשעבד את
רכושן וזכויותיהן, הקיימים והעתידיים ולגרום לכך שהחברה בבעלותן לא ישעבדו את
רכושן וזכויותיה, כולן או מקצתן, בשעבוד שוטף כללי ו/או בשעבוד שוטף כלשהו ו/או

-29-

בשעבודים ספציפיים (לרבות שעבוד שוטף על נכס/ים ספציפי/ים), ללא קבלת הסכמה
מראש של אסיפת מחזיקי אגרות החוב (סדרה ג') לכך בהחלטה מיוחדת. החברה תכלול
גילוי כאמור בדבר אי יצירת שעבודים על ידי תאגידי ההחזקה וחברת הנכס במסגרת דוח
הדירקטוריון אשר יצורף לדוח התקופתי ו/או הרבעוני של החברה.

6.3.3   למען הסר ספק יובהר כי, למעט ביחס לתאגידי ההחזקה וחברת הנכס כאמור בסעיף
6.3.2 לעיל, לא חלה כל מגבלה מכח שטר זה על חברות בנות של החברה והן רשאיות
לשעבד את רכושן, כולו או מקצתו, בכל שעבוד (לרבות שעבוד שוטף על כלל רכושן) ובכל
דרך שהיא, ללא קבלת הסכמת אסיפת מחזיקי אגרות החוב (סדרה ג') לכך ומבלי
שתתגרש חתימתם בטוחה כלשהי למחזיקי אגרות החוב (סדרה ג') במקביל ליצירת שעבוד
כאמור על ידיהן.

6.3.4   החברה תמציא לנאמן, מידי 31 לינואר של כל שנה, אישור מאת עו"ד המתמחה בדין
הרלוונטי החל על החברה הרלבנטית ו/או אישור מאת חברת ביטוח בעלות ( title
company), לפי העניין, לפיו נכון ליום 31 בדצמבר של השנה הקלנדרית שהסתיימה,
החברה הרלבנטית לא רשמה במרשמיה ו/או במרשם אחר המתנהל על פי הדין הרלוונטי
שעבוד שוטף כללי כלשהו לטובת מאן דהוא בניגוד להתחייבותה בסעיף 6.3 לעיל. לאישור
כאמור תצורף אסמכתא מהמרשם המתנהל לעניין זה על פי הדין החל על החברה
הרלבנטית. החברה תכלול בדיווחיה התקופתיים ו/או הרבעוניים, לפי העניין, התייחסות
בדבר עמידתה או אי עמידתה בהתחייבות האמורה בסעיף זה לעיל. למעט בקשר עם
הנכסים המשועבדים, החברה תהיה רשאית למכור, להחכיר, להמחות, למסור או להעביר
בכל דרך שהיא, את רכושה, כולו או חלקו, בכל דרך שהיא, לטובת מי שתמצא לנכון, ללא
צורך בהסכמת כלשהי של הנאמן ו/או מחזיקי אגרות החוב (סדרה ג'), לפי העניין.
החברה אינה מחוייבת להודיע לנאמן על העברה או מכירה של נכס כלשהו מנכסיה אלא
אם מדובר במכירה או העברה של "נכס מהותי של החברה" כמשמעו בסעיף 8.1 להלן,
וכן, אינה מחוייבת להודיע לנאמן על כל שעבוד כל שיצירת כל נכסים, למעט כאמור בסעיף 6.3
לעיל.

6.3.5   יובהר, כי אין בידי הנאמן נתונים אשר יאפשרו לו לוודא עמידה של החברה, תאגידי
ההחזקה וחברת הנכס בהתחייבויותיהם המפורטות בסעיף 6.3 לעיל (על סעיפי המשנה
שלו) ולפיכך, לצורך בדיקת עמידת של החברה, תאגידי ההחזקה וחברת הנכס בהוראות
סעיף 6.3 יסתמך הנאמן על דיווחי החברה והאישורים המפורטים בסעיף 6.3 לעיל ולא
יידרש לוודא את נכונותם.

6.4   **התחייבויות פיננסיות**

עד למועד הסילוק המלא, הסופי והמדוייק של החוב על פי תנאי אגרות החוב (סדרה ג'),
ומילוי כל יתר התחייבויות החברה כלפי מחזיקי אגרות החוב (סדרה ג') על פי שטר
נאמנות זה ותנאי אגרות החוב (סדרה ג'), תעמוד החברה בכל עת בהתניות הפיננסיות
המפורטות להלן:

(1)   ההון העצמי המאוחד של החברה (לא כולל זכויות מיעוט) לא יפחת מ-120 מיליון
דולר ארה"ב (סכום זה לא יוצמד למדד) (להלן : **"התניית ההון העצמי"** או **"ההון
המינימאלי"** ;

(2)   יחס ההלוואה לבטוחה לא יעלה על 80% (להלן: **"התניית יחס ההלוואה
לבטוחה"** או **"יחס ההלוואה לבטוחה המינימאלי"**).

לעניין סעיף 6.4 (2) זה :

**"יחס ההלוואה לבטוחה"** - הסך השווה ליתרה הבלתי מסולקת של קרן אגרות
החוב (סדרה ג') בלבד (ללא ריבית), מחולק בסכום השווה לשווי הבטחוני של
הנכס המשועבד.

**"השווי הבטחוני של הנכס המשועבד"** - יהא שוויו של הנכס המשועבד על פי
דוחותיה הכספיים המאוחדים המבוקרים של החברה, אשר פורסמו עובר למועד

-30-

הבדיקה הרלבנטי, בתוספת כספים, פיקדונות וניירות ערך אשר מוחזקים / יוחזקו במועד הבדיקה הרלבנטי (דהיינו, במועד פרסום הדוחות הכספיים הרלבנטיים), בחשבון הנאמנות, כפי שמוצגים בדוח יתרות שמנפיק הבנק בו מתנהל חשבון הנאמנות.

לעניין זה, החברה מתחייבת להזמין הערכת שווי ממעריך שווי חיצוני, אחת לשנה ומדי שנה, אשר תצורף לדוחותיה הכספיים המאוחדים של החברה.

(3)    היקף פרויקטי היזום של החברה במאוחד (לרבות חלקה של החברה בחברות כלולות ובחברות בשליטה משותפת) לא יעלה על 40% מסך המאזן המאוחד של החברה (כהגדרתו להלן) (להלן: **"התניית יחס היקף פרויקטי יזום לסך מאזן"** או **"יחס היקף פרויקטי יזום לסך מאזן המקסימאלי"**) ;

**"היקף פרויקטי היזום של החברה"** בסעיף זה משמעם - עלות ההשקעה (במובחן משווי הוגן) של החברה בפרויקטים שהבנייה שלהם החלה נכון למועד הדוחות הכספיים הרלבנטיים.

**"המאזן המאוחד"** בסעיף זה משמעו - סך המאזן המאוחד של החברה בתוספת חלק החברה בחברות כלולות וחברות בשליטה משותפת ;

(4)    יחס החוב הפיננסי נטו מתואם ל-CAP נטו לא יעלה על שיעור של 75% (להלן : **"התניית יחס חוב ל-CAP"** או **"יחס חוב ל-CAP המקסימאלי"**).

**CAP נטו"** – חוב פיננסי נטו מתואם בתוספת סך ההון העצמי המאוחד של החברה (כולל זכויות מיעוט) בדוח על המצב הכספי.

הבדיקה בדבר עמידת החברה בהתניות הפיננסיות שבס"ק (1) עד (4) לעיל, תתבצע ביום פרסום הדוחות הכספיים של החברה על ידי החברה וכל עוד אגרות חוב (סדרה ג') קיימות במחזור, ביחס לדוחות הכספיים הרבעוניים/השנתיים שהיה על החברה לפרסם עד לאותו מועד.

החברה תפרט במסגרת הביאורים לדוח הכספי לתקופה הרלבנטית, את עמידתה או אי עמידתה בהתניות הפיננסיות שבס"ק (1) עד (4) לעיל לרבות ציון הערך המספרי של כל אחת מאמות המידה הפיננסיות.

פחת ההון העצמי של החברה מהתון המינימאלי ו/או פחת יחס ההלוואה לבטוחה מיחס החוב לבטוחה המינימאלי ו/או עלה יחס היקף פרויקטי יזום לסך מאזן מיחס היקף פרויקטי יזום לסך מאזן המקסימאלי ו/או עלה יחס החוב ל-CAP מיחס חוב ל-CAP המקסימאלי ברבעון כלשהו, החברה תדווח בכתב על כך לנאמן וכן תדווח בדיווח מיידי ביום אודות נתון זה ואת משמעותו הנתון בהתאם לסעיף זה, וזאת לא יאוחר מתום יום עסקים אחד לאחר פרסום הדוחות הכספיים (רבעוני ושנתי). לעניין סעיף זה דיווח במגנ"א **לא** ייחשב כדיווח לנאמן. אי עמידה בהתניית ההון העצמי של החברה במשך שני רבעונים רצופים ו/או אי עמידה בהתניית יחס ההלוואה לבטוחה במשך שני רבעונים רצופים ו/או אי עמידה בהתניית יחס היקף פרויקטי יזום לסך מאזן במשך שני רבעונים רצופים ו/או אי עמידה בהתניית יחס חוב ל-CAP במשך שני רבעונים רצופים, תהווה עילה להעמדה לפירעון מיידי של כל יתרתו הבלתי מסולקת של אגרות החוב (סדרה ג'), כמפורט בסעיפים 8.1.15, 8.1.16, 8.1.17, 8.1.18- ו-8.1.18 להלן (בהתאמה).

6.5    **מגבלת חלוקה**

החברה מתחייבת כי היא לא תבצע חלוקה (כהגדרתה בחוק החברות, התשנ"ט-1999) כלשהי, ובכלל זה לא תכריז, תשלם או תחלק כל דיבידנד אלא אם מתקיימים כל התנאים המפורטים להלן :
(1) יתרת הרווחים והקרנות שנצברו עד ליום 30 בספטמבר 2014 לא יהיו ניתנים לחלוקה;
(2) סכום החלוקה לא יעלה על 50% מהרווחים אשר נוצרו החל מיום 1 באוקטובר 2014 בנטרול רווח/הפסדי שערוך נטו (שטרם מומשו) הנובעים משינוי בשוויה של נכסיה ביחס לשוויים ההוגן ליום 30 בספטמבר 2014 או למועד בו נרכשו הנכסים, לפי המאוחר מביניהם (להלן : **"רווחים צבורים"**). רווח אשר בגינו לא בוצעה חלוקה ברבעון מסוים ניתן יהיה לחלק על בסיסו ברבעונים הבאים. יובהר כי במקרה של מכירת נכס (מימוש)

-31-

ששוערך, יתווספו/ויפחתו (לפי העניין) רווחי/הפסדי שערוך שנצטרלו כאמור לעיל החל
מיום 1 באוקטובר 2014 לרווחים הצבורים; על אף האמור לעיל, חלוקה מרווחי שערוך
שמומשו כאמור לעיל, שנוצרו ממכירת נכס שכתוצאה ממכירתו קטן ה-FFO של החברה
ביותר מ-2 מיליון דולר, תהא מוגבלת ל-25% מהרווח שמומש כאמור.

(3) ההון העצמי של החברה (לא כולל זכויות מיעוט) בתום הרבעון האחרון, בטרם חלוקת
הדיבידנד, בניכוי הדיבידנד שיחולק, לא פחות מ-150 מיליון דולר ארה"ב (סכום זה לא
יוצמד למדד) (להלן : **"מגבלת החלוקה"**). החברה תעביר לידי הנאמן זמן סביר בטרם
ביצוע החלוקה על ידי דירקטוריון החברה וטרם ביצוע החלוקה אישור של
המשרה בחברה בדבר עמידת החברה במגבלת החלוקה כולל
פירוט החישוב הרלבנטי.

(4) אם יחס החוב ל-CAP, כמשמעותו בסעיף 6.4(א) לעיל, על פי דוחותיה הכספיים
המאוחדים של החברה, אשר פורסמו עובר למועד הבדיקה הרלבנטי, אינו עולה על 70%.

(5) החברה עומדת בהתחייבויות הפיננסיות המפורטות בסעיף 6.4 לעיל על פי דוחותיה
הכספיים המאוחדים של החברה, אשר פורסמו עובר למועד הבדיקה הרלבנטי וכן החברה
אינה מפרה איזו מהתחייבויותיה למחזיקי אגרות החוב (סדרה ג').

6.6    החברה מתחייבת כי לא תיטול חוב פיננסי בעל זכות חזרה מלאה (Recourse) נוסף בעת
אי עמידה באמות המידה הפיננסיות הקבועות בסעיף 6.4 לעיל, למעט חוב פיננסי מבעל
השליטה בחברה, אשר יהא נחות לאגרות החוב (סדרה ג') של החברה הן בפירוק והן
מבחינת מועד הפרעון וזאת למשך כל התקופה בה עמידת החברה באמות המידה
הפיננסיות הקבועות בסעיף 6.4 לעיל, ובכפוף לאמור בסעיף 5.6 לעיל. כמו כן, כל עוד
החברה לא עומדת באמות המידה הפיננסיות הקבועות בסעיף 6.4 לעיל, החברה לא תיטול
חוב פיננסי שאינו בעל זכות חזרה לחברה (Non Recourse), אלא אם הוא נלקח לצורך
ריפוי אי העמידה באמות המידה הפיננסיות או לצורך פרעון על חשבון קרן או ריבית של
אגרות החוב (סדרה ג'), במלואן או חלקן.

6.7    החברה מתחייבת כי לא תיטול אשראי מאת/תיטול מוסדות פיננסיים שאינם ישראלים ולא תענ��ק
שעבודים/ערבויות למוסדות פיננסיים שאינם ישראלים, למעט בגין מסגרת אשראי אשר יכול
שיועמדו על ידי מוסדות פיננסיים בארה"ב (לרבות שעבודים ספציפיים להבטחתם אותן
מסגרות אשראי) וזאת לצורך עמידה בדרישות נזילות גוֹיִלוֹת לצורך עמידה על הדרוג ולצורך
ביצוע עסקאות הגנה על שער החליפין של השקל מול הדולר ביחס לאגרות חוב אותן
תנפיק החברה. החברה תמסור לנאמן אישור מאת נושא המשרה הבכיר בתחום הכספים
בחברה, בסוף חודש אפריל של כל שנה, כי החברה עמדה בהתחייבותה על פי סעיף זה.
אישור כאמור יינתן על ידי החברה גם במסגרת דוח הדירקטוריון אשר יצורף לדוח
התקופתי של החברה.

למען הסר ספק, החברה תהא רשאית לשעבד את המניות של חברות המוחזקות על ידה
(להלן : **"חברות הנכס"**), למעט חברת הנכס ו/או תאגידי ההחזקה, לטובת בנק ממ��ן אשר
חברת הנכס משעבדת לטובתו נכס שלה, לטובת הלוואה שניתנה על ידו לחברת הנכס.

6.8    החברה מתחייבת/הודיעה לנאמן ולמחזיקי אגרות החוב (סדרה ג') של החברה, בגין כל
הפרה של התחייבות כלפי נושה פיננסי כלשהו כשזה מבלי שהדבר יהווה עילה להעמדה
לפרעון מיידי, ואת מבלי לגרוע מהאמור בסעיף 8.1 להלן.

7.    **פדיון מוקדם**

7.1    פדיון מוקדם ביוזמת הבורסה

אם וככל שיוחלט על ידי הבורסה לנירות ערך על מחיקה למסחר של אגרות החוב
מפני ששווי סדרת אגרות החוב פחת מהסכום הקבוע בהנחיות הבורסה בדבר מחיקה
מהמסחר, תפעל החברה כדלקמן :

(א)    תוך 45 יום מתאריך החלטת דירקטוריון הבורסה על המחיקה מהרישום למסחר
כאמור תודיע החברה על מועד פדיון מוקדם שבו רשאי המחזיק באגרות החוב לפדותן.

(ב)    מועד הפדיון המוקדם לגבי אגרות החוב יחול לא לפני 17 יום מתאריך פרסום ההודעה,
ולא מאוחר מ- 45 יום מהתאריך הנ"ל, אך לא בתקופה שבין המועד הקובע לתשלום
ריבית לבין מועד תשלומה בפעל.

-32-

(ג) במועד הפדיון המוקדם תפדה החברה את אגרות החוב שהמחזיקים בהן ביקשו לפדותן, לפי יתרת ערך הנקוב בצירוף הריבית שהצטברה על הקרן עד מועד הפדיון בפועל (חישוב הריבית יעשה על בסיס 365 יום בשנה).

(ד) קביעת מועד פדיון מוקדם כאמור לעיל אין בה כדי לפגוע בזכויות הפדיון הקבועות באגרות החוב, למי ממחזיקי אגרות החוב שלא יפדו אגרות אותן במועד הפדיון המוקדם כאמור לעיל, אך אגרות החוב יימחקו מהמסחר בבורסה, ויחולו עליהן בין היתר השלכות המס הנובעות מכך.

פדיון מוקדם של אגרות החוב כאמור לעיל, לא יקנה למי שהחזיק למי באגרות החוב, שתיפדנה כאמור, את הזכות לתשלום קרן ו/או ריבית בגין התקופה שלאחר מועד הפדיון.

החברה תפרסם הודעה על מועד הפידיון המוקדם בדו"ח מיידי. בהודעה כאמור יפורט גם סכום תמורת הפידיון המוקדם.

7.2 **פדיון מוקדם ביוזמת החברה**

7.2.1 החברה תהא רשאית, לפי שיקול דעתה הבלעדי, לבצע פדיון מוקדם, מלא או חלקי, של אגרות החוב (סדרה ג'), החל מחלוף 60 ימים לאחר מועד רישומן למסחר בבורסה ובמקום כאמור יחולו הוראות הבאות, והכל בכפוף להנחיות והוראות תקנון הבורסה וההנחיות והתנאות מכוחו, כפי שיהיו במועד הרלוונטי:

7.2.2 תדירות הפדיונות המוקדמים לא תעלה על פדיון אחד לרבעון.

7.2.3 נקבע פדיון מוקדם ברבעון שקבוע בו גם מועד לתשלום ריבית, או מועד לתשלום פדיון חלקי או מועד לתשלום פדיון סופי, יבוצע הפדיון המוקדם במועד שנקבע לתשלום כאמור.

לעניין זה "רבעון" משמעו כל אחת מהתקופות הבאות: ינואר – מרץ, אפריל – יוני, יולי – ספטמבר, אוקטובר-דצמבר.

7.2.4 ההיקף המזערי של כל פדיון מוקדם, לא יפחת מ-1 מיליון ש"ח. למרות האמור לעיל, חברה רשאית לבצע פדיון מוקדם בהיקף הנמוך מ-1 מיליון ש"ח ובלבד שתדירות הפדיונות לא תעלה על פדיון אחד לשנה.

7.2.5 כל סכום שיפרע בפירעון מוקדם ע"י החברה, ייפרע ביחס לכלל לכלל מחזיקי אגרות החוב (סדרה ג'), פרו-רטה לפי ע.נ. של אגרות החוב (סדרה ג') המוחזקות.

7.2.6 עם קבלת החלטה של דירקטוריון החברה בעניין ביצועו פדיון מוקדם כאמור לעיל, תפרסם החברה דוח מיידי עם העתקו לנאמן לא פחות משבעה עשר (17) ולא יותר מארבעים וחמישה (45) ימים לפני מועד הפדיון המוקדם אשר יכלול, בין היתר, את הסכום שישולם בפדיון למחזיקי אגרות החוב (סדרה ג'). מועד הפדיון המוקדם לא יחול בתקופה שבין המועד הקובע לתשלום ריבית בגין אגרות החוב (סדרה ג') לבין מועד תשלום הריבית בפועל. בדוח המיידי אש כאמור תפרסם החברה את סכום הקרן שייפרע בפדיון מוקדם וכן את הריבית שנצברה בגין סכום הקרן האמור עד למועד הפדיון המוקדם, בהתאם לאמור להלק.

7.2.7 לא ייעשה פדיון מוקדם לחלק מסדרת אגרות החוב (סדרה ג') אם סכום הפדיון האחרון יפחת מ-3.2 מיליון ש"ח.

7.2.8 במועד הפדיון מוקדם חלקי, ככל שיהיה, החברה תשלם למחזיקי אגרות החוב (סדרה ג') את הריבית שנצברה רק עבור חלק הנפדה בפדיון החלקי ולא בגין כל היתרה הבלתי מסולקת. במועד פדיון מוקדם חלקי, ככל שיהיה, החברה תודיע בדואר מיידי על: (1) שיעור הפדיון החלקי במונחי היתרה הבלתי מסולקת; (2) שיעור הפדיון החלקי במונחי הסדרה המקורית; (3) שיעור הריבית בפדיון החלקי מסולקת; (4) שיעור הריבית שישולמו בפדיון החלקי, מחושב לגבי היתרה הבלתי מסולקת; (5) עדכון שיעורי הפדיונות החלקיים בפדיון המקורית, במונחי הסדרה המקורית; (6) המועד הקובע לזכאות לקבלת הפדיון המוקדם של קרן אגרות החוב שיהיה שנים-עשר (12) ימים לפני המועד שנקבע לפדיון המוקדם.

-33-

7.2.9    הסכום שישולם למחזיקי אגרות החוב (סדרה ג') במקרה של פדיון מוקדם, יהיה הסכום
הגבוה מבין הבאים: (1) שווי שוק של אגרות החוב (סדרה ג') העומדות לפדיון מוקדם
שבמחזור, אשר ייקבע על-פי מחיר הסגירה הממוצע של אגרות החוב (סדרה ג') בשלושים
(30) ימי המסחר שקדמו למועד קבלת החלטת הדירקטוריון בדבר ביצוע הפדיון
המוקדם. במידה ומועד הפדיון המוקדם חל במועד בו מבוצע תשלום ריבית על חשבון
אגרות החוב, ינוכה מהמחיר הממוצע כאמור סכום השווה לסכום הריבית המשולם
באותו מועד בגין אגרות החוב; (2) הערך ההתחייבותי של אגרות החוב (סדרה ג')
העומדות לפדיון מוקדם שבמחזור, דהיינו קרן בתוספת ריבית, עד למועד הפדיון
המוקדם בפועל; (3) בהלך שלוש השנים הראשונות מההנפקה לראשונה של אגרות
החוב (סדרה ג'): יתרת תזרים המזומנים של אגרות החוב (סדרה ב') העומדות לפדיון
מוקדם (קרן בתוספת ריבית) כשהיא מהוונת לפי תשואת האג"ח הממשלתי (כהגדרתה
להלן) בתוספת 2% לשנה; בתום שלוש השנים הראשונות מההנפקה לראשונה של אגרות
החוב (סדרה ג'): יתרת תזרים המזומנים של אגרות החוב (סדרה ב') העומדות לפדיון
מוקדם (קרן בתוספת ריבית) כשהיא מהוונת לפי תשואת האג"ח הממשלתי (כהגדרתה
להלן) בתוספת 1.5% לשנה. היוון אגרות החוב (סדרה ב') העומדות לפדיון מוקדם יחושב
החל ממועד הפדיון המוקדם ועד למועד הפירעון האחרון שנקבע ביחס לאגרות החוב
(סדרה ב') העומדות לפדיון מוקדם.

לעניין זה: **"תשואת האג"ח הממשלתי"** משמעה, ממוצע התשואה (ברוטו) לפדיון,
בתקופה של שבעה ימי עסקים, המסתיימים שני ימי עסקים לפני מועד ההודעה על הפדיון
המוקדם, של שלוש סדרות אגרות חוב ממשלתי אי צמודות בריבית קבועה ושמשך חייהן
הממוצע הוא הקרוב ביותר למשך החיים הממוצע של אגרות החוב (סדרה ג') במועד
הרלוונטי.

על אף האמור בסעיף 7.2.9 לעיל, במקרה של פדיון מוקדם חלקי אשר נעשה בסמוך
למועד בדיקה של אמת המידה המפורטת בסעיף 6.4(2) לעיל, שבו נמצא כי יחס ההלוואה
לבטוחה פתח מהיחס המחייב הבטוחות המינימאלי, ולצורך עמידה בתניית יחס ההלוואה
לבטוחה, יהיה הסכום שישולם למחזיקי אגרות החוב (סדרה ג') בפדיון מוקדם כאמור,
הערך ההתחייבותי של אגרות החוב (סדרה ג') העומדות לפדיון מוקדם שבמחזור, דהיינו
קרן בתוספת ריבית, עד למועד הפדיון המוקדם בפועל, בלבד.

7.2.10    החברה תמציא לנאמן תוך חמישה ימי עסקים ממועד החלטת הדירקטוריון אישור רואה
החשבון המבקר של החברה בדבר חישוב הסכם לפרעון.

8.    **זכות להעמדה לפירעון מיידי**

8.1    **בקרות אחד או יותר מן המקרים המנויים בסעיף זה להלן יחולו הוראות שסעיף 8.2,
לפי העניין:**

8.1.1    אם החברה לא תפרע סכום כלשהו שיגיע ממנה בקשר לאגרות החוב או לא תעמוד באיזו
מיתר התחייבויותיה המהותיות כלפי המחזיקים.

8.1.2    אם החברה תגיש בקשה לצו הקפאת הליכים או אם יינתן צו הקפאת הליכים כנגד החברה
או אם החברה תגיש בקשה לפשרה או להסדר עם נושי החברה לפי סעיף 350 לחוק
החברות, התשנ"ט-1999, או אם החברה תציע לנושיה בדרך אחרת פשרה או הסדר
כאמור, על רקע העדר יכולתה של החברה לעמוד בהתחייבויותיה במועדן (למעט למטרת
מיזוג עם חברה אחרת כאמור בסעיף 8.1.23 להלן ו/או שינוי במבנה החברה או פיצול
שאינם אסורים לפי תנאי שטר זה ולמעט עשיית הסדרים בין החברה ובעלי מניותיה ו/או
מחזיקי אופציות (הניתנות לממימוש למניות) של החברה, שאינם אסורים לפי תנאי
שטר זה ושאין בהם כדי להשפיע על יכולת הפירעון של אגרות החוב (סדרה ג') או בוצע
הליך דומה על ידי החברה או כלפיה על פי הדין הרלוונטי החל על החברה. לעניין סעיף זה,
בקשות כאמור שהוגשו על ידי כל צד ג' בהסכמת החברה ייחשבו כבקשות שהוגשו על ידי
החברה.

8.1.3    אם תוגש בקשה לפי סעיף 350 לחוק החברות או לפי הדין הזר החל על החברה, כנגד
החברה (שלא בהסכמתה) אשר לא נדחתה או בוטלה בתוך 45 ימים ממועד הגשתה או
בוצע הליך דומה על ידי החברה או כלפיה על פי הדין הרלוונטי החל על החברה.

-34-

8.1.4   אם החברה תקבל החלטת פירוק (למעט פירוק למטרות מיזוג עם חברה אחרת כאמור
בסעיף 8.1.23 להלן) או אם יינתן ביחס לחברה צו פירוק קבוע וסופי על ידי בית משפט
ו/או ימונה לה מפרק קבוע או התקבלה החלטה דומה או מונה בעל תפקיד דומה על ידי
החברה ו/או כלפיה על פי הדין הרלוונטי החל על החברה.

8.1.5   אם יינתן צו פירוק זמני או צו דומה על פי הדין הרלוונטי ו/או ימונה מפרק זמני או כל
בעל תפקיד דומה שימונה על פי הדין הרלוונטי ו/או תתקבל החלטה שיפוטית בעלת
אופי דומה, וצו או החלטה כאמור לא נדחו או בוטלו בתוך 45 ימים ממועד מתן הצו או
קבלת ההחלטה, לפי העניין. על אף האמור, לא תינתן לחברה תקופת ריפוי כלשהי ביחס
לבקשות או צווים שהוגשו או ניתנו, לפי העניין, על ידי החברה או בהסכמתה.

8.1.6   אם הוגשה בקשה לכינוס נכסים או למינוי כונס נכסים (זמני או קבוע) או כל בעל תפקיד
דומה שימונה על פי הדין הרלוונטי לחברה או על נכס מהותי של החברה (כהגדרתו להלן),
או אם יינתן צו למינוי כונס נכסים זמני או כל בעל תפקיד דומה שימונה על פי הדין
הרלוונטי - אשר לא נדחו או בוטלו בתוך 45 ימים ממועד הגשתם או נתינתם, לפי העניין;
או - אם ניתן צו למינוי כונס נכסים קבוע לחברה או על נכס מהותי של החברה (כהגדרתו
להלן) או צו דומה על פי הדין הרלוונטי. על אף האמור, לא תינתן לחברה תקופת ריפוי
כלשהי ביחס לבקשות או צווים שהוגשו או ניתנו, לפי העניין, על ידי החברה או
בהסכמתה.

8.1.7   אם יוטל עיקול או יבוצעו פעולות הוצאה לפועל או הליך דומה על פי הדין הרלוונטי בקשר
עם נכס מהותי של החברה (כהגדרת מונח זה להלן) ו/או בקשר עם כל או מרבית נכסי
החברה, והעיקול לא יוסר, או הפעולה לא תבוטל, לפי העניין, תוך 45 (ארבעים וחמישה)
ימים ממועד הטלתם או ביצועם, לפי העניין. על אף האמור, לא תינתן לחברה תקופת
ריפוי כלשהי ביחס לבקשות או צווים שהוגשו או ניתנו, לפי העניין, על ידי החברה או
בהסכמתה.

8.1.8   אם ימומשו בעלי שעבודים את השעבודים שיש להם על נכס מהותי של החברה (כהגדרת
מונח זה להלן).

8.1.9   אם קיים חשש ממשי שהחברה לא תעמוד, או שהחברה לא עמדה, בהתחייבויותיה
המהותיות כלפי מחזיקי אגרות החוב (סדרה ג׳). מובהר כי בין ההתחייבויות המהותיות
של החברה נכללים גם היתר סכומי התשלום למחזיקים ומועדיהם.

8.1.10   אם החברה הפסיקה או הודיעה על כוונתה להפסיק את תשלומיה, או חדלה או הודיעה על
כוונתה לחדול מניהול עסקיה, כפי שאלו יהיו מעת לעת.

8.1.11   אם חלה הרעה מהותית בעסקי החברה לעומת מצבה במועד ההנפקה לראשונה של אגרות
החוב (סדרה ג׳) וקיים חשש ממשי שהחברה לא תוכל לפרוע את אגרות החוב (סדרה ג׳)
במועדן.

8.1.12   אם הועברה השליטה בחברה, במישרין או בעקיפין, ולא התקבלה להעברת השליטה
כאמור הסכמת מחזיקי אגרות החוב (סדרה ג׳) בהחלטה מיוחדת. בעל השליטה בחברה
במועד הנפקת אגרות החוב (סדרה ג׳) הינו מר יואל גולדמן.

לעניין ס״ק זה ״**שליטה**״ – כהגדרתה בחוק ניירות ערך, לא כולל החזקה ביחד עם אחרים
שאינם קרובי משפחה מדרגה ראשונה. למען הסר ספק יובהר לעניין זה כי ירושה על פי
דין אינה מהווה העברת שליטה.

8.1.13   אם יועמדו לפרעון מיידי סדרת אגרות חוב אחרת שהנפיקה החברה (להלן בסעיף זה:
״**הסדרה האחרת**״) או חוב מגונים מוסדיים מישראל, או חוב אחר של החברה, אשר
היקפו עולה על 10% מסך הנכסים של החברה על פי דוחותיה הכספיים המאוחדים
האחרונים (לרבות חלקה של החברה בשרשור סופי בחברות כלולות) או 20 מיליון דולר
ארה״ב, לפי הגבוה, (למעט חוב שהינו ללא זכות חזרה לחברה עצמה (Non-Recourse)
אלא אם מדובר בחוב (Non-Recourse) המהווה 25% ומעלה מסך נכסי החברה, בהתאם
לדוחותיה הכספיים המאוחדים או 75 מיליון דולר ומעלה, לפי הגבוה) (להלן: ״**החוב
האחר**״), והדרישה לפרעון מיידי כאמור לא הוסרה תוך 30 ימים מהמועד בו הועמדו
לפרעון מיידי כאמור. לעניין זה יצוין כי, בקשר עם חוב אחר אשר חבות החברה בגינו הינה

-35-

בעקבות מתן ערבות לפירעון אותו חוב, העילה שבסעיף 8.1.13 זה תקום רק ככל    8.1.13
שיתקיימו התנאים הבאים: (1) ערבות החברה לפירעון החוב אינה מוגבלת בסכום או
שהיא מוגבלת לסכום הגבוה מסכום החוב האחר (כהגדרתו לעיל);
ו-(2) התקיימו כל התנאים הנדרשים לפתיחת סכם הגבוה או השווה לחוב האחר האמור; ככל
שיתקיימו התנאים האמורים לעיל אזי תתום העילה האמורה וזאת החל מאותו מועד
שבו נדרשה החברה לפרוע את החוב האחר (בכפוף לתקופת הריפוי המפורטת לעיל) ולא
ממועד העמדת אותו חוב לפירעון מיידי, ככל שמועדים אלו אינם חופפים.

אם החברה לא שילמה במועדו חוב אחר (כהגדרתו בסעיף 8.1.13 לעיל), והפרה זו לא    8.1.14
תוקנה בתוך 45 ימים מהמועד הקבוע לתשלום החוב הרלוונטי. לעניין זה יצוין כי, בקשר
עם חוב אחר אשר חבות החברה בגינו הינה בעקבות מתן ערבות לפירעון אותו חוב, העילה
שבסעיף 8.1.14 זה תקום רק ככל שערבות החברה לפירעון החוב אינה מוגבלת בסכום או
שהיא מוגבלת לסכום הגבוה מסכום החוב האחר.

אם ההון העצמי של החברה (לא כולל זכויות מיעוט) יפחת מההון המינימאלי, כהגדרתו    8.1.15
בסעיף 6.4(1), לעיל במשך שני רבעונים רצופים.

אם יחס ההלוואה לבטוחה יפחת מהיחס המינימאלי, כהגדרתו בסעיף 6.4(2) לעיל, במשך    8.1.16
שני רבעונים רצופים.

אם יחס היקף פרוייקטי ייזום לסך מאזן יעלה על יחס היקף פרוייקטי ייזום לסך מאזן    8.1.17
המקסימאלי, כהגדרתו בסעיף 6.4(3) לעיל, במשך שני רבעונים רצופים.

אם יחס החוב ל-CAP יעלה על יחס חוב ל-CAP המקסימאלי, כהגדרתו בסעיף 6.4(4)    8.1.18
לעיל, במשך שני רבעונים רצופים.

אם החברה ביצעה חלוקה בניגוד להוראות מגבלת החלוקה, כמפורט בסעיף 6.5 לעיל;    8.1.19

ככל שדירוג אגרות החוב (סדרה ג') על ידי חברת הדירוג יופחת לדירוג הנמוך מדירוג    8.1.20
BBB מינוס או דירוג המקביל לו. במקרה של החלפת חברת דירוג, תעביר החברה לידי
הנאמן השוואה בין סולם הדירוג של חברת הדירוג המוחלפת לבין סולם הדירוג של חברת
הדירוג החדשה.

**לעניין סעיף זה להלן יודגש כי כל עוד אגרות החוב (סדרה ג') מדורגות על ידי יותר**
**מחברת דירוג אחת, בחינת הדירוג לעניין העילה לפירעון מיידי שלעיל תיעשה, כל עת, על**
**פי הדירוג הנמוך מביניהם.**

אם החברה תמכור לאחר/ים את עיקר נכסיה במהלך שני רבעונים קלנדאריים, ולא    8.1.21
התקבלה למכירה כאמור הסכמת מחזיקי אגרות החוב (סדרה ג') ברוב רגיל. לעניין ס"ק
זה – **"מכירה לאחר"** – מכירה לכל צד שלישי שהוא (לרבות בעל השליטה ו/או
תאגידים בשליטתו), למעט מכירה לתאגידים בשליטתו מלאה של החברה; **"עיקר נכסי**
**החברה"** – נכס או צירוף של מספר נכסים אשר ערכו ו/או ערכם המצרפי (לפי העניין)
בדוחות הכספיים האחרונים שפורסמו טרם קרות האירוע הרלוונטי עולה על 50% מהיקף
נכסיה במאזן המאוחד על פי הדוחות הכספיים כאמור.

אם החברה תבצע שינוי של עיקר פעילותה. לעניין זה, עיקר פעילותה של החברה וחברות    8.1.22
בשליטתה במועד ההנפקה הינו ייתום נדל"ן מניב למגורים, הכולל, בין היתר, ייזום,
פיתוח, הקמה, רכישה, השכרה וניהול נכסי נדל"ן מניב למגורים. החברה תכלול בדוחות
התקופתיים ו/או הרבעוניים, לפי העניין, במסגרת דוח הדירקטוריון, אישור כי עיקר
פעילותה של החברה לא השתנה. כמו כן, החברה מתחייבת להודיע לנאמן על שינוי עיקר
פעילותה כנ"ל. פרסום דיווח מיידי בעניין זה **לא** ייחשב כמתן דיווח כנ"ל. לעניין סעיף זה
בלבד, השכרת דירות למגורים בניו יורק, בהיקף שירד מתחת ל- 70% מפעילות החברה,
ייחשב כשינוי של עיקר פעילותה של החברה. יובהר למען הסר ספק, כי בית דירות הכולל
מספר יחידות מסחר, כדוגמת נכסי החברה הקיימים ערב הנפקת אגרות החוב (סדרה ג')
של החברה, יסווג כבית דירות, קרי, כנכס בעל שימוש יחיד לנדל"ן מניב למגורים.

-36-

8.1.23    בוצע מיזוג ללא קבלת אישור מוקדם של מחזיקי איגרות החוב (סדרה ג׳) ברוב רגיל, אלא
אם כן הצהירה החברה הקולטת (לפי העניין) כלפי מחזיקי איגרות החוב (סדרה ג׳), לרבות
באמצעות הנאמן, לפחות 10 ימי עסקים לפני מועד המיזוג, כי לא קיים חשש סביר שעקב
המיזוג לא יהיה ביכולתה של החברה הקולטת לקיים את ההתחייבויות כלפי מחזיקי
איגרות החוב (סדרה ג׳). אין בסעיף זה כדי לגרוע מיתר העילות להעמדה לפירעון מיידי
המוקנות למחזיקי איגרות החוב בהתאם לסעיף 8.1 זה לעיל ולהלן וכי החל מתקופה של
30 ימים לפני מועד המיזוג המתוכנן, יחולו כל העילות המנויות בסעיף 8.1 זה לעיל ולהלן
גם ביחס לחברה הקולטת כאילו היתה החברה. ביחס לאמור בסעיפים בהם האמור נגזר
מהדוחות הכספיים של החברה, תבוצע הבדיקה ביחס לדוחות הכספיים של החברה
הקולטת כפי שיהיו לאחר המיזוג. לעניין זה יודגש ויובהר כי סעיף זה לא יחול על מיזוג
בתוך החברה בין תאגידים של החברה.

8.1.24    אם המסחר באיגרות החוב (סדרה ג׳) בבורסה הושעה על ידי הבורסה, למעט השעייה
בעילה של היווצרות אי בהירות כאמור בחלק הרביעי לתקנון הבורסה, וחלפו 60 ימים
ממועד ההשעייה במהלכם ההשעייה לא בוטלה.

8.1.25    אם החברה התחסל או תימחק מכל סיבה שהיא.

8.1.26    אם החברה הפרה את תנאי איגרות החוב (סדרה ג׳) ו/או שטר הנאמנות הפרה יסודית,
ובכלל זה אם יתברר כי מצג מהותי ממצגי החברה באיגרות החוב ו/או בשטר הנאמנות
אינו נכון ו/או מלא, והנאמן נתן הודעה לחברה בכתב לתקן את ההפרה וההפרה לא תיקנה
את ההפרה כאמור תוך 14 ימים ממתן ההודעה.

8.1.27    אם אגרות החוב (סדרה ג׳) תפסקנה להיות מדורגות לתקופה העולה על 60 יום עקב סיבות
ו/או נסיבות שהינן בשליטת החברה (לעניין זה יראו, בין היתר, את אי ביצוע התשלומים
שהתחייבה החברה לשם לחברת המדרגת ואת אי מסירת הדיווחים והמידע הסבירים
הנדרשים על ידי החברה המדרגת במסגרת ההתקשרות בין החברה לחברה המדרגת,
כסיבות ונסיבות שהינן בשליטת החברה).

8.1.28    במקרה שהחברה תבצע הרחבת סדרה לאיגרות החוב (סדרה ג׳) או תנפיק סדרות נוספות
של אגרות חוב, בניגוד להוראות סעיף 4 לשטר הנאמנות.

8.1.29    אם החברה תחדל להיות תאגיד מדווח כהגדרתו בסעיף 1 לחוק ניירות ערך.

8.1.30    אם החברה לא פרסמה דוח כספי שהיא חייבת בפרסומו לפי כל דין או לפי הוראות השטר,
בתוך 30 יום מהמועד האחרון שבו הוא חייב בפרסומו.

8.1.31    אם אגרות החוב (סדרה ג׳) נמחקו מהמסחר בבורסה.

8.1.32    אם אגרות החוב (סדרה ג׳) לא נפרעו במועדן או לא קויימה התחייבות מהותית אחרת
שניתנה לטובת המחזיקים.

8.1.33    אם תופרנה איזו מהתחייבויותיה החברה ו/או תאגידי ההחזקה ו/או חברת הנכס בקשר
לאי יצירת שעבודים (לפי העניין) כאמור בסעיפים 6.3.1 ו/או 6.3.2 לעיל.

8.1.34    בקרות כל אירוע אחר המהווה פגיעה מהותית ו/או יכול לגרום לפגיעה מהותית בזכויות
מחזיקי אגרות החוב.

8.1.35    אם החברה תפר את התחייבויותיה בקשר עם אישור עסקאות מיוחדות כאמור בסעיף 5.6
לעיל.

8.1.36    אם הסכם השכירות המתואר בנספח א׳ לשטר הנאמנות, בין חברת הנכס לבין חברת
התפעול יבוא לכדי סיום ולא התקבל לכך אישור מחזיקי אגרות החוב בהחלטה מיוחדת.

לעניין סעיף זה, **"נכס מהותי של החברה"** הינו נכס או מספר נכסים במצטבר של החברה או של
תאגידים בשליטתה, אשר ערכם, על פי הדוחות הכספיים המאוחדים האחרונים (מבוקרים או
מסוקרים) של החברה, במועד האירוע עולה על 25% מהיקף הנכסים במאזן המאוחד של החברה על
פי דוחותיה הכספיים כאמור.

-37-

לעניין סעיף זה, **"חוב מהותי של החברה"** משמעו חוב של החברה שהערך ההתחייבותי שלו הינו
10% מסך הכנסים של החברה על פי דוחותיה הכספיים המאוחדים האחרונים או 20 מיליון דולר
ארה"ב, לפי הנמוך, לפי הדוחות הכספיים המאוחדים האחרונים של החברה שפורסמו (בין
מבונקרים ובין שאינם מבונקרים) (להלן: **"הדוחות הכספיים"**) או חוב של חברה כלולה שמכפלת
שיעור ההחזקה (בשרשור סופי) בחברה הכלולה בערך ההתחייבותי של החוב מהוותה 10% מסך
הכנסים של החברה על פי דוחותיה הכספיים המאוחדים האחרונים או 20 מיליון דולר ארה"ב, לפי
הנמוך, לפי הדוחות הכספיים. הלוואה ללא יכולת חזרה לחברה עצמה (Non-Recourse) לא
תיחשב לעניין זה כחוב מהותי, למעט, הלוואה (לרבות מספר הלוואות במצטבר) ללא יכולת חזרה
לחברה עצמה (Non-Recourse), שסכומה עולה על 75 מיליון דולר או 25% מסך הכנסים של
החברה על פי דוחותיה הכספיים המאוחדים האחרונים, אשר כן תיחשב כחוב מהותי.

**יחולו ההוראות שבסעיפים 8.2 להלן:**

8.2    בקרות איזה מהאירועים המפורטים בסעיפים 8.1.1 עד 8.1.36 (כולל) לעיל יחולו, לפי העניין,
ההוראות הבאות:

8.2.1    בקרות איזה מהאירועים המפורטים בסעיפים 8.1.1 עד 8.1.36 (כולל) לעיל, הנאמן יהיה
חייב לזמן אסיפת מחזיקי אגרות החוב (סדרה ג') אשר מועד קצר יותר בהתאם להוראות סעיף 8.2.4 להלן), ואשר על סדר
ממועד זימונה (או מועד קצר יותר בהתאם להוראות סעיף 8.2.4 להלן), ואשר על סדר
יומה תהיה החלטה בדבר העמדה לפירעון מיידי של כל היתרה הבלתי מסולקת של איגרות
החוב (סדרה ג') ו/או מימוש בטוחות (ככל שניתנו), בשל קרות איזה מהאירועים
המפורטים בסעיפים 8.1.1 עד 8.1.36 (כולל) לעיל, לפי העניין, כי בהתודע הזימון יצוין, כי
היה וחתהרנה תגרום לביטולו ו/או להפסקתו של האירוע המפורט בסעיף 8.1 לעיל שבגינו
זומנה האסיפה, עד למועד כינוס האסיפה, אזי יבוטל זימון אסיפת מחזיקי אגרות החוב
כאמור לעיל.

8.2.2    החלטת מחזיקים להעמיד את אגרות החוב (סדרה ג') לפירעון מיידי תתקבל באסיפת
מחזיקים שנכחו בה מחזיקים בחמישים אחוזים (50%) לפחות מיתרת הערך הנקוב של
אגרות החוב (סדרה ג'), ברוב של המחזיקים ביתרת הערך הנקוב של אגרות החוב המיוצג
בהצבעה או ברוב באסיפת מחזיקים נדחית שנכחה בה מחזיקים בעשרים אחוזים
(20%) לפחות מהיתרה כאמור.

8.2.3    במקרה בו עד למועד כינוס האסיפה לא בוטל או הוסר איזה מהאירועים המפורטים
בסעיפים 8.1.1 עד 8.1.36 (כולל) לעיל, והחלטה באסיפת מחזיקי אגרות החוב (סדרה ג')
כאמור התקבלה באופן הנדרש כמפורט בסעיף 8.2.2 לעיל, הנאמן יהיה חייב, תוך זמן
סביר, להעמיד לפירעון מיידי את כל היתרה הבלתי מסולקת של איגרות החוב (סדרה ג')
ו/או מימוש בטוחות (ככל שניתנו).

8.2.4    העתק מהודעת זימון האסיפה כאמור ישלח על ידי הנאמן לחברה וזימונה לאסיפה יהווה
התראה מראש ובכתב לחברה על כוונת הנאמן לפעול להעמדה לפירעון מיידי של אגרות
החוב כאמור ו/או מימוש בטוחות (ככל שניתנו).

8.2.5    הנאמן רשאי בהתאם לשיקול דעתו לקצר את מנין 21 הימים האמורים בסעיף 8.2.1 לעיל
ו/או לא למסור התראה כלל, במקרה בו יהיה הנאמן בדעה, כי קיים חשש סביר כי המתנת
תקופה זו או מסירת ההתראה, לפי העניין, תפגע באפשרות להעמדה לפירעון את אגרות החוב
לפירעון מיידי או תפגע בזכויות המחזיקים.

8.2.6    נקבעה באיזה מסעיפי המשנה בסעיף 8.1 לעיל, תקופה סבירה שבה רשאית החברה לבצע
פעולה או לקבל החלטה שתוצאתה ממנה נשמטת העילה להעמדה לפירעון מיידי, רשאים
הנאמן או המחזיקים להעמיד את אגרות החוב לפירעון מיידי כאמור בסעיף 8 זה, רק אם
חלפה התקופה שנקבעה כאמור והעילה לא נשמטה; ואולם רשאי הנאמן לקצר את
התקופה האמורה אם סבר שיש בה כדי לפגוע באופן מהותי בזכויות המחזיקים.

8.2.7    למען הסר ספק יובהר, כי אין באמור בסעיף 8.2 זה לעיל בכדי לגרוע מסמכותו של הנאמן
להעמיד לפירעון מיידי את אגרות החוב (סדרה ג') ו/או מימוש בטוחות (ככל שניתנו) על פי
שיקול דעתו.

-38-

**8.2.8** על אף האמור בסעיף 8.2 זה לעיל, במקרה בו תבקש החברה מהנאמן בכתב למנות נציגות דחופה, יש לפעול על פי ההוראות הקבועות **בתוספת השלישית** לשטר הנאמנות.

**8.2.9** למען הסר ספק מובהר כי הפירעון המיידי ייעשה לפי יתרת ערך הנקוב של אגרות החוב (סדרה ג'), אשר טרם נפרעו כולל הפרשי ריבית שהצטברו על הקרן, כאשר הריבית תחושב לתקופה המתחילה לאחר היום האחרון שבגינו שולמה ריבית ועד למועד הפירעון המיידי בפועל (חישוב הריבית עבור חלק משנה יעשה על בסיס 365 יום לשנה).

**8.2.10** למען הסר ספק, מובהר כי אין בזכות ההעמדה לפירעון מיידי כאמור לעיל ו/או בהעמדה לפירעון מיידי כדי לגרוע או לגנוע בכל סעד אחר או נוסף העומד למחזיקי אגרות החוב (סדרה ג') או לנאמן על פי תנאי אגרות החוב (סדרה ג') וההוראות שטר זה או על פי דין, ואי העמדת החוב לפירעון מיידי בקרות איזה מהמקרים המפורטים בסעיף 8.1 לעיל, לא תהווה ויתור כלשהו על זכויותיהם של מחזיקי אגרות החוב או של הנאמן כאמור.

**9.** **תביעות והליכים בידי הנאמן**

**9.1** בנוסף על כל הוראה בשטר זה וכוכחה וסמכות עצמאית, הנאמן יהיה רשאי, בכל עת, לפי שיקול דעתו, וללא מתן הודעה נוספת, לנקוט בכל אותם הליכים, לרבות הליכים משפטיים וכקשות לקבוצת הוראות, כפי שימצא לנכון ובכפוף לכל דין, לשם מימוש ו/או הגנה על זכויות מחזיקי אגרות החוב (סדרה ג') וכן לשם אכיפת ביצוע כל של החברה על פי שטר הנאמנות. אין באמור לעיל כדי לפגוע ו/או לגרוע מזכותו של הנאמן לפתוח בהליכים משפטיים ו/או אחרים גם אם מחזיקי אגרות החוב (סדרה ג') לא העמידו לפירעון מיידי והכל להגנת מחזיקי אגרות החוב (סדרה ג') ו/או לצורך מתן כל צו בעניין הנאמנות ובכפוף להוראות כל דין. על אף האמור בסעיף זה מובהר כי, זכות ההעמדה לפירעון מיידי תקום רק בהתאם להוראות סעיף 8 לעיל ולא מכח סעיף זה.

**9.2** בכפוף להוראות שטר הנאמנות, רשאי הנאמן אך לא חייב, לכנס בכל עת אסיפה כללית של מחזיקי אגרות החוב (סדרה ג') על מנת לדון ו/או לקבל את הוראותיהם בכל עניין הנוגע לשטר הנאמנות.

**9.3** כל אימת שהנאמן יהיה חייב לפי תנאי שטר הנאמנות לעשות פעולה כלשהי, לרבות פתיחת הליכים או הגשת תביעות לפי דרישת מחזיקי אגרות החוב (סדרה ג') כאמור בסעיף זה, יהיה הנאמן רשאי, על פי שיקול דעתו הבלעדי, לעכב ביצוע של כל פעולה כאמור עד שיקבל הוראות מאסיפה כללית של מחזיקי אגרות החוב (סדרה ג') ו/או הוראות מבית המשפט כיצד לפעול לפעול בדבר לחזיום לביחמ"ש ייעשה במועד הראשוני האפשרי. למען הסר ספק יובהר, כי הנאמן לא יהיה רשאי לעכב נקיטת פעולות או הליכים כאמור במקרה בו השיחתו עשוי לפגוע בזכויות מחזיקי אגרות החוב (סדרה ג').

**9.4** הנאמן יהיה רשאי, בכפוף לכל החלטה מיוחדת של מחזיקי אגרות החוב (סדרה ג') כאמור לעיל, לוותר באותם תנאים שיראה לנכון על קיומן של אותן התחייבויות, כולו או מקצתן, של החברה.

**9.5** הנאמן רשאי בטרם ינקוט בהליכים משפטיים כלשהם לכנס אסיפת מחזיקי אגרות חוב (סדרה ג') כדי שיותחלט על ידי המחזיקים באילו הליכים לנקוט למימוש זכויותיהם על פי שטר זה. כמו כן, יהיה הנאמן רשאי לשוב ולכנס אסיפת מחזיקי אגרות חוב (סדרה ג') לצורך קבלת הוראות בכל הנוגע לניהול ההליכים כאמור ובלבד שכינוס האסיפה יעשה במועד הראשוני האפשרי על פי הוראות התוספת השנייה לשטר הנאמנות ולא יהיה בדחיית ההליכים כדי לסכן את זכויות המחזיקים.

**10.** **נאמנות על התקבולים**

כל הכספים שיוחזקו מעת לעת על ידי הנאמן למעט שכר טרחתו, הוצאותיו ופירעון כל חוב כלפיו, בכל דרך שהיא לרבות בגין אך לא רק כתוצאה מהעמדת אגרות החוב לפירעון מיידי, ו/או כתוצאה מהליכים שינקוט, ינקוט, כנגד החברה, יוחזקו על ידיו בנאמנות וישושו בידיו למטרות ולפי סדר הקדימויות בנשייה הבא: **תחילה** - לסילוק ההוצאות, התשלומים, ההיטלים וההתחייבויות שהוצאו על ידי הנאמן, הוטלו עליו, או נגרמו אגב אגב כתוצאה מפעולות בנצוע הנאמנות או באופן אחר בקשר עם תנאי שטר הנאמנות, לרבות שכרו (ובתנאי כי הנאמן לא יקבל את שכרו הן מהחברה והן ממחזיקי אגרות החוב). **שנית** - לתשלום כל סכום

-39-

אחר על פי ה'התחייבות לשיפוי" (כהגדרת מונח זה בסעיף 26.1.6 להלן) ; **שלישית** - לתשלום למחזיקי אגרות
החוב מסדרה ג' אשר נשאו בתשלומים לפי סעיף 26.4.2 להלן ;

היתרה תשמש, אלא אם הוחלט אחרת בהחלטה מיוחדת באסיפת מחזיקי אגרות החוב (סדרה ג'), למטרות
לפי סדר העדיפות הבא: (א) ראשית - כדי לשלם למחזיקים את פיגורי הריבית המגיעה להם לפי תנאי
אגרות החוב (סדרה ג') פרי-פסו ובאופן יחסי לסכום הריבית המגיע לכל אחד מהם ללא העדפה או זכות
קדימה לגבי איזה מהם ; (ב) שנית - כדי לשלם למחזיקי אגרות החוב (סדרה ג') את פיגורי הקרן המגיעים
להם לפי תנאי אגרות החוב פרי-פסו ובאופן יחסי לסכום הקרן שבפיגור המגיע לכל אחד מהם ללא העדפה
או זכות קדימה לגבי איזה מהם ; (ג) שלישית - כדי לשלם למחזיקי אגרות החוב (סדרה ג') את סכומי
הריבית המגיעים להם על-פי אגרות החוב המוחזקות על-ידיהם פרי-פסו שמועד תשלומם טרם חל ובאופן
יחסי לסכומים המגיעים להם, בלי כל העדפה בקשר לקדימות בזמן של הוצאת אגרות החוב (סדרה ג') על-
ידי החברה או באופן אחר ; (ד) רביעית - כדי לשלם למחזיקים את סכומי הקרן המגיעים להם על פי אגרות
החוב המוחזקות על ידם פרי-פסו, זאת בין אם הגיע זמן סילוק סכומי הקרן ובין אם לאו ובאופן יחסי על ידי
החברה או באופן אחר ; (ה) את העודף - במידה שיהיה כזה, ישלם הנאמן לחברה או לחליפיה, לפי העניין.

מהתשלומים למחזיקי אגרות החוב (סדרה ג') ינוכה מס במקור, ככל שיש חובה לנכותו על פי כל דין.

מחזיקי אגרות החוב (סדרה ג') יוכלו לשנות את סדר העדיפויות שלעיל בהחלטה מיוחדת שתתקבל כדין
באסיפת מחזיקים, וזאת ביחס לחלופות (א) עד (ד) בפסקה השנייה בסעיף זה לעיל בלבד. הנ"ל כפוף לכך
שיתקבל אישור מתאים מרשות המסים.

יובהר, כי ככל וזהיה על החברה לשאת באיזה מהההוצאות אולם זו לא עשתה כן, יפעל הנאמן לקבלת הסכומים
כאמור מהחברה ובמקרה ויצליח לקבל יוחזקו על ידו בנאמנות וישמשו בידיו למטרות ולפי סדר העדיפות
המפורט בסעיף זה.

## **סמכות לדרוש תשלום למחזיקים באמצעות הנאמן**    .11

הנאמן רשאי להורות לחברה להעביר לחשבונו (עבור מחזיקי אגרות החוב) כל תשלום (ריבית
ו/או קרן) אותו על החברה לשלם למחזיקים, כך שהסכמים האמור המועד המיועד לפירעון יועבר לחשבונו הנאמן
(עבור מחזיקי אגרות החוב) לא יאוחר מיום עסקים לפני מועד פרעונו למחזיקי אגרות החוב וזאת לשם
מימון הליכים ו/או הוצאות ו/או שכר הנאמן על פי שטר זה. הנאמן אינה רשאית לסרב לפעול בהתאם
להודעה כאמור ויראו אותה כמי שמילאה אחר התחייבויות אחר התחייבות כלפי המחזיקים על תוכית זו. העברתו את
בתשלומי ההוצאות והשכר כאמור מקום בו היא חיבת לשאת ההוצאות בהם על פי שטר זה ו/או על פי כל דין. כמו כן, אין
באמור כדי לגרוע מחובתו של הנאמן לפעול באופן סביר למען לשאת הסכומים המגיעים למחזיקים מהחברה,
אשר ישמשו לשם מימון הליכים ו/או הוצאות ו/או שכר הנאמן על פי שטר הנאמנות. הנאמן רשאי לבצע
את התשלומים הדרושים מסכומים אלו בכפוף להוראות כל דין.

## **סמכות לעכב חלוקת כספים**    .12

למרות האמור בסעיף 10 לעיל, היה והסכום הכספי, אשר יתקבל כתוצאה מנקיטת ההליכים האמורים לעיל
ואשר יעמוד בזמן כלשהו לחלוקה בהתאם לסעיף 10 לעיל, יהיה פחות ממיליון ש"ח, לא יהיה הנאמן חייב
לחלקו והוא יהיה רשאי להשקיע את הסכום האמור, כולו או מקצתו, בהשקעות המותרות לפי שטר
הנאמנות כמפורט בסעיף 17 להלן. לכשהמצטבר ההשקעה השקעו כספיים אלה על רווחיהן יחד עם כספים נוספים שיגיעו לידי
הנאמן לסכום אשר יספיק כדי לשלם את הסך האמור לעיל, ישלם הנאמן למחזיקים בהתאם לסדר
הקדימויות הקבוע בסעיף 10 לעיל. במקרה בו עד למועד המוקדם מבין, מועד תשלום הריבית ו/או הקרן
הקרוב וזמן סביר לאחר קבלת הסכום הכספי האמור, לא יהיה בידי הנאמן סכום, אשר יספיק כדי לשלם
לפחות מיליון ש"ח כאמור, יהיה הנאמן רשאי לחלק למחזיקי אגרות החוב את הכספים שבידו.

על אף האמור בסעיף 12 זה לעיל, רשאים מחזיקי אגרות החוב (סדרה ג'), לפי החלטה רגילה שתתקבל על
ידם, להורות לנאמן לשלם לשלם להם את הכספים שנתקבלו על ידי הנאמן ועומדים לחלוקה כאמור בסעיף 10
לעיל, אף אם סכום עומד על פחות ממיליון ש. זאת בכפוף להוראות הבורסה והנחיותיו כפי שיהיו
מועד עת. על אף האמור תשלום שכר הנאמן והוצאות הנאמן ישולמו מתוך הכספים האמורים מיד עם הגיע
מועדם (ולעניין ההוצאות שכר הנאמן שכבר שולמו על ידי הנאמן, יוחזר לנאמן סכומם מיד עם הגיע הכספים לידי
הנאמן) אף אם הסכומים שהגיעו לידי הנאמן הינם נמוכים מסך של מיליון ש"ח כאמור.

-40-

### 13.    הודעה על חלוקה

הנאמן יודיע למחזיקי אגרות החוב (סדרה ג') על היום והמקום שבו יבוצע תשלום כל שהוא מבין התשלומים
הנזכרים בסעיפים 10 ו-12 לעיל, וזאת בהודעה מוקדמת של 14 יום שתימסר באופן הקבוע בסעיף 28 להלן.
לאחר היום הקבוע בהודעה יהיו מחזיקי אגרות החוב (סדרה ג') זכאים לריבית לפי השיעור הקבוע באגרת
החוב, אך ורק על יתרת סכום הקרן (אם תהיה כזו) לאחר ניכוי הסכום שישולם או שהוצע לשלם להם
כאמור.

### 14.    הימנעות מתשלום מסיבה שאינה תלויה בחברה

14.1    סכום כלשהו המגיע למחזיק אגרת חוב (סדרה ג') ואשר לא שולם בפועל במועד הקבוע
לתשלומו, מסיבה שאינה תלויה בחברה, בעוד שהחברה היתה מוכנה ויכולה לשלמו
(להלן: "המניעה"), יחדל לשאת ריבית ממועד שנקבע לתשלומו והמחזיק באגרת החוב
(סדרה ג') יהיה זכאי אך ורק לאותם סכומים שהיה זכאי להם במועד שנקבע לפירעון
אותו תשלום על חשבון הקרן או הריבית.

14.2    החברה תפקיד בידי הנאמן, במועד המוקדם ביותר האפשרי לאחר המועד שנקבע
לתשלום ולא יאוחר מתום 14 יום ממועד שנקבע לתשלום, את סכום התשלום שלא
שולם במועדו, כאמור בסעיף 14.1 לעיל ותודיע בכתב על כך להנסיבות המצויות ברשותה,
ככל שמצויות ברשותה, למחזיקי אגרת החוב (סדרה ג') על ההפקדה כאמור. והפקדה
כאמור תיחשב כסילוק אותו תשלום למחזיק ובמקרה של סילוק כל המגיע בגין איגרות
החוב, גם כפדיון אגרת החוב (סדרה ג') על ידי החברה. אין באמור לעיל כדי לגרוע
מחובתה החברה לשאת בשכר טרחתו של הנאמן והוצאותיו והכל בהתאם לקבוע בשטר
זה.

14.3    כל סכום שיווחזק על ידי הנאמן בנאמנות עבור המחזיקים יופקד על ידי הנאמן בבנק
ויושקע על ידו, בשמו או בפקודתו, לפי שיקול דעתו בהשקעות המותרות לו על-פי סעיף
17 להלן. עשה כן הנאמן לא יהיה חייב לזכאים בגין אותם סכומים אלא את התמורה
שתתקבל ממימוש ההשקעות בניכוי ההוצאות הקשורות בהשקעה האמורה, לרבות בגין
ניהול חשבון הנאמנות ובניכוי שכר טרחתו של הנאמן, וישולמה לזכאים כנגד אותן
הוכחות שידרוש על ידו לשביעות רצונו המלאה. לאחר שיקבל הנאמן מהמחזיק הודעה
על הסרת המניעה כאמור, יעביר הנאמן למחזיק את הכספים שהצטברו לרבות דמי ניהול
והנובעים ממימוש השקעתם, בניכוי כל ההוצאות הסבירות לרבות בגין ניהול חשבון
הנאמנות ובניכוי שכר טרחתו וכל מס על פי דין. התשלום יעשה כנגד הצגת אותן הוכחות,
שיהיו מקובלות על דעת הנאמן, בדבר זכותו של המחזיק לקבל.

14.4    הנאמן יחזיק בכספים אלו וישקיעם על פי הוראות סעיף 17 להלן, עד לתום שנה מהמועד
הסופי לפירעון אגרת החוב (סדרה ג'), אז יחזיר הנאמן את הסכומים שהצטברו בידיו
(כולל פירותיהם) בניכוי הוצאותיו ובניכוי שכר טרחתו והוצאות אחרות אשר הוצאו
בהתאם להוראות שטר זה (כגון שכר נותני שירותים וכו'), לחברה, והחברה תחזיק
בסכומים אלו בנאמנות עבור מחזיקי אגרת החוב (סדרה ג') הזכאים לאותם סכומים
לתקופה של עד תום שבע (7) שנים ממועד הפירעון הסופי של אגרות החוב (סדרה ג'),
ובכל הנוגע לסכומים שיועברו אליה על ידי הנאמן כאמור לעיל יחולו עליה הוראות סעיף
קטן 14.3 לעיל בשינויים המחויבים. כספים שלא יידרשו מאת החברה על ידי מחזיקי
אגרת חוב (סדרה ג') בתום שבע (7) שנים ממועד הפירעון הסופי של אגרות החוב (סדרה
ג'), יעברו לבעלות החברה לאחר 30 יום ממועד מסירת הודעה למחזיקים האמורים
על ידי החברה, בכתב, על פי הכתובות המצויות ברשותה, ככל שמצויות ברשותה, והיא
תהא רשאית להשתמש בכספים הנותרים לכל מטרה שהיא. לאחר החזרת הסכומים
לחברה לא יהיה הנאמן חייב למחזיקי אגרת החוב (סדרה ג') תשלום כלשהו בגין
הסכומים שהוחזקו על-ידו כאמור.

14.5    החברה תאשר בכתב לנאמן את החזרת הסכומים כאמור בסעיף 14.4 לעיל ואת דבר
קבלתם בנאמנות עבור מחזיקי אגרת החוב (סדרה ג') כאמור ותשפה את הנאמן בגין כל
תביעה ו/או הוצאה ו/או נזק מכל סוג שהוא שייגרם לו עקב העברת הכספים
כאמור, אלא אם כן פעל הנאמן ברשלנות (למעט רשלנות הפטורה על פי חוק כפי שתהיה
מעת לעת), בחוסר תום לב או בזדון.

-41-

**15.** **קבלה מאת מחזיקי אגרות החוב ומאת הנאמן**

15.1 קבלה חתומה מאת מחזיק איגרת החוב (סדרה ג') או אסמכתא של חבר הבורסה המעביר
על ביצוע ההעברה או ביצוע התשלום יחשבו ראיה מספקת לסילוק סכומי הקרן
והריבית ששולמו לו על ידי הנאמן בגין אגרת החוב תשחרר את הנאמן בשחרור מוחלט
בכל הקשור לעצם ביצוע התשלום של הסכומים הנקובים בקבלה.

15.2 קבלה מאת הנאמן בדבר הפקדת סכומי הקרן והריבית אצלו לזכות מחזיקי איגרת החוב
(סדרה ג') כאמור לעיל תחשב כקבלה מאת מחזיק איגרת החוב (סדרה ג') לצורך האמור
בסעיף 15.1 לעיל ביחס לשחרור החברה בכל הקשור לביצוע התשלומים של הסכומים
הנקובים בקבלה.

15.3 כספים שחולקו כאמור בסעיפים 10 ו-12 לעיל יחשבו על חשבון הפירעון של
איגרת החוב (סדרה ג').

**16.** **הצגת איגרת חוב לנאמן; רישום בקשר עם תשלום חלקי**

16.1 הנאמן יהיה רשאי לדרוש לדרוש ממחזיק איגרת חוב (סדרה ג') להציג בפני הנאמן, בזמן תשלום
ריבית כלשהיו או תשלום חלקי של קרן ו/או ריבית, את תעודת איגרות החוב (סדרה ג') שבגינן
משולמים התשלומים. מחזיק אגרת החוב (סדרה ג') יהיה חייב להציג את תעודת איגרת
החוב כאמור ובלבד שלא יהיה בכך כדי לחייב את מחזיקי איגרות החוב (סדרה ג') בכל
תשלום ו/או הוצאה ו/או להטיל על מחזיקי איגרות החוב (סדרה ג') אחריות ו/או חובת
כלשהיי.

16.2 הנאמן יהיה רשאי לרשום על תעודת איגרות החוב (סדרה ג') הערה בנוגע לסכומים
ששולמו כאמור לעיל ותאריך תשלומם.

16.3 הנאמן יהיה רשאי בכל מקרה מיוחד, לפי שיקול דעתו, לוותר על הצגת תעודת איגרת
החוב (סדרה ג') לאחר שניתנו לו על ידי מחזיקי איגרת החוב (סדרה ג') כתב שיפוי ו/או
ערובה מספקים להנחת דעתו בגין נזקים העלולים להיגרם מחמת אי רישום ההערה
כאמור, הכל כפי שימצא לנכון.

16.4 למרות האמור לעיל יהיה הנאמן רשאי על פי שיקול דעתו לקיים רישומים באופן אחר,
לגבי תשלומים חלקיים כאמור.

**17.** **השקעות כספים**

כל הכספים אשר רשאי הנאמן להשקיעם לפי שטר הנאמנות, יושקעו על ידי באחד מארבעת הבנקים
הגדולים בישראל, ובלבד שדירוג הבנק לא יפחת מדירוג AA בשמו או בפקדותו, ובלבד שישקיע בפיקדונות
בנקאיים, מק"מים המונפקים על ידי בנק ישראל ו/או אגרת חוב ממשלתיות המונפקת על ידי בנק ישראל
או ממשלת ארה"ב בלבד ו/או ניירות ערך דומים המונפקים על ידי ממשלת ארה"ב.

עשה כן הנאמן, לא יהיה חייב ליכאאים בגין אותם סכומים אלא את התמורה שתתקבל בפועל ממימוש ההשקעות
בניכוי שכר טרחתו והוצאותיו, העמלות וההוצאות הקשורות בהשקעה האמורה ובניהול חשבונות הנאמנות,
העמלות ובניכוי תשלומי תשלום על חשבון החוב החלים על חשבון הנאמנות, ויתרת הכספים כאמור יפעל הנאמן על פי
הוראות סעיפים 12 ו/או 14 לעיל, לפי העניין.

**18.** **התחייבויות החברה כלפי הנאמן**

החברה מתחייבת בזאת כלפי הנאמן ומחזיקי אגרות החוב, כל זמן שאגרות החוב מסדרה ג' טרם נפרעו
במלואן, כדלקמן:

18.1 להתמיד ולנהל את עסקי החברה בצורה סדירה, נאותה ויעילה.

18.2 לנהל פנקסי חשבונות סדירים בהתאם לעקרונות חשבונאיים מקובלים, ולשמור את
הפנקסים לרבות המסמכים המשמשים להם כאסמכתאות (לרבות שטרי משכון,
משכנתא, חשבונות וקבלות) במשרדיה, ולאפשר לנאמן ו/או לכל נציג מורשה של הנאמן
לעיין, לא יאוחר מ-5 ימי עסקים ממועד בקשתו של הנאמן שיתואם מראש עם החברה,
בכל פנקס כאמור ו/או מסמך כאמור שהנאמן יבקש לעיין בו. לעניין זה, נציג מורשה של
הנאמן פירושו מי שהנאמן ימנה למטרת עיון כאמור, וזאת בהודעה בכתב של הנאמן

-42-

שתימסר לחברה לפני העיון כאמור, וזאת בכפוף להתחייבות לסודיות בכפוף להוראות
סעיף 31.12 להלן.

18.3 להודיע לנאמן בכתב בהקדם האפשרי הסביר, ולא יאוחר מיום עסקים אחד, לאחר שנודע
לה, על כל מקרה בו הוטל עיקול ו/או בוצעה פעולת הוצאה לפועל על נכס מהותי של
החברה (כהגדרת מונח זה בסעיף 8.1 לעיל), וכן בכל מקרה בו מונה לנכס מהותי של
החברה כונס נכסים, מנהל מיוחד ו/או מפרק זמני או קבוע ו/או נאמן שמונה במסגרת
בקשה להקפאת הליכים לפי סעיף 350 לחוק החברות, התשנ"ט-1999 ו/או כל בעל תפקיד
דומה אחר כנגד החברה, וכן לנקוט על חשבונה בכל האמצעים הסבירים לשם
הסרת עיקול כזה או ביטול כינוס הנכסים, הפירוק או הניהול לפי העניין.

18.4 להודיע לנאמן בכתב, מיד עם היוודע הדבר לחברה לא יאוחר מיום מסחר אחד, על: (1)
קרות אחד או יותר מן המקרים המנויים בסעיף 8.1 לעיל על סעיפיו הקטנים; (2) חשש
ממשי של החברה לקרות אחד או יותר מן המקרים המנויים בסעיף 8.1 לעיל על סעיפיו
הקטנים. האמור בסעיף זה, על כל סעיפיו המשנה שלו יבוצע על ידי החברה מבלי להביא
בחשבון את תקופות הריפוי וההמתנה המנויות בסעיף 8.1 לעיל, ככל שקיימות.

18.5 למסור לנאמן, לא יאוחר מתום 30 ימים ממועד הנפקתן של אגרות חוב (סדרה ג') לפי
שטר זה לוח סילוקין לתשלום אגרות החוב (קרן וריבית).

18.6 למסור לנאמן, הודעה בכתב חתומה בידי נושא המשרה הבכיר בתחום הכספים בחברה,
לא יאוחר מ- 5 ימי עסקים מהמועד בו יבקש הנאמן, על ביצוע כל תשלום לבעלי אגרות
החוב ועל יתרת הסכומים אותם חייבת החברה באותו מועד לבעלי אגרות החוב לאחר
ביצוע התשלום הנ"ל.

18.7 למסור לנאמן מיד עם מסירתו, כל דוח שהיא חייבת בהגשתו לרשות ניירות ערך. דיווח
מיידי במערכת המגנ"א של רשות ניירות ערך וכל דיווח או מידע אשר יפורסם (במלואו)
על ידי החברה במערכת המגנ"א, ייחשב כאילו נמסר לנאמן. על אף האמור לעיל, לבקשת
הנאמן תמסור החברה לנאמן עותק מודפס של הדיווח או המידע כאמור.

18.8 למסור לנאמן העתקים מהודעות ומהזמנות שנתיני החברה, כאמור בסעיף 28 לשטר זה.

18.9 לגרום לכך נושא משרה הבכיר בתחום הכספים בחברה יתן, לא יאוחר מ-10 ימי
עסקים ממועד דרישתו של הנאמן, לנאמן ו/או לאנשים שיורה, כל הסבר, מסמך, חישוב
או מידע בנוגע לחברה, עסקה ו/או נכסים שהיו דרושים באופן סביר, על-פי שיקול דעתו
של הנאמן, לשם בדיקות שנעשות על ידי הנאמן לצורך הגנה על מחזיקי איגרות החוב.

18.10 לזמן את הנאמן להיות נוכח באסיפות הכלליות (בין אם באסיפות כלליות שנתיות ובין
אם באסיפות כלליות מיוחדות) של בעלי המניות בחברה) של בעלי המניות של החברה
(ללא זכויות השתתפות או הבעה) שתתקיימנה בישראל. פרסום זימון לאסיפה כללית
של בעלי מניות של החברה במערכת המגנ"א, ייחשב כזימון הנאמן לצרכי סעיף זה. כל
עוד החברה הינה חברת אגרות חוב כהגדרת המונח בחוק החברות - להמציא לנאמן
הפרוטוקולים חתומים של אסיפות בעלי המניות בתוך יום עסקים אחד ממועד חתימת
הפרוטוקולים האמורים.

18.11 כל זמן שאגרות החוב (סדרה ג') טרם נפרעו במלואן לתת לנאמן את הדוחות והדיווחים
כמפורט להלן:

18.11.1.1 דוחות כספיים שנתיים מבוקרים של החברה, ודוחות כספיים רבעוניים
סקורים של החברה, לא יאוחר מהמועדים הקבועים לכך לפי חוק ניירות
ערך גם במקרה בו החברה תפסיק להיות תאגיד מדווח.

18.11.1.2 אם וככל שהחברה תהא חברה ציבורית, כהגדרתה בחוק החברות - העתק
מכל מסמך שהחברה מעבירה לכלל בעלי מניותיה או לכלל המחזיקים
באגרות החוב ופרטי כל מידע שהחברה מעבירה להם בדרך אחרת, לרבות
כל דוח המוגש על פי דין לרשות ניירות ערך לשם פרסומו לציבור (דיווחים
מיידיים), מיד עם פרסומו. כל עוד החברה הינה חברה פרטית שהיא
חברת איגרות חוב – להמציא לנאמן העתק מכל מסמך שהחברה מעבירה
לכלל המחזיקים באגרות החוב ופרטי כל מידע שהחברה מעבירה להם
בדרך אחרת, לרבות כל דו"ח המוגש על פי דין לרשות ניירות ערך לשם
פרסומו לציבור (דיווחים מיידיים), מיד עם פרסומו.

-43-

| | |
|---|---|
| 18.11.1.3 | למסור לנאמן, לפי דרישתו הראשונה בכתב, אישור בכתב חתום על ידי רואה חשבון כי כל התשלומים למחזיקי אגרות החוב שולמו במועדם, ואת יתרת הערך הנקוב של אגרות החוב שבמחזור. |
| 18.11.1.4 | חדלה החברה מהיות תאגיד מדווח, תמסור החברה לנאמן, בנוסף לאמור בסעיפים 18.11-18.3 לעיל, דיווחים שנתיים, רבעוניים ומיידיים כמפורט להלן כשהם חתומים על ידי מנכ"ל החברה ונושא המשרה הבכיר בתחום הכספים: |
| (א) | דיווח שנתי הכולל את המידע המפורט בנספח 5.2.4.8 לפרק 4 בחלק 2 (ניהול נכסי השקעה והעמדת אשראי) בשער 5 (עקרונות לניהול עסקים) בחוזר המאוחד, לא יאוחר מ-60 יום מהמועד בו הייתה נדרשת החברה לפרסם את הדוחות השנתיים אילו הייתה תאגיד מדווח; |
| (ב) | דיווח רבעוני הכולל את המידע המפורט בנספח 5.2.4.9 לפרק 4 בחלק 2 (ניהול נכסי השקעה והעמדת אשראי) בשער 5 (עקרונות לניהול עסקים) בחוזר המאוחד, לא יאוחר מ-30 יום מהמועד בו הייתה נדרשת החברה לפרסם את הדוחות הרבעוניים אילו הייתה תאגיד מדווח; |
| (ג) | דיווח מיידי אם אירע אחד מן האירועים המפורטים בנספח 5.2.4.10 לפרק 4 בחלק 2 (ניהול נכסי השקעה והעמדת אשראי) בשער 5 (עקרונות לניהול עסקים) בחוזר המאוחד. הדיווח יימסר במועד בו הייתה נדרשת החברה לדווח על קרות האירוע עפ"י תקנה 30(ב) לתקנות ניירות ערך (דוחות תקופתיים ומיידיים), התש"ל-1970 או בכל תקנה אשר תחליף תקנה זו. |
| 18.12 | למסור לנאמן, על פי דרישתו, תצהיר ו/או הצהרות ו/או מסמכים ו/או פרטים ו/או מידע נוסף, בנוגע לחברה (לרבות הסכמים, מסמכים וחישובים בנוגע לחברה, עסקיה או נכסיה) ואף להורות לרואה החשבון שלה ו/או ליועצים המשפטיים לעשות כן, לפי דרישה סבירה בכתב של הנאמן, וזאת לא יאוחר מ-10 ימי עסקים ממועד בקשתו של הנאמן וזאת ככל שלדעתו הסבירה של הנאמן המידע דרוש לנאמן לשם ישום והפעלת הסמכויות, הכוחות וההרשאות של הנאמן ו/או בא כוחו על פי שטר הנאמנות, לרבות מידע אשר עשוי להיות חיוני ונדרש לשם הגנה על זכויות מחזיקי אגרות החוב ובלבד שהנאמן פועל בתום לב, וזאת בכפוף להתחייבות לסודיות כאמור בסעיף 31.12 להלן. |
| 18.13 | למסור לנאמן את כל הדוחות או ההודעות כמפורט בסעיף 35 לחוק. |
| 18.14 | לא יאוחר מ-10 ימי עסקים לאחר פרסום הדוחות הכספיים השנתיים או הרבעוניים של החברה, לפי העניין, תמציא החברה לנאמן אישור מפורט בכתב, בנוסף לשביעות רצון הנאמן, חתום על ידי נושא המשרה הבכיר בתחום הכספים בחברה, בדבר אי עמידתה בכל אחת מהתניות הפיננסיות המפורטות בסעיף 6.4 לשטר זה בצירוף פירוט החישוב הרלוונטי בקשר עם כל התניה פיננסית. |
| 18.15 | לא יאוחר מ-10 ימי עסקים לאחר פרסום הדוחות הכספיים הרבעוניים של החברה, וכל עוד שטר זה בתוקף, תמציא החברה לנאמן אישור בכתב של דירקטוריון החברה, בחתימת החתימה מטעמם וכן יו"ר הדירקטוריון שלה ו/או מנהלה הכללי, על כך שבתקופה שמתארית השטר ו/או מתארית האישור הקודם שנמסר לנאמן, המאוחר מביניהם, ועד למועד מתן האישור לא קיימת הפרה מצד החברה של שטר זה ותנאי אגרות החוב (סדרה ג') ובכלל זה לא קיימת הפרה מצד החברה של השליטה של ההתחייבויות המנויות בסעיף 5.9(ח) דלעיל, אלא אם כן צוין בו במפורש אחרת. |
| 18.16 | מדי 10 באפריל של כל שנה, עבור השנה הקלנדרית הקודמת, וכל עוד שטר זה בתוקף, תעביר החברה לנאמן אישור חתום על ידי נושא המשרה הבכיר בתחום הכספים בחברה (סדרה ג'), בדבר ביצוע של כל תשלומי הריבית ו/או תשלומים על חשבון הקרן, בקשר עם אגרות חוב (סדרה ג'), שמועד תשלומם הגיע לפני תאריך האישור, ומועד תשלום, וכן את יתרת הערך הנקוב של אגרות החוב, מדווחת זו, שעדיין במחזור נכון למועד האישור; וכן אישור הינה קיימת מצד החברה הפרה של התנאים וההגבלות הקבועים בשטר הנאמנות (לרבות אותם הגבלות ותנאים ספציפיים בשטר ובאגרת החוב, שבייחס אליהם יבקש הנאמן מהחברה להתייחס במסגרת האישור), אלא אם צוין אחרת במפורש באישור האמור. |

-44-

18.17 מדי 31 בינואר של כל שנה תמציא החברה לנאמן אישור אישור מאת עו"ד המתמחה בדין הרלוונטי החל על החברה הרלבנטית ו/או אישור מאת חברת ביטוח בעלות ( title company), לפי העניין, לפיו נכון ליום 31 בדצמבר של השנה הקלנדרית שהסתיימה, השעבודים רשומים והינם בתוקף מלא.

18.18 להודיע בכתב לנאמן על כל שינוי בשמה או בכתובתה.

18.19 הנאמן רשאי להורות לחברה לדווח לאלתר במערכת המגנ"א, בשם הנאמן כל דיווח בנוסח כפי שיועבר בכתב על ידי הנאמן לחברה, והחברה תהיה חייבת לדווח את הדיווח כאמור.

18.20 הנאמן ישמור בסוד מידע שהגיע אליו לפי סעיף זה, לא יגלה אותו לאחר ולא יעשה בו כל שימוש, אלא אם כן גילויו או השימוש בו נדרש לשם מילוי תפקידו של הנאמן לפי החוק, לפי שטר הנאמנות, או לפי צו של בית משפט או לשם הגנה על זכויות מחזיקי אגרות החוב.

18.21 החברה תודיע לנאמן על אי עמידה בקובננט זר כלשהו בהקדם האפשרי ולא יאוחר מ-2 ימי עסקים מיום תחילת אי העמידה בקובננט הזר או בתוך 2 ימי עסקים מהמועד בו ניתנה לה הודעה על ידי חברה כלולה בדבר אי עמידה בקובננט זר כלשהו, לפי העניין וכן את ההשלכות הצפויות של אי עמידה זו בהתאם להסכמי החברה או אותו גורם. מובהר, כי ככל שהחברה לא תעמוד בקובננט זר כלשהו וניתנו לה ארכה לשם עמידה בקובננט הזר, לא יראו, לעניין סעיף זה בלבד, את הארכה כעמידה בקובננט והחברה תודיע לנאמן על אי העמידה בקובננט הזר כאמור.

לעניין סעיף זה –

"קובננט זר" - תניה פיננסית מהותית של החברה ושל כל חברה כלולה של החברה, במסגרת הסכם עם מוסד פיננסי או עם גורם אחר אשר העמיד לחברה או לחברה הכלולה אשראי מהותי.

"תניה פיננסית מהותית" – תניה פיננסית אשר אי עמידה בה מקימה עילה לפירעון מיידי של החוב הרלוונטי.

"אשראי מהותי" – אשראי המהווה לפחות 25% מהון העצמי המאוחד של החברה (כולל זכויות מיעוט). לעניין חברה כלולה – אשראי אשר מכפלת סכומו בשיעור ההחזקה של החברה (בשרשור סופי) בחברה הכלולה מהווה לפחות 25% מהון העצמי המאוחד של החברה (כולל זכויות מיעוט).

על אף האמור בסעיף 27 שלהלן, תעביר החברה לנאמן הודעה בכתב על אי העמידה בקובננט זר בנוסף לכל דיווח מיידי שתפרסם החברה בעניין, ככל שיפורסם.

**19.   התחייבויות נוספות**

19.1 ככל שאגרות החוב תעמודנה לפרעון מיידי, כמוגדר בסעיף 8 לעיל, תבצע החברה מזמן לזמן ובכל עת שתדרש לכך על ידי הנאמן, את כל הפעולות הסבירות כדי לאפשר את הפעלת כל הסמכויות הנתונות בידי הנאמן ובמיוחד תעשה החברה את הפעולות הבאות, וזאת לא יאוחר מ-7 ימי עסקים ממועד בקשת הנאמן:

19.1.1 תצהיר את הצהרות ו/או תחתום על כל המסמכים ו/או תבצע ו/או תגרום לביצוע כל הפעולות הנחוצות או הדרושות בהתאם לדין לשם מתן תוקף להפעלת הסמכויות, הכוחות וההרשאות של הנאמן ו/או בא כוחו על-פי שטר נאמנות זה.

19.1.2 תיתן את כל ההודעות, הפקודות וההוראות שהנאמן יראה אותן למועילות ודרושות לשם יישום הוראות שטר הנאמנות.

19.2 למטרות סעיף זה - הודעה בכתב חתומה על-ידי הנאמן המאשרת כי פעולה הנדרשת על ידו, במסגרת סמכויותיו, היא פעולה סבירה, תהווה ראיה לכאורה לכך.

-45-

**20.    באי כוח**

20.1    החברה ממנה בזאת, ובאופן בלתי חוזר, את הנאמן בתור בא כוחה, להוציא לפועל ולבצע
בשמה ובמקומה את כל הפעולות שהתניה חייבת לבצע לפי התנאים הכלולים בשטר זה,
ובדרך כלל לפעול בשמה בהתייחס לפעולות שהחברה חייבת לעשותן על-פי שטר זה ולא
ביצעה אותן או לבצע חלק מהסמכויות הנתונות לה, ולמנות כל אדם אחר כפי שהנאמן
ימצא לנכון לביצוע תפקידיו על-פי שטר זה וזאת, בכפוף לכך שהחברה לא ביצעה את
הפעולות שהיא חייבת לבצע לפי תנאי שטר זה תוך פרק זמן סביר על-פי קביעת הנאמן
ממועד דרישת הנאמן ובלבד שפעל באופן סביר.

20.2    אין במינוי לפי סעיף 20.1 לעיל כדי לחייב את הנאמן לעשות כל פעולה והחברה פוטרת
בזאת את הנאמן ושלוחיו מראש במקרה שלא יעשו כל פעולה שהיא, והחברה מוותרת
מראש על כל טענה כלפי הנאמן ושלוחיו בגין כל נזק שנגרם או עלול להגרם לחברה
למישרין או בעקיפין, בגין זה, על סמך כל פעולה שלא נעשתה על ידי הנאמן ושלוחיו
כאמור לעיל.

**21.    הסכמים אחרים**

בכפוף להוראות החוק ולמגבלות המוטלות על הנאמן בחוק לא יהיה במילוי תפקידו של הנאמן, לפי שטר זה,
או בעצם מעמדו כנאמן, כדי למנוע אותו מלהתקשר עם החברה בחוזים שונים או מלבצע עמה עסקאות
במהלך הרגיל של עסקיו. יצוין כי הנאמן לא יוכל להתקשר עם החברה כאמור אם יהיה בכך כדי ליצור ניגוד
עניינים עם כהונתו כנאמן למחזיקי אגרות החוב (סדרה ג').

**22.    דוחות על ענייני הנאמנות**

22.1    הנאמן יהיה חייב להגיש דוח לגבי פעולות שביצע בהתאם להוראות סעיף 35ח1 לחוק ניירות ערך.

22.2    הנאמן יערוך עד ליום 30 ביוני של כל שנה, עבור השנה הקלנדרית הקודמת, דוח שנתי על ענייני הנאמנות
(להלן: "**הדוח השנתי**"). הדוח השנתי יכלול דיווח על אירועים חריגים בקשר עם הנאמנות שאירעו
במהלך השנה שחלפה.

22.3    הנאמן יפרסם (בעצמו או באמצעות החברה) לבקשת הנאמן) את הדוח השנתי במערכת המגנ"א.

22.4    נודע לנאמן על הפרה מהותית של שטר זה ו/או של תנאי אגרות החוב (סדרה ג') מצד החברה, מכח
פרסומים פומביים או מכח הודעת החברה לנאמן לפי ס' 18.4 לעיל, יודיע למחזיקי אגרות
החוב (סדרה ג') על ההפרה ועל הצעדים שנקט למניעתה או לאכיפת קיום התחייבויות החברה על
החברה, לפי העניין. חובה זו לא תחול אם מדובר באירוע שפורסם על ידי החברה על-פי הדין. חובת
זאת של הנאמן כפופה לידיעתו בפועל אודות ההפרה כאמור.

22.5    לפי דרישת המחזיקים למעלה מ- 5% (חמישה אחוזים) מיתרת הערך הנקוב של אגרות החוב
(סדרה ג'), הנאמן יעביר למחזיקים נתונים ופרטים אודות הוצאותיו בקשר עם הנאמנות נשוא שטר
הנאמנות.

22.6    עד לפירעון מלא של אגרות החוב (סדרה ג'), ככל ותתקבל פנייה של המחזיקים בלמעלה מ-10%
(עשרה אחוזים) מיתרת הערך הנקוב של אגרות החוב (סדרה ג') לקבלת מידע אודות הבדיקות שערך
הנאמן ביחס לסדרת אגרות החוב, לרבות ביחס לבדיקת עמידת החברה בהתחייבויותיה למחזיקי
המידע האמור, והכל בכפוף להוראות הסודיות וכל דין (למען הסר ספק יובהר, כי קבלת המידע
האמורה תהיה מעבר לדוח השנתי שמפרסם הנאמן בהתאם להוראות חוק ניירות ערך).

22.7    הנאמן יעדכן את החברה על כל דוח שיגוש לפי סעיף 22 זה.

**23.    שכר וכיסוי הוצאות הנאמן**

החברה תשלם לנאמן שכר טרחה כמפורט ב**נספח 23** לשטר זה.

-46-

24. **סמכויות מיוחדות**

24.1 הנאמן יהיה רשאי להפקיד את כל השטרות והמסמכים המעידים, המייצגים ו/או הקובעים את זכותו בקשר עם הנאמנות נשוא שטר זה לרבות בקשר עם כל נכס הנמצא באותו זמן בידיו, בכספת ו/או במקום אחר שיבחר, אצל כל בנקאי ו/או כל חברה בנאמנות ו/או אצל עורך דין.

24.2 הנאמן רשאי במסגרת ביצוע ענייני הנאמנות לפי שטר הנאמנות להזמין את חוות דעתו או את עצתו של כל עורך דין, רואה חשבון, שמאי, מעריך, מודד, מתווך או מומחה אחר (להלן: "**היועצים**"), ולפעול בהתאם למסקנותיה בין אם חוות דעת או עצה כזו הוכנה לבקשת הנאמן או לבקשת החברה והנאמן לא יהיה אחראי בעד כל הפסד או נזק שיגרם כתוצאה מכל פעולה או מחדל שיעשה על ידו על סמך עצה או חוות דעת כאמור, אלא אם כן נקבע בפסק דין חלוט כי הנאמן פעל ברשלנות (למעט רשלנות הפטורה על פי חוק כפי שהיה מעת לעת ו/או בחוסר תום לב ו/או בזדון). החברה תישא במלוא הוצאות העסקת היועצים שימונו כאמור ובלבד, ככל שהדבר אפשרי בנסיבות אותו עניין וככל שלא יהיה בכך כדי לפגוע בזכויות המחזיקים, שהנאמן ייתן לחברה הודעה מראש על כוונתו לקבל חוות דעת מומחה או עצה כאמור.

24.3 כל עצה ו/או חוות דעת כזו יכולה להינתן, להישלח או להתקבל על ידי מכתב, מברק, פקסימיליה, דואר אלקטרוני ו/או כל אמצעי אלקטרוני אחר להעברת מידע, והנאמן לא יהיה אחראי בגין פעולות שנעשו על סמך עצה ו/או חוות דעת או ידיעה שהועברו באחד האופנים המוזכרים לעיל למרות שנפלו בה שגיאות ו/או שלא היו אותנטיות, אלא אם ניתן היה לגלות שגיאות אלה בבדיקה סבירה.

24.4 בכפוף לכל דין, הנאמן לא יהיה חייב להודיע לצד כלשהו על חתימתו על שטר הנאמנות ואינו רשאי להתערב באיזו צורה שהיא בהתנהלות עסקי החברה או ענייניה, אלא על-פי הסמכויות אשר הוקנו לנאמן זה בכדי להגביל את הנאמן בפעולותיו שעליו לבצע בהתאם לשטר הנאמנות. אין כאמור בסעיף זה כדי להגביל את הנאמן בפעולותיו שעליו לבצע בהתאם לשטר הנאמנות.

24.5 הנאמן ישתמש בנאמנות בכוחות, בהרשאות ובסמכויות שהוקנו לו לפי שטר הנאמנות, לפי שיקול דעתו המוחלט ובכפוף ליתר הוראות שטר זה. פעל כך הנאמן, הוא לא ישא באחריות לכל נזק ואו הפסד ו/או הוצאה אשר יגרמו לחברה ו/או למחזיקי אגרות החוב ו/או אשר אשר בהם יהיה עליהם לשאת עקב כל פעולה ו/או מחדל שיעשה על ידי הנאמן, לרבות כתוצאה מטעויות בשיקול דעת אלא אם כן נקבע בפסק דין חלוט כי הנאמן פעל ברשלנות (למעט רשלנות הפטורה על פי חוק כפי שהיה מעת לעת) או בחוסר תום לב או בזדון או בניגוד להוראות שטר זה והכל בכפוף ובהתאם להוראות הדין.

24.6 למעט אם נקבע במפורש אחרת בחוק או בהוראות שטר זה, הנאמן אינו מחויב לפעול באופן, שאינו מפורט במפורש בשטר זה, כדי שמידע כלשהו, לרבות על החברה ו/או בקשר ליכולתה של החברה לעמוד בהתחייבויותיה למחזיקי אגרות החוב יגיע לידיעתו ואין זה מתפקידו.

-47-

**25.** **סמכות הנאמן להעסיק שלוחים**

הנאמן יהיה רשאי, במסגרת ניהול עסקי הנאמנות, למנות שלוח/ים שיפעל/ו במקומו, בין עורך דין ובין אדם אחר, ככל שלא יהיה בכך כדי לפגוע בזכויות המחזיקים באגרות החוב (סדרה ג'), כדי לעשות או להשתתף בעשיית פעולות מיוחדות שיש לעשותן בקשר לנאמנות ולשלם שכר סביר לכל שלוח כאמור, ומבלי לגרוע מכלליות האמור לעיל נקיטת בהליכים משפטיים. כן יהיה הנאמן רשאי לסלק על חשבון החברה את שכרו של כל שלוח כזה לרבות בדרך של קיזוז מסכומים שהגיעו לידיו והחברה תחזיר לנאמן מייד עם דרישתו הראשונה כל הוצאה כנ"ל, והכל בתנאי שהנאמן נתן לחברה הודעה מראש בדבר מינוי שלוחים כאמור זאת ככל שהדבר יהיה אפשרי בנסיבות העניין וככל שלא יהיה בכך כדי לפגוע בזכויות המחזיקים.

מובהר כי אין במינוי שלוח כאמור בכדי לגרוע מאחריות הנאמן בגין פעולותיו ופעולות שלוחיו.

**26.** **שיפוי לנאמן**

**26.1** החברה ומחזיקי אגרות החוב (במועד הקובע הרלוונטי כאמור בסעיף 26.6 לשטר הנאמנות, כל אחד בגין התחייבותו כאמור בסעיף 26.4 לשטר הנאמנות) מתחייבים בזאת לשפות את הנאמן וכל נושא משרה בו, עובדיו, שלוח או מומחה שימנה ו/או ימונה ע"י הנאמן על פי הוראות שטר נאמנות זה ו/או על פי החלטה כדין שהתקבלה באסיפה של מחזיקי אגרות החוב (סדרה ג') על פי הוראות שטר נאמנות זה (להלן : "**הזכאים לשיפוי**") :

**26.1.1** כל נזק ו/או הפסד ו/או בגין חיוב כספי על פי פסק דין (שלא ניתן לגביו עיכוב ביצוע) או על פי פשרה (שבהסכמה ו/או שהשיפורה נוגעת לחברה ניתנה הסכמת החברה לעשות שבקשר לפעולות שביצעו הזכאים לשיפוי או שעליהם לבצע מכוח הוראות שטר זה, ו/או על פי חוק ו/או הוראה של רשות מוסמכת ו/או כל דין ו/או לפי דרישת מחזיקי אגרות החוב (סדרה ג') ו/או הנאמן בקשר לביצוע הוראות שטר זה ו/או לפי דרישת החברה; וכן

**26.1.2** בגין שכר הזכאים לשיפוי והוצאות שהוצאו ו/או שעומדים להוציא וכן בגין כל נזק ו/או הפסד שייגרמו להם בשל פעולות שביצעו הזכאים לשיפוי או שעליהם לבצע מכוח הוראות שטר זה, ו/או על פי חוק ו/או הוראה של רשות מוסמכת ו/או כל דין ו/או לפי דרישת מחזיקי אגרות החוב (סדרה ג') ו/או לפי דרישת החברה ו/או הנאמן בקשר לשימוש בסמכויות והרשאות הנתונות בתוקף שטר זה וכן בקשר לכל מיני הליכים משפטיים, חוות דעת עורכי דין וממומחים אחרים, משא ומתן, דין ודברים, הוצאות, תביעות ודרישות בנוגע לכל עניין ו/או דבר שנעשה ו/או לא נעשה באופן כלשהו ביחס לנדון.

והכל בתנאי כי:

**26.1.3** הזכאים לשיפוי לא ידרשו שיפוי מראש בעניין שאינו סובל דיחוי (מבלי לפגוע בזכות לשיפוי בדיעבד) ;

**26.1.4** לא נקבע בהחלטה שיפוטית שהזכאים לשיפוי פעלו שלא בתום לב, או שלא במסגרת מילוי תפקידם, שלא בהתאם להוראות הדין ו/או שלא על פי שטר נאמנות זה;

**26.1.5** לא נקבע בהחלטה שיפוטית כי הזכאים לשיפוי התרשלו ברשלנות שאינה פטורה על פי חוק כפי שיהיה מעת לעת;

**26.1.6** לא נקבע בהחלטה שיפוטית כי הזכאים לשיפוי פעלו בזדון.

התחייבויות השיפוי על פי סעיף 26.1 זה תקרא "**התחייבות השיפוי**".

מוסכם כי בכל מקרה בו יטען כנגד הזכאים לשיפוי כי (1). פעלו שלא בתום לב, או שלא במסגרת מילוי תפקידם, שלא בהתאם להוראות הדין או שטר הנאמנות; ו/או (2). התרשלו ברשלנות שאינה פטורה על פי חוק; ו/או (3). פעלו בזדון – יהיו הזכאים לשיפוי זכאים מיד עם דרישתם לתשלום סכום התחייבות השיפוי אך ככל שיקבע בהחלטה שיפוטית כי אכן פעלו בהתאם לנטען כנגד כאמור לעיל, ישיבו הזכאים לשיפוי את סכום התחייבות השיפוי ששולמו להם.

**26.2** מבלי לפגוע בזכויות לפיצוי הניתנות לנאמן לפי החוק ובכפוף לאמור בשטר זה ו/או במחוייבויות החברה על-פי שטר זה, יהיו הזכאים לשיפוי, זכאים לקבל שיפוי מתוך הכספים שיתקבלו על-ידי ביצוע הנאמנות שנקבע, בנוגע להתחייבויות שקיבלו על עצמם, בנוגע להוצאות שהוציאו אגב בסמכויות והרשאות הנתונות בקשר לפעולות כאלה, שלפי דעתם היו דרושות לביצוע הנ"ל ו/או בקשר לשימוש דין וממומחים אחרים, משא ומתן, דין ודברים, הוצאות, תביעות ודרישות בנוגע לכל עניין ו/או דבר שנעשו ו/או לא נעשו באופן כלשהו ביחס לנדון, והנאמן יוכל לעכב את הכספים הנמצאים ברשותו ולשלם מתוכם

-48-

את הסכומים הנחוצים לשם תשלום השיפוי האמור. כל הסכומים האמורים יעמדו בעדיפות על זכויות מחזיקי אגרות החוב (סדרה ג') ובכפוף להוראות כל דין ובלבד שהנאמן נהג בתום לב ובהתאם לחובות המוטלות עליו על פי כל דין ועל פי שטר זה. לעניין סעיף זה פעולה של הנאמן שאושרה על ידי חברה ו/או מחזיקי אגרות החוב, תיחשב שהינה דרושה באופן סביר.

26.3    מבלי לגרוע מתוקף 'התחייבות השיפוי' שבסעיף 26.1 לעיל, כל אימת שהנאמן יהיה חייב לפי תנאי שטר הנאמנות ו/או על-פי חוק ו/או לפי דרישת רשות מוסמכת ו/או כל דין ו/או לפי דרישת מחזיקי אגרות החוב (סדרה ג') ו/או לפי דרישת החברה, לעשות פעולה כלשהי, לרבות, אך לא רק, פתיחת הליכים או הגשת תביעות לפי דרישת בעלי אגרות החוב (סדרה ג'), כאמור בשטר זה, יהיה הנאמן רשאי להימנע מלנקוט כל פעולה כאמור, עד שיקבל לשביעות רצונו פיקדון כספי לכיסוי 'התחייבות השיפוי' (להלן: "**כרית המימון**") בסכום הנדרש, בעדיפות ראשונה מהחברה, ובמקרה בו החברה לא תפקיד את מלוא 'כרית המימון' במועד בו נדרשה לעשות זאת על ידי הנאמן, ובלבד שהזכאים לשיפוי יפנה הנאמן למחזיקי אגרות החוב (סדרה ג') שהחזיקו באגרות החוב (סדרה ג') במועד הקובע (כאמור בסעיף 26.6 להלן), בבקשה כי יפקידו בידיו את סכום 'כרית המימון', כל אחד את 'חלקו היחסי' (כהגדרת מונח זה להלן). במקרה בו מחזיקי אגרות החוב (סדרה ג') לא יפקידו בפועל את מלוא סכום 'כרית המימון' הנדרש, לא תחול על הנאמן חובה לנקוט בפעולה; אין באמור כדי לפטור את הנאמן מנקיטת פעולה דחופה הדרושה לשם מניעת פגיעה מהותית לרעה בזכויות מחזיקי אגרות החוב (סדרה ג').

הנאמן מוסמך לקבוע את סכום 'כרית המימון' וייהיה רשאי לחזור ולפעול ליצירת כרית נוספת כאמור, מעת לעת, בסכום שיקבע על ידו. יובהר כי אין בתשלום על ידי המחזיקים לפי סעיף זה כדי לשחרר את החברה מחובתה לשאת בתשלום האמור.

הנאמן על פי שיקול דעתו הבלעדי יהיה רשאי לעשות שימוש בכספים המופקדים בכרית המימון לשם ביצוע פעולות או שימוש בהליכים הרלוונטיים.

26.4    התחייבות השיפוי

26.4.1    תחול על החברה בכל מקרה של: (1) פעולות שבוצעו על פי שיקול דעת הנאמן ו/או על פי כל דין ו/או נדרשו להתבצע לפי תנאי שטר הנאמנות או לשם הגנה על זכויות מחזיקי אגרות החוב (לרבות בשל דרישת מחזיק הדרושה לשם הגנה כאמור); וכן (2) פעולות שבוצעו ו/או נדרשו להתבצע לפי דרישת החברה.

26.4.2    תחול על המחזיקים שהחזיקו במועד הקובע (כאמור בסעיף 26.6 לשטר הנאמנות) בכל מקרה של: (1) פעולות שבוצעו ו/או נדרשו להתבצע לפי דרישת מחזיקים לשם הגנה על זכויות מחזיקי אגרות החוב (ולמעט פעולות שכאמור שננקטו לפי דרישת מחזיקים לשם הגנה כאמור); וכן (2) אי תשלום על ידי החברה של סכום 'התחייבות השיפוי' עליה על-פי סעיף 26.3 לשטר הנאמנות (בכפוף להוראות סעיף 26.6 לשטר הנאמנות) ובלבד שהזכאים לשיפוי נקטו בפעולות בנסיבות הסבירות הנדרשות לשם גביית הסכומים האמורים מהחברה. יובהר כי אין בתשלום בהתאם לסעיף קטן (2) לעיל כדי לגרוע מחובת החברה לשאת ב'התחייבות השיפוי' בהתאם להוראות סעיף 26.4.1.

26.5    בכל מקרה בו החברה לא תשלם את מלוא הסכומים הדרושים לכיסוי 'התחייבות השיפוי' ו/או לא תפקיד את מלוא סכום 'כרית המימון', וזאת לפי העניין; ו/או נקראו נקטו המחזיקים להפקיד את סכום 'כרית המימון' לפי סעיף 26.3 לעיל, ובלבד שהזכאים לשיפוי נקטו בפעולות הסבירות בנסיבות העניין הנדרשות לשם גביית הסכומים האמורים מהחברה, יחולו ההוראות הבאות:

26.5.1    הכספים יגבו באופן הבא:

26.5.1.1    **ראשית** - הסכום ימומן מתוך כספי הריבית ו/או הקרן שעל החברה לשלם למחזיקי אגרות החוב (סדרה ג') לאחר תאריך הפעולה הנדרשת, ויחולו הוראות סעיף 11 לעיל.

26.5.1.2    **שנית** - ככל שלדעת הנאמן לא יהיה בסכומים המופקדים בכרית המימון כדי לכסות את 'התחייבות השיפוי', יפקידו המחזיקים שהחזיקו במועד הקובע (כאמור בסעיף 26.6 להלן) בהתאם לחלקו היחסי (כהגדרת מונח זה) בידי הנאמן הסכום החסר.

"**חלקו היחסי**" משמעו: החלק היחסי של אגרות החוב (סדרה ג') אותם החזיק המחזיק במועד הקובע הרלוונטי, מתוך יתרת הערך הנקוב בסעיף 26.6 להלן מסך הערך הנקוב שבמחזור באותו מועד. מובהר כי חישוב החלק היחסי ייוותר קבוע אף אם לאחר אותו מועד יחול שינוי בערך הנקוב של אגרת החוב שבידי המחזיק.

-49-

יובהר, כי מחזיקי אגרות החוב אשר יישאו באחריות לכיסוי הוצאות כאמור בסעיף זה לעיל יוכלו לשאת בהוצאות כאמור בסעיף זה לעיל מעבר לחלקם היחסי ובמקרה זה יחול על השבת הסכומים סדר העדיפות בהתאם לאמור בסעיף 10 לשטר זה.

26.6 המועד הקבוע לקביעת חבותו של מחזיק ב'התחייבות השיפוי' ו/או בתשלום 'כריית המימון' הינו כדלקמן:

26.6.1 בכל מקרה בו 'התחייבות השיפוי' ו/או תשלום 'כריית המימון' נדרשים בשל החלטה או פעולה דחופה הדרושים לשם מניעת פגיעה מהותית לרעה בזכויות מחזיקי אגרות החוב (סדרה ג') וזאת ללא החלטה מוקדמת של אסיפת מחזיקי אגרות החוב (סדרה ג') - יהיה המועד הקבוע לחבות תום יום המסחר יום נקיטת הפעולה או קבלת ההחלטה, ואם אותו יום אינו יום מסחר, יום המסחר הקודם לו.

26.6.2 בכל מקרה בו 'התחייבות השיפוי' ו/או תשלום 'כריית המימון' נדרשים על פי החלטת אסיפת מחזיקי אגרות חוב (סדרה ג') - יהיה המועד הקבוע לחבות המועד הקבוע להשתתפות באסיפה (כפי שמועד זה נקבע בהודעת הזימון) ותחול גם על מחזיק אשר לא השתתף באסיפה.

26.7 אין בתשלום על ידי המחזיקים במקום החברה של סכום כלשהו המוטל על החברה על פי סעיף 26 זה, כדי לשחרר את החברה מחבותה לשאת בתשלום כאמור. על הנאמן לפעול להשבת כספים כאמור ששולמו על ידי המחזיקים במקום החברה, מהחברה.

26.8 לעניין קדימות ההחזר למחזיקים אשר נשאו בתשלומים לפי סעיף זה מתוך תקבולים בידי הנאמן ראה סעיף 10 לעיל.

27. **הודעות**

27.1 כל הודעה מטעם החברה ו/או הנאמן למחזיקי אגרות החוב תינתן כדלקמן:

27.1 על ידי דיווח במערכת המגנ"א של רשות ניירות ערך; (הנאמן רשאי להורות לחברה והחברה תהיה חייבת לדווח לאלתר במערכת המגנ"א כל דיווח בנוסח ובמיקום כפי שיועבר בכתב על ידי הנאמן לחברה), ובמקרים המפורטים להלן בלבד בנוסף בדרך של פרסום מודעה בשני עיתונים יומיים בעלי תפוצה רחבה, היוצאים לאור בישראל בשפה העברית: (א) הסדר או פשרה לפי סעיף 350 לחוק החברות, התשנ"ט – 1999; (ב) מיזוג. כל הודעה שתפורסם או שתישלח כאמור תיחשב כאילו נמסרה לידי מחזיקי אגרות החוב ביום פרסומה כאמור (במערכת המגנ"א או בעיתונים), לפי העניין.

27.2 כל הודעה או דרישה מטעם הנאמן לחברה או מטעם החברה לנאמן תוכל להינתן על ידי מכתב שישלח בדואר רשום לפי הכתובת המפורטת בשטר הנאמנות, או לפי כתובת אחרת עליה יודיע צד אחד למשנהו בכתב (לרבות כתובת דואר אלקטרוני), או באמצעות שיגורה בפקסימיליה או על ידי שליח וכל הודעה או דרישה כזו תחשב כנמסרה ליד הצד השני: (1) במקרה של שיגור בדואר רשום- כעבור שלושה ימי עסקים מיום מסירתה לנאמן על פי רישומי הדואר; (2) במקרה של שיגורה בפקסימיליה (בתוספת וידוא טלפוני בדבר קבלתה)- כעבור יום עסקים אחד מיום שיגורה; (3) במקרה של שליחתה על ידי שליח- במסירתה על ידי השליח או בהצעתה לנמען לקבלה, לפי העניין; ובמקרה של שליחתה באמצעות דואר אלקטרוני – כעבור יום עסקים אחד מיום שליחתה.

28. **ויתור, פשרה, ושינויים בשטר הנאמנות**

בכפוף להוראות כל דין, למעט בנוגע למועדי התשלומים על פי אגרת החוב (אך לרבות שינוי טכני במועדים או במועד הקבוע לתשלומים), שיעור הריבית (לרבות ריבית הפיגורים), התאמות הריבית בנובעות מאי עמידה באמות מידה פיננסית ומשינוי בדירוג, התחייבויות החברה בקשר עם ההתניות הפיננסיות והפרתן, התחייבויות החברה בקשר לחלוקה, התחייבויות החברה בשעבודים, התחייבויות החברה בנוגעות לאי יצירת שעבודים, הוראות הנוגעות להרחבת סדרה, הוראות הנוגעות לדין החל על שטר זה, עילות להעמדה לפירעון מיידי ודיווחים שעל החברה לתת בקשר עם **"התחייבויות החברה שאינן ניתנות להתנייה"**, יהיה הנאמן רשאי מזמן לזמן ובכל עת כאשר אין בכך בדבר, לדעתו, משום פגיעה בזכויות מחזיקי אגרות החוב (סדרה ג'), לוותר על כל הפרה או אי-מילוי של תנאי מתנאי אגרות החוב או אי מילוי של כל תנאי מתנאי שטר הנאמנות על ידי החברה.

-50-

בכפוף להוראות כל דין ובאישור מוקדם של מחזיקי אגרות החוב בהחלטה מיוחדת, יהיה הנאמן רשאי, בין לפני ובין אחרי שקרן אגרות החוב (סדרה ג') תעמוד לפירעון, להתפשר עם החברה בקשר לכל זכות או תביעה של מחזיקי אגרות החוב (סדרה ג'), לוותר על כל זכות או תביעה של מחזיקי אגרות החוב (סדרה ג') או מי מהם כלפי החברה על פי שטר הנאמנות ואגרות החוב (סדרה ג') ולהסכים עם החברה לכל הסדר של זכויותיהם, כולל לוותר על כל זכות או תביעה של מחזיקי אגרות החוב (סדרה ג') כלפי החברה על פי שטר זה.

התפשר הנאמן עם החברה, ויתר על כל זכות או תביעה של מחזיקי אגרות החוב (סדרה ג') או הסכים עם החברה לכל הסדר של זכויות מחזיקי אגרות החוב (סדרה ג') לאחר שקיבל אישור מוקדם של האסיפה הכללית, ובלבד שהנאמן לא הפר חובת אמון ולא פעל בחוסר תום לב או בזדון או ברשלנות בייושם החלטות האסיפה הכללית.

מבלי לגרוע מהאמור לעיל, בכפוף להוראות כל דין יהיו החברה והנאמן רשאים בין לפני ובין אחרי שקרן אגרות החוב תעמוד לפירעון, לשנות את שטר הנאמנות ו/או נספחיו (לרבות שינוי בתנאי אגרות החוב (סדרה ג')) אם נתקיים אחד מאלה :

(א)    אם הנאמן שוכנע כי השינוי אינו פוגע במחזיקים באגרות החוב, (למעט לגבי התחייבויות החברה שאינן ניתנות להתניה כהגדרתן בסעיף זה לעיל ולמעט שינוי של זהות הנאמן או שכרו בשטר הנאמנות, לשם מינוי נאמן במקומו של נאמן שהסתיימה כהונתו ; – אשר הנאמן לא רשאי להסכים לשינויים ו/או ויתורים בהם או לגביהם), ובלבד שהודיע על כך בכתב למחזיקי אגרות החוב (סדרה ג').

(ב)    השינוי אושר על ידי מחזיקי אגרות החוב (סדרה ג') בהחלטה מיוחדת.

החברה תמסור למחזיקי אגרות החוב הודעה באמצעות דו"ח מיידי ו/או באמצעות אתר האינטרנט של רשות ניירות ערך (המגנ"א) על כל שינוי כאמור לעיל, בסמוך לאחר ביצועו.

בכל מקרה של שימוש בזכות הנאמן על פי סעיף זה, יהיה הנאמן רשאי לדרוש מממחזיקי אגרות החוב (סדרה ג') למסור לו או לחברה את תעודות אגרות החוב, לשם רישום הערה בהן בדבר כל פשרה, ויתור, שינוי או תיקון כאמור ולפי דרישת הנאמן תרשום החברה הערה כאמור. בכל מקרה של שימוש בזכות הנאמן על פי סעיף זה, יודיע על כך, בכתב, למחזיקי אגרות החוב (סדרה ג') תוך זמן סביר.

### 29.    מרשם המחזיקים באגרות החוב

29.1    החברה תחזיק ותנהל במשרדה הרשום מרשם של מחזיקים באגרות החוב (סדרה ג') בהתאם לחוק ניירות ערך, שיהיה פתוח לעיונו של כל אדם.

29.2    החברה לא תהיה חייבת לרשום במרשם מחזיקי אגרות החוב (סדרה ג') שום הודעה בדבר נאמנות מפורשת, מכללא או משוערת, ואף משכון מכל מין שהוא או כל זכות שביושר, תביעה או קיזוז או זכות אחרת כלשהי, בקשר לאגרות החוב (סדרה ג'). החברה תכיר אך ורק בבעלותו של האדם שבשמו נרשמו אגרות החוב. יורשיו החוקיים, מנהלי עזבונו או מבצעי צוואתו של הבעלים הרשום וכל אדם שיהיה זכאי לאגרות חוב, עקב פשיטת רגל של בעלים רשום (ואם הוא תאגיד – עקב פירוקו), יהא רשאי להירשם כמחזיק לאחר מתן הוכחות שלדעת מנהלי החברה תספקנה כדי להוכיח את זכותו להירשם כמחזיק של אגרות חוב.

### 30.    שחרור

לכשיוכח לשביעות רצונו של הנאמן כי כל אגרות החוב (סדרה ג') נפרעו, נפדו או לכשהופקד בחברה בנאמנות בידי הנאמן סכומי כסף אשר יספיקו לפדיון מלא וסופי של אגרות החוב בפארו, וכן לכשיוכח לשביעות רצונו של הנאמן כי מלואו שכרו וכל ההוצאות שהוצאו על ידי הנאמן ו/או שלוחיו בקשר עם פעולתו על פי שטר הנאמנות ועל-פי הוראותיי שולמו לו במלואו, אזי יהיה הנאמן חייב, לפי דרישה ראשונה של החברה לפעול בכספים שהופקדו אצלו בגין אגרות חוב (סדרה ג') שלא נדרש פדיונן על-פי התנאים הקבועים בשטר זה.

-51-

## 31. מינוי הנאמן, תפקידי הנאמן, סמכויות הנאמן ופקיעת כהונתו של הנאמן

31.1    החברה ממנה בזאת את הנאמן כנאמן עבור מחזיקי אגרות החוב (סדרה ג') בלבד מכח הוראות סעיף 35ב לחוק ניירות ערך.

31.2    תקופת מינויו של הנאמן תהיה עד מועד כינוסה של אסיפת מחזיקים בהתאם להוראות סעיף 35ב(א1) לחוק ניירות ערך.

31.3    ממועד כניסתו לתוקף של שטר נאמנות זה תפקידי הנאמן יהיו על-פי כל דין ושטר זה.

31.4    הנאמן יפעל בהתאם להוראות חוק ניירות ערך.

31.5    הנאמן ייצג את המחזיקים באגרות החוב (סדרה ג') בכל עניין הנובע מהתחייבויות החברה כלפיהם, והוא יהיה רשאי, לשם כך לפעול למימוש הזכויות הנתונות למחזיקים לפי חוק זה או לפי שטר הנאמנות.

31.6    הנאמן רשאי לנקוט בכל הליך לשם הגנה על זכויות המחזיקים בהתאם לכל דין והמפורטות בשטר נאמנות זה.

31.7    הנאמן רשאי למנות שלוחים כמפורט בסעיף 25 לשטר זה.

31.8    פעולותיו של הנאמן הן בנות תוקף על אף פגם שנתגלה במינויו או בכשירותו.

31.9    אין בחתימת הנאמן על שטר נאמנות זה הבעת דעת מצדו בדבר טיבם של ניירות הערך המוצעים או כדאיות ההשקעה בהם.

31.10    הנאמן לא יהיה חייב להודיע לצד כל שהוא על חתימתו על שטר זה. הנאמן לא יתערב באיזו צורה שהיא בהנהלת עסקי החברה או ענייניה והדבר אינו נכלל בין תפקידיו. אין באמור בסעיף זה כדי להגביל את הנאמן בכל פעולה שעליו לבצע בהתאם להוראות שטר זה.

31.11    בכפוף להוראות כל דין, הנאמן אינו מחויב לפעול באופן שאינו מפורש במפורש בשטר נאמנות זה, כדי שמידע כלשהו, לרבות על החברה ו/או בקשר ליכולתה של החברה לעמוד בהתחייבויותיה למחזיקי אגרות החוב יגיע לידיעתו ואין זה מתפקידו.

31.12    בכפוף להוראות כל דין ולאמור בשטר נאמנות זה, הנאמן מתחייב, בחתימתו על שטר זה, לשמור בסודיות כל מידע שניתן לו מהחברה, לא יגלה אותו לאחר ולא יעשה בו כל שימוש, אלא אם כן גילויו או השימוש בו נדרש לשם מילוי תפקידיו לפי חוק ניירות ערך, לפי שטר הנאמנות, או לפי צו של בית משפט. חובת הסודיות כאמור תחול גם על כל שלוח של הנאמן (לרבות כל יועץ, בא כח וכיוצא).[?] מובהר כי העברת מידע למחזיקי אגרות החוב לצורך קבלת החלטה הנוגעת לזכויותיהם על-פי אגרת החוב או לצורך מתן דיווח על מצב החברה, אינה מהווה הפרה של התחייבויות לסודיות כאמור.

31.13    הנאמן רשאי להסתמך במסגרת נאמנותו על כל מסמך בכתב לרבות, כתב הוראות, הודעה, בקשה, הסכמה או אישור, הנחזה להיות חתום או מוצא על ידי אדם או גוף כלשהו, אשר הנאמן מאמין בתום לב כי נחתם או הוצא על ידו.

31.14    על סיום כהונת הנאמן יחולו הוראות חוק ניירות ערך.

31.15    פקיעת כהונתו של נאמן, ימונה נאמן חדש במקומו באסיפת מחזיקים.

31.16    למרות האמור לעיל, החלטת מחזיקים על סיום כהונת הנאמן והחלפתו בנאמן אחר תיעשה באסיפה אשר נכחו בה מחזיקים אשר להם 50% מיתרת הערך הנקוב של אגרות החוב מסדרה ג', או אסיפה נדחית אשר נכחו בה מחזיקים אשר להם 10% לפחות מהיתרה כאמור, וברוב של 75%.

31.17    בכפוף להוראות כל דין, הנאמן שכהונתו פקעה ימשיך לכהן בתפקידו עד למינויו נאמן אחר. הנאמן יעביר לידי הנאמן החדש את כל המסמכים והסכומים שהצטברו בקשר עם הנאמנות נשוא שטר נאמנות לסדרה ג', ויחתום על כל מסמך שיידרש לשם כך. לכל נאמן חדש יהיו אותם כוחות, חובות וסמכויות, והוא יוכל לפעול לכל דבר ועניין, כאילו התמנה כנאמן מלכתחילה.

31.18    החברה תפרסם דוח מיידי בכל מקרה של התפטרות הנאמן ו/או מינוי נאמן אחר.

-52-

**32.** **אסיפות של מחזיקי אגרות החוב**

אסיפות מחזיקי אגרות החוב (סדרה ג') יתנהלו כאמור **בתוספת השנייה** לשטר זה.

**33.** **תחולת הדין**

הדין החל על שטר הנאמנות, תוספותיו ונספחיו לרבות אגרות החוב (ולמעט מסמכי השעבוד אשר נוצרים לפי דין זר) הינו הדין הישראלי. בכל עניין שלא נזכר בשטר זה וכן בכל מקרה של סתירה בין הוראות הדין לבין שטר זה, יפעלו הצדדים בהתאם להוראות הדין הישראלי בלבד.

**34.** **סמכות ייחודית**

בית המשפט הייחודי שיהיה מוסמך לדון בעניינים הקשורים בשטר זה על תוספותיו ונספחיו ובכלל זה באגרת החוב המצורפת כנספח זו יהיה בית המשפט המוסמך בתל-אביב-יפו.מובהר כי לשם מימוש השעבודים עשויים להינקט על ידי הנאמן הליכים בבתי משפט בארה"ב ו/או באיי הבתולה ועל פי הדין החל על השעבודים.

לפרטים אודות התחייבויות החברה, בעל השליטה ונושאי המשרה ראו סעיף 5.9 לעיל.

**35.** **כללי**

מבלי לגרוע מהוראותיו האחרות של שטר זה ושל אגרות החוב (סדרה ג'), הרי כל ויתור, ארכה, הנחה, שתיקה, הימנעות מפעולה ("ויתור") מצד הנאמן לגבי אי קיומם או קיומם החלקי או הבלתי נכון של התחייבות כלשהי מהתחייבויות לנאמן על-פי שטר זה ואגרת החוב (סדרה ג'), לא יחשבו כוויתור מצד הנאמן על זכות כלשהי אלא כהסכמה מוגבלת להזדמנות המיוחדת בה ניתנה. מבלי לגרוע מהוראותיו האחרות של שטר זה ואגרת החוב (סדרה ג'), הרי כל שינוי בהתחייבויות לנאמן מחייב קבלת הסכמת הנאמן מראש ובכתב. כל תיחשב כהסכמה כלשהי. ויתור, בין בעל פה ובין על דרך של ויתור והימנעות מפעולה או בכל דרך אחרת שאינה בכתב, לא תיחשב כהסכמה כלשהי. זכויותיו של הנאמן לפי הסכם זה הינן עצמאיות ובלתי תלויות זו בזו, ובאות בנוסף לכל זכות שקיימת ו/או שתהיה לנאמן על פי דין ו/או הסכם (לרבות שטר זה ואגרת החוב (סדרה ג')).

**36.** **אחריות הנאמן**

36.1 על אף האמור בכל דין ובכל מקום בשטר הנאמנות, ככל שהנאמן פעל לשם מילוי תפקידו בתום לב ובתוך זמן סביר וכן בירר את העובדות שנאמן סביר היה מברר בנסיבות העניין, לא יהא אחראי כלפי מחזיק באגרות החוב לנזק שנגרם לו כתוצאה מכך שהנאמן הפעיל את שיקול דעתו לפי הוראות סעיף 35ח(1ד) או 35ט1 לחוק, אלא אם כן נקבע בפסק דין חלוט כי הנאמן פעל ברשלנות חמורה. מובהר כי ככל שתתעורר סתירה בין הוראות סעיף זה להוראות אחרת בשטר הנאמנות, תגבר הוראת סעיף זה.

36.2 פעל הנאמן בתום לב ובלא התרשלות בהתאם להוראות סעיף 35ח(2ד) או 35ח(3ד) לחוק, לא יהיה אחראי בשל ביצוע הפעולה כאמור.

**37.** **מענים**

כתובות הצדדים יהיו כמפורט במבוא לשטר זה, או כל מען אחר אשר תינתן לגביו הודעה מתאימה בכתב לצד שכנגד.

**38.** **הסמכה למגנ"א**

בהתאם להוראות תקנות ניירות ערך (חתימה ודיווח אלקטרוני) התשס"ג 2003, הנאמן מאשר בזאת לגורם המוסמך לכך מטעם החברה, לדווח באופן אלקטרוני לרשות לניירות ערך על שטר נאמנות זה.

ולראיה באו הצדדים על החתום



All Year Holdings Limited

משמרת-חברה לשירותי נאמנות בע"מ

משמרת חברה לשירותי נאמנות
בע"מ

אני החתו"מ ניר כהן ששון, עו"ד, ממשרד שמעונוב ושותי- עורכי דין, מאשר כי שטר נאמנות זה נחתם על ידי מורשי
החתימה של All Year Holdings Limited, באמצעות מר יואל גולדמן וחתימתו מחייבת את החברה בקשר עם
שטר נאמנות זה.

ניר כהן-ששון, עו"ד
מס' רשיון 43406

ניר כהן ששון, עו"ד

**התחייבות החברה המועברת, חברת הבת, חברת הנכס**

To

Mishmeret Trust Services Company Ltd.

The undersigned, **YG WV LLC**, confirms the declarations and undertakings regarding the Pledged Assets listed in section 6.2.8 of the deed of trust of debentures (Series C) of All Year Holdings Limited.

2/20/2017
Date

signature

Attorney confirmation

I, the undersigned, Dov Tratner, esq ~~adv.~~, confirms that these undertakings duly signed by the authorized signatory of YG WV LLC, Mr. Yoel Goldman

Adv.

-55-

## All Year Holdings Limited

### תוספת ראשונה

### תעודת אגרת חוב (סדרה ג')

אגרות חוב (סדרה ג') רשומות על שם, נושאות ריבית שנתית קבועה בשיעור שיקבע במכרז (להלן : "**הריבית**"), עומדות לפירעון (קרן) בשנים עשר (12) תשלומים חצי שנתיים בימים 31 באוגוסט ו-28 בפברואר, החל מיום 31 באוגוסט 2018 ועד ליום 28 בפברואר 2024 (כולל), באופן שכל אחד מאחד עשר התשלומים הראשונים יהווה 1.25% מקרן ערכן הנקוב הכולל של אגרות החוב (סדרה ג') והתשלום האחרון יהווה 86.25% מקרן ערכן הנקוב הכולל של אגרות החוב (סדרה ג'). הריבית בגין אגרות החוב (סדרה ג') תשולם פעמיים בשנה, בימים 31 באוגוסט ו-28 בפברואר, החל מיום 31 באוגוסט 2017 ועד ליום 28 בפברואר 2024 (כולל). הריבית תיצבר ממועד הקצאת אגרות החוב (סדרה ג') ועד מועד פרעון הסופי ביום 28 בפברואר 2024 (כולל).

### אגרת חוב (סדרה ג') רשומה על שם

מספר   **1**

ערך נקוב   _____ ש"ח

ריבית שנתית קבועה בשיעור _____%.

1.   תעודה זו מעידה, כי All Year Holdings Limited ("**החברה**") תשלם בימים 31 באוגוסט ו-28 בפברואר, החל מיום 31 באוגוסט 2018 ועד ליום 28 בפברואר 2024 (כולל) למזהיר טפחות חברה לרישומים בע"מ או לכל מי שיהיה הבעלים הרשום של איגרת חוב זו ("**מחזיק איגרת החוב (סדרה ג')**") ביום 19 באוגוסט של כל אחת מהשנים 2018 עד 2023 וביום 16 בפברואר של כל אחת מהשנים 2019 עד 2024 (כולל), שיעור מהערך הנקוב של אגרת חוב זו, והכל בהתאם ליתר התנאים המפורטים בשטר הנאמנות ובתנאים שמעבר לדף.

2.   על אף האמור לעיל, התשלום האחרון של הקרן והתשלום האחרון של הריבית ייעשה כנגד מסירת תעודת אגרות החוב (סדרה ג') לידי החברה במועד התשלום האחרון (קרי 28 בפברואר 2024), במשרדה הרשום של החברה או בכל מקום אחר עליו תודיע החברה. הודעת החברה כאמור תפורסם לא יאוחר מחמישה (5) ימי עסקים לפני מועד התשלום האחרון.

3.   אגרות חוב (סדרה ג') מונפקות בהתאם לשטר נאמנות ("**שטר נאמנות**") מיום 19 בחודש פברואר 2017 אשר נחתם בין החברה לבין משמרת חברה לשירותי נאמנות בע"מ ("**הנאמן**").

4.   כל אגרות החוב (סדרה ג') תעמודנה בדרגה בטחון שווה זו בינן לבין עצמן (פרי-פסו) בקשר עם התחייבויות החברה על-פי אגרות החוב (סדרה ג') ובלי זכות בכורה או עדיפות של האחת כלפי האחרת.

5.   איגרת חוב (סדרה ג') זו מונפקת בכפיפות לתנאים המפורטים מעבר לדף, לתנאים המפורטים בשטר הנאמנות ובדוח ההצעה.

**נחתם בחותמת החברה שהוטבעה ביום** _____

על-ידי :

מורשה חתימה : _____             מורשה חתימה : _____

אני החו"מ, _____, עו"ד, מאשר כי תעודת אגרת חוב זו זה נחתמה על ידי חברת All Year Holdings Limited כדין ע"פ תקנונה, באמצעות מר _____ וחתימתו מחייבת את החברה לצורכי איגרת חוב זו.

_____, עו"ד

-56-

## <u>התנאים הרשומים מעבר לדף</u>

**1.** <u>**כללי**</u>

באיגרת חוב (סדרה ג') זו תהיינה לביטויים הבאים המשמעויות הבאות וככל שלא הוקנו להם משמעויות להלן, המשמעויות המוקנות להם בשטר הנאמנות, אלא אם כן משתמעת כוונה אחרת מהקשר הדברים:

| | |
|---|---|
| **"יום עסקים"**<br>או **"יום עסקים בנקאי"** | כל יום בו פתוחים מסלקת הבורסה רוב הבנקים בישראל לביצוע עסקאות. |
| **"סדרת אגרות החוב"** | אגרות החוב רשומות על שם, שתנאיהן יהיו בהתאם לשטר הנאמנות, לתעודת אגרת החוב (סדרה ג') ולידוע הצעת מדף, כהגדרתם בשטר הנאמנות, לפיהם הן תונפקנה. |
| **"קרן"** | הערך הנקוב שטרם נפרע של אגרות החוב (סדרה ג'). |
| **"החלטה מיוחדת"** | החלטה שנתקבלה באסיפה כללית של מחזיקי אגרות החוב (סדרה ג'), בה נכחו בעצמם או על-ידי באי-כוח מחזיקים באגרות החוב שלהם לפחות 50% מיתרת הערך הנקוב של אגרות החוב (סדרה ג'), או באסיפה נדחית שנכחו בה מחזיקים באגרות החוב, בעצמם או על-ידי באי-כוח, שלהם לפחות 20% מיתרת הערך הנקוב כאמור, ואשר נתקבלה (בין באסיפה המקורית ובין באסיפה הנדחית) ברוב של לפחות שני שלישים (2/3) מיתרת הערך הנקוב של אגרות החוב (סדרה ג') המיוצג בהצבעה. |
| **"החברה לרישומים"** | מזרחי טפחות חברה לרישומים בע"מ או חברה לרישומים שתבוא בנעלה. |
| **"יום מסחר"** | יום בו מתבצעות עסקאות בבורסה לניירות ערך בתל אביב בע"מ. |
| **"מסלקת הבורסה"** | מסלקת הבורסה לניירות ערך בתל-אביב בע"מ. |

**2.** <u>**אגרות החוב**</u>

לפרטים בדבר אגרות החוב (סדרה ג') ראו בסעיף 2 לשטר הנאמנות.

**3.** <u>**תנאי אגרות החוב (סדרה ג') המוצעות על פי התשקיף**</u>

(א)    אגרות החוב (סדרה ג'), רשומות על שם, בנות 1 ש"ח ע.נ. כל אחת. אגרות החוב (סדרה ג') תעמודנה לפירעון (קרן) בשנים עשר (12) תשלומים חצי שנתיים בימים 31 באוגוסט ו-28 בפברואר, החל מיום 31 באוגוסט 2018 ועד ליום 28 בפברואר 2024 (כולל), באופן שכל אחד מאחד עשר התשלומים הראשונים יהווה 1.25% מקרן ערך הנקוב הכולל של אגרות החוב (סדרה ג') והתשלום האחרון יהווה 86.25% מקרן ערך הנקוב הכולל של אגרות החוב (סדרה ג').

(ב)    היתרה הבלתי מסולקת של קרן אגרות החוב (סדרה ג') תישא ריבית שנתית קבועה בשיעור שיקבע במכרז (בכפוף להתאמות במקרה של שינוי בדירוג אגרות החוב (סדרה ג')[3] ו/או אי עמידה באמת מידה פיננסית כמפורט בסעיפים 5.3 ו-5.4 לשטר הנאמנות ו/או ריבית פיגורים, ככל שתחול).

---

[3] יובהר כי כל עוד כל אגרות החוב (סדרה ג') מדורגות על ידי יותר מחברת דירוג אחת, בחינת הדירוג לצורך התאמת שיעור הריבית לשינוי בדירוג (אם וככל שיהא שינוי כאמור) תיעשה, בכל עת, על פי הדירוג הנמוך מביניהם.

-57-

(ג)     אגרות החוב (סדרה ג') לא תהיינה צמודות למדד או מטבע כלשהו.

(ד)     הריבית בגין איגרות החוב (סדרה ג') תשולם פעמיים בשנה, בימים 31 באוגוסט ו-28 בפברואר,
החל מיום 31 באוגוסט 2017 ועד ליום 28 בפברואר 2024 (כולל). למועט תקופת הריבית
הראשונה, כל תשלום ריבית ישולם בעד התקופה של שישה החודשים שנסתיימה ביום הקודם
למועד התשלום (להלן : "**תקופת הריבית**"). שיעור הריבית שתשולם בעד תקופת ריבית מסוימת
(למעט תקופת הריבית הראשונה) (קרי תקופה המתחילה ביום שלאחר מועד התשלום של תקופת הריבית
הקודמת ומסתיימת ביום האחרון שלפני מועד התשלום הסמוך אחרי יום תחילתה) תחושב
כשיעור הריבית השנתית חלקי שניים. תשלום הריבית הראשון ישולם ביום 31 באוגוסט 2017
בגין התקופה המתחילה ביום המסחר הראשון שלאחר יום המכרך על אגרות החוב (סדרה
ג') והמסתיימת ביום 30 באוגוסט 2017 (לעיל: "**תקופת הריבית הראשונה**"), מחושבת על בסיס של
365 יום בשנה לפי מספר הימים בתקופה זו ותשלום הריבית האחרון ישולם ביום 28 בפברואר
2024.

(ה)     תשלום הקרן הראשון בגין איגרות החוב (סדרה ג') יהיה ביום 31 באוגוסט 2018. התשלום
הראשון של ריבית אגרות החוב (סדרה ג') ישולם ביום 31 באוגוסט 2017 עבור התקופה
המתחילה ביום המסחר הראשון שלאחר מועד סגירת החתימות ותסתיים ביום האחרון שלפני
מועד התשלום הראשון של הריבית (קרי, ביום 30 באוגוסט 2017) (להלן: "**תקופת הריבית
הראשונה**"), אשר תחושב על פי מספר הימים בתקופה זו ועל בסיס 365 ימים בשנה. שיעור
הריבית שתשולם בעד תקופת ריבית מסוימת (למעט תקופת הריבית הראשונה) (קרי התקופה
המתחילה ביום התשלום של תקופת הריבית הקודמת ומסתיימת ביום האחרון שלפני מועד
התשלום הסמוך אחרי יום תחילתה) תחושב כשיעור הריבית השנתית חלקי שניים (להלן :
"**שיעור הריבית החצי שנתית**"). החברה תפרסם בדוח מיידי את תוצאות ההנפקה את שיעור
הריבית הראשונה ואת שיעור הריבית השנתית ואת שיעור הריבית החצי שנתית.

(ו)     התשלומים על חשבון הקרן בגין אגרות החוב (סדרה ג'), ישולמו למי שהחזיק באגרות החוב
ביום 19 באוגוסט של כל אחת מהשנים 2018 עד 2023 וביום 16 בפברואר של כל אחת מהשנים
2019 עד 2024 (כולל) אשר קדמו למועד פירעונו של התשלום הרלוונטי, למעט התשלום האחרון.
התשלומים בגין ריבית אגרות החוב (סדרה ג') ישולמו למי שהחזיק באגרות החוב
ביום 19 באוגוסט של כל אחת מהשנים 2017 עד 2023 וביום 16 בפברואר של כל אחת מהשנים
מהשנים 2018 עד 4 2024 (כולל). על אף האמור לעיל, התשלום האחרון
של הקרן והריבית יעשה כנגד מסירת תעודות אגרות החוב (סדרה ג') לידי החברה במשרדה
הרשום של החברה או בכל מקום אחר עליו תודיע החברה. הודעת החברה כאמור תפורסם לא יאוחר מחמישה (5) ימי עסקים לפני מועד
התשלום האחרון.

(ז)     מובהר כי מי שאינו נמנה על מחזיקי אגרות החוב באיזה ממועדי התשלום האמורים בס"ק (ו)
לעיל, לא יהיה זכאי לתשלום בגין התקופה שהתתחילה לפני אותו מועד.

## 4.     **תשלומי הקרן והריבית של אגרות החוב (סדרה ג')**

(א)     כל תשלום על חשבון קרן ו/או ריבית, אשר ישולם באיחור העולה על שבעה (7) ימים מהמועד
הקבוע לתשלומו על פי תנאי אגרות החוב, וזאת מסיבה התלויה בחברה, ישא ריבית פיגורים
כהגדרתה להלן, החל מהמועד הקבוע לתשלומו ועד למועד תשלומו בפועל. לעניין זה, שיעור
ריבית הפיגורים יהיה שיעור הריבית על אגרות החוב כאמור בסעיף 3(ב) לעיל, לפי העניין,
בתוספת 3%, והכל על בסיס שנתי (להלן: "**ריבית הפיגורים**"). החברה תודיע על שיעור ריבית
שנתית בתוספת ריבית הפיגורים וכן על מועד התשלום כאמור בדיווח מיידי ואת זאת שני (2) ימי
מסחר לפני מועד התשלום בפועל.

לעניין זה, תשלום על חשבון קרן ו/או ריבית, אשר לא הופקד בידי הנאמן בהתאם לסעיף 14.2
לשטר הנאמנות, ייחשב כתשלום שלא שולם מסיבה התלויה בחברה.

(ב)     התשלום לזכאים יעשה בשיקים או בהעברה בנקאית ו/או באמצעות מסלקת הבורסה לזכות
חשבון הבנק של מחזיקי אגרות החוב (סדרה ג'). אם החברה לא תוכל, מכל סיבה שהיא, שאינה
תלויה בה, לשלם סכום כלשהו לזכאים לכך, יחולו הוראות סעיף 7 להלן.

-58-

(ג)    מחזיק אגרת חוב (סדרה ג') שיחפוץ בכך יודיע לחברה את פרטי חשבון הבנק לזיכוי בתשלומים
לאותו מחזיק על פי אגרות החוב (סדרה ג') כאמור לעיל, או על שינוי בפרטי החשבון האמור
בכתובתו, לפי העניין, בהודעה שישלח בדואר רשום לחברה. החברה תהא חייבת לפעול על פי
הודעתו של המחזיק בדבר שינוי כאמור לאחר חלוף 15 ימי עסקים מיום שהודעתו של המחזיק
הגיעה לחברה.

(ד)    לא מסר מחזיק אגרת חוב הרשום במרשם המחזיקים כאמור מבעוד מועד לחברה פרטים בדבר
חשבון הבנק שלו, שלזכותו יש להעביר לאותו מחזיק תשלומים על פי אגרת החוב, ייעשה כל
תשלום כזה בשיק שיישלח בדואר רשום לכתובתו האחרונה הרשומה במרשם המחזיקים.
משלוח שיק לזכאי בדואר רשום כאמור ייחשב לכל דבר ועניין כתשלום הסכום הנקוב בו
בתאריך שיגורו בדואר כאמור, כפוף לכך שהשיק הופקד בבנק ונפרע בפועל.

## 5.    דחיית מועדים

בכל מקרה שבו מועד פירעון התשלום על חשבון קרן ו/או ריבית יחול ביום שאינו יום עסקים, יידחה מועד
התשלום ליום העסקים הראשון הבא אחריו, ללא תוספת תשלום ו"המועד הקובע" לצורך קביעת הזכאות
לפדיון או לריבית לא ישתנה בשל כך.

## 6.    הבטחת אגרות החוב

ראו בסעיף 6 לשטר הנאמנות.

## 7.    הימנעות מתשלום מסיבה שאינה תלויה בחברה

לעניין הימנעות מתשלום מסיבה שאינה תלויה בחברה, ראה הוראות סעיף 14 לשטר הנאמנות.

## 8.    מרשם מחזיקי אגרות החוב

לעניין מרשם מחזיקי אגרות החוב (סדרה ג'), ראה סעיף 29 לשטר הנאמנות.

## 9.    פיצול תעודות אגרות החוב

(א)    בגין אגרות החוב (סדרה ג') הרשומות על שם מחזיק אחד תוצא לו תעודה אחת, או לפי בקשתו,
תוצאנה לו מספר תעודות בכמות סבירה (התעודות הנזכרות בסעיף זה תיקראנה להלן:
"**התעודות**").

(ב)    כל תעודת אגרת חוב ניתנת לפיצול לתעודות אגרות חוב אשר סך כל הערך הנקוב שלהן שווה
לסכום הערך הנקוב של התעודה שפיצולה מבוקש, ובלבד שתעודות אלא תוצאנה אלא בכמות
סבירה ובשקלים חדשים שלמים. הפיצול ייעשה כנגד מסירת אותה תעודת אגרת חוב ביחד עם
בקשה בכתב בחתימת המחזיק הרשום לחברה במשרדה הרשום לשם ביצוע הפיצול. כל ההוצאות
הכרוכות בפיצול, לרבות מסים והיטלים, אם יהיו כאלה, יחולו על מבקש הפיצול.

## 10.    העברת אגרות החוב

אגרות החוב ניתנות להעברה במלואו סכום הקרן הנקוב, ואף לגבי חלקו, ובלבד שיהיה בשקלים חדשים
שלמים. כל העברה של אגרות החוב תיעשה על פי כתב העברה בנוסח מקובל, חתום כיאות על ידי המחזיק
הרשום או נציגיו החוקיים ועל ידי מקבל ההעברה או נציגיו החוקיים, אשר יימסר לחברה במשרדה הרשום
בצרוף תעודות אגרות החוב המועברות על פי וכל הוכחה אחרת שתידרש על ידי החברה לשם הוכחת זכותו
של המעביר להעברתן. אם יחול מס או כל תשלום חובה אחר על כל העברה של אגרות החוב, יימסרו לחברה
הוכחות על תשלומם שתהיינה להנחת דעתה של החברה. תקנון ההתאגדות של החברה יחול על העברה מניית
נפרעון במלואן ועל הסבתן יחול, בשינויים המחויבים, לפי העניין, על אופן העברת אגרות החוב ועל הסבתן.

-59-

במקרה של העברת חלק בלבד מסכום הקרן הנקוב בתעודה של אגרת חוב, יש לפצל, על פי הוראות סעיף 9
לעיל, תחילה את תעודת אגרת החוב למספר תעודות אגרות חוב כמתחייב מכך, באופן שסך כל סכומי הקרן
הנקובים בהן יהיה שווה לסכום הקרן הנקוב בתעודת אגרת החוב האמורה. לאחר קיום כל התנאים האלה
תירשם ההעברה במרשם, והחברה תהא רשאית לדרוש לו הערה כי הערה בדבר ההעברה על תעודת
אגרת חוב המוענבת שתימסר למקבל ההעברה או כי תוצא לו במקומה תעודת אגרת חוב חדשה, ויחולו על
הנעבר כל התנאים המפורטים בתעודת אגרת חוב המוענבת, כך שבכל מקום בו נאמר "מחזיק" יראו כאילו
נאמר "הנעבר", והוא ייחשב כ"מחזיק" לצורכי שטר הנאמנות.

**11.** **פדיון מוקדם**

לעניין פדיון מוקדם של אגרות החוב, ביוזמת הבורסה ולעניין פדיון מוקדם ביוזמת החברה ראה סעיף 7 לשטר
הנאמנות.

**12.** **רכישת אגרות החוב על ידי החברה ו/או אדם קשור**

לעניין רכישת אגרות החוב, ראה סעיף 3 לשטר הנאמנות.

**13.** **ויתורים; פשרות ושינויים בשטר הנאמנות**

לעניין ויתורים, פשרות ושינויים בשטר הנאמנות, ראה סעיף 28 לשטר הנאמנות.

**14.** **אסיפות מחזיקי אגרות החוב**

האסיפה הכללית של מחזיקי אגרות החוב (סדרה ג') תתכנסנה ותתנהלנה בהתאם לאמור **בתוספת השניה**
לשטר הנאמנות.

**15.** **קבלה מאת מחזיקי אגרות החוב**

לעניין קבלה מאת מחזיקי אגרות החוב, ראה סעיף 15 לשטר הנאמנות.

**16.** **פירעון מיידי**

לעניין פירעון מיידי של אגרות החוב, ראה סעיף 8 לשטר הנאמנות.

**17.** **הודעות**

לעניין הודעות, ראה סעיף 27 לשטר הנאמנות.

**18.** **הדין החל וסמכות שיפוט**

לעניין הדין החל וסמכות שיפוט ראה סעיפים 33 ו-34 לשטר הנאמנות.

**19.** **סדר קדימויות**

במקרה של סתירה בין תוספת זו לבין שטר הנאמנות יגבר האמור בשטר הנאמנות. מובהר בזאת כי נכון
למועד השטר, אין סתירה בין ההוראות המתוארות בתוספת זו לשטר הנאמנות.

\*\*\*

-60-

## All Year Holdings Limited

### תוספת שנייה

### אסיפות מחזיקי אגרות החוב (סדרה ג')

1. **זכאות לכינוס אסיפה**

1.1 הנאמן יכנס אסיפת מחזיקים, אם ראה צורך בכך או לדרישת מחזיק בתעודות התחייבות מסדרה מסוימת, אחד או יותר, שלו חמישה אחוזים לפחות מיתרת הערך הנקוב של תעודות ההתחייבות מאותה סדרה במקרה שהמבקשים את זימון האסיפה הינם מחזיקי אגרות החוב, יהיה הנאמן רשאי לדרוש מהמבקשים שיפוי, לרבות מראש, עבור ההוצאות הסבירות הכרוכות בכך.

1.2 יובהר כי, דרישת השיפוי על ידי הנאמן, לא תפגע בזימון אסיפה אשר זומנה לצורך נקיטת פעולה שנועדה למנוע פגיעה בזכויות מחזיקי אגרות החוב ולא יהיה בדרישת שיפוי זו כדי לגרוע מחובת החברה לשאת בהוצאות הכרוכות בזימון האסיפה.

1.3 הנאמן יזמן אסיפת מחזיקים בתוך 21 ימים מיום שהוגשה לו הדרישה לכנסה, למועד שיקבע בהזמנה, ובלבד שמועד הכינוס לא יהיה מוקדם משבעה ימים ולא מאוחר מ-21 ימים ממועד הזימון ; ואולם הנאמן רשאי להקדים את כינוס האסיפה, ליום אחד לפחות לאחר מועד הזימון, אם סבר כי הדבר דרוש לשם הגנה על זכויות המחזיקים ; עשה כן, ינמק הנאמן בדוח בדבר זימון האסיפה את הסיבות להקדמת מועד הכינוס.

1.4 לא זימן הנאמן אסיפת מחזיקים, לפי דרישת מחזיק, בתוך 21 ימים מיום שנדרש רשאי המחזיק לכנס את האסיפה, ובלבד שמועד הכינוס יהיה בתוך 14 ימים, מתום התקופה לזימון האסיפה בידי הנאמן, והנאמן יישא בהוצאות שהוציא המחזיק בקשר עם כינוס האסיפה.

1.5 כל אסיפת מחזיקי אגרות החוב (סדרה ג') תתקיים בישראל, במקום עליו יודיעו החברה ו/או הנאמן, והחברה תישא בכל העלויות הסבירות של כינוס האסיפה.

2. **זימון לאסיפה וסדר היום באסיפה**

2.1 זימון לאסיפה מטעם הנאמן לשם התייעצות בלבד עם מחזיקי אגרות החוב יפורסם לפחות יום אחד לפני מועד כינוסה (להלן: "אסיפת ההתייעצות"). לאסיפת התייעצות לא יפורסם סדר יום ולא יתקבלו בה החלטות.

2.2 זימון לאסיפה, שאינה אסיפת התייעצות, יפורסם בהתאם להוראות חוק ניירות ערך כפי שיהיה מעת לעת, לפחות 7 (שבעה) ימים, אך לא יותר מ- 21 (עשרים ואחד) ימים, טרם כינוס האסיפה (להלן: "זימון").

2.3 הנאמן יקבע את סדר היום באסיפת מחזיקים. מחזיק באגרות החוב (סדרה ג'), אחד או יותר, שלו חמישה אחוזים לפחות מיתרת הערך הנקוב של אגרות החוב (סדרה ג'), רשאי לבקש מהנאמן לכלול נושא בסדר היום של אסיפת מחזיקים שתתכנס בעתיד, ובלבד שהנושא מתאים לדעת הנאמן להיות נדון באסיפה כאמור ;

2.4 הנאמן יהיה רשאי לקצר את מועד ההתכנסות ליום אחד לפחות לאחר מועד הזימון אם ראה כי דחייה בכינוס האסיפה מהווה או עלולה להוות פגיעה בזכויות מחזיקי אגרות החוב. עשה כן, ינמק הנאמן בדוח בדבר זימון האסיפה את הסיבות להקדמת מועד הכינוס.

2.5 בזימון יפורט :

2.5.1 מקום התכנסות האסיפה.

2.5.2 תאריך התכנסות האסיפה ושעת האסיפה ;

2.5.3 המניין החוקי לפתיחת האסיפה כמפורט בסעיף 3 להלן ;

-61-

2.5.4    המועד הקובע להשתתפות באסיפה אשר יחול לא פחות משלושה ימי מסחר לפני
כינוס האסיפה ולא יותר מארבעה עשר ימים טרם כינוסה.

2.5.5    יצוינו הנושאים שידונו באסיפה וההחלטות המוצעות;

2.5.6    הסדרים לעניין הצבעה בכתב;

### 3.    **המניין החוקי לפתיחת אסיפה ואסיפה נדחית**

3.1    אסיפת התייעצות תתקיים בכל מספר משתתפים שהוא.

3.2    אסיפת מחזיקי אגרות החוב תיפתח לאחר שיוכח כי קיים המניין החוקי הדרוש לקיום
האסיפה.

3.3    לשם קביעת המניין החוקי לאסיפה לא יובאו בחשבון אגרות חוב המוחזקות על ידי אדם
קשור כהגדרתו בסעיף 3.2 לשטר הנאמנות.

3.4    כפוף למניין החוקי הנדרש באסיפה שכונסה לקבלת החלטה מיוחדת וכפוף להוראות חוק
ניירות ערך, המניין החוקי לקיום אסיפה מחזיקים הוא נוכחות של לפחות שני מחזיקים
באגרות החוב שלהם 25% (עשרים וחמישה אחוזים) לפחות מהיתרה הבלתי מסולקת של
הערך הנקוב של אגרות החוב הנמצאות במחזור אותה עת, בתוך מחצית השעה מהמועד
שנקבע לפתיחת האסיפה.

3.5    לא נכח באסיפה מחזיקים, בתום מחצית השעה מהמועד שנקבע לתחילת האסיפה, מניין
חוקי, תידחה האסיפה למועד אחר שלא יקדם משני ימי עסקים לאחר המועד שנקבע לקיום
האסיפה המקורית או מיום עסקים אחד, אם סבר הנאמן כי הדבר דרוש לשם הגנה על זכויות
מחזיקי אגרות החוב; נדחתה האסיפה, ינמק הנאמן בדום בדבר זימון האסיפה הנדחית את
הסיבות לכך.

3.6    למעט בקשר עם אסיפה שכונסה לקבלת החלטה מיוחדת ובכפוף להוראות חוק ניירות ערך,
לא נכח באסיפה המחזיקים הנדחית מניין חוקי כעבור מחצית השעה לאחר המועד שנקבע
לתחילתה, יהיה המניין החוקי כדלקמן :

3.6.1    אם כונסה האסיפה ע"י הנאמן - בכל מספר משתתפים שהוא;

3.6.2    אם כונסה האסיפה עקב דרישת מחזיקים או על ידי מחזיקים, כמפורט בסעיפים 1.1
ו- 1.3 לעיל – יהיה המניין החוקי מחזיקים באגרות החוב, אחד או יותר, שלהם 5%
(חמישה אחוזים) לפחות מזכויות ההצבעה בסדרת אגרות החוב.

3.7    אגרות חוב המוחזקות על ידי אדם קשור (כהגדרתו בסעיף 3.2 לשטר) לא יובאו בחשבון לצורך
קביעת המניין החוקי.

### 4.    **יושב ראש**

בכל אסיפת מחזיקים יכהן הנאמן או מי שהוא מינה כיושב ראש לאותה אסיפה.

### 5.    **אסיפה נמשכת**

5.1    אסיפה שנפתחה תינעל על פי הודעת הנאמן או הודעת יושב ראש האסיפה ויכול שיהיו בה
מושב אחד או יותר.

5.2    אסיפת מחזיקים שיש בה מניין חוקי, יושב ראש האסיפה ו/או הנאמן, רשאים להחליט על
קיום מושב נוסף אשר יתקיים במועד אחר ובמקום שייקבעו על ידי הנאמן (להלן :"**אסיפה
נמשכת**");

5.3    הנאמן יהיה אחראי לפרסום הודעה בדבר המועד והמקום בהם תתכנס האסיפה הנמשכת
ובלבד שהודעה כאמור תינתן 12 שעות לפחות טרם כינוסה של האסיפה הנמשכת.

-62-

5.4 באסיפה נמשכת לא יידון אלא נושא שהיה על סדר יומה של האסיפה המקורית ושלא נתקבלה
לגביו החלטה.

5.5 מחזיק שלא נכח באסיפה המקורית יוכל להתייצב לאסיפה הנמשכת ולהצביע על הנושאים
שעלו להצבעה (ושהתחבצעות עליהם טרם נגמלה) ושיעלעו להצבעה, בכפוף לכך שיוכיח בפני מזמן
האסיפה את בעלותו באגרות החוב נושא האסיפה נכון למועד הקבוע לאסיפה כפי שנקבע
בהודעת הזימון של האסיפה.

## 6. הוראות באסיפות מיוחדות

באסיפות מחזיקי אגרות חוב שעל סדר יומן אחד הנושאים שלהלן, יחולו לעניין המניין החוקי באסיפת
מחזיקים או באסיפה נדחית וכן לעניין הרוב הדרוש לשם קבלת החלטה ההוראות שלצידן:

6.1 באסיפה שעל סדר יומה העמדה לפירעון מיידי של אגרות החוב – יחולו הוראות סעיף 8.2.2
לשטר הנאמנות.

6.2 באסיפה שעל סדר יומה העברת הנאמן מכהונתו – יחולו הוראות סעיף 31 לשטר הנאמנות.

6.3 שינוי ו/או תיקון ו/או תוספת לשטר הנאמנות – יחולו הוראות סעיף 28 בשטר הנאמנות.

באסיפה שעל סדר יומה החלטה בנושא שנקבע בשטר הנאמנות או באגרת החוב כי הוא כפוף להחלטה
מיוחדת המניין החוקי הינו נוכחות של מחזיקים באגרות החוב בעצמם או על ידי באי כוחם שלהם
חמישים אחוזים (50%) לפחות מיתרת הערך הנקוב של אגרות החוב או באסיפה נדחית, נוכחות של
מחזיקים באגרות החוב בעצמם או על ידי באי כוחם שלהם עשרים אחוזים (20%) לפחות מיתרת הערך
הנקוב של אגרות החוב. הרוב הנדרש לקבלת החלטה מיוחדת (בין באסיפה המקורית ובין באסיפה
הנדחית) הינו רוב של שני שלישים (2/3) מיתרת הערך הנקוב של אגרות החוב המיוצג בהצבעה.

## 7. הודעות עמדה

7.1 הנאמן או מחזיק אגרות החוב, אחד או יותר, שלו חמישה אחוזים לפחות מיתרת הערך הנקוב
של אגרות החוב (סדרה ג') רשאי לפנות בכתב למחזיקים באגרות החוב במכתב שיצורף לכתב
ההצבעה על מנת לשכנעם לגבי אופן הצבעתם בנושאים המתנשאים העולים לדיון באותה אסיפה
(בתוספת זו – **"הודעת עמדה"**).

7.2 מחזיק אשר יבקש לעשות שימוש בזכות זו, יודיע על כך לנאמן בעת המושב בו הוחלט על
העמדת אותו נושא להצבעה ויעביר לנאמן את הודעת העמדה בתוך 24 שעות ממועד אותו
מושב.

7.3 באסיפה שזומנה עקב דרישת מחזיקי אגרות חוב או על ידי מחזיקי אגרות החוב כמפורט
בסעיפים 1.1 ו- 1.3 יהיה רשאי כל מחזיק, באמצעות הנאמן, לפרסם הודעת עמדה ביחס
לנושאים שעל סדר יומה של האסיפה.

7.4 הנאמן והחברה יהיו רשאים, כל אחד בנפרד, לפרסם הודעת עמדה בתגובה על הודעת עמדה
שנשלחה בהתאם לסעיפים 7.1 או 7.3 לעיל או בתגובה לפניה אחרת למחזיקי אגרות החוב.

7.5 באסיפת התייעצות לא יפורסמו הודעות עמדה.

## 8. הצבעות באסיפה

8.1 ההצבעה באסיפת מחזיקי אגרות חוב תיערך ביחס לנושאים אשר פורטו בזימון בלבד.

8.2 מחזיק יהיה רשאי להצביע בעצמו, באמצעות שלוח שימונה בהתאם לתוספת זו או באמצעות
כתב הצבעה.

8.3 יו"ר האסיפה רשאי לקבוע כי הצבעות יהיו בדרך של כתבי הצבעה או בהצבעה במהלך
האסיפה. במקרה בו קבע היו"ר כי ההצבעה תהיה בדרך של כתב הצבעה ידאג הנאמן, כי נוסח
כתב ההצבעה יופץ למחזיקים, ויקבע את מועד נעילת ההצבעה שעד אליו על המחזיקים
לשלוח לנאמן את כתב ההצבעה מלא וחתום כדין. הנאמן רשאי לדרוש ממחזיקים להצהיר

-63-

במסגרת כתב ההצבעה אשר לקיומו או היעדרו של עניין מנוגד (כהגדרתו להלן) שיש לו, בהתאם לשיקול דעתו של הנאמן. מחזיק אשר לא ימלא את כתב ההצבעה במלואו ו/או אשר לא יוכיח את זכאותו להשתתף ולהצביע באסיפה על פי הוראות התוספת השנייה, ו/או אשר שלא ימסור כתב הצבעה, ולפיכך בחר שלא להצביע על הנושא/ים שבכתב ההצבעה. כתב הצבעה מלא וחתום כדין שבו צוין מחזיק את אופן הצבעתו, אשר הגיע לנאמן עד למועד האחרון שנקבע לכך, ייחשב כנוכחות באסיפה לעניין קיום המניין החוקי באסיפה.

8.4    אלא אם נקבע במפורש אחרת בשטר זה, הרוב הדרוש לקבלת כל החלטה של האסיפה הכללית הוא רוב רגיל של מספר הקולות המיוצגים בהצבעה והמצביעים בעד או נגד. בנוסף רשאי הנאמן להחליט על פי שיקול דעתו בהתאם לנסיבות האם אישור ההחלטה דורש רוב שאינו רגיל.

8.5    הנאמן ישתתף באסיפה ללא זכות הצבעה. החברה לא תיטול חלק באסיפה. החברה רק תציג סוגיות טרם הדיון באסיפה ו/או שנציגיה יטלו חלק ככל שיהיו שאלות של מחזיקים לחברה. לעניין זה יובהר, כי הנאמן יהיה רשאי לפי שיקול דעתו הבלעדי להחליט כי אסיפת מחזיקים תתקיים ללא נוכחות החברה או נציג מטעמה או אדם קשור או אדם אחר כלשהו מבלי שיהיה כפוף לחובת נימוק.

8.6    בעלי אגרות החוב זכאים להשתתף ולהצביע בכל אסיפה כללית בעצמם או באמצעות באי כוח. בכל הצבעה של מחזיקי אגרות חוב תתנהל ההצבעה לפי מניין קולות, כך שכל מחזיק אגרות חוב או בא-כוחו, יהיה זכאי לקול אחד בגין כל 1 ש"ח ע.נ. מהקרן הכוללת הנקובה שטרם נפרעה של אגרות החוב שמכוחה הוא רשאי להצביע. במקרה של מחזיקים במשותף, יתקבל רק קולו של המבקש להצביע הרשום ראשון מביניהם במרשם, אם בעצמם ואם על ידי שלוח.

בעל אגרות החוב או שלוחו רשאים להצביע בגין חלק מהקולות שלו בעד הצעת החלטה מסוימת, ובגין חלק אחר נגד, ובגין חלק אחר להימנע, הכל לפי ראות עיניו.

## 9.    בדיקת קיומו של "עניין מנוגד"

9.1    במניין המצביעים לא יובאו בחשבון קולותיהם של בעלי אגרות חוב אשר הינם אדם קשור כהגדרתו בסעיף 3.2 לשטר הנאמנות ואגרות חוב אלו לא תקנינה לאדם הקשור זכות להצביע באסיפות הכלליות של מחזיקי אגרות החוב כל עוד הוחזקו על ידי האדם הקשור.

9.2    הנאמן יבחן את קיום של ניגודי עניינים אצל המחזיקים, בין עניין הנובע מהתקשקת באגרות החוב לבין עניין אחר שלהם, כפי שיקבע הנאמן (בתוספת זו – "עניין אחר"); הנאמן רשאי לדרוש ממחזיקי המשתתף באסיפת מחזיקים להודיע לו על עניין אחר שלו וכן אם יש לו ניגוד עניינים כאמור.

9.3    מבלי לגרוע מכלליות האמור לעיל, ייחשב כל אחד מאלה כבעל עניין מנוגד:

10.3.1    מחזיק אשר הנו אדם קשור (כהגדרת מונח זה בסעיף 3.2 שטר הנאמנות);

10.3.2    מחזיק אשר כיהן כנושא משרה בחברה בסמוך למועד האירוע הנדון שבבסיס ההחלטה באסיפה;

10.3.3    כל מחזיק אשר קבע הנאמן לגביו כי הינו בעל "עניין מנוגד" לפי האמור להלן בכפוף לכל דין ו/או הוראת רשות מוסמכת ובכלל כך: כל מחזיק אשר יצהיר בכתב לנאמן כי הינו בעל עניין אישי מהותי כלשהו אשר עורג מעניינים של כלל מחזיקי אגרות החוב באסיפת מחזיקי אגרות החוב ב'. מחזיק אשר לא ימסור הצהרה בכתב לאחר שהתבקש לעשות כן על-ידי הנאמן, ייחשב כמי שהצהיר שיש לו עניין אישי כאמור, ולגביו יקבע הנאמן כי הינו מחזיק בעל עניין מנוגד. מבלי לגרוע מהאמור בסעיף 10 זה, הנאמן יבחן אם מחזיק הינו מחזיק בעל "עניין מנוגד", גם בהתבחנו בהתחזקותו ו/או אותו מחזיק בניירות ערך אחרים של החברה ו/או ניירות ערך של כל תאגיד רלוונטי אחר להחלטה המובאת לאישור באסיפה (כפי שיפורט בכתב ההצבעה), בהתאם להצהרת אותו מחזיק.

קביעת קיומו של עניין מנוגד תיעשה גם על סמך מבחן כללי של ניגודי עניינים שיערוך הנאמן. כמו כן, להסרת ספק מובהר, כי אין בהוראות הדין, בהוראות לעניין הגדרת מחזיקי אגרות חוב בעלי עניין מנוגד כדי לגרוע מהוראות הדין, הפסיקה והנחיות ומחיצות של רשות ניירות ערך, לעניין הגדרת מחזיקי אגרות חוב בעלי עניין מנוגד, כפי שיחולו במועד הבחינה.

-64-

9.4    לצורך בחינת ניגוד עניינים כאמור יהא הנאמן רשאי להסתמך על חוות דעת משפטית שיזמין, ויחולו
עליה הוראות שטר הנאמנות לעניין נשיאה בהוצאות.

9.5    יובהר, כי בחינת ניגוד עניינים כאמור לעיל, ככל והיא דרושה לדעת הנאמן, תיערך בנפרד ביחס לכל
החלטה על סדר יומה של האסיפה וכן ביחס לכל אסיפה בנפרד. עוד יובהר, כי אין בהכרזה על מחזיק
כעל בעל עניין מנוגד בהחלטה או אסיפה כלשהי, כשלעצמה, כדי להראות על עניין מנוגד של אותו
מחזיק בהחלטה אחרת אשר על סדר יומה של האסיפה או על עניין מנוגד שלו באסיפות אחרות.

9.6    בספירת מניין הקולות בהצבעה שהתקיימה באסיפת מחזיקים, לא יביא הנאמן בחשבון את
קולותיהם של מחזיקים שלא נענו לדרישתו כאמור בסעיף 9.2 לעיל או של מחזיקים שלגביהם
מצא כי מתקיים ניגוד עניינים כאמור באותו סעיף קטן (בתוספת זו – **"מחזיקים בעלי עניין
מנוגד"**).

9.7    על אף האמור בסעיף 9.6 לעיל, פתח סך החזקות המשתתפים בהצבעה, שאינם מחזיקים בעלי
עניין מנוגד, משיעור של חמישה אחוזים (5%) מיתרת הערך הנקוב של אגרות החוב (סדרה ג'),
יביא הנאמן בחשבון בספירת מניין הקולות בהצבעה גם את קולותיהם של המחזיקים בעלי
עניין מנוגד.

## 10. **הכרזה על קבלת החלטה**

10.1    הכרזה יושב הראש שהחלטה באסיפת מחזיקים נתקבלה או נדחתה, בין אחד ובין ברוב
פלוני, תהיה ראיה לכאורה לאמור בה.

## 11. **כתב מינוי**

11.1    כתב מינוי הממנה מיופה כוח ו/או שלוח יהיה בכתב ויחתם על ידי הממנה או על ידי בא כוחו
שיש לו הסמכה לעשות כן בכתב כהלכה. אם הממנה הוא תאגיד, ייעשה המינוי בכתב חתום
בחותמת התאגיד בצירוף חתימתם של פקיד התאגיד או בא כח של התאגיד שיש לו הסמכה
לעשות כן. כתב המינוי של שלוח ייערך בכל צורה מקובלת. שלוח אינו חייב להיות בעצמו
מחזיק.

11.2    כתב מינוי ויפוי-הכח או התעודה האחרת שעל פיה נחתם כתב המינוי, או העתק מאושר של
יפוי כח כזה, יופקד במשרדי הנאמן, עובר למועד האסיפה שלגביה ניתן יפוי כח, אלא אם נקבע
אחרת בהודעה המזמנת את האסיפה.

11.3    הצבעה שנעשתה בהתאם לתנאים שבמסמך הממנה שלוח תהא תקפה אף אם קודם לכן נפטר
הממנה או הוכרז פסול דין או בוטל כתב המינוי או הועברה אגרת החוב שלגביה ניתן הקול,
אלא אם נתקבלה במשרדי הנאמן, לפני האסיפה, הודעה בכתב בדבר הפטירה, החלטת
הפסלות, הביטול או ההעברה, לפי העניין.

11.4    כל תאגיד שהוא בעלים של איגרת חוב, רשאי על ידי הרשאה בכתב חתומה כדין ליפות את
כוחו של אדם שיראה בעיניו לפעול כנציגו בכל אסיפה של בעלי איגרות החוב, והאדם שהורשה
כך יהיה רשאי לפעול בשם התאגיד שהוא מייצג.

## 12. **פרוטוקול**

12.1    הנאמן יערוך פרוטוקולים של אסיפת המחזיקים, וישמור אותם במשרדו הרשום לתקופה של
שבע שנים ממועד האסיפה.

12.2    פרוטוקול שנחתם על ידי יושב ראש האסיפה, ישמש ראיה לכאורה לעניינים הרשומים בו.
הכרזת יושב ראש האסיפה בדבר קבלת החלטה או דחייתה והרישום בעניין זה במרשם
הפרוטוקולים, ישמשו ראיה לכאורה על עובדה זו.

12.3    מרשם הפרוטוקולים של אסיפות המחזיקים יישמר במשרדו הרשום של הנאמן, ויהיה פתוח
לעיון מחזיקי אגרות החוב, והעתק ממנו יישלח לכל מחזיק באגרות החוב שביקש זאת.

-65-

12.4.  הנאמן יהיה רשאי לעכב מסירה של כל פרוטוקול, לכל גורם שהוא, אם עפ"י שיקול דעתו
הבלעדי, העברת הפרוטוקול, כולו או חלקו, עשויה לפגוע או להביא לפגיעה בזכויות מחזיקי
אגרות החוב (סדרה ג').

13.  אדם או אנשים שימונו על ידי הנאמן, מזכיר החברה וכל אדם או אנשים אחרים שיורשו לכך על- ידי
הנאמן, יהיו רשאים להיות נוכחים באסיפות של מחזיקי איגרות החוב. במקרה בו על-פי שיקול דעתו
הסביר של הנאמן יידרש לערוך בחלק מהאסיפה דיון ללא נוכחות נציגי החברה, אזי לא ישתתפו באותו
חלק של הדיון נציגי החברה או מי מטעמם.

14.  כל האמור בתוספת זו כפוף להוראות שטר הנאמנות.

15.  על תוספת זו יחולו תקנות ניירות ערך (הצבעה בכתב, הודעות עמדה והוכחת בעלות בתעודות התחייבות
לצורך הצבעה באסיפת מחזיקים של תעודות התחייבות) התשע"ה-2015.

***

# All Year Holdings Limited

## תוספת שלישית

## נציגות דחופה למחזיקי אגרות החוב

1.     ביחס לאגרות החוב (סדרה ג'), ככל שתמונה נציגות דחופה של מחזיקי אגרות החוב (סדרה ג'),
החברה מתחייבת כי הנציגות הדחופה תמונה לפעול בהתאם להוראות הרלוונטיות מתוך נספח
5.2.4.4 לפרק 4 בחלק 2 (ניהול נכסי השקעה והעמדת אשראי) בשער 5 (עקרונות לניהול עסקים)
בחוזר המאוחד וכן מתחייבת החברה לפעול באופן סביר בשיתוף פעולה עם הנציגות הדחופה
והנאמן, ככל הנדרש לצורך ביצוע הבדיקות הנדרשות על ידם וגיבוש החלטת הנציגות הדחופה
ולהעביר לנציגות הדחופה את כל הנתונים והמסמכים שיידרשו לה לגבי החברה .

2.     מינוי ; תקופת כהונה

2.1     הנאמן יהיה רשאי או לבקשת החברה בכתב – יהיה חייב למנות ולכנס נציגות דחופה מבין
מחזיקי אגרות החוב, כפי שיפורט להלן (להלן: "**הנציגות הדחופה**").

2.2     הנאמן ימנה לנציגות דחופה את שלושה (3) מחזיקי אגרות החוב, אשר למיטב ידיעת הנאמן הינם
המחזיקים בערך הנקוב הגבוה ביותר מבין כלל מחזיקי אגרות החוב ואשר יצהירו כי מתקיימים
לגביהם כל התנאים המפורטים להלן (להלן : "**חברי הנציגות הדחופה**"). במקרה בו, מי מבין אלו,
לא יוכל לכהן כחבר בנציגות דחופה כאמור, ימנה הנאמן, במקומו את מחזיק אגרות החוב,
המחזיק בשיעור הערך הנקוב הגבוה ביותר הבא בתור, אשר לגביו מתקיימים כל התנאים
המפורטים להלן. ואלו התנאים :

2.2.1     מחזיק אגרות החוב אינו מצוי בניגוד עניינים בשל קיומם של כל עניין מהותי נוסף
המנוגד לעניין הנוגע מכהונתו בנציגות הדחופה ומחזיקתו באגרות החוב. למען
הסר ספק מובהר, כי מחזיק שהינו אדם קשור (כהגדרתו בסעיף 3.2 לשטר
הנאמנות) ייחשב כבעל ניגוד עניינים כאמור ולא יכהן בנציגות הדחופה.

2.2.2     במהלך אותה שנה קלנדרית, מחזיק אגרות החוב לא מכהן בנציגויות דומות של
אגרת חוב אחרות ששוויין המצרבי עולה על השיעור מתוך תיק הנכסים המנוהל
על ידו, אשר נקבע כשיעור המקסימלי המאפשר כהונה בנציגות דחופה לפי
הוראות הממונה על הגבלים עסקיים בקשר עם כינון נציגות דחופה;

2.3     היה ובמהלך כהונתה של הנציגות הדחופה, חדלה להתקיים באחד מחבריה אחת הנסיבות המנויות
בסעיפים 2.2.1 ו- 2.2.2 לעיל, תפקע כהונתו, וידוע כי כל בכתב לנאמן והנאמן ימנה חבר אחר
במקומו מבין מחזיקי אגרות החוב כאמור בסעיף 2.2 לעיל.

2.4     בטרם מינוי חברי הנציגות הדחופה, יקבל הנאמן מן המועמדים לכהן כחברי הנציגות הדחופה,
הצהרה בדבר קיומם או היעדרם של ניגודי עניינים כאמור בסעיף 2.2.1 לעיל ובדבר כהונה
בנציגויות נוספת כאמור בסעיף 2.2.2 לעיל. כמו כן, הנאמן יהא רשאי לדרוש הצהרה כאמור
מחברי הנציגות הדחופה בכל עת במהלך כהונתם של הנציגות הדחופה. מחזיק שלא ימסור הצהרה
כאמור ייחשב כמי שיש לו ניגוד עניינים מניעה לכהן מכוח הוראות הממונה על הגבלים עסקיים
כאמור לעיל, לפי העניין. ביחס להצהרות בדבר ניגוד עניינים, הנאמן יבחן את קיומם של העניינים
המנוגדים, ובמידת הצורך יחליט האם יש בניגודי העניינים כדי לפסול את אותו המחזיק מכהונה
בנציגות. מובהר, כי הנאמן יסתמך על ההצהרות כאמור ולא יהיה חייב לערוך בדיקה או חקירה
עצמאית נוספת. קביעתו של הנאמן בעניינים אלו תהיה סופית.

2.5     תקופת כהונת הנציגות הדחופה תסתיים במועד בו תפרסם החברה את החלטות הנציגות
הדחופה בקשר עם מתן ארכה לחברה לצורך עמידתה בתנאי שטר הנאמנות כמפורט בסעיף 8
לשטר אך בכל מקרה לא תעלה על שלושה חודשים ממועד מינויה.

3.     סמכות

3.1     לנציגות הדחופה תהא הסמכות למתן ארכה חד פעמית לחברה בקשר למועדים לעמידתה באיזו
מאמות העמידה הפיננסיות שנקבעו בשטר הנאמנות באופן שלא תחולנה העילות לפירעון מיידי
שבסעיפים 8.1.15, 8.1.16, 8.1.17 ו-8.1.18 לשטר הנאמנות, לפי העניין, למשך תקופת הארכה, ככל
שניתנה, וזאת לתקופה שעד למועד פרסום הדוחות הכספיים הבאים לאחר מועד פרסום הדוחות

-67-

הכספיים, מהם עלה כי, החברה לא עמדה באיזו מאמות המידה הפיננסיות במשך שני רבעונים קלנדריים רצופים או לתקופה של עד 90 יום לפי המוקדם מביניהם. יובהר, כי פרק הזמן שעד למינויים של הנציגות הדחופה יובא בחשבון במסגרת הארכה האמורה לעיל, והוא לא יהווה עילה למתן ארכה נוספת כלשהי לחברה מעבר לאמור לעיל. יובהר, כי פעולות הנציגות הדחופה ושיתוף הפעולה בין חברי, יוגבל לדיון באפשרות של מתן ארכה כאמור וכי לא יועבר בין חברי הנציגות כל מידע אחר שאינו נוגע למתן ארכה כאמור.

3.2    אם לא מונתה נציגות דחופה כאמור לעיל, או אם הנציגות הדחופה החליטה שלא לתת לחברה ארכה כאמור בסעיף 3.1 לעיל, הנאמן יהיה חייב לזמן אסיפת מחזיקי אגרות החוב בהתאם להוראות סעיף 8.2 לשטר.

אין באמור כדי לגרוע מסמכות הנאמן לכנס אסיפת מחזיקי אגרות חוב, לרבות ביחס לאותו עניין בגין כינוס הנציגות הדחופה. התקבלה החלטה של אסיפת מחזיקי אגרות החוב באותו עניין תגבר החלטת האסיפה על החלטת הנציגות הדחופה, לרבות כלפי החברה.

### 4.    התחייבויות החברה בקשר לנציגות הדחופה

4.1    החברה מתחייבת לספק לנאמן כל מידע שבידיה או שביכולתה להשיג בקשר לזהות המחזיקים באגרות החוב וכיהוק החזקותיהם. כמו כן, הנאמן יפעל לקבלת המידע האמור בהתאם לסמכויות המוקנות לו על פי דין.

4.2    בנוסף, החברה מתחייבת לפעול בשיתוף פעולה מלא עם הנציגות הדחופה והנאמן ככל הנדרש לצורך ביצוע הבדיקות הנדרשות על ידם וגיבוש החלטות הנציגות הדחופה, ולהעביר לנציגות הדחופה את כל הנתונים והמסמכים שיידרשו להם לגבי החברה, בכפוף למגבלות הדין. מבלי לגרוע מכלליות האמור, החברה תמסור לנציגות הדחופה את המידע הרלוונטי לצורך גיבוש החלטתה, אשר לא יכלול כל פרט מטעה ולא יהיה חסר.

4.3    החברה תישא בעלויות הנציגות הדחופה, ובכלל זה בעלויות העסקת יועצים ומומחים על ידי הנציגות הדחופה או מטעמה ולעניין זה יחולו הוראות סעיף 26 לשטר, בשינויים המחויבים.

### 5.    אחריות

5.1    הנציגות הדחופה תפעל ותחליט בעניינים המסורים לידה, על פי שיקול דעתה המוחלט ולא תהא אחראית, היא או מי מבין חברי, נושאי המשרה בהם, עובדיהם או יועציהם, והחברה ומחזיקי אגרות החוב פוטרים אותם בזאת, ביחס לכל טענה, דרישות ותביעות כנגדם בגין כך שהשתמשו או נמנעו מלהשתמש בכוחות, בסמכויות או בשיקול הדעת שהוקנו להם על פי שטר הנאמנות ועל פי נספח זה ובקשר אליהן או מכל פעולה אחרת אותה ביצעו על פי, למעט אם פעלו כך בזדון ו/או בחוסר תום לב.

5.2    על פעולותיה של חברי הנציגות הדחופה ומי מטעמם יחולו הוראות השיפוי הקבועות בסעיף 26 לשטר הנאמנות, כאילו היו הנאמן.

5.3    החברה תפרסם דיווח מיידי מיד עם מינוי הנציגות הדחופה כאמור, על דבר מינויה של הנציגות הדחופה, זהות חבריה וסמכויותיה.

5.4    החברה תפרסם דיווח מיידי מיד אודות החלטת הנציגות הדחופה כאמור. עם סיום כהונת הנציגות הדחופה תפרסם החברה את כל המידע אשר הועבר לעיון הנציגות הדחופה ובלבד שאין מניעה לפרסמו על פי דין.

\*\*\*

<u>נספח 23</u>

לשטר הנאמנות מיום 19 בפברואר 2017

שנחתם בין All Year Holdings Limited לבין משמרת חברה לשירותי נאמנות בע"מ

החברה תשלם שכר לנאמן עבור שירותיו, בהתאם לשטר נאמנות זה, כמפורט להלן:

1.1 בגין הטיפול בשטר הנאמנות וליווי תהליך ההנפקה יהיה הנאמן זכאי לתשלום שכר טרחה מהחברה בסך של 600 ש"ח, בעבור כל שעת עבודה. שכר זה ישולם מיד לאחר ההנפקה בגין פעילות הנאמן עד להנפקה, לרבות, במקרה של ביטול ההנפקה או דחייתה, לאחר שהנאמן כבר ביצע עבודה בקשר עם גיבוש המסמכים הקשורים בנאמנות ו/או השתתף בדיונים עם רשות ניירות ערך.

1.2 בגין כל שנת הנאמנות או חלק ממנה החל ממועד הנפקת אגרות החוב (סדרה ג') ישולם לנאמן שכר טרחה שנתי בסך של 28,000 ש"ח.

1.3 כל אימת שתבוצע, לאחר ההנפקה המקורית של הסדרה, הנפקה של אגרות חוב נוספות מאותה הסדרה, או שהיקף הסדרה יורחב בכל דרך אחרת, יגדל שכר הטרחה השנתי של הנאמן בסכום המשקף את מלוא שיעור הגידול בהנ"ח הסדרה וזאת באופן קבוע עד לתום תקופת הנאמנות.

הסכומים הכלולים בסעיפים 1.1 ו-1.2 לעיל יכונו להלן: **"השכר השנתי"**

1.4 בנוסף יהיה הנאמן זכאי מהחברה להחזר ההוצאות הסבירות כהגדרתן להלן.

**"הוצאות סבירות"** – סכומים אשר יוציא הנאמן במסגרת מילוי תפקידו ו/או מכוח הסמכויות המוענקות לו על פי שטר זה ובכלל זה: הוצאות ועלויות בגין זימון וכינוס אסיפות של מחזיקי אגרות החוב והוצאות בגין שליחויות ונסיעות ובגין פרסומים בעיתונות הקשורים לזימון אסיפה וככל שמתחייב על פי כל דין.

1.5 מבלי לפגוע בכלליות האמור בנספח זה, יהיה הנאמן זכאי לתשלום שכר טרחה מהחברה בסך של 600 ש"ח, בעבור כל שעת עבודה שיידרש זו בגין פעולות מיוחדות אשר יבצע במסגרת תפקידו כנאמן (הכל בכפוף להוראות שטר הנאמנות), ולרבות:

1.5.1 פעולות הנובעות מהפרה של השטר או חשש ממשי להפרה של השטר על ידי החברה;

1.5.2 פעולות בקשר להעמדת אגרות החוב לפירעון מיידי ו/או פעולות בקשר עם החלטת אסיפת מחזיקי אגרות חוב להעמיד את אגרות החוב לפירעון מיידי;

1.5.3 פעולות מיוחדות שיידרש או שיהא צריך לבצע, לצורך מילוי תפקידו על פי שטר זה בקשר עם זכויות מחזיקי אגרות החוב ולשם הגנה עליהן, לרבות בשל אי עמידת החברה בהתחייבויותיה על פי שטר זה, לרבות כינוס של אסיפות מחזיקי אגרות חוב כאמור בשטר זה ולרבות בשל ההשתתפות באסיפות מחזיקי אגרות חוב;

1.5.4 עבודות מיוחדות (לרבות, אך לא רק, עבודה הנדרשת בשל שינוי במבנה החברה או עבודה בשל דרישת החברה) או בגין הצורך בביצוע פעולות נוספות לשם מילוי תפקידו כנאמן סביר, בשל שינוי בחוקים (לרבות תקנות שיותקנו בעקבות תיקונים 50 ו-51 לחוק ניירות ערך) ו/או תקנות ו/או הוראות מחייבות אחרות שיחולו בקשר לפעולותיו הנאמן ואחריותו לפי שטר נאמנות זה;

1.5.5 פעולות בקשר לרישום או ביטול רישום של בטוחות במרשם המתנהל על פי כל דין (לרבות בחו"ל), כמו כן, בדיקה, פיקוח בקרה, אכיפה וכיוצ"ב של ההתחייבויות (כגון, הגבלות על חופש הפעולה של החברה, שעבוד נכסים וכד'), שנטילה או שנטילתם או שינוטלו על ידי מי מטעמם או עבורם, בקשר להבטחת התחייבויות אחרות של החברה או מי מטעמה (כגון : ביצוע תשלומים לפי תנאי אגרות החוב) כלפי מחזיקי אגרות החוב, לרבות כאשר למחות תנאי בטוחות והתחייבויות כאמור והתקיימותם.

1.6 במקרה בו החברה תהיה אמורה לשלם לנאמן שכר טרחתו בגין הוצאות ו/או תשלום בעבור

-69-

הוצאות סבירות שהוציא ו/או בעבור פעולות מיוחדות שעליו לבצע או שביצע במסגרת מילוי
תפקידו ו/או מכוח הסמכויות המוענקות לו על פי שטר זה כאמור בנספח זה לעיל, אם וככל שאלו
יהיו, והחברה לא עשתה כן, הנאמן יהיה רשאי לשלם את מלוא הסכומים האלה מהתקבולים
שנצברו בידו בהתאם לאמור בסעיף 9 ו-10 לשטר, ובלבד שהודיע לחברה על כוונתו לעשות כן בכתב
ומראש.

1.7    מובהר כי במידה ובשל שינוי עתידי בחוקים ו/או תקנות ו/או הוראות מחייבות אחרות החלים על
פעולת הנאמן יושתו על הנאמן הוצאות נוספות, שידרשו ממנו לשם מילוי תפקידו כנאמן סביר,
תשפה החברה את הנאמן על הוצאותיו הסבירות לרבות שכר טרחתו הסביר.

1.8    מע"מ, אם יחול, יתווסף לכל אחד מהסכומים האמורים וישולם על ידי החברה.

1.9    כל הסכומים האמורים יהיו צמודים למדד בגין חודש דצמבר 2016 אולם בכל מקרה לא ישולם
סכום הנמוך מהסכום הנקוב בשטר זה.

1.10    במקרה בו יוענקו למחזיקי אגרות החוב בטחונות כלשהם, ידונו החברה והנאמן בעדכון שכר
הטרחה, בהתאם להיקף השעות אשר יידרש הנאמן להקדיש לנאמנות במקרה כאמור.

1.11    שכר הנאמן ישולם בגין התקופה שעד תום הנאמנות הכלולה בשטר זה אף אם מונה כונס נכסים
לחברה (או כונס נכסים, מנהל או מפרק), או אם הנאמנות לפי שטר זה תנוהל בהשגחת בית
המשפט אם לאו.

1.12    השכר השנתי האמור לעיל ישולם בתחילת כל שנת נאמנות.

1.13    כל הסכומים האמורים בנספח זה, ייהנו מעדיפות על פני הכספים המגיעים למחזיקי איגרות החוב.

1.14    במידה ופקעה כהונת הנאמן, כאמור בשטר הנאמנות, לא יהיה הנאמן זכאי לתשלום שכר טרחתו
החל מיום תחילת כהונתו של הנאמן החלופי. במידה וכהונת הנאמן פקעה במהלך שנת הנאמנות
ייחזר שכר הטרחה בגין החודשים בהם לא שימש הנאמן כנאמן לאגרות החוב החל ממינוי
הנאמן החלופי. האמור בסעיף זה לא יחול לגבי שנת הנאמנות הראשונה.

1.15    בגין השתתפות הנאמן באסיפות כלליות של בעלי המניות שתתקיימנה בישראל יהיה הנאמן
לשכר בסך של 750 ש"ח.

1.16    מונה נאמן במקומו של נאמן שהסתיימה כהונתו לפי סעיפים 35ב(א1) או 35יד(ד) לחוק ניירות ערך,
יישאו המחזיקים בעדות ובמידה והתחייבויות מסדרה ג' בהפרש שבו עלה שכר של הנאמן שמונה כאמור
על השכר ששולם לנאמן שבמקומו מונה אם ההפרש כאמור הוא בלתי סביר ויחולו הוראות הדין
הרלוונטיות במועד החלפה כאמור.

נשיאה של המחזיקים בהפרש כאמור תבוצע באופן של קיזוז החלק היחסי של ההפרש מכל תשלום
שהחברה תבצע למחזיקי אגרות החוב בהתאם לתנאי שטר הנאמנות והעברתו ע"י החברה ישירות
לנאמן.

1.17    ככל שעל פי דין ואו תחול על החברה חובת הפקדת פיקדון להבטחת נשיאת החברה בהוצאות מיוחדות
של הנאמן, תפעל החברה בהתאם להוראות כאמור.

1.18    האמור בסעיפים אחרים בשטר זה בדבר כיסוי הוצאות ועלויות בקשר לפעולות הנאמן בא להוסיף
על האמור בנספח זה.

***

# תיקון מספר 1
## מיום 4 בפברואר 2020

לשטר נאמנות שנערך ונחתם ביום 19 בפברואר 2017

ב י ן :

**All Year Holdings Limited**

חברה זרה מאיי הבתולה הבריטיים אשר משרדה הרשום באיי הבתולה הינו אצל :

Hauteville Trust (BVI) Limited, P.O. Box 3483, Road Town, Tortola, British Virgin Islands

ומענה בישראל לצורך שטר זה ולצורך המצאת כתבי בי דין הינה (בכפוף לאמור בסעיף 5.9 לשטר הנאמנות) :

אצל י.א.אס. ריל אסטייייס רפרזנטטיישן בע"מ,

מגדל השחר, רחוב אריאל שרון 4, גבעתיים

טל: 03-6123939

פקסימיליה: 03-6125030

(להלן : "**החברה**")

<u>מצד אחד</u> ;

ל ב י ן :

**משמרת – חברה לשירותי נאמנות בע"מ**

דרך מנחם בגין 48, תל אביב

טלפון : 03-6374352

פקס : 03-6374344

(להלן : "**הנאמן**")

<u>מצד שני</u> ;

**הואיל**   וביום 19 בפברואר 2017 נחתם בין החברה לבין הנאמן שטר נאמנות (להלן : "**שטר הנאמנות**") בקשר עם הצעה לציבור של אגרות חוב (סדרה ג') וזאת על פי תשקיף המדף של החברה שפורסם ביום 29 בנובמבר 2015, נושא תאריך 30 בנובמבר 2015 ;

**והואיל**   ודירקטוריון החברה החליט לאשר תיקון לשטר הנאמנות, במסגרתו תעודכנה הוראות הפדיון המוקדם ביוזמת החברה הקבועות בשטר הנאמנות במקרה של מכירת הנכס המשועבד ו/או מימון מחדש של הלוואת המשכנתא (לרבות בדרך של מכירת או המחאת שטר החוב לצד ג'), הכול כמפורט בתיקון זה להלן ;

**והואיל**   וביום 30 בינואר 2020, החליטה אסיפת מחזיקי אגרות החוב (סדרה ג') בהחלטה מיוחדת, לאשר את תיקון שטר הנאמנות, הכול כמפורט בתיקון זה להלן ;

**והואיל**   והצדדים מעוניינים לעגן בכתב במסגרת תיקון זה לשטר הנאמנות את השינוי לשטר הנאמנות (להלן : "**התיקון**") ;

<u>**לפיכך הוצהר, הותנה והוסכם בין הצדדים כדלקמן**</u> :

**1.** **פרשנות והגדרות**

1.1    המבוא לתיקון זה מהווה חלק בלתי נפרד הימנו.

1.2    לביטויים ולמונחים בתיקון זה תהא המשמעות הנתונה להם בשטר הנאמנות, אלא אם נקבע מפורשות אחרת.

1.3    במקרה של סתירה בין האמור בתיקון זה לבין שטר הנאמנות, יגברו הוראות תיקון זה.

1.4    כל אחד מהצדדים מצהיר, כי למיטב ידיעתו, אין כל מניעה על פי כל דין ו/או הסכם להתקשרותו בתיקון זה וכי הגופים המוסמכים בו אישרו את אישרו את תיקון זה, וכי התקבלו בו כל ההחלטות הדרושות על מנת להסמיך את החתומים על תיקון זה, בשמו.

**2.** **תיקון שטר הנאמנות**

2.1    בסעיף 2.2 סיפא לשטר הנאמנות, תתווסף הפסקה שלהלן:

"על אף האמור לעיל, ובהתאם לאמור בסעיף 7.2.9 להלן, לשיעור הריבית שתישא יתרת קרן אגרות החוב (סדרה ג') החל מיום 28 בפברואר 2020 ועד ליום 30 באוגוסט 2020 (להלן: "תקופת השינוי"), וישולם ביום 31 באוגוסט 2020, יתווסף רבע מסך קנס הפדיון המוקדם (כהגדרתו בסעיף 7.2.9 להלן) (קרי, 0.5% מסך יתרת הקרן הבלתי מסולקת של אגרות החוב (סדרה ג')) (להלן: "שיעור ריבית אוגוסט 2020"). החברה תפרסם בתוך חמישה ימי מסחר ממועד כניסתו לתוקף של תיקון מס' 1 לשטר הנאמנות את שיעור הריבית שנושאות אגרות החוב (סדרה ג') במועד הדיווח המיידי על פי תנאי שטר הנאמנות, את שיעור הריבית הנוספת בתקופת השינוי היתרה הבלתי מסולקת של קרן אגרות החוב (סדרה ג'), את שיעור הריבית המשוקללת בתקופת השינוי במונחי סך היתרה הבלתי מסולקת של קרן אגרות החוב (סדרה ג') (קרי, שיעור ריבית אוגוסט 2020) ואת שיעור הריבית השנתית המשתקפת משיעור הריבית המשוקללת בתקופת השינוי כאמור לעיל. מובהר כי פרט לשיעור ריבית אוגוסט 2020, לא יחול שינוי בשיעור הריבית השנתית ושיעור הריבית החצי שנתית לתקופות הריבית האחרות (כפוף לשינויים בשיעור הריבית בהתאם להוראות שטר נאמנות זה ככל שיהיו)."

2.2    בסעיף 7.2.9 לשטר הנאמנות, לפני הפסקה המתחילה במילים "על אף האמור בסעיף 7.2.9 לעיל...", תתווסף הפסקה שלהלן:

"על אף האמור בסעיף 7.2.9 לעיל, הסכום שישולם למחזיקי אגרות החוב (סדרה ג') במקרה של פדיון מוקדם מלא עקב מכירת הנכס המשועבד ו/או מימון מחדש של הלוואת המשכנתא (לרבות בדרך של המחאת שטר החוב לצד ג') בתקופה של 9 החודשים שתחילתה במועד אישור אסיפת מחזיקי אגרות החוב (סדרה ג') את תיקון מספר 1 לשטר זה, יהיה סכום הערך ההתחייבותיו של אגרות החוב (סדרה ג') העומדות לפדיון מוקדם שבמסגרתו, דהיינו קרן בתוספת ריבית, בתוספת שיעור של 2% מסך יתרת הקרן הבלתי מסולקת של אגרות החוב (סדרה ג') אשר ישולם כריבית (להלן: "קנס הפדיון המוקדם"). כמו כן, היה ולא בוצע פדיון מוקדם כאמור עד למועד הקובע לתשלום הריבית שחל ביום 31 באוגוסט 2020 (להלן: "מועד תשלום ריבית אוגוסט 2020"), במועד תשלום ריבית אוגוסט 2020 ישולם רבע מסך קנס הפדיון המוקדם (קרי, 0.5% מסך יתרת הקרן הבלתי מסולקת של אגרות החוב (סדרה ג')) כשיתרת קנס הפדיון המוקדם תשולם במועד הפדיון המוקדם לפי פסקה זו בפועל (ככל שיבוצע). עם קבלת החלטה של דירקטוריון החברה בעניין ביצוע פדיון מוקדם כאמור בפסקה זו לעיל, תפרסם החברה דוח מיידי שיכלול את סכום הקרן שייפרע בפדיון המוקדם, את הריבית שנצברה בגין סכום הקרן האמור עד למועד הפדיון המוקדם, את שיעור הריבית המשתקף מסך קנס הפדיון המוקדם (לפי העניין) במונחי היתרה הבלתי מסולקת של קרן אגרות החוב (סדרה ג'), את שיעור הריבית המשוקללת במועד הפדיון המוקדם (ריבית שנצברה בתוספת רכיב קנס הפדיון המוקדם) במונחי סך היתרה הבלתי מסולקת של קרן אגרות החוב (סדרה ג') ואת שיעור הריבית השנתית המשתקפת משיעור הריבית המשוקללת במועד הפדיון המוקדם כאמור."

**3.**    למען הסר ספק, יובהר כי ביתר הוראות שטר הנאמנות לא יחול כל שינוי.

<u>ולראיה באו הצדדים על החתום :</u>

משמרת-חברה לשירותי נאמנות בע"מ

משמרת — חברה לשירותי נאמנות בע"מ

All Year Holdings Limited

<u>אישור עו"ד</u>

אני החת"מ, איתמר נבות, עו"ד, מאשר כי תיקון זה לשטר הנאמנות נחתם על-ידי All Year Holdings Limited ("**החברה**") כדין ע"פ תקנונה, באמצעות מר יואל גולדמן אשר חתימתו מחייבת את החברה בקשר עם תיקון זה.

איתמר נבות, עורך-דין
Yitamar Navott, Advocate
מס' רישיון No. 80973 License

איתמר נבות, עו"ד

# Deed of Trust

# Drawn Up and Signed in Tel-Aviv on February 19, 2017

**Between**

### All Year Holdings Limited

A foreign Company from the British Virgin Islands whose registered office in the Virgin Islands is care of:

Blenheim Trust (BVI) Limited,

P.O. Box 3483, Road Town, Tortola, British Virgin Islands

and its address in Israel for the purpose of this Deed of Trust and for the purpose of service of judicial documents is:

Gabriel Daranov, C/O U.S. Real Estate Represent Ltd.

16, Aba Hillel, Ramat Gan 5250608

Tel: 03-6123939

Fax: 03-6125030

(Hereinafter: the **"Company"**)

**Of the first part**;

**And**

### Mishmeret Trust Services Company Ltd.

Of 48 Derech Menachem Begin, Tel Aviv

Tel: 03-6374352

Fax: 03-6374344

(Hereinafter: the **"Trustee"**)

**Of the second part**;

| Section | Subject | Page |
|---|---|---|
| | **Deed of Trust** | |
| 1 | Preamble, Interpretation and Definitions | 6 |
| 2 | Issue of the Debentures; Terms of Issue; Pari Passu Debentures | 12 |
| 3 | **Acquisition of Debentures by the Company and/or a Related Party and distribution** | 13 |
| 4 | Issue of additional Debentures | 15 |
| 5 | The Company's undertakings | 19 |
| 6 | Securing the Debentures | 36 |
| 7 | Early redemption | 54 |
| 7.1 | Early redemption at the discretion of the TASE | 54 |
| 7.2 | Early redemption at the discretion of the Company | 55 |
| 8 | The right to declare the Debentures due and payable | 57 |
| 9 | Claims and proceedings by the Trustee | 67 |
| 10 | Receipts held in Trust | 68 |
| 11 | Power to demand payment to the holder through the Trustee | 69 |
| 12 | Power to withhold distribution of funds | 70 |
| 13 | Notice of distribution | 70 |
| 14 | Failure to pay for reasons out of the Company's control | 72 |
| 15 | Receipt from the holders of the Debentures and from the Trustee | 73 |
| 16 | Presentation of a Debenture to the Trustee; Registration with respect to partial payment | 75 |
| 17 | Investment of funds | 75 |
| 18 | The Company's undertakings to the Trustee | 76 |
| 19 | Additional undertakings | 81 |
| 20 | Agents | 82 |
| 21 | Other agreements | 82 |
| 22 | Trusteeship reports | 82 |
| 23 | Remuneration of the Trustee and remuneration of its expenses | 83 |
| 24 | Special powers | 83 |
| 25 | The Trustee's power to engage agents | 84 |
| 26 | Indemnification of Trustee | 85 |
| 27 | Notices | 90 |
| 28 | Waiver, settlement and alterations to the Deed of Trust | 91 |
| 29 | Register of holders of Debentures | 93 |
| 30 | Release | 94 |
| 31 | Appointment of Trustee; Trustee's' Duties | 94 |
| 32 | Meetings of holders of Debentures | 96 |
| 33 | Governing law | 96 |
| 34 | Exclusive jurisdiction | 96 |
| 35 | General | 96 |
| 36 | Trustee's liability | 97 |
| 37 | Addresses | 97 |
| 38 | Magna authorization | 97 |
| **First Schedule to the Deed of Trust – Certificate of Debentures (Series C)** | | 100 |
| **Terms Overleaf** | | 102 |
| 1 | General | 102 |
| 2 | The Debentures | 103 |
| 3 | Terms of the Debentures (Series C) offered under the Prospectus | 103 |
| 4 | Principal and interest payments on the Debentures (Series C) | 105 |
| 5 | Deferral of dates | 106 |
| 6 | Securing of Debentures | 106 |
| 7 | Nonpayment for a reason beyond the Company's control | 106 |
| 8 | Register of holders of Debentures | 106 |
| 9 | Splitting of Debenture certificates | 106 |
| 10 | Transfer of Debentures | 106 |
| 11 | Early redemption | 107 |
| 12 | Purchase of Debentures by the Company or a Related Party | 107 |
| 13 | Waiver; Settlement; Changes to Deed of Trust | 107 |
| 14 | Meetings of holders of Debentures | 107 |
| 15 | Receipts from holders of Debentures | 107 |

| 16 | Immediate repayment | 108 |
|----|---------------------|-----|
| 17 | Notices | 108 |
| 18 | Governing law; Jurisdiction | 108 |
| 19 | Priority | 108 |
| **Second Schedule of Deed of Trust – Meetings of Holders of Debentures (Series C)** | | 109 |
| **Third Schedule of Deed of Trust – Emergency Representation Committee of the Holders of Debentures** | | 119 |
| **Appendix 23** | | 125 |

- 4 -

**Whereas**    the Company intends to publish a Shelf Offering Report pursuant to which the Company will make a preliminary offering of Debentures (Series C) in an amount to be determined in the Shelf Offering Report which may be published by the Company, all in a way, manner and at the terms to be determined in the Offering Memorandum;

**Whereas**    on February 7, 2017  Midroog Ltd. (hereinafter: "**Midroog**") announced the assignment of a A2.il(P) rating with a stable outlook to the issue of Debentures (Series C)  with a total value of up to NIS 650 million par value;

**Whereas**    as of the date of signing this Deed of Trust the Company is in compliance with all the terms of the Rating Agency for the purpose of rating the aforementioned Debentures (Series C);

**Whereas**    the Trustee is a private Company limited in shares that was incorporated in Israel pursuant to the Companies Law, 1999 (hereinafter: the " **Companies Law**") whose main purpose is to engage in Trusteeship activities;

**Whereas**    the Trustee has declared that there is no impediment under the Securities Law, 1968, or any other law, to prevent it from entering into this Deed of Trust with the Company and that it complies with the requirements and qualifications stipulated in the Securities Law to serve as Trustee for the issue of the Debentures (Series C) offered under the Offering Memorandum;

**Whereas**    the Trustee has no interest in the Company and the Company has no personal interest in the Trustee;

**Whereas**    the Company declares that there is no impediment under any law (whether within Israel or outside of Israel), and/or agreement for executing the issue of Debentures and/or to enter into this Deed of Trust with the Trustee;

**Whereas**    the Debentures (Series C) will be listed for trade on the Tel Aviv Stock Exchange Ltd;

**Whereas**    the Company has applied to the Trustee to serve as Trustee for the holds of Series A Debentures and the Trustee has agreed to sign this Deed of Trust and to act as the Trustee of the holders of Debentures (as they are defined above), all subject to and in accordance with the terms of this Deed of Trust;

**Now, therefore, it is agreed, declared and stipulated between the**

**Parties as follows:**

1. **Preamble, Interpretation and Definitions**

1.1    The preamble to this Deed of Trust and the appendixes attached hereto constitute an integral part hereof.

1.2    The division of this Deed of Trust into sections as well as the section headings herein are for purposes of convenience and ease of reference only and shall not be used for the purpose of interpretation.

1.3    All the foregoing in this Deed of Trust in the plural shall implicitly refer also to the singular and vice versa, all the foregoing in the masculine gender shall implicitly refer also to the feminine gender and vice versa, and any reference in the foregoing to a person shall also implicitly refer to a corporate body, all insofar as there is no other explicit and/or implicit provision in this Deed of Trust or if the content of the foregoing or the context thereof does not demand otherwise.

1.4    With respect to any matter not mentioned in this Deed of Trust and in the event of a conflict between the provision of the Law and this Deed of Trust, the provisions of the Israeli Law shall prevail. In the event of a conflict between the provisions set forth in the Offering Memorandum in connection with this Deed of Trust and/or the Debentures, the provisions of this Deed of Trust shall prevail, all subject to the rules, regulations and instructions of the TASE.

1.5    In this Deed of Trust and in the Debentures, the following terms shall have the meaning set out opposite them, unless the content or the context otherwise requires.

    1.5.1    "**This Deed**" or the "**Deed of Trust**" – this Deed of Trust, and the amendments thereto, as shall be from time to time, including the appendices attached thereto that constitute an integral part thereof;

    1.5.2    "**Debentures (Series C)**" –Debentures (Series C) to be issued by the Company pursuant to the Shelf Offering Report;

    1.5.3    :**Debenture Series**" – Registered Debentures, the terms of which are as set out in this Deed of Trust, Debenture (Series C) certificates and the Shelf Offering Report, pursuant to which they are to be issued;

    1.5.4    "**The Prospectus**" or "**Shelf Prospectus**" – Shelf Prospectus of the Company published on November 29, 2015, dated November 30, 2015.

- 6 -

**1.5.5**     "**Shelf Offering Report**" – Shelf Offering Report/s which will be published pursuant to the Shelf Prospectus, in accordance with Article 23A (F) of the Securities Law 5728-1968, in which all the special details of the offering of the Debentures (Series C) will be completed:

**1.5.6**     "**Preliminary Offering Report**" – Shelf Offering Report pursuant to which the Debentures (Series C) will be initially be issued;

**1.5.7**     "**The Trustee**" –Mishmeret Trust Services Company Ltd. and/or anyone serving from time to time as Trustee for the holders of Debentures pursuant to this Deed;

**1.5.8**     "**Register of Debenture Holders**" and/or "**the Register**" – the register of holders of Debentures as set forth in section 29 of this Deed;

**1.5.9**     "**Holder**" and/or "**Debenture Holder**": in accordance with the definition of the term in the Securities Law;

**1.5.10**     "**Debenture Certificate**"- a Debenture certificate whose wording appears in the **First Addendum** to this Deed;

**1.5.11**     "**The Law**" or "**the Securities Law**" – The Securities Law, 5728-1968 and the regulations promulgated thereunder, as they shall be from time to time;

**1.5.12**     "**The Companies Law**" – the Companies Law, 5759-1999 and the regulations promulgated thereunder, as they shall be from time to time;

**1.5.13**     "**Business Day**" or "**Bank Business Day**" – Any day on which the TASE Clearing House most of the banks in Israel are open for transactions;

**1.5.14**     "**Trading Day**" – day on which transactions are performed on the TASE;

**1.5.15**     "**Nominee Company**": Mizrahi Tefahot Nominee Company Ltd. or any nominee company in its place, provided that all of the listed securities of the Company are listed in its name;

**1.5.16**     "**Amount of the Principal**" – the outstanding par value of the debentures;

**1.5.17**     "**TASE**" – the Tel Aviv Stock Exchange Ltd.;

1.5.18  **"Collateral"**: the pledges specified in section 6.2;

1.05.19  **"The Transferred Company"**: YG WV LLC which holds 50% of the participation rights in the subsidiary;

1.5.20  **"Subsidiary"**: Wythe Berry Member LLC, which holds all the participation rights in the Property Company;

1.5.21  **"The Property Company"**: Wythe Berry Fee Owner LLC, which shall hold ownership rights in the property on the closing date;

1.5.22  **"Holding Corporations"**: The Transferred Company and the Subsidiary;

1.5.23  **"The Pledged Property"**: the property known as William Vale Complex, the details of which are specified in Appendix A of the Deed of Trust;

1.5.24  **"Closing Date"**: The date on which the transfer of the property pledged to the Property Company is completed as well as the completion of the Collateral in favor of the holders of the Debentures, as specified in section 6.2.3 below

1.5.25  **"Special Resolution"**:

A resolution adopted at a general meeting of the holders of Debentures (Series C), at which holders of at least fifty (50%) of the outstanding par value of the Debentures (Series C) were present, in person or by proxy, or at an adjourned meeting, at which holders of Debentures were present, in person or by proxy, holding at least twenty percent (20%) of such outstanding balance, and which was adopted (whether at the original meeting or at the adjourned meeting) by a majority of at least two thirds (2/3) of the outstanding par value of the Debentures (Series C), which is represented in the vote, except for abstainers.

1.5.26  **"Conflicting Matter"** – within its meaning in section 9.3 of this Deed;

1.5.27  **"The Consolidated Circular"**: the consolidated circular of the Commissioner of Capital Markets, Insurance and Savings for Institutional Investors, as shall be from time to time[1];

1.5.28  **"Rating"** – rating by a rating agency, as defined below;

---

[1]  http://mof.gov.il/hon/Information-entities/Pages/Codex.aspx

- 8 -

**1.5.29    In this Deed of Trust and in the Debentures, the rating shall have the meaning set forth in the table below:**

| | |
|---|---|
| **"A"** | ilA as rated by Maalot or A2 as rated by Midroog, or a rating equivalent to these ratings that will be assigned by another Rating Agency which is rating or will rate the Debentures (Series B). |
| **"A-"** | ilA- as rated by Maalot or A3 as rated by Midroog or a rating equivalent to these ratings, which will be assigned by another Rating Agency which is rating or will rate the Debentures (Series C). |
| **"BBB+ "** | ilBBB+ as rated by Maalot or Baa1 as rated by Midroog or a rating equivalent to these ratings, which will be assigned by another Rating Agency which is rating or will rate the Debentures (Series C). |
| **"BBB"** | ilBBB as rated by Maalot or Baa2 as rated by Midroog or a rating equivalent to these ratings, which will be assigned by another Rating Agency which is rating or will rate the Debentures (Series C). |

| **"BBB-"** | ilBBB- as rated by Maalot or Baa3 as rated by Midroog or a rating equivalent to these ratings, which will be assigned by another Rating Agency which is rating or will rate the Debentures (Series C). |
|---|---|
| **"BB+ "** | ilBB+ as rated by Maalot or Ba1 as rated by Midroog or a rating equivalent to these ratings, which will be assigned by another Rating Agency which is rating or will rate the Debentures (Series C). |

1.5.30    **"The Rating Agency"** – Standard and Poor's Maalot Ltd. (above and hereinafter: "**Maalot**"), Midroog Ltd. (above and hereinafter: "**Midroog**") or a rating agency as this term is defined in the Law to Regulate the Activities of Credit Rating Agencies, 5774 - 2014;

1.5.31    **"Reporting Corporation"** – as defined in the Securities Law or a corporation traded on a stock exchange outside Israel, as set forth in the Second or Third Addendum to the Securities Law;

1.5.32    **"Controlling Shareholder"** – Mr. Yoel Goldman, whose particulars are detailed in Chapter 8 of the Prospectus.

1.5.33    **"Reports Regulations"** – The Securities Regulations (Periodic and Immediate Reports), 1970.

1.5.34    **"Financial Statements"** – Annual or quarterly financial statements, audited or reviewed which the Company must publish in accordance with the Securities Law and its regulations.

1.6    For as long as the debentures are listed for trade at the stock exchange, where the TASE rules apply or will apply to any act pursuant to this Deed of Trust, the dates of the said act and manner of execution shall be set in accordance with the TASE rules. It is clarified that the execution of the aforementioned acts shall not derogate (including in the event the TASE regulations will be amended) from the covenants between the parties in accordance with this deed.

1.7   In the event of any conflict between the provisions of this Deed of Trust and the documents attached thereto, the provisions of the Deed of Trust shall prevail. It is hereby clarified that as of the date of the Deed, there is no contradiction between the provisions specified in the Offering Memorandum in connection with this Deed and/or the Debentures.

1.8   In the event of cancellation of the issuance of the Debentures, for whatever reason, the validity of this Deed of Trust shall expire.

1.9   Any reference in this Deed of Trust to provisions in the law shall be adjusted, mutatis mutandis, to the changes that shall take place in the law, if any.

1.10   The activities of the Trustee are valid, despite any flaw that is discovered in his appointment or his competence.

1.11   By the signing the Deed of Trust, the Trustee is not expressing an opinion concerning the quality of the securities being offered or whether they are a worthwhile investment.

**2.    Issue of the Debentures; Terms of Issue; Terms of Linkage; Pari Passu**

2.1    The Company will issue the Debentures (Series C) as described in the preamble to this Deed. The Debentures (Series C) issued pursuant to the Preliminary Offering Memorandum shall be listed for trade on the TASE.

2.2    The Company is entitled to issue under the Prospectus, subject to the publication of a Shelf Offering Report, and at its sole discretion, the Debentures (Series C) the terms of which shall be as follows:

Debentures (Series C) (hereinafter: the " **Debentures**") will be registered, repayable in twelve (12) semi-annual installments on August 31 and February 28, starting from August 31, 2018 until February 28, 2024 (inclusive), such that each of the first eleven payments will represent 1.25% of the total par value of the Debentures (Series C) and the final payment will represent 86.25% of the total par value of the Debentures (Series C), bearing a fixed annual interest rate to be determined in a tender (subject to adjustments in the event of a change in the rating of the Debentures (Series C) and/or failure to comply with the financial covenants set forth in section 5.3 and 5.4 below and subject to adjustment for arrears interest, if applicable),  which shall be paid twice a year on August 31 and February 28, starting from August 31, 2017 until February 28, 2024 (inclusive). Except for the First Interest Period each interest payment shall be paid for the six-month period that ended on the day prior to the date of payment (hereinafter: the "**Interest Period**"). The interest rate payable in respect of a specific Interest Period (except for the first Interest Period) (i.e. the period commencing on the date of payment of previous Interest Period and ending on the last day before the date of payment following commencement thereof) will be calculated as the annual interest rate divided by two. The first interest payment is payable on August 31, 2017 in respect of the period commencing on the first trading day after the day of tender on the Debentures (Series C) and ending on August 30, 2017 (above – the "**First Interest Period**"), is calculated on the basis of 365 days a year based on the number of days in this period, and the final interest payment will be paid on February 28, 2024. The Debentures (Series C) will not be linked (principal and interest) to any index or currency.

2.3    The Company reserves the right to an early redemption of the Debentures provided the terms set forth in section 7 of this Deed are met.

2.4    The Debentures (Series C) shall rank *pari passu* among themselves, with respect to the Company's obligations pursuant to the Debentures, without any preference or priority of one over the other.

3.    **<u>Acquisition of Debentures by the Company and/or a Related Party and distribution</u>**

3.1    The Company reserves its right, subject to the law, to acquire the Debentures (Series C) at any time and from time to time, without prejudice to the duty to repay the outstanding Debentures (Series C). In the event of said acquisition, the Company shall notify the Trustee in writing, without derogating from the duty to submit an immediate report applicable thereto. In the event that the Debentures (Series C) are acquired by the Company, the Company shall request to the TASE Clearing House to withdraw the debentures so acquired.

In the event of acquisition by the Company as aforesaid the acquired Debentures (Series C) will expire immediately, will be cancelled and delisted from trading and the Company may not re-issue these debentures. Nothing in the foregoing shall derogate from the Company's right to make an early redemption of the Debentures (Series C) as stated in section 7 below.

3.2    The controlling shareholder of the Company (directly or indirectly) and/or a member of his family (spouse as well as a sibling, parent, the parent of a parent, offspring or an offspring of his spouse, or the spouse of each of them) and/or a subsidiary of the Company and/or a related Company of the Company and/or an associate of the Company and/or a Company controlled by any of them (directly or indirectly) (except for the Company itself with respect to which the provisions of section 3.1 above shall apply) (hereinafter: "**Related Party**") may acquire and/or sell Debentures (Series C) at their discretion (and subject to any law), at any time and from time to time, including by means of an issue by the Company, Debentures (Series C) that will be issued under the Deed of Trust. In the event of an acquisition and/or sale as aforesaid by a subsidiary of the Company and/or a Company controlled by it the Company shall file an immediate report to that effect. The Debentures (Series C) that will be held be a Related Party, as above, shall be deemed an asset of the Related Party, and if they are listed for trading, they shall not be delisted from the TASE, and shall be transferrable as the other Debentures (Series C). The Debentures (Series C) owned by a Related Party shall not confer on the Related Party voting rights at meeting of holders of Debentures

(Series C) and may not be counted for purposes of determining the existence of a quorum at such meetings. Meetings of Holders shall be held in accordance with the provisions of the Second Addendum to the Deed of Trust. A Related Party shall report to the Company, to the extent that he is obligated by law to do so, the acquisition of Debentures (Series C) and the Company shall submit to the Trustee, at its request, the list of Related Parties and the quantities held by them on the date requested by the Trustee based on the reports received, as noted above, from Related Parties, which were reported by the Company via the MAGNA system. It is hereby clarified that reporting via the MAGNA system shall constitute reporting to the Trustee for the purposes of this section.

**3.3** **Nothing in the foregoing section shall bind the Company and/or a Related Party or the Debenture Holders (Series C) to acquire Debentures and/or sell the Debentures (Series C) in their possession.**

**3.4** As of the date of signing this Deed the Company is not subject to any restriction with respect to the distribution of dividends or the buyback of its shares, except as specified in section 6.5 below, except restrictions undertaken as specified in the Deeds of Trust of the Debentures (Series A and B) of the Company.

**4.    Issue of additional Debentures**

4.1    The Company may, from time to time, without requiring the approval of the Trustee and/or the Holders existing at that time, to issue additional debentures (Series C) (whether by way of a private placement, as part of a Prospectus or in any other way), including to a Related Party (as it is defined in section 3.2 above), on such terms as it sees fit (the terms of the additional issued Debentures shall be identical to the terms of the Debentures (Series C)), however, in this case the Trustee shall have the right to demand that the annual fees by increased pro rata to the expansion of the Debenture series, permanently until the end of the trust period and by entering into this Deed the Company has granted its consent to increase the Trustee's fees as aforesaid. The outstanding Debentures (Series C) on the date of expansion of the series and the additional debentures (Series C) (from the date of issue thereof) shall constitute one series for all intents and purposes, and the Deed of Trust for the Debentures (Series C), shall apply also to all additional Debentures (Series C), as aforesaid. The Company shall apply to the TASE to list the additional Debentures (Series C) for trading as aforesaid, once they are issued.

The expansion of the Series will be limited to a maximum series volume of US$ 650 million, after deducting the principal portion which has been repaid; namely, the maximum volume of the series for the purpose of the expansion of the Series will be reduced from time to time, in accordance with the amortization schedule of the principal of the Debentures (Series C).

Without derogating from the aforesaid, an additional issue of Debentures (Series C) shall be carried out provided all the terms set forth below are met: (a) the additional issue of Debentures (Series C) does not adversely affect the rating of the Debentures (Series C) that were initially issued under this Deed, as it shall be at that time (**namely. the rating preceding the expansion of the series**, regarding this section it should be noted that as long as the Debentures (Series C) are rated by more than one rating agency, the rating for the purpose of this section shall be analyzed at any time, according to the highest rating; (b) on the date of the additional issue the Company shall be in compliance with the financial covenants set forth in section 6.4 of this Deed certification as aforementioned, regarding compliance with the financial conditions only, shall be given by the Auditors of the Company before the date of expanding the

Series; (c) on the date of the additional issue, immediately following the implementation of the additional issue, the Loan to Collateral Ratio (as specified in section 6.4 (2) did not exceed 66%: (d) on the date of the additional issue, in accordance with the recent financial statements published prior to the date of the additional issue, and after taking into account retrospectively the additional issue, the Company is in compliance with the said financial covenants. The Company will submit to the Trustee at least 7 days before the additional issue a written certification signed by the chief financial officer that: (1) the said terms have been fulfilled; (2) the Company is not in breach of any of its obligations to the Debenture Holders (Series C) and that there is no cause for immediate repayment as specified in section 8.1 below; and (3) the expansion of the series will not undermine the Company's ability to repay the Debentures (Series C). In the event of an additional issue as aforesaid, the expansion of the series will be subject to prior certification by the Rating Agency that the said expansion will not affect the rating of the Debentures (Series C) in effect at that time. The certification of the Rating Agency will be published prior to the expansion of the series and will be attached to the Company's certification to the Trustee. The Company will notify the Trustee in writing and will publish an immediate report, prior to the additional issue, whether the additional issue meets (or does not meet, as the case may be) the aforementioned conditions and will affirm to the Trustee in writing that said expansion does not undermine the Debenture Holders (Series C) and that the board of directors of the Company examined the effect of the expansion of the series on the Company's ability to meet its obligations to the holders of Debentures (Series C) prior to the issue of the Debentures. Additionally, the Company shall transfer to the Trustee an Auditor's certification regarding the Company's compliance with the financial conditions (only) detailed in section 6.4 of this Deed of Trust below.

In the event of the Expansion of the Series, during trading on the TASE (ATM) the Company will indicate its compliance with the provisions of this section during the expansion, namely, on the date of the issue of the additional Debentures of the Company and/or Subsidiary (creator of the "magazine"), and not at the time of implementing the sales during the trading.

This right of the Company does not exempt the Trustee from examining the said issue, to the extent that such duty is imposed on the Trustee by law, and does not derogate from the rights of the Trustee and the holder of Debentures pursuant to this Deed,

including their right to declare the Debentures due and payable as stated in section 8 below.

The Debentures (Series C) shall rank *pari passu* among themselves, with respect to the Company's obligations pursuant to the Debentures, without any preference or priority of one over the other.

If the discount rate determined for the additional Debentures (Series C), if any, shall be different than the discount rate of the Debentures (Series C) in circulation at the time (including the absence of discounting, in as much as this is relevant), the Company will apply to the Tax Authority, prior to expansion of the Debenture series, in order to obtain its approval that, for purposes of deducting withholding tax from the discount fees in respect of the Series A Debentures, a uniform discount rate be determined for the Debentures (Series C) based on a formula that weights the different discount rates in the series, if any (hereinafter: the "**Weighted Discount Rate**").

In the event that such approval is obtained, the Company will calculate the Weighted Discount Rate in respect of all the Debentures (Series C), and will publish an immediate report with respect to the results of the issue, the uniform Weighted Discount Rate for the entire series, prior to the expansion of the series, and tax will be deducted on the dates of repayment of the Debentures (Series C), according to the Weighted Discount Rate and in accordance with the provisions of the law. In such case, all other provisions of the law relating to the taxation of discount fees shall apply. If such approval is not obtained, the Company will publish an immediate report, immediately prior to the issue of the additional debentures (Series C), stating the highest discount rate in respect of that series. The Company will deduct withholding upon the repayment of the Debentures (Series C), in line with the discount rate reported as aforesaid.

Therefore, there may be cases where withholding tax will be deducted in respect of discount fees, at a rate higher than the discount rate set for the holders of Debentures (Series C) prior to the expansion of the series (hereinafter: "**Excess Discount Fees**"), and this will affect them unfavorably whether or not the tax authority approved a uniform discount rate for the Debentures (Series C). In this case, an assessee that held debentures (Series C) before the expansion of the series will be entitled to file a tax report with the tax authority and receive a tax return for the amount of the tax that was

deducted from the Excess Discount Fees, provided he is entitled to such return under the law.

**4.2**    Without derogating from the generality of the foregoing, the Company reserves the right, subject to the provisions of any applicable law, to issue at any time and from time to time (whether by way of a private placement, as part of a Prospectus or in any other manner) and without requiring the approval of the holders of Debentures (Series C) and/or the approval of the Trustee, as the case may be, including to a Related Party (as it is defined in section 3.2 above), additional series of debentures, as the Company sees fit, except for debentures whose commercial terms (namely, the percentage of the principal repaid on each payment date and the repayment dates of the principal, the interest rate and the dates of payment thereof, as well as no indexation of the principal and interest rate) will be identical to the terms of the outstanding Debentures (Series C) and except for Debenture series  which despite not being secured by collateral will have priority over Debentures (Series C) with respect to priority of repayment solely in the event of dissolution (meaning that Debenture series may be issued that which be secured by collateral).

Notwithstanding the aforesaid, the issue of debentures as stated in section 4.2 above (hereinafter in section 4.2 only: the "**Additional Issue**") is subject to the fulfilment of all the terms set forth below: (a) the Additional Issue will not adversely affect the rating of the Debentures (Series C) that were initially issued under this Deed, as shall be in effect at the time (**namely, the rating immediately preceding the Additional Issue**); regarding this section it should be noted that as long as the Debentures (Series C) are rated by more than one rating agency, the rating for the purpose of this section shall be analyzed at any time, according to the highest rating; (b) on the date of the Additional Issue the Company is in compliance with the financial covenants set forth in section 6.4 of this Deed and the Company is not in violation of any of its obligations to the holders of the Debentures (Series C) and there is cause for immediate repayment as specified in section 8.1 below; and (c) on the date of the Additional Issue, in accordance with the recent financial statements published prior to the date of the Additional Issue, and after taking into account retrospectively the Additional Issue, the Company is in compliance with the said financial covenants in section 6.4 of this Deed.

Prior to the issue of additional Debentures of additional series, the Company shall relay the following certifications and shall make the following publications:

1. The Company will give the Trustee a written certification signed by the chief financial officer that the aforesaid conditions have been met, no later than 7 days prior to the Additional Issue and certification that the terms of the Additional Issue are not preferred to the terms of the Debentures (Series C) upon dissolution.

2. The Company shall publish certification from the Rating Agency that the aforementioned Additional Issue, shall not affect the rating of the Debentures (Series C) which were first issued pursuant to this Deed, as the rating shall be in effect at the time.

3. The Company shall transfer to the Trustee certification from the chief financial officer of the Company regarding the Company's compliance with the financial covenants (only) detailed in Section 6.4 of this Deed of Trust.

Without derogating from the generality of the foregoing, the Company's aforesaid rights do not diminish the Trustee's right to examine the repercussions of the said issue, and do not derogate from the rights of the Trustee and/or the holders of Debentures under this Deed, including their rights to declare the Debentures (Series C) due and payable as stated in section 8 below.

Subject to the provisions of any law, the Company shall inform the Trustee of additional issues of debentures a reasonable time before the issue and will submit to the Trustee any report it published in connection therewith pursuant to any law.

## 5.    **The Company's undertakings**

**5.1**    The Company hereby undertakes to pay, on the designated dates, the principal and interest amounts payable under the terms of the Debentures (Series C), and to comply with all the other terms and obligations imposed on it, pursuant to the terms of the Debentures (Series C) and under the terms of this Deed.

**5.2**    [Deleted]

**5.3**    **Adjustment of the interest rate to changes in the rating of the Debentures (Series C):**

**For purposes of this section below it is clarified that as long as the Debentures (Series C) are rated by more than one Rating Agency, the review of the rating for the purpose of adjusting the interest rate to a change in the rating (if any) shall be done, at any time, based on the lower rating thereof.**

The interest rate on the Debentures (Series C) will be adjusted to changes in the rating of the Debentures (Series C) as set forth in this section:

> It is hereby clarified that if an adjustment of the interest rate is required in accordance with the mechanism described in this section above and below and in accordance with the mechanism described in section 5.4 below, then in any case the maximum interest rate will not exceed the interest rate determined in the Tender by more than 1%. Arrears interest, to the extent applicable in accordance with Section 4(a) of the terms overleaf, shall be added to the aforesaid rate and shall not be a part thereof.

With respect to this section 5.3:

The ratings of A, A-, BBB+, BBB and BBB- are as defined in the table in section 1.5.29 above.

 "**The Basic Rating**" – An 'A' rating

 "**The Additional Interest Rate**" – an additional interest rate that shall be given to the Debentures holders of 0.25% per annum, for each notch, for each notch below the Basic Rating (namely, with respect to a downgrade from the Basing Rating to A-, with respect to a downgrade from A- to BBB+, with respect to a downgrade from BBB+ to BBB and with respect to a downgrade from BBB to BBB-), up to a maximum additional annual interest rate of 1%, at the most.

A.    If the rating of the Debentures (Series C) by the Rating Agency (in the event that the Rating Agency is replaced, the Company will submit to the Trustee a report comparing the ratings scale of the replaced Rating Agency and the ratings scale of the new Rating Agency) is revised during any Interest Period, so that the rating

assigned for the Debentures (Series C) is one or more notches (hereinafter: the "**Downgraded Rating**") below the Basic Rating, the annual interest rate on the outstanding principal amount of the Debentures (Series C) will be raised by the incremental interest rate or a portion thereof (as specified below), in accordance with the aforementioned notches, in respect of the period from the date of publication of the new rating by the Rating Agency to the full repayment of the outstanding principal amount of the Debentures (Series C), or up to the date of the rating upgrade, in accordance with the provisions of section 5.3(e) below and the provisions of section 5.4 below. If the interest rate is raised before than due to breach of the financial covenant as set forth in section 5.4 below, then the interest rate increase in respect of the downgrade will be limited so that the interest rate increment per year does not exceed 1% in any case.

B.   No later than one business day after the Rating Agency's announcement that the rating of the Debentures (Series C) has been downgraded as defined in subsection (A) above, the Company shall publish an immediate report stating: (a) the downgrading of the Debentures, the Downgraded Rating, the rating report and the date of the Rating Downgrade of the Debentures (Series C) (hereinafter: the "**Date of the Downgrade**"); (b) the Company's compliance/ non-compliance with the financial covenants described in section 5.4 below according to the last audited or reviewed consolidated financial statements of the Company that were published before the date of the immediate report and whether there was a change in the interest rate due to its compliance / non-compliance with the financial covenants as aforesaid; (c) the accurate interest rate on the outstanding principal amount of the Debentures (Series C) for the period from the start of the current interest rate period until the Date of the Downgrade (the interest rate shall be calculated based on 365 days a year) (hereinafter: the "**Original Interest Rate**" and the "**Original Interest Rate Period**", respectively); (d) the interest rate on the outstanding principal of the Debentures (Series C) for the period from the Date of the Downgrade until the date of the nearest interest payment, that is: the Original Interest Rate plus the Additional Interest Rate per year (the interest rate is calculated based on 365 days a year) (hereinafter: the "**Revised Interest Rate**"), provided the interest rate was not raised before that, to the extent it was raised, due to breach of the financial covenants as stated in section 5.4 below to

the extent it occurred, in which case the interest rate increment in respect of the rating downgrade will be limited so that the annual interest rate increment for downgrading and noncompliance with financial covenants  does not exceed 1%; (e) the weighted interest rate paid by the Company to the holders of Debentures (Series C) in the nearest interest payment, arising from the provisions of subsection (c) and (d) above; (f) the annual interest rate and the semi-annual interest rate (the semi-annual interest rate shall be calculated by dividing the annual interest rate by two) for the upcoming periods.

C.   If the date of the Rating Downgrade in respect of the Debentures (Series C) falls during the period commencing four days before the record date for any interest payment and ending on the interest payment date nearest to the said record date (hereinafter: the "**Deferral Period**"), the Company shall pay the holders of Debentures (Series C), on the nearest interest payment date, the Original Interest Rate prior to the change; and provided the interest rate was not raised before that due to any breach of the financial covenants as stated in section 5.4 below, whereas the interest rate arising from an interest increment at a rate equal to the Additional Interest Rate per year during the Deferral Period, will be paid on the next interest payment date. The Company will publish an immediate report stating the accurate interest rate payable on the next interest payment date.

D.   In the event of a revision in the rating of the Debentures (Series C) by the Rating Agency which affects that the interest rate on the Debentures (Series C) as stated in section 5.3(A) above or 5.3(E) below, the Company shall inform the Trustee in writing one business day after the date of publication of the immediate report as aforesaid.

E.   If after the downgrade which affected the interest rate on the Debentures (Series C) as stated in section 5.3(A) above, the Rating Agency upgrades the rating of the Debentures (Series C) and insofar as the interest rate was not increased before that due to breach of the financial covenants as stated in section 5.4 below, the interest rate will be decreased by 0.25% annually for each notch

Notch (בגין העלאה מדירוג BBB מינוס לדירוג BBB, בגין העלאה מדירוג BBB לדירוג BBB פלוס,
בגין העלאה מדירוג BBB פלוס לדירוג A מינוס ובגין העלאה מדירוג A מינוס לדירוג הבסיס)

(in respect of an upgrade from BBB- to BBB, with respect to a upgrade from a BBB to BBB+, in respect of an upgrade from BBB+ to A- and in respect of an upgrade from A- to the Basing Rating) and if the Rating Agency upgrades the rating of the Debentures (Series C) to a rating higher than the Basic Rating (hereinafter: the "**High Rating**"), and insofar as the interest rate was not raised before that due to breach of a financial covenant as stated in section 5.4 below, the interest rate payable by the Company to the holders of Debentures (Series C) on the relevant interest payment date, will decrease, in respect of the period in which the Debentures (Series C) were assigned the High Rating, so that the interest rate which the outstanding principal of the Debentures (Series C) will bear shall be the interest rate to be determined in the tender, as shall be published by the Company in an Immediate Report on the results of the issue, with no increment in respect of the Downgrade as stated in section 5.3 (and in any event, the rate of interest to be carried by the Debentures shall not be less than the interest rate to be determined in the tender). In such case the Company shall act in accordance with subsections (B to (D) above, with the necessary changes arising from a High Rating instead of the Downgraded Rating.

It is clarified, that a revision in the interest rate as the result of a change in rating or noncompliance with the financial covenant will be examined without one affecting the other, provided the cumulative maximum interest in respect of the downgrade and noncompliance with the financial covenant shall not exceed 1% per annum, An interest rate increase due to non-compliance with a financial covenant, to the extent it applies as provided in Section 5.4 above, will continue to apply also in the event of a rating upgrade. It is clarified, that the arrears interest, to the extent applicable, shall be added to the interest rates stated above.

F.      If the Debentures (Series C) cease to be rated for a reason attributed to the Company (for example, but not limited to, failure to fulfill the Company's obligations to the Rating Agency, including failure to make payments and/or reports as part of the Company's undertaking to the Rating Agency) for a period of 21 days, before the final repayment, the cessation of the rating shall be deemed a downgrading of the Debentures (Series C) such that the additional interest rate shall total 1%, even though the interest rate was raised before that due to breach of a financial covenant as stated in section 5.4 below, and the provisions of

subsections (B) to (E) shall apply accordingly without derogating from the provisions of subsection 8.1.27 specified below. To remove any doubt it is clarified that if the Debentures (Series C) cease to be rated, prior to the final maturity of the Debentures, for a reason out of the Company's control, this will not affect the interest rate as stated in section (A) above and the provisions of section 5.3 will not apply.

G. In the event that the Rating Agency is replaced (even if there is more than one rating agency) or the Debentures (Series C) cease to be rated by a Rating Agency, the Company shall publish an immediate report within one trading day from the date of the change, to explain the reasons for replacing the Rating Agency or the withdrawal of the rating, as the case may be.

H. To remove any doubt, it is clarified that: (1) a change in the rating outlook of the Debentures (Series C) will not entail a change in the interest rate on the Debentures (Series C) as stated in this section above; (2) as long as the Debentures (Series C) are rated by more than one Rating Agency, subsection (F) above will not apply unless **all the rating companies cease to rate the Debentures (Series C).**

I. In the event of a downgrade the Company will act in accordance with sections 5.3(A) and (B) above. If prior to the Date of the Downgrade the interest rate increases due to breach of one or more of the financial covenants in accordance with the mechanism specified in section 5.4 below, **the change in the interest rate** in line with the adjustment mechanism specified in section 5.3 above will be limited such that in any case, the cumulative increase in the interest rate (if any) will not be more than 1% above the interest rate to be determined in the tender. Arrears interest as applicable shall be in addition to the aforementioned interest.

J. The Company undertakes that to the extent that it is under their control, the Debentures (Series C) will be rated by a rating agency for the entire term of the Debentures (Series C) and for this purpose the Company undertakes to pay the Rating Agency and to provide the Rating Agency with the reports and information reasonably required by them as part of the agreement between the Company and the Rating Agency. For this purpose, the failure of the Company to make the payments which it is committed to pay the Rating Agency and failure to

provide the reports and information reasonably required by the Rating Agency as part of the agreement between the Company and the Rating Agency shall be regarded as factors and circumstances that are under the control of the Company. In the event of termination of the rating of Debentures (Series C) or replacement of the Rating Agency, the Company will publish an immediate report thereof and shall specify the reasons for replacing the Rating Agency. It should be noted that the aforementioned does not derogate from the right of the Company to replace the rating agency at any time, as per its sole discretion, and for any reason it deems necessary. **The Company is permitted to replace the Rating Agency or terminate the agreement therewith during the period of the Debentures (Series C). In the event that the Company replaces the Rating Agency ,which on the date of the replacement is the sole rating agency rating the Debentures (Series C), and/or terminates the work of the rating agency (in the event that it is not a sole rating agency), the Company is obliged to report this in an Immediate Report and to notify the Trustee and the holders of the debentures specifying in its report the reasons for the replacement of the Rating Agency, all no later than one trading day from the date of the said replacement and/or the date of the decision to terminate the work of the rating agency, whichever is earlier. It is clarified that the aforementioned does not derogate from the right of the Company to replace the Rating Agency at any time or to terminate the work of the rating agency (in the event that it is not a sole rating agency), at its sole discretion and for any reason it deems necessary.**

5.4      **Interest rate adjustment as a result of failure to comply with a financial covenant**

With respect to this section 5.4:

The interest rate on the Debentures (Series C) will be adjusted in respect of breach of a financial covenant as set forth below:

The Loan to Collateral Ratio (as specified in section 6.4 (2) below) shall not exceed 75% (in this section 5.4 above and hereinafter: the **"Financial Covenant"**)

.With reference to this subsection only:

It is hereby clarified that if an adjustment of the interest rate is required in accordance with the mechanism described in this section above and below and in line with the mechanism described in section 5.3 above, then in any case the maximum interest rate increment will not be more than 1% of the interest rate to be determined in the tender. Arrears interest, to the extent applicable in accordance with Section 4(a) of the terms overleaf, shall be added to the aforesaid rate and shall not be a part thereof.

In this regard:

"**The Additional Interest Rate**" – an additional interest at a rate of 0.5% shall be in respect of a breach of a financial covenant. The interest rate will be raised only once for breach of a financial covenant to the extent there is such a breach, and the interest rate will not be raised a second time if the breach of a financial covenant continues. It is emphasized that where a rating downgrade led to an increase in the annual interest rate under the provisions of section 5.3 above, in any case the additional interest rate by virtue of section 5.3 together with the additional interest rate by virtue of section 5.4, due to breach of the financial covenant, shall not exceed 1%.

"**The Breach Date**" – the date of publication of the financial statements that indicate the breach.

A.  If the Company violates a financial covenant pursuant to the reviewed or audited consolidated financial statements of the Company (hereinafter: the "**Breach**"), the annual interest rate on the outstanding principal amount of the Debentures (Series C) will increase by the Additional Interest Rate in respect of the Breach, above the interest rate in effect at the time, prior to the change, in respect of the period from the Date of the Breach until the date of repayment of the outstanding principal amount of the Debentures (Series C) or until the date of publication of the Company's financial statements pursuant to which the Company is compliance with the financial covenant, due to a rating downgrade as stated in section 5.3 above. If the interest rate was increased before that due to a rating downgrade as stated in section 5.3 above, the interest rate increment due to the breach of financial covenant as provided in this subsection will be limited so that the annual interest rate with respect to the downgrade in rating or non-compliance with a financial covenant shall in any event not exceed 1%.

B.  In the event of said breach, no later than one business day after the publication of the Company's reviewed or audited financial statements (as the case may be), the Company shall publish an immediate report stating the following: (a) its failure to comply with the said undertaking, detailing the financial covenant on the date of publication of the financial statements; (b) the current rating of the Debentures (Series C) based on the last rating report that was published prior to the immediate report; (c) the accurate interest rate on the Debentures (Series C) for the period from the current interest rate period until the Date of the Breach (the interest will be calculated based on 365 days a year) (hereinafter: the "**Original Interest Rate**" and the "**Original Interest Period**"), respectively); (d) the interest rate on the outstanding Debentures (Series C) from the Date of the Breach until the date of the nearest interest payment, that is, the Original Interest Rate plus the Additional Interest Rate per year (the interest rate will be calculated based on 365 days a year) (hereinafter: the "**Current Interest Rate**"). If the interest rate was increased prior to that due to a rating downgrade as stated in section 5.3 above then the interest rate increment due to a breach of financial covenant as provided in this subsection will be limited so that the annual interest rate increment with respect to a downgrade in rating and non-compliance with a financial covenant will not exceed 1%; (e) the weighted interest rate payable by the Company to the holders of Debentures (Series C) on the nearest interest payment date, which arises from the provisions of subsection (c) and (d) above; (f) the annual interest rate arising from the weighted interest rate; (g) the annual interest rate and the semi-annual interest rate (the semi-annual interest rate will be calculated as the annual interest rate divided by two) for the upcoming periods.

C.  If the Date of the Breach occurs during the period commencing four days prior to the record date for the payment of any interest and ending on the interest payment date that is nearest to the record date (hereinafter: the "**Deferral Period**"), the Company shall pay the holders of Debentures (Series C), on the nearest interest payment date, the Original Interest Rate only, while the interest rate arising from the incremental interest at a rate equal to the Additional Interest Rate per year during the Deferral Period, will be paid on the next interest payment. The Company shall publish an immediate report stating the accurate interest rate payable on the next interest payment date.

D.  In the event of a breach of a financial covenant which affects the interest rate on the Debentures (Series C) as aforesaid in section 5.4(A) above or in section 5.4(E) below, the Company shall notify the Trustee in writing within one business day from the date of publication of the financial statements, as aforesaid.

E.  To remove any doubt it is clarified that if after the breach, the Company will publish its audited or reviewed financial statements (as the case may be), pursuant to which the Company will be in compliance with the financial covenant, then the interest rate paid by the Company to the holders of Debentures (Series C), on the relevant interest payment date, will decrease, in respect of the period in which the Company complied with the financial covenant, which commenced on the date of publication of the financial statements that point to its compliance with the financial covenant, so that the interest rate on the outstanding principal amount of the Debentures (Series C) will be, provided the interest rate was not raised before that due to a rating downgrade of Debentures (Series C) as stated in section 5.3 above, the interest rate to be determined in the tender, or another interest rate determined due to the rating downgrade of the Debentures (Series C) as stated in section 5.3 above (and in any event the rate of interest the Debentures will bear will not be less than the interest rate to be determined in the tender). In such case the Company shall act in accordance with subsections (B) to (D) above, with the necessary changes, as the case may be, arising from the Company's compliance with the financial covenant.

It is clarified, that updating the interest rate as the result of a change in rating or noncompliance with a financial covenant shall be examined separately and without the one influencing the other, subject to the maximum interest rate increment due to the downgrading and noncompliance with the financial covenant, shall not exceed 1% annually. An additional interest due to downgrading, if applicable, in accordance with section 5.3 will continue to apply even if the Company complies with the financial covenant.  It is clarified that the arrears interest, to the extent applicable, shall be added to the interest rates stated above.

F.  A review as to whether the Company is compliance with the financial covenant will be conducted on the date of publication of the Company's financial statements and as long as the Debentures (Series C) are outstanding, in relation to

the quarterly/annual financial statement which the Company published until that date.

The Company will indicate its compliance or non-compliance with the financial covenants in the quarterly or annual board of directors' report, as applicable.

To remove any doubt it is clarified that, subject to the aforesaid, the incremental interest rate payments arising from the rating downgrade as stated in section 5.3 above and/or as a result of the Company's failure to comply with the financial covenant as stated in section 5.4 above are cumulative. Therefore, in the event of a rating downgrade and a breach of a financial covenant by the Company, the holders of Debentures (Series C) will be entitled to a higher interest rate as aforesaid provided the annual interest rate increment for a downgrade in rating and non-compliance with a financial covenant does not exceed 1%. It is also clarified that arrears interest, as applicable, shall be in addition to the rates of interest stated above

5.5.  The Company declares that at the time of signing this Deed there were no restrictions applicable to the Company in connection with making a distribution (as defined in the Companies Law), except as described in section 6.5 below, except for restrictions undertaken as specified in the Deeds of Trust of the Debentures (Series A and B) of the Company.

5.6  **Interested party transactions**

The Company undertakes that irregular transactions of the Company (as defined in the Companies Law) with its controlling shareholder, or irregular transactions of the Company with another party with whom the controlling shareholder is an interested party or agreements of the Company with the controlling shareholder or his relative, directly or indirectly, including through a Company controlled thereby, for the purpose of the Company receiving services, and if he is also an officer of the Company, with regard to his terms of service and employment, and if he works in the Company and is not an officer thereof, with regard to his employment in the Company (hereinafter: the **"Special Transactions"**), shall be contingent, in addition to the approvals under section 275 of the Companies Law, as applicable to the Company, on the consent of the holders of the Debentures (Series C) by a resolution with a simple majority. The Company shall provide the

Trustee with confirmation from the senior officer in the field of finance in the Company every April 15 and September 15 of each year, that there were no special transactions as provided in this section 5.6 that had not received the consent of the holders of the Debentures (Series C) as stated above (hereinafter in this subsection: "**Officer Approval** "). Such approval shall also be given by the Company as part Board of Directors Report which shall be attached to the quarterly and/or periodic statement of the Company, as applicable. With respect to section 5.6 it should be clarified for the avoidance of doubt that the transactions specified below shall not be considered "special transactions" and therefore the approval of the holders, as provided in Section 5.6 above, is not required: (1) the transfer of assets to the Company against the allotment of shares only (no financial remuneration); (2) the acquisition of the share of the partners in the affiliated companies of the Company; (3) the update or renewal of the management agreements specified in section 9.2 of Chapter 9 of the Prospectus with respect to headquarter management services, business development services such as bookkeeping, office, communications, computer and secretarial services as well as Chairman of the Board and CEO services, through Mr. Goldman and the management Company headquarter employees, including of the management Company's headquarters, including officers of the Company and management services, provided that the amendment of the consideration component specified in section 9.2 of the Prospectus shall not exceed 2.5% relative to the 12 month period preceding the date of the update or renewal. The Company shall provide the Trustee, on April 15 of each year, with confirmation from the senior officer in the field of finance in the Company that the update or renewal of the management agreements was in accordance with this section (3) the abovementioned authorization shall also be given by the Company as part of the Board of Directors Report which shall be attached to the quarterly rand/or periodic report of the Company, as applicable; (4) the provision of guarantees by the controlling shareholder in favor of the financing bodies of the Company and/or corporations controlled by the Company; (5) irregular transactions in accordance with the Companies Regulations (Relief in Transactions with Interested Parties), 5760-2000; (6) insurance policy agreements to insure the assets of the Company against the accepted risks, within the framework of policies that cover the asset portfolio of the Company together with the assets of the controlling shareholder,

as they shall be (with the premium amounts being allocated to the various assets by the insurance Company); (7) granting an indemnity to the controlling shareholder and/or his relative as specified in section 9.3.1 of the Prospectus and a new indemnity notice as may be updated, if updated, in accordance with the Companies Law and the regulations thereunder from time to time. In the aforementioned officer approval to be provided every April 15, the Company shall notify the Trustee of the implementation of the transactions listed above, if implemented, that do not require the approval of the meeting.

5.7     **Expense cushion**

The sum of US$ 300 thousand from the proceeds of the issuance will be deposited in the trust account (as the term is specified below), which will serve the Trustee for the purpose of execution of proceedings in accordance with this Deed of Trust (including the appointment of experts, etc.) (hereinafter: the **"Expense Cushion"**). The amount of the Expense Cushion shall be held in the trust account in favor of the holders of the Debentures until final and full repayment date of the Debentures (Series C). Following the full repayment of the Debentures (Series C) the Expense Cushion will be transferred (together with any yields accrued thereto), if unused, to the Company in accordance with the details to be provided thereby.

In the event that the Expense Cushion will not be sufficient to cover the expenses of the Trustee in connection with the implementation of the procedures in accordance with this Deed of Trust, the Trustee will act in accordance with the provisions of section 26 below.

In the event that all or part of the Expense Cushion is used, the Company shall pay the remaining expenses up to the amount specified in section 5.7 above, within 10 business days from the date in which it was required to pay the remaining expenses.

5.8     **Appointment of a representative of the Company in Israel**

As long as there are outstanding Debentures (Series C), the Company undertakes that a Representative of the Company in Israel will be nominated (hereinafter: the **"Representative of the Company in Israel"**), to whom it will be possible to deliver court notices addressed to the Company and/or its officers thereof.

Delivery to the representative of the Company in Israel shall be considered as valid and binding in connection with any claim and/or demand of the Trustee and/or the holders of the Debentures (Series C), in accordance with this Deed of Trust. At the time of the appointment/replacement of a representative of the Company in Israel, the Company will specify the details of the representative in an Immediate Report and shall notify the Trustee of the details of the representative of the Company in Israel.

In the event of the appointment of a new representative, the immediate report and the notification to the Trustee shall also include the date on which the appointment of the new representative comes into force.

The Company undertakes that, in the event the Company's representative in Israel is replaced, the Company shall appoint a representative within a period of up to ninety (90) days. Up to the date of appointment of a new representative as stated, the Company's address in Israel for the purpose of this Deed and for the purpose of serving court documents will be the address of the replaced representative.

The Company undertakes that the Company's representative in Israel shall remain in office until the full, final and accurate repayment of the Debentures (C).

**5.9    Undertakings of the Company, the controlling shareholder and officers of the Company**

The Company, the controlling shareholder and the officers of the Company, present and future, irrevocably undertake and will irrevocably undertake (as applicable) as follows:

A.    Not to raise objections to the application, validity or manner of implementation of Article 39A of the Securities Law;

B.    Not raise claims against the local authority of a court in Israel in connection with proceedings submitted by the Trustee and/or holders of the Debentures (Series C) of the Company;

C.    Not to raise claims against the right of the holders of the Debentures (Series C) to file a derivative action.

D.    That in any agreement entered into by the Company, directly with third parties, including with employees of the Company, it shall be determined that insolvency proceedings against the Company shall only be filed in a court in Israel, and in accordance with Israeli law. In this regard it is clarified that this undertaking shall not apply to agreements of the Company with third parties, associated with agreements of investee companies (as the term is defined in the Securities Regulations (Annual Financial Statements), 5770-2010 of the Company, including (without derogating from the generality of the foregoing) the provision of guarantees by the Company, and this will not apply to hedging agreements entered into by the Company with a third party, if and when entered;

E.    Not to oppose a request of the Trustee and/or holders of the Debentures (Series C), which will be submitted to a court in Israel for the application of Israeli law with respect to compromise, settlement and insolvency, if submitted, not to apply on their own initiative to a court outside Israel to obtain protection against a proceeding submitted by the Trustee and/or holders of the Debentures (Series C) of the Company, not to oppose if a court in Israeli will seek to apply Israeli law with respect to a compromise, settlement and insolvency and not to raise claims against the authority of the local court in Israel in connection with the proceedings submitted by the Trustee and/or holders the Debentures (Series C) of the Company;

F.     Not to set in motion, on their own initiative, insolvency proceedings under foreign law and in a jurisdiction that is not in Israel. In this regard it should be noted that if insolvency proceedings are submitted, not under Israeli law and in a foreign court, arising from the claims of a foreign creditor, the Company will do its utmost to argue an "inappropriate forum". all subject to the law and the agreement;

G.     Not to raise claims against the authority of the Securities Authority and/or the Administrative Enforcement Committee in Israel in connection with financial sanctions and/or administrative means of enforcement imposed thereon by the Israel Securities Authority and/or the Administrative Enforcement Committee in Israel, in accordance with Chapter H3 and/or Chapter H4 of the Securities Law and to comply with the decisions of the Israel Securities Authority and/or the Administrative Enforcement Committee in Israel, including without derogating from the generality of the foregoing, to pay the financial sanctions and/or payments to the victims of the breach which shall be imposed thereupon (if imposed) and to take actions to correct the breach and to prevent its recurrence.

H.     In addition, the controlling shareholder undertakes[2] that it will not amend the articles of association of the Company in connection with those paragraphs which have been applied in the articles of association of the Company in order to reflect the Securities Order (Replacement of the Fourth Schedule), 5776 - 2016;

I. It is hereby clarified that the undertakings in sections A, B, C, F and G above shall be undertaken by the Company, the controlling shareholder and the officers of the Company, whereas section D shall be undertaken only by the Company.

---

[2] In addition the controlling shareholder undertakes that if it sells the control of the Company it undertakes that a condition of the sale will be that the new controlling shareholder will take its place with respect to this undertaking.

J.  In accordance with and subject to section I above, the Company shall cause the controlling shareholder and the officers of the Company, as of the date of the signing of this Deed, to sign irrevocable undertakings as set forth in this section 5.9 above, prior to the listing of the Debentures (Series C). In addition, the Company undertakes to cause, no later than two business days from the date of the appointment of a new officer of the Company and/or the date of change in control of the Company, the said undertakings to be signed by the new officer or controlling shareholder, as applicable, and the publication thereof. The Company will provide the Trustee with the said undertakings, signed in the original, within 14 business days from their date of signature.

5.10  **Purpose of the issue proceeds – providing mortgage-backed loans and a promissory note to the Property Company and collateral assignment of the Company's rights by virtue of the mortgage and a promissory note in favor of the Trustee**

A.    The Company confirms and hereby declares that the proceeds of the issue which will be received from the holders of the Debentures (Series C) as part of the offering, will be provided thereby as a loan to the Property Company (hereinafter - "**the Mortgage Loan**") and shall be used first, for repayment of the current mortgage on the pledged property and second, for repayment of the preferred equity that was provided by the preferred equity investors, as specified in **Appendix A** of the Deed of Trust, and if any balance remains, it will be used to cover the issuance costs.

The mortgage loan will carry the same repayment terms (back to back including amounts and dates) of the Debentures (Series C ), in accordance with a promissory note to be duly signed between the Company and the Property Company, in a version prepared by the US attorney (as defined below) and agreed to by the Trustee (hereinafter: the "**Promissory Note**").

The mortgage loan to be provided, as stated, by the Company to the Property Company, will be secured by a first priority mortgage, in favor of the Company, on the Property Company's rights in the Pledged Property, in the amount of the Debenture principal (Series C) on the date of the issuance (hereinafter – "**the Mortgage**").

To secure the full and accurate fulfillment of all the Company's obligations under the Debentures (Series C) and the Deed of Trust, the Company will pledge all the Company's rights by virtue of the promissory note and the mortgage, in favor of the Trustee (as a Trustee for the holders of the Debentures (Series C)) by a sole, first ranking collateral assignment, as detailed extensively in section 6.2 below.

- 36 -

The Trustee shall transfer to the subsidiary the funds of the Mortgage Loan (proceeds of the issue, net of the early commitment fee to classified investors and the expense cushion) from the trust account in accordance with the provisions of section 6.2.4 below. It should be noted that the Property Company shall bear the costs of the issue (including early commitment fees to the Classified Investors and the Expense Cushion) and to the mortgage loan will be added a loan provision fee that will be deducted from the amount to actually be transferred to the Subsidiary in a manner such that the actual amount of the mortgage loan shall be equal to the principal of the Debentures on the date of the issuance. The Mortgage and Promissory Note will be amended in the event of the issue of additional debentures (Series C), to secure any outstanding debt in respect of the additionally issued debentures.

of and any said expansion of the series, the Company will provide the Trustee with the said Mortgage Loan agreement or amendment thereto, as applicable, signed by the parties thereupon. It shall be noted in the loan agreement that except for the repayment of the existing mortgage on the pledged property and the full or partial repayment of the preferred capital investors (up to the amount of the actual proceeds of the issuance) which shall be implemented close to the date of the issuance (or expansion, as applicable), the Property Company shall not be entitled to pay management fees or make a distribution to the shareholders thereof, except only after having paid all of the fees it had undertaken to pay under the mortgage loan agreement up to that date, and only if a surplus cash flow has been generated therefor from operations with respect to that same period.

The Promissory Note will be subject to the following provisions:

1.  The Promissory Note shall constitute a contract in favor of a third party (the Trustee and the Debenture holders).

2.  The Company shall not be entitled to repeal and/or amend any of the terms of the Promissory Note and the mortgage without the Trustee's prior written approval.

3. The Property Company shall not be entitled to defer and/or offset any amount it is required to pay under the Promissory Note against any debt of the Company towards the Property Company;

4. Except for the repayment of the outstanding Mortgage on the Pledged Property and the full or partial repayment of the Preferred Equity Investors (up to the actual proceeds of the issue) close to the date of the issuance (or the expansion, as the case may be), the Property Company shall not pay management fees and or distribute dividends to its shareholders, before it has paid all the amount it was required to pay under the Promissory Note up to that date and no more than the excess cash flows from it operations in respect of that period.

5. The Property Company and the Company shall not be entitled to sell the Pledged Property without the Trustee's prior written approval, including with respect to the sale of corporation holding the Pledged Property. It is clarified that the Trustee will give its approval, provided the terms of the sale are consistent with the requirements in the Promissory Note.

6. Any repayment on account of the mortgage loan shall be deemed as having been made if it was made directly to the Trust Account only, or to the Nominee Company's account for the purpose of repaying the principal and/or interest on the Debentures (Series C) and/or for purposes of early redemption of the Debentures (Series C).

7. The Company shall be entitled to call the Mortgage Loan under the Promissory Note immediately due and payable upon the early redemption of the debentures and/or the immediate repayment thereof.

B.   The Company undertakes not to agree to change the provisions of the lease agreement described in Appendix A of the Deed of Trust, between the Property Company and Wythe Berry, LLC, the company operating the pledged property (hereinafter in this section: the **"Operating Company"**), without receiving prior consent from the meeting of holders of the Debentures (Series C) by special resolution, regarding the following issues: (1) decrease of the lease fees paid by the Operating Company; (2) determining rent payment dates in advance for a period exceeding a year; (3) any decrease in guarantees of shareholders of the Operating Company.

## 6.   Securing the Debentures

**6.1**   Debentures (Series C) shall be secured by the collaterals specified in this section below. For details on the Company's undertaking not to create a general floating charge, see section 6.2 below.

To remove any doubt it is clarified that the Trustee is not obligated and shall not be obligated to review, and in practice the Trustee has not reviewed and shall not review the need to provide collateral to secure the payments to the holders of Debentures (Series C). The Trustee was not requested to conduct, and in practice the Trustee has not conducted and shall not conduct an economic, accounting or legal due diligence review with regard to the condition of the Company's business, the Holding Corporations, the Property Company and the Property. By entering into this Deed of Trust and by consenting to serve as Trustee for the holders of (Series C) Debentures, the Trustee is not expressing its opinion, whether explicitly or implicitly, with regard to the Company's ability to meet its obligations to the holders of Debentures (Series C). Nothing in the foregoing derogates from the Trustee's duties under any law and/or this Deed nor does it derogate from the Trustee's duty (insofar as such duty applies to the Trustee pursuant to any law) to examine the effect of changes in the Company as of the date of the Prospectus, insofar as they may adversely affect the Company's ability to meet its obligations to the holders of Debentures (Series C).

**6.2**   **Pledging of the pledged assets**

6.2.1   As collateral to secure full and accurate fulfillment of all Company obligations pursuant to Debentures (Series C) and the Deed of Trust, the Company undertakes to pledge by a sole, first ranking assignment by way of collateral assignment, in favor of the Trustee (as Trustee for the holders of Debentures (Series C)), inter alia the rights

detailed below, in accordance with the provisions of the attorney's opinion as detailed in section 6.2.2.1 below (hereinafter: the **"Pledge Agreement"**, the **"Attorney's Opinion"**):

6.2.1.1    Full Company rights by virtue of the promissory note (as defined in section 5.10 above) in the amount of the Mortgage Loan.

6.2.1.2    Full Company rights by virtue of the mortgage (as defined in section 5.10 above) in the amount of the Mortgage Loan.

6.2.1.3    As part of the said collateral assignment documents (Security Agreement – Collateral Assignment and Pledge of Secured Notes), the Property Company shall assign to the Debenture holders (Series C), in favor of the Trustee, all of the rights of the Property Company to receive funds arising from or pursuant to the pledged asset, rights of precedence or other rights and/or any right to receive cash flow arising from the pledged asset and/or the right to receive any insurance receipts, if any and/or any other agreement, if any, conferred or to be conferred from time to time on the Property Company with respect to its interest in the pledged asset, will be assigned, as is customary, under an irrevocable assignment. If the Property Company has the rights to receive rights of any type whatsoever and/or to receive funds from any party whatsoever, the Property Company shall provide the Company, with a copy to the Trustee with the notification forwarded to those entities with respect to the assignment of the rights thereof to the Trustee for the Debentures (Series C) together with their signatures acknowledging receipt of the notification and the updating of their records. If such entities exist they will be required to provide the notification specified above, and the Company shall provide notice thereof to the Trustee and shall specify the rights of the Property Company, which were assigned and with which entities, and will confirm receipt of notices from said entities up to the closing date.

Hereinafter jointly: "the **Liens**" and "the **Pledged Assets**" or "the **Pledged Rights**", respectively.

Upon the occurrence of one of the events detailed in the Pledge Agreement, including the occurrence of an event of breach of the Deed of Trust which gives the Trustee the right to call for immediate repayment of the Debentures and/or to realize the collateral, and upon the occurrence of an event of breach of any of the other collateral documents which secure the Trustee, the Trustee (who is the secured party under the pledge agreement) may, among the other remedies given him within the pledge agreement, announce, without advance notice, the calling for immediate repayment of any liability secured under the pledge agreement, or to act to sell the pledged assets or any part of them under his sole discretion, by a 10 day advance notice. **It is clarified that the pledge realization proceeding will be executed according to the US law and according to advice received by the Trustee close to the pledge realization date.**

6.2.1.4    It is hereby clarified that:

A. In the event that the proceeds from the issuance will be lower than the required amount for repayment of the current loan (as defined below), and the Company provides from its own resources the difference required for completion of the required amount for repayment of the current loan (as defined below), The mortgage in favor of the Company will be repaid from the expansion of the Debenture series.

B. In the event of an expansion of the Debentures (Series C), the amount of the mortgage will be amended and/or the mortgage will be endorsed in the name of the Company in favor of the holders of the Debentures (Series C) and/or an additional mortgage will be created equal to the par value of the additional Debentures (Series C) in favor of the Trustee (as the Trustee for the holders of the Debentures).

6.2.1.5    In addition to the foregoing, on the closing date the Property Company shall deposit a guarantee with the Trustee pursuant to which the Property Company has an irrevocable commitment to uphold the Company's obligations towards the Debenture holders (Series C).

6.2.1.6    The Company certifies that, as of the signing date of this Deed of Trust, a mortgage and a promissory note are recorded on the pledged asset in an amount of US$ 96 million, to secure loans amounting in total to US$ 96 million, as set forth in **Appendix A** to the Deed of Trust. In order to create the lien pursuant to this section, the current mortgage and the promissory note will be endorsed in favor of the Company against the provision of a mortgage loan to the Property Company, and thereafter the Company shall assign the current mortgage and the promissory note, by way of pledge, in favor of the Trustee and if needed, the amount of the mortgage the and promissory note specified above would be increased to secure the obligations of the Company towards holders of Debentures (Series C), all in conformity with the Attorney Opinion.

6.2.1.7    The process of creating and improving the encumbrances shall be made in accordance with the provisions of a legal opinion, as specified in section 6.2.2 below (hereinafter – "**the legal opinion**") and subject to the provisions of this Deed.

> The Company's rights in the mortgage and the promissory note shall be endorsed in favor of the Trustee and shall be improved to third parties in the manner accepted in the State of New York and in the Virgin Islands, in accordance with the instruction of an attorney licensed to practice law in the State of New York and in the Virgin Islands (accordingly), and shall be subject to the applicable laws in the location of the registration of the mortgage. It is further noted that the collateral is expected to be created on the date of transfer of the proceeds of the issuance and the registration thereof is expected in a period of up to 21 days following this date, during which the Debenture holders' rights shall be secured by a mortgage insurance policy, as specified in section 6.2.3.6 below.

As long as no decision has been made with respect to the immediate redemption and/or realization of collateral under this Deed of Trust, whichever is sooner (hereinafter:

"**Realization Event**"), subject to the liens and obligations in this Deed, the rights of the Company in the pledged properties and the pledged rights pursuant to any law, agreement or bylaws (which have not been restricted in this said Deed) would not be impacted and would be entirely and exclusively owned by the Company.

6.2.2    Recording and/or creating the liens:

The liens listed in section 6.2.1 above would be recorded and/or created, as the case may be, in conformity with the memorandum or the opinion of attorney(s) specializing in the relevant laws in the USA applicable to the Pledged Asset and to the Property Company (hereinafter: the "**US Attorney**") as set forth in section 6.2.2.1 below, who will rely, inter alia, on an opinion of an attorney familiar with the laws of the Virgin Islands, which apply to the Company (hereinafter: the "**Virgin Islands Attorney**"), and in conformity with the following documents which, when all have been provided to the Trustee worded to the Trustee's satisfaction, the lien would be deemed "recorded" and/or "created", as the case may be:

6.2.2.1    Memo addressed to the Trustee (indicating that the Company may transfer the memo to third parties in accordance with the restrictions specified therein), with a copy to the Company, from the US Attorney with regard to how the lien was created, indicating the required documents, to be enclosed with the memo, as well as the required resolutions to create and record the liens according to laws applicable to the Pledged Asset, as the case may be. The memo would also list how the lien is to be realized pursuant to applicable law in the USA.

6.2.2.2    A copy of the documents required for execution and recording of the liens, to be enclosed with the memo from the US Attorney, as set forth in section 6.2.2.1 above, worded to the Trustee's satisfaction.

6.2.2.3    Opinion from the US Attorney addressed to the Trustee that the Property Company has passed all the resolutions required to create the liens and that their authorized signatories have signed all the documents required to create the liens with regard to creating and/or recording the liens.

6.2.2.4    A memo addressed to the Trustee (in which it will be noted that the Company may transfer the memo to third parties in accordance with the restrictions detailed therein) with a copy to the Company, from the Virgin Islands Attorney, regarding the manner of creating the liens, and detailing the required documents to be attached to the memo, as well as the decisions required to create the lien and recording it under the law applicable to the liens, as applicable. The memo will also detail the manner and modes of realizing the lien according to the relevant law of the Virgin Islands.

6.2.2.5    All documents required for the execution and registration of the liens, to be enclosed with the memo from the Virgin Islands Attorney, as set forth in section 6.2.2.4 above, worded to the Trustee's satisfaction.

6.2.2.6   The opinion of the Virgin Islands Attorney, that the Company passed all the resolutions required for creating the liens, and that those authorized to sign on its behalf have signed all the documents required to create the liens with regard to creating the liens or their registration.

6.2.27   Certification of an officer of the Company and/or the Property Company, as the case may be, certifying that the resolutions required to record the liens have been passed, as well as absence of any contradictory commitments by the Company and/or the Property Company with regard to creating and/or recording the liens, that the laws of the State of New York and/or the Virgin Islands (as applicable) are the applicable law for these liens and that the property is secured as stated in section 6.2.18 below.

6.2.2.8   Authorization from the title insurance company (hereinafter: the "**Insurance Company**") that the liens and/or the mortgage have been recorded.

6.2.2.9   An opinion of the US Attorney that subject to the recording of the liens in accordance with that stated in the opinion of the US Attorney, the liens are valid and enforceable, as well as certification that certification of recording the liens by the Insurance Company as stated matches the requirements specified in the US Attorney's memo as aforesaid.

6.2.2.10   An opinion of the Virgin Islands Attorney that in accordance with that stated in the opinion of Virgin Islands Attorney, the liens are valid and enforceable.

6.2.2.11   Authorization from the US attorney relying in part on the officer certificates that the property is held by the Property Company on the Closing Date, that the Property Company is held (100%) by the Subsidiary, that the Subsidiary is held ( 50%) by the transferred company, and that the transferred company is held (100%) by the Company.

Lien agreements with respect to the liens in favor of the Trustee would be worded to the Trustee's satisfaction and the Trustee would be authorized to consent to any change in wording of the lien agreements, subject to the same conditions whereby the Trustee may consent to changes in the actual Deed of Trust, as set forth in section 28 of the Deed of Trust, *mutatis mutandis*. The draft lien documents are enclosed as **Appendix B** to the Deed of Trust.

It is hereby clarified that upon the date of the final payment for principal and interest (including arrears interest) with respect to Debentures (Series C) and subject to full redemption or settlement of the outstanding balance of Debentures (Series C) in any way (including by way of buy-back and/or early redemption) and payment in full of the Trustee's fees and expenses, including those of their proxies, the liens created pursuant to this Deed of Trust shall expire and shall be deemed terminated, without requiring any further action and the Trustee shall sign any document required to eliminate the liens, if needed, and/or the Trustee shall sign any document required in order to

terminate the assignment by way of collateral assignment and/or transfer and/or assign the mortgage and the promissory note to another entity, as instructed by the Company, without the Trustee having any responsibility with respect to the validity of the aforesaid liens that were transferred and/or assigned and/or terminated.

The Company, the holding companies and the Property Company undertake to sign any document required to create, record and realize the liens.

6.2.3        Conversion of existing liens recorded on the Pledged Asset

6.2.3.1      The Company certifies that, as of the signing date of this Deed of Trust, a mortgage and a promissory note are recorded on the pledged asset in an amount of US$ 96 million, to secure loans amounting in total to US$ 96 million extended by a financial lender to Wythe Berry LLC (hereinafter – "**the Current Owners**"), as set forth in **Appendix A** to the Deed of Trust (hereinafter: the " **Existing Lien**", the " **Existing Loan**" and the "**Financial Lender**", respectively).

6.2.3.2      In order to release the Existing Lien, the Company will provide a mortgage loan to the Property Company which would repay the outstanding balance of the Existing Loan, out of the issuance proceeds. To this end, the Trustee would transfer, subject to an instruction as set forth above, out of the issuance proceeds to be held in trust by the Trustee, as set forth in section 6.2.4 below, amounts to the insurance company (as defined below) in conformity with a Payoff Letter (hereinafter: "**Payoff Letter**") from the Financial Lender, to be provided by the Company to the Trustee, listing the repayment amount required to be transferred to remove the liens and the details of the bank account to which the amount should be transferred, all subject to provisions of sections 6.2.3.3 and 6.2.3.4 below (hereinafter: "**Amount Required to Repay the Existing Loan**"). The Payoff Letter shall be addressed to the Company and/or the Property Company and/or the Current Owners and shall indicate that against transfer of the Amount Required to Repay the Existing Loan, which will constitute full and final settlement of the Existing Loan, the Financial Lender would release the Existing Lien in favor thereof and would remove any record with respect to said lien.

6.2.3.3      Notwithstanding the foregoing, the Company may repay the aforementioned mortgage from its own resources and not from the proceeds of the issuance of Debentures (Series C). Note, on this matter, that should the funds to be provided by the Company to the Property Company out of the issuance proceeds be less than the Amount Required to Repay the Existing Loan, the Company would provide, from its own resources, the difference required to make up the Amount Required to Repay the Existing Loan (all subject to achieving the minimum issuance amount, as specified in the shelf offering report).

6.2.3.4      The Company will provide the Payoff Letter to the Trustee. The Trustee will transfer to the Insurance Company (subject to the provisions of section 6.2.3.7 below) amounts from the issuance proceeds, which will first be used to repay the Amount Required to

Repay the Existing Loan (as defined above) plus the premium of the Insurance Company, and assignment of the current mortgage in favor of the Company; at the same time, the Company shall assign its rights in the mortgage and in the promissory note (as defined in section 5.10 above) in favor of the Trustee, and if required, the amount of the mortgage and promissory note specified above, to secure the obligations of the Company to the holders of the Debentures (Series C) with respect to the full mortgage loan amount (as defined in section 5.10 above), all in accordance with the opinion of the attorney; the funds will then be used to pay the Preferred Equity Investors; and if a balance remains, it will be used to cover the issuance costs, in accordance with the Company's instructions.

6.2.3.5   On the Closing Date, the Company will complete the transfer of the property to the Property Company.

6.2.3.6   On the Closing Date, the Insurance Company shall provide the Trustee with a Mortgage insurance policy in the name of the Company and the Trustee in the amount of the mortgage loan (hereinafter: the "**Mortgage Insurance Policy**"), concurrent with the release of funds by the Trustee as specified above, whereby on the Closing Date the property is under the ownership of the Property Company. Following the Closing Date it will ensure the recording of pledges, whereas with respect to this matter it should be clarified that the mortgage insurance will be valid from the date of the release of funds by the Trustee (regardless of the registration of the pledges). The Mortgage Insurance Policy shall insure the entire amount of the Mortgage Loan, in respect of any defect that may be detected in the ownership of the Property Company in the Pledged Property and/or the Mortgage and/or the Promissory Note and/or the pledges in favor of the Trustee, including in cases where bankruptcy proceedings are initiated against the Company and/or the Property Company.

6.2.3.7   The proceedings set forth above shall be executed by the insurance company with which, among others, a trust agreement will be signed with the Trustee. All the proceedings set forth below as well as the transfer of funds to the insurance company will be made by the insurance company as soon as the insurance company confirms to the trustee in writing (under the Trust Agreement) that:

A. It has all the documents required for the execution of the following actions:

1.   Repayment of the existing loan;

2.   Transfer of the property from the Current Owners to the Property Company.

3.   Creation of the Mortgage Loan, which will be secured by the Mortgage and Promissory Note, in relation to the amount that will be transferred to the insurance company.

4.   Creation of liens in favor of the Trustee (assignment by way of pledge).

     5.    Full or partial repayment to the Preferred Equity Investors;

  B.  Copies of the above documents will be sent to the Trustee within 7 business days from the closing date.

  C.  It shall not transfer any amount to the lender, without the Trustee's written instruction.

  D.  The payments shall first be made to repay the Existing Loan, to provide the Mortgage Loan and to create the liens in favor of the Trustee, and then to pay the Preferred Equity Investors. The remaining balance will be released to the Company.

  E.  If the Trustee's instruction is not received until such date as shall be specified by the insurance company, the amounts deposited by the Trustee will be returned to the account.

  F.  Once the funds are transferred to the financial entity, the insurance policy will enter into effect as set forth above, and the Mortgage Insurance Policy shall be delivered to the Trustee.

  G.  Once the funds are transferred, it will submit for registration all the documents set forth above and verify that they are duly registered.

6.2.3.8    Additionally, on the closing date and prior to transferring the funds to the Insurance Company, the Company will provide the Trustee with the guarantee document of the Property Company as stated in section 6.2.1.4 above, and the Property Company's notices to the debtors as detailed in section 6.2.1.3' with the addition of the Company's and the Property Company's declaration and stating that these notices are from any person towards whom the Property Company has rights.

6.2.3.9    It should be clarified that the process of creating, assigning and recording the pledges will be handled by the American attorney, the Virgin Islands attorney and the Insurance Company, as applicable.

6.2.4    Transfer of issuance proceeds to the Company

6.2.4.1    Upon receiving confirmation from the issuance coordinator, whereby the issuance proceeds have been received by the issuance coordinator, the Company would transfer, from its own resources, to the Trust Account, an amount equal to the issuance expenses (net of early commitment fee to qualified investors), in conformity with a calculation to be provided by the Company to the Trustee (hereinafter in this section: "**Issuance Expenses**"). After receiving confirmation from the Trustee whereby the Issuance Expenses have been transferred to the Trust Account, the Issuance Proceeds to be received by the issuance coordinator with respect to issuance of Debentures

(Series C), net of early commitment fee to qualified investors, would be transferred by the issuance coordinator, including any gains, to the Trust Account.

The issuance proceeds shall be released from the trust account to the insurance company, in accordance with the provisions of section 6.2.3 above.

**"Trust Account"** means: An account to be opened by the Trustee, in the Trustee's name, in trust for the Debentures holders (Series C) with one of the top five banks in Israel, with the Trustee being the sole authorized signatory therein. A sole, fixed and first priority lien, unlimited in amount, shall be created by the Company on its rights in the trust account including any sub-accounts, in favor of the Trustee, to the extent possible within 30 days from the issuance day, in accordance with the opinion of an attorney proficient in the laws applicable to the Company, which will be transferred to the trustee with a copy for the Company. Only the Trustee shall have signatory rights in the account. The Company would bear all expenses for account opening, management and closing. Policy with regard to management of funds in this account and execution thereof would be at the Company's sole discretion, provided that such investment would be in conformity with provisions of section 17 below.

**It should be noted that until the trust account is pledged as set forth above, the Company's rights (if any) to the Trust Account are not pledged in favor of the Trustee (on behalf of holders of Debentures (Series C)); therefore, it is possible that a third party (including an Officer of the Court etc.) could claim that the Company has rights to the Trust Account and that funds deposited therein belong to the Company and/or to its creditors, rather than exclusively to holders of Debentures (Series C). The foregoing shall not derogate from undertakings of the Company, the controlling shareholders and officers thereof, as set forth in section 5.9 above, which - for the sake of clarity - would also apply to the Trust Account.**

**The Company undertakes that pending completion of creation and/or recording of the liens, as the case may be, and transfer of all documents listed in sections 6.2.2 and 6.2.3 above, as the case may be, to the Trustee – the Company would not contract agreements and/or undertake any kind of undertaking which would create additional creditors of the Property Company other than holders of Debentures (Series C). It is hereby clarified that as of the signing date of this deed, to the best of the Company's knowledge, there are no such undertakings.**

6.2.4.2    For the purpose of listing the Debentures for trading, the Company regards the receipt of the issuance proceeds by the issuance coordinator as receipt of the proceeds by the Company and therefore would seek to list the Debentures (Series C) for trading on the stock exchange.

6.2.4.3    It is agreed that as long as the conditions for the release of the proceeds of the issue to the Company have not been fulfilled, the Company shall not be entitled to any amount

of the proceeds of the issue for which there is no compliance of the conditions for the release thereof.

6.2.4.4    The Company undertakes that all the conditions specified in sections 6.2.2 and 6.2.3 above (creating the lien, recording it etc.) would be fulfilled within ninety (90) days after the issue date of Debentures (Series C). The General Meeting of Debentures holders may extend the aforementioned period by special resolution passed by the General Meeting of Debentures holders (the period of 90 days plus any extension thus approved, hereinafter: "the **Interim Period**").

In case of failure to fulfill all the conditions listed in sections 6.2.2 and 6.2.3 above (creating the lien, recording it etc.) by the end of the Interim Period, the Company would act to make a full early redemption and de-listing of the Debentures but not prior to the end of the Interim Period (in this section: "the **Forced Early Redemption**"). One business day after the end of the Interim Period, the Company would issue an immediate report, with a copy to the Trustee, in which it would announce the Forced Early Redemption and its date. The date of the Forced Early Redemption would be no less than seventeen (17) days and no more than forty-five (45) days after the report by the Company to Debenture holders of the Forced Early Redemption. In such immediate report, the Company would indicate the principal amount subject to the Forced Early Redemption as well as the interest accrued with respect to this principal amount through the Forced Early Redemption date.

In such case, the principal of Debentures (Series C) plus annual interest at the interest rate for Debentures (Series C) accrued since the auction date through the actual date of the Forced Early Redemption would be payable to holders of Debentures (Series C) net of tax by law. In order to conduct the Forced Early Redemption pursuant to this subsection the Company may use the funds remaining in the Trust Account, to be transferred by the Trustee directly from the Trust Account to the Registration Company, net of costs for account opening, management and closing and any other fees payable to third parties, if any – and the Company would make up any amount required to conduct the aforementioned Forced Early Redemption.

It is clarified that in case a Forced Early Redemption occurs as stated in this section 6.2.4 above, the provisions detailed in section 7.2 below will apply (as the case may be), except for the provisions of section 7.2.9 above regarding the determination of the amount to be paid to the holders of the Debentures (Series c), which will be as detailed in this section 6.2.4.4 above.

For the sake of clarity, should the liens listed in section 6.2.1 above not yet be recorded on the date of conducting the Forced Early Redemption, the Company would no longer be required to record the liens in favor of holders of Debentures (Series C) and this Deed of Trust shall expire and be null and void.

6.2.4.5    Notwithstanding the foregoing, it is clarified that pending fulfillment of the conditions for transfer of issuance proceeds to the Company, the issuance proceeds to be held in the Trust Account, would be designated to secure all Company obligations with regard to Debentures (Series C) in conformity with the Deed of Trust and the Company may only receive the issuance proceeds subject to fulfillment of all conditions set forth in sections 6.2.2 and 6.3.3 above.

6.2.5    <u>Sale of the Pledged Asset and full Early Redemption of Debentures (Series C)</u>

The Company and/or the Property Company is entitled, at its sole discretion, sell to any third party the Pledged Asset (whether directly or through sale of corporations that hold the Pledged Asset), without obtaining consent from the Trustee and/or from the General Meeting of Debenture holders for this transaction, provided that upon the sale of the Pledged Property the Company will call the outstanding debentures due and payable in accordance with the provisions of section 7.2 of the Trust Deed and the following provisions shall apply:

6.2.5.1    The Company undertakes that the net sale proceeds with the addition of any amount required for the execution of the early redemption by the Company, would be deposited directly into the Trust Account or a similar trust mechanism will be determined, which will ensure receipt in the Trust Account of the amounts required for the full and early redemption of the debentures, simultaneous to the transfer of the property to the buyer.

6.2.5.2    Subject to provisions of section 6.2.5.1 above, the Trustee would sign any reasonable document and/or approval required or beneficial for conducting the sale; to this end, the Trustee would sign a letter of commitment, giving their consent to removal and/or endorsement of the liens recorded in favor thereof against and concurrently with transfer of the amounts required for the early redemption of the debentures into the Trust Account, as set forth in section 6.2.5.1 above.

6.2.5.3    It is clarified that the provisions set forth in section 7.2 below shall apply to the full and early redemption of the debentures.

6.2.5.4    Moreover, in case of full early redemption as listed in this section 6.2.5 above, the amounts required to conduct the full early redemption would be payable directly from the Trust Account by the Trustee and the Company would make up any amount required for conducting the full early redemption as noted above. Note that any amounts remaining in the Trust Account after the full early redemption as set forth above in this section 6.2.5 would be reimbursed by the Trustee to the Company.

6.2.6    <u>Amendment of liens in case of series expansion</u>

As stated, in case of expansion of Debentures (Series C), the liens would be amended to secure the total outstanding debt in respect of the par value of the additional Debentures

(Series C) (hereinafter in this section: **"Lien Amendment"**) in favor of the Trustee as the Trustee of the holders of Debentures (Series C).

The issuance proceeds to be received by the issuance coordinator with respect to issuance of any additional Debentures (Series C), net of payment of issuance expenses, would be transferred by the issuance coordinator, including any gains, into the Trust Account (as defined below), pending the creation of the liens and their recording in conformity with the opinion of the US Attorney and the Virgin Islands Attorney, as specified in section 6.2.3 above, *mutatis mutandis*.

6.2.7    <u>Lien removal and/or assignment</u>

6.2.7.1    Upon fulfillment of all Company obligations with respect to Debentures (Series C), including complete, final redemption of Debentures (Series C) (principal, interest and any arrears interest) and including repayment of any amount stipulated by terms and conditions of the Deed of Trust, the Trustee would provide to the Company their consent to removal and/or assignment of any liens in effect at that time within seven (7) days from receipt by the Trustee of signed confirmation by the Company's most senior financial officer with regard to such redemption. The lien removal and/or assignment would be carried out in practice by the Company (note that the US Attorney of the Trustee will be entitled to act to remove the liens in coordination with the Company).

6.2.8    Certifications and undertakings with regard to the Pledged Assets

The Company, holding companies and Property Company certify and undertake as follows:

6.2.8.1    To use the power conferred by their holdings to have the Property Company sign any document required pursuant to the Deed of Trust.

6.2.8.2    Operating agreements of the holding companies and Property Company nor any other agreement to which the holding companies and Property Company are party, do not contradict the provisions of this Deed and in the future shall not contradict any of the provisions of this Deed.

6.2.8.3    To use the power conferred by their holdings in order for the Property Company not to amend its operating agreement nor any other agreement contracted thereby, so as to impose any restrictions on the rights of the pledged property, the transfer or realization thereof and/or the assignment of the rights attached thereto and/or realization of the liens created pursuant to the Deed of Trust.

6.2.8.4    Subject to provisions of the Deed of Trust, avoid any disposition in the Property Company and/or in the Pledged Assets, including avoiding any allotment of additional rights in the Property Company to anyone (including the Company and the holding companies), including not to confer any right on any person with respect to the

Pledged Assets, pending full repayment of the secured amounts and fulfillment of all Company obligations with respect there to, without prior signed confirmation from the Trustee, after a resolution on this matter has been passed by the General Meeting of Debenture holders by special resolution.

6.2.8.5    Subject to provisions of the Deed of Trust, not to take any action with respect to the liens which would impact the capacity of the Trustee to realize the liens.

6.2.8.6    Not to mortgage nor pledge the Pledged Assets or part thereof in favor of any third party in any way whatsoever.

6.2.8.7    Subject to provisions of the Deed of Trust – and in particular to provisions of section 6.2.5 above – for as long as the Pledged Assets are pledged, not to sell, transfer, assign nor to confer on any party in any way whatsoever the Pledged Assets or part thereof or any right arising therefrom, whether directly or indirectly.

6.2.8.8    To do and instruct the holding companies and/or the Property Company to do, at the Company's expense or at their expense, as the case may be, anything required under circumstances for the liens created pursuant to this Deed of Trust on the Pledged Assets to be valid towards third parties, including other current or future creditors of the Company and of the holding companies and of the Property Company – and shall prevail over their rights with respect to the liens.

6.2.8.9    Effective from the Closing Date, the Property Company is wholly owned by the subsidiary and other than in case of sale of the Property Company pursuant to provisions of this Deed, would be wholly owned by the subsidiary pending redemption of Debentures (series C).

6.2.8.10   Effective from the Closing Date, the subsidiary is 50% owned by the transferred company and other than in case of sale of the Property Company pursuant to provisions of this Deed, it shall be at least 50% owned by the subsidiary pending redemption of Debentures (series C).

6.2.8.11   Upon signing this Deed, there   is no impediment due to any law, agreement or undertaking, including the Articles of Association of the Company and/or of the holding companies and/or of the Property Company for the Company signing or cross-signing the Deed of Trust (as the case may be) and for performance of all their obligations therein the Company signing this Deed is not in breach of any undertaking assumed by the Company, the holding companies or the Property Company and that their qualified organs have duly passed a resolution with regard to creating the liens and their signing of this Deed or their signing in the margins thereof (as applicable) and that no consent for creating the liens is required from any party. The Company hereby undertakes to inform the Trustee of any change to provisions of this sub-section.

6.2.8.12   Subject to provisions of section 6.2 with regard to the Existing Lien and to liens created pursuant to this Deed, the rights of the Property Company in the Pledged Asset are free and clear of any debt, foreclosure, lien or any third-party right and there is no restriction or condition by law or by agreement on the transfer of ownership thereof or on pledging, realizing and/or transferring ownership thereof upon realization.

6.2.8.13   Upon signing this Deed, the Company and/or the holding companies and/or the Property Company are not in any process of dissolution and/or receivership (whether temporary or permanent) and/or stay of proceedings (nor any similar proceeding under applicable law) nor threat of filing a motion or launching such proceedings and the Company and/or the holding companies and/or the Property Company have not passed a dissolution resolution.

6.2.8.14   The Company and/or the holding companies and/or the Property Company have not received any notification of any claims with regard to the Property Company's rights in the pledged rights. The Company hereby undertakes to inform the Trustee in writing of any change to provisions of this sub-section, immediately upon learning of this.

6.2.8.15   The Company and/or the holding companies and/or the Property Company are not aware of any defect in the pledged rights and should such a defect in the pledged rights be uncovered, they would act promptly to remedy such defect immediately upon learning of such defect.

6.2.8.16   Subject to provisions of this Deed, pending approval by holders of Debentures (Series C) to be passed by special resolution, the Property Company shall not pledge, mortgage, transfer, sell or assign the pledged rights or any part thereof in favor of any third party in any way and shall not launch any proceedings (including creating or modifying its Articles of Association) with respect to the pledged rights, which would impact the capacity of the Trustee and/or of holders of Debentures (Series C) to realize the lien, for as long as there are Debentures outstanding and for which the Company's obligations have yet to be fulfilled.

6.2.8.17   Immediately upon learning thereof, the Company and/or the holding companies and/or the Property Company would inform the Trustee in writing of any case of foreclosure, Court order execution proceedings or filing of a motion to appoint a Receiver or a motion to appoint any other officer for any of the Pledged Assets and/or the pledged rights and/or part thereof (or any similar proceeding according to applicable law). Furthermore, after the Company and/or the holding companies and/or the Property Company would learn of the same, it would immediately inform the authority which initiated the seizure or moved to appoint a Receiver or any other such officer (or any similar proceeding according to applicable law) and to inform the third party which initiated the same, or part thereof, and to immediately take any reasonable action, at their expense, required to remove such seizure or appointment of Receiver or the Special Administrator, as the case may be.

6.2.8.18   For as long as there are outstanding Debentures (Series C) the Company undertakes to have the Pledged Asset insured as is customary. The Company undertakes to inform the Trustee in writing immediately upon learning of any detrimental change in the scope of insurance coverage with respect to the Pledged Asset or of expiration of the insurance policy with respect to the Pledged Asset or should the insurer inform the Company of expiration or termination of the insurance policy with respect to the Pledged Asset. The Company shall disclose details regarding the validity of the insurance policy in the board of directors' report that will be attached to the Company's periodic and/or quarterly report.

6.2.8.19   For as long as there are Debentures (Series C) outstanding, the Company undertakes to have the holding companies and/or the Property Company avoid passing any resolution of voluntary dissolution or similar resolution according to applicable law.

6.2.8.20   As long as the Debentures (Series C) remain in circulation, the Company undertakes that the holding companies and/or the Property Company shall not provide any guarantees (except for guarantees in favor of the Debenture holders (Series C)) and that no additional debts shall be created.

**6.3**     **Undertaking not to create a floating charge**

**6.3.1**   The Company undertakes not to create a general floating charge on all its assets (only those it holds directly), without the prior approval of the meeting of holders of Debentures (Series C) by special resolution. It is emphasized that the Company is entitled to create specified charges on all or part of its assets (and a floating charge on specific asset/s), and to provide guarantees without the approval of the meeting of holders of Debentures (Series C).

**6.3.2**   The Holding Corporations and the Property Company, by their signature in the margins of this Deed, undertake not to pledge their property and rights, current and future, and to cause the companies they hold not to pledge their property and their rights, in whole or in part, under a general floating charge and/or any floating charge and/or specific pledges (including a floating charge on a specific property/properties), without the prior consent of the holders of the Debentures (Series C) by a special resolution. The Company will include such disclosure regarding non-creation of pledges by the Holding Corporations and the Property Company within the Report of the Board of Directors which will be attached to the Company's periodic report and/or the quarterly report. 6.3.3.   To remove any doubt it is clarified that, with the exception of with respect to the Holding Corporations and the Property Company specified in section 6.3.2 above, there is no restriction under this Deed on the subsidiaries of the Company

- 53 -

and they are entitled to create any charge (including a floating charge on all their assets) on all or part of their assets and may pledge their assets by any other means, without the approval of the meeting of holders of Debentures (Series C) and without requiring to provide any collateral in favor of the holders of Debentures (Series C) concurrently with creating charges as aforesaid.

6.3.4   The Company shall submit to the Trustee, on January 30 of each year, certification by an attorney that specializes in the relevant law applicable to the relevant company and/or certification from a title insurance company, as applicable, that as of the December 31 of the calendar year, the relevant Company did not register with its registries and/or any other registry that meets the relevant law, any pledge in favor of anyone in contrast to its undertaking in section 6.3 above. Proof from the registry that meets the relevant law which is applicable to the Company shall be attached to the stated certification. The Company shall include in its quarterly and/or periodic reports, as the case may be, reference to its compliance or failure to comply with the undertaking stated in this section above. Except in connection with the pledged properties, the Company shall be entitled to sell, lease, assign, give or transfer in any way whatsoever, all or part of its assets, to any person it deems fit, without requiring the approval of the Trustee and/or the holders of Debentures (Series C), as the case may be. The Company is not obligated to notify the Trustee of the transfer or sale of any of its assets unless it is a sale or transfer of a "material asset of the Company" as it is defined in section 8.1 below. Additionally, it is not obligated to notify the Trustee of creating any pledge on its assets, except as aforesaid in section 6.3 above.

6.3.5   It should be clarified that the Trustee does not have the data that will enable it to ensure the compliance of the Company, the Holding Corporations and the Property Company with their undertakings set forth in section 6.3 above (including the subsections thereto) and, therefore, for the purpose of examining the compliance of the Company, the Holding Corporations and the Property Company with the provisions of section 6.3, the Trustee will rely on the reports of the  Company and  the certifications specified in section 6.3 and shall not be required to ensure their correctness.

**6.4**     **Financial covenants**

Up to the date of the full and final payment of the debt pursuant to the terms of the Debentures (Series C) and fulfilment of all the Company's other obligations to the

holders of Debentures (Series C) pursuant to this Deed and the terms of the Debentures (Series C), the Company shall comply at any time with the financial covenants set forth below:

(1)   The Company's consolidated equity (excluding minority interests) will not be less than US$120 million (this amount will not be linked to the Index) (hereinafter: the "**Equity Covenant**" or the "**Minimum Equity**").

(2)   The Loan to Collateral Ratio shall not exceed 80% (hereinafter: the "**Loan to Collateral Ratio Covenant**" or the "**Minimum Loan to Collateral Ratio**").

With respect to this section 6.4 (2)

"**The Loan to Collateral Ratio**" – an amount equal to the outstanding balance of the principal of the Debentures (Series C) only (without interest), divided by an amount equal to the value of the collateral of the pledged property.

"**The Collateral Value of the Pledged Property**" – the value of the pledged property in accordance with the audited consolidated financial statements of the Company published prior to the date of the relevant examination, plus funds, deposits and securities held/to be held on the date of the relevant examination (namely, on the date of publication of the relevant financial statements), in the trust account, as presented in the balance statement issued by the bank in which the trust account is located.

In this regard, the Company undertakes to request a valuation by an external appraiser once a year, in each year, which will be attached to the consolidated financial statements of the Company.

(3)   The volume of projects initiated by the Company on a consolidated basis (including the share of the Company in affiliated companies and in jointly held companies) shall not exceed 40% of the total consolidated balance sheet of the Company (as defined below) (hereinafter: the "**Ratio of Volume of Initiated Projects to Total Balance Sheet Covenant**" or the "**Ratio of Volume of Initiated Projects to Maximum Total Balance Sheet Covenant**");

"**The volume of projects initiated by the Company**" in this section means - the cost of investment (as distinct from fair value) of the Company in projects in which construction has started as of the date of the relevant financial statements.

- 55 -

"**Consolidated balance sheet**" in this section means - consolidated balance sheet of the Company plus the share of the Company in affiliated companies and jointly held companies;

(4)  The Adjusted Net Debt to Net CAP Ration shall not exceed 75% (hereinafter: the "**Debt to CAP Ratio Covenant**" or the "**Maximum Debt to CAP Ratio**")

"**Net CAP**" – the adjusted net financial debt plus total consolidated shareholders equity of the Company (including minority interests), in the Statement of Financial Position

 The examination regarding the Company's compliance with the financial covenants in subsections (1) to (4) above shall be conducted on the date of publication of the Company's financial statements and as long as the Debentures (Series C) are outstanding, in relation to the annual/quarterly financial statements which the Company would have published until that date.

The Company shall specify in the notes to the financial statement for the relevant period whether or not it complies with the financial covenants in subsections (1) to (4) above, including the numerical value of each of the financial covenants.

If the Company's equity drops below the Minimum Equity and/or if the Loan to Collateral Ratio drops below the Minimum Loan to Collateral Ratio and/or the Ratio of the Volume of Total Initiated Projects to Total Balance Sheet  has exceeded the Ratio of Volume of Initiated Projects to Maximum Total Balance Sheet and/or the debt to CAP ratio has exceeded the maximum debt to CAP in any quarter, the Company shall notify the Trustee in writing and report this data and the meaning of this data by means of an immediate report via the Magna system , no later than one business day after the publication of the financial statements (quarterly and annual). For purposes of this section, reporting via the Magna system **will not** be considered reporting to the Trustee.

Failure to comply with the Equity Covenant for two consecutive quarters and/or failure to comply with the Assets to Equity Ratio Covenant for three consecutive quarters and/or failure to comply with the Loan to Collateral Ratio for two consecutive quarters and/or failure to comply with the Ratio of the Volume of Initiated Projects to Total Balance Sheet condition for two consecutive quarters

and/or failure to comply with the debt to CAP ratio condition for two consecutive quarters shall constitute grounds for declaring the outstanding balance of the Debentures (Series C) due and payable, as specified in sections 8.1.15, 8.1.16, 8.1.17 and 8.1.18 (respectively).

6.5    **Distribution restriction**

The Company undertakes not to make any distribution (as the term is defined in the Companies Law, 1999), and not to declare, pay or distribute any dividend unless all the terms set forth below are met:

(1) The balance of the earnings and the funds that have accumulated up to September 30, 2014 will not be available for distribution;

(2) the distribution amount will not exceed 50% of the profits generated as of October 1, 2014 after neutralizing net profit/loss revaluation (not yet realized) deriving from changes in fair value of its assets with regard to their fair value on December 30, 2014 or the date of purchasing the assets, the later of the two (hereinafter: "**Accumulated Profits**"). Profit for which no distribution was made during a certain quarter, can be basis for distribution in subsequent quarters. It is clarified that in the event of selling (exercising) a revaluated assets, profit/loss revaluation neutralized as aforementioned shall be added/deducted (as the case may be), starting October 1, 2014 from the accumulated profits; notwithstanding the foregoing, a distribution from the revaluation gains that were realized as mentioned above, which were generated from the sale of a property which as a result reduced the FFO of the Company by more than $ 2 million, will be limited to 25% of the aforementioned realized gain;

(3) the Company's equity (excluding minority interests) at the end of the last quarter, before the distribution of the dividend, net of the distributed dividend, will not be less than  US$ 150 million (this amount shall not be linked to the index) (hereinafter: the "**Distribution Restriction**"). The Company will submit to the Trustee a reasonable time after the distribution is approved by the Company's board of directors and prior to the distribution, certification by the chief financial officer of the Company with

- 57 -

respect to the compliance of the Company with the Distribution Restriction, including the relevant calculation.;

(4) If the debt to CAP ratio, as it is defined in section 6.4(4) above, according to the Company's consolidated financial statements, which were published prior to the relevant review date, does not exceed 70%.

(5) The Company is in compliance with the financial commitments set out in section 6.4 above, according to the consolidated financial statements, which were published prior to the relevant review date and the Company is not in violation of any of its obligations to the Debenture holders (Series C).

6.6    The Company undertakes not to assume additional financial recourse debt while not in compliance with the financial covenants set forth in section 6.4 above, with the exception of the financial debt of the controlling shareholder of the Company which shall be subordinate to the Debentures (Series C), upon dissolution of the Company and upon maturity, for the entire period in which the Company is not in compliance with the financial covenants set forth in section 6.4 above, and subject to section 5.6 above. In addition, as long as the Company does not comply with the financial covenants set forth in section 6.4 above, the Company shall not assume non-recourse financial debt, unless the debt is assumed for the remedy of non-compliance with the financial covenants or for repayment on account of principal or interest of the Debentures (Series C), in whole or in part.

6.7    The Company undertakes not to assume credit from financial institutions that are not Israeli and shall not award pledges to financial institutions that are not Israeli, except for lines of credit that may be provided by financial institutions in the United States (including specific pledges to secure these credit lines) to enable compliance with the requirements for maintaining liquidity rating and for maintain the rating and for the purpose of hedging transactions on the exchange rate of the shekel against the dollar in connection with the debentures issued by the Company. The Company shall provide the Trustee with confirmation from the senior officer in the field of finance in the Company at the end of the month of April of each year that the Company has complied with its obligation under this section. Such confirmation shall also be provided by the Company as part of

the Board of Directors Report which shall be attached to the periodic report of the Company.

To remove any doubt, the Company shall be entitled to pledge the shares of its investee companies (hereinafter – "**the property companies**"), except for the Property Company and/or the Holding Companies, in favor of the bank, for which the Property Company has pledged its asset, with respect to a loan which the bank provided to the Property Company.

6.8    The Company undertakes to inform the Trustee and the holders of the Debentures (Series C) of the Company of any breach of obligation to any financial creditor without this constituting cause for immediate repayment, without prejudice to that stated in section 8.1 below.

## 7.    **Early redemption**

### 7.1    **Early redemption at the discretion of the TASE**

If the Tel Aviv Stock Exchange decides to delist the Debentures from trading because the value of the Debenture series falls below the amount prescribed in the TASE Regulations regarding delisting, the Company shall act as follows:

(A)    Within 45 days from the date of the resolution of the Board of Directors of the TASE to delist the Debentures, the Company will announce an early redemption date on which the holder may redeem the debentures.

(B)    The early redemption date with regard to the Debentures will not take place before seventeen (17) days from the date of publication of the announcement and no later than forty five (45) days from the said date, but not during the period between the Record Date for the payment of Interest and the actual date of payment thereof.

(C)    On the early redemption date, the Company will redeem the Debentures whose Holders asked to redeem them, in accordance with the balance of the par value thereof and the addition of interest that has accrued on the principal until the actual redemption date (the Interest for part of a year will be calculated on the basis of 365 days per year).

(D)    The setting of an early redemption date as aforesaid is without prejudice to the rights of redemption as stipulated in the Debentures, for those Holders of the

Debentures who do not redeem them on the early redemption date as aforesaid, but the Debentures will be delisted from the TASE, and the resulting tax implications will apply thereto.

Early redemption of the Debentures as aforesaid will not grant to a Debenture Holder who redeems same as stated the right to the payment of principal and/or interest in respect of the period after the redemption date.

The Company will publish notice of the earliest redemption date in an immediate report. The said notice will also detail the proceeds of the early redemption.

**7.2**    **Early redemption at the initiative of the Company**

7.2.1    The Company shall be entitled, at its sole discretion, to perform an early redemption, full or partial, of the Debentures (Series C), commencing 60 days following the date of the listing thereof on the TASE, in which case the following provisions shall apply, all subject to the guidelines of the Securities Authority and the provisions of the TASE Rules and Regulations as shall be in effect on the relevant date:

7.2.2    The frequency of early redemptions shall be limited to one per quarter.

7.2.3    If an early redemption was scheduled for a quarter with a pre-scheduled interest payment, or partial redemption payment or final redemption payment, the early redemption will occur on the date scheduled for such payment.

For purposes of this section, "**quarter**" shall mean any of the following periods: January-March, April-June, July – September, October – December.

7.2.4    The minimum amount of an early redemption of Debentures shall not be less than NIS 1 million. Notwithstanding the aforesaid, the Company may make an early redemption of Debentures totaling less than NIS 1 million provided the number of redemptions a year will be limited to one.

7.2.5    Any early redemption amount will be paid on a pro rata basis to the holders of Debentures (Series C) at the par value of the Debentures (Series C) held.

7.2.6    Upon the Company's board of directors' resolution to make an early redemption as aforesaid, the Company shall publish an immediate report with a copy to the Trustee no less than seventeen (17) days and no more than forty five (45) days prior to the early redemption date which shall include, *inter alia*, the amount to be paid in the early redemption to the holders of the Debentures (Series C). The early redemption date shall

not occur in the period between the record date for interest payment in respect of the Debentures (Series C) and the actual interest payment date. In said immediate report, the Company will publish the early redemption amount of the principal and the interest accrued on the principal until the early redemption date, in accordance with the following provisions.

7.2.7    An early redemption will not be made for a portion of the Debentures (Series C) if the last redemption amount is less than NIS 3.2 million.

7.2.8    On the date of the partial early redemption, if applicable, the Company will pay the holders of the Debentures (Series C) the accrued interest only for the portion of the partial redemption and not for all of the outstanding balance. On the date of a partial early redemption, should there be one, the Company shall give notice in an immediate report of: (1) the proportion of the partial redemption in terms of the unpaid balance; (2) the proportion of the partial redemption in terms of the original series; (3) the interest rate of the partial redemption on the redeemed part; (4) the rate of interest that will be paid on the partial redemption, calculated in respect of the unpaid balance; (5) an update of the rates of the partial redemptions that remain, in terms of the original series; (6) the determining date for eligibility to receive an early redemption of the principal of the Debentures shall be twelve days (12) prior to the date determined for the early redemption.

7.2.9    The amount payable to the holders of Debentures (Series C) in the event of early redemption, shall be the higher of: (1) the market value of the outstanding Debentures (Series C) called for early redemption, which will be determined based on the average closing price of the Debentures (Series C) in the thirty (30) trading days prior to the date of the board of directors' resolution regarding an early redemption. In the event that the date of early redemption occurs on the date an interest payment is to be made on account of the Debentures, an amount equal to the amount of interest paid on the same date for the Debentures shall be deducted from the said average price.; (2) the liability value of the outstanding Debentures (Series C) called for early redemption, that is, the principal plus interest, until the actual early redemption date; (3) during the first three years from initial public offering of the Debentures (Series C): the remaining cash flows from the series B debentures, which are subject to early redemption (principal and interest), discounted by the yield on government bonds (as defined below) plus 2% per annum; at the end of the first three years from initial public offering of the

Debentures (Series C): the remaining cash flows from the series B debentures, which are subject to early redemption (principal and interest), discounted by the yield on government bonds (as defined below) plus 1.5% per annum. The discounting of the series B debentures that are subject to early redemption will be calculated from the early redemption date to the date of maturity of the debentures (series B).

For purposes of this section: "**the yield on government bonds**" means the average yield (gross) to maturity in the seven-day period that ends two business days prior to the date of announcement of the early redemption, of three non-linked, fixed-coupon government bond series whose average term to maturity is similar to the average term of the Debentures (Series C) on the relevant date.

Notwithstanding the provisions of section 7.2.9 above, in the event of a partial early redemption that is implemented close to the date of the examination of the covenant specified in section 6.4 (2) above, in which it is discovered that the Loan to Collateral Ratio is less than the Debt to Minimum Collateral Ratio, and for compliance with the Loan to Collateral Ratio Covenant, the amount to be paid to the holders of the Debentures (Series C) in the said early redemption, shall be the liability value of the outstanding Debentures (Series C) put up for early redemption, namely, principal plus interest, up to the actual early redemption date only.

7.2.10   The Company shall furnish to the Trustee within five business days from the date of resolution of the board of directors a certification by the Company's Auditor regarding the calculation of the redemption amount.

8. **The right to declare the Debentures due and payable**

8.1   **Upon the occurrence of one or more of the cases listed in this section below, the provisions of Section 8.2 below will apply, as relevant:**

8.1.1   If the Company does not pay any sum owed by it in connection with the Debentures or it fails to meet any of the remaining material obligations toward the holders of the Debentures.

8.1.2   If the Company files an order for the stay of proceedings or if an order for the stay of proceedings is given against the Company or if the Company files a motion for a settlement or arrangement with the creditors of the Company pursuant to Section 350 of the Companies Law 5759-1999, or if the Company make another offer to its creditors for a settlement or arrangement as aforesaid,

due to its inability to meet its obligations on time (except for purposes of merging with another Company, as specified in section 8.1.23 below and/or restructuring of the Company or a split, which are not prohibited under the terms of this Deed and except for making arrangements between the Company and its shareholders and/or the holders of stock options (exercisable into shares) of the Company, which are not prohibited under the terms of this Deed and which do not affect the ability to repay the Debentures (Series C)) or the implementation of a similar procedure by the Company or against the Company in accordance with the relevant law applicable to the Company. In regard with this section, orders filed as aforementioned by any third party with the consent of the Company shall be deemed orders filed by the Company.

8.1.3    If an application was filed pursuant to Section 350 of the Companies Law or according to foreign law applicable to the Company, against the Company (not with the Company's consent) which was not dismissed or cancelled within 45 days from the date of submission thereof or a similar procedure was implemented by the Company or to the Company in accordance with the relevant law applicable to the Company.

8.1.4    If the Company adopts a valid resolution for the liquidation thereof (other than winding up for the purpose of a merger with another Company as specified in section 8.1.23 below), or where with respect to the Company a permanent and final liquidation order has been approved by the court and/or a permanent liquidator has been appointed to the Company and/or a similar decision has been made or a similar official has been appointed by the Company and/or to the Company in accordance with the relevant law applicable to the Company.

8.1.5    If a temporary liquidation order has been granted or a similar order pursuant to the relevant law and/or a temporary liquidator has been appointed or any similar official has been appointed in accordance with the relevant law and/or a judicial decision of a similar nature has been rendered, and such order or decision were not dismissed or cancelled within 45 days of the date of issuing the order or rendering the decision, as the case may be. Notwithstanding the aforesaid, the Company will not be provided any remedy period with respect to applications made or orders issued, as the case may be, by the Company or with its consent.

**8.1.6**    If an application has been filed for receivership or the appointment of a receiver (temporary or permanent) or any similar official has been appointed in accordance with the relevant law applicable to the Company or on a material asset of the Company (as the term is defined below), or if a temporary order has been issued for the appointment of a temporary receiver ) or any similar official has been appointed in accordance with the relevant law - which were not dismissed or cancelled within 45 days of the date of filing the application or issuing the order, as the case may be; or – of an order has been filed for a permanent receiver for the Company or for a material asset of the Company (as the term is defined below) ) or similar order in accordance with the relevant law. Notwithstanding the foregoing, the Company will not be granted any remedy period in relation to the applications filed or orders issued, as the case may be, by the Company or with its consent.

**8.1.7**    If an attachment is imposed or if an action of execution or a similar proceeding under the relevant law are carried out in connection with a material asset of the Company (as this term is defined below) and/or in connection with all or most of the properties of the Company, and the attachment is not rescinded, or the action is not cancelled, as the case may be, within 45 (forty five) days following the imposition or execution thereof, as the case may be. Notwithstanding the foregoing, the Company will not be granted any remedy period in relation to the applications filed or orders issued, as the case may be, by the Company or with its consent.

**8.1.8**    If the holders of liens exercise their liens against a material asset of the Company in respect of a material debt of the Company (as this term is defined below).

**8.1.9**    If there is a real concern that the Company will not meet, or that the Company has failed to meet, its material obligations toward the holders of Debentures (Series C). It is clarified that the Company's material obligations, *inter alia*, include the amounts of payment to the holders and the dates thereof.

**8.1.10**   If the Company terminated or announced its intent to terminate the payment of its debts or ceased or announced its intent to cease to conduct its business affairs as they shall be from time to time.

**8.1.11**   If there was material deterioration in the Company's finances compared to its condition on the date of initial offering of the Debentures (Series C) and there is real concern that the Company would not be able to repay the Debentures (Series C) on time.

**8.1.12**   If control of the Company has been transferred, directly or indirectly, and the transfer of control was not approved by the holders of Debentures (Series C) by special resolution. The controlling shareholder of the Company on the date of issue of the Debentures (Series C) is Mr. Yoel Goldman.

For purposes of this subsection – "**control**" – as defined in the Securities Law, excluding ownership together with others that are not first degree relatives. To remove any doubt, it is clarified in this regard that by law inheritance does not constitute transfer of control.

**8.1.13**   If another series of debentures issued by the Company, which is listed for trading on the TASE, (hereinafter in this section: the "**Other Series**") or a debt from institutional bodies in Israel, or other debt of the Company, which exceeds 10% of the total assets of the Company according to its latest consolidated financial statements (including the share of the Company in the final chain of affiliated companies) or US$20 million, whichever is lower, (except for non-recourse debt) unless it is a non-recourse debt constituting 25% or more of the total assets of the Company, based on its consolidated financial statements or $ 75 million and above, whichever is lower) (hereinafter : the "**Other Debt**"), and the demand for immediate repayment is not withdrawn within 30 days of the date in which they were declared due and payable. It is noted that in connection with the Other Debt, in respect of which the Company's indebtedness arises from the provision of a guarantee to repay that debt, the grounds specified in this section 8.1.13 shall exist provided the following terms are met: (1) the Company's guarantee to repay the debt is not limited in amount or is limited to an amount that is higher than the amount of the other debt (as defined above; and (2) the Company was required to repay an amount that is at least higher or equal to the aforementioned Other Debt;; if these terms are met the aforesaid grounds will exist as of the date on which the Company was required to repay the Other Debt (subject to the remedy period

specified above) and not from the date of declaring that debt due and payable, provided these dates do not overlap.

**8.1.14**    If the Company fails to pay the Other Debt on time (as it is defined in section 8.1.13 above), and such breach is not remedied within 45 days of the date prescribed for the payment of the relevant debt. It is noted that, in connection with the Other Debt in respect of which the Company's indebtedness arises from the provision of a guarantee to repay that debt, the grounds specified in this section 8.1.14 will exist provided the Company's guarantee to repay the debt is not limited in amount or is limited to an amount higher than the other debt.

**8.1.15**    If the Company's equity (excluding minority interests) drops below the minimum equity, as it is defined in section 6.4 (1) above, for two consecutive quarters.

**8.1.16**    If the Loan to Collateral Ratio  drops below the minimum ratio, as it is defined in section 6.4 (2) above, for two consecutive quarters.

**8.1.17**    If the Ratio of Volume of Initiated Projects to Total Balance Sheet exceeds the Volume of Initiated Projects to Maximum Total Balance Sheet as these terms are defined in section 6.4 (3), for two consecutive quarters.

**8.1.18**    If the Debt to CAP Ratio exceeds the Maximum Debt to CAP Ratio, as these terms are defined in section 6.4 (4) above, for two consecutive quarters.

**8.1.19**    If the Company distributed dividend in violation of the distribution restriction provisions, as specified in section 6.5 above;

**8.1.20**    If the rating of the Debentures (Series C) by the Rating Agency is downgraded to below a BBB-_ rating or an equivalent rating. In the event that the Rating Agency is replaced, the Company shall submit to the Trustee a comparison between the ratings scale of the replaced Rating Agency and the ratings scale of the new Rating Agency.

**For purposes of this section it is emphasized that as long as the Debentures (Series C) are rated by more than one Rating Agency, the review of the rating with respect to the grounds for immediate repayment shall be conducted, at any time, based on the lower rating.**

8.1.21  If the Company sells to another / others most of its assets during two calendar quarters, and the holders of Debentures (Series C) have not approved the sale by ordinary majority. For purposes of this subsection – "**sale to another**" – shall mean sale to any third party whatsoever (including the controlling shareholder of the Company and/or companies controlled by him), except for sale to companies wholly owned by the Company; **"Most of the Company's properties**" – shall mean a property or several properties the cumulative value of which (as the case may be) in the last financial statements published before the relevant event occurred exceeds 50% of the value of its assets in the consolidated balance sheet, based on the said financial statements.

8.1.22  If the Company makes a change in its main business activity. In this regard, the Company's main activity and that of the companies it controls at the date of the Prospectus, is in the area of income-producing residential property, which includes, *inter-alia*, initiation, development, erection, acquisition, rental and management of investment property assets. The Company's periodic and/or quarterly reports, as applicable, within the board of directors' report, shall include a certification that main business activity of the Company has not changed. In addition, the Company undertakes to notify the Trustee of the change in business activity as aforesaid. The publication of an immediate report via the Magna system **shall not** constitute notification of the Trustee. For the purposes of this section only, the leasing of residential apartments in New York with a volume that falls below 780% of the operations of the Company shall be considered to be a change in the main activity of the Company. For the avoidance of doubt, it should be clarified that apartment buildings containing several commercial units, such as the current properties of the Company on the eve of the issue of the Debentures (Series C) of the Company, shall be classified as apartment buildings, namely, a property with the sole use of income-producing residential real estate.

8.1.23  If a merger was performed without the prior approval of the holders of Debentures (Series C) by ordinary majority, unless the recipient Company (as applicable) warrants to the holders of Debentures (Series C), including by means of the Trustee, at least 10 business days before the date of the merger, that there is no reasonable concern that because of the merger the recipient

Company will not be able to meet its obligations to the holders of Debentures (Series C). Nothing in this section shall derogate from the other grounds for immediate repayment of the holders of the Debentures pursuant to section 8.1 above and below also with respect to the recipient Company as if it were the Company, With regard to sections the provisions of which arise from the Company's financial statements, the review shall be conducted in relation to the financial statements of the recipient Company following the merger. In this regard it should be emphasized and clarified that this section does not apply to a merger within the Company between corporations of the Company.

**8.1.24** If trading in the Debentures (Series C) on the TASE was suspended by the TASE, except for suspension on the grounds of ambiguity as stated in the fourth part of the TASE Regulations, and 60 days have elapsed from the date of suspension during which the suspension was not cancelled.

**8.1.25** If the Company is liquidated for any reason whatsoever.

**8.1.26** If the Company committed a fundamental breach of the terms of the Debentures (Series C) or the Deed of Trust, including if it turns out that a material representation of the Company's representations in the Debentures or the Deed of Trust is incorrect and/or incomplete and the Trustee gave the Company written notice to remedy the breach and the Company did not remedy the breach as aforesaid within 14 days from giving the notice. .

**8.1.27** If the Debentures (Series C) cease to be rated for a period longer than 60 days due to reasons and/or circumstances beyond the Company's control (for purposes of this section, see, *inter alia*, failure to make the payments that the Company has undertaken to pay the Rating Agency and failure to deliver the reasonable reports and information which are required by the Rating Agency as part of the contract between the Company and the Rating Agency, shall be deemed as reasons and circumstances under the Company's control).

**8.1.28** If the Company expands the Debentures (Series C) series or issues additional Debenture series, in violation of the provisions of section 4 of the Deed of Trust.

**8.1.29** If the Company ceases to be a reporting corporation as the term is defined in section 1 of the Securities Law.

**8.1.30**   If the Company does not publish a financial statement as is it required to publish under any law or pursuant to the provisions of the Deed, within 30 days of the final date for publication thereof.

**8.1.31**   If the Debentures (Series C) are delisted from the TASE.

**8.1.32**   If the Debentures (Series C) are not repaid on time or if another material obligation made to the holders thereof is not met.

**8.1.33**   If the Company and/or the holding companies and/or the Property Company violate their undertakings not to pledge all of its assets in a general pledge as specified in sections 6.3.1 and/or 6.3.2 above.

**8.1.34**   Upon the occurrence of another event that materially prejudices and/or could materially prejudice the rights of the Debenture Holders.

**8.1.35**   If the Company breaches its obligations regarding the approval of special transactions as provided in Section 5.6 above.

**8.1.36**   If the lease agreement described in Appendix A of the Deed of Trust, between the Property Company and the Operating Company, will terminate and approval by the debenture holders for this was not passed by a special resolution.

For purposes of this section, "**Material Asset of the Company**" is an asset or several assets of the Company or of companies controlled by it, whose cumulative value, in accordance with the recent consolidated financial statements (reviewed or audited), on the date of the Company's event, exceeds 25% of the total assets in the consolidated balance sheet of the Company in accordance with the said financial statements.

For purposes of this section, "**Material Debt of the Company**" means Company debt whose liability value is 10% of the total assets of the Company  according to the latest consolidated financial statements of the Company or US$20 million, whichever is lower, in accordance with the recent consolidated financial statements (reviewed or audited) (hereinafter: the "**Financial Statements**") or an affiliate's debt where the percentage holdings (through a chain of holdings) in the affiliated Company of the liability value of the debt is 10% of the total assets of the Company in accordance with the latest financial statements or US$ 20 million, whichever is lower, in accordance with the Financial Statements. A non-recourse loan shall not be deemed a material debt

in this regard, except for a non-recourse loan (or aggregate non-recourse loans) in an amount that exceeds $ 75 million or 25% of the total assets of the Company in accordance with its latest financial statements, which shall be considered a material debt.

**The provisions of sections 8.2 below shall apply:**

8.2    In the event of one of the instances set out in sections 8.1.1 to 8.1.36 (inclusive) above, he following provisions shall apply, as the case may be:

8.2.1    Upon the occurrence of any of the events set forth in sections 8.1.1 through 8.1.36 (inclusive), the Trustee shall be obligated and each one of the holders of the Debentures shall be entitled to convene a general meeting of the holders of Debentures (Series C), the date of which shall be 21 days after the date of invitation thereof (or a shorter date in accordance with the provisions of section 8.2.4 below), and on whose agenda shall be a resolution concerning the immediate repayment of the outstanding balance of the Debentures (Series C) and/or realization of collateral (if given), due to the occurrence of any of the events specified in sections 8.1.1 to 8.1.36 (inclusive), above, as the case may be. The notice of the meeting shall state that if the Company acts to cancel and/or discontinue the event specified in section 8.1 above, in respect of which the meeting was convened, until the date of the meeting, the meeting of the holders of the Debentures shall be cancelled.

8.2.2    The holders' resolution to declare the Debentures (Series C) due and payable shall be adopted at a meeting attended by holders of at least fifty percent (50%) of the outstanding par value of the Debentures (Series C), by a majority of holders of the outstanding par value of the Debentures participating in the vote or such majority at an adjourned meeting attended by holders of at least twenty (20%) of the aforesaid outstanding par value.

8.2.3    If until the date of the meeting, any of the events stipulated in sections 8.1.1 to 8.1.36 (inclusive) above has not been cancelled or removed, and a resolution in the meeting of the holders of Debentures (Series C) has been adopted in the manner stipulated in section 8.2.2 above, the Trustee will be obligated, within a reasonable time, to declare the outstanding balance of the Debentures (Series C) immediately due and payable, and/or to realize the collateral (if provided).

**8.2.4**  A copy of the notice of the meeting as stated shall be sent by the Trustee to the Company for the purpose of publication thereof and the notice shall constitute a prior written warning to the Company of the intent of the Trustee to declare the said debentures due and payable and/or to realize the collateral (if provided).

**8.2.5**  The Trustee may, at its discretion, reduce the period of 21 days specified in section 8.2.1 above and/or not give a notice at all, should the Trustee be of the opinion that there is reasonable concern that any deferral of the date or delivery of the notice, as the case may be, could jeopardize the possibility to declare the Debentures due and payable or prejudice the rights of the Holders.

**8.2.6**  If any of the subsections of section 8.1 above stipulate a reasonable period in which the Company may take action or make a decision that will remove the grounds for immediate repayment, the Trustee or the holders may declare the Debentures due and payable as stated in section 8, only if the period stipulated as aforesaid has elapsed and the grounds have not been removed; however, the Trustee may reduce the said period if it is of the opinion that it could materially prejudice the rights of the holders.

**8.2.7**  To remove any doubt, nothing in section 8.2 above shall derogate from the powers of the Trustee to declare the Debentures (Series C) due and payable and/or realize the collateral (if provided), at its discretion.

**8.2.8**  Notwithstanding the provisions of section 8.2 above, in the event that the Company requests the Trustee in writing to appoint an urgent representation, the provisions stipulated in the **third addendum** to the Deed of Trust shall be followed.

**8.2.9**  To remove any doubt it is clarified that the immediate repayment shall be based on the outstanding par value of the Debentures (Series C), including interest on the principal amount, while the interest will be calculated for the period beginning after the final day in respect of which interest was paid and ending on the immediate repayment date (the calculation of the interest for a portion of the year will be based on 365 days a year).

**8.2.10**  To remove any doubt, it is clarified that the right of immediate repayment as aforesaid and/or declaring the debentures due and payable shall not impair or

prejudice any other or additional remedy available to the holders of
Debentures (Series C) or to the Trustee under the terms of the Debentures
(Series C) and the provisions of this Deed or pursuant to any law and the
decision not to call the debentures due and payable upon the occurrence of any
of the events listed in section 8.1 above, shall not constitute a waiver of the
rights of the Debenture Holders or the Trustee.

9. **Claims and proceedings by the Trustee**

9.1    In addition to any provision herein and as an independent authority, the Trustee may, at
its discretion and without giving additional notice, adopt all such proceedings,
including legal proceedings and applications for orders, as it finds fit and subject to the
provisions of any law, to protect the rights of the holders of Debentures (Series C) and
enforce the Company's duty to meet another obligation under the Deed of Trust.
Nothing in the foregoing shall prejudice and/or derogate from the Trustee's right to
institute legal and/or other proceedings, even if the Debentures (Series C) have not
been declared due and payable, all with a view to protecting the holders of Debentures
(Series C) and/or for purposes of issuing any order with regard to Trusteeship matters
and subject to the provisions of any law. Notwithstanding the provisions of this section
it is clarified that the right to declare the debentures due and payable will arise only in
accordance with the provisions of section 8 above and not by virtue of this section.

9.2    Subject to the provisions of the Deed of Trust, the Trustee may but is not obligated, to
convene at any time a general meeting of the holders of Debentures (Series C) in order
to discuss and/or receive its instructions on any matter regarding the Deed of Trust.

9.3    Any time the Trustee is obligated under the terms of the Deed of Trust to take any
action, including institute proceedings or file claims at the request of the holders of
Debentures (Series C) as stated in this section, the Trustee may, at its sole discretion,
withhold the execution of any action until such time as it receives instructions from the
general meeting of the holders of Debentures (Series C) and/or instructions from the
court on how to proceed provide such meeting is convened or the court is petitioned at
the earliest possible date. To remove any doubt it is clarified that the Trustee may not
delay any actions or proceedings as aforesaid if the delay could prejudice the rights of
the holders of Debentures (Series C).

**9.4**     The Trustee shall be entitled, subject to any special resolution of the holders of Debentures (Series C) as aforementioned to waver, entirely or partly, according to the terms he deems proper, the existence of those liabilities of the Company.

9.5     The Trustee may, before instituting any legal proceedings, convene a general meeting of the holders of Debentures (Series C), to determine which proceedings to take in order to exercise their rights under this Deed. The Trustee may further reconvene general meetings of the holders of Debentures (Series C) for the purpose of receiving orders with regard to conducting such proceedings provided the meeting is convened at the earliest possible date pursuant to the provisions of the second addendum to the Deed of Trust and the delay of proceedings does not prejudice the rights of the Holders.

## 10.   <u>Receipts held in Trust</u>

All money held from time to time by the Trustee, except for its fees, expenses and repayment of any debt to it, in any way whatsoever, including but not only in consequence of declaring the Debentures due and payable, and/as a result of proceedings instituted by it, if any, against the Company, shall be held by the Trustee in trust and shall be used for such purposes and according to the order of priorities as follows:

<u>**First**</u> – for the settlement of all expenses, payments, levies and obligations incurred by the Trustee, imposed on it, or caused in the course or in consequence of acts to execute the trust or otherwise, with respect to the terms of the Deed of Trust, including its fee (provided the Trustee does not receive its fee from the Company or from the holders of the Debentures). <u>**Second**</u> – for the payment of any other amount pursuant to the "undertaking to indemnify" (as this term is defined in section 26.1.6 below); <u>**Third**</u> – for the payment to the holders of the Debentures (Series C) that incurred payments pursuant to section 26.4.2 below;

The balance will be used, unless decided otherwise in a special resolution of a meeting of holders of Debentures (Series C), for such purposes and according to the following priorities subject to the terms of linkage of the Debentures: (a) First – to pay to the holders of Debentures (Series C) the arrears interest due to them under the terms of the Debentures (Series C), pari passu and pro rata to the sums payable to each of them, without preference or priority with respect to any of them; (b) to pay to the holders of Debentures (Series C) the amount of the principal in arrears owed to them under the terms of the Debentures pari passue and pro rata to the amount of the principal in arrears payable to each of them, without preference or priority with respect to any of them; (c) Third – to pay to the holders of Debentures (Series C) the

amounts of the interest owed to them under the terms of the Debentures held by them Pari passu which have not yet become due and pro rata to the sums payable to each of them, without preference as to the time priority of the issuance of the Debentures by the Company or otherwise; (d) Fourth – to pay to the holders of Debentures (Series C) the amounts of the principal owing to them under the terms of the Debentures they hold, Pari passu, whether or not such amounts have become due, pro rata to the sums owing to them, without any preference as to the time priority of the issuance of the Debentures (Series C) by the Company or otherwise; (e) the surplus, if any, shall be paid by the Trustee to the Company or its successors, as the case may be.

Tax will be withheld from the payments to the holders of Debentures (Series C), to the extent such should be deducted under any law.

The holders of Debentures (Series C) may change the above priorities by a special resolution passed at a meeting of holders, in relation to alternatives (a) to (d) in the second paragraph of this section above. The above is subject to proper approval by the tax authority.

It is clarified that if the Company should have incurred any of the expenses but has failed to do so, the Trustee shall act to collect said amounts from the Company and if it succeeds in obtaining them they will be held by it in trust and will be used for the purposes and according to the order of priorities specified in this section.

**11.** **Power to demand payment to the holder through the Trustee**

The Trustee may instruct the Company in writing to transfer to the Trustee's account (for the holders of the Debentures) any payment (interest and/or principal) which the Company is required to pay the Holders, so that the amount intended for settlement as aforesaid will be transferred to the Trustee's account (for the holders of the Debentures) no later than one business day prior to the date of repayment to the holders of the Debentures for the purpose of financing the proceedings and/or expenses and/or the Trustee's fees pursuant to this Deed. The Company may not refuse to act in accordance with said notice and it shall be deemed to have fulfilled its obligations to the Holders if it proves that it has transferred the full amount to the credit of the Trustee's account. Nothing in the foregoing shall relieve the Company of its obligation to incur the expenses and fees as aforesaid where it is required to incur them under this Deed or pursuant to any law. In addition, nothing in the foregoing shall derogate from the Trustee's duty to act reasonably to obtain the amounts due to the Holders from the Company which was used to finance the proceedings and/or expenses and/or the Trustee's fees under the

Deed of Trust. The Trustee is entitled to make the required payment of these amounts subject to the provisions of the law.

## 12. **Power to withhold distribution of funds**

Notwithstanding the provisions of section 10 above, in the event that the monetary sum obtained in consequence of the institution of proceedings as aforesaid, which at any time is available for distribution, as set out in section 10 above, is less than NIS 1 million, the Trustee shall not be obligated to distribute same, and it may invest such sum, in whole or in part, in such investments as are permitted under the Deed of Trust as specified is section 17 below. Where such investments, including accruals thereon, together with other funds received by the Trustee, total such amount as is sufficient to pay the aforementioned amount, the Trustee shall pay same to the Holders in accordance with the order of priorities set out in section 10 above. In the event that until the earlier of: the date of payment of the interest and/or principal or a reasonable period of time after receipt of the monetary amount, the Trustee does not have a sufficient sum to pay at least NIS 1 million, the Trustee may distribute the funds held by it to the Debenture Holders.

Notwithstanding the foregoing in this section 12 above, the holders of Debentures (Series C), in an ordinary resolution adopted by them, may instruct the Trustee to pay them the distributable funds obtained by the Trustee as set forth in section 10 above, even if the sum total is less than NIS 1 million subject to the provisions of the TASE Regulations and instructions as shall be in effect at the time. Notwithstanding the foregoing, the Trustee's fees and the Trustee's expenses will paid from the said funds when they become due (with respect to the expenses already paid to the Trustee, the Trustee will be reimbursed for said expenses immediately when the funds are obtained by the Trustee) even if the amounts obtained by the Trustee are less than NIS 1 million.

## 13. **Notice of distribution**

The Trustee shall give notice to the Debentures Holders (Series C) of the date and the place of effecting any payment of the installments set out in sections 10 and 12 above, in a prior 14 days' notice to be delivered to them in the manner designated in section 28 below. After the date designated in the notice, the holders of Debentures (Series C) shall be entitled to interest thereon at the rate designated in the Debentures, only in respect of the outstanding balance of the principal (if any), after deduction of the amount paid, or offered to be paid to them as aforesaid.

14.    **Failure to pay for reasons out of the Company's control**

14.1    Any amount due to the holders of Debentures (Series C) which was not paid on the date
prescribed for its payment, for a reason that is out of the Company's control, while the
Company was willing and able to pay said amount (hereinafter: the "**Obstruction**",
shall cease to bear interest from the date designated for its payment and the holders of
Debentures (Series C) will only be entitled to the amount he was entitled to on the date
prescribed for repayment thereof on account of the principal or the interest.

14.2    The Company shall deposit, with the Trustee at the earliest possible date following the
date determined for payment and no later than 14 days after the date designated for
payment, the sum of the installment not paid in a timely fashion, as set out in section
14.1 above, and shall give notice in writing according to the addresses available to it, if
any, to the holders of Debentures (Series C), of such deposit, and such deposit shall be
deemed as settlement of such installment, and, in the event of settlement of everything
owing for the Debenture, also as redemption of the Debentures (Series C) by the
Company. The above does not detract from the obligation of the Company to assume
the fees and expenses of the Trustee, all as prescribed herein.

14.3    Any amount held by the Trustee in trust for the holders shall be deposited by the
Trustee in a bank and held by it, in its name or on its behalf, at its discretion, in
permitted investments as set forth in section 17 below. If the Trustee did same it will
owe the holders, in respect of said amounts, only the proceeds from the disposal of the
investments less the expenses related to said investments, including for the
management of the trust account and less its fees and mandatory payments, and it shall
pay same to the holders against such certifications as shall be required by it to its
satisfaction. Once the Trustee receives notice from the holder that such impediment has
been lifted, the Trustee shall transfer to the holder all the funds accumulated in the
deposit as a result of the disposal of the investment, net of all the reasonable expenses
including with respect to the trust fund management fees and net of its fee and any
applicable tax under the law. Payment shall be effected against presentation of
certifications, which are acceptable by the Trustee, regarding the holder's right to
receipt thereof.

14.4    The Trustee shall hold such funds and shall invest them according to the provisions of
section 17 below, up to the end of one year from the final settlement date of the

Debentures (Series C). After such date, the Trustee shall return such amounts, to the Company, including profits arising from their investment, less its reasonable expenses and less its fees and other expenses which were expended in accordance with the provisions of this Deed (such as payment to service providers, etc.), and the Company shall hold such amounts in trust for the holders of Debentures (Series C) that are entitled to such sum for a period of up to seven (7) years from the date of final repayment of the Debentures (Series C), and in respect of the sums transferred to it by the Trustee, as aforesaid, the provisions of subsection 14.3 above shall apply to it, mutatis mutandis. Funds that are not claimed from the Company by the holders of Debentures (Series C) at the end of seven years (7) from the date of final repayment of Debentures (Series C), shall be transferred to the Company's possession 30 days after notice has been given to the aforementioned holders by the Company, in writing, at the address held by the Company, if held, and it may use the remaining funds for any purpose whatsoever. Following the return of the amounts to the Company the Trustee will not owe the holders of the Debentures (Series C) any payment in respect of the said amounts held thereby.

14.5    The Company shall confirm to the Trustee, in writing, the return of the amounts as stated in section 14.4 above and the receipt thereof on behalf of the holders of Debentures (Series C), and shall indemnify the Trustee for any claim and/or expense and/or damage of any type whatsoever incurred by it, in consequence of, and due to, the transfer of the funds as aforesaid, unless the Trustee has acted negligently (except for negligence which is exempt by law as shall be in effect from time to time), in bad faith or maliciously.

15.    **Receipt from the holders of the Debentures and from the Trustee**

15.1    A receipt from the holder of Debentures (Series C) or written confirmation by the TASE member of the transfer or a transfer through the TASE Clearing House for any payment on account of the principal and the interest paid to him by the Trustee, in connection with the Debenture, shall serve as absolute exemption of the Trustee in connection with the performance of the payment of the sums designated in the receipt.

15.2    A receipt from the Trustee as to the deposit of the amounts of the principal and the interest with it, for the benefit of the holders of Debentures (Series C), shall be deemed as a receipt from the holder of Debentures (Series C)  for purposes of the provisions of

section 15.1 above, with respect to the exemption of the Company in connection with the performance of the payment of the sums designated in the receipt.

**15.3**   Funds distributed as aforesaid in sections 10 and 12 above, shall be deemed as payment on account of the repayment of the Debentures (Series C).

**16.    Presentation of A Debenture to the Trustee; Registration with respect to partial payment**

16.1    The Trustee may demand of a holder of Debentures (Series C)  to present, to the Trustee, upon the payment of any interest or partial payment of principal and interest, the Debenture (Series C) certificates in respect of which the payments are made. The holder of the Debentures (Series C) will be required to present said Debenture certificate provided this will not obligate the holders of Debentures (Series C) to incur any payment and/or expenses and/or impose any responsibility and/or liability on the holders of Debentures (Series C).

16.2    The Trustee may register, in the Debenture (Series C) certificate, a note with respect to the sums paid as aforesaid and as to the date of payment thereof.

16.3    The Trustee may, in any special case, at its discretion, waive the presentation of a Debenture (Series C) certificate, after an indemnity undertaking and/or sufficient security, to its satisfaction, has been given to it by the holder of Debentures (Series C) , for damages liable to be caused due to failure to register such note, all as it deems fit.

16.4    Notwithstanding the aforesaid, the Trustee may, at its discretion, keep records in any other manner, with respect to such partial payments.

**17.    Investment of Funds**

All funds which the Trustee may invest under this Deed of Trust, shall be invested by it, in accounts of one of the four leading banks in Israel, provided the bank's rating does not drop below AA, in its name or to its order, provided it invests the funds in bank deposits, treasury bills issued by the Bank of Israel and/or government Debentures issued solely by the Bank of Israel or the US Government and/or similar securities issued by the US Government.

If the Trustee did same it will owe the holders, in respect of said amounts, only the proceeds from the disposal of the investments less its fees and expenses, less the fees and expenses related to the said investment and the management of the trust accounts and less the fees and mandatory payments that apply to the trust account, and with respect to the balance of said funds, the Trustee shall act in accordance with the provisions of sections 12 and/or 14 above, as the case may be.

18. **The Company's undertakings to the Trustee**

The Company hereby undertakes to the Trustee and the holders of the Debentures that so long as the Debentures (Series C) have not been repaid in full, as follows:

18.1    To continue to conduct its business in a regular and appropriate manner.

18.2    To maintain orderly books of account in accordance with accepted accounting principles, to maintain the books and documents used as their references (including deeds of pledge, mortgage, accounts and receipts) in its offices, and to allow the Trustee and/or any authorized representative of the Trustee to review no later than 5 business days after the date of the request of the Trustee to be coordinated in advance with the Company, any book and/or document, as aforesaid, which the Trustee asks to review. In this context, an authorized representative of the Trustee means a person designated by the Trustee for the purpose of such review, by means of a written notice on the part of the Trustee, to be given to the Company prior to the review as aforesaid, subject to an undertaking of confidentiality subject to the provisions of section 31.12 below.

18.3    To notify the Trustee in writing, as soon as reasonably possible, and no later than one business day after learning of any event of imposition of an attachment on the Company's material assets (as this term is defined in section 8.1 above), and if a receiver, a special administrator and/or temporary or permanent liquidator and/or trustee was appointed for a material asset of the Company, as part of a motion for suspension of proceedings pursuant to section 350 of the Companies Law, 1999 and/or any similar position-holder against the Company, and to take, at its expense, all measures required to remove such attachment or to cancel the receivership, liquidation or administration, as the case may be.

18.4    To advise the Trustee in writing, immediately upon the Company learning thereof, no later than one trading day, of: (1) the occurrence of any of the events set out in the subsections of section 8.1 above; (2) reasonable concern by the Company that one or more of the cases enumerated in the above section 8.1 and subsections thereof.  This section and all the sub-sections hereunder, shall be implemented by the Company without regard to the remedy and waiting periods listed in section 8.1 above, if any.

18.5    To advise the Trustee in writing, no later than 30 days from the date of issue of the Debentures (Series C), pursuant to this Deed, an amortization table for the payment of the Debentures (principal and interest).

18.6    To deliver to the Trustee a signed written notice by the chief financial officers of the Company, no later than 5 business days of the date requested by the Trustee, of the performance of any payment to the holders of the Debentures and the remaining amounts which the Company owes, on that date, to the holders of the Debentures , after the performance of the above payment.

18.7    To deliver to the Trustee, immediately upon receipt thereof, any report that it is compelled to submit to the Securities Authority, an immediate report on the Magna system and any report or information that will be published (in full) by the Company on the Magna system shall be deemed to have been delivered to the Trustee. Notwithstanding the aforesaid, at the Trustee's request, the Company shall deliver to the Trustee a printed copy of the report or information as aforesaid.

18.8    To deliver to the Trustee copies of notices and invitations to be given by the Company and/or the Trustee to the holders of the Debentures, as stated in section 28 of this Deed.

18.9    To cause the chief financial officers of the Company, to provide the Trustee and/or such persons as he may instruct, no later than 10 business days from the date of the Trustee's instruction, with any explanation, document, calculation or information regarding the Company, its business and/or assets, which shall be reasonably required, at the Trustee's discretion, for the purpose of reviews conducted by the Trustee to protect the holders of the Debentures.

18.10    To invite the Trustee to attend general meetings (whether annual general meetings or extraordinary general meetings of shareholders of the Company) of shareholders of the Company (with no participation or voting rights) which shall take place in Israel. The publication of the invitation for a general meeting of shareholders of the Company on the Magna system shall be deemed as invitation of the Trustee for purposes of this section. As long as the Company is a Debenture Company as this term is defined in the Companies Law - provide the Trustee with signed minutes of shareholders meetings within one business day of the date of signing said minutes.

18.11    As long as the Debentures (Series C) have not been repaid in full, to provide the Trustee with the following reports:

**18.11.1.1**   Audited annual financial statements of the Company, and reviewed quarterly financial statements of the Company, no later than the dates designated therefor in accordance with the Securities Law, even if the Company ceased to be a reporting corporation.

**18.11.1.2**   If and as long as the Company is a public Company as this term is defined in the Companies Law – a copy of each document transmitted by the Company to all its shareholders or to all the holders of the debentures and details of any information transmitted to them by the Company by other means, including any report submitted by law to the Securities Authority (immediate report), immediately upon its publication. As long as the Company is a private Company, which is a Debenture Company – to provide the Trustee with a copy of each document transmitted by the Company to all the holders of the debentures and details of any information transmitted to them by the Company by other means, including any report submitted by law to the Securities Authority (immediate report), immediately upon its publication.

**18.11.1.3**   To provide the Trustee, at its first request in writing, with a signed written confirmation by an accountant that all the payments to the Holders of the Debentures have been made on time, and the balance of par value of the outstanding debentures.

**18.11.1.4**   If the Company ceased to be a reporting corporation, the Company shall provide with the Trustee, in addition to the provisions of section 18.3to 18.11 above, annual, quarterly and immediate reports, as specified below, signed by the Company's CEO and CFO:

   (a)   An annual report that includes the information specified in Appendix 5.2.4.8 to Chapter 4 of Part II (Management of Investment Assets and Provision of Credit) Gate 5 (Principles of Business Management) of the Consolidated Circular no later than 60 days from the date on which the Company would have been required to publish its financial statements had it been a reporting corporations;

   (b)   A quarterly report that includes the information specified in Appendix 5.2.4.9 to Chapter 4 of Part II (Management of Investment Assets and

Provision of Credit) Gate 5 (Principles of Business Management) of the Consolidated Circular no later than 30 days from the date on which the Company would have been required to publish its financial statements had it been a reporting corporations;

(c)    An immediate report upon the occurrence of any of the events specified in Appendix 5.2.4.10 to Chapter 4 of Part II (Management of Investment Assets and Provision of Credit) Gate 5 (Principles of Business Management) of the Consolidated Circular. The report will be published on the date on which the Company would have been required to report the event pursuant to Regulation 30(B) of the Securities Regulations (Periodic and Immediate Reports), 1970 and or any regulation that replaces it.

18.12    To deliver to the Trustee, at its request, a declaration and/or declarations and/or documents and/or details and/or additional information on the Company (including explanations, documents and calculations regarding the Company, its business or assets) and to instruct its accountant and its legal consultants to do same, upon reasonable request in writing by the Trustee, no later than 10 business days from the date of the Trustee's instruction if, in the Trustee's reasonable opinion, the information is required by the Trustee to exercise the powers and authority of the Trustee and/or his representative under the Deed of Trust, including information that could be essential for the purpose of protecting the rights of the holders of the Debentures provided the Trustee acted in good faith, and subject to the confidentiality undertaking, as stated in section 31.12 below.

18.13    To deliver to the Trustee all the reports or notices as specified in Section 35J of the Law.

18.14    No later than 10 business days after publication of the annual or quarterly financial reports of the Company, as the case may be, the Company shall provide the Trustee a detailed written approval, to the Trustee's satisfaction, signed by a senior officer of the Company's Financial Department, regarding the Company's compliance or non-compliance with each of the financial covenants detailed in section 6.4 of this deed and with the attachment of the details of the relevant calculation related to each financial covenant.

18.15    No later than 10 business days after the publication of the Company's quarterly financial statements, and as long as this Deed of Trust is in effect, the Company shall furnish to the Trustee, a written confirmation by the Company, signed by authorized signatories on its behalf as well as the chairman of its board of directors and/or general manager, that during the period from the date of the Deed and/or the date of the previous confirmation delivered to the Trustee, whichever is later, and until the date of the confirmation, the Company is not in violation of this Deed and the terms of the Debentures (Series C), including no violation of the controlling shareholder of the liability specified in section 5.9 (h) above, unless it expressly states otherwise.

**18.16**    On April 10 of each year, for the previous calendar year, and as long as this Deed of Trust is in effect, the Company shall deliver to the Trustee, a written confirmation signed by the chief financial officer of the Company with regard to interest payments and/or payments on account of the principal, in connection with the Debentures (Series C), which became due prior to the date of confirmation, and the date of payment, and the balance of par value of the outstanding Debentures (Series C) as of the date of confirmation; as well as confirmation by a director of the Company and by its general manager, that on the year ended December 31 the Company was not in breach of the terms and restrictions stipulated in the Deed of Trust (including specific terms and restrictions in the Deed and in the Debentures, which the Trustee shall ask the Company to address in the confirmation), unless expressly stated otherwise in the said confirmation.

**18.17**    Each January 31, the Company shall deliver to the Trustee certification by the attorney specializing in the relevant law applicable to the relevant company and/or certification by the title company, as the case may be, that as of December 31 of the calendar year, the liens are registered and in force.

**18.18**    Inform the Trustee in writing of any change in its name or address

**18.19**    The Trustee may instruct the Company to report forthwith on the Magna system, in the Trustee's name, any report the wording of which shall be delivered in writing by the Trustee to the Company, and the Company shall be obligated to report same.

**18.20**    The Trustee shall keep secret information he received under this section, shall not divulge it to another person and shall not make any use of it, unless disclosure or use thereof, is required in order to fulfill the Trustee's duty by law, pursuant to the Deed of

Trust, or a court order or for the purpose of protecting the rights of the Debenture holders.

18.21    The Company shall notify the Trustee of non-compliance with any foreign covenant as soon as possible and no later than 2 business days from the day in which the Company's non-compliance with the foreign covenant began or within 2 business days from the date on which it was notified by an associate of the non-compliance with any foreign covenant, as the case may be, and the expected repercussions of such non-compliance pursuant to the Company's agreements with such entity. It is clarified that if the Company fails to comply with a foreign covenant and a grace period is provided for the purpose of compliance with the foreign covenant, such grace period shall not be deemed, for purposes of this section only, as compliance with the covenant and the Company shall notify the Trustee of non-compliance with the foreign covenant as aforesaid.

For purposes of this section –

"**Foreign covenant**" – a material financial covenant of the Company and of each associate of the Company, pursuant to an agreement with a financial institution or with another entity that provided material credit to the Company or the associate company.

"**Material financial covenant**" – a financial covenant in respect of which non-compliance constitutes grounds for declaring the debt due and payable.

"**Material credit**" – credit that constitutes at least 25% of the Company's consolidated equity (including minority interest). For purposes of an associate – credit the amount of which multiplied by the Company's percentage holding (through a chain of holdings) in the associate is at least 25% of the Company's consolidated equity (including minority interests).

Notwithstanding the provisions of section 27 below, the Company shall give the Trustee a written notice of non-compliance of the foreign covenant in addition to any immediate report that the Company will publish on the matter, if any.

## 19.    <u>Additional undertakings</u>

19.1    To the extent that the Debentures are declared due and payable, as defined in section 8 above, the Company shall perform, from time to time and any time it is required by the Trustee, all the reasonable acts to enable the exercise of the powers vested in the

Trustee, and in particular the Company shall take the following actions, no later than 7 business days from the date of request by the Trustee:

**19.1.1**   Make the statements and/or sign all the documents and/or execute and/or cause the execution of all the necessary or required actions under the law, for the purpose of validating the exercise of the powers and authority of the Trustee and/or its representative under this Deed of Trust.

**19.1.2**   Give all the notices, instructions and orders that the Trustee views as beneficial and requires same for the purpose of implementing the provisions of the Deed of Trust.

**19.2**   For purposes of this section – a signed written notice by the Trustee that confirms that an action required by it, within its powers, is a reasonable action, shall constitute prima facie evidence.

## 20.   <u>Agents</u>

**20.1**   The Company hereby irrevocably appoints the Trustee as its agent, to execute and carry out in its name and in its stead, all the actions that it will be required to carry out under the terms of this Deed, and in general to act in its name in relation to the actions that the Company is obligated to carry out under this Deed and has not carried out or to exercise some of the powers it holds, and to appoint any other person as the Trustee deems fit to perform its duties under this Deed, provided the Company has not carried out the actions it is required to carry out under the terms of this Deed within a reasonable period of time as determined by the Trustee, as of the date of the Trustee's instruction, and provided it acted reasonably.

**20.2**   An appointment as stated in section 20.1 above shall not obligate the Trustee to take any action and the Company hereby exempts the Trustee and its representatives in the event that they do not take any action, and the Company hereby waives any claim toward the Trustee and its representatives in respect of any damage that was incurred or may be incurred to the Company directly or indirectly, in respect of that, on the basis of any action that was not taken by the Trustee and its representatives as aforesaid.

## 21.   <u>Other Agreements</u>

Subject to the provisions of the Law and the restrictions imposed on the Trustee under the law, the fulfilment of its capacity as Trustee, under this Deed, or its very status as Trustee, shall not

prevent the Trustee from entering into various agreements with the Company, or entering into transactions with the Company in the ordinary course of its business. It should be noted that the Trustee will not be able to contact the said Company if this creates a conflict of interest with his tenure as Trustee for the holders of Debentures (Series C).

22. **Trusteeship reports**

22.1    The Trustee shall be required to submit a report with regard to the acts performed by it in accordance with the provisions of Section 35H(1) of the Securities Law.

22.2    Until June 30 of each year the Trustee shall prepare an annual report on trust affairs (hereinafter: the "**Annual Reports**"). The annual report shall include a report of irregular events in connection with the Trusteeship that occurred during the past year.

22.3    The Trustee will publish (itself or through the Company at the Trustee's request) the annual report on the Magna system.

22.4    If the Trustee learns of a material breach of the terms of this Deed and/or the terms of the Debentures (Series C) by the Company, from public reports issued by the Company or the Company's notice to the Trustee pursuant to section 18.4 above, it will notify the holders of Debentures (Series C) of such breach and the steps taken by the Trustee to prevent it or to enforce the Company's fulfilment of the obligations, as the case may be. Such duty shall not apply if this is an event that was published by the Company under the law. Such duty of the Trustee is subject to its knowledge of the said breach.

22.5    Upon the request of investors holding more than 5% (five percent) of the outstanding par value of the Debentures (Series C), the Trustee shall transfer data and details regarding its expenses to said holders in connection with the trust under the Deed of Trust.

22.6    Until the full and final repayment of the Debentures (Series C), if a request is made by holders holding more than 10% (ten percent) of the outstanding par value of the Debentures (Series C), to receive information on reviews conducted by the Trustee in relation to the debenture series, including in relation to the Company's compliance with its obligations to the Debenture Holders (Series C) pursuant to the Trust Deed, the Trustee shall cooperate with the holders regarding the receipt of said information, subject to the provisions of confidentiality and any applicable law (to remove any doubt it is clarified that such information shall be provided in addition to the annual report published by the Trustee in accordance with the provisions of the Securities Law).

22.7    The Trustee shall inform the Company of each submitted report pursuant to this section 22.

### 23. Remuneration of the Trustee and reimbursement of its expenses

The Company shall pay the Trustee a fee as specified in Appendix 23 of this Deed.

### 24. Special powers

24.1    The Trustee will be entitled to deposit all the deeds and documents which evidence, represent and/or specify its right under this Deed including in connection with any asset held by it at the time, in a safe and/or at another place it may choose, with any banker and/or bank and/or with an attorney.

24.2    The Trustee may, as part of the fulfilment of the Trust affairs under this Deed, to enlist the opinion and/or advice of any attorney, accountant, appraiser, assessor, surveyor, mediator or other specialist (hereinafter: the "**Consultants**") and to act in accordance with its conclusions, whether such opinion or advice has been prepared at the request of the Trustee and/or at the Company, and the Trustee shall not be responsible for any loss or damage caused in consequence of any act and/or omission performed by it, on the basis of such advice or opinion, unless a peremptory judgment has determined that the Trustee has acted negligently (except for negligence which is exempt by law as shall be in effect from time to time and/or in bad faith or maliciously). The Company shall incur all the expenses of employing the Consultants who are appointed as aforesaid, provided, in as much as this is possible in the circumstances of the matter and if this does not violate the rights of the holders, that the Trustee gives the Company prior notice of its intent to obtain such expert opinion or advice.

24.3    Any such advice and/or opinion may be given, forwarded or received by means of a letter, telegram, facsimile and/or any other electronic means for transmission of information, and the Trustee shall not be responsible for any acts performed by it on the basis of any advice and/or opinion and/or information transmitted in one of the aforesaid manners, notwithstanding that same contained errors and/or was not authentic, unless such errors could have been detected under a reasonable examination.

24.4    Subject to the law, the Trustee shall not be obliged to notify any party whatsoever of the signing this Deed of Trust and he may not intervene in any manner whatsoever in the management of the Company's business or its matters unless, in accordance with

the authority conferred to the Trustee under this Deed of Trust, or as shall be decided between the Company and holders of the Debentures (Series C) and the Trustee.

24.5 The Trustee shall use the trust, powers, authorizations and authorities conferred on it under this Deed, at its absolute discretion and subject to the other provisions of this Deed. In doing so, it shall not be responsible for any damage and/or loss and/or expense caused to the Company and/or the holders of the Debentures and/or which they will have to incur in consequence of any act and/or omission performed by the Trustee, including as a result of errors in judgment, unless a peremptory judgment has determined that the Trustee has acted negligently (except for negligence which is exempt by law as shall be in effect from time to time and/or in bad faith or maliciously).

24.6 Unless explicitly stated otherwise by law or by the provisions of this Deed, the Trustee is not obligated to act in a manner that is not explicitly detailed herein, regarding any information, including about the Company and/or in connection with the ability of the Company to meet its obligations to the holders of the debentures shall come to his attention and this is not his function.

## 25. **The Trustee's power to engage agents**

The Trustee may, as part of the management of Trust affairs, appoint an attorney or other agent/s to act in its stead, to the extent that it does not undermine the rights of the Debenture Holders (Series C), to perform or participate in the performance of special acts to be performed with respect to the Trust and pay a reasonable fee to any such agent, and, without derogating from the generality of the foregoing, institution of legal proceedings. The Trustee may also pay, at the Company's expense, the fees of any such agent including by deducting the payment from the funds received by it and the Company shall reimburse the Trustee immediately upon its first request for any such expense, all provided the Trustee gave the Company advance notice regarding the appointment of agents as aforesaid, in as much as this is possible in the circumstances of the matter and if this does not violate the rights of the holders.

It is clarified that the appointment of said agent shall not release the Trustee from any responsibility for its actions and for the actions of its agents.

## 26. **Indemnification of Trustee**

26.1 The Company and the holders of the Debentures (on the relevant effective date as provided in section 26.6 of the Deed of Trust, each in respect of their undertaking

as provided in section 26.4 of the Deed of Trust) hereby undertake to indemnify the Trustee and all its officers, employees and any proxy or expert appointed by it and/or which it shall appoint in accordance with the provisions of this Deed of Trust and/or in accordance with any lawful resolution of the holders of Debentures (Series C) meeting in accordance with the provisions of this Deed of Trust (hereinafter: "**Entitled to Indemnification**"):

26.1.1    For any damage and/or loss and/or for any monetary charge under any judgment (for which no stay of execution was granted) or under any completed settlement (and insofar as the settlement relates to the Company, the Company gave its agreement thereto), arising from actions that were performed by the parties entitled to indemnification or which they are required to perform under the provisions of this Deed and/or by law and/or by order of a competent authority and/or in accordance with any statute and/or upon the demand of the holders of Debentures (Series C) and/or upon the Company's demand; and

26.1.2    For the fee of the parties entitled to indemnification and expenses which they incurred and/or are about to incur, and for any damage and/or loss caused to them due to actions which they performed or are required to perform under the provisions of this Deed and/or by law and/or by order of a competent authority and/or in accordance with any statute and/or upon the demand of the holders of Debentures (Series C) and/or upon the Company's demand and/or in connection with the exercise of powers and authorizations conferred by this Deed and in connection with all kinds of legal proceedings, opinions of lawyers and other experts, negotiations, discussions, expenses, claims and demands relating to any matter and/or thing done and/or not done in any way in connection with the subject matter hereof.

All the above on the condition that:

26.1.3    The parties entitled to indemnification do not demand to be indemnified in advance in a matter that does not brook delay (without prejudice to their right to retroactive indemnification).

**26.1.4**  It was not determined in a judiciary decision that the parties entitled to indemnification acted in bad faith and the action was done outside the framework of their duties, not in accordance with the statutory provisions and/or not in accordance with this Deed of Trust.

**26.1.5**  It was not determined in a judiciary decision that the parties entitled to indemnification were guilty of non-exempt negligence under any law as in effect from time to time.

**26.1.6**  It was not determined in a judiciary decision that the parties entitled to indemnification acted willfully.

The indemnification undertaking under this section 26.1 is hereinafter referred to as the "**Indemnification Undertaking**."

It is hereby agreed that in the event it is alleged against the parties entitled to indemnification that: (1) they acted in bad faith, or outside the framework of their duties, or not in accordance with the statutory provisions or the Deed of Trust; and/or (2) they were guilty of non-exempt negligence under any law; and/or (3) they acted willfully – the parties entitled to indemnification shall be entitled, immediately upon demand, to payment of the amount of the indemnification undertaking. However, where it has been determined in a judiciary decision that the parties entitled to indemnification did in fact act in the manner alleged against them as set forth above, they shall refund the amounts of the indemnification undertaking that were paid to them.

**26.2**  Without derogating from the compensation rights granted to the Trustee by law and subject to the provisions of this Deed and/or the Company's obligations under this Deed, the parties entitled to indemnification may be indemnified out of the monies received by the Trustee from proceedings instituted by it, with respect to obligations which they assumed, with respect to reasonable expenses which they incurred in connection with the performance of the trust or in connection with such actions as in their opinion were required for said performance and/or in connection with the exercise of the powers and authorizations conferred by this Deed and in connection with all kinds of legal proceedings, opinions of lawyers and other experts, negotiations, discussions, claims and demands relating to any matter and/or thing done and/or not done in any way in connection with the

subject matter hereof, and the Trustee may withhold the monies held by it and pay out of them the amounts necessary for the payment of such indemnification. All the above amounts shall have priority over the rights of the holders of Debentures (Series C), subject to any statutory provisions and provided that the Trustee acted in good faith and in accordance with the duties imposed on it by any statute and by this Deed. For purposes of this section, an action of the Trustee that was approved by the Company and/or the holders of the Debentures shall be deemed an action that was reasonably required.

26.3    Without derogating from the validity of the indemnification undertaking in section 26.1 above, where the Trustee is obligated by the terms of the Deed of Trust and/or by law and/or by order of a competent authority and/or in accordance with any statute and/or upon the demand of the holders of Debentures (Series C) and/or upon the Company's demand to do any action, including but not limited to the institution of proceedings or the filing of claims upon the demand of the holders of Debentures (Series C), the Trustee may abstain from taking any such action until it receives from the Company, to its satisfaction, a monetary deposit in the amount required to cover the indemnification undertaking (hereinafter: the **"Financing Cushion"**), with first priority, and in the event that the Company does not deposit the full amount of the 'financing cushion' within the time it was required to do so by the Trustee, provided that the persons entitled to indemnification resorted to act reasonably under the circumstances required to collect these amounts from the Company, the Trustee shall address to the holders of Debentures (Series C) on the effective date (as provided in section 26.6 below) a request to deposit the financing cushion with it, each according to their proportionate share (as this term is defined hereinafter). If the holders of Debentures (Series C) do not actually deposit the full amount of the required financing cushion, the Trustee shall not be obligated to take the relevant action or institute the relevant proceedings. The foregoing shall not exempt the Trustee from taking any urgent action required to prevent material harm to the rights of the holders of Debentures (Series C).

The Trustee is authorized to determine the amount of the financing cushion, and it shall be entitled to act again to create an additional such cushion, from time to time, in an amount to be determined by it. It is clarified that payment by the

holders under this section does not release the Company from its liability to the above payment.

The Trustee, at its sole discretion, will be entitled to use the funds deposited in the financing cushion for the purpose of implementing activities or use in relevant proceedings.

**26.4**    The indemnification undertaking:

**26.4.1**    Shall apply to the Company in case of: (1) actions that were performed according to the Trustee's judgment and/or in accordance with any statute and/or that were required to be performed under the terms of this Deed of Trust or for protecting the rights of the holders of the Debentures (including due to a holder's demand required for such protection); and (2) actions that were performed and/or that were required to be performed upon the Company's demand.

**26.4.2**    Shall apply to holders on the effective date (as provided in section 26.6 of the Deed of Trust) in case of: (1) actions that were performed and/or that were required to be performed upon the demand of the holders of the Debentures (excluding actions taken as stated upon the demand of holders for protecting the rights of the holders of the Debentures); and (2) nonpayment by the Company of the amount of the indemnification undertaking due from it under section 26.3 of the Deed of Trust (subject to the provisions of section 26.6 of the Deed of Trust), provided that the persons entitled to indemnification resorted to act reasonably under the circumstances required to collect these amounts from the Company. It is clarified that payment in accordance with subsection (2) above shall not derogate from the Company's obligation to bear the indemnification undertaking in accordance with the provisions of section 26.4.1.

**26.5**    If the Company fails to pay the full amounts required to cover the indemnification undertaking and/or does not deposit the full amount of the financing cushion, as the case may be, and/or if the holders were called upon to deposit the amount of the financing cushion under section 26.3 above, provided that the persons entitled to indemnification resorted to act reasonably under the circumstances required to collect these amounts from the Company, the following provisions shall apply:

**26.5.1**   The monies shall be collected in the following manner:

**26.5.1.1**   <u>First</u> – The amount shall be financed out of the amounts of interest and/or principal which the Company is required to pay to the holders of Debentures (Series C) after the date of the required action, and the provisions of section 11 above shall apply.

**26.5.1.2**   <u>Second</u> – If in the Trustee's opinion the amounts deposited in the financing cushion are not enough to cover the indemnification undertaking, the holders on the effective date (as provided in section 26.6 above) shall deposit, each according to their proportionate share (as this term is defined) the missing amount with the Trustee.

"**Proportionate share**" means: The proportion of the Debentures (Series C) held by the holder on the relevant effective date as provided in section 26.6 above out of the nominal amount in circulation on that date. It is clarified that the calculation of the proportionate share shall remain fixed even if after that date there is a change in the nominal amount of the debentures held by the holder.

It is clarified that the holders of the Debentures that are liable to cover expenses as provided in this section above, may bear expenses as provided in this section above beyond their proportionate share, and in such case the order of priorities as provided in section 10 of this Deed shall apply to the reimbursement of the amounts.

**26.6**   The effective date for determining the obligation of a holder in respect of the indemnification undertaking and/or payment of the financing cushion is as follows:

**26.6.1**   If the indemnification undertaking and/or payment of the financing cushion is required pursuant to a resolution or an urgent action necessary to prevent material harm to the rights of the holders of Debentures (Series C), without a prior resolution of the meeting of holders of Debentures (Series C) – the effective date for the obligation shall be the end of the trading day on the day when the action

was taken or the resolution was adopted, and if that day is not a trading day, then the previous trading day.

26.6.2   If the indemnification undertaking and/or payment of the financing cushion is required pursuant to a resolution of a meeting of holders of Debentures (Series C) – the effective date for the obligation shall be the effective date for participation in the meeting (as such date was specified in the notice of invitation) and will also apply to a holders that did not participate in a meeting.

26.7   The payment by the holders in place of the Company of any amount that is due from the Company under this section 26, shall not release the Company from its obligation to bear such payment. The Trustee is to work towards the return of the said funds, which were paid by the holders instead of the Company, from the Company

26.8   Regarding priority in reimbursing holders who bore payments under this section out of the receipts held by the Trustee, see section 10 above.

## 27.  **Notices**

27.1   Any notice by the Company and/or the Trustee of the holders of the Debentures shall be given as follows:

27.1.1   By reporting on the Magna system of the Securities Authority (the Trustee may instruct the Company and the Company shall be obligated to make immediately on the Magna system, on the Trustee's behalf, any report in the wording provided in writing by the Trustee to the Company); and solely in the cases specified below, in addition, by the publication of a notice in two daily newspapers with a wide distribution published in Hebrew in Israel: (a) any arrangement or settlement under section 350 of the Companies Law, 5759-1999; (b) any merger. Any notice published or sent as stated, shall be deemed to have been delivered to the holders of the Debentures on the day of its publication as stated (on the Magna system or in the press, as the case may be).

27.1.2   Any notice or demand by the Trustee to the Company or by the Company to the Trustee may be delivered by a letter sent by registered mail to the address specified in the Deed of Trust, or to another address of which one party has notified the other in writing (including an email address), or by

sending by fax or by messenger, and any such notice or demand shall be deemed to have been received by the second party: (1) if sent by registered mail – at the end of three business days from the date of its delivery to the Trustee in accordance with the post office records; (2) if sent by fax (together with a telephone verification of receipt) – at the end of one business day from the day of its sending; (3) if sent by messenger – upon its delivery by the messenger at the address or upon its presentation to the addressee for acceptance, as the case may be; (4) and if sent by email – at the end of one business day from the day of its sending.

## 28.  <u>Waiver, settlement and alterations to the Deed of Trust</u>

Subject to any statutory provisions, except with respect to the times of the payments under the Debenture(but including a technical change in the times or in the effective date for their payment), the interest rate (including arrears interest), interest rate adjustments resulting from non-compliance with a financial covenant and a change in the rating, the obligations of the Company in connection with the financial covenants and the violation thereof, the obligations of the Company in connection with distributions, the Company's undertakings regarding liens, the Company's undertakings regarding non-creation of liens, provisions relating to the expansion of the series, provisions relating to the law applicable to this Deed, grounds for demanding immediate repayment and reports which the Company is required to make to the Trustee (hereinafter jointly – **"the Company's undertakings that may not be contracted out of"**) the Trustee may, from time to time and whenever, in its opinion, this does not harm the rights of the holders of Debentures (Series C), forgive any violation or non-fulfillment of any of the terms of the debentures or nonfulfillment of any of the terms of the Deed of Trust by the Company.

Subject to any statutory provisions and with the prior approval of the holders of the Debentures in a special resolution, the Trustee may, whether before or after the principal of the Debentures (Series C) has come due, settle with the Company regarding any right or claim of the holders of Debentures (Series C), waive any right or claim of the holders of Debentures (Series C) or any of them against the Company under the Deed of Trust and the Debentures (Series C), and agree with the Company on any arrangement with respect to their rights including waiver of any right or claim of his and/or of the holders of the Debentures (Series C) towards the Company in accordance with this deed..

If the Trustee settled with the Company, waived any right or claim of the holders of Debentures (Series C) or agreed with the Company on any arrangement with respect to the rights of the holders of Debentures (Series C), after it received the prior approval of the meeting of holders of Debentures (Series C) as provided above, the Trustee shall be exempt from liability in respect of such action, as it was approved by the general meeting, provided the Trustee did not breach its fiduciary duty and did not act in bad faith or willfully or recklessly in the implementation of the resolution of the general meeting.

Without derogating from the generality of the foregoing, subject to any statutory provisions, the Company and the Trustee may, whether before or after the principal of the debentures has come due, modify the Deed of Trust including its appendices (including an alteration to the terms of the Debentures (Series C)), if either of the following is fulfilled:

(a)   If the Trustee is satisfied that the alteration does not harm the holders of Debentures (Series C) (except with respect to the Company's undertakings which may not be contracted out of, as such undertakings are defined in this section above and except for a change in the Trustee's identity or in its fee in the Deed of Trust, for the appointment of a Trustee instead of a Trustee whose term of office has expired; in respect of which the Trustee may not agree to alterations and/or waivers therein or in regard thereto), provided it notified the holders of Debentures (Series C) in writing in that regard.

(b)   The alteration was approved by the holders of Debentures (Series C) in a special resolution.

The Company shall deliver to the holders of the Debentures a notice by means of an immediate report through the internet site of the Securities Authority (The MAGNA), regarding any alteration as above, immediately after it was made.

If the Trustee exercises its right under this section, it may require the holders of Debentures (Series C) to deliver the Debenture certificates to it or to the Company for recording therein a caveat regarding any settlement, waiver, alteration or amendment as stated, and the Company shall record such a caveat at the Trustee's request. If the Trustee exercises its right under this section, it shall give the holders of Debentures (Series C) a written notice in that regard within a reasonable time.

**29.**   **Register of the** holders of the Debentures

29.1    The Company shall maintain and manage at its registered office a register of holders of Debentures (Series C) in accordance with the Securities Law, which shall be open to inspection by any person.

29.2    The Company shall not be obligated to record in the register of holders of Debentures (Series C) any notice concerning an explicit, implicit or presumed trust, or a pledge or charge of any nature and kind, or any equitable right, claim or offset or any other right, in connection with the Debentures (Series C). The Company shall only recognize the title of the person in whose name the debentures were registered. Its legal heirs, administrators of the estate or executors of the will of the registered owner and any person becoming entitled to debentures due to the bankruptcy of any registered owner (and in the case of a corporation – due to its winding up) shall be entitled to be registered as the holder, after producing proofs which in the opinion of the Company's managers suffice to establish his right to be registered as a holder of Debentures.

## 30.  <u>Release</u>

Upon proof to the Trustee's satisfaction that all the Debentures (Series C) were paid or redeemed or upon the Company's depositing in trust with the Trustee amounts sufficient for the full and final redemption of the debentures at par, and upon proof to the Trustee's satisfaction that its entire fee and all the expenses incurred by the Trustee and/or its proxies in connection with its activity under the Deed of Trust and in accordance with its instructions were fully paid to it, the Trustee shall be obligated, upon the Company's first demand, to act with the monies deposited with it in respect of Debentures (Series C) whose redemption was not demanded in accordance with the terms of this Deed.

## 31.  <u>Appointment of Trustee; Trustee's Duties; Trustee's Powers; Termination of Trustee's Office</u>

31.1    The Company hereby appoints the Trustee as Trustee for the holders of Debentures (Series C) only, pursuant to the provisions of section 35B of the Securities Law.

31.2    The term of the appointment of the Trustee shall be until the date of convening of a holders' meeting in accordance with the provisions of section 35B(a1) of the Securities Law.

31.3    From the effective date of this Deed of Trust, the Trustee's duties shall be in accordance with any statute and this Deed.

31.4    The Trustee shall act in accordance with the provisions of the Securities Law.

31.5    The Trustee shall represent the holders of Debentures (Series C) in any matter arising from the Company's obligations towards them, and for this purpose it may act to realize the rights vested in the holders by law or by the Deed of Trust.

31.6    The Trustee may institute any proceeding to protect the holders' rights in accordance with any statute and as set forth in this Deed of Trust.

31.7    The Trustee may appoint proxies as set forth in section 25 of this Deed.

31.8    The Trustee's actions shall be valid even if a defect is discovered in its appointment or capacity.

31.9    The Trustee's signature on this Deed of Trust does not constitute an expression of its opinion regarding the quality of the offered securities or the profitability of investing in them.

31.10    The Trustee is not obligated to notify any party of the signing of this Deed. The Trustee may not intervene in any way in the management of the Company's business or interests, and this is not included among its duties. Nothing stated in this section shall restrict the Trustee in any action it is required to perform in accordance with the provisions of this Deed.

31.11    Subject to any statutory provisions, the Trustee is not obligated and does not have a responsibility to act in a manner not provided for explicitly in this Deed of Trust, so that any information, including about the Company and/or in connection with the Company's ability to meet its obligations towards the holders of the Debentures, comes to its attention.

31.12    Subject to any statutory provisions and the provisions of this Deed of Trust, by signing this Deed the Trustee undertakes to keep confidential any information provided to it by the Company, not to disclose it to another and not to use it in any way, unless such disclosure or use is required for the fulfillment of its function in accordance with the Securities Law, the Deed of Trust or a court order. Said duty of confidentiality shall also apply to any proxy of the Trustee (including any consultant, representative, etc.). It is clarified that the transfer of information to

the holders of the Debentures for the purpose of reaching a decision relating to their rights under the Debentures or for the purpose of reporting on the Company's condition does not constitute a violation of said confidentiality undertaking.

31.13   The Trustee may rely in the framework of its trust on any written document, including any letter of instruction, notice, request, consent or approval, purporting to be signed or issued by any person or entity who the Trustee believes in good faith to have signed or issued it.

31.14   The provisions of the Securities Law shall apply to the termination of the office of the Trustee.

31.15   Upon the expiration of the office of the Trustee, a new Trustee shall be appointed in its place in the holders' meeting.

31.16   Notwithstanding the foregoing, a holders' resolution to terminate the office of the Trustee and replace it with another Trustee shall be passed at a meeting at which holders of 50% of the balance of the nominal amount of Debentures (Series C) are present, or at an adjourned meeting at which holders of at least 10% of such balance are present, by a majority of 75%.

31.17   Subject to any statutory provisions, the Trustee whose office has expired shall continue in office up to the appointment of another Trustee. The Trustee shall transfer to the new Trustee all the documents and amounts that accumulated with it in connection with the trust under the Deed of Trust for Series C and shall sign any document require for this purpose. Any new Trustee shall have the same powers, duties and authorities and shall be able to act in all respects as if it had been appointed as the Trustee from the outset.

31.18   The Company shall issue an immediate report in the event of the Trustee's resignation and/or the appointment of another Trustee.

32.   **Meetings of** holders of the Debentures

Meetings of holders of Debentures (Series C) shall be conducted as provided in the **Second Schedule** to this Deed.

33.   **Governing Law**

The law governing the Deed of Trust, its addendums and appendices, including the debentures (other than pledge documents created under foreign law), is the Israeli law. In

any matter not referred to in this Deed **and in case of a contradiction between the statutory provisions and this Deed**, the parties shall act in accordance with the provisions of the Israeli law only.

## 34.   Exclusive Jurisdiction

The sole court with jurisdiction to consider matters related to this Deed, its addendums and appendices, including the Debenture appended hereto shall be the competent court in Tel Aviv-Jaffa. It is clarified that in order to realize the pledges, the Trustee may start proceedings in US and/or Virgin Islands courts and under the law applicable to the pledges.

For details of the undertakings of the Company, the controlling shareholder and the officers of the Company, see section 5.9 above.

## 35.   General

Without derogating from the other provisions of this Deed and the Debentures (Series C), any waiver, time extension, relaxation, silence or inaction (**"waiver"**) on the part of the Trustee with respect to the nonfulfillment or partial or incorrect fulfillment of any of the undertakings towards the Trustee under this Deed and the Debentures (Series C), shall not be deemed as the Trustee's waiver of any right but only as consent limited to the particular occasion on which it was given. Without derogating from the other provisions of this Deed and the Debentures (Series C), any change in the undertakings towards the Trustee requires the Trustee's prior written consent. Any other consent, whether verbal or by way of waiver and inaction or other than in writing, shall not be deemed consent at all. The Trustee's rights under this agreement are autonomous and independent of each other and are in addition to any existing and/or future right of the Trustee by law and/or agreement (including this Deed and the Debenture (Series C)).

## 36.   Trustee's Liability

36.1   Notwithstanding any statutory provision and any provision of the Deed of Trust, if the Trustee acted for the fulfillment of its duties in good faith and within a reasonable time and clarified the facts which a reasonable Trustee would have clarified in the circumstances of the case, then it shall not be liable towards any holders of the Debentures for damage caused to him by the Trustee having exercised its discretion in accordance with the provisions of section 35H(d1) or 35I1 of the Law, unless decided by peremptory rule that the Trustee acted with

gross negligence. It is clarified that if a contradiction arises between the provision of this section and any other provision of the Deed of Trust, the provision of this section shall prevail.

**36.2**   If the Trustee acted in good faith and without negligence in accordance with the provisions of section 35H (d2) or 35H (d3) of the Law, it shall not be liable for the performance of such action.

## 37.   Addresses

The parties' addresses shall be as set out in the preamble to this Deed, or any other address regarding which a suitable written notice is given to the other party.

## 38.   Magna Authorization

In accordance with the provisions of the Securities Regulations (Electronic Signature and Reporting), 5763-2003, the Trustee hereby authorizes the person authorized for that purpose by the Company to report electronically to the Securities Authority regarding this Deed of Trust.

**In witness whereof the parties have signed:**

———————————————                              ———————————————

**All Year Holdings Limited**                              **Mishmeret Trust Services Company Ltd.**

I, the undersigned, Nir Cohen Sasson, Adv., from the office of Shimonov & Co. – Advocates, certify that this Deed of Trust has been signed by the authorized signatories of All Year Holdings Limited, through Mr. Yoel Goldman, and his signature is binding on the Company in connection with this Deed of Trust.

———————————————

**Nir Cohen Sasson, Adv.**

**Undertaking of the Transferred Company, the Subsidiary, the Property Company**

To

Mishmeret Trust Services Company Ltd.

The undersigned, _____, confirms the declarations and undertakings regarding the Pledged Assets listed in section 6.2.8 of the Deed of Trust of Debentures (Series C) of All Year Holdings Limited.


_____                    _____
Signature                                              Date



Attorney confirmation

I, the undersigned, _____ adv., confirm that these undertakings are duly signed by the authorized signatory of _____, Messrs._____

_____

  Adv.

# All Year Holdings Limited

## First Schedule

### Certificate of Debenture(Series C)

Registered Debentures (Series C), bearing fixed annual interest at a rate to be determined in the tender (hereinafter: "**Interest**"), repayable (principal) in twelve (12) semi-annual payments on August 31 and February 28, starting from August 31, 2018 until February 28, 2024 (inclusive), such that each of the first eleven payments will be equal to 1,25% of the total nominal principal of the Debentures (Series C) and the final payment will be equal to 86.25% of the total nominal principal of the Debentures (Series C). The interest on the Debentures (Series C) will be paid in two semi-annual payment on August 31 and February 28, starting from August 31, 2017 until February 28, 2024 (inclusive). The interest will accumulate from the date of the allotment of the Debentures (Series C) until the date of their final repayment on February 28, 2024 (inclusive).

### Registered Debenture(Series C)

**No.      1**

**Par value NIS _____**

**Fixed annual interest at a rate of ___%**

1.   This certificate attests that All Year Holdings Limited ("**the Company**") will pay on  August 31 and February 28, starting from August 31, 2018 until February 28 2024 (inclusive) to Mizrahi Tefahot Nominee Company, or to whoever is the registered holder of this Debenture("**holder of Debenture(Series C)**") on August 19 of each of the years 2018 until 2023 and on February 16 of each of the years 2019 until 2024 (inclusive) the proportion of the nominal principal of this Debenture, all in accordance with the other terms set forth in the Deed of Trust and in the terms overleaf.

2.   Notwithstanding the foregoing, the final installment of the principal  and the final installment of interest will be paid against the delivery of the certificates of the Debentures (Series C) to the Company on the final payment date (namely, February 28, 2024), at the Company's registered office or at another place as notified by the Company. Such notice of the Company will be published no later than five (5) business days before the final payment date.

**3.**     The Debentures (Series C) are issued in accordance with a Deed of Trust ("**Deed of Trust**") dated February 19, 2017, signed between the Company and Mishmeret Trust Services Company Ltd. (the "**Trustee**").

**4.**     All the Debentures (Series C) will rank *pari passu* with one another with respect to the Company's obligations thereunder, without one having a preferred right or priority over another.

**5.**     This Debenture (Series C) is issued subject to the terms set out overleaf, the terms set out in the Deed of Trust and in the Offering Memorandum.


**Signed under the Company's affixed seal on _____**


By:

Authorized signatory _____       Authorized signatory _____


I, the undersigned, Adv. _____, certify that this Debenture certificate has been duly signed by All Year Holdings Limited in accordance with its articles, through Mr. _____, and his signature is binding on the Company for the purposes of this debenture.

_____, Adv.

- 106 -

# <u>Terms Overleaf</u>

**1.**   <u>General</u>

In this Debenture(Series C), the terms below shall have the meaning set out next to them, and terms for which no meaning is provided below shall have the meaning given to them in the Deed of Trust, unless the context dictates another meaning.

| | |
|---|---|
| **"business day"** or **"bank business day"** | Any day on which the TASE Clearing House and most banks in Israel are open for the execution of transactions. |
| **"the Debenture series"** | Registered debentures for a total nominal amount of up to NIS 330 million, whose terms shall be in accordance with the Deed of Trust, the Debenture (Series C) certificate, and the Shelf Offering Report, as these terms are defined in  the Deed of Trust, pursuant to which they shall be issued. |
| **"principal"** | The outstanding nominal amount of the Debentures (Series C). |
| **"special resolution"** | A resolution adopted in a general meeting of holders of Debentures (Series C) at which holders of the Debentures holding at least 50% of the balance of the nominal amount of the Debentures (Series C) are present in person or by proxy, or in an adjourned meeting at which holders of the Debentures holding at least 20% of the balance of said nominal amount are present in person or by proxy, by a majority (whether in the original meeting or in the adjourned meeting) of at least two thirds (2/3) of the balance of the nominal amount of the Debentures (Series C) represented in the vote. |
| **"the Nominee Company"** | Mizrahi Tefahot Nominee Company Ltd. or a nominee Company that is a replacement thereof.. |
| **"trading day"** | A day on which transactions are executed on the Tel Aviv Stock Exchange Ltd. |
| **"the TASE Clearing House"** | The Tel Aviv Stock Exchange Clearing House Ltd. |

**2. The Debentures**

For details regarding the Debentures (Series C), see section 2 of the Deed of Trust.

**3.    Terms of the Debentures (Series C) Offered under the Prospectus**

(a)    Registered Debentures (Series C) of NIS 1 par value each. The Debentures (Series C) shall be repayable (principal) in twelve (12) semi-annual installments on August 31 and February 28, starting from August 31, 2018 until February 28, 2024 (inclusive), such that each of the first eleven payment shall be equal to 1.26% of the total nominal principal of the Debentures (Series C) and the final payment will be equal to 86.25% of the total nominal principal of the Debentures (Series C).

(b)    The outstanding balance of the principal of the Debentures (Series C) shall bear fixed annual interest at a rate to be determined in the tender (but subject to adjustments in the event of a change in the rating of the Debentures (Series C) [3] and/or noncompliance with a financial covenant as set forth in sections 5.3 and 5.4 of the Deed of Trust and/or arrears interest, if applicable).

(c)    The Debentures (Series C) shall not be linked to any index or currency.

(d)    The interest on the Debentures (Series C) shall be paid twice a year, on August 31 and February 28, starting from 31 August 2017 until to February 28, 2024 (inclusive). Except for the First Interest Period, every payment of interest shall be paid for the period of six months ending on the day preceding the date of payment (hereinafter: the "**Interest Period**"). The interest rate to be paid for a certain Interest Period (except for the First Interest Period) (namely, the period starting on the date of the payment of the previous interest rate period and ending on the day preceding the next payment date following the date of commencement thereof) will be calculated as a percentage of the annual interest rate divided by two. The first interest payment will be paid on August 31, 2017 in respect of the period commencing on the first trading day following the tender on the Debentures (Series C) and ending on August 30, 2017 (above: the "**First Interest Period**"),

---

[3] It is clarified that as long as the Debentures (Series C) are rated by more than one rating agency, the examination of the rating for the purpose of adjusting the interest rate to a change in the rating (should there be any such change) shall be done, at all times, according to the lower rating among them.

calculated on the basis of 365 days a year, in accordance with the number of days in this period and the final interest payment will be paid on February 28, 2024.

(e)   The first payment of principal of the Debentures (Series C) shall be made on August 31, 2018. The first payment of interest on the Debentures (Series C) shall be made on August 31. 2017 for the period commencing on the first trading day after the subscription closing date and ending on the last day before the first interest payment date (namely, on August 30, 2017) (hereinafter: "**the First Interest Period**"), calculated according to the number of days in that period based on 365 days in a year. The interest rate payable for a particular Interest Period (excluding the first Interest Period) (i.e. the period commencing on the payment day of the previous Interest Period and ending on the last day before the next payment date after the commencement thereof) shall be calculated at the annual interest rate divided by two (hereinafter: the "**Semiannual Interest Rate**"). The Company shall publish in the immediate report with respect to the results of the issue, the first interest rate, the interest rate to be determined in the said tender and the biannual interest rate.

(f)   The payments on account of principal of the Debentures (Series C) shall be made to the holders of the Debentures (Series C) on August 19 of each of the years 2018 to 2023 and on February 16 of each of the years 2019 to 2024 (inclusive) which preceded the date of effecting of the relevant payment, excluding the final payment. The payments on account of interest on the Debentures (Series C) shall be made to whoever is the holder of the Debentures (Series C) on August 19, of each of the years from 2017 until 2023 and on February 16 of each of the years from 2018 to 2024 (inclusive), which preceded the date of effecting of the relevant payment, excluding the final payment. Notwithstanding the foregoing, the final payment of principal and interest shall be made against the delivery of the certificates of the Debentures (Series C) to the Company on the final payment date (namely. February 28, 2024), to the registered offices of the Company or at any other place as notified by the Company. Such notice of the Company shall be published no later than five (5) business days before the final payment date.

(g)   It is hereby clarified that anyone who is not counted among the holders of the Debentures on any of the payment dates specified in subsection (f) above, shall not be entitled to payment for the period commencing before that date.

**4.   Principal and Interest Payments on the Debentures (Series C)**

(a)    Any payment on account of principal and/or interest delayed more than seven (7) days after the date set for payment thereof under the terms of the debenture, for a reason within the Company's control, shall bear arrears interest, as hereinafter defined, from the date set for payment to the date of actual payment thereof. In this regard, the rate of arrears interest shall be the rate of interest on the debentures as provided in section 3(b) above, as the case may be, plus 2%, all on an annual basis (hereinafter: "**Arrears Interest**"). The Company shall give notice of the arrears interest that accumulated (if accumulated), of the exact amount of interest to be paid including the semi-annual interest plus arrears interest, and of such payment date in an immediate report, two (2) trading days before the date of actual payment.

In this regard, a payment on account of the principal and/or the interest, which has not been deposited with the Trustee pursuant to section 14.2 of the Deed of Trust, will be considered an unpaid payment for a reason contingent on the Company.

(b)    The payment to the entitled persons shall be made by check or by a bank transfer and/or through the TASE Clearing House to the credit of the bank account of the holders of Debentures (Series C). If the Company is unable, for any reason beyond its control, to pay any amount to the persons entitled thereto, the provisions of section 7 below shall apply.

(c)    Any holder of a Debenture(Series C) who so wishes, may notify the Company of the details of the bank account for crediting the payments to that holder under the Debentures (Series C) as stated, or of a change in the details of said account or in his address, as the case may be, in a notice sent by registered mail to the Company. The Company shall be required to act in accordance with the holder's notice of change after the expiration of 15 business days from the day on which the Company received such notice.

(d)    If a holders of the Debentures who is registered in the register of holders failed to give the Company timely notice of the details of the bank account to which payments under the Debentures should be transferred to him, any such payment shall be made in a check sent by registered mail to his last address recorded in the register of holders. The sending of a check to an entitled person by registered mail as stated shall be deemed in all respects as payment of the amount specified thereon on the date of mailing thereof, subject to the check being deposited in the bank and actually cashed.

## 5.    <u>Deferral of Dates</u>

If the date specified for making any payment of principal and/or interest falls on a day that is not a business day, the payment date shall be deferred to the business day immediately following that day, with no additional payment, and the "effective date" for determining entitlement to redemption and interest shall not be changed by reason thereof.

**6.    Securing of Debentures**

See section 6 of the Deed of Trust.

**7.    Nonpayment for a Reason beyond the Company's Control**

As to nonpayment for a reason beyond the Company's control, see the provisions of section 14 of the Deed of Trust.

**8.    Register of holders of the Debentures**

As to the register of holders of Debentures (Series C), see section 29 of the Deed of Trust.

**9.    Splitting of Debenture Certificates**

(a)    In respect of Debentures (Series C) registered in the name of one holder, one certificate shall be issued to the holder, or, at his request, several certificates shall be issued to him in a reasonable quantity (the certificates discussed in this section are hereinafter referred to as: the **"Certificates"**).

(b)    Any Debenture certificate may be split into several Debenture certificates with a total nominal amount equal to the nominal amount of the certificate it is proposed to split, provided such certificates are only issued in a reasonable quantity and in whole NIS. The split shall be made against delivery of the relevant Debenture certificate to the Company at its registered office for the performance of the split, together with a written request to make the split, signed by the registered holder. All the costs entailed in the split, including taxes and levies, if any, shall be borne by the party requesting the split.

**10.    Transfer of Debentures**

The debentures are transferrable with respect to the full amount of the nominal principal, and also a part thereof, provided it is in whole shekels. Any transfer of the debentures shall be made by a deed of transfer drawn up in the accepted form, duly signed by the registered holder or his legal representatives and by the transferee or his legal representatives, which shall be delivered to the Company at its registered office together with the certificates of the debentures which are being transferred on the basis thereof as well as any other reasonable proof as requested by the

Company in evidence of the transferor's right to transfer them. If any tax or other mandatory payment applies to the deed of transfer of the debentures, the Company shall be given reasonable proof of the payment thereof. The Company's articles as relating to the transfer and endorsement of fully paid-up shares shall apply, *mutatis mutandis*, as the case may be, to the transfer and endorsement of the debentures. If only a part of the amount of the nominal principal in a Debenture certificate is transferred, the Debenture certificate shall first be split, as provided in section 9 below, into the number of Debenture certificates necessitated thereby, such that the total of the amounts of the nominal principal in those Debenture certificates is equal to the amount of the nominal principal of such Debenture certificate. Following the fulfillment of all the above stated conditions, the transfer shall be recorded in the Register, and the Company may demand that a caveat regarding such transfer be recorded on the transferred Debenture certificate that is to be transferred to the transferee, or that a new Debenture certificate be issued to him in its stead, and the transferee shall be subject to all the conditions set forth in the transferred Debenture certificate, such that the term "holder" where it appears shall be deemed to refer to the "transferee," and the transferee shall be regarded as the "holder" for purposes of the Deed of Trust.

## 11.   **Early Redemption**

As to early redemption of the debentures at the initiative of the TASE and as to early redemption at the Company's initiative, see section 7 of the Deed of Trust.

## 12.   **Purchase of Debentures by the Company or a Related Party**

As to the purchase of the debentures, see section 3 of the Deed of Trust.

## 13.   **Waiver; Settlement; Changes to Deed of Trust**

As to waiver, settlement and changes to the Deed of Trust, see section 28 of the Deed of Trust.

## 14.   **Meetings of** holders of the Debentures

General meetings of the holders of Debentures (Series C) shall convene and be conducted in the manner provided in the **Second Schedule** to the Deed of Trust.

## 15.   **Receipts from** holders of the Debentures

As to receipts from the holders of the Debentures , see section 15 of the Deed of Trust.

## 16.   **Immediate Repayment**

As to immediate repayment of the debentures, see section 8 of the Deed of Trust.

17. **Notices**

As to notices, see section 27 of the Deed of Trust.

18. **Governing Law; Jurisdiction**

As to the governing law and jurisdiction, see sections 33 and 34 of the Deed of Trust.

19. **Priority**

In case of a contradiction between this schedule and the Deed of Trust, the provisions of the Deed of Trust shall prevail. It is hereby clarified that as of the date of the Deed, there is no contradiction between the provisions described in this schedule and the Deed of Trust.

# All Year Holdings Limited

## Second Schedule

### Meetings of Holders of Debentures (Series C)

1.    **Entitlement to Convene a Meeting**

1.1    The Trustee shall call a meeting of the holders of the Debentures if he deems it necessary or at the request of one or more holders of the Debentures holding Debentures of a certain series of at least 5% of the balance nominal amount of the Debentures from that series. If the request to call a meeting is made by holders of the Debentures, the Trustee may demand from the requesting parties, including in advance, compensation for the reasonable expenses entailed therein.

1.2    It is clarified that the Trustee's demand for compensation shall not prevent the convening of a meeting that was called for the purpose of taking any action intended to prevent harm to the rights of the holders of the Debentures, and such demand for compensation shall not derogate from the Company's obligation to bear the expenses entailed in convening the meeting.

1.3    The Trustee shall call a holders' meeting within 21 days from when the request to convene the meeting was submitted to it, for a date as set in the invitation, provided the date of convening is not earlier than seven days and not later than 21 days after the date of the invitation. However, the Trustee may advance the date of the meeting to at least one day after the date of the invitation, if it considers this necessary for protecting the rights of the holders. If the Trustee does so, it shall explain in the report concerning the calling of the meeting the reasons for advancing its date.

1.4    If the Trustee does not call a holders' meeting, pursuant to a holder's request, within 21 days from when he was so requested, the holder may convene the meeting, provided the date of convening is within 14 days from the end of the period within which the Trustee should have called the meeting, and the Trustee shall bear the expenses incurred by the holder in connection with the convening of the meeting.

1.5     Any meeting of holders of Debentures (Series C) shall be held in Israel, at a venue of which the Company and/or the Trustee give notice, and the Company shall bear the reasonable costs of the convening of the meeting..

**2.    Convening of a Meeting; Agenda of Meeting**

2.1     An invitation to a meeting called by the Trustee solely for the purpose of consulting with the holders of the Debentures shall be published at least one day before the date of convening thereof (hereinafter: "**Consultation Meeting**"). No agenda shall be published for a consultation meeting and no resolutions shall be adopted thereat.

2.2     An invitation to a holders' meeting which is not a consultation meeting shall be published in accordance with the provisions of the Securities Law as in effect from time to time, at least 7 (seven) days but not more than 21 (twenty one) days before the convening of the meeting (hereinafter: "**Invitation**").

2.3     The Trustee shall set the agenda at a holders' meeting. One or more holders of Debentures (Series C), holding at least five percent of the balance of the nominal amount of Debenture (Series C), may request the Trustee to include some matter on the agenda of a holders' meeting which is to convene in the future, provided matter is suitable, in the opinion of the Trustee, to be considered at such meeting.

2.4     The Trustee may advance the date of convening to at least one day after the date of the invitation, if it considers that postponing the meeting prejudices or could prejudice the rights of the holders of the Debentures. If the Trustee does so, it shall explain in a report concerning the convening of the meeting the reasons for advancing its date.

2.5     The invitation shall set out:

2.5.1     The place of convening of the meeting.

2.5.2     The date and time of convening of the meeting.

2.5.3     The quorum for opening the meeting as provided in section 3 below.

2.5.4     The effective date for participating in the meeting, being not less than three trading days and not more than fourteen days prior to the convening of the meeting.

2.5.5    The matters to be considered at the meeting and the proposed resolutions.

2.5.6    Arrangements regarding written votes.

**3.    Quorum for Opening a Meeting and an Adjourned Meeting**

3.1    A consultation meeting shall be held with any number of participants.

3.2    A meeting of holders of the Debentures shall be opened after it has been proven that the quorum required for holding the meeting is present.

3.3    For purposes of determining the quorum, debentures held by a related party as defined in section 3.2 of the Deed of Trust shall not be taken into account.

3.4    Subject to the quorum required at a meeting convened for adopting a special resolution, and subject to the provisions of the Securities Law, a quorum for holding a holders' meeting shall be at least two holders of the Debentures holding at least 25% (twenty five percent) of the outstanding balance of the nominal amount of the debentures in circulation at the time, present within half an hour from the time set for opening the meeting.

3.5    If a quorum is not present at the end of half an hour from the time set for the commencement of a holders' meeting, the meeting shall be adjourned to another date being no earlier than two business days after the date set for holding the original meeting, or one business day, if the Trustee considers this necessary for protecting the rights of the holders of the Debentures. If the meeting is adjourned, the Trustee shall explain the reasons for this in the report concerning the convening of the adjourned meeting.

3.6    Except in respect of a meeting convened to adopt a special resolution and subject to the provisions of the Securities Law, if a quorum is not present at the end of half an hour from the time set for an adjourned holders' meeting, the quorum shall be as follows:

3.6.1    If the meeting was convened by the Trustee – any number of participants.

3.6.2    If the meeting was convened at the request of holders or by holders, as provided in sections 1.1 and 1.3 above – the quorum shall be one or more holders of the Debentures holding at least 5% (five percent) of the voting rights in the Debenture series.

3.7    Debentures held by an affiliated person (as defined in section 3.3 of the Deed) shall not be taken into account for the purpose of determining the quorum.

## 4.    **Chairman**

At any holders' meeting, the Trustee or whoever is appointed by it shall act as chairman of that meeting.

## 5.    **Continuing Meeting**

5.1    A meeting that was opened shall be closed by an announcement of the Trustee or of the chairman of the meeting, and it may consist of one or more sessions.

5.2    In a meeting at which a quorum is present, the chairman of the meeting and/or the Trustee may decide to hold an additional session on another date, at a place to be determined by the Trustee (hereinafter: "**Continuation Meeting**").

5.3    The Trustee shall be responsible for publishing a notice concerning the time and the place of convening of the continuing meeting, provided such notice is given at least 12 hours prior to the convening of the continuing meeting.

5.4    No matter may be considered at a continuing meeting other than a matter that was on the agenda of the original meeting and regarding which no resolution was adopted.

5.5    A holder who was not present at the original meeting may attend the continuing meeting and vote on matters that were put to the vote (and on which the vote was not yet closed) and which will be put to the vote, subject to his proving to the party that convened the meeting his ownership of the debentures the subject of the meeting as of the effective date for the meeting as determined in the notice of invitation to the meeting.

## 6.    **Provisions for Extraordinary Meetings**

For meetings of debentures holders having on their agenda one of the matters below, the provisions for legal quorum at a debentures holders meeting or at an adjourned meeting, as well as the subject of majority required for arriving at a resolution, stated alongside them below shall apply:

6.1    In a meeting that on its agenda is the immediate repayment of the Debentures – the provisions of section 8.2.2 of the Deed of Trust shall apply.

6.2     In a meeting that on its agenda is the transfer of the Trustee from office – the provisions of section 31 of the Deed of Trust shall apply.

6.3     A change and/or amendment and/or addition to the Deed of Trust – the provisions of section 28 of the Deed of Trust shall apply.

In a meeting having on its agenda a resolution on a matter which the Deed of Trust or the Debenture provides is subject to a special resolution, the quorum shall be the presence of the holders of the Debentures themselves, or the proxies thereof, holding at least fifty percent (50%) of the outstanding nominal amount of the debentures, or in an adjourned meeting, the presence of the holders of the Debentures themselves, or the proxies thereof, holding at least twenty percent (20%) of the balance of the nominal amount of the debentures. The majority required for adopting a special resolution (whether in the original meeting or in the adjourned meeting) is two thirds (2/3) of the balance of the nominal amount of the debentures represented in the vote.

7.    **Position Statements**

7.1     The Trustee or one or more holders of the Debentures holding at least five percent of the balance of the nominal amount of the Debentures (Series C) may apply to the holders of the Debentures in writing, in a letter attached to the voting instrument, in order to persuade them regarding the manner of their voting on matters put forward for consideration in a meeting (in the schedule – "**position statement**").

7.2     A holder wishing to exercise this right shall notify the Trustee in that regard during the session in which it was resolved to put that matter to the vote, and shall submit the position statement to the Trustee within 24 hours from the time of that session.

7.3     At a meeting called at the request of the holders of the Debentures or by the holders of the Debentures, as provided in sections 1.1 and 1.3, each holder may publish, through the Trustee, a position statement regarding matters on the agenda of the meeting.

7.4     The Trustee and the Company may, each separately, publish a position statement in response to a position statement sent in accordance with sections 7.1 or 7.3 above or in response to another application to the holders of the Debentures.

7.5     No position statement may be published in a consultation meeting.

**8.    Votes in a Meeting**

8.1    Voting in a meeting of holders of the Debentures may be held only on matters that were listed in the invitation.

8.2    A holder may vote in person, by a proxy appointed by him in accordance with this schedule or by a voting instrument.

8.3    The chairman of the meeting may determine that votes shall be conducted by way of voting instruments or by voting during the meeting. If the chairman determines that the vote shall be by way of voting instruments, the Trustee shall ensure that the text of the voting instrument is distributed to the holders and shall set the vote closing time by which the holders must send to the Trustee a duly completed and signed voting instrument. The Trustee, at its discretion, may require a holder to declare in the voting instrument the existence or absence of a conflicting interest (as hereinafter defined). A holder who does not complete the voting instrument and/or does not prove his entitlement to participate and vote at a meeting in accordance with the provisions of the Second Schedule, shall be deemed not to have delivered a voting instrument and therefore to have chosen not to vote on the matter/s set out in the voting instrument. A duly completed and signed voting instrument in which the holder has indicated the manner of his voting, reaching the Trustee by the appointed deadline, shall be deemed as presence at the meeting for purposes of the existence of a quorum at the meeting.

8.4    Unless explicitly stated otherwise in this Deed, the majority required for passing any resolution of the general meeting is a simple majority of the number of votes represented in the vote, cast for or against. The Trustee at its discretion may also decide whether the circumstances require the approval of a resolution by a majority other than a simple majority.

8.5    The Trustee may participate in the meeting without any voting rights. The Company may not take part in the meeting. The Company may only present issues prior to the deliberation or its representative may take part insofar as there are any questions by holders to the Company. In this regard it is clarified that the Trustee may at his sole discretion decide that a meeting shall be held without the attendance of the Company or its representative, or a related party, or any other person without being subject to the obligation of a reason.

8.6     The holders of the Debentures may participate and vote in any general meeting in person or by proxy. Any vote by holders of the Debentures shall be conducted by a poll, such that each holders of the Debentures or his proxy shall be entitled to one vote for each NIS 1 par value of the total outstanding nominal principal of the debentures based on which he is entitled to vote. In the case of joint holders, only the vote, in person or by proxy, of the holder proposing to vote who is first listed in the Register shall be accepted.

A holder of the Debentures or his proxy may use part of his votes to vote for a particular proposed resolution, another part to vote against, and another part to abstain, all as he sees fit.

## 9.    Examination of the Existence of a "Conflicting Interest"

9.1     In a count of votes, the votes of holders of the Debentures being an affiliated person as this term is defined in section 3.2 of the Deed of Trust shall not be taken into account, and those Debentures shall not confer on the affiliated person a right to vote in general meetings of the holders of the Debentures, as long as they are held by the affiliated person.

9.2     The Trustee shall examine the existence of conflicts of interest among the holders, whether an interest arising from their holding of the debentures or another interest of theirs, as determined by the Trustee (in this schedule – "**another interest**"). The Trustee may require a holder participating in a holders' meeting to notify it of another interest it has and whether he has such a conflict of interests.

9.3     Without derogating from the generality of the foregoing, each of the following shall be deemed to have a conflicting interest:

9.3.1     A holder who is an affiliated person (as this term is defined in section 3.2 of the Deed of Trust.

9.3.2     A holder who served as an officer of the Company immediately prior to the event underlying the resolution in the meeting.

9.3.3     Any holder the Trustee has determined has a "conflicting interest" as provided hereinafter, subject to any law and/or directive of a competent authority, and *inter alia*: any holder declaring in writing to the Trustee that he has a material, personal interest which lies outside the interest of the body of holders of the Debentures at the meeting of the Debenture (Series C) holders. Any holder

who fails to submit such a declaration in writing after being requested to do so by the Trustee, shall be deemed to have declared that he has such a personal interest, and the Trustee shall determine that he is a holder with a conflicting interest. Without derogating from the provisions of this section 10, the Trustee shall examine whether a holder has a "conflicting interest" also taking into account that holder's holdings in other securities of the Company and/or securities of any other corporation relevant to the resolution that is being submitted to the meeting for approval (as set out in the voting instrument), according to the declaration of that holder.

The existence of a conflicting interest shall be determined also on the basis of a general test of conflicts of interest which the Trustee shall conduct. Furthermore, for the avoidance of doubt, it is clarified that the provisions regarding the definition of holders of the Debentures having a conflicting interest shall not derogate from the provisions of the law, the case law and the binding guidelines of the Securities Authority relating to the definition of holders of the Debentures having a conflicting interest, as applying at the time of the examination.

9.4     For purposes of the conflict-of-interest examination as stated, the Trustee may rely on a legal opinion ordered by it, which shall be subject to the provisions of the Deed of Trust as to the bearing of expenses.

9.5     It is clarified that a conflict-of-interest examination as stated, insofar as it is required in the Trustee's opinion, shall be conducted separately for each resolution on the agenda of the meeting and separately for each meeting. It is further clarified that the declaration of a Holder as having a conflicting interest in any resolution or in any meeting shall not in itself prove the existence of a conflicting interest of that holder in another resolution on the agenda of the meeting or a conflicting interest in other meetings.

9.6     In counting the votes cast at a holders' meeting, the Trustee shall not take into account the votes of holders who did not comply with its request as provided in section 9.2 above, or of holders which it found have a conflict of interest as provided in that section (in this schedule – **"holders having a conflicting interest"**).

9.7    Notwithstanding that stated in section 9.6, if the total holdings of the participants in a vote who are not holders having a conflicting interest is less than five percent (5%) of the balance of the nominal amount of the debentures (Series C), the Trustee shall take into account, in the count of the votes cast, also the votes of the holders having a conflicting interest.

## 10.    Declaration of the Adoption of a Resolution

10.1    A declaration by the chairman that a resolution in a holders' meeting was accepted or rejected, unanimously or by a certain majority, shall be *prima facie* proof thereof.

## 11.    Instrument of Appointment

11.1    An instrument appointing a proxy and/or an agent shall be in writing under the hand of the appointer or his representative duly authorized in writing in regard. If the appointer is a corporation, the appointment shall be made in writing under the seal of the corporation, together with the signature of the corporation's official or representative authorized in that regard. The instrument appointing a proxy shall be drawn up in any accepted form. A proxy need not himself be a holder.

11.2    An instrument of appointment and a power of attorney or other certificate based on which the instrument of appointment was signed, or a certified copy of such a power of attorney, shall be deposited at the office of the Trustee prior to the meeting in respect of which the power of attorney was granted, unless specified otherwise in the notice calling the meeting.

11.3    A vote given in accordance with the conditions in the document appointing a proxy shall be valid even if the appointer previously died or was declared incapacitated or the instrument of appointment was cancelled or the Debenture in respect of which the vote was given was transferred, unless a written notice concerning the death, the decision of incapacity, the cancellation or the transfer, as the case may be, was received at the office of the Trustee prior to the meeting.

11.4    Any corporation holding a Debenture may authorize any person deemed fit by it, by a duly signed authorization in writing, to act as its representative in any meeting of the holders of the Debentures, and the person so authorized shall be entitled to act on behalf of the corporation he is representing.

## 12.   **Minutes**

12.1   The Trustee shall prepare minutes of the holders' meeting and shall keep them at its registered office for a period of seven years from the date of the meeting.

12.2   Minutes signed by the chairman of the meeting shall be *prima facie* evidence of the matters recorded therein. The announcement of the chairman of the meeting that a resolution was accepted or rejected, and the entry made in that regard in the register of minutes, shall be *prima facie* proof thereof.

12.3   The register of minutes of holders' meetings shall be kept at the Trustee's office and shall be open to the inspection of the holders of the Debentures, and a copy thereof shall be sent to each holder of the Debentures, so requesting.

12.4   The Trustee may withhold the delivery of any minutes, to any entity, if in its exclusive judgment the delivery of the minutes, wholly or partly, could prejudice or result in an injury to the rights of the holders of Debentures (Series C).

13.   A person or persons appointed by the Trustee, the Company's Secretary and any other person or persons so authorized by the Trustee, may be present at meetings of the holders of the Debentures. If in the Trustee's reasonable judgment, the discussion in a part of the meeting should be held without the presence of the Company's representatives, then the Company's representatives or anyone acting on its behalf shall not participate in that part of the meeting.

14.   This schedule is subject to the provisions of the Deed of Trust.

15.   The Securities Regulations (Written Votes, Position Statements and Proof of Ownership of Debenture Certificates for Voting at Meeting of Holders of Debenture Certificates) 5775-2015 apply to this schedule.

\*\*\*

1.

# All Year Holdings Limited

## Third Schedule

### Emergency Representation Committee of the Holders of the Debentures

1. With respect to the Debentures (Series C), if an Emergency Representation Committee of the holders of Debentures (Series C) is appointed, the Company undertakes that the Emergency Representation Committee shall be appointed to act in accordance with the relevant provisions of Appendix 5.2.4.4 to Chapter 4 in Part 2 (Management of Investment Properties and Provision of Credit) in Title 5 (Business Management Principles) of the Consolidated Circular and the Company also undertakes to act within reason in cooperation with the Emergency Representation Committee and the Trustee, as necessary for the performance of the examinations required by them and the formulation of the decision of the Emergency Representation Committee, and to transfer to the Emergency Representation Committee all the data and documents required by it regarding the Company.

2. **Appointment; Term of Office**

   2.1 The Trustee may, and pursuant to the Company's written request shall, appoint and convene an emergency representation committee from among the holders of the Debentures, as set forth hereinafter (hereinafter: the " **Emergency Representation Committee**").

   2.2 The Trustee shall appoint to the Emergency Representation Committee the three (3) holders of the Debentures who to the best of the Trustee's knowledge, hold the highest nominal amount among all the holders of the Debentures, and who declare that they comply with all the conditions set forth below (hereinafter: "**Emergency Representation Committee Members**"). If any of them is unable to serve as an Emergency Representation Committee member as stated, the Trustee shall appoint in his stead the holder of the Debentures who holds the next highest nominal amount and who complies with all the conditions set forth below; and the following are the conditions:

       2.2.1 The holder of the Debentures does not have a conflict of interest due to the existence of any additional material interest that conflicts with the interest arising from his service on the Emergency Representation

Committee and from his holding of the debentures. For the avoidance of doubt, it is clarified that a holder who is a Related Party (as defined in section 3.2 of the Deed of Trust) shall be deemed to have a conflict of interest as stated and may not serve on the Emergency Representation Committee.

2.2.2   The holder of the Debentures is not serving in the same calendar year on similar representation committees for other debentures with an aggregate value greater than the percentage from the asset portfolio managed by him set as the maximum percentage permitting service on an emergency representation committee according to the directives of the Antitrust Commission relating to the establishment of an emergency representation committee.

2.3   If during the term of office of the Emergency Representation Committee, one of its members ceases to meet any of the circumstances listed in sections 2.2.1 and 2.2.2 above, his service shall terminate, and he shall notify the Trustee in writing, and the Trustee shall appoint another member in his stead from among the holders of the Debentures as stated in section 2.2 above.

2.4   Prior to the appointment of the Emergency Representation Committee members, the Trustee shall receive from the candidates to serve as members a declaration regarding the existence or absence of conflicts of interest as stated in section 2.2.1 above and regarding service on additional representation committees as stated in section 2.2.2 above. The Trustee may also request such a declaration from the Emergency Representation Committee members at any time during its term of office. A holder who fails to submit such a declaration shall be deemed to have conflicts of interest or to be precluded from serving pursuant to the above directives of the Antitrust Commissioner, as the case may be. With respect to the conflict-of-interest declaration, the Trustee shall examine the existence of conflicting interests, and if necessary shall decide whether such conflicts of interest disqualify that holder from serving on the Emergency Representation Committee. It is clarified that the Trustee shall rely on said declarations and shall not be required to conduct an additional independent examination or investigation. The Trustee's determination in these matters shall be final.

2.5    The term of office of the Emergency Representation Committee shall end on the date on which the Company publishes the Committee's decisions regarding the grant of a grace period to the Company for compliance with the terms of the Deed of Trust as set forth in section 8 thereof, but in any event it may not exceed three months from the date of the Committee's appointment.

## 3.    Authority

3.1    The Emergency Representation Committee shall have authority to grant the Company a one-time grace period in connection with the times of compliance with any of the financial covenants specified in the Deed of Trust, such that the grounds for immediate repayment in sections 8.1.15, 8.1.16, 8.1.17 and 8.1.18 of the Deed of Trust shall not apply, as the case may be, during the grace period, if granted – the foregoing for the period up to the date of publication of the next financial statements after the date of publication of the financial statements from which it emerged that the Company did not comply with some financial covenant during two consecutive calendar quarters or for a period of 90 days, whichever is earlier. It is clarified that the period of time up to the appointment of the Emergency Representation Committee shall be counted in the above grace period, and it shall not be grounds for grant the Company any additional grace period beyond that stated above. It is clarified that the actions of the Emergency Representation Committee and the cooperation among its members shall be limited to consideration of the possibility of granting such a grace period, and no other information that does not relate to the grant of a grace period as stated shall be exchanged among the members.

3.2    If no Emergency Representation Committee was appointed as above, or if the Emergency Representation Committee decided not to grant the Company a grace period as provided in section 3.1 above, the Trustee shall be obligated to call a meeting of the holders of the Debentures in accordance with the provisions of section 8.2 of the Deed.

Nothing in the foregoing section derogates from the Trustee's authority to call a meeting of holders of the Debentures, including with regard to the same matter for which the Emergency Representation Meeting had been called. Should the holders of the Debentures arrive at a resolution on that same matter, it shall take

precedence over the resolution of the Emergency Representation Meeting, including with regard to the Company.

4.    The Company's Undertakings with Respect to the Emergency Representation Committee

4.1    The Company undertakes to furnish to the Trustee all the information in its possession or which it is able to obtain in connection with the identity of the holders of the Debentures and the scope of their holdings. The Trustee as well shall act to obtain said information in accordance with the powers vested in it by law.

4.2    In addition, the Company undertakes to cooperate fully with the Emergency Representation Committee and the Trustee, as required for the performance of the necessary examinations by them and the formulation of the Committee's decision, and to furnish to the Emergency Representation Committee all the data and documents required by them in connection with the Company, subject to legal limitations. Without derogating from the generality of the foregoing, the Company shall furnish to the Emergency Representation Committee the relevant information for the formulation of its decision, which may not include any misleading particular and may not be incomplete.

4.3    The Company shall bear the costs of the Emergency Representation Committee, including the costs of engagement of consultants and experts by or on behalf of the Committee, and in this regard the provisions of section 26 of the Deed shall apply, *mutatis mutandis*.

5.    Liability

5.1    The Emergency Representation Committee shall act and decide in the matters delegated to it according to its absolute discretion, and neither it nor any of its members, their officers, employees and consultants shall be liable, and the Company and the holders of the Debentures hereby discharge it from all complaints, demands and claims against them, for having exercised or refrained from exercising the powers, authority or discretion granted to them under the Deed of Trust and this appendix and in connection therewith, or for any other action they performed pursuant thereto, except if they acted willfully and/or in bad faith.

5.2    The actions of the Emergency Representation Committee members and anyone acting on their behalf shall be subject to the indemnification provisions in section 26 of the Deed of Trust, as if they were the Trustee.

5.3    The Company shall issue an immediate report immediately upon the appointment of the Emergency Representation Committee as stated, concerning the appointment of the Committee, the identity of its members and its powers.

5.4    The Company shall issue another immediate report concerning the decision of the Emergency Representation Committee as stated. Upon the termination of the office of the Emergency Representation Committee, the Company shall publish all the information that was furnished to the Committee for its review, provided there is no legal impediment to its publication.

\*\*\*

## **Appendix 23**

### **To Deed of Trust Dated February 19, 2017**

**Signed between All Year Holdings Limited and Mishmeret Trust Services Company Ltd.**

The Company shall pay the Trustee for its services in accordance with this Deed of Trust as set forth hereinafter:

1.1    For handling the Deed of Trust and accompanying the process of the issuance the Trustee shall be entitled to the payment of a fee from the Company in an amount of NIS 600 for each hour of work. This fee shall be paid immediately following the issuance for the Trustee's activity up to the issuance, including, in the event of cancellation of the issuance or the deferment thereof, after the Trustee had already done work related to the consolidation of the documents related to the trust and/or participated in meetings with the Securities Authority.

1.2    For each year of the trust or a part thereof starting from the date of offering of the Debentures (Series C) the Trustee shall be paid an annual fee of NIS 28,000.

1.3    Whenever, subsequent to the original offering of the series, an additional offering of the same series is held, or the series is otherwise expanded, the Trustee's annual fee shall increase by an amount reflecting the full rate of expansion of the series, on a regular basis until the end of the trust period.

   The amounts included in sections 1.1 and 1.2 above are hereinafter referred to as the **"Annual Fee."**

1.4    In addition, the Trustee shall be entitled to reimbursement of its reasonable expenses, as hereinafter defined, by the Company.

   **"Reasonable expenses"** – Amounts expended by the Trustee in the fulfillment of its duties and/or pursuant to the powers granted to it under this Deed, and *inter alia:* expenses and costs of calling and convening meetings of the holders of the Debentures and expenses in respect of deliveries and trips and publications in the press related to the calling of a meeting and as required by law.

1.5    Without derogating from the generality of the provisions of this appendix, the Trustee shall be entitled to payment from the Company of a fee of NIS 600 for each hour of

work involving special actions performed by it in its capacity as Trustee (all subject to the provisions of the Deed of Trust, and *inter alia*:

1.5.1    Actions arising from a breach of the Deed or a real concern of a breach of the Deed by the Company.

1.5.2    Actions in connection with the calling in of the debentures for immediate payment and/or actions in connection with a resolution of the meeting of holders of the Debentures to call in the debentures for immediate payment.

1.5.3    Special actions it will be required or need to perform for the fulfillment of its duties under this Deed in connection with and for the protection of the rights of the holders of the Debentures, including due to the Company's defaulting on its obligations under this Deed, including the convening of meetings of holders of the Debentures as stated in this Deed and including due to participation in meetings of holders of the Debentures.

1.5.4    Special work, including but not limited to work required due to a change in the Company's structure or work requested by the Company, or due to the need to perform additional actions for the fulfillment of its duties as a reasonable Trustee, by reason of a change in laws (including regulations enacted pursuant to Amendments 50 and 51 to the Securities Law) and/or regulations and/or other binding provisions applying to the Trustee's activities and its liability under this Deed of Trust.

1.5.5    Actions related to the registration or deletion of the registration of securities in a register maintained in accordance with any law (including outside Israel), as well as the examination, supervision, control and so forth of obligations (such as restrictions on the Company's freedom of action, encumbrance of assets, etc.) which the Company assumed or may assume or which may be assumed by anyone acting for it or on its behalf, in connection with the securing of other obligations of the Company or anyone acting on its behalf (such as the effecting of payments under the terms of the debentures) towards the holders of the Debentures, including as to the substance of the terms of such securities and obligations and their fulfillment.

1.6     In the event that the Company will be required to pay the Trustee its fee and/or reasonable expenses incurred by it and/or for special actions it is required to perform or which it performed as part of its duties and/or pursuant to the powers granted to it under this Deed, as provided in this appendix above, if and to the extent there are any such, and the Company did not do so, the Trustee shall be entitled to payment of these amounts in their entirety from the receipts accumulated by it in accordance with the provisions of sections 9 and 10 of the Deed, provided it gave the Company prior written notice of its intention to do so.

1.7     It is clarified that in the event that due to a future change in laws and/or regulations and/or other binding provisions applying to the Trustee's activity, the Trustee is required to bear additional expenses for the fulfillment of its duties as a reasonable Trustee, the Company shall indemnify the Trustee for its reasonable expenses including its reasonable fee.

1.8     VAT, if payable, shall be added to each of the above amounts and shall be paid by the Company.

1.9     All the above amounts shall be linked to the December 2016 index, but in no event shall a lower amount be paid than the amount specified in this Deed.

1.10    In the event that any securities are provided to the holders of the Debentures, the Company and the Trustee shall conduct discussions for updating the fee according to the number of hours the Trustee must devote to the trust in such an event.

1.11    The Trustee's fee shall be paid for the period until the end of the trust included under this Deed, even if a receiver (or a receiver, administrator or liquidator) is appointed to the Company and whether the trust under this Deed is managed or is not managed under the supervision of the court.

1.12    The above annual fee shall be paid at the beginning of each trust year.

1.13    All the amounts specified in this appendix shall have priority over the amounts due to the holders of the Debentures.

1.14    In the event that the term of the Trustee expires as provided in the Deed of Trust, the Trustee shall not be entitled to payment of its fee starting from the date the replacement Trustee enters office. If the Trustee's office terminates in the course of the trust year,

the fee paid for the months in which the Trustee did not serve as Trustee for the debentures, starting from the appointment of the replacement Trustee, shall be refunded. The provisions of this section shall not apply in the first trust.

1.15    For the Trustee's participation at general meetings of shareholders that shall take place in Israel the Trustee shall be entitled to a fee of NIS 750.

1.16    If a Trustee is appointed instead of the Trustee due to the termination of his office under sections 35B(a1) or 35N(d) of the Securities Law, the holders of the Debenture (Series C) certificates shall bear the amount by which the fee of the Trustee so appointed exceeds the fee paid to the Trustee in whose place it was appointed. If such difference is unreasonable, the relevant statutory provisions shall apply at the time of such replacement.

The holders shall bear such difference by way of deduction of the proportion of the difference from any payment made by the Company to the holders of the Debentures in accordance with the terms of the Deed of Trust, and the transfer thereof directly to the Trustee.

1.17    If the Company is required by law to make a deposit as security for its bearing of the Trustee's special expenses, the Company shall act in accordance with such provisions.

1.18    The foregoing in the other sections of this Deed with respect to the covering of costs and expenses relating to activities of the Trustee is in addition to the foregoing in this appendix.


***