## EXHIBIT A

**To:** Selbst, Stephen[sselbst@herrick.com]; Goldberg, Janice[jgoldberg@herrick.com]
**Cc:** Eric S. Silvestri[silvest@chapman.com]; David T. B. Audley[audley@chapman.com]; Helena Honig[hhonig@chapman.com]; Noam Bar Or[nbaror@chapman.com]
**From:** Michael Friedman[friedman@chapman.com]
**Sent:** Mon 10/24/2022 5:43:44 PM Eastern Daylight Time
**Subject:** In re Wythe Berry Fee Owner LLC, Case No. 22-11340 (MG)
**Attachment:** Debtor Discovery Response Letter 4870-7042-7706 v2.pdf
**Attachment:** Wythe Berry - DIP Term Sheet.pdf

---

Counsel:

Please see the attached response to your letter dated October 19, 2022.

In addition, I am also attaching a draft DIP Term Sheet for discussion. Please note that the Term Sheet is being provided for discussion purposes only and does not represent an offer or commitment.

Please let us know if you have any questions regarding the letter and if you would like to schedule a call to discuss the DIP Term Sheet.

Regards,

Michael Friedman

Michael Friedman | Partner
**Chapman and Cutler** LLP
1270 Avenue of the Americas | New York, NY 10020
D 212.655.2508
F 646.690.6412
friedman@chapman.com
* Admitted in New York only
Please consider the Environment before printing this email.

Chapman and Cutler LLP is an Illinois limited liability partnership that has elected to be governed by the Illinois Uniform Partnership Act (1997).

The information contained in this email transmission is confidential information which may contain information that is legally privileged and exempt from disclosure under applicable law. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this communication in error, please delete it from your system without copying it and notify the sender by reply email, so that our records can be corrected. Thank you.

---

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com

---



**CHAPMAN**
Focused on Finance

Michael Friedman
Partner

1270 Avenue of the Americas
30th Floor
New York, New York  10020-1708

T 212.655.6000
D 212.655.2508
friedman@chapman.com

October 24, 2022
*In re: Wythe Berry Fee Owner LLC*, Case No. 22-11340 (MG) (S.D.N.Y.)

<u>Via Email</u>

Janice Goldberg, Esq
Herrick Feinstein LLP
jgoldberg@herrick.com

*Response to Letter dated October 19, 2022*

Dear Counsel:

As you know, we represent Mishmeret Trust Company Ltd. (*"Mishmeret"* or
the *"Trustee"*), as Trustee for the holders (the *"Bondholders"*) of, among others, certain Series C
Notes issued by All Year Holdings Limited (*"All Year"*) under that certain Deed of Trust dated
February 19, 2017 (the *"Deed of Trust"*).  We write in response to your letter dated October 19,
2022 (the *"Letter"*)[1] sent on behalf of your client, Wythe Berry Fee Owner LLC (the *"Debtor"*)
as part of the above-referenced bankruptcy case (the *"Bankruptcy Proceeding"*).

First, enclosed you will find documentation requested in your Letter, specifically records
substantiating the unsecured claims of Klirmark Opportunity Fund III L.P. and Yelin Lapidot
Provident Funds Management Ltd. against the Debtor that is not subject to any bona fide dispute
and that exceed $18,600.  We anticipate receiving records substantiating the unsecured claim of
The Phoenix Insurance Company Limited shortly, and will provide such documentation promptly
upon our receipt thereof.

Second, your analysis regarding the claim under the Guaranty is incorrect, belied by the
relevant contracts, and unsupported by applicable law.  As the U.S. Supreme Court explained, a
"claim" under Section 101(5) of the Bankruptcy Code "means nothing more nor less than an
enforceable obligation," reflecting Congress' intent "to adopt the broadest available definition of
the word" under the Bankruptcy Code.  *In re Johns-Manville Corp.*, 552 B.R. 221, 231 (Bankr.
S.D.N.Y. 2016).  There is no question that the Guaranty is enforceable and that the unsecured
obligation thereunder exceeds $18,600, all of which you appear to acknowledge in your Letter.

Moreover, the Guaranty obligation is one held by all of the Series C Bondholders because
it is those Bondholders who are entitled to the benefits of the Guaranty and it is those Bondholders
for whom the Guaranty was executed.  Specifically, the Guaranty promises "prompt payment and
performance of all debts, obligations, and liabilities . . . **under the Bond Documents** . . . and any

---

[1]    Unless otherwise stated all capitalized terms used herein are the same as those in the Letter.



Michael Friedman          1270 Avenue of the Americas
Partner                   30th Floor
                          New York, New York  10020-1708

                          T 212.655.6000
                          D 212.655.2508
                          friedman@chapman.com

and all sums of money . . . **under the provisions of the Deed of Trust."**  Guaranty § 2 (emphasis added).  Thus, the Guaranty memorializes what every party to these transactions already knows: the obligations are to the Series C Bondholders and the Guaranty was delivered specifically to secure those obligations.  The Deed of Trust is also unequivocal on this point:

> [T]he Property Company shall deposit a guarantee with the Trustee pursuant to which the Property Company has an irrevocable commitment to uphold **the Company's obligations towards the Debenture holders (Series C)."**
> Deed of Trust § 6.2.1.5 (emphasis added).

Israeli law, which governs the Deed of Trust, further establishes that a trustee acts on behalf of bondholders.  *See* Section 35I to the Israeli Securities Law.  Affirming that commonsense rule, the Israeli Securities Authority's position on matters implicating Section 35I is that collective representation by a trustee does not exclude the individual rights of holders, such as the Bondholders here.  The Guaranty additionally makes plain that it was delivered to Mishmeret in its capacity "as trustee for the holders of Debentures under that certain Deed of Trust by and between Debtor and Trustee" for the purpose of "obtaining the proceeds of the Debentures."  Guaranty p. 1.

Thus, U.S. law, Israeli law, and the contracts are squarely aligned against the position you take in your Letter.  The Trustee has the right to *assert* the claim under the Guaranty, but it does not *hold* the claim.  To assert otherwise is to ignore the entire purpose of the Deed of Trust and the Trustee's appointment to act on the Bondholders' behalf.

**CHAPMAN**
**Focused on Finance**

**Michael Friedman**
Partner

1270 Avenue of the Americas
30th Floor
New York, New York  10020-1708

T 212.655.6000
D 212.655.2508
friedman@chapman.com

Third and finally, even assuming your conclusion were correct that the Debtor's Guaranty obligations all somehow belong solely to the Trustee, individually, the Trustee would still nonetheless be entitled to file an involuntary bankruptcy petition under § 303(b)(2) as a creditor of a Debtor with fewer than twelve creditors holding an unsecured claim exceeding $18,600.[2]  The underlying premise of your Letter that the individual petitioning Bondholders do not hold a claim is therefore entirely academic and of no use to anyone.  Rather, our shared efforts and attention should be aimed at achieving the best possible result for both the Debtor and its creditors.  Should you wish to discuss further, we will make ourselves available for a meet-and-confer.

Very truly yours,

CHAPMAN AND CUTLER LLP

By: _____
Michael Friedman

ESS
Enclosures

cc:  David T.B. Audley
     Eric S. Silvestri

---

[2] If as counsel to the Debtor you have any information to suggest that the Debtor has twelve (12) or more creditors, inclusive of the Trustee's individual claim on behalf of all of the Bondholders (again, an assumption only made herein for purposes of pointing out the clear alternative basis for the involuntary petition, of which the Trustee is a petitioning creditor), we request that you immediately provide such information.

◆ בנק הפועלים

תאריך : 20.10.2022

# אישור בעלות

מספר חברה:                                                שם החברה:

אול-יר אג"ח ג

<u>פרטי בעלי המניות</u>

**(1)** שם תאגיד: כלירמארק אופורטיוניטי פאנד 3 ש.מ.

**(2)** מספר זהות : 500462056

מדינת התאגדות:

**(1)** שם תאגיד:

**(2)** מספר רישום תאגיד:

מדינת התאגדות:

**(1)** שם תאגיד:

**(2)** מספר רישום תאגיד:

מדינת התאגדות:

**(3)** המועד שלגביו ניתן אישור הבעלות - **19.10.2022**

פרטים על המניות

**(1)** שם נייר ערך: אול-יר אג"ח ג

מספר בורסה: <u>1140136</u>

**(2)** מספר מניות:  <u>78,124,154.23</u>

בנק הפועלים בע"מ
מדף ניירות חלון
חותמות + חתימות מורשים...

בנק הפועלים בע"מ

<div dir="rtl">

בל"ל סניף חטיבת תפעול 724 (724)
יתרות ני"ע 114013/6  אול-יר    אגח ג
ליום : 19/10/2022  מחיר/שער : 62.100  מטבע : ש"ח
לפי מנהל : ילין לפידות ניהול קופות גמל בעמ – 427
מיון לפי : מיועץ(מ)/מנוהל(נ) \/
השאלות : יתרה בניכוי השאלות

תאריך 23/10/2022
שעה 14:17
עמוד מס 1

</div>

<div dir="rtl">

## ד ו " ח   א ח ז ק ו ת   ב נ י " ע

| שווי בש"ח | יתרת חובה | יתרת זכות | שם פקדון | מס' פקדון | סניף | ת ח | כ ש | מ נ | מ ש |
|---|---|---|---|---|---|---|---|---|---|
| ▆ |  | 3,167,763.86 | ילין לפידות | 214950/29 | 800 |  |  |  | ש |
|  |  | 334,289.65 | ילין לפידות | 299824/61 | 800 |  |  |  | ש |
|  |  | 889,181.02 | ילין לפידות | 299823/63 | 800 |  |  |  | ש |
|  |  | 2,416,751.11 | ילין לפידות | 299632/70 | 800 |  |  |  | ש |
|  |  | 2,176,205.79 | ילין לפידות | 299631/72 | 800 |  |  |  | ש |
|  |  | 1,904,719.85 | ילין לפידות | 299559/54 | 800 |  |  |  | ש |
|  |  | 96,941.94 | ילין – לפיד | 295788/59 | 800 |  |  |  | ש |
|  |  | 147,197.83 | ילין לפידות | 299825/59 | 800 |  |  |  | ש |
|  |  | 480,283.49 | ילין – לפיד | 216593/17 | 800 |  |  |  | ש |
|  |  | 25,238,512.23 | ילין לפידות | 214956/17 | 800 |  |  |  | ש |
|  |  | 14,074,979.04 | ילין לפידות | 214955/19 | 800 |  |  |  | ש |
|  |  | 3,121,486.89 | ילין לפידות | 214954/21 | 800 |  |  |  | ש |
|  |  | 197,368.51 | ילין לפידות | 214953/23 | 800 |  |  |  | ש |
|  |  | 1,391,720.69 | ילין לפידות | 214952/25 | 800 |  |  |  | ש |
|  |  | 390,561.39 | ילין לפידות | 214951/27 | 800 |  |  |  | ש |
|  |  | 918,548.78 | ילין לפידות | 214957/15 | 800 |  |  |  | ש |
|  |  | 19,737.10 | ילין לפידות | 299826/57 | 800 |  |  |  | ש |

| ▆ |  | 56,966,249.17 | | | סה"כ 17 פקדונות | | | | |

</div>

<div dir="rtl">

בנק לאומי לישראל בע"מ

</div>

**Wythe Berry Fee Owner LLC**
**Outline of Terms and Conditions for**
**Debtor-In-Possession Credit Facility**

This Term Sheet is for discussion purposes only and is intended to constitute a non-binding expression of intent and neither party is legally bound to the other unless and until terms and conditions related to this transaction are negotiated and incorporated into definitive documents signed by both parties.

| | |
|---|---|
| **Borrower:** | Wythe Berry Fee Owner LLC (the "Borrower") is a debtor and debtor-in-possession in a case (the "Borrower's Case") commenced pursuant to an involuntary petition filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). |
| **DIP Lender:** | Mishmeret Trust Company Limited, in its capacity as Trustee for the Series C Notes (the "Trustee"), and any other lenders from time to time party to the DIP Loan Agreement (collectively, in such capacities, the "DIP Lender").  Mishmeret shall serve as administrative agent for the DIP Lender (in such capacity, the "DIP Agent"). |
| **Petition Date:** | October 6, 2022 (the "Petition Date"). |
| **Entry of Order for Relief:** | The date on which the Bankruptcy Court enters an order for relief (an "Order for Relief") in the Chapter 11 Case (the "Relief Date"). |
| **Closing Date:** | The closing date in respect of the DIP Facility (defined below) (the "Closing Date"), which shall be no later than five (5) Business Days following the entry of the Final Order (defined below). |
| **DIP Facility:** | A senior secured debtor-in-possession credit facility (the "DIP Facility" and the extensions of credit under the DIP Facility, the "DIP Loans") providing for extensions of credit not to exceed $[2,000,000] (the "Maximum Amount"), pursuant to the terms of DIP Loan Agreement in form and substance acceptable to the DIP Lender (the "DIP Loan Agreement").  As set forth in this Outline of Terms and Conditions (this "Term Sheet"), the DIP Facility will be provided on a "super-priority" basis and secured by liens on all of the assets of the Borrower as described below under the heading "Priority and Liens; Collateral." |
| **Availability:** | Subject to all of the terms and conditions hereof, upon the entry of an order by the Bankruptcy Court in form and substance satisfactory to the DIP Lender (the "Final Order"), availability under the DIP Facility shall be available in an amount not to exceed the Maximum Amount, the extension of which shall be made in multiple draws pursuant to the schedule contained herein upon the provision by the Borrower of an updated Budget (as defined below) for which the Borrower shall provide the DIP Lender with at least three (3) Business Days' notice, provided that the entry of the Final Order shall be deemed to be notice to the DIP Lender of Borrower's request for the initial draw in the amount of $[__], which draw shall not occur until those "Conditions Precedent" as set forth herein have been met.  Subject to the foregoing limits, the DIP |

| | Loans shall be available under the DIP Facility in increments of no less than $[ ] per draw. Amounts repaid with respect to DIP Loans may not be re-borrowed. Amounts released to the Borrower pursuant to the foregoing shall continue to constitute DIP Loans for all purposes under the DIP Facility, and shall be subject to the provisions and limitations applicable thereto (including, without limitation, interest and use of proceeds).<br><br>"Business Day" means any day of the year except Saturdays, Sundays and national holidays or other days on which commercial banks are required or authorized by law to close in New York City or Israel.<br><br><div align="center">Draw Schedule: [**NTD: Borrower to propose**]</div> |
|---|---|
| **Purpose/Use of Proceeds:** | Proceeds of loans under the DIP Facility (and any letters of credit issued thereunder) may be used by the Borrower in the Case solely for: (i) general working capital purposes for the Borrower consistent with the Budget and to be mutually agreed with the DIP Lender; (ii) to pay all DIP Transaction Expenses (as defined herein) and those reasonable and documented fees and expenses payable to the DIP Lender; (iii) paying fees, costs and expenses specifically related to the Case to the extent such fees, costs and expenses are consistent with the Budget, are approved by the Bankruptcy Court, and relate solely to fees, costs and expenses of the Borrower's professionals (allowance of such fees shall be subject to final approval of the Bankruptcy Court) or professionals retained by the DIP Lender; (iv) to pay any other amounts included in the Budget, including without limitation adequate protection payments, which other amounts shall not exceed the amounts so budgeted, and (v) to fund the Carve-Out (as defined below). In no event shall any proceeds of the extensions of credit under the DIP Facility be used to challenge or contest any of the liens or claims of the DIP Lender, the Trustee or the Series C Noteholders under (x) the mortgage (the "Mortgage") granted by the Debtor (the "Mortgage Claims" and the corresponding liens, the "Prepetition Liens") and (y) the Series C Notes issued pursuant to the Deed of Trust (the "Deed of Trust") (such claims, the "Notes Claims") The collateral securing the Prepetition Liens shall be referred to herein as the "Prepetition Collateral". The Mortgage Claims and the Notes Claims are referred to herein as the "Prepetition Claims." |
| **Budget:** | The Borrower will provide the DIP Lender with a detailed bi-monthly budget covering the succeeding 13-calendar week period (as amended or modified from time to time, the "Budget"), substantially in the form attached as Exhibit A hereto, that shall set forth in reasonable detail receipts and disbursements of the Borrower on a bi-monthly basis for the 13-calendar week period following the Petition Date, which Budget shall be subject to approval by the DIP Lender in its reasonable discretion, and the Borrower will provide the DIP Lender with an update to the Budget every two (2) weeks (by no later than 12:00 noon (Eastern Time) of the third Business Day of such week), commencing for the first full calendar week following the Relief Date, for each rolling 13-calendar week period that begins with the first full calendar week following the date each such updated budget is delivered, which Budget updates shall also be subject |

<div align="center">2</div>

|  | to approval by the DIP Lender (i) in its reasonable discretion with respect to the new 13th week being added to the Budget, and (ii) in its sole discretion with respect to any of the other weeks in such updated Budget. Unless otherwise approved by the DIP Lender, each updated Budget shall be identical to the previously approved Budget except with respect to the week not covered by such prior Budget. The Borrower shall provide the DIP Lender with variance reports (in substantially the same format as the Budget) showing actual cash receipts, disbursements and net cash flow for the immediately preceding two (2) calendar weeks, noting therein all variances from values set forth for such calendar weeks in the Budget (and updates thereto), which variance reports will be provided on a bi-monthly basis (by no later than 12:00 noon (Eastern Time) of the third Business Day of each week). For the avoidance of doubt, the Budget shall be the weekly budget solely for the Borrower and its wholly owned subsidiaries. |
|---|---|
| **Maturity Date:** | The DIP Facility shall mature, be repayable in full, and the DIP Facility shall terminate on such date (the "Maturity Date") that is the earliest to occur of (i) six (6) months after the Relief Date (which date shall be extended in conjunction with and pursuant to the terms set forth in the Milestones (as defined below), provided that the Bankruptcy Court enters an order declaring the Lease (as defined below) to be terminated within such six month period), (ii) the date on which the obligations under the DIP Facility are accelerated following the occurrence of an Event of Default (defined below) and (iii) the date on which the Bankruptcy Court approves the extension of any other credit facilities to the Borrower, or to any entity whose bankruptcy case has been ordered by the Bankruptcy Court to be jointly administered with the Case, over the objection of the DIP Lender. |
| **Commitment Termination Date:** | The commitment of the DIP Lender to provide the DIP Facility shall terminate on the earlier of (i) the Maturity Date, (ii) the date the Borrower terminates the commitments of the DIP Lender to make further DIP Loans under the DIP Facility, and (iii) the date the DIP Lender terminates its commitments to make the DIP Loans upon the occurrence of an Event of Default. |
| **Priority and Liens: Collateral:** | Subject to the Carve-Out (defined below), all obligations to the DIP Lender, including, without limitation, all principal, accrued interest, costs, fees and expenses, shall:<br><br>• pursuant to Bankruptcy Code section 364(c)(1), be joint and several claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 (the "Superpriority Claims"), which Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Borrower and all proceeds thereof, including, without limitation, subject to the entry of the Final Order (defined below), all proceeds or other amounts received in respect of the Borrower's claims and causes of action arising |

3

under chapter 5 of the Bankruptcy Code or the proceeds or other amounts received in respect thereof (such claims and causes of action, collectively the "<u>Avoidance Actions</u>");

- pursuant to Bankruptcy Code section 364(c)(2), be secured by a perfected first priority lien on all now owned or hereafter acquired assets and property of the Borrower and proceeds thereof (including, without limitation, all cash, cash equivalents, accounts, payment intangibles, promissory notes, consignments, commercial tort claims, tax refunds, inventory, goods, chattel paper, documents, deposit accounts, instruments, investment property, letter-of-credit rights, general intangibles, contracts, contract rights, all causes of action and proceeds thereof, computer hardware and software, motor vehicles, intellectual property, real and personal property, plant and equipment of the Borrower) that are not subject to valid, perfected and non-avoidable liens as of the commencement of the Case or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code, but specifically excluding the Avoidance Actions or any proceeds thereof (collectively, the "Unencumbered Collateral");

- pursuant to Bankruptcy Code section 364(d)(1), be secured by a first-priority, senior priming perfected lien on, and security interest in, all assets, including Cash Receipts (as defined below), other than Avoidance Actions or proceeds thereof, that (a) are subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Case or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement, and (b) in each case, constitute Prepetition Collateral (the "<u>Primed Collateral</u>" and together with the Unencumbered Collateral, the "<u>DIP Collateral</u>").

| | |
|---|---|
| **Carve-Out:** | The aforementioned Superpriority Claims and liens on the DIP Collateral and the Adequate Protection Claims and Adequate Protection Liens (each defined below) and any pre-Petition Date liens and claims shall be subject only to (1) (x) after delivery by the DIP Lender, of the Carve Out Trigger Notice (defined below), to the extent allowed on an interim basis or final basis by the Bankruptcy Court at any time, all unpaid fees, disbursements, costs and expenses incurred by Borrower's professionals from and after the date following the date of delivery of the Carve Out Trigger Notice, in an aggregate amount not to exceed $[50,000] (such amount, the "<u>Post-Carve Out Trigger Notice Cap</u>") *plus* (y) the amount of all accrued and/or unpaid fees, disbursements, costs and expenses incurred by professionals on and before the date of delivery of the Carve Out Trigger Notice, to the extent allowed on an interim basis or final basis by the Bankruptcy Court at any time (including after the date of delivery of the Carve Out Trigger Notice); provided, however, that nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursements or compensation sought by any professionals or any other Person or entity; (2) the payment of fees |

4

|  | required pursuant to 28 U.S.C. § 1930; and (3) all reasonable and documented fees and expenses incurred by a trustee appointed under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed \$[ ] ((1), (2) and (3), together, the "Carve-Out").<br><br>"Carve Out Trigger Notice" shall mean a written notice delivered by the DIP Lender to the Borrower and its lead counsel, the United States Trustee for the Southern District of New York (the "U.S. Trustee"), and filed with the Court, which notice may be delivered only following the occurrence and during the continuance of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.<br><br>• Notwithstanding the foregoing, so long as no Event of Default shall have occurred and be continuing, the Borrower shall be permitted to pay compensation and reimbursement of fees and expenses of professionals allowed and payable under Bankruptcy Code sections 328, 330 and 331, as the same may be due and payable, and the same shall not reduce the Carve-Out. No portion of the Carve-Out or proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of any liens or claims of the DIP Lender or the Prepetition Claims or Prepetition Liens, or the initiation or prosecution of any claim or action against any of the foregoing or their respective advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof. The Borrower's stipulations, acknowledgements and covenants concerning the extent, validity, priority, perfection, enforceability and non-avoidance of the obligations under the Mortgage, the Deed of Trust and all documents executed in connection therewith, and the liens securing the obligations thereunder shall be binding on the Borrower, its estates, and any successor in interest in this or any successor case, and subject to any applicable investigation period required by local rule or otherwise agreed to by the DIP Lender in its sole discretion. |
| --- | --- |
| **Adequate Protection:** | The DIP Lender shall be granted the following as adequate protection of its interest in the Prepetition Collateral in an amount equal to the aggregate actual diminution in the value of its interest therein:<br><br>• effective and perfected as of the date of entry of the Final Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, (i) a valid, perfected replacement security interest in and lien on the collateral to which they hold priority liens existing as of the Petition Date or thereafter acquired and any proceeds thereof and (ii) a valid, perfected security interest in and lien on all of the DIP Collateral, which shall for the avoidance of doubt exclude the Avoidance Actions and the proceeds thereof (collectively, the "Adequate Protection Liens"), subject and subordinate only to (x) the Carve-Out and (y) the liens securing the DIP Facility; |

FEE_0000022

|  | |
|---|---|
|  | - a superpriority administrative expense claim as provided for in section 507(b) of the Bankruptcy Code (collectively, the "Adequate Protection Claims"), subject and subordinate only to (x) the Carve-Out and (y) the Superpriority Claims held by the DIP Lender under the DIP Facility. Except for the Superpriority Claims held by the DIP Lender, no claims shall be permitted with priority *pari passu* with, or senior to, the Adequate Protection Claims; provided, however that the Adequate Protection Claims may not be satisfied from the proceeds of the Avoidance Actions; and<br><br>- current cash payments of all reasonable and documented fees and expenses payable to the DIP Lender, including but not limited to attorney and professional fees and expenses, promptly following the 7th calendar day after the DIP Lender have provided statements of such fees and expenses to the U.S. Trustee and lead counsel to the Borrower, provided no objection has been filed thereto. |
| **363 Sales:** | No sale of assets of the Borrower under section 363 of the Bankruptcy Code, outside the ordinary course of business, will be authorized without the DIP Lender's consent, unless the proceeds of such sale or other disposition will be sufficient to pay the DIP Loans under the DIP Facility, the Mortgage Claims and the Notes Claims in full. |
| **Interest Rate:** | The interest rate shall be 12.00% per annum, applied to the outstanding amount of the DIP Facility and measured on a 360 day year. Upon the occurrence and during the continuance of an Event of Default, at the election of the DIP Lender, all obligations under the DIP Facility shall bear interest at a rate of 3.00% above the otherwise applicable rate. Interest on the DIP Facility shall accrue monthly. |
| **Commitment Fee:** | (i) An upfront fee upon funding in the amount of 2.00% of the DIP Lender's total commitment, one-half of which shall accrue and be paid upon exit, and (ii) an exit fee upon the repayment or termination of the DIP Facility (including on the Maturity Date) in the amount of [ ]% of the total amount loaned by the DIP Lender. |
| **Representations and Warranties:** | The documentation evidencing the DIP Facility (the "DIP Loan Documents") shall include representations and warranties that are reasonable and customary for post-petition financings of this type, including, without limitation, continued effectiveness of orders of the Bankruptcy Court, including the Final Order, as applicable, and full disclosure and good faith accuracy of the Budget. |
| **Covenants:** | The DIP Loan Documents shall include affirmative and negative covenants that are reasonable and customary for post-petition financings of this type, and shall be acceptable in all respects to the DIP Lender, and with such changes as may be required to reflect the pendency of the Case. The Borrower shall comply with the following: |

|  | • *Disbursements.* As of the end of each two (2) calendar weeks starting with the fourth full calendar week following the entry of the Order for Relief, the unfavorable variance (if any) between (i) the aggregate amount of the Borrower's actual disbursements, on a cumulative basis, for "Total Operating Cash Disbursements" in the Budget, for the most recent 2-consecutive calendar week period then ended and (ii) the sum of (A) the aggregate amount of the Borrower's forecasted disbursements, on a cumulative basis, for "Total Operating Cash Disbursements" in the Budget, for the same 2-consecutive calendar week period then ended, plus (B) any Operating Disbursement Carryforward (herein, the "Disbursements Unfavorable Variance"), shall not exceed 5.00%. "Operating Disbursement Carryforward" means the amount of any forecasted Total Operating Cash Disbursements not expended in a prior period, which shall carry forward into future periods. |
|  | • *Receipts.* Borrower shall notify the DIP Lender of any cash received ("Cash Receipts") by Borrower within [two (2)] Business Days of such receipt, and deposit all Cash Receipts in a segregated account, to form part of the DIP Collateral. Borrower shall not use any Cash Receipts for any purpose without the prior written consent of the DIP Lender. |
| **Events of Default:** | The DIP Loan Documents will include events of default that are reasonable and customary for post-petition financings of this type, with such changes as may be required to reflect the pendency of the Case and/or to reflect institutional requirements of the DIP Lender (subject to grace, notice and cure periods to be agreed) (each, an "Event of Default"), including, without limitation: |
|  | (a)  Borrower fails to pay any principal or interest on the DIP Loans or any fee or other amount due with respect to the DIP Facility as and when the same becomes due, and such failure shall not have been remedied within two (2) Business Days after such due date; |
|  | (b)  any representation or warranty made by Borrower with respect to the DIP Facility or in any statement or certificate given by Borrower in writing pursuant to the DIP Facility or in connection with any Loan Document shall be false in any material respect on the date as of which made; |
|  | (c)  Borrower shall breach or violate any term, covenant or agreement contained in the DIP Facility or any financing order or any Event of Default (as defined in the Deed of Trust) shall occur, other than existing defaults as of the Petition Date (including the filing of the Chapter 11 petition and other defaults existing at the time of the filing or arising as a result of such filing that are stayed pursuant thereto); |
|  | (d)  the dismissal of Borrower's Case or the conversion to a case under Chapter 7 of the Bankruptcy Code; |
|  | (e)  a trustee or an examiner with enlarged powers (beyond those set forth in § 1106(a)(3) and (4) of the Bankruptcy Code) relating to the |

FEE_0000024

operation of Borrower's business is appointed in Borrower's Case without the prior written consent of the DIP Lender (which consent may be withheld in its sole discretion), or Borrower applies for, consents to, or acquiesces in, any such appointment without the prior written consent of the DIP Lender (which consent may be withheld in its sole discretion);

(f)      the Final Order is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the DIP Lender and the DIP Agent (which consent may be withheld in its sole discretion);

(g)      the Court or any other court enters an order or judgment in the Case modifying, limiting, subordinating or avoiding the priority of any prepetition obligations or the perfection, priority or validity of the Prepetition Liens or the DIP Lender's postpetition liens on any collateral or imposing, surcharging or assessing against the Trustee, the Series C Noteholders, the DIP Agent or the DIP Lender or their claims or collateral any costs or expenses, whether pursuant to § 506(c) of the Bankruptcy Code or otherwise, other than as provided in the Final Order;

(h)      except as otherwise provided herein, Borrower or any entity whose bankruptcy case has been ordered by the Bankruptcy Court to be jointly administered with the Case, files any application for approval or allowance of, or any order is entered approving or allowing, any administrative expense claim in the Case, having any priority over, or being pari passu with, the superpriority claims of the DIP Lender;

(i)      any motion or application is filed by or on behalf of Borrower seeking the entry of an order, or an order is entered in the Case, approving any subsequent debtor-in-possession facility for borrowed money or other extensions of credit unless such subsequent facility and such order expressly provide for the indefeasible payment and complete satisfaction in full in cash to the DIP Lender of all obligations prior to, or concurrently with, any initial borrowings or other extensions of credit under such subsequent facility or has been consented to, in writing, by the DIP Lender;

(j)      Borrower fails to timely achieve any of the milestones set forth in the Final Order unless consented to in writing by the DIP Lender in its sole discretion;

(k)      a plan of reorganization or liquidation is proposed which does not provide for termination of the commitment and payment in full of the DIP Facility in cash on the effective date of such plan, if such termination and payment in full has not already occurred;

(l)      except as otherwise provided herein, any other superpriority administrative expense claim or lien senior to or pari passu with the DIP Loan Agreement obligations, or the liens granted to secure the DIP Loan Agreement obligations, shall be granted, approved, imposed, or otherwise created;

(m)      Borrower seeks to obtain additional financing under section 364(c) or 364(d) of the Bankruptcy Code or to grant any lien other than liens permitted under the DIP Facility and financing orders without the

8

|  | prior written consent of the DIP Lender; |
|---|---|
|  | (n)      Borrower files, or any representative of Borrower's estate files, any action challenging the validity, perfection, priority, extent, or enforceability of the loan documents for the DIP Facility or the liens and claims granted thereunder or with respect to the Deed of Trust and the Mortgage; |
|  | (o)      Borrower, or any entity whose bankruptcy case has been ordered by the Bankruptcy Court to be jointly administered with the Case, commences any action against the DIP Agent or the Series C Noteholders, including, without limitation, any action to avoid, modify, dispute, challenge, or subordinate any of the prepetition obligations or any Prepetition Liens in favor of the Trustee, the DIP Agent or the DIP Lender, or entry of an order in any action by any other party granting such relief; |
|  | (p)      the entry of an order dismissing the Case that does not provide for the termination of the DIP commitment and payment in full of the DIP Loans and all related obligations in cash prior to dismissal; |
|  | (q)      any collateral becoming subject to surcharge or marshaling; |
|  | (r)      the entry of an order of the Court granting relief from the automatic stay with respect to any Prepetition Collateral or other collateral or any other assets of Borrower (other than at the request of the DIP Lender); |
|  | (s)      any material contract or unexpired lease of the Borrower is rejected or otherwise terminated (other than in accordance with its terms, and other than a declaration or order of the Bankruptcy Court or other court of competent jurisdiction declaring the Lease (as defined below) to be terminated) or any property of the Borrower is sold outside the ordinary course of business, in each instance, without the express written consent of the DIP Lender; or |
|  | (t)      the State Court Litigation, following removal to the Bankruptcy Court, is remanded to Supreme Court of the State of New York. |
| **Remedies:** | Customary remedies, including, without limitation, the right of the DIP Lender, upon the occurrence of an Event of Default, to seek relief from the automatic stay under the Bankruptcy Code, and the Borrower's consent to an expedited hearing within three (3) Business Days on a motion seeking such relief.  The Bankruptcy Court shall retain exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies hereunder with respect to the Borrower, under the Final Order, and with respect to the DIP Collateral. |
| **Assignments and Participations:** | The DIP Facility will contain customary provisions for facilities of this kind, including, without limitation, each DIP Lender's right to (i) assign its DIP Loans to other DIP Lender or affiliates thereof without the consent of the Borrower, (ii) participate its DIP Loans without notice to, or consent of, the Borrower and (iii) pledge its DIP Loans. |

9

| | |
|---|---|
| **Chapter 11 Plan:** | The Borrower's plan of reorganization (the "Approved Plan") shall, among other things, provide for (i) payment in full, on the Effective Date thereof, of all DIP Loans under the DIP Facility, or (ii) such other treatment as may be acceptable in all respects to the DIP Lender. |
| **Conditions Precedent:** | (a)    The initial draw and any subsequent draws shall be subject to all subsections contained herein, and pursuant to conditions precedent that are customary and appropriate for financings of this type and acceptable to the DIP Lender, including, without limitation: |
| | 1.  The DIP Lender's review of and satisfaction with the Budget; |
| | 2.  Execution and delivery by the Borrower of definitive DIP Loan Documents, in form and substance consistent with this Term Sheet, and otherwise satisfactory in all respects to the DIP Lender; |
| | 3.  The absence of any Default or Event of Default under any of the DIP Loan Documents or this Term Sheet; |
| | 4.  The Bankruptcy Court's entry of the Final Order, as described below; |
| | 5.  The DIP Lender's review of and reasonable satisfaction with all "first day orders" (other than the Final Order, which shall be satisfactory in all respects to the DIP Lender); |
| | 6.  Borrower shall have paid to the DIP Lender all fees and expenses required to be paid to the DIP Lender on the Closing Date pursuant to any of the DIP Loan Documents and the transactions contemplated thereby; |
| | 7.  All proceedings taken in connection with the execution of the DIP Loan Documents and approval thereof by the Bankruptcy Court (including, without limitation, the nature, scope and extent of notices to interested parties with respect to all hearings related to the DIP Facility) shall be satisfactory in all respects to the DIP Lender; |
| | 8.  All representations and warranties made by the Borrower under the DIP Loan Documents shall be true and correct in all material respects on and as of the date of each extension of credit under the DIP Facility, except to the extent such representations or warranties relate solely to an earlier date (in which case, they shall be true and correct in all material respects as of such earlier date); and |
| | 9.  Receipt of a notice of borrowing from the Borrower.  The request for and acceptance of each DIP Loan by the Borrower shall constitute a representation and warranty that the conditions to each extension of credit shall have been satisfied. |

10

(b)    The Final Order shall include, among other terms and conditions to be agreed by the DIP Lender, the following milestones (the "Milestones"):

1.    Within seven (7) days of the Relief Date, the filing of a Notice of Removal (the "Removal Notice Date") in the Bankruptcy Court removing the case currently pending in the Supreme Court of the State of New York (County of Kings) styled as *Wythe Berry Fee Owner LLC v. Zelig Weiss et al.*, Index Number 514152/2021 (the "State Court Litigation") to the Bankruptcy Court.

2.    Within thirty (30) days of the Removal Notice Date, the removal of the State Court Litigation to the Bankruptcy Court (the "Removal Period"). If a request for remand is filed in the Case, the Removal Period may be extended, in the sole discretion of the DIP Lender, by an additional thirty (30) days to allow for a decision on such request by the Bankruptcy Court.

3.    A final and appealable order issued by the Bankruptcy Court within six (6) months of the entry of the Order for Relief declaring the Ground Lease (the "Lease") between the Borrower and Wythe Berry LLC terminated (such date, the "Lease Termination Date").

4.    Within forty-five (45) days of the entry of a final and appealable order referred to in paragraph (2) above, the eviction of Wythe Berry LLC from the leased premises.

5.    Within thirty (30) days of the Lease Termination Date, the Borrower shall have filed either (i) a disclosure statement ("Disclosure Statement") for an Approved Plan with the Bankruptcy Court or (ii) a motion pursuant to Section 363 of the Bankruptcy Code seeking approval of bid procedures (a "Bid Procedures Motion") for a sale of the Borrower's assets.

6.    If the Borrower files a Disclosure Statement and Approved Plan, (i) have a hearing scheduled to approve such Disclosure Statement within [forty-five (45)] days of filing, (ii) have a hearing scheduled to consider confirmation of the Approved Plan and the approval of a confirmation order for no later than [forty-five (45)] days following approval of the Disclosure Statement (the "Confirmation Date"), and (iii) cause the closing of the transactions contemplated by the Approved Plan to close within [fifteen (15)] days of the Confirmation Date. For the avoidance of doubt, each such deadline may be extended by no more than [thirty (30)] days to accommodate the schedule of the Bankruptcy Court.

7.    If the Borrower files a Bid Procedures Motion, (i) have a hearing scheduled to approve such Bid Procedures Motion

11

<table>
<tr><td></td><td>within [forty-five (45)] days of filing, (ii) hold an auction to select a bidder (the "<u>Successful Bidder</u>") for the Borrower's assets being sold pursuant to Section 363 of the Bankruptcy Code (such sale, the "<u>363 Sale</u>") within [thirty (30)] days of approval of the Bid Procedures Motion, (iii) receive approval of the Bankruptcy Court of the 363 sale within [forty-five (45)] days of selection of a Successful Bidder, and (iv) close the 363 Sale within [fifteen (15)] days of such Bankruptcy Court approval.  For the avoidance of doubt, each such deadline may be extended by no more than [thirty (30)] days to accommodate the schedule of the Bankruptcy Court.<br><br>(c) Within twenty (20) calendar days (or such longer period as may be agreed by the DIP Lender) after entry of the Final Order, the DIP Lender shall have received evidence, in form, scope and substance, satisfactory to the DIP Lender, of all insurance coverage set forth on <u>Exhibit B</u> attached hereto.</td></tr>
</table>

| **Final Order:** | <u>Final Order</u>.  A condition precedent to the DIP Lender's DIP Loans under the DIP Facility will be the entry of the Final Order, in form and substance satisfactory in all respects to the DIP Lender, by the Bankruptcy Court, which must occur no later than [thirty (30)] days after the Relief Date, following proper notice and hearing thereon, which, among other things, approves the form and substance of the definitive DIP Loan Documents evidencing the DIP Facility; approves Borrower's stipulation of the validity, extent, amount, perfection, priority, enforceability, and non-avoidability of the Prepetition Liens; grants adequate protection (as hereinabove provided) for the benefit of the DIP Lender; authorizes the DIP Agent to enforce its liens and the DIP Loan Documents upon the occurrence and during the continuance of Events of Default; contains a Carve-Out for professional fees and expenses on terms and conditions described herein; confers section 364(c)(1) priority status on all DIP Loans under the DIP Facility and provides for the securing of all such DIP Loans by a Lien on all DIP Collateral having the priority provided herein; finds that the DIP Agent and the DIP Lender have acted in good faith in connection with the proposed financing and are entitled to the benefits of section 364(e) of the Bankruptcy Code; provides that the liens granted to the DIP Lender under the DIP Loan Documents and pursuant to the Final Order are deemed perfected without the necessity of the filing for record of any documents, notices, or other filings (but the Borrower agrees to execute and deliver to the DIP Lender, and to authorize the DIP Lender to file, any such documents at the DIP Lender's sole discretion); and contains such other terms and conditions as the DIP Lender shall request or find acceptable.  For the avoidance of doubt, the Final Order shall include milestones for a Section 363 sale process and Chapter 11 plan process as set forth herein.  The Final Order shall also prohibit any surcharge on the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise. |
|---|---|
| **Governing Law:** | New York, except as governed by the Bankruptcy Code. |

12

| | |
|---|---|
| **Indemnity:** | The Borrower shall indemnify, pay and hold harmless the DIP Lender and the DIP Agent (and their respective directors, officers, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence, bad faith or willful misconduct of the indemnified party, and except to the extent resulting from claims between or among any DIP Lender in their capacity as such) (including the reasonable and documented fees and expenses of counsel to the DIP Lender). |
| **Expenses:** | The Borrower shall pay (a) all reasonable and documented out-of-pocket costs and expenses of the DIP Lender and DIP Agent (including, but not limited to Gornitzky & Co. and Chapman and Cutler LLP) associated with the preparation, execution, delivery and administration of the DIP Loan Documents and any amendments or waivers with respect thereto, (b) all reasonable and documented out-of-pocket costs and expenses of the DIP Lender (including the documented fees and expenses of appropriate counsel to the DIP Lender, including but not limited to Gornitzky & Co. and Chapman and Cutler LLP) in connection with the enforcement of the DIP Loan Documents, (c) all out-of-pocket transaction expenses incurred in connection with the DIP Facility (items in clauses (a), (b) and (c) collectively, the "DIP Transaction Expenses"), and (d) all reasonable and documented fees and expenses payable to the DIP Lender and DIP Agent, including but not limited to attorney and professional fees and expenses, in connection with the Case and as provided in the Final Order. |
| **Amendments, Modifications and Waivers:** | Except as otherwise specified herein, this Term Sheet may only be modified, amended or supplemented by an agreement in writing signed by the Borrower and the DIP Lender. |
| **Counsel to DIP Lender:** | Gornitzky& Co. and Chapman and Cutler LLP |
| **Counsel to Borrower:** | [Herrick Feinstein LLP] |

13

**Exhibit A to the DIP Term Sheet**

**Budget**

14

FEE_0000031

**Exhibit B to the DIP Term Sheet**

**Required Insurance**

15

FEE_0000032