# **EXHIBIT C**

Page 1

1

2

        IN THE UNITED STATES BANKRUPTCY COURT

3

        FOR THE SOUTHERN DISTRICT OF NEW YORK

4

5

   In re:
6   WYTHE BERRY FEE OWNER LLC,    ) Chapter 11
                                  )
7                 Alleged Debtor.  )No.22-11340 (MG)
                                  )
8   ----------------------------)

9

10

11

12   REMOTE VIDEOTAPED DEPOSITION OF EPHRAIM DIAMOND

13

14              Wednesday, January 4, 2023

15

16

17

18

19

20

21   Reported by:
     LISA M. MURACO
22   JOB NO. 221055

23

24

25

Page 2

```
1
2              Wednesday, January 4, 2023
3                  9:30 a.m. Eastern
4
5
6
7        REMOTE Deposition of EPHRAIM
8    DIAMOND, held VIA ZOOM, before LISA M.
9    MURACO, a Notary Public of the State of New
10   York and Florida.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2    A P P E A R A N C E S:
3    (REMOTE)
4
5        PAUL HASTINGS LLP
6        Attorneys for Zelig Weiss
7            2050 M Street, NW
8            Washington, DC 20036
9        BY:  NICHOLAS BASSETT, ESQ.
10           WILL FARMER, ESQ.
11           JASON PIERCE, ESQ.
12
13
14       HERRICK, FEINSTEIN LLP
15       Attorneys for Wythe Berry Fee Owner
16           2 Park Ave
17           New York, NY 10016
18       BY:  JANICE GOLDBERG, ESQ.
19           STEPHEN SELBST, ESQ.
20           ZACHARY DENVER, ESQ.
21           AVERY MEHLMAN, ESQ.
22
23
24
25
```

Page 4

```
1
2    A P P E A R A N C E S:
3    (REMOTE)
4
5        CHAPMAN AND CUTLER LLP
6        Attorneys for Witness
7            320 S Canal Street
8            Chicago, IL 60606
9        BY:   ERIC SILVESTRI, ESQ.
10           MICHAEL FRIEDMAN, ESQ.
11
12   ALSO PRESENT:
13   Legal Video Specialist, Jon Popham
14   Zelig Weiss
15   Jon Brook, ESQ., on Behalf of Zelig Weiss
16   Osnat Tenenbaum, Bondholders
17   Shlomy Ilany, General Counsel, Mishmeret
18   Ephraim Diamond, Wythe
19   Asaf Ravid, Wythe
20
21
22
23
24
25
```

Page 5

```
1
2        IT IS HEREBY STIPULATED AND AGREED
3    by and between the attorneys for the
4    respective parties herein, that filing and
5    sealing be and the same are hereby waived.
6        IT IS FURTHER STIPULATED AND AGREED
7    that all objections, except as to the form
8    of the question, shall be reserved to the
9    time of the trial.
10       IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to
12   and signed before any officer authorized
13   to administer an oath, with the same
14   force and effect as if signed and sworn
15   to before the Court.
16
17
18
19
20              - oOo -
21
22
23
24
25
```

Page 10

```
1                    E. DIAMOND
2              And what group did you practice in?
3         A.    A year in the corporate, and then
4  five-and-a-half years in the bankruptcy --
5         Q.    Okay.
6         A.    -- group.
7         Q.    Well, Mr. Diamond, you know how a
8  deposition works, so I won't belabor the
9  details.
10             But if you need break at any time
11 today, just let me know, and I'm happy to try
12 to accommodate that.
13             If I say -- if I ask a question that
14 is not clear to you, let me know.
15             I'm happy to try to rephrase for
16 you, okay?
17        A.    Okay.
18        Q.    So you are the associate
19 restructuring officer for All Year Holdings
20 Limited; is that right?
21        A.    Correct.
22        Q.    And how long have you held that
23 position?
24        A.    Since December 30, 2020.
25        Q.    Okay.
```

Page 11

```
1                    E. DIAMOND
2              And All Year is the sole member of
3  another entity called YGWV LLC; is that right?
4         A.    Correct.
5         Q.    And then YGWV LLC, in turn, is the
6  50 percent member of another entity called
7  Member LLC; is that right?
8         A.    Yes.
9         Q.    I did -- the full name is Wythe
10 Berry Member LLC, right?
11        A.    Yes.
12        Q.    Is that okay if I refer to that as
13 Member LLC today?
14        A.    Yes.
15        Q.    And the other 50 percent owner of
16 Member LLC is Mr. Weiss.
17             Is that your understanding?
18        A.    That is my understanding.
19        Q.    Okay.
20             And then Member LLC is the sole
21 member of another entity called Wythe Berry Fee
22 Owner LLC; is that right?
23        A.    Correct.
24        Q.    Okay.
25             Do you have any position at YGWV
```

Page 12

```
1                    E. DIAMOND
2  LLC?
3         A.    No.
4         Q.    Do you make decisions on behalf of
5  YGWV LLC?
6         A.    I'm sorry.  I don't understand the
7  question.
8              Do I make?
9         Q.    Well, YGWV LLC is the -- not only
10 the 50 percent owner, but the 50 percent
11 controlling, managing member of Member LLC.
12             Is that your understanding?
13        A.    Yes.
14        Q.    Okay.
15             So YGWV, subject to the Member LLC
16 operating agreement, makes decisions on behalf
17 of Member LLC; is that correct?
18        A.    Correct.
19        Q.    So -- so who are the individuals who
20 would make those decisions at YGWV on behalf of
21 Member LLC?
22        A.    Well, there are two restructuring
23 officers at All Year Holdings, myself and Asaf
24 Ravid.  And collectively, we, you know, discuss
25 and make decisions about how, you know, to
```

Page 13

```
1                    E. DIAMOND
2  operate generally the All Year business,
3  including YGWV.
4         Q.    Okay.
5              So does YGWV have any of its own
6  employees?
7         A.    Not that I'm aware of.
8         Q.    And does Member LLC?
9         A.    Not that I'm aware of.
10        Q.    And does Fee Owner?
11        A.    Not that I'm aware of.
12        Q.    Okay.
13             So yourself and Mr. Ravid at All
14 Year are the ones who ultimately make decisions
15 for YGWV, for Member LLC, and for Fee Owner; is
16 that right?
17        A.    Make decisions for All Year, which
18 have implications for YGWV and down the chain,
19 as you said.
20        Q.    Okay.
21             If there was ever a situation where
22 the interest of YGWV, Member LLC, or Fee Owner
23 would diverge from those of All Year, how would
24 that be handled?
25             MS. GOLDBERG:  Objection.
```

Page 14

E. DIAMOND

1
2  BY MR. BASSETT:
3      Q.    You can answer.
4      A.    Oh, okay.  Sorry.
5            Again, repeat the question.
6            How would we.
7      Q.    Well, I think what you said is you
8  make decisions at the All Year level and those
9  decisions would have implications for the other
10 LLC entities that we have talked about, that
11 are further down in the chain, if you will.
12     A.    Correct.
13     Q.    And my question for you is, if there
14 was a situation in which there was not
15 alignment between the interests of one of those
16 LLCs and All Year, how would you deal with
17 that?
18           MS. GOLDBERG:  Objection.
19           Speculative.
20 BY MR. BASSETT:
21     Q.    You can answer.
22           And as a general rule, Mr. Diamond,
23 unless your -- I will let your counsel correct
24 me if I'm wrong, but unless your counsel
25 instructs you or recommends that you not

Page 15

E. DIAMOND

1
2  answer, you should answer notwithstanding any
3  objection.
4            MS. GOLDBERG:  That's correct.
5      A.    Okay.  I'm -- you're asking what if
6  the interest diverts, what would happen there.
7            So I think the answer to that is
8  that Asaf and I -- first of all, I'm not sure
9  that those interests ever diverge because, you
10 know, the Fee Owner is ultimately an asset
11 whose benefit enures to the All Year Holdings.
12           And likewise, to your clients Zelig
13 Weiss, because he is a 50 owner.  But they
14 don't -- when we take actions that are relevant
15 to each of those subsidiaries, we consider
16 their impact on those subsidiaries and their
17 constituents, as well as our constituents.
18     Q.    So in your view, there's never a
19 situation in which the interests of Fee Owner,
20 for example, can possibly be different from the
21 interests of All Year?
22           MS. GOLDBERG:  Objection.
23     A.    I can't speculate as to whether
24 there would ever be.  But for the moment,
25 they're aligned.

Page 16

E. DIAMOND

1
2      Q.    Okay.
3            But there's no -- there's no sort of
4  corporate governance procedures in place to
5  address that situation?
6            MS. GOLDBERG:  Objection.
7            MR. SILVESTRI:  Objection.  Sorry.
8      A.    I think we take guidance and counsel
9  when needed, when we feel that we need to, on
10 those questions.
11     Q.    Okay.
12           But just to be clear, there's no
13 one, to your knowledge, at present, who is
14 independently tasked with making decisions on
15 behalf of Fee Owner, as opposed to All Year?
16           MS. GOLDBERG:  Objection.
17     A.    Again, I think we -- we act in that
18 capacity as well.
19     Q.    Is there anyone who makes decisions
20 exclusively on behalf of Fee Owner and not on
21 behalf of All Year?
22           MS. GOLDBERG:  Objection.
23     A.    There's no third -- if you're
24 asking, like, physically, is there a third
25 person, no, there is no third person.

Page 17

E. DIAMOND

1
2      Q.    Okay.
3            So there's -- you mentioned you and
4  Mr. Ravid as restructuring officers at All
5  Year, who made decisions.
6            And just so the record is clear,
7  there's no additional person, no other person
8  at Fee Owner who just makes decisions on behalf
9  of Fee Owner?
10           MS. GOLDBERG:  Objection.
11     A.    Fee Owner has no employees.  I'm
12 just trying to -- I apologize.
13           I'm just not fully understanding the
14 question.
15     Q.    I think you answered.  I just wanted
16 to make the record clear.
17           I thought you said there is no other
18 person.
19     A.    There's no other physical person.
20 Exactly.
21     Q.    Okay.
22           Mr. Diamond, do you -- you're
23 obviously familiar with the involuntary
24 bankruptcy case that the parties, whom I'll
25 refer to as the petitioning creditors, which by

Page 18

```
                    E. DIAMOND
 1
 2   the way, that consists of, just so the record
 3   is clear and we're on the same page, Mishmeret
 4   and then three other bondholders who signed on
 5   to the petition.
 6          If I refer to them all as the
 7   petitioning creditors, is that okay?
 8      A.   That's okay.
 9      Q.   Okay.
10          And you're aware that they filed an
11   involuntary Chapter 11 case against Fee Owner,
12   right?
13      A.   I am.
14      Q.   And do you believe that the
15   involuntary case moving forward is in the best
16   interests of Fee Owner?
17      A.   Now that it's been filed, yes.
18      Q.   Why do you say now that it's been
19   filed?
20      A.   Now, that we have the ability to be
21   in bankruptcy, I think it -- and where we find
22   ourselves, I think we can try to resolve many
23   issues at Fee Owner that have been pending.
24      Q.   Okay.
25          Well, prior to it having been
```

Page 19

```
                    E. DIAMOND
 1
 2   filed -- I'm just trying to understand why you
 3   answered the question the way you did.
 4          Prior to it having been filed, at
 5   that time, did you believe that an involuntary
 6   bankruptcy was in Fee Owner's best interest?
 7          MS. GOLDBERG:  Object to form.
 8      A.   Prior to which time, the petition?
 9      Q.   That's correct.
10      A.   If you're asking -- my personal view
11   is I, you know, I wasn't -- I didn't think that
12   they -- I didn't think that an involuntary
13   bankruptcy was necessarily the best path
14   forward, you know, prior to the filing.
15          But once it was filed, I think it's
16   an efficient way for us to move forward and
17   resolve all matters at Fee Owner in order to
18   enhance the value for everybody.
19      Q.   Okay.
20          When you say that you didn't
21   necessarily think it was the best path
22   forward --
23      A.   You would have asked my opinion.
24          MS. GOLDBERG:  Just let Nick finish
25      the question, please.
```

Page 20

```
                    E. DIAMOND
 1
 2          THE WITNESS:  Sorry.
 3      Q.   Well, I think you were starting to
 4   answer, and I was going to ask you what you
 5   meant by -- what you meant by that.
 6      A.   My personal opinion was that I don't
 7   know if I would have filed it.  But once it was
 8   filed, I am supporting of it.
 9      Q.   Why would you not have filed it?
10      A.   Again, we were in the middle of a
11   confirmation proceeding, as you know, for the
12   larger case.  And I think it was a distraction
13   to me, personally, at that time since we were
14   trying to move forward.
15      Q.   Do you have any understanding of
16   what anyone else at All Year's -- strike that.
17          Do you have any understanding of
18   whether anyone else at All Year had a view at
19   that time, prior to the filing of the petition,
20   as to whether or not it was in the best
21   interest of Fee Owner?
22          MS. GOLDBERG:  Objection.
23      A.   I don't.
24      Q.   Well, what you said earlier is that
25   you said you personally did not think that an
```

Page 21

```
                    E. DIAMOND
 1
 2   involuntary bankruptcy was necessarily the best
 3   path forward.
 4          What other paths forward could there
 5   have been?
 6          MS. GOLDBERG:  Objection.
 7      A.   Not filing an involuntary.
 8      Q.   Okay.
 9          And what would have happened if no
10   involuntary was filed?
11      A.   Well, we -- like I said, we were in
12   we were in the middle of a -- trying to keep
13   our larger deal together and move forward
14   towards confirmation.
15          We've had litigation pending against
16   your -- your client, as well, as you know.  And
17   so, that litigation would keep moving forward
18   and we would focus there.  And then, you know,
19   just keep moving forward that way until we had
20   solidified our plan and exit for the major, you
21   know, for the main case.
22      Q.   Okay.
23          But is it your understanding that at
24   some point a path forward for Fee Owner needed
25   to be arrived at?
```

Page 22

E. DIAMOND

1
2    A.    Eventually, yeah.  We needed to
3  resolve those issues that are pending there,
4  including the fact that we're not paying our
5  mortgage and the fact we have guaranty claims,
6  and so on and so forth.  Those all have to be
7  resolved.
8         So your question is, you know,
9  whether the timing of that was okay.  Like I
10  said, I was not supportive of -- in the sense
11  of the timing.  But eventually, all those
12  issues do need to be resolved.
13         And a bankruptcy process is
14  certainly the most efficient way, and one that
15  will allow us to resolve that in the greatest
16  -- by enhancing the value for all the
17  constituencies at Fee Owner.
18    Q.    Why is a bankruptcy the most
19  efficient way?
20    A.    Because I think we can deal all of
21  the issues in one single form.
22    Q.    Okay.
23         What are all of the issues?
24    A.    Like I said, the guaranty claims,
25  the mortgage claims, issues that we're having

Page 23

E. DIAMOND

1
2  with our lessee.
3         And, you know, at the moment we're
4  hamstrung in our abilities to resolve those,
5  because we have, as you know, the -- your
6  client has stopped paying the -- on the lease,
7  so we don't have any ability to pay the
8  mortgage.  We don't have any ability to
9  restructure the mortgage because we don't have
10  any payments coming.  We can't show that we
11  have income in order to do that.
12         So, like I said, having an efficient
13  way to resolve all of those issues is certainly
14  in the best interest of all parties, including
15  your client, as a 50 percent owner, by the way.
16    Q.    All right.
17         So we'll get into some of those
18  comments that you mentioned in more detail in a
19  moment.
20         But I just want to go back.
21         So the question that I asked you
22  was:  What are -- you had said you thought that
23  bankruptcy was the most efficient form to
24  resolve all of Fee Owner's issues.
25         I asked you:  What are all of those

Page 24

E. DIAMOND

1
2  issues?
3         You told me the guaranty claims, and
4  the mortgage claims, and then issues with the
5  lessee; is that right?
6         MS. GOLDBERG:  Object to the form.
7    A.    Correct.
8    Q.    And the -- the guaranty claims, just
9  so we're on the same page, that's the claims
10  that the Series C bondholders hold against Fee
11  Owner under the guaranty of the Series C bonds
12  issued by All Year; is that right?
13    A.    Correct.
14    Q.    And then the mortgage claim, are you
15  generally referring there to the claim that the
16  Series C bondholders, by way of assignment from
17  All Year, hold against Fee Owner on the -- the
18  noted mortgage that was issued in, I think,
19  February of 2017?
20    A.    Correct.
21    Q.    And then the issues with the lessee
22  that you described, those are in the -- those
23  are before the New York court in the litigation
24  that was commenced in June of 2021; is that
25  right?

Page 25

E. DIAMOND

1
2    A.    Correct.
3    Q.    Okay.
4         So other than the guaranty claims,
5  the mortgage claims, and the issues with the
6  lessee in the New York litigation, are there
7  any other issues of Fee Owner that would be
8  resolved in an involuntary case?
9         MS. GOLDBERG:  Objection.
10    A.    I couldn't say at this time.  There
11  may be other issues that come up, that could be
12  dealt with.
13    Q.    So I think you started to touch on
14  this a little bit.
15         But when considering whether an
16  involuntary bankruptcy case is in the best
17  interest of Fee Owner, did you consider the
18  interests of multiple stakeholders of Fee
19  Owner?
20         MS. GOLDBERG:  Objection.
21    A.    Yes.
22    Q.    And which stakeholders' interests
23  did you consider?
24    A.    The creditors and the equity owners.
25    Q.    When you say the creditors, who are

Page 34

E. DIAMOND

1                         E. DIAMOND
2 will represent to you this is, and you'll see
3 the Bates stamp at the top, but this is the
4 answer that Fee Owner filed in response to the
5 involuntary petition.
6          And if you would scroll to page 16
7 of the PDF, you will find a document entitled
8 declaration of yourself in support of the
9 answer.
10    A.   Okay.
11    Q.   Do you see that?
12    A.   I do.
13    Q.   Do you recognize this document?
14    A.   I do.
15    Q.   Did you prepare this declaration?
16    A.   I worked together with my counsel on
17 it.
18    Q.   And is it -- and you authorized the
19 electronic signature of this document on
20 page 9?
21    A.   Yes.  Oh, yes, that I authorized it.
22          I don't know that it's on page 9.  I
23 didn't scroll that fast.
24    Q.   That's okay.
25          And would everything in this

Page 35

E. DIAMOND

1                         E. DIAMOND
2 declaration be true and accurate, as far as you
3 know?
4    A.   To the best of my knowledge.
5    Q.   Okay.
6          Could you please scroll to page 10,
7 internal page 10 of the document, which also is
8 page 10 of the PDF, I guess.
9    A.   I'm sorry.  My declaration or?
10    Q.   Oh, I'm sorry.
11          I -- I -- your declaration and the
12 answer are very similar.
13          So I was looking at the wrong
14 document for a moment.
15          MS. GOLDBERG:  So it is page 10 of
16    the answer?
17          MR. BASSETT:  No, I'm sorry.  I went
18    to the wrong document on my screen.  I
19    meant to stay in his declaration.
20 BY MR. BASSETT:
21    Q.   So this is page 8 of your
22 declaration, which is page 23 of the PDF.
23    A.   Okay.
24    Q.   And do you see where it says at the
25 top of that page, LLC agreement restrictions on

Page 36

E. DIAMOND

1                         E. DIAMOND
2 consent to bankruptcy proceedings?
3    A.   Correct.
4    Q.   Okay.
5          And then the paragraph 32 talks
6 about Section 5.25, which we were just looking
7 at.
8          And then paragraph 33 says, under
9 Section 5.10 (as read):  Managing member -- and
10 that is defined earlier as YGWV -- is similarly
11 barred from, without unanimous consent of
12 members, causing any direct or indirect
13 subsidiary of Member LLC to take any of the
14 foregoing actions.
15          Do you see that?
16    A.   I see that.
17    Q.   Okay.
18          So now, do you recall, is it your
19 understanding that Section 5.25 of Exhibit 1
20 that we were looking at also applies to actions
21 that Member LLC would take on behalf of Fee
22 Owner?
23          MS. GOLDBERG:  Objection.
24    A.   I would have to see the sections
25 again.  I'm sorry.

Page 37

E. DIAMOND

1                         E. DIAMOND
2          I mean, I see what's written.
3    Q.   Okay.
4          Well, I mean you -- okay.
5          Let's look back at Exhibit 1 then.
6          We were on page 5.  If you scroll
7 down to page 6, you'll see Section 5.2.10.
8    A.   Okay.
9    Q.   And I think your declaration
10 actually may have had a typo in that it
11 referred in paragraph 33 to 5.10 instead of
12 5.2.10.
13          (Document review.)
14    Q.   So I'll ask my question again.
15          Do you understand that those
16 restrictions in Section 5.2.5 that we had
17 discussed apply to actions that Member LLC
18 would take on behalf of Fee Owner?
19          MS. GOLDBERG:  Objection.
20    A.   Correct.
21    Q.   Okay.
22          And do you have a view as to whether
23 the things we discussed that Fee Owner has
24 filed with the Court and the positions that it
25 has taken with the Court, whether those things

Page 38

E. DIAMOND

1
2 are consistent with Sections 5.25 and Sections
3 5.2.10 of the Member LLC agreement?
4         MS. GOLDBERG:  Objection.
5     Calls for a legal conclusion.
6 BY MR. BASSETT:
7     Q.    You can answer.
8     A.    It is my understanding with, after
9 consulting with counsel, that we --
10        MS. GOLDBERG:  Please, I don't want
11    you to testify about anything that you
12    spoke about with counsel.
13        THE WITNESS:  Okay.
14        MS. GOLDBERG:  Can you answer the
15    question without disclosing privileged
16    communications with counsel?
17        THE WITNESS: No.
18 BY MR. BASSETT:
19    Q.    Well, as a layperson, not a lawyer,
20 you understand what it means to consent to
21 something, right?
22    A.    Yes.
23    Q.    How would you define what that
24 means?
25    A.    Gosh.  How would I define consent?

Page 39

E. DIAMOND

1
2        It's a fraught question nowadays.
3        Consent, I mean, either supporting,
4 agreeing to.
5     Q.    Thank you.
6        Sorry.  Let me -- just give me one
7 moment, please.
8     A.    Sure.
9        (Document review.)
10 BY MR. BASSETT:
11    Q.    So, Mr. Diamond, you said you were
12 appointed to be the associate restructuring
13 officer of All Year in December of 2020; is
14 that right?
15    A.    December 30th, I believe, 2020.
16    Q.    December 30, 2020.  Okay.
17        And how did you come to be involved
18 with All Year and end up taking that position?
19    A.    How did I -- I had previously been
20 working for an unrelated company that had
21 issued bonds in Israel, doing a restructuring
22 for them.  And as that was winding down, I had
23 heard that All Year was having some financial
24 issues and trouble, and reached out to the
25 board of directors of All Year to see if they

Page 40

E. DIAMOND

1
2 could use some help.
3        And as luck would have it, they did.
4     Q.    So you reached out affirmatively to
5 the board of directors of All Year to see if
6 they could use help?
7     A.    Correct.
8     Q.    Anyone specific on the board?
9     A.    I don't recall.  I think it was -- I
10 reached -- I find out who their counsel was.
11    Q.    And who was that?
12    A.    The woman I spoke with was Sherrell
13 Guttman (phonetic).
14    Q.    And is she at a law firm?
15    A.    She is.  She's a lawyer.
16    Q.    At what law firm?
17    A.    I -- I don't recall.  She's no
18 longer -- she was representing some of the
19 independent directors back then.
20    Q.    Okay.
21        Prior to this case, did you have any
22 relationship with Yoel Goldman?
23    A.    No.
24    Q.    Did you speak to him prior to your
25 appointment?

Page 41

E. DIAMOND

1
2     A.    I don't -- I don't recall.
3     Q.    Did you speak to anyone -- you know
4 who Mishmeret -- am I pronouncing that
5 correctly, from your perspective?
6     A.    Mishmeret, yeah.
7     Q.    You're familiar with Mishmeret Trust
8 Company?
9     A.    I am now.
10    Q.    And what's their role in this case?
11    A.    They are the trustee for the various
12 series of bonds, All Year.
13    Q.    The B through E?
14    A.    B through E.
15    Q.    And did you have any contact with
16 anyone at Mishmeret prior to your appointment?
17    A.    I may have spoken with somebody.
18 Once I was being vetted, I think I spoke with
19 somebody either from Mishmeret or one of their
20 lawyers.
21    Q.    How about -- are you aware that
22 there's a committee of Series C bondholders?
23    A.    No.
24    Q.    Are you aware of a person named
25 Osnat Tenenbaum, for example?

Page 50

E. DIAMOND

1
2      I'm sorry, sorry.  I'm thinking the
3  wrong way.  It was after the housing bubble
4  burst, not before.
5      Q.   Oh, okay.
6      A.   It must have been like 2010, '11.
7      Q.   Got it.  Got it.  Okay.
8           Any other involuntary cases you
9  recall?
10     A.   Not that I recall.
11     Q.   Before I asked you if you had -- had
12 been deposed, and we talked about that.  I
13 think you said once when you were at Paul
14 Weiss.
15          I'm not sure if I asked you, have
16 you ever testified in court before?
17     A.   No.
18     Q.   I assume you submitted declarations
19 before in past cases, though, right?
20     A.   I've submitted, yes.
21     Q.   Okay.
22          Fee Owner's counsel in this matter
23 is the Herrick law firm, right?
24     A.   Correct.
25          MR. MEHLMAN:  Herrick, Feinstein.

Page 51

E. DIAMOND

1
2      Q.   Herrick, Feinstein.
3           Does Herrick -- does Herrick also
4  serve as counsel to YGWV?
5      A.   I'm -- I don't think so.
6      Q.   Does Herrick also serve as counsel
7  to All Year?
8      A.   No.
9      Q.   Herrick is not counsel to All Year?
10     A.   I don't believe we've -- I don't
11 think they've been retained by All Year.
12     Q.   Does Herrick represent Fee Owner in
13 the state court litigation?
14     A.   Yes.
15     Q.   Does Fee Owner engage in any other
16 business other than leasing the William Vale
17 hotel complex to Wythe Berry LLC?
18     A.   Not that I'm aware of.
19     Q.   What's your understanding of the
20 assets that Fee Owner owns?
21     A.   Fee Owner owns -- my understanding
22 is that it owns the ground and the building
23 upon which the hotel, you know, the physical
24 plant of the hotel, and the office complex and
25 parking.

Page 52

E. DIAMOND

1
2      Q.   And is it okay if we refer to that
3  as the William Vale complex today?
4      A.   Sure.
5      Q.   Does, to your knowledge, Fee Owner
6  own any other assets other than the William
7  Vale complex?
8      A.   Not that I'm aware of.
9      Q.   One second.
10          If I could direct your attention to
11 Exhibit 2, which is your declaration.
12          It's Tab 2, also.
13     A.   Okay.
14     Q.   I'd like you to look at paragraph 3,
15 please.
16          And in particular -- well, I'll just
17 read it to you, and you can read it yourself as
18 well.
19          But it says (as read):  As a result
20 of Weiss's obstruction, Fee Owner now finds
21 itself embroiled in multiple litigations and
22 faces the prospect of imminent foreclosure with
23 few means available other than proceeding as a
24 Chapter 11 debtor in possession to remedy the
25 situation.

Page 53

E. DIAMOND

1
2      Do you see that?
3      A.   I do.
4      Q.   When you said that Fee Owner finds
5  itself embroiled in multiple litigations, what
6  litigations were you referring to?
7      A.   The state litigation, where, you
8  know, where we're suing your client for
9  nonpayments.
10          And also, obviously, now the
11 involuntary.  We're involved in that as well.
12     Q.   Any other litigations?
13     A.   Subsequent, we were also -- I don't
14 remember the exact date, but I think there's
15 now some mechanic lien litigation that was
16 initiated because apparently your client
17 stopped paying his vendors.
18     Q.   When you say apparently my client
19 stopped paying his vendors, what's your basis
20 for that statement?
21     A.   Because they're mechanic liens and
22 they're, you know, like he's running the
23 operations of the hotel.  So presumably, they
24 arose from services he requested.
25     Q.   Do you understand -- well, are you

Page 54

E. DIAMOND

1    familiar with the particular mechanic's liens
2    that have been asserted?
3        A.    No, not specifically.
4        Q.    And is it possible that those
5    mechanic's liens resulted from the failure of a
6    sublessee to make payments?
7        MS. GOLDBERG:  Objection.
8        A.    I believe many of the sublessees are
9    your client as well.  That's my understanding,
10   so, I guess.
11       Q.    Is it -- is it possible that those
12   mechanic's liens could have resulted from a
13   sublessee that's not controlled by my client?
14       MS. GOLDBERG:  Objection.
15       A.    Anything is possible.
16       Q.    Yes.
17           You wouldn't know if that were true,
18   right?
19       MS. GOLDBERG:  Objection.
20       A.    Sitting here today, no.
21       Q.    When you said there's -- you think
22   there's litigation related to mechanic's liens,
23   what litigation are you referring to?
24       A.    Litigation -- I mean, I think there

Page 55

E. DIAMOND

1    was a lawsuit filed.
2        Q.    How many mechanic's liens are you
3    aware of?
4        A.    One or two offhand.
5        Q.    Do you -- what are those, do you
6    remember?
7        A.    I don't remember offhand.
8        Q.    And you think one of those two --
9    one of those two parties that asserted a
10   mechanic's lien has also filed litigation?
11       A.    Correct.
12       Q.    Okay.
13           So you're aware of that mechanic's
14   lien litigation, the New York State Court
15   litigation, and this involuntary.
16           Is there any other litigation that
17   Fee Owner is involved in?
18       A.    Well, there was an adversary
19   proceeding.  But I don't recall if Fee Owner
20   was a named party offhand.
21       Q.    Anything else?
22       A.    But that's been resolved in our
23   favor.
24       Q.    Anything else?

Page 56

E. DIAMOND

1        A.    Not that I can recall.
2        Q.    And just to be clear, I was asking
3    you about paragraph 3 of your declaration.
4            Were you aware of this mechanic lien
5    litigation at the time you signed this
6    declaration?
7        A.    I don't recall.
8        Q.    Paragraph 3 also says that -- well,
9    before I go there.  We may have covered this
10   partially before, but I'm going to ask it more
11   generally.
12           Can you tell me all of the claims
13   that have been asserted against Fee Owner --
14       MS. GOLDBERG:  Objection.
15       Q.    -- by persons who purport to be
16   creditors of Fee Owner?
17       MS. GOLDBERG:  Sorry.  Objection.
18           Sorry, Nick.  I didn't mean to cut
19   you off.
20       MR. BASSETT:  That's okay.
21       A.    Say that again.
22       Q.    I want to understand all of the
23   claims that you are aware of that have been
24   asserted against Fee Owner by potential

Page 57

E. DIAMOND

1    creditors.
2        MS. GOLDBERG:  Objection.
3        A.    All of the claims asserted by
4    potential --
5        Q.    Strike that.
6            Maybe the word asserted is
7    misleading.
8            I just want to understand your --
9    what you know about the universe of claims that
10   exist against Fee Owner.
11       A.    To the best of my knowledge, we have
12   claims being asserted by -- we have claims by
13   our bond Cs, both in a guaranty form and also
14   as part of the mortgage.
15           And now, I've become aware of some
16   mechanic liens as well.  Although, you know,
17   other than those, I'm not aware of any.
18       Q.    Well, do you have an understanding,
19   does a holder of a mechanic's lien actually
20   have a claim against the -- against, in this
21   case, Fee Owner?
22       MS. GOLDBERG:  Objection.
23           Calls for a legal conclusion.
24       A.    I -- I know they've been asserted

Page 58

E. DIAMOND

1  against Fee Owner.  You know, I -- I don't know
2  if they're -- you know, I would have to ask
3  counsel if they would be claims or not, or how
4  you would characterize them.
5       Q.    Okay.
6             Well, a mechanic's lien is a lien
7  that's asserted against property, right?
8             MS. GOLDBERG:  Objection.
9       A.    Correct.
10      Q.    And -- and is it -- do you have any
11  understanding as to whether or not that holder
12  of that mechanic's lien also has a claim
13  against the owner of the property?
14            MS. GOLDBERG:  Objection.
15      A.    I don't.
16      Q.    So other than the Series C bond
17  claims, and potentially these mechanic
18  lienholder's claims, are you aware of any other
19  claims against Fee Owner?
20      A.    Sitting here today, I'm not aware of
21  any other claims.  But that's also because we
22  don't have perfect information about the hotel.
23            As you've know, we've been asking
24  your client for information for quite a long

Page 59

E. DIAMOND

1  time.  And so, sitting here today, that's the
2  universe of claims that I know of.
3       Q.    Okay.
4             Also, in paragraph 3, you say that
5  Fee Owner faces the prospect of imminent
6  foreclosure.
7             Do you see that?
8       A.    I do.
9       Q.    What's the basis for that statement?
10      A.    The basis for that statement is that
11  we haven't been able to pay our mortgage
12  because your client hasn't been paying the
13  lease payments.
14            And so, the holder of the mortgage
15  has been demanding payment and, you know, their
16  rights are to foreclose against us.
17      Q.    When was there first a default under
18  the mortgage?
19      A.    I believe February 2021.  The first
20  time your -- the first time your client failed
21  to pay.
22      Q.    So is what you're saying that --
23  what your testimony is, is that Fee Owner has
24  been facing the prospect of imminent

Page 60

E. DIAMOND

1  foreclosure since February 2021?
2             MS. GOLDBERG:  Objection.
3       A.    We've been facing the prospect of
4  foreclosure since then, yes.
5       Q.    Why do you say in paragraph 3 that
6  foreclosure is now imminent?
7       A.    Well, as -- you know, it's been
8  almost two years since we've been in there.
9  And I think, as you know, witnessed by the
10  filing of the involuntary, the creditors have
11  gotten restive again.  So...
12      Q.    Have the creditors ever told you --
13  and when you say creditors, you mean the Series
14  C bondholders, right?
15      A.    Correct.
16      Q.    Have they ever told you that they
17  were planning to foreclose on the William Vale
18  complex?
19            MS. GOLDBERG:  Objection.
20      A.    I don't recall.
21      Q.    Other than the fact that the
22  involuntary was filed, is there any other
23  reason why you believe foreclosure is imminent?
24      A.    Nothing specific.

Page 61

E. DIAMOND

1       Q.    You also say in paragraph 3 that Fee
2  Owner has been left with few means available
3  other than proceeding as a Chapter 11 debtor in
4  possession to remedy their situation.
5             Do you see that?
6       A.    I do.
7       Q.    So you said few means available
8  other than proceeding as a Chapter 11 debtor.
9             So what were the other means
10  available as of the date you wrote this
11  declaration?
12      A.    I --
13      Q.    If you recall.
14      A.    Sorry?
15      Q.    I'm just asking you what you meant
16  there.
17            So what were the few other available
18  means that Fee Owner could've used to remedy
19  its situation?
20      A.    Well, with few means meaning almost
21  no means.  All right.  With almost no means,
22  with few means available.
23            I mean, a negotiation was always
24  available.  But it wasn't getting anywhere

Page 78

```
                    E. DIAMOND
1
2       A.    Yes.
3       Q.    Has the Court, to your knowledge,
4  ruled on the merits of that claim for default
5  for that reason?
6             MS. GOLDBERG:  Objection.
7             Calls for legal conclusion.
8       A.    I don't think the Court has yet
9  ruled on that.
10      Q.    Prior to the litigation being
11 commenced, are you aware that there were some
12 discussions that occurred between Mr. Weiss,
13 All Year, and Mishmeret about potential
14 resolution of disputes under the note and
15 mortgage?
16      A.    What was the time frame?
17      Q.    Prior to the June 2021 litigation,
18 in or around May of 2021.
19      A.    I know there have been various
20 discussions throughout time.  I don't recall
21 specifically the time frame, you know, prior to
22 the litigation.
23      Q.    Do you recall any discussion at or
24 around that time with Mr. Weiss and with Wythe
25 Berry lessee about the entry into a potential
```

Page 79

```
                    E. DIAMOND
1
2  nondisclosure agreement?
3       A.    I remember there was a discussion
4  regarding that, yes.
5       Q.    I'm going to ask my colleague if he
6  could put that document on the screen, please.
7             MS. GOLDBERG:  And, Nick, I just
8        want to say that I think this is kind of
9        far afield from the reasons why we're here
10       today.  So we'll allow some limited
11       questioning.
12            But I hope you're not planning to
13       take up a lot of time on this.
14            MR. BASSETT:  Well, I'm not -- I'm
15       not planning to take up necessarily a lot
16       of time.
17            And hopefully, frankly, I hope this
18       deposition does not take too long at all.
19            But I do think this line of inquiry
20       is relevant, especially considering
21       Mr. Diamond's testimony about the other
22       available option of negotiating a solution.
23            And also -- and also about this
24       information regarding, you know,
25       information, nondisclosure in particular.
```

Page 80

```
                    E. DIAMOND
1
2        That's why this line of questioning is
3        relevant.
4             MS. GOLDBERG:  Well, I will
5        respectfully disagree.
6             But I said we'll allow it for some
7        time.  And hopefully, it just is not going
8        to be a lot of time at this deposition.
9             MR. BASSETT:  Okay.
10 BY MR. BASSETT:
11      Q.    So, Mr. Diamond, this document that
12 I've put on the screen will be marked by the
13 court reporter as Diamond Exhibit 4.
14            (Diamond Exhibit 4, Nondisclosure
15       Agreement, marked for identification.)
16 BY Diamond
17      Q.    Mr. Diamond, do you recognize this
18 document?
19      A.    Not this one specific.  I mean, it
20 looks familiar.
21      Q.    Okay.
22            Is it possible that this is draft of
23 a nondisclosure agreement -- strike that.
24            Do you recognize this as a
25 nondisclosure agreement that had been
```

Page 81

```
                    E. DIAMOND
1
2  negotiated between Mr. Weiss and All Year with
3  respect to the disclosure of confidential
4  information?
5             MS. GOLDBERG:  Objection.
6       A.    I mean, that's what it purports to
7  be.  I know there was some draft
8  back-and-forth.  I don't know which version
9  this is.
10      Q.    Did you have any involvement in that
11 back-and-forth?
12      A.    Yes.
13      Q.    And what was your involvement?
14      A.    Just on behalf of the company,
15 trying to negotiate a nondisclosure agreement.
16      Q.    So you were leading that effort on
17 behalf of the company?
18            MS. GOLDBERG:  Objection.
19      A.    I don't recall if I was leading it.
20      Q.    Okay.
21            Do you recall if this nondisclosure
22 agreement was ultimately executed?
23            MS. GOLDBERG:  Objection.
24      A.    A nondisclosure agreement was never
25 signed.
```

Page 82

E. DIAMOND

2      Q.    And do you have any understanding of
3  why not?
4      A.    My recollection is that we couldn't
5  get to an agreement on the terms and the
6  negotiation since fell away.
7      Q.    Do you recall anything about why you
8  were not able to reach an agreement on the
9  terms?
10     A.    My recollection is that the demands
11  -- we were being asked to circumscribe our
12  rights under the -- under our current -- the
13  NDA was going to limit our rights that were
14  under our current, you know, under the lease.
15          And so, we felt like ultimately that
16  those were terms we couldn't live with.
17     Q.    So it was -- it was All Year's
18  decision?
19          MR. BASSETT:  I'm getting background
20     noise from somewhere.
21          MS. GOLDBERG:  Yeah, it's actually
22     outside of the conference room.
23          Let me just poke my head out and --
24          THE WITNESS:  Scream at them.
25          MS. GOLDBERG:  Please just hold the

Page 83

E. DIAMOND

2  question.
3          THE WITNESS:  Yeah, sure.
4          MS. GOLDBERG:  Sorry about that.
5      A.    Can you repeat the question.
6      Q.    Sure.
7          So it was All Year's decision
8  ultimately not to sign an NDA with Mr. Weiss?
9          MS. GOLDBERG:  Objection.
10     A.    I mean, we certainly made a
11  decision.  I think -- I don't know if it was
12  just ours.  It could have been Mr. Weiss's.
13          I don't remember how it concluded.
14     Q.    Was Mishmeret, or were the Series C
15  bondholders involved at all in the decision of
16  whether or not to enter into a nondisclosure
17  agreement with Mr. Weiss?
18     A.    I don't recall specifically.
19     Q.    Do you ever recall getting to a
20  point where there was a final draft of a
21  nondisclosure agreement that was ready to be
22  executed?
23          MS. GOLDBERG:  Objection.
24     A.    I don't recall.  Like I said, there
25  were many drafts back and forth.

Page 84

E. DIAMOND

2      Q.    Who -- and was the idea while this
3  was being negotiated that this nondisclosure
4  agreement would allow for the provision of the
5  information that Fee Owner ultimately ended up
6  seeking in the New York litigation?
7          MS. GOLDBERG:  Objection.
8      A.    I'm sorry.  I didn't follow that.
9      Q.    Well, we discussed earlier that, you
10  know, one of the claims in the New York
11  litigation is that All Year -- sorry, one of
12  the claims we discussed earlier is that one of
13  the -- strike that again.
14          Earlier, we discussed that one of
15  the claims in the New York litigation brought
16  by Fee Owner is that Wythe Berry LLC has
17  breached an obligation to provide certain
18  information, right?
19     A.    Correct.
20     Q.    And what I'm asking is whether it's
21  your understanding that this nondisclosure
22  agreement or some other version of it that was
23  being negotiated, generally whether the idea
24  was that this nondisclosure agreement would
25  provide for the provision of that same

Page 85

E. DIAMOND

2  information?
3          MS. GOLDBERG:  Objection.
4      A.    I don't recall if this, the
5  provision, the information being sought between
6  both of them was, you know, coterminous.
7          But -- and whether or not the
8  provision under the nondisclosure agreement
9  would've satisfied the -- if that's your
10  question.  I don't know.
11     Q.    Okay.
12          But was it the same type of
13  information generally?
14          MS. GOLDBERG:  Objection.
15     A.    Generally, yeah, because it's the
16  same relevant information.
17     Q.    Okay.
18          Who was counsel to Fee Owner at the
19  time of the negotiation of the NDA?
20     A.    I don't recall who was representing
21  us then.
22     Q.    Had -- had Fee Owner retained
23  Herrick at that time?
24     A.    I don't believe so.
25     Q.    When was Herrick retained?

E. DIAMOND
1
2     A.    Around the time the litigation was
3 commenced.
4     Q.    So Herrick was retained for the
5 purpose of commencing the litigation?
6     A.    Correct.
7     Q.    Another claim in the New York
8 litigation that we discussed was -- well, there
9 were two claims.
10          One, there was a claim that Fee
11 Owner brought asking for a declaration that the
12 lease had been terminated, right?
13    A.    I believe so, yes.
14    Q.    And then another claim asking for
15 ejectment; is that right?
16    A.    I'll take your word for it.  Okay.
17    Q.    Well, to your knowledge, has the New
18 York court issued a ruling, a final ruling on
19 either of those claims?
20          MS. GOLDBERG:  Objection.
21    A.    No.
22    Q.    And do you understand that Mr. Weiss
23 is contesting those claims?
24          MS. GOLDBERG:  Objection.
25    A.    Correct.

E. DIAMOND
1
2     Q.    And you understand that Wythe Berry
3 LLC is also contesting those claims?
4          MS. GOLDBERG:  Objection.
5     A.    Correct.
6     Q.    Are you aware that in the New York
7 litigation, Fee Owner sought a preliminary
8 injunction to enjoin Wythe Berry LLC from
9 advertising or entering into new leases on the
10 premises on the grounds that Fee Owner had
11 asked the Court in the litigation to have Wythe
12 Berry LLC ejected from the premises?
13          MS. GOLDBERG:  Objection.
14    A.    Not to my recollection.
15    Q.    And are you aware of if the Court
16 ever issued a ruling on that request for
17 preliminary injunction?
18    A.    I believe the Court entered an order
19 or issued a ruling.
20    Q.    And what did that ruling say?
21    A.    I don't remember the specifics.  But
22 maybe some granting the lessee some limited
23 rights to continue to do so.
24          But I don't recall specifically.
25    Q.    Do you recall if the Court denied

E. DIAMOND
1
2 the preliminary injunction?
3     A.    I don't remember specifically.
4          MR. BASSETT:  Will, can you put the
5 December 6th order on the page, please.
6          MS. GOLDBERG:  Nick, again, I'm --
7 are we going to go through the entire
8 procedural history of the New York
9 litigation in this deposition?
10          I don't see what the purpose of that
11 is for the issues that are going to be
12 addressed by the Court in a week.
13          MR. BASSETT:  I will caveat all of
14 my questions, Janice, on this topic with
15 the fact that I agree with you that all of
16 the procedural history of the New York
17 litigation is not relevant.
18          The problem that I have is that
19 Mr. Diamond, in his declaration, and Fee
20 Owner, in its answer, have chronicled the
21 entire history.  So I -- no, I don't see
22 how I cannot ask some of these questions.
23          MS. GOLDBERG:  Well, you know, in
24 the adversary proceeding there was a joint
25 stipulations of facts as to certain events

E. DIAMOND
1
2 that had occurred.
3          So I think that's one way that this
4 could resolved without needing to spend
5 time in this deposition asking these
6 questions.
7          Because I don't really think that
8 there's any factual dispute about what
9 procedurally has occurred.
10          MR. BASSETT:  All right.
11          I'll tell you what.  I don't agree
12 that -- that there's not a need for us to
13 explore these topics.
14          Again, the only reason I'm doing it
15 is because they were put at issue in the
16 declaration.  I otherwise wouldn't be.
17          And I, you know, reserve all rights
18 with respect to whether it's appropriate to
19 ask Mr. Weiss these questions.  I think
20 it's absolutely not, because we didn't put
21 them at issue.
22          But I'll tell you what, for right
23 now, I won't ask about that particular
24 document because I think the December 6th
25 order speaks for itself.

Page 150

E. DIAMOND

1
2     Q.    Generally familiar with its terms,
3  at least at a high level?
4     A.    Yes.
5     Q.    Is it -- is it your understanding
6  that the All Year plan, as it currently exists,
7  would transfer All Year's membership interest
8  -- strike that.
9           Is it your understanding that under
10 the All Year plan, All Year's interest in YGWV
11 would be transferred to Wind Down Co. upon the
12 effective date?
13    A.    Yes.
14    Q.    And then do you understand that
15 creditors in Class 4 of the plan would have
16 claims against -- well, would be paid by, so,
17 you know, whatever proceeds Wind Down Co. is
18 able to generate from the sale of that
19 interest?
20          MS. GOLDBERG:  Objection.
21    A.    The answer is yes.  I just don't
22 recall if it's Class 3 or Class 4.
23          I'll take your word that it's
24 Class 4, though.
25    Q.    Okay.  Thank you.

Page 151

E. DIAMOND

1
2           I'll represent to you that it is
3  Class 4.
4     A.    Okay.
5     Q.    So -- and the plan does not say
6  anything about what the value of that YGWV
7  interest will be, right?
8     A.    No, it doesn't give values.  No.
9     Q.    So it doesn't warrant that the YGWV
10 interest is going to be at least a certain
11 dollar, worth a certain dollar amount, right?
12    A.    No.
13    Q.    So it's -- and, in fact, it's
14 possible that that interest could be valueless,
15 right?
16          MS. GOLDBERG:  Objection.
17    A.    Certainly possible.
18          I don't think so.
19    Q.    Why do you say you don't think so?
20    A.    So I'd like to -- my hope is that
21 it's worth something and the creditors of All
22 Year recover.
23          And the fact that people were
24 willing to buy it and fighting over it, tells
25 me that there's some value there.

Page 152

E. DIAMOND

1
2     Q.    Well, has All Year or Fee Owner ever
3  asked for an appraisal of the value of the YGWV
4  interest?
5          MS. GOLDBERG:  Objection.
6     A.    I'm sorry.  Of the interest?
7     Q.    Of All Year's interest in YGWV?
8     A.    We have an -- we ask -- we
9  commissioned an appraisal of the hotel itself.
10          But, as you know, absent having
11 relevant and timely information, it's very hard
12 to form an opinion about the value.  So we
13 don't have an independent appraisal of the
14 shares themselves.
15    Q.    When was that appraisal of the hotel
16 done?
17    A.    It was published in our disclosure
18 statement.  But maybe as of December -- the
19 dating is in the disclosure statement.
20          But it might have been as of the end
21 of 2021.
22    Q.    Do you remember who performed that
23 appraisal?
24    A.    No, I don't.
25          MR. BASSETT:  Will, can you put that

Page 153

E. DIAMOND

1
2  appraisal that we have in the chat, please.
3          MR. FARMER:  Apologies for a brief
4  delay.  I'm having a technical issue.
5          MR. BASSETT:  While we're waiting --
6  BY MR. BASSETT:
7     Q.    Mr. Diamond, do you understand that
8  the Class 4 creditors are the only impaired
9  class under the All Year plan?
10          MS. GOLDBERG:  Objection.
11    A.    Yes.
12    Q.    So in order for the All Year plan to
13 be confirmed, Class 4 needs to vote in favor of
14 the plan, right?
15          MS. GOLDBERG:  Objection.
16    A.    I don't recall -- I -- the technical
17 -- the technicalities of them.  But yes, we do
18 need Class 4 to vote in favor.
19    Q.    Okay.
20          And the Class 4 creditors consist
21 of, among other creditors, the holders of the
22 Series C bonds, right?
23          MS. GOLDBERG:  Objection.
24    A.    They are part of Class -- of
25 Class 4, yes.

E. DIAMOND

1
2      Q.    And who else is in Class 4, to your
3  recollection?
4      A.    Other noteholders.  Other classes of
5  noteholders.
6            There were some D&O indemnity
7  claims.
8            And I don't -- I don't -- the class
9  action claims I think we classified are a
10 different classification.
11     Q.    Do you know what -- do you know what
12 percentage, in terms of total dollar amount,
13 the Series C bond claims represent in Class 4?
14     A.    Not offhand, no.
15     Q.    Do you know if it's more than
16 one-third?
17     A.    Sitting here, I don't recall.
18     Q.    Well, do you know if the Series C
19 noteholders have what could be referred to as a
20 blocking position in Class 4?
21           MS. GOLDBERG:  Objection.
22     A.    Again, sitting here, I don't
23 remember the numbers specifically.
24     Q.    Do you recall ever discussing
25 whether they do, in fact, have a blocking

E. DIAMOND

1
2  position?
3           MS. GOLDBERG:  Objection.
4      A.    I do remember thinking about it.  I
5  don't remember the conclusion.
6      Q.    So if Fee Owner in its involuntary
7  case were to sell the William Vale complex for
8  less than whatever the total amount outstanding
9  under the Series C bonds is, would any value in
10 that scenario flow up to All Year as the
11 indirect 50 percent owner of Fee Owner?
12           MS. GOLDBERG:  Objection.
13     A.    I'm sorry.  Say that again.
14           I'm just following the steps you
15 laid out.
16     Q.    So the -- we've established that Fee
17 Owner is liable on the guaranty of the Series C
18 bonds, right?
19     A.    Yes.
20     Q.    Okay.
21           So if in bankruptcy Fee Owner were
22 to sell its assets and realize something less
23 than what is outstanding under the Series C
24 bonds, would there be anything, any value that
25 flows up to All Year as equity in that

E. DIAMOND

1
2  situation?
3           MS. GOLDBERG:  Objection.
4      A.    Certainly potentially, yes.  The --
5  again, in the context of a negotiated sale or
6  proceeding, then certainly.
7      Q.    Well, I'm positing a scenario in
8  which after the sale of Fee Owner's assets, Fee
9  Owner is insolvent.
10           So if -- and I'll just speak --
11 these aren't general numbers.  Just for purpose
12 of asking.  These aren't accurate numbers.  But
13 for purposes of asking the questions.
14           If you were to assume that the total
15 outstanding amount of the Series C bonds, the
16 obligations under the Series C bonds was
17 $190 million, then Fee Owner is liable on a
18 guaranty claim against it for up to
19 $190 million, right?
20           MS. GOLDBERG:  Objection.
21     A.    I don't know if it's dollar for
22 dollar exactly, but okay.  Roughly.
23     Q.    Okay.
24           Let's just assume that the guaranty
25 liability is $190 million.

E. DIAMOND

1
2      A.    Sure.
3      Q.    If the William Vale complex sells
4  for $160 million, in that situation would there
5  be any value that flows up to the equity
6  holders, to All Year and to Mr. Weiss of Fee
7  Owner?
8           MS. GOLDBERG:  Objection.
9      A.    Without any concessions on the
10 guaranty claim?
11     Q.    Right.
12     A.    Under a strict -- under those strict
13 numbers, then I would agree with you.
14     Q.    Okay.
15           But in that situation, the sale of
16 the note and mortgage for $160 million would
17 still reduce All Year's liability accordingly
18 on the Series C bonds, right?
19           MS. GOLDBERG:  Objection.
20     A.    Any -- any value received -- any --
21 if they receive 160 million for the note and
22 the mortgage, that would reduce their claim at
23 All Year.
24     Q.    Right.
25           The Series C, the Series C bond

Page 158

E. DIAMOND

1  claims against All Year are going to be reduced
2  by whatever the Series C bondholders end up
3  getting on account of the note and mortgage,
4  right?
5
6          MS. GOLDBERG:  Objection.
7      A.  That -- yes, correct.
8      Q.  Okay.
9          I don't know if my -- I think the
10 technical issue has been resolved.
11         MR. BASSETT:  Wow, this is a huge
12     document.
13         MS. GOLDBERG:  Yeah, it's going to
14     take a little bit of -- a few minutes to
15     download, probably.
16         MR. BASSETT:  While that's
17     downloading, why don't we take a quick
18     break.  I think that would be a better use
19     of our time.
20         And then I don't want to make
21     promises, because that's always dangerous,
22     but I don't think I have a whole lot left.
23         MS. GOLDBERG:  Great.  Okay.
24         So ten minutes, is that good, or do
25     you want even shorter?

Page 159

E. DIAMOND

1          MR. BASSETT:  Let's do ten, just in
2      case there are any technological issues.
3          MS. GOLDBERG:  Okay.
4          So we'll be back right before
5      2:00 p.m.
6          MR. BASSETT:  All right.  Thank you.
7          THE VIDEOGRAPHER:  Okay.
8          We're going off the record at
9      1:48 p.m.
10         This marks the end of media three.
11         (Recess is taken.)
12         THE VIDEOGRAPHER:  We are back on
13     the record at 2:02 p.m.
14         This marks the beginning of media
15     four.
16 BY MR. BASSETT:
17     Q.  Mr. Diamond, I think my colleague
18 was able to successfully upload the next
19 document.  At least I'm able to access it.
20     Are you able to access it, too?
21     Mr. Diamond, are you on mute?
22     A.  Sorry, yeah.  We were on mute.
23     Yes, I have it.
24     Q.  Okay.
25

Page 160

E. DIAMOND

1          This will be marked as Diamond
2  Exhibit 9.
3          (Diamond Exhibit 9, CBRE Appraisal
4      Report for the William Vale, marked for
5      identification.)
6          MR. BASSETT:  I believe that's where
7      we are.
8  BY MR. BASSETT:
9      Q.  And if you look at the first page,
10 this is the CBRE appraisal report for the
11 William Vale.
12     Have you seen this document before?
13     A.  Yes.
14     Q.  Is this the appraisal report that
15 you're referring to?
16     A.  Yes.
17     Q.  This is dated as of -- well, it was
18 sent by CBRE on February 23, 2022, right?
19     A.  Correct.
20     Q.  Okay.
21     And why -- why -- did Fee Owner
22 commission this appraisal report?
23     A.  I'm sorry?
24     Q.  Who commissioned this appraisal

Page 161

E. DIAMOND

1  report?
2      A.  We did.
3      Q.  We being All Year?
4          MS. GOLDBERG:  Objection.
5      A.  We being, you know, Asaf and myself.
6      Q.  Okay.
7          And why -- why did you seek the
8  appraisal at this time?
9      A.  I don't specifically recall why.
10 But...
11     Q.  Well, you were, as we discussed
12 before, you were having discussions with
13 potential purchasers of the noted mortgage in
14 2022, right?
15     A.  Sorry.  The -- well, I believe
16 Mishmeret was having conversations with people.
17     Q.  Okay.
18         And then ultimately, at least one or
19 more of those proposals ended up also
20 including, as a related piece, acquisition of
21 the YGWV equity or All Year's interest in YGWV,
22 right?
23         MS. GOLDBERG:  Objection to form.
24     A.  Yes.

Page 178

E. DIAMOND

1  whether a claim like the one I'm describing
2  would fall into that class?
3         MS. GOLDBERG:  Objection.
4    A.    I don't know.
5    Q.    Okay.
6          I think I'm done or almost done.
7          Can we just take -- I just want to
8  take a break to talk to my colleague.
9         MS. GOLDBERG:  Sure.
10        MR. BASSETT:  Five minutes?
11        MS. GOLDBERG:  Sure.
12        MR. BASSETT:  Thanks, guys.
13        THE VIDEOGRAPHER:  We're going off
14    the record at 2:25 p.m.
15        (Recess is taken.)
16        THE VIDEOGRAPHER:  We are back on
17    the record at 2:33 p.m.
18 BY MR. BASSETT:
19   Q.    Mr. Diamond, before the break, we
20 spent some time discussing an analysis that you
21 said Fee Owner conducted of whether there were
22 any defenses to payment on the Series C bonds.
23        Do you remember that?
24   A.    I do.

Page 179

E. DIAMOND

1    Q.    I think you said there was one that
2  occurred after the filing of the petition, and
3  then another you said sometime early in your
4  tenure?
5    A.    Correct.
6    Q.    And by early in your tenure, do you
7  mean sometime in early -- in early 2021?
8    A.    Yes.
9    Q.    Okay.
10         And who performed that analysis in
11 2021 on behalf of Fee Owner?
12   A.    Our counsel at the time would've
13 been either Weil or Archer.
14   Q.    Do you remember which one?
15   A.    I don't.
16   Q.    Was -- did Archer -- Archer
17 represented Fee Owner at that time or All Year?
18   A.    I don't remember specifically the
19 retentions.
20   Q.    Okay.
21         So you don't know if they
22 represented Fee Owner or All Year or both?
23   A.    Correct.
24   Q.    Was that an analysis that was done

Page 180

E. DIAMOND

1  at that time, was that shared with Mr. Weiss?
2    A.    I don't believe so.
3    Q.    Okay.
4          But that analysis would have been
5  relevant to any defenses that Fee Owner might
6  have under the guaranty, right?
7    A.    Again.
8    Q.    That analysis that was performed in
9  2021 would have been relevant to any defenses
10 that Fee Owner might have had under the
11 guaranty, correct?
12   A.    Yes.
13   Q.    And Mr. Weiss is a 50 percent owner
14 of Fee Owner through his interest in Member
15 LLC, right?
16   A.    I believe so.
17   Q.    So was any consideration given to
18 sharing that analysis with Mr. Weiss?
19   A.    I don't recall.
20   Q.    On behalf of Fee Owner -- strike
21 that.
22         Did Fee Owner ever, after the
23 defaults under the Series C notes, seek to
24 negotiate any kind of forbearance of payments

Page 181

E. DIAMOND

1  with the Series C bondholders?
2         MS. GOLDBERG:  Objection.
3    A.    We had a variety of conversations.
4  I don't remember specifically if forbearance
5  was part of those or not.
6    Q.    Did Fee Owner have any discussions
7  with All Year at the time about its liability
8  under the guaranty?
9         MS. GOLDBERG:  Objection.
10   A.    I'm sorry.  Did who?
11   Q.    Fee Owner.
12   A.    Discuss with whom?  I'm sorry.
13   Q.    All Year.
14        MS. GOLDBERG:  Same objection.
15   A.    I mean, we just -- it was part of
16 our thinking.
17        I don't know how to separate that.
18   Q.    Well, were there any discussions
19 between -- strike that.
20        Did Fee Owner ever at any time have
21 discussions with Mishmeret about a forbearance
22 of payments due under the note and mortgage?
23        MS. GOLDBERG:  Objection.
24   A.    Like I said, there were a number of

Page 182

E. DIAMOND

1             E. DIAMOND
2 discussions.  I don't remember if forbearance
3 was ever a specific topic or not.
4      Q.    Do you remember whether -- do you
5 remember when the note and mortgage were
6 transferred by All Year to Mishmeret?
7      A.    Are you asking, like, temporally
8 when it happened or?
9      Q.    Yeah, yeah.  Like the date.
10         I have it somewhere, but...
11      A.    Probably -- my recollection, it was
12 spring of 2021.  March or April.
13      Q.    Yeah.  I should have it at my
14 fingertips.
15         Yeah, I think it was March of 2021.
16         Prior to March of 2021, All Year
17 held the note and mortgage, right?
18      A.    Yes.
19      Q.    Okay.
20         So are you aware of any discussions
21 that occurred between Fee Owner and All Year
22 regarding Fee Owner's liability on the note and
23 mortgage prior to it being transferred to the
24 Series C bondholders?
25         MS. GOLDBERG:  Objection.

Page 183

1             E. DIAMOND
2      A.    I don't recall any specific
3 conversations.
4      Q.    Do you have a general recollection
5 of any conversations?
6      A.    You mean, between me and myself?
7      Q.    Well, that's the question.
8         How would -- how would those
9 discussion occur?
10         I mean, prior to the transfer of the
11 note and mortgage to Fee Owner, Fee Owner was
12 obligated on the note and mortgage.  And it was
13 obligated to make payments to All Year.
14         So was there -- was there anyone
15 capable of discussing --
16      A.    I believe we made a demand for
17 payment.  That's my recollection, that we made
18 some type demand for payment.
19         We didn't have anything to discuss
20 because we had no income coming in.  Right.  So
21 there was nothing we could do to deal with it
22 at that moment in time.
23      Q.    Okay.
24         But -- yeah.
25         But All Year and Fee Owner did not

Page 184

1             E. DIAMOND
2 have separate representatives who could've had
3 arms' length discussions about liability on the
4 note and mortgage, right?
5         MS. GOLDBERG:  Objection.
6      A.    I guess, yes.
7         MR. BASSETT:  I think that's all the
8 questions that I have.
9         MS. GOLDBERG:  Okay.
10         We have no questions for
11 Mr. Diamond.
12         MR. MEHLMAN:  Anyone else?
13         MS. GOLDBERG:  Anyone else?
14         MR. SILVESTRI:  Nothing from
15 petitioning creditors.
16         MS. GOLDBERG:  Okay.
17         MR. BASSETT:  Thanks.
18         MS. GOLDBERG:  Thank you.
19         Lisa, we are going to ask for the
20 immediate turnaround of the final
21 transcript.
22         I don't think we need the rough,
23 though, right?
24         Okay.
25         THE VIDEOGRAPHER:  Are we all set to

Page 185

1             E. DIAMOND
2 go off, Counsel?
3         MS. GOLDBERG:  Oh, yeah.
4         THE VIDEOGRAPHER:  This concludes
5 today's testimony of Ephraim Diamond.
6         We are going off the record at 2:40
7 p.m.
8         This also concludes media four.
9         (Time Noted:  2:40 p.m.)
10
11
12         ---------------------
13         EPHRAIM DIAMOND
14
15 Subscribed and sworn to before me
16 this      day of              2023.
17
18 -------------------------------------
19
20
21
22
23
24
25

Page 186

1

2      C E R T I F I C A T E

3

4  STATE OF NEW YORK   )

5                      ) ss.:

6  COUNTY OF NEW YORK  )

7

8          I, LISA M. MURACO, a Notary Public

9      within and for the State of New York and

10     Florida, do hereby certify:

11         That EPHRAIM DIAMOND, the witness

12     whose deposition is hereinbefore set forth,

13     was duly sworn by me and that such

14     deposition is a true record of the

15     testimony given by such witness.

16         I further certify that I am not

17     related to any of the parties to this

18     action by blood or marriage; and that I am

19     in no way interested in the outcome of this

20     matter.

21         IN WITNESS WHEREOF, I have hereunto

22     set my hand this 4th day of January, 2023.

23                   ----Lisa M. Muraco----------

24              LISA M. MURACO

25

---

Page 187

1

2              I N D E X

3

4  WITNESS                              PAGE
5  EPHRAIM DIAMOND
6  MR. BASSETT                           8

7

8           E X H I B I T S
9  DESCRIPTION                          PAGE
10 Diamond Exhibit 1, Member LLC Limited   29
   Liability Agreement
11
12
   Diamond Exhibit 2, Tab 2, Answer of Fee  33
13 Owner in Response to Involuntary
   Petition and October Declaration of
14 Ephraim Diamond
15
   Diamond Exhibit 3, Tab 6, First Day      43
16 Declaration Submitted by Mr. Ravid in
   Support of All Year's Chapter 11
17 Petition
18
19 Diamond Exhibit 4, Nondisclosure         80
   Agreement
20
21
   Diamond Exhibit 5, Opposition that Fee   92
22 Owner Filed to Mr. Weiss's Motion to
   Dismiss the Involuntary Case
23
24
25

---

Page 188

1

2   I N D E X   O F   E X H I B I T S(Cont'd.)

3  DESCRIPTION                          PAGE
4  Diamond Exhibit 6, Deposition Notice    117

5

6  Diamond Exhibit 7, Screen shot of      137
   WhatsApp Message

7

8

   Diamond Exhibit 8, Bates Number FEE    143
9  Ending in 11, October 24, 2022, E-mail
   from Mr. Friedman at Chapman to
10 Attorneys at Herrick

11

12 Diamond Exhibit 9, CBRE Appraisal      160
   Report for the William Vale

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 189

1

2       ERRATA SHEET FOR THE TRANSCRIPT OF:

3  Case Name:    IN RE: WYTHE BERRY FEE OWNER LLC

   Dep. Date:    WEDNESDAY, JANUARY 4, 2023

4  Deponent:     EPHRAIM DIAMOND

5             CORRECTIONS:

6  Pg. Ln.  Now Reads      Should Read    Reason

7  ___ ___  _____   _____   ____

8  ___ ___  _____   _____   ____

9  ___ ___  _____   _____   ____

10 ___ ___  _____   _____   ____

11 ___ ___  _____   _____   ____

12 ___ ___  _____   _____   ____

13 ___ ___  _____   _____   ____

14 ___ ___  _____   _____   ____

15 ___ ___  _____   _____   ____

16 ___ ___  _____   _____   ____

17 ___ ___  _____   _____   ____

18

19              _____

20                      Signature of Deponent

21 SUBSCRIBED AND SWORN BEFORE ME

22 THIS____DAY OF_____, 2023.

23

24 _____

25 (Notary Public)  MY COMMISSION EXPIRES:_____