**Hearing Date and Time: February 22, 2024 at 4:00 p.m.**
**Objection Due Date and Time: February 21, 2024 at 4:00 p.m.**

HERRICK, FEINSTEIN LLP
Stephen B. Selbst
Janice Goldberg
Steven B. Smith
Rodger T. Quigley
Two Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
sselbst@herrick.com
jgoldberg@herrick.com
ssmith@herrick.com
rquigley@herrick.com

*Counsel for the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                                          :
In re                                     :    Chapter 11
                                          :
WYTHE BERRY FEE OWNER LLC,                 :    Case No. 22-11340 (MG)
                                          :
          Debtor.[1]                      :
                                          :
                                          :
                                          :
-------------------------------------------------------------X

**NOTICE OF HEARING ON DEBTOR'S MOTION FOR THE ENTRY OF AN ORDER**
**(I) APPROVING ITS SELECTION OF A STALKING HORSE BIDDER, (II)**
**APPROVING BID PROTECTIONS IN CONNECTION THEREWITH,**
**AND (III) GRANTING RELATED RELIEF**

    **PLEASE TAKE NOTICE** that a hearing on the above Debtor's *Motion for Entry of an*

*Order (i) Approving Its Selection of a Stalking Horse Bidder, (ii) Approving Bid Protections in*

*Connection Therewith, and (iii) Granting Related Relief*, annexed hereto (the "Motion") will be

held via Zoom for Government before the Honorable Martin Glenn, Chief United States

Bankruptcy Judge of the United States Bankruptcy Court for the Southern District of New York,

---

[1] The Debtor's principal offices are located at The William Vale Hotel, 111 N. 12th Street, Brooklyn, NY 11249. The last four digits of the Debtor's Federal Tax Id. No. are 9776.

Courtroom 523, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court") on

**February 22, 2024 at 4:00 p.m.** (prevailing Eastern Time) (the "Hearing") to consider the Motion.

**PLEASE TAKE FURTHER NOTICE** that the Motion has been electronically filed with

the Clerk of the Bankruptcy Court and, as such, may be examined and inspected by contacting the

applicant or by accessing the Court's website (http://www.nysb.uscourts.gov).

**PLEASE TAKE FURTHER NOTICE** that responses to the Motion, if any, shall be in

writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

and the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy

Rules"), shall be filed with the Bankruptcy Court (i) by attorneys practicing in the Bankruptcy

Court, including attorneys admitted pro hac vice, electronically in accordance with General Order

M-399 (which can be found at www.nysb.uscourts.gov), and (ii) by all other parties in interest, on

a CD-ROM, in text-searchable portable document format (PDF) (with two single-sided hard copies

delivered to the Judge's Chambers), in accordance with the customary practices of the Bankruptcy

Court and General Order M-399, to the extent applicable, and shall be served in accordance with

General Order M-399, the Bankruptcy Rules, and the Local Bankruptcy Rules, so as to be filed

and served upon (i) counsel for the Debtor Herrick, Feinstein LLP, Two Park Avenue, New York,

NY 10016 (Stephen B. Selbst, Esq., and Janice Goldberg, Esq.); (ii) the Office of the United States

Trustee – NY, Alexander Hamilton Custom House, One Bowling Green, Room 534, New York,

NY 10004-1408 (Attn: Andrea B. Schwartz, Esq.); (iii) counsel to Mishmeret Trust Company Ltd.,

as Trustee for the Bondholders, Chapman & Cutler LLP, 1270 Sixth Avenue, New York, New

York 10020 (Attn: Michael Friedman, Esq.); (iv) counsel to the Stalking Horse Bidder, Gibson,

Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166 (Attn: Harry R. Silvera,

Esq., and Keith R. Martorana, Esq.); and (v) all parties who have timely filed requests for notice

2

under Rule 2002 of the Bankruptcy Rules, by no later than **February 21, 2024 at 4:00 p.m. (prevailing Eastern Time)** (the "Response Deadline").

**PLEASE TAKE FURTHER NOTICE** that if no responses are filed in the form and manner provided above, the Court may decide that the Motion is unopposed.

**PLEASE TAKE FURTHER NOTICE** the Hearing will be conducted using Zoom for Government. Parties should not appear in person and those wishing to appear or participate at the Hearing (whether "live" or "listen only") must make an electronic appearance ("eCourtAppearance") through the Court's website prior to 4:00 p.m. (Prevailing Eastern Time) on the business day prior to the Hearing. Instructions for making an eCourtAppearance and additional information on the Court's Zoom procedures can be found at https://www.nysb.uscourts.gov/content/chief-judge-martin-glenn and https://www.nysb.uscourts.gov/ecourt-appearances.

Dated: February 15, 2024
New York, New York

/s/ Stephen B. Selbst
HERRICK, FEINSTEIN LLP
Stephen B. Selbst
Janice Goldberg
Steven B. Smith
Rodger T. Quigley
Two Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
sselbst@herrick.com
jgoldberg@herrick.com
ssmith@herrick.com
rquigley@herrick.com

*Counsel for the Debtor
 and Debtor in Possession*

**Hearing Date and Time: February 22, 2024 at 4:00 p.m.**
**Objection Due Date and Time: February 21, 2024 at 4:00 p.m.**

HERRICK, FEINSTEIN LLP
Stephen B. Selbst
Janice Goldberg
Steven B. Smith
Rodger T. Quigley
Two Park Avenue
New York, New York 10016
(212) 592-1400
(212) 592-1500 (fax)
sselbst@herrick.com
jgoldberg@herrick.com
ssmith@herrick.com
rquigley@herrick.com

*Counsel for the Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                                            :
In re                                                       :        Chapter 11
                                                            :
WYTHE BERRY FEE OWNER LLC,                                   :        Case No. 22-11340 (MG)
                                                            :
            Debtor.[1]                                       :
                                                            :
                                                            :
------------------------------------------------------------X


**DEBTOR'S MOTION FOR THE ENTRY OF AN ORDER (I) APPROVING ITS
SELECTION OF A STALKING HORSE BIDDER, (II) APPROVING
BID PROTECTIONS IN CONNECTION THEREWITH, AND
(III) GRANTING RELATED RELIEF**

---

[1] The Debtor's principal offices are located at The William Vale Hotel, 111 N. 12th Street, Brooklyn, NY 11249. The last four digits of the Debtor's Federal Tax Id. No. are 9776.

TO:    **THE HONORABLE MARTIN GLENN,**
       **CHIEF UNITED STATES BANKRUPTCY JUDGE**

Wythe Berry Fee Owner LLC, as debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), respectfully submits this motion (the "Motion"), seeking entry of an order (the "Bid Protections Order"), the proposed form of which is annexed hereto as **Exhibit A**: (i) approving its selection of a Stalking Horse Bidder (as defined below); (ii) approving bid protections in connection therewith; and (iii) granting related relief, pursuant to sections 105, 363 and 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ *et seq.* (the "Bankruptcy Code"), rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1 and 6004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"). In support of the Motion, the Debtor represents as follows:

## PRELIMINARY STATEMENT

1.    As discussed in the Debtor's Bid Procedures Motion, the Debtor has determined to sell the WV Complex pursuant to the court approved Bid Procedures designed to provide a clear and open process for the solicitation, receipt, and evaluation of third-party bids.

2.    The Bid Procedures contemplate that bidding occurs in two stages. The first stage consisted of an initial marketing process for the WV Complex that resulted in the Debtor receiving over 10 non-binding indications of interest by the initial deadline of December 19, 2023. The second stage consists of a period during which potential bidders may submit binding, irrevocable offers to purchase the WV Complex with a bidding deadline of February 26, 2024.

3.    The Bid Procedures Order authorizes the Debtor to enter into a stalking horse agreement for the sale of the WV Complex and offer a stalking horse purchaser certain bid protections, subject to the approval of this Court.

2

4.      On January 9, 2024, the Debtor received a bid from William Vale Owner LLC (the "Stalking Horse Bidder"). Ellman Decl. ¶ 14.[2] Following extensive negotiations with the Debtor and representatives of Mishmeret Trust Company Ltd. (the "Trustee"), the Stalking Horse Bidder increased its proposed purchase price to $177,000,000 in cash and assumption of certain liabilities as described in the agreement (the "Stalking Horse Bid"). Id. ¶ 16. After consultation with the Trustee, the Debtor is pursuing the Stalking Horse Bid as the best bid to emerge from the initial marketing process. Id. ¶¶ 18, 25. To the extent another bidder proposes a transaction that is superior, the Debtor can consider and, if appropriate, act upon that transaction in an exercise of its fiduciary duties including, if determined to be appropriate, holding an auction, all in accordance with the terms and conditions of the Bid Procedures Order. The proposed bid protections—a break-up fee of 2.5% of the purchase price and up to $250,000 in expense reimbursement—are typical for "stalking horse" bidders in chapter 11 cases approved in this district, are intended to enhance competitive bidding, and are therefore reasonable and appropriate. Id. ¶ 29.

5.      Courts in this district have held that a debtor's selection of a stalking horse purchaser and the approval of bid protections for that purchaser intended to enhance competitive bidding are consistent with the goal of maximizing estate value and are appropriate in the context of a bankruptcy sale. The Debtor therefore submits that its selection of the Stalking Horse Bidder and its proposed bid protections represent a sound exercise of the Debtor's business judgment and should be approved.

---

[2] "Ellman Decl." refers to the Declaration of Scott B. Ellman dated February 15, 2024, attached hereto as **Exhibit B**.

## JURISDICTION AND VENUE

6.　　　　This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference M-431* from the United States District Court

dated January 31, 2012 (Preska, C.J.). The Debtor confirms its consent to the Court entering a final

order in connection with this Motion to the extent that it is later determined that the Court, absent

consent of the parties, cannot enter final orders or judgments in connection herewith consistent

with Article III of the United States Constitution.

7.　　　　This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

8.　　　　Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.　　　　The statutory predicates for the relief requested herein are Bankruptcy Code

sections 105, 363 and 503, and 507, Bankruptcy Rules 2002 and 6004, and Local Rules 2002-1

and 6004-1.

## BACKGROUND

### A.　　　The Debtor and the 2017 Lease

10.　　　　The Debtor is the owner of The William Vale Hotel, office, retail, and parking

located at 55 Wythe Avenue, Brooklyn, New York (together, the "WV Complex"). On or about

February 28, 2017, the Debtor and Wythe Berry LLC, with Zelig Weiss and Yoel Goldman as

guarantors, entered into a February 28, 2017 Lease Agreement (the "Lease"), pursuant to which

the WV Complex was leased to Wythe Berry LLC ("Lessee"). The Debtor terminated the Lease

effective May 20, 2021 based upon Lessee's failure to pay rent, yet Lessee failed to vacate or

surrender the WV Complex and illegally held over at the premises.

### B.　　　The State Court Action

11.　　　　On June 11, 2021, the Debtor commenced an action styled *Wythe Berry Fee Owner

LLC v. Wythe Berry LLC*, Index No. 514152/2021 (Kings Cnty. Sup. Ct.) (the "State Court

4

Action"), naming Lessee, Zelig Weiss and Yoel Goldman as defendants. The complaint alleged breaches of the Lease based on Lessee's failure to pay rent and other defaults, and sought a judgment that the Lease had been terminated and an ejectment of Lessee.

**C.      The Involuntary Chapter 11 Filing and Removal of the State Court Action**

12.      On the Petition Date, the Trustee, Yelin Lapidot Provident Funds Management Ltd., The Phoenix Insurance Company Limited and Klirmark Opportunity Fund III L.P. filed an involuntary petition seeking an Order for Relief pursuant to Bankruptcy Code section 303 against the Debtor [Dkt. No. 1, 2]. On January 18, 2023, this Court entered an Order for Relief against the Debtor [Dkt. No. 56].

13.      On February 14, 2023, the State Court Action was removed to this Court, and is now proceeding under Case No. 23-10112 (MG) (the "Adversary Proceeding").

14.      On August 23, 2023, the Debtor filed a motion for partial summary judgment in the Adversary Proceeding as to liability against Lessee, including a declaration that the Lease had been terminated as of May 20, 2021. [Adversary Proceeding, Dkt. Nos. 30-31].

15.      On September 29, 2023, Lessee delivered a notice to the Debtor of its intention to vacate the WV Complex by October 31, 2023 [Dkt. No. 191, Ex. A].

16.      On October 5, 2023, the Court granted partial summary judgment to the Debtor in the Adversary Proceeding, finding that the Lease was terminated by the Notice of Cancellation served on May 20, 2021 [Adversary Proceeding, Dkt. No. 45].

**D.      Bid Procedures**

17.      After Lessee vacated the WV Complex, the Debtor began efforts to sell it. To that end, the Debtor filed two motions: (i) on October 26, 2023, an application for authority to retain Eastdil Secured, L.L.C. and A&G Realty Partners, LLC (together, the "Brokers") as the Debtor's real estate brokers (the "Broker Retention Motion"); and (ii) on November 16, 2023, the *Motion*

*of Wythe Berry Fee Owner LLC For Entry of an Order (I) Approving the Bid Procedures for the Sale of the WV Complex, (II) Scheduling Certain Dates, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Dkt. No. 216] (the "Bid Procedures Motion") which sought approval of bid procedures (the "Bid Procedures") [Dkt. No. 216].

18.        On December 8, 2023, the Court entered an order (the "Bid Procedures Order"), approving the Bid Procedures [Dkt. No. 220] and on December 20, 2023, the Court entered an order granting the Broker Retention Motion [Dkt. No. 228].

**E.        Filing of the Plan and Disclosure Statement**

19.        On February 6, 2024, the Debtor filed the Disclosure Statement [Dkt. No. 242] and Plan [Dkt. No. 243]. The Plan classifies the holders of Claims into four (4) Classes, all of which are impaired and entitled to vote on the Plan. The Plan provides holders of Allowed Claims to be paid in Cash following the sale of the WV Complex in accordance with the priorities set forth in the Bankruptcy Code. The Debtor believes that the Plan is fair and equitable to all holders of Claims and equity interests ("Interests") and provides the best possible recovery to all stakeholders.

**F.        Stalking Horse Agreement**

20.        Pursuant to the Bid Procedures Order, on January 9, 2024, the Stalking Horse Bidder submitted its initial bid, including a draft purchase agreement. Ellman Decl. ¶ 14.

21.        In the days following receipt of the initial bid, the Debtor and Stalking Horse Bidder and their respective advisors negotiated in good faith and at arms'-length and exchanged multiple drafts of the purchase agreement. *Id.* ¶ 15. On February 13, 2024, a purchase and sale agreement was executed by the Stalking Horse Bidder and the Debtor (the "Stalking Horse Agreement"), a copy of which is annexed hereto as **Exhibit C**. *Id.* ¶ 17.

6

**RELIEF REQUESTED**

22.    The Debtor seeks the entry of the Bid Protections Order, substantially in the form

attached hereto as **Exhibit A**: (i) approving the Debtor's selection of the Stalking Horse Bidder;

(ii) approving bid protections for the Stalking Horse Bidder of (a) a break-up fee of 2.5% of the

purchase price, and (b) up to $250,000 in expense reimbursement in connection therewith

(together, the "Bid Protections"); and (iii) granting related relief.

**MARKETING AND SALE PROCESS**

23.    To maximize the value of its assets, the Debtor, in consultation with the Trustee,

has undergone an open process for the solicitation, receipt, and evaluation of bids for the purchase

of the WV Complex. *Id.* ¶ 11.

24.    The Debtor, in consultation with its Brokers, developed a list of over 5,000 parties

whom it believed would be interested in, and whom the Debtor believed would have the financial

resources to consummate, a Sale, including strategic parties, private equity firms, and traditional

financial institutions. *Id.* ¶ 12. As part of that process, over 180 potential investors executed non-

disclosure agreements. *Id.* Prospective bidders were granted access to a virtual data room

populated with diligence materials to facilitate their evaluation and assessment of the WV

Complex. *Id.*

25.    The Debtor's marketing process produced numerous non-binding bids for the WV

Complex. *Id.* ¶ 13. The Debtor, in consultation with the Trustee and its Brokers, engaged with

certain of these bidders in order to diligence the bids and bidders, increase competitive tension,

and identify the bid that provides the best value for the Debtor's estate. *Id.*

26.    The Debtor examined the bids and determined, in the exercise of its business

judgment and in a manner consistent with the exercise of its fiduciary duties, and in consultation

with the Trustee and the Brokers, that the Stalking Horse Bid represents the highest and best bid

for the Debtor and its estate at this time because it is a cash offer for a higher purchase price than

any other bid and contains other terms and conditions favorable to the Debtor. *Id.* ¶¶ 18, 25.

27.     The Bid Protections in the Stalking Horse Agreement consist of (a) a break-up fee

equal to 2.5% of the cash purchase price (the "Break-Up Fee"), and the reimbursement of all

reasonable and documented fees and expenses incurred by the Stalking Horse Bidder and its

advisors in connection with the transaction up to a maximum of $250,000 (the "Expense

Reimbursement"), each of which are payable only in the limited circumstances set forth in the

Stalking Horse Agreement. *Id.* ¶¶ 19, 29. Importantly, the Break-Up Fee is only payable in

connection with an alternative transaction and thus would be paid out of the proceeds from such

alternative transaction. *Id.* ¶ 19.

## THE BID PROTECTIONS

28.     The Debtor has agreed to provide the Stalking Horse Bidder with certain Bid

Protections. Specifically, the Stalking Horse Agreement[3] sets forth the following terms for

payment of the Bid Protections:

- **Break-Up Fee**: In consideration for Buyer having expended considerable time and
  expense in connection with this Agreement and the negotiation thereof, Seller shall pay
  to Buyer a break-up fee in an amount equal to two and one-half percent (2.5%) of the
  Cash Consideration (the "Breakup Fee") plus the Expense Reimbursement to an
  account designated by Buyer in writing to Seller, if (i) the Stalking Horse Agreement
  is terminated pursuant to Section 10.1(h) or (j) and (ii) a sale of the Acquired Assets is
  consummated with another party (whether or not Buyer was the Backup Bidder). Seller
  shall pay such Breakup Fee to Buyer by wire transfer of immediately available funds
  within three (3) Business Days following the sale of the Acquired Assets to such third
  party. The Breakup Fee shall be treated as an administrative expense in the Bankruptcy
  Case under section 503 and section 507(b) of the Bankruptcy Code. For the avoidance
  of doubt, the Breakup Fee, if payable pursuant to Section 10.2(c) of the Stalking Horse
  Agreement, shall be in addition to the return of the Deposit and payment of the Expense

---

[3] Capitalized terms used but not defined herein have the meanings given to them in the Stalking Horse Agreement.

Reimbursement, in each case, to the extent payable to Buyer pursuant to <u>Section 3.2</u> and <u>Section 10.2(b)</u> of the Stalking Horse Agreement, respectively.

- **Expense Reimbursement**: If the Stalking Horse Agreement is terminated pursuant to <u>Section 10.1(c)</u>, <u>(h)</u>, <u>(j)</u> or <u>(k)</u> thereof, then Seller shall pay Buyer by wire transfer of immediately available funds within three (3) Business Days following such termination an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of its counsel and financial advisor) incurred by Buyer in connection with the negotiation, diligence, execution, performance and enforcement of the Stalking Horse Agreement ("<u>Expense Reimbursement</u>"), which amount shall not exceed $250,000. The Expense Reimbursement shall be treated as an administrative expense in the Bankruptcy Case under Section 503 and Section 507(b) of the Bankruptcy Code. For the avoidance of doubt, the Expense Reimbursement, if payable pursuant to <u>Section 10.2(b)</u> of the Stalking Horse Agreement, shall be in addition to the return of the Deposit and payment of the Breakup Fee, in each case, to the extent payable to Buyer pursuant to <u>Section 3.2</u> and <u>Section 10.2(c)</u> of the Stalking Horse Agreement, respectively.

29.     The Bid Protections are an integral part of the Stalking Horse Bid and the Stalking Horse Bidder's commitment to consummate the sale. Ellman Decl. ¶ 26. Indeed, the Debtor does not believe that the Stalking Horse Bidder would have submitted such a proposal without a commitment from the Debtor to seek approval of the Bid Protections. *See id.* The Bid Protections ensure competitive bidding for the WV Complex by inducing the Stalking Horse Bidder to hold open its offer as a baseline bid on which other bidders and the Debtor can rely. *Id.* ¶ 22. As a result, providing the Bid Protections to the Stalking Horse Bidder represents a sound exercise of the Debtor's business judgment. *Id.* ¶ 18.

30.     Pursuing the Stalking Horse Bid is consistent with the Bid Procedures Order, which provides that "the Debtor is authorized, but not directed, in a manner consistent with the exercise of its fiduciary duties as set forth in the Bid Procedures, after consultation with the Trustee, to select a bidder to act as a Stalking Horse Bidder for the WV Complex, and enter into a Stalking Horse Agreement with such Stalking Horse Bidder." Bid Procedures Order ¶ 11.

## THE STALKING HORSE AGREEMENT

31.　　　The Debtor and the Stalking Horse Bidder have negotiated and finalized the

Stalking Horse Agreement, the material terms of which are as follows:

| Material Terms of Stalking Horse Agreement | |
| --- | --- |
| **Buyer** | William Vale Owner LLC |
| **Termination (Article X)** | Section 10.1 Termination of Agreement. This Agreement may be terminated only in accordance with this Section 10.1. This Agreement may be terminated at any time prior to the Closing:<br><br>(a) by the mutual written consent of Seller and Buyer;<br><br>(b) by written notice of either Buyer or Seller, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; provided that no Party may terminate this Agreement under this Section 10.1(b) if the issuance of such Order was caused by such Party's material breach of any of its obligations under this Agreement;<br><br>(c) by written notice of either Buyer or Seller, if the Closing shall not have occurred on or before September 18, 2024 (as the same may have been extended by the extension rights under Section 4.1, the "Outside Date"); provided that a Party shall not be permitted to terminate this Agreement pursuant to this Section 10.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's material breach of any of its obligations under this Agreement;<br><br>(d) by written notice from Seller to Buyer, |

upon a breach of any covenant or agreement on the part of Buyer hereunder or under the MIPA, or if any representation or warranty of Buyer hereunder or under the MIPA will have become untrue, in each case, such that the conditions set forth in Section 9.3(a) or Section 9.3(b) or Section 3 of the MIPA would not be satisfied, including a breach of Buyer's obligation to consummate the Closing; provided that (i) if such breach is curable by Buyer then Seller may not terminate this Agreement under this Section 10.1(d) unless such breach has not been cured by the date which is the earlier of (A) the Outside Date and (B) fifteen (15) Business Days after Seller notify Buyer in writing of such breach and (ii) the right to terminate this Agreement pursuant to this Section 10.1(d) will not be available to Seller at any time that Seller is in material breach of its obligations under this Agreement or Seller is in material breach of its obligations under the MIPA;

(e) by written notice from Buyer to Seller, upon a breach of any covenant or agreement on the part of Seller hereunder or the part of Seller under the MIPA, or if any representation or warranty of Seller hereunder or of Seller under the MIPA will have become materially untrue, in each case, such that the conditions set forth in Section 9.2(a) or Section 9.2(b) or Section 3 of the MIPA would not be satisfied and if the Conditional Approval Letter for the issuance of a Temporary Retail Permit is issued to the Liquor License Applicant; provided that (i) if such breach is curable by Seller then Buyer may not terminate this Agreement under this Section 10.1(e) unless such breach has not been cured by the date which is the earlier of (A) the Outside Date and (B) fifteen (15) Business Days after Buyer notifies Seller in writing of such breach and (ii) the right to terminate this Agreement pursuant to this Section 10.1(e) will not be available to Buyer at any time that Buyer is in material breach of

its obligations under this Agreement or under the MIPA;

(f) by written notice from Seller to Buyer, if all of the conditions set forth in <u>Section 9.1</u> and <u>9.2</u> herein and Section 3 of the MIPA have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Buyer fails to complete the Closing at the time required by <u>Section 4.1</u> or fails to complete the closing under the MIPA at the time required therein;

(g) by written notice from Seller to Buyer, if Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with the Seller's fiduciary duties under applicable Law;

(h) by written notice of either Buyer or Seller, if Seller consummates a sale of the Acquired Assets with one or more Persons other than Buyer;

(i) by Buyer;

(i) if the Bankruptcy Case is dismissed or converted to a liquidation proceeding under Chapter 7 of the Bankruptcy Code;

(ii) If the Bankruptcy Court enters any Order that would reasonably be expect to prevent, impede or materially delay the consummation of the transactions contemplated hereby in accordance with the terms hereof; or

(iii) if any creditor of Seller obtains a final and unstayed Order of the Bankruptcy Court granting relief from the stay to foreclose on any portion of the Acquired Assets.

(j) by written notice from Buyer to Seller, if (i)

Buyer is not the Successful Bidder or the Backup Bidder at the Auction or (ii) Buyer is the Backup Bidder and the Parties have not consummated the transactions contemplated hereby in accordance of the terms hereof within forty-five (45) days (unless the Closing Date hereunder is extended by Buyer or Seller pursuant to Section 4.1) of the entry of the sale order approving the sale of the Acquired Assets to the Successful Bidder; or

(k) by written notice from Buyer to Seller, if all of the conditions set forth in Sections 9.1 and 9.3 and Section 3 of the MIPA have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Seller fails to complete the Closing at the time required by Section 4.1 or fails to complete the closing under the MIPA at the time required therein.

Section 10.2 Effect of Termination.

(a) In the event of termination of this Agreement pursuant to Section 10.1, this Agreement shall forthwith become void and no Party or any of its partners, officers, directors, managers or equity holders will have any Liability under this Agreement; provided that: (i) Section 3.2, Section 8.2(b), this Section 10.2 and Article XII shall survive any such termination; and (ii) no termination will relieve any Party from any Liability for damages, losses, costs or expenses (which the Parties acknowledge and agree shall not include the benefits of the transactions contemplated by this Agreement lost by the Parties), resulting from any Willful Breach of this Agreement prior to the date of such termination. Subject to Section 12.12, nothing in this Section 10.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

(b) If this Agreement is terminated pursuant to Section 10.1(c), (h), (j) or (k), , then Seller shall pay Buyer by wire transfer of immediately available funds within three (3) Business Days following such termination of this Agreement an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of its counsel and financial advisor) incurred by Buyer in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement ("Expense Reimbursement"), which amount shall not exceed $250,000. The Expense Reimbursement shall be treated as an administrative expense in the Bankruptcy Case under Section 503 and Section 507(b) of the Bankruptcy Code. For the avoidance of doubt, the Expense Reimbursement, if payable pursuant to this Section 10.2(b), shall be in addition to the return of the Deposit and payment of the Breakup Fee, in each case, to the extent payable to Buyer pursuant to Section 3.2 and Section 10.2(c), respectively.

(c) In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, Seller shall pay to Buyer a break-up fee in an amount equal to two and one-half percent (2.5%) of the Cash Consideration (the "Breakup Fee") plus the Expense Reimbursement to an account designated by Buyer in writing to Seller, if (i) this Agreement is terminated pursuant to Section 10.1(h) or (j) and (ii) a sale of the Acquired Assets is consummated with another party (whether or not Buyer was the Backup Bidder). Seller shall pay such Breakup Fee to Buyer by wire transfer of immediately available funds within three (3) Business Days following the sale of the Acquired Assets to such third party. The Breakup Fee shall be treated as an administrative expense in the Bankruptcy Case under Section 503 and Section 507(b) of the Bankruptcy Code. For the avoidance of doubt, the Breakup Fee, if

|  | payable pursuant to this <u>Section 10.2(c)</u>, shall be in addition to the return of the Deposit and payment of the Expense Reimbursement, in each case, to the extent payable to Buyer pursuant to <u>Section 3.2</u> and <u>Section 10.2(b)</u>, respectively.<br><br>(d) Each of the Parties acknowledges and agrees that the agreements contained in this <u>Section 10.2</u> are an integral part of this Agreement and that the Expense Reimbursement and the Breakup Fee are not a penalty, but rather represent liquidated damages in a reasonable amount that will reasonably compensate Buyer in the circumstances in which such Expense Reimbursement and/or Breakup Fee, as applicable, is payable for the efforts and resources expended and opportunities foregone by Buyer while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.<br><br>(e) Pursuant to the Bid Procedures Order, the claim of Buyer in respect of the Expense Reimbursement or the Breakup Fee is and constitutes an allowed administrative expense claim against Seller under sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case. |
| **Bankruptcy Court Matters: Bankruptcy Actions (Article VII, Section 7.1(b))** | No later than three (3) Business Days following the Effective Date, Seller shall file a motion (a "<u>Stalking Horse Motion</u>") seeking authority to designate Buyer as the Stalking Horse Bidder and approve the Bid Protections (each as defined in the Bid Procedures Order) consistent with the Bid Procedures Order and this Agreement.  The Stalking Horse Motion and the order approving the same shall be in form and substance reasonably acceptable to the Buyer. |

## BASIS FOR RELIEF

**A.    The Relief Requested is in the Best Interests of the Debtor's Estate and Should Be Approved.**

32.    Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). In this district, "[t]he standard used for judicial approval of the use of estate property outside of the ordinary course of business is [] the business judgment of the debtor." *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014) (citing *In re Glob. Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003)). Additionally, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

**B.    The Bid Protections Are a Sound Exercise of the Debtor's Business Judgment and Are Reasonable and Appropriate Under the Circumstances.**

33.    Courts in this district have recognized that the paramount goal of any proposed sale of property of a debtor's estate is maximizing value. *See, e.g.*, *In re Metaldyne Corp.*, 409 B.R. 661, 667–68 (Bankr. S.D.N.Y. 2009) ("It is the overarching objective of sales in bankruptcy to maximize value to the estate."); *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("'It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.'").

34.    In furtherance of that goal, bid protections intended to enhance competitive bidding are consistent with the goal of maximizing the value of the estate and are appropriate in the context of bankruptcy transactions. *See id.* (holding that bid protections "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *see also In re Metaldyne Corp.*, 409

B.R. at 670 ("Bidder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer."); *In re Dura Automotive Sys., Inc.*, No. 06-11202, 2007 WL 7728109, at *90 (Bankr. D. Del. Aug. 15, 2007) (recognizing that bidding procedures and bid protections "intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales").

35.     Moreover, break-up fee arrangements, which have been described as "an incentive payment to a prospective purchaser with which a company fails to consummate a transaction," are a common feature of many sale processes—whether conducted inside or outside of a bankruptcy court. *See Integrated Res.*, 147 B.R. at 653 ("Break-up fee arrangements outside bankruptcy are presumptively valid under the business judgment rule."). This is because "[b]reak up fees are important tools to encourage bidding and to maximize the value of the debtor's assets." *Id.* at 659. To be sure, to the extent a third party (or multiple third parties) submits a competing bid that is superior to Stalking Horse Bid, the Debtor has the flexibility to consider and, if appropriate, act upon such alternative proposal in an exercise of its fiduciary duties. As such, the Stalking Horse Bid is setting a floor for the sale of the WV Complex, and therefore the Bid Protections are appropriate.

36.     Bankruptcy courts in the Second Circuit analyze the appropriateness of bidding incentives using the "business judgment rule" standard, and, in particular, courts in this district have considered three questions when considering such incentives: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; (3) is the amount of the fee unreasonable relative to the proposed purchase price?" *See Integrated Res.*, 147 B.R. at 657; *see also Genco Shipping & Trading*

*Ltd.*, 509 B.R. at 465; *Metaldyne Corp.*, 409 B.R. at 670. Here, the answer to each of these questions is emphatically "no."

37.     ***First***, the Debtor seeks authority to pay Bid Protections in the form of the Break-Up Fee equal to 2.5% of the cash purchase price and Expense Reimbursement up to a maximum of $250,000. Such Bid Protections are customary and regularly included in transactions of this magnitude to induce bidders to incur the time and expenses necessary to submit a credible and attractive bid and ultimately, to document and consummate such bid. *See, e.g.*, *Integrated Res.*, 147 B.R. at 659-60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value." (emphasis added)); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (breakup fee "may be legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking" (quotations omitted)).

38.     Here, the Stalking Horse Bidder and its advisors expended extensive time and effort to structure a proposal that will maximize the value of the Debtor's estate. The Bid Protections are necessary in light of the Stalking Horse Bidder's substantial effort and the considerable time and resources that it has expended, and the Debtor's right to pursue alternate transactions under the Bid Procedures Order and the Stalking Horse Agreement.

39.     ***Second***, the Bid Protections are the product of good faith, arms'-length negotiations among the Debtor, the Trustee, and the Stalking Horse Bidder, and each party's respective advisors. The Debtor and the Stalking Horse Bidder are wholly unrelated, sharing no officers, directors, shareholders, incorporators, employees or economic interests—other than as

embodied in these transactions—in common. Additionally, the Stalking Horse Bidder is not an "insider" as that term is defined in the Bankruptcy Code. 11 U.S.C. § 101(31).

40.    **Third**, the Bid Protections enhance the value of the Debtor's estate. These protections, individually and collectively, were a material inducement for, and a condition of, the Stalking Horse Bidder's entry into the Stalking Horse Agreement. The Stalking Horse Bidder was unwilling to serve as Stalking Horse Bidder without the assurance of payment of the Break-Up Fee and Expense Reimbursement. The transaction embodied in the Stalking Horse Agreement establishes a floor against which other parties can bid. Accordingly, authorizing and approving the Bid Protections will enhance, rather than hamper, competitive bidding.

41.    **Fourth**, the amounts of the Break-Up Fee and Expense Reimbursement are fair and reasonable. The Break-Up Fee is equal to 2.5% of the cash purchase price, the Expense Reimbursement is capped at $250,000, and each are payable only in the circumstances set forth in the Stalking Horse Agreement and, with respect to the Break-Up Fee, payable only from the proceeds of a sale to another buyer. Moreover, the significant time and expenses expended by the Stalking Horse Bidder in formulating the transaction will provide substantial benefits to the Debtor's estate even in the event the Debtor pursues an alternative transaction.

42.    Courts in this jurisdiction have approved similar break-up fees and bid protections. *See, e.g.*, *In re Voyager Digit. Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y Aug. 5, 2022) (authorizing bid protections, including a break-up fee and expense reimbursement after three-day notice and objection period); *In re All Year Holdings Ltd.*, No. 21-12051 (MG) (Bankr. S.D.N.Y. Apr. 19, 2022) (approving a $1.8 million break-up fee—about 3% of the purchase price under the Investment Agreement—and $300,000 expense reimbursement); *In re Evergreen Gardens Mezz LLC*, No. 21-10335 (MG) (Bankr. S.D.N.Y. Oct. 4, 2021) (approving $20 million

break-up fee—about 3.98% of the proposed cash consideration— and expense reimbursement of up to $150,000); *In re Aralez Pharmaceuticals US Inc.*, No. 18-12425 (MG) (Bankr. S.D.N.Y. Oct. 11, 2018) (approving $1.6625 million break-up fee—about 3.5% of the purchase price—and expense reimbursement of up to $425,000); *In re Synergy Pharmaceuticals Inc.*, No. 18-14010 (LGB) (Bankr. S.D.N.Y. Jan. 7, 2019) (approving $7 million break-up fee—about 3.5% of the purchase price—and expense reimbursement of up to $1.95 million).

43.    Furthermore, courts in this jurisdiction have provided administrative priority status to break-up fees and expense reimbursements in the event that the applicable bidder becomes entitled to them. *See, e.g.*, *In re All Year Holdings Ltd.*, No. 21-12051 (MG) (Bankr. S.D.N.Y. Apr. 19, 2022) (approving treatment of break-up fee and expense reimbursement as administrative expenses); *In re Evergreen Gardens Mezz LLC*, No. 21-10335 (MG) (Bankr. S.D.N.Y. Oct. 4, 2021) (same); *In re KB US Holdings, Inc.*, No. 20-22962 (SHL) (Bankr. S.D.N.Y. Sep. 17, 2020) (same); *In re Fairway Group Holdings Corp.*, No. 20-10161 (JLG) (Bankr. S.D.N.Y. Feb. 21, 2020) (same); *In re Hooper Holmes, Inc. d/b/a Provant Health*, No. 18-23303 (Bankr. S.D.N.Y. Sept. 20, 2018) (same).

44.    As stated above, the Bid Protections were a material inducement for, and a condition of, execution of the Stalking Horse Agreement by the Stalking Horse Bidder, which was unwilling to serve as Stalking Horse Bidder without assurance of the Bid Protections. The Stalking Horse Bidder's commitment to consummate the sale provides substantial benefits to the Debtor's estate by establishing a framework against which other interested parties can bid. Thus, the Bid Protections are actual and necessary costs of preserving the Debtor's estate within the meaning of section 503(b) of the Bankruptcy Code. Accordingly, the Bid Protections should be accorded administrative expense status.

45.    Based on the foregoing, the Bid Protections represent a reasonable exercise of the Debtor's business judgment and should be approved.

## **WAIVER OF BANKRUPTCY RULE 6004(A), 6004(H), AND 6006(D)**

46.    To successfully implement the foregoing, the Debtor requests that the Court enter an Order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).[4]

## **RESERVATION OF RIGHTS**

47.    Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or should be construed as (a) an admission as to the validity of any particular claim against the Debtor, (b) a waiver of the Debtor's rights to dispute any particular claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion, (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) a waiver or limitation of the Debtor's rights under the Bankruptcy Code or any other applicable law, or (g) a concession by the Debtor that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtor expressly reserves its rights to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be

---

[4] In paragraph 11 of the Bid Procedures Order, the Court pre-approved notice of a hearing on a motion to approve the Stalking Horse Bidder on a date that is "at least five business days after filing the" notice of a hearing [Dkt. No. 220].

construed as an admission as to the validity of any particular claim or a waiver of the Debtor's rights to subsequently dispute such claim.

## NOTICE

48.        Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 2, One Bowling Green, Room 534, New York, NY 10004; (ii) counsel to the Trustee, Chapman and Cutler LLP, 1270 Sixth Avenue, New York, New York 10020 (Attn: Michael Friedman, Esq., David T.B. Audley, Esq., and Eric Silvestri, Esq.); (iii) counsel to the Stalking Horse Bidder, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166 (Attn: Harry R. Silvera, Esq., and Keith R. Martorana, Esq.); and (iv) all other persons and entities that have requested service in this Chapter 11 Case pursuant to Bankruptcy Rule 2002. The Debtor respectfully submits that no further notice is required.

## CONCLUSION

49.        The Debtor respectfully submits that the Bid Protections are reasonable, appropriate, and within the Debtor's sound business judgment under the circumstances because the Bid Protections are designed to maximize the value to be received by the Debtor's estate.

50.        No prior application for the relief sought has been made by the Debtor to this or any other court.

**WHEREFORE**, the Debtor respectfully requests that this Court enter the Order granting

the relief requested herein and such other and further relief as the Court deems just and appropriate.

Dated: February 15, 2024
     New York, New York              Respectfully submitted,

                                    HERRICK, FEINSTEIN LLP


                                  By:*/s/ Stephen B. Selbst*
                                      Stephen B. Selbst
                                      Janice Goldberg
                                      Steven B. Smith
                                      Rodger T. Quigley
                                      2 Park Avenue
                                      New York, NY 10016
                                      Tel: (212) 592-1474
                                      Fax: (212) 545-2345
                                      sselbst@herrick.com
                                      jgoldberg@herrick.com
                                      ssmith@herrick.com
                                      rquigley@herrick.com

                                  *Counsel for the Debtor and Debtor in Possession*

**<u>Exhibit A</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
:
In re                                 :        Chapter 11
:
WYTHE BERRY FEE OWNER LLC,    :        Case No. 22-11340 (MG)
:
          Debtor.[5]          :
:
:
---------------------------------------------------------------X

**ORDER (I) APPROVING DEBTOR'S SELECTION OF A STALKING HORSE BIDDER,**
**(II) APPROVING BID PROTECTIONS IN CONNECTION THEREWITH, AND**
**(III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[6] of Wythe Berry Fee Owner LLC, as debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case"), seeking entry of an order (the "Order"): (i) approving its selection of a Stalking Horse Bidder; (ii) approving bid protections in connection therewith; and (iii) granting related relief; and this Court having jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431* from the United States District Court for the Southern District of New York dated January 31, 2012 (Preska, C.J.); and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of the Chapter 11 Case in this district is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties in interest; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing thereon were

---

[5] The Debtor's principal offices are located at 199 Lee Avenue, Suite 693, Brooklyn, New York 11211. The last four digits of the Debtor's Federal Tax Id. No. are 9776.

[6] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

appropriate under the circumstances and no other notice need be provided; and this Court having

reviewed the Motion and having heard the statements in support of the relief requested therein at

a hearing before this Court (the "Hearing"); and this Court having determined that the legal and

factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted

herein; and after due deliberation and sufficient cause appearing therefore, **IT IS HEREBY**

**FOUND AND DETERMINED THAT**:

A.    Bid Protections.

1.    The Bid Protections: (a) have been negotiated by the Debtor, the Trustee,

and the Stalking Horse Bidder and their respective advisors at arms'-length and in good faith; and

(b) are necessary to ensure that the Stalking Horse Bidder will continue to pursue, and, ultimately,

consummate the purchase of the WV Complex (the "Transaction") pursuant to the terms set forth

in the Stalking Horse Agreement and the Bid Procedures.

2.    The Bid Protections: (a) are actual and necessary costs and expenses of

preserving the Debtor's estate within the meaning of section 503(b) of the Bankruptcy Code and

shall be treated as an allowed administrative expense claim against the Debtor's estate pursuant to

sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code; (b) are commensurate to the real

and material benefits conferred upon the Debtor's estate by the Stalking Horse Bidder; and (c) are

fair, reasonable, and appropriate, including in light of the size, nature, and complexity of the

Transaction and the significant efforts that have been and will continue to be expended by the

Stalking Horse Bidder in connection therewith.

3.    The Bid Protections are a material inducement for, and condition of, the

Stalking Horse Bidder's execution of the Stalking Horse Agreement. The Stalking Horse Bidder

is unwilling to remain obligated to consummate the Transaction or otherwise be bound under the Stalking Horse Agreement absent approval of the Bid Protections.

B.    <u>Adequate Notice</u>. The Motion and the notice of the Hearing was served on the Court's electronic filing system and those parties who filed notices of appearance in the Chapter 11 Case. The notice of the Motion and the Hearing was reasonable and sufficient in light of the circumstances and nature of the relief requested in the Motion and no other or further notice of the Motion or the Hearing was necessary. A reasonable and fair opportunity to object to the Motion and the relief granted in this Order has been afforded to all parties in interest under the circumstances.

C.    <u>Relief is Warranted</u>. The Debtor has demonstrated and proven that its performance of the obligations related to the Stalking Horse Bid and the Bid Protections is in the best interests of the Debtor, its creditors, its estate and all parties in interest, and that the foregoing represents a sound exercise of the Debtor's business judgment. The Debtor has articulated good, sufficient and sound business reasons for selecting the Stalking Horse Bidder and for approving the Bid Protections including: (i) the Stalking Horse Bid constitutes the highest or otherwise best offer that the Debtor has received to date; (ii) the approval of the relief requested is a necessary and constructive step toward the completion of the sale process; and (iii) the Stalking Horse Bid and the Bid Protections allow the Debtor to solicit the highest or otherwise best bid for the WV Complex through the Bid Procedures.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Motion is GRANTED as set forth herein.

2.    William Vale Owner LLC shall be the Stalking Horse Bidder subject to the terms of the Stalking Horse Agreement and as otherwise set forth herein and in the Motion.

3.      The Bid Protections are reasonable and are approved in their entirety subject to the terms of the Stalking Horse Agreement.

4.      The Debtor is authorized to pay the Break-Up Fee and the Expense Reimbursement in cash or by wire transfer of immediately available funds in accordance with the terms of the Stalking Horse Agreement without further action or order by the Court.

5.      The Break-Up Fee and Expense Reimbursement, to the extent payable under the Stalking Horse Agreement, shall constitute allowed administrative expense claims against the Debtor's estate pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code.

6.      Except with respect to the relief expressly granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an admission as to the validity of any particular claim against the Debtor; (b) a waiver of the Debtor's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of any rights, remedies or defenses the Debtor has or may have under the Bankruptcy Code or any other applicable law, all such rights, remedies or defenses are expressly preserved; or (g) a concession by the Debtor that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtor expressly reserves its rights to contest the extent, validity, or perfection or seek avoidance of all such liens.

7.      Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

8.      Notwithstanding the possible applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

28

9.      The Debtor is authorized to take all actions necessary or appropriate to effectuate the relief granted in this Order.

10.     This Court shall retain exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

11.     To the extent there is any conflict between this Order, the Motion or the Stalking Horse Agreement, this Order shall govern.

New York, New York
Dated: February __, 2024

_____
THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**Declaration of Scott B. Ellman**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------X
                                                              :
In re                                                         :        Chapter 11
                                                              :
WYTHE BERRY FEE OWNER LLC,                                    :        Case No. 22-11340 (MG)
                                                              :
                Debtor.[1]                                    :
                                                              :
                                                              :
----------------------------------------------------------------X

**DECLARATION OF SCOTT B. ELLMAN IN SUPPORT OF DEBTOR'S MOTION FOR
THE ENTRY OF AN ORDER (I) APPROVING ITS SELECTION OF A STALKING
HORSE BIDDER, (II) APPROVING BID PROTECTIONS IN CONNECTION
THEREWITH, AND (III) GRANTING RELATED RELIEF**

I, Scott B. Ellman, pursuant to section 1746 of title 28 of the United States Code, hereby

declare that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am a Managing Director of Eastdil Secured, L.L.C. ("Eastdil"), a premier

independent real estate investment bank with expertise in commercial real estate and capital

markets.

2.      I am over the age of 18, I am authorized to execute this Declaration (the

"Declaration") on behalf of Eastdil, and I am competent to testify.

3.      I respectfully submit this Declaration in support of the Debtor's motion (the

"Motion"), seeking entry of an order: (i) approving its selection of a Stalking Horse Bidder (as

defined below); (ii) approving bid protections in connection therewith; and (iii) granting related

relief, pursuant to sections 105, 363 and 503, and 507, United States Code, 11 U.S.C. §§ *et seq.*,

rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure, and rules 2002-1 and 6004-1

---

[1] The Debtor's principal offices are located at The William Vale Hotel, 111 N. 12th Street, Brooklyn, NY 11249. The last four digits of the Debtor's Federal Tax Id. No. are 9776.

of the Local Bankruptcy Rules for the Southern District of New York, filed contemporaneously herewith.

4. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtor's operations and finances, personal knowledge gleaned during the course of my engagement, personal knowledge based on my restructuring asset sale experience, my discussions with the Debtor's management, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor's operations and financial affairs.

## **Qualifications**

5. Eastdil is one of the largest independent commercial real estate investment banks in the world by transaction volume and has recently been recognized as a top global advisor on transactions of $100 million and higher; a top debt placement platform in the United States and Europe; and a leader in office, retail, multifamily, hotel, and industrial investment sales in the United States and Europe.

6. I have been with Eastdil for over sixteen years and have extensive experience in commercial real estate transactions, including the disposition of hotels and hospitality assets in and out of bankruptcy.

## **Background**

7. The Debtor entered into an engagement letter with Eastdil and A&G Realty Partners, LLC ("A&G"), dated October 8, 2023, to retain Eastdil and A&G to arrange the sale of The William Vale Hotel, office, retail, and parking located at 55 Wythe Avenue, Brooklyn, New York (the "WV Complex") by a disposition of the entire WV Complex or a portion of or partial interest in the same.

2

8.      On October 26, 2023, the Debtor filed the *Application for Authority to Retain and Employ Eastdil Secured, L.L.C. and A&G Realty Partners, LLC as Exclusive Real Estate Brokers for the Debtor* [Dkt. No. 197], which was supported by declarations from me and Emilio Amendola of A&G. Mr. Amendola and I then executed supplemental declarations to provide clarifications, which were filed to the docket in the Chapter 11 Case on December 20, 2023 [Dkt. Nos. 226-27]. The Court signed the *Order Authorizing Retention and Employment of Eastdil Secured, L.L.C. and A&G Realty Partners, LLC as Exclusive Real Estate Brokers for the Debtor* [Dkt. No. 228] later that day.

### The Marketing Process

9.      On November 16, 2023, the Debtor filed the *Motion of Wythe Berry Fee Owner LLC For Entry of an Order (I) Approving the Bid Procedures for the Sale of the WV Complex, (II) Scheduling Certain Dates, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Dkt. No. 216] (the "Bid Procedures Motion") which sought approval of bid procedures (the "Bid Procedures") [Dkt. No. 216].

10.     On December 8, 2023, the Court entered an order (the "Bid Procedures Order"), approving the Bid Procedures [Dkt. No. 220].

11.     The Bid Procedures Order authorizes the Debtor to enter into a stalking horse agreement for the sale of the WV Complex and offer a stalking horse purchaser certain bid protections, subject to the approval of this Court.

12.     To maximize the value of its assets, the Debtor, in consultation with Mishmeret Trust Company Ltd., Trustee of the Series C Notes (the "Trustee")—with whom the Bid Procedures Order requires the Debtor to consult about selection of bids, among other things—has

HF 17227866v.4

undergone an open process for the solicitation, receipt, and evaluation of bids for the purchase of the WV Complex.

13.    The Debtor, in consultation with Eastdil and A&G (together, the "Brokers"), developed a list of over 5,000 parties whom it believed would be interested in, and whom the Debtor believed would have the financial resources to consummate, a Sale, including strategic parties, private equity firms, and traditional financial institutions. As part of that process, over 180 potential investors executed non-disclosure agreements. Prospective bidders were granted access to a virtual data room populated with diligence materials to facilitate their evaluation and assessment of the WV Complex.

14.    The Debtor's marketing process produced numerous non-binding bids for the WV Complex. The Debtor, in consultation with the Trustee and its Brokers, engaged with certain of these bidders in order to diligence the bids and bidders, increase competitive tension, and identify the bid that provides the best value for the Debtor's estate.

15.    On January 9, 2024, the Debtor received a bid (the "Initial Bid") from William Vale Owner LLC (the "Stalking Horse Bidder").

16.    Thereafter, the Debtor and Stalking Horse Bidder and their respective advisors negotiated in good faith and at arms'-length and exchanged multiple drafts of a purchase and sale agreement to memorialize the terms of the Stalking Horse Bidder's offer to purchase the WV Complex.

17.    Following extensive negotiations with the Debtor and representatives of the Trustee, the Stalking Horse Bidder increased the amount of its Initial Bid to $177,000,000 in cash and assumption of certain liabilities as described in the agreement (the "Stalking Horse Bid").

4

18.     On February 13, 2024, a purchase and sale agreement was executed by the Stalking Horse Bidder and the Debtor (the "Stalking Horse Agreement").

19.     The Debtor compared the Stalking Horse Bid against all other bids received and determined, in the exercise of its business judgment and in a manner consistent with the exercise of its fiduciary duties, and in consultation with the Trustee and the Brokers, that the Stalking Horse Bid represents the highest and best bid for the Debtor and its estate at this time because it is a cash offer for a higher purchase price than any other bid and contains other terms and conditions favorable to the Debtor.

**The Reasonableness of the Bid Protections**

20.     The Bid Protections in the Stalking Horse Agreement consist of (a) a break-up fee equal to 2.5% of the cash purchase price (the "Break-Up Fee"), and the reimbursement of all reasonable and documented fees and expenses incurred by the Stalking Horse Bidder and its advisors in connection with the transaction up to a maximum of $250,000 (the "Expense Reimbursement"), each of which are payable only in the limited circumstances set forth in the Stalking Horse Agreement. Importantly, the Break-Up Fee is only payable in connection with an alternative transaction and thus would be paid out of the proceeds from such alternative transaction.

21.     Based on my professional experiences as a real estate broker, bid protections, including break-up fees and expense reimbursements, are an essential and common tool used in real estate transactions implemented through a bankruptcy process to induce prospective purchasers to make a firm commitment to the transaction, given the fiduciary duties imposed on debtors in possession to maximize value for the benefit of stakeholders, and are broadly accepted by bankruptcy courts.

5

22.      I believe that, by providing bid protections in exchange for a purchaser's firm commitment, a debtor receives a level of certainty that may be otherwise unavailable absent such protections due to the unique challenges and uncertainty inherent in bankruptcy sales.

23.      In addition to certainty, I believe that bid protections provide a debtor with flexibility to consider alternative transaction proposals that exceed the sum of the stalking horse purchaser's bid and that the protections are especially important in a competitive bidding situation because the purchaser's committed bid sets the floor for other interested parties. Accordingly, in my professional experience, bid protections are a standard and customary means to provide tremendous value to a debtor/seller and to facilitate a value-maximizing transaction.

24.      In my experience, after reaching agreement on the terms of such a transaction, a debtor often seeks the approval of bid protections to, among other things: (a) induce the proposed purchaser to firmly commit to such transaction; and (b) compensate the stalking horse purchaser for the time, risk, and expense associated with (i) moving forward with a transaction in a potentially uncertain bankruptcy process and (ii) setting a floor for other potential purchasers who seek to propose an alternative transaction. Accordingly, when serving as a debtor's real estate broker, I regularly advise such debtor to consent to providing bid protections when requested by a prospective purchaser.

25.      Based on my professional experience, I believe that the facts and circumstances of the specific transaction largely influences the amount of bid protections a debtor should reasonably provide, and the following factors are typically relevant: (a) the timeline for consummating a transaction; (b) the need for certainty; (c) the purchase price; (d) whether "credible" alternatives exist; (e) whether an adequate "market-test" has occurred following comprehensive and professional marketing process; (f) whether the prospective buyer has the sophistication and

6

financial wherewithal to close the transaction; and (g) whether the prospective buyer requires bid protections to proceed with a transaction.

26.    Here, the Brokers conducted a comprehensive and transparent marketing process that adequately tested the market. This process resulted in the Debtor's entry into the Stalking Horse Agreement, which the Debtor determined, in its business judgment, represented the best actionable transaction to maximize value.

27.    Based on my participation in negotiations with the Stalking Horse Bidder, it was unwilling to hold open its bid or enter into the Stalking Horse Agreement without the assurance provided by the Bid Protections, including the Break-Up Fee and Expense Reimbursement, as set forth in the Stalking Horse Agreement. It is my professional opinion, given the facts and circumstances of the Chapter 11 Case as I understand them, that the Bid Protections are reasonable, designed to maximize value, and in the best interests of the Debtor's estate for the reasons set forth herein.

28.    ***First***, the Bid Protections provide the certainty of a transaction that the Debtor has determined, in its business judgment, will maximize value for its estate in a timely manner. Notably, that transaction also has the preliminary consent of the Trustee on behalf of the Series C Noteholders, the Debtor's largest creditor constituency. The Stalking Horse Bidder, however, was unwilling to proceed without the Debtor's agreement to the Bid Protections. Accordingly, if the Bid Protections are approved by the Court, the Debtor will be able to "lock in" the Stalking Horse Bidder's firm commitment to consummate a restructuring transaction negotiated at arms-length by sophisticated parties. If unable to do so, the Debtor risks the Stalking Horse Bidder walking away from the transaction, which could adversely impact the Debtor's estate. Given the Debtor's need to consummate a value-maximizing transaction, its determination that the Stalking Horse

7

Agreement represents such transaction following the marketing process, and its need to provide the Bid Protections to induce the Stalking Horse Bidder's ongoing commitment to the restructuring transaction embodied in the Stalking Horse Agreement, I believe that providing the Bid Protections in exchange for the certainty of the Stalking Horse Bidder's firm commitment is reasonable.

29.    *Second*, the Bid Protections will provide a floor for any alternative transaction. The Stalking Horse Agreement contains a fiduciary-out provision and the Debtor is not subject to a "no shop" or any other provision restricting its ability to consider any alternative offers that may be presented during the Chapter 11 Case. The Bid Protections will serve to provide the Debtor with the certainty and benefits of the value-maximizing transaction reflected therein, while simultaneously establishing a floor so that interested parties may still submit proposals for an alternative transaction that represents a higher or better offer.

30.    *Third*, it is my professional opinion that the amount of the Break-Up Fee is within the range of break-up fees offered in other cases I have seen throughout my career, and the Expense Reimbursement is appropriate in light of the complexity of the transaction reflected in the Stalking Horse Agreement. The Break-Up Fee amounts to at most 2.5% of the $177,000,000 purchase price provided under the Stalking Horse Agreement. The Expense Reimbursement of up to $250,000, which the Stalking Horse Bidder is entitled to receive only in certain circumstances when it is payable for efforts and resources expended and opportunities foregone buy the Stalking Horse Bidder while negotiating and reasonably relying on the Stalking Horse Agreement, amounts to less than .15% of the purchase price. During my career, I have generally seen break-up fees offered in the range of 1% to 3%. The Break-Up Fee is within this range and is consistent with similarly complex transactions I have seen.

8

31.     For these reasons, I believe that the Bid Protections are reasonable, are designed to maximize value, and are in the best interests of the Debtor's estate.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: February 15, 2024
       New York, New York                    /s/ *Scott B. Ellman*
                                             Scott B. Ellman
                                             Managing Director

9

## **Exhibit C**

**Stalking Horse Agreement**

**EXECUTION VERSION**

**PURCHASE AND SALE AGREEMENT**

**DATED AS OF FEBRUARY 13, 2024**

**BY AND BETWEEN**

**WYTHE BERRY FEE OWNER LLC, as Seller**

and

**WILLIAM VALE OWNER LLC, as Buyer**

**Property**:

The William Vale Hotel
111 N. 12th Street
aka 55 Wythe Avenue
Brooklyn, New York 11249

# TABLE OF CONTENTS

Page

Article I DEFINITIONS ...................................................................2

   Section 1.1 Definitions ...............................................................2
   Section 1.2 Other Definitions and Interpretive Matters............................10

Article II PURCHASE AND SALE .......................................................12

   Section 2.1 Purchase and Sale of the Acquired Assets..............................12
   Section 2.2 Assumed Liabilities ....................................................14
   Section 2.3 Excluded Liabilities ...................................................14
   Section 2.4 Assignment of Contracts and Leases ...................................14
   Section 2.5 MIPA .................................................................15

Article III PURCHASE PRICE ..........................................................16

   Section 3.1 Purchase Price .........................................................16
   Section 3.2 Deposit ...............................................................16
   Section 3.3 Closing Date Payments .................................................17
   Section 3.4 Discharge of Assumed Liabilities After Closing........................17
   Section 3.5 Allocation of Purchase Price ..........................................17

Article IV CLOSING ...................................................................17

   Section 4.1 Closing Date ...........................................................17
   Section 4.2 Buyer's Deliveries .....................................................18
   Section 4.3 Seller's Deliveries ....................................................18
   Section 4.4 Prorations ............................................................20

Article V REPRESENTATIONS AND WARRANTIES OF SELLER.......................23

   Section 5.1 Organization and Qualification ........................................23
   Section 5.2 Authorization of Agreement ...........................................23
   Section 5.3 Conflicts; Consents ...................................................23
   Section 5.4 Leases................................................................24
   Section 5.5 Contracts ............................................................24
   Section 5.6 No Litigation..........................................................24
   Section 5.7 Eminent Domain .......................................................24
   Section 5.8 Employment Matters....................................................24
   Section 5.9 Sales, Use and Occupancy Taxes .......................................25
   Section 5.10 Financial Statements ..................................................25
   Section 5.11 Foreign Person .......................................................25
   Section 5.12 Capital Improvements .................................................25
   Section 5.13 Ground Lease .........................................................26
   Section 5.14 Trademarks ...........................................................26

Section 5.15 Liquor License .................................................................................26
Section 5.16 Anti-Money Laundering .................................................................26
Section 5.17 OFAC...............................................................................................26
Section 5.18 No Other Representations or Warranties .........................................26
Section 5.19 Any and all uses of the phrase "to Seller's knowledge" or words of similar import
    in this Agreement shall mean the actual knowledge of Asaf Ravid (the "Seller
    Knowledge Individual")...................................................................................27

Article VI REPRESENTATIONS AND WARRANTIES OF BUYER......................................27

Section 6.1 Organization and Qualification.........................................................27
Section 6.2 Authorization of Agreement .............................................................27
Section 6.3 Conflicts; Consents ..........................................................................28
Section 6.4 Financing ..........................................................................................28
Section 6.5 No Litigation.....................................................................................28
Section 6.6 No Foreign Person ............................................................................29
Section 6.7 Anti-Money Laundering ...................................................................29
Section 6.8 OFAC.................................................................................................29
Section 6.9 No Additional Representations or Warranties ...................................30

Article VII BANKRUPTCY COURT MATTERS.................................................................30

Section 7.1 Bankruptcy Actions ..........................................................................30
Section 7.2 Sale Order ..........................................................................................31
Section 7.3 Approval ............................................................................................32

Article VIII COVENANTS AND AGREEMENTS ...............................................................33

Section 8.1 Continued Operations .......................................................................33
Section 8.2 Access to Information........................................................................35
Section 8.3 Reasonable Efforts; Cooperation ......................................................37
Section 8.4 Further Assurances ............................................................................37
Section 8.5 Insurance Matters..............................................................................37
Section 8.6 Receipt of Misdirected Assets; Liabilities ........................................37
Section 8.7 Title....................................................................................................38
Section 8.8 Employees..........................................................................................40
Section 8.9 Casualty; Condemnation ...................................................................41
Section 8.10 Broker ..............................................................................................43
Section 8.11 Liquor Licenses................................................................................43
Section 8.12 Trademarks ......................................................................................43
Section 8.13 Acknowledgment by Buyer .............................................................43

Article IX CONDITIONS TO CLOSING ............................................................................44

Section 9.1 Conditions Precedent to the Obligations of Buyer and Seller ...............44
Section 9.2 Conditions Precedent to the Obligations of Buyer .................................45
Section 9.3 Conditions Precedent to the Obligations of Seller.................................45

Article X TERMINATION ...................................................................................................46

Section 10.1 Termination of Agreement.................................................................46
Section 10.2 Effect of Termination.........................................................................48

Article XI TAXES ............................................................................................................49

Section 11.1 Taxes ..................................................................................................49
Section 11.2 Reimbursements..................................................................................49
Section 11.3 Cooperation.........................................................................................49
Section 11.4 Preparation of Tax Returns and Payment of Taxes ............................49

Article XII MISCELLANEOUS........................................................................................50

Section 12.1 Non-Survival of Representations and Warranties and Certain Covenants; Certain
            Waivers...............................................................................................50
Section 12.2 Expenses .............................................................................................50
Section 12.3 Notices ................................................................................................50
Section 12.4 Binding Effect; Assignment................................................................51
Section 12.5 Amendment and Waiver .....................................................................52
Section 12.6 Third Party Beneficiaries ...................................................................52
Section 12.7 Non-Recourse .....................................................................................52
Section 12.8 Severability .........................................................................................52
Section 12.9 Construction ........................................................................................52
Section 12.10 Electronic Signatures ........................................................................52
Section 12.11 Complete Agreement .........................................................................53
Section 12.12 Specific Performance .........................................................................53
Section 12.13 Jurisdiction and Exclusive Venue......................................................53
Section 12.14 Governing Law; Waiver of Jury Trial ...............................................54
Section 12.15 No Right to Set Off ............................................................................54
Section 12.16 Counterparts .......................................................................................55
Section 12.17 Publicity .............................................................................................55
Section 12.18 Bulk Sales Laws.................................................................................55
Section 12.19 Recordation ........................................................................................55
Section 12.20 Condition of Delivery ........................................................................56
Section 12.21 INDEPENDENT COUNSEL .............................................................56
Section 12.22 No Partnership ....................................................................................56
Section 12.23 Time of Essence .................................................................................56
Section 12.24 Merger/AS IS, WHERE IS ................................................................56
Section 12.25 Special Damages ................................................................................57
Section 12.26 Survival...............................................................................................58

<u>EXHIBITS</u>

EXHIBIT A Legal Description

EXHIBIT B Membership Interest Purchase Agreement

EXHIBIT C Permitted Exceptions

EXHIBIT D Form of Deed

EXHIBIT E Form of Bill of Sale and Assignment and Assumption Agreement

EXHIBIT F Form of Escrow Agreement

EXHIBIT G Form of Title Affidavit

EXHIBIT H Form of Noho Estoppel Certificate

EXHIBIT I Form of Tenant Estoppel Certificate

<u>SCHEDULES</u>

<u>Schedule 1.1</u> – Sale Order Provisions

<u>Schedule 2.1(d)</u> – Leases

<u>Schedule 2.1(f)</u> – Contracts

<u>Schedule 2.2(c)</u> – Cure Costs

<u>Schedule 3.5</u> – Allocated Purchase Price

<u>Schedule 4.4(i)</u> – Vending Machines

<u>Schedule 4.4(j)</u> – Tenant Improvement, Leasing Commissions and other Concessions

<u>Schedule 5.8</u> – Employment Matters

<u>Schedule 5.12</u> – Anticipated Capital Improvements

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "**Agreement**") is made as of February 13, 2024 (the "**Effective Date**"), by and between Wythe Berry Fee Owner LLC, a Delaware limited liability company ("**Seller**") and William Vale Owner LLC, a Delaware limited liability company ("**Buyer**").  Capitalized terms used herein and not otherwise defined herein have the meaning set forth in <u>Article I</u>.

## RECITALS

WHEREAS, Seller is the fee simple owner of a commercial real property complex located at 111 N. 12th Street, Brooklyn, New York 11249 aka 55 Wythe Avenue, Brooklyn, New York 11249 that is comprised of a 183-room luxury hotel, commonly known as "The William Vale Hotel" (the "**Hotel**") as well as office space, retail space and parking (collectively the "**WV Complex**").  The legal description of the underlying land of the WV Complex is more particularly described in **<u>Exhibit A</u>** attached hereto and incorporated herein by this reference (the "**Land**");

WHEREAS, on October 6, 2022 (the "**Petition Date**"), Mishmeret Trust Company Ltd ., solely in its capacity as Trustee of the Series C Bonds ("**Bondholder**"), Yelin Lapidot Provident Funds Management Ltd., The Phoenix Insurance Company Limited and Klirmark Opportunity Fund III L.P. filed an involuntary petition in the matter *In re Wythe Berry Fee Owner LLC*, Case No. 22-11340 (MG) seeking entry of an Order for Relief pursuant to Title 11, United States Code (the "**Bankruptcy Code**"), Section 303 against Seller in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, on January 18, 2023, the Bankruptcy Court entered an Order for Relief against Seller;

WHEREAS, Buyer has delivered, or is delivering within two Business Days of the Effective Date, to the Deposit Escrow Agent (defined below) an amount in cash equal to seven and one-half percent (7.5%) of the Cash Consideration (the "**Initial Deposit**") in immediately available funds pursuant to the terms of the Bid Procedures Order;

WHEREAS, Seller desires to sell to Buyer all of the Acquired Assets (defined below) and transfer to Buyer the Assumed Liabilities (defined below) and Buyer desires to purchase from Seller all of the Acquired Assets and assume all of the Assumed Liabilities, in each case upon the terms and conditions hereinafter set forth;

WHEREAS, the execution and delivery of this Agreement and Seller's ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order (defined below) under, *inter alia*, Sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, the Parties desire to consummate the proposed transactions set forth in this Agreement as promptly as practicable after the Bankruptcy Court enters the Sale Order.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the

receipt and adequacy of which are hereby acknowledged and intending to be legally bound hereby, the Parties agree as follows:

**ARTICLE I**
**DEFINITIONS**

Section 1.1    **Definitions**.  For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"**Accrued PTO**" means the monetary value of any vacation days, sick days and other "paid time off" days to the extent accrued by the Employees as of the time in question (computed by reference to, as applicable, the rate of the salaries and wages earned by such Employees as of the time in question), and all employment taxes with respect thereto, including, without limitation, withholding or employer contributions under the Federal Insurance Contribution Act and Federal Unemployment Taxes Act.

"**Acquired Assets**" shall have the meaning set forth in <u>Section 2.1</u>.

"**Additional Deposit**" shall have the meaning set forth in <u>Section 4.1</u>.

"**Advisors**" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

"**Affiliate**" means, with respect to any Person and as of any relevant time, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person. For purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

"**Agreement**" shall have the meaning set forth in the Preamble.

"**Agreement Dispute**" shall have the meaning set forth in <u>Section 12.13</u>.

"**Allocation**" shall have the meaning set forth in <u>Section 3.6(a)</u>.

"**Assignment and Assumption Agreement**" shall have the meaning set forth in <u>Section 4.2(e)</u>.

"**Assumed Liability**" or "**Assumed Liabilities**" shall have the meaning set forth in <u>Section 2.2</u>.

"**Auction**" shall have the meaning set forth in the Bidding Procedures.

"**Backup Bidder**" shall have the meaning set forth in <u>Section 7.1(d)</u>.

-2-

"**Bankruptcy Case**" means the Chapter 11 Proceeding of Seller pending in the Bankruptcy Court.

"**Bankruptcy Code**" means Title 11 of the United States Code, Sections 101 et seq.

"**Bankruptcy Court**" shall have the meaning set forth in the Recitals.

"**Bar Date Motion**" shall have the meaning set forth in Section 5.9(a).

"**Bid Procedures**" means the bid procedures attached as Exhibit 1 to the Bid Procedures Order and approved by the Bankruptcy Court pursuant to the Bid Procedures Order and as amended and supplemented.

"**Bid Procedures Order**" means the *Order, (I) Approving the Bid Procedures, (II) Scheduling Certain Dates, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures and (V) Granting Related Relief* (Docket No. 220).

"**Breakup Fee**" shall have the meaning set forth in Section 10.2(c).

"**Brokers**" shall have the meaning set forth in Section 8.10.

"**Business Day**" means any day of the year, other than a Saturday or Sunday, on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized by Law to close.

"**Buyer**" shall have the meaning set forth in the Preamble.

"**Cash Consideration**" means One Hundred Seventy-Seven Million and 00/100 U.S. dollars ($177,000,000.00).

"**Casualty Notice**" shall have the meaning set forth in Section 8.9(a).

"**Chosen Courts**" shall have the meaning set forth in Section 12.13.

"**Claims**" means all claims, causes of action, rights of recovery (including rights of indemnity, warranty rights, rights of contribution, rights to refunds and rights to reimbursement) and rights of set-off, in each case, of whatever kind or description against any Person (including any claim as defined in the Bankruptcy Code).

"**Closing**" shall have the meaning set forth in Section 4.1.

"**Closing Date**" shall have the meaning set forth in Section 4.1.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Community Board**" shall have the meaning set forth in Section 5.15.

"**Compensation**" means all wages, salaries, Employee Leave, fringe benefits, mandatory withholdings, garnishments, payroll taxes, and other costs of employment of the Employees, including, without limitation, incentive compensation, commissions, termination and severance payments, relocation payments, workers' compensation, sick pay, dues, vacation, "PTO" and retirement payments (including any matching, profit sharing or other employer contributions to any defined contribution pension plan), medical and other welfare benefits, deferred compensation or remuneration in any other form (including any type of employee benefit or insurance), and payroll taxes payable on any such Employee compensation or remuneration.

"**Confidentiality Agreement**" means that certain letter agreement, dated as of November 7, 2023 by and between Seller and Buyer.

"**Consent**" means any approval, consent, ratification, permission, waiver, Governmental Authorization or other authorization, or an Order of the Bankruptcy Court that renders unnecessary the same.

"**Contract**" means any contract, agreement, undertaking, lease, sublease, license, sublicense, sales order, purchase order or other instrument or commitment, whether written or oral, that is binding on any Person or any part of its property under applicable Law.

"**Cure Costs**" means, with respect to any Contract, the amount required to be paid with respect to such Contract to cure all monetary defaults under such Contract to the extent required by section 365(b) of the Bankruptcy Code.

"**Dataroom**" shall have the meaning set forth in Section 5.18.

"**Deposit**" shall have the meaning set forth in Section 4.1.

"**Deposit Escrow Agent**" means First American Title Insurance Company.

"**Displaced Hotel Service Workers Act**" shall have the meaning set forth in Section 8.8(a).

"**Documents**" means all of Seller's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"**Effective Date**" shall have the meaning set forth in the Preamble.

"**Employee Liabilities**" means all obligations and liabilities, actual or contingent with respect to Employees, independent contractors or vendor employees claiming employment status with Seller Employer, Seller or Manager, including, without limitation, any and all obligations or

liabilities for: (A) Compensation; (B) contributions and other payments to employee benefit plans; (C) worker's compensation claims based on any real or alleged occurrence; and (D) claims or penalties under applicable Laws governing employer/employee relations (including the National Labor Relations Act and other labor relations laws, fair employment standards Laws, fair employment practices and anti-discrimination Laws, the Worker Adjustment and Retraining Notification Act of 1988 and ERISA).

"**Employees**" shall have the meaning set forth in <u>Section 5.8(a)</u>.

"**Encumbrance**" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

"**Enforceability Exceptions**" shall have the meaning set forth in <u>Section 5.2</u>.

"**EOS Fund**" – means, collectively, (i) EOS Real Estate Partners III, L.P., a Delaware limited partnership, (ii) any other investment fund or investment vehicle (or group of related investment funds or investment vehicles) sponsored, Controlled, or advised by EOS Investors or an Affiliate thereof, (iii) any co-investment or joint venture vehicle sponsored, controlled, or advised by EOS Investors or an Affiliate thereof, and (iv) the general partner(s), managing member(s), or functional equivalent(s) of any of the foregoing.

"**EOS Group**" – means any one or more of (i) EOS Investors and (ii) any EOS Fund.

"**EOS Investors**" – means EOS Real Estate Investors LLC, a Delaware limited liability company.

"**Escrow Agreement**" means the escrow agreement attached as **<u>Exhibit F</u>**.

"**Excluded Assets**" means (a) all rights under the Ground Lease and (b) any and all claims and causes of action, whether known or unknown, contingent, liquidated or disputed, that the Seller may have against any third-parties, including, but not limited to, claims against the tenant and the guarantors under the Ground Lease.

"**Excluded Liabilities**" shall have the meaning set forth in <u>Section 2.3</u>.

"**Expense Reimbursement**" shall have the meaning set forth in <u>Section 10.2(b)</u>.

"**Express Representations**" shall have the meaning set forth in <u>Section 5.18</u>.

"**F&B Operator**" shall have the meaning set forth in <u>Section 4.3(k)</u>.

"**Fraud**" means with respect to a party to this Agreement, an actual and intentional misrepresentation of a material existing fact with respect to the making of any representation or warranty in this Agreement, made by such party to their actual knowledge of its falsity and made

for the purpose of inducing the other party to act, for the avoidance of doubt, taking into account the terms and conditions of this Agreement, but does not include any fraud claim based on constructive knowledge, negligent misrepresentation, recklessness or a similar theory, equitable fraud, promissory fraud or any other fraud or torts based on recklessness or negligence).

"**Governmental Authority**" means any United States federal, state, municipal or local or any foreign government, governmental agency or authority, or regulatory or administrative authority, or any court, tribunal or judicial body having jurisdiction, including the Bankruptcy Court.

"**Governmental Authorization**" means any permit, license, certificate, approval, consent, permission, clearance, designation, qualification, or authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Law.

"**Ground Lease**" means that certain Ground Lease between Seller and Wythe Berry LLC ("**Ground Lessee**") dated February 28, 2017 and terminated as of May 20, 2021, as determined by the U.S. Bankruptcy Court of the Southern District of New York in the Memorandum Opinion and Order Granting Plaintiff's Motion for Partial Summary Judgment Against Wythe Berry LLC dated October 5, 2023.

"**Information Presentation**" shall have the meaning set forth in <u>Section 5.18</u>.

"**Initial Deposit**" shall have the meaning set forth in the Recitals.

"**Intangible Property**" shall have the meaning set forth in <u>Section 2.1(g).</u>

"**Internet Properties**" shall have the meaning set forth in <u>Section 2.1(g)</u>.

"**Law**" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, Order, directive, pronouncement, determination, decision, opinion or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

"**Leases**" shall have the meaning set forth in <u>Section 2.1(d)</u>.

"**Liability**" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, Tax, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"**Liquor Application Documents**" shall have the meaning set forth in <u>Section 4.3(o)</u>.

"**Liquor License**" shall have the meaning set forth in <u>Section 8.11</u>.

"**Liquor License Applicant**" shall have the meaning set forth in <u>Section 2.5</u>.

"**Losses**" shall have the meaning set forth in <u>Section 4.3(n)</u>.

"**Management Company**" shall have the meaning set forth in <u>Section 2.1(h)</u>

"**Manager**" shall have the meaning set forth in <u>Section 2.1(h)</u>.

"**Material Adverse Effect**" means (i) any material adverse change to the Acquired Assets and the Assumed Liabilities or the value thereof, taken as a whole (including a change in law or other event or circumstance that would prohibit or materially limit or restrict use as a hotel of that portion of the Acquired Assets currently being used as a hotel and such limitation or restriction extends or would be reasonably expected to extend for six (6) months or more), or (ii) any event, change condition, circumstance, development or effect that, individually or in the aggregate, would reasonably be expected to prevent or materially impair or delay the ability of Seller to consummate the Closing.

"**Material Damage**" or "**Materially Damaged**" shall have the meaning set forth in <u>Section 8.9(b)</u>.

"**MIPA**" shall have the meaning set forth in <u>Section 2.5</u>.

"**MTC**" shall have the meaning set forth in <u>Section 8.12</u>.

"**NYCDOF**" shall have the meaning set forth in <u>Section 5.9(a)</u>.

"**NYSTAF**" shall have the meaning set forth in <u>Section 5.9(a)</u>.

"**Order**" means any order, injunction, order, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority, including any order entered by the Bankruptcy Court in the Bankruptcy Case (including the Bid Procedures Order and the Sale Order).

"**Ordinary Course**" means the ordinary and usual course of operations of the Property taken as a whole consistent with past practice and taking into account the contemplation, commencement and pendency of the Bankruptcy Case.

"**Outside Date**" shall have the meaning set forth in <u>Section 10.1(c)</u>.

"**Paid Leave Transfer Directive**" shall have the meaning set forth in <u>Section 8.8(d)</u>.

"**Party**" or "**Parties**" means, individually or collectively, Buyer and Seller.

"**Paying Party**" shall have the meaning set forth in <u>Section 11.2</u>.

"**Permits**" means licenses, permits, approvals, certificates, authorizations, testing certifications, testing reports, compliance results, operating permits, registrations, Orders, variances, plans, exemptions and other similar documents and authorizations, required under any applicable Laws for the operation of the Property by Seller.

"**Permitted Encumbrances**" means (i) intentionally omitted, (ii) any items set forth on **Exhibit C** and (iii) Leases set forth on Schedule 2.1(d), as the same may be updated prior to and at the Closing in accordance with the terms hereof.

"**Person**" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, organization, estate, Governmental Authority or other entity or group.

"**Personal Property**" shall have the meaning set forth in Section 2.1(e).

"**Proceeding**" means any Claim, action, complaint, suit, litigation, arbitration, appeal, petition, inquiry, hearing, Order, decree, legal proceeding, investigation, or other legal dispute, whether civil, criminal, administrative or otherwise, at law or in equity, by or before any Governmental Authority.

"**Property**" shall have the meaning set forth in Section 2.1(c).

"**Prorations**" shall have the meaning set forth in Section 4.4.

"**Purchase Price**" shall have the meaning set forth in Section 3.1.

"**Records**" shall have the meaning set forth in Section 2.1(h).

"**Rehired Employee**" shall have the meaning set forth in Section 8.8(b).

"**Reimbursing Party**" shall have the meaning set forth in Section 11.2.

"**Rent Roll**" shall have the meaning set forth in Section 5.4.

"**Representative**" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"**Sale Order**" means an Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby, which Order shall contain the sections attached as Schedule 1.1, with such changes as may be consented to by Buyer (which consent shall not be unreasonably withheld, conditioned or delayed) or as the Parties may mutually agree. Without limiting the foregoing, if the provisions of the Sale Order attached as Schedule 1.1 are proposed to be modified in a manner that would materially and detrimentally affect the Purchase Price, delay the time of Closing or prevent the transfer of the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), then Buyer may exercise its rights to terminate this Agreement in accordance with Section 10.1(i) of this Agreement.

"**Sales Taxes**" shall have the meaning set forth in Section 11.1(b).

"**Seller**" shall have the meaning set forth in the Preamble.

"**Seller Employer**" shall have the meaning set forth in Section 5.8(a).

"**Seller Knowledge Individual**" shall have the meaning set forth in <u>Section 5.19</u>.

"**Seller Parties**" means Seller and its former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, Advisors, successors or permitted assigns.

"**SLA**" shall have the meaning set forth in <u>Section 9.2(e).</u>

"**Social Media Accounts**" means the social media profiles, accounts, addresses and handles (including those made available through Facebook, X (formerly known as Twitter), YouTube, Pinterest, Instagram, Snapchat, TikTok, Foursquare, Tumblr, Spotify and similar platforms).

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other equity interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof.

"**Successful Bidder**" shall have the meaning set forth in <u>Section 7.1(c)</u>.

"**Survey**" shall have the meaning set forth in <u>Section 8.7(a).</u>

"**Tax**" or "**Taxes**" means any federal, state, provincial, local, municipal, foreign or other taxes, duties, levies, governmental charges or assessments in the nature of a tax, including sales, use, goods and services, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, production, environmental, natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment, social security (or similar), disability, workers' compensation, payroll, health care, withholding, estimated or other taxes, duties, levies or other governmental charges or assessments in the nature of a tax or deficiencies thereof (including all interest and penalties thereon and additions thereto).

"**Tax Consideration**" shall have the meaning set forth in <u>Section 3.5(a)</u>.

"**Tax Proceeding**" means any audit, examination, contest, litigation or other Proceeding by or against any taxing authority or otherwise with respect to or relating to Taxes.

"**Tax Return**" means any return, claim for refund, declaration, election, notice, report, statement or information return or other similar document relating to Taxes filed or required to be filed with a Governmental Authority, including any schedule or attachment thereto, and including any amendments thereof.

"**Tenants**" shall mean all tenants, occupants, guests and licensees of the Property.

"**Tenant Deposits**" shall have the meaning set forth in Section 2.1(d).

"**Title Company**" shall have the meaning set forth in Section 8.7(a).

"**Title Objection**" shall have the meaning set forth in Section 8.7(a).

"**Title Report**" shall have the meaning set forth in Section 8.7(a).

"**Trademarks**" shall have the meaning set forth in Section 2.1(g).

"**Transaction Documents**" means this Agreement, the documents and instruments required to be delivered by Buyer and/or Seller pursuant to Section 4.2 and Section 4.3, respectively, the Escrow Agreement and any other agreements, instruments or documents entered into pursuant to this Agreement.

"**Transfer Taxes**" shall have the meaning set forth in Section 11.1(a).

"**Transferred Contracts**" shall have the meaning set forth in Section 2.1(f).

"**UCC Sale**" shall have the meaning set forth in Section 8.12.

"**UCC Foreclosure Bid**" shall have the meaning set forth in Section 8.12.

"**Unclaimed Safe Contents List**" shall have the meaning set forth in Section 4.3(o).

"**Voluntary Liens**" shall have the meaning set forth in Section 8.7(b).

"**WARN Act**" shall have the meaning set forth in Section 8.8(b).

"**WV Complex**" shall have the meaning set forth in Section 2.1(b).

"**WVH**" shall have the meaning set forth in Section 8.12.

Section 1.2    Other Definitions and Interpretive Matters.

(a)    Unless otherwise indicated to the contrary in this Agreement by the context or use thereof:

(i)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Any reference in this Agreement to $ means U.S. dollars.

(iii)    Unless the context otherwise requires, all capitalized terms used in the Exhibits and Schedules shall have the respective meanings assigned in this Agreement.

-10-

All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

(iv)    Any reference in this Agreement to gender includes all genders, and words importing the singular number also include the plural and vice versa.

(v)    The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "Section," "Article," "Schedule," or "Exhibit" are to the corresponding Section, Article, Schedule, or Exhibit of or to this Agreement unless otherwise specified.

(vi)    Words such as "herein," "hereof" and "hereunder" refer to this Agreement as whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

(vii)    The word "extent" and the phrase "to the extent" when used in this Agreement shall mean the degree to which a subject or other thing extends, and such word or phrase shall not merely mean "if."

(viii)    The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(ix)    The word "will" will be construed to have the same meaning and effect as the word "shall".  The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(x)    All references to a day or days will be deemed to refer to a calendar day or calendar days, as applicable, unless otherwise specifically provided.

(xi)    Any document or item will be deemed "conveyed", "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement if such document or item is (A) included in the Dataroom or (B) actually delivered or provided to Buyer or any of Buyer's Advisors.

(xii)    Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

(xiii)    Any reference to any particular Bankruptcy Code or Tax Code section or any Law will be interpreted to include any amendment to, revision of or successor to that section or Law regardless of how it is numbered or classified; provided that, for the purposes of the representations and warranties set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Bankruptcy Code or Tax Code section or Law, the reference to such Bankruptcy Code or Tax Code section or Law means such Bankruptcy Code or Tax Code section or Law as

in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(xiv)    A reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

(b)    **No Strict Construction**.  Buyer, on the one hand, and Seller, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Seller, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    <u>Purchase and Sale of the Acquired Assets</u>.  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Closing, Seller shall sell, transfer, assign and convey to Buyer, or cause to be sold, transferred, assigned and conveyed to Buyer (or its designee) to the extent saleable, transferable, assignable and conveyable, and Buyer (or its designee) shall purchase, acquire and accept from Seller all of Seller's right, title and interest, if any, as of the Closing in, to or under the following assets free and clear of any and all Encumbrances of any and every kind, nature and description, other than Permitted Encumbrances.  Notwithstanding anything to the contrary in this Agreement, the Excluded Assets shall not be included in the Acquired Assets, shall not be transferred and shall remain the property of the Seller:

(a)    Fee simple interest in the Land;

(b)    The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now and hereinafter erected or located on the Land (collectively the "**WV Complex**");

(c)    All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever with respect to the Land or WV Complex, and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possessions, claim and demand whatsoever, both at law and in equity, of Seller of, in and to the Land and the WV Complex and every part and parcel thereof, with the appurtenances thereto (the "**Easements**"; the Land, WV Complex and Easements are herein collectively called, the "**Property**");

(d)      All existing leases, licenses and other occupancy agreements relating to the Property (or any portion thereof)as listed on Schedule 2.1(d) hereof and attached hereto (collectively, the "**Leases**"), if any, and any and all tenant refundable deposits (and any required interest thereon), in the form of cash, letter or credit or otherwise, paid by any Tenant (or in the case of a letter of credit, delivered by the letter of credit issuing bank of any Tenant) under any such Lease and not returned, released or applied by Seller prior to the Closing Date in accordance with this Agreement (collectively, the "**Tenant Deposits**"), if any;

(e)      All tangible personal property owned or leased by Seller that is now or hereafter placed or installed in, on or about the Property and used in connection with the use, ownership, operation, management, maintenance and/or repair of the Property and the operation of the Hotel: (i) all machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures), furnishings, inventory and other property of every kind and nature whatsoever, and (ii) all of the paper goods, linens, maintenance equipment and supplies, inventory, uniforms, office supplies and all similar items used in operation of the Hotel (collectively, the "**Personal Property**");

(f)      All Contracts listed on Schedule 2.1(f) and designated as Transferred Contracts pursuant to Section 2.4 (the "**Transferred Contracts**");

(g)      All of Seller's right, title and interest in, to and arising out of, the Property and/or development entitlements related to the Acquired Assets, including, but not limited to, all permits, licenses (but specifically excluding any alcohol, liquor or beer licenses), rights of way, plans, maps, specifications, surveys, warranties, guaranties, agreements, contracts, air rights, if any, off-site parking rights, approvals, utility rights, development rights and similar rights related to the Property, whether granted by governmental or quasi-governmental authorities or private persons including all of Seller's right, title and interest to all guest and customer lists, reservations, bookings and inquiries, licenses, telephone numbers, and concessions, and including without limitation trade names, trademarks and service marks with respect to "The William Vale Hotel" ("**Trademarks**") and Internet domain names, URLs, internet protocol addresses, Social Media Accounts, registrations or web addresses used in connection with the Property and the Hotel, (including, without limitation, www.thewilliamvale.com, the "**Internet Properties**") (the items described in this Section 2.1(g), collectively, the "**Intangible Property**");

(h)      All records, statements, invoices, files, books and other data in Seller's possession or control or under the control of Performance Interim Advisory LLC (the "**Manager**" or the "**Management Company**"), and associated primarily with the ownership, use and operation of the Land, and/or the WV Complex (collectively, the "**Records**").  Buyer agrees to preserve at the Property or at another location selected by Buyer in the New York Metropolitan area, to the extent required by the Bankruptcy Court, all employment records and sales records conveyed by Seller until entry of a final decree in the Bankruptcy Case, at Buyer's sole cost and expense.  Where there is a legitimate purpose not injurious to the other party or if there is a tax audit, other governmental inquiry, or litigation or prospective litigation to which Seller is, or may become, a party, making necessary Seller's access to such records, Buyer will allow representatives of Seller access to such records during regular business hours at Buyer's place of business for the sole purpose of obtaining information for use as aforesaid for the statutory period.

The Land, together with the WV Complex, Easements, Leases, Tenant Deposits, Transferred Contracts, Personal Property, Intangible Property and Records are collectively hereinafter referred to as the "**Acquired Assets**".

Section 2.2    Assumed Liabilities.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Buyer shall assume and agree to perform and discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), the following Liabilities (collectively, the "**Assumed Liabilities**"):

(a)    all Liabilities and obligations of Seller under the Transferred Contracts that become due from and after, solely to the extent relating to facts, occurrences or other circumstances first arising on or after, the Closing;

(b)    all Liabilities arising from the ownership of the Acquired Assets and the use thereof by Buyer solely to the extent first arising on or after the Closing; and

(c)    subject to the terms, conditions and procedures set forth in the Bid Procedures Order, all Cure Costs related to the assignment and assumption of the Transferred Contracts and Leases that are listed on Schedule 2.2(c); provided, that if the Cure Costs associated with any Transferred Contract or Lease are adjudicated to be in excess of the Cure Costs identified on Schedule 2.2(c) (other than to a de minimis extent), then Buyer shall have the right to remove such Transferred Contract or Lease from Schedule 2.2(c), and the Cure Costs (and any related rejection damages or termination costs) associated with such Transferred Contract or Lease shall not be Assumed Liabilities hereunder.  If Buyer elects not to assume any Contracts or Leases other than as set forth in the proviso in the immediately preceding sentence, then Buyer shall pay any and all costs of such terminations.

Section 2.3    Excluded Liabilities.  Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform, or otherwise discharge, and Seller shall be solely and exclusively liable with respect to, any Liability of Seller that is not an Assumed Liability (such Liabilities, collectively, the "**Excluded Liabilities**").

Section 2.4    Assignment of Contracts and Leases.  The Sale Order shall, to the extent permitted by Law, provide for the assignment by Seller to Buyer, effective upon the Closing, of the Transferred Contracts and Leases in accordance with this Section 2.4.

(a)    Schedule 2.2(c) sets forth, with respect to each Transferred Contract and Lease at the Property, the Seller's good faith estimate of the amount of the Cure Costs.  Prior to the entry of the Sale Order, Seller shall have obtained an order of the Bankruptcy Court determining the Cure Costs with respect to any Transferred Contract or Lease and prior thereto, shall act in a commercially reasonable manner and in good faith to negotiate or litigate, if necessary, with any counterparty to a Transferred Contract or Lease, the Cure Costs needed to cure all monetary defaults under such Transferred Contract or Lease, and Seller shall further use commercially reasonable efforts to cooperate with Buyer in its efforts to reduce Cure Costs (including through the negotiation of rent reductions and other concessions under any Transferred Contracts or Leases).  Notwithstanding the foregoing, at any time prior to the Closing, Buyer may

identify any Transferred Contract or Lease that Buyer no longer desires to have assigned to it and such Transferred Contract or Lease shall be deemed to be removed from Schedule 2.1(f).

(b)     Seller shall provide timely and proper written notice of the motion seeking entry of the Sale Order to Buyer and shall use commercially reasonable efforts to provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts to which Seller is a party that are Transferred Contracts and take all other actions reasonably necessary to cause such Contracts to be assigned to Buyer pursuant to section 365 of the Bankruptcy Code.  At the Closing, Seller shall assign to Buyer the Transferred Contracts that may be assigned by any such Seller to Buyer pursuant to sections 363 and 365 of the Bankruptcy Code.

(c)     In connection with and upon the assignment to Buyer of any Transferred Contract or Lease pursuant to this Section 2.4, Buyer shall pay all of the Cure Costs consistent with the terms and conditions of the Bid Procedures Order and the allocation of Assumed Liabilities and Excluded Liabilities set forth in Section 2.2 (c) and Section 2.3.

(d)     If Seller is unable to assign any Transferred Contract of Lease to Buyer as a result of an Order of the Bankruptcy Court or applicable Law, then Buyer and Seller shall use commercially reasonable efforts prior to the Closing to obtain, and to cooperate in obtaining, all Consents and Governmental Authorizations from Governmental Authorities and third parties necessary to assign such Transferred Contract or Lease to Buyer; provided, however, neither Buyer nor Seller shall be required to pay any amount or incur any obligation to any Person from whom any such Consent or Governmental Authorization may be required in order to obtain such Consent.

(e)     Notwithstanding any provision herein to the contrary, a Contract or a Lease shall not be a Transferred Contract hereunder and shall not be assigned by the Seller and assumed by Buyer to the extent that such Contract or Lease requires a Consent or Governmental Authorization (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of Seller's rights under such Contract, if such Consent or Governmental Authorization has not been obtained prior to the Closing.  In such event, the Closing will proceed with respect to the remaining Acquired Assets upon the terms and subject to the conditions hereof, and there will be no reduction in the Purchase Price as a result thereof, and Seller shall terminate any such outstanding Contracts or Leases.  For the avoidance of doubt, the consummation of the transactions contemplated by this Agreement shall in no way be contingent or conditioned on obtaining any such Consents for the assignment of the Transferred Contracts or Leases.

Section 2.5     MIPA.  Concurrently with the execution of this Agreement, Buyer and Seller shall execute and deliver in escrow, that certain Membership Interest Purchase Agreement (the "**MIPA**") attached hereto as **Exhibit B**, pursuant to which, simultaneous with the Closing hereunder, Buyer shall acquire 100% of the membership interests in, and issued by WB FNB LLC, a Delaware limited liability company ("**Liquor License Applicant**").  The MIPA will be released from escrow upon the entry of a Sale Order approving this Agreement and identifying the Buyer as the chosen purchaser of the Property.  If the Buyer is not chosen as the purchaser by the Sale Order, this Agreement and the MIPA shall be deemed terminated and the Deposit shall be returned to Buyer pursuant to the provisions of Article X.

**ARTICLE III**
**PURCHASE PRICE**

Section 3.1    Purchase Price.    The purchase price (the "**Purchase Price**") for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to and under the Acquired Assets shall consist of:

(a)    cash in the amount of the Cash Consideration; and

(b)    the assumption of the Assumed Liabilities.

BUYER EXPRESSLY AGREES AND ACKNOWLEDGES THAT BUYER'S OBLIGATION TO PAY THE PURCHASE PRICE AND OTHERWISE CONSUMMATE THE TRANSACTIONS CONTEMPLATED HEREBY ARE NOT IN ANY WAY CONDITIONED UPON BUYER'S ABILITY TO OBTAIN FINANCING OF ANY TYPE OR NATURE WHATSOEVER (I.E., WHETHER BY WAY OF DEBT FINANCING, EQUITY INVESTMENT OR OTHERWISE).

Section 3.2    Deposit.

(a)    Buyer has delivered, or will deliver within two (2) Business Days of the Effective Date, to the Deposit Escrow Agent the Initial Deposit in immediately available funds pursuant to the Bid Procedures Order, by wire transfer of immediately available funds for deposit into a separate, segregated, interest bearing escrow account maintained by the Deposit Escrow Agent in accordance with the Bid Procedures Order; provided that Buyer shall have no obligation to deliver the Initial Deposit unless and until the Escrow Agreement has been executed and delivered by each of Seller and the Deposit Escrow Agent.  The Deposit (as hereinafter defined) shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Buyer and shall be applied against payment of the Cash Consideration on the Closing Date or otherwise distributed or returned according to the terms of this Section 3.2.

(b)    If this Agreement has been terminated by Seller pursuant to Section 10.1(d) or Section 10.1(f), then Seller shall retain the Deposit as Seller's sole and exclusive remedy hereunder.

(c)    If this Agreement has been terminated by Seller pursuant to its rights under Section 10.1, other than as contemplated by Section 3.2(b), then the Deposit shall be returned to Buyer within three (3) Business Days after such termination.

(d)    If this Agreement has been terminated by Buyer pursuant to its rights under Section 10.1, then the Deposit shall be returned to Buyer within three (3) Business Days after such termination.

(e)    The Parties agree that Seller's right to retain the Deposit, as set forth in Section 3.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Seller for its efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the

consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

Section 3.3    <u>Closing Date Payments</u>.  At the Closing, (a) Buyer shall pay to Seller cash by wire transfer of immediately available funds in an amount equal to (i) the Cash Consideration <u>minus</u> (ii) the Deposit plus or minus the (iii) Prorations and (iv) minus the UCC Foreclosure Bid and (b) Seller shall direct the Deposit Escrow Agent to indefeasibly transfer the Deposit to an account designated by Seller.

Section 3.4    <u>Discharge of Assumed Liabilities After Closing</u>.  Following the Closing, Buyer shall pay, perform or satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

Section 3.5    <u>Allocation of Purchase Price</u>.  Seller and Buyer have agreed on the values to be allocated among the Acquired Assets as set forth in <u>Schedule 3.5</u>.  Seller and Buyer hereby acknowledge that the fair market value of each item set forth in the Allocation shall be binding for all purposes (including but not limited to, Section 1060 of the Internal Revenue Code, the preparation of any financial statement and the preparation of income, sales or transfer tax returns) and neither party shall take any position for any purpose inconsistent, in whole or in part, with the Allocation.  Any subsequent adjustment to the Purchase Price shall be reflected in an amendment made by Seller and Buyer to the Allocation in a manner consistent with Treasury Regulation Section 1.1060-1.  Seller and Buyer shall prepare IRS Form 8594 (and any other state, local or foreign form or tax return) strictly in accordance with the Allocation and shall cooperate in the preparation and filing of any such form or tax return, including but not limited to, reviewing, executing and delivering any such form or tax return.

**ARTICLE IV**
**CLOSING**

Section 4.1    <u>Closing Date</u>.  The closing of the purchase and sale of the Acquired Assets, the delivery of the Cash Consideration, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "**Closing**") will take place by telephone conference and electronic exchange of documents on date that is ten (10) Business Days following the satisfaction of all conditions precedent set forth in <u>Sections 9.1, 9.2 and 9.3</u>, or at such other place and time as the Parties may agree in writing.  Buyer shall also have the right to extend the then-scheduled date for Closing by up to thirty (30) days by providing written notice to Seller and Deposit Escrow Agent at least five (5) Business Days prior to the then-scheduled date for Closing and delivering an additional deposit to the Deposit Escrow Agent in immediately available funds in an amount equal to seven and one-half percent (7.50%) of the Cash Consideration (the "**Additional Deposit**"; and together with the Initial Deposit, the "**Deposit**"); provided, that if Buyer is the Backup Bidder at the Auction, Buyer shall have the right to extend the then-scheduled date for Closing by up to forty-five (45) days (rather than thirty (30) days) and otherwise upon the same terms and conditions set forth in this sentence.  Seller shall have the right to extend the then-scheduled date for Closing by up to thirty (30) days by providing written notice to Buyer and Deposit Escrow Agent at least five (5) Business Days prior to the then-scheduled

date for Closing.  The date on which the Closing actually occurs is referred to herein as the "**Closing Date**."

Section 4.2   <u>Buyer's Deliveries</u>.  At the Closing, Buyer shall deliver to Seller:

(a)   the Cash Consideration <u>minus</u> the Deposit in accordance with Section 3.3(a);

(b)   a closing settlement statement (to be prepared by the Title Company) apportioning the Prorations and any other costs as required by this Agreement (the "**Settlement Statement**"), duly executed by Buyer;

(c)   a counterpart to the bill of sale and assignment and assumption agreement substantially in the form of **Exhibit E** (the "**Assignment and Assumption Agreement**") duly executed by Buyer.

(d)   Except to the extent exempted under Section 1146(a) of the Bankruptcy Code, the Bankruptcy Case and/or Sale Order, New York State and any applicable county or city sales tax and real property transfer tax returns and forms required to be completed by Buyer, together with payment to the appropriate governmental authority an amount necessary to pay all sales taxes;

(e)   A certificate from Buyer to Seller certifying that the condition set forth in Section 9.3(a) is satisfied; and

(f)   Any other documents, instruments or agreements necessary to consummate the transactions contemplated herein reasonably requested by Seller or the Title Company.

Section 4.3   <u>Seller's Deliveries</u>.  At the Closing, Seller shall deliver to Buyer:

(a)   The Settlement Statement, duly executed by Seller;

(b)   A bargain and sale deed without covenants against grantor's acts for the conveyance of a fee simple interest in the Land and the  WV Complex to Buyer, free and clear of all Encumbrances other than Permitted Encumbrances, in the form attached as **Exhibit D** and which shall be duly executed and acknowledged by Seller so as to convey to Buyer the fee simple interest in the Land and the WV Complex (the "**Deed**");

(c)   Except to the extent exempted under Section 1146(a) of the Bankruptcy Code, the Bankruptcy Case and/or Sale Order, New York State and any applicable county or city sales tax and real property transfer tax returns and forms required to be completed by Seller;

(d)   a counterpart to the Assignment and Assumption Agreement, duly executed by Seller;

(e)   a copy of the Sale Order entered by the Bankruptcy Court;

(f)        A termination of that certain Interim Agreement between Wythe Berry Fee Owner LLC and Manager for the management of the Property (the "**HMA**");

(g)        A Certificate of Non-Foreign Status duly executed by Seller certifying that Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986, (the "**Non-Foreign Affidavit**");

(h)        A certificate from Seller to Buyer certifying that the condition set forth in Section 9.2(a) is satisfied;

(i)        An owner's affidavit in the form attached as **Exhibit G**;

(j)        To the extent not previously delivered to Buyer and in the possession or control of Seller or Manager, all originals (or copies if originals are not available) of the Leases, Contracts, Intangible Property and Records; it being agreed that the foregoing which are located at the Property on the Closing Date shall be deemed to be delivered to Buyer or its permitted designee upon delivery of possession of the Property;

(k)        An estoppel certificate, dated not more than thirty (30) days prior to Closing Date (unless the Closing Date is extended by Buyer, in which case the estoppel shall be dated no more than thirty (30) days prior to the originally scheduled date for Closing, duly executed by WV Hospitality LLC, a New York limited liability company (the "**F&B Operator**") in the form attached as **Exhibit H** (the "**Noho Estoppel Certificate**");

(l)        All tenant estoppel certificates received by Seller.

(m)        Guests' Baggage. On the Closing Date, authorized representatives of Buyer and Seller shall take inventory of and tag (a) all baggage, suitcases, luggage, valises and trunks of hotel guests checked or left in the care of Seller, (b) all luggage or other property of guests retained by Seller as security for unpaid accounts receivable, and (c) the contents of any storage room; provided, however, that no such baggage, suitcases, luggage, valises or trunks shall be opened. All such baggage and other items shall be sealed and listed in an inventory prepared and signed jointly by the representatives of Buyer and Seller as of the Closing Date, and any such items shall be the responsibility of Buyer from and after such date, and Buyer agrees to indemnify and hold Seller, harmless from and against any and all claims, demands, suits, liability or judgments, including third-party costs and out-of-pocket reasonable attorney's fees, but excluding special, consequential or punitive damages except to the extent actually incurred pursuant to third-party claims ("**Losses**") in connection therewith and first arising from and after the Closing Date and Seller hereby agrees to indemnify and hold Buyer harmless from and against any and all Losses in connection therewith arising prior to the Closing Date. The provisions of this Section 4.3(m) shall survive the Closing.

(n)        Guests' Safe Deposits. On the Closing Date, Seller shall send written notice to Tenants or other persons who have items located in the Hotel safe (i.e., not located within the safe deposit boxes that may be contained in individual Hotel rooms), advising of the sale of the Hotel to Buyer and requesting immediate removal of the contents thereof or the removal thereof and concurrent re-deposit of such contents pursuant to new safe deposit agreements with Buyer within two (2) days after the Closing Date. All such removals and verifications shall be under the

supervision and control of one representative each of Seller and Buyer.  Safe deposit boxes of guests who have not responded to such written notice by so removing and verifying the contents thereof shall be removed by Buyer in the presence of a representative of Seller, and listed on a separate sheet and verified and signed jointly by the representatives of Buyer and Seller effective as of the Closing Date (the "**Unclaimed Safe Contents List**").  Buyer shall be solely responsible from and after the Closing Date for the verified contents of all such items that are on the Unclaimed Safe Contents List, and Buyer hereby agrees to indemnify and hold Seller harmless from and against any and all Losses in connection therewith first arising from and after the Closing Date and Seller hereby agrees to indemnify and hold Buyer harmless from and against any and all Losses in connection therewith arising prior to the Closing Date.  The provisions of this <u>Section 4.3(n)</u> shall survive the Closing.

(o)    <u>Liquor license requirements</u>. At Closing, Seller shall deliver (a) the original Liquor License certificate, (b) a letter authorizing Buyer to deposit the Liquor License for safekeeping with the SLA, (c) an undated executed SLA Petition for Surrender of License, (d) an executed SLA Liquidator's Permit application and (e) a bill of sale for equipment used in connection with the food and beverage operations at the Property from an existing holder of the Liquor License, for Buyer to file an application/petition with the SLA to transfer the Liquor Licenses to Liquor License Applicant (the "**Liquor Application Documents**").

Section 4.4    <u>Prorations</u>.  Unless otherwise provided in this Agreement, adjustments between the parties shall be made as of 12:01 a.m. (the "**Cutoff Time**") on the Closing Date, with the income and expenses for the Hotel accrued prior to the Cutoff Time being allocated to Seller and the income and expenses accruing on and after the Cutoff Time being allocated to Buyer (collectively, the "**Prorations**").  Seller shall use commercially reasonable efforts to prepare and deliver to Buyer an unaudited statement for the Property showing estimated prorations for the items set forth in this <u>Section 4.4</u> on or prior to the date which is five (5) Business Days prior to the Closing Date.

(a)    <u>Taxes</u>. All taxes and assessments applicable to the Land and/or Property, including, without limitation, all property taxes and assessments and other charges and expenses payable by Seller, shall be prorated as of the Cutoff Time on the basis of the actual number of days of the month that have elapsed as of the Cutoff Time and based upon a three hundred sixty-five (365) day year.  With respect to prorations related to real property taxes and assessments, the basis for said proration shall be the amount shown for real property taxes and assessments in the most recent installment for the fiscal year in which the Closing Date occurs.  If no installment for the fiscal year in which Closing Date occurs is available, Buyer and Seller shall reasonably estimate such installment which shall be used to prorate taxes and assessments.  No adjustment shall be made for any change in the real property taxes and assessments occurring by virtue of the sale of the Property to Buyer.  The amount of such prorations shall be subject to adjustment in cash as and when complete and accurate information becomes available, if such information is not available on the Closing Date.  Seller and Buyer agree to cooperate to make such adjustments prior to forty-five (45) days after receipt of the first property tax bill following the Closing Date.

(b)    <u>Rents</u>. All rents and other amounts collected under each Lease shall be prorated between Buyer and Seller as of the Cutoff Time.  Buyer shall receive a credit for all assignable security deposits held by Seller under a Lease which are not transferred to Buyer at

Closing.  If any rents or other amounts are collected after Closing under any Lease (and the same were not adjusted for at Closing), such rents and other amounts shall be applied in the following order of priority: (a) first, to the month in which the Closing occurred, (b) then to the period following the month in which the Closing occurred and (c) finally to the period prior to the month in which the Closing occurred.  Seller shall have no right after Closing to attempt to collect any delinquent rents owing to Seller (except as may result from any Excluded Assets or the Ground Lease) unless the applicable Lease has been terminated and the applicable Tenant has vacated its leased premises.

(c)    Contracts.  Other than the HMA, all Transferred Contracts (including that certain letter agreement between Wythe Berry Fee Owner LLC and WV Hospitality LLC dated as of November 1, 2023 regarding food and beverage operations management for the Hotel) shall be assigned to and assumed by Buyer as of the Cutoff Time and the costs under each such Contract shall be prorated as such.

(d)    Bookings.  Buyer shall receive a credit for all prepaid deposits and advance payments for bookings scheduled to occur on or after the Cutoff Time; travel agents' commissions, if any, shall be apportioned consistent with the allocation of Hotel room revenues referable to each such travel agent.

(e)    Gift Certificates.  Seller shall give Buyer a credit at Closing for any gift certificates or similar items which allow a person to use the hotel's room and facilities after Closing at no cost or at a discounted price except that there shall be no proration or credit for discounts on any bookings made prior to the date hereof for periods after Closing which were offered in the Ordinary Course.  Within ten (10) days prior to the Closing Date, Seller shall provide Buyer with a schedule of any and all outstanding gift certificates or similar items.

(f)    Guest Ledgers.  All amounts in the Guest Ledger (including charges for rooms, food, beverage, telephone charges and otherwise) accruing prior to the Cutoff Time, shall be credited to Seller (in the amount thereof), and all amounts in the Guest Ledger accruing after the Closing Date shall belong to Buyer.  The entire Guest Ledger shall thereupon become the property of Buyer.  "**Guest Ledger**" shall mean any accounts of registered guests of the hotel who have not checked out as of the Cutoff Time.  All amounts in the City Ledger accruing prior to the Cutoff Time shall be credited to Seller (in the amount thereof) and shall become the property of Buyer upon the occurrence of the Closing hereunder.  "**City Ledger**" shall mean all accounts receivable of non-registered guests and/or patrons of the hotel who have received hotel services but not yet paid their bills.  All other accounts receivables with respect to the Property and Hotel shall become the property of Buyer upon Closing.

(g)    Consumables; Food and Beverage.  Seller shall receive a credit at Closing for the cost of any inventories of all Consumables and Food and Beverage whether located at the Hotel or prepaid and in transit or to be delivered to the Hotel.  "**Consumables**" and/or "**Food and Beverage**" means unopened alcohol and beverage items.

(h)    Employment Expenses.  Seller shall be responsible for all wages, salaries, benefits, pension and health and welfare contributions and other costs of employment of Employees relating to the period prior to the Cut-Off Time, and Buyer shall be responsible for all

wages, salaries, benefits, pension and health and welfare contributions, and other costs of employment of Employees relating to the period after the Cut-Off Time. All Compensation due and payable to Employees shall be prorated as of the Cut-Off Time. In addition to the foregoing, except as otherwise provided in Section 8.8(d), Buyer shall receive a credit at Closing in an amount equal to one hundred percent (100%) of the Accrued PTO as of the Cut-Off Time of all Employees.

(i)     Vending Machines.  As and to the extent applicable, Seller shall remove all monies from all vending machines, laundry machines, pay telephones and other coin-operated equipment as of the Closing Date and shall retain all such monies collected as of the Closing Date, and Buyer shall be entitled to any monies collected therefrom after the Closing Date. The existing vending machines are set forth on Schedule 4.4(i).

(j)     Tenant Improvement Costs, Leasing Commissions and Concessions.  Buyer shall be responsible for all landlord work, tenant improvement work, tenant improvement allowances, leasing commissions, grants of free rent periods or other concessions under (i) any Leases in effect on the Effective Date and that remain in effect on the Closing Date, that are set forth on Schedule 4.4(j) and that remain outstanding, unpaid or unperformed, as applicable, on the Closing Date, and (ii) any Leases entered into by Seller after the Effective Date in accordance with the terms of this Agreement that remain in effect on the Closing Date (including but not limited to any work, allowances, commissions, grants of free rent periods or other concessions under those proposed leases with WV Bar and Alien Experience first accruing after the date that Seller attorns thereto in accordance with the terms hereof), whether or not the same have been paid by Seller prior to the Closing Date. Pursuant to the Assignment and Assumption Agreement, Buyer shall assume the obligations of Seller with respect to such landlord work, tenant improvement work, tenant improvement allowance, leasing commissions, grants of free rent period or other concessions under such Leases.

(k)     Other Adjustments and Prorations.  All income, expense or other item with respect to the Hotel shall be adjusted and prorated between Seller and Buyer in accordance with Uniform System of Accounts for the Lodging Industry.

(l)     Mortgage Recording Tax.  If Buyer enters into a mortgage at Closing and such mortgage is not exempt from mortgage recording tax, then Seller shall use commercially reasonable efforts to cause its lender to assign the existing mortgage to Buyer's lender at Closing. At Closing, if Buyer's mortgage lender accepts the assignment of the existing mortgages, then Buyer shall pay to Seller fifty percent (50%) of the costs and savings of mortgage tax (i.e., fifty percent (50%) of the actual third-party cost of assigning the mortgages and fifty percent (50%) of the reduction in the mortgage recording tax that otherwise would have been paid by the Buyer if not for the assignment).

Seller and Buyer hereby agree that if any of the aforesaid prorations and credits cannot be calculated accurately on the Closing Date or in the case of rents or other charges received from tenants, such amounts have not been collected, then the same shall be calculated as soon as reasonably practicable after the Closing Date or the date such amounts have been collected (and in any case, the Parties shall endeavor to reconcile such amounts within ninety (90) days following the Closing Date, except for the prorations set forth in clause (a), which the Parties shall reconcile within forty-five (45) days after the receipt of the first property tax bill following Closing), and

either Party owing the other Party a sum of money based on such subsequent proration(s) or credits shall pay said sum to the other Party within thirty (30) days thereafter.  Upon the request of either Party, the other Party shall provide a detailed and accurate written statement signed by such Party certifying as to the payments received by such Party from tenants from and after Closing and to the manner in which such payments were applied, and shall make their books and records available for inspection by the other Party during ordinary business hours upon reasonable advance notice.

The provisions of this <u>Section 4.4</u> shall survive Closing for a period of one hundred eighty (180) days following the Closing.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

The following representations and warranties are true in all material respects to the actual knowledge of the Seller Knowledge Individual, as of the date hereof and on the Closing Date.

Section 5.1    <u>Organization and Qualification</u>.  Seller is duly formed, validly existing and in good standing under the laws of the state of its formation and has all requisite power and authority necessary to carry on its business as it is now being conducted.

Section 5.2    <u>Authorization of Agreement</u>.  The execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which Seller is a party, and the consummation by Seller of the transactions contemplated hereby and thereby, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate action, limited liability company action or limited partnership action on the part of Seller, as applicable, and no other organizational proceedings on Seller's part are necessary to authorize the execution, delivery and performance by Seller of this Agreement or the other Transaction Documents and the consummation by it of the transactions contemplated hereby and thereby.  Subject to requisite Bankruptcy Court approvals, this Agreement and the other Transaction Documents to which Seller is a party have been, or will be, duly executed and delivered by Seller and, assuming due authorization, execution and delivery hereof and thereof by the other parties hereto and thereto, constitutes, or will constitute, legal, valid and binding obligations of Seller, enforceable against Seller in accordance with its and their terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "**Enforceability Exceptions**").

Section 5.3    <u>Conflicts; Consents</u>.  Assuming that the requisite Bankruptcy Court approvals and any Governmental Authorizations required in connection with the transfer of the any applicable licenses or permits used in the operation of the Hotel are obtained, (a) to Seller's knowledge, no other Consent of any Governmental Authority or other Person is necessary for the execution or delivery by Seller of this Agreement or other Transaction Documents or Seller's performance of its obligations hereunder or thereunder and (b) neither the execution and delivery by Seller of this Agreement or the other Transaction Documents, nor the consummation by Seller of the transactions contemplated hereby or thereby, nor performance or compliance by Seller with any of the terms or provisions hereof or thereof, will (i) conflict with or violate any provision of

Seller's certificate of formation or limited liability company agreement, (ii) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any Transferred Contract or accelerate Seller's obligations under any such Transferred Contract, or (iii) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Seller, except, in the case of <u>clause (ii)</u>, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.4    <u>Leases</u>.  <u>Schedule 2.1(d)</u> sets forth a true, correct and complete list of each Lease as of the Effective Date.  Except as set forth on <u>Schedule 2.1(d)</u>, as of the Effective Date, there are no leases, licenses or other occupancy agreements affecting Seller's use, operation and ownership of the Property or providing a third party the right to occupy the Property or the Hotel other than the hotel guests in the Ordinary Course.  Seller has delivered to Buyer true, correct and complete copies in all material respects of all Leases. Seller is the sole owner and holder of the interest of the landlord, lessor, or licensor, as applicable, under each Lease, and assuming that the requisite Bankruptcy Court approvals are obtained and, in the case of Alien Experience and WV Bar, Seller accepts the attornment of such tenants, then Seller has the right to assign such interest to Buyer.  To the knowledge of Seller, there are no understandings oral or written, between the parties to each Lease that vary the obligations or rights of either party set forth in the Lease.  The rent roll attached hereto as <u>Schedule 2.1(d)</u> (the "**Rent Roll**") is the same rent roll currently used by Seller in the ordinary course of its ownership and operation of the Property.

Section 5.5    <u>Contracts</u>.  <u>Schedule 2.1(e)</u> sets forth a true, correct and complete list of each material Contract as of the Effective Date.  Seller has delivered to Buyer true, correct and complete copies in all material respects of all such Contracts.  To the knowledge of Seller, there are no understandings, oral or written, between the parties to each Contract that in any manner vary the obligations or rights of either party set forth in such Contract.

Section 5.6    <u>No Litigation</u>.  There are no Proceedings pending (other than the pending Proceeding listed on <u>Schedule 5.8</u>) or, to Seller's knowledge, threatened against or affecting Seller that will adversely affect Seller's performance of its obligations under this Agreement or the consummation of the transactions contemplated by this Agreement.

Section 5.7    <u>Eminent Domain</u>.  There is no existing, nor, to the knowledge of Seller, any proposed or threatened eminent domain or similar proceeding which would materially affect the Property.

Section 5.8    <u>Employment Matters</u>.

(a)    <u>Schedule 5.8</u> attached hereto sets forth the names, addresses, positions, salary, dates of hire, and accrued paid time off benefit balances of the employees employed at the Hotel as of the Effective Date ("**Employees**"). Except as otherwise set forth in Schedule 5.8, Seller has no employees; all Employees are currently employed by WB Hotel LLC, a Subsidiary of Seller ("**Seller Employer**"); until November 2023, all Employees were employed by William Vale Staffing LLC.  Neither Seller nor Seller Employer, nor any of their respective affiliates, have hired in the past two (2) years a third-party service provider, independent contractors, or temporary labor staffing company to provide services at the Hotel.

(b)      There is no agreement with any labor organization of any kind that pertains to the Hotel, the Seller, Seller Employer or any of the respective affiliates regarding any person who regularly performs work at the Hotel.

(c)      None of Seller, Seller Employer, Manager, or any of their respective affiliates have received written notice of union organizing activities among Hotel Employees, other than those working in the Housekeeping Department.

(d)      Except as set forth on <u>Schedule 5.8</u>, Seller, Seller Employer, Manager and their respective affiliates, have not experienced any strikes or picketing, committed any unfair labor practices, and are not aware of any allegations that any of them has committed any unfair labor practice or experienced any strikes within the period of six months prior to the execution of this Agreement related to the Employees.

(e)      None of Seller, Seller Employer, Manager, or any of their respective affiliates have received any written notice claiming any violation of any applicable law related to any Employee or Employee Liability, except as set forth on <u>Schedule 5.8</u> attached hereto.

Section 5.9      <u>Sales, Use and Occupancy Taxes</u>.

(a)      By motion dated March 6, 2023, Seller filed a motion (the "**Bar Date Motion**") in the Bankruptcy Court seeking entry of a bar date order in the Bankruptcy Case. On March 8, 2023, Seller filed an affidavit of service stating that, *inter alia,* the New York City Department of Finance ("**NYCDOF**") and the New York State Department of Taxation and Finance ("**NYSTAF**") were each served with notice of the Bar Date Motion. On March 17, 2023, the Bankruptcy Court entered an order setting a bar date of May 1, 2023, for all creditors other than governmental entities and July 17, 2023, for governmental entities. Neither NYCDOF nor NYSTAF filed a proof of claim against Seller in the Bankruptcy Case.

(b)      Seller will reserve from the Purchase Price an amount sufficient to pay the sales tax liability, if any, owed for the period from the Petition Date to the date of Closing, and shall satisfy such sales tax liability when due with such reserved funds.

Section 5.10      <u>Financial Statements</u>.  To Seller's knowledge, (a) The William Vale Hotel LLC T12 P&L Statement for calendar year 2023, (b) The William Vale F&B LLC Profit & Loss Statement - Trailing 12 Periods for calendar year 2023, and (c) the Wythe Berry LLC Profit and Loss Statement for calendar year 2023 for the Hotel previously delivered to Buyer are each true and correct in all material respects.

Section 5.11      <u>Foreign Person</u>.   Neither Seller nor any person owning all of the membership interest in Seller is a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code, as amended.

Section 5.12      <u>Capital Improvements</u>.  There are no ongoing capital improvements at the Hotel or the Property other than (a) those set forth on <u>Schedule 5.12</u> and (b) those being performed in Ordinary Course and which do not, individually or in the aggregate (but excluding any amounts listed on Schedule 5.12) with any related improvements, exceed $100,000 in cost.

-25-

Section 5.13    Ground Lease.  The Ground Lease has been terminated and is of no further force or effect.

Section 5.14    Trademarks.  Seller has provided Buyer with a true, correct and complete copy of the Trademark Agreement.

Section 5.15    Liquor License.  Seller has provided Buyer with a true, correct and complete copy of the Liquor License.  As of the Effective Date, Brooklyn Community Board No. 1 (the "**Community Board**") has recommended to the SLA that the Liquor License Applicant be approved, as a transferee of the Liquor License, in accordance with the terms of the stipulation/questionnaire signed by the Liquor License Applicant and the Community Board, and Seller has provided Buyer a true, correct and complete copy of such stipulation/questionnaire and such recommendation.  At Closing, Liquor License Applicant shall own all alcoholic beverage inventory at the Property.

Section 5.16    Anti-Money Laundering.  To the best of Seller's knowledge, neither Seller nor any Seller Party, nor any Person providing funds to Seller (a) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti Money Laundering Laws; (b) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws (as defined below); or (c) has had any of its funds seized or forfeited in any action under any Anti Money Laundering Laws.

Section 5.17    OFAC.  Seller is not now nor shall it be at any time until Closing an individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity with whom a U.S. Person is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by OFAC (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Specially Designated Nationals and Blocked Persons or otherwise.  Neither Seller nor any Seller Party is now nor shall be at any time until Closing a Person with whom a U.S. Person, including a Financial Institution, is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.

Section 5.18    No Other Representations or Warranties.  Except for the representations and warranties expressly contained in this Agreement (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "**Express Representations**") (it being understood that Buyer relied only on such express representations and warranties), Buyer acknowledges and agrees  that the Acquired Assets are being acquired by Buyer "as is" and "where is" and with all faults and all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, and that no Seller nor any other Person on behalf of Seller makes, and Buyer has not

relied on, is not relying on, and will not rely on (i) the accuracy or completeness of any express or implied representation or warranty with respect to Seller, the Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by Seller, Seller's agents or representatives or Broker) (the "**Information Presentation**") or in that certain datasite administered by the Brokers (the "**Dataroom**") or elsewhere to Buyer or any of its Affiliates or Advisors on behalf of Seller or any of its Affiliates or Advisors, or (ii) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets. Without limiting the foregoing, no Seller nor any other Person will have or be subject to any Liability whatsoever to Buyer, or any other Person, resulting from the distribution to Buyer or any of its Affiliates or Advisors, or Buyer's or any of its Affiliates' or Advisors' use of or reliance on, any such information, including the Information Presentation, the Projections, any information, statements, disclosures, documents, projections, forecasts or other material made available to Buyer or any of its Affiliates or Advisors in the Dataroom or otherwise in expectation of the transactions contemplated by this Agreement or any discussions with respect to any of the foregoing information.

Section 5.19    Any and all uses of the phrase "to Seller's knowledge" or words of similar import in this Agreement shall mean the actual knowledge of Asaf Ravid (the "**Seller Knowledge Individual**"). Without limiting the foregoing, Buyer acknowledges that the Seller Knowledge Individual has not performed and is not obligated to perform any investigation or review of any files or other information in the possession of Seller or to make any inquiry of any persons or to take any other actions in connection with the representations and warranties set forth in this Agreement. Neither the actual knowledge of any other individual or entity or the constructive knowledge of the Seller Knowledge Individual, or any other individuals or entities shall be imputed to the Seller Knowledge Individual. Seller represents that the Seller Knowledge Individual is a person affiliated with Seller with knowledge of the operation of the Property.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows.

Section 6.1    <u>Organization and Qualification</u>. Buyer is a corporation duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority necessary to carry on its business as it is now being conducted, except (other than with respect to Buyer's due formation and valid existence) as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on Buyer's ability to consummate the transactions contemplated hereby.

Section 6.2    <u>Authorization of Agreement</u>. Buyer has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Buyer of this Agreement, and the consummation by Buyer of the transactions contemplated hereby, subject to requisite Bankruptcy Court approvals, have been duly authorized by all requisite corporate or

similar organizational action and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery and performance by Buyer of this Agreement and the consummation by it of the transactions contemplated hereby.  Subject to requisite Bankruptcy Court approvals, this Agreement has been duly executed and delivered by Buyer and, assuming due authorization, execution and delivery hereof by the other Parties, constitutes a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except that such enforceability may be limited by the Enforceability Exceptions.

Section 6.3    Conflicts; Consents.

(a)    Assuming that (i) requisite Bankruptcy Court approvals are obtained, and (ii) the notices, authorizations, approvals, Orders, permits or consents set forth on Section 6.3(a) of the Schedules are made, given or obtained, neither the execution and delivery by Buyer of this Agreement, nor the consummation by Buyer of the transactions contemplated hereby, nor performance or compliance by Buyer with any of the terms or provisions hereof, will (A) conflict with or violate any provision of Buyer's articles of incorporation or bylaws or similar organizational documents, (B) violate any Law or Order applicable to Buyer, (C) violate or constitute a breach of or default (with or without notice or lapse of time, or both) under or give rise to a right of termination, modification, or cancelation of any obligation or to the loss of any benefit, any of the terms or provisions of any loan or credit agreement or other Contract to which Buyer is a party or accelerate Buyer's obligations under any such Contract, or (D) result in the creation of any Encumbrance (other than a Permitted Encumbrance) on any properties or assets of Buyer or any of its Subsidiaries, except, in the case of clauses (A) through (D), as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Buyer to consummate the transactions contemplated hereby.

(b)    Buyer is not required to file, seek or obtain any notice, authorization, approval, Order, permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by Buyer of this Agreement or the consummation by Buyer of the transactions contemplated hereby, except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Buyer to consummate the transactions contemplated hereby.

Section 6.4    Financing.  Buyer has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Cash Consideration, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other transactions contemplated by this Agreement, including the payment of the Purchase Price and all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated by this Agreement.  Buyer is and shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Transferred Contracts and the related Assumed Liabilities.

Section 6.5    No Litigation.  There are no Proceedings pending or, to Buyer's knowledge, threatened in writing or pending against Buyer except as would not, individually or in the aggregate, reasonably be expected to prevent or materially impair, alter or delay the ability of Buyer to consummate the transactions contemplated hereby.

Section 6.6    No Foreign Person.  As of Closing, Buyer will not be a "foreign person," as defined in Section 721 of the U.S. Defense Production Act of 1950, including any implementing regulations thereof.

Section 6.7    Anti-Money Laundering.  Buyer has taken, and shall continue to take until Closing, such measures as are required by law to reasonably assure that the funds used to pay to Seller the Cash Consideration are derived (i) from transactions that do not violate United States law nor, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under United States law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated.  To the best of Buyer's knowledge, neither Buyer nor any Buyer Party (as hereinafter defined), nor any Person providing funds to Buyer (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti Money Laundering Laws; (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws (as defined below); or (iii) has had any of its funds seized or forfeited in any action under any Anti Money Laundering Laws.  For purposes of this Section 6.9, the term "**Anti-Money Laundering Laws**" shall mean laws, regulations and sanctions, state and federal, criminal and civil, that (1) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (2) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (3) require identification and documentation of the parties with whom a Financial Institution (as hereinafter defined) conducts business; or (4) are designed to disrupt the flow of funds to terrorist organizations. Such laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "**Patriot Act**"), the Bank Secrecy Act, 31 U.S.C. Section 5311 et. seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.  Buyer is in compliance with any and all applicable provisions of the Patriot Act.

Section 6.8    OFAC.  Buyer is not now nor shall it be at any time until Closing an individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity  with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories (collectively, a "**U.S. Person**"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the Office of Foreign Assets Control of the Department of the Treasury ("**OFAC**") (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC ("**Specially Designated Nationals and Blocked Persons**") or otherwise.  Neither Buyer nor any Person who owns a direct interest in Buyer (collectively, a "**Buyer Party**") is now nor shall be at any time until Closing a Person with whom a U.S. Person,

including a United States Financial Institution as defined in 31 U.S.C. 5312, as periodically amended ("**Financial Institution**"), is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders and lists published by the OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.

      Section 6.9   <u>No Additional Representations or Warranties</u>.   Except for the representations and warranties contained in this <u>Article VI</u>, Seller acknowledges that neither Buyer nor any other Person on behalf of Buyer makes any other express or implied representation or warranty with respect to Buyer or with respect to any other information provided to Seller by Buyer.

## ARTICLE VII
## BANKRUPTCY COURT MATTERS

      Section 7.1   <u>Bankruptcy Actions</u>.

      (a)   The bidding procedures to be employed with respect to this Agreement shall be those reflected in the Bid Procedures Order.  Buyer agrees and acknowledges that Seller, including through their representatives, are and may continue soliciting inquiries, proposals or offers from third parties pursuant to the terms of the Bid Procedures Order.

      (b)   No later than three (3) Business Days following the Effective Date, Seller shall file a motion (a "**Stalking Horse Motion**") seeking authority to designate Buyer as the Stalking Horse Bidder and approve the Bid Protections (each as defined in the Bid Procedures Order) consistent with the Bid Procedures Order and this Agreement.  The Stalking Horse Motion and the order approving the same shall be in form and substance reasonably acceptable to the Buyer.

      (c)   Seller shall use its commercially reasonable efforts to obtain entry by the Bankruptcy Court of the Sale Order.  While Seller shall be primarily responsible for obtaining Bankruptcy Court approval of the Sale Order, Buyer shall promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Agreement as promptly as practicable, including furnishing affidavits, financial information, or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Buyer and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Buyer's ability to pay and perform or otherwise satisfy any Assumed Liabilities following the Closing.

      Seller and Buyer shall: (i) appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement; and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request

promptly furnishing the other with copies of notices or other communications received by Seller from the Bankruptcy Court with respect to the transactions contemplated by this Agreement.

(d)      If an Auction is conducted, and Buyer is not the prevailing party at the conclusion of such Auction (such prevailing party, the "**Successful Bidder**") but has the next highest (or otherwise best) bid at the Auction, Buyer shall be required to serve as a back-up bidder (the "**Backup Bidder**") and keep Buyer's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until the Outside Date.  If prior to the Outside Date the Successful Bidder fails to consummate the transactions contemplated by this Agreement as a result of a breach or failure to perform on the part of such Successful Bidder, the Backup Bidder will be deemed to have the new prevailing bid, and Seller may, and may cause Buyer to, consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may have been improved upon in the Auction).

(e)      Seller and Buyer acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval.  Buyer acknowledges that Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about Seller to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.  Seller and Buyer agree that a bid shall not be deemed to be for a higher price than that offered by the Buyer hereunder unless the bid exceeds the sum of the Cash Consideration, the Expense Reimbursement, the Breakup Fee and $200,000.

(f)      Buyer shall provide adequate assurance of future performance as required under section 365 of the Bankruptcy Code for the Transferred Contracts.  Buyer agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Transferred Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's Advisors available to testify before the Bankruptcy Court.

(g)      After entry of the Sale Order, Seller shall not take any action which is intended to (or would reasonably be expected to), or fail to take any action the intent of which failure to act is to (or would reasonably be expected to), result in the reversal, voiding, modification or staying of the Sale Order.

Section 7.2    Sale Order.

(a)      The Sale Order shall, among other things: (a) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement and the MIPA, (ii) the sale of the Acquired Assets (which, for all purposes of this Article VII and the Sale Order shall include the Membership Interests (as defined in the MIPA) to Buyer on the terms set forth herein and free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), and (iii) the performance by Seller of their obligations

under this Agreement, (b) authorize and empower Seller to assign to Buyer the Transferred Contracts and Leases, (c) find that Buyer is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code, find that Buyer is not a successor to Seller, and grant Buyer the protections of section 363(m) of the Bankruptcy Code, (d) find that, other than the Assumed Liabilities, Buyer shall have no Liability or responsibility for any Liability or other obligation of Seller or any other party arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity, (e) find that Buyer has provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption of the Transferred Contracts or Leases, (f) find that Buyer shall have no Liability for any Excluded Liability, (g) find that the consideration provided by Buyer pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Acquired Assets, (h) find that Buyer and Seller did not engage in any conduct which would allow this Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code and (i) order that, notwithstanding the provisions of the Federal Rules of Bankruptcy Procedures 6004(h) and 6006(d), the Sale Order is not stayed and is effective immediately upon entry.  While Seller shall be primarily responsible for obtaining Bankruptcy Court approval of the Sale Order, Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (A) demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (B) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

(b)      In the event the Sale Order shall be appealed, the Seller shall (i) as promptly as possible notify Buyer of such appeal or stay request and provide Buyer a copy of the related notice of appeal or order of stay, (ii) provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders, (iii) in consultation with Buyer, be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal, and (iv) use commercially reasonable efforts to defend such appeal. For the avoidance of doubt, if the Bankruptcy Court requires any amendment, modification, or waiver to this Agreement, Buyer's consent thereto shall be required, which consent shall not be unreasonably withheld, conditioned or delayed, subject to the following sentence.  Notwithstanding the foregoing, if this Agreement or the provisions of the Sale Order attached as Schedule 1.1 are proposed to be modified in a manner that would materially and detrimentally affect the Purchase Price, delay the time of Closing or prevent the transfer of the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances and Assumed Liabilities), then Buyer may exercise its rights to terminate this Agreement in accordance with Section 10.1(i) of this Agreement.

Section 7.3      Approval.  Seller's obligations under this Agreement and in connection with the transactions contemplated hereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order).  Nothing in this Agreement shall require Seller, Buyer or their respective Affiliates to give testimony to or submit a motion or other pleadings to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE VIII
## COVENANTS AND AGREEMENTS

Section 8.1    Continued Operations.

(a)    Except (i) as required by applicable Law, an Order or a Governmental Authority, (ii) any limitations on operations imposed by the Bankruptcy Court, or (iii) as expressly contemplated, required or permitted by this Agreement, unless Buyer otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Seller shall:

(i)    use its commercially reasonable efforts, or cause the Manager, to continue to manage, administer, operate, repair and maintain the Hotel and the Property in the Ordinary Course;

(ii)    maintain property and liability insurance related to the Property and Personal Property at the level and with the insurance companies that Seller currently maintains;

(iii)    use its commercially reasonable efforts to comply in all material respects with all applicable Laws governing the use, occupancy, ownership or maintenance of the Property and to maintain all licenses and permits currently held by or on behalf of Seller with respect to the Acquired Assets and Hotel, and promptly furnish Buyer with copies of any and all written notices or communications that it receives from any governmental or quasi-governmental entities regarding any violation by Seller of any such Laws;

(iv)    use its commercially reasonable efforts, or cause the Manager, to cause the continuation in the Ordinary Course of Seller's normal practices with respect to the purchase and replacement of supplies, the maintenance of inventories and the maintenance and repairs of the Personal Property, except for normal wear and tear.

(b)    Except (A) as required by applicable Law, an Order or a Governmental Authority, (B) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, as the case may be, or (C) as expressly contemplated, required or permitted by this Agreement, unless Buyer otherwise consents in writing (such consent not to be unreasonably withheld, delayed or conditioned), Seller shall not:

(i)    sell, assign, transfer, abandon, fail to maintain, allow to lapse or otherwise dispose of, or mortgage or pledge, or voluntarily impose or suffer to be imposed any Encumbrance (other than Assumed Liabilities and any Encumbrances that will be removed or released by operation of the Sale Order) on, any Acquired Asset;

(ii)    cancel or compromise any material claim or waive or release any material right, in each case, that is a claim or right related to an Acquired Asset;

(iii)    settle any pending or threatened Proceeding against Seller that would have an adverse effect on the Acquired Assets or result in an Assumed Liability;

(iv)    enter into any new Lease or amend or modify the terms of any Lease or Encumbrance affecting the Property except as expressly set forth in this clause (iv); Seller shall provide Buyer with the copy of any proposed new Lease, amendment or modification, and if Buyer does not respond to Seller within three (3) Business Days of receipt of such proposed new Lease, amendment or modification, Buyer shall be deemed to have consented thereto.  Notwithstanding the foregoing, nothing herein shall prevent or restrict Seller from entering into month-to-month licenses for the 8th floor workspace;

(v)    sell, remove, transfer or otherwise convey any Personal Property or terminate, amend or otherwise modify any Intangible Property;

(vi)    other than for bookings made in the Ordinary Course that will occur prior to the Outside Date or as previously agreed to between Seller and Buyer, allow or take Hotel room or event reservations or bookings at discounted rates, or allow or take Hotel room or event reservations or booking with a duration of more than two (2) weeks for groups of ten (10) or more persons; or

(vii)    commit or agree to take any of, the foregoing actions.

(c)    Tenant Estoppel Certificates

(i)    Seller shall use commercially reasonable efforts to obtain estoppel certificates from each Tenant of the Property that is obligated to deliver an estoppel certificate pursuant to its Lease, which estoppel certificates shall be substantially in the form attached hereto as **Exhibit I** or, if a Tenant's Lease requires different substance or a different form, in the form or substance required by such applicable Tenant's Lease.  It shall be a condition precedent to Buyer's obligation to close the sale and purchase of the Property hereunder that, on or before the Closing, Buyer receives an estoppel certificate substantially in such form from each of (A) Blue Panda Office Spaces, LLC (for each of its Leases), (B) Suit Supply (U.S.A.), Inc., and (C) Williamsburg Psychological Services, P.C. (collectively, the "**Required Estoppels**").  All tenant estoppel certificates shall be dated no more than thirty (30) days prior to the Closing Date (unless the Closing Date is extended by Buyer, in which case the tenant estoppel certificates shall be dated no more than thirty (30) days prior to the originally scheduled date for Closing).

(ii)    If any Required Estoppel discloses (1) a material default, failure or breach by Seller under the applicable Lease, (2) any matter that is inconsistent in any material respect with Seller's representations and warranties contained herein, (3) any matter which is inconsistent in any material respect with the terms and conditions of the applicable Lease as disclosed to Buyer or (4) any other material information or omissions that are unacceptable to Buyer, then Buyer may, by written notice given to Seller before the Closing, elect to terminate this Agreement and receive a refund of the Deposit or waive said condition and proceed to Closing in accordance with the terms hereof.

(iii)    If any tenant estoppel certificate that is not a Required Estoppel discloses (1) a default, failure or breach (other than in de minimis respects) by Seller under the applicable Lease, (2) any matter that is inconsistent with Seller's representations and

warranties contained herein (other than in immaterial or de minimis respects), (3) any matter which is inconsistent (other than in de minimis respects) with the terms and conditions of the applicable Lease as disclosed to Buyer or (4) any other information or omissions that are unacceptable to Buyer in its reasonable discretion, then if any such disclosure, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect, then Buyer may, by written notice given to Seller before the Closing, elect to terminate this Agreement and receive a refund of the Deposit or waive said condition and proceed to Closing in accordance with the terms hereof.  Seller shall deliver to Buyer a true and correct copy of each tenant estoppel certificate received by Seller.

(iv)     Notwithstanding anything herein to the contrary, in no event shall Seller be in default by reason of any statements or disclosures made in any tenant estoppel certificate, Required Estoppel or otherwise.

(d)     Liquor License.  Subject to Section 8.11 and except (i) as required by applicable Law, an Order or a Governmental Authority, (ii) any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, as the case may be, or (iii) as expressly contemplated, required or permitted by this Agreement, neither Seller nor Buyer shall correspond, submit any application or other materials, or otherwise communicate, in writing or in person, with the Community Board or the SLA without (A) the other party's approval as to the content of any written communications, which approval shall not be unreasonably withheld, conditioned or delayed or (B) the other party's presence and participation with respect to any in-person communications.

Section 8.2     Access to Information.

(a)     From the Effective Date until the Closing (or the earlier termination of this Agreement pursuant to Article X), Seller will provide Buyer and its authorized Advisors with reasonable access and upon reasonable advance notice (but no less than two (2) Business Days) and during regular business hours to the books and records of Seller, in order for Buyer and its authorized Advisors to perform their review of the Land and the Acquired Assets and perform non-invasive inspections of the Property, all at Buyer's sole cost and expense; provided that (i) such access does not unreasonably interfere with the normal operations of Seller or Tenants, (ii) such access will occur in such a manner as Seller reasonably determines to be appropriate to protect the confidentiality of the transactions contemplated by this Agreement, (iii) all requests for access will be directed to such Person(s) as Seller may designate in writing from time to time and (iv) nothing herein will require Seller to provide access to, or to disclose any information to, Buyer if such access or disclosure (A) would cause significant competitive harm to Seller if the transactions contemplated by this Agreement are not consummated, (B) would require Seller to disclose any financial or proprietary information of Seller, the Hotel or the Acquired Assets or otherwise disclose information that Seller deems to be commercially sensitive, (C) would waive any legal privilege or (D) would be in violation of applicable Laws; provided that Seller shall use commercially reasonable efforts to provide the Buyer, to the extent possible, with access to the relevant information in a manner that would not reasonably be expected to violate the foregoing clauses (A) through (D).  Seller may, at its election, have an authorized representative of Seller present during any inspection by Buyer.  Buyer agrees that it shall, at its sole cost and expense,

repair any damage and restore the Property at Buyer's sole cost and expense to the condition existing prior to any of Buyer's tests or examinations of the Property that was caused by any inspection of the Property by or at the direction of Buyer. Notwithstanding anything contained in this <u>Section 8</u> to the contrary, except as expressly provided by this Agreement, Buyer shall have no right to terminate this Agreement based upon any further inspections or due diligence conducted by Buyer as permitted under this Agreement following the Effective Date.

(b)    Buyer shall indemnify and hold harmless Seller, its partners and its employees and agents from all claims and liability arising due to any activities of Buyer or its Advisors or Representatives on the Property in connection with any inspection of the Property. The foregoing indemnification obligation of Buyer shall survive Closing or any termination of this Agreement. Without limiting the generality of the foregoing indemnity, Buyer shall maintain or cause each of its Advisors and Representatives accessing the Property to maintain commercial general liability insurance in amounts not less than $3,000,000 per occurrence. Buyer shall cause Seller to be named as an additional insured on all such insurance policies.

(c)    The information provided pursuant to this <u>Section 8.2</u> will be used solely for the purpose of consummating the transactions contemplated hereby and not for any other purposes; such information will be governed by all the terms and conditions of the Confidentiality Agreement, which Confidentiality Agreement shall not terminate upon the execution of this Agreement notwithstanding anything to the contrary therein. Buyer will, and will cause its Advisors to, abide by the terms of the Confidentiality Agreement with respect to such access and any information furnished to Buyer or any of its Advisors. Seller makes no representation or warranty as to the accuracy of any information, if any, provided pursuant to this <u>Section 8.2</u>, and Buyer may not rely on the accuracy of any such information, in each case, other than the Express Representations.

(d)    From and after the Closing for a period of two years following the Closing Date (or, if later, the closing of the Bankruptcy Case), without representation or warranty or recourse of any nature whatsoever, Buyer will provide Seller and their Advisors with reasonable access, during normal business hours, and upon reasonable advance notice, to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Acquired Assets or the Assumed Liabilities with respect to periods or occurrences prior to or including the Closing Date, and reasonable access, during normal business hours, and upon reasonable advance notice, to employees, officers, Advisors, accountants, offices and properties of Buyer, in each case, solely to the extent: (i) necessary to permit Seller or its Affiliates to comply with its financial reporting, accounting or auditing obligations with respect to any period ending before or including the Closing Date with respect to the Acquired Assets, (ii) as reasonably necessary for Seller to comply with regulatory requirements under applicable Law or otherwise in connection with tax, or regulatory matters or (iii) in connection with the administration of the Bankruptcy Case, the winding down of Seller's estate, the payment of any Taxes or the recording of any claims in connection therewith. Unless otherwise consented to in writing by Seller, Buyer will use commercially reasonable efforts not to, for a period of three years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records without first offering to surrender to Seller such books and records or any portion thereof that Buyer may intend to destroy, alter or dispose of. If Buyer determines that it is necessary or desirable for Buyer to store any such

materials offsite, Buyer shall be permitted to do so, at Buyer's sole cost and expense. Notwithstanding anything to the contrary in this Agreement, Seller (or any Advisor thereof) shall not have any right to review any Tax Return (or copy thereof) or other confidential information of Buyer or any of its Affiliates, other than Tax Returns or other documentation prepared or applicable to the so-called "straddle period" (i.e., the period including the Closing).

(e)    Except in the ordinary course of business unrelated to the Acquired Assets or the transactions contemplated hereby, Buyer will not and will use commercially reasonable efforts cause all its Advisors and Affiliates not to knowingly contact any Tenant, officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of Seller prior to the Closing with respect to Seller, its business or the transactions contemplated by this Agreement without the prior written consent of Seller for each such contact (which consent shall not be unreasonably withheld, conditioned or delayed).

Section 8.3    Reasonable Efforts; Cooperation.    Subject to the other terms of this Agreement, each Party shall, and shall cause its Advisors to, use commercially reasonable efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable to cause the transactions contemplated hereby to be effected as soon as practicable, but in any event on or prior to the Outside Date, in accordance with the terms hereof and to cooperate reasonably with each other Party and its Advisors in connection with any step required to be taken as a part of its obligations hereunder.

Section 8.4    Further Assurances.  From time to time, as and when requested by any Party and at such requesting Party's expense, any other Party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting Party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement; provided that no such action shall increase such other Party's liabilities or decrease its rights in any manner, other than de minimis.  In furtherance and not in limitation of the foregoing, in the event that any of the Acquired Assets shall not have been conveyed at Closing, Seller shall use commercially reasonable efforts to convey such Acquired Assets to Buyer as promptly as practicable after the Closing. Notwithstanding anything in this Agreement to the contrary, Buyer shall have the right, following the Closing, to enter into any contracts or other commercial arrangements with respect to the Acquired Assets, including with existing or prior vendors, suppliers and other counterparties of the Acquired Assets and Seller, and Seller shall use commercially reasonable efforts to cooperate with Buyer (at no cost or expense to Seller, unless such cost or expense is covered by Buyer) in connection with facilitating the foregoing.

Section 8.5    Insurance Matters.  Buyer acknowledges that, upon Closing, all insurance that is maintained by Seller or any Affiliate of Seller shall be terminated and no coverage will be available under such policies to Buyer and/or the Acquired Assets.

Section 8.6    Receipt of Misdirected Assets; Liabilities.

(a)    From and after the Closing, if Seller or any of its respective Affiliates receives any right, property or asset that is an Acquired Asset, the applicable Seller shall promptly

transfer or cause such of its Affiliates to transfer such right, property or asset (and shall promptly endorse and deliver any such asset that is received in the form of cash, checks or other documents) to Buyer, and such asset will be deemed the property of Buyer held in trust by such Seller for Buyer until so transferred.  From and after the Closing, if Buyer or any of its Affiliates receives any right, property or asset that is an Excluded Asset, Buyer shall promptly transfer or cause such of its Affiliates to transfer such asset (and shall promptly endorse and deliver any such right, property or asset that is received in the form of cash, checks, or other documents) to the applicable Seller, and such asset will be deemed the property of such Seller held in trust by Buyer for such Seller until so transferred.

(b)    From and after the Closing, if Seller or any of its respective Affiliates is subject to a Liability that should be the obligation of Buyer pursuant to the terms of this Agreement, such Seller shall promptly transfer or cause such of its Affiliates to transfer such Liability to Buyer, and Buyer shall assume and accept such Liability.  From and after the Closing, if Buyer or any of its Affiliates is subject to a Liability that should be the obligation of a Seller pursuant to the terms of this Agreement, Buyer shall promptly transfer or cause such of its Affiliates to transfer such Liability to the applicable Seller, and such Seller shall assume and accept such Liability.

Section 8.7    Title.

(a)    Buyer has received, prior to the date hereof, a copy of title report no. NLT-34363-K-23 with respect to the Property (the "**Title Report**") prepared by National Land Tenure Company, LLC, 950 Franklin Avenue, Garden City, NY 11530, as agent for First American Title Insurance Company (the "**Title Company**").  In addition, Seller has delivered a survey identified as Job No. 13-35567E for the Property (the "**Survey**") prepared by Leonard J. Strandberg and Associates on September 20, 2016.  If, after the date hereof, continuation reports or other written evidence indicates any new title defect(s) which are not Permitted Encumbrances, then Buyer shall notify Seller of its objection to such title defects within five (5) Business Days after receipt of such continuation report or other written evidence (each such objection, a "**Title Objection**"). Seller shall notify Buyer within five (5) Business Days after receipt of notice of Buyer's Title Objection whether (i) Seller agrees to cure such Title Objections (including, without limitation, by operation of the Sale Order) or (ii) Seller elects not to cause such Title Objection to be removed. Seller's failure to provide notice to Buyer as to any Title Objection shall be deemed an election by Seller not to remove over such Title Objections (other than any such Title Objections that will be removed by operation of the Sale Order). If Seller notifies Buyer in writing within such five (5) Business Day period that Seller agrees to cure such any such Title Objection, Seller shall cure such Title Objections on or before the Closing Date. If Seller so notifies or is deemed to have notified Buyer that Seller will not remove or insure over any or all of Buyer's Title Objections, Buyer shall have the right either (i) to waive such Title Objections that Seller has elected not to remove over and accept title to the Property subject to such exceptions (and such exceptions shall constitute Permitted Encumbrances) with no reduction in the Purchase Price, or (ii) to terminate this Agreement and receive a return of the Deposit.

(b)    If Seller is unable to convey to Buyer title to the Property subject to and in accordance with the provisions of this Agreement, Seller shall be entitled, upon written notice delivered to Buyer on or prior to the Closing Date, to reasonable adjournments of the Closing one or more times for a period not to exceed one hundred twenty (120) days in the aggregate to enable

Seller to convey such title to the Property.  If Seller does not so elect to adjourn the Closing, or if at the adjourned date Seller fails or is unable to convey title subject to and in accordance with the provisions of this Agreement, Buyer shall be entitled, to either: (A) terminate this Agreement by written notice to Seller and Escrow Agent, in which event Buyer shall be entitled to a return of the Deposit (together with all interest thereon, if any), and this Agreement shall thereupon be deemed terminated and of no further effect, and neither party hereto shall have any obligations to the other hereunder or by reason hereof, except for the provisions hereof that expressly survive termination of this Agreement; or (B) complete the purchase of the Property (with no reduction in the Purchase Price) with such title as Seller is able to convey on the date, as applicable, that is the scheduled Closing Date if Seller does not elect to adjourn the Closing or the adjourned date of the Closing if Seller elects to adjourn the Closing. If Seller elects to adjourn the Closing as provided above, this Agreement shall remain in effect for the period or periods of adjournment in accordance with its terms.  Buyer shall make its election between clauses (A) and (B) of the second sentence of this Section 8.7(b) by written notice to Seller given no later than ten (10) Business Days after notice by Seller to Buyer of Seller's failure or inability to remove any Title Objections (it being understood that, if necessary, the Closing shall be automatically adjourned for such number of days as is necessary to provide Buyer with ten (10) Business Days to respond to Seller's notice, unless such adjournment is waived by Buyer in its sole discretion).  If Buyer shall fail to give such notice as aforesaid, Buyer shall be deemed to have elected clause (B) above and the Closing shall take place on the date that is ten (10) Business Days after the scheduled Closing Date as set forth above.  Notwithstanding anything to the contrary contained in this Agreement, Seller shall not be required to take or bring any action or proceeding or any other steps to remove any Title Objections or to fulfill any condition precedent to Buyer's obligations under this Agreement or to expend any moneys therefor, nor shall Buyer have any right of action against Seller therefor, at law or in equity, except that Seller shall be required, on or prior to the Closing, whether or not Buyer has objected to the same, to pay, discharge or remove of record or cause to be paid, discharged or removed of record at Seller's sole cost and expense all of the following items: (i) Voluntary Liens (as hereinafter defined), (ii) solely prior to Closing, any encumbrances that will be discharged, forgiven, invalidated, rejected, removed or released by operation of the Sale Order and (iii) other liens, fines and penalties encumbering the Property (including judgments and those assessed in connection with violations, but expressly excluding any open real estate taxes, water and sewer charges that are subject to adjustment in accordance with Section 4.4 hereof and any Permitted Exceptions) which are in liquidated amounts and which may be satisfied solely by the payment of money (including the preparation or filing of appropriate satisfaction instruments in connection therewith) not to exceed $50,000.  The term **"Voluntary Liens"** as used herein shall mean Encumbrances which Seller has knowingly and intentionally placed (or allowed to be placed) on the Property, including, without limitation, mortgages, mechanics' liens, and judgments, but shall expressly exclude any federal, state and municipal tax liens.

(c)    Notwithstanding anything in this Section 8.7 above to the contrary, Buyer may at any time accept such title as Seller can convey, without reduction of the Purchase Price or any credit or allowance on account thereof or any claim against Seller.  The acceptance of the Deed by Buyer shall be deemed to be full performance of, and discharge of, every agreement and obligation on Seller's part to be performed under this Agreement, except for such matters which are expressly stated to survive the Closing hereunder.

(d)    The amount of any unpaid taxes, assessments and water and sewer charges which Seller is obligated to pay and discharge may, at the option of Seller, be paid by Buyer out of the balance of the Cash Consideration (with Buyer receiving a credit for the same), if bills therefor with any interest and penalties thereon figured to said date are furnished to or obtained by the Title Company at the Closing and the Title Company omits same as an exception to its Title Policy. Notwithstanding the foregoing, in the event final water meter readings are not obtained, Seller shall deposit with the Title Company (or Closing Agent) such amount as may be deemed necessary to permit the Title Company (or Closing Agent) to omit from the title commitment/policy water meter charges through the date of the Closing.

(e)    If the Property shall, at the time of the Closing, be subject to any liens (such as for judgments or transfer, inheritance, estate, franchise, license or other similar taxes), encumbrances or other title exceptions which would be grounds for Buyer to reject title hereunder, the same shall not be deemed an objection to title provided that, at the time of the Closing, one of the following occurs: (a) Seller delivers checks (or wire transfers) at the Closing in the amount required to satisfy the same and delivers to Buyer and/or the Title Company (or Closing Agent) at the Closing instruments in recordable form (and otherwise in form reasonably satisfactory to the Title Company (or Closing Agent) in order to omit same as an exception to its Title Policy) sufficient to satisfy and discharge of record such Encumbrances together with the cost of recording or filing such instruments, or (b) Seller shall remove, bond or discharge such Encumbrances placed on the Premises after the Effective Date hereof, such that the Title Company (or Closing Agent) shall be willing, without special premium or additional cost payable by Buyer, to (i) omit as exceptions to coverage or (ii) except from such coverage with affirmative insurance against collection out of or enforcement against the Property that is acceptable to Buyer's lender.

(f)    If the Title Company shall be unwilling to remove any Title Objections that Madison Title Agency, acting as agent on behalf of another major national title insurance company, would be willing to remove, then Seller shall have the right to cause Madison Title Agency to be the Title Company; provided, that Madison Title Agency, acting as agent on behalf of such other major national title insurance company, agrees to provide such extended coverage and endorsements requested by Buyer as the Title Company has otherwise agreed to provide Buyer, all at no additional cost or expense to Buyer.

Section 8.8    Employees.

(a)    Buyer and Seller shall comply with the New York City Displaced Hotel Service Workers Act (N.Y.C., Administrative Code Section 22-510, as may be amended or supplemented from time to time (the "**Displaced Hotel Service Workers Act**").    Subject to Buyer's obligations under the Displaced Hotel Service Workers Act, Buyer shall have the sole, unilateral, unreviewable and irrevocable right to determine all of the initial and subsequent terms and conditions of employment of every person whom it chooses to employ.    Subject to Seller's performance of its obligations under the Displaced Hotel Service Workers Act, Buyer shall indemnify and hold Seller harmless from and against any and all claims or damages of any kind or nature, including any demands, actions or causes of action, assessments, losses, costs, expenses, liabilities, interest and penalties, and reasonable fees suffered, incurred, or sustained by Seller arising from or by reason of (i) Buyer's termination of the employees listed on Schedule 5.8, (ii) any termination pay required to be paid to the employees listed on Schedule 5.8 as a result of

Buyer's actions, or (iii) Buyer's breach of its obligations under the Displaced Hotel Service Workers Act; provided, that Buyer shall not be liable for any violation of the Displaced Hotel Service Workers Act caused by the non-compliance of, or otherwise inaccurate information provided by, Seller, Seller Employer, Manager, or any of their respective affiliates, under the same law.  The obligations and undertaking of Buyer under this <u>Section 8.8(a)</u> are a special inducement to Seller to enter into this Agreement without which Seller would not enter into this Agreement.

(b)     Without limiting Buyer's obligations under <u>Section 8.8(a)</u>, Buyer shall, or shall cause its hired management company to, make offers of employment which commence upon Closing to a sufficient number of Employees listed in <u>Schedule 5.8</u> on employment terms (each a "**Rehired Employee**") to avoid triggering any notice obligations under the Worker Adjustment and Retraining Notification Act of 1988 and the New York State Labor Law Art. 25-A (collectively, the "**WARN Act**").  As such, Seller, Seller Employer, Manager, or any of their respective affiliates shall not issue any notice pursuant to the WARN Act for this Hotel as a result of the transaction contemplated by this Agreement.

(c)     Subject to <u>Section 8.8(a)</u>: (i) Buyer shall assume, and shall indemnify and hold Seller (and Seller Employer) harmless from an against all Employee Liabilities which arise or pertain to circumstances after the Closing Date, or are otherwise directed by Buyer; and (ii) Seller shall assume, and shall indemnify and hold Buyer or its respective management company harmless from and against, all Employee Liabilities which arise or pertain to circumstances prior to the Closing Date, or are otherwise directed by the Seller.

(d)     Seller shall transfer the Accrued PTO for all Employees of the Closing using a written record that lists the amount of Accrued PTO to be transferred to the incoming employer and its total dollar value which is signed by each interested Employee ("**Paid Leave Transfer Directive**").  Buyer shall cause its property manager to credit Accrued PTO according to each signed Paid Leave Transfer Directive received within one (1) week after the Closing, with the value of such Accrued PTO credited by the Seller to the Buyer at Closing in accordance with <u>Section 4.4(h)</u>.  Those Employees who do not sign a Paid Leave Transfer Directive shall be paid the Accrued PTO by Seller (or Seller Employer) less any applicable deductions and withholdings upon Closing (and Buyer shall not receive a credit for such amounts pursuant to <u>Section 4.4(h)</u>).

(e)     The provisions of this <u>Section 8.8</u> shall survive the Closing.

Section 8.9     <u>Casualty; Condemnation</u>.

(a)     <u>Risk of Loss</u>. Until the Closing, the risk of loss by fire or other casualty to the Property, and liability for personal injury or damage to property of others at the Property, shall be borne by Seller, except as expressly provided for herein.  If prior to Closing the Property is damaged by fire or other casualty, Seller shall use an independent professional selected by Seller and reasonably approved by Buyer, which approval shall not be unreasonably withheld, conditioned or delayed to estimate the cost to repair and the time required to complete repairs. Seller shall provide Buyer written notice of such estimation (the "**Casualty Notice**") no later than five (5) Business Days after receipt of the same from the chosen professional.

(b)    Material Damage.  In the event of any Material Damage to or destruction of the Property or any portion thereof prior to Closing, Buyer may, at its option, terminate this Agreement by giving notice to Seller on or before the expiration of fifteen (15) days after the date Seller delivers the Casualty Notice to Buyer (and, if necessary, the Closing Date shall be extended to give Buyer the fifteen-day period to give such notice).  Upon any such termination, the Earnest Money shall be returned to Buyer promptly and the parties hereto shall have no further rights or obligations hereunder, other than those that by their terms survive the termination of this Agreement.  If Buyer does not terminate this Agreement within said fifteen (15) day period or if such liability or damage does not give rise to Buyer's right to terminate, then the parties shall proceed under this Agreement and close on schedule (subject to extension of Closing as provided above), and as of Closing Seller shall, at Buyer's election, credit Buyer with the applicable deductible or retention and pay over (to the extent already received by Seller and not used to repair the casualty) or assign to Buyer, without representation or warranty by or recourse against Seller, all of Seller's rights in and to any resulting insurance proceeds (including any rent loss insurance applicable to any period on and after the Closing Date) due Seller as a result of such damage or destruction (provided that if such proceeds are not assignable, then Seller shall pay such proceeds to Buyer when received by Seller), and Buyer shall assume full responsibility for all needed repairs.  For the purposes of this Agreement, "**Material Damage**" or "**Materially Damaged**" means damage which exceeds seven and one-half percent (7.5%) of the Cash Consideration to repair.

(c)    No Material Damage.  If the Property is not Materially Damaged, then neither Buyer nor Seller shall have the right to terminate this Agreement, and Seller shall, at its option, either (i) repair the damage before the Closing in a manner reasonably satisfactory to Buyer, or (ii) assign to Buyer at Closing the insurance proceeds in accordance with Section 8.9(b) hereof.

(d)    Condemnation.  If proceedings in eminent domain are threatened (in writing by the condemning authority) or instituted with respect to the Property or any portion thereof, Seller shall notify Buyer in writing of such fact promptly after obtaining knowledge thereof.  If the Property is subject to a Major Condemnation, Buyer may, at its option, by notice to Seller given within fifteen (15) days after Seller notifies Buyer of such proceedings (and if necessary the Closing Date shall be automatically extended to give Buyer the fifteen-day period to make such election), either:  (i) terminate this Agreement, in which case the Earnest Money shall be promptly returned to Buyer and the parties hereto shall have no further rights or obligations, other than those that by their terms survive the termination of this Agreement, or (ii) proceed under this Agreement, in which event Seller shall, at the Closing, assign to Buyer its entire right, title and interest in and to any condemnation award, and Buyer shall have the sole right after the Closing, and pay over such award (to the extent already received by Seller), to negotiate and otherwise deal with the condemning authority in respect of such matter.  If Buyer does not give Seller written notice of its election within the time required above, or if the condemnation is not a Major Condemnation, then Buyer shall be deemed to have elected option (ii) above.  For purposes of this Agreement, "**Major Condemnation**" means any condemnation or eminent domain proceedings that occurs after the Effective Date, if and only if, in Buyer's reasonable estimation, the portion of the Property that is the subject of such proceedings has a value in excess of seven and one-half percent (7.5%) of the Cash Consideration, as determined by the demand or pleading of the condemning authority.

-42-

(e)    The provisions of this Section 8.9 constitute an express agreement superseding any provisions of law to the contrary, including, without limitation, the provisions of Section 5-1311 of the General Obligation Law of the State of New York.

Section 8.10    Broker.  Buyer and Seller each acknowledge that Eastdil Secured, L.L.C. and A&G Realty Partners, LLC (collectively, the "**Brokers**") have been engaged in connection with the transactions contemplated by this Agreement.  In the event of any claim for broker's, consultant's or finder's fees or commissions in connection with the negotiation, execution or consummation of this Agreement by any party other than Brokers, then Buyer shall indemnify, save harmless and defend Seller from and against such claim if it shall be based upon any statement, representation or agreement made by Buyer, and Seller shall indemnify, save harmless and defend Buyer from and against such claim if it shall be based upon any statement, representation or agreement made by Seller.  Seller shall pay Brokers pursuant to a separately negotiated agreement.  The provisions of this Section 8.10 shall survive the Closing.

Section 8.11    Liquor Licenses.  Each of Seller and Buyer acknowledges that there is a liquor license associated with the operation of the WV Complex (the "**Liquor License**").  Within thirty (30) days after the Effective Date, Buyer shall deliver to Seller, for Seller's review, completed forms of the Liquor Application Documents to be delivered to the SLA in connection with the application to obtain a Liquor License in the name of the Liquor License Applicant.  Seller and Buyer shall reasonably cooperate with each other to, and take such reasonable action for the timely prosecution of the application/petition to transfer the Liquor License to Liquor License Applicant.  If Buyer fails to close by the Outside Closing Date, Seller will withdraw its application and hereby authorizes Buyer to withdraw its application, and Seller and its Affiliates may continue to prosecute such application/petition.

Section 8.12    Trademarks.  Seller shall cause Mishmeret Trust Company Ltd., an Israeli company ("**MTC**") to (a) schedule a UCC sale of the "Trademark Collateral" (as defined in that certain Trademark Security Agreement dated February 28, 2017 (the "**Trademark Agreement**") between MTC and The William Vale Hotel LLC, a New York limited liability company ("**WVH**")) no later than 30 days after entry of the Sale Order (the "**UCC Sale**") and (b) provide Buyer with written notice of the UCC Sale at the same time notice thereof is given to WVH.  If Buyer is the successful bidder at the UCC Sale, then Buyer shall receive a credit in the amount of the price it actually pays for the Trademark Collateral (the "**UCC Foreclosure Bid**") against the Cash Consideration, which Cash Consideration will be reduced accordingly.  If Buyer fails to bid at the UCC Sale, or fails to bid an amount up to twenty five percent (25%) of the Cash Consideration, and consequently is not the winner at the UCC Sale, then Buyer shall be deemed to have waived the condition that the Trademark Collateral be delivered to Buyer at or prior to the Closing Date.  To the extent permitted by applicable law, the Closing hereunder and the consummation of the transfer of the Trademark Collateral to Buyer shall occur simultaneously in accordance with and subject to the conditions set forth in this Agreement.

Section 8.13    Acknowledgment by Buyer.  Buyer acknowledges and agrees that it has conducted to its full satisfaction an independent investigation and verification of the business (including its financial condition, results of operations, assets, Liabilities, properties, Leases, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects) of Seller, the Acquired Assets and the

Assumed Liabilities, and, in making its determination to proceed with the transactions contemplated by this Agreement, Buyer has relied solely on the Express Representations and the results of the Buyer's own independent investigation and verification and has not relied on, is not relying on, and will not rely on, any information, statements, disclosures, documents, projections, forecasts or other material made available to Buyer or any of its Affiliates or Advisors in the Dataroom, the Information Presentation, or any other information, statements, disclosures or materials, in each case, whether written or oral, made or provided by or on behalf of Seller, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations (it being understood that Buyer has relied only on the Express Representations). Buyer acknowledges and agrees that (i) the Express Representations are the sole and exclusive representations, warranties and statements of any kind made to Buyer and on which Buyer may rely in connection with the transactions contemplated by this Agreement and (ii) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (A) the completeness or accuracy of, or any omission to state or to disclose, any information (other than solely to the extent expressly set forth in the Express Representations) including in the Dataroom, Information Presentation, meetings, calls or correspondence with management of Seller, any of the Seller Parties or any other Person on behalf of Seller or any of the Seller Parties or any of their respective Affiliates or Advisors and (B) any other statement relating to the historical, current or future business, financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental, health or safety conditions and compliance, employee matters, regulatory compliance, business risks and prospects of Seller, or the quality, quantity or condition of Seller's assets, are, in each case, specifically disclaimed by Seller, on its behalf and on behalf of the Seller Parties. Buyer: (1) disclaims reliance on the items in <u>clause (ii)</u> in the immediately preceding sentence; and (2) acknowledges and agrees that it has relied on, is relying on and will rely on only the items in <u>clause (i)</u> in the immediately preceding sentence.

## ARTICLE IX
## CONDITIONS TO CLOSING

Section 9.1    <u>Conditions Precedent to the Obligations of Buyer and Seller</u>.  The respective obligations of each Party to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller and Buyer) on or prior to the Closing Date, of each of the following conditions:

(a)    no court of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any Order (including any temporary restraining Order or preliminary or permanent injunction) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement that is still in effect; and

(b)    the Bankruptcy Court shall have entered the Sale Order, which shall not (i) be subject to any stay or (ii) have been vacated or modified after entrance in any respect and this Agreement shall become effective in accordance with its terms.

(c)    If the Conditional Approval Letter is issued to Liquor License Applicant, then the closing of the sale of the membership interests in Liquor License Applicant by Seller to Buyer pursuant to the MIPA shall have closed simultaneously with the delivery of the Deed.

Section 9.2    <u>Conditions Precedent to the Obligations of Buyer</u>.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Buyer in its sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    the representations and warranties made by Seller in this Agreement shall be true and correct in all material respects (i) as of the Effective Date and (ii) as of the Closing Date as though made on and as of the Closing Date, except as to this <u>clause (ii),</u> (A) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (B) for a qualification to a representation that derives from an act taken by Seller, or an omission made by Seller, in either case after the Effective Date that is not prohibited to be taken or made by Seller hereunder and (C) for a qualification to a representation that (i) derives from events that occur after the Effective Date that are outside of the reasonable control of Seller and (ii) has not had and will not have a Material Adverse Effect;

(b)    Seller shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed and complied with by Seller on or prior to the Closing;

(c)    Seller shall have delivered, or caused to be delivered, to Buyer all of the items set forth in <u>Section 4.3</u>, except for such deliveries which, by their nature, cannot be made on or prior to the Closing;

(d)    Seller shall have delivered, or caused to be delivered, to Buyer the Required Estoppel Certificates and the Noho Estoppel Certificate;

(e)    New York State Liquor Authority (the "**SLA**") shall have issued to Buyer or Liquor License Applicant  a Conditional Approval Letter for the issuance of a Temporary Retail Permit for Buyer or Liquor License Applicant for the WV Complex; and

(f)    The closing of the sale of the Trademarks to Buyer pursuant to the UCC Sale shall occur simultaneously with the Closing.

Section 9.3    <u>Conditions Precedent to the Obligations of Seller</u>.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by Seller in their sole discretion), on or prior to the Closing Date, of each of the following conditions:

(a)    The representations and warranties of Buyer contained in <u>Article VI</u> shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except (i) that representations and warranties that are made as of a specified date need be true and correct only as of such date and (ii) to the extent the failure of such representations and warranties to be true and correct as of such dates, individually or in the aggregate, has not had and would not reasonably be expected to prevent Buyer from consummating the transactions contemplated by this Agreement;

(b)    Buyer shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed and complied with by it on or prior to the Closing; and

(c)    Buyer shall have delivered, or caused to be delivered, to Seller all of the items set forth in <u>Section 4.2</u>, except for such deliveries which, by their nature, cannot be made on or prior to the Closing.

## ARTICLE X
## TERMINATION

Section 10.1    <u>Termination of Agreement</u>.  This Agreement may be terminated only in accordance with this <u>Section 10.1</u>.  This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Buyer;

(b)    by written notice of either Buyer or Seller, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such Order having become final, binding and non-appealable; <u>provided</u> that no Party may terminate this Agreement under this <u>Section 10.1(b)</u> if the issuance of such Order was caused by such Party's material breach of any of its obligations under this Agreement;

(c)    by written notice of either Buyer or Seller, if the Closing shall not have occurred on or before September 18, 2024 (as the same may have been extended by the extension rights under <u>Section 4.1</u>, the "**Outside Date**"); <u>provided</u> that a Party shall not be permitted to terminate this Agreement pursuant to this <u>Section 10.1(c)</u> if the failure of the Closing to have occurred by the Outside Date was caused by such Party's material breach of any of its obligations under this Agreement;

(d)    by written notice from Seller to Buyer, upon a breach of any covenant or agreement on the part of Buyer hereunder or under the MIPA, or if any representation or warranty of Buyer hereunder or under the MIPA will have become untrue, in each case, such that the conditions set forth in <u>Section 9.3(a)</u> or <u>Section 9.3(b)</u> or Section 3 of the MIPA would not be satisfied, including a breach of Buyer's obligation to consummate the Closing; <u>provided</u> that (i) if such breach is curable by Buyer then Seller may not terminate this Agreement under this <u>Section 10.1(d)</u> unless such breach has not been cured by the date which is the earlier of (A) the Outside Date and (B) fifteen (15) Business Days after Seller notify Buyer in writing of such breach and (ii) the right to terminate this Agreement pursuant to this <u>Section 10.1(d)</u> will not be available to Seller at any time that Seller is in material breach of its obligations under this Agreement or Seller is in material breach of its obligations under the MIPA;

(e)    by written notice from Buyer to Seller, upon a breach of any covenant or agreement on the part of Seller hereunder or the part of Seller under the MIPA, or if any representation or warranty of Seller hereunder or of Seller under the MIPA will have become materially untrue, in each case, such that the conditions set forth in <u>Section 9.2(a)</u> or <u>Section 9.2(b)</u>

or Section 3 of the MIPA would not be satisfied and if the Conditional Approval Letter for the issuance of a Temporary Retail Permit is issued to the Liquor License Applicant; provided that (i) if such breach is curable by Seller then Buyer may not terminate this Agreement under this Section 10.1(e) unless such breach has not been cured by the date which is the earlier of (A) the Outside Date and (B) fifteen (15) Business Days after Buyer notifies Seller in writing of such breach and (ii) the right to terminate this Agreement pursuant to this Section 10.1(e) will not be available to Buyer at any time that Buyer is in material breach of its obligations under this Agreement or under the MIPA;

(f)    by written notice from Seller to Buyer, if all of the conditions set forth in Section 9.1 and 9.2 herein and Section 3 of the MIPA have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Buyer fails to complete the Closing at the time required by Section 4.1 or fails to complete the closing under the MIPA at the time required therein;

(g)    by written notice from Seller to Buyer, if Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with the Seller's fiduciary duties under applicable Law;

(h)    by written notice of either Buyer or Seller, if Seller consummates a sale of the Acquired Assets with one or more Persons other than Buyer;

(i)    by Buyer:

(i)    if the Bankruptcy Case is dismissed or converted to a liquidation proceeding under Chapter 7 of the Bankruptcy Code;

(ii)    If the Bankruptcy Court enters any Order that would reasonably be expect to prevent, impede or materially delay the consummation of the transactions contemplated hereby in accordance with the terms hereof; or

(iii)    if any creditor of Seller obtains a final and unstayed Order of the Bankruptcy Court granting relief from the stay to foreclose on any portion of the Acquired Assets.

(j)    by written notice from Buyer to Seller, if (i) Buyer is not the Successful Bidder or the Backup Bidder at the Auction or (ii) Buyer is the Backup Bidder and the Parties have not consummated the transactions contemplated hereby in accordance of the terms hereof within forty-five (45) days (unless the Closing Date hereunder is extended by Buyer or Seller pursuant to Section 4.1) of the entry of the sale order approving the sale of the Acquired Assets to the Successful Bidder; or

(k)    by written notice from Buyer to Seller, if all of the conditions set forth in Sections 9.1 and 9.3 and Section 3 of the MIPA have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and Seller fails to complete the Closing at the time required by Section 4.1 or fails to complete the closing under the MIPA at the time required therein.

Section 10.2    Effect of Termination.

(a)    In the event of termination of this Agreement pursuant to Section 10.1, this Agreement shall forthwith become void and no Party or any of its partners, officers, directors, managers or equity holders will have any Liability under this Agreement; provided that: (i) Section 3.2, Section 8.2(b), this Section 10.2 and Article XII shall survive any such termination; and (ii) no termination will relieve any Party from any Liability for damages, losses, costs or expenses (which the Parties acknowledge and agree shall not include the benefits of the transactions contemplated by this Agreement lost by the Parties), resulting from any Willful Breach of this Agreement prior to the date of such termination.  Subject to Section 12.12, nothing in this Section 10.2 will be deemed to impair the right of any Party to be entitled to specific performance or other equitable remedies to enforce specifically the terms and provisions of this Agreement.

(b)    If this Agreement is terminated pursuant to Section 10.1(c), (h), (j) or (k), , then Seller shall pay Buyer by wire transfer of immediately available funds within three (3) Business Days following such termination of this Agreement an amount equal to the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of its counsel and financial advisor) incurred by Buyer in connection with the negotiation, diligence, execution, performance and enforcement of this Agreement ("**Expense Reimbursement**"), which amount shall not exceed $250,000.  The Expense Reimbursement shall be treated as an administrative expense in the Bankruptcy Case under Section 503 and Section 507(b) of the Bankruptcy Code. For the avoidance of doubt, the Expense Reimbursement, if payable pursuant to this Section 10.2(b), shall be in addition to the return of the Deposit and payment of the Breakup Fee, in each case, to the extent payable to Buyer pursuant to Section 3.2 and Section 10.2(c), respectively.

(c)    In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof, Seller shall pay to Buyer a break-up fee in an amount equal to two and one-half percent (2.5%) of the Cash Consideration (the "**Breakup Fee**") plus the Expense Reimbursement to an account designated by Buyer in writing to Seller, if (i) this Agreement is terminated pursuant to Section 10.1(h) or (j) and (ii) a sale of the Acquired Assets is consummated with another party (whether or not Buyer was the Backup Bidder).  Seller shall pay such Breakup Fee to Buyer by wire transfer of immediately available funds within three (3) Business Days following the sale of the Acquired Assets to such third party. The Breakup Fee shall be treated as an administrative expense in the Bankruptcy Case under Section 503 and Section 507(b) of the Bankruptcy Code.  For the avoidance of doubt, the Breakup Fee, if payable pursuant to this Section 10.2(c), shall be in addition to the return of the Deposit and payment of the Expense Reimbursement, in each case, to the extent payable to Buyer pursuant to Section 3.2 and Section 10.2(b), respectively.

(d)    Each of the Parties acknowledges and agrees that the agreements contained in this Section 10.2 are an integral part of this Agreement and that the Expense Reimbursement and the Breakup Fee are not a penalty, but rather represent liquidated damages in a reasonable amount that will reasonably compensate Buyer in the circumstances in which such Expense Reimbursement and/or Breakup Fee, as applicable, is payable for the efforts and resources expended and opportunities foregone by Buyer while negotiating and pursuing this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation

of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

(e)       Pursuant to the Bid Procedures Order, the claim of Buyer in respect of the Expense Reimbursement or the Breakup Fee is and constitutes an allowed administrative expense claim against Seller under sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Case.

## ARTICLE XI
## TAXES

Section 11.1    Taxes.

(a)       Transfer Taxes.  Any purchase, transfer, deed, conveyance and other similar Taxes imposed on or with respect to the sale of the WV Complex under this Agreement ("**Transfer Taxes**") shall be borne and timely paid one hundred percent (100%) by Seller.

(b)       Sales Taxes.  Any sales, use or similar Taxes (other than Transfer Taxes) imposed on or with respect to the sale of the Personal Property under this Agreement ("**Sales Taxes**") shall be borne and timely paid one hundred percent (100%) by Buyer.

Section 11.2    Reimbursements.  Seller, on the one hand, or Buyer on the other hand, as the case may be (the "**Reimbursing Party**") shall provide reimbursement for any Tax paid by the other (the "**Paying Party**"), all or a portion of which is the responsibility of the Reimbursing Party in accordance with the terms of this Agreement.

Section 11.3    Cooperation.  Subject to Section 11.4, Buyer and Seller shall reasonably cooperate, as and to the extent reasonably requested by the other Party, in connection with the preparation or filing of Tax Returns, the determination of any liability in respect of Taxes or the right to any refund, credit, or prepayment in respect of Taxes, and any Tax Proceeding.  Subject to Section 11.4, Buyer and Seller will use commercially reasonable efforts and cooperate in good faith to exempt the transactions contemplated hereby from any Transfer Taxes to the extent allowed under applicable Law.

Section 11.4    Preparation of Tax Returns and Payment of Taxes.  Buyer shall prepare and timely file all non-income Tax Returns solely relating to the Acquired Assets for any period including the Closing Date.  Buyer shall prepare such Tax Returns consistent with past practice and shall provide Seller with a draft of such Tax Returns at least thirty (30) days (or such shorter period as is reasonable taking into account the Tax period and the nature of the relevant Tax Return or other relevant circumstances) prior to the filing of any such Tax Return.  Buyer shall incorporate any changes reasonably requested by Seller with respect to such Tax Returns if such Tax Returns could materially and adversely affect Seller in a Pre-Closing Tax Period or reflect a Tax that is borne by Seller pursuant to this Agreement or otherwise.

## ARTICLE XII
## MISCELLANEOUS

Section 12.1   <u>Non-Survival of Representations and Warranties and Certain Covenants;</u> <u>Certain Waivers</u>.  Each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing.

Section 12.2   <u>Expenses</u>.  Whether or not the Closing takes place, except as otherwise provided herein (including, for the avoidance of doubt, <u>Section 10.2</u>), all fees, costs and expenses (including fees, costs and expenses of Advisors) incurred in connection with the negotiation of this Agreement and the other agreements contemplated hereby, the performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby will be paid by the Party incurring such fees, costs and expenses; it being acknowledged and agreed that (a) Seller and Buyers shall each bear fifty percent (50%) of any reasonable fees and expenses of the Escrow Agent, (b) all Transfer Taxes and Sales Taxes will be governed by <u>Section 11.1</u>, and (c) all Cure Costs will be governed by <u>Section 2.4(c)</u>.

Section 12.3   <u>Notices</u>.  Except as otherwise expressly provided herein, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given (a) when personally delivered, (b) when transmitted by electronic mail (having obtained electronic delivery confirmation thereof), (c) the day following the day on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case, to the respective Party at the number, electronic mail address or street address, as applicable, set forth below, or at such other number, electronic mail address or street address as such Party may specify by written notice to the other Party.

|  |  |
|---|---|
| If to Seller, to: | WYTHE BERRY FEE OWNER LLC<br>at The William Vale Hotel<br>111 N 12th Street<br>Brooklyn, NY 11249<br>Attention:  Asaf Ravid<br>Email:  ravidasaf@gmail.com |
| With a copy to: | Herrick, Feinstein LLP<br>Two Park Avenue<br>New York, New York 10016<br>Attention:  Stephen Selbst, Yariv Ben-Ari and Gita Gandhi<br>Email:  sselbst@herrick.com, ybenari@herrick.com and<br>ggandhi@herrick.com |

|  |  |
|---|---|
| If to Buyer, to: | William Vale Owner LLC<br>c/o EOS Acquisitions LLC<br>444 Madison Avenue, 14th Floor<br>New York, New York 10022<br>Attention:  Tom Burns<br>Email:  tburns@eosinvestors.com |
| With a copy to: | EOS Acquisitions LLC<br>444 Madison Avenue, 14th Floor<br>New York, New York 10022<br>Attention:  Edward G. Stromberg III<br>Email:  estromberg@eosinvestors.com |
| And a copy to: | Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, New York 10166<br>Attention:  Harry R. Silvera, Esq.<br>Email:  hsilvera@gibsondunn.com |
| If to Title Company, to: | National Land Tenure, LLC<br>950 Franklin Avenue, 2nd Floor<br>Garden City, NY 11530<br>Attention: Edward F. Dull<br>Email: edull@nltco.com |
| If to Deposit Escrow Agent, to: | First American Title Insurance Company<br>666 Third Avenue, 5th Floor<br>New York, NY 10017<br>Attention: Antonio G. Vozza<br>Email: anvozza@firstam.com |

Section 12.4    Binding Effect; Assignment.

(a)    This Agreement shall be binding upon Buyer and, subject to the terms of the Bid Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Seller, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Case or any successor Chapter 7 cases.

(b)    Buyer shall not assign its rights under this Agreement without first obtaining Seller's written consent, which consent may be withheld in Seller's sole and absolute discretion.  Any transfer of direct or indirect ownership interests in Buyer or any change in control, either directly or indirectly, in Buyer shall be deemed an assignment of this Agreement by Buyer which is prohibited under this Section 12.4(b); provided, that any transfer of a direct or indirect

ownership interest in Buyer shall be permitted, without Seller's consent, so long as following such transfer: (i) EOS Group continues to own twenty-five percent (25%) or more of the direct or indirect interest in Buyer, and (ii) Buyer remains controlled by or under common control with EOS Investors.  Notwithstanding and without limiting the foregoing, no consent given by a party to any transfer or assignment of a party's rights or obligations hereunder shall be deemed to constitute a consent to any other transfer or assignment of rights or obligations hereunder and no transfer or assignment in violation of the provisions hereof shall be valid or enforceable.

Section 12.5    Amendment and Waiver.  Any provision of this Agreement or the Schedules or exhibits hereto may be (a) amended only in a writing signed by Buyer and Seller that are party to this Agreement or (b) waived only in a writing executed by the Person against which enforcement of such waiver is sought.  No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.

Section 12.6    Third Party Beneficiaries.  Except as otherwise expressly provided herein, nothing expressed or referred to in this Agreement will be construed to give any Person other than the Parties any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.

Section 12.7    Non-Recourse.  This Agreement may only be enforced against, and any Proceeding based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement.  Except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent or Advisor of any Party will have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements, or other obligations or Liabilities of any of the Parties with respect to the matters set forth in this Agreement or for any Agreement Dispute.

Section 12.8    Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law in any jurisdiction, such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

Section 12.9    Construction.  The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Person.  The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and will in no way restrict or otherwise modify any of the terms or provisions hereof.

Section 12.10    Electronic Signatures.  Signatures to this Agreement transmitted by facsimile or via electronic mail (.pdf or similar file types) shall be valid and effective to bind the party so signing.  If requested, each party agrees to promptly deliver an executed original to this Agreement, any amendment thereto or any notice sent via facsimile or via electronic mail with its

actual signature to the other party, but a failure to do so shall not affect the enforceability of this Agreement, or of any amendment or notice, it being expressly agreed that each party to this Agreement shall be bound to its own telecopied or electronically mailed signature in all instances and shall accept the telecopied or electronically mailed signature of the other party to this Agreement.

Section 12.11  Complete Agreement.  This Agreement, together with the Confidentiality Agreement and any other agreements expressly referred to herein (including the Transaction Documents) or therein, contains the entire agreement of the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement and supersedes all prior agreements among the Parties respecting the sale and purchase of the Acquired Assets and the Assumed Liabilities and the transactions contemplated by this Agreement.  In the event an ambiguity or question of intent or interpretation arises with respect to this Agreement, the terms and provisions of the execution version of this Agreement will control and prior drafts of this Agreement and the documents referenced herein will not be considered or analyzed for any purpose (including in support of parole evidence proffered by any Person in connection with this Agreement), will be deemed not to provide any evidence as to the meaning of the provisions hereof or the intent of the Parties with respect hereto and will be deemed joint work product of the Parties.

Section 12.12  Specific Performance.  The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the transactions contemplated by this Agreement.  It is accordingly agreed that (a) the Parties will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in Section 12.13 without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, neither Seller nor Buyer would have entered into this Agreement.  The Parties acknowledge and agree that any Party pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this Section 12.12 will not be required to provide any bond or other security in connection with any such Order.  If, prior to the Outside Date, any Party brings any action, in each case in accordance with Section 12.13, to enforce specifically the performance of the terms and provisions hereof by any other Party, the Outside Date will automatically be extended (i) for the period during which such action is pending, plus three (3) Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be.

Section 12.13  Jurisdiction and Exclusive Venue.  Each of the Parties irrevocably agrees that any Proceeding of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any Liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the transactions

contemplated hereby and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "**Agreement Dispute**") brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Proceeding, in the United States federal courts for the Southern District of New York (the "**Chosen Courts**"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the Parties agrees not to commence any Agreement Dispute except in the Chosen Courts, other than Proceedings in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Courts, and no Party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of forum non-conveniens. The Parties irrevocably agree that venue would be proper in any of the Chosen Court, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 12.3</u>. Nothing in this Agreement will affect the right of any Party to serve process in any other manner permitted by Law.

Section 12.14  <u>Governing Law; Waiver of Jury Trial</u>.

(a)     Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement and any Agreement Dispute will be governed by and construed in accordance with the internal Laws of the State of New York applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of New York or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of New York to apply.

(b)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY AGREEMENT DISPUTE IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND THEREFORE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY AGREEMENT DISPUTE. EACH OF THE PARTIES AGREES AND CONSENTS THAT ANY SUCH AGREEMENT DISPUTE WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY (I) CERTIFIES THAT NO ADVISOR OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY AGREEMENT DISPUTE, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 12.15  <u>No Right to Set Off</u>. Each of Buyer and Seller hereby waives any rights of set-off, netting, offset, recoupment or similar rights that it or its successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be

made pursuant to this Agreement or any other document or instrument delivered in connection herewith.

Section 12.16 <u>Counterparts</u>.  This Agreement and any other agreements referred to herein or therein, and any amendments hereto or thereto, may be executed in multiple counterparts, any one of which need not contain the signature of more than one party hereto or thereto, but all such counterparts taken together will constitute one and the same instrument.

Section 12.17 <u>Publicity</u>.  Neither Seller nor Buyer shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably conditioned, withheld or delayed, unless, in the reasonable judgment of Buyer or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Buyer or Seller (or their respective Affiliates) lists securities; <u>provided</u> that (a) the Party intending to make such release shall use its reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof and (b) the restrictions set forth herein shall not apply to the extent the information contained therein substantially reiterates (or is substantially consistent with) previous releases, public disclosures or public statements made in compliance with this <u>Section 12.17</u>.

Section 12.18 <u>Bulk Sales Laws</u>.  The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any Encumbrances in the Acquired Assets including any liens or claims arising out of the bulk transfer laws except Permitted Encumbrances, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.  In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement.

Section 12.19 <u>Recordation</u>.  Neither this Agreement nor any memorandum or notice hereof shall be recorded. Buyer shall (i) not, and hereby waives its rights to, file any notice of lis pendens or other form of notice of pendency or other instrument against the Property or any portion thereof in connection herewith and (ii) indemnify Seller against all liabilities (including reasonable attorneys' fees, expenses and disbursements) incurred by Seller by reason of the filing by Buyer or its agent of any such memorandum, notice or other instrument. If Buyer fails to comply with the terms hereof by recording or attempting to record this Agreement or a notice thereof, such act shall not operate to bind or cloud the title to the Property. Seller shall, nevertheless, have the right forthwith to institute appropriate legal proceedings to have the same removed from record. If Buyer or any agent, broker or counsel acting for Buyer shall cause or willingly permit this Agreement or a copy thereof to be filed in an office or place of public record, Seller, at its option, and in addition to Seller's other rights and remedies, may treat such act as a default of this Agreement on the part of the Buyer. However, the filing of this Agreement in any lawsuit or other proceedings in which such document is relevant or material or in connection with a pending action for specific performance shall not be deemed to be a violation of this <u>Section 12.19</u>.

Section 12.20  <u>Condition of Delivery</u>.  Seller has no obligation to cause the Hotel to be in a "broom clean" condition as of the Closing, and at Closing Seller may leave in the Hotel all items of Personal Property, partitions and other items as are now there present in the normal course of operating and maintaining the Hotel.

Section 12.21  <u>INDEPENDENT COUNSEL</u>.  EACH PARTY TO THIS AGREEMENT ADMITS, ACKNOWLEDGES AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY TO CONSULT WITH AND BE REPRESENTED BY INDEPENDENT COUNSEL OF SUCH PARTIES' CHOICE IN CONNECTION WITH THE NEGOTIATION AND EXECUTION OF THIS AGREEMENT.  AS SUCH, THE TERMS OF THIS AGREEMENT SHALL BE FAIRLY CONSTRUED AND THE USUAL RULE OF CONSTRUCTION, TO WIT, THAT AMBIGUITIES IN THIS AGREEMENT SHOULD BE RESOLVED AGAINST THE DRAFTING PARTY, SHALL NOT BE EMPLOYED IN THE INTERPRETATION OF THIS AGREEMENT OR ANY AMENDMENTS, MODIFICATIONS OR EXHIBITS HERETO OR THERETO.  EACH PARTY FURTHER ADMITS, ACKNOWLEDGES AND REPRESENTS THAT IT HAS NOT RELIED ON ANY REPRESENTATION OR STATEMENT MADE BY ANY OF THE ATTORNEYS AND REPRESENTATIVES OF THE OTHER PARTY WITH REGARD TO THE SUBJECT MATTER, BASIS, OR EFFECT OF THIS AGREEMENT.

Section 12.22  <u>No Partnership</u>.  Nothing contained in this Agreement shall be construed to create a partnership or joint venture between the Parties or their successors in interest.

Section 12.23  <u>TIME OF ESSENCE</u>.  WITH REGARD TO ALL DATES AND TIME PERIODS SET FORTH OR REFERRED TO IN THIS AGREEMENT, TIME IS OF THE ESSENCE.

Section 12.24  <u>Merger/AS IS, WHERE IS</u>.  All understandings and agreements heretofore had between the parties hereto are merged in this Agreement, which alone fully and completely expresses their understanding and agreement.  Except as otherwise provided in this Agreement, this Agreement is entered into after full investigation, neither party relying upon any statement or representation, not embodied in this Agreement, made by the other.

Buyer acknowledges and agrees that Seller shall convey to Buyer and Buyer shall accept the Acquired Assets "**AS IS, WHERE IS, WITH ALL FAULTS**" and there are no oral agreements, warranties or representations, collateral to or affecting the Property by Seller or any third party.  Except as expressly stated in this Agreement, Buyer has not relied and will not rely on, and Seller is not liable for or bound by, any express or implied warranties, guarantees, statements, representations or information pertaining to the Acquired Assets or relating thereto made or furnished by Seller or any real estate broker or agent representing or purporting to represent Seller, to whomever made or given, directly or indirectly, orally or in writing, unless specifically set forth in this Agreement.

Buyer confirms to Seller that Buyer, acting directly or through its qualified representatives, has conducted such investigations of the Acquired Assets, including but not limited to, the physical and environmental conditions and land use characteristics thereof and its suitability for Buyer's intended use thereof, as Buyer deemed reasonably necessary or desirable and has reached a

favorable conclusion as to the condition of the Property and the Acquired Assets and the existence or nonexistence with respect to any hazardous materials, and will rely solely upon such investigations, with which it is satisfied fully and in all material respects and not upon any information, if any, provided by or on behalf of Seller or its agents or employees with respect thereto.  Except as expressly stated in this Agreement, Buyer agrees that upon Closing, Buyer shall assume the risk that adverse matters, including but not limited to, construction defects, title and adverse physical and environmental conditions, may not have been revealed by Buyer's investigations or that of its representatives, and that Buyer, upon Closing, shall be deemed to have waived, relinquished and released Seller and Seller Parties from and against any and all claims, demands, causes of action (including causes of action in tort), losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees) of any and every kind or character, known or unknown, which Buyer might have asserted or alleged against Seller at any time by reason of or arising out of any latent or patent construction defects or physical conditions, violations of laws and any and all other acts, omissions, events, circumstances or matters regarding the Property. Buyer further acknowledges that it has satisfied itself, after consultation with counsel as to the nature and state of title of the Property it will obtain from Seller and is satisfied with such title. Moreover, Buyer has reached a satisfactory determination as to value of the Acquired Assets.

**WITHOUT IN ANY WAY LIMITING THE FOREGOING, EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE WHATSOEVER, WITH RESPECT TO THE ACQUIRED ASSETS, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PROPERTY OR ANY WARRANTY AS TO MATTERS OF TITLE, ZONING, TAX CONSEQUENCES, PHYSICAL OR ENVIRONMENTAL CONDITION (INCLUDING, WITHOUT LIMITATION, LAWS, RULES, REGULATIONS, ORDERS AND REQUIREMENTS PERTAINING TO THE USE, HANDLING, GENERATION, TREATMENT, STORAGE OR DISPOSAL OF ANY TOXIC OR HAZARDOUS WASTE OR TOXIC, HAZARDOUS OR REGULATED SUBSTANCE), VALUATION, GOVERNMENTAL APPROVALS, GOVERNMENTAL REGULATIONS OR ANY OTHER MATTER OR THING RELATING TO OR AFFECTING THE PROPERTY AND ALL SUCH WARRANTIES ARE HEREBY DISCLAIMED.  IN ADDITION, EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE INTANGIBLE PROPERTY AND ANY RIGHTS OR OWNERSHIP WITH RESPECT THERETO.**

THE TERMS AND CONDITIONS OF THIS <u>SECTION 12.24</u> SHALL EXPRESSLY SURVIVE THE CONSUMMATION OF THE PURCHASE AND SALE OF THE ACQUIRED ASSETS ON THE CLOSING DATE, THE DELIVERY OF THE DEED AND THE PAYMENT OF THE PURCHASE PRICE, WITHOUT REGARD TO ANY LIMITATIONS UPON SURVIVAL SET FORTH IN THIS AGREEMENT.

Section 12.25 <u>Special Damages</u>.    SELLER AND BUYER HEREBY EXPRESSLY WAIVE, RELEASE, AND RELINQUISH ALL CLAIMS, DAMAGES AND ACTIONS FOR, AND AGREES THAT THE OTHER PARTY SHALL NOT BE LIABLE FOR, ANY SPECIAL, CONSEQUENTIAL, PUNITIVE, OR OTHER SIMILAR-TYPE DAMAGES HEREUNDER,

EXCEPT TO THE EXTENT OF ANY INDEMNIFICATION CLAIM FOR SUCH DAMAGES INCURRED PURSUANT TO A THIRD-PARTY CLAIM.

Section 12.26  <u>Survival</u>.  The provisions of this Article XII shall survive the Closing.

[Signature pages follow.]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Effective Date.

**SELLER**

WYTHE BERRY FEE OWNER LLC

By: _____

Name: __Assaf Ravid_____

Its: __CRO/ Authorized Manager_____

**BUYER**

WILLIAM VALE OWNER LLC,
a Delaware limited liability company

By: _____

Name:   Tom Burns

Its:     Managing Director

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the Effective Date.

**SELLER**

WYTHE BERRY FEE OWNER LLC

By:_____

Name:_____

Its:_____

**BUYER**

WILLIAM VALE OWNER LLC,
a Delaware limited liability company

By:_____

Name:  Tom Burns

Its:     Managing Director

## EXHIBIT A - LEGAL DESCRIPTION

ALL that certain plot, piece or parcel of land situate, lying and being in the Borough of Brooklyn, County of Kings, State of New York bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Wythe Avenue, with the southwesterly side of North 13th Street;

RUNNING THENCE southeasterly along the southwesterly side of North 13th Street, 250 feet;

THENCE southwesterly and at right angles to the last mentioned course, 200 feet to the northeasterly side of North 12th Street;

THENCE northwesterly along the northeasterly side of North 12th Street, 250 feet to the southeasterly side of Wythe Avenue;

THENCE northeasterly along the southeasterly side of Wythe Avenue, 200 feet, more or less, to the point or place of BEGINNING.

NOTE: Being Block 2283 Lot 1, Tax Map of the Borough of Brooklyn, County of Kings.

## <u>EXHIBIT B – MEMBERSHIP INTEREST PURCHASE AGREEMENT</u>

**MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT**
**WB FNB LLC**

THIS MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT (this "**Agreement**") is made and entered into as of February 8, 2024 (the "**Effective Date**") by and between WYTHE BERRY FEE OWNER LLC, a Delaware limited liability company (the "**Seller**") and WILLIAM VALE OWNER LLC, a Delaware limited liability company (the "**Purchaser**").

## EXPLANATORY STATEMENT

A.      The Seller currently owns one hundred percent (100%) of all of the issued and outstanding membership interests (the "**Membership Interests**") in WB FNB LLC (the "**Company**"), a New York limited liability company;

B.      The Seller and Purchaser are party to that certain Purchase and Sale Agreement, dated as of the Effective Date (the "**PSA**"), and this Agreement constitutes the "MIPA" set forth in Section 2.5 of the PSA. Capitalized terms used but not defined herein shall have the meaning set forth in the PSA; and

B.      The Seller desires to sell, assign, transfer and deliver to the Purchaser, and the Purchaser desires to purchase, all, but not less than all, of the Seller's Membership Interests in the Company on the terms and subject to the conditions hereinafter contained.

NOW THEREFORE, in consideration of the mutual covenants, promises, agreements, representations and warranties contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby covenant, promise, agree, represent and warrant as follows:

1.      *Purchase and Sale of the Seller's Membership Interests.*

1.1.      *Purchase and Sale.* On the terms and subject to the conditions set forth in this Agreement, the Seller shall sell, assign, transfer and deliver to the Purchaser and the Purchaser shall purchase from the Seller, all of the Seller's Membership Interest in the Company on the Closing Date. At the closing of the purchase and sale transaction contemplated by this Agreement (the "**Closing**"), Seller and Purchaser shall enter into an assignment and assumption of membership interests, in form and substance substantially similar as the form attached hereto as <u>Exhibit A</u> (the "**Assignment**"), conveying to Purchaser 100% of the issued and outstanding Membership Interests in the Company. Notwithstanding anything in this Agreement to the contrary, the purchase and sale transaction contemplated by this Agreement is for the sale of Seller's Membership Interests in the Company and all assets of the Company except cash and cash equivalents, including, without limitation, accounts receivables, all of which will be the property of and retained by Seller at Closing.

1.2.      *Purchase Price.*  The full, entire, and aggregate purchase price that shall be paid by the Purchaser to the Seller for the Seller's *Membership* Interests in the Company shall be Five Thousand and 00/100 Dollars ($5,000.00) (the "**Purchase Price**"). The Purchaser shall pay the Purchase Price to Seller on the Closing Date, simultaneously with the delivery of the Assignment, by federal funds wire transfer of immediately available funds to an account at such bank or banks as shall be designated by Seller by notice to Purchaser.  The "Deposit" set forth in the PSA shall be and hereby is considered the consideration for this Agreement.

1.3.      *Simultaneous Closing Condition.*  Closing under this Agreement is conditioned upon

- 1 -

HF 17201861v.4

simultaneous closing of, and shall simultaneously close with the closing of, the transactions contemplated by the PSA. Seller and Purchaser each hereby agree that it is a material *condition* hereunder that the transactions contemplated under this Agreement and under the PSA close simultaneously. Furthermore, if either the PSA or this Agreement is terminated then the other agreement shall be deemed simultaneously and automatically terminated without the need for any further act or instrument.

2.     *Representations and Warranties.*

2.1.     The Seller represents and warrants to the Purchaser that:

2.1.1.     *Ownership of Seller' Membership Interests.* The Seller is the sole and exclusive record and beneficial owner of one hundred percent (100%) of all of the issued and outstanding Membership Interests in the Company.  The Seller possesses good and merchantable title to the Seller's Membership Interests in the Company, and owns Seller's Membership Interests in the Company free and clear of any and all security interests, agreements, restrictions, claims, liens, pledges and encumbrances of any nature or kind (collectively, "**liens**").  Subject to Article VII of the PSA, Seller has the absolute and unconditional right to sell, assign, transfer and deliver the Seller's Membership Interests in the Company to the Purchaser in accordance with the terms of this Agreement. The Seller represents and warrants that the Membership Interests are uncertificated.  Upon consummation of the transactions contemplated hereby, Purchaser shall own of record and beneficially 100% of the issued and outstanding Membership Interests in the Company, free and clear of any and all liens. There are no rights of first refusal, right of first offer, right of exclusivity or similar right to purchase the Membership Interests in the Company.

2.1.2.     *[Reserved].*

2.1.3.     *Options, Warrants and Other Rights and Agreements Affecting the Limited Liability Company's Membership Interests.*     The Company has no authorized or outstanding options, warrants, calls, subscriptions, rights, convertible securities or other securities as defined in the federal Securities Act of 1933 (hereinafter "Securities") or any commitments, agreements, arrangements or understandings of any kind or nature obligating the Company, in any such case, to issue membership shares or interests or other Securities or securities convertible into or evidencing the right to purchase Membership Interests in the Company. Neither any Seller Party nor the Company is a party to any agreement, understanding, arrangement or commitment, or bound by any articles of organization or similar provision which creates any rights in any Person with respect to the authorization, issuance, voting, sale or transfer of any Membership Interests in the Company or other Securities.

2.1.4.     *[Reserved].*

2.1.5.     *Books and Records and Assets.* Purchaser has been given access to the books and records of the Company (which as of the Effective Date consist only of the Company's organizational documents attached hereto as Exhibit B and Exhibit C), has been made aware of the financial condition and results of operations of the Company by Seller, and the Company has no assets or liabilities except as adequately disclosed in such books and records, if any. The Company was formed by Seller on July 26, 2023 in connection with the food and beverage operations at the WV Complex and has not conducted any business or owned any assets unrelated thereto.

2.1.6.     *Employees.* The Company has no, and never has had any, employees.

2.1.7.     *Contracts.* Schedule 2.1(e) attached hereto sets forth a true, correct and complete list

- 2 -

HF 17201861v.4

of each material Contract as of the Effective Date to which the Seller, the Company or the Seller and the Company are a party.  Seller has delivered to Buyer true, correct and complete copies in all material respects of all such Contracts.  No later than March 5, 2024, Seller shall deliver to Buyer a true, correct and complete list of each Contract executed by Seller and true, correct and complete copies in all material respects of all such Contracts.  To the knowledge of Seller, there are no understandings, oral or written, between the parties to each Contract that in any manner vary the obligations or rights of either party set forth in such Contract.

2.1.8.  *Organizational Documents.*  A true, correct and complete copy of the Company's Articles of Organization and Operating Agreement are attached hereto as <u>Exhibits B and C</u>, respectively, said organizational documents are all of the organizational documents of the Company and said organizational documents have not been amended, modified, or rescinded except as disclosed to Purchaser.

2.1.9.  *Tax Matters*. The Company is a disregarded entity whose regarded entity for U.S. federal income tax purposes is Seller. Each of the Company and Seller has prepared and timely filed, or has had prepared and timely filed on its behalf, all income tax returns required to be filed with any taxing authority, and such income tax returns are accurate and complete in all material respects.  Neither the Company nor Seller has received any written notice from any taxing authority in any jurisdiction where it has not filed tax returns notifying it that it may be subject to taxation in such jurisdiction. Each of the Company and Seller (i) has paid, or has had paid on its behalf, all income taxes that would otherwise be delinquent if not paid and (ii) will have withheld and remitted to the appropriate taxing authority all income taxes required to be withheld and remitted.  There is no income tax deficiency outstanding or assessed or, to Seller's knowledge, proposed against either the Company or Seller.

3.  *Incorporation by Reference.*  The following Sections and Articles of the PSA are incorporated herein by this reference, *mutatis mutandis,* as if fully set forth herein: Section 1.2, Section 4.2(e), Section 4.3(e), Section 5.1, Section 5.2, Section 5.3, Section 5.6,  Section 5.11, Section 5.15, Section 5.16, Section 5.17, Section 5.18, Section 5.19, Article VI, Article VII, Section 8.1(d), Section 8.2, Section 8.3, Section 8.4, Section 8.5, Section 8.6, Section 8.10, Section 8.11, Section 8.13, Article IX, Section 10.1, Section 10.2(a), and Article XII (other than the proviso set forth in Section 12.2).
.

4.  *Miscellaneous.*

4.1.  *Survival of Representations, Warranties, and Agreements.* All of the representations, warranties, covenants, promises and agreements of the parties contained in this Agreement (or in any document delivered or to be delivered pursuant to this Agreement or in connection with the Closing) shall survive the execution, acknowledgement, sealing and delivery of this Agreement and the consummation of the transactions contemplated hereby for the applicable period(s) of time, and subject to the limitations, set forth in the PSA.

4.2.  *Entire Agreement.* This Agreement constitutes the full, entire and integrated agreement between the parties hereto with respect to the subject matter hereof, and supersedes all prior negotiations, correspondence, understandings and agreements among the parties hereto respecting the subject matter hereof.

4.3.  *Assignability.* This Agreement shall not be assignable by Purchaser without the prior written consent of the Seller except (i) as set forth in Section 12.4(b) of the PSA and (ii) that Purchaser may designate an affiliated Person under common control with Purchaser to take title to the Membership Interests at Closing (which, in case of this clause (ii), the Parties agree shall not constitute an assignment hereof).

- 3 -

4.4. *Binding Effect; Benefit.* This Agreement shall inure to the benefit of and be binding upon the parties hereto, each other person who is indemnified under any provision of this Agreement, and their respective heirs, personal and legal representatives, guardians, successors and, in the case of Purchaser, its respective permitted assigns. Nothing in this Agreement, express or implied, is intended to confer upon any other person any rights, remedies, obligations, or liabilities.

4.5. *Severability.* Any provision of this Agreement which is held by a court of competent jurisdiction to be prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability, without invalidating or rendering unenforceable the remaining provisions of this Agreement.

4.6. *Amendment; Waiver.* No provision of this Agreement may be amended, waived, or otherwise modified without the prior written consent of all of the parties hereto. No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement herein contained. The waiver by any party hereto of a breach of any provision or condition contained in this Agreement shall not operate or be construed as a waiver of any subsequent breach or of any other conditions hereof.

4.7. *Section Headings.* The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

4.8. *Counterparts.* This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

4.9. *Applicable Law; Jurisdiction and Venue.* This Agreement is made and entered into, and shall be governed by and construed in accordance with, the laws of the State of New York, excluding its conflict of laws principles. Each of the parties hereto agrees that any action or proceeding arising out of or related in any way to this Agreement shall be brought solely in a state court located in the State of New York.

4.10. *Intentionally Omitted.*

4.11. *Enforcement Fees and Expenses.* In connection with any action or claim brought with respect to this Agreement and/or the transactions contemplated hereby, including in connection with any breach of a representation, warranty or covenant hereunder, the non-prevailing party shall be liable to the prevailing party for all attorneys' fees, costs, and litigation-related costs and expenses incurred by the prevailing party.

4.12. *Further Assurances.* The Seller agrees to execute, acknowledge, seal and deliver, after the Effective Date, without additional consideration, such further assurances, instruments and documents, and to take such further actions, as the Purchaser may request in order to fulfill the intent of this Agreement and the transactions contemplated hereby.

4.13. *Use of Genders.* Whenever used in this Agreement, the singular shall include the plural and vice versa, and the use of any gender shall include all genders and the neuter.

5. *Covenants.* The Company shall not take (or fail to take) any action except as contemplated under Section 8.1(d) and Section 8.11 of the PSA.

- 4 -

6.	*Certain Definitions.*  As used herein, the following terms are defined as set forth below:

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any arbitrator, court or tribunal of competent jurisdiction.

"**Person**" means any individual, partnership, corporation, limited liability company, association, joint-stock company, trust, joint venture, unincorporated organization or association or a Governmental Authority (or any department, agency or political subdivision thereof).

- 5 -

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the Effective Date.

SELLER:

**WYTHE BERRY FEE OWNER LLC**,
a Delaware limited liability company

By: _____
          Name:  Asaf Ravid
          Title:    Authorized Signatory

PURCHASER:

**WILLIAM VALE OWNER LLC**,
a Delaware limited liability company

By: _____
          Name:
          Title:

EXHIBIT A

**ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST**

THIS ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTEREST (this "Agreement") is made and entered into as of _____, 2024, by and between **WYTHE BERRY FEE OWNER LLC**, a Delaware limited liability company ("Assignor"), and [_____], a Delaware limited liability company ("Assignee").

W I T N E S S E T H:

WHEREAS, Assignor owns one hundred percent (100%) of all the issued and outstanding membership interests (the "Membership Interests") in WB FNB LLC, a New York limited liability company (the "Company");

WHEREAS, Assignor and Assignee are party to that certain Membership Interest Purchase and Sale Agreement, dated as of February [____], 2024 (the "Membership Interest PSA"); and

WHEREAS, pursuant to the Membership Interest PSA, Assignor has agreed to sell to Assignee, and Assignee has agreed to purchase from Assignor, all of Assignor's Membership Interests in the Company (such interests, the "Assigned Interest") pursuant to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises, Assignors and Assignee hereby agree as follows:

1.      Transfer.  Assignors hereby unconditionally and irrevocably transfer, convey, deliver and set over to Assignee all of Assignors' right, title and interest in and to the Assigned Interest.

2.      Acceptance.  Assignee hereby accepts the assignment of the Assigned Interest and hereby approves and becomes party to, and succeeds to all rights and assumes and agrees to be bound by all of the liabilities, obligations, terms, provisions and conditions of, the Operating Agreement of the Company.

3.      Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Assignors and Assignee and their respective legal representatives, heirs, successors and assigns.

4.      Counterparts; Facsimile Signatures.  This Agreement may be executed in counterparts, all of which when taken together shall constitute one complete instrument and may be executed by the transmission of an email pdf or facsimile copy of an executed counterpart of or signature page hereto and any pdf, facsimile or photostatic copy of an executed counterpart hereof or signature page hereto shall be given the same effect as the original.

5.      Governing Law.  The validity and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard to principles of conflicts of law, and such laws shall apply in any action or proceeding arising out of or under this Agreement. Each party hereto hereby irrevocably consents to the jurisdiction of the courts of the State of New York and of any Federal court located in such State in connection with any action, suit or other proceeding arising out of, or relating to, this Agreement, and hereby waives personal service of any summons, complaint or other process and agrees that the service thereof may be made by certified or registered mail directed to such party at such party's last known address and irrevocably waives any objection such party may now or hereafter have as to the venue of any such suit, action or proceeding brought in such court or that such court is an inconvenient forum.

- 1 -

6.    <u>Further Assurances</u>.  Assignor shall execute, acknowledge and deliver, upon the written request of Assignee, any and all such further agreements or instruments as may be reasonably required for carrying out the purpose and intent of this Agreement and to transfer to Assignee all of Assignor's rights, title and interests in and to the Assigned Interest.

7.    <u>Conflict of Terms</u>. Nothing in this Agreement shall alter any liability or obligation of Assignor or Assignee arising under the Membership Interest PSA. For the avoidance of doubt, in the event of any conflict between this Agreement and the Membership Interest PSA, the Agreement shall control.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

ASSIGNOR:

**WYTHE BERRY FEE OWNER LLC**,
a Delaware limited liability company

By:    _____
       Name:  Asaf Ravid
       Title:    Authorized Signatory

ASSIGNEE:

[_____],
a Delaware limited liability company

By:    _____
       Name:  [_____]
       Title:    [_____]

- 2 -

Exhibit B

**ARTICLES OF ORGANIZATION**



# Delaware

Page 1

The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "WYTHE BERRY FEE OWNER LLC" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF FORMATION, FILED THE FIRST DAY OF FEBRUARY, A.D. 2017, AT 5:41 O'CLOCK P.M.

CERTIFICATE OF REVIVAL, FILED THE ELEVENTH DAY OF DECEMBER, A.D. 2023, AT 4:40 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID LIMITED LIABILITY COMPANY, "WYTHE BERRY FEE OWNER LLC".

Jeffrey W. Bullock, Secretary of State

6302821  8100H
SR# 20240416857

Authentication: 202769392
Date: 02-08-24

You may verify this certificate online at corp.delaware.gov/authver.shtml

HF 17201861v.4


State of Delaware
Secretary of State
Division of Corporations
Delivered 05:41 PM 02/01/2017
FILED 05:41 PM 02/01/2017
SR 20170598153 - File Number 6302821

## CERTIFICATE OF FORMATION

### OF

### WYTHE BERRY FEE OWNER LLC

**FIRST:** The name of the limited liability company is WYTHE BERRY FEE OWNER LLC

**SECOND:** The address of its registered office in the State of Delaware is 1013 Centre Road, Suite 403-B in the City of Wilmington, Delaware 19805, in the County of New Castle. The name of its registered agent at such address is Vcorp Services, LLC.

**THIRD:** Members may be admitted in accordance with the terms of the Operating Agreement of the limited liability company.

**IN WITNESS WHEREOF**, the undersigned has executed this Certificate of Formation, on February 01, 2017.

/s/Taylor Lolya
Taylor Lolya, Authorized Person

CERTIFICATE OF REVIVAL

OF

WYTHE BERRY FEE OWNER LLC

WYTHE BERRY FEE OWNER LLC (hereinafter called the "company"), Pursuant to Section 18-1109 of the Limited Liability Company Act of the State of Delaware, a limited liability company organized and existing under and by virtue of the Limited Liability Company Act of the State of Delaware, does hereby certify:

1.  The name of the limited liability company is WYTHE BERRY FEE OWNER LLC.

2.  The date the original certificate of formation of the limited liability company is February 1, 2017.

3.  The address of the registered office and the name and the address of the registered agent of the limited liability company required to be maintained by Section 18-104 of the Delaware Limited Liability Company Act are National Registered Agents, Inc., 1209 Orange Street, Wilmington, Delaware 19801.

4. The person executing and filing this Certificate of Revival is authorized to do so.

/s/ Asaf Ravid
Name: Asaf Ravid
Title:    Authorized Person

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:40 PM 12/11/2023
FILED 04:40 PM 12/11/2023
SR 20234191674 - File Number 6362821

Delaware Domestic Limited Liability Company
Certificate of Revival 6/01 : 1

<u>Exhibit C</u>

**OPERATING AGREEMENT**

## Schedule 2.1(e) – Contracts

| | | Hotel and Food & Beverage Service Contracts | |
|---|---|---|---|
| # | Company Name | Description | Contract Assignment Language | Known Cost to Assign or Recontract |
| 1 | AAA | Membership Agreement to join AAA | This agreement and official appointment is non-transferable. If the establishment is sold, the appointee shall remain liable for all fees due AAA. AAA approval of new owner is required for new owner to continue license and official appointment status. | $0.00 |
| 2 | ADP | Workforce system | Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. | $0.00 |
| 3 | Alice | Professional Services | Customer may not assign its rights and obligations under this Agreement without the prior written permission of Actabl. | $0.00 |
| 4 | Amadeus Hospitality Americas | Hotel Software | In the event a Customer's property is sold by Customer, the Subscripton Products assigned to the customer may either be internally reallocated, assigned to a different Customer property or terminated in accordance with the terms of the Order Form. | $0.00 |
| 5 | Associated Fire Protection | Inspection and Testing Agreement for Fire Protection Equipment | You cannot transfer or assign this Agreement without our written consent. | $1,415.37 |
| 6 | Bacchus Agency Inc. | Media Consulting | N/A | |
| 7 | Birchstreet Systems, LLC | Purchasing Software | A Party may from time to time change its address or designee for notification purposes by giving the other a writen notice of the new address or designee in accordance with this Section 11 and date upon which it became effective. | |
| 8 | Capricorn Luxury Travel | Limousine Service | N/A | $0.00 |
| 9 | Celopay | Third-party billing service | Customer may not assign this agreement or any obligation, right or interest hereunder without the prior written consent of CeloPay. | $0.00 |
| 10 | Croker Fire Drill Corporation | Fire saftey service | N/A | $0.00 |
| 11 | Cvent | Advertising services | Except for assignment to a Party's affiliate (any entity which directly or indirectly controls, is controlled by, or is under common control with such Party), or in the case of a merger, acquisition or sale of all or substantially all assets not involving a direct competitor of the other Party, neither Party may assign or otherwise transfer any right or obligation set forth under the Agreement without the other Party's prior written consent, not to be unreasonably withheld or delayed. | $0.00 |
| 12 | EFRIDGE | Supports/ operates minibar services at the hotel | Neither party shall, without the prior written consent of the other party (which consent shall not be unreasonably withheld) assign this Agreement or delegate its duties hereunder in whole or part.... A change in control of either party (including a change in ownership resulting in a new majority owner, alone or acting together as a group, of a party) shall be deemed an assignment of this Agreement by that party. | $0.00 |
| 13 | Elavon | Credit card service company | Customer shall not have the right to transfer or assign its rights or obligations under this Agreement to any other individual or entity, without the prior written consent of Elavon or its permitted assigns, which consent shall not be unreasonably withheld. | $0.00 |
| 14 | Infor (US), Inc. | EzRMS, revenue management system | Licensee may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Infor, whether by operation of law or otherwise, including in connection with a change in control, merger, acquisition, consolidation, asset sale or other reorganization, and any attempt at such assignment or transfer will be void. | $18,314.95 (Combined total for EzRMS, HMS, and other Infor products) |
| 15 | Caviar | Restaurant service order | N/A | $0.00 |
| 16 | Freedom Pay | Payment platform | N/A | $0.00 |
| 17 | Doordash | Online food order/ delivery service | N/A | $0.00 |
| 18 | Grubhub | Online food order/ delivery service | N/A | $0.00 |
| 19 | Grubhub | Online food order/ delivery service | N/A | $0.00 |
| 20 | Grubhub | Online food order/ delivery service, sale of alcohol agreement | N/A | $0.00 |
| 21 | ItsaCheckmate | Integrates 3rd party delivery platforms directly into POS systems | This Agreement is not assignable, transferable, or sublicensable by Customer except with Company's prior written consent. | $0.00 |
| 22 | OpenTable | Online reservation system | N/A | $0.00 |
| 23 | OpenTable | Online reservation system | N/A | $0.00 |
| 24 | OpenTable | Online reservation system | N/A | $0.00 |
| 25 | Postmates | Online food order/ delivery service | Merchant may not assign this Agreement or any of its rights and obligations hereunder. Postmates may assign this Agreement or any of its right and obligations pursuant to a merger, acquisition, or a sale of all or substantially all of its assets obligations hereunder pursuant to a merger, acquisition, or a sale of all or substantially all of its assets. | $0.00 |
| 26 | Postmates | Online food order/ delivery service | Merchant may not assign this Agreement or any of its rights and obligations hereunder. Postmates may assign this Agreement or any of its right and obligations pursuant to a merger, acquisition, or a sale of all or substantially all of its assets obligations hereunder pursuant to a merger, acquisition, or a sale of all or substantially all of its assets. | $0.00 |
| 27 | SevenRooms | Reservation system | N/A | $0.00 |
| 28 | Your Fare | Manages third-party delivery services | N/A | $0.00 |
| 29 | ItsaCheckmate | Integrates 3rd party delivery platforms directly into POS systems | This Agreement is not assignable, transferable, or sublicensable by Customer except with Company's prior written consent. | $0.00 |
| 30 | Socialtables | Event planning app | N/A | $0.00 |
| 31 | JTECH | Pager system for staff and guests | N/A | $0.00 |

| # | Company Name | Description | Contract Assignment Language | Known Cost to Assign or Recontract |
|---|---|---|---|---|
| | | | **Hotel and Food & Beverage Service Contracts** | |
| 32 | Konica Minolta | Copier Lease | N/A | $0.00 |
| 33 | Micros | POS system | Not transferable or assignable | $0.00 |
| 34 | Micros | POS system | Not transferable or assignable | $0.00 |
| 35 | Micros | POS system | Not transferable or assignable | $0.00 |
| 36 | Salido | Monthly recurring software and support change | License Grant. Subject to the terms and conditions set forth herein, SALIDO hereby grants to you during the Term (as defined below) a limited, non-exclusive, non-transferable license, without the right to grant sublicenses, to access and use the Services | $0.00 |
| 37 | R365 | Operations software | N/A | $0.00 |
| 38 | Salido | Operations software | N/A | $0.00 |
| 39 | Kitchen Repair Specialists | Kicthen repair | N/A | $0.00 |
| 40 | Metro Recycling | Recycling program | N/A | $0.00 |
| 41 | PCC | Cleaning and maintenance | N/A | $0.00 |
| 42 | Doordash | Food delivery system | N/A | $0.00 |
| 43 | Grubhub | Food delivery system | N/A | $0.00 |
| 44 | ItsaCheckmate | Integrates 3rd party delivery platforms directly into POS systems | Agreement is not assignable, transferable or sublicensable by Customer except with Company's prior writen consent. | $0.00 |
| 45 | OpenTable | Online reservation system | N/A | $0.00 |
| 46 | OpenTable | Online reservation system | N/A | $0.00 |
| 47 | SevenRooms | Reservation system | Neither party may assign the Agreement without the other party's prior written consent, except if there is a merger, consolidation or sale of all or substantiall all of a party's stock or assets and provided that the assigning party provides written notice to the other promptly following any such assignment. | $0.00 |
| 49 | Tripleseat | Event management software | Client may not assign any of its rights or delegate any of its obligations hereunder without Tripleseat Software written consent, which such consent shall not be unreasonably withheld or delayed. | $0.00 |
| 50 | Gray V | Entertainment agency | Sale, transfer, closure or change in location of Subscribers business by the Subscriber herein designated shall not reduce, eliminate or otherwise affect its obligation under this Agreement. Neither party may assign this Agreement, without the other party's prior written consent, except to a successor to the business of the assigning party. | $0.00 |
| 51 | GRM | Shredding Services | N/A | $0.00 |
| 52 | Guest-Tek Interactive Entertainment | Interactive solutions for hospitality | Neither Party may transfer or assign any rights or delegate any obligations hereunder, in whole or in part, whether voluntarily or by operation of law, without the prior written consent of the other. | $0.00 |
| 53 | Infor | Business cloud software | Licensee may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Infor, whether by operation of law or otherwise, including in connection with a change in control, merger, acquisition, consolidation, asset sale or other reorganization, and any attempt at such assignment or transfer will be void. | $18,314.95 (Combined total for EzRMS, HMS, and other Infor products) |
| 54 | Hospitality Staffing Solutions | Contract Staffing services | Client shall not transfer or assign this agreement without the written consent of HSS, which shall not be unreasonably withheld | $0.00 |
| 55 | Infinity Resoration | Monthly stone maintenance proposal | N/A | $0.00 |
| 56 | Infinity Resoration | Monthly stone maintenance proposal | N/A | $0.00 |
| 57 | International Proactive Secuirty, Inc (IPS) | Security Services | Client may assign this Agreement to its affiliates or in the event of a merger, consolidation, or sale of substantially all of its assets. | $0.00 |
| 58 | Infinite Solutions (ISNY) | IT Services | N/A | $0.00 |
| 59 | Jack Jaffa and Associates | Real estate consultants | N/A | $0.00 |
| 61 | KNOWCROSS | Service operations | N/A | $0.00 |
| 62 | LEAF Capital Funding, LLC | Equiptment finance and capital solutions provider | You have no right to sell or assign the Equiptment or Lease. We may sell or assign our rights in the lease and/or equiptment and the new owner willhave all our rights but will not be subject to any claim or defense you have against us | $0.00 |
| 63 | LEAF Capital Funding, LLC | Equiptment finance and capital solutions provider | You have no right to sell or assign the Equiptment or Lease. We may sell or assign our rights in the lease and/or equiptment and the new owner willhave all our rights but will not be subject to any claim or defense you have against us | $0.00 |
| 64 | M3 | Accounting Software | N/A | $0.00 |
| 65 | The Madison Melle Agency | Business consulting | Neither this Agreement nor any of the rights or obligations hereunder may be assigned without prior written consent of the other party hereto. Any attempted assignment in violation of this provision is null and void. | $0.00 |
| 66 | Metropolis | Tracking and reporting software | Neither party shall assign this Agreement or any right granted or to be granted under it without the prior written consent of the other. | $0.00 |
| 67 | Premium Pest Control | Pest control service | N/A | $0.00 |
| 68 | Quadient | Mail service | N/A | $0.00 |
| 69 | Resort Pass | Provides amenity access to hotel without having an overnight stay | N/A | $0.00 |
| 70 | Rotavele Elevator Service | Elevator service | This agreement shall be binding upon the owners, their successors and assigns. | $0.00 |

| | | Hotel and Food & Beverage Service Contracts | | |
|---|---|---|---|---|
| # | Company Name | Description | Contract Assignment Language | Known Cost to Assign or Recontract |
| 71 | Sabre | Online media | N/A | $0.00 |
| 72 | Selfbook | Booking system | Client may not assign any of its rights or delegate any of its obligations hereunder, in each case whether voluntarily, involuntarily, by operation of law or otherwise, without the prior written consent of Selfbook. Any purported assignment or delegation in violation of this Section will be void. | $0.00 |
| 73 | SKCHASE | Gift vouchers system | The Seller may not assign, sub-license or otherwise transfer any of its rights under the contract without the prior written consent of SKChase | $0.00 |
| 74 | Travel Tripper | Hotel technology provider providing reservation, distribution and e-commerce solutions | The parties may freely assign this Assignment (including a transfer in the event of a sale of all or substantially all of the assets corresponding to the business to which this Agreement pertains) with the prior written consent of the other party, which must not be unreasonably withheld or delayed | $0.00 |
| 75 | Travel Tripper | Hotel technology provider providing reservation, distribution and e-commerce solutions | The parties may freely assign this Assignment (including a transfer in the event of a sale of all or substantially all of the assets corresponding to the business to which this Agreement pertains) with the prior written consent of the other party, which must not be unreasonably withheld or delayed | $0.00 |
| 76 | Tri State Linen | Linen service | The Hotel shall have the right to assign this agreement to any successor entity operating the Hotel at this location at any time, without consent of Tri State Linen. | $0.00 |
| 77 | Tri State Fire Sprinkler | Fire sprinkler inspection | N/A | $2,400.00 |
| 78 | Wage Works | Benefits management system | Neither of us may assign any of our rights and obligations in connection with the provision of Services without the prior written consent of the other, which consent shall not be unreasonably withheld. | $0.00 |
| 79 | Valet Kings | Valet parking service | N/A | N/A |
| 80 | KOUTO INC. | Peer-to-Peer software platform for branded experiential connections. Such services are more fully described in Schedule A hereto. | N/A | $0.00 |
| 81 | WIHP | Hotel digital marketing agency | N/A | $0.00 |
| 82 | Telego | Telephone System | N/A | $0.00 |
| 83 | Booking.com | Online Travel Agency | Neither Party may assign, transfer, and/or encumber any of its rights and/or obligations under the Agreement (other than to a Booking.com Affiliated Company) without the prior written consent of the other Party. No assignment, novation, or transfer by the Accommodation shall relieve it of its obligations under the Agreement. | $0.00 |
| 84 | Expedia | Online Travel Agency | No Party may assign or otherwise transfer in any manner (whether voluntary or involuntary, or by operation of law, sale of securities or assets, merger, reorganization or otherwise) this Contract, or any of its rights or obligations under this Contract, without the other Party's prior written consent; | $0.00 |
| 85 | Hotel Tonight | Online Travel Agency | N/A | $0.00 |
| 86 | Day Use | Online Travel Agency | Neither Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the other Party. | $0.00 |
| 87 | Mr. Mrs Smith | Online Travel Agency | In the event of any change of ownership of the business of the Principal or the ownership of the Accommodation, the Principal shall notify the Agent of this immediately and shall, with the Agent's prior consent, transfer its obligations under this contract to the new owner. Should the Agent not consent to the transfer, the Agent shall be entitled to immediately terminate the Agreement upon giving written notice to the Principal, without liability. | $0.00 |
| 88 | Revinate | CRM & Marketing Platform | Neither party may assign or otherwise transfer its rights or delegate its duties under this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed, and any attempt to do so without consent shall be void. | $0.00 |
| 89 | STR | Market Intelligence | N/A | $0.00 |
| 90 | TripAdvisor | Online Guest Reviews | N/A | $0.00 |
| 91 | OTA Insight | Market Intelligence - Rate Shopping Tool | Neither this Agreement nor any of the rights or obligations under this Agreement, may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any party hereto without the prior written consent of the other parties hereto, and any such assignment without such prior written consent shall be null and void. | $0.00 |
| 92 | Ben Franklin HVAC | HVAC Service Provider | N/A | $4,000.00 |
| 93 | Cendyn | Hotel Website | N/A | |
| 94 | American Express | Credit card merchant services | You shall not assign the Agreement, or any of your rights, interests, or obligations hereunder, whether voluntarily or by operation of law (including by way of sale of assets, merger, or consolidation), without our prior written consent. Any purported assignment by operation of law is voidable in our sole discretion. | $0.00 |

| Additional Contracts | |
|---|---|
| Hadar Consulting Services LLC | Listing Agreement for Lease dated as of September 20, 2022 between Wythe Berry LLC and Hadar Consulting Services LLC |
| Meridian Capital Group, LLC, d/b/a Meridian Retail Leasing | Listing Agreement between Wythe Berry LLC and Meridian Capital Group, LLC, d/b/a Meridian Retail Leasing dated September 23, 2022 |
| Archimaera | Architect – Agreement for Alt-1 filing with DOB - $25,000 Remaining |
| ABS – Joel Tyrnauer | Expeditor Service – $10,000 Remaining |

**EXHIBIT C – PERMITTED EXCEPTIONS**

(a)    All unpaid real estate taxes and water and sewer charges which are not yet a lien and are not yet due and payable as of the Closing Date, subject to adjustment as hereinafter provided;

(b)    All present and future zoning, building, environmental and other laws, ordinances, codes, restrictions, resolutions, orders and regulations of all governmental authorities having jurisdiction with respect to the Property, including, without limitation, landmark designations and all zoning variances and special exceptions, if any (collectively, "**Laws and Regulations**"), provided that such Laws and Regulations do not render title unmarketable, uninsurable without payment of a special or additional premium, or prevent the use of the Property as a Hotel;

(c)    All encroachments and projections shown on the Survey;

(d)    Violations of record, provided that any fines and penalties are paid through the Closing Date;

(e)    Rights of tenants under leases, as tenants only, with no options or other rights to purchase all or any portion of the property; and

(f)    The items described in exceptions numbers 11 (provided that Seller has made a request for a Property Transfer Meter Reading prior to Closing), 19-22 and 32 on **Exhibit C-1** attached hereto and made a part hereof.

## EXHIBIT C-1 – PERMITTED EXCEPTIONS (attached)

### First American Title Insurance Company

Title No: **NLT-34363-K-23**

#### SCHEDULE B

Hereinafter set forth are additional matters which will appear in our policy as exceptions from coverage unless disposed of to our satisfaction prior to the closing or delivery of the policy.

#### DISPOSITION

1.  Taxes, tax liens, tax sales, water rates, sewer and assessments set forth in schedule herein.

2.  Mortgages returned herein ( **TEN** ). Detailed statement herein.

3.  Rights of tenants, persons and parties in possession.

4.  Any state of facts which an accurate survey might show OR survey exceptions set forth herein.

5.  Covenants, conditions, easements, leases, agreements of record, if any.

6.  Searches have been run in the Office of the Clerk of the County in which the premises are located against the following names for Judgments, Federal, State and Local Tax Liens and other liens indexed against the following names, and the returns are as follows:

    **Wythe Berry Fee Owner LLC – Two (2) Judgments and four (4) Environmental Control Board Liens**
    **The William Vale Hotel LLC – Nothing Found**
    **The William Val FNB LLC – One (1) Judgment**
    **Wythe Berry LLC – Nothing Found**

    **Note: Six (6) Environmental Control Board Liens against the Premises.**

7.  Pursuant to Section 1409a of the NYS Tax Law as amended on September 13, 2019, the NYS TP-584 and NYC-RPT accompanying deeds where the Seller and/or Purchaser of a One to Four Family is a limited liability company must contain the following:

    The name and business address of the LLC and ALL of its members, managers, and any other authorized persons acting on behalf of the LLC. In the event any of said members, managers or authorized persons are an LLC, the same information must be disclosed as to that entity. This disclosure must continue until the level of ownership is a Natural Person.

    **THE COMPANY WILL EXCEPT ALL LOSS OR DAMAGE AND NO COVERAGE WILL BE PROVIDED TO THE INSURED AS A RESULT OF THE FAILURE TO COMPLY WITH SAID REQUIREMENT AT OR PRIOR TO CLOSING.**

8.  Proof of due formation of **Wythe Berry Fee Owner LLC** is a Limited Liability Company organized under the Laws of the State of Delaware must be submitted to the Company prior to closing, together with the following:

    a.  a copy of the certificate of authority to do business in the State of New York;
    b.  proof of publication of notice containing the substance of the application for authority;
    c.  a copy of a certificate of existence or good standing issued by the state in which the LLC

## First American Title Insurance Company

Title No: **NLT-34363-K-23**

was formed.

A copy of the Articles of Organization and Operating Agreement, together with all amendments thereto, must be submitted to this Company for review prior to closing of title to determine:

    a.  The identity of the member or members of the LLC authorized to acquire, sell, mortgage or lease its real property as appropriate to the transaction to be insured;

    b.  Whether the articles of organization or operating agreement require the express consent, approval or affirmative vote of the members thereof at a meeting duly called or otherwise;

Any limitations imposed under the terms of the articles of organization or operating Agreement on the power of the LLC to acquires, sell, mortgage or lease its real property.

9.   Proof of due formation of **Wythe Berry LLC** by production of the secretary of state filing receipt together with proof of publication and an affidavit that it is a valid and subsisting limited liability company which has not been terminated or dissolved by the bankruptcy, death, dissolution, expulsion, incapacity or withdrawal of any member or classes of members specified in the articles of organization sometimes referred to as the operating agreement, or any other event that, under the terms of operating agreement, terminates the LLC, including the entry of a degree of judicial dissolution under Section 702 of the Limited Liability Company Law.

10.  The articles of organization and operating agreement of a **Wythe Berry LLC** together with all amendments thereto, must be submitted to this company for review prior to closing of title to determine:

The identity of the member or members of the LLC authorized to acquire, sell, mortgage or lease its real property as appropriate to the transaction to be insured;

Whether the articles of organization or operating agreement require the express consent, approval or affirmative vote of the members thereof at a meeting duly called or otherwise;

Any limitations imposed under the terms of the articles of organization or operating agreement on the power of the LLC to acquire, sell, mortgage or lease its real property;

If the articles of organization or operating agreement call for the consent of the members, an instrument duly executed by the managing member, financial, or recording officer or member evidencing that such consent was duly obtained will be required and must be submitted to this company prior to closing.

11.  Tax search discloses water meters which have been read to the date indicated thereon. Policy will except subsequent meter readings from the date of the last actual reading:

Tax search discloses water meters. Information is limited to the account numbers and current balance. The NYC DEP has requested that a title read letter be ordered from them as part of any NYC purchase transaction. If you are purchasing property in NYC it is important to request a Property Transfer Meter Reading or Title Read Letter prior to closing. To protect yourself from charges incurred by the seller you must obtain the reading thirty (30) days prior to the closing. Purchasers should have their legal representative request that the seller obtain this title reading thirty days prior to closing. See information at:

https://www1.nyc.gov/site/nycwaterboard/rates/rates-regulations.page

## First American Title Insurance Company

Title No. **NLT-34363-K-23**

A Title Read Letter should be obtained prior to the date of closing by (a) sending an email request to TitleReadRequests@dep.nyc.gov, (b) visiting the DEP borough office, (c) calling the Borough Call Center at 718-595-7000, or (d) mailing a request to DEP/BCS Customer Service, P.O. Box 739055, Elmhurst, NY 11373-9055.

Policy will except subsequent meter readings from the date of the last actual reading.

12. Liens pursuant to the Administrative Code of the City of New York may have attached and not been filed or recorded no liability is assumed for same.

13. Satisfactory proof must be furnished showing whether any work has been done upon the premises by the City of New York, or whether any demand has been made by the City of New York for any such work that may result in the filing of subsequent Emergency Repair Liens against which the policy does not protect.

14. For Income Producing Property: Proof must be submitted that the Real Property Income and Expense Statement required by Section 11-208.1 of New York City's Administrative Code has been filed.

15. The following two (2) judgments against **Wythe Berry Fee Owner LLC** must be disposed to the satisfaction of the company at or prior to closing. (See herein).

16. The following four (4) New York City Environmental Control Board judgments against **Wythe Berry Fee Owner LLC** must be disposed of to the satisfaction of the company at or prior to closing.

17. The following judgment against **The Willliam Val FNB LLC** must be disposed to the satisfaction of the company at or prior to closing. (See herein).

**OMIT**

18. Railroad Consent dated 10/1/1885, recorded 12/9/1896 in Section 8 Liber 6 Page 167.

19. Sewer Agreement dated 12/5/1907, recorded 1/13/1907 in Liber 3043 Page 367.

20. Waiver of Legal Grade dated 3/7/1969, recorded 3/28/1969 in Reel 323 Page 1493.

21. For Information Only: Zoning Lot Certification dated 5/5/2014, recorded 5/8/2014 in CRFN 2014000157136.

22. For Information Only: Zoning Lot Description and Ownership Statement dated 5/6/2014, recorded 5/8/2014 in CRFN 2014000157137.

23. Terms, Covenants and Conditions in a lease made by Wythe Berry Fee Owner LLC (Lessor) and Wythe Berry LLC (Lessee) dated 2/28/2017, a Memorandum of which is dated 2/28/2017, recorded 3/6/2017 in CRFN 2017000087433.

With regards thereto:

Subordination, Non-Disturbance and Attornment Agreement made by All Year Holdings Limited (Lender) and Wythe Berry Fee Owner LLC (Landlord) and Wythe Berry LLC (Tenant) dated 2/28/2017, recorded 3/6/2017 in CRFN 2017000087432.

## First American Title Insurance Company

Title No. **NLT-34363-K-23**

24. Terms, Covenants and Conditions in an unrecorded lease made by Wythe Berry LLC (Landlord) and The William Vale Hotel LLC (Tenant) dated 2/28/2017.

With regard thereto:

Subordination, Non-Disturbance and Attornment Agreement made by All Year Holdings Limited (Lender) and Wythe Berry LLC (Landlord) and The William Vale Hotel LLC (Tenant) dated 2/28/2017, recorded 3/6/2017 in CRFN 2017000087429 and Subordination, Non-Disturbance and Attornment Agreement made by All Year Holdings Limited (Lender) and Wythe Berry LLC (Landlord) and The William Vale FNB LLC (Tenant) dated 2/28/2017, recorded 3/6/2017 in CRFN 2017000087431

25. Terms, Covenants and Conditions in an unrecorded lease made by Wythe Berry LLC (Landlord) and North 12 Parking LLC (Tenant).

With regard thereto:

Subordination, Non-Disturbance and Attornment Agreement made by All Year Holdings Limited (Lender) and Wythe Berry LLC (Landlord) and North 12 Parking LLC (Tenant) dated 2/28/2017, recorded 3/6/2017 in CRFN 2017000087430.

26. Assignment of Leases and Rents and Security Deposits made by Wythe Berry Fee Owner LLC to All Year Holdings Limited, dated 2/28/2017, recorded 3/6/2017 in CRFN 2017000087419.   Assigned by Collateral Assignment of Assignment of Leases and Rents from All Year Holdings Limited to Mishmeret Trust Company Ltd. Dated 2/28/2017, recorded 3/6/2017 in CRFN 2017000087420.

27. Title to personal property is not insured, but the following Uniform Commercial Code security agreement/financing statement must be discharged of record as it affects the real property.  (See UCC attached).

| | |
|---|---|
| Debtor: | Wythe Berry Fee Owner LLC |
| Secured Party: | All Year Holdings Limited |
| No.: | CRFN 2017000087421 |
| File Date: | 3/6/2017 |

Assigned in CRFN 2021000162121.

Correction Statement filed in CRN 2021000172408

Correction Statement filed in CRFN 2021000185446.

Continuation filed in CRFN 2021000512508.

28. The following Mechanic's Liens must be disposed of:

Lienor: Turtle & Hughes Inc.
Owner: Wythe Berry Fee Owner LLC
In the amount of $39,817.92
Filed: 9/26/2022; Extension filed 9/25/2023

## First American Title Insurance Company

Title No.  **NLT-34363-K-23**

Lienor: Ziba Construction Inc.
Owner: Wythe Berry Fee Owner LLC
In the amount of $89,217.56
Filed: 10/6/2022; Extension filed 10/3/2023

Lienor: Flushing Iron Weld Inc.
Owner: Wythe Berry Fee Owner LLC
In the amount of $12,035.30
Filed: 10/17/2022; Extension filed 10/10/2023

Lienor: Sunbelt Rentals Inc.
Owner: Wythe Berry Fee Owner LLC
In the amount of $7,399.74
Filed: 11/4/2022

Lienor: S.R. Mechanical Design Corp.
Owner: Wythe Berry Fee Owner LLC
In the amount of $105,066.12
Filed: 11/22/2022.  In foreclosure, see herein.

Lienor: Ace Wire & Cable Co Inc.
Owner: Wythe Berry Fee Owner LLC
In the amount of $38,610.00
Filed: 11/10/2022

Lienor: D. and J. Industries LLC
Owner: Wythe Berry Fee Owner LLC
In the amount of $90,514.12
Filed: 11/30/2022

Lienor: Impulse Electrical Supply Inc.
Owner: Wythe Berry Fee Owner LLC
In the amount of $12,787.39
Filed: 1/18/2023

Lienor: L'Forma LLC
Owner: Wythe Berry Fee Owner LLC
In the amount of $63,137.00
Filed: 5/31/2023

Lienor: Schimenti Construction Company LLC
Owner: Wythe Berry Fee Owner LLC
In the amount of $1,406,796.72
Filed: 11/2/2022.  In foreclosure, see herein

29.    Notice of Pendency filed 11/2/2022, Index Number 531828/22 in action entitled: Schimenti
Construction Co LLC plaintiffs vs. Wythe Berry Fee Onwer LLC et al; defendants.  Nature of Action:
Action to foreclose mechanic's lien.  This action must be discontinued, the Notice of Pendency
cancelled of record and the Judgment, if any, must be vacated by Order of the court.

**First American Title Insurance Company**

Title No: **NLT-34363-K-23**

30.    Notice of Pendency, filed 9/8/2023 Index Number 526101/23 in action entitled: S.R. Mechanical/Design Corp plaintiffs vs. Wyth Berry Fee Owner LLC; defendants.  Nature of Action: Action to foreclose mechanic's lien.  This action must be discontinued, the Notice of Pendency cancelled of record and the Judgment, if any, must be vacated by Order of the court.

31.    Examination shows premises may be subject to Bankruptcy Proceedings.  Being investigated.

32.    Survey made by Leonard J. Strandberg and Associates Consulting Engineers and Land Surveyors, P.C., dated August 20, 2013, last amended on December 15, 2023 (updated) shows a 1 story/3 story/22 story buildings with multi-level overhangs and the following survey exceptions:

- Stone steps encroach on Wythe Avenue up to 2.1 feet
- Stone steps encroach on North 13th Street up to 2.0 feet
- Stone steps encroach on North 12th Street 1.3 feet and 2.0 feet
- Edge of Façade projects over North 12th Street 4.2 feet

**EXHIBIT D – FORM OF DEED**

<u>DEED</u>

**THIS INDENTURE**, made the _____ day of _____, 2024, between **WYTHE BERRY FEE OWNER LLC**, party of the first part, and [_____], a _____, with offices at c/o [_____], [_____], party of the second part.

**WITNESSETH**, that the party of the first part, in consideration of Ten Dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

**ALL THE CERTAIN PLOT OR PARCEL OF LAND, WITH THE BUILDINGS AND IMPROVEMENTS SITUATED THEREON AS MORE PARTICULARLY DESCRIBED ON SCHEDULE A ANNEXED HERETO AND MADE A PART HEREOF**

**BEING** and intended to be the same premises conveyed to Wythe Berry Fee Owner LLC by deed recorded in the Office of the City Registrar of Kings County on [_____] as CRFN [_____].

**TOGETHER** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above-described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

**AND** this conveyance is made pursuant to the Bankruptcy Order dated _____ __, 2023, Case No. [_____], titled United States Bankruptcy Court of the Southern District of New York In Re: Wythe Berry Fee Owner LLC. Order pursuant to Sections [105(a), 363(b), 365 and 1146(c)] of the Bankruptcy Code approving the sale of 111 N. 12th Street, Brooklyn, New York, a copy of which is attached hereto as Schedule B.

**AND** the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

-11-

**IN WITNESS WHEREOF**, the party of the first part has duly executed this deed as of the day and year first above written.

**WYTHE BERRY FEE OWNER LLC**

By: _____

     Name:

     Title:

STATE OF NEW YORK     )

                      ) ss:

COUNTY OF NEW YORK  )

On the ___ day of _____, 2024, before me, the undersigned, a Notary Public in and for said state, personally appeared [_____], personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on this instrument, the individual, or person upon behalf of which the individual acted, executed the instrument.

_____

Notary Public

## SCHEDULE A

### LAND

ALL that certain plot, piece or parcel of land situate, lying and being in the Borough of Brooklyn, County of Kings, State of New York bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Wythe Avenue, with the southwesterly side of North 13th Street;

RUNNING THENCE southeasterly along the southwesterly side of North 13th Street, 250 feet;

THENCE southwesterly and at right angles to the last mentioned course, 200 feet to the northeasterly side of North 12th Street;

THENCE northwesterly along the northeasterly side of North 12th Street, 250 feet to the southeasterly side of Wythe Avenue;

THENCE northeasterly along the southeasterly side of Wythe Avenue, 200 feet, more or less, to the point or place of BEGINNING.

NOTE: Being Block 2283 Lot 1, Tax Map of the Borough of Brooklyn, County of Kings.

**SCHEDULE B**

SALE ORDER

(immediately following)

**EXHIBIT E – FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

## ASSIGNMENT AGREEMENT

THIS ASSIGNMENT AGREEMENT (this "**Agreement**") is entered into as of this ___ day of _____, 202_, by and between [_____] ("**Assignor**"), and [_____], a [_____] ("**Assignee**"), in connection with that certain Purchase and Sale Agreement between Assignor as the "Seller" and Assignee as the "Buyer" dated as of _____, 202_, as the same has been or may be amended (the "**Purchase Agreement**") pursuant to which Assignor agreed to sell to Assignee the "Property" described therein.  All terms with initial capital letters shall have the meaning ascribed thereto in the Purchase Agreement except as otherwise defined herein.

NOW, THEREFORE, in consideration of the covenants and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.      Assignment.  Assignor hereby assigns and transfers to Assignee all of Assignor's right, title and interest in and to (a) the Leases, (b) the Contracts, (c) the Intangible Property (excluding the Trademarks, in which Assignor has no interest) and (d) the Personal Property (collectively herein, the "**Assigned Rights**").  This Assignment shall be binding upon and inure to the benefit of the successors, assigns, personal representatives, heirs and legatees of Assignor and Assignee.

2.      Intentionally Omitted.

3.      Further Assurances.  Each Party shall execute and deliver to the other any additional instrument or other document that such other Party reasonably requests to evidence the assignment of the Assigned Rights hereunder promptly upon request, provided that such shall not increase Assignor's obligations or liability hereunder or under the Purchase Agreement.  Assignor shall cooperate and assist Assignee in obtaining any Consents required to effectuate this Agreement.

4.      Governing Law.  This Assignment shall be deemed to be an agreement made under the laws of the State of New York and for all purposes shall be governed by and construed in accordance with such laws, excluding, however, the provisions related to conflict of laws.

5.      Counterparts.  This Assignment may be executed in one or more separate counterparts, each of which, when so executed, shall be deemed to be an original.  Such counterparts shall, together, constitute and be one and the same instrument.

6.      Electronic Signatures.  Signatures to this Agreement transmitted by facsimile or via electronic mail (.pdf or similar file types) shall be valid and effective to bind the party so signing. If requested, each party agrees to promptly deliver an executed original to this Agreement, any amendment thereto or any notice sent via facsimile or via electronic mail with its actual signature to the other party, but a failure to do so shall not affect the enforceability of this Agreement, or of any amendment or notice, it being expressly agreed that each party to this Agreement shall be bound to its own telecopied or electronically mailed signature in all instances and shall accept the telecopied or electronically mailed signature of the other party to this Agreement.

7.    <u>AS-IS</u>.  EXCEPT AS SET FORTH IN THE PURCHASE AGREEMENT, THE ASSIGNED RIGHTS ARE CONVEYED AS IS, WHERE IS WITHOUT ANY REPRESENTATIONS OR WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, OF ANY KIND WHATSOEVER BY SELLER AND ALL WARRANTIES OF QUALITY, FITNESS AND MERCHANTABILITY ARE HEREBY EXCLUDED.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BY BUYER'S ACCEPTANCE OF THIS AGREEMENT, BUYER ACKNOWLEDGES THAT SELLER EXPRESSLY DISCLAIMS AND NEGATES, AS TO ALL ASSIGNED RIGHTS TRANSFERRED HEREBY: (A) ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY; AND (B) ANY IMPLIED OR EXPRESS WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE.

[Signature page follows]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the year and date first above written.

**ASSIGNOR:**

**WYTHE BERRY FEE OWNER LLC**

By:_____

Name:_____

Its:   _____

**ASSIGNEE:**

[_____],

a [_____]

By:_____

Name:_____

Its:_____

**EXHIBIT F – FORM OF ESCROW AGREEMENT**

**ESCROW AGREEMENT**

**ESCROW AGREEMENT** ("Agreement") made as of January __, 2023 by and among **WYTHE BERRY FEE OWNER LLC** ("Seller"), and [_____], a [state of formation][type of entity] ("Buyer", and together with Seller, the "Parties", and each, a "Party"), and [_____] (the "Escrow Agent").  All capitalized terms used but not defined herein shall have the meaning assigned to them in the Purchase Agreement (as defined below).

**RECITALS**

A.    Buyer and Seller have entered into a Purchase and Sale Agreement, dated as of the date hereof (as may be amended, the "Purchase Agreement"), pursuant to which, among other things, Buyer has or shall deposit [_____] and 00/100 Dollars ($[_____].00) (the "Initial Deposit"; together with the Additional Deposit, if any, the "Deposit") into escrow with Escrow Agent upon execution of this Agreement.

**NOW, THEREFORE,** the parties hereto as follows:

1.    Deposit and Acknowledgment of Receipt.

1.1    Concurrently with or prior to the execution and delivery of this Agreement, Buyer has delivered to Escrow Agent, and Escrow Agent by its execution hereof acknowledges receipt of, Buyer's wire transfer in the amount of the Initial Deposit, payable to Escrow Agent. Buyer may deposit the Additional Deposit in accordance with the Purchase Agreement, in which case such Additional Deposit shall be deemed part of the Deposit and subject to the terms and conditions of this Agreement.

1.2    Intentionally omitted.

1.3    Provided Escrow Agent is given an executed and completed Form W-9, Escrow Agent hereby agrees to hold the Escrow Fund in an interest-bearing account pending the disbursement of such Escrow Fund in accordance with the terms of this Agreement.

1.4    The Escrow Fund shall not be subject to lien or attachment by any creditor of any party hereto and shall be used solely for the purposes set forth in this Agreement.  Amounts held in the Escrow Account shall not be available to, and shall not be used by, Escrow Agent to set off any obligations of either Buyer or Seller owing to Escrow Agent in any capacity.

2.    Terms of Escrow.

2.1    Escrow Agent shall disburse amounts from the Escrow Fund, and any accrued interest thereon, upon delivery, by Seller and Buyer to Escrow Agent, of joint written instructions executed by an authorized officer of both parties directing Escrow Agent to deliver to Seller or Buyer, as the case may be, an amount equal to the amount to which it is entitled.  Upon receipt of the joint written instructions, Escrow Agent shall release by wire transfer to an account or accounts designated by Seller or Buyer, as the case may be, the amount specified in the joint written instructions.

-18-

2.2    If Escrow Agent receives a written demand from Seller stating that Seller has terminated the Purchase Agreement pursuant to its rights under Section 10.1(f) of the Purchase Agreement and a summary of the facts and circumstances underlying such termination (a "Notice of Buyer Default"), Escrow Agent shall promptly provide Buyer a copy of such Notice of Buyer Default.  If Escrow Agent does not receive a written notice of objection from Buyer within seven (7) business days after Escrow Agent delivered the Notice of Buyer Default to Buyer, Escrow Agent shall disburse the Escrow Funds to Seller.  If Escrow Agent does receive a written notice of objection from Buyer within such seven (7) business day period, Escrow Agent shall continue to hold the Escrow Funds in accordance with Section 2.4 below

2.3    If Escrow Agent receives a written demand from Buyer stating that the Purchase Agreement has been terminated pursuant to any provision other than Section 10.1(f) of the Purchase Agreement and a summary of the facts and circumstances underlying such default (a "Notice of Seller Default"), Escrow Agent shall promptly provide Seller a copy of such Notice of Seller Default.  If Escrow Agent does not receive a written notice of objection from Seller within seven (7) business days after Escrow Agent delivered the Notice of Seller Default to Seller, Escrow Agent shall disburse the Escrow Funds to Buyer.  If Escrow Agent does receive a written notice of objection from Seller within such seven (7) business day period, Escrow Agent shall continue to hold the Escrow Funds in accordance with Section 2.4 below.

2.4    Notwithstanding anything to the contrary contained in this Agreement, in the event of a dispute concerning the Escrow Fund, the Escrow Agent shall not disburse any amounts from the Escrow Fund until its receipt of joint written instructions from Seller and Buyer as set forth hereinabove or a final non-appealable order of a court of competent jurisdiction directing the disbursement of the Escrow Fund.

2.5    Upon the completion of the disbursements as set forth above, Escrow Agent shall have no further duties hereunder.

3.    <u>Obligations and Liabilities of Escrow Agent</u>.

3.1    The duties and obligations of Escrow Agent shall be determined solely by the express provisions of this Agreement.

3.2    Escrow Agent shall not be responsible in any manner whatsoever for any failure or inability of Buyer or Seller to perform or comply with any of the provisions of the respective agreements between them.

3.3    Escrow Agent shall not be bound by any modification, cancellation or rescission of this Escrow Agreement unless in writing, signed by Buyer and Seller and expressly consented to in writing by Escrow Agent.

3.4    Escrow Agent's duties hereunder are as a depository only, ministerial in nature, and Escrow Agent shall incur no liability whatsoever hereunder for any error of judgment, or any action taken or omitted hereunder, except for damages directly resulting from Escrow Agent's gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

3.5     Delivery of the Escrow Funds, along with any accrued interest thereon, by Escrow Agent pursuant to the provisions of this Agreement shall constitute a complete discharge and satisfaction of all obligations of Escrow Agent hereunder.

3.6     Nothing contained herein shall be deemed to preclude Escrow Agent at any time and for any reason from depositing the Escrow Fund into a court of competent jurisdiction upon prior notice to the parties hereto, and abiding by the determination of such court with respect thereto.  In such event, such delivery shall constitute a complete discharge and release of Escrow Agent of its obligations hereunder.

3.7     Escrow Agent shall be entitled to rely conclusively upon any written notice, waiver, receipt, or other document which Escrow Agent believes in good faith to be genuine, including, without limitation, a written statement by Buyer or Seller that they have complied with the terms of the Agreement with respect to a demand for payment.

3.8     In the event of any controversy or dispute under this Escrow Agreement or with respect to any question as to the construction hereof or any action to be taken or omitted by Escrow Agent, Escrow Agent shall be entitled to consult with counsel of its own choosing.

3.9     The Escrow Agent will deposit the Deposit (collectively, the "Escrow Fund") in its escrow account at Citibank, N.A. (the "Bank").  Due to a recent change in federal law, the FDIC will guarantee only $250,000.00 of the Escrow Fund in the event that the Bank fails or is otherwise unable to pay the Escrow Fund.  While the Escrow Agent is not aware of any circumstances that might suggest a risk of the failure of the Bank, the Escrow Agent is not in a position to advise the parties hereto of the condition or prospects of the Bank (financial or otherwise).  Accordingly, as a condition of the Escrow Agent's acting as escrow agent, both Buyer and Seller acknowledge and agree that the Escrow Agent will deposit the Escrow Fund at the Bank and that the Escrow Agent will have no liability whatsoever to any party for any loss caused by, arising out of, or related to the selection of the Bank (including, without limitation, if the Bank fails or is otherwise unable to pay the Escrow Fund), and Buyer and Seller agree that they will not seek to hold the Escrow Agent liable for any loss, injury or damage whatsoever that may be incurred by either or both parties related to, caused by or arising out of the selection of the Bank (including, without limitation, if the Bank fails or is otherwise unable to pay the Escrow Fund).  Buyer and Seller will each, jointly and severally, indemnify the Escrow Agent for any and all costs and expenses, including legal fees, incurred by the Escrow Agent related to, caused by, or arising out of the selection of the Bank, including but not limited to, seeking to recover all or any part of the Escrow Fund from the Bank.  Buyer and Seller each further acknowledge that the Escrow Agent has advised the parties hereto that Buyer and Seller are free to choose another Escrow Agent in connection with the transaction who may or may not use another bank for the deposit of the Escrow Fund, and that Buyer and Seller should each separately consult with independent lawyers, selected by each party, prior to signing this agreement, and that Buyer and Seller have each had a reasonable opportunity to do so.  In addition to signing this agreement below, each of Buyer and Seller shall, by its authorized representative, initial and date at the place indicated adjacent to this paragraph indicating that each of Buyer and Seller has read and understands and agrees to its terms

4.     Expenses of Escrow Agent.  Seller shall be liable for fifty percent (50%) and Buyer shall be liable for fifty percent (50%) of any reasonable out-of-pocket fees and expenses incurred by Escrow Agent in connection with any disputes directly arising from this Agreement, including

reasonable counsel fees, if any.  The parties shall pay any such amounts due Escrow Agent promptly upon its demand.

5.    <u>Indemnification of Escrow Agent</u>.  Buyer and Seller agree, jointly and severally, to indemnify Escrow Agent and hold Escrow Agent harmless from any loss, liability and expenses which it incurs in connection with or arising out of its compliance with the terms of this Agreement, including the fees, costs and expenses of defending itself against any claims of liability hereunder, except for a loss, liability or expense arising solely from Escrow Agent's own gross negligence or willful misconduct as determined by a final and non-appealable judgment of a court of competent jurisdiction.

6.    <u>Successor Escrow Agent</u>.  In the event Escrow Agent is no longer able or willing to serve, Escrow Agent shall have the right, after consultation with Seller and Buyer, to appoint a successor Escrow Agent who shall be bound by the terms and conditions set forth herein.

7.    <u>Notices</u>.

7.1    Notices shall be sent as set forth in the Purchase Agreement.  The provisions Section 12.3 of the Purchase Agreement are hereby deemed incorporated herein.

8.    <u>Binding Effect; Further Assurances</u>.

8.1    This Agreement shall inure to the benefit of and shall be binding upon the respective heirs, personal representatives, successors, and assigns of the parties hereto.

8.2    Seller and Buyer hereto covenant that they will execute all instruments and documents and will take all steps which may be necessary in order to implement the provisions of this Agreement.

9.    <u>Governing Law; Forum</u>.

9.1    This Agreement shall be construed under and governed by the laws of the State of New York, without regard to its principles of conflicts of laws.

9.2    Each party to this Agreement irrevocably consents and agrees that any dispute arising out of or in any way connected to this Agreement shall only be adjudicated by the Bankruptcy Court, <u>provided</u> that if the Bankruptcy Case has closed, each of the parties hereto irrevocably agrees that any Legal Proceeding with respect to this Agreement shall be brought and determined exclusively in the United States District Court for the Southern District of New York or if such Legal Proceeding may not be brought in such court for jurisdictional purposes, exclusively in the Supreme Court of New York sitting in the County of New York.  Each of the parties hereto hereby (a) irrevocably submits with regard to any such Legal Proceeding to the exclusive personal jurisdiction of the aforesaid courts in the event any dispute arises out of this Agreement or any transaction contemplated hereby, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court or that such action is brought in an inconvenient forum and (c) agrees that it shall not bring any action relating to this Agreement or any transaction contemplated hereby in any court other than the state or federal courts referenced above.

10.     <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts (whether facsimile or original), each of which when taken together shall be deemed one and the same original instrument.

11.     <u>Electronic Signatures</u>.  Signatures to this Agreement transmitted by facsimile or via electronic mail (.pdf or similar file types) shall be valid and effective to bind the party so signing. If requested, each party agrees to promptly deliver an executed original to this Agreement, any amendment thereto or any notice sent via facsimile or via electronic mail with its actual signature to the other party, but a failure to do so shall not affect the enforceability of this Agreement, or of any amendment or notice, it being expressly agreed that each party to this Agreement shall be bound to its own telecopied or electronically mailed signature in all instances and shall accept the telecopied or electronically mailed signature of the other party to this Agreement.

**[signature page follows]**

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement the day and year first above written.

**SELLER**

WYTHE BERRY FEE OWNER LLC

By: _____
Name:
Title:

**BUYER**

[_____]

By: _____
  Name:
  Title:

**ESCROW AGENT**

[_____]

By: _____
  Name:  [_____]

**EXHIBIT G – FORM OF TITLE AFFIDAVIT**

Date: _____

Title No.: _____

Premises:  111 N. 12th Street aka 55 Wythe Avenue, Brooklyn, New York 11249
           (Block 2283/Lot 1)

State of New York                    )
                                     ) ss:
County of New York                   )

_____, being duly sworn deposes and says under penalty of perjury:

1. That I am the _____ of Wythe Berry Fee Owner LLC (the "Company") and that said entity is the Grantor of real property located at 111 N. 12th Street aka 55 Wythe Avenue, Brooklyn, New York 11249.

2. I have full authority to act on the behalf of the Company, specifically including, but not limited to, the authority to execute deed and any other closing documents on behalf of the Company, pursuant to its organizational documents.

3. There are no residential tenants.  No tenant has any option to purchase or right of first refusal granted to it. There are no other persons or parties in possession other than as aforesaid. There are no existing claims involving tenants, either present or past, claiming a possessory interest.

4. In the past six (6) months, no work has been done upon the above premises by NYC for which costs remain unpaid, nor has any demand been made by NYC for any such work that may result in charges and/or liens by the following: The NYC Dept. of Rent and Housing Maintenance Emergency Services; The NYC Dept. of Environmental Protection for water tap closings or any related work; the NYC dept. of Health; or the New York City Dept. of Buildings.

5. That the Company's ownership has been peaceable and undisturbed and I/we have no knowledge of any other parties' claim to an interest in this property.

6. This affidavit is made to induce _____ [and its underwriter] to issue its policy covering the above referenced premises, knowing full well that it relies upon the truth hereof and indemnify them and hold them harmless for any claim or cause of action which may arise due to their reliance hereon.

*[SIGNATURE PAGE FOLLOWS]*

-24-

**WYTHE BERRY FEE OWNER LLC,**
a Delaware limited liability company


By: _____
Name: _____
Title: _____


Sworn to and subscribed before me
on this _____ day of _____, 2024


_____

Name:


NOTARY SEAL

# EXHIBIT H - FORM OF NOHO ESTOPPEL CERTIFICATE

## EXHIBIT D

## FORM OF ESTOPPEL CERTIFICATE

### ESTOPPEL CERTIFICATE

_WV Hospitality_ ("Operator"), hereby certifies that:

1.    The Food and Beverage Operations Management Agreement attached hereto as EXHIBIT A (the "Agreement") pursuant to which Operator has been engaged by _____ ("Owner") to operate certain food and beverage facilities (the "Food and Beverage Facilities") and operations at The William Vale Hotel, located at 55 Wythe Avenue, Brooklyn, New York, New York (the "Hotel"), is a true, correct and complete copy of the Agreement, has not been modified or amended, and is now in full force and effect.

2.    Operator is not in default under the Agreement and there are no conditions which but for the passage of time, or the giving of notice or both, would constitute a default by Operator under the Agreement.

3.    To the best of the knowledge and belief of Operator, Owner is not in default under the Agreement, and there are no conditions which, but for the passage of time or the giving of notice, or both, would constitute a default by Owner under the Agreement or entitle the undersigned to terminate the Agreement.

This Certificate may be relied upon by Owner, any proposed assignee or transferee of Owner, or any prospective mortgagee in respect of any mortgage placed, or about to be placed, on the Hotel, or such portion of the Hotel in which the Food and Beverage Facilities are located, as the case may be. This statement shall be binding upon Operator and its successors and assigns and shall inure to the benefit of Owner and its respective successors and assigns.

This Certificate is being executed as of _December 22, 2015_

OPERATOR

_WV Hospitality LLC_

By: _____

Name: _Joshua Pickard_

Title: _member_

Error! Unknown document property name.

**EXHIBIT I – FORM OF TENANT ESTOPPEL CERTIFICATE**

TENANT ESTOPPEL CERTIFICATE

_____, 2024

[SELLER'S ADDRESS]

William Vale Owner LLC
c/o EOS Acquisitions LLC
444 Madison Avenue, 14th Floor
New York, New York 10022

   RE: William Vale Complex, Brooklyn, NY (the "Property")

Dear Sirs:

   The undersigned [_____] ("Tenant") certifies to each of the Reliance Parties (defined below) with respect to that certain Lease Agreement dated [_____] (the "Lease") located at the Property that:

   (i) Attached hereto as Exhibit A is a true, correct and complete copy of the Lease. The Lease is in full force and effect and has not been modified, amended or supplemented except as set forth on Exhibit A. The Lease constitutes the entire agreement between Landlord and Tenant, and there are no other agreements to which Tenant is a party, relating to the premises demised thereunder and/or Tenant's use and occupancy thereof.

   (ii) The term of the Lease commenced on _____, 20[__] and is scheduled to expire on _____, 20[__] pursuant to the provisions thereof. Except as expressly set forth in the Lease, Tenant has no right to renew or extend the term of the Lease beyond such scheduled expiration date. Tenant has no expansion right, right of first refusal, right of first offer or other similar future possessory right with respect to the Lease, the term thereof, the premises demised thereunder or any other space in the [Building] (as defined in the Lease), except for [describe any expansion rights].

   (iii) The premises demised under the Lease have been completed and the undersigned has taken possession of the same on a rent-paying basis, all improvements required to be completed by Landlord have been completed and there are no contributions, allowances, credits or other sums due to Tenant from Landlord.

   (iv) The [Rent Commencement Date] under the Lease is _____.

   (v) The annual fixed rent payable under the Lease is $_____. [The amount of annual fixed rent payable under the Lease includes annual electric charges in the amount of $_____.]

Error! Unknown document property name.

(vi)    Tenant's [percentage share] under the Lease for purposes of [real estate taxes] and [operating expenses] is _____%.  The current estimated monthly payment in respect of increases in real estate taxes is $_____, and the base year for real estate taxes is _____. The current estimated monthly payment in respect of increases in operating expenses (or porter's wage increase) is $_____, and the base year for operating expenses (or porter's wage increases) is _____.

(vii)    All fixed rents, additional rents (including pass-through escalation payments and other charges) and other sums due and payable under the Lease have been paid in full through _____.  No rents, additional rents or other sums payable under the Lease have been paid for more than one month in advance of the due dates thereof.

(viii)    Neither Tenant nor Landlord is in default under any of the terms, covenants or provisions of the Lease and Tenant knows of no event which, but for the passage of time or the giving of notice, or both, would constitute a default under the Lease by Tenant or Landlord.  Tenant has no claims against Landlord under the Lease and there are no offsets or defenses to the payment of the rents, additional rents, or other sums payable under the Lease.  Neither Tenant nor Landlord has commenced any action or given or received any notice for the purpose of terminating the Lease.

(ix)    Tenant has posted with Landlord the security deposit set forth in the Lease in the amount of $_____.  [Tenant's obligations under the Lease are guaranteed by [name of Guarantor] pursuant to [describe guaranty agreement], and such guaranty agreement is in full force and effect.]

(x)    Tenant has not assigned, or otherwise encumbered its interest in, the Lease.  Tenant has not subleased the premises demised thereunder or any party thereof, except for [describe any subleases].

(xi)    Tenant has no right to terminate the Lease except, to the extent expressly set forth in the Lease, in connection with a casualty or condemnation and except, to the extent permitted by applicable law, in connection with an actual or constructive eviction of Tenant.

(xii)    Tenant has no right to purchase, right of first refusal, right of first offer or other similar right to purchase with respect to the premises demised under the Lease, the [Building] (as defined in the Lease) or any portion thereof.

Error! Unknown document property name.

The truth and accuracy of the certifications contained herein may be relied upon by (i) Landlord, (ii) any purchaser of the Property, including, without limitation, William Vale Owner LLC, a Delaware limited liability company ("Purchaser"), (iii) each lender ("Lender") of Landlord or Purchaser (or any of their respective direct or indirect owners), and its successors, participants, assigns and transferees, (iv) any rating agency or trustee involved in a securitization of one or more loans made by a Lender, and (v) any servicer of any such loan (collectively, the "Reliance Parties"), and said certifications shall be binding upon Tenant and its successors and assigns, and inure to the benefit of the Reliance Parties.

Very truly yours,

[NAME OF TENANT]

By: _____
Name:
Title:

29

Error! Unknown document property name.

Exhibit A

<u>The Lease</u>

(see attached)

**SCHEDULE 1.1 – SALE ORDER PROVISIONS**

No other person or entity or group of persons or entities has offered to purchase the Acquired Assets for an amount that would give equal or greater economic value to the Debtor in the aggregate than the value being provided by the Successful Bidder pursuant to the PSA. Among other things, the Sale is the best alternative available to the Debtor to maximize the return to its estate in respect of the Acquired Assets. The terms and conditions of the PSA, including the consideration to be realized by the Debtor, are fair and reasonable. Given all of the circumstances of this chapter 11 case and the adequacy and fair value of the consideration provided by the Successful Bidder under the PSA, approval of the Motion, the PSA, and the transactions contemplated thereby, including the Sale and the assumption and assignment of the Transferred Contracts and Leases, is in the best interests of the Debtor, its estate and creditors and all other parties in interest.

The PSA and Transaction Documents are approved, and all of the terms and conditions thereof, and all of the transactions contemplated therein, are approved in all respects. The Debtor is authorized and directed to perform under the PSA and all ancillary documents filed therewith or described therein (and each of the transactions contemplated thereby is hereby approved in its entirety and is incorporated herein by reference). The failure to specifically include any particular provision of the PSA or any other Transaction Document in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the PSA and other Transaction Documents, and all of their respective provisions and the payments and transactions provided for therein, shall be authorized and approved in their entirety. Likewise, all of the provisions of this Order that relate to the Sale are non-severable and mutually dependent.

The Debtor is hereby authorized, empowered, and directed to, and shall, take any and all actions necessary or appropriate to (a) perform, consummate, implement, and close the Sale without further order of the Court, including the Sale to the Successful Bidder of the Acquired Assets, in accordance with the terms and conditions set forth in the PSA and other Transaction Documents and this Order; (b) assume and assign any and all Transferred Contracts and Leases; (c) transfer and assign to the Successful Bidder all right, title and interest (including common law rights) to all property, licenses, and rights to be conveyed in accordance with and subject to the terms and conditions of the PSA and other Transaction Documents, in each case without further notice to or order of the Court; and (d) take all further actions and to execute and deliver the PSA and other Transaction Documents and any and all additional instruments and documents that may be (i) reasonably requested by the Successful Bidder for the purpose of assigning, transferring, granting, conveying, and conferring to the Successful Bidder, or reducing to possession, the Acquired Assets, (ii) necessary, appropriate, or desirable to the performance of the obligations contemplated by the PSA, and (iii) as may be reasonably requested by the Successful Bidder to implement the PSA and consummate the Sale in accordance with the terms thereof, all without further order of the Court.  Neither the Successful Bidder nor the Debtor shall have any obligation to proceed with consummating the Sale until all conditions precedent to their obligations to do so have been met, satisfied, or waived.

All persons and entities are hereby forever prohibited, enjoined, and barred from taking any action that would adversely affect or interfere with, or that would be inconsistent with (a) the ability of the Debtor to sell and transfer the Acquired Assets to the Successful Bidder in accordance with the terms of the PSA and other Transaction Documents and this Order and (b) the ability of

the Successful Bidder to acquire, take possession of, use and operate the Acquired Assets in accordance with the terms of the PSA and other Transaction Documents and this Order.

The Debtor shall not modify the chapter 11 plan or request entry of an order in this case that conflicts with or derogates from the terms of this Order. Nothing contained in the chapter 11 plan or any order to be entered in this case (including any order entered after conversion of this chapter 11 case under chapter 7 of the Bankruptcy Code) shall alter, conflict with or derogate from the provisions of the PSA or this Order, and to the extent of any conflict or derogation between this Order or the PSA (including the rights, benefits, protections and consideration provided to the Successful Bidder hereunder) and such plan or order, the terms of this Order and the PSA shall control.

### <u>Sale and Transfer Free and Clear of Liens, Claims, Interests, and Encumbrances</u>

Except for liabilities specifically assumed by the Successful Bidder pursuant to the PSA, the sale and transfer of the Acquired Assets to the Successful Bidder shall be free and clear of liens, defenses (including rights of setoff and recoupment), claims, and interests, in each case, in, on or related to the Acquired Assets, including security interests of whatever kind or nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust, hypothecations, liens (including but not limited to mechanics' or materialman's liens), encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, offsets, claims for reimbursement, contribution, indemnity or exoneration, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature in, on or related to the Acquired Assets (including all "claims" as defined in Bankruptcy Code section 101(5)), known or unknown, whether prepetition or postpetition, secured or unsecured,

choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances").  The foregoing is not intended, and shall not be construed, to limit the generality of the categories of liabilities, debts, commitments or obligations referred to as "Encumbrances" therein.

At Closing, all of the Debtor's legal, equitable, and beneficial right, title, and interest in and to, and possession of, the Acquired Assets shall be immediately vested in the Successful Bidder pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code free and clear of all Encumbrances to the fullest extent permitted by law, *provided*, *however*, that all remaining Encumbrances shall attach to the proceeds of the Sale in the order of their priority, with the same validity, force and effect that they now have against the Acquired Assets.  All persons or entities, presently or on or after the Closing, in possession of some or all of the Acquired Assets, are directed to surrender possession of the Acquired Assets to the Successful Bidder or its respective designees on the Closing or at such time thereafter as the Successful Bidder may request.

This Order:  (a) shall be effective as a determination that, as of the Closing, (i) no claims other than Assumed Liabilities will be assertable against the Successful Bidder or any of its respective assets, (ii) the Acquired Assets shall have been transferred to the Successful Bidder free and clear of all Encumbrances, other than the Permitted Encumbrances, and (iii) the conveyances described herein have been effected; and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments,

secretaries of state, federal, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the PSA provided that nothing herein shall relieve any entity of the obligation to pay any filing fees required under non-bankruptcy law. The Acquired Assets are sold free and clear of any reclamation rights.  For the avoidance of doubt, all Encumbrances on the Acquired Assets attach to the proceeds of the Sale ultimately attributable to the property against which such Encumbrances applied or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such Encumbrances applied prior to the Sale, subject to any rights, claims, and defenses of the Debtor or its estate, as applicable, or as otherwise provided herein.

Except as otherwise provided in the PSA, and with respect to the Assumed Liabilities, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding claims arising under or out of, in connection with, or in any way relating to, the Debtor, the Acquired Assets, and the ownership, Sale, or operation of the Acquired Assets prior to Closing or the transfer of the Acquired Assets to the Successful Bidder, are barred from asserting such claims against the Successful Bidder, its property or the Acquired Assets.  Following the Closing, no holder of any claim shall interfere with the Successful Bidder's title to or use and

enjoyment of the Acquired Assets based on or related to any such claim, or based on any action the Debtor may take in its Bankruptcy Case.

If any person or entity that has filed financing statements, mortgages, mechanic's claims, lis pendens, or other documents or agreements evidencing claims against or in the Debtor or the Acquired Assets shall not have delivered to the Debtor prior to the Closing of the Sale, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all claims that the person or entity has with respect to the Debtor or the Acquired Assets or otherwise, then only with regard to the Acquired Assets that are purchased by the Successful Bidder pursuant to the PSA and this Order: (a) the Debtor is hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Acquired Assets; (b) the Successful Bidder is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances against the Successful Bidder and the Acquired Assets; and (c) upon consummation of the Sale, the Successful Bidder may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction, and releases of all Encumbrances that are extinguished or otherwise released pursuant to this Order under section 363 of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with respect to the Acquired Assets. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office. Notwithstanding the foregoing, the provisions of this Order authorizing the Sale and assignment of the Acquired Assets free and clear of claims and liens shall be self-executing, and neither the Debtor nor Successful Bidder shall be required to execute or file

releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order.

None of the Successful Bidder, any of its affiliates, present or contemplated members, officers, directors, shareholders, or any of their respective successors and assigns (each such entity individually and taken together, the "Successful Bidder Group") shall be deemed, as a result of any action taken in connection with the PSA, the Transaction Documents, the consummation of the Sale contemplated by the PSA, or the transfer, operation, or use of the Acquired Assets to: (a) be a legal successor, or otherwise be deemed a successor to the Debtor (other than, for the Successful Bidder, with respect to any obligations as an assignee under the Transferred Contracts and Leases arising after the Closing) to the fullest extent provided by law; (b) have, de facto or otherwise, merged with or into the Debtor; or (c) be an alter ego or a mere continuation or substantial continuation of the Debtor.

The Successful Bidder shall not have any responsibility for (a) any liability or other obligation of the Debtor or related to the Acquired Assets other than as expressly set forth in the PSA (including the Assumed Liabilities) or (b) any claims against the Debtor or any of their predecessors or affiliates.

Except with respect to the Assumed Liabilities, effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Successful Bidder, or its assets (including the Acquired Assets), with respect to any (a) claim or (b) successor or transferee liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any

manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Encumbrance; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, or failing, or refusing to renew any license, permit, or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with such assets.

Notwithstanding anything to the contrary herein, the Successful Bidder shall have any and all rights, defenses, or objections with regard to any Assumed Liabilities, including the Successful Bidder's rights hereunder and under the PSA.

**Good Faith Purchaser**

The Successful Bidder is a good faith purchaser for value and, as such, is entitled to all the protections afforded under section 363(m) of the Bankruptcy Code and any other applicable or similar bankruptcy and nonbankruptcy law. The Sale contemplated by the PSA is undertaken by the Successful Bidder without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Transferred Contracts and Leases), unless such authorization and consummation of such Sale are duly and properly stayed pending such appeal.

Neither the Debtor nor the Successful Bidder (including, but not limited to, their equity owners, officers, directors, employees, professionals and other agents thereof) has engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under Bankruptcy Code section 363(n). Entry into the PSA is undertaken by the parties thereto, without collusion and in good faith, as that term is used in Bankruptcy Code

sections 363(m) and 364(e), and the Successful Bidder shall be entitled to all of the benefits of and

protections under Bankruptcy sections 363(m) and 364(e). The Sale is not subject to avoidance

pursuant to Bankruptcy Code section 363(n) or chapter 5 of the Bankruptcy Code and the

Successful Bidder is entitled to all the protections and immunities thereunder.

**Assumption and Assignment of Transferred Contracts and Leases**

The Debtor is authorized and directed at the Closing to assume and assign each of the

Transferred Contracts and Leases to the Successful Bidder, pursuant to the terms of the PSA and

sections 105(a) and 365 of the Bankruptcy Code, and to execute and deliver to the Successful

Bidder such documents or other instruments as may be necessary to assign and transfer the

Transferred Contracts and Leases to the Successful Bidder. The payment of the applicable Cure

Costs (if any) shall: (a) effect a cure of all defaults existing thereunder as of the Closing;

(b) compensate for any actual pecuniary loss to such non-Debtor counterparty resulting from such

default; and (c) together with the assumption of the Transferred Contracts and Leases by the

Debtor and the assignment of the Transferred Contracts and Leases to the Successful Bidder,

constitute adequate assurance of future performance thereof.

Pursuant to section 365(f) of the Bankruptcy Code, subject to the payment of the applicable

Cure Costs, the Transferred Contracts and Leases to be assumed and assigned under the PSA shall

be assigned and transferred to, and remain in full force and effect for the benefit of, the Successful

Bidder notwithstanding any provision in the contracts or other restrictions prohibiting their

assignment or transfer. Except as otherwise provided in section 365(c) of the Bankruptcy Code,

any provisions in any Transferred Contract or Lease that prohibit or condition the assignment of

such Transferred Contract or Lease to the Successful Bidder or allow the counterparty to such

Transferred Contract or Lease to terminate, recapture, impose any penalty, condition on renewal

or extension, or modify any term or condition upon the assignment of such Transferred Contract

or Lease to the Successful Bidder, constitute unenforceable anti-assignment provisions that are void and of no force and effect.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to the Successful Bidder of the Transferred Contracts and Leases have been satisfied.  Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Successful Bidder shall be fully and irrevocably vested with all right, title, and interest of the Debtor under the Transferred Contracts and Leases, and such Transferred Contracts and Leases shall remain in full force and effect for the benefit of the Successful Bidder.  Each non-Debtor counterparty to the Transferred Contracts and Leases shall be forever barred, estopped, and permanently enjoined from:  (a) asserting against the Debtor or the Successful Bidder or their respective property any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing or arising by reason of the Closing, including any breach related to or arising out of change-in-control provisions in such Transferred Contracts or Leases, or any purported written or oral modification to the Transferred Contracts or Leases and (b) asserting against the Successful Bidder (or its property, including the Acquired Assets) any claim, counterclaim, defense, breach, condition, setoff asserted, or assertable against the Debtor existing as of the Closing or arising by reason of the Closing.

Upon the Closing and the payment of the relevant Cure Costs, if any, the Successful Bidder shall be deemed to be substituted for the Debtor as a party to the applicable Transferred Contracts and Leases, and the Debtor shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Transferred Contracts and Leases.  There shall be no rent accelerations, assignment fees, increases, or any other fees charged to the Successful Bidder or Debtor as a result of the assumption and assignment of the Transferred Contracts or Leases.  The failure of the Debtor

or the Successful Bidder to enforce at any time one or more terms or conditions of any Transferred Contract or Lease shall not be a waiver of such terms or conditions or of the right of the Debtor or the Successful Bidder, as the case may be, to enforce every term and condition of such Transferred Contract or Lease.  The validity of the assumption and assignment of any Transferred Contract or Lease to the Successful Bidder shall not be affected by any existing dispute between the Debtor and any counterparty to such Transferred Contract or Lease.  Any party that may have had the right to consent to the assignment of any Transferred Contract or Lease is deemed to have consented for the purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code.

### **Excluded Liabilities and Excluded Assets.**

All persons, governmental units, and holders of Encumbrances, including those based upon or arising out of the Excluded Liabilities, are hereby barred and estopped from taking any action against the Successful Bidder or the Acquired Assets to recover property on account of any adverse interests or on account of any liabilities of the Debtor other than Assumed Liabilities pursuant to the PSA.  All persons holding or asserting any Encumbrances with respect to the Excluded Assets are hereby enjoined from asserting or prosecuting such Encumbrances against the Successful Bidder or the Acquired Assets for any liability whatsoever associated with the Excluded Assets.

## SCHEDULE 2.1(d) – LEASES

| # | Tenant | Unit(s) | Current Monthly Rent | Opex | Security Deposits |
|---|--------|---------|----------------------|------|-------------------|
| | | **Office & Retail Leases as of 2/5/2024** | | | |
| 1 | WV Hospitality LLC | Lower Level | $4,844.58 | $0.00 | -- |
| 2 | Suit Supply (U.S.A.), Inc. | Lower Level | $5,649.30 | $0.00 | -- |
| 3 | Suit Supply Brooklyn, Inc. | Ground Floor Retail - 57 Wythe Avenue | $50,697.98 | $0.00 | -- |
| 4 | Isla Café Williamsburg LLC | Ground Floor Retail - 105-107 N. 12th St.) | $21,000.00 | $0.00 | $42,000.00 |
| 5 | Williamsburg Psychological Services, P.C. | 503 | $5,514.99 | $331.70 | -- |
| 6 | Williamsburg Psychological Services, P.C. | 504A | $1,181.78 | $66.83 | $2,294.72 |
| 7 | Williamsburg Psychological Services, P.C. | 507 | $9,566.83 | $806.28 | $18,576.36 |
| 8 | Williamsburg Psychological Services, P.C. | 701/702 | $22,519.88 | $1,237.04 | $21,447.50 |
| 9 | Sucafina N/A Inc. | 602 | $8,090.42 | $488.31 | $24,271.26 |
| 10 | Impact Equities 2.0 LLC | 603 | $3,009.77 | $0.00 | $5,930.58 |
| 11 | Vism Studio | 606 | $11,862.00 | $515.75 | $59,310.00 |
| 12 | NK Dental P.C. | 607 | $9,414.17 | $682.08 | $20,540.00 |
| 13 | Blue Panda Office Spaces, LLC | 704 | $14,709.00 | $726.93 | $30,887.86 |
| 14 | Blue Panda Office Spaces, LLC | 707 | $5,392.69 | $429.08 | $13,953.60 |
| 15 | The Malin Williamsburg LLC | 9th Floor | $35,000.00 | $250.00 | -- |
| 16 | Overall Murals, Inc. | Signage - North & West Facing Walls | $40,910.00 | $0.00 | $42,436.00 |
| 17 | Overall Murals, Inc. | Signage - North Wall, N 12th Street | $7,426.30 | $0.00 | $14,852.60 |
| 18 | Seen Outdoor Media, LLC | Signage (A) - North Facing Wall, N. 13th Street | $1,768.17 | $0.00 | $3,536.34 |
| 19 | Seen Outdoor Media, LLC | Signage (C) - North Facing Wall, N. 13th Street | $1,149.31 | $0.00 | $2,298.62 |
| 20 | Seen Outdoor Media, LLC | Signage (D) - Garage Entrance N. 12th Street | $1,768.17 | $0.00 | $3,536.34 |
| 21 | Big City Outdoor LLC | Signage - North Facing Wall, N. 13th Street | $11,000.00 | $0.00 | $22,000.00 |

*Note, this excludes The Alien Experience LLC or WVH Bar LLC, as Seller has not demanded attornment by these tenants pursuant to their respective leases.*

*Note, Seller is negotiating an attornment of WVH Bar LLC which would provide for the following: (i) removal of any Post Commencement Landlord's Work responsibility from Seller (estimated to be $300K) except for the Seller's obligation to amend the Certificate of Occupancy; (ii) remove the Tenant's Allowance ($200K) from the Seller; and (iii) provide an abatement of rent during construction (the later of 6 months or obtaining the Temporary Certificate of Occupancy) and an additional 3-month abatement of rent from the date tenant commences its operations and opens to the public. Their initial monthly rent would be $19,420.07. Their security deposit would be $58,260.21 with prepaid rent of $19,420.07.*

*Note, The Alien Experience LLC has advised that they would only agree to attorn their lease with the prior ground tenant without amendment of any terms within said lease. The current estimated Landlord Work scheduled on Exhibit E to the lease is $200K along with a broker commission of $172,038.38 due to Hadar Consulting Services LLC. Their initial monthly rent would be $67,797.50. Their security deposit would be $203,392.50 with prepaid rent of $67,797.50.*

| # | Licensee | Unit | Current Monthly Rent | Opex / Cleaning | Security Deposits |
|---|----------|------|---------------------|-----------------|-------------------|
| | **Studio 109 Licenses as of 2/5/2024** | | | | |
| 1 | New York Creative Arts Therapists PLLC | 811 | $1,500.00 | | $1,650.00 |
| 2 | Michael Ventura | 812 | $74.69 | | $150.00 |
| 3 | Marissa Manzanares | 822 | $2,625.00 | | $150.00 |
| 4 | Lori Sprester | 807 | $1,850.00 | | $2,000.00 |
| 5 | Kateri Berasi | 808 | $2,250.00 | | $4,350.00 |
| 6 | Kateri Berasi | 817 | $2,039.63 | | $4,350.00 |
| 7 | Joseph Hoots | 810 | $405.17 | | $150.00 |
| 8 | Joseph Hoots | 812 | $625.00 | | $775.00 |
| 9 | Joseph Hoots | 810/812 | $1,100.00 | | $1,250.00 |
| 10 | Guinevere Johnson | 816 | $2,464.00 | | $150.00 |
| 11 | Dominika Piestrak | 805 | $1,200.00 | | $812.00 |
| 12 | Deniz Oktay | 815 | $2,700.00 | | $2,150.00 |
| 13 | Catherine Von Klitzing | 827 | $533.60 | | $683.60 |
| 14 | Carl Oscar Gunnar Aakermo | 823 | $2,900.00 | $200.00 | $5,950.00 |
| 15 | Carl Oscar Gunnar Aakermo | 824/825 | $7,900.00 | | $15,950.00 |
| 16 | Alexander Martinez | Virtual | $114.00 | | $150.00 |
| 17 | Agata Jozejowicz | 805 | $1,200.00 | | $812.00 |
| 18 | Adee Chandally | 813 | $1,500.00 | | $1,650.00 |
| 19 | Tanya White | 812 | $500.00 | | $650.00 |
| 20 | Shay Mokai | 505B | $1,000.00 | | $1,150.00 |
| 21 | Russell Van Schaick | 821 | $2,800.00 | | $2,950.00 |
| 22 | Dr. Nicole Lief | 826 | $2,500.00 | | $2,650.00 |
| 23 | Brooklyn Psychiatric NP Services, dba Brooklyn Parent Support | 827 | $550.00 | | $700.00 |
| 24 | Andree DeCastro | 827 | $629.70 | | $1,327.00 |
| 25 | Diamond Panther Studio LLC | 828 | $3,000.00 | | $3,000.00 |

## SCHEDULE 2.1(f) – CONTRACTS

| # | Company Name | Description | Contract Assignment Language | Known Cost to Assign or Recontract |
|---|---|---|---|---|
| | | **Hotel and Food & Beverage Service Contracts** | | |
| 1 | AAA | Membership Agreement to join AAA | This agreement and official appointment is non-transferable. If the establishment is sold, the appointee shall remain liable for all fees due AAA. AAA approval of new owner is required for new owner to continue license and official appointment status. | $0.00 |
| 2 | ADP | Workforce system | Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. | $0.00 |
| 3 | Alice | Professional Services | Customer may not assign its rights and obligations under this Agreement without the prior written permission of Actabl. | $0.00 |
| 4 | Amadeus Hospitality Americas | Hotel Software | In the event a Customer's property is sold by Customer, the Subscripton Products assigned to the customer may either be internally reallocated, assigned to a different Customer property or terminated in accordance with the terms of the Order Form. | $0.00 |
| 5 | Associated Fire Protection | Inspection and Testing Agreement for Fire Protection Equiptment | You cannot transfer or assign this Agreement without our written consent. | $1,415.37 |
| 6 | Bacchus Agency Inc. | Media Consulting | N/A | |
| 7 | Birchstreet Systems, LLC | Purchasing Software | A Party may from time to time change its address or designee for notification purposes by giving the other a writen notice of the new address or designee in accordance with this Section 11 and date upon which it became effective. | |
| 8 | Capricorn Luxury Travel | Limousine Service | N/A | $0.00 |
| 9 | Celopay | Third-party billing service | Customer may not assign any obligation, right or interest hereunder without the prior written consent of CeloPay | $0.00 |
| 10 | Croker Fire Drill Corporation | Fire saftey service | N/A | $0.00 |
| 11 | Cvent | Advertising services | Except for assignment to a Party's affiliate (any entity which directly or indirectly controls, is controlled by, or is under common control with such Party), or in the case of a merger, acquisition or sale of all or substantially all assets not involving a direct competitor of the other Party, neither Party may assign or otherwise transfer any right or obligation set forth under the Agreement without the other Party's prior written consent, not to be unreasonably withheld or delayed. | $0.00 |
| 12 | EFRIDGE | Supports/ operates minibar services at the hotel | Neither party shall, without the prior written consent of the other party (which consent shall not be unreasonably withheld) assign this Agreement or delegate its duties hereunder in whole or part…. A change in control of either party (including a change in ownership resulting in a new majority owner, alone or acting together as a group, ofa party) shall be deemed an assignment of this Agreement by that party. | $0.00 |
| 13 | Elavon | Credit card service company | Customer shall not have the right to transfer or assign its rights or obligations under this Agreement to any other individual or entity, without the prior written consent of Elavon or its permitted assigns, which consent shall not be unreasonably withheld. | $0.00 |
| 14 | Infor (US), Inc. | EzRMS, revenue management system | Licensee may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Infor, whether by operation of law or otherwise, including in connection with a change in control, merger, acquisition, consolidation, asset sale or other reorganization, and any attempt at such assignment or transfer will be void. | $18,314.95 (Combined total for EzRMS, HMS, and other Infor products) |
| 15 | Caviar | Restaurant service order | N/A | $0.00 |
| 16 | Freedom Pay | Payment platform | N/A | $0.00 |
| 17 | Doordash | Online food order/ delivery service | N/A | $0.00 |
| 18 | Grubhub | Online food order/ delivery service | N/A | $0.00 |
| 19 | Grubhub | Online food order/ delivery service | N/A | $0.00 |
| 20 | Grubhub | Online food order/ delivery service, sale of alcohol agreement | N/A | $0.00 |
| 21 | ItsaCheckmate | Integrates 3rd party delivery platforms directly into POS systems | This Agreement is not assignable, transferable, or sublicensable by Customer except with Company's prior written consent. | $0.00 |
| 22 | OpenTable | Online reservation system | N/A | $0.00 |
| 23 | OpenTable | Online reservation system | N/A | $0.00 |
| 24 | OpenTable | Online reservation system | N/A | $0.00 |
| 25 | Postmates | Online food order/ delivery service | Merchant may not assign this Agreement or any of its rights and obligations hereunder. Postmates may assign this Agreement or any of its right and obligations hereunder pursuant to a merger, acquisition, or a sale of all or substantially all of its assets obligations hereunder pursuant to a merger, acquisition, or a sale of all or substantially all of its assets. | $0.00 |
| 26 | Postmates | Online food order/ delivery service | Merchant may not assign this Agreement or any of its rights and obligations hereunder. Postmates may assign this Agreement or any of its right and obligations hereunder pursuant to a merger, acquisition, or a sale of all or substantially all of its assets obligations hereunder pursuant to a merger, acquisition, or a sale of all or substantially all of its assets. | $0.00 |
| 27 | SevenRooms | Reservation system | N/A | $0.00 |
| 28 | Your Fare | Manages third-party delivery services | N/A | $0.00 |
| 29 | ItsaCheckmate | Integrates 3rd party delivery platforms directly into POS systems | This Agreement is not assignable, transferable or sublicensable by Customer except with Company's prior written consent. | $0.00 |
| 30 | Socialtables | Event planning app | N/A | $0.00 |
| 31 | JTECH | Pager system for staff and guests | N/A | $0.00 |

| # | Company Name | Description | Contract Assignment Language | Known Cost to Assign or Recontract |
|---|---|---|---|---|
| across top: **Hotel and Food & Beverage Service Contracts** | | | | |
| 32 | Konica Minolta | Copier Lease | N/A | $0.00 |
| 33 | Micros | POS system | Not transferable or assignable | $0.00 |
| 34 | Micros | POS system | Not transferable or assignable | $0.00 |
| 35 | Micros | POS system | Not transferable or assignable | $0.00 |
| 36 | Salido | Monthly recurring software and support change | License Grant. Subject to the terms and conditions set forth herein, SALIDO hereby grants to you during the Term (as defined below) a limited, non-exclusive, non-transferable license, without the right to grant sublicenses, to access and use the Services | $0.00 |
| 37 | R365 | Operations software | N/A | $0.00 |
| 38 | Salido | Operations software | N/A | $0.00 |
| 39 | Kitchen Repair Specialists | Kicthen repair | N/A | $0.00 |
| 40 | Metro Recycling | Recycling program | N/A | $0.00 |
| 41 | PCC | Cleaning and maintenance | N/A | $0.00 |
| 42 | Doordash | Food delivery system | N/A | $0.00 |
| 43 | Grubhub | Food delivery system | N/A | $0.00 |
| 44 | ItsaCheckmate | Integrates 3rd party delivery platforms directly into POS systems | Agreement is not assignable, transferable or sublicensable by Customer except with Company's prior writen consent. | $0.00 |
| 45 | OpenTable | Online reservation system | N/A | $0.00 |
| 46 | OpenTable | Online reservation system | N/A | $0.00 |
| 47 | SevenRooms | Reservation system | Neither party may assign the Agreement without the other party's prior written consent, except if there is a merger, consolidation or sale of all or substantially all of a party's stock or assets and provided that the assigning party provides written notice to the other promptly following any such assignment. | $0.00 |
| 49 | Tripleseat | Event management software | Client may not assign any of its rights or delegate any of its obligations hereunder without Tripleseat Software written consent, which such consent shall not be unreasonably withheld or delayed. | $0.00 |
| 50 | Gray V | Entertainment agency | Sale, transfer, closure or change in location of Subscribers business by the Subscriber herein designated shall not reduce, eliminate or otherwise affect its obligation under this Agreement. Neither party may assign this Agreement, without the other party's prior written consent, except to a successor to the business of the assigning party. | $0.00 |
| 51 | GRM | Shredding Services | N/A | $0.00 |
| 52 | Guest-Tek Interactive Entertainment | Interactive solutions for hospitality | Neither Party may transfer or assign any rights or delegate any obligations hereunder, in whole or in part, whether voluntarily or by operation of law, without the prior written consent of the other. | $0.00 |
| 53 | Infor | Business cloud software | Licensee may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Infor, whether by operation of law or otherwise, including in connection with a change in control, merger, acquisition, consolidation, asset sale or other reorganization, and any attempt at such assignment or transfer will be void. | $18,314.95 (Combined total for EzRMS, HMS, and other Infor products) |
| 54 | Hospitality Staffing Solutions | Contract Staffing services | Client shall not transfer or assign this agreement without the written consent of HSS, which shall not be unreasonably withheld | $0.00 |
| 55 | Infinity Resoration | Monthly stone maintenance proposal | N/A | $0.00 |
| 56 | Infinity Resoration | Monthly stone maintenance proposal | N/A | $0.00 |
| 57 | International Proactive Secuirty, Inc (IPS) | Security Services | Client may assign this Agreement to its affiliates or in the event of a merger, consolidation, or sale of substantially all of its assets. | $0.00 |
| 58 | Infinite Solutions (ISNY) | IT Services | N/A | $0.00 |
| 59 | Jack Jaffa and Associates | Real estate consultants | N/A | $0.00 |
| 61 | KNOWCROSS | Service operations | N/A | $0.00 |
| 62 | LEAF Capital Funding, LLC | Equiptment finance and capital solutions provider | You have no right to sell or assign the Equiptment or Lease. We may sell or asign our rights in the lease and/or equiptment and the new owner willhave all our rights but will not be subject to any claim or defense you have against us | $0.00 |
| 63 | LEAF Capital Funding, LLC | Equiptment finance and capital solutions provider | You have no right to sell or assign the Equiptment or Lease. We may sell or asign our rights in the lease and/or equiptment and the new owner willhave all our rights but will not be subject to any claim or defense you have against us | $0.00 |
| 64 | M3 | Accounting Software | N/A | $0.00 |
| 65 | The Madison Melle Agency | Business consulting | Neither this Agreement nor any of the rights or obligations hereunder may be assigned without prior written consent of the other party hereto. Any attempted assignment in violation of this provision is null and void. | $0.00 |
| 66 | Metropolis | Tracking and reporting software | Neither party shall assign this Agreement or any right granted or to be granted under it without the prior written consent of the other. | $0.00 |
| 67 | Premium Pest Control | Pest control service | N/A | $0.00 |
| 68 | Quadient | Mail service | N/A | $0.00 |
| 69 | Resort Pass | Provides amenity access to hotel without having an overnight stay | N/A | $0.00 |
| 70 | Rotavele Elevator Service | Elevator service | This agreement shall be binding upon the owners, their successors and assigns. | $0.00 |

| # | Company Name | Description | Contract Assignment Language | Known Cost to Assign or Recontract |
|---|---|---|---|---|
| | | | **Hotel and Food & Beverage Service Contracts** | |
| 71 | Sabre | Online media | N/A | $0.00 |
| 72 | Selfbook | Booking system | Client may not assign any of its rights or delegate any of its obligations hereunder, in each case whether voluntarily, involuntarily, by operation of law or otherwise, without the prior written consent of Selfbook. Any purported assignment or delegation in violation of this Section will be void. | $0.00 |
| 73 | SKCHASE | Gift vouchers system | The Seller may not assign, sub-license or otherwise transfer any of its rights under the contract without the prior written consent of SK Chase | $0.00 |
| 74 | Travel Tripper | Hotel technology provider providing reservation, distribution and e-commerce solutions | The parties may freely assign this Assignment (including a transfer in the event of a sale of all or substantially all of the assets corresponding to the business to which this Agreement pertains) with the prior written consent of the other party, which must not be unreasonably withheld or delayed | $0.00 |
| 75 | Travel Tripper | Hotel technology provider providing reservation, distribution and e-commerce solutions | The parties may freely assign this Assignment (including a transfer in the event of a sale of all or substantially all of the assets corresponding to the business to which this Agreement pertains) with the prior written consent of the other party, which must not be unreasonably withheld or delayed | $0.00 |
| 76 | Tri State Linen | Linen service | The Hotel shall have the right to assign this agreement to any successor entity operating the Hotel at this location at any time, without consent of Tri State Linen. | $0.00 |
| 77 | Tri State Fire Sprinkler | Fire sprinkler inspection | N/A | $2,400.00 |
| 78 | Wage Works | Benefits management system | Neither of us may assign any of our rights and obligations in connection with the provision of Services without the prior written consent of the other, which consent shall not be unreasonably withheld. | $0.00 |
| 79 | Valet Kings | Valet parking service | N/A | N/A |
| 80 | KOUTO INC. | Peer-to-Peer software platform for branded experiential connections. Such services are more fully described in Schedule A hereto. | N/A | $0.00 |
| 81 | WIHP | Hotel digital marketing agency | N/A | $0.00 |
| 82 | Telego | Telephone System | N/A | $0.00 |
| 83 | Booking.com | Online Travel Agency | Neither Party may assign, transfer, and/or encumber any of its rights and/or obligations under the Agreement (other than to a Booking.com Affiliated Company) without the prior written consent of the other Party. No assignment, novation, or transfer by the Accommodation shall relieve it of its obligations under the Agreement. | $0.00 |
| 84 | Expedia | Online Travel Agency | No Party may assign or otherwise transfer in any manner (whether voluntary or involuntary, or by operation of law, sale of securities or assets, merger, reorganization or otherwise) this Contract, or any of its rights or obligations under this Contract, without the other Party's prior written consent; | $0.00 |
| 85 | Hotel Tonight | Online Travel Agency | N/A | $0.00 |
| 86 | Day Use | Online Travel Agency | Neither Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the other Party. | $0.00 |
| 87 | Mr. Mrs Smith | Online Travel Agency | In the event of any change of ownership of the business of the Principal or the ownership of the Accommodation, the Principal shall notify the Agent of this immediately and shall, with the Agent's prior consent, transfer its obligations under this contract to the new owner. Should the Agent not consent to the transfer, the Agent shall be entitled to immediately terminate the Agreement upon giving written notice to the Principal, without liability. | $0.00 |
| 88 | Revinate | CRM & Marketing Platform | Neither party may assign or otherwise transfer its rights or delegate its duties under this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed, and any attempt to do so without consent shall be void. | $0.00 |
| 89 | STR | Market Intelligence | N/A | $0.00 |
| 90 | TripAdvisor | Online Guest Reviews | N/A | $0.00 |
| 91 | OTA Insight | Market Intelligence - Rate Shopping Tool | Neither this Agreement nor any of the rights or obligations under this Agreement, may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any party hereto without the prior written consent of the other parties hereto, and any such assignment without such prior written consent shall be null and void. | $0.00 |
| 92 | Ben Franklin HVAC | HVAC Service Provider | N/A | $4,000.00 |
| 93 | Cendyn | Hotel Website | N/A | |
| 94 | American Express | Credit card merchant services | You shall not assign the Agreement, or any of your rights, interests, or obligations hereunder, whether voluntarily or by operation of law (including by way of sale of assets, merger, or consolidation), without our prior written consent. Any purported assignment by operation of law is voidable in our sole discretion. | $0.00 |

| Additional Contracts | |
|---|---|
| Hadar Consulting Services LLC | Listing Agreement for Lease dated as of September 20, 2022 between Wythe Berry LLC and Hadar Consulting Services LLC |
| Meridian Capital Group, LLC, d/b/a Meridian Retail Leasing | Listing Agreement between Wythe Berry LLC and Meridian Capital Group, LLC, d/b/a Meridian Retail Leasing dated September 23, 2022 |

## SCHEDULE 2.2(c) – CURE COSTS

| | | Hotel and Food & Beverage Service Contracts | |
|---|---|---|---|
| # | Company Name | Description | Contract Assignment Language | Known Cost to Assign or Recontract |
| 1 | AAA | Membership Agreement to join AAA | This agreement and official appointment is non-transferable. If the establishment is sold, the appointee shall remain liable for all fees due AAA. AAA approval of new owner is required for new owner to continue license and official appointment status. | $0.00 |
| 2 | ADP | Workforce system | Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other party. | $0.00 |
| 3 | Alice | Professional Services | Customer may not assign its rights and obligations under this Agreement without the prior written permission of Actabl. | $0.00 |
| 4 | Amadeus Hospitality Americas | Hotel Software | In the event a Customer's property is sold by Customer, the Subscripton Products assigned to the customer may either be internally reallocated, assigned to a different Customer property or terminated in accordance with the terms of the Order Form. | $0.00 |
| 5 | Associated Fire Protection | Inspection and Testing Agreement for Fire Protection Equiptment | You cannot transfer or assign this Agreement without our written consent. | $1,415.37 |
| 6 | Bacchus Agency Inc. | Media Consulting | N/A | |
| 7 | Birchstreet Systems, LLC | Purchasing Software | A Party may from time to time change its address or designee for notification purposes by giving the other a writen notice of the new address or designee in accordance with this Section 11 and date upon which it became effective. | |
| 8 | Capricorn Luxury Travel | Limousine Service | N/A | $0.00 |
| 9 | Celopay | Third-party billing service | Customer may not assign its obligation, right or interest hereunder without the prior written consent of CeloPay | $0.00 |
| 10 | Croker Fire Drill Corporation | Fire saftey service | N/A | $0.00 |
| 11 | Cvent | Advertising services | Except for assignment to a Party's affiliate (any entity which directly or indirectly controls, is controlled by, or is under common control with such Party), or in the case of a merger, acquisition or sale of all or substantially all assets not involving a direct competitor of the other Party, neither Party may assign or otherwise transfer any right or obligation set forth under the Agreement without the other Party's prior written consent, not to be unreasonably withheld or delayed. | $0.00 |
| 12 | EFRIDGE | Supports/ operates minibar services at the hotel | Neither party shall, without the prior written consent of the other party (which consent shall not be unreasonably withheld) assign this Agreement or delegate its duties hereunder in whole or part..... A change in control of either party (including a change in ownership resulting in a new majority owner, alone or acting together as a group, ofa party) shall be deemed an assignment of this Agreement by that party. | $0.00 |
| 13 | Elavon | Credit card service company | Customer shall not have the right to transfer or assign its rights or obligations under this Agreement to any other individual or entity, without the prior written consent of Elavon or its permitted assigns, which consent shall not be unreasonably withheld. | $0.00 |
| 14 | Infor (US), Inc. | EzRMS, revenue management system | Licensee may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Infor, whether by operation of law or otherwise, including in connection with a change in control, merger, acquisition, consolidation, asset sale or other reorganization, and any attempt at such assignment or transfer will be void. | $18,314.95 (Combined total for EzRMS, HMS, and other Infor products) |
| 15 | Caviar | Restaurant service order | N/A | $0.00 |
| 16 | Freedom Pay | Payment platform | N/A | $0.00 |
| 17 | Doordash | Online food order/ delivery service | N/A | $0.00 |
| 18 | Grubhub | Online food order/ delivery service | N/A | $0.00 |
| 19 | Grubhub | Online food order/ delivery service | N/A | $0.00 |
| 20 | Grubhub | Online food order/ delivery service, sale of alcohol agreement | N/A | $0.00 |
| 21 | ItsaCheckmate | Integrates 3rd party delivery platforms directly into POS systems | This Agreement is not assignable, transferable, or sublicensable by Customer except with Company's prior written consent. | $0.00 |
| 22 | OpenTable | Online reservation system | N/A | $0.00 |
| 23 | OpenTable | Online reservation system | N/A | $0.00 |
| 24 | OpenTable | Online reservation system | N/A | $0.00 |
| 25 | Postmates | Online food order/ delivery service | Merchant may not assign this Agreement or any of its rights and obligations hereunder. Postmates may assign this Agreement or any of its right and obligations hereunder pursuant to a merger, acquisition, or a sale of all or substantially all of its assets obligations hereunder pursuant to a merger, acquisition, or a sale of all or substantially all of its assets. | $0.00 |
| 26 | Postmates | Online food order/ delivery service | Merchant may not assign this Agreement or any of its rights and obligations hereunder. Postmates may assign this Agreement or any of its right and obligations hereunder pursuant to a merger, acquisition, or a sale of all or substantially all of its assets obligations hereunder pursuant to a merger, acquisition, or a sale of all or substantially all of its assets. | $0.00 |
| 27 | SevenRooms | Reservation system | N/A | $0.00 |
| 28 | Your Fare | Manages third-party delivery services | N/A | $0.00 |
| 29 | ItsaCheckmate | Integrates 3rd party delivery platforms directly into POS systems | This Agreement is not assignable, transferable or sublicensable by Customer except with Company's prior written consent. | $0.00 |
| 30 | Socialtables | Event planning app | N/A | $0.00 |
| 31 | JTECH | Pager system for staff and guests | N/A | $0.00 |

| # | Company Name | Description | Contract Assignment Language | Known Cost to Assign or Recontract |
|---|---|---|---|---|
| | | | **Hotel and Food & Beverage Service Contracts** | |
| 32 | Konica Minolta | Copier Lease | N/A | $0.00 |
| 33 | Micros | POS system | Not transferable or assignable | $0.00 |
| 34 | Micros | POS system | Not transferable or assignable | $0.00 |
| 35 | Micros | POS system | Not transferable or assignable | $0.00 |
| 36 | Salido | Monthly recurring software and support change | License Grant. Subject to the terms and conditions set forth herein, SALIDO hereby grants to you during the Term (as defined below) a limited, non-exclusive, non-transferable license, without the right to grant sublicenses, to access and use the Services | $0.00 |
| 37 | R365 | Operations software | N/A | $0.00 |
| 38 | Salido | Operations software | N/A | $0.00 |
| 39 | Kitchen Repair Specialists | Kicthen repair | N/A | $0.00 |
| 40 | Metro Recycling | Recycling program | N/A | $0.00 |
| 41 | PCC | Cleaning and maintenance | N/A | $0.00 |
| 42 | Doordash | Food delivery system | N/A | $0.00 |
| 43 | Grubhub | Food delivery system | N/A | $0.00 |
| 44 | ItsaCheckmate | Integrates 3rd party delivery platforms directly into POS systems | Agreement is not assignable, transferable or sublicensable by Customer except with Company's prior writen consent. | $0.00 |
| 45 | OpenTable | Online reservation system | N/A | $0.00 |
| 46 | OpenTable | Online reservation system | N/A | $0.00 |
| 47 | SevenRooms | Reservation system | Neither party may assign the Agreement without the other party's prior written consent, except if there is a merger, consolidation or sale of all or substantially all of a party's stock or assets and provided that the assigning party provides written notice to the other promptly following any such assignment. | $0.00 |
| 49 | Tripleseat | Event management software | Client may not assign any of its rights or delegate any of its obligations hereunder without Tripleseat Software written consent, which consent shall not be unreasonably withheld or delayed. | $0.00 |
| 50 | Gray V | Entertainment agency | Sale, transfer, closure or change in location of Subscribers business by the Subscriber herein designated shall not reduce, eliminate or otherwise affect its obligation under this Agreement. Neither party may assign this Agreement, without the other party's prior written consent, except to a successor to the business of the assigning party. | $0.00 |
| 51 | GRM | Shredding Services | N/A | $0.00 |
| 52 | Guest-Tek Interactive Entertainment | Interactive solutions for hospitality | Neither Party may transfer or assign any rights or delegate any obligations hereunder, in whole or in part, whether voluntarily or by operation of law, without the prior written consent of the other. | $0.00 |
| 53 | Infor | Business cloud software | Licensee may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of Infor, whether by operation of law or otherwise, including in connection with a change in control, merger, acquisition, consolidation, asset sale or other reorganization, and any attempt at such assignment or transfer will be void. | $18,314.95 (Combined total for EzRMS, HMS, and other Infor products) |
| 54 | Hospitality Staffing Solutions | Contract Staffing services | Client shall not transfer or assign this agreement without the written consent of HSS, which shall not be unreasonably withheld | $0.00 |
| 55 | Infinity Resoration | Monthly stone maintenance proposal | N/A | $0.00 |
| 56 | Infinity Resoration | Monthly stone maintenance proposal | N/A | $0.00 |
| 57 | International Proactive Secuirty, Inc (IPS) | Security Services | Client may assign this Agreement to its affiliates or in the event of a merger, consolidation, or sale of substantially all of its assets. | $0.00 |
| 58 | Infinite Solutions (ISNY) | IT Services | N/A | $0.00 |
| 59 | Jack Jaffa and Associates | Real estate consultants | N/A | $0.00 |
| 61 | KNOWCROSS | Service operations | N/A | $0.00 |
| 62 | LEAF Capital Funding, LLC | Equiptment finance and capital solutions provider | You have no right to sell or assign the Equiptment or Lease. We may sell or assign our rights in the lease and/or equiptment and the new owner willhave all our rights but will not be subject to any claim or defense you have against us | $0.00 |
| 63 | LEAF Capital Funding, LLC | Equiptment finance and capital solutions provider | You have no right to sell or assign the Equiptment or Lease. We may sell or assign our rights in the lease and/or equiptment and the new owner willhave all our rights but will not be subject to any claim or defense you have against us | $0.00 |
| 64 | M3 | Accounting Software | N/A | $0.00 |
| 65 | The Madison Melle Agency | Business consulting | Neither this Agreement nor any of the rights or obligations hereunder may be assigned without prior written consent of the other party hereto. Any attempted assignment in violation of this provision is null and void. | $0.00 |
| 66 | Metropolis | Tracking and reporting software | Neither party shall assign this Agreement or any right granted or to be granted under it without the prior written consent of the other. | $0.00 |
| 67 | Premium Pest Control | Pest control service | N/A | $0.00 |
| 68 | Quadient | Mail service | N/A | $0.00 |
| 69 | Resort Pass | Provides amenity access to hotel without having an overnight stay | N/A | $0.00 |
| 70 | Rotavele Elevator Service | Elevator service | This agreement shall be binding upon the owners, their successors and assigns. | $0.00 |

| # | Company Name | Description | Contract Assignment Language | Known Cost to Assign or Recontract |
|---|---|---|---|---|
| | | | **Hotel and Food & Beverage Service Contracts** | |
| 71 | Sabre | Online media | N/A | $0.00 |
| 72 | Selfbook | Booking system | Client may not assign any of its rights or delegate any of its obligations hereunder, in each case whether voluntarily, involuntarily, by operation of law or otherwise, without the prior written consent of Selfbook. Any purported assignment or delegation in violation of this Section will be void. | $0.00 |
| 73 | SKCHASE | Gift vouchers system | The Seller may not assign, sub-license or otherwise transfer any of its rights under the contract without the prior written consent of SK Chase | $0.00 |
| 74 | Travel Tripper | Hotel technology provider providing reservation, distribution and e-commerce solutions | The parties may freely assign this Assignment (including a transfer in the event of a sale of all or substantially all of the assets corresponding to the business to which this Agreement pertains) with the prior written consent of the other party, which must not be unreasonably withheld or delayed | $0.00 |
| 75 | Travel Tripper | Hotel technology provider providing reservation, distribution and e-commerce solutions | The parties may freely assign this Assignment (including a transfer in the event of a sale of all or substantially all of the assets corresponding to the business to which this Agreement pertains) with the prior written consent of the other party, which must not be unreasonably withheld or delayed | $0.00 |
| 76 | Tri State Linen | Linen service | The Hotel shall have the right to assign this agreement to any successor entity operating the Hotel at this location at any time, without consent of Tri State Linen. | $0.00 |
| 77 | Tri State Fire Sprinkler | Fire sprinkler inspection | N/A | $2,400.00 |
| 78 | Wage Works | Benefits management system | Neither of us may assign any of our rights and obligations in connection with the provision of Services without the prior written consent of the other, which consent shall not be unreasonably withheld. | $0.00 |
| 79 | Valet Kings | Valet parking service | N/A | N/A |
| 80 | KOUTO INC. | Peer-to-Peer software platform for branded experiential connections. Such services are more fully described in Schedule A hereto. | N/A | $0.00 |
| 81 | WIHP | Hotel digital marketing agency | N/A | $0.00 |
| 82 | Telego | Telephone System | N/A | $0.00 |
| 83 | Booking.com | Online Travel Agency | Neither Party may assign, transfer, and/or encumber any of its rights and/or obligations under the Agreement (other than to a Booking.com Affiliated Company) without the prior written consent of the other Party. No assignment, novation, or transfer by the Accommodation shall relieve it of its obligations under the Agreement. | $0.00 |
| 84 | Expedia | Online Travel Agency | No Party may assign or otherwise transfer in any manner (whether voluntary or involuntary, or by operation of law, sale of securities or assets, merger, reorganization or otherwise) this Contract, or any of its rights or obligations under this Contract, without the other Party's prior written consent; | $0.00 |
| 85 | Hotel Tonight | Online Travel Agency | N/A | $0.00 |
| 86 | Day Use | Online Travel Agency | Neither Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the other Party. | $0.00 |
| 87 | Mr. Mrs Smith | Online Travel Agency | In the event of any change of ownership of the business of the Principal or the ownership of the Accommodation, the Principal shall notify the Agent of this immediately and shall, with the Agent's prior consent, transfer its obligations under this contract to the new owner. Should the Agent not consent to the transfer, the Agent shall be entitled to immediately terminate the Agreement upon giving written notice to the Principal, without liability. | $0.00 |
| 88 | Revinate | CRM & Marketing Platform | Neither party may assign or otherwise transfer its rights or delegate its duties under this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed, and any attempt to do so without consent shall be void. | $0.00 |
| 89 | STR | Market Intelligence | N/A | $0.00 |
| 90 | TripAdvisor | Online Guest Reviews | N/A | $0.00 |
| 91 | OTA Insight | Market Intelligence - Rate Shopping Tool | Neither this Agreement nor any of the rights or obligations under this Agreement, may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any party hereto without the prior written consent of the other parties hereto, and any such assignment without such prior written consent shall be null and void. | $0.00 |
| 92 | Ben Franklin HVAC | HVAC Service Provider | N/A | $4,000.00 |
| 93 | Cendyn | Hotel Website | N/A | |
| 94 | American Express | Credit card merchant services | You shall not assign the Agreement, or any of your rights, interests, or obligations hereunder, whether voluntarily or by operation of law (including by way of sale of assets, merger, or consolidation), without our prior written consent. Any purported assignment by operation of law is voidable in our sole discretion. | $0.00 |

| Additional Contracts | |
|---|---|
| Hadar Consulting Services LLC | Listing Agreement for Lease dated as of September 20, 2022 between Wythe Berry LLC and Hadar Consulting Services LLC |
| Meridian Capital Group, LLC, d/b/a Meridian Retail Leasing | Listing Agreement between Wythe Berry LLC and Meridian Capital Group, LLC, d/b/a Meridian Retail Leasing dated September 23, 2022 |

## SCHEDULE 3.5 – ALLOCATED PURCHASE PRICE

| Assets* | Aggregate fair market value (actual amount for Class I) | Allocation of sales price |
|---|---|---|
| Class I | $[0][any transferred cash] | $[0][any transferred cash] |
| Class II | $0 | $0 |
| Class III | $0 | $0 |
| Class IV | $0 | $0 |
| Class V (real property) | $[remainder of Cash Consideration] | $[remainder of Cash Consideration] |
| Class V (personal property) | $560,000 | $560,000 |
| Class VI and VII | To be determined at UCC Sale | Consideration paid at UCC Sale |
| Total | $[Cash Consideration amount] | $[Cash Consideration amount] |

*The general definitions of the above asset classes are outlined below. The full definitions of the above asset classes are outlined in the instructions of Form 8594.*

**Class I assets:** Cash and general deposit accounts (including savings and checking accounts) other than certificates of deposit held in banks, savings and loan associations, and other depository institutions.

**Class II assets:** Actively traded personal property within the meaning of Section 1092(d)(1) of the Internal Revenue Code and Treasury Regulations Section 1.1092(d)-1 (determined without regard to Section 1092(d)(3) of the Internal Revenue Code). In addition, Class II assets include certificates of deposit and foreign currency even if they are not actively traded personal property. Class II assets do not include stock of seller's affiliates, whether or not actively traded, other than actively traded stock described in Section 1504(a)(4) of the Internal Revenue Code.

**Class III assets:** Assets that the taxpayer marks to market at least annually for federal income tax purposes and debt instruments (including accounts receivable). Class III assets do not include:

1) Debt instruments issued by persons related at the beginning of the day following the acquisition date to the target under Section 267(b) or 707 of the Internal Revenue Code;
2) Contingent debt instruments subject to Treasury Regulations Sections 1.1275-4 and 1.483-4, or Section 988 of the Internal Revenue Code, unless the instrument is subject to the noncontingent bond method of Treasury Regulations Section 1.1275-4(b) or is described in Treasury Regulations Section 1.988-2(b)(2)(i)(B)(2); and
3) Debt instruments convertible into the stock of the issuer or other property.

**Class IV assets:** Stock in trade of the taxpayer or other property of a kind that would properly be included in the inventory of the taxpayer if on hand at the close of the tax year, or property held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business.

**Class V assets:** All assets other than Class I, II, III, IV, VI, and VII assets. Furniture and fixtures, buildings, land, vehicles, and equipment that constitute all or part of a trade or business are generally Class V assets.

**Class VI assets:** All Section 197 intangibles except goodwill and going concern value.

**Class VII assets:** Goodwill and going concern value.

## SCHEDULE 4.4(I) – VENDING MACHINES

**1 On-site Vending Machine**

| Location | Vendor | Contract Status |
|---|---|---|
| Lower Level - Team Member Cafeteria | Balanced Vending | TBA - Researching Contract |

## SCHEDULE 4.4(J) – TENANT IMPROVEMENT, LEASING COMMISSIONS AND OTHER CONCESSIONS

| Tenant | Unit | Description | Remaining Value | Anticipated Completion Date |
|--------|------|-------------|-----------------|-----------------------------|
| Vism Studio | 606 | 3 Month Rent Abatement | $        35,586.00 | 4/23/2024 |

*Note, Seller is negotiating the attornment of WVH Bar LLC which would provide for the following: removal any TI responsibility from Seller (estimated to be $300K) except for the amendment to the CO; remove the TI contributions ($200K) from the Seller; and, provide an abatement of rent during construction (not to exceed 6 months) and an additional 3-month abatement from the date of opening.*

*Note, Ownership is in discussions with The Alien Experience LLC to provide for an attornment of their lease on similar terms provided to WVH Bar LLC.  The current estimated TI responsibility from the landlord is $200K*

## SCHEDULE 5.8 – EMPLOYMENT MATTERS

| PAYROLL LAST NAME | PAYROLL FIRST NAME | JOB TITLE | HOME DEPARTMENT | WORKER CATEGORY | PRIMARY ADDRESS LINE 1 | PRIMARY ADDRESS LINE 2 | PRIMARY ADDRESS - CITY | STATE | ZIP CODE | HIRE DATE | ANNUAL SALARY | HOURLY SALARY | Personal Hours Balance | Sick Hours Balance | Vacation Hours Balance | Weekly Pay Estimate | Total Value of Accrued PTO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Systems Manager | IT | EFT - Exempt - FT | | | | | | 05/15/2023 | $ 69,999.90 | $ 33.65 | 0 | 3.72 | 31.44 | $1,346.15 | $1,183.27 |
| | | Public Area Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 04/13/2017 | $ 42,848.00 | $ 20.60 | 0 | 38.21 | 28.49 | $824.00 | $1,374.02 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 05/24/2021 | $ 42,848.00 | $ 20.60 | 0 | 0.97 | 0.97 | $824.00 | $39.96 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 05/23/2022 | $ 41,776.80 | $ 20.09 | 0 | 1.18 | 4.18 | $803.40 | $107.66 |
| | | Housekeeping Manager | Housekeeping | EFT - Exempt - FT | | | | | | 09/17/2022 | $ 66,434.99 | $ 31.94 | 0 | 5.86 | 51.84 | $1,277.60 | $1,842.93 |
| | | Painter | Engineering | NFT - Non-Exempt FT | | | | | | 11/09/2021 | $ 59,987.20 | $ 28.84 | 0 | 48.47 | 36.19 | $1,153.60 | $2,441.59 |
| | | Director of Entertainment Sales | Sales | EFT - Exempt - FT | | | | | | 01/02/2018 | $ 98,800.00 | $ 47.50 | 16 | 41.54 | 74.52 | $1,900.00 | $6,272.85 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 08/23/2022 | $ 41,776.80 | $ 20.09 | 0 | 2.17 | 2.17 | $803.40 | $87.17 |
| | | Sales Admin. | Sales | NFT - Non-Exempt FT | | | | | | 05/03/2022 | $ 55,702.40 | $ 26.78 | 0 | 20.49 | 12.49 | $1,071.20 | $883.20 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 11/25/2019 | $ 42,848.00 | $ 20.60 | 16 | 6.07 | 50.2 | $824.00 | $1,488.76 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 10/19/2023 | $ 40,560.00 | $ 19.50 | 0 | 10.78 | 10.78 | $780.00 | $732.42 |
| | | Director of Front Desk | Front Office | EFT - Exempt - FT | | | | | | 09/27/2021 | $ 88,999.94 | $ 43.27 | 0 | 24.47 | 66.94 | $1,730.77 | $3,955.24 |
| | | Public Area Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 05/23/2016 | $ 42,848.00 | $ 20.60 | 0 | 40.47 | 75.41 | $824.00 | $2,387.13 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 05/30/2017 | $ 42,848.00 | $ 20.60 | 0 | 12.92 | 51.33 | $824.00 | $1,323.55 |
| | | Door Attendant | Front Office | NFT - Non-Exempt FT | | | | | | 09/27/2023 | $ 41,600.00 | $ 20.00 | 16 | 12.32 | 12.32 | $800.00 | $812.80 |
| | | Assistant Director of Housekeeping | Housekeeping | EFT - Exempt - FT | | | | | | 08/11/2021 | $ 86,521.14 | $ 41.60 | 0 | 9.13 | 14.26 | $1,663.87 | $972.95 |
| | | Door Attendant | Front Office | NFT - Non-Exempt FT | | | | | | 07/15/2021 | $ 42,848.00 | $ 20.60 | 0 | 4.79 | 4.79 | $824.00 | $197.35 |
| | | Guest Services Representative | Front Office | NFT - Non-Exempt FT | | | | | | 12/02/2021 | $ 49,920.00 | $ 24.00 | 16 | 45.39 | 39.39 | $960.00 | $2,418.72 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 07/25/2017 | $ 42,848.00 | $ 20.60 | 0 | 3.65 | 51.06 | $824.00 | $1,127.03 |
| | | Guest Services Representative | Front Office | NFT - Non-Exempt FT | | | | | | 05/04/2023 | $ 51,417.60 | $ 24.72 | 0 | 5.49 | 5.49 | $988.80 | $271.43 |
| | | Asst Director of Finance and Acctg | Admin & Gen | EFT - Exempt - FT | | | | | | 11/01/2017 | $ 99,999.95 | $ 48.08 | 16 | 20.47 | 83.88 | $1,923.08 | $5,786.05 |
| | | Engineering Supervisor | Engineering | NFT - Non-Exempt FT | | | | | | 06/01/2023 | $ 61,360.00 | $ 29.50 | 0 | 17.41 | 25.41 | $1,180.00 | $1,263.19 |
| | | Engineer | Engineering | NFT - Non-Exempt FT | | | | | | 08/15/2016 | $ 62,129.60 | $ 29.87 | 0 | 26.24 | 43.41 | $1,194.80 | $2,080.45 |
| | | Night Manager | Front Office | EFT - Exempt - FT | | | | | | 05/10/2023 | $ 79,999.92 | $ 38.46 | 0 | 11.72 | 47.44 | $1,538.46 | $2,275.38 |
| | | Housekeeping Manager | Housekeeping | EFT - Exempt - FT | | | | | | 10/05/2021 | $ 66,435.20 | $ 31.94 | 0 | 10.22 | 14.41 | $1,277.60 | $786.68 |
| | | Bell Supervisor | Front Office | NFT - Non-Exempt FT | | | | | | 05/23/2016 | $ 53,560.00 | $ 25.75 | 0 | 11 | 51.41 | $1,030.00 | $1,607.06 |
| | | Public Area Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 04/11/2022 | $ 41,776.80 | $ 20.09 | 0 | 4.8 | 8.8 | $803.40 | $273.16 |
| | | Public Area Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 07/19/2022 | $ 41,776.80 | $ 20.09 | 0 | 44.02 | 44.02 | $803.40 | $1,768.28 |
| | | Human Resources Coordinator | Admin & Gen | NFT - Non-Exempt FT | | | | | | 11/20/2023 | $ 60,320.00 | $ 29.00 | 0 | 6.93 | 6.93 | $1,160.00 | $401.94 |
| | | Marketing Coordinator | Sales | EFT - Exempt - FT | | | | | | 12/02/2021 | $ 58,240.00 | $ 28.00 | 0 | 8.47 | 18.35 | $1,120.00 | $750.96 |
| | | Reservations Supervisor | Front Office | NFT - Non-Exempt FT | | | | | | 10/25/2021 | $ 58,240.00 | $ 28.00 | 0 | 13.24 | 29.24 | $1,120.00 | $1,189.44 |
| | | Director of Sales | Sales | EFT - Exempt - FT | | | | | | 02/12/2018 | $136,500.00 | $ 65.63 | 0 | 32.47 | 67.41 | $2,625.00 | $6,554.63 |
| | | Director of Engineering | Engineering | EFT - Exempt - FT | | | | | | 12/15/2021 | $147,006.91 | $ 70.68 | 16 | 8.43 | 55.7 | $2,827.06 | $5,663.30 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 10/16/2017 | $ 40,560.00 | $ 19.50 | 16 | 11.06 | 12.06 | $780.00 | $762.84 |
| | | Door Attendant | Front Office | NFT - Non-Exempt FT | | | | | | 03/28/2017 | $ 42,848.00 | $ 20.60 | 0 | 3.4 | 15.4 | $824.00 | $387.28 |
| | | Guest Relations Agent | Front Office | NFT - Non-Exempt FT | | | | | | 07/11/2023 | $ 49,920.00 | $ 24.00 | 0 | 12.79 | 20.79 | $960.00 | $805.92 |
| | | Reservations Agent | Front Office | NFT - Non-Exempt FT | | | | | | 09/11/2023 | $ 49,920.00 | $ 24.00 | 16 | 14.63 | 14.63 | $960.00 | $1,086.24 |
| | | Assistant Front Desk Manager | Front Office | EFT - Exempt - FT | | | | | | 10/06/2022 | $ 64,499.97 | $ 31.01 | 0 | 3.55 | 10.69 | $1,240.38 | $441.58 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 05/12/2022 | $ 41,776.80 | $ 20.09 | 0 | 5.72 | 11.72 | $803.40 | $350.28 |
| | | Human Resources Manager | Admin & Gen | EFT - Exempt - FT | | | | | | 04/24/2023 | $ 89,999.94 | $ 43.27 | 0 | 10.03 | 36.06 | $1,730.77 | $1,994.28 |
| | | Sales Manager | Sales | EFT - Exempt - FT | | | | | | 09/07/2021 | $ 78,000.00 | $ 37.50 | 0 | 32.47 | 27.01 | $1,500.00 | $2,230.50 |
| | | Public Area Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 09/19/2016 | $ 42,848.00 | $ 20.60 | 0 | 48.47 | 75.41 | $824.00 | $2,551.93 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 05/23/2016 | $ 42,848.00 | $ 20.60 | 0 | 12.85 | 51.41 | $824.00 | $1,323.76 |
| | | Engineering Supervisor | Engineering | NFT - Non-Exempt FT | | | | | | 03/08/2021 | $ 69,409.60 | $ 33.37 | 16 | 10.48 | 10.48 | $1,334.80 | $1,233.36 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 02/10/2021 | $ 42,848.00 | $ 20.60 | 0 | 3.73 | 6.73 | $824.00 | $215.48 |
| | | Human Resources Manager | Admin & Gen | EFT - Exempt - FT | | | | | | 06/21/2023 | $ 84,999.82 | $ 40.87 | 0 | 3.1 | 10.2 | $1,634.61 | $543.51 |
| | | Engineer | Engineering | NFT - Non-Exempt FT | | | | | | 04/09/2018 | $ 59,987.20 | $ 28.84 | 0 | 39.57 | 66.94 | $1,153.60 | $3,071.75 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 04/06/2022 | $ 41,776.80 | $ 20.09 | 0 | 23.57 | 26.47 | $803.40 | $1,005.05 |

*Note, weekly payroll estimate assumes 40 hours per week for full-time employees, and 20 hours per week for part-time employees.*

| PAYROLL LAST NAME | PAYROLL FIRST NAME | JOB TITLE | HOME DEPARTMENT | WORKER CATEGORY | PRIMARY ADDRESS LINE 1 | PRIMARY ADDRESS LINE 2 | PRIMARY ADDRESS - CITY | STATE | ZIP CODE | HIRE DATE | ANNUAL SALARY | HOURLY SALARY | Personal Hours Balance | Sick Hours Balance | Vacation Hours Balance | Weekly Pay Estimate | Total Value of Accrued PTO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Guest Relations Agent | Front Office | NFT - Non-Exempt FT | | | | | | 02/09/2022 | $ 51,417.60 | $ 24.72 | 0 | 13.73 | 23.73 | $988.80 | $926.01 |
| | | Rooms Intern | Front Office | NFT - Non-Exempt FT | | | | | | 01/26/2024 | $ 62,999.87 | $ 30.29 | 0 | 0 | 0 | $605.77 | $0.00 |
| | | Door Attendant | Front Office | NFT - Non-Exempt FT | | | | | | 06/20/2023 | $ 41,600.00 | $ 20.00 | 0 | 15.1 | 15.1 | $800.00 | $604.00 |
| | | Assistant Front Desk Manager | Front Office | EFT - Exempt - FT | | | | | | 07/21/2020 | $ 66,241.97 | $ 31.85 | 0 | 36.02 | 27.41 | $1,273.88 | $2,020.06 |
| | | Environmental Manager | Engineering | EFT - Exempt - FT | | | | | | 05/01/2017 | $ 75,004.18 | $ 36.06 | 0 | 29.26 | 83.88 | $1,442.39 | $4,079.79 |
| | | Director of Revenue Mgt | Sales | EFT - Exempt - FT | | | | | | 07/06/2020 | $173,621.97 | $ 83.47 | 0 | 13.56 | 65.21 | $3,338.88 | $6,575.10 |
| | | Groundskeeper | Engineering | NFT - Non-Exempt FT | | | | | | 08/30/2023 | $ 47,840.00 | $ 23.00 | 0 | 15.4 | 15.4 | $920.00 | $708.40 |
| | | Night Desk Clerk | Front Office | NFT - Non-Exempt FT | | | | | | 10/16/2023 | $ 50,960.00 | $ 24.50 | 16 | 10.78 | 10.78 | $980.00 | $520.22 |
| | | Director of Finance | Admin & Gen | EFT - Exempt - FT | | | | | | 05/17/2021 | $148,837.52 | $ 71.56 | 0 | 24.47 | 66.94 | $2,862.26 | $6,540.98 |
| | | Spa Host | Spa | NFT - Non-Exempt FT | | | | | | 11/03/2022 | $ 45,760.00 | $ 26.00 | 18 | 27.12 | 35.12 | $1,040.00 | $2,086.24 |
| | | Engineering Manager | Engineering | EFT - Exempt - FT | | | | | | 05/30/2017 | $ 74,999.81 | $ 36.06 | 0 | 6.94 | 75.88 | $1,442.30 | $2,986.29 |
| | | Spa Host | Spa | NPT - Non-Exempt PT | | | | | | 12/21/2023 | $ 45,760.00 | $ 22.00 | 0 | 3.08 | 3.08 | $440.00 | $135.52 |
| | | Accounts Payable Clerk | Admin & Gen | NFT - Non-Exempt FT | | | | | | 09/28/2021 | $ 51,503.30 | $ 24.76 | 0 | 8.32 | 3.32 | $990.45 | $288.22 |
| | | Public Area Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 05/18/2021 | $ 41,776.60 | $ 20.09 | 0 | 34.95 | 36.95 | $803.40 | $1,444.11 |
| | | Guest Services Representative | Front Office | NFT - Non-Exempt FT | | | | | | 05/30/2023 | $ 49,920.00 | $ 24.00 | 0 | 3.41 | 17.41 | $960.00 | $499.68 |
| | | Guest Relations Agent | Front Office | NFT - Non-Exempt FT | | | | | | 03/21/2023 | $ 51,417.60 | $ 24.72 | 0 | 9.11 | 17.11 | $988.80 | $648.16 |
| | | Public Area Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 08/29/2016 | $ 42,848.00 | $ 20.60 | 0 | 16.39 | 19.41 | $824.00 | $737.48 |
| | | Door Attendant | Front Office | NFT - Non-Exempt FT | | | | | | 04/24/2023 | $ 42,848.00 | $ 20.60 | 0 | 6.03 | 30.03 | $824.00 | $742.84 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 03/20/2018 | $ 42,848.00 | $ 20.60 | 0 | 6.27 | 34.94 | $824.00 | $848.93 |
| | | Director of Digital Marketing | Sales | EFT - Exempt - FT | | | | | | 10/02/2023 | $144,999.92 | $ 69.71 | 0 | 12.32 | 28.96 | $2,788.46 | $2,877.69 |
| | | Housekeeping Manager | Housekeeping | EFT - Exempt - FT | | | | | | 02/27/2023 | $ 66,435.20 | $ 31.94 | 0 | 4.19 | 10.38 | $1,277.60 | $465.37 |
| | | Painter | Engineering | NFT - Non-Exempt FT | | | | | | 10/31/2023 | $ 58,240.00 | $ 28.00 | 16 | 8.47 | 8.47 | $1,120.00 | $922.32 |
| | | Assistant Front Desk Manager | Front Office | EFT - Exempt - FT | | | | | | 05/17/2022 | $ 66,241.55 | $ 31.85 | 0 | 10.95 | 10.95 | $1,273.88 | $697.45 |
| | | Group Sales & Service Manager | Sales | EFT - Exempt - FT | | | | | | 12/18/2023 | $ 78,000.00 | $ 37.50 | 0 | 3.85 | 7.7 | $1,500.00 | $433.13 |
| | | Concierge | Front Office | NFT - Non-Exempt FT | | | | | | 08/15/2023 | $ 60,320.00 | $ 29.00 | 0 | 16.94 | 16.94 | $1,160.00 | $982.52 |
| | | Rooms Control Manager | Front Office | EFT - Exempt - FT | | | | | | 07/26/2021 | $ 66,242.18 | $ 31.85 | 0 | 19.25 | 33.96 | $1,273.89 | $1,694.59 |
| | | Lead Concierge | Front Office | NFT - Non-Exempt FT | | | | | | 11/11/2021 | $ 84,999.82 | $ 40.87 | 16 | 8.7 | 43.46 | $1,634.61 | $2,785.38 |
| | | Director of Human Resources | Admin & Gen | EFT - Exempt - FT | | | | | | 07/16/2018 | $152,065.47 | $ 73.11 | 0 | 48.47 | 43.41 | $2,924.34 | $6,717.20 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 08/29/2016 | $ 42,848.00 | $ 20.60 | 0 | 23.4 | 67.41 | $824.00 | $1,870.69 |
| | | Door Attendant | Front Office | NFT - Non-Exempt FT | | | | | | 05/31/2023 | $ 41,600.00 | $ 20.00 | 0 | 9.41 | 9.41 | $800.00 | $376.40 |
| | | Public Area Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 09/19/2016 | $ 42,848.00 | $ 20.60 | 0 | 13.09 | 67.41 | $824.00 | $1,658.30 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 08/30/2023 | $ 40,560.00 | $ 19.50 | 0 | 3.4 | 15.4 | $780.00 | $366.60 |
| | | Guest Relations Agent | Front Office | NFT - Non-Exempt FT | | | | | | 07/11/2023 | $ 49,920.00 | $ 24.00 | 0 | 4.79 | 12.79 | $960.00 | $421.92 |
| | | House Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 05/02/2016 | $ 42,848.00 | $ 20.60 | 0 | 1.68 | 16.71 | $824.00 | $378.83 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 05/30/2017 | $ 42,848.00 | $ 20.60 | 16 | 5.1 | 2.93 | $824.00 | $495.02 |
| | | Director of Security | Admin & Gen | EFT - Exempt - FT | | | | | | 07/27/2022 | $120,750.03 | $ 58.05 | 0 | 23.25 | 66.94 | $2,322.12 | $5,235.79 |
| | | Public Area Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 10/18/2021 | $ 41,776.60 | $ 20.09 | 0 | 22.01 | 18.01 | $803.40 | $803.80 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 05/03/2021 | $ 42,848.00 | $ 20.60 | 0 | 2.79 | 13.79 | $824.00 | $341.55 |
| | | Marketing Manager | Sales | EFT - Exempt - FT | | | | | | 01/03/2023 | $ 93,600.21 | $ 45.00 | 16 | 17.54 | 3.08 | $1,800.00 | $1,647.90 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 06/22/2022 | $ 41,776.80 | $ 20.09 | 0 | 10.51 | 8.51 | $803.40 | $382.02 |
| | | Engineer | Engineering | NFT - Non-Exempt FT | | | | | | 03/07/2023 | $ 55,702.40 | $ 26.78 | 0 | 4.65 | 1.65 | $1,071.20 | $168.71 |
| | | Spa Host | Spa | NFT - Non-Exempt FT | | | | | | 11/03/2022 | $ 45,760.00 | $ 22.00 | 16 | 19.12 | 43.12 | $880.00 | $1,721.28 |
| | | Security Manager | Admin & Gen | EFT - Exempt - FT | | | | | | 04/11/2023 | $ 89,999.94 | $ 43.27 | 0 | 30.8 | 61.6 | $1,730.77 | $3,998.07 |
| | | Director of Guest Relations | Front Office | EFT - Exempt - FT | | | | | | 04/01/2019 | $150,000.03 | $ 72.12 | 0 | 15.18 | 31.5 | $2,884.62 | $3,366.35 |
| | | Hotel Manager | Admin & Gen | EFT - Exempt - FT | | | | | | 05/11/2021 | $171,438.80 | $ 82.42 | 0 | 3.72 | 34.77 | $3,296.90 | $3,172.44 |
| | | Purchasing/Receiving Manager | Admin & Gen | EFT - Exempt - FT | | | | | | 12/01/2021 | $ 66,149.82 | $ 31.80 | 0 | 1.39 | 1.78 | $1,272.11 | $100.81 |
| | | Concierge | Front Office | NFT - Non-Exempt FT | | | | | | 01/08/2024 | $ 60,320.00 | $ 29.00 | 0 | 1.54 | 1.54 | $1,160.00 | $89.32 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 03/08/2022 | $ 41,776.80 | $ 20.09 | 0 | 22.65 | 58.47 | $803.40 | $1,629.30 |
| | | Public Area Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 05/24/2022 | $ 41,776.80 | $ 20.09 | 0 | 26.18 | 58.18 | $803.40 | $1,694.37 |
| | | Room Attendant | Housekeeping | NFT - Non-Exempt FT | | | | | | 09/04/2018 | $ 42,848.00 | $ 20.60 | 0 | 6.16 | 20.02 | $824.00 | $539.31 |
| | | Spa Host | Spa | NPT - Non-Exempt PT | | | | | | 05/02/2023 | $ 45,760.00 | $ 22.00 | 16 | 7.7 | 7.7 | $440.00 | $690.80 |

*Note, weekly payroll estimate assumes 40 hours per week for full-time employees, and 20 hours per week for part-time employees.*

**Pending litigation:**

**The William Vale Staffing, LLC, Case No. 29-RC-300927**

*Nature of Case*

The representation petition seeks certification of the Hotel and Gaming Trades Council ("Union") as the collective bargaining representative of housekeeping employees which are employed by The William Vale Staffing, LLC ("TWVS"). The Union filed a representation petition with the National Labor Relations Board ("NLRB") to represent those housekeeping employees on August 8, 2022. After a hearing where TWVS argued that the petitioned-for unit was inappropriate, the NLRB directed an election among housekeeping employees only. In the first election, held on October 13, 2022, a majority of voters cast ballots in favor of union representation. Election objections were subsequently filed by TWVS. The objections were found meritorious and a second election was directed to be held on February 27, 2023. A majority of voters in the second election supported union representation. TWVS thereafter filed objections to the second election. The objections were overruled and a certification in favor of the Union was issued on September 12, 2023. TWVS filed a request for review of the NLRB decisions leading to the certification on September 26, 2023.

*Case Status*

The September 26, 2023 request for review remains pending.

**The William Vale Staffing, LLC, Case No. 29-CA-313197**

*Nature of Case*

This is an unfair labor practice proceeding pending before the National Labor Relations Board alleging unlawful conduct related to a union election involving the Hotel and Gaming Trades Council, AFL-CIO. The allegations of unlawful conduct include: (1) interrogation, surveillance, threats and promises directed toward voting unit employees; (2) rule changes with respect to the holding of baby showers in the workplace and access to cleaning supplies; and (3) failure to provide a wage increase to voting unit employees in September 2022. The Employer has denied the material allegations and is intending to vigorously defend against them.

*Case Status*

A hearing in the matter is currently scheduled for March 2024.

## SCHEDULE 5.12 – ANTICIPATED CAPITAL IMPROVEMENTS

| Project | Remaining Scope | Estimated Remaining Cost |
|---|---|---|
| Guestroom Painting | 48 out of 183 guestrooms remaining as of 1/23/24 | $33,600 |
| Emergency Action Plan Preparation | Floor Plan Drawings & Standpipe Diagram Preparation | $16,800 |