DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Elliot Moskowitz
Chase McReynolds

*Attorneys for Yoel Goldman*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| WYTHE BERRY FEE OWNER LLC, | Case No. 22-11340 (MG) |
| Debtor. | |

**OBJECTION OF YOEL GOLDMAN TO THE (1) SECOND AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF WYTHE BERRY FEE OWNER LLC AND (2) DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENT PURSUANT TO <u>BANKRUPTCY RULE 9019</u>**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................1

BACKGROUND ....................................................................................................4

    A.    The Hotel Venture......................................................................................4

    B.    Litigation Involving the Debtor, Goldman, and Weiss...................................7

    C.    The Settlement Agreement. ......................................................................10

    D.    The Plan. ...............................................................................................13

THE SETTLEMENT AGREEMENT AND PLAN § 10.7 ARE UNLAWFUL...............14

    A.    The Settlement Agreement Conveys Goldman's Property Without
        His Consent in Violation of Standing AAA Panel Orders and the
        Goldman Entities' Operating Agreements...................................................14

    B.    The Settlement Agreement and Plan § 10.7 Violate Bankruptcy Code
        Section 1129(a)(3) Because They are Unlawful and Not Proposed in
        Good Faith ............................................................................................19

    C.    The Settlement Agreement and Plan § 10.7 Are Subject to
        Heightened Scrutiny Because Weiss Is a Statutory Insider of the
        Debtor. .................................................................................................22

    D.    Plan § 10.7 Violates Sections 1123(b)(6), 1129(a)(1), and 1129(a)(3)
        of the Bankruptcy Code Because It Contains Non-Consensual Third-
        Party Releases. ......................................................................................23

THE IRIDIUM FACTORS WEIGH AGAINST APPROVING THE
        SETTLEMENT AGREEMENT ..........................................................................30

GOLDMAN HAS STANDING TO RAISE THESE OBJECTIONS ..............................34

THE SETTLEMENT AGREEMENT AND PLAN § 10.7 SHOULD BE
        REVISED TO PROTECT GOLDMAN'S RIGHTS ...............................................35

RESERVATION OF RIGHTS ...............................................................................35

NOTICE.............................................................................................................35

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*In re Adelphia Commc'ns Corp.*,
    336 B.R. 610 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006) ........... 33

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................................................ 31, 32

*In re Bally Total Fitness of Greater N.Y., Inc.*,
    No. 07-12395 (BRL), 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) ............ 25

*In re Barman*,
    237 B.R. 342 (Bankr. E.D. Mich. 1999) ..................................................................... 23

*In re Brooke Corp.*,
    506 B.R. 560 (Bankr. D. Kan. 2014) .......................................................................... 23

*In re Chassix Holdings, Inc.*,
    533 B.R. 64 (Bankr. S.D.N.Y. 2015) .......................................................................... 31

*In re Chemtura Corp.*,
    439 B.R. 561 (Bankr. S.D.N.Y. 2010) ....................................................................... 24

*In re Ditech Holding Corp.*,
    606 B.R. 544 (Bankr. S.D.N.Y. 2019) ................................................................... 19, 34

*In re Drexel Burnham Lambert Grp., Inc.*,
    134 B.R. 493 (Bankr. S.D.N.Y. 1991) ....................................................................... 31

*In re Future Energy Corp.*,
    83 B.R. 470 (Bankr. S.D. Ohio 1988) ....................................................................... 22

*In re Hal Luftig Co.*,
    657 B.R. 704 (S.D.N.Y. 2024) ................................................................................... 30

*In re Hampton Hotel Invs., L.P.*,
    270 B.R. 346 (Bankr. S.D.N.Y. 2001) ....................................................................... 33

*In re Iridium Operating LLC*,
    478 F.3d 452 (2d Cir. 2007) .............................................................................. *passim*

*Kane v. Johns–Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988) ....................................................................................... 19

*In re Kerner*,
    599 B.R. 751 (Bankr. S.D.N.Y. 2019) ................................................................... 31, 33

iii

*In re Lull,*
  No. ADV. 08-90074, 2009 WL 3853210 (Bankr. D. Haw. Nov. 17, 2009) ............. 22

*In re Majestic Liquor Stores, Inc.,*
  No. 10-43849-RFN11, 2010 WL 6982615 (Bankr. N.D. Tex. June 6, 2010) ........... 24

*In re Metromedia Fiber Network, Inc.,*
  416 F.3d 136 (2d Cir. 2005) ............................................................................ *passim*

*In re Mirant Corp.,*
  348 B.R. 725 (Bankr. N.D. Tex.) ................................................................................ 34

*In Re Purdue Pharma L.P.,*
  69 F.4th 45 (2d Cir.), *cert. granted sub nom. Harrington v. Purdue Pharma L.P.,*
  144 S. Ct. 44 (2023).......................................................................................... *passim*

*In re Quigley,*
  437 B.R. 102 (Bankr. S.D.N.Y. 2010) ....................................................................... 19

*In re Remsen Partners, Ltd.,*
  294 B.R. 557 (Bankr. S.D.N.Y. 2003) ....................................................................... 34

*Stern v. Marshall,*
  564 U.S. 462 (2011) .................................................................................................. 26

*In re Stone Barn Manhattan LLC,*
  405 B.R. 68 (Bankr. S.D.N.Y. 2009) ......................................................................... 34

*In re The Present Co.,*
  141 B.R. 18 (Bankr. W.D.N.Y. 1992) ....................................................................... 32

STATUTES & RULES

11 U.S.C. § 101............................................................................................... 22, 23

11 U.S.C. § 1109(b) ............................................................................................ 34

11 U.S.C. § 1123 ............................................................................................ 23, 25

11 U.S.C. § 1129 ........................................................................................ *passim*

Fed. R. Bankr. P. 9019 ................................................................................ 1, 34

Yoel Goldman ("Goldman"), as a party-in-interest in the above-captioned chapter 11 case (the "Chapter 11 Case") and a party to the Rent Action, by and through his counsel, Davis Polk & Wardwell LLP, respectfully submits this objection (the "Objection") to confirmation of the Second Amended Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC (Dkt. #306, the "Plan") and the Debtor's Motion for Entry of an Order Approving Settlement Agreement Pursuant to Bankruptcy Rule 9019 (Dkt. #304, the "Motion").[1]

## PRELIMINARY STATEMENT

1.      The Plan references and incorporates a proposed Settlement Agreement between the Debtor and Zelig Weiss ("Weiss") regarding the William Vale Hotel (the "Hotel").  Together, these documents purport to dispose of Goldman's property without his consent; to release claims held by Goldman without his consent; and to impact an unresolved proceeding pending before the American Arbitration Association (the "AAA") and related N.Y. state court proceedings, including violating existing orders of the AAA panel to which Weiss is subject.  The exculpation provisions of the Plan (§ 10.7) separately infringe upon Goldman's rights by purporting to exculpate a long list of "Additional Exculpated Parties" which include Weiss—i.e., Goldman's adversary in the AAA and N.Y. state court proceedings—and numerous related parties of Weiss.  The exculpation of Weiss is objectionable in itself as a non-consensual third-party release and is even worse alongside the Settlement Agreement, as it would ostensibly facilitate Weiss's misappropriation of property and rights belonging to Goldman, while also ostensibly insulating Weiss from claims relating to such conduct.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan or the Disclosure Statement for the Plan (Dkt. #305, the "Disclosure Statement").

2.        Moreover, the Plan includes as "Exculpated Parties" a list of other non-debtor parties who also are not fiduciaries to the estate, including the Notes Trustee, the Series C Noteholders themselves and all of their representatives and advisors.  These non-debtor Exculpated Parties—both directly in Israel, and via their representatives in New York—have threatened litigation against Goldman and are the beneficiaries of the Debtor's litigation against him.  The exculpation provision would not only constitute a non-consensual third-party release of certain of Goldman's claims against them but impair Goldman's defenses to their claims against him.

3.        The Debtor and Weiss are not freezing out Goldman by accident.  The Debtor knows that Goldman and Weiss each own 50% of the entities created to operate the Hotel.  The Debtor also knows that Goldman and Weiss are engaged in arbitration and related state court proceedings where Goldman has alleged that Weiss breached his contractual and fiduciary duties to Goldman by violating their agreements and disloyally enriching himself at Goldman's expense.  The Debtor even knows that the AAA panel enjoined Weiss from engaging in Major Decisions (as defined by the relevant operating agreements) or making transfers from the entities' accounts that are not for their exclusive benefit, without Goldman's express written consent.  Nevertheless, the Debtor has apparently negotiated with Weiss for months over how to divvy up Goldman's property without once consulting with Goldman about his property rights or conducting basic diligence about whether Weiss even has the capacity to convey these assets to the Debtor.  In exchange for Goldman's property, the Settlement Agreement delivers some $4 million in value to Weiss—a statutory insider—including a $1.3 million payment

purportedly in exchange for a domain name he appropriated from Goldman, under circumstances that should have been obviously suspicious to the Debtor.

4.     The Court should not approve exculpation provisions that would directly impact active proceedings between non-debtors in another forum.  Nor should the Court approve a settlement that disposes of Goldman's property without his consent and violates existing orders of an arbitration panel—and then threatens to deprive Goldman of any recourse via the aforementioned exculpation provisions.  Because the Plan does these things, it does not comport with section 1129(a)(3) of the Bankruptcy Code and should not be approved in its current form.  Nor is the Settlement Agreement fair and equitable given that the consideration to the Debtor comes at Goldman's expense and without his consent.  And Goldman has standing to raise these objections—the Debtor (together with an insider) cannot take away Goldman's property and then argue he does not have standing to object to what they are doing to him.

5.     To be clear, Goldman does not wish to litigate his claims against Weiss or any other party before this Court; he merely wants to ensure that his rights are not infringed upon.  Goldman has proposed a way forward: the exculpation provisions should be modified to preserve certain of his claims against Weiss and other non-debtors, and the disputed funds should be deposited into escrow until the conclusion of the non-bankruptcy proceedings between Goldman and Weiss, where their rights against one another are being adjudicated.  Taking these steps would clear a path to confirmation while preserving Goldman's rights.  Goldman also stands ready, willing and able to negotiate with any of the parties—the Debtor, Weiss, the Notes Trustee, the Series C Noteholders and/or the Purchaser itself—in order to reach a consensual resolution.

## BACKGROUND

### A. The Hotel Venture.

6.      In 2013, Goldman and Weiss partnered to purchase land for and develop a luxury hotel located at 55 Wythe Avenue, Brooklyn, New York, also known as 111 N. 12th Street, Brooklyn, New York.  After acquiring the land, Goldman and Weiss developed this property into the Hotel, as well as office and retail space and parking (collectively, the "WV Complex"), which opened in 2016.

7.      Formed in September 2013, the oldest and primary entity through which Goldman and Weiss operated the Hotel venture is WB.  *See Goldman v. Weiss*, Index No. 653186 (N.Y. Cnty. 2022) (the "State Court Action") Dkt. #1 (Verified Petition) ¶ 3. Goldman and Weiss each own a 50% interest.  *Id.* § 8.  As Managing Member, Weiss was responsible for day-to-day management of the business, and Goldman, who invested most of the equity, oversaw matters relating to funding, financing, and refinancing the Hotel venture.  *See* State Court Action Dkt. #80 (Fifth Amendment to the WB Operating Agreement (the "Fifth Amendment")) ¶ 7(a).  Accordingly, Goldman played the lead role in arranging funding for the Hotel and readying the Hotel for its successful 2016 opening.

8.      The WB Operating Agreement contains provisions to protect members Goldman and Weiss from improper financial leakage and the diversion of cash flows. For  example, Section 10 requires that "[a]ll funds of the Company shall be deposited in the Company's name in such bank account or accounts as shall be designated by the Company."  State Court Action Dkt. #79 (WB Operating Agreement) § 10.  And "[w]ithdrawals . . . shall be made only in the regular course of the business of the Company and shall be made upon the signature of the written designee of both Members."  *Id.* at 5.

4

9.     The Fifth Amendment to the WB Operating Agreement, effective as of December 31, 2016, also includes several important terms that define the parties' rights and duties concerning the Hotel venture.  Among other things, the Fifth Amendment makes clear that, as a 50% Class A interest holder, Goldman is entitled to a significant share of the Hotel venture revenues, and it lays out a process for distributions and allocations of such revenues, in part in relation to their Capital Contributions.  State Court Action Dkt. #80 at 29 (Fifth Amendment) ¶ 6.  As of December 31, 2016, Goldman had made Capital Contributions of $37,487,114.22, and Weiss had made no Capital Contributions.  *Id.* ¶ 2(b).

10.     As to any substantial decision regarding the Hotel venture, defined as "Major Decisions," the Fifth Amendment prohibits Weiss from taking action "without prior written approval" of Goldman.  *Id.* ¶ 7(e).  As relevant to this matter, the Fifth Amendment defines "Major Decisions" to include:

- "(ii) the terms and conditions of any agreement between the Company and an Affiliate of any Member;"

- "(xvii) employ[ing], or permit[ting] the Company to employ, the funds or assets of the Company in any manner except for the exclusive benefit of the Company;"

- "(xix) tak[ing] action which has a disproportionate effect on any Class A Member, or take any action with the intent to discriminate in a prejudicial manner with respect to the rights of any Member under this Agreement;" and

- "(xxi) tak[ing] any of the foregoing actions with respect to the Company's subsidiaries or affiliates in which both Weiss and Goldman own substantial interests."  *Id.* at Schedule 1.

11.     Over time, Goldman and Weiss formed several more entities to develop, hold, and operate the WV Complex.  The William Vale Hotel LLC ("WV Hotel") operated the space used as traditional guest accommodations.  *See* Declaration of Elliot

5

Moskowitz ("Moskowitz Declaration") Ex. 1 (WV Hotel Operating Agreement) § 3.  The

William Vale FNB LLC ("FNB") operated the food and beverage space.  *See* Moskowitz

Decl. Ex. 2 (FNB Operating Agreement) § 3.  And North 12 Parking LLC ("Parking,"

together with WB, WV Hotel, and FNB, the "Goldman Operating Entities") operated the

parking garage.  *See* Moskowitz Decl. Ex. 3 (Parking Operating Agreement) § 3.

      12.      As with WB, Goldman and Weiss each own a 50% interest in WV Hotel,

FNB, and Parking.  Moskowitz Decl. Ex. 1 (WV Hotel Operating Agreement) § 8;

Moskowitz Decl Ex. 2 (FNB Operating Agreement § 8); Moskowitz Decl. Ex. 3 (Parking

Operating Agreement) § 8.  Similar to the WB Operating Agreement and Fifth

Amendment, the operating agreements for WV Hotel, FNB, and Parking identify Weiss

as Managing Member, responsible for day-to-day management, and assign Goldman

oversight of funding, financing, and refinancing matters.  *Id.* § 11.  The operating

agreements also provide for distributions of cash receipts and all "assets of [each]

Company," and restrict Weiss and Goldman from making Major Decisions without joint

written approval in the same manner as the WB Fifth Amendment.  *Id.* § 8, Schedule 1.

      13.      In addition to the Goldman Operating Entities, Espresso Hospitality

Management LLC ("Espresso") and The William Vale Staffing LLC ("Staffing," and

together with Espresso and the Goldman Operating Entities, the "Operating Entities")

were also formed to assist with managing the WV Complex.  Espresso contracted with

WV Hotel to manage hotel operations, and Staffing was formed to lease its employees to

the Hotel.  *See* Moskowitz Decl. Ex. 4 (Espresso Operating Agreement); Moskowitz

Decl. Ex. 5 (Staffing Operating Agreement) art. 2.  Espresso is owned by Weiss.

Moskowitz Decl. Ex. 4 (Espresso Operating Agreement).  Staffing is owned by David

Lemmond.  Moskowitz Decl. Ex. 5 (Staffing Operating Agreement); Moskowitz Decl.

Ex. 6 (Staffing Membership Interest Assignment).

14.    The Hotel opened in 2016, and in 2017 Goldman and Weiss refinanced the

property's original construction financing.  Disclosure Statement at 4.  To do so,

Goldman and Weiss altered the Hotel venture's original structure, forming a new entity,

the Debtor, which acquired title to the real property.  *Id.*  The Debtor is owned by Wythe

Berry Member LLC ("WB Member"), which is 50% owned by both Weiss and YGWV

LLC.  *Id.* at 3.  The Debtor then leased the property to WB through the Lease.  *Id.* at 4.

15.    In the refinancing transaction, the Debtor raised $166 million through a

bond offering on the Tel Aviv Stock Exchange (the "Series C Notes").  *Id.*  Formally, the

bond issuer was All Year Holdings Limited ("All Year"), which had been wholly owned

by Goldman before its own chapter 11 proceeding before this Court.  *Id.*  All Year loaned

bond proceeds to the Debtor in exchange for a promissory note, which was secured by a

mortgage on the Debtor's fee simple interest in the Hotel venture property.  *Id.*  All Year

later assigned its collateral to Mishmeret Trust Company Ltd. ("Mishmeret"), as trustee for

the Series C Noteholders.  *Id.*

16.    Each of the entities in which Goldman owns a 50% interest—WB, WV

Hotel, FNB and Parking—are parties to the Settlement Agreement, all without

Goldman's consent.

**B. Litigation Involving the Debtor, Goldman, and Weiss.**

17.    In February 2021, WB failed to make its rent payment to the Debtor under

the Lease, upon which the Debtor sued WB, Weiss, and Goldman in New York Supreme

Court, Kings County in the case styled *Wythe Berry Fee Owner v. Wythe Berry LLC et

al.*, Index No. 514152/2021 (the "Rent Action").  Disclosure Statement at 5.  The state

7

court ordered WB to make semiannual use and occupancy payments of $7.5 million to the Debtor (the "U&O Order"). *Id.*

18.     On October 6, 2022, the Series C Noteholders or related parties filed an involuntary chapter 11 petition against the Debtor. Dkt. #1. The Bankruptcy Court entered an order for relief against the Debtor on January 18, 2023. Dkt. #58.

19.     The Rent Action was subsequently removed to the Bankruptcy Court as an adversary proceeding on February 9, 2023. Disclosure Statement at 7. On October 5, 2023, this Court granted the Debtor's motion for partial summary judgment against WB (the "Summary Judgment Order") and dismissed WB's affirmative defenses and counterclaims, finding that the Debtor had validly terminated the Lease. *Id.* at 7.

20.     Meanwhile, Weiss continued to exercise total control over the Hotel and the Operating Entities until November 2023. *Id.* at 3.

21.     Goldman commenced multiple related proceedings against Weiss to enforce his rights, as the Debtor is well aware. *See generally* State Court Action Dkt. #1 (Verified Petition); *Goldman v Weiss*, Case No. 01-23-0001-2090 (AAA) (the "Arbitration"). On September 1, 2022, Goldman commenced the State Court Action against Weiss, seeking preliminary relief in aid of the then-forthcoming arbitration, including seeking an injunction and documents to support claims based on Weiss's disloyal management of the Goldman Operating Entities. State Court Action Dkt. #1 (Verified Petition). On March 23, 2023, Goldman commenced the Arbitration; on October 13, 2023, he served an Amended Demand on his own behalf, and on behalf of the Goldman Operating Entities, against Weiss and the Goldman Operating Entities, seeking monetary and equitable relief based on alleged violations of Weiss's fiduciary

and contractual duties under the Goldman Operating Entities' operating agreements, including claims for fraud. *See id.* Dkt. #73 (Demand for Arbitration). The Arbitration is currently stayed pending a First Department decision on the arbitrability of Goldman's claims on behalf of and against the Goldman Operating Entities. *See Wythe Berry LLC v. Goldman*, No. 2023-06011 (1st Dep't 2023).

22. Before the stay, however, the AAA arbitrators issued several orders based on the Fifth Amendment and concerns about Weiss's conduct—which remain in force and enjoin Weiss as follows:

- On May 10, 2023, Weiss was enjoined from "engaging in unilateral Major Decisions as expressly prohibited in the [Fifth Amendment]" and "from making any transfer out of the accounts of Wythe Berry LLC and [WV Hotel, FNB, and Parking] that are not for the exclusive benefit of Wythe Berry LLC or [WV Hotel, FNB, and Parking] without the express written consent of [Goldman] (as required by the [Fifth Amendment]), during the pendency of this arbitration proceeding." Moskowitz Decl. Ex. 7 (Emergency Interim Award) at 3.

- On August 22, 2023, the panel enjoined Weiss from "directly or indirectly consummating, entering into, executing or otherwise finalizing" any purchase, acquisition, or receipt of interest in the William Vale Hotel *or its assets*. Dkt. #171 Ex. A (Procedural Order No. 1) at 2-3. On August 24, 2023, the panel ordered the injunction to continue until "forty-five (45) days after such time as Claimant is provided with all of the Subject Books and Records as either acknowledged by Claimant or by order of the Panel after the Production Protocol is conducted, including, if necessary, the submission of any Redfern Chart, the Panel's decision thereon and subsequent production, if any, so ordered by the Panel." Dkt. #173 Ex. A (Procedural Order No. 2) at 8.[2] These steps did not occur, and on September 13, 2023, the Panel acknowledged Weiss's continued failure to comply with its orders regarding production in Procedural Order 4. Moskowitz Decl. Ex. 9 (Procedural Order 4). None of the Panel's subsequent orders addressed or terminated the injunction.

---

[2] Following a request from Weiss to modify the injunction, the Panel revised the 45-day injunction period to 14 days on September 8, 2023. The injunction was otherwise left undisturbed. Moskowitz Decl. Ex. 8 (Procedural Order 3).

### C. The Settlement Agreement.

23.    Since the start of the Chapter 11 Case, the "Debtor pursued a dual track strategy to either: (i) negotiate a resolution of the State Court Action; or (ii) sell the WV Complex pursuant to a court supervised process. During the summer of 2023, the Debtor, the Notes Trustee and Weiss negotiated concerning a proposed purchase of the WV Complex, a transaction that the Debtor contemplated would form the basis for a plan of reorganization. However, those negotiations reached an impasse . . . ." Disclosure Statement at 7-8. Following the Debtor's efforts to sell the WV Complex consistent with the Bid Procedures Order, the Debtor and Stalking Horse Bidder negotiated and executed a purchase and sale agreement for the sale of the WV Complex. *Id.* at 9.

24.    Separately, the Debtor engaged with Weiss and the Operating Entities (controlled by Weiss) "in late 2023 and early 2024 regarding a potential settlement of the [Rent Action] and issues concerning a sale of the WV Complex." Mot. at 8. The Debtor characterizes the "extensive discussions, meetings, and negotiations" as "arm's length" and conducted in "good faith." *Id.* at 8; *id.* Ex. B ("Ravid Declaration") ¶¶ 5, 19-21. Despite being 50% owner of the Goldman Operating Entities and defendant in the Rent Action, Goldman was not a party to these negotiations.

25.    On April 19, the Debtor filed the First Amended Plan, including the Settlement Agreement. Dkt. #303. On April 21, the Debtor filed the Plan, which attached and incorporated a lightly revised signed Settlement Agreement ("SA"). Dkt. #306. Weiss signed the Settlement Agreement on behalf of WB and the Operating Entities, with the exception of David Lemmond signing for Staffing. *See* SA. The signatory for TWV Domain LLC ("Domain") is illegible. *Id.*

10

26.     In sum, the Settlement Agreement resolves the Rent Action as to Weiss and "provides for certain arrangements that will assist the Debtor in the planned sale of the WV Complex," Ravid Declaration ¶ 5, through paying Weiss and the Goldman Operating Entities for assets (at least) 50% owned by Goldman and releases from those entities and their related parties.  Specifically, as relevant to Goldman, the Settlement Agreement includes the following summarized terms:

- *Cash Settlement Payment*: WB will pay the Debtor $8,512,152 sourced from, among other things, $4,220,731 in WB's cash, Espresso's $726,000 employee retention tax credit, and a portion of WV Hotel's prepaid Workers' Compensation Insurance.  SA § 4(a)-(b).  The treatment of any remaining cash left in the Hotel's accounts is unclear; Weiss may be taking it for himself impermissibly.

- *Employee Retention Tax Credit ("ERTC")*:  Anything above $726,000 from Espresso's ERTC will be retained by Espresso (i.e., Weiss).  SA § 4(b).

- *Domain Name and Social Media Accounts*: The Debtor will purchase the Domain Name from Domain (and WB and the Operating Entities to the extent they have any rights to the Domain Name) for $1.3 million.  SA § 4(d).  WV Hotel surrenders all title and interest in the Social Media Accounts, which the agreement values at $45,000, and not make any use of previous content previously created and posted.  *Id.* § 4(c).

- *Transition Services Payment*: The Debtor will pay Espresso (i.e., Weiss) $200,000 for consulting services rendered by Espresso to the Debtor in "implementing the transition of the operation, direction, management, and supervision" of the Hotel pursuant to the Consulting Services Agreement.  SA § 4(e).  The Consultant Services Agreement states that the Debtor had engaged Espresso as a consultant since September 30, 2023 to offer services "different from and/or in addition to those services [Espresso] had rendered as manager of the Hotel," but otherwise provides no details on these alleged services.  SA Ex. D at 1.

- *Liquor License Transfer*: The Debtor will pay Weiss the consideration exchanged under "that certain FF&E Purchase and Sale Agreement" in exchange for Weiss (on behalf of WV Hotel and FNB) transferring FNB's liquor license to the Debtor's new entity WB FNB LLC.  SA § 4(h)(1).  Presumably "FF&E" stands for "Furniture, Fixtures, and Equipment" which are "considered part of the good and valuable consideration exchanged by the Parties" under the Settlement Agreement.  *Id.*  The terms of the FF&E Agreement are not disclosed.

11

- *Deposit Account*:  The Operating Entities agree that the Debtor shall receive deposits of all "revenues generated by the Debtor's operation of the WV Complex during the period from the Petition Date through the date on which" FNB receives its liquor license (the "DACA Funds").  SA § 4(h)(2).

- *Member Distribution*:   Weiss will receive 50% of the Debtor's equity distribution of $2,127,107 (the "Initial Member Distribution") plus a Contingent Member Distribution, subject to various conditions.  SA § 4(i).

- *Weiss Releases*: Weiss, in his individual capacity, along with any of his "partners, agents, employees, heirs, counsel, financial advisors, representatives, successors, and assigns, and all persons acting through, under, or in concert with any of them," will release any claims against the Debtor or the Debtor's newly created operating entities, Member , and the Trustee.  SA § 5(a).  Although the following carveout language is somewhat ambiguous, it appears intended to confirm that Goldman not be included as a releasor or released party in the Weiss Releases: "the foregoing releases described by this subparagraph do not apply to Goldman, and Goldman shall not receive a release under this paragraph."  *Id.*

- *LLC Releases*: Each of the Operating Entities and Domain release any claims against the Debtor and the Trustee.  SA § 5(b).  Again, Goldman is carved out.

- *Debtor and Trustee Releases*: The Debtor and Trustee release any claims against Weiss, Domain, and the Operating Entities—but not Goldman.  SA § 5(c)-(d).

27.    Since the Hotel opened in 2016, the Hotel venture has used the internet domain "www.thewilliamvale.com" (the "Domain Name").  *See, e.g.*, Vogue France, "Our 5 favorite new hotels in New York" (Sept. 8, 2017), *available at* https://www.vogue.fr/lifestyle/travel/diaporama/fwss18-new-hotels-new-york-fashion-week/45757.  Although Weiss has not shared the details of the Domain Name's history with Goldman, publicly available information reflects that the Domain Name has been owned since at least August 2016 by William Vale Hotel DE LLC (an entity intended to replace WV Hotel as part of a Hotel-related potential financing and 50% co-owned by Goldman and Weiss) and associated with Chaim Kohn, the CEO of an information technology consulting company upon which Weiss relied in managing the Hotel.  Moskowitz Decl. Ex. 10 (Domain Name History).  The Domain Name's publicly

12

available history also reflects that its ownership changed hands in August 2023, though the new owner is unknown. *Id.*

28.    The Debtor represents that Domain owns the Domain Name.  Disclosure Statement at 10; Settlement Agreement § 4(d).  However, according to the New York Department of State, Domain was incorporated *just weeks before the Settlement Agreement*, on March 14, 2024.  Moskowitz Decl. Ex. 11 (Domain Search Results).

29.    In any event, the Domain Name's value derives from its use of the Hotel trademark, which was an asset of Goldman's and Weiss's joint Hotel venture, owned by WV Hotel at the time of the 2017 refinancing and Lease.  *See generally* Moskowitz Decl. Ex. 12 (Trademark Security Agreement).

30.    To Goldman's knowledge, the Debtor made little or no inquiry regarding Weiss's authority to enter into the Settlement Agreement or to unilaterally convey assets such as the Domain Name before reaching an agreement with Weiss.

**D.  The Plan.**

31.    The Plan references and incorporates the Settlement Agreement.  Plan § 5.2.  Although the Plan does not expressly so state, Debtor's counsel has advised that approval of the Settlement Agreement is a condition to effectiveness of the Plan.

32.    The Plan contains broad exculpation provisions that extend well beyond estate fiduciaries.  In particular, Plan § 10.7(a) provides exculpation for the following "Exculpated Parties": "(a) the Debtor; (b) the Plan Administrator; (c) the Notes Trustee and its representatives and advisors; (d) the Series C Noteholders and their representatives and advisors; (e) any current director, manager or officer of the Debtor; (f) any advisors retained by the Debtor in connection with the Chapter 11 Case; and (g) with respect to each of the foregoing Persons in clauses (a) through (f), only such Entity

13

or Person's representatives and advisors, in each case in their capacity as such, who

served as estate fiduciaries in the Chapter 11 Case." Plan § 10.7(a) releases the

Exculpated Parties from all liabilities from the Petition Date to the Effective Date in

connection with the Chapter 11 Case, the Sale process, closing of the Sale, the Disclosure

Statement, the Plan Administration Agreement, the Plan formulation, negotiation,

confirmation, and consummation, or any transactions in furtherance of the foregoing—

which would include the Settlement Agreement.

33.     Plan § 10.7(b) further exculpates the "Additional Exculpated Parties": (a)

Zelig Weiss; (b) Wythe Berry LLC; (c) The William Vale Hotel LLC; (d) The William

Vale FNB LLC; (e) North 12 Parking LLC; (f) The William Vale Staffing LLC; (g)

TWV Domain LLC; (h) Espresso Hospitality Management LLC; (i) any current or former

director, manager, officer, or employee of the entities listed in subparagraphs (b) through

(h) above; and (j) any counsel or other advisors representing any of the forgoing in

connection with the Settlement Agreement or the Chapter 11 Case (provided, however,

that for the avoidance of doubt, Yoel Goldman shall not be included in the foregoing

definition). Plan § 10.7(b) releases the Additional Exculpated Parties from all liabilities

from the Petition Date to the Effective Date in connection with the Settlement

Agreement.

### THE SETTLEMENT AGREEMENT AND PLAN § 10.7 ARE UNLAWFUL

**A. The Settlement Agreement Conveys Goldman's Property Without His Consent in Violation of  Standing AAA Panel Orders and the Goldman Entities' Operating Agreements.**

34.     Goldman is 50% owner of the Goldman Operating Entities, all of which

he co-founded with Weiss to operate the Hotel venture. *See* State Court Action Dkt. #79

(WB Operating Agreement) § 8; Moskowitz Decl. Exs. 1-3 § 8.  As such, Goldman has a

right to any proceeds generated from them, whether through operations or the sale of assets. While the Entities' operating agreements vary slightly, each essentially provides for a distribution of their "cash receipts" "from whatever source derived" to their members based on varying allocations. *Id.* (distribution based on members' percentage interests); *see* State Court Action Dkt. #80 at 29 (Fifth Amendment) ¶ 6 ("cash receipts derived from the operations of the Company . . . and other revenues generally classified as income," with distributions based on their capital contributions and other factors).

35.    Besides providing distribution rights, the operating agreements also require joint written approval by Goldman and Weiss for any "Major Decisions" regarding the Hotel venture. These include taking actions that affect the "terms and conditions of any agreement between the [Goldman Operating Entity] and the Affiliate of any Member" or taking "any action which has a disproportionate effect" on either of them. State Court Action Dkt. #80 at 29 (Fifth Amendment) at Schedule 1; Moskowitz Decl. Exs. 1-3 at Schedule 1. Because it was long-ago apparent that Weiss was seeking to negotiate with the Debtor and violate these provisions, the AAA panel issued two injunctions—which remain in force today—enjoining Weiss from "engaging in unilateral Major Decisions as expressly prohibited in the [WB] Operating Agreement," "from making any transfer out of the accounts" of the Goldman Operating Entities that are not for their exclusive benefit without Goldman's "express written consent," and from "directly or indirectly" obtaining any "interest in the William Vale Hotel *or its assets*." Moskowitz Decl. Ex. 7 (Emergency Interim Award); Dkt. #171 Ex. A (Procedural Order No. 1) at 2-3 (emphasis added). If the Court were to approve the Settlement Agreement in its current form (and then release such conduct through the Plan exculpation

provisions), this would authorize Weiss to do exactly what the Goldman Operating

Entities' operating agreements and AAA orders prohibit, in violation of Goldman's

ownership interests: enter into agreements with Weiss's affiliates through the Debtor's

bankruptcy to disproportionately impact Goldman.

36.    *First*, Weiss is undertaking several Major Decisions on behalf of the

Goldman Operating Affiliates without Goldman's required written consent:

- Weiss impacts the "terms and conditions of an agreement between [the Goldman Operating Entities] and an Affiliate of [Weiss / Goldman]"—which includes all the Operating Entities party to the Settlement Agreement—by signing the Settlement Agreement on behalf of the Goldman Operating Entities;

- Weiss "employ[s] the funds or assets" of the Goldman Operating Entities in a manner not for their "exclusive benefit" by terminating the Lease, releasing claims on behalf of the Goldman Operating Entities against the Debtor Releasors/Releasees and Trustee, and selling assets including those co-owned by the Goldman Operating Entities from the Hotel venture operation—the Domain Name, the Social Media Accounts, FNB's liquor license, and the furniture, fixtures, and equipment referenced in the FF&E Agreement—all for which he is receiving more than $4 million; and

- These actions have a "disproportionate effect" on Goldman—who receives nothing at all—while prejudicing his rights and claims under the Goldman Operating Entities' respective operating agreements.  State Court Action Dkt. #80 at 29 (Fifth Amendment) at Schedule 1; Moskowitz Decl. Exs. 1-3 at Schedule 1.

37.    *Second*, the Settlement Agreement violates the AAA orders because, as

noted above, Weiss is impermissibly "engag[ing] in unilateral Major Decisions" on

behalf of WB "as expressly prohibited by the [Fifth Amendment]."  Moskowitz Decl. Ex.

7 (Emergency Interim Award) at 3.  Additionally, Weiss purports to pay the

approximately $8.5 million Cash Settlement Payment primarily from WB and WV Hotel,

thereby making impermissible "transfer[s] out of the [Goldman Operating Entities']

accounts."  *Id.*; SA §§ 4(a)-(b).  Weiss also impermissibly enters into a "receipt of

16

interest" in the Hotel's "assets" by receiving more than $4 million.  Dkt. #171 Ex. A

(Procedural Order No. 1) at 2-3.

38.    In particular, the circumstances of the Domain Name should have been
highly suspicious to the Debtor and appear to be an attempted end-run around Goldman's
claim to $1.3 million.  As noted above, in 2016 the Domain Name was owned by William
Vale Hotel DE LLC, an entity wholly owned by WV Hotel (which is co-owned by
Goldman and Weiss).  *See supra* ¶¶ 27-28.  Weiss unilaterally transferred the Domain
Name in August 2023, and the Domain Name was ultimately transferred to Domain—
which was first created on March 14, 2024, shortly before the Debtor and Weiss finalized
the Settlement Agreement.  *Id.*  All of this occurred without Goldman's knowledge or
consent, and the Debtor should have asked—before entering into the Settlement
Agreement—about the provenance of intellectual property it was paying $1.3 million to
acquire.  Even the signature line for Domain in the Settlement Agreement does not
contain a typewritten name, but rather only an illegible signature.[3]

39.    To the extent Weiss argues that—notwithstanding the aforementioned
ownership history—the Domain Name is an asset he somehow held separately from his
joint interests in the Hotel venture, that argument is without any basis.  The Hotel has
been using the Domain Name since its inception, it is the portal through which
reservations are made, and it is plainly an asset covered by the purpose set forth in WB's
operating agreement: to "operate and develop" the Hotel.  *See* State Court Action Dkt.

---

[3] Perhaps this is why the Settlement Agreement includes cautious language wherein the Operating Entities waive "all rights, title and interest in and to the existing content on the website associated with the Domain Name."  SA § 4(d).

#79 (WB Operating Agreement) § 3.  The argument is no more credible than an assertion

that Weiss owns the front desk of the Hotel and can market it for sale separately.

40.    Other elements of the $4 million in consideration flowing to Weiss are

likewise problematic.  The Debtor has never disclosed the terms of the FF&E Purchase

and Sale Agreement under which Weiss is transferring the liquor license, furniture,

furnishings, and equipment away from WV Hotel and FNB, so not only is Weiss

transferring assets 50% owned by Goldman, but he is doing so without even disclosing

their sale price.

41.    Similarly, the Debtor provides no details on the purported "consulting

services" justifying a $200,000 payment beyond generically "implementing the transition

of the operation, direction, management and supervision of the Hotel," and no basis for

the purported value of these services, which further suggests that the payment is merely

another vehicle to deliver value to Weiss on account of his relinquishing property and

claims co-owned by Goldman.  SA § 4(e).

42.    The $2,127,107 Initial Member Distribution (plus the Contingent Member

Distribution) is also a method to deliver money to Weiss that should belong equally to

Goldman under the Goldman Operating Entities' operating agreements; as the Debtor

makes no representation about the basis for these payments, SA § 4(b), it is fair to assume

the payments are (at least in part) in exchange for Goldman's property and for

relinquishing the Goldman Operating Entities' claims.

43.    In effect, Weiss is using millions of dollars of Goldman's property to

obtain from the Debtor and other parties releases for himself and his related parties, in

18

addition to enriching himself through $4 million that goes straight to him or entities he currently controls, all without Goldman's consent, and with Goldman receiving nothing.

44.     This Court should not allow the Debtor to enter into a settlement that (i) violates two orders of an arbitration panel and addresses rights that are the subject of proceedings before the panel and state court; (ii) allows Weiss to use property owned by Goldman to pay for the settlement, in violation of multiple operating agreements; and (iii) as explained below, attempts to deprive Goldman of any recourse for these actions.

**B.  The Settlement Agreement and Plan § 10.7 Violate Bankruptcy Code Section 1129(a)(3) Because They are Unlawful and Not Proposed in Good Faith.**

45.     Section 1129(a)(3) requires the Court to find that "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The plan proponent bears the burden of establishing compliance with Section 1129(a).  *In re Ditech Holding Corp.*, 606 B.R. 544, 571-72 (Bankr. S.D.N.Y. 2019).

46.     An inquiry into good faith under section 1129(a)(3) must take into account the totality of the circumstances surrounding the plan.  *In re Quigley*, 437 B.R. 102, 125 (Bankr. S.D.N.Y. 2010) (citations omitted); *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("The good-faith test means that the plan was proposed with honesty and good intentions.").  In other words, Section 1129(a)(3) imposes a strict mandate for process and methodology.  *See Quigley*, 437 B.R. at 125 (Section 1129(a)(3) "speaks more to the process of plan development than to the content of the plan.").

47.     Here, the Settlement Agreement and Plan were proposed by "means forbidden by law," as explained in Paragraphs 34-44, *supra.*  The terms and process of the Settlement Agreement and Plan also belie that they were proposed in good faith.

Instead, they reveal an attempt to deliver value to Weiss by misappropriating Goldman's

property, and then free Weiss from the claims he would otherwise face for doing so.

48.    The Debtor is well aware that Goldman and Weiss co-own the Goldman

Operating Entities.  *See* Disclosure Statement at 3 (noting that Goldman and Weiss "each

have a 50% interest" in "the commercial office space, the garage, and the Hotel").  The

Debtor is also well aware of the Arbitration, as Goldman and Weiss have submitted

multiple letters regarding the Arbitration, attached multiple orders by the Arbitration

panel, and discussed the Arbitration in open court.  *See, e.g.*, Dkt. ##171, 176, 182.  A

minimal level of diligence would confirm that the AAA panel's orders and the operating

agreements of all the Goldman Operating Entities bar Weiss from entering the Settlement

Agreement without Goldman's consent.  *See* Paragraphs 34-37, *infra*.  But the Debtor

apparently disregarded all of this and entered into the Settlement Agreement anyway,

either based on representations made by Weiss or because it takes the position that these

other proceedings do not present a legal obstacle.  Whether the Debtor is intentionally

taking Goldman's property or burying its head in the sand to settle with Weiss, the fair

process required by Section 1129(a)(3) was not satisfied.

49.    This point is confirmed by (i) the dubious circumstances surrounding the

$1.3 million Domain Name transfer; (ii) the lack of transparency regarding the $200,000

payment for purported consulting services rendered by Espresso, (iii) the undisclosed

amount for FNB's liquor license, furniture, furnishings, and equipment, and (iv) the 50%

of the $2,127,107 (the "Initial Member Distribution") plus the indeterminate Contingent

Member Distribution.  *See* Paragraphs 38-43, *supra*.  *First*, a few minutes of internet

searching shows that the Domain Name was operating since the Hotel opened in 2016,

and, as described above, cannot be lawfully owned by Domain—which was incorporated

on March 14, 2024—unless Weiss transferred it recently and surreptitiously.  *See*

Moskowitz Decl. Ex. 10 (Domain Name History); *id.* Ex. 11 (Domain Search Results).

Apparently this was too much diligence for the Debtor.  The Debtor also offers no

evidence or analysis supporting the $1.3 million price for the Domain Name, which is

facially unreasonable[4], particularly given the Domain Name is valueless without the

Hotel trademark owned by WV Hotel[5].  *Second*, the Debtor provides no details on the

purported consulting services beyond generically "implementing the transition of the

operation, direction, management and supervision of the Hotel," and no basis for the

purported value of these services.  SA § 4(e).  *Third*, the Debtor does not even identify

the amount it will pay Weiss for the liquor license, furniture, furnishings, and equipment

owned by an entity 50% owned by Goldman—as the Debtor has not disclosed the terms

of the FF&E Agreement.  *Fourth*, the Debtor offers no detail for the basis of the Initial

Member Distribution plus the indeterminate Contingent Member Distribution to Weiss;

given that the assets the Debtor receives under the Settlement Agreement are at least 50%

owned by Goldman, as noted above, these distributions are plainly another channel to pay

Weiss for Goldman's property and claims.

---

[4] Even the heavily trafficked "www.hotels.com" (currently 69 million monthly unique visitors) sold for only $2.2 million in 2015.  Andrew Allemann, *Booking.com buys .Hotels domain name for $2.2 million*, Domain Name Wire (Nov. 18, 2015), https://domainnamewire.com/2015/11/18/booking-com-buys-hotels-domain-name-for-2-2-million/; "Reach an active audience of frequent travelers," Expedia Group Media Solutions, https://advertising.expedia.com/getting-started/brands/hotelscom/.

[5] The Debtor also offers no evidence or analysis for its representation that the Social Media Accounts are worth $45,000.  SA § 4(c).  The Social Media Accounts are owned by WV Hotel (*id.*), but this does not stop the Debtor from taking them without Goldman's consent as a "non-cash settlement payment."

50.    Despite finalizing a Plan provision that seeks to exculpate Weiss and the Goldman Entities from a Rent Action where Goldman is a party and negotiating a Settlement Agreement disposing of Goldman's property since "late 2023" (Mot. at 8), the Debtor excluded Goldman from any negotiations and only contacted him after finalizing the agreement with Weiss.  Under the circumstances, the Plan and Settlement Agreement incorporated within it do not satisfy Section 1129(a)(3).

### C.  The Settlement Agreement and Plan § 10.7 Are Subject to Heightened Scrutiny Because Weiss Is a Statutory Insider of the Debtor.

51.    The Court should apply heightened scrutiny to the Settlement Agreement and Plan exculpation clauses because Weiss is a statutory insider of the Debtor.  An attempt "to give favorable treatment to an insider is violative of § 1129(a)(3)'s good faith requirement."  *In re Future Energy Corp.*, 83 B.R. 470, 487 (Bankr. S.D. Ohio 1988).  Under Bankruptcy Code Section 101(31)(E), the term "insider" includes (i) an "affiliate" and (ii) an "insider of an affiliate as if such affiliate were the debtor."  In other words, an affiliate of the debtor's affiliate is an insider.  *E.g.*, *In re Lull*, No. ADV. 08-90074, 2009 WL 3853210, at *3 (Bankr. D. Haw. Nov. 17, 2009) (holding that an individual who held 50% of the membership interests of an LLC which was an affiliate of the debtor was himself an insider of the debtor).  Weiss is an insider of the Debtor for multiple reasons.

52.    *First*, Weiss is an insider of the Debtor because he is an affiliate of its affiliate WB Member.  WB Member is an affiliate of the Debtor because it is an "entity" that "directly or indirectly owns, controls, or holds with power to vote" more than "20 percent or more of the outstanding voting securities of the debtor."  11 U.S.C. §

22

101(2)(A).[6]  LLCs are treated equally to corporations, as the term "corporation" includes

any "unincorporated company or association." 11 U.S.C. § 101(9)(A)(iv); *see, e.g.*, *In re*

*Barman*, 237 B.R. 342, 348 (Bankr. E.D. Mich. 1999) (holding that an LLC was

analogous to a corporation for purposes of determining insiders); *In re Brooke Corp.*, 506

B.R. 560, 571 (Bankr. D. Kan. 2014) (same).  As WB Member is the sole member of the

Debtor, Disclosure Statement at 3, it is therefore its affiliate.  And because Weiss is 50%

owner of WB Member, Disclosure Statement at 3, he is an affiliate of WB Member and

therefore an insider of both WB Member and the Debtor under § 101(31)(E).

53.      *Second*, Weiss is an insider of the Debtor because he is an affiliate and an

insider of Debtor affiliate WB.  WB is the Debtor's affiliate because it operates

"substantially all of the property of the debtor under a lease."  11 U.S.C. § 101(2)(D).

And Weiss is an insider of WB LLC because (i) as its 50% owner (with Goldman) he is

WB's affiliate under § 101(2)(A), or alternatively (ii) he exercises plenary control over

WB LLC under § 101(31)(B)(iii).

**D.  Plan § 10.7 Violates Sections 1123(b)(6), 1129(a)(1), and 1129(a)(3) of the
Bankruptcy Code Because It Contains Non-Consensual Third-Party
Releases.**

54.      Section 1123(b)(6) provides that a plan may only include "any other

appropriate provision not inconsistent with the applicable provisions of this title," and

Section 1129(a)(1) authorizes the Bankruptcy Court to confirm a plan only when it

"complies with the applicable provisions of [the Bankruptcy Code]."  And as noted,

Section 1129(a)(3) requires the Court to find that "[t]he plan has been proposed . . . not

by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  As with Section 1129, the plan

---

[6] An "entity" includes a "person", and "person" includes "individual, partnership, and
corporation."  11 U.S.C. §§101(15), (41).

23

proponent bears the burden of establishing compliance with Section 1123.  *In re Majestic Liquor Stores, Inc.*, No. 10-43849-RFN11, 2010 WL 6982615, at *3 (Bankr. N.D. Tex. June 6, 2010).

55.    The Bankruptcy Code and applicable case law limit a debtor's ability to include exculpation and third-party releases in a plan.  This Court has explained that "exculpation provisions (and their first cousins, so-called 'third party releases') are permissible under some circumstances but not as a routine matter." *In re Chemtura Corp.*, 439 B.R. 561, 610-11 (Bankr. S.D.N.Y. 2010).  Both exculpation provisions and third-party releases are evaluated under the factors set forth in *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005), as updated by *In Re Purdue Pharma L.P.*, 69 F.4th 45, 77 (2d Cir.), *cert. granted sub nom. Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 44 (2023).  *See, e.g.*, *In re Bally Total Fitness of Greater New York, Inc.*, No. 07-12395 (BRL), 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) (finding that plan exculpation provisions "satisfy the applicable standards contained in [*Metromedia*]").

56.    Here, the exculpation provisions grant broad, nonconsensual third-party releases to a long list of non-estate fiduciaries:

- Plan § 10.7(a) releases the Notes Trustee and Series C Noteholders (and their representatives and advisors) from all liabilities "for any conduct occurring on or after the Petition Date and up to and including the Effective Date in connection with or arising out of the filing and administration of the Chapter 11 Case, the Sale process, closing of the Sale; the Disclosure Statement, the Plan Administration Agreement, including the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation, and consummation thereof, the Plan . . . the occurrence of the Effective Date . . . or the transactions in furtherance of any of the foregoing . . . except for acts or omissions of an Exculpated Party that constitute gross negligence, fraud, or willful misconduct, in each case as determined by a Final Order."

24

- Plan § 10.7(b) releases the Additional Exculpated Parties from all
  liabilities "for any conduct occurring on or after the Petition Date
  and up to and including the Effective Date in connection with or
  arising out of the Settlement Agreement, including the formulation,
  negotiation, preparation, dissemination, implementation,
  administration, confirmation, and consummation thereof or the
  transactions in furtherance of any of the foregoing; except for acts
  or omissions of an Additional Exculpated Party that constitute
  gross negligence, fraud, or willful misconduct, in each case as
  determined by a Final Order."

57.    In other words, Plan § 10.7 purports to cut off Goldman's claims and

defenses against non-debtor fiduciaries (i) the Notes Trustee and Series C Noteholders

(and their representatives and advisors) for conduct related to the Sale, Disclosure

Statement, Plan Administration Statement, and Plan from the Petition Date to the

Effective Date, and (ii) Weiss and many other Additional Exculpated Parties (and their

representatives and advisors) for conduct related to the Settlement Agreement—which

would potentially include the Arbitration and State Court Action.[7]  For the reasons set

forth below, these provisions cannot meet the Second Circuit's stringent requirements for

nonconsensual third party releases, which means the Debtor cannot meet its burden of

showing that the releases comply with Bankruptcy Code Sections 1123(b)(6) and 1129.

58.    A release of claims held by non-debtors against other non-debtors is a

"dramatic measure to be used cautiously" in "truly unusual circumstances" because it

"may operate as a bankruptcy discharge arranged without a filing and without the

safeguards of the Code." *Metromedia*, 416 F.3d at 141, 143 (2d Cir. 2005) (citation

omitted).  "[T]hird-party releases are not a merit badge that somebody gets in return for

making a positive contribution to a restructuring."  *Purdue*, 69 F.4th at 77-78.  The

---

[7] For the avoidance of doubt, Goldman does not object to the portion of Plan § 10.7(a) which
exculpates the Debtor and its fiduciaries such as the Plan Administrator, "any current director, manager, or
officer of the Debtor, and "any advisors retained by the Debtor in connection with the Chapter 11 Case."

25

Second Circuit has set forth seven factors for evaluating non-fiduciary, nonconsensual

third-party releases, "remain[ing] conscious of the heightened potential for abuse posed

by such releases." *Id.* Accordingly, even if all factors are present, there may be instances

where such releases should not be approved. *Id.* at 77-79. The factors are as follows: (i)

whether there is identity of interests between debtor and released third parties, such that

suit against a non-debtor is essentially against the debtor, or will deplete assets of the

estate, (ii) whether claims against debtor and nondebtor are factually and legally

intertwined, including whether the debtor and released parties share common defenses,

insurance coverage, or levels of culpability, (iii) whether the scope of releases is

"necessary to the Plan," (iv) whether the releases are "essential to reorganization, in that

the debtor needs claims to be settled in order for the res to be allocated, rather than

because the released party is somehow manipulating the process to its own advantage,"

such that, "without the releases, there is little likelihood of plan's success," (v) whether

the non-debtor contributed substantial assets to reorganization, (vi) whether the impacted

class of creditors "overwhelmingly" voted in support of plan with releases, and (vii)

whether the plan provides for fair payment of enjoined claims. *Id.* at 78-79.

     59.    As a procedural matter, this Court does not have constitutional authority to

finally approve Plan § 10.7 because the releases do not stem "from the bankruptcy itself"

and "would [not] necessarily be resolved in the claims allowance process," and are

therefore "non-core under *Stern v. Marshall*." *Purdue*, 69 F.4th at 68 (citing *Stern*, 564

U.S. 462, 471, 499 (2011)). Accordingly, the Court is required to submit "proposed

findings of fact and conclusions of law to the district court, for that court's [de novo]

review and issuance of final judgment." *Id.* These must be supported by specific and

detailed findings, which "most often" requires extensive discovery into the facts of the released claims.  *Id.* at 79.

60.    In this case, every *Purdue* factor turns against Plan § 10.7(b), and the majority of *Purdue* factors turn against Plan § 10.7(a).  Moreover, the Disclosure Statement, Motion, and Ravid Declaration offer minimal insight into the settlement negotiations, and cursorily describe exculpation as "reasonable, appropriate, and in the best interests of the Debtor's estate."  Mot. at 16.  In fact, the Ravid Declaration copies most of the Motion *word for word* (or vice versa).  *Compare, e.g.*, Mot. at 2-4 *with* Ravid Decl. at 2-4.  Not only do the Settlement Agreement's negotiation history and text contradict the Debtor's representation, as addressed in Paragraphs 38-42 and 47-50, *supra.*, but the Debtor has created an insufficient record for its approval.

61.    Applying the *Purdue* factors to Plan § 10.7(b):

- *First*, Weiss and the Additional Exculpated Parties are completely separate from the Debtor—to such an extent that the Debtor has actively litigated against Weiss and the Goldman Operating Entities in the Rent Action since June 2021—and Goldman's claims against these parties will not deplete the Debtor's estate.

- *Second*, Goldman's Arbitration and State Court Action claims against Weiss are not intertwined with the Debtor, as they relate solely to Weiss's unilateral actions under the operating agreements for the Goldman Operating Entities.  Goldman's potential claims against Weiss relating to the Settlement Agreement would be similar in nature, even if the means of Weiss's contractual and fiduciary violations was an agreement with the Debtor.

- *Third* and *fourth*, the Debtor has put forward no evidence to support that Plan §
  10.7 is necessary to the Plan, such that "there is little likelihood of the plan's
  success" without the exculpation provisions. *Purdue*, 69 F.4th at 78. To the
  contrary, Plan § 10.7(b) serves little function besides purportedly insulating Weiss
  from misappropriating Goldman's property through the Settlement Agreement—
  presumably a concession Weiss bargained for in his efforts to secure a maximum
  return before the Hotel sale is complete. If "the only reason for the inclusion of
  [the] release is the non-debtor's financial contribution . . . , the release is not
  essential to the bankruptcy." *Purdue*, 69 F.4th at at 81.

- *Fifth*, similarly, the Debtor has put forward no evidence to show that Weiss
  contributed "substantial assets" to the reorganization. While the Debtor is
  receiving certain operational assets such as the FNB liquor license, furniture,
  furnishings, and equipment, the Domain Name, Social Media Accounts, and
  consulting services, the Debtor does not quantify these assets and merely asserts
  in cursory fashion that they "assist the Debtor in the planned sale of the WV
  Complex," Mot. at 2-3, and "will provide for cooperation in the sale of the WV
  Complex," Ravid Decl. ¶ 8. And while the Debtor claims that the Settlement
  Agreement resolves "potential protracted litigation," Disclosure Statement at 10,
  this minimizes that the Rent Action has already advanced through summary
  judgment with respect to WB, *id.* at 7.[8] As *Metromedia* explained, even where a
  "material contribution" to the estate was made, this cannot overcome a lack of

---

[8] The Debtor also claims that the Settlement Agreement resolves litigation "among WB, Weiss, Member LLC and [YGWV] relating to the Series C Notes, the Lease and the Chapter 11 Case," but provides no additional detail on such hypothetical litigation.

evidence that the releases were important to the Plan and their breadth was necessary to the Plan. 416 F.3d at 143.

- *Sixth*, the only relevant party-in-interest (besides the parties to the Settlement Agreement themselves) opposes the plan. The court in *In re Hal Luftig Co.* faced a similar situation, where an investor had initiated a pre-petition arbitration against the Debtor and its sole shareholder (Luftig), and received an arbitration award that the Debtor and Luftig were jointly and severally liable. 657 B.R. 704, 706-07 (S.D.N.Y. 2024). Luftig appealed the award, the Debtor filed for bankruptcy, and the bankruptcy court confirmed a plan releasing the investor's third-party claims against Luftig over the investor's objection. *Id.* The district court reversed based solely on *Purdue* factor six, explaining that as the "one affected creditor"—the investor—was "unequivocally opposed" to the plan, this should be given "controlling weight." *Id.* at 708-09. The court reasoned that the release had cost the investor "its right to pursue its claims against Luftig," a "tangible financial harm" for which "resolving these issues through a nonconsensual release with the Debtor's bankruptcy is not permissible." *Id.* Here, as in *Luftig*, the one interested party besides the parties to the settlement— Goldman—"unequivocally opposes" Plan § 10.7(b) because it adversely impacts his "right to pursue [prepetition] claims" for which he has already received favorable rulings. 657 B.R. at 708-09; Moskowitz Decl. Ex. 7 (Emergency Interim Award); Dkt. #171 Ex. A (Procedural Order No. 1).
- *Seventh*, the Plan provides for no payment to Goldman for the claims that would be released against his consent.

29

62.    As applied to Plan § 10.7(a), the *Purdue* factors support the same result because it impairs Goldman's defenses to claims the Notes Trustee and Series C Noteholders have threatened to bring against him relating to the Hotel.  Factors three, four, six, and seven are identical to the Plan § 10.7(b) analysis.  Factors one and two are aimed at assessing whether the Debtor and released third parties (here the Notes Trustee, and Series C Noteholders) share an identity of interests and common defenses such that a suit against the released third parties would effectively deplete the estate; here there is no risk of depleting the estate where Goldman seeks only to protect his ability to respond in potential litigation by the Notes Trustee and Series C Noteholders.  Regarding factor five, the Notes Trustee and Series C Noteholders contributed no assets to the reorganization besides releasing Weiss and the Operating Entities (and their representatives), but still latch onto the Debtor's exculpation.

63.    In short, application of the *Purdue* factors shows that Plan § 10.7 exhibits the exact risks that *Metromedia* and *Purdue* warned against, rather than the "truly unusual circumstances" required for approval.  *Metromedia*, 416 F.3d at 143.[9]

## THE IRIDIUM FACTORS WEIGH AGAINST APPROVING THE SETTLEMENT AGREEMENT

64.    The Second Circuit requires that a settlement proposed under Rule 9019 be fair and equitable, and has set forth the following factors courts must consider in making an independent judgment of the settlement: (i) the balance between the litigation's possibility of success and the settlement's future benefits; (ii) the likelihood of

---

[9] That Plan § 10.7 only offers exculpation "[t]o the maximum extent permitted by law" does not save it.  Even where Plans contain this language, courts define what is "permitted, and not permitted, 'under applicable law.'"  *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 266 (Bankr. S.D.N.Y. 2007).  "It would set the law on its head if parties could get around it by making a third party release a sine qua non of their deal, to establish a foundation for an argument that the injunction is essential to the reorganization, or even an important part of the reorganization."  *Id.* at 269 (internal quotations omitted).

complex and protracted litigation; (iii) whether other parties in interest support the settlement; (iv) the paramount interests of the creditors; (v) the nature and breadth of releases to be obtained by officers and directors; (vi) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; and (vii) the extent to which the settlement is the product of arm's-length bargaining. *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007). The burden is on the proponent to show that the settlement is in the best interests of the estate. *In re Kerner*, 599 B.R. 751, 755 (Bankr. S.D.N.Y. 2019) (Glenn, J.).

65.    Notably, courts in this district have applied "heightened scrutiny and some skepticism" to settlements negotiated with insiders, like this one. *In re Chassix Holdings, Inc.*, 533 B.R. 64, 70 (Bankr. S.D.N.Y. 2015); *see In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 242 (Bankr. S.D.N.Y. 2007) (while the settlement at issue was negotiated at arm's-length, the court "would give it much greater weight if [it] ever thought it had not been satisfied"); *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) (noting that the settlement was subject to "closer scrutiny" because it was negotiated with an insider and holding that "closer scrutiny of insider agreements should be added to the cook book list of factors that [c]ourts use to determine whether a settlement is fair and reasonable"). As six of the seven *Iridium* factors weigh against the Settlement Agreement, it cannot withstand heightened scrutiny and must be rejected as neither fair nor equitable.

66.    *First*, under factors six and seven, the Settlement Agreement was a product of collusion between the Debtor and Trustee on the one hand and insider Weiss on the other. The Debtor states in cursory fashion that the Settlement Agreement was

"intensely negotiated by the Parties, in good faith and from arm's length bargaining

positions," Mot. at 16, but the Settlement Agreement's text and circumstances undermine

this assertion.  *See* Paragraphs 37-42, 47-50, *supra*.  While the Parties' counsel are

experienced, in this instance they apparently did not even undertake basic diligence on

Weiss's authority bind the Goldman Operating Entities or the circumstances of Domain's

creation.  *Id.*  Put differently, the Debtor did not meet its duty "to refrain from . . . the

appearance of impropriety."  *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 669-70

(Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122 (S.D.N.Y. 2006) (quoting *In re Hampton

Hotel Invs., L.P.*, 270 B.R. 346, 362 (Bankr. S.D.N.Y. 2001).

67.     *Second*, under factor four, Goldman is the only party-in-interest not a

party to the Settlement Agreement, and he obviously opposes the Settlement

Agreement.[10]  Combined with a lack of true arm's-length bargaining, opposition from

"the only other part[y] in interest" besides the settlement parties is grounds for a court to

reject a settlement.  *In re The Present Co., Inc.*, 141 B.R. 18, 23 (Bankr. W.D.N.Y. 1992).

68.     *Third*, under factor 5 regarding the breadth of releases, while Goldman

objects to the "exculpation provided to the Parties for entry into the Settlement," Mot. at

16, for the reasons discussed in Paragraphs 54-63.

69.     *Fourth*, under factors one and two, the balance between the settled

litigation's probability of success and expensive, protracted litigation should not be given

much weight here.  While the Debtor touts the settlement of the Rent Action, Mot. at 14,

this omits that the U&O Order and Partial Summary Judgment Order effectively

---

[10] The Debtor misstates that "the Settlement Agreement is supported by WB, and the other
settlement Parties."  Mot. at 15.  To the contrary, WB and the other Goldman Operating Entities have no
authority to support the Settlement Agreement without Goldman's written consent.  *See* Paragraphs 34-37,
*supra*.

concluded the Rent Action against WB by declaring the Lease terminated as of May 20,

2021, holding WB liable to the Debtor for its breach of the Lease, and dismissing WB's

counterclaims and affirmative defenses, Settlement Agreement at 4.  The Debtor also

references (i) "potential additional litigation among the Parties related to the Adversary

Proceeding" and (ii) "litigation concerning the Debtor's and/or Weiss'/WB's respective

liability for mechanic's lien obligations."  Mot. at 14-15.  But the Debtor (i) provides no

additional detail on this purely hypothetical "potential additional litigation" and (ii) does

not explain how the Debtor assuming mechanic lien claims filed against the Debtor in its

bankruptcy, *id.* at 10, is atypical or would be lengthy or expensive.  This is hardly

sufficient to "inform" the court of "all facts necessary for an intelligent and objective

opinion of the probabilities of ultimate success should the claim be litigated."  *Kerner*,

599 B.R. at 755.

  70. The Debtor asserts that factor three (the paramount interests of creditors)

is satisfied because the estate will benefit by receiving more than $8 million from WB,

efficiently transferring Hotel operational assets like the Domain Name, Social Media

Accounts, and liquor license and FF&E to assist the Hotel sale, and resolving the

litigation addressed above.[11]  This is true as far as it goes—after all, it is obviously a good

deal for the Debtor to obtain Goldman's property while not paying him anything for it.

However, given that the *Iridium* factors are aimed at determining whether a settlement is

"fair and equitable," factor three cannot overcome the remaining six where the settlement

is so patently unfair and inequitable for a party-in-interest – Goldman.  *See Ditech*

*Holding Corp.*, 606 B.R. at 624-25 (rejecting a global settlement which satisfied the

---

[11] The Debtor provides no support for characterizing factor three as "arguably the most important" factor.  Mot. at 14.

*Iridium* factors but did not attempt to resolve issues with certain creditors who "did not negotiate the settlement let alone agree to it). Notably, while the Debtor states that the Settlement will "allow[] the Debtor to more efficiently sell the William Vale Hotel," Mot. at 14, the Debtor never represents that the Settlement is *necessary* for the sale.

### <u>GOLDMAN HAS STANDING TO RAISE THESE OBJECTIONS</u>

71.    Under Section 1109(b), any "party in interest" may object to a Rule 9019 motion to approve a settlement. The Bankruptcy Code does not define "party in interest," but this Court has construed the term to apply to parties that have "a pecuniary interest . . . directly affected by the bankruptcy proceeding." *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 74 (Bankr. S.D.N.Y. 2009) (finding standing where Rule 9019 motion objectors had a "direct interest in the escrow account from which the Settlement is proposed to be funded"); *see also In re Remsen Partners, Ltd.*, 294 B.R. 557, 563 (Bankr. S.D.N.Y. 2003) (rejecting argument that objector did not have standing because it would not be entitled to any recovery if the settlement were approved, and holding that even if Section 1109(b) did not provide standing, the objector had standing because it was "aggrieved" by the proposed settlement).[12]  For all the reasons explained above, it cannot be disputed that Goldman has a direct pecuniary interest in the Settlement Agreement and Plan exculpation provisions which would together misappropriate his property and release his claims and defenses in ongoing and threatened litigation.

---

[12] For example, non-creditors may still object to a Rule 9019 motion as parties-in-interest because "[i]t would be absurd to provide in a plan for retention by the court of jurisdiction, for example, to hear and determine all controversies . . . and disputes that may relate to, impact upon, or arise in connection with the Plan and yet disenfranchise those whom that retained jurisdiction is intended to protect." *In re Mirant Corp.*, 348 B.R. 725, 733 (Bankr. N.D. Tex.)  (internal quotations omitted).

## THE SETTLEMENT AGREEMENT AND PLAN § 10.7 SHOULD BE REVISED TO PROTECT GOLDMAN'S RIGHTS

72.    Although he is aggrieved by the settlement, Goldman does not wish to stand in the way of Plan confirmation.  In Exhibit 13 to the Moskowitz Declaration, Goldman proposes modifications to the exculpation provisions that, if accepted, would resolve his objection to those provisions of the Plan.  In addition, Goldman proposes that the Settlement Agreement be revised to place all money being paid to Weiss and/or any entities under his control into escrow until the Arbitration is completed and a final order is issued by the appropriate tribunal with jurisdiction to address each party's rights.

73.    These compromises would allow the Plan to go effective while respecting Goldman's legal and property rights.  Goldman also welcomes the opportunity to negotiate with any of the parties—the Debtor, Weiss, the Notes Trustee, the Series C Noteholders and/or the Purchaser itself—to reach a consensual resolution.

## RESERVATION OF RIGHTS

74.    This Objection is based on the facts presented by the Debtor to date.  To the extent the Debtor raises additional facts in connection with the Plan confirmation hearing and/or Motion hearing, Goldman reserves the right to supplement this Objection.

## NOTICE

75.    Notice of this response shall be given to: (i) the Office of the United States Trustee; (ii) counsel to Mishmeret; (iii) counsel to the Debtor; (iv) counsel to Weiss; and (v) all parties who appeared and requested notice and service in this Chapter 11 Case.

WHEREFORE, Goldman respectfully requests that the Court enter an order denying confirmation of the Plan and approval of the Settlement Agreement, and such other and further relief as it deems just and proper.

Dated:   New York, New York
         May 8, 2024

By:  _/s/ Elliot Moskowitz_____
Elliot Moskowitz
Chase McReynolds

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York  10017
(212) 450-4000

*Attorneys for Yoel Goldman*