UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------- X
                                                        :
In re                                                   :   Chapter 11
                                                        :
WYTHE BERRY FEE OWNER LLC,                              :   Case No. 22-11340 (MG)
                                                        :
              Debtor.¹                                  :
                                                        :
                                                        :
------------------------------------------------------- X
```

**DECLARATION OF ASSAF RAVID IN FURTHER SUPPORT OF (I) THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF WYTHE BERRY FEE OWNER LLC AND (II) DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENT PURSUANT TO BANKRUPTCY RULE 9019**

I, Assaf Ravid, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1. I submit this declaration in further support of the Debtor's (i) Third Amended Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC (the "Third Amended Plan") [Dkt. No. 340] and (ii) Debtor's *Motion for Entry of an Order Approving Settlement Agreement Pursuant to Bankruptcy Rule 9019* ("Settlement Motion") [Dkt. No. 304] and in response to *Objection of Yoel Goldman to the (1) Second Amended Plan of Reorganization of Wythe Berry Fee Owner LLC and (2) Debtor's Motion for Entry of an Order Approving Settlement Agreement Pursuant to Bankruptcy Rule 9019* ("Objection") [Dkt. No. 330].[2]

2. I previously submitted: (i) a declaration, pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York, to apprise the Court and other parties in

---

[1] The Debtor's principal offices are located at The William Vale Hotel, 111 N. 12th Street, Brooklyn, NY 11249. The last four digits of the Debtor's federal tax identification number are 9776.

[2] Capitalized terms used herein, if not separately defined, have the meanings assigned to such terms in the Third Amended Plan, the Settlement Motion, and/or the Third Amended Disclosure Statement [Dkt. No. 339].

interest of the circumstances that compelled the commencement of the Debtor's case under the Bankruptcy Code [ECF No. 68]; (ii) a declaration in support of the Settlement Motion [ECF No. 304, Ex. B]; and (iii) a declaration in support of the Third Amended Plan [Dkt. No. 336], each which is incorporated herein by reference. In addition, the on May 10, 2024, the Debtor filed the *Notice of Filing of Plan Supplement* [Dkt. No. 335], which includes a form Plan Administration Agreement attached thereto as Exhibit A. As reflected in the Plan Administration Agreement, I am the Plan Administrator of AYH Wind Down [Dkt. No. 335, Ex. A].

3. Because I am both an authorized manager of the Debtor and the Plan Administrator of AYH Wind Down, and for the sake of efficiency, I submit this declaration in two parts based on my roles with each of the Debtor and AYH Wind Down: **Part A**, beginning on page 4 hereof, and **Part B**, beginning on page 13 hereof.

4. Except as otherwise indicated herein, the facts set forth in **Part A** of this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the other individuals working under my supervision, information provided to me by the Debtor's professional advisors working under my direction, or my opinion based upon experience, knowledge, and information concerning the Debtor. I am authorized to submit **Part A** of this Declaration on behalf of the Debtor. If called upon to testify, I would testify competently to the facts set forth in **Part A** of this Declaration.

5. Except as otherwise indicated herein, the facts set forth in **Part B** of this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the other individuals working under my supervision, information provided to me by AYH Wind Down's professional advisors working under my direction, or my opinion based upon experience, knowledge, and information concerning AYH Wind Down. I am authorized to submit

**Part B** of this Declaration on behalf of the AYH Wind Down. If called upon to testify, I would testify competently to the facts set forth in **Part B** of this Declaration.

*[Remainder of Page Intentionally Left Blank]*

## PART A

**Settlement Negotiations and Weiss's Authority**

6.  In December 2023, the Debtor, the Notes Trustee and Weiss commenced negotiations that resulted in the Settlement Agreement. Each of the parties, all of whom were represented by experienced counsel, had individual and sometimes conflicting goals; there was concrete adversity among the parties, resulting in arms'-length negotiations. No party achieved all its goals and each party made compromises. Those negotiations culminated in the Settlement Agreement dated April 19, 2024, as now amended and restated on May 10, 2024.

7.  On February 15, 2024, Goldman's counsel asked the Debtor's counsel whether the newly announced Purchaser had any connections to Weiss and whether the Debtor had settled with Weiss. A true and correct copy of the February 15, 2024 email from Goldman's counsel to the Debtor is attached hereto as **Exhibit A**. The Debtor's counsel responded that day, confirming the Purchaser had no connections to Weiss, and further advising that while the Debtor believed it had reached an agreement in principle with Weiss, the agreement was not yet final.

8.  On April 10, 2024, after settlement negotiations concluded but before the Settlement Agreement was filed with the Court, Debtor's counsel sent Goldman's counsel a near-final draft of the Settlement Agreement. A true and correct copy of the April 10, 2024 email from Debtor's counsel to Goldman's counsel is attached hereto as **Exhibit B**. That transmission was followed by a phone call on April 16, 2024 to explore whether Goldman wished to become party to the Settlement Agreement. In that conversation, Goldman's counsel raised all the issues later reflected in his Objection. After that call, Debtor's counsel conveyed all of Goldman's concerns to Weiss and the Notes Trustee. A true and correct copy of the April 17, 2024 email from Debtor's counsel to Weiss and the Notes Trustee is attached hereto as **Exhibit C**.

9. On April 16, 2024, Goldman's counsel sent Debtor's counsel an email memorializing his objections. A true and correct copy of the April 16, 2024 email from Goldman's counsel to Debtor's counsel is attached hereto as **Exhibit D.**

10. On May 2, 2024, Debtor's counsel conferred by phone with Goldman's counsel to continue to explore settlement. While those negotiations were unsuccessful, that history further refutes Goldman's contention that he was frozen out.

11. Similarly refuted by the record is Goldman's challenge to the Settlement Agreement that the Debtor failed to conduct adequate due diligence concerning Weiss's authority to enter into the Settlement Agreement and cause Wythe Berry LLC ("WB"), WV Hotel, William Vale FNB LLC ("WV FNB"), and North 12 Parking LLC ("Parking") (collectively, "WV LLCs") to become parties thereto. A true and correct copy of the Fifth Amendment to the Limited Liability Company Agreement of WB is attached hereto as **Exhibit E**.

12. Goldman cites the "Major Decisions" clauses of the limited liability company agreements for the WV LLCs, arguing that Weiss's entry into the Settlement Agreement violates those clauses and that the Debtor failed to do due diligence regarding that issue. This is false. The Debtor was well aware of and discussed the Major Decisions clause issue with Weiss and his counsel during the Settlement Agreement negotiations. Thus, Goldman's ill-taken charges of misfeasance are belied by the record.

The Arbitral Panel Decisions Do Not Bar Weiss from Entering into the Settlement Agreement

13. Goldman also mischaracterizes what has transpired in the arbitration he commenced against Weiss in March 2023. In the arbitration, Goldman alleged that the Major Decisions provision prohibited Weiss, in his individual capacity, from entering into a transaction with the Debtor to purchase the WV Complex. Although the temporarily-appointed Emergency

- 5 -

Arbitrator initially relied on Goldman's argument and held on May 10, 2023 that Weiss "is enjoined from engaging in unilateral Major Decisions," at a subsequent preliminary hearing held by the three-member arbitration panel on April 22, 2023, that order was reviewed and significantly revised to permit Weiss to "negotiate directly or indirectly to purchase, acquire or otherwise obtain an interest in [the WV Complex] or [its] assets…" while still enjoining Weiss from consummating any such transaction. A true and correct copy of the Procedural Order No. 1 dated August 22, 2023 is attached hereto as **Exhibit F**.

14. Further statements by the arbitration panel demonstrate that the only issue pressed by Goldman—and thus the only issue addressed by the arbitral orders—concerned preventing Weiss, in his individual capacity, from pursuing and/or consummating a "Proposed Transaction." But the arbitration panel again rejected Goldman's argument and further narrowed the Emergency Interim Award by holding Goldman had not established that the Major Decisions Clause of the Fifth Amendment applied to Weiss's personal conduct. A true and correct copy of the Procedural Order No. 2 dated August 24, 2023 is attached hereto as **Exhibit G**.

15. Goldman's stated purpose in seeking an injunction against Weiss was to prevent Weiss from having an unfair advantage over Goldman in bidding for the WV Complex, which is why the arbitration panel tied the duration of the injunction to Weiss's provision of books and records to Goldman. "The sooner Respondent produces the Subject Books and Records as required by PO No. 2, the sooner the injunction can be lifted, and thereby enable him to finalize any agreement."

16. Further, the arbitration panel made clear that the injunction was limited to Weiss in his individual capacity: "[T]he injunction in this Arbitration does not enjoin the Debtor . . . ." On the contrary, both "***PO No. 1 and PO No. 2 solely enjoin Respondent***," and only "as set forth in

- 6 -

paragraph 3 of PO No. 1"; *i.e.*, from consummating a "Proposed Transaction" in which Weiss purchased an interest in the WV Complex or its assets.

17. No part of either the Settlement Agreement or the Plan involves Weiss "purchas[ing], acquir[ing] or otherwise obtain[ing] an interest in" the WV Complex or its assets. Consequently, assuming *arguendo* the injunction issued against Weiss remains in effect and is enforceable given that the Supreme Court of the State of New York Appellate Division, First Department, has recently stayed the entire arbitration, it has no application to the Settlement Agreement and/or the Plan.

Goldman's Complaints About Provisions of The Settlement Agreement Fall Short

18. **_FF&E Agreement_**. As a general matter, New York requires that any business involved in the sale of alcohol must have a liquor license issued to it by the New York State Liquor Authority ("SLA").

19. In or about August 2023, Debtor retained the firm of Bernstein, Redo & Savitsky, P.C., ("BRS") a boutique hospitality law firm, as special counsel to advise Debtor for the purpose of ensuring that the WV Complex is properly licensed and remains properly licensed upon any sale of the WV Complex to a third-party buyer.

20. In the fall of 2023 and acting upon the guidance and advice of BRS, Debtor's subsidiary, WB FNB LLC ("FNB Sub") commenced the process of preparing an application to the SLA to approve the transfer the current liquor license for the WV Complex from William Vale FNB LLC ("WV FNB") to FNB Sub. As BRS advised Debtor, an application to transfer an existing license can be processed on an expedited time frame in comparison to the time frame for applying for a new liquor license. It also allows the transferee to operate under a temporary approval of the transfer application. The license transfer process therefore aligned with Debtor's goal of selling

the WV Complex as expeditiously as possible, and Debtor commenced the liquor license transfer process before even reaching an agreement to sell the WV Complex to any third-party buyer.

21. BRS further advised Debtor that when a liquor license is transferred from one party to another, the license transfer is required to be accompanied by the transfer from transferor to transferee of: (i) the existing alcohol inventory owned by the transferor, if any; and (ii) other fixed or "hard" assets used by the transferor in connection with the operation of the business involving the sale of alcoholic beverages.

22. This second requirement presented an issue for Debtor. Specifically, during the transition of the management of the operations of the WV Complex from Wythe Berry LLC ("WB") to Debtor during the months of October and November 2023, Debtor had already advised WB and Weiss that under Sections 7.1 and 7.2 of the Lease between Debtor and WB, all fixtures, furnishing & equipment ("FF&E") at the WV Complex was Lessor's Equipment (as defined therein) and was not the property of WB (or any of the WV LLCs). A true and correct copy of the Lease is attached hereto as **Exhibit H**.

23. Section 7.1 of the Lease provides that "[a]ll equipment, furniture and furnishings on hand as of the Commencement Date and which are not tagged or marked by Lessee [i.e., WB] as Lessee's equipment shall constitute a part of the Leased Premises and shall be and remain the personal property of Lessor ("Lessor's Equipment") (emphasis in original).

24. Section 7.2 of the Lease provides that "[a]ll equipment, fixtures, and furnishings acquired by Lessee and not constituting Lessor's Equipment and not necessary for the operation of a hotel shall be and remain the personal property of Lessee ("Lessee's Equipment") and shall be tagged or marked by Lessee as such and all other property shall become that of Lessor's when purchased and left at the Leased Premises at Lease termination."

25. During the transition, Debtor's counsel and WB's counsel had several discussions regarding the ownership of the FF&E at the WV Complex. WB's counsel demanded that Debtor reimburse WB for FF&E; the Debtor's counsel refused to do so based on the clear terms of Sections 7.1 and 7.2 of the Lease, as stated above, and because there was no evidence that WB had "tagged" any FF&E as its personal property in compliance with the Lease. Debtor's counsel invited WB's counsel to provide documentation that WB had claimed or tagged any part of the FF&E at the WV Complex at any time. WB did not provide such documentation.

26. Accordingly, in or about February 2024 when settlement negotiations were ongoing and the Sale Contract had already been executed and submitted to the Court for approval [Dkt. No. 251], Debtor and WB FNB compromised by having FNB Sub and WB FNB enter into that certain FF&E Purchase and Sale Agreement dated as of February 8, 2024 and attached hereto as **Exhibit I** so that the FF&E at the WV Complex, "if any," would be transferred for nominal consideration of $5,000 in order to properly support the liquor license transfer application. Recognizing that the transfer of the liquor license was invaluable to the Purchaser under the Sale Contract, Debtor viewed this as an appropriate resolution in light of Debtor's position that it already owned the FF&E.

27. ***Social Media Accounts***. The Social Media Accounts are a closing deliverable that Debtor must provide to Purchaser in order to close the transaction contemplated by the Plan. Accordingly, Debtor negotiated with Weiss, as Managing Member of The William Vale Hotel LLC ("WV Hotel"), to ensure that the Social Media Accounts were conveyed in the global Settlement Agreement. As set forth in Debtor's accompanying reply memorandum of law, Debtor's counsel advised Debtor that Debtor could take the position that the Social Media Accounts are assets already owned by the Debtor as a matter of intellectual property law, but that

it would be necessary for Debtor to commence an adversary proceeding and litigate to enforce its rights therein. *See* Reply ¶¶ 35-39. In order to avoid the unnecessary risk, delay and expense that litigation entails and in consideration of Purchaser's expressed willingness to acquire the WV Complex as promptly as possible, Debtor determined that it was prudent to purchase the Social Media Account assets in the context of the Settlement Agreement.

28. The value ascribed to the Social Media Accounts in the Settlement Agreement is $45,000. This value was arrived at after consultation between and among Debtor, Debtor's counsel, Debtor's hospitality consultant and interim hotel management company, Performance Interim Advisory LLC d/b/a LW Hospitality Advisors ("LWHA") and the William Vale Hotel's Director of Marketing, who is the person responsible for managing and posting content to the Social Media Accounts.

29. Per guidance from LWHA, Debtor was advised that social media accounts are generally valued by ascribing a set dollar value to each "follower" of each social media account, which represents the anticipated "conversion" of the account having a follower into actual sales.

30. Using applicable industry guidance, LWHA ascribed the following values and discounts to each of the six Social Media Accounts:

| Channel | Followers / Page Likes | Value per Follower | Total | Adjustment Factor | Net Value |
|---|---|---|---|---|---|
| Facebook | 8800 | $0.83 | $7,304.00 | 30% | $2,191.20 |
| Instagram | 58200 | $2.34 | $36,188.00 | 30% | $ 40,856.40 |
| X (Twitter) | 429 | N/A | $0 | 30% | $0 |
| YouTube | 3 | N/A | $0 | 30% | $0 |
| Pinterest | 0 | N/A | $0 | 30% | $0 |
| TikTok | 38 | N/A | $0 - | 30% | $0 |

31. The 30% discount adjustment factor was applied because the base value per follower is reflective of a typical e-commerce business, and the "conversion" rate for followers is

- 10 -

much lower for a hotel in comparison. Four of the Social Media Accounts had either minimal or no followers, and thus no metrics that could show any intent by consumers to convert interest into actual reservations at the WV Complex.

32. The foregoing analysis was discussed by Debtor and WV Hotel during the settlement negotiations and the ultimate ascribed value of $45,000 was a negotiated resolution to ensure the conveyance of this asset to Debtor and, ultimately, to the Purchaser.

33. **_Consulting Services_**. On or about September 29, 2023, WB served Debtor with an Early Vacate Notice pursuant to the Cash Collateral Stipulation [Dkt. No. 159] and advised Debtor that it anticipated vacating the WV Complex by October 31, 2023 and turning over the management of the operations at the Complex to Debtor on November 1, 2023.

34. The service of the Early Vacate Notice triggered an incredibly lengthy and complex transition process that commenced in October 2023 and continued up through the execution of the Settlement Agreement. During that time period, Espresso, which had contracted with WV Hotel to serve as its property manager and hotel operator, worked in tandem with Debtor and LWHA to, among other things, familiarize them with each and every aspect of the operation of the WV Complex, transition all available books and records, facilitate introductions to the many tenants and licensees at the WV Complex, maintain the hotel's employees, and otherwise assist Debtor in readying the WV Complex for sale.

35. The transition services rendered by Espresso were not only essential to the Debtor's assumption and control of the management and operations of the WV Complex after November 1, 2023, which allowed the WV Complex to operate without interruption to the services provided to guests and tenants of the Hotel, but were likewise essential to the Sale Contract, as the Purchaser

- 11 -

would not seek to purchase the WV Complex without promise of a smooth transition of management and operations.

36. Like everything else in the Settlement Agreement, the compensation to be paid to Espresso in the amount of $200,000 for services rendered to Debtor throughout the transition period was negotiated by Debtor and Espresso. In arriving at the amount of $200,000, Debtor considered the amount of compensation it agreed pay to LWHA as base Management Fees under that certain Hotel Management Agreement effective as of November 1, 2023 ("HMA" [Dkt. No. 205]). That amount, as set forth in Section 4.1, is the greater of $70,000 or 2.5% of Total Operating Revenues for each calendar month. Thus, over a six-month period, LWHA would earn at least $420,000 in Management Fees (if not more). Accordingly, Debtor believed that a payment to Espresso of less than half of that amount was fair and reasonable compensation for the transition services Espresso has provided.

*[Remainder of Page Intentionally Left Blank]*

## PART B

**A.    The Settlement Agreement is in AYH Wind Down's Best Interest.**

37.    The Settlement is in AYH Wind Down's best interest because: (i) it maximizes the recovery of the Series C Noteholders against the Debtor, and (ii) resolves claims and threatened claims among Weiss and YG WV.

38.    Both AYH Wind Down and the Debtor have the same goal: maximizing the value of the Debtor and the recovery by the Series C Bonds from the Estate. The greater the recovery of the Series C Bondholders from the Estate, the lower the deficiency claim that the Series C Bondholders will have against AYH Wind Down which benefit the remaining bondholders' recovery from AYH Wind Down.

39.    The Settlement Agreement also addresses and resolves any claims or causes of action that Weiss could assert against YG WV or AYH Wind Down in connection with its management of Member, the Debtor's manager. In this context, the payment that YG WV is directing Member to pay to Weiss pursuant to the Settlement Agreement constitutes a reasonable settlement of any claims that YG WV and AYH Wind Down would otherwise have to pay to litigate.

[*Remainder of Page Intentionally Left Blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.


By: */s/ Assaf Ravid*
Name: Assaf Ravid
Titles: Authorized Manager of the Debtor
       Plan Administrator of AYH Wind Down