> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- X
                                  :

In re                                :        Chapter 11
                                  :

WYTHE BERRY FEE OWNER LLC,       :        Case No. 22-11340 (MG)
                                  :

           Debtor.[1]             :
                                  :
                                  :
-------------------------------------------------------- X

## DISCLOSURE STATEMENT FOR ~~THIRD~~FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF WYTHE BERRY FEE OWNER LLC

**HERRICK, FEINSTEIN LLP**
Stephen B. Selbst
Janice Goldberg
Steven B. Smith
Rodger T. Quigley
2 Park Avenue
New York, New York 10016
Telephone: (212) 592-1400
Facsimile: (212) 592-1500

*Attorneys for the Debtor and Debtor in Possession*

Dated: May ~~10~~17, 2024
      New York, New York

---

[1]   The Debtor's principal offices are located at The William Vale Hotel, 111 N. 12th Street, Brooklyn, NY 11249. The last four digits of the Debtor's federal tax identification number are 9776.

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, AND TOGETHER WITH ALL SCHEDULES AND EXHIBITS HERETO, THE "DISCLOSURE STATEMENT"), IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING VOTES ON THE DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE.**

**THE DEADLINE FOR CREDITORS IN THE VOTING CLASSES (AS DEFINED BELOW) TO SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN TIME, ON MAY 3, 2024 (THE "VOTING DEADLINE"), UNLESS EXTENDED BY THE DEBTOR. THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN MARCH 22, 2024 (THE "VOTING RECORD DATE").**

**RECOMMENDATION OF THE DEBTOR**

**THE DEBTOR SUPPORTS CONFIRMATION OF THE PLAN AND URGES ALL HOLDERS OF ALLOWED CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN. THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN AND THE SALE OF THE WILLIAM VALE COMPLEX PROVIDES THE HIGHEST AND BEST RECOVERY FOR ALL CREDITORS. MISHMERET TRUST COMPANY LTD., AS MORTGAGEE AND TRUSTEE FOR THE SERIES C NOTES, HAS PRELIMINARILY CONSENTED TO THE SALE OF THE WILLIAM VALE COMPLEX, SUBJECT TO THE TERMS SET FORTH IN THE BID PROCEDURES.**

**PLEASE READ THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY. THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT SUCH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL PROVISIONS OF THE PLAN. ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL. UNLESS SEPARATELY DEFINED, TERMS DEFINED IN THE PLAN HAVE THE SAME MEANINGS IN THIS DISCLOSURE STATEMENT.**

**HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.**

**ALL INFORMATION IN THIS DISCLOSURE STATEMENT HAS BEEN PREPARED OR COMPILED BY THE DEBTOR'S MANAGEMENT TO THE BEST OF THEIR KNOWLEDGE AND BELIEF, AS OF THE DATE HEREOF (UNLESS OTHERWISE**

ii

INDICATED HEREIN) BASED ON INFORMATION PROVIDED TO THE DEBTOR'S MANAGEMENT FROM THE DEBTOR'S EXISTING BOOKS AND RECORDS. THE DEBTOR IS UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIMS ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS (E.G., STATEMENTS THAT PREDICT, PROJECT, OR USE FUTURE EVENTS AS EXPECTATIONS OR POSSIBILITIES) OR OTHER INFORMATION SET FORTH HEREIN WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING, BUT NOT LIMITED TO, THOSE IDENTIFIED IN THIS DISCLOSURE STATEMENT. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.

THE DEBTOR BELIEVES THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THIS DISCLOSURE STATEMENT, IS EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED AND RELATED STATE STATUTES BY REASON OF THE EXEMPTION PROVIDED BY SECTION 1145(a)(1) OF THE BANKRUPTCY CODE.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS, THE FINANCIAL PROJECTIONS, OR ANY OTHER STATEMENTS OR ANALYSES CONTAINED HEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

UNLESS OTHERWISE DEFINED HEREIN, CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

Table of Contents

                                                                                              Page

I.      EXECUTIVE SUMMARY .................................................................................1

        A.      Claims and Interests under the Plan .....................................................2

II.     OVERVIEW OF THE DEBTOR'S BUSINESS ................................................3

        A.      The Debtor's Ownership and Operations ..............................................3

        B.      Prior Ownership Structure and 2017 Refinancing ................................3

        C.      Events Leading to Chapter 11 ..............................................................4

III.    OVERVIEW OF THE DEBTOR'S RESTRUCTURING ...................................5

        A.      Key Events During Chapter 11 Case ....................................................5

IV.     SUMMARY OF PLAN .....................................................................................11

        A.      Administrative Expenses and Priority Claims ....................................11

        B.      Classification of Claims and Interests ................................................13

        C.      Treatment of Claims and Interests .....................................................14

        D.      MEANS FOR IMPLEMENTATION ..................................................16

        E.      Distributions ......................................................................................19

        F.      Procedures for Disputed Claims .........................................................23

        G.      Executory Contracts and Unexpired Leases .......................................25

        H.      Conditions Precedent to Confirmation of Plan and Effective Date .....27

        I.      Effect of Confirmation of Plan ...........................................................28

        J.      Retention of Jurisdiction ....................................................................32

        K.      Miscellaneous Provisions ...................................................................34

V.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ...................38

        A.      General ...............................................................................................38

i

B.      Consequences of Payment of Allowed Claims Pursuant to Plan Generally ........ 39

C.      Additional Consequences to Holders of Allowed Direct or Indirect Equity
Holders .......................................................................................................... 40

VI.     CERTAIN RISK FACTORS TO BE CONSIDERED .......................................... 40

A.      Bankruptcy-Related Considerations ............................................................. 40

VII.     VOTING PROCEDURES AND REQUIREMENTS ........................................... 41

VIII.    CONFIRMATION OF PLAN .......................................................................... 42

A.      Absolute Priority Rule .................................................................................. 43

B.      Best Interest of Creditors Test; Liquidation Analysis ................................. 43

IX.     ALTERNATIVES TO CONFIRMATION AND
CONSUMMATION OF THE PLAN ................................................................. 44

X.      CONCLUSION AND RECOMMENDATION ................................................. 45

HF 17334758v.5HF 17382379v.1

# I.
## EXECUTIVE SUMMARY

Wythe Berry Fee Owner LLC, a Delaware limited liability company, as debtor and debtor in possession (the "Debtor" and, together with its direct and indirect non-debtor subsidiaries, the "Company") in the above-captioned chapter 11 case (the "Chapter 11 Case"), submits this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, in connection with the solicitation of votes to accept or reject the ~~Third~~**Fourth** *Amended Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC*, dated May ~~10~~**17**, 2024 (as may be amended, modified, or supplemented from time to time, and together with all schedules and exhibits thereto, the "Plan"). A copy of the Plan is attached hereto as **Exhibit A**.

The Debtor owns a commercial real property complex located at 55 Wythe Avenue, Brooklyn, New York that is comprised of a 183-room luxury hotel, known as The William Vale Hotel (the "Hotel"), as well as office and retail space and parking (collectively, the "WV Complex").

The Debtor has entered into an agreement to sell the WV Complex to William Vale Owner LLC for a purchase price of $177,000,000, subject to the approval of the Bankruptcy Court. The purchase price payable to the Debtor, together with the Debtor's cash on hand, will fund the Distribution Fund from which holders of Allowed Claims and Allowed Interests will be paid in accordance with the Plan and the priorities of the Bankruptcy Code.

In developing the Plan, the Debtor gave due consideration to various exit alternatives and engaged in significant discussions and negotiations with representatives of the Series C Noteholders, the Notes Trustee, and other parties in interest. The Debtor also conducted a careful review of the range of possible sale prices for the WV Complex, and estimated recoveries in a liquidation scenario, and concluded that recoveries to the Debtor's creditors will be maximized by a sale of the WV Complex under the Plan. The Debtor believes the WV Complex has value that would not be realized in a liquidation. Consistent with the liquidation analysis, appraisals, and other analyses prepared by the Debtor with the assistance of its advisors, the value of the WV Complex is substantially greater in a sale as a going concern than in a liquidation. The Debtor believes that any alternative to confirmation of the Plan would result in significant delays, litigation, and additional costs, which would ultimately lower the recoveries for all holders of Allowed Claims.

**Accordingly, the Debtor urges all holders of Allowed Claims entitled to vote to accept the Plan.**

**WHO IS ENTITLED TO VOTE**: Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all

existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

## A.    The Voting Classes

All holders of Allowed Claims and Interests may vote on the Plan unless:

(i)    as of the Voting Record Date, the outstanding amount of such claimant's Claim is not greater than zero ($0.00);

(ii)    as of the Voting Record Date, such claimant's Claim has been disallowed, expunged, disqualified, or suspended; or

(iii)    as of the Voting Record Date, such claimant's Claim is subject to an objection or request for estimation, in accordance with the procedures set forth below.

Any creditor that is not scheduled in the Debtor's Schedules and that did not file a proof of claim prior to the Voting Record Date is not entitled to vote on the Plan.

## B.    Claims and Interests under the Plan

The following table summarizes: (i) the treatment of Claims and Interests under the Plan; (ii) the Classes that are impaired by the Plan; and (iii) the Classes that are entitled to vote on the Plan. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, see Article IV — Summary of Plan below.

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Senior Secured Claims | Impaired | Yes |
| 2A | Mechanic's Lien Claim of D and J | Unimpaired | No |
| 2B | Mechanic's Lien Claim of JSP | Unimpaired | No |
| 2C | Mechanic's Lien Claim of Schimenti | Unimpaired | No |
| 2D | Mechanic's Lien Claim of Ziba | Unimpaired | No |
| 3 | Unsecured Claims | Impaired | Yes |
| 4 | Interests | Unimpaired | No |

THE PLAN PROVIDES THAT THE RELEASED PARTIES SHALL BE DEEMED RELEASED AND DISCHARGED TO THE MAXIMUM EXTENT PERMITTED BY LAW BY THE DEBTOR AND ITS ESTATE. FURTHER, THE PLAN PROVIDES FOR CERTAIN MUTUAL RELEASES BETWEEN AND AMONG: (A) THE NOTES TRUSTEE AND ITS

REPRESENTATIVES AND ADVISORS; (B) THE SERIES C NOTEHOLDERS AND THEIR
REPRESENTATIVES AND ADVISORS; (C) ANY CURRENT OFFICER, DIRECTOR OR
MANAGER OF THE DEBTOR; AND (D) ANY ADVISORS RETAINED BY THE DEBTOR
IN CONNECTION WITH THE CHAPTER 11 CASE ON OR AFTER OCTOBER 6, 2022.

RELEASED PARTIES MUST AFFIRMATIVELY OPT IN TO THE RELEASES UNDER
ARTICLE 10.6 OF THE PLAN; PROVIDED, HOWEVER, THAT ANY RELEASED PARTY
THAT: (I) DOES NOT RETURN A BALLOT BY THE DEADLINE PROVIDED IN SUCH
BALLOT (THE "VOTE DEADLINE"); (II) RETURNS A BALLOT AFTER THE VOTE
DEADLINE AND ITS BALLOT IS NOT ACCEPTED OR CONSIDERED FOR VOTING
PURPOSES; OR (III) DOES NOT AFFIRMATIVELY OPT IN TO THE RELEASE UNDER
ARTICLE 10.6 HEREOF SHALL NOT BE A "RELEASED PARTY."

## II.
## OVERVIEW OF THE DEBTOR'S BUSINESS.

### A.     The Debtor's Ownership and Operations

The Debtor is owned by Wythe Berry Member LLC ("Member LLC"), which is its sole
member. Member LLC is co-owned by Zelig Weiss ("Weiss") and YGWV LLC ("YGWV"),
with each party holding a 50% interest. YGWV is the managing member of Member LLC.
YGWV is a wholly owned subsidiary of AYH Wind Down LLC ("Wind-Down Co.", the
successor to All Year Holdings Limited ("All Year"), a debtor that confirmed a plan of
reorganization in a separate chapter 11 proceeding before this Court.

Until May 20, 2021, the WV Complex was leased to Wythe Berry LLC ("WB LLC"). As
discussed more fully below, WB LLC maintained possession by holding over at the WV
Complex and subsequently via a New York Supreme Court use and occupancy order through
October 31, 2023, and continued to operate the commercial office space, the garage, and the
Hotel through subleases (the "Sublessees"). Weiss and Yoel Goldman ("Goldman"), the
former principal of All Year, each have a 50% ownership interest in each of the Sublessees. Until
October 31, 2023, management services at the WV Complex were provided by Espresso
Hospitality Management, LLC ("Espresso"), which is owned and managed by Weiss.

On November 1, 2023, the Debtor's management assumed operational control of the WB
Complex. While WB LLC operated the WV Complex, WB LLC had no full-time employees
because it was party to an employee leasing agreement with William Vale Staffing, LLC
("Staffing"), an unrelated entity. As described below, when the Debtor assumed control of the
WV Complex, it entered into an interim staffing agreement with Weiss and his affiliated entities
to retain the services of substantially all the employees who had previously worked at the WV
Complex, which was extended through December 2, 2023. Thereafter, all of the employees were
terminated by Staffing and immediately rehired effective December 3, 2023, by WB Hotel LLC
("Hotel Sub").

### B.     Prior Ownership Structure and 2017 Refinancing

3

The WV Complex was originally owned by WB LLC, which was then owned 50% by Weiss and 50% by Goldman. Weiss serves as the managing member of WB LLC.

In February 2017 WB LLC refinanced its existing mortgage debt through a series of related transactions. As part of that transaction, the Debtor was formed, and WB LLC transferred title to the WV Complex to the Debtor. The Debtor then leased the WV Complex to WB LLC pursuant to a 15-year lease (the "Lease") dated February 28, 2017.

To refinance its existing mortgage debt, the Debtor borrowed $166,320,000 from All Year (the "Mortgage Loan"), secured by a mortgage on the WV Complex (the "Mortgage"). The rent payable to the Debtor under the Lease was structured to be sufficient to enable the Debtor to make the payments due on the Mortgage and provide All Year sufficient funds to make payments due under the Series C Notes issued in connection with the refinancing (see below). The Lease required WB LLC to pay rent of $15,000,000 per year, in two installments of $7,500,000 on each February 1st and August 1st.

As part of the refinancing, All Year issued Series C Debentures (the "Series C Notes," and the holders thereof the "Series C Noteholders") in the original principal amount of NIS 617,970,000 pursuant to a Deed of Trust dated February 19, 2017 (the "Deed of Trust") between All Year and the Notes Trustee, Mishmeret. The proceeds of the Series C Notes were then loaned by All Year to the Debtor as the Mortgage Loan.

In connection with the issuance of the Series C Notes, the Debtor executed a Guaranty of Payment (the "Guaranty"), which guaranteed to All Year the "prompt payment and performance of all debts, obligations, and liabilities [of All Year] . . . under the Bond Documents . . . and any sums of money under the provisions of the Deed of Trust." The Guaranty was delivered to secure the obligations to the Series C Noteholders. The Series C Noteholders also received a Collateral Assignment of Agreement of Mortgage, Security Agreement, Assignment of Rents and Fixture Filing (the "Collateral Assignment") of the Mortgage from All Year.

## C.   Events Leading to Chapter 11

### 1.   *All Year Default*

In November 2020, All Year, then under the control of Goldman, defaulted on its payment obligations under another series of bonds it had issued, which triggered a cross-default (the "All Year Default") under the Series C Notes and the Mortgage Loan. Following the occurrence of the All Year Default, the Notes Trustee, on behalf of the Series C Noteholders declared a default by All Year under the Deed of Trust and accelerated the Series C Notes. As part of a forbearance agreement with the Notes Trustee, on March 16, 2021, All Year assigned the Mortgage and the Mortgage Loan to the Notes Trustee. As a result, the Notes Trustee became a direct creditor of the Debtor, holding a claim secured by the WV Complex and all rents and other security interests transferred to the Notes Trustee pursuant to the assignment from All Year and an unsecured deficiency claim for the balance.

### 2.   *Rent Dispute*

On February 1, 2021, WB LLC failed to make its rent payment under the Lease. The WB LLC rent payment default meant that the Debtor had insufficient funds to make payment to All

4

Year on the Mortgage Loan, which left All Year with insufficient funds to make payments due to the Series C Noteholders. On February 17, 2021, the Notes Trustee accelerated All Year's obligations under the Series C Notes. The following month, All Year assigned the Mortgage and related loan documents to the Notes Trustee in consideration for the Notes Trustee's forbearance from exercising remedies under the Deed of Trust.

The Debtor then sent WB LLC notice of the default, and after unsuccessfully insisting that WB LLC pay, served a Notice of Cancellation and Termination of the Lease on May 20, 2021, which was effective immediately. Weiss and WB LLC neither paid rent nor vacated the leasehold after receiving the Notice of Cancellation and Termination of the Lease, and WB LLC continued to operate the WV Complex.

On June 11, 2021, the Debtor sued WB LLC, Weiss and Goldman (the "Rent Action"), in New York Supreme Court, Kings County (the "New York Court") in the case styled *Wythe Berry Fee Owner v. Wythe Berry LLC et al.*, Index No. 514152/2021. The Rent Action sought money damages for unpaid rent, a declaratory judgment that the Lease was terminated, an order of ejectment, and an order directing WB LLC and Weiss to produce books, records, and information regarding the physical condition and operation of the WV Complex. After the litigation was commenced, Weiss and WB LLC failed to pay the installment of rent due on August 1, 2021.

By order dated December 1, 2021, the New York Court ordered WB LLC to make semiannual use and occupancy payments of $7.5 million to the Debtor (the "U&O Order"), the same amounts due under the Lease, and on the same schedule called for in the Lease. The New York Court also ordered certain entities affiliated with Weiss, including Espresso and the Sublessees, to produce documents and financial information regarding their operations.

Weiss and WB LLC made the use and occupancy payment of $7.5 million due in February 2022, but did not make the next payment due on August 1, 2022. The Notes Trustee delivered a Demand for Payment under the Deed of Trust and Guaranty (the "Demand Letter") to the Debtor on September 21, 2022.

By Order dated November 3, 2022, the New York Court ordered WB LLC to either provide a $45 million bond on its appeal of the U&O Order or pay the Debtor $7.5 million by November 14, 2022. Weiss and WB LLC made two post-petition U&O payments; the first on January 26, 2023, and the second on February 1, 2023.

3.   *All Year Bankruptcy*

On December 14, 2021, All Year filed a voluntary Chapter 11 petition. (All Year Dkt. No. 1.) All Year filed its first proposed plan of reorganization on May 31, 2022. (All Year Dkt. No. 123.) The plan was confirmed on January 31, 2023 (All Year Dkt. No. 352).

## III.
## OVERVIEW OF THE DEBTOR'S RESTRUCTURING

### A.   Key Events During Chapter 11 Case

HF 17334758v.5HF 17382379v.1

1.  *Involuntary Chapter 11 Petition*

On October 6, 2022, the Notes Trustee, Yelin Lapidot Provident Funds Management Ltd., The Phoenix Insurance Company Limited and Klirmark Opportunity Fund III L.P. filed an involuntary chapter 11 petition against the Debtor [Dkt. No. 1], to which the Debtor filed an answer on October 27, 2022 [ Dkt. No. 9]. On October 27, 2022, Weiss and WB LLC moved to dismiss the involuntary petition [Dkt. No. 12]. Following a trial on January 17, 2023, the Court denied the motion to dismiss and entered an Order for Relief against the Debtor on January 18, 2023 [Dkt. No. 58].

(1)  Prepetition Indebtedness

As of the Petition Date, total liabilities were $195,561,327 consisting of a short-term loan and maturities of $182,596,831 (plus fees and expenses) and an inter-company loan owed to All Year for $12,964,496.

(2)  Equity Ownership

Member LLC owns 100% of the common equity interests in the Debtor. To the best of the Debtor's knowledge and belief, Member LLC does not hold any financial interest in, or relationship with, any of the Debtor's various creditor constituencies. Wind Down Co. is a 50% indirect equity holder in the Debtor and the Notes Trustee is a beneficiary of Wind Down Co.

2.  *Cash Collateral Agreement*

On February 6, 2023, the Debtor filed a motion (the "Cash Collateral Motion") to authorize the use of cash collateral [Dkt. No. 72]. After the Cash Collateral Motion was filed, the Debtor entered into negotiations with Weiss and WB LLC concerning the Cash Collateral Motion and the removal of the Rent Action. To resolve these interrelated issues, the Debtor, Weiss and WB LLC entered into a stipulation (the "Removal Stipulation"), which provided that: (1) Weiss and WB LLC would consent to the removal of the Rent Action; (2) Weiss would not object to LW Hospitality Advisors serving as its hospitality advisor; (3) Weiss and WB LLC agreed to respond to documents requests identified in the Removal Stipulation; and (4) provided WB LLC responded to such document requests, the Rent Action would be stayed until April 30, 2023. On March 2, 2023, the Court entered orders approving the Removal Stipulation [Dkt. No. 90] and the Cash Collateral Motion (the "Cash Collateral Order") [Dkt. No. 91].

On August 9, 2023, the Debtor filed a motion (the "August Cash Collateral Motion") for approval of a stipulation an order amending the Cash Collateral Order and approving a related settlement [Dkt. No. 159]. The August Cash Collateral Motion provided for: (1) the waiver by the Notes Trustee of events of default for failing to meet certain timetables set forth in the Cash Collateral Order; (2) WB LLC to remain in possession of the WV Complex through January 31, 2024; (3) the right of the Debtor or WB LLC to give notice (an "Early Vacate Notice") of its intent to terminate the occupancy of the WV Complex by WB LLC at the end of any calendar month, in which event WB LLC would be entitled to receive a *pro rata* refund of the $7.5 million Use & Occupancy payment it made in August 2023; and (4) WB LLC to provide transition services and information if it terminated possession of the WV Complex prior to

6

January 31, 2024. By order dated August 16, 2023 (the "Augus_t Cash Collateral Order"), the Court approved the August Cash Collateral Motion [Dkt. No. 166].

On October 31, 2023, the Debtor filed a motion (the "Transition Cash Collateral Motion") [Dkt. No. 201] to amend the Cash Collateral Order, as amended by the August Cash Collateral Order, for the following purposes: (1) to extend the date of permitted use of cash collateral to March 31, 2024; and (2) to authorize the Debtor to use $1,207,000 of cash collateral as working capital for the Hotel and WV Complex in connection with the transition of management. By order dated November 1, 2023, the Court approved the Transition Cash Collateral Motion [Dkt. No. 204].

On April 22, 2024, the Debtor filed a motion (the "Second Cash Collateral Motion") [Dkt. No. 308] for approval of a stipulation among the Debtor, the Notes Trustee and The William Vale FNB LLC executed for the following purposes: (i) to extend the date of permitted use of cash collateral to June 1, 2024; (ii) to make an adequate protection payment to the Notes Trustee in the amount of $4,300,000; and (iii) to allow for the transfer of operating revenue from WB FNB LLC and WB Hotel LLC to The William Vale FNB LLC and The William Vale Hotel LLC for regulatory purposes. By order dated May 2, 204, the Court approved the Second Cash Collateral Motion [Dkt. No. 328].

   3.   *Removal of the Rent Action*

On February 9, 2023, the Debtor removed the Rent Action to the United States District Court for the Southern District of New York. On February 14, 2023, the Rent Action was removed to the Bankruptcy Court as adversary proceeding 23-01012 (the "Adversary Proceeding") [Adv. Pro. Dkt. No. 1]. On May 9, 2023, Weiss and WB LLC filed answers to the complaint including affirmative defenses and counterclaims [Adv. Pro. Dkt. Nos. 10-11], to which the Debtor responded on May 30, 2023 [Adv. Pro. Dkt. Nos. 16-17]. Goldman filed an answer to the complaint on July 28, 2023 [Adv. Pro. Dkt. No. 24].

   4.   *Rent Action Summary Judgment Motion*

On August 23, 2023, the Debtor filed a motion for partial summary judgment against WB LLC [Adv. Pro. Dkt. Nos. 30-34]. On September 8 and 10, 2023, WB LLC filed its opposition to the Debtor's motion for partial summary judgment [Adv. Pro. Dkt. Nos. 39-42]. On September 21, 2023, the Debtor filed reply papers [Adv. Pro. Dkt. Nos. 43-44]. On October 5, 2023, the Court issued its Motion Opinion and Order (the "Summary Judgment Order"), in which it granted the Debtor's motion for partial summary judgment and dismissed the affirmative defenses and counterclaims of WB LLC. The Court found, *inter alia*, that the Debtor had validly terminated the Lease on May 20, 2021, based upon the failure of WB LLC to pay rent when due on February 1, 2021.

   5.   *The Debtor's Schedules and Statement of Financial Affairs*

On March 2, 2023, the Debtor filed its schedules of assets and liabilities and statement of financial affairs (the "Original Schedules") [Adv. Pro. Dkt. Nos. 86- 87]. On March 6, 2023, the Debtor filed amended and restated schedules of assts and liabilities (the "Amended Schedules")

7

[Dkt. No. 96]. The Amended Schedules made minor and nonmaterial changes to correct typographical and other errors.

6.    *The Section 341 Meeting of Creditors*

On March 22, 2023, the Debtor's meeting of creditors pursuant to section 341(a) of the Bankruptcy Code was conducted by counsel for the U.S. Trustee. The U.S. Trustee's counsel interviewed Assaf Ravid, in his capacity as Plan Administrator of AYH Wind Down LLC, the sole shareholder of YG WV LLC, which is the manager of Wythe Berry Member LLC, the Debtor's sole member, and parties in interest were provided an opportunity to ask questions of the Debtor. The Debtor and the staff of the U.S. Trustee also participated in an initial debtor interview on February 22, 2023.

7.    *Negotiations with Zelig Weiss; Delivery of Early Vacate Notice*

Since the start of the Chapter 11 Case, the Debtor pursued a dual track strategy to either: (i) negotiate a resolution of the State Court Action; or (ii) sell the WV Complex pursuant to a court supervised process. During the summer of 2023, the Debtor, the Notes Trustee and Weiss negotiated concerning a proposed purchase of the WV Complex, a transaction that the Debtor contemplated would form the basis for a plan of reorganization. However, those negotiations reached an impasse, and on September 29, 2023, WB LLC delivered to Debtor an Early Vacate Notice, effective October 31, 2023 pursuant to the August Cash Collateral Order.

8.    *Goldman Claim Objection*

On May 1, 2023, Goldman filed a proof of claim (the "Goldman Claim") against the Debtor in the amount of $994,048, asserting a right to reimbursement of legal fees. On July 14, 2023, the Debtor filed an objection to the Goldman Claim [Dkt. No. 148], which Goldman replied to on August 23, 2023 [Dkt. No. 170], and to which the Debtor filed a reply on September 22, 2023 [Dkt. No. 187]. The Court held a hearing on the Debtor's objection to the Goldman Claim on September 26, 2023, and on September 27, 2023, entered an order disallowing the Goldman Claim in its entirety [Dkt. No. 190].

9.    *Management Transition*

After WB LLC delivered the Early Vacate Notice on September 29, 2023, the Debtor began to prepare for the transition of management of the Hotel and the WV Complex. The Debtor's goal was to ensure a smooth and orderly transition that did not disrupt Hotel operations or services to rental tenants. To effect the transition, the Debtor entered into three new agreements (collectively, the "Transition Agreements") and amended its existing cash collateral orders to permit the Debtor to fund the initial working capital needs of Hotel operations. The Transition Agreements are: (a) a hotel management agreement (the "Management Agreement") with Performance Interim Advisory LLC ("Performance"), which provides hotel management services at the WV Complex, (b) a staffing agreement (the "Staffing Agreement"), pursuant to which the existing staffing arrangements at the WV Complex were extended through November 30, 2023, and (c) an agreement with WV Hospitality LLC ("Noho"), the existing food and beverage manager, to continue its services with the Debtor. Orders approving the amended cash collateral order and the Transition Agreements were approved by the Court as follows: (1) the cash collateral on November 1, 2003 [Dkt. No. 204]; (2) the Management Agreement and Noho

8

food and beverage agreement on November 2, 2023 [Dkt. No. 208]; and (3) the Staffing
Agreement on November 6, 2023 [Dkt. No. 214].

      10.    *Bid Procedures Motion*

On November 16, 2023, the Debtor filed a motion to approve bid procedures (the "<u>Bid
Procedures Motion</u>") for the sale of the WV Complex [Dkt. No. 216]. The Bid Procedures
Motion contemplated a two-phase marketing and sale process, in which initial indications of
interest would be submitted by potential bidders, with the Debtor, in consultation with the Notes
Trustee, determining which parties would participate in the second round of bidding, and a
potential auction sale of the WV Complex. On December 8, 2023, the Court entered an order
(the "<u>Bid Procedures Order"</u>) [Dkt. No. 220] approving the Bid Procedures Motion.

The Bid Procedures Motion also authorized the Debtor, subject to Court approval, to
designate a bidder as the "stalking horse" and provide the stalking horse bidder with customary
bid protections in the form of a break-up fee and an expense reimbursement. The Debtor
currently is negotiating an agreement with a potential stalking horse bidder and will seek Court
approval of bid protections as necessary by a motion filed in the Chapter 11 Case within three
days following execution of the agreement.

      11.    *Sale Process*

As discussed in the Bid Procedures Motion, the Debtor determined to sell the WV
Complex pursuant to the Bid Procedures, which were designed to provide a clear and open
process for the solicitation, receipt, and evaluation of third-party bids.

The Debtor, in consultation with the Brokers, developed a list of over 5,000 parties whom
it believed would be interested in, and whom the Debtor believed would have the financial
resources to consummate, a Sale, including strategic parties, private equity firms, and traditional
financial institutions. As part of that process, over 180 potential investors executed
non-disclosure agreements. Prospective bidders were granted access to a virtual data room
populated with diligence materials to facilitate their evaluation and assessment of the WV
Complex.

The Bid Procedures contemplated that bidding would in two stages. The first stage
consisted of an initial marketing process for the WV Complex that resulted in the Debtor
receiving over 10 non-binding indications of interest by the initial deadline of December 19,
2023. The second stage consisted of a period during which potential bidders may submit binding,
irrevocable offers to purchase the WV Complex with a bidding deadline of February 26, 2024.

The Bid Procedures Order authorized the Debtor to enter into a stalking horse agreement
for the sale of the WV Complex and offer a stalking horse purchaser certain bid protections,
subject to the approval of the Bankruptcy Court. On January 9, 2024, the Debtor received a bid
from William Vale Owner LLC (the "Stalking Horse Bidder"). Following extensive negotiations
with the Debtor and the Notes Trustee, the Stalking Horse Bidder increased its proposed
purchase price to $177,000,000 in cash and assumption of certain liabilities (the "Stalking Horse
Bid").

HF 17334758v.5HF 17382379v.1

After the economic terms were agreed to, the Debtor and Stalking Horse Bidder negotiated in good faith and at arms'-length to finalize the terms of the purchase and sale agreement to memorialize the terms of the Stalking Horse Bidder's offer to purchase the WV Complex. On February 13, 2024, a purchase and sale agreement was executed by the Stalking Horse Bidder and the Debtor (the "Stalking Horse Agreement").

The Debtor compared the Stalking Horse Bid against all other bids received and determined, and in consultation with the Trustee and the Brokers, that the Stalking Horse Bid represented the highest and best bid for the Debtor because, among other terms, it was a cash offer for a higher purchase price than any other bid and contains other terms and conditions favorable to the Debtor. On February 15, the Debtor filed its *Motion for the Entry of an Order (I) Approving Its Selection of a Stalking Horse Bidder, (II) Approving Bid Protections in Connection Therewith, and (III) Granting Related Relief* (the "Bid Protection Motion"), which authorized the payment of a break-up fee of 2.5% of the purchase price and an expense reimbursement of up to $250,000 for the Stalking Horse Bidder if it was not the purchaser of the WV Complex [Dkt. No. 251]. On February 22, 2024, the Bankruptcy Court entered an order approving the Bid Protection Motion [Dkt. No. 256].

Pursuant to the Bid Procedures Order, the Final Bid Deadline was February 26, 2024. The Debtor received no Qualified Bids (as defined in the Bid Procedures Order) by that date and on February 27, the Debtor filed a notice of cancellation of the Auction contemplated by the Bid Procedures Order [Dkt. No. 260]. On March 8, 2024, the Debtor filed a Notice of Successful Bidder.

12.    *Mechanic's Lien Claim Objections*

The Debtor intends to file an omnibus objection to the Mechanic's Lien Claims asserted by D and J Industries LLC, JSP Electrical Contracting Corp.; Schimenti Construction Company LLC, and Ziba Construction Inc. dba 212 Carpet. If the Debtor's objection to these Mechanic's Lien Claims has not been resolved by the Confirmation Date, the Debtor intends to request entry of an order from the Bankruptcy Court estimating the amount of Cash that must be reserved for payment to holders of Allowed Mechanic's Lien Claims.

13.    *Global Settlement*

The dispute between the Debtor and WB LLC and Zelig Weiss and Yoel Goldman, which led to the commencement of the Rent Action, was one of the precipitating causes of the Debtor's Chapter 11 Case. In the Rent Action, the Debtor sought damages against WB LLC for breach of the lease, and also asserted claims against Weiss and Goldman as guarantors of the lease. The Rent Action was removed to the Bankruptcy Court after the order for relief was entered against the Debtor and on October 5, 2023, the Bankruptcy Court issued the Summary Judgment Order.

After the entry of the Summary Judgment Order, the Debtor, the Notes Trustee, and Weiss and his affiliated entities conducted arm's-length negotiations, which led to a global settlement (the "Global Settlement"), which: (i) resolves potential protracted litigation (a) among the Debtor, WB LLC, and Weiss in the Adversary Proceeding to liquidate the Debtor's damages as

10

HF 17334758v.5HF 17382379v.1

against WB LLC and to prosecute the Debtor's guaranty claims against Weiss and Goldman, and (b) among WB, Weiss, Member LLC and YG WV LLC ("YG WV") relating to the Series C Notes, the Lease and the Chapter 11 Case; and (ii) provides for certain arrangements that will assist the Debtor in the sale of the WV Complex. The terms of the Global Settlement are memorialized in a settlement agreement (the "Settlement Agreement") among the parties. The Settlement Agreement provides numerous, substantial benefits to the Debtor's estates and its creditors, while eliminating the need for protracted, costly and highly uncertain litigation. Specifically, the Settlement Agreement contemplates, among other things, that:

- In settlement of the Adversary Proceeding, WB, will pay not less than $8,512,152 to the Debtor in three installments as described in the Settlement Agreement and section D.2 below;
- In order to maintain the Hotel as a going concern, the Debtor will purchase the internet domain and social media from The William Vale Hotel LLC for a purchase price of $1.3 million by entering into a domain name purchase and transfer agreement in an agreed form that will be annexed to the Settlement Agreement as Exhibit C.
- WB LLC will execute a Memorandum of Termination of Lease that can be publicly filed in the chain of title of the WV Complex, and the William Vale Hotel LLC ("WV Hotel") and/or WV FNB LLC ("WV FNB") will assist with the transfer of the liquor license utilized in the food and beverage service at the Hotel to an affiliate of the Purchaser. In addition, the Debtor shall be responsible to pay 100% of any costs or liabilities incurred in connection with settling, extinguishing and/or satisfying the Mechanic's Lien Claims.

Under the Plan, the Debtor will make an initial distribution of $2,127,107 to Member LLC, the holder of Interests in the Debtor, and an additional distribution to Member LLC in such amount, if any, as remains in escrow after resolution and satisfaction in full of certain contingent liabilities as defined in the Settlement Agreement.

On April 21, 2024, the Debtor filed its *Motion for Entry of an Order Approving Settlement Agreement Pursuant to Bankruptcy Rule 9019* (the "9019 Motion") [Dkt. No. 304] seeking approval of the terms of the Settlement Agreement once the agreement is fully executed. The Court will consider approval of the 9019 Motion at the Confirmation Hearing.

14.    *Sales Tax Adversary Proceeding*

On March 27, 2024, the Debtor commenced an adversary proceeding against the New York State Department of Taxation and Finance, styled *Wythe Berry Fee Owner LLC v. New York State Department of Taxation and Finance*, No. 24-01334-mg (the "Sales Tax Adversary"), seeking a declaration that it has no liability for sales tax under New York law, or alternatively, seeking a determination of such liability ("Sales Tax Liability"). If the Sales Tax Adversary has not been resolved by the Confirmation Date, the Debtor intends to request entry of an order from

HF 17334758v.5HF 17382379v.1

the Bankruptcy Court estimating the amount of Cash that must be reserved for payment of Sales
Tax Liability.

     15.    *Retention of Professionals*

     To administer the Chapter 11 Case, the Debtor retained: (1) Herrick, Feinstein LLP as
restructuring counsel; (2) Eastdil Secured, L.L.C. and A&G Realty Partners, LLC as real estate
brokers; and (3) Performance Hospitality Advisors LLC d/b/a LWHA Asset and Property
Management Group, as hospitality advisor.

| Restructuring Professionals | |
|---|---|
| Counsel to the Debtor:<br><br>Herrick, Feinstein LLP<br>2 Park Avenue<br>New York, NY 10016<br>Attn:  Stephen Selbst, Esq.<br>       Janice Goldberg, Esq.<br>Telephone: (212) 592-1400<br>Facsimile: (212) 592-1500<br>Email: sselbst@herrick.com<br>       jgoldberg@herrick.com | Real Estate Brokers to the Debtor:<br><br>Eastdil Secured, L.L.C.<br>40 West 57th Street<br>23rd Floor<br>New York, NY 10019<br>Attn:  Scott Ellman<br>Telephone: (212) 315-7207<br>Email: sellman@eastdilsecured.com<br><br>Real Estate Broker to the Debtor:<br><br>A&G Realty Partners, LLC<br>445 Broadhollow Rd<br>Melville, NY 11747<br>Attn:  Emilio Amendola<br>Telephone: (631) 465-9507<br>Email: emilio@agrep.com |
| Hospitality Advisor to the Debtor:<br><br>LWHA Asset and Property Management<br>Group<br>200 West 41st Street<br>Suite 602<br>New York, NY 10036<br>Attn:  Evan Weiss<br>Telephone: (212) 300-6684<br>Email: evan.weiss@lwhadvisors.com | |

     16.    *Timetable for Debtor's Restructuring*

| Anticipated Timetable |
|---|

HF 17334758v.5HF 17382379v.1

| Deadline for Debtor to Submit Opening Brief, Declarations and Other Affirmative Evidence in Support of Plan Confirmation | May 10, 2024, at 5:00 p.m. |
|---|---|
| Deadline to file Plan Supplement (if any) | May 10, 2024, at 5:00 p.m. |
| Plan Voting Deadline | May 3, 2024, at 5:00 p.m. |
| Deadline to Submit Objections, Declarations and Other Evidence in Opposition to Confirmation | May 3, 2024, at 5:00 p.m. |
| Deadline to Submit Reply and Rebuttal Evidence in Response to Plan Objections | May 10, 2024, at 5:00 p.m. |
| Plan Confirmation Hearing | May 15, 2024, at 10:00 a.m. |

## IV.
## SUMMARY OF PLAN

This section of the Disclosure Statement summarizes the Plan, which is annexed hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the Plan.

In general, a chapter 11 plan divides claims and equity interests into separate classes, specifies the property that each class is to receive under the Plan, and contains other provisions necessary to implement the Plan.

Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and equity interests in more than one class.

Statements as to the rationale underlying the treatment of claims and equity interests under the Plan are not intended to, and will not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

### A.  **Administrative Expenses and Priority Claims**

1.  *Administrative Expense Claims*

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim), shall receive from the Debtor or Plan Administrator, as applicable, in full and final satisfaction, settlement, and release of such Claim against the Debtor, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of: (a) the Effective Date as defined in the Plan ("Effective Date" or "Plan Effective Date"); and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim. Amounts sufficient for the Debtor or the Plan Administrator, as applicable, to pay in full

13

all Allowed Administrative Expense Claims that are the responsibility of the Debtor in accordance with the Plan, including all Fee Claims, shall be funded on the Effective Date from the Debtor's Cash on hand.

      2.    *Sales Tax Liability*

On March 27, 2024, the Debtor commenced the Sales Tax Adversary, seeking a declaration that it has no prepetition or postpetition Sales Tax Liability. To the extent that the Bankruptcy Court determines that the Debtor has any Sales Tax Liability, any such Allowed Claim shall be paid from funds in the Sales Tax Escrow Account.

      3.    *Fee Claims*

(1)    All Entities seeking an award by the Bankruptcy Court of Fee Claims shall file and serve on counsel to the Debtor, the U.S. Trustee, counsel to the Notes Trustee, and counsel for the Plan Administrator on or before the date that is thirty (30) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Effective Date. Objections to Fee Claims must be filed and served on counsel to the Debtor, the U.S. Trustee, counsel to the Notes Trustee, counsel for the Plan Administrator, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the Debtor and the party requesting compensation of a Fee Claim, or as approved by the Court).

(2)    Allowed Fee Claims shall be paid in full, in Cash, by the Plan Administrator in such amounts as are Allowed by the Bankruptcy Court: (i) on the date upon which an order relating to any such Allowed Fee Claim is entered or as soon as reasonably practicable thereafter; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtor, or the Plan Administrator.

(3)    No later than ten (10) days prior to the Effective Date, holders of Fee Claims shall provide an estimate of unpaid Fee Claims incurred in rendering services prior to the Effective Date to the Debtor and the Notes Trustee and the Debtor (or Plan Administrator if applicable) shall, subject to the Plan, separately escrow from funds of the Debtor such estimated amounts in a Professional Fees Escrow Account for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties. If a holder of a Fee Claim does not provide an estimate, the Debtor or the Plan Administrator, as applicable, may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Fee Claim, and provide notice thereof to the Notes Trustee. The Professional Fees Escrow Account shall be treated as a trust account for the benefit of holders of Fee Claims and otherwise subject to the terms of the Plan. When all such Allowed Fee Claims have been paid in full, any remaining amount in a Professional Fees Escrow Account shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Debtor for distribution in accordance with the terms hereof without any further action or order of the Bankruptcy Court.

HF 17334758v.5HF 17382379v.1

(4)    The Plan Administrator is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date, including for services rendered or expenses incurred by the Debtor's or the Plan Administrator's professionals, as applicable, in the ordinary course and without the need for Bankruptcy Court approval.

4.    *Priority Tax Claims*

Each holder of an allowed Priority Tax Claim shall receive treatment in a manner consistent with Bankruptcy Code section 1129(a)(2). Except to the extent that a holder of a Priority Tax Claim agrees to less favorable treatment, Priority Tax Claims shall be satisfied, disputed, pursued, or otherwise reconciled in the ordinary course by the Debtor or the Plan Administrator, as applicable, who shall retain the rights to any defenses and setoffs against any Priority Tax Claim available to the Debtor.

As of the date hereof, no Priority Tax Claim has been filed in the Chapter 11 Case.

**B.    Classification of Claims and Interests**

1.    *Classification in General*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under Bankruptcy Code sections 1122 and 1123(a)(1); provided, however, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

2.    *Summary of Classification*

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are: (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with Bankruptcy Code section 1126; and (c) presumed to accept or deemed to reject the Plan.

HF 17334758v.5HF 17382379v.1

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Senior Secured Claims | Impaired | Yes |
| 2A | Mechanic's Lien Claim of D and J | Unimpaired | No |
| 2B | Mechanic's Lien Claim of JSP | Unimpaired | No |
| 2C | Mechanic's Lien Claim of Schimenti | Unimpaired | No |
| 2D | Mechanic's Lien Claim of Ziba | Unimpaired | No |
| 3 | Unsecured Claims | Impaired | Yes |
| 4 | Interests | Unimpaired | No |

3. *Elimination of Vacant Classes*

Any Class of Claims against the Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies Bankruptcy Code section 1129(a)(8) with respect to that Class.

4. *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Debtor shall request that the Bankruptcy Court at the Confirmation Hearing deem the Plan accepted by the holders of such Claims in such Class.

5. *Confirmation Pursuant to Bankruptcy Code Sections 1129(a)(10) and 1129(b)*

The Debtor shall seek confirmation of the Plan pursuant to Bankruptcy Code section 1129(b) with respect to any Class of Claims or Interests that rejects or is deemed to reject the Plan. The Debtor reserves the right to modify the Plan to the extent, if any, that confirmation pursuant to Bankruptcy Code section 1129(b) requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**C.    Treatment of Claims and Interests**

1. *Treatment in General*

On the Effective Date, each holder of an Allowed Claim or Interest shall receive under the Plan the treatment described in this Article IV in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's allowed Claim or Interest, except to

16

the extent different treatment is agreed to by the Debtor or Plan Administrator, as applicable, and the applicable holder of such Allowed Claim or Interest.

2. *Senior Secured Claims (Class 1)*

Each holder of an Allowed Senior Secured Claim shall receive its Pro Rata Share of the remaining proceeds in the Distribution Fund promptly after the payment in full in Cash or adequate reserve being made by the Debtor of all of the following (i) all regular closing costs and adjustments; (ii) Allowed Fee Claims; (iii) Allowed Administrative Claims (subject to the provisions of Section 2.1 above); and (iv) Allowed Priority Claims (subject to the provisions of Section 2.3 above); provided, however, that any deficiency Claim of a holder of Series C Notes shall be treated as a Class 3 Unsecured Claim.

3. *Mechanic's Lien Claims (Classes 2A-2D)*

Each holder of an Allowed Mechanic's Lien Claim shall receive payment in full in Cash.

To the extent that any Mechanic's Lien Claim has not been Allowed as of the Confirmation Date, the Debtor will seek an estimation order from the Bankruptcy Court as to the amount to be reserved on account of such Mechanic's Lien Claim.

Classes 2A-2D are Unimpaired and deemed to accept the Plan.

4. *Unsecured Claims (Class 3)*

Each holder of an Allowed Unsecured Claim shall receive its Pro Rata Share of the remaining proceeds in the Distribution Fund promptly after the payment in full in Cash or adequate reserve being made by the Debtor of all of the following (i) all regular closing costs and adjustments; (ii) Allowed Fee Claims; (iii) Allowed Administrative Claims (subject to the provisions of Section 2.1 above); (iv) Allowed Priority Claims (subject to the provisions of Section 2.3 above); (v) Allowed Senior Secured Claims; and (vi) Allowed Mechanic's Lien Claims Class 3 is impaired. Holders of Allowed Unsecured Claims are entitled to vote to accept or reject the Plan.

5. *Interests (Class 4)*

Member, as the sole holder of a Class 4 Interest shall receive an initial distribution on the Effective Date in the amount of $2,127,107, which it shall distribute to Weiss. If (A) (i) the aggregate Mechanic Lien Claims is Allowed in an amount less than full amount asserted in the proofs of claim filed by Mechanic Lien Claims, or (ii) the Unfair Labor Claim is Allowed in amount less than $700,000, or (iii) the legal fees expended to settle or resolve the Mechanic Lien Claims were less than the amount set aside by the Debtor, or (B), if the Mechanic Lien Claims and the Unfair Labor Claim are not Allowed prior to the Plan Effective Date, and any amounts remain in the Debtor Contingent Liabilities Escrow after resolution and satisfaction in full of the Mechanic's Lien Claims and the Unfair Labor Claim, the Debtor shall distribute such amounts to Member, who shall make an immediate equity distribution of such distribution to each member of Member, in accordance with their pro rata ownership percentages of Member.

17

Class 4 is Unimpaired and deemed to accept the Plan.

**D.    MEANS FOR IMPLEMENTATION**

      1.    *The Sale of the WV Complex*

      (a)    The Sale Process. Subject to the approval of this Court, the Debtor will sell the WV Complex to the Purchaser, free and clear of any Liens, Claims, and encumbrances (except for Assigned Contracts) to the fullest extent provided by the Bankruptcy Code or other applicable law.

      (b)    The Closing. On the Closing Date, the Purchaser shall consummate the purchase of the WV Complex in accordance with the Bid Procedures.

      (c)    Vesting of Assets. Except as otherwise provided in the Plan, on the Closing Date, to the fullest extent provided by the Bankruptcy Code or other applicable law, the WV Complex shall vest in the Purchaser, free and clear of all Liens, Claims and encumbrances (other than Assigned Contracts) and any other Liens, Claims and encumbrances that have not been expressly preserved under the Plan shall attach to the Sale Proceeds as of such date.

      (d)    Net Sale Proceeds.    Net Sale Proceeds shall be used solely to fund the Distribution Fund and utilized to satisfy payments consistent with the terms of the Plan.

      (e)    Transfer Taxes. Pursuant to Bankruptcy Code section 1146(a), the Sale and any other transfers of property pursuant to the Plan and the making or delivery of an instrument of transfer of property or otherwise, pursuant to or in connection with the Plan or the Sale shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax or governmental assessment in the United States or by any other governmental unit, and the Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local (domestic or foreign) governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to or in connection with such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to the Sale of the WV Complex to the Purchaser.

HF 17334758v.5HF 17382379v.1

2.   *The Global Settlement*[2]

Subject to the approval of the Settlement Agreement by the Bankruptcy Court, the Debtor and other parties to the Settlement Agreement will perform their respective obligations arising pursuant to such agreement, including, without limitation, the following:

Cash Settlement Payment. WB LLC shall pay to the Debtor an amount equal to not less than $8,512,152 (the "Cash Settlement Payment") in three installments: The initial installment shall be made on the effective date as defined in the Settlement Agreement (the "Settlement Agreement Effective Date"), on which date WB LLC shall pay to the Debtor an amount equal to $7,705,076, which payment shall be in the form of (i) cash in the amount of $4,220,731 and (ii) the retention by the Debtor of a portion of the $7.5 million payment to Debtor from WB LLC on or about August 2, 2023 (the "August U&O Payment") in the amount of $3,484,346 (such amount equal to $3.75 million minus all transition reconciliation amounts aggregating $265,654 that are credited to the Debtor pursuant to the Cash Collateral Stipulation) in lieu of reimbursing such amount to WB LLC pursuant to the Cash Collateral Stipulation. (For the avoidance of doubt, the transition reconciliation amounts aggregating $265,654 deducted from the August U&O Payment shall be retained by the Debtor and shall not be part of the Cash Settlement Payment.) The second installment shall be made in the form of the transfer by Hospitality to the Debtor of the full amount of the Employee Retention Tax Credit ("ERTC") in an amount not less than $726,000, provided that, to the extent the ERTC received by Debtor exceeds $726,000, such excess amount shall be transferred to Espresso in accordance with section 4(b) of the Settlement Agreement. In the event that, notwithstanding the Direction Letter (attached to the Settlement Agreement as Exhibit B), Hospitality transfers any portion of the ERTC to WV FNB rather than to the Debtor, WV FNB shall transfer such portion of the ERTC to the Debtor promptly upon receipt of the ERTC from Hospitality. The third installment shall be made in the form of a transfer by WV Hotel of the refund of a portion of prepaid Workers' Compensation Insurance in the amount of $81,075 (the "WC Refund Payment"), which transfer shall be made promptly upon WV Hotel's receipt of the WC Refund Payment.

Employee Retention Tax Credit. WV FNB has advised the Debtor that, pursuant to that certain award dated March 11, 2024 in the Hospitality Arbitration, Hospitality is obligated to pay WV FNB the ERTC that will be paid by the Internal Revenue Service to Hospitality. On the Settlement Agreement Effective Date, WV FNB shall send Hospitality an executed version of the Direction Letter in the form annexed to the Settlement Agreement as Exhibit B, pursuant to which WV FNB shall direct Hospitality (i) to notify WV FNB, Espresso and the Debtor promptly when Hospitality receives payment of the ERTC and which form shall include a confirmation by Hospitality of such direction, and (ii) to promptly transfer directly to the Debtor the full amount of the ERTC received by Hospitality; provided however that to the extent the ERTC received by the Debtor exceeds $726,000 (the "Excess ERTC Amount"), the Debtor shall promptly transfer to Espresso, in full and final satisfaction of the Arbitration Success Fee, the Excess ERTC Amount.

---

[2] Capitalized terms used but not defined in this section have the meanings given to them in the Settlement Agreement.

<u>Non-Cash Settlement Payment</u>: On the Settlement Agreement Effective Date, WV Hotel shall irrevocably surrender, assign and transfer, and Hotel Sub shall irrevocably assume and accept, all right, title and interest in and to the following social media accounts associated with the Hotel: (i) Instagram "@thewilliamvale"; (ii) YouTube "@thewilliamvale9284"; (iii) TikTok "thewilliamvale"; (iv) X f/k/a Twitter: "@thewilliamvale"; (v) Facebook "The William Vale"; and (vi) Pinterest "The William Vale" (collectively, the "<u>Social Media Accounts</u>"). WV Hotel acknowledges and agrees that all usernames, administrator accounts, and passwords associated with the foregoing Social Media Accounts have been provided to Hotel Sub and are currently in the possession of the Hotel's Director of Marketing. WV Hotel further acknowledges and agrees that on and after the Settlement Agreement Effective Date, WV Hotel shall not make any use, either for its own benefit or for the benefit of any other person or entity, of the Social Media Accounts, including but not limited to all content created and posted thereon and/or thereunder, and that Hotel Sub shall have the exclusive right to use and/or to otherwise transfer the Social Media Accounts. The value attributable to the Social Media Accounts is $45,000.

<u>Internet Domain</u>. On the Settlement Agreement Effective Date, the Debtor shall purchase from WV Hotel all right, title and interest in and to the internet domain for the Hotel, "www.thewilliamvale.com," and any goodwill associated therewith (collectively, the "<u>Domain Name</u>") for the purchase price of $1.3 million (the "<u>Domain Purchase Price</u>") by entering into that certain Domain Name Purchase and Transfer Agreement in the agreed form annexed to the Settlement Agreement as Exhibit C. As directed by the members of WV Hotel, the Debtor shall distribute the Domain Purchase Price as follows: 50% shall be paid to Weiss (or as otherwise directed by Weiss) and 50% shall be paid to Yoel Goldman (or as otherwise directed by Yoel Goldman). For the avoidance of doubt, each of WB LLC, WV Hotel, WV FNB, North 12 Parking LLC, Espresso, and Staffing represent and warrant that, to the extent, if any, it has, had or ever had any rights, title and interest in or to the existing content on the website associated with the Domain Name, it waives all rights, title and interest in and to the existing content on the website associated with the Domain Name.

<u>Consulting Services Payment</u>. On the Settlement Agreement Effective Date, the Debtor shall pay Espresso $200,000 in consideration for consulting services that have been rendered by Espresso to the Debtor in implementing the transition of the operation, direction, management, and supervision of the William Vale Hotel for the period that commenced as of September 30, 2023 through the execution date of the Consulting Services Agreement between the Debtor and Espresso.

Mechanics' Lien Claims. Notwithstanding anything to the contrary in the Cash Collateral Stipulation, the Debtor shall be responsible to pay 100% of all amounts paid to settle, extinguish and/or satisfy the claims, including without limitation, all legal fees and expenses incurred by the Debtor in connection with such claims, (collectively, the "Mechanic Lien Claims" and each individually a "Mechanic Lien Claim") of: (i) D and J Industries LLC (Claim No. 2); (ii) JSP Electrical Contracting Corp (Claim No. 5); (iii) Schimenti Construction Company LLC (Claim No. 6); and (iv) Ziba Construction Inc. dba 212Carpet (Claim No. 7) in the Chapter 11 Case. The Debtor further agrees that it shall not settle or compromise any Mechanic Lien Claim without the unanimous written consent of the members of Member LLC, which consent shall not be unreasonably withheld, conditioned or delayed. To the extent the Mechanic Lien Claims are not settled, extinguished and/or satisfied prior to the Plan Effective Date, the Debtor will retain in escrow the amounts necessary to satisfy such Mechanic Lien Claims.

Unfair Labor Practice Claims. The Debtor shall be responsible to pay 100% of all amounts paid to settle, extinguish and/or satisfy the claims, including without limitation, all legal fees and expenses incurred by the Debtor in connection with such claims, pending before the National Labor Relations Board as follows: (i) Staffing and Hotel And Gaming Trades Council, AFL-CIO, Case No. 29-RC-200927, commenced August 5, 2022 which seeks to certify a unit of employees including all full-time and regular part-time housekeeping employees for collective bargaining purposes; and (ii) Staffing and Hotel and Gaming Trades Council, AFL-CIO, Case No. 29-CA-31397, commenced November 9, 2023, which asserts unfair labor practices in violation of the National Labor Relations Act (together, the "Unfair Labor Claim"). The Debtor further agrees that it shall not settle or compromise any Unfair Labor Claim without the unanimous written consent of the members of Member LLC, which consent shall not be unreasonably withheld, conditioned or delayed. To the extent the Unfair Labor Claim is not settled, extinguished and/or satisfied prior to the Plan Effective Date, the Debtor will retain in escrow the amounts necessary to satisfy such Unfair Labor Claim.

Liquor License Transfer. On and after the Settlement Agreement Effective Date, Weiss, in his capacity as managing member of WV Hotel and WV FNB, shall cause WV Hotel and/or WV FNB, as applicable to cooperate with all commercially reasonable requests of WB FNB LLC ("FNB Sub") and take such commercially reasonable actions as are necessary to (i) submit a liquor license transfer application on behalf of FNB Sub to the New York State Liquor Authority (the "SLA") and (ii) effectuate the transfer of the liquor license for the WV Complex from WV FNB to FNB Sub. Such cooperation shall include, but not be limited to:

(a)    FF&E Agreement. The Parties acknowledge that on February 8, 2024, WV FNB as Seller and FNB Sub as Buyer entered into that certain FF&E Purchase and Sale Agreement (the "FF&E Agreement"), and the Parties agree that such FF&E Agreement is and shall be considered part of the good and valuable consideration exchanged by the Parties under this Agreement.

(b)    Deposit Account. On the Settlement Agreement Effective Date, (i) WV FNB shall open bank account in its name at Flagstar Bank and (ii) WV Hotel shall open a bank account in its name at Flagstar Bank (collectively, the "Deposit Accounts"). Each of the Deposit Accounts shall be subject to a deposit account control agreement (each, a "DACA") in a form reasonably acceptable to each of Debtor, Trustee, WV FNB, FNB Sub, WV Hotel, Hotel Sub and

21

WB Operations LLC ("Op Sub"). Simultaneously with the filing of the motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure that the Debtor shall file as soon as reasonably practicable following execution of the Settlement Agreement, the Debtor shall file a motion with the Bankruptcy Court to approve a second cash collateral stipulation in a form reasonably acceptable to each of the Debtor, Trustee, WV FNB, FNB Sub, WV Hotel, Hotel Sub and Op Sub to further modify certain provisions of the Cash Collateral Order and obtain approval of certain agreements among the Debtor, FNB Sub, Hotel Sub, WV FNB, WV Hotel and the Trustee with respect to all revenues generated by the Debtor's operation of the WV Complex during the period from the Petition Date through the date on which the SLA issues a temporary liquor license to FNB Sub (the "DACA Funds"). The Parties agree that, pursuant to the DACAs, from and after the Settlement Agreement Effective Date, the Debtor shall be entitled to direct Flagstar Bank to administer the DACA Funds in the Deposit Accounts for any purpose in the Debtor's sole discretion, including without limitation, (a) from and after the Settlement Agreement Effective Date, to direct Flagstar Bank to transfer all or any portion of the DACA Funds to fund or satisfy its obligations with respect to the payment described in Section 4(c) of the Settlement Agreement and the payment described in Section 4(d) therein; and (b) on the Plan Effective Date, to direct Flagstar Bank to transfer all or any portion of the DACA Funds to fund or satisfy its obligations with respect to the payment of the equity distribution described in Sections 3(b) and its obligations under sections 4(b), 4(d), 4(e), 4(f) and 4(g) of the Settlement Agreement. Notwithstanding the foregoing, the Parties agree that neither WV FNB nor WV Hotel, nor their respective managing members and/or members, shall be liable for any damages, losses, penalties or fees arising in connection with the DACA Funds, including the deposit of the DACA Funds into the Deposit Accounts or the distribution of the DACA Funds from the Deposit Accounts. The Debtor shall indemnify each of WV FNB, WV Hotel, and their respective managing members and members for any such damages, losses, penalties or fees.

(c)    Liquidator's Permit. On the Settlement Agreement Effective Date, WV Hotel and WV FNB shall deliver a completed Application for Liquidator's Permit to FNB Sub.

(d)    Liquor License Surrender. On the date that the SLA issues a temporary liquor license to FNB Sub, WV Hotel and WV FNB shall complete the petition for surrender found on the reverse side of the liquor license certificate.

HF 17334758v.5HF 17382379v.1

Distribution of Amounts Received by Member LLC. On the Plan Effective Date, YG WV shall cause Member LLC to make an equity distribution to Weiss, in his capacity as 50% member of Member LLC, of the Initial Member Distribution received by Member LLC under paragraph 3(b) of this Agreement. As to the Contingent Member Distribution as defined in the Settlement Agreement, if any, whether made on or after the Plan Effective Date, YG WV shall cause Member LLC to make an immediate equity distribution of such distribution to each member of Member LLC, in accordance with their pro rata ownership percentages of Member LLC.

Termination of Lease Agreement. On the Settlement Agreement Effective Date, the Debtor and WB LLC shall execute the Memorandum of Termination of Lease retroactive to May 20, 2021 substantially in the form annexed to the Settlement Agreement as Exhibit D and the Debtor shall record it in the ACRIS system for Kings County, New York.

Releases

(a)    *Weiss Releases*.  In consideration of the payments and covenants contained in the Settlement Agreement, Weiss, in his individual capacity, along with any of his partners, agents, employees, heirs, counsel, financial advisors, representatives, successors, and assigns, and all persons acting through, under, or in concert with any of them, (the "Weiss Releasors" and each, a "Weiss Releasor") irrevocably and unconditionally release and discharge:

(i)    each of the Debtor, Hotel Sub, Op Sub, FNB Sub, Member, and YG WV and their officers, directors, shareholders, members, partners, agents, employees, heirs, counsel, financial advisors, representatives, successors, subsidiaries, affiliates and assigns, and all persons acting through, under, or in concert with any of them (the "Debtor Releasees" and each, a "Debtor Releasee") from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, remedies, actions, causes of action, suits, rights, demands, costs, losses, debts, and expenses of any nature whatsoever, known or unknown, whether in law or equity, which each Weiss Releasor ever had, now has or hereafter can, shall, or may have against each or any of the Debtor Releasees arising from, under, in connection with or relating to (a) the Series C Bonds; (b) the Deed of Trust; (c) the Guaranty; (d) the Note; (e) the Mortgage; (f) the Lease; (g) the acquisition, development and operation of the WV Complex; (h) that certain Limited Liability Company Agreement of Wythe Berry Fee Owner LLC dated as of February 28, 2017; and (i) that certain Limited Liability Company Agreement of Wythe Berry Member LLC dated as of February 28, 2017; provided, however, nothing contained in the Settlement Agreement shall release the Debtor Releasees from their obligations under the terms of the Settlement Agreement or any representations made therein or any of the exhibits annexed thereto (the "Weiss Debtor Releases"); provided further, however, for the avoidance of doubt, the foregoing releases described by this sub paragraph do not apply to Goldman, and Goldman shall not receive a release under this paragraph;

(ii)    the Trustee and its officers, directors, shareholders, members, partners, agents, employees, heirs, counsel, financial advisors, representatives, successors, subsidiaries, affiliates and assigns, and all persons acting through, under, or in concert with it, including without limitation all and any holders of the Series C Bonds (the "Trustee Releasees" and each, a "Trustee Releasee") from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, remedies, actions, causes of action, suits, rights, demands, costs, losses, debts, and expenses of any nature whatsoever, known or

23

unknown, whether in law or equity, which each Weiss Releasor ever had, now has or hereafter can, shall, or may have against each or any of the Trustee Releasees arising from, under, in connection with or relating to (a) the Series C Bonds; (b) the Deed of Trust; (c) the Guaranty; (d) the Note; (e) the Mortgage; (f) the Lease; and (g) the acquisition, development and operation of the WV Complex; provided, however, nothing contained in the Settlement Agreement shall release the Trustee Releasees from their obligations under the terms of the Settlement Agreement or any representations made in the Settlement Agreement or any of the exhibits annexed thereto (the "Weiss Trustee Releases"); provided further, however, for the avoidance of doubt, the foregoing releases described by this sub paragraph do not apply to Goldman, and Goldman shall not receive a release under this paragraph;

(b)    *LLC Releases*.  In consideration of the payments and covenants contained in the Settlement Agreement, each of WB, WV Hotel, WV FNB, Parking, Espresso, Domain, and Staffing, and their officers, directors, shareholders, members, partners, agents, employees, heirs, counsel, financial advisors, representatives, successors, subsidiaries, affiliates and assigns, and all persons acting through, under, or in concert with any of them (the "WB Releasors" and each, a "WB Releasor") irrevocably and unconditionally release and discharge:

(i) the Debtor Releasees from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, remedies, actions, causes of action, suits, rights, demands, costs, losses, debts, and expenses of any nature whatsoever, known or unknown, whether in law or equity, which each WB Releasor ever had, now has or hereafter can, shall, or may have against each or any of the Debtor Releasees arising from, under, in connection with or relating to (a) the Series C Bonds; (b) the Deed of Trust; (c) the Guaranty; (d) the Note; (e) the Mortgage; (f) the Lease; and (g) the acquisition, development and operation of the WV Complex; provided, however, nothing contained in the Settlement Agreement shall release the Debtor Releasees from their obligations under the terms of the Settlement Agreement or any representations made therein or any of the exhibits annexed thereto (the "WB Debtor Releases"); provided further, however, for the avoidance of doubt, the foregoing releases described by this sub paragraph do not apply to Goldman, and Goldman shall not receive a release under this paragraph;

(ii) the Trustee Releasees, from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, remedies, actions, causes of action, suits, rights, demands, costs, losses, debts, and expenses of any nature whatsoever, known or unknown, whether in law or equity, which each WB Releasor ever had, now has or hereafter can, shall, or may have against each or any of the Debtor Releasees arising from, under, in connection with or relating to (a) the Series C Bonds; (b) the Deed of Trust; (c) the Guaranty; (d) the Note; (e) the Mortgage; (f) the Lease; and (g) the acquisition, development and operation of the WV Complex; provided, however, nothing contained in the Settlement Agreement shall release the Trustee Releasees from their obligations under the terms of the Settlement Agreement or any representations made therein or any of the exhibits annexed thereto (the "WB Trustee Releases"); provided further, however, for the avoidance of doubt, the foregoing releases described by this sub paragraph do not apply to Goldman, and Goldman shall not receive a release under this paragraph;

(b)    *Debtor Releases*.  In consideration of the payments and covenants contained in the Settlement Agreement, each of the Debtor, Hotel Sub, Op Sub, FNB Sub, Member, and YG WV and any of their officers, directors, shareholders, members, partners, agents, employees, heirs, counsel, financial advisors, representatives, successors, subsidiaries,

24

affiliates and assigns, and all persons acting through, under, or in concert with any of them (the "<u>Debtor Releasors</u>" and each, a "<u>Debtor Releasor</u>") irrevocably and unconditionally release and discharge:

(i) Weiss, in his individual capacity, along with any of his partners, agents, employees, heirs, counsel, financial advisors, representatives, successors, and assigns, and all persons acting through, under, or in concert with any of them (though, for the avoidance of doubt, excluding Goldman) (the "<u>Weiss Releasees</u>" and each, a "<u>Weiss Releasee</u>") from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, remedies, actions, causes of action, suits, rights, demands, costs, losses, debts, and expenses of any nature whatsoever, known or unknown, whether in law or equity, which each Debtor Releasor ever had, now has or hereafter can, shall, or may have against each or any of the Weiss Releasees arising from, under, in connection with or relating to (a) the Series C Bonds; (b) the Deed of Trust; (c) the Guaranty; (d) the Note; (e) the Mortgage; (f) the Lease; (g) the acquisition, development and operation of the WV Complex; (h) that certain Limited Liability Company Agreement of Wythe Berry Fee Owner LLC dated as of February 28, 2017; (i) that certain Limited Liability Company Agreement of Wythe Berry Member LLC dated as of February 28, 2017; (j) the Adversary Proceeding; and (k) the Chapter 11 Case; <u>provided</u>, <u>however</u>, nothing contained in the Settlement Agreement shall release the Weiss Releasees from their obligations under the terms of the Settlement Agreement or any representations made therein or any of the exhibits annexed thereto (the "<u>Debtor Weiss Releases</u>"); <u>provided</u> <u>further</u>, <u>however</u>, for the avoidance of doubt, the foregoing releases described by this subparagraph do not apply to Goldman, and Goldman shall not receive a release under this paragraph;

(ii) each of WB, WV Hotel, WV FNB, Parking, Espresso, Domain, and Staffing, and their officers, directors, shareholders, members, partners, agents, employees, heirs, counsel, financial advisors, representatives, successors, subsidiaries, affiliates and assigns, and all persons acting through, under, or in concert with any of them (though, for the avoidance of doubt, excluding Goldman) (the "<u>WB Releasees</u>" and each, a "<u>WB Releasee</u>") from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, remedies, actions, causes of action, suits, rights, demands, costs, losses, debts, and expenses of any nature whatsoever, known or unknown, whether in law or equity, which each Debtor Releasor ever had, now has or hereafter can, shall, or may have against each or any of the WB Releasees arising from, under, in connection with or relating to (a) the Series C Bonds; (b) the Deed of Trust; (c) the Guaranty; (d) the Note; (e) the Mortgage; (f) the Lease; (g) the acquisition, development and operation of the WV Complex; (h) the Adversary Proceeding; and (i) the Chapter 11 Case; <u>provided</u>, <u>however</u>, nothing contained in the Settlement Agreement shall release the WB Releasees from their obligations under the terms of the Settlement Agreement or any representations made in the Settlement Agreement or any of the exhibits annexed to thereto (the "<u>Debtor WB Releases</u>"); <u>provided</u> <u>further</u>, <u>however</u>, for the avoidance of doubt, the foregoing releases described by this subparagraph do not apply to Goldman, and Goldman shall not receive a release under this paragraph; and

(c)    *Trustee Releases*.  In consideration of the payments and covenants contained in the Settlement Agreement, the Trustee and its officers, directors, shareholders, members, partners, agents, employees, heirs, counsel, financial advisors, representatives, successors, subsidiaries, affiliates and assigns, and all persons acting through, under, or in concert with any of them, including without limitation all and any holders of the Series C Bonds

25

(the "Trustee Releasors" and each, a "Trustee Releasor") irrevocably and unconditionally release and discharge:

(i) the Weiss Releasees from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, remedies, actions, causes of action, suits, rights, demands, costs, losses, debts, and expenses of any nature whatsoever, known or unknown, whether in law or equity, which each Trustee Releasor ever had, now has or hereafter can, shall, or may have against each or any of the Weiss Releasees arising from, under, in connection with or relating to (a) the Series C Bonds; (b) the Deed of Trust; (c) the Guaranty; (d) the Note; (e) the Mortgage; (f) the Lease; (g) the acquisition, development and operation of the WV Complex; (h) the Adversary Proceeding; and (i) the Chapter 11 Case; provided, however, nothing contained in the Settlement Agreement shall release the Weiss Releasees from their obligations under the terms of the Settlement Agreement or any representations made therein or any of the exhibits annexed thereto (the "Trustee Weiss Releases"); provided further, however, for the avoidance of doubt, the foregoing releases described by this subparagraph do not apply to Goldman, and Goldman shall not receive a release under this paragraph; and

(ii) the WB Releasees from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, remedies, actions, causes of action, suits, rights, demands, costs, losses, debts, and expenses of any nature whatsoever, known or unknown, whether in law or equity, which each Trustee Releasor ever had, now has or hereafter can, shall, or may have against each or any of the WB Releasees arising from, under, in connection with or relating to (a) the Series C Bonds; (b) the Deed of Trust; (c) the Guaranty; (d) the Note; (e) the Mortgage; (f) the Lease; (g) the acquisition, development and operation of the WV Complex; (h) the Adversary Proceeding; and (i) the Chapter 11 Case; provided, however, nothing contained in the Settlement Agreement shall release the WB Releasees from their obligations under the terms of the Settlement Agreement or any representations made therein or any of the exhibits annexed thereto (the "Trustee WB Releases"); provided further, however, for the avoidance of doubt, the foregoing releases described by this subparagraph do not apply to Goldman, and Goldman shall not receive a release under this paragraph.

(d)     Notwithstanding anything to the contrary set forth in the Settlement Agreement, (a) each of the Debtor Weiss Releases, the Debtor WB Releases, the Trustee Weiss Releases, and the Trustee WB Releases set forth in paragraph 5 of the Settlement Agreement shall become effective upon the later of (i) the Settlement Agreement Effective Date and (ii) the earliest to occur of (A) the completion by WV Hotel and WV FNB of the Petition for Surrender (the "Petition for Surrender Obligation"), (B) the SLA's denial of the application for a temporary liquor license to FNB Sub, or (C) the termination pursuant to its terms of the Purchase and Sale Agreement dated as of February 13, 2024 between the Debtor and William Vale Owner LLC (the "PSA"), in any case with such releases becoming effective retroactive to the Settlement Agreement Effective Date; and (b) each of the Weiss Debtor Releases, the Weiss Trustee Releases, the WB Debtor Releases, and the WB Trustee Releases set forth in paragraph 5 of the Settlement Agreement shall become effective upon the Debtor's transfer of the Excess ERTC Amount to Espresso in accordance with paragraph 4(b) of the Settlement Agreement (the "Excess ERTC Obligation"), with such releases being effective retroactive to the Settlement Agreement Effective Date; provided, however, that notwithstanding the foregoing, immediately upon the Effective Date, (x) the Debtor Releasors and Trustee Releasors shall not assert, pursue, commence litigation, or otherwise take any action with respect to any claims released by paragraph 5 of the Settlement Agreement unless and until WV Hotel and WV FNB have failed to

satisfy the Petition for Surrender Obligation, and (y) the Weiss Releasors and WB Releasors shall not assert, pursue, commence litigation, or otherwise take any action with respect to any claims released by paragraph 5 unless and until the Debtor has failed to satisfy the Excess ERTC Obligation.

3.  *Administration and Liquidation of the Debtor*

(a)  <u>Appointment of the Plan Administrator</u>.

Prior to the Effective Date, the Debtor, in consultation with the Notes Trustee, shall identify a Plan Administrator for the purpose of conducing the Wind Down in accordance with the Plan and the Plan Administration Agreement to be filed as part of the Plan Supplement.

Upon the Effective Date, the appointment of the Plan Administrator will automatically become effective.

The Plan Administrator: (a) shall act for the Debtor in the same capacity and shall have the same rights and powers as are applicable to a manager, managing member, board of managers, board of directors or equivalent governing body, as applicable, and the Debtor's certificates of formation and limited liability company agreements are deemed amended pursuant to the Plan to permit and authorize the same; (b) will be the Debtor's representative for purposes of Bankruptcy Code section 1123(b)(3); (c) shall be the sole representative of and shall act for the Debtor with the authority set forth in the Plan and the Plan Administration Agreement; and (d) shall succeed to all of the Debtor's rights with respect to its assets, including, without limitation, control over (including the right to waive) all attorney-client privileges, work-product privileges, accountant-client privileges and any other evidentiary or other privileges that, prior to the Effective Date, belonged to the Debtor pursuant to applicable law.

The Plan Administrator shall have the authority, subject to the terms of the Plan Administration Agreement, but without the need for Bankruptcy Court approval, to carry out and implement all provisions of the Plan, including, without limitation, to: (a) implement the Wind Down as expeditiously as reasonably possible and administer the liquidation, dissolution, sale and/or abandonment or similar action of the Excluded Assets after the Effective Date; (b) except to the extent Claims have been previously Allowed or are Unimpaired, manage the Claims reconciliation process; (c) make distributions to holders of Allowed Claims in accordance with the Plan; (d) retain and compensate professionals to assist in performing his duties under the Plan; (e) complete and file, as necessary, all final or otherwise required federal, state, and local tax returns and other tax reports for the Debtor; (f) represent the Debtor's interests before any taxing authority in all matters including, without limitations, any action, suit, proceeding, appeal or audit; and (g) perform other duties and functions that are consistent with the implementation of the Plan or required by the Bankruptcy Code.

The Plan Administrator shall effectuate the Wind Down in accordance with the Wind Down Budget. The Plan Administrator shall pay any reasonable and documented costs and expenses incurred in connection with the Wind Down, including the reasonable fees and expenses of its professionals and the reasonable fees and expenses of the Debtor's professionals

HF 17334758v.5HF 17382379v.1

incurred for services rendered to the Debtor and its Estate following the Effective Date, without further order of the Bankruptcy Court.

The Debtor shall indemnify and hold harmless the Plan Administrator solely in its capacity as such and, where the Disbursing Agent is the Plan Administrator, the Disbursing Agent solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's or Disbursing Agent's gross negligence, willful misconduct, or criminal conduct.

All matters provided for herein involving the corporate structure of the Debtor, or any corporate or related action required by the Debtor, in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the members, directors or managers of the Debtor, with like effect as though such action had been taken unanimously by the members, directors, managers, or officers, as applicable, of the Debtor.

The Plan Administrator shall be compensated and reimbursed for reasonable costs and expenses as set forth in the Plan Administration Agreement.

(b)    Existing Managers and Officers. Upon the Effective Date, all of the Debtor's managers and officers will cease to have any power or authority to act for the Debtor, the Estate or the post-Effective Date Estate.

(c)    Dissolution of the Debtor. Upon the conclusion of the Wind Down in accordance with the Plan and the Plan Administration Agreement, the Plan Administrator shall dissolve the Debtor. The Plan Administrator shall be authorized to file on the Debtor's behalf, a certificate of dissolution and any other corporate and company documents necessary to effectuate the Wind Down without further action under applicable law, regulation, order, or rule, including any action by the members, the board of directors or similar governing body of the Debtor.

(d)    Effectuating Documents; Further Transactions. Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, in each case, in accordance with and subject to the terms hereof. All matters provided for in the Plan involving the limited liability company structure of the Debtor, and any limited liability company action required by the Debtor, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the members, directors, managers, or officers of the Debtor. On or before the Effective Date, the authorized officers of the Debtor shall be authorized and directed to issue, execute, and deliver the agreements, documents, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtor, including, but not limited to, any other agreements, documents, and instruments relating to the foregoing. The authorizations and approvals contemplated in the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

On or as soon as practicable after the Effective Date, the Debtor may take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, subject in all respects to the provisions of the Plan, including: (i) the execution and delivery of appropriate agreements or other documents

HF 17334758v.5HF 17382379v.1

of restructuring, financing, conversion, disposition, transfer, dissolution, transition services, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates of dissolution pursuant to applicable state law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

Prior to making any post-Effective Date distribution to any holder of an Allowed Remaining Unsecured Claims, the Plan Administrator shall adopt a "plan of liquidation" (as determined for U.S. federal income tax purposes) in furtherance of its duties and responsibilities under the Plan to monetize all of the Debtor's remaining assets (including any Avoidance Actions or other Causes of Action) and distribute the proceeds thereof in accordance with the Plan, and shall timely file IRS Form 966 in connection therewith.

(e)    <u>Certain Tax Matters</u>. For U.S. federal income tax purposes, and comparable state and local tax purposes, the Debtor shall implement the Plan in a manner such that it shall continue to be treated as a disregarded entity through the implementation of the Plan on the Effective Date and shall not take any action that would cause the Debtor to be treated as an association taxable as a corporation at any time.

The Debtor and all holders of Claims shall report consistently with the Plan for all income tax purposes and shall: (i) use commercially reasonable efforts to cause consistent reporting therewith by others; or (ii) not join in, encourage, and/or support inconsistent reporting therewith by others.

4.    *Cancellation of Existing Securities and Agreements*

On the Effective Date, except (i) for the purpose of evidencing a right to a distribution under the Plan; and (ii) as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed or assumed and assigned by the Debtor to the Purchaser, all agreements, instruments, and other documents evidencing any Claim or any indebtedness or other obligations thereunder, and any Interests, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect against the Debtor, and the obligations of the Debtor thereunder shall be deemed fully satisfied, released, and discharged.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtor as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtor or any of their counterparties under

29

any executory contract or lease to the extent such executory contract or lease has been assumed and assigned by the Debtor to the Purchaser pursuant to the Plan.

5.     *Cancellation of Liens*

Except as otherwise specifically provided herein, any Lien securing a Claim shall be deemed released, and the holder of such Secured Claim shall be directed to release any collateral or other property of the Debtor held by such holder and to take such actions as may be requested by the Debtor or the Plan Administrator, as applicable, to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases as may be requested by the Debtor.

6.     *Closing of the Chapter 11 Case*

After the Estate has been fully administered, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules

**E.     Distributions**

1.     *Distributions Generally*

The Debtor or the Plan Administrator, as applicable, shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan. The Plan Administrator shall be the Disbursing Agent with respect to all other Claims to be satisfied, disputed, pursued, or otherwise reconciled in accordance with the Plan.

2.     *Effective Date*

On the Effective Date, the Debtor's records of the Classes of Claims or Interests shall be deemed closed for purposes of determining whether a holder of such a Claim or Interest is a record holder entitled to distributions under the Plan, and there shall be no further changes in the record holders or the permitted designees of any such Claims or Interests. With respect to payment of any Cure Amount or Assumption Disputes, the Disbursing Agent shall not have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the close of business on the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim or Cure Amount.

3.     *Date of Distributions*

Except as otherwise provided in the Plan, any distributions and deliveries to be made under the Plan by the Plan Administrator shall be made within ten (10) Business Days following the Effective Date, as determined in accordance with the Plan, including, without limitation, the treatment provisions of Article IV of the Plan, or as soon as practicable thereafter.

HF 17334758v.5HF 17382379v.1

4. *Disbursing Agent*

All distributions under the Plan shall be made by the Disbursing Agent and the Debtor, as applicable, as provided herein.

5. *Rights and Powers of Disbursing Agent*

From and after the Effective Date, the Plan Administrator, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtor and other parties in interest, from any Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent. No holder of a Claim or Interest or other party in interest shall have or pursue any claim or Cause of Action against the Plan Administrator, solely in its capacity as Disbursing Agent, for making distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or ultra vires acts of such Disbursing Agent.

The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6. *Expenses of Disbursing Agent*

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash, subject to the Plan Administration Agreement.

7. *Post-petition Interest on Claims*

Except as otherwise provided in the Plan or the Confirmation Order, interest shall not accrue or be paid on any Claims against the Debtor on or after the Petition Date.

8. *Delivery of Distributions*

Subject to Bankruptcy Rule 9010, all distributions to any holder or permitted designee, as applicable, of an Allowed Claim or Interest shall be made by the Debtor or Disbursing Agent to the applicable holders or permitted designees of Allowed Claims or Interests on behalf of the Debtor. In the event that any distribution to any holder or permitted designee is returned as undeliverable, no further distributions shall be made to such holder or such permitted designee unless and until the Disbursing Agent is notified in writing of such holder's or permitted designee's, as applicable, then-current address, at which time all currently due, missed

31

distributions shall be made to such holder as soon as reasonably practicable thereafter without interest. Nothing herein shall require the Disbursing Agent to attempt to locate holders or permitted designees, as applicable, of undeliverable distributions and, if located, assist such holders or permitted designees, as applicable, in complying with Section 6.19 of the Plan.

9.    *Distributions after Effective Date*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

10.    *Unclaimed Property*

Undeliverable distributions shall remain in the possession of the Debtor until such time as a distribution becomes deliverable or a holder accepts distribution, or such distribution reverts to the Debtor and shall not be supplemented with any interest, dividends, or other accruals of any kind. Such distributions shall be deemed unclaimed property under Bankruptcy Code section 347(b) and forfeited at the expiration of one hundred and twenty (120) days from the applicable date of distribution and the holder of the Claim entitled to such distribution shall be discharged and forever barred. After such date, all unclaimed property or interest in property of the Debtor shall revert to and vest in and shall be thereafter disbursed to the holders of Unsecured Claims, and all unclaimed property or interest in property shall be discharged and forever barred.

11.    *Time Bar to Cash Payments*

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Thereafter, the amount represented by such voided check shall immediately and irrevocably revert to the Debtor and any Claim on account of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check prior to the expiration of the one hundred and twenty (120) day period from the date of issuance shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

12.    *Manner of Payment Under Plan*

Except as otherwise specifically provided in the Plan, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtor.

13.    *Minimum Cash Distributions*

Except with respect to any Claim that is Unimpaired under the Plan, the Disbursing Agent shall not be required to make any distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; provided, however, that any such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

32

14.    *Setoff and Recoupment*

The Debtor, or its designee—including, without limitation, the Plan Administrator—may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any claims, rights, and Causes of Action of any nature whatsoever that the Debtor may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law (other than the released Causes of Action); provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or its successor, of any claims, rights, or Causes of Action that the Debtor, or its successor or assign may possess against the holder of such Claim (other than the released Causes of Action).

15.    *Allocation of Distributions between Principal and Interest*

Except as otherwise required by law (as reasonably determined by the Debtor), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the portion of such Allowed Claim (if any) that reflects reimbursable expenses, and then to the accrued and unpaid interest on such Allowed Claim.

16.    *No Distribution in Excess of Amount of Allowed Claim*

No holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

17.    *Distributions Free and Clear*

Any distributions under the Plan shall be free and clear of and Liens, Claims, and encumbrances, and no other Entity, including the Debtor, shall have any interest, legal, beneficial, or otherwise, in any amounts transferred pursuant to the Plan.

18.    *Withholding and Reporting Requirements*

(a)    Withholding Rights. In connection with the Plan, the Debtor or the Disbursing Agent making distributions pursuant to the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Any Disbursing Agent or such other Entity designated thereby, as applicable, and any other Person making distributions pursuant to the Plan, shall be authorized to take any actions that they determine, in their reasonable discretion, to be necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. Each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. The Disbursing Agent has the

33

right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    Forms. Any party entitled to receive any property as a distribution under the Plan shall, upon request of the Disbursing Agent, deliver to the Disbursing Agent an appropriate Internal Revenue Service Form W-9 or (if the payee is a foreign Entity) Form W-8, and any other reasonably requested tax information. If such request is made by the Plan Administrator and the holder fails to comply before the earlier of: (i) the date that is one hundred and eighty (180) days after the request is made; and (ii) the date that is one hundred and eighty (180) days after the date of distribution, the amount of any such distribution shall irrevocably revert to the Debtor, and any Claim on account of such distribution shall be discharged and forever barred from assertion against the Debtor, or its property.

## F.    **Procedures for Disputed Claims**

1.    *Objections to Claims*

As of the Effective Date, the Plan Administrator shall exclusively be entitled to object to Impaired Claims and shall have and retain any rights and defenses that the Debtor had with regard to any Impaired Claim which the Plan Administrator may object to or otherwise challenge in the ordinary course. Nothing under the Plan shall affect the Debtor's claims, causes of action, rights, or defenses in respect of any Impaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Impaired Claims. Any objections to Claims shall be served and filed by the Plan Administrator on or before the later of: (a) one hundred and twenty (120) days after the Effective Date; and (b) on such other date as ordered by the Bankruptcy Court for cause.

2.    *Resolution of Disputed Administrative Expenses and Disputed Claims*

On and after the Effective Date, except as otherwise provided herein, all Unimpaired Claims will be satisfied, disputed, pursued, or otherwise reconciled by the Plan Administrator. From and after the Effective Date, the Plan Administrator may satisfy, dispute, pursue, or otherwise resolve any Impaired Claim without approval of the Bankruptcy Court, and shall have the exclusive authority to compromise, settle, otherwise resolve, or withdraw any objections to Impaired Claims without further approval of the Bankruptcy Court.

3.    *Payments and Distributions with Respect to Disputed Claims*

Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, the Plan Administrator shall not be required to make any payment or distribution provided hereunder on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

4.    *Distributions After Allowance*

After such time as a Disputed Claim becomes an Allowed Claim, in whole or in part, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as

provided in the Plan, with or without interest as provided in the Plan. Such distributions shall be made in accordance with Article VI of the Plan.

5. *Estimation of Claims*

The Plan Administrator may: (a) determine, resolve and otherwise adjudicate all contingent, unliquidated, and Disputed Impaired Claims in the Bankruptcy Court; and (b) at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Impaired Claim pursuant to Bankruptcy Code section 502(c), regardless of whether the Debtor previously objected to such Impaired Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Impaired Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Impaired Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Impaired Claim, the Debtor and the Plan Administrator may pursue supplementary proceedings to object to the allowance of such Claim; provided, however, that such limitation shall not apply to Claims requested by the Debtor to be estimated for voting purposes only.

6. *No Distributions Pending Allowance*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

7. *Claim Resolution Procedures Cumulative*

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

8. *Insured Claims*

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies. To the extent that the Debtor's insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of the Court.

## G.   **Executory Contracts and Unexpired Leases**

1.    *General Treatment*

Deemed Rejection of Executory Contracts and Unexpired Leases. As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which the Debtor is a party shall be deemed rejected by the Debtor, unless such contract or unexpired lease: (i) is specifically designated by the Debtor; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) was previously assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court; or (iv) is the subject of a motion to assume, assume and assign, or reject filed by the Debtor on or before the Confirmation Date.

Assumption of Executory Contracts and Unexpired Leases. As of and subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumption, assumption and assignment, or rejection provided for in the Plan pursuant to Bankruptcy Code sections 365(a) and 1123 and a determination by the Bankruptcy Court that the Debtor or the Purchaser, as applicable, has provided adequate assurance of future performance under such assumed executory contracts and unexpired leases. Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the Debtor or the Purchaser, as applicable, in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

2.    *The Assumption and Assignment Procedures*

The Assumption and Assignment Procedures governing the assumption and assignment of the Assigned Contracts to be assumed by the Debtor and assigned to the Purchaser as part of the Sale are contained in the Bid Procedures Order. Notwithstanding anything to the contrary contained in the Plan, in the event of any conflict between the Plan, the Confirmation Order and the Bid Procedures Order respecting the Assumption and Assignment Procedures, the Bid Procedures Order shall govern and control.

3.    *Rejection Damages Claims*

In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtor, or their respective properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtor and the Plan Administrator, as applicable, no later than thirty (30) days after the later of: (i) the Confirmation Date; or (ii) the effective date of rejection of such executory contract or unexpired lease. Any such Claims, to the extent Allowed, shall be classified as Unsecured Claims.

4.    *Insurance Policies*

Notwithstanding anything to the contrary in the Definitive Documents, any claim objection, and any other document related to any of the foregoing, and any other order of the

36

Bankruptcy Court, on the Effective Date: (i) all insurance policies issued or providing coverage to the Debtor shall (subject to the applicable insurer's right to object to such a designation) be assumed in their entirety and assigned to the Purchaser pursuant to Bankruptcy Code sections 365 and 1123, and the Purchaser shall remain liable in full for any now existing or hereinafter arising obligations, liabilities, terms, provisions and covenants of the Debtor under such insurance policies, without the need or requirement for an insurer to file a proof of Claim, Administrative Expense Claim or objection to any Cure Amount; (ii) nothing shall alter or modify the terms and conditions of and/or any rights, obligations, benefits, claims, rights to payments, or recoveries under the insurance policies without the express written consent of the applicable insurer; and (iii) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (a) claimants with valid workers' compensation claims or direct action claims against an insurer under applicable non-bankruptcy law to proceed with their claims; (b) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court: (I) workers' compensation claims; (II) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay to proceed with its claim; and (III) all costs in relation to each of the foregoing; and (c) the insurers to cancel any insurance policies, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the insurance policies.

5.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed or assumed and assigned shall include any modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

6.    *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease by the Debtor on any exhibit, schedule, or other annex to the Plan, nor anything contained in the Plan, will constitute an admission by the Debtor that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtor or its affiliates have any liability thereunder. The Bid Procedures Order provides that the Debtor reserves all its rights respecting any Assigned Contract including (i) to reject or assume any Assigned Contract pursuant to Bankruptcy Code section 365(a) and (ii) to designate any Assigned Contract as either rejected or assumed on a post-closing basis.

Except as otherwise provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtor and the Purchaser, as applicable, under any executory or non-executory contract or any unexpired or expired lease.

**H.**     **Conditions Precedent to Confirmation of Plan and Effective Date**

      1.     *Conditions Precedent to Confirmation of Plan*

The following are conditions precedent to confirmation of the Plan: (a) the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed and be in conformity with the Plan; (b) the Bankruptcy Court shall have approved the Sale of the WV Complex to the Purchaser; and (c) the Bankruptcy Court shall have entered an order granting the 9019 Motion and approving the Settlement Agreement.

      2.     *Conditions Precedent to Effective Date*

The following are conditions precedent to the Effective Date of the Plan: (a) the Confirmation Order shall have been entered and have become a Final Order and shall be in full force and effect; (b) the Sale of the WV Complex to the Purchaser shall have closed; (c) all other actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; (d) all governmental approvals, orders and consents necessary in connection with the Plan, including Bankruptcy Court approval, shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on the consummation of the Plan; (e) the conditions to the obligations of the Debtor to consummate the Closing set forth in the Sale Contract shall have been satisfied or waived in accordance with the terms thereof; and (f) the Professional Fees Escrow Account shall be established and fully funded.

      3.     *Waiver of Conditions Precedent*

Each of the conditions precedent in Section 9.1 and Section 9.2 of the Plan, other than those set forth in Section 9.1(a), Section 9.2(a), Section 9.2(b), and Section 10.2(f), may be waived in writing with the consent of the Debtor, and the Notes Trustee, underlined provided, *however*, the requirement that the Confirmation Order become a Final Order set forth in Section 9.2(a) may be waived in writing by the Debtor.

      4.     *Effect of Failure of a Condition*

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the date that is thirty (30) days after the Bankruptcy Court enters the Confirmation Order, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtor, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtor, the Notes Trustee, or any other Entity.

**I.**     **Effect of Confirmation of Plan**

HF 17334758v.5HF 17382379v.1

1.   *Vesting of Assets*

On the Effective Date, pursuant to Bankruptcy Code sections 1141(b) and (c), any remaining property of the Debtor's Estate, including the Excluded Assets, shall vest in the Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests except as provided pursuant to the Plan and the Confirmation Order. On and after the Effective Date, the Plan Administrator may take any action, including, without limitation, the assertion of any Causes of Action; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether or not in the ordinary course of business, and execute, deliver, implement, and fully perform any obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there was no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided herein. Without limiting the foregoing, the Plan Administrator may pay the charges that it incurs on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

2.   *Binding Effect*

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtor and their respective successors and assigns, notwithstanding whether any such holders are: (a) Impaired or Unimpaired under the Plan; (b) presumed to accept or deemed to reject the Plan; (c) failed to vote to accept or reject the Plan; (d) voted to reject the Plan; or (e) will receive any distribution under the Plan.

3.   *Discharge of Claims and Termination of Interests*

Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtor, to the fullest extent permitted by Bankruptcy Code section 1141, of and from any Claims, Interests, rights, and liabilities of the Debtor that arose prior to the Effective Date. Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to Bankruptcy Code section 524, from prosecuting or asserting against the Debtor any such discharged Claim against or terminated Interest in the Debtor.

4.   *Term of Injunctions or Stays*

Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Case.

5.   *Injunction*

Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers,

HF 17334758v.5HF 17382379v.1

directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim extinguished, discharged, or released pursuant to the Plan, provided, however, the foregoing shall not enjoin or prevent any party from taking any action to enforce any rights or obligations granted pursuant to the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as expressly agreed to by the Debtor or the Plan Administrator, as applicable, and a holder of any Unimpaired Claim, Impaired Claim, or Impaired Interest, all Entities who have held, hold, or may hold Claims against or Interests in the Debtor and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action against the Debtor that will be or are extinguished, discharged, or released pursuant to the Plan from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting the Debtor or the property of any of the Debtor or the Plan Administrator; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor or the property of any of the Debtor or the Plan Administrator; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, or the property of any of the Debtor or the Plan Administrator; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor or the Plan Administrator, or against property or interests in property of any of the Debtor or the Plan Administrator, except as contemplated or Allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth therein, which shall extend to any successors of the Debtor (including the Plan Administrator), and their respective property and interests in property.

6.    *Releases*

(a)    Estate Releases.

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce: (i) the Plan; and (ii) the Definitive Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, without limitation, the services rendered by the Released Parties to facilitate the implementation of the Plan, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties shall be deemed released and discharged, to the maximum extent permitted by law, by the Debtor and its Estate, on behalf of themselves and their respective successors, assigns, and representatives, and any other persons that may purport to assert any Cause of Action derivatively, by, through or on behalf of the foregoing Persons or Entities, from any claims, obligations, suits, judgments,

40

damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor or its Estate, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtor or its Estate would have been legally entitled to assert in their own right or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the purchase or sale of any Asset of the Debtor, the business or contractual arrangements between any of the Debtor and any Released Party, the restructuring of any Claim or Interest during the Chapter 11 Case, the Disclosure Statement, the Plan (including the Definitive Documents), or any related agreements, instruments, and other documents, and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all of the foregoing cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, provided, however, that nothing in the Plan shall be construed to release the Released Parties from gross negligence, willful misconduct, or fraud, in each case as determined by a Final Order. The Debtor, its Estate, and the Plan Administrator shall be permanently enjoined from prosecuting any of the foregoing claims or Causes of Action released in accordance with the Plan against each of the Released Parties.

(b)    Mutual Releases.

As of the Effective Date, except: (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date; (ii) for the right to defend against any objections to Claims that may be asserted under the Plan; or (iii) as otherwise expressly provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtor under the Plan and the contributions made by the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Released Parties shall be deemed released and discharged by each of the other Released Parties, in each case, from any claims, Interests, or Causes of Action whatsoever, including any derivative claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert based on, relating to, or arising from, in whole or in part, the Debtor, the restructuring, the Chapter 11 Case, the post-petition marketing and sale process, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, or consummation of the Plan (including the Plan Supplement), the Definitive Documents, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, in all of the foregoing cases based upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, however, that nothing in the Plan shall be construed to release the Released Parties from any gross negligence, willful misconduct, or fraud, in each case as determined by a Final Order.

41

Notwithstanding anything to the contrary herein, nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

      7.    *Exculpation*

To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any conduct occurring on or after the Petition Date and up to and including the Effective Date in connection with or arising out of the filing and administration of the Chapter 11 Case, the Sale process, the closing of the Sale; the Disclosure Statement, the Plan Administration Agreement, including the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation, and consummation thereof, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding or consummation of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; or the transactions in furtherance of any of the foregoing; or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place from the Petition Date through and including the Effective Date; except for acts or omissions of an Exculpated Party that constitute gross negligence, fraud, or willful misconduct, in each case as determined by a Final Order. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

~~To the maximum extent permitted by applicable law, no Additional Exculpated Party will have or incur, and each Additional Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any conduct occurring on or after the Petition Date and up to and including the Effective Date in connection with or arising out of the Settlement Agreement, including the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation, and consummation thereof or the transactions in furtherance of any of the foregoing; except for acts or omissions of an Additional Exculpated Party that constitute gross negligence, fraud, or willful misconduct, in each case as determined by a Final Order. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Additional Exculpated Party from liability.~~

      8.    *Retention of Causes of Action/Reservation of Rights*

Except as otherwise provided in Sections 10.5, 10.6, and 10.7 of the Plan, or in the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtor had immediately prior to the Effective Date on behalf of its Estate in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Causes of Action against parties with a relationship with the Debtor. Except as otherwise provided in the Plan, the Debtor and the Plan Administrator, as applicable, shall have, retain, reserve, and be

HF 17334758v.5HF 17382379v.1

entitled to assert all rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and equitable rights in respect of any Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Case had not been commenced.

## J.    **Retention of Jurisdiction**

1.    *Retention of Jurisdiction*

On and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case for, among other things, the following purposes:

(1)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, including Assumption Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(2)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(3)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and the Confirmation Order and to adjudicate any disputes arising from or relating to distributions under the Plan, including, cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely paid;

(4)    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(5)    to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(6)    to issue injunctions, enter, and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(7)    to hear and determine any application to modify the Plan in accordance with Bankruptcy Code section 1127, to remedy any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(8)    to hear and determine all Fee Claims;

(9)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Administration Agreement,

43

or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(10)   to hear and determine disputes arising in connection with the Plan Administration Agreement, or any agreement, instrument, or other document governing or relating to the Plan Administration Agreement;

(11)   to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(12)   to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(13)   to hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146 (including any Disputed Claims for taxes and any requests for expedited determinations under Bankruptcy Code section 505(b));

(14)   to hear, adjudicate, decide, or resolve any matters related to Article X of the Plan, including, without limitation, the releases, exculpations, and injunctions issued thereunder;

(15)   to resolve disputes concerning Disputed Claims or the administration thereof;

(16)   to hear and determine any other matters related hereto and consistent with the Bankruptcy Code and title 28 of the United States Code;

(17)   to enter a final decree closing the Chapter 11 Case;

(18)   to recover all Assets of the Debtor and property of the Debtor's Estate, wherever located;

(19)   to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Case, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Case, or any deadline for responding or objection to a Cure Amount, in each case, for any purpose;

(20)   to hear and determine matters or disputes arising from, or in connection with, the appointment of a successor Plan Administrator in the event of the Plan Administrator's death, disability, dissolution, or removal;

(21)   to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtor or the Plan Administrator pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory, including, without limitation, Avoidance Actions; and

(22)   to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in Bankruptcy Code sections 502 or 503, other

than defenses or limits that are asserted under non-bankruptcy law pursuant to Bankruptcy section 502(b)(1).

    2.    *Courts of Competent Jurisdiction*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## K.    <u>Miscellaneous Provisions</u>

    1.    *Payment of Statutory Fees*

On the Effective Date and thereafter as may be required, with respect to any Claims, the Plan Administrator shall make all required filings and pay all fees incurred pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for the Debtor's case, until such time as a final decree is entered closing the Debtor's case, a Final Order converting the Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the Debtor's case is entered.

    2.    *Substantial Consummation of the Plan*

On the Effective Date, the Plan shall be deemed to be substantially consummated under Bankruptcy Code sections 1101 and 1127(b).

    3.    *Plan Supplement*

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

    4.    *Requests for Expedited Determination of Taxes*

The Plan Administrator shall have the right to request an expedited determination under Bankruptcy Code section 505(b) with respect to tax returns filed, or to be filed, for any taxable periods.

    5.    *Exemption from Certain Transfer Taxes*

Pursuant to Bankruptcy Code section 1146: (a) the making or delivery of any instrument of transfer in connection or furtherance of the Plan; (b) the issuance, transfer or exchange of any securities, instruments or documents pursuant to, in implementation of or as contemplated in the Plan; (c) the creation of any Lien, mortgage, deed of trust, or other security interest; (d) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan; and

45

(e) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment to the fullest extent provided by law, including, but not limited to: (i) mortgage recording taxes imposed under Article 11 of the tax law of the State of New York, (ii) the New York Real Estate transfer tax imposed under Article 31 of the Tax Law of the State of New York (including by reason of a change in the equity ownership of the Debtor), (iii) the New York City Real Property transfer tax imposed by title 11, chapter 21 of the New York City Administrative Code (including by reason of a change in the equity ownership of the Debtor) and, (iv) any similar tax on the recording of deeds, transfers or property or ownership interests in property, recording of mortgages or other security instruments imposed by the State of New York, or any political subdivision thereof. Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded (including, without limitation, the Register of the City of New York) shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax. All governmental authorities and any other taxing authorities shall be permanently enjoined from the commencement or continuation of any action to collect from the Properties, any taxes from which the transactions effectuated pursuant to the Plan and Confirmation Order are exempt, pursuant to and in furtherance of Bankruptcy section 1146(a) and to the greatest extent provided by law, including but not limited to, New York State Real Estate Transfer Taxes, and any mortgage recording tax, and any penalties, interest, or additions to any tax related thereto.

6.    *Sales Taxes*

From 2017 until late 2023, the WV Complex was managed and operated by WB LLC pursuant to a lease dated February 28, 2027. If and to the extent a portion of the lease payment is allocable to leased personal property, New York sales tax may have been required to have been collected with respect to such portion of the rent, subject to any applicable exclusion or exemption (if any). The extent to which the Debtor properly accounted for and filed appropriate sales tax returns with respect to leased personal property is unclear and remained to be determined. To that end, the Debtor intends to commence the Sales Tax Adversary, seeking a declaration that it has no unpaid sales tax liability, or in the alternative, asking the Bankruptcy Court to determine the amount, if any, due and owing.

To the extent that the Debtor has not filed or paid sales taxes on a post-petition basis, any amounts due and payable constitute administrative expenses. To confirm a chapter 11 plan of reorganization, a debtor must demonstrate, among other things, that it has paid or provided for all administrative amounts that are due and payable as of the time of plan confirmation. Accordingly, the Debtor intends to request an expedited determination under Bankruptcy Code section 505 with respect to any sales taxes that should have been collected for all taxable periods after the Petition Date and through the Effective Date, including, but not limited to, any sales taxes that may have been due on any rental or sale of personal property by the Debtor to Wythe

Berry LLC. Additionally, any personal property sold as part of the sale of the WV Complex will be subject to sales tax based on the fair market value of the personal property at the time of the sale.

The sales taxes described above may reduce the amount available for distribution to holders of Allowed Claims.

7. *Amendments*

(a) <u>Plan Modifications</u>. The Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify, or supplement the Plan (i) prior to the entry of the Confirmation Order, including amendments or modifications to satisfy Bankruptcy Code section 1129(b), and (ii) after entry of the Confirmation Order, in the manner provided for by Bankruptcy Code section 1127 or as otherwise permitted by law, in each case without additional disclosure pursuant to Bankruptcy Code section 1125. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan and subject to the reasonable consent of the Notes Trustee, the Debtor may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

(b) <u>Other Amendments</u>. Before the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement, with the consent of the Notes Trustee (such consent not to be unreasonably withheld), without further order or approval of the Bankruptcy Court.

8. *Effectuating Documents and Further Transactions*

The Debtor and the Plan Administrator are each authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

9. *Revocation or Withdrawal of Plan*

The Debtor reserves the right to revoke or withdraw the Plan prior to the Effective Date with the consent of the Notes Trustee (such consent not to be unreasonably withheld). If the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtor or any other Entity; or (iii) constitute an

HF 17334758v.5HF 17382379v.1

admission of any sort by the Debtor, the Notes Trustee, or any other Entity. This provision shall have no adverse impact on the rights of the Notes Trustee or the Debtor in respect of any such revocation or withdrawal.

10. *Severability of Plan Provisions*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, with the reasonable consent of the Notes Trustee, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or further modified without the consent of (i) the Debtor, (ii) the Notes Trustee, and (iii) the Plan Administrator, but only to the extent such deletions or modifications negatively impact the Plan Administrator, and (c) nonseverable and mutually dependent.

11. *Governing Law*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof; <u>provided</u>, <u>however</u>, that corporate or entity governance matters relating to the Debtor or the Plan Administrator, shall be governed by the laws of the state of incorporation or organization of the Debtor.

12. *Dates of Actions to Implement the Plan*

In the event that any payment or act under the Plan is required to be made or performed on a date that is on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

13. *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtor, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns.

14.    *Successor and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

15.    *Entire Agreement*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which shall be deemed to become merged and integrated into the Plan.

16.    *Exhibits to Plan*

All exhibits, schedules, supplements, and appendices to the Plan are incorporated into and are a part of the Plan as if set forth in full herein.

## V.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

**A.    General**

THE DESCRIPTION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS LIMITED TO THE SPECIFIC FEDERAL INCOME TAX MATTERS DESCRIBED HEREIN. IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN OR OTHER FEDERAL INCOME TAX MATTERS DISCUSSED HEREIN AND THIS DISCUSSION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. EACH TAXPAYER IS STRONGLY URGED TO SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM SUCH TAXPAYER'S INDEPENDENT TAX ADVISOR.

THE DESCRIPTION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS SOLELY FOR THE PURPOSE OF COMPLIANCE WITH SECTION 1125(a) OF THE BANKRUPTCY CODE. THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "INTERNAL REVENUE CODE") TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS AMENDED DISCLOSURE STATEMENT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION MAY HAVE RETROACTIVE EFFECT, WHICH MAY CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW. NO RULING HAS BEEN REQUESTED FORM THE INTERNAL REVENUE SERVICE (THE "IRS") AND NO LEGAL OPINION HAS BEEN REQUESTED FROM COUNSEL

49

**CONCERNING ANY TAX CONSEQUENCE OF THE PLAN, AND NO TAX OPINION
OR ADVICE IS GIVEN BY THIS DISCLOSURE STATEMENT.**

This description does not cover all aspects of federal income taxation that may be relevant to the Debtor or holders of Claims. For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations and foreign taxpayers, nor is it intended to address all of the possible federal income tax consequences to holders of Claims against the Debtor. This description also does not discuss the possible state tax or non-U.S. tax consequences that might apply to the Debtor or to holders of Claims.

**B.    Consequences of Payment of Allowed Claims Pursuant to Plan Generally**

The federal income tax consequences of the implementation of the Plan to the holders of Allowed Claims will depend, among other things, on the consideration to be received by the holder, whether the holder reports income on the accrual or cash method, whether the holder's Claim is Allowed or Disputed on the Effective Date, and whether the holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim. All holders of Claims are urged to consult with their tax advisors concerning the tax consequences applicable under the Plan. Nothing contained herein shall be relied upon as tax advice.

1.    *Recognition of Gain or Loss*

In general, a holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the holder's tax basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a market discount or premium. If the holder realizes a capital loss, the holder's deduction of the loss may be subject to limitation. The holder's tax basis for any property received under the Plan generally will equal the amount realized.

2.    *Bad Debt or Worthless Security Deduction*

A holder who receives in respect of an Allowed Claim an amount less than the holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166 of the Internal Revenue Code. The rules governing the availability, character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

3.    *Receipt of Interest*

The Plan does not address the allocation of the aggregate consideration to be distributed to holders between principal and interest and the Debtor cannot make any representations as to how the IRS will address the allocation of consideration under the Plan. In general, to the extent that any amount of consideration received by a holder is treated as received in satisfaction of

50

unpaid interest that accrued during such holder's holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income and not otherwise exempt from U.S. federal income tax). Conversely, a holder may be allowed a bad debt deduction to the extent any accrued interest was previously included in its gross income but subsequently not paid in full. However, the IRS may take the position that any such loss must be characterized based on the character of the underlying obligation, such that the loss will be a capital loss if the underlying obligation is capital asset. Again, holders of Allowed Claims should address all potential tax implications with their own tax advisors.

## C.  **Additional Consequences to Holders of Allowed Direct or Indirect Equity Holders**

Implementation of the Plan will have additional U.S. federal income tax consequences to holders of Allowed Claims that are also direct or indirect equity holders of the Debtor as follows. The Debtor may recognize taxable income from various sources, including, but not limited to, income from discharge of indebtedness and sale or exchange gain. Because the Debtor is a pass-through entity for federal income tax purposes, any such income will pass through to any direct equity holder and any indirect equity holder that owns its indirect interest solely through one or more entities that are pass-through entities. If any such direct or indirect equity holder is a "C" corporation for U.S. federal income tax purposes, such direct and indirect equity holder will be required to report its allocable share of such income and pay income taxes on such allocable share to the extent the holder is unable to offset such income with any available deductions and/or credits. The amount of income the Debtor may recognize from the sale of the WV Complex is indeterminate at the present time and will ultimately depend on multiple factors, including the price at which the WV Complex is sold and the Debtor's asset basis in the WV Complex.

## VI.
## CERTAIN RISK FACTORS TO BE CONSIDERED

## A.  **Bankruptcy-Related Considerations**

### 1.  *Parties in Interest May Object to the Debtor's Classification of Claims*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims in such class. The Debtor believes that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.  *Risk of Plan Not Being Confirmed*

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the Plan will not be required for Confirmation, that any negotiations regarding such modifications would not adversely affect the holders of the Allowed Claims or that any such modifications would not necessitate the re-solicitation of votes.

3.    *Nonconsensual Confirmation*

As set forth above, in the event any impaired class of claims does not accept a plan, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the acceptance of any "insider" in such class) and, as to each impaired class which has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to non-accepting impaired classes.

In the event that any Impaired Class of Claims fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Debtor reserves the right to seek nonconsensual confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code.

4.    *Risks that Conditions to Effectiveness Will Not Be Satisfied*

Article IX of the Plan contains certain conditions precedent to the effectiveness of the Plan. There can be no assurances that the conditions contained in Article IX will be satisfied.

5.    *Claims Objections/Reconciliation Process*

The Debtor reserves the right to object to the amount of any Claim, except as provided in the Plan. The estimates set forth herein cannot be relied on by any holder of a Claim whose Claim is subject to an objection. Any such holder of a Claim may not receive its specified share of the estimated distributions described in the Disclosure Statement.

## VII.
## VOTING PROCEDURES AND REQUIREMENTS

Pursuant to the Bankruptcy Code, a plan groups various claims into classes, each consisting of parties having similar legal rights in relation to a debtor. Each class may then be treated as either "impaired" or "unimpaired" under a plan. There are three ways in which a plan may leave a claim or interest "unimpaired." First, a plan may not propose to alter the legal, equitable or contractual rights of the holder of the claim or interest. Second, all defaults (excluding those covered by Section 365(b)(2) of the Bankruptcy Code) may be cured and the original terms of the obligation reinstated. Third, a plan may provide for the payment in full of the obligation to the holder of the claim or interest. If a class is unimpaired, then it is conclusively presumed to vote in favor of a plan.

An Impaired Class that would receive nothing under a plan is deemed to have rejected such a plan.

An Impaired Class that is proposed to receive any distribution has the right to vote, as a class, to accept or reject the plan. A Class of creditors accepts a plan if more than one-half (1/2) of the ballots that are timely received form members of such Class, representing at least two-thirds (2/3) of the dollar amount of Claims for which ballots are timely received, vote in favor of such plan. Section 1126(e) of the Bankruptcy Code provides that a creditor's vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the creditor's vote either to accept or reject a plan was not solicited or made in good faith, or in compliance

with the Bankruptcy Code. A plan under which any Class of Claims is Impaired may be confirmed by the Bankruptcy Court only if it has been accepted by at least one such Class.

Each holder of an Allowed Claim in an Impaired Class which retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan and shall indicate such vote on a duly executed and delivered Ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

Holders of Claims in an Impaired Class entitled to vote will receive, together with this Disclosure Statement, a Ballot to be used in voting to accept or reject the Plan. Voting instructions will accompany the Ballot.

Each creditor should first carefully review this Disclosure Statement and the Plan. The Creditor should then complete the portions of the Ballot indicating the Class or Classes in which the creditor's Claim falls and the total dollar amount of the Claim. If the creditor's Claim falls into more than one Class, then the creditor should list each Class and state the dollar amount of the Claims which belongs in each Class. It is critical that the Class(es) and amounts of the Claim be correctly stated on the Ballot, so that the creditor's vote can be properly counted.

Next, the creditor should mark in the space provided on the Ballot whether the creditor wishes to accept or to reject the Plan. Please be sure to fill in the name of the creditor for whom the Ballot is being filed. Finally, the Ballot must be signed by the creditor, or by an officer, partner, or other authorized agent of the creditor. Please note that the Debtor reserves the right to object to the allowance, designation of Class and/or allowable amount of any Claim set forth in a Ballot for purposes of voting and/or Distribution under the Plan.

Completed and signed Ballots should be returned by first class mail to the Debtor's counsel at the below address in the enclosed self-addressed return envelope:

Herrick, Feinstein LLP
2 Park Avenue
New York, NY 10016
Attention: Larisa Poretsky

Completed Ballots should be returned as soon as possible, and, in any event so that they are RECEIVED NO LATER THAN **MAY 3, 2024, AT 5:00 P.M**. ANY BALLOTS WHICH ARE RECEIVED BY THE DEBTOR AFTER THIS DEADLINE SHALL NOT BE COUNTED IN DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

## VIII.
## CONFIRMATION OF PLAN

In Order for the Plan to be confirmed, the Bankruptcy Code requires, among other things, that the Plan be proposed in good faith, that the Debtor disclose specified information concerning payments made or promised to insiders, and that the Plan comply with the applicable provisions of chapter 11 of the Bankruptcy Code. Section 1129(a) of the Bankruptcy Code also requires that at least one Class of Claims has accepted the Plan ("Minimum Voting Threshold"), that

53

Confirmation of the Plan is not likely to be followed by the need for further financial reorganization, and that the Plan be fair and equitable with respect to each Class of Claims that is impaired under the Plan. The Bankruptcy Court can confirm the Plan if it finds that all of the requirements of section 1129(a) have been met. The Debtor believes that the Plan meets all of these required elements. With respect to the so-called "feasibility" test (*i.e.*, that the Plan is not likely to be followed by the need for further financial reorganization), the Plan maximizes the value of its estate, and the Debtor believes that it will be able to consummate the Plan fully.

In order to confirm a plan over the dissenting vote of an impaired Class under Section 1129(b) of the Bankruptcy Code that satisfies the remaining provisions of Section 1129(a) of the Bankruptcy Code, the Bankruptcy Court, on request of the proponent of a plan, "shall" confirm the Plan if the Plan does not discriminate unfairly, and is fair and equitable with respect to each Class of Claims that is impaired under, and has not accepted, the Plan. For purposes of Section 1129(b) of the Bankruptcy Code, a Plan is "fair and equitable" with respect to a class of unsecured creditors if, at a minimum, it satisfies the "absolute priority rule" and the "best interests of creditors test."

## A.    <u>Absolute Priority Rule</u>

To satisfy the absolute priority rule, the Plan must provide that the holder of any Claim that is junior to the Claims of the dissenting Class will not receive or retain under the Plan on account of such junior Claim any property unless the Claims of the dissenting Class are paid in full.

The Debtor believes that the Plan satisfies the absolute priority rule. The Debtor further believes that all non-accepting impaired Classes will receive or retain payment on account of their Claims, sufficient to permit full satisfaction of such Claims before junior Classes receive or retain any property on account of such junior Claims.

## B.    <u>Best Interest of Creditors Test; Liquidation Analysis</u>

Notwithstanding acceptance of the Plan by a voting Class of creditors, in order to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Voting class which has not voted to accept the Plan. Accordingly, if a voting class does not vote unanimously to accept the Plan, the best interests test under section 1129(a)(7) of the Bankruptcy Code requires the Bankruptcy Court to find that the Plan provides to each member of such voting Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtor was liquidated under chapter 7.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of the properties securing their liens. If any assets are remaining in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to receive payment. Unsecured creditors are paid from any remaining sales proceeds, according to their respective

HF 17334758v.5HF 17382379v.1

priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

Here, the Debtor believes that the Plan satisfies the best interests test, because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available through a chapter 7 liquidation. Specifically, pursuing the Sale of the WV Complex as proposed in the Plan will provide greater recoveries than pursuing the sale of the WV Complex through a chapter 7 liquidation for the following reasons:

1.   *The Chapter 11 Transfer Tax Exemption is Available Only in Chapter 11*

Section 1146(a) of the Bankruptcy Code allows debtors, *in chapter 11 only*, to avoid paying stamp taxes or similar taxes on assets transferred pursuant to a confirmed chapter 11 plan of reorganization. Here, this transfer tax exemption, unavailable in a sale in a chapter 7 case, will save the Purchaser millions of dollars.

2.   *Conversion to Chapter 7 Will Cause Additional Costs and Delay*

The hypothetical conversion of the Chapter 11 Case to one under chapter 7 would: (a) result in additional fees and expenses; (b) cause a significant delay before any distributions could be made to the holders of Allowed Claims or Interests; and (c) not maximize the value of the WV Complex—all of which would be avoided if the Chapter 11 Case remains in chapter 11 and the Plan is confirmed.

**First**, a conversion to chapter 7 would entail the appointment of a chapter 7 trustee who would retain his or her own professionals—attorneys, accountants or brokers—in order to properly discharge his or her duties and responsibilities. In other words, the automatic appointment of a chapter 7 trustee will result in an additional layer of cost not otherwise present in chapter 11.

**Second**, in addition to increased fees and expenses, liquidating the Debtor's estate under chapter 7 will result in a significant delay considering: (i) the Bankruptcy Court has already approved the Bid Procedures which would not be applicable in chapter 7; (ii) the Debtor has already received bids from prospective purchasers who m ay not participate in a chapter 7 sale; and (iii) the chapter 7 trustee's newly retained professional(s) will need time to familiarize themselves with the Chapter 11 Case.

**Third**, the Debtor and its brokers are running a comprehensive marketing and sale process pursuant to court-approved Bid Procedures designed to maximize estate value. And, as noted, the Debtor has already received bids from a number of prospective purchasers. In a chapter 7, the chapter 7 trustee would likely favor a fire-sale approach designed not to maximize value but to expeditiously liquidate the Debtor's assets.

HF 17334758v.5HF 17382379v.1

Thus, in light of the foregoing, the Debtor believes the Plan satisfies the "best interests of creditors test," and, indeed, that the Plan is in the best interest of creditors.

## IX.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan, the Chapter 11 Case could be converted to a liquidation case under chapter 7 of the Bankruptcy Code.

1. *Alternative Plan*

With respect to an alternative plan, the Debtor has explored various alternative scenarios and believes that the Plan enables the holders of Claims to realize the maximum recovery under the circumstances. Further, the Debtor believes that the Plan is the best plan that can be proposed and serves the best interests of the Debtor and other parties-in-interest.

2. *Chapter 7 Liquidation*

(1)     As discussed above in Section XIII(B), the Debtor believes that the Plan satisfies the best interests test, because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available through a chapter 7 liquidation.

## X.
## CONCLUSION AND RECOMMENDATION

The Debtor believes the Plan is in the best interests of all stakeholders and urges the holders of Allowed Claims in Classes 1 and 3 to vote in favor thereof.

HF 17334758v.5HF 17382379v.1

Dated: May ~~10~~17, 2024


            **WYTHE BERRY FEE OWNER LLC, as Debtor**

            By:     */s/ Assaf Ravid*
            Name: Assaf Ravid
            Title:  Authorized Signatory

| Summary report: Litera Compare for Word 11.5.0.74 Document comparison done on 5/17/2024 3:13:34 PM | |
|---|---|
| **Style name:** HF Color | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Wythe Berry - Disclosure Statement for Third Amended Plan 4884-5248-7101 v4.docx | |
| **Modified filename:** Wythe Berry - Disclosure Statement for Fourth Amended Plan(17382379.1).docx | |
| **Changes:** | |
| **Add** | 11 |
| Delete | 12 |
| Move From | 0 |
| Move To | 0 |
| **Table Insert** | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 23 |