**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>WYTHE BERRY FEE OWNER LLC<br><br>                                             Debtor. | **FOR PUBLICATION**<br><br>Case No. 22-11340 (MG) |

**MEMORANDUM OPINION AND ORDER**
**APPROVING THE SETTLEMENT WITH ZELIG WEISS**

*A P P E A R A N C E S:*

HERRICK, FEINSTEIN LLP
*Attorneys for the Debtor*
2 Park Avenue
New York, NY 10016
By:     Stephen B. Selbst, Esq
        Janice Goldberg, Esq.
        Roya Imani, Esq.
        Avery S. Mehlman, Esq.
        Rodger T. Quigley, Esq.
        Meaghan Roe, Esq.
        Steven B. Smith, Esq.

ABRAMSON BROOKS LLP
*Attorney for Wythe Berry LLC*
1051 Port Washington Boulevard
Suite 322
Port Washington, NY 11050
By:     Jon S. Brooks, Esq.

PAUL HASTINGS LLP
*Attorneys for Zelig Weiss*
875 15th Street, N.W.
Washington, DC 20005
By:     Nicholas A. Bassett, Esq.

GORNITZKY & CO.
*Attorneys for Notes Trustee*
20 Haharash Street
Tel Aviv, Israel 6761310
By:    Maya Ben Meir, Esq.
       Amnon Biss, Esq.


CHAPMAN AND CUTLER LLP
*Attorneys for Notes Trustee/Plan Administrator for Wind Down Co.*
1270 Avenue of the Americas
New York, NY 10020
By:    Michael Friedman, Esq.
       Helena Honig, Esq.

320 South Canal Street
27th Floor
Chicago, IL 60606
By:    Eric Silvestri, Esq.


GORDON REES SCULLY MANSUKHANI, LLP
*Attorneys for Schimenti Construction*
One Battery Park Plaza
28th Floor
New York, NY 10004
By:    Jacob C. Cohn, Esq.


GIBSON, DUNN & CRUTCHER LLP
*Attorneys for William Vale Owner LLC*
333 South Grand Avenue
Los Angeles, CA 90071
By:    Michael G. Farag, Esq.


200 Park Avenue
New York, NY 10166
By:    Keith R. Martorana, Esq.
       Harry R. Silvera, Esq.

DAVIS POLK & WARDWELL LLP
*Attorneys for Yoel Goldman*
450 Lexington Avenue
New York, NY 10017
By:    Chase McReynolds, Esq.
       Elliot Moskowitz, Esq.


OFFICE OF THE NYS ATTORNEY GENERAL
*Attorneys for NYS Department of Taxation and Finance*
28 Liberty Street
New York, NY 10005
By:    Leo V. Gagion, Esq.


**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Settlements are welcome in bankruptcy because they prevent costly litigation between parties and contribute to the efficient administration of the bankruptcy estate. *See e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir.1996); *In re MF Glob. Inc.*, 466 B.R. 244, 247 (Bankr. S.D.N.Y. 2012). However, a settlement must be fair, equitable, and in the best interest of the estate to be approved by a bankruptcy court. *See, e.g.*, *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968); *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007); *Air Line Pilots Assoc. v. Am. Nat'l Bank & Trust Co. of Chi. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd,* 17 F.3d 600 (2d Cir. 1994). And, even more fundamentally, parties entering a settlement must have the requisite authority to bind their side to the compromise. The settlement at issue here is proper on both fronts.

On April 21, 2024, Wythe Berry Fee Owner LLC (the "Debtor") filed a motion for entry of an order approving the global settlement (as amended, the "Settlement") pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Motion," ECF Doc. # 304). The

Debtor annexed a copy of the settlement agreement (the "Settlement Agreement") as Exhibit A to

the Motion, and submitted the declaration of Assaf Ravid (the "First Ravid Declaration") in

support of the Motion as Exhibit B.  On May 10, 2024, the Debtor filed a revised settlement

agreement (the "Revised Settlement Agreement," ECF Doc. #341.)[1]  The Revised Settlement

Agreement is between the Debtor, WB Hotel LLC ("Hotel Sub"), WB Operations LLC ("Op

Sub"), WB FNB LLC ("FNB Sub"), YG WV LLC ("YG WV"), Wythe Berry Member LLC

("Member"), AYH Wind Down LLC ("Wind Down"), Wythe Berry LLC ("WB"), The William

Vale Hotel LLC ("WV Hotel"), The William Vale FNB LLC ("WV FNB"), North 12 Parking

LLC ("Parking"), Espresso Hospitality Management LLC ("Espresso"), Zelig Weiss ("Weiss"),

TWV Domain LLC ("Domain"), The William Vale Staffing LLC ("Staffing"), and Mishmeret

Trust Company Ltd., solely in its capacity as Trustee of the Series C Notes (the "Trustee," and

collectively, the "Parties").  Notably, on May 10, 2024, the Debtor filed the *Third Amended Plan*

*of Reorganization of Wythe Berry Fee Owner LLC* (the "Third Amended Plan," ECF Doc. # 340).

Later, on May 20, 2024, the Debtor filed the Fourth Amended *Plan of Reorganization of Wythe*

*Berry Fee Owner LLC* (the "Fourth Amended Plan," ECF Doc. # 364.)

On May 8, 2024, Yoel Goldman ("Goldman") filed an objection to the *Second Amended*

*Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC* and the Motion (the

"Goldman Objection," ECF Doc. # 330).  The Goldman Objection is supported by the

declaration of Elliot Moskowitz, Esq. (the "Moskowitz Declaration," ECF Doc. # 331).

Thereafter, Weiss filed a reply to the Goldman Objection (the "Weiss Reply," ECF Doc. # 351).

The same day, the Debtor filed a reply to the Goldman Objection (the "Debtor Reply," ECF Doc.

# 352), which is supported by the declaration of Assaf Ravid (the "Ravid Reply Declaration,"

---

[1]    The Debtor did not file a revised Motion with the Revised Settlement Agreement.

ECF Doc. # 354).[2]  The Court held a hearing on the Motion, and a combined hearing on the

Disclosure Statement and confirmation of the Plan, on May 15, 2024 (the "Hearing").

For the reasons explained below, the Court **GRANTS** the relief requested in the Motion

and approves the Settlement.  Concurrent with the entry of this Opinion, the Court will enter a

separate Opinion confirming the Fourth Amended Plan.  In addition, the Court will also enter the

*Findings of Fact, Conclusions of Law, and Order Approving the Modified Disclosure Statement*

*and Confirming the Modified Chapter 11 Plan of Wythe Berry Fee Owner LLC* (the "Disclosure

Statement and Confirmation Order").

## I.    BACKGROUND

### A.  Relevant Case History

The facts below, unless otherwise noted, are derived from supporting documentation as

cited.

#### 1.   The Involuntary Chapter 11 Filing

On October 6, 2022 (the "Petition Date"), the Trustee, Yelin Lapidot Provident Funds

Management Ltd., The Phoenix Insurance Company Limited and Klirmark Opportunity Fund III

L.P. filed an involuntary chapter 11 petition against the Debtor (the "Involuntary Filing," ECF

Doc. # 1.)  Following a hearing on the Involuntary Filing on January 17, 2023, the Court denied

Weiss's Motion to Dismiss and entered an Order for Relief against the Debtor on January 18,

2023.  (ECF Doc. # 58.)

The Debtor remains in possession of its property and continues to operate and manage its

business as debtor-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.

---

[2]      A prior version of the Ravid Reply Declaration was filed at ECF Doc. # 353 but omitted copies of the exhibits referenced.

(Motion ¶ 9.)  No trustee, examiner, or statutory committee of creditors has been appointed in this chapter 11 Case.  (*Id.*)

        2.   <u>The Debtor and the Lease Agreement</u>

The Debtor owns the commercial real property complex located at 55 Wythe Avenue, Brooklyn, New York (the "WV Complex"), comprised of The William Vale Hotel, office and retail space, and parking.  (*Id.* ¶¶ 1, 11.)  The Debtor is owned by its sole member, Member.  (*Id.* ¶ 11.)  In turn, Member is co-owned equally by YG WV and Weiss, with each holding 50% of the membership interests.  (*Id.*)  YG WV is the managing member of Member, and YG WV sits below Wind Down as its wholly owned subsidiary.  (*Id.*)  Notably, Wind Down is the successor entity to All Year Holdings Limited ("All Year"), which was the debtor that confirmed a plan of reorganization in a separate chapter 11 case in this Court.  (*Id.*)

The WV Complex was leased to WB until May 20, 2021.  (*Id.* ¶ 12.)  However, WB stayed in possession of the WV Complex by first holding over and then securing a use and occupancy order from the New York Supreme Court, extending its possession through October 31, 2023.  (*Id.*)  On August 16, 2023, the Court entered an order approving a stipulation amending the initial cash collateral order, which provided for, among other things: "(i) WB to remain in possession of the WV Complex through January 31, 2024; (ii) the right of the Debtor or WB to give notice (an "Early Vacate Notice") of an intent to terminate the occupancy of the WV Complex by WB at the end of any calendar month, which would entitle WB to receive a *pro rata* refund of a $7.5 million use and occupancy payment made by WB in August 2023; and (iii) WB to provide transition services and information if it surrendered possession of the WV Complex prior to January 31, 2024."  (*Id.*)

On September 29, 2023, WB provided the Early Vacate Notice, and the Debtor assumed operational control of the WV Complex on November 1, 2023. (*Id.* ¶ 13.)

### 3. Prior Ownership Structure and the 2017 Refinancing

WB originally owned the WV Complex. (*Id.* ¶ 14.) WB is co-owned equally by Weiss and Goldman, both of which are Class A Members holding 50% interest. (*Id.*) The WB operating agreement (as amended, the "WB Operating Agreement," ECF Doc. # 354-5) designates Weiss as the "Managing Member" of WB, who is "responsible for the management of the business and affairs of [WB] . . . ." (WB Operating Agreement at 37.)

In February 2017, WB refinanced its existing mortgage debt and formed the Debtor. (Motion ¶ 15.) Thereupon, WB transferred the title of the WV Complex to the Debtor who then leased the WV Complex back to WB pursuant to that certain Lease Agreement dated and effective as of February 28, 2017 (the "Lease") for a period of 15 years. (*Id.*; *see also* Revised Settlement Agreement at 1.)

The Debtor borrowed $166,320,000 from All Year (the "Mortgage Loan") to refinance its existing mortgage debt, which was secured by a mortgage on the WV Complex (the "Mortgage"). (Motion ¶ 16.) The Lease transaction contemplated rent payable to the Debtor that would allow the Debtor to make Mortgage payments and provide All Year the necessary funds to make payments due under the Series C Notes issued by All Year in the original principal amount of NIS 617,970,000 pursuant to a Deed of Trust dated February 19, 2017 between All Year and the Trustee. (*Id.*; *see also* Revised Settlement Agreement at 1.) Notably, the Debtor executed a Guaranty of Payment in connection with the issuance of the Series C Notes, which guaranteed to All Year, in relevant part, the "prompt payment and performance of

all debts, obligations, and liabilities [of All Year] . . . under the Bond Documents . . . and any and all sums of money under the provisions of the Deed of Trust." (Motion ¶ 16.)

### 4. All Year and WB Defaults

In November 2020, All Year, while under Goldman's control, defaulted on its payment obligations under another series of notes it had issued, which triggered cross-defaults under the Series C Notes and the Mortgage Loan. (*Id.* ¶ 17.) On February 1, 2021, WB failed to make a rent payment under the Lease, which in turn caused the Debtor to fail on its payment to All Year on the Mortgage Loan, and ultimately left All Year with insufficient funds to pay its obligations toward the Series C Notes. (*Id.* ¶ 18.)

All Year entered into a forbearance agreement with the Trustee and assigned the Mortgage and Mortgage Loan to the Trustee on March 16, 2021, as part of the agreement. (*Id.* ¶ 19.) Notably, following the transactions under the forbearance agreement, the Trustee held a secured claim against the Debtor.

### 5. Termination of the Lease and the Adversary Proceeding

On May 5, 2021, the Debtor provided WB with a Notice of Default under the Lease. (*Id.* ¶ 20; *see also* Case. No. 23-01012, ECF Doc. #45 at 7.) However, WB failed to cure the defaults, and the Debtor followed with a Notice of Cancellation and Termination of Lease on May 20, 2021. (Motion ¶ 20.) Nevertheless, WB neither paid the rent nor surrendered the WV Complex and continued to operate the business. (*Id.*)

Later, on June 11, 2021, the Debtor filed a complaint in New York Supreme Court (the "State Court"), Kings County, against WB, Weiss, and Goldman.[3] (*Id.* ¶ 21.) The State Court entered an order (the "U&O Order") requiring WB to make semiannual payments to the Debtor

---

[3]      *See Wythe Berry Fee Owner LLC v. Wythe Berry LLC et al.*, Index No. 514152/2021 (NY. Sup. Ct. Kings Cty. 2021) [hereinafter, the "Rent Action"].

for use and occupancy in the amount of $7.5 million on the same schedule for payments as established under the Lease. (*Id.*)

In February 2023, the Debtor removed the Rent Action from the State Court to the U.S. District Court for the Southern District of New York, and the case was later removed to this Court as Adversary Proceeding Case No. 23-01012 (the "Adversary Proceeding"). On August 23, 2023, the Debtor filed the *Motion for Partial Summary Judgment as to Liability Against Defendant Wythe Berry LLC.* (Adversary Proceeding, ECF Doc. # 30.) Following a hearing, the Court granted partial summary judgment, concluding, among other things, that the Debtor had effectively terminated the Lease on May 20, 2021 (the "Partial SJ Decision," Adversary Proceeding, ECF Doc. 45 at 41.) The Court, however, did not make a determination with respect to damages, or Weiss and Goldman's liability related to the Debtor's guaranty claims. (Motion ¶ 22; *see generally* Partial SJ Decision.)

### B. The Revised Settlement Agreement[4]

Following extensive, arms-length negotiations, the Parties arrived at the Revised Settlement Agreement. The primary terms of the Revised Settlement Agreement are as follows:

| Term | Description |
| --- | --- |
| **Cash Settlement Payment** | WB shall pay to the Debtor an amount equal to not less than $8,512,152 (the "Cash Settlement Payment") in three installments: The initial installment shall be made on the Effective Date, on which date WB shall pay to the Debtor an amount equal to $7,705,076, which payment shall be in the form of (i) cash in the amount of $4,220,731 and (ii) the retention by the Debtor of a portion of the [$7.5 million payment from WB to Debtor made on or about August 2, 2023 (the "August U&O Payment"] in the amount of $3,484,346 (such amount equal to $3.75 million minus all transition reconciliation amounts aggregating $265,654 that are credited to the Debtor pursuant to the Cash Collateral Stipulation) in lieu of |

---

[4]    Capitalized but undefined terms shall have the meaning ascribed to such terms in the Revised Settlement Agreement.

| | |
|---|---|
| | reimbursing such amount to WB pursuant to the Cash Collateral Stipulation. (For the avoidance of doubt, the transition reconciliation amounts aggregating $265,654 deducted from the August U&O Payment shall be retained by the Debtor and shall not be part of the Cash Settlement Payment described herein.) The second installment shall be made in the form of the transfer by [WV Hospitality LLC "Hospitality"] to the Debtor of the full amount of the ERTC in an amount not less than $726,000, provided that, to the extent the ERTC received by Debtor exceeds $726,000, such excess amount shall be transferred to Espresso in accordance with section 4(b) [of the Revised Settlement Agreement]. In the event that, notwithstanding the Direction Letter (as defined below), Hospitality transfers any portion of the ERTC to WV FNB rather than to the Debtor, WV FNB shall transfer such portion of the ERTC to the Debtor promptly upon receipt of the ERTC from Hospitality. The third installment shall be made in the form of a transfer by WV Hotel of the refund of a portion of prepaid Workers' Compensation Insurance in the amount of $81,075 (the "WC Refund Payment"), which transfer shall be made promptly upon WV Hotel's receipt of the WC Refund Payment. |
| **Employee Retention Tax Credit ("ERTC")** | WV FNB has advised the Debtor that, pursuant to that certain Award dated March 11, 2024 in the Hospitality Arbitration[5], Hospitality is obligated to pay WV FNB the ERTC that will be paid by the Internal Revenue Service to Hospitality. On the Effective Date, WV FNB shall send Hospitality an executed version of the Direction Letter in the form annexed [to the Revised Settlement Agreement] as Exhibit B, pursuant to which WV FNB shall direct Hospitality (i) to notify WV FNB, Espresso and the Debtor promptly when Hospitality receives payment of the ERTC and which form shall include a confirmation by Hospitality of such direction, and (ii) to promptly transfer directly to the Debtor the full amount of the ERTC received by Hospitality; provided however that to the extent the ERTC received by the Debtor exceeds $726,000 (the "Excess ERTC Amount"), the Debtor shall promptly transfer to Espresso, in full and final satisfaction of the Arbitration Success Fee, the Excess ERTC Amount.. |
| **Non-Cash Settlement Payment** | On the Effective Date, WV Hotel shall irrevocably surrender, assign and transfer, and Hotel Sub shall irrevocably assume and accept, all right, title and interest in and to the following social media accounts associated with the William Vale Hotel: (i) Instagram "@thewilliamvale"; (ii) YouTube "@thewilliamvale9284"; (iii) TikTok "thewilliamvale"; (iv) X f/k/a Twitter: "@thewilliamvale"; (v) Facebook "The William Vale"; and |

---

[5]      The Hospitality Arbitration refers to that certain arbitration proceeding pending between WV FNB and Hospitality, captioned *In the Matter of the Arbitration between The William Vale FNB LLC v. WV Hospitality LLC*, AAA No. 01-23-000-3943.

| | |
|---|---|
| | (vi) Pinterest "The William Vale" (collectively, the "Social Media Accounts").  WV Hotel acknowledges and agrees that all usernames, administrator accounts, and passwords associated with the foregoing Social Media Accounts have been provided to Hotel Sub and are currently in the possession of the William Vale Hotel's Director of Marketing.  WV Hotel further acknowledges and agrees that on and after the Effective Date, WV Hotel shall not make any use, either for its own benefit or for the benefit of any other person or entity, of the Social Media Accounts, including but not limited to all content created and posted thereon and/or thereunder, and that Hotel Sub shall have the exclusive right to use and/or to otherwise transfer the Social Media Accounts.  The value attributable to the Social Media Accounts is $45,000. |
| **Internet Domain** | On the Effective Date, the Debtor shall purchase from WV Hotel all right, title and interest in and to the internet domain for the William Vale Hotel, "www.thewilliamvale.com," and any goodwill associated therewith (collectively, the "Domain Name") for the purchase price of $1.3 million (the "Domain Purchase Price") by entering into that certain Domain Name Purchase and Transfer Agreement in the agreed form annexed [to the Revised Settlement Agreement] as Exhibit C. As directed jointly by the members of WV Hotel, the Debtor shall distribute the Domain Purchase Price as follows: 50% shall be paid to Weiss (or as otherwise directed by Weiss) and 50% shall be paid to Yoel Goldman (or as otherwise directed by Yoel Goldman).  For the avoidance of doubt, each of WB, WV Hotel, WV FNB, Parking, Espresso and Staffing represent and warrant that, to the extent, if any, it has, had or ever had any rights, title and interest in or to the existing content on the website associated with the Domain Name, it waives all rights, title and interest in and to the existing content on the website associated with the Domain Name. |
| **Consulting Services Payment** | On the Effective Date, the Debtor shall pay Espresso $200,000 in consideration for consulting services that have been rendered by Espresso to the Debtor in implementing the transition of the operation, direction, management, and supervision of the William Vale Hotel for the period that commenced as of September 30, 2023 through the Execution Date of the Consulting Services Agreement between the Debtor and Espresso in the agreed form annexed [to the Revised Settlement Agreement] as Exhibit D. |
| **Mechanics' Lien Claims** | Notwithstanding anything to the contrary in the Cash Collateral Stipulation, the Debtor shall be responsible to pay 100% of all amounts paid to settle, extinguish and/or satisfy the claims, including without limitation, all legal fees and expenses incurred by the Debtor in connection with such claims (collectively, the "Mechanic Lien Claims" and each individually a "Mechanic Lien Claim") of: (i) D and J Industries LLC (Claim No. 2); (ii) JSP Electrical Contracting |

|  | Corp (Claim No. 5); (iii) Schimenti Construction Company LLC (Claim No. 6); and (iv) Ziba Construction Inc. dba 212Carpet (Claim No. 7) in the Chapter 11 Case.  The aggregate amounts set forth in each of the proofs of claim evidencing the Mechanic Liens is referred to [in the Revised Settlement Agreement] as the "ML Aggregate Proof of Claim Amount."  The Debtor further agrees that it shall not settle or compromise any Mechanic Lien Claim without the unanimous written consent of the members of Member, which consent shall not be unreasonably withheld, conditioned or delayed. To the extent the Mechanic Lien Claims are not settled, extinguished and/or satisfied prior to the effective date of the First Amended Plan (the "Plan Effective Date"), the Debtor will retain in escrow the amounts necessary to satisfy such Mechanic Lien Claims and all remaining Lien Defense Funds (collectively, the "ML Escrow"). |
|---|---|
| **Unfair Labor Practice Claim** | The Debtor shall be responsible to pay 100% of all amounts paid to settle, extinguish and/or satisfy the claims, including without limitation, all legal fees and expenses incurred by the Debtor in connection with such claims, pending before the National Labor Relations Board as follows: (i) The William Vale Staffing, LLC and Hotel And Gaming Trades Council, AFL-CIO, Case No. 29-RC-200927, commenced August 5, 2022 which seeks to certify a unit of employees including all full-time and regular part-time housekeeping employees for collective bargaining purposes; and (ii) The William Vale Staffing, LLC and Hotel and Gaming Trades Council, AFL-CIO, Case No. 29-CA-31397, commenced November 9, 2023, which asserts unfair labor practices in violation of the National Labor Relations Act (together, the "Unfair Labor Claim").  The Debtor further agrees that it shall not settle or compromise any Unfair Labor Claim without the unanimous written consent of the members of Member, which consent shall not be unreasonably withheld, conditioned or delayed.  To the extent the Unfair Labor Claim is not settled, extinguished and/or satisfied prior to the Plan Effective Date, the Debtor will retain in escrow the amounts necessary to satisfy such Unfair Labor Claim (the "UL Escrow" and, together with the ML Escrow, the "Debtor Contingent Liabilities Escrow"). |
| **Liquor License Transfer** | On and after the Effective Date, Weiss, in his capacity as Managing Member of WV Hotel and WV FNB, shall cause WV Hotel and/or WV FNB, as applicable to cooperate with all commercially reasonable requests of FNB Sub and take such commercially reasonable actions as are necessary to (i) submit a liquor license transfer application on behalf of FNB Sub to the New York State Liquor Authority (the "SLA") and (ii) effectuate the transfer of the liquor license for the WV Complex from WV FNB to FNB Sub. Such cooperation shall include, but not be limited to: |

1. FF&E Agreement.  The Parties acknowledge that on February 8, 2024, WV FNB as Seller and FNB Sub as Buyer entered into that certain FF&E Purchase and Sale Agreement (the "FF&E Agreement"), and the Parties agree that such FF&E Agreement is and shall be considered part of the good and valuable consideration exchanged by the Parties under this Agreement.

2. Deposit Accounts.  On the Effective Date, (i) WV FNB shall open bank account in its name at Flagstar Bank and (ii) WV Hotel shall open a bank account in its name at Flagstar Bank (collectively, the "Deposit Accounts").  Each of the Deposit Accounts shall be subject to a deposit account control agreement (each, a "DACA") in a form reasonably acceptable to each of Debtor, Trustee, WV FNB, FNB Sub, WV Hotel, Hotel Sub and Op Sub.  On April 22, 2024, the Debtor filed a motion with the Bankruptcy Court to approve the Second Cash Collateral Stipulation, to further modify certain provisions of the Initial Cash Collateral Order and reflect certain agreements among the Debtor, FNB Sub, Hotel Sub, WV FNB, WV Hotel and the Trustee with respect to all revenues generated by the Debtor's operation of the WV Complex during the period from the Petition Date through the date on which the SLA issues a temporary liquor license to FNB Sub (the "DACA Funds").  The Parties agree that, pursuant to the DACAs, from and after the Effective Date, the Debtor shall be entitled to direct Flagstar Bank to administer the DACA Funds in the Deposit Accounts for any purpose in the Debtor's sole discretion, including without limitation, (a) from and after the Effective Date, to direct Flagstar Bank to transfer all or any portion of the DACA Funds to fund or satisfy its obligations with respect to the payment described in Section 4(c) herein and the payment described in Section 4(d) [in the Revised Settlement Agreement]; and (b) on the Plan Effective Date, to direct Flagstar Bank to transfer all or any portion of the DACA Funds to fund or satisfy its obligations with respect to the payment of the equity distribution described in Sections 3(b) and its obligations under sections 4(b), 4(d), 4(e), 4(f) and 4(g) [in the Revised Settlement Agreement].  Notwithstanding the foregoing, the Parties agree that neither WV FNB nor WV Hotel, nor their respective Managing Members and/or Members, shall be liable for any damages, losses, penalties or fees arising in connection with the DACA Funds, including the deposit of the DACA Funds into the Deposit Accounts or the distribution of the DACA Funds from the Deposit Accounts.  The Debtor shall indemnify each of WV FNB, WV Hotel, and their respective Managing Members and Members for any such damages, losses, penalties or fees.

| | |
|---|---|
| | 3. Liquidator's Permit.  On the Effective Date, WV Hotel and WV FNB shall deliver a completed Application for Liquidator's Permit to FNB Sub.<br><br>4. Liquor License Surrender.  On the date that the SLA issues a temporary liquor license to FNB Sub, WV Hotel and WV FNB shall complete the petition for surrender found on the reverse side of the liquor license certificate (the "Petition for Surrender"). |
| **Member Distribution** | . . . [T]he Debtor shall make an initial distribution to Member, in its capacity as the sole member of the Debtor, on the Plan Effective Date, in the amount of $2,127,107 (the "Initial Member Distribution"), and an additional distribution to Member (the "Contingent Member Distribution") in such amount, if any, equal to (i) (x) the positive difference, if any, between the [Mechanics Lien] Aggregate Proof of Claim Amount . . . and the aggregate amount of such claims ultimately Allowed by the Bankruptcy Court (the "Aggregate ML Allowed Amount"), plus (y) the positive difference, if any between the amount set aside by Debtor (as agreed by all Parties [in the Revised Settlement Agreement]) for legal fees and expenses (the "Lien Defense Funds") to defend the Mechanic Lien Claims . . .and the amount of such fees and expenses actually expended by the Debtor, plus (z) the positive difference, if any, between $700,000 and the settled, extinguished and/or satisfied Unfair Labor Claim . . .and/or (ii) if the Mechanic Lien Claims or the Unfair Labor Claim (collectively, referred to [in the Revised Settlement Agreement] as the "Contingent Liabilities") are not settled, resolved or Allowed on or before the Plan Effective Date, such amount as remains in the Debtor Contingent Liabilities Escrow (as defined below) after resolution and satisfaction in full of the Mechanic Lien Claims, including, for the avoidance of doubt, the Lien Defense Funds deposited in such escrow by Debtor remaining after payment of all legal fees and expenses incurred in connection therewith, which distribution shall be made promptly following resolution of the Contingent Liabilities. For the avoidance of doubt, other than the First Member Distribution and the Contingent Member Distribution, Member shall not be entitled to any other distributions under the First Amended Plan on account of its equity interest in the Debtor.  Notwithstanding anything to the contrary set forth [in the Revised Settlement Agreement], in the event the First Amended Plan is not consummated, (i) the Debtor (A) shall retain funds in the amount equal to the Initial Member Distribution, (B) shall preserve all and any funds remaining, if any, in the Debtor Contingent Liabilities Escrow, and (C) shall not use such funds for any purpose absent the unanimous consent of the members of Member, (ii) the distributions to Member set forth [in the Revised Settlement Agreement] (including the Initial Member Distribution and, to the extent funds remain in the Debtor Contingent Liabilities Escrow, the Contingent Member Distribution) |

| | |
|---|---|
| | shall be included in any future plan of reorganization filed by the Debtor in the Debtor's bankruptcy proceeding, and (iii) the Debtor shall not file or support any plan of reorganization that does not provide for the distributions to Member set forth herein. |
| **Distribution of Amounts Received by Member** | On the Plan Effective Date, YG WV shall cause Member to make an equity distribution to Weiss, in his capacity as 50% member of Member, of the Initial Member Distribution received by Member under paragraph 3(b) of [the Revised Settlement Agreement]. As to the Contingent Member Distribution, if any, whether made on or after the Plan Effective Date, YG WV shall cause Member to make an immediate equity distribution of such distribution to each member of Member, in accordance with their pro rata ownership percentages of Member. |
| **Termination of Lease Agreement** | On the Effective Date, the Debtor and WB shall execute the Memorandum of Termination of Lease retroactive to May 20, 2021 substantially in the form annexed [to the Revised Settlement Agreement] as Exhibit E and the Debtor shall record it in the ACRIS system for Kings County, New York. |
| **Releases** | [The Releases are summarized as below in the Settlement Agreement. The complete Releases can be found at section 5 of the Revised Settlement Agreement.]

Subject to obligations imposed by the Settlement, the Settlement provides for various general releases, specifically:

Weiss, in his individual capacity, along with any of his partners, agents, employees, heirs, counsel, financial advisors, representatives, successors, and assigns, and all persons acting through, under, or in concert with any of them, (the "Weiss Releasors/Releasees") release any claims against: each of the Debtor, Hotel Sub, Op Sub, FNB Sub, Member, and YG WV (the "Debtor Releasors/Releasees"); and the Trustee.

Each of WB, WV Hotel, WV FNB, Parking, Espresso, Domain and Staffing (the "WB Releasors/Releasees") release any claims against the Debtor Releasees and the Trustee.

The Debtor Releasors/Releasees release any claims against the Weiss Releasors/Releasees and the WB Releasees.

The Trustee releases the Weiss Releasees, the WB Releasees.

The Parties shall be exculpated from liability in connection with the Settlement under the Plan. |

### C. The Motion

Through the Motion, the Debtor seeks entry of an order approving the Settlement. (Motion ¶ 27.)  The Debtor notes that since the start of the chapter 11 case, it has aimed to either "(i) negotiate a resolution of the Adversary Proceeding; or (ii) sell the WV Complex pursuant to a court supervised process."  (Motion ¶ 23.)  And after extensive, hard-fought negotiations, the Parties have arrived at a compromise.

The Debtor submits that the Settlement satisfies each of the *Iridium* Factors (defined below).  *See In re Iridium Operating LLC*, 478 F.3d at 462.  First, the Debtor emphasizes that the Settlement offers the Debtor "numerous tangible and intangible benefits" and is in the best interests of creditors.  (Motion ¶¶ 32, 37.)  Specifically, these benefits include (i) the $8 million settlement payment from WB; (ii) the needed cooperation to efficiently transfer the WV Complex, including, for example, the provision of certain transition services, the transfer of the liquor license, and the purchase of the internet domain and social media accounts; (iii) the avoidance of litigation and the mitigation of uncertainty and costs; and (iv) greater recoveries for creditors.  (*Id.* ¶¶ 33–36.)

*Second*, the Debtor emphasizes that the Settlement avoids continued litigation of the Adversary Proceeding, potential additional litigation relating to the Adversary Proceeding, and litigation over liability for mechanic's lien obligations that would otherwise be lengthy and expensive.  (*Id.* ¶ 38.)

*Third*, the Settlement has the support of the Debtor, the Trustee, WB, and the other settlement Parties.  (*Id.* ¶ 39.)

*Fourth*, the Debtor maintains that the "nature and breadth" of the releases in the Settlement are "fair and reasonable under the circumstances" as they were necessary to induce the Parties to enter into the Settlement and otherwise provide certainty and finality.  (*Id.* ¶ 40.)

Similarly, the Debtor states that the exculpation provision is also "reasonable, appropriate, and in the best interests of the estate." (*Id.*)

*Fifth*, the Debtor notes that the terms of the Settlement Agreement were "intensely negotiated" and were reached in good faith and following arms-length negotiations. (*Id.* ¶ 41.) The Parties were also represented by experienced and sophisticated counsel. (*Id.*)

### D.  The Goldman Objection

Goldman opposes the *Second Amended Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC* (the "Second Amended Plan," ECF Doc. # 306) and the Motion on several grounds.[6]

*First*, Goldman argues that the Settlement conveys his property without his consent in violation of orders issued by the American Arbitration Association ("AAA") panel that remain in effect and the operating agreements of WB, the WV Hotel, Parking, and the WV FNB (collectively, the "Operating Entities"). (Goldman Objection ¶¶ 34–44.)  The AAA panel orders relate to the arbitration (the "Arbitration") Goldman commenced against Weiss and the Operating Entities based on Weiss's alleged violations of his fiduciary and contractual duties.[7] (*Id.* ¶ 21.) The Arbitration is currently stayed. (*Id.*)  Additionally, Goldman alleges that the Settlement allows Weiss to use property Goldman owns to pay for the Settlement and ultimately deprives him of any recourse for these actions. (*Id.* ¶ 44.)

Goldman believes that, as 50% owner of the Operating Entities, he is entitled to any proceeds stemming from operations or the sale of assets. (*Id.* ¶ 34.)  He indicates that entering

---

[6]    The Goldman Objection specifically objects to the Second Amended Plan and the Settlement Agreement. However, the Debtor has filed revised versions of each document.  *See Fourth Amended*; *see also* Revised Settlement Agreement.  Goldman has not filed a further objection to the Fourth Amended Plan or the Revised Settlement Agreement.  The Court nevertheless considers each of Goldman's objections as to the current operative Plan.

[7]    The Arbitration is captioned *Goldman v. Weiss*, AAA No. 01-23-0001-2090.

the Settlement involves "Major Decisions" that, under the operating agreements for the

Operating Entities, would require joint written approval by Goldman and Weiss.  (*Id.* ¶ 36.)

However, Goldman maintains that Weiss is "engaging in unilateral Major Decisions" and making

impermissible transfers out of the Operating Entities' accounts in violation of the AAA panel's

standing injunctions.  (*Id.* ¶ 37.)  Therefore, Goldman concludes that the approval of the

Settlement along with the release of conduct via the Second Amended Plan's exculpation clause

would permit Weiss to enter into agreements with Weiss's affiliates with a disproportionate

impact to Goldman.  (*Id.* ¶ 35.)  Goldman also believes that Weiss is diverting value that belongs

equally to Goldman through the following means: (i) circumstances surrounding the domain

name and its ownership (*id.* ¶¶ 38–39); (ii) lack of disclosure over the agreement underlying the

transfer of the liquor license, furnishings, equipment and the related sale price (*id.* ¶ 40);

(iii) lack of details concerning the consulting services that justify the $200,000 payment to

Espresso (*id.* ¶ 41); and (iv) the Initial Member Distribution (*id.* ¶ 42).

*Second*, Goldman argues that the Settlement Agreement and the exculpation provision in

the Second Amended Plan violate section 1129(a)(3) of the Bankruptcy Code as they were not

proposed in good faith and are otherwise unlawful for reasons already discussed.  (*Id.* ¶ 47.)

Goldman indicates that the Debtor excluded him from any negotiations and only contacted him

after finalizing the agreement with Weiss.  (*Id.* ¶ 50.)

*Third*, Goldman claims that the Settlement Agreement and exculpation provision in the

Second Amended Plan are subject to heightened scrutiny because Weiss is a statutory insider.

(*Id.* ¶¶ 51–53.)  Goldman believes that Weiss is a statutory insider of the Debtor under section

101(31)(E) of the Bankruptcy Code because he is (i) an affiliate of the Debtor's affiliate, WB

Member, and (ii) an affiliate and insider of Debtor affiliate, WB.  (*Id.*)

*Fourth*, Goldman believes that the exculpations in the Second Amended Plan violate

sections 1123(b)(6), 1129(a)(1), and 1129(a)(3) of the Bankruptcy Code because they contain

non-consensual third-party releases that "cut off Goldman's claims and defenses against non-

debtor fiduciaries," including in the Arbitration and state court action[8] between the parties.  (*Id.*

¶ 57.)  Goldman asserts that the Court lacks constitutional authority to issue final judgment as to

the exculpation provision in section 10.7 of the Second Amended Plan because the releases "do

not stem from the bankruptcy itself" and are therefore, non-core under *Stern v. Marshall*, 564

U.S. 462 (2011).  (*Id.* ¶ 59 (quoting *In re Purdue Pharma L.P.*, 69 F.4th 45, 78–79 (2d Cir. 2023),

*cert. granted sub nom. Harrington v. Purdue Pharma L.P.*, No. (23A87), 2023 WL 5116031

(Aug. 10, 2023)).)  Additionally, Goldman argues that every *Purdue* factor weighs against

approval of section 10.7(b) of the Second Amended Plan and the majority of the *Purdue* factors

weight against approval of section 10.7(a).[9]  (Goldman Objection ¶¶ 60–63.)

---

[8]        The case is captioned *Goldman v. Weiss*, Index No. 653186 (N.Y. Cnty. 2022) (the "State Court Action").

[9]        Section 10.7 of the Second Amended Plan provides:

    (a)  To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and
each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment,
damage, demand, debt, right, cause of action, remedy, loss, and liability for any conduct occurring
on or after the Petition Date and up to and including the Effective Date in connection with or arising
out of the filing and administration of the Chapter 11 Case, the Sale process, the closing of the Sale;
the Disclosure Statement, the Plan Administration Agreement, including the formulation,
negotiation, preparation, dissemination, implementation, administration, confirmation, and
consummation thereof, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the
funding or consummation of the Plan; the occurrence of the Effective Date; the administration of
the Plan or the property to be distributed under the Plan; or the transactions in furtherance of any of
the foregoing; or upon any other related act or omission, transaction, agreement, event, or other
occurrence taking place from the Petition Date through and including the Effective Date; except for
acts or omissions of an Exculpated Party that constitute gross negligence, fraud, or willful
misconduct, in each case as determined by a Final Order.  This exculpation shall be in addition to,
and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law
or rules protecting such Exculpated Parties from liability.

    (b)  To the maximum extent permitted by applicable law, no Additional Exculpated Party will have or
incur, and each Additional Exculpated Party is hereby released and exculpated from, any claim,
obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability
for any conduct occurring on or after the Petition Date and up to and including the Effective Date
in connection with or arising out of the Settlement Agreement, including the formulation,

*Fifth*, Goldman argues that six of the seven *Iridium* Factors weigh against approval of the Settlement Agreement.  (*Id.* ¶¶ 64–70.)  Notably, Goldman states that he is the "only party-in-interest not a party to the Settlement Agreement."  (*Id.* ¶ 67.)  And Goldman emphasizes that, contrary to the Debtor's statements, the Operating Entities have "no authority to support the Settlement Agreement without [his] written consent."  (*Id.* at 32 n.10.)

*Sixth*, Goldman submits that he has standing to raise these objections since he possesses a "direct pecuniary interest in the Settlement Agreement and [Second Amended] Plan exculpation provisions which . . . together misappropriate his property and release his claims and defenses in ongoing and threatened litigation."  (*Id.* ¶ 71.)  Therefore, Goldman concludes that he is a "party in interest" under section 1109(b) of the Bankruptcy Code who "may object to a Rule 9019 motion to approve a settlement."  (*Id.*)

Goldman, nonetheless, proposes a resolution that he states, if incorporated, would resolve the Goldman Objection.  He indicates that if the Debtor incorporates his proposed modifications to the exculpation provisions as set forth in Exhibit 13 to the Moskowitz Declaration, his concerns would be allayed.  (*Id.* ¶ 72.)  Additionally, if the Settlement Agreement were to be revised to "place all money being paid to Weiss and/or any entities under his control into escrow until the Arbitration is completed and a final order is issued by the appropriate tribunal with jurisdiction to address each party's rights," his objection as to the Settlement Agreement would also be resolved.  (*Id.*)  Goldman argues that these "compromises" would allow the Second

---

negotiation, preparation, dissemination, implementation, administration, confirmation, and consummation thereof or the transactions in furtherance of any of the foregoing; except for acts or omissions of an Additional Exculpated Party that constitute gross negligence, fraud, or willful misconduct, in each case as determined by a Final Order.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Additional Exculpated Party from liability.

(Second Amended Plan § 10.7.)  As noted below, subsection (b) to the exculpation provision has since been removed.

Amended Plan to go effective while "respecting Goldman's legal and property rights." (*Id.* ¶ 73.) Lastly, Goldman welcomes any opportunity to negotiate with the Parties and "reach a consensual resolution." (*Id.*)

### E. Replies to the Goldman Objection

#### 1. <u>Weiss Reply</u>

Weiss indicates that each of the Operating Entities are New York limited liability companies and, therefore, are governed under New York limited liability company laws ("NY LLCL"). (Weiss Reply ¶ 1.) Weiss argues that neither he nor Goldman has any interest in any specific property of the Operating Entities in accordance with section 601 of the NY LLCL, which provides that a member of an LLC has "no interest in specific property." (*Id.*) Rather, Goldman is entitled solely to his "share of distributions, if any, made by the respective [Operating Entity]." (*Id.* ¶ 2.) This right is qualified by provisions reserving the right to such distributions to the Managing Member of the Operating Entities, which is undisputed to be Weiss. (*Id.*) Goldman does not argue that Weiss violated the waterfall set forth in the Operating Entities' respective operating agreements. (*Id.*)

Weiss asserts that none of the terms of the Settlement disturb the Major Decisions provision in the governing operating agreements. (*Id.* ¶ 4.) Indeed, he rejects each of Goldman's contentions that:

- the Settlement implicates the "terms and conditions of any agreement between the Company and an Affiliate of any Member (*i.e.,* Development Agreement, Property Management Agreement, Hotel Management Agreement, Leasing Agreement, Food and Beverage Operations Agreement, or Lease) (*id.* ¶ 5);

- the cash and non-cash assets of the Operating Entities used to fund the Settlement are not being used for the exclusive benefit of the Operating Entities (*id.* ¶ 6); and

- that Goldman is being disproportionately impacted by the Settlement Agreement (compared to Weiss) because Goldman "receives nothing at all" (*id.* ¶¶ 7–9).

Furthermore, Weiss asserts that Goldman is mischaracterizing the Arbitration proceedings during which he raised the issue whether the Major Decisions provision prohibited Weiss, acting in his individual capacity, from entering a transaction with the Debtor to purchase the WV Complex. (*Id.* ¶¶ 10–11.) Notably, the Weiss Reply emphasizes that while the Emergency Arbitrator initially held that "Weiss '[was] enjoined from engaging in unilateral Major Decisions,'" the three-member arbitration panel reviewed and rejected that decision. (*Id.* ¶ 12.) Ultimately, the arbitration panel permitted Weiss, in his capacity as Managing Member, to proceed with the sale of the WV Complex. (*Id.*) Weiss further notes that the arbitration panel concluded in a separate decision that Goldman also failed to establish that the Major Decisions clause applies to Weiss's "personal conduct" as opposed to conduct on behalf of the company. (*Id.* ¶ 13.) As for the injunction issued in the Arbitration, it was "limited to Weiss in his individual capacity." (*Id.* ¶ 15.) Therefore, Weiss concludes that the injunction is inapplicable to the Second Amended Plan or the Settlement Agreement because neither involves Weiss "'purchas[ing], acquir[ing] or otherwise obtain[ing] an interest in' the [WV Complex] or its assets." (*Id.* ¶¶ 15, 18.)

2. Debtor Reply

At the outset, the Debtor indicates that the Revised Settlement Agreement reflects a further compromise with Goldman over his objection to the domain name transaction. (Debtor Reply ¶¶ 13–14.) The Debtor then presents responses to Goldman's arguments.

*First*, the Debtor argues that Weiss possessed the authority to enter into the Revised Settlement Agreement and convey the property to be transferred to the Debtor contemplated therein. (*Id.* ¶¶ 15–23.) Echoing the Weiss Reply, the Debtor, citing to section 601 of the NY

LLCL, states that Goldman is only entitled to his "share of distributions, if any, made by the [Operating Entities] subject to the terms of the operating agreements, which place limits on this right." (*Id.* ¶ 16.)  The Debtor asserts that Goldman's arguments that the Major Decisions provision of the operating agreements prevents the Revised Settlement Agreements from moving forward is also without merit for the following reasons:

- the Settlement Agreement does not impact the "terms and conditions of any agreement between the Company and an Affiliate of any Member" and Goldman has not identified any (*id.* ¶ 18);

- Goldman's argument that the Operating Entities' cash and non-cash assets are not being used for the exclusive benefit of the Operating Entities fails to recognize the Court's ruling in the Partial SJ Decision and that, but for the Settlement, the Debtor could seek monetary recovery from the Operating Entities (*id.* ¶ 19);

- the Settlement impacts Goldman and Weiss equally as Class A Members of the Operating Entities (*id.* ¶ 20); and

- Goldman waived any claim that Weiss improperly settled the Rent Action as he did not participate in it while it was in State Court and did not oppose the motion for partial summary judgment or otherwise object to Weiss opposing the motion on behalf of WB (*id.* ¶ 23).

*Second*, the Debtor argues that the Arbitration decisions do not bar Weiss from entering the Revised Settlement Agreement since the Arbitration decisions only prevented Weiss, in his individual capacity, from pursuing and/or consummating a sale of the WV Complex.  (*Id.* ¶¶ 25–27.)  The Debtor, similar to Weiss, concludes that the Arbitration decisions are inapplicable to the Revised Settlement Agreement or the Third Amended Plan.  (*Id.* ¶ 28.)

*Third*, the Plan Administrator for Wind Down supports the Settlement and believes it is in the best interests of Wind Down and the Debtor since it maximizes recoveries for the Series C Noteholders against the Debtor and resolves claims and threatened claims against Weiss and YG WV.  (*Id.* ¶¶ 29, 31.)  Specifically, the Settlement resolves claims or causes of action that Weiss could assert against YG WV or Wind Down.  (*Id.* ¶ 30.)  Therefore, the Debtor maintains that the

payment YG WV is directing Member to pay to Weiss is reasonable when accounting for costs relating to litigating.  (*Id.*)

*Fourth*, the Debtor argues that Goldman's issues with the Revised Settlement Agreement are without merit since the Debtor acted on reasonable information in agreeing to these provisions and its business judgment cannot be second-guessed.  (*Id.* ¶ 41.)  With respect to the domain name and social media accounts, the Debtor maintains that it "already had the right to sell the Domain Name and Social Media Accounts as assets owned by the Debtor as a matter of intellectual property law" despite settling with Goldman on this issue.  (*Id.* ¶ 33.)  Additionally, the Debtor asserts that its decision to purchase the domain name and social media accounts "was a business judgement entered into in the context of the Settlement Agreement."  (*Id.* ¶ 36.)  The Debtor considered its litigation position, the need to resolve the issue outside of the Settlement in an adversary proceeding, and the purchaser's willingness to close on the WV Complex sale. (*Id.*)  The Debtor reserves the right to commence and adversary proceeding if the Court declines to approve the terms of the Revised Settlement Agreement that convey the social media accounts to the Debtor.  (*Id.*)  The Debtor consulted with its hospitality consultant and interim hotel management company, Performance Interim Advisory LLC d/b/a LW Hospitality Advisors ("LWHA"), and the William Vale Hotel's Director of Marketing to arrive at the $45,000.00 valuation ascribed to the social media accounts in the Revised Settlement Agreement.  (*Id.* ¶ 37.)

With respect to the Debtor's agreement regarding its furniture, fixtures, and equipment ("FF&E") as well as consulting services, the Debtor indicates first that it was not required to disclose support for the consideration to be paid to FNB Sub. and Espresso.  (*Id.* ¶ 38.)  In any event, the Debtor reached a $5,000 payment for the transfer of the FF&E, if any, at the WV Complex because the transfer of the liquor license was "invaluable" to the Purchaser and the sale

generally. (*Id.*)  The Debtor also emphasizes that the consideration paid to Espresso is warranted for its assistance in the smooth transition of the management and direction of the WV Complex, which was essential both to the Debtor's assumption and control of the WV Complex and to the sale contract. (*Id.* ¶ 39.)

As for the initial member distribution issue, the Debtor contends that Goldman has no standing to raise this issue since he is "not aggrieved in any way by this distribution." (*Id.* ¶ 40.)

*Fifth*, the Debtor maintains that there is no basis for the assertion that the Revised Settlement Agreement was a product of collusion.  The Settlement is a multi-party agreement where Parties made concessions and obtained benefits, was negotiated in good faith and at arm's-length, and Weiss is not an "insider" since he lacks the ability to control or influence the Debtor. (*Id.* ¶¶ 42–44.)  Therefore, the Debtor concludes that heightened scrutiny is unwarranted. (*Id.* ¶ 45.)

*Sixth*, the Debtor argues that the exculpation provisions comply with Second Circuit law. (*Id.* ¶ 46.)  The Debtor Reply emphasizes that the exculpation provision is essential to the Third Amended Plan, the sale contract, and the Revised Settlement Agreement and all voting classes voted to approve the provision. (*Id.* ¶ 46.)  In any event, the Debtor claims that the exculpation provision meets the relevant factors set out by the Second Circuit in *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141–43 (2d Cir. 2005). (*Id.* ¶¶ 47–49.)  Notably, the Debtor states that Goldman is not a creditor of the estate and possesses no standing to object and is only seeking the ability to pursue his claims twice—once here and again before the arbitral panel.[10] (*Id.* ¶¶ 50–51.)

---

[10]    At the conclusion of the May 25 Hearing, counsel for the Debtor agreed to remove Weiss from the exculpation provision.  *See* Section III.B.6, *infra*.

*Seventh*, the Debtor also notes that Goldman lacks standing to object to the Revised Settlement Agreement since he is not a creditor in this chapter 11 case and does not have a "direct economic stake."  (*Id.* ¶ 53.)  In any event, the Debtor Reply argues that any harm Goldman may suffer is too remote to convey standing.  (*Id.*)

*Seventh*, the Debtor claims that the *Iridium* Factors "strongly" support approval of the Revised Settlement Agreement and Goldman relies on flawed premises to rebut the argument that the *Iridium* Factors are satisfied.  (*Id.* ¶ 55.)

## II.   <u>LEGAL STANDARD</u>

Rule 9019(a) of the Bankruptcy Rules governs the approval of compromises and settlements, and provides as follows:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States Trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

Generally, "settlements or compromises are favored in bankruptcy and, in fact, encouraged."  *In re Chemtura Corp.*, 439 B.R. 561, 595 (Bankr. S.D.N.Y. 2010).  This approach stems from the idea that settlements and compromises "minimize litigation and expedite the administration of the bankruptcy estate."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

However, before approving a settlement, a court must first determine that the proposed settlement "is fair and equitable and in the best interests of the estate."  *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (internal quotation marks omitted) (citing *TMT Trailer Ferry*, 390 U.S. at 424 (1968)); *see also In re Lehman Bros. Holdings*, 435 B.R. 122, 134 (S.D.N.Y. 2010).

Courts have developed standards to analyze settlements based on the original framework

announced in *TMT Trailer Ferry*. The Second Circuit has set forth seven interrelated factors (the

"*Iridium* Factors") to be considered by a court in deciding whether to approve a compromise or

settlement:

> (1) [T]he balance between the litigation's possibility of success and the settlement's
> future benefits; (2) the likelihood of complex and protracted litigation, "with its
> attendant expense, inconvenience, and delay," including the difficulty in collecting
> on the judgment; (3) "the paramount interests of the creditors," including each
> affected class's relative benefits "and the degree to which creditors either do not
> object to or affirmatively support the proposed settlement;" (4) whether other
> parties in interest support the settlement; (5) the "competency and experience of
> counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court
> judge" reviewing, the settlement; (6) "the nature and breadth of releases to be
> obtained by officers and directors;" and (7) "the extent to which the settlement is
> the product of arm's length bargaining."

*In re Iridium Operating*, 478 F.3d at 462. A court "need not conduct an independent

investigation into the reasonableness of the settlement but must only canvass the issues and see

whether the settlement falls below the lowest point in the range of reasonableness." *Chemtura*,

439 B.R. at 594 (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (internal

quotation marks omitted)).

In passing upon a proposed settlement, "the bankruptcy court does not substitute its

judgment for that of the trustee." *Depo v. Chase Lincoln First Bank, N.A.*, 77 B.R. 381, 384

(N.D.N.Y. 1987), *aff'd sub nom. Depo v. Lincoln Bank*, 863 F.2d 45 (2d Cir. 1988) (citations

omitted). Nonetheless, "while the 'approval of a settlement rests in the Court's sound discretion,

the debtor's business judgment should not be ignored.'" *JPMorgan Chase Bank, N.A. v. Charter

Communs. Operating, LLC (In re Charter Communs.)*, 419 B.R. 221, 252 (Bankr. S.D.N.Y.

2009) (quoting *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y 2009)). In

addition, the court may "give weight to the informed judgments of the trustee or debtor-in-

possession and their counsel that a compromise is fair and equitable." *In re Kerner*, 599 B.R.

751, 756 (Bankr. S.D.N.Y. 2019) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. at

505).

## III.    DISCUSSION

Goldman objects to the Settlement, arguing that (i) Weiss did not have authority to enter

into the Settlement on behalf of the Operating Entities, and (ii) the *Iridium* Factors weigh against

approving the Settlement.  The Court disagrees.

### A.  Weiss Had Authority to Bind the Operating Entities to the Settlement

As a threshold matter, the Court must determine whether Weiss possessed the necessary

authority to enter into the Settlement on behalf of the Operating Entities, and, if so, whether this

action was a Major Decision that required Goldman's written approval.

The Operating Entities are all New York limited liability companies, and therefore, the

NY LLCL is applicable.  (Weiss Reply ¶ 1; Debtor Reply ¶ 15.)  As aptly stated by the Supreme

Court of the State of New York, Appellate Division, First Judicial Department:

> It is often said that LLCs are "creatures of contract," and that "[o]ne attraction of
> the LLC form of entity is the statutory freedom granted to members to shape, by
> contract, their own approach to common business relationship problems."  Article
> IV of the [NY LLCL] makes clear that the operating agreement of an LLC governs
> the relationships among members and the powers and authority of the members and
> manager.

*In re KG Winddown, LLC*, 632 B.R. 448, 492 (Bankr. S.D.N.Y. 2021) (quoting *LNYC Loft, LLC*

*v. Hudson Opportunity Fund I, LLC*, 57 N.Y.S.3d 479, 483 (1st Dep't 2017) (citations omitted));

*see also In re E. End Dev., LLC*, 491 B.R. 633, 638 (Bankr. E.D.N.Y. 2013) ("Under [NY LLCL],

the LLC's operating agreement governs the parties' conduct.  To the extent the agreement is

silent, there are default provisions in the New York Limited Liability Company laws that apply.")

Therefore, the Operating Entities' respective operating agreements define the scope of

authority its members have and whether actions taken by a member is binding on that entity.

Under New York law, a court's review of an LLC operating agreement is governed by the rules and constructs of contract interpretation.  In *Coudert Bros*., Judge Engelmayer described these rules and constructs as follows:

> 'It is the primary rule of construction of contracts that when the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations.'  *Howard v. Howard*, 292 A.D.2d 345, 345, 740 N.Y.S.2d 71 (2d Dep't 2002).  'Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing.'  W.*W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990).  That said, in analyzing contractual text, a court need not turn a blind eye to context. Rather, 'a court should accord [contractual] language its plain meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.'  *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir.1990) (quoting *William C. Atwater & Co. v. Panama R.R. Co.*, 246 N.Y. 519, 524, 159 N.E. 418 (1927) (second alteration in original)).  'A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties.'  *Acumen Re Mgmt. Corp. v. Gen. Sec. Nat'l Ins. Co.*, No. 09 Civ. 1796 (GBD), 2012 WL 3890128, at *5 (S.D.N.Y. Sept. 7, 2012) (citation omitted).

*In re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y. 2013).

Lastly, under New York Law, an agent has actual authority to act on behalf of the principal if the principal has granted the agent "the power to enter into contracts on the principal's behalf," subject to any explicit or implicit limitations the principal may place on this power.  *See Highland Cap. Mgmt. LP v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010); *see also Ford v. Unity Hosp.*, 299 N.E.2d 659, 664 (1973) ("An agent's power to bind his principal is coextensive with the principal's grant of authority.")  Therefore, an LLC may grant actual authority to a member to bind the LLC to contracts and other agreements through the LLC operating agreement.

1.  <u>Weiss Had Actual Authority Under the Operating Agreements to Enter into
    the Settlement on Behalf of the Operating Entities</u>

The Operating Entities are each governed by the terms of their respective operating

agreements.  These agreements are the Parking operating agreement (the "Parking Operating

Agreement," ECF Doc. # 331-3), the WB Operating Agreement, the WV Hotel operating

agreement (the "WV Hotel Operating Agreement," ECF Doc. # 331-1), and the WV FNB

operating agreement (the "WV FNB Operating Agreement," ECF Doc. # 331-2, and together

with the Parking Operating Agreement, the WB Operating Agreement, and the WV Hotel

Operating Agreement, the "Operating Agreements").

The Operating Agreements establish the division of roles and authority between Goldman

and Weiss, who each hold 50% membership interest in the Operating Entities.  With respect to

management of the Operating Entities, the Parking Operating Agreement, the WV FNB

Operating Agreement, and the WV Hotel Operating Agreement all share identical language,

which states:

> ***Zelig Weiss shall be the Managing Member responsible for the management of
> the business and affairs of the Company and the Space.***  Goldman shall be
> responsible for overseeing matters relating to the funding, financing and
> refinancing of the Space.  If Weiss or Goldman shall at any time be unable or
> unwilling to serve, the holders of a majority of Percentage Interests, including his
> successors in interest, shall designate a successor.

(Parking Operating Agreement § 11; WV FNB Operating Agreement § 11; WV Hotel Operating

Agreement § 11) (emphasis added).

The WB Operating Agreement includes the following operative language:

> ***Weiss shall be the "Managing Member" responsible for the management of the
> business and affairs of the Company and the day to day operation and
> functioning of the Property***, and Goldman shall be responsible for overseeing
> matters relating to the funding, financing and refinancing of Property.

(WB Operating Agreement § 7(a)) (emphasis added).

The express, unambiguous language in the Operating Agreements grant Weiss the actual authority to serve as the "Managing Member" of the Operating Entities and take the actions necessary to "manage[] the business and affairs" of these entities.  (*See* Parking Operating Agreement § 11; WV FNB Operating Agreement § 11; WV Hotel Operating Agreement § 11; WB Operating Agreement § 7(a).)  These provisions establish that the Managing Member is expected and authorized to take the actions necessary to run the Operating Entities.  In fact, there is a clear bifurcation of the Operating Entities' leadership structure with Weiss leading the management of the business and Goldman overseeing the finances.  Under this management structure, entering the Settlement is a business decision that falls under Weiss's authority as the Managing Member.  As a result, the Operating Agreements show that Weiss, in his capacity as Managing Member, had the express power to bind the Operating Entities.

Notably, the Goldman Objection does not challenge Weiss's authority as the Managing Member to bind the Operating Entities to the Settlement.  Instead, Goldman acknowledges that the "[Operating Agreements] identify Weiss as Managing Member, responsible for day-to-day management . . . ."  (Goldman Objection ¶ 12.)

Accordingly, Weiss has the power to exercise his business judgment and enter into the Settlement on behalf of the Operating Entities under the actual authority granted to him by the Operating Agreements.

2.    The Settlement Does Not Trigger the Major Decisions Provision in the
        Operating Agreements

The authority granted to Weiss by the Operating Agreements is broad, but comes with limits.  Most notably, Weiss is prohibited from taking actions as the Managing Member that fall under the contractually defined Major Decisions.  Each of the Operating Agreements contain a schedule establishing the Major Decisions ("Major Decisions Schedule") that require written

approval from both Goldman and Weiss.  The Parking Operating Agreement, the WV FNB

Operating Agreement, and the WV Hotel Operating Agreement state as follows:

> Notwithstanding the grants of authority above or anything contained in this Agreement, in no event will the Company take any of the actions listed on Schedule 1 annexed hereto (each, a "Major Decision") ***without the prior written approval of both Members*** [*i.e.*, Weiss and Goldman].  If a Member fails to respond to a request for approval of a Major Decision within fifteen (15) days after the Member has received a written request for approval then the Member shall be deemed to have approved the request.

(Parking Operating Agreement § 11; WV FNB Operating Agreement § 11; WV Hotel Operating

Agreement § 11) (emphasis added).  Meanwhile, the WB Operating Agreement includes similar

language, which states:

> Notwithstanding the grants of authority under Section 11(a) of the Original Agreement or anything contained in this Agreement, ***in no event will the Company take any of the actions listed on Schedule 1 annexed hereto (each, a "Major Decision") without the prior written approval of both Class A Members*** [*i.e.*, Weiss and Goldman].  If a Class A Member fails to respond to a request for approval of a Major Decision within fifteen (15) days after the Class A Member has received a written request for approval then the Class A Member shall be deemed to have approved the request.

(WB Operating Agreement § 7(e)) (emphasis added).

The Goldman Objection claims that Weiss's decision to enter into the Settlement on

behalf of the Operating Entities contravenes the Major Decisions provisions, and therefore,

Weiss acted without proper authority.  However, none of the enumerated Major Decisions apply

to the Settlement or Weiss's decision to enter into the Settlement.

### a.  The Major Decisions Schedule

The Court will outline the actions listed in the Major Decisions Schedule,[11] which require

approval from both Weiss and Goldman, and explain why each is inapplicable to the Settlement:

---

[11]    The list of actions under the Major Decisions Schedule are substantially similar across the Operating Agreements.  The differences between the Operating Agreements, if any, are noted for convenience.

(i) *The decision to make any permitted calls or requests for additional capital contributions from the Members*;

The Settlement does not "make any permitted calls or requests for additional capital contributions from the Members." Accordingly, this provision is not implicated.

(ii) *the terms and conditions of any agreement between the Company and an Affiliate of any Member (i.e., Development Agreement, Property Management Agreement, Hotel Management Agreement, Leasing Agreement, Food and Beverage Operations Agreement, or Lease* [(the "Covered Agreements")][12];

Goldman argues that Weiss has *impacted* the terms and conditions of an agreement between the Operating Entities and "an Affiliate of [Weiss/Goldman]" by binding the Operating Entities to the Settlement. (Goldman Objection ¶ 36.) In response, Weiss and the Debtor each argue that Goldman misapplies the provision. Weiss notes that the provision was meant to apply to the Covered Agreements and does not extend to any other agreement. (Weiss Reply ¶ 5.) Weiss clarifies that "lease," as used in this provision, does not refer to Lease between the Debtor and WB, but rather to the lease between WB and WV Hotel before the WV Complex was conveyed to the Debtor. (*Id.* at 3 n.2; *see also* WB Operating Agreement § 7(d)(i).) Weiss concludes that the Settlement does not change the terms of any of the Covered Agreements and "impact" is not relevant to the Major Decisions analysis. (Weiss Reply ¶ 5.)

The Court agrees that Goldman's reliance on this provision is misplaced. First, Goldman fails to identify which specific agreement between an Operating Entity and an Affiliate of a Member is modified by the Settlement. It is clear from the operative language that Weiss and Goldman intended for this provision to protect the Covered Agreements from unilateral change. And the fact that the Major Decisions Schedules in the Parking Operating Agreement, WV FNB Operating Agreement, and the WV Hotel Operating Agreement do not have the parenthetical language regarding the Covered Agreements does not change the analysis. Ultimately, the alleged "impact" of the Settlement on an unspecified agreement is insufficient to invoke the Major Decisions provision and require Goldman's written approval. And, in any event, the Covered Agreements were terminated and inoperative when the Debtor properly terminated the Lease on May 20, 2021, as this Court recognized in the Partial SJ Decision.

---

[12]    The Operating Agreements, except for the WB Operating Agreement have the following language, which omits the parenthetical: "the terms and conditions of any agreement between the Company and an Affiliate of any Member . . . ." (Parking Operating Agreement at 13; WV FNB Operating Agreement at 13; WV Hotel Operating Agreement at 13.)

(iii) *to change the character of the Company's business or any material change to the physical components of the Property or to the branding of the hotel located on the Property*[13];

The Settlement does not purport to "change the character of the Company's business or [make] any material change to the physical components of the Property or to the branding of the hotel located on the Property." Accordingly, this provision is not implicated.

(iv) *the decision to obtain, and the terms and conditions of, any mortgage or other financing or refinancing of the Property*;

The Settlement does not involve any financing, refinancing, or mortgage transaction. Accordingly, this provision is not implicated.

(v) *the budgets for any substantial future development or construction projects*;

The Settlement does not establish any budgets for future development or construction projects. Accordingly, this provision is not implicated.

(vi) *the decision whether to repair, rebuild or restore substantially all or any portion of the Property then owned by the Company affected by a casualty or condemnation, where the estimated cost exceeds $500,000*;

The Settlement does not involve a decision to repair, rebuild or restore any property. Accordingly, this provision is not implicated.

(vii) *the commencement, defense or discontinuance of any actions in the nature of legal proceeding in any court, before any governmental agency, of in arbitration, where the amount in dispute is in excess of $500,000, other than actions arising out of the ordinary course of leasing or operating the Property, such as eviction and unlawful detainer actions against defaulting tenants, except that all decisions involving criminal matters (other than code violations) shall be Major Decisions*;

As the Debtor concedes, the Settlement involves a dispute in excess of $500,000. (*See* May 15, 2024 Hr'g Tr. at 131:9–22.) However, the Debtor maintains, and the Court agrees, that with respect to WB and the Debtor, the Settlement involves a dispute which arose in the ordinary course of leasing or operating the Property. Accordingly, this provision is not implicated.

---

[13]     The Operating Agreements, except for the WB Operating Agreement, have the following language in their Major Decisions Schedule: "to change the character of the Company's business or any material change to the physical components of the Space." (Parking Operating Agreement at 13; WV FNB Operating Agreement at 13; WV Hotel Operating Agreement at 13.)

(viii) *the approval of the Company tax returns (provided that approval of such returns by the regular accountants for the Company shall be presumed to be correct) or making any change in the depreciation or accounting methods, or making other decisions with respect to the treatment of various transactions for accounting or Federal or state income tax purposes (except as advised by the regular accountants for the Company to be required to be in compliance with law), which would have a material adverse effect on any Member or the Company, or conducting any other actions, litigation or other activities with Federal or state taxing authorities; provided that the Managing Member may respond to normal audit requests of governmental authorities to which the Company is obligated to respond without Member approval but shall keep the Members informed regarding such requests*;

The Settlement does not involve any decision related to tax returns. Accordingly, this provision is not implicated.

(ix) *the approval of the admission to the Company of any successor or additional Member or the issuance of any new membership or other class of interests in the Company*;

The Settlement does not involve any decision related to the membership of the Operating Entities. Accordingly, this provision is not implicated.

(x) *the acquisition of any real property or any option or interest therein, or the exchange of any part of the Land for any other real property*[14];

The Settlement does not involve a sale or exchange as contemplated by this provision. Accordingly, this provision is not implicated.

---

[14] The Operating Agreements, except for the WB Operating Agreement, have the following language in their Major Decisions Schedule: "the acquisition of any real property or any option or interest therein, or the exchange of any part of the Space for any other real property." (Parking Operating Agreement at 13; WV FNB Operating Agreement at 13; WV Hotel Operating Agreement at 13.)

(xi) *the sale, assignment, transfer, exchange or other disposition of the Property or any improvements thereon or any portion thereof or interest therein, subject to Paragraph 8 (d)* [15,16];

At the hearing, Goldman raised the argument that the Settlement constituted a "disposition of an interest in the Property insofar as [Weiss had] giv[en] releases." (*See* May 15, 2024 Hr'g Tr. at 161:13–20.)  However, this purported prohibition on the Managing Member's ability to provide releases or otherwise settle disputes is a significant qualifier on his authority, and it is not explicitly established in the Operating Agreements.  The expansion of this provision to cover releases does not have support from the Operating Agreements or from case law.  As a result, the Court disagrees with Goldman's framing of the issue.  Instead, the Settlement does not involve a sale, assignment, transfer, exchange or other disposition as contemplated by this provision.  Accordingly, this provision is not implicated.

(xii) *the entry into a lease or other occupancy agreement for all or a portion of the Space* [17];

The Settlement does not involve any decision related to a lease or occupancy agreement.  Accordingly, this provision is not implicated.

---

[15]    Paragraph 8(d) of the WB Operating Agreement reads as follows:

If the Major Decision is for a sale of the entire Property or of so much of the entire Property as is then owned by the Company, and if the other Class A Member declines to approve such sale, then the Class A Member desiring to make such sale may give notice to the other Class A Member requiring the other Class A Member to approve such sale and to cooperate in effectuating such sale or to purchase the interest in the Company of the Member desiring to sell at a purchase price equal to an amount which the Offering Member would receive in the event of a sale on the terms theretofore presented by it to the other Member after payment of all expenses, including, but not limited to, brokerage, but excluding transfer taxes, and the liquidation of the Company and the distribution of remaining cash to the Members under Section 6. The Member receiving such notice shall have 15 days within which to either reverse his position and approve the proposed sale or to elect to purchase the interest of the Member desiring to sell in which latter event the purchase will be conducted in the same manner as a purchase under the provisions of paragraph 9(c). Failure to elect within such 15 day period to make such purchase shall be deemed an election to approve the sale as proposed, in which event, the Class A Members shall proceed together in an orderly fashion to consummate such sale.

(WB Operating Agreement § 8(d)).

[16]    The Operating Agreements, except for the WB Operating Agreement, have the following language in their Major Decisions Schedule: "the sale, assignment, transfer, lease or other disposition of the Space or any improvements thereon or any portion thereof or interest therein, except pursuant to a transfer of the Property made in accordance with the Operating Agreement of Wythe Berry LLC."  (Parking Operating Agreement at 14; WV FNB Operating Agreement at 14; WV Hotel Operating Agreement at 14.)

[17]    The WB Operating Agreement does not include this provision.

(xiii) *the decision to enter into, terminate or accept the surrender of, as applicable, any Property Management Agreement; Hotel Management Agreement; Food and Beverage Operations Agreement; Development Agreement*[18];

The Settlement does not involve a decision with respect to the Covered Agreements, and therefore, this provision is not implicated.

(xiv) *the approval of any material proposals submitted to, or agreements entered into with, government officials relating to zoning, subdivision or environmental matters or other land use matters applicable to the Property*;

The Settlement does not involve any proposals or agreements with government officials related to the enumerated matters. Accordingly, this provision is not implicated.

(xv) *take any action under applicable bankruptcy, insolvency or similar laws with respect to the Company*;

The Debtor submits, and the Court agrees, that this provision contemplates taking unanimous action under applicable bankruptcy, insolvency or similar laws where an Operating Entity is the debtor. Here, the debtor is not an Operating Entity. Accordingly, this provision is not implicated.

(xvi) *amend, modify or terminate this Agreement or any of the organizational documents and organizational instruments of the Company*;

The Settlement does not purport to amend, modify, or terminate any of the Operating Agreements or other organizational documents. Accordingly, this provision is not implicated.

(xvii) *do any act in contravention of [the Operating Agreements]*;

This is a catch-all provision that purports to require Weiss and Goldman to have unanimous agreement before the Managing Member takes any action in "contravention of the [Operating Agreements]. Goldman does not expressly invoke this provision; however, his various objections to the Settlement necessarily involve alleged violations of the Operating Agreements. Nevertheless, the Court finds that neither the Settlement nor Weiss's decision to sign the Settlement violate any part of the Operating Agreements. Weiss had the authority to bind the Operating Entities to the Settlement, and the decision to sign the Settlement was not a Major Decision that required Goldman's input. Moreover, as discussed in more detail below, Weiss has not used "Goldman's

---

[18] The Operating Agreements, except for the WB Operating Agreement, have the following language in their Major Decisions Schedule: "the decision to enter into, terminate or accept the surrender of, as applicable, any Property Management Agreement." (Parking Operating Agreement at 14; WV FNB Operating Agreement at 14; WV Hotel Operating Agreement at 14.)

property" to pay for the Settlement.  (Goldman Objection ¶ 44.)  Instead, the funds and assets of the Operating Entities have been used for the exclusive benefit of the Entities, in accordance with the Operating Agreements. Similarly, and as detailed below, the Settlement does not treat Weiss and Goldman disproportionately in their capacities as Members.  Any difference in treatment between Weiss and Goldman in the Settlement is unrelated to their Member status.

(xviii) *employ, or permit the Company to employ, the funds or assets of the Company in any manner except for the exclusive benefit of the Company*;

Goldman claims that Weiss has employed the funds or assets of the Operating Entities in a manner that is not for the Operating Entities' exclusive benefit by "terminating the Lease, releasing claims on behalf of the [] Operating Entities against the Debtor Releasors/Releasees and Trustee, and selling assets including those co-owned by the [] Operating Entities from the Hotel venture operation—the Domain Name, the Social Media Accounts, FNB's liquor license, and the furniture, fixtures, and equipment referenced in the FF&E Agreement."  (Goldman Objection ¶ 36.)  The Goldman Objection argues that Weiss receives "more than $4 million" through the Settlement, but the benefit to the Operating Entities is not apparent.  (*Id.*)  Additionally, at the Hearing, Goldman alleged that Weiss had diverted the money coming in from the Settlement from the Operating Entities' accounts thereby preventing such funds from being distributed according to the waterfall structure established in the Operating Agreements.  (*See* May 15, 2024 Hr'g Tr. at 166:1–25.)

The Court finds that Goldman's argument overlooks the benefits that accrue to the Operating Entities from the Settlement.  First, the Operating Entities would face significant legal exposure to the Debtor because of the Lease termination but for the Settlement.  As this court recognized in the Partial SJ Decision, the Debtor had properly terminated the Lease.  *See generally* Partial SJ Decision. However, to date, there has been no determination of the damages.  As a result, it is highly likely that the Debtor could pursue a judgment against WB to recover damages.  (Weiss Reply ¶ 6; Debtor Reply ¶ 19.)  The Debtor could also attach the funds the other Operating Entities may owe to WB under various inter-party contracts.  (Debtor Reply ¶ 19.)  Second, the Settlement also benefits the Operating Entities by resolving the legal uncertainty with respect to them arising from the Lease termination.  As a result, the Settlement allows the Operating Entities to reduce their legal spending and other related expenses.

Furthermore, the Court does not find that Weiss improperly diverted funds that would otherwise go to the Operating Entities.  At the hearing, Goldman specifically referenced the funds Weiss will receive through the Excess ERTC Amount and the Member Distribution as problematic.  (*See* May 15, 2024 Hr'g Tr. at 166:10–12.)  However, these payments are not improper.  The Excess ERTC Payment is made to Espresso (and to Weiss, as a Member of Espresso)

as a result of Espresso's "support and services" to the Debtor during the Hospitality Arbitration[19]. (Revised Settlement Agreement at 4.) Similarly, the Debtor is making the Initial Member Distribution and the potential Contingent Member Distribution to Member (and, therefore, to Weiss in his capacity as a Member of Member) for "provid[ing] objectively valuable services to Debtor since the Petition Date and/or during the transition of management of the WV Complex." (Weiss Reply at 4 n.3.) Accordingly, Weiss has not diverted such funds from the Operating Entities in contravention of his duties as Managing Member.

Taken together, Weiss did not violate the provision when he entered into the Settlement on behalf of the Operating Entities and employed the funds and assets of the Operating Entities to arrive at a compromise with the Parties.

(xix) *enter into any lease covering at least 5,000 square feet of space*[20];

The Settlement does not involve entry into a new lease. Accordingly, this provision is not implicated.

(xx) *take action which has a disproportionate effect on any Class A Member, or take any action with the intent to discriminate in a prejudicial manner with respect to the rights of any Member under this Agreement*[21];

Goldman claims that Weiss's actions (*i.e.*, binding the Operating Entities to the Settlement) have a "'disproportionate effect' on Goldman—who receives nothing at all—while prejudicing his rights and claims under the [] Operating Entities' respective operating agreements." (Goldman Objection ¶ 36.) Relatedly, Goldman argues that Weiss has used "property owned by Goldman to pay for the settlement, in violation of multiple operating agreements." (*Id.* ¶ 44.)

Goldman's objection is misplaced for several reasons. First, the Settlement does not treat Weiss and Goldman differently in their capacities as Members of the Operating Entities. As stated in the Weiss Reply, "(i) neither receives a distribution; (ii) both derive the same benefit from the releases issued to the [Operating Entities]; and (iii) both give up the same rights through the releases

---

[19] The Hospitality Arbitration involved proceedings between FNB and WV Hospitality LLC ("Hospitality"), styled In *the Matter of the Arbitration between The William Vale FNB LLC v. WV Hospitality LLC*, AAA No. 01-23-000-3943. (*See* Revised Settlement Agreement at 4.)

[20] This provision is only included in the WB Operating Agreement.

[21] The Operating Agreements, except for the WB Operating Agreement, have the following language in their Major Decisions Schedule: "take action which has a disproportionate effect on any Member or take any action with the intent to discriminate in a prejudicial manner with respect to the rights of any Member under this Agreement." (Parking Operating Agreement at 14; WV FNB Operating Agreement at 14; WV Hotel Operating Agreement at 14.)

issued by the [Operating Entities]." (Debtor Reply ¶ 20.)  Notably, the benefits that Weiss receives under the Settlement, which Goldman does not, are unrelated to his status as Member of the Operating Entities.  Instead, Weiss derives these benefits in his capacities as a Member of Member and as a Member of Espresso.  (*See* Revised Settlement Agreement at 4; *see also* Weiss Reply at 4 n.3.)  Goldman, however, does not hold such interests.  Accordingly, Weiss has not taken an action that has disproportionate effect on any Member of an Operating Entity.

Furthermore, Weiss has not used "property owned by Goldman to pay for the [S]ettlement." (Goldman Objection ¶ 44.)  To the extent Goldman asserts an interest of any specific Operating Entity property, that argument fails as a matter of law.  Under NY LLCL section 601, "[a] member has no interest in specific property of the limited liability company." NY LLCL § 601.  However, at the Hearing, the Court clarified that Goldman position is better understood as an objection against the violation and trading of his rights under the Operating Agreements without his consent.  (*See* May 15, 2024 Hr'g Tr. at 112:21–25.)  Nevertheless, the Court disagrees.  The Settlement does not improperly take away Goldman's rights under the Operating Agreements.  There is no improper distribution that goes against the waterfall structure established in the Operating Agreements, Weiss acted within his authority to bind the Operating Entities to the Settlement, and Weiss's actions did not implicate the Major Decisions provision.  As a result, Goldman's consent was not required under this provision.

(xxi) *take any other decision or action which, by any provision of the LLC Act or this Agreement, is specifically required to be approved by the Members*;

This provision is not applicable to the Settlement Agreement.

(xxii) *take any of the foregoing actions with respect to the Company's subsidiaries or affiliates in which both Weiss and Goldman own substantial interests.*

The Operating Entities all have the Major Decisions Schedule as analyzed by the Court herein.  Therefore, this catch-all provision is not relevant to Settlement Agreement.

Clearly, Weiss had actual authority to enter into the Settlement on behalf of the Operating Entities, and this specific grant of power was not limited by the Major Decisions provision in the Operating Agreements because Weiss's decision to bind the Operating Entities to the Settlement did not implicate any of the items on the Major Decisions Schedule.  Accordingly, the Court finds that Weiss acted properly pursuant to his authority.

**B.  The Iridium Factors Weigh in Favor of Approving the Settlement**

An analysis of the nonexclusive *Iridium* Factors confirms that the Settlement should be approved.

> 1.  <u>The Balance Between the Litigation's Possibility of Success and the Settlement's Future Benefits</u>

The Settlement's future benefits are clear and evident—it provides an immediate and certain resolution of the Adversary Proceeding, any potential related litigation among the Parties, and litigation concerning the Debtor's, Weiss's, or WB's liability for mechanic's lien obligations.  (*See* Motion ¶ 38; *id.* ¶ 2 (indicating that the Settlement resolves potential protracted litigation relating to the Adversary Proceeding and among WB, Weiss, Member and YG WV relating to the Series C Notes, the Lease and the subsequent bankruptcy proceedings).)  The Debtor submits that without the Settlement, proceeding with the foregoing litigation would be protracted, lengthy, expensive, and uncertain.  (*Id.* ¶¶ 3, 38.)  Additionally, the Parties believe that the Settlement is the "only path to avoiding piecemeal resolution (via litigation) of the many issues resolved by the Settlement."  (*Id.* ¶ 4.)

Goldman contends that this factor should not be given much weight because the U&O Order and the Partial SJ Decision have already "effectively concluded the Rent Action against WB."  (Goldman Objection ¶ 69.)  And Goldman further states that any additional litigation related to the Adversary Proceeding or related to mechanic's lien obligations are "purely hypothetical."  (*Id.* ¶ 69.)  However, Goldman overlooks several live issues that remain even after these decisions, specifically related to damages and liability, among others.  As a result, the Court finds that this factor is relevant to the overall *Iridium* analysis and in favor of approval of the Settlement.

### 2. The Likelihood of Complex and Protracted Litigation

Absent the Settlement, litigation on the remaining issues between the Parties would likely be protracted, significant, and costly.  (Motion ¶ 38; *see also id.* ¶ 2 (indicating that the "alternative to the Settlement is significant litigation among all Parties on various contested matters").)  The Settlement addresses not only current litigation but also anticipated litigation as well.  (*Id.* ¶ 2.)  Notably, the mitigation of legal uncertainty and legal expenses will likely contribute to greater creditor recovery.  (*Id.*)  Based on the Debtor's representations, the second *Iridium* Factor favors approval of the Settlement.

### 3. The Paramount Interests of Creditors

The Settlement serves the interest of creditors as it offers a clear and definitive resolution of pending and anticipated litigation thereby conserving estate resources and offers a cash infusion of $8 million into the Debtor's estate.  (*Id.* ¶¶ 2, 33, 35–36.)  Additionally, the Settlement provides for arrangements that assist the Debtor in the sale of the WV Complex and "positions [the] estate to confirm a chapter 11 plan and thereafter maximize recoveries for all creditors."  (*Id.* ¶¶ 2, 34.)  The Debtor submits that the Settlement allows creditors to receive "significantly greater recoveries" than they could otherwise have expected to receive.  (*Id.* ¶ 36.)

Goldman rejects the Debtor's analysis, arguing that the Debtor is obtaining his property without paying him and the Settlement is "patently unfair and inequitable" to him as a party-in-interest.  (Goldman Objection ¶ 70.)  The Court disagrees.  The Court has discussed and rejected Goldman's position regarding his alleged property interest.  Goldman has no interest in any specific property of the Operating Entities, and Goldman's rights, in his capacity as Member of the Operating Entities, were not violated through the Settlement.  Instead, the Settlement serves the interests of the creditors.

Accordingly, the third *Iridium* Factor favors approval as well.

### 4. Whether Other Parties in Interest Support the Settlement

All parties were apprised of the Motion and only Goldman objected. (*See* Affidavit of Service, ECF Doc. # 322.) However, as analyzed above, the Goldman Objection has no merit. Goldman acknowledges that the Operating Agreements identify Weiss as the Managing Member who was responsible for the day-to-day operations of the Operating Entities. (Goldman Objection ¶¶ 7, 12.) Weiss, in his capacity as Managing Member, had actual authority to enter into the Settlement on behalf of the Operating Entities.

Additionally, Goldman's assertion that each of the following "Major Decisions" applies to the Settlement is inaccurate:

- "(ii) the terms and conditions of any agreement between the Company and an Affiliate of any Member;"

- "(xvii) employ[ing], or permit[ting] the Company to employ, the funds or assets of the Company in any manner except for the exclusive benefit of the Company;"

- "(xix) tak[ing] action which has a disproportionate effect on any Class A Member, or take any action with the intent to discriminate in a prejudicial manner with respect to the rights of any Member under this Agreement;" and

- "(xxi) tak[ing] any of the foregoing actions with respect to the Company's subsidiaries or affiliates in which both Weiss and Goldman own substantial interests."

(Goldman Objection ¶ 10; *see also id.* ¶ 36.)

Each of these assertions is without merit.

*First*, none of the Covered Agreements between the Company and an Affiliate of a Member are impacted by the Settlement. In any event, the Debtor indicates and the Court concludes that the Covered Agreements were "either terminated or negated as a matter of law upon the termination of the Lease between Debtor and WB." (Debtor Reply ¶ 18.)

*Second*, the Operating Entities' assets are being used for their exclusive benefit as, absent the Settlement, the Debtor would likely expend more funds to litigate outstanding disputes. The Settlement offers a clear and clean resolution of pending and potential litigation for the benefit of all parties.

*Third*, there is no disproportionate impact on Goldman under the Settlement in his capacity as Member of the Operating Entities. The Settlement impacts Goldman and Weiss equally as Members since "(i) neither receives a distribution; (ii) both derive the same benefits of releases to the Operating Entities; and (iii) both release the same rights via the releases issued by the Operating Entities." (*Id.* ¶ 20.) The compensation Weiss individually receives is on account of claims he individually holds, which is separate from the issues that Goldman raises. (*Id.*)

Accordingly, while Goldman has opposed the Motion, his objection has no merit. In light of such and against the backdrop of all other Parties, including the Trustee, supporting the Settlement, this factor weighs in favor of approval.

### 5. The Competency and Experience of Counsel Supporting, Experience and Knowledge of the Bankruptcy Court Judge Reviewing, the Settlement

The competency and experience of Debtor's counsel and the presiding judge in this proceeding was not questioned by any party. Thus, the fifth *Iridium* Factor favors approval of the Settlement.

### 6. The Nature and Breadth of the Releases of Officers and Directors

The nature and breadth of the releases contained in the Settlement Agreement are fair and reasonable under the circumstances as (i) they provide certainty and finality to the Parties with respect to matters the Settlement Agreement resolves and (ii) were necessary to induce the Parties to enter into the Settlement.

Specifically, the Settlement provides for the release of:

44

> Weiss Releasors/Releasees and the WB Releasors/Releasees from all claims and causes of action that could be asserted by the Debtor Releasors/Releasees and/or the Trustee Releasors/Releasees arising from, under, in connection with or relating to (a) the Series C Notes; (b) the Deed of Trust; (c) the Guaranty; (d) the Note; (e) the Mortgage; (f) the Lease; (g) the acquisition, development and operation of the WV Complex; (h) that certain Limited Liability Company Agreement of Wythe Berry Fee Owner LLC dated as of February 28, 2017 (the "Fee Owner LLC Agreement"); (i) that certain Limited Liability Company Agreement of Wythe Berry Member LLC dated as of February 28, 2017 (the "Member LLC Agreement"); (j) the Adversary Proceeding; and (k) the chapter 11 Case.

(Motion ¶ 40.)

The Settlement also bars the Parties as follows:

> Weiss Releasors/Releasees and the WB Releasors/Releasees [are barred] from asserting claims against the Debtor, its ownership entities, and the current hotel operating entities and the Trustee Releasors/Releasees arising from, under, in connection with or relating to: (a) the Series C Notes; (b) the Deed of Trust; (c) the Guaranty; (d) the Note; (e) the Mortgage; (f) the Lease; (g) the acquisition, development and operation of the WV Complex; (h) the Fee Owner LLC Agreement; and (i) the Member LLC Agreement (subsections (h) and (i) being applicable only to the Debtor, its ownership entities, and the current hotel operating entities).

(*Id.*)

Goldman takes issues with the releases set forth under the Settlement Agreement and, relatedly, the exculpation provision in the Second Amended Plan. (Goldman Objection ¶ 68.) In support, Goldman contends that the exculpation provided in the Second Amended Plan § 10.7(b) infringes on his claims and defenses in the Arbitration and State Court Action. (Goldman ¶¶ 54–63.) At the hearing, the U.S. Trustee also voiced concerns regarding the exculpation provided under § 10.7(b). (*See* May 15, 2024 Hr'g Tr. at 181:3–24.) In response, the Debtor has removed § 10.7(b) from the Fourth Amended Plan, which resolves the exculpation issue as it relates to Weiss. (Fourth Amended Plan § 10.7.) Ultimately, the Debtor submits, and the Court agrees, that the other releases under the Settlement are essential because the Settlement cannot "be effected" without them. (Debtor Reply ¶ 49.)

45

Therefore, the sixth *Iridium* Factor weighs in favor of approval as well.

       7.   <u>The Extent to Which the Settlement is the Product of Arm's-Length</u>
<u>Bargaining</u>

Finally, the Debtor submits that the terms of the Settlement were reached in good faith after intense but arm's-length negotiations. (*Id.* ¶¶ 25, 41.) The Parties have been on opposing sides of protracted, hard-fought litigation before the Settlement. Therefore, it is highly unlikely that the negotiations leading up to the Settlement have been nothing short of true arm's-length bargaining.

Goldman objects to the Settlement on these grounds as he is not a participant to the Settlement. However, the record at the Hearing reflects that Goldman was kept "informed as the settlement negotiations progressed, provided him with a copy of the proposed agreement before it was filed with the Court, and invited Goldman to participate in the Settlement," which he ultimately declined. (Debtor Reply ¶¶ 5, 19.) There is no reason to doubt that the negotiations leading up to the Settlement Agreement were arm's-length among the Parties. Accordingly, this *Iridium* Factor favors approval of the Settlement.

## IV.   <u>CONCLUSION</u>

For the reasons explained above, the Court **GRANTS** the relief requested in the Motion and approves the Settlement.

**IT IS SO ORDERED.**

Dated:   May 29, 2024
         New York, New York

                                   *Martin Glenn*
                                  MARTIN GLENN
                  Chief United States Bankruptcy Judge