**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x
In re:                                                    **NOT FOR PUBLICATION**

     WYTHE BERRY FEE OWNER LLC,                    Chapter 11

                                      Case No. 22-11340 (MG)

                    Debtor.
---------------------------------------------------------------x

### MEMORANDUM OPINION APPROVING THE DISCLOSURE STATEMENT AND CONFIRMING THE FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF WYTHE BERRY FEE OWNER LLC

*A P P E A R A N C E S :*

HERRICK, FEINSTEIN LLP
*Attorneys for the Debtor*
2 Park Avenue
New York, NY 10016
By:    Stephen B. Selbst, Esq
        Janice Goldberg, Esq.
        Steven B. Smith, Esq.
        Rodger T. Quigley, Esq.
        Roya Imani, Esq.
        Avery S. Mehlman, Esq.
        Meaghan Roe, Esq.

ABRAMSON BROOKS LLP
*Attorney for Wythe Berry LLC*
1051 Port Washington Boulevard
Suite 322
Port Washington, NY 11050
By:    Jon Schuyler Brooks, Esq.

PAUL HASTINGS LLP
*Attorney for Zelig Weiss*
2050 M Street NW
Washington, DC 20036
By:    Nicholas A. Bassett, Esq.

GORNITZKY & CO.
*Attorneys for Notes Trustee*
20 Haharash Street
Tel Aviv, Israel 6761310
By:    Maya Ben Meir, Esq.
       Amnon Biss, Esq.

CHAPMAN AND CUTLER LLP
*Attorneys for Notes Trustee/Plan Administrator for Wind Down Co.*
320 South Canal Street
27th Floor
Chicago, IL 60606
By:    Eric Silvestri, Esq.

1270 Avenue of the Americas
New York, NY 10020
By:    Michael Friedman, Esq.
       Helena Honig, Esq.

GORDON REES SCULLY MANSUKHANI, LLP
*Attorney for Schimenti Construction*
One Battery Park Plaza
28th Floor
New York, NY 10004
By:    Jacob C. Cohn, Esq.

GIBSON, DUNN & CRUTCHER LLP
*Attorneys for William Vale Owner LLC*
333 South Grand Avenue
Los Angeles, CA 90071
By:    Michael G. Farag, Esq.

200 Park Avenue
New York, NY 10166
By:    Keith R. Martorana, Esq.
       Harry R. Silvera, Esq.

DAVIS POLK & WARDWELL LLP
*Attorneys for Yoel Goldman*
450 Lexington Avenue
New York, NY 10017
By:    Elliot Moskowitz, Esq.
       Chase McReynolds, Esq.

OFFICE OF THE NYS ATTORNEY GENERAL
*Attorney for NYS Department of Taxation and Finance*
28 Liberty Street
New York, NY 10005
By:    Leo V. Gagion, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Wythe Berry Fee Owner LLC (the "Debtor") is the owner of a commercial real property complex located at 55 Wythe Avenue, Brooklyn, NY (the "WV Complex") that is comprised of the William Vale Hotel, office and retail space, and parking.  Over a year and a half ago, an involuntary Chapter 11 petition was filed and, after an unsuccessful motion to dismiss, an order for relief was entered.  (*See* ECF Doc. # 57.)

Despite the challenges the Debtor faced when it entered chapter 11, the Debtor has worked throughout the pendency of this case with its constituencies to resolve issues material to its emergence from bankruptcy.  The product of its efforts is encapsulated in the sale of the WV Complex (the "WV Complex Sale") and a global settlement (as amended, the "Settlement") with the Mishmeret Trust Company Ltd. ("Mishmeret" or the "Trustee"), Zelig Weiss ("Weiss"), and number of other entities.[1]  Each of these is incorporated in the Debtor's *Fourth Amended Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC* (ECF Doc. # 364 and, together with the plan supplement (the "Plan Supplement," ECF Doc. # 335), the "Plan") and its related disclosure statement (the "Disclosure Statement," ECF Doc. # 363) that are before the Court for its consideration.

---

[1]    The entities are comprised of WB Hotel LLC ("Hotel Sub"), WB Operations LLC ("Op Sub"), WB FNB LLC ("FNB Sub"), YG WV LLC ("YG WV"), Wythe Berry Member LLC ("Member"), AYH Wind Down LLC ("Wind Down"), Wythe Berry LLC ("WB"), The William Vale Hotel LLC ("WV Hotel"), The William Vale FNB LLC ("WV FNB"), North 12 Parking LLC ("Parking"), Espresso Hospitality Management LLC ("Espresso"), TWV Domain LLC ("Domain"), and The William Vale Staffing LLC ("Staffing").

Pending before the Court is the (A) motion (the "Motion," ECF Doc. # 246) of Wythe Berry Fee Owner LLC (the "Debtor"), seeking entry of an order (i) approving the Disclosure Statement; (ii) approving solicitation, voting, and tabulation procedures; (iii) approving the form of ballots and notices; (iv) scheduling a confirmation hearing; (v) establishing procedures for filing confirmation objections; (vi) approving form and manner of notice of confirmation hearing; and (vii) granting related relief and (B) confirmation of the Plan.  Annexed to the Motion, as Exhibit A, is a proposed order granting the relief sought with respect to the Disclosure Statement (the "Proposed Order").

While the Motion sought approval of the Disclosure Statement, with a hearing on confirmation to follow, with the Court's permission, the case proceeded with a combined Disclosure Statement and Plan Confirmation hearing.[2]  The Disclosure Statement and Plan before the Court represent the sixth iteration of the Debtor's proposed Disclosure Statement and Plan.  (*See* ECF Doc. # 242 (initial disclosure statement); ECF Doc. # 243 (initial plan); ECF Doc. # 280 (first amended disclosure statement); ECF Doc. # 281 (first amended plan); ECF Doc. # 302 (second amended disclosure statement); ECF Doc. # 303 (second amended plan); ECF Doc. # 305 (third amended disclosure statement); ECF Doc. # 306 (third amended plan); ECF Doc. # 339 (fourth amended disclosure statement); ECF Doc. # 340 (fourth amended plan); ECF Doc. # 363 (the Disclosure Statement); ECF Doc. # 364 (the Plan).)

---

[2]    The Debtor initially solicited acceptances of the *Amended Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC* (ECF Doc. #281), the second iteration of the Plan.  After entering into the Settlement, the Debtor resolicited acceptances of the *Second Amended Plan of Reorganization of Wythe Berry Fee Owner LLC* (ECF Doc. # 306), the fourth iteration of the Plan, which has since been further amended.  The Debtor did not resolicit acceptances and rests on the voting tabulation results with respect to the fourth iteration of the Plan.  (*See Declaration of Daniel Sasson Regarding the Solicitation and Tabulation of Votes on the Second Amended Plan of Reorganization of Wythe Berry Fee Owner LLC*, ECF Doc. # 333 (the "Voting Declaration") ¶ 10 (indicating that the Debtor did not, and does not intend to, resolicit votes to accept or reject the Plan "because the changes in the Third Amended Plan of Reorganization do not affect the distributions to creditors in Classes 1 and 3" so "votes solicited for the Second Amended Plan of Reorganization remain valid").)

4

In support of confirmation, the Debtor filed the *Debtor's Opening Brief in Support of Confirmation of Third Amended Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC* (the "Confirmation Brief," ECF Doc. # 337) along with the declaration of Assaf Ravid, plan administrator of AYH Wind Down LLC (the "AYH Wind Down Plan Administrator" and his declaration, the "Ravid Declaration," ECF Doc. # 336). The Debtor also filed the Voting Declaration concerning the solicitation and tabulation of votes on the Plan.

The Debtor received two formal responses: on March 3, 2024, creditor and mechanic's lienholder, Schimenti Construction Company LLC ("Schimenti"), filed a limited objection (the "Schimenti Limited DS Objection," ECF Doc. # 262); on May 8, 2024, Yoel Goldman ("Goldman") filed an objection (the "Goldman Objection," ECF Doc. # 330) to confirmation of the Plan as well as the Settlement as it was memorialized at the time in the Initial Settlement Agreement (defined below). In support of the Goldman Objection, Goldman filed the declaration of Elliot Moskowitz, an attorney at Davis Polk & Wardwell LLP (the "Moskowitz Declaration," ECF Doc. # 331).

On May 13, 2024, Weiss and the Debtor each filed a reply to the Goldman Objection (the "Weiss Reply," ECF Doc. # 351 and the "Debtor Reply," ECF Doc. # 352, respectively). The Debtor Reply is supported by the declaration of Assaf Ravid (the "Ravid Reply Declaration," ECF Doc. # 354).[3]

On May 15, 2024, the Court held a combined hearing (the "Combined Hearing") on approval of the Disclosure Statement and confirmation of the Plan.

Concurrent with the entry of this Opinion, the Court is separately entering the *Memorandum Opinion and Order Approving the Settlement* (the "Settlement Opinion") that

---

[3]     A prior version of the Ravid Reply Declaration was filed at ECF Doc. # 353 but omitted copies of the exhibits referenced.

concludes that Weiss possessed the authority to enter into and bind the Operating Entities to the

Settlement and approves the Settlement.  In addition, the Court is also entering the *Findings of*

*Fact, Conclusions of Law, and Order Approving the Modified Disclosure Statement and*

*Confirming the Modified Chapter 11 Plan of Wythe Berry Fee Owner LLC* (the "Disclosure

Statement and Confirmation Order").  The Court's findings and conclusions set forth in the

Settlement Opinion and the Disclosure Statement and Confirmation Order are incorporated

herein by reference.

The Court writes here separately to explain its reasoning in support of the Disclosure

Statement and Confirmation Order.

## I.    BACKGROUND

### A.  Relevant Case History

#### 1.  The Debtor and the Lease Agreement

On or about February 28, 2017, the Debtor and Wythe Berry LLC entered into a lease

agreement (the "Lease"), pursuant to which the Debtor leased the WV Complex to Wythe Berry

LLC ("Lessee").  (Motion ¶ 10.)  Weiss and Goldman serve as guarantors under the Lease.  (*Id.*)

The Debtor terminated the Lease, effective as of May 20, 2021, based upon Lessee's failure to

pay rent due under the Lease and other defaults.  (*Id.*; *see also Memorandum Opinion and Order*

*Granting Plaintiff's Motion for Partial Summary Judgment Against Wythe Berry LLC*, Adv. Pro.

No. 23-01012 ("Partial SJ Decision," ECF Doc. # 45) (granting partial summary judgment,

including a declaration that the Lease was cancelled and terminated, effective May 20, 2021).)

The Lessee did not vacate or surrender the WV Complex.  (Motion ¶ 10.)

2.  The State Court Action

On June 11, 2021, the Debtor filed a complaint in the Supreme Court of the State of New

York, Kings County (the "State Court") in the case captioned *Wythe Berry Fee Owner LLC v.*

*Wythe Berry LLC*, Index No. 514152/2021 (the "State Court Action"). (*Id.* ¶ 11.) The complaint

alleged breaches of the Lease for, among other things, the Lessee's failure to pay rent and sought

both judgment that the Lease had been terminated and the ejectment of the Lessee. (*Id.*)

3.  The Involuntary Chapter 11 Filing and Removal of the State Court Action

On October 6, 2022 (the "Petition Date"), Mishmeret, solely in its capacity as Trustee of

the Series C Notes, Yelin Lapidot Provident Funds Management Ltd., the Phoenix Insurance

Company Limited, and Klirmark Opportunity Fund III L.P. (collectively, the "Petitioning

Creditors") filed an involuntary chapter 11 petition against the Debtor. (*See* ECF Doc. # 1).

Following a trial on January 17, 2023, the Court denied the motion to dismiss and entered an

Order for Relief against the Debtor on January 18, 2023 (ECF Doc. # 57). (*Id.*)

On February 14, 2023, the State Court Action was removed to this Court as an

adversary proceeding under Adv. Pro. Case No. 23-01012 (the "Adversary Proceeding"),

which remains pending. (*Id.* ¶ 13.) Thereafter, the Debtor filed a motion for partial summary

judgment on August 23, 2023, as to liability against Lessee. (*Id.* ¶ 14.) On October 5, 2023,

the Court entered the Partial SJ Decision, granting partial summary judgment to the Debtor in

the Adversary Proceeding and finding, among other things, that the Lease was cancelled and

terminated by the Notice of Cancellation served on May 20, 2021. (*Id.* ¶ 16.)

4.  Sale of the WV Complex

After Lessee vacated the WV Complex, the Debtor began efforts to sell it. (*Id.* ¶ 17.) On

October 26, 2023, the Debtor sought authorization to retain and employ Eastdil and A&G Realty

Partners, LLC (collectively, the "Brokers") as the Debtor's real estate brokers and filed a bid

procedures motion (ECF Doc. # 216). (*Id.*) On December 8, 2023, the Court entered an order

approving the Debtor's proposed bid procedures (ECF Doc. # 220) and, on December 20, 2023,

authorized the Debtor's retention of the Brokers. (*Id.* ¶ 18.) Additionally, on February 22, 2024,

the Court entered an order approving the Debtor's selection of William Vale Owner LLC as the

stalking horse bidder (the "Stalking Horse Bidder") for the sale as well as the Debtor's proposed

bid protections for the Stalking Horse Bidder. (*See* ECF Doc. # 256.)

As set forth in the Executive Summary to the Disclosure Statement, the Debtor entered

into an agreement to sell the WV Complex to the Stalking Horse Bidder for a purchase price of

$177,000,000.00. (Disclosure Statement at 1.) At the Combined Hearing, the Court approved

the WV Complex Sale. (*See* May 15, 2024 Hr'g Tr. at 106:5–8 ("I've reviewed this completely.

I agree . . . the sale is appropriate. The process was conducted properly. It's an arm's-length

transaction. It's an independent buyer. The sale is approved.").)

5. <u>Settlement with Zelig Weiss and his Affiliated Entities</u>

The Debtor, along with Weiss and the Trustee, among others, entered into the Settlement.

The Settlement (i) resolves potential litigation relating to (A) the Adversary Proceeding to

liquidate the Debtor's damages against Wythe Berry LLC and prosecute the Debtor's guaranty

claims against Weiss and (B) the Series C Notes, the Lease, and the bankruptcy proceedings; and

(ii) assists in the WV Complex Sale and confirmation of the Plan. (*See Debtor's Motion for

Entry of an Order Approving Settlement Agreement Pursuant to Bankruptcy Rule 9019* (the

"9019 Motion"), ECF Doc. # 304 ¶ 2.)

On May 10, 2024, the Debtor amended the initial version of the settlement agreement

(the "Initial Settlement Agreement") and filed a revised version (the "Revised Settlement

Agreement," ECF Doc. # 341). The Revised Settlement Agreement reflects the parties' entry

into, and the Court's approval of, a stipulation concerning the Debtor's use of cash collateral.

(*See Order Approving Stipulation, Agreement and Order Regarding Cash Collateral*, ECF Doc.

# 328; Revised Settlement Agreement at 5, 10.) Moreover, the Revised Settlement Agreement

was further amended to reflect (i) the Debtor's purchase of the internet domain for the William

Vale Hotel and any associated goodwill from WV Hotel and not TWV Domain LLC and (ii) that

proceeds from the purchase will be distributed equally between Yoel and Goldman unless either

otherwise directs. (Revised Settlement Agreement at 8.) This Revised Settlement Agreement

resolves the Goldman Objection as to the domain name. (*See* May 15, 2024 Hr'g Tr. at 17:21–

24 ("We have reached an agreement, as the Court has been advised, about the domain name.

The parties have agreed to settle the domain name and the proceeds allocated to that.").)

The pending Plan and Disclosure Statement incorporate the terms of the Settlement,

which the Court has approved.

**B. Overview of the Plan**

1. <u>Generally</u>

The Plan, which contemplates the ultimate dissolution of the Debtor, classifies holders of

claims and interests into 4 classes with Class 2 (Mechanics' Lien Claims) further divided into 4

subclasses.[4] (Disclosure Statement at 15.) Only Class 1 (Senior Secured Claims) and Class 3

(Unsecured Claims) are impaired and are entitled to vote on the Plan. (*Id.*) The Plan provides

for allowed claims to be paid in cash following the WV Complex Sale in accordance with the

priorities set forth in the Bankruptcy Code. (Motion ¶ 19; *see also* Disclosure Statement at 1

(stating that sale proceeds payable to the Debtor, together with the Debtor's cash on hand, will

---

[4]    Defined terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan and Disclosure Statement.

fund the Distribution Fund from which holders of allowed claims and interests will be paid in accordance with the Plan and priorities under the Bankruptcy Code).)

The Debtor submits that "[i]n developing the Plan, the Debtor gave due consideration to various exit alternatives and engaged in significant discussions and negotiations with representatives of the Noteholders, the Notes Trustee, and other parties in interest." (Disclosure Statement at 1.) Further, "[t]he Debtor believes that any alternative to confirmation of the Plan would result in significant delays, litigation, and additional costs, which would ultimately lower the recoveries for all holders of Allowed Claims." (*Id.*)

2.  Proposed Classification of Claims and Interests

The Plan purposes to classify claims and interests in the following manner:

| Classes of Claims | Status & Voting Rights | Proposed Treatment |
|---|---|---|
| Class 1 – Senior Secured Claims | Impaired; Entitled to vote. | Each holder of an Allowed Senior Secured Claim shall receive its Pro Rata Share of the remaining proceeds in the Distribution Fund promptly after the payment in full in Cash or adequate reserve being made by the Debtor of all of the following (i) all regular closing costs and adjustments; (ii) Allowed Fee Claims; (iii) Allowed Administrative Claims (subject to the provisions of Section 2.1); and (iv) Allowed Priority Claims (subject to the provisions of Section 2.3); provided, however, that any deficiency Claim of a holder of Series C Notes shall be treated as a Class 3 Unsecured Claim. |
| Class 2A – Mechanic's Lien Claim of D and J | Unimpaired; Not entitled to vote. | Each holder of an Allowed Mechanic's Lien Claim shall receive payment in full in Cash. To the extent that any Mechanic's Lien Claim has not been Allowed as of the Confirmation Date, the Debtor will seek an estimation order from the Bankruptcy Court as to the amount to be reserved on account of such Mechanic's Lien Claim.<br><br>The same treatment applies to claims falling in Classes 2A through 2D. |
| Class 2B – Mechanic's Lien Claim of JSP | Unimpaired; Not entitled to vote. | (Same as Class 2A.) |
| Class 2C – Mechanic's | Unimpaired; Not entitled to vote. | (Same as Class 2A.) |

| Classes of Claims | Status & Voting Rights | Proposed Treatment |
|---|---|---|
| **Lien Claim of Schimenti** | | |
| **Class 2D** – **Mechanic's Lien Claim of Ziba** | Unimpaired; Not entitled to vote. | (Same as Class 2A.) |
| **Class 3** – **Unsecured Claims** | Impaired; Entitled to vote. | Each holder of an Allowed Unsecured Claim shall receive its Pro Rata Share of the remaining proceeds in the Distribution Fund promptly after the payment in full in Cash or adequate reserve being made by the Debtor of all of the following (i) all regular closing costs and adjustments; (ii) Allowed Fee Claims; (iii) Allowed Administrative Claims (subject to the provisions of Section 2.1); (iv) Allowed Priority Claims (subject to the provisions of Section 2.3); (v) Allowed Senior Secured Claims; and (vi) Allowed Mechanic's Lien Claims Class 3 is impaired. Holders of Allowed Unsecured Claims are entitled to vote to accept or reject the Plan. |
| **Class 4** – **Interests** | Unimpaired; Not entitled to vote. | Member, as the sole holder of a Class 4 Interest shall receive an initial distribution on the Effective Date in the amount of $2,127,107, which it shall distribute to Weiss. If (A) (i) the aggregate Mechanic Lien Claims is Allowed in an amount less than full amount asserted in the proofs of claim filed by Mechanic Lien Claims, or (ii) the Unfair Labor Claim is Allowed in amount less than $700,000, or (iii) the legal fees expended to settle or resolve the Mechanic Lien Claims were less than the amount set aside by the Debtor, or (B), if the Mechanic Lien Claims and the Unfair Labor Claim are not Allowed prior to the Plan Effective Date, and any amounts remain in the Debtor Contingent Liabilities Escrow after resolution and satisfaction in full of the Mechanic's Lien Claims and the Unfair Labor Claim, the Debtor shall distribute such amounts to Member, who shall make an immediate equity distribution of such distribution to each member of Member, in accordance with their pro rata ownership percentages of Member.<br><br>"Member" refers to Wythe Berry Member LLC. |

(Disclosure Statement at 16–17.) The Disclosure Statement also details the treatment of administrative expenses and other unclassified claims, including claims for professional fees and priority tax claims. (*Id.* at 13–15.)

3. <u>Means for Implementation</u>

   *a. Sale of the WV Complex*

The Plan provides for recoveries to allowed claim holders in the form of cash from the

WV Complex Sale.  Specifically, sale proceeds—net of sale commissions, purchase price

adjustments, and contingency reserves—will be used "solely to fund the Distribution Fund" for

distributions to creditors and to satisfy payments in accordance with the Plan.  (Disclosure

Statement at 17.)  The Debtor indicates that the sale will be "in accordance with the priorities set

forth in the Bankruptcy Code."  (Motion ¶ 19.)  As a condition precedent to confirmation of the

Plan, the Bankruptcy Court must approve the WV Complex Sale, the closing of which serves as

a condition precedent to the Effective Date of the Plan.  (Disclosure Statement at 36.)

   *b. The Global Settlement*

In addition to the WV Complex Sale, the Debtor has also entered into the Settlement that

provides for, among other things:

- a cash payment of $8,512,152.00 from Wythe Berry LLC to the Debtor in three
  installments in settlement of the Adversary Proceeding;

- a transfer to the Debtor of the entirety of the Employee Retention Tax Credit from the
  Internal Revenue Service (with any excess above $726,000.00 to be transferred to
  Espresso);

- the surrender, assignment, and transfer of all social media accounts of The William
  Vale Hotel LLC to WB Hotel LLC;

- the Debtor's purchase of an internet domain from WV Hotel for a purchase price of
  $1.3 million in order to maintain The William Vale Hotel as a going concern with
  proceeds to be distributed equally between Weiss and Goldman unless either
  otherwise directs;[5]

---

[5]     A copy of the domain name purchase and transfer agreement is annexed to the Revised Settlement
Agreement as Exhibit C.

- the Debtor's payment of $200,000.00 to Espresso for rendered consulting services in connection with the transition of operations and management of The William Vale Hotel;

- the Debtor's payment of 100% of any costs or liabilities incurred in connection with settling, extinguishing, and/or satisfying the Mechanic's Lien Claims and the unfair labor practice claim pending before the National Labor Relations Board;

- the transfer of the liquor license utilized in the food and beverage service at The William Vale Hotel to an affiliate of the Purchaser;

- cash distributions to Wythe Berry Member LLC, the sole member of the Debtor, and an equity distribution from Wythe Berry Member LLC to Weiss and each member of Wythe Berry Member LLC in accordance with their *pro rata* ownership percentages;

- Wythe Berry LLC's execution of a Memorandum of Termination of Lease, retroactive to May 20, 2021, to be publicly filed in the chain of title of the WV Complex; and

- certain releases of the parties to the Settlement.

(*See generally* Revised Settlement Agreement.)

In connection with the cash distributions contemplated under the Settlement, the Plan provides for an initial distribution of $2,127,107.00 to Wythe Berry Member LLC, the holder of Interests in the Debtor, and an additional distribution to Wythe Berry Member LLC of any amounts remaining in escrow after resolution and satisfaction in full of certain contingent liabilities.  (Disclosure Statement at 11.)

Lastly, as with the WV Complex Sale, entry of an order approving the Settlement also serves as a condition precedent to confirmation.  (*Id.* at 36.)

### c.  Administration and Liquidation of the Debtor

In consultation with the Trustee, the Debtor will select a Plan Administrator who will administer and implement the Plan and the wind down, dissolution, and liquidation of the Debtor and distribution of any remaining assets in accordance with the Plan (the "Wind Down").

(Disclosure Statement at 26–27.)  Upon the conclusion of the Wind Down, the Plan

Administrator will dissolve the Debtor.  (*Id.* at 27.)

> 3.  Exculpation Clause

Section 10.7 of the Plan sets forth the exculpation clause (the "Exculpation Provision").

As initially set forth in the fourth and fifth iterations of the Plan, the Exculpation Provision

provides:

> (a) To the maximum extent permitted by applicable law, no Exculpated
> Party will have or incur, and each Exculpated Party is hereby released
> and exculpated from, any claim, obligation, suit, judgment, damage,
> demand, debt, right, cause of action, remedy, loss, and liability for any
> conduct occurring on or after the Petition Date and up to and including
> the Effective Date in connection with or arising out of the filing and
> administration of the Chapter 11 Case, the Sale process, the closing of
> the Sale; the Disclosure Statement, the Plan Administration Agreement,
> including the formulation, negotiation, preparation, dissemination,
> implementation, administration, confirmation, and consummation
> thereof, the Plan, or the solicitation of votes for, or confirmation of, the
> Plan; the funding or consummation of the Plan; the occurrence of the
> Effective Date; the administration of the Plan or the property to be
> distributed under the Plan; or the transactions in furtherance of any of
> the foregoing; or upon any other related act or omission, transaction,
> agreement, event, or other occurrence taking place from the Petition
> Date through and including the Effective Date; except for acts or
> omissions of an Exculpated Party that constitute gross negligence,
> fraud, or willful misconduct, in each case as determined by a Final
> Order.  This exculpation shall be in addition to, and not in limitation of,
> all other releases, indemnities, exculpations, and any other applicable
> law or rules protecting such Exculpated Parties from liability.
>
> (b) To the maximum extent permitted by applicable law, no Additional
> Exculpated Party will have or incur, and each Additional Exculpated
> Party is hereby released and exculpated from, any claim, obligation,
> suit, judgment, damage, demand, debt, right, cause of action, remedy,
> loss, and liability for any conduct occurring on or after the Petition Date
> and up to and including the Effective Date in connection with or arising
> out of the Settlement Agreement, including the formulation,
> negotiation, preparation, dissemination, implementation,
> administration, confirmation, and consummation thereof or the
> transactions in furtherance of any of the foregoing; except for acts or
> omissions of an Additional Exculpated Party that constitute gross
> negligence, fraud, or willful misconduct, in each case as determined by

> a Final Order. This exculpation shall be in addition to, and not in
> limitation of, all other releases, indemnities, exculpations, and any other
> applicable law or rules protecting such Additional Exculpated Party
> from liability.

(ECF Doc. # 306 § 10.7; ECF Doc. # 340 § 10.7)

At the Combined Hearing, the Debtor indicated that, if the Court issued a determination

that Weiss possessed authority to bind the Operating Entities and enter into the Settlement, the

Debtor would agree that the "exculpation provision . . . in favor of [Weiss] and the entities could

come out of the settlement agreement." (May 15, 2024 Hr'g Tr. at 186:1–7.) Accordingly, as

the Court has approved the Settlement, subsection (b) is excluded from the Exculpation

Provision as reflected in the Plan that is presently before this Court.[6]

### 4.  Voting Results

On May 10, 2024, the Debtor filed the Voting Declaration, which indicates that all voting

classes—Classes 1 and 3—unanimously voted to accept the fourth iteration of the Plan (ECF

Doc. # 306) and opted into the releases set forth in section 10.6 therein by voting deadline of

May 3, 2024 at 5:00 p.m. (the "Voting Deadline"). (Voting Declaration ¶¶ 17–18.) These

results, the Debtor indicates, remain valid with respect to the current version of the Plan. (*Id.* ¶

10.) The Debtor indicates that modifications made to the Plan since solicitation do not impact

the treatment of impaired creditors and therefore, resolicitation is unnecessary. (*Id.*; *see also* 11

U.S.C. § 1127(d) ("Any holder of a claim or interest that has accepted or rejected a plan is

deemed to have accepted or rejected, as the case may be, *such plan as modified*, unless, within

the time fixed by the court, such holder changes such holder's previous acceptance or rejection.")

(emphasis added); 7 COLLIER ON BANKR. ¶ 1127.03[1][b] ("If a modification is nonmaterial, no

---

[6]     The removal of Weiss from the Exculpation Provision also addresses and resolves the informal objection
raised by the U.S. Trustee at the Combined Hearing. (*See* May 15, 2024 Hr'g Tr. at 182:13–16 ("It would be an
objection of ours, Your Honor, that [Weiss is] included as [an] exculpated part[y].").)

resolicitation is required.  Otherwise, the court should order a resolicitation.").)  The Court

agrees.

### C.  Objections Received

#### 1.  Schimenti Limited Disclosure Statement Objection

The Schimenti Limited DS Objection, which was filed in opposition to the first iteration

of the Disclosure Statement (ECF Doc. # 242), asserts that the Disclosure Statement lacks

adequate information with respect to holders of Class 2 claims.[7]  Schimenti seeks modification

of the Disclosure Statement to include additional disclosures concerning the following:

- amount of expected proceeds from the WV Complex Sale to be paid into the Distribution Fund;

- an estimated amount of the Distribution Fund generally;

- details regarding the purchase price and the nature and amount of "certain liabilities" to be assumed by the Stalking Horse Bidder;

- expected amounts payable from the Distribution Fund to (i) closing costs and adjustments; (ii) Allowed Fee, Administrative, Priority, and Senior Secured Claims; and

- anticipated distributions or range of distributions to holder of Allowed Class 2 claims.

(Schimenti Limited DS Objection ¶¶ 6–13.)

Schimenti is now an unimpaired creditor under the Plan whose claim fall in Class 2C.  He

was, therefore, not entitled to vote on the Plan.

Nonetheless, the Court finds that the Disclosure Statement is comprehensive and

information and contains sufficient information necessary for impaired creditors to make an

"informed judgment" about the Plan.  *See* 11 U.S.C. § 1125 (requiring a chapter 11 plan

---

[7]    The first iteration of the Disclosure Statement and Plan initially grouped all mechanic's lien claims together into a single Class 2.  In the Disclosure Statement and Plan that are presently before the Court, each mechanic's lien claim is separately classified into its own sub-class.  (*See* Disclosure Statement at 2.)  Schimenti's mechanic's lien claim, in particular, is classified under Class 2C.

16

proponent to provide "adequate information" regarding a plan to holders of impaired claims and interests entitled to vote).  Only creditors falling in classes 1 and 3 are impaired, and the Court concludes that the Disclosure Statement contains adequate information for such creditors and satisfies the requirements of section 1125 of the Bankruptcy Code.  (*See generally* Disclosure Statement and Confirmation Order.)

2.  <u>Goldman Objection to Confirmation and the Settlement</u>

Goldman opposes confirmation of the Plan as well as the Settlement on several grounds.[8]

*First*, he argues that the Settlement conveys his property without his consent in violation of orders issued by the American Arbitration Association ("AAA") panel that remain in effect and the operating agreements of WB, the William Vale Hotel LLC (operator of the space used for traditional guest accommodations), and the William Vale FNB LLC (food and beverage space operator) (collectively, the "Operating Entities").  (Goldman Objection ¶¶ 34–44.)  The AAA panel orders relate to the arbitration (the "Arbitration") Goldman commenced against Weiss and the Operating Entities based on Weiss's alleged violations of his fiduciary and contractual duties.  (*Id.* ¶ 21.)  The arbitration is currently stayed.  (*Id.*)  Additionally, he alleges that the Settlement allows Weiss to use property Goldman owns to pay for the Settlement and ultimately deprives him of any recourse for these actions.  (*Id.* ¶ 44.)

Goldman believes that, as 50% owner of these Operating Entities, he is entitled to any proceeds stemming from operations or the sale of assets.  (*Id.* ¶ 34.)  He indicates that Settlement involves "Major Decisions" that, under the operating agreements for the Operating Entities, would require joint written approval by Goldman and Weiss.  (*Id.* ¶ 36.)  Moreover, Weiss is "engaging in unilateral Major Decisions" and making impermissible transfers out of the

---

[8]     The Goldman Objection is with respect to the fourth iteration of the Plan (ECF Doc. # 306) and the Initial Settlement Agreement (ECF Doc. # 304), both of which have since been amended.

Operating Entities' accounts in violation of the AAA panel's standing injunctions.  (*Id.* ¶ 37.)

Therefore, approval of the Settlement along with the release of conduct via the Plan's

Exculpation Provision would permit Weiss to enter into agreements with Weiss's affiliates with

a disproportionate impact to Goldman.  (*Id.* ¶ 35.)  Goldman also details a number of other

issues, which he believes go to the idea that value is being delivered to Weiss that should equally

belong to Goldman: (i) circumstances surrounding the domain name and its ownership (*id.* ¶¶

38–39); (ii) lack of disclosure over the agreement underlying the transfer of a liquor license,

furnishings, equipment, and the related sale price (*id.* ¶ 40); (iii) lack of details concerning the

consulting services (*id.* ¶ 41); and (iv) the Initial Member Distribution (*id.* ¶ 42).

*Second*, Goldman argues the Settlement and the Exculpation Provision violate section

1129(a)(3) of the Bankruptcy Code as they were not proposed in good faith and are otherwise

unlawful for reasons already discussed.  (*Id.* ¶ 47.)  Goldman indicates that the Debtor excluded

him from any negotiations and only contacted him after finalizing the agreement with Weiss.

(*Id.* ¶ 50.)

*Third*, the Settlement and Exculpation Provision are subject to heightened scrutiny

because Weiss is a statutory insider.  (*Id.* ¶¶ 51–53.)  Goldman believes that Weiss is a statutory

insider of the Debtor as he is (i) an affiliate of its affiliate Wythe Berry Member LLC and (ii) an

affiliate and insider of Debtor affiliate Wythe Berry LLC.  (*Id.*)

*Fourth*, the exculpation provision in the Plan violates sections 1123(b)(6), 1129(a)(1),

and 1129(a)(3) because it contains non-consensual third-party releases that "cut off Goldman's

claims and defenses against non-debtor fiduciaries," including the Arbitration and State Court

Action.  (*Id.* ¶ 57.)  Goldman asserts that the court lacks constitutional authority to issue final

judgment as to the exculpation provision in section 10.7 of the Plan because the releases "do not

stem from the bankruptcy itself" and are therefore, non-core under *Stern v. Marshall*, 564 U.S.

462 (2011).  (*Id.* ¶ 59 (quoting *In re Purdue Pharma L.P.*, 69 F.4th 45, 78–79 (2d Cir. 2023),

*cert. granted sub nom. Harrington v. Purdue Pharma L.P.,* No. (23A87), 2023 WL 5116031

(Aug. 10, 2023) [hereinafter "*Purdue*"]).)  Additionally, Goldman argues that every *Purdue*

factor weighs against approval of section 10.7(b) of the Plan and the majority of the *Purdue*

factors weigh against approval of section 10.7(a).  (Goldman Objection ¶¶ 61–63.)

Fifth, Goldman argues that six of the seven factors (collectively, the "*Iridium* Factors")

set forth in the Second Circuit's ruling in *Motorola, Inc. v. Official Comm. of Unsecured*

*Creditors (In re Iridium Operating LLC)*, 478 F.3d 452 (2d Cir. 2007) weigh against approval of

the Settlement.  (*Id.* ¶¶ 64–70.)  In support, Goldman argues that he is the "only party-in-interest

not a party to the Settlement Agreement."  (*Id.* ¶ 67.)

Sixth, Goldman argues he has standing to raise his objection since he possesses a "direct

pecuniary interest in the Settlement Agreement and Plan exculpation provisions which . . .

together misappropriate his property and release his claims and defenses in ongoing and

threatened litigation."  (*Id.* ¶ 71.)  Therefore, he is a "party in interest" under section 1109(b) of

the Bankruptcy Code who "may object to a Rule 9019 motion to approve a settlement."  (*Id.*)

Goldman, nonetheless, proposes a resolution that he states, if incorporated, would resolve

his objection.  He indicates that if the Debtor incorporates his proposed modifications to the

exculpation provisions as set forth in Exhibit 13 to the Moskowitz Declaration, his concerns

would be allayed.  (*Id.* ¶ 72.)  Additionally, if the Settlement were to be modified to "place all

money being paid to Weiss and/or any entities under his control into escrow until the Arbitration

is completed and a final order is issued by the appropriate tribunal with jurisdiction to address

each party's rights," his objection as to the Settlement would also be resolved.  (*Id.*)  Goldman

19

argues that these "compromises" would allow the Plan to go effective while "respecting Goldman's legal and property rights." (*Id.* ¶ 73.)

### D. Replies to the Goldman Objection

#### 1. Weiss Reply

Weiss indicates that each of the Operating Entitles are New York limited liability companies and are therefore, governed under New York limited liability company laws ("NY LLCL"). (Weiss Reply ¶ 1.) Weiss argues that neither him nor Goldman have any interest in any specific property of the Operating Entities in accordance with section 601 of the NY LLCL, which provides that a member has "no interest in specific property." (*Id.*) Rather, Goldman is entitled solely to his "share of distributions, if any, made by the respective [Operating Entities]." (*Id.* ¶ 2.) This right is qualified by provisions reserving the right to such distributions to the Managing Member of the Operating Entities, which is undisputed to be Weiss. (*Id.*) Goldman does not argue that Weiss violated the waterfall set forth in the Operating Entities' respective operating agreements. (*Id.*)

Weiss asserts that none of the terms of the Settlement Agreement run afoul of the Major Decisions provision in the governing operating agreements. (*Id.* ¶ 4.) Indeed, he rejects Goldman's contentions that:

- the Settlement constitutes an "agreement between the Company and an Affiliate of any Member" or alters the terms and conditions of any covered agreements (*id.* ¶ 5);

- the cash and non-cash assets of the Operating Entities used to fund the Settlement are not being used for the exclusive benefit of the Operating Entities (*id.* ¶ 6); and

- he is being disproportionately impacted since (i) the Settlement Agreement affects Goldman and Weiss equally (neither is getting a distribution, each is benefiting the same under the releases, and each is giving up the same rights), (ii) the benefits Weiss is receiving under the Settlement that Goldman will not receive are unrelated to Weiss's status as a Member of the Operating Entities, and (iii) Goldman receives "nothing at all" with or without the Settlement (*id.* ¶¶ 8–9).

20

Weiss asserts that Goldman is mischaracterizing the arbitration proceedings during which he raised the issue of whether the Major Decisions provision prohibited Weiss from entering into a transaction with the Debtor to purchase the WV Complex. (*Id.* ¶¶ 10–11.) The arbitration panel ultimately "rejected Goldman's argument" and permitted Weiss to proceed with the sale. (*Id.* ¶ 12.) Weiss further notes that the arbitration panel concluded that Goldman failed to establish that the Major Decisions clause applies to Weiss's "personal conduct" as opposed to conduct on behalf of the company. (*Id.* ¶ 13.) As for the injunction the arbitration panel issued, it was limited to Weiss in his individual capacity only and is, therefore, inapplicable to the Plan or Settlement Agreement. (*Id.* ¶¶ 15, 18.) Weiss suggests that the arbitration orders are inapplicable as no part of the Settlement or the Plan involves Weiss obtaining an interest in the William Vale Hotel or its assets and otherwise does not apply to the Operating Entities. (*Id.* ¶¶ 16–17.)

2. <u>Debtor Reply</u>

At the outset, the Debtor indicates that the Revised Settlement Agreement reflects a settlement with Goldman over his objection to the domain name. (Debtor Reply ¶¶ 13–14.) The Debtor then addresses each of Weiss's contentions.

*First*, the Debtor argues that Weiss possessed the authority to enter into the Settlement and convey the property to be transferred to the Debtor contemplated therein. (*Id.* ¶¶ 15–23.) Echoing the Weiss Reply, the Debtor, citing to section 601 of the NY LLCL, states that Goldman is only entitled to his "right to a share of distributions, if any, made by the [Operating Entities] subject to the terms of the operating agreements, which place limits on this right." (*Id.* ¶ 16.) The Debtor asserts that Weiss's arguments that the Major Decisions provision of the operating

agreements prevents the Settlement from moving forward is also without merit for the following

reasons:

- the Settlement does not impact the "terms and conditions of any agreement between the Company and an Affiliate of any Member" and Goldman has not identified any (*id.* ¶ 18);

- Goldman's argument that the Operating Entities' assets are not being used for the exclusive benefit of the Operating Entities fails to recognize the Court's ruling in the Partial SJ Decision and that, but for the Settlement, the Debtor would seek monetary recovery (*id.* ¶ 19);

- the Settlement impacts Goldman and Weiss equally (*id.* ¶ 20); and

- Goldman waived any claim that Weiss improperly settled State Court Action as he did not participate in it while it was in state court and did not oppose the motion for partial summary judgment or otherwise object to Weiss opposing the motion on behalf of Wythe Berry LLC (*id.* ¶ 23.)

*Second*, the arbitral panel decisions do not bar Weiss from entering into the Settlement

since the arbitration decisions only prevented Weiss, in his individual capacity, from pursuing

and/or consummating the WV Complex Sale.  (*Id.* ¶¶ 25–27.)  No part of the Settlement or Plan

implicates Weiss "purchas[ing], acquir[ing] or otherwise obtain[ing] an interest in" the WV

Complex or its assets and is therefore, inapplicable to the Settlement or the Plan.  (*Id.* ¶ 28.)

*Third*, the AYH Wind Down Plan Administrator supports the Settlement and believes it is

in the best interests of AYH Wind Down and the Debtor since it maximizes recoveries for the

Series C Noteholders against the Debtor and resolves claims and threatened claims against Weiss

and YG WV.  (*Id.* ¶¶ 29, 31.)  Specifically, Settlement resolves claims or causes of action that

Weiss could assert against YG WV or AYH Wind Down.  (*Id.* ¶ 30.)  Therefore, the payment

that YG WV is directing Member to pay Weiss is reasonable when accounting for litigation

costs.  (*Id.*)

*Fourth*, the Debtor argues that the Goldman's issues with the Settlement are without

merit since the Debtor acted on reasonable information in agreeing to these provisions and its

business judgment cannot be second-guessed.  (*Id.* ¶ 41.)  With respect to the domain name and social media accounts, the Debtor maintains that it "already had the right to sell the Domain Name and Social Media Accounts as assets owned by the Debtor as a matter of intellectual property law" despite settling with Goldman on the domain name.  (*Id.* ¶ 33.)  Additionally, the Debtor defends its decision to purchase the domain name and social media accounts as an exercise of its business judgment in connection with entering into the Settlement.  (*Id.* ¶ 36.)  The Debtor considered its litigation position, the need to resolve the issue outside of the Settlement in an adversary proceeding, and the purchaser's willingness to close on the WV Complex Sale.  (*Id.*)  The Debtor reserves the right to commence an adversary proceeding if the Court declines to approve the terms of the Settlement that convey the social media accounts to the Debtor.  (*Id.*)  The $45,000.00 valuation ascribed to the social media accounts in the Settlement was reached after consultation with the Debtor's hospitality consulting and interim hotel management company, Performance Interim Advisory LLC d/b/a LW Hospitality Advisors ("LWHA") and the William Vale Hotel's Director of Marketing.  (*Id.* ¶ 37.)

With respect to the Debtor's agreement regarding its furniture, fixtures, and equipment ("FF&E") as well as consulting services, the Debtor indicates that it was not required to disclose support for the consideration to be paid to WB FNB and Espresso.  (*Id.* ¶ 38.)  In any event, the Debtor reached a $5,000 payment for the transfer of the FF&E, if any, at the WV Complex because the transfer of the liquor license was "invaluable" to the Purchaser and the sale generally.  (*Id.*)  Transition of management and direction of the WV Complex was essential both to the Debtor's assumption and control of the WV Complex management and operations and to the sale contract.  (*Id.* ¶ 39.)  Therefore, the payment negotiated between the Debtor and Espresso was warranted.  (*Id.*)

As for the initial member distribution issue, the Debtor contends that Goldman has no standing to raise this issue since he is "not aggrieved in any way by this distribution." (*Id.* ¶ 40.)

*Fifth*, there is no basis for the assertion that the Settlement was a product of collusion. The Settlement is a multi-party agreement where parties made concessions and obtained benefits, was negotiated in good faith and at arm's-length, and Weiss is not an "insider" since he lacks the ability to control or influence the Debtor. (*Id*. ¶¶ 42–44.) Therefore, heightened scrutiny is unwarranted. (*Id.* ¶ 45.)

*Sixth*, the Exculpation Provision complies with Second Circuit law. It is essential to the Plan, the sale contract, and the Settlement and all voting classes voted to approve it. (*Id.* ¶ 46.) In any event, the Exculpation Provision meets the *Metromedia* factors and is integral to the Plan. (*Id.* ¶¶ 47–49.) Moreover, Goldman is not a creditor of the estate and possesses no standing to object and is seeking the ability to pursue his claims twice—once here and again before the arbitral panel. (*Id.* ¶¶ 50–51.)

*Seventh*, Goldman lacks standing to object to the Settlement since he is not a creditor and lacks a "direct economic stake." (*Id.* ¶ 53.) Any harm he may suffer is too remote. (*Id.*)

*Seventh*, the *Iridium* Factors support approval of the Settlement and Weiss relies on "flawed premises" to rebut the argument that the factors are satisfied. (*Id.* ¶ 55.)

## II.    DISCUSSION

### A.  The Exculpation Provision, as Modified, is Proper

"Exculpation provisions are designed to 'insulate court-supervised fiduciaries and some other parties from claims that are based on actions that relate to the restructuring.'" *In re Genesis Glob. HoldCo, LLC*, No. 23-10063 (SHL), 2024 WL 2264719, at *56 (Bankr. S.D.N.Y. May 17, 2024) (quoting *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 720

(Bankr. S.D.N.Y. 2019)).  Indeed, "[i]t is well settled that an exculpation clause approved at

confirmation may exculpate estate fiduciaries like a committee, its members, and estate

professionals for their actions in the bankruptcy case except where those actions amount to

willful misconduct or gross negligence." *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG),

2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June 18, 2022) (citations omitted).  Such provisions

in chapter 11 plans are "not uncommon" and are generally permissible "so long as they are

properly limited and not overly broad." *Id.* at *49 (quoting *In re Nat'l Heritage Found., Inc.*,

478 B.R. 216, 233 (Bankr. E.D. Va. 2012)).

Generally, it has been recognized that:

> [A] proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions.  If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should be not be subject to claims that effectively seek to undermine or second-guess this Court's determinations. In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do.

*Aegean Marine Petroleum Network*, 599 B.R. at 721.

Here, the Exculpation Provision, as modified, provides that the Exculpated Parties are

exculpated for actions from the Petition Date through the Effective Date that stem from the (i)

filing and administration of the chapter 11 case; (ii) the WV Complex Sale; (iii) the Disclosure

Statement; (iv) the Plan; (v) transactions in furtherance of the foregoing; or (vi) "any other

related act, omission, transaction, agreement, event, or occurrence."  (Plan § 10.7(a).)  The Plan

defines "Exculpated Parties" to comprise of (a) the Debtor; (b) the Plan Administrator; (c) the

[Trustee] and its representatives and advisors; (d) the Series C Noteholders and their

representatives and advisors; (e) any current director, manager or officer of the Debtor; (f) any

advisors retained by the Debtor in connection with the Chapter 11 Case; and (g) with respect to

each of the foregoing Persons in clauses (a) through (f), only such Entity or Person's representatives and advisors, in each case in their capacity as such, who served as estate fiduciaries in the Chapter 11 Case." (*Id.* § 1.49.)

*First*, the scope of Exculpated Parties is proper as it seeks to exculpate parties who have "made substantial contributions to the reorganization process and whose inclusion in the exculpation provision was a critical component in forming a plan." *Genesis*, 2024 WL 2264719, at *58. In general, "[e]xculpated [p]arties who are not estate fiduciaries are entitled to benefit from a broad exculpation provision" where they have been "actively involved in all aspects of [the] Chapter 11 Cases and have made significant contributions to the success of [the] cases." *LATAM*, 2022 WL 2206829, at *50. Therefore, while Exculpated Parties includes non-fiduciaries such as the Trustee, the Series C Noteholders, and their respective professionals, the participation of such parties in these chapter 11 cases was instrumental to the Debtor formulating a plan "on an expedited basis," and their support was "essential to the successful negotiation of the Plan, the Stalking Horse Agreement and the Settlement Agreement."[9] (Confirmation Brief ¶ 42.; *see also* May 15, 2024 Hr'g Tr. at 178:2–6 (stating that the Court has no issue with the Debtor's inclusion of the Trustee, the Series C Noteholders, and their professionals as the exculpation is "in relation to their conduct during this case to get to where we are now"); *id.* at 181:19–24 (indicating that the U.S. Trustee has no issue with the inclusion of the Trustee and Series C Noteholders despite their typical "strict" view that exculpation should be limited solely to estate fiduciaries).) Accordingly, absent gross negligence or intentional wrongdoing, extension of the Exculpation Provision to such parties for matters relating to the bankruptcy case

---

[9]     Goldman objects to the Exculpation Provision for its inclusion of the Trustee and Series C Noteholders (and their representatives and advisors), but "does not object to the exculpation of the Debtor and its fiduciaries such as the Plan Administrator, 'any current director, manager, or officer of the Debtor,['] and 'any advisors retained by the Debtor in connection with the Chapter 11 Case.'" (Goldman Objection ¶ 56; *id* at 25 n.7.)

is appropriate. *Aegean Marine Petroleum Network*, 599 B.R. at 721 ("I think that a proper

exculpation provision is protection not only of court-supervised fiduciaries, but also of court-

supervised and court-approved transactions.").

     *Second*, the scope of the exculpated conduct is also proper. The Exculpation Provision is

limited to acts that occurred in connection with the bankruptcy case and includes a carve out for

"acts or omissions . . . that constitute gross negligence, fraud, or willful misconduct, in each case

as determined by Final Order." (Plan § 10.7(a).) This is sufficiently narrow and consistent with

exculpation clauses approved in other cases before this Court. *See, e.g.*, *In re Granite Broad*

*Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (concluding that an exculpation provision that

was limited to actions "in connection, related to, or arising out of the Reorganization Cases" but

carved out "gross negligence and intentional misconduct" generally corresponded with the

"standard" in this district so as to be "unexceptionable"); *In re Stearns Holdings, LLC*, 607 B.R.

781, 790–91 (Bankr. S.D.N.Y. 2019) (approving an exculpation clause that sought to exculpate

parties whose "contributions and concessions" had made the plan possible but carved out gross

negligence, intentional fraud, and willful misconduct); *see also Aegean Marine Petroleum*

*Network*, 599 B.R. at 720–21 (stating that proper exculpation provisions include court-supervised

fiduciaries and transactions, and, in the absence of gross negligence or intentional wrongdoing,

such parties should not be liable). Accordingly, the Court concludes that the Exculpation

Provision, as modified, is appropriate and proper.

     Also, given that the reach of the Exculpation Provision covers matters relating to this

case from the Petition Date through the Effective Date, Goldman's contention that the Court

lacks the authority to approve the Exculpation Provision is without merit. (*See* Goldman

Objection ¶ 59 (arguing that the Court lacks "constitutional authority to finally approve Plan

§ 10.7 because the releases do not stem 'from the bankruptcy itself' . . . and are therefore 'non-core . . . .'"").)  This is particularly so as the Exculpation Provision is part of the Debtor's proposed Plan.  Generally, "exculpation and injunction clauses 'derive[] from . . . bankruptcy law'—they are embedded within a confirmed reorganization plan, the 'operative proceeding' for constitutional purposes." *Lynch v. Lapidem Ltd. (In re Kirwan Offices S.á.r.l.)*, 592 B.R. 489, 511 (S.D.N.Y. 2018) (quoting *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 271 (Bankr. D. Del. 2017)) (alterations in original).  Indeed, "[a] reorganization plan is a creature solely of Bankruptcy law and must comply with all of the provisions of 11 U.S.C. § 1129(a) & (b)." *Kirwan Offices*, 592 B.R. at 511.  Therefore, the Court possesses the authority to approve the Exculpation Provision, as modified, and finds that it is proper.

**B.  The Goldman Objection as it Relates to Confirmation is Without Merit**

Goldman objects to confirmation on the following grounds: (i) the Plan violates section 1129(a)(3) of the Bankruptcy Code as it was not proposed in good faith in light of the Settlement it incorporates, and (ii) the Exculpation Provision, as set forth in the fourth and fifth iterations of the Plan, violate sections 1123(b)(6), 1129(a)(1), and 1129(a)(3) of the Bankruptcy Code. (Goldman Objection ¶¶ 45–50, 54–57.)  Each is unpersuasive.

1.  The Plan Generally Does Not Violate Section 1129(a)(3)

Section 1129(a)(3) requires the plan to be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  This means that the plan must have been "proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (quoting *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984)).  Courts have held that a plan is considered proposed in good faith "if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code." *In re The Leslie Fay*

*Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (quoting *In re Texaco Inc.*, 84 B.R. 893, 907

(Bankr. S.D.N.Y. 1988)).  "The requirement of good faith must be viewed in light of the totality

of the circumstances surrounding the establishment of a chapter 11 plan."  *Leslie Fay*, 207 B.R.

at 781 (citations omitted); *Greer v. Gaston & Snow (In re Gaston & Snow)*, 1996 WL 694421, at

*9 (S.D.N.Y. Dec. 4, 1996) ("[F]ailure to propose a plan in good faith occurs when the Plan is

not proposed with honesty, good intentions, and to effectuate the reorganization of the enterprise,

but rather for some other motive") (citing *Kane*, 843 F.2d at 649).

    In support of his contention that the Plan was not proposed in good faith, Goldman argues

that the Settlement, which the Plan incorporates, seeks to dispose of his property and release

claims without his consent and his rights in the pending arbitration proceeding against Weiss.

Specifically, he alleges that the Plan and Settlement "misappropriat[e] Goldman's property, and .

. . free Weiss from the claims he would otherwise face for doing so" since the "AAA panel's

orders and the operating agreements of all the [] Operating Entities bar Weiss from entering the

Settlement Agreement without Goldman's consent."  (Goldman Objection ¶¶ 47–48.)  This, in

his mind, renders both the Settlement and the Plan unlawful.  Goldman's argument is without

merit.

    As this Court has already established in the Settlement Opinion, Weiss possessed the

authority to enter into and bind the Operating Entities to the Settlement.  Additionally, the

arbitration orders that Goldman refers to are limited to Weiss in his individual capacity within a

specific context: the consummation of a sale of the WV Complex.  (*See* Debtor Reply ¶¶ 27–28;

Weiss Reply ¶ 12.)  Accordingly, the arbitration orders are inapplicable to the Settlement and

Plan as they do not involve Weiss's "purchase, acqui[sition] or . . . obtain[ing] [of] an interest in

the William Vale Hotel . . . or the Hotel's assets."  (Weiss Reply ¶ 12; Debtor Reply ¶ 28.)

Notably, Goldman did not object to the WV Complex Sale, which the Court ultimately approved at the Confirmation Hearing.  (*See* May 15, 2024 Hr'g Tr. at 106:2–3 (noting that the WV Complex Sale is uncontested and approving the same).)  Therefore, Goldman's assertion that the Plan and Settlement are unlawful is baseless.

Goldman also takes issue with the process leading up to the Settlement and Plan as being indicative of a lack of good faith.  He argues that he was excluded from "any negotiations" and alleges that the Debtor only contacted him after "finalizing the agreement with Weiss." (Goldman Objection ¶ 50.)  However, Goldman has acknowledged that the Debtor did, in fact, reach out to him with a "near-final draft" of the Initial Settlement Agreement on April 10th to initiate a discussion prior to the Debtor's filing of the 9019 Motion.  (*See* May 15, 2024 Hr'g Tr. at 27:11–13 (Goldman's counsel stating that "the evidence will show that when the debtor proposed a solution to us, when they first called us on April 10th, it wasn't much of a solution"); *id.* at 45:11–14 (receiving confirmation that Debtor's counsel circulated a "near-final draft" of the Settlement to Goldman's counsel); *see also* Debtor Reply ¶¶ 5, 19 (indicating that Goldman was kept "informed as the settlement negotiations progressed, [was] provided . . . with a copy of the proposed agreement before it was filed with the Court, and [was] invited . . . to participate in the Settlement," which he ultimately declined).)  Indeed, discussions as to the Settlement with Goldman continued through May 2, 2024.  (*See* Ravid Reply Declaration ¶¶ 8–10 (reflecting that discussions with Goldman began on April 10, 2024 and continued through May 2, 2024 when Debtor's counsel "conferred by phone with Goldman's counsel to continue to explore settlement," which ultimately proved to be "unsuccessful").)

While Goldman may be dissatisfied with the precise manner in which negotiations leading up to the Settlement was conducted, "[i]t is not necessary for the court to conduct a

'mini-trial' of the facts or the merits underlying the dispute" in evaluating a settlement. *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 225 (Bankr. S.D.N.Y. 2007). As discussed, the Settlement Opinion makes clear that Weiss possessed the authority, in his capacity as Managing Member of the Operating Entities, to enter into the Settlement on behalf of these entities, and the Settlement was the product of arm's-length bargaining.

In light of the foregoing, the Court has no reason to find that the Plan was not proposed with "honesty and good intentions and with a basis for expecting that a reorganization can be effected" and is unlawful. *Kane*, 843 F.2d at 649. Accordingly, the Plan (including the Exculpation Provision as discussed below) satisfies section 1129(a)(3) of the Bankruptcy Code.

    2.   <u>The Exculpation Provision Does Not Violate Sections 1123(b)(6), 1129(a)(1), and 1129(a)(3)</u>

In addition to the foregoing, Goldman also contends that the Exculpation Provision violates sections 1123(b)(6), 1129(a)(1), and 1129(a)(3) because it contains non-consensual third-party releases. (*See generally* Goldman Objection ¶¶ 54–63.) Section 1123(b)(6) provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6). Meanwhile, sections 1129(a)(1) and (a)(3) provide that a plan may be confirmed if "[t]he plan complies with the applicable provisions of this title" and was "proposed in good faith and not by any means forbidden by law." 11 U.S.C. §§ 1129(a)(1) and (a)(3).

In support of this, Goldman argues that the majority of the factors articulated in *Purdue* support a finding that subsection (a) of the Exculpation Provision, which now serves as the entirety of the Exculpation Provision for the Court's consideration, is improper since it "impairs

Goldman's defenses to claims the [Trustee] and Series C Noteholders have threatened to bring

against him relating to [William Vale Hotel]."[10]   (Goldman Objection ¶¶ 60, 62.)

The Exculpation Provision, as modified, is proper in light of the Exculpated Parties'

contributions to the chapter 11 case and the Debtor's reorganization efforts.  It is not lost on the

Court that this case commenced because the Petitioning Creditors, comprised of the Trustee and

certain Series C Noteholders whom the Debtor now seeks to exculpate, filed an involuntary

chapter 11 petition against the Debtor.  (*See Statement on Involuntary Petition Against Wythe

Berry Fee Owner LLC*, ECF Doc. # 2, Schedule A (listing each Petitioning Creditor and their

holdings of Series C Notes as of October 6, 2022).)  And notwithstanding how this chapter 11

case began, the Trustee and Series C Noteholders have worked with the Debtor throughout this

case, and their efforts have culminated into the WV Complex Sale and the Settlement that now

collectively serve as the primary means for implementation of the Plan.  (*See* Disclosure

Statement, Art. V.)  These efforts include, for example, (i) negotiating and increasing the

stalking horse bidder's purchase price to $177 million in connection with the WV Complex Sale,

which now funds the Distribution Fund and other payments under the Plan; (ii) developing the

Plan and evaluating various exit alternatives; and (iii) engaging in arm's-length negotiations with

the Debtor and other parties that culminated into the Settlement.  (*See Debtor's Motion for the

Entry of an Order (I) Approving its Selection of a Stalking Horse Bidder, (II) Approving Bid

Protections in Connection Therewith, and (III) Granting Related Relief*, ECF Doc. # 251 ¶ 4

(reflecting that the stalking horse bidder for the WV Complex Sale increased its proposed

purchase price to $177  million "[f]ollowing extensive negotiations with the Debtor and

---

[10]      Goldman also takes issue with subsection (b) of the former Exculpation Provision.  As the Exculpation
Provision no longer includes subsection (b) in light of the Court's Settlement Opinion, the Opinion will focus solely
on the Goldman Objection as it relates to subsection (a).

32

representatives of [the Trustee]," which now serves as the stalking horse bid); Disclosure

Statement at 1 ("In developing the Plan, the Debtor gave due consideration to various exit

alternatives and engaged in significant discussions and negotiations with representatives of the

Series C Noteholders, the [] Trustee, and other parties in interest."); *id.* at 10 (discussing how the

Debtor, the Trustee, and Weiss and his affiliated entities commenced arm's-length negotiations

that ultimately resulted in the Settlement).)  Therefore, the contributions of the Trustee and the

Series C Noteholders to this chapter 11 case are undeniable.

Exculpation clauses, while similar to third-party releases, are nonetheless different, and

the Second Circuit's ruling in *Purdue* centered solely on the propriety of the latter.  *See In re*

*Chemtura Corp.*, 439 B.R. 561, 610–11 (Bankr. S.D.N.Y. 2010) ("[E]xculpation provisions (and

their first cousins, so-called 'third party releases') are permissible under some circumstances but

not as a routine matter.")  Nonetheless, even if the Court were to consider and apply the *Purdue*

factors to the Exculpation Provision, certain of the factors would weigh in favor of its approval.

*See Purdue*, 69 F.4th at 79 ("Although consideration of each factor is required, it is not

necessarily sufficient—there may even be cases in which all factors are present, but the inclusion

of third-party releases in a plan of reorganization should not be approved.")  As already

discussed, the scope of the Exculpation Provision as to conduct is appropriate since its "breadth"

is limited to specific parties and their actions that relate to the chapter 11 case from the Petition

Date through the Effective Date.  Moreover, the Debtor has represented that, absent the inclusion

of the Exculpation Provision, "the Settlement . . . , an integral part of the Plan, could not be

effected."  (Debtor Reply ¶ 49.)  Additionally, all impaired creditors who were entitled to vote on

the Plan voted unanimously to accept the Plan, including subsection (a) to the Exculpation

Provision.  (*See* Voting Declaration ¶¶ 17–18.)

Regardless, against the backdrop of the substantial contributions of the Trustee and the Series C Noteholders and the Court's determination that the Exculpation Provision and the Exculpated Parties are both appropriate in scope, the Exculpation Provision is proper and does not violate sections 1123(b)(6), 1129(a)(1), and 1129(a)(3).

### C. Heightened Scrutiny is Not Required

Lastly, Goldman also contends that the Court should apply a "heightened scrutiny" standard to both the Settlement and Exculpation Provision because "Weiss is a statutory insider of the Debtor." (Goldman Objection ¶ 51.) In general, "[t]he business judgment rule is not applicable to transactions among a debtor and an insider of the debtor." *In re LATAM Airlines Grp. S.A.*, 2022 WL 272167, at *14 (Bankr. S.D.N.Y. Jan. 28, 2022). Rather, "courts apply a 'heightened scrutiny' test in assessing the *bona fides* of a transaction among a debtor and an insider of the debtor." *Id.* (quoting *In re Bidermann Indus. U.S.A. Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997)). When applying heightened scrutiny, "courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).

However, application of heightened scrutiny here is unnecessary. The Court has already concluded that Weiss possessed the authority to enter into and bind the Operating Entities to the Settlement as set forth in the Settlement Opinion. (*See also* May 15, 2024 Hr'g Tr. at 119:25–120:3 (indicating that the Court did not think it was a "question of heightened scrutiny or the normal business judgment rule standard . . . [as] [t]he LLC agreements give Weiss rights against Goldman and Goldman rights against Weiss.").) Additionally, in light of the Court's finding that

34

Weiss had such authority, subsection (b) to the Exculpation Provision, which provided for the exculpation of Weiss in connection with the Settlement, has been removed.  Therefore, the Court need not apply heightened scrutiny as Goldman contends.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that the Plan, including the Exculpation Provision, satisfy the requirements of 1123(b)(6), 1129(a)(1), and 1129(a)(3).

A separate Order confirming the Plan will be entered.

**IT IS SO ORDERED.**

Dated:   May 29, 2024
         New York, New York

                                          *Martin Glenn*
                                          MARTIN GLENN
                                 Chief United States Bankruptcy Judge