DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Elliot Moskowitz
Chase McReynolds

*Attorneys for Yoel Goldman*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| WYTHE BERRY FEE OWNER LLC, | |
| Debtor. | Case No. 22-11340 (MG) |

<u>**NOTICE OF APPEAL**</u>

<u>**Part 1: Identify the appellant(s)**</u>

1. Name(s) of appellant(s): Yoel Goldman

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding.
\_\_\_Plaintiff
\_\_\_Defendant
\_\_\_Other (describe)_____

For appeals in a bankruptcy case and not in an adversary proceeding.
\_\_\_Debtor
\_\_\_Creditor
\_\_\_Trustee
_×_ Other (describe): <u>Party in interest</u>

**Part 2: Identify the subject of this appeal**

1. Describe the judgment, order, or decree appealed from:

This appeal is from the Memorandum Opinion and Order Approving the Settlement With Zelig Weiss (Dkt. #369) (attached as Exhibit A), the Memorandum Opinion Approving the Disclosure Statement and Confirming the Fourth Amended Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC (Dkt. #370) (attached as Exhibit B), and Findings of Fact, Conclusions of Law, and Order Approving the Disclosure Statement and Confirming the Fourth Amended Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC (Dkt. #371) (attached as Exhibit C).

2. State the date on which the judgment, order, or decree was entered:

May 29, 2024.

**Part 3: Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys (attach additional pages if necessary):

| **Parties** | |
|---|---|
| Wythe Berry Fee Owner LLC, Debtor | Stephen Selbst |
| Wythe Berry Member LLC | Janice Goldberg |
| YG WV LLC | Herrick, Feinstein LLP |
| | 2 Park Avenue, NY, NY 10016 |
| | (212) 592-1400 |
| | |
| Zelig Weiss | Nicholas Bassett |
| | Paul Hastings LLP |
| | 875 15th St. N.W., Washington, DC 20005 |
| | (202) 551-0402 |
| | |
| Mishmeret Trust Company Ltd. | Maya Ben Meir |
| | Amnon Biss |
| | Gornitzky & Co. |
| | 20 Haharash Street |
| | Tel Aviv, Israel 6761310 |
| | |
| AYH Wind Down LLC | Michael Friedman |
| | Helena Hong |
| | Chapman & Cutler LLP |
| | 1270 Avenue of the Americas |
| | New York, NY 10020 |
| | (212) 655-6000 |
| | |
| | Eric Silvestri |
| | Chapman & Cutler LLP |

|                                              | 320 South Canal Street, 27th Floor<br>Chicago, IL 60606<br>(312) 845-3000 |
| -------------------------------------------- | ------------------------------------------------------------------------- |
| Wythe Berry LLC, The William Vale Hotel LLC, The William Vale FNB LLC, North 12 Parking LLC, Espresso Hospitality Management LLC | Jon S. Brooks<br>Abramson Brooks LLP<br>1051 Port Washington Boulevard, Suite 322<br>Port Washington, NY 11050<br>(516) 455-0215 |
| William Vale Owner LLC, WB Hotel LLC, WB Operations LLC, WB FNB LLC | Michael G. Farag<br>Gibson, Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071<br>(213) 229-7000 |
|                                              | Keith R. Martonara<br>Harry R. Silvera<br>Gibson, Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, NY 10166<br>(212) 351-4000 |
| Office of the NYS Attorney General           | Leo V. Gagion<br>Attorney for NYS Department of Taxation and Finance<br>28 Liberty Street<br>New York, NY 10005<br>(800) 771-7755 |

## Part 4: Optional election to have appeal heard by District Court (applicable only in certain districts)

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(l), a party elects to have the appeal heard by the United States District Court. If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below. Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

☐ Appellant(s) elect to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

**Part 5: Sign below**


Dated:   New York, New York
           June 12, 2024

                                        By:   */s/ Elliot Moskowitz*
                                        Elliot Moskowitz
                                        Chase McReynolds


                                        DAVIS POLK & WARDWELL LLP
                                        450 Lexington Avenue
                                        New York, New York  10017
                                        (212) 450-4000

                                        *Attorneys for Yoel Goldman*

**<u>Exhibit A</u>**

Memorandum Opinion and Order Approving the Settlement With Zelig Weiss
(Dkt. #369)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | **FOR PUBLICATION** |
| WYTHE BERRY FEE OWNER LLC | Case No. 22-11340 (MG) |
| Debtor. |  |

**MEMORANDUM OPINION AND ORDER**
**APPROVING THE SETTLEMENT WITH ZELIG WEISS**

*A P P E A R A N C E S :*

HERRICK, FEINSTEIN LLP
*Attorneys for the Debtor*
2 Park Avenue
New York, NY 10016
By:     Stephen B. Selbst, Esq
          Janice Goldberg, Esq.
          Roya Imani, Esq.
          Avery S. Mehlman, Esq.
          Rodger T. Quigley, Esq.
          Meaghan Roe, Esq.
          Steven B. Smith, Esq.

ABRAMSON BROOKS LLP
*Attorney for Wythe Berry LLC*
1051 Port Washington Boulevard
Suite 322
Port Washington, NY 11050
By:     Jon S. Brooks, Esq.

PAUL HASTINGS LLP
*Attorneys for Zelig Weiss*
875 15th Street, N.W.
Washington, DC 20005
By:     Nicholas A. Bassett, Esq.

GORNITZKY & CO.
*Attorneys for Notes Trustee*
20 Haharash Street
Tel Aviv, Israel 6761310
By:    Maya Ben Meir, Esq.
       Amnon Biss, Esq.


CHAPMAN AND CUTLER LLP
*Attorneys for Notes Trustee/Plan Administrator for Wind Down Co.*
1270 Avenue of the Americas
New York, NY 10020
By:    Michael Friedman, Esq.
       Helena Honig, Esq.

320 South Canal Street
27th Floor
Chicago, IL 60606
By:    Eric Silvestri, Esq.


GORDON REES SCULLY MANSUKHANI, LLP
*Attorneys for Schimenti Construction*
One Battery Park Plaza
28th Floor
New York, NY 10004
By:    Jacob C. Cohn, Esq.


GIBSON, DUNN & CRUTCHER LLP
*Attorneys for William Vale Owner LLC*
333 South Grand Avenue
Los Angeles, CA 90071
By:    Michael G. Farag, Esq.


200 Park Avenue
New York, NY 10166
By:    Keith R. Martorana, Esq.
       Harry R. Silvera, Esq.

DAVIS POLK & WARDWELL LLP
*Attorneys for Yoel Goldman*
450 Lexington Avenue
New York, NY 10017
By:     Chase McReynolds, Esq.
        Elliot Moskowitz, Esq.


OFFICE OF THE NYS ATTORNEY GENERAL
*Attorneys for NYS Department of Taxation and Finance*
28 Liberty Street
New York, NY 10005
By:     Leo V. Gagion, Esq.


**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Settlements are welcome in bankruptcy because they prevent costly litigation between parties and contribute to the efficient administration of the bankruptcy estate. *See e.g.*, *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir.1996); *In re MF Glob. Inc.*, 466 B.R. 244, 247 (Bankr. S.D.N.Y. 2012). However, a settlement must be fair, equitable, and in the best interest of the estate to be approved by a bankruptcy court. *See, e.g.*, *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968); *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007); *Air Line Pilots Assoc. v. Am. Nat'l Bank & Trust Co. of Chi. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd,* 17 F.3d 600 (2d Cir. 1994). And, even more fundamentally, parties entering a settlement must have the requisite authority to bind their side to the compromise. The settlement at issue here is proper on both fronts.

On April 21, 2024, Wythe Berry Fee Owner LLC (the "Debtor") filed a motion for entry of an order approving the global settlement (as amended, the "Settlement") pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Motion," ECF Doc. # 304). The

3

Debtor annexed a copy of the settlement agreement (the "Settlement Agreement") as Exhibit A to the Motion, and submitted the declaration of Assaf Ravid (the "First Ravid Declaration") in support of the Motion as Exhibit B.  On May 10, 2024, the Debtor filed a revised settlement agreement (the "Revised Settlement Agreement," ECF Doc. #341.)[1]  The Revised Settlement Agreement is between the Debtor, WB Hotel LLC ("Hotel Sub"), WB Operations LLC ("Op Sub"), WB FNB LLC ("FNB Sub"), YG WV LLC ("YG WV"), Wythe Berry Member LLC ("Member"), AYH Wind Down LLC ("Wind Down"), Wythe Berry LLC ("WB"), The William Vale Hotel LLC ("WV Hotel"), The William Vale FNB LLC ("WV FNB"), North 12 Parking LLC ("Parking"), Espresso Hospitality Management LLC ("Espresso"), Zelig Weiss ("Weiss"), TWV Domain LLC ("Domain"), The William Vale Staffing LLC ("Staffing"), and Mishmeret Trust Company Ltd., solely in its capacity as Trustee of the Series C Notes (the "Trustee," and collectively, the "Parties").  Notably, on May 10, 2024, the Debtor filed the *Third Amended Plan of Reorganization of Wythe Berry Fee Owner LLC* (the "Third Amended Plan," ECF Doc. # 340).  Later, on May 20, 2024, the Debtor filed the Fourth Amended *Plan of Reorganization of Wythe Berry Fee Owner LLC* (the "Fourth Amended Plan," ECF Doc. # 364.)

On May 8, 2024, Yoel Goldman ("Goldman") filed an objection to the *Second Amended Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC* and the Motion (the "Goldman Objection," ECF Doc. # 330).  The Goldman Objection is supported by the declaration of Elliot Moskowitz, Esq. (the "Moskowitz Declaration," ECF Doc. # 331).  Thereafter, Weiss filed a reply to the Goldman Objection (the "Weiss Reply," ECF Doc. # 351).  The same day, the Debtor filed a reply to the Goldman Objection (the "Debtor Reply," ECF Doc. # 352), which is supported by the declaration of Assaf Ravid (the "Ravid Reply Declaration,"

---

[1]      The Debtor did not file a revised Motion with the Revised Settlement Agreement.

ECF Doc. # 354).[2]  The Court held a hearing on the Motion, and a combined hearing on the

Disclosure Statement and confirmation of the Plan, on May 15, 2024 (the "Hearing").

For the reasons explained below, the Court **GRANTS** the relief requested in the Motion

and approves the Settlement.  Concurrent with the entry of this Opinion, the Court will enter a

separate Opinion confirming the Fourth Amended Plan.  In addition, the Court will also enter the

*Findings of Fact, Conclusions of Law, and Order Approving the Modified Disclosure Statement*

*and Confirming the Modified Chapter 11 Plan of Wythe Berry Fee Owner LLC* (the "Disclosure

Statement and Confirmation Order").

## I.    BACKGROUND

### A.  Relevant Case History

The facts below, unless otherwise noted, are derived from supporting documentation as

cited.

### 1.  The Involuntary Chapter 11 Filing

On October 6, 2022 (the "Petition Date"), the Trustee, Yelin Lapidot Provident Funds

Management Ltd., The Phoenix Insurance Company Limited and Klirmark Opportunity Fund III

L.P. filed an involuntary chapter 11 petition against the Debtor (the "Involuntary Filing," ECF

Doc. # 1.)  Following a hearing on the Involuntary Filing on January 17, 2023, the Court denied

Weiss's Motion to Dismiss and entered an Order for Relief against the Debtor on January 18,

2023.  (ECF Doc. # 58.)

The Debtor remains in possession of its property and continues to operate and manage its

business as debtor-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.

---

[2]      A prior version of the Ravid Reply Declaration was filed at ECF Doc. # 353 but omitted copies of the
exhibits referenced.

(Motion ¶ 9.)  No trustee, examiner, or statutory committee of creditors has been appointed in this chapter 11 Case.  (*Id.*)

### 2.  The Debtor and the Lease Agreement

The Debtor owns the commercial real property complex located at 55 Wythe Avenue, Brooklyn, New York (the "WV Complex"), comprised of The William Vale Hotel, office and retail space, and parking.  (*Id.* ¶¶ 1, 11.)  The Debtor is owned by its sole member, Member.  (*Id.* ¶ 11.)  In turn, Member is co-owned equally by YG WV and Weiss, with each holding 50% of the membership interests.  (*Id.*)  YG WV is the managing member of Member, and YG WV sits below Wind Down as its wholly owned subsidiary.  (*Id.*)  Notably, Wind Down is the successor entity to All Year Holdings Limited ("All Year"), which was the debtor that confirmed a plan of reorganization in a separate chapter 11 case in this Court.  (*Id.*)

The WV Complex was leased to WB until May 20, 2021.  (*Id.* ¶ 12.)  However, WB stayed in possession of the WV Complex by first holding over and then securing a use and occupancy order from the New York Supreme Court, extending its possession through October 31, 2023.  (*Id.*)  On August 16, 2023, the Court entered an order approving a stipulation amending the initial cash collateral order, which provided for, among other things: "(i) WB to remain in possession of the WV Complex through January 31, 2024; (ii) the right of the Debtor or WB to give notice (an "Early Vacate Notice") of an intent to terminate the occupancy of the WV Complex by WB at the end of any calendar month, which would entitle WB to receive a *pro rata* refund of a $7.5 million use and occupancy payment made by WB in August 2023; and (iii) WB to provide transition services and information if it surrendered possession of the WV Complex prior to January 31, 2024."  (*Id.*)

On September 29, 2023, WB provided the Early Vacate Notice, and the Debtor assumed operational control of the WV Complex on November 1, 2023.  (*Id.* ¶ 13.)

### 3.   Prior Ownership Structure and the 2017 Refinancing

WB originally owned the WV Complex.  (*Id.* ¶ 14.)  WB is co-owned equally by Weiss and Goldman, both of which are Class A Members holding 50% interest.  (*Id.*)  The WB operating agreement (as amended, the "WB Operating Agreement," ECF Doc. # 354-5) designates Weiss as the "Managing Member" of WB, who is "responsible for the management of the business and affairs of [WB] . . . ."  (WB Operating Agreement at 37.)

In February 2017, WB refinanced its existing mortgage debt and formed the Debtor. (Motion ¶ 15.)  Thereupon, WB transferred the title of the WV Complex to the Debtor who then leased the WV Complex back to WB pursuant to that certain Lease Agreement dated and effective as of February 28, 2017 (the "Lease") for a period of 15 years.  (*Id.*; *see also* Revised Settlement Agreement at 1.)

The Debtor borrowed $166,320,000 from All Year (the "Mortgage Loan") to refinance its existing mortgage debt, which was secured by a mortgage on the WV Complex (the "Mortgage").  (Motion ¶ 16.)  The Lease transaction contemplated rent payable to the Debtor that would allow the Debtor to make Mortgage payments and provide All Year the necessary funds to make payments due under the Series C Notes issued by All Year in the original principal amount of NIS 617,970,000 pursuant to a Deed of Trust dated February 19, 2017 between All Year and the Trustee.  (*Id.*; *see also* Revised Settlement Agreement at 1.)  Notably, the Debtor executed a Guaranty of Payment in connection with the issuance of the Series C Notes, which guaranteed to All Year, in relevant part, the "prompt payment and performance of

all debts, obligations, and liabilities [of All Year] . . . under the Bond Documents . . . and any and all sums of money under the provisions of the Deed of Trust." (Motion ¶ 16.)

### 4. All Year and WB Defaults

In November 2020, All Year, while under Goldman's control, defaulted on its payment obligations under another series of notes it had issued, which triggered cross-defaults under the Series C Notes and the Mortgage Loan. (*Id.* ¶ 17.) On February 1, 2021, WB failed to make a rent payment under the Lease, which in turn caused the Debtor to fail on its payment to All Year on the Mortgage Loan, and ultimately left All Year with insufficient funds to pay its obligations toward the Series C Notes. (*Id.* ¶ 18.)

All Year entered into a forbearance agreement with the Trustee and assigned the Mortgage and Mortgage Loan to the Trustee on March 16, 2021, as part of the agreement. (*Id.* ¶ 19.) Notably, following the transactions under the forbearance agreement, the Trustee held a secured claim against the Debtor.

### 5. Termination of the Lease and the Adversary Proceeding

On May 5, 2021, the Debtor provided WB with a Notice of Default under the Lease. (*Id.* ¶ 20; *see also* Case. No. 23-01012, ECF Doc. #45 at 7.) However, WB failed to cure the defaults, and the Debtor followed with a Notice of Cancellation and Termination of Lease on May 20, 2021. (Motion ¶ 20.) Nevertheless, WB neither paid the rent nor surrendered the WV Complex and continued to operate the business. (*Id.*)

Later, on June 11, 2021, the Debtor filed a complaint in New York Supreme Court (the "State Court"), Kings County, against WB, Weiss, and Goldman.[3] (*Id.* ¶ 21.) The State Court entered an order (the "U&O Order") requiring WB to make semiannual payments to the Debtor

---

[3]      *See Wythe Berry Fee Owner LLC v. Wythe Berry LLC et al.*, Index No. 514152/2021 (NY. Sup. Ct. Kings Cty. 2021) [hereinafter, the "Rent Action"].

for use and occupancy in the amount of $7.5 million on the same schedule for payments as established under the Lease. (*Id.*)

In February 2023, the Debtor removed the Rent Action from the State Court to the U.S. District Court for the Southern District of New York, and the case was later removed to this Court as Adversary Proceeding Case No. 23-01012 (the "Adversary Proceeding"). On August 23, 2023, the Debtor filed the *Motion for Partial Summary Judgment as to Liability Against Defendant Wythe Berry LLC.* (Adversary Proceeding, ECF Doc. # 30.) Following a hearing, the Court granted partial summary judgment, concluding, among other things, that the Debtor had effectively terminated the Lease on May 20, 2021 (the "Partial SJ Decision," Adversary Proceeding, ECF Doc. 45 at 41.) The Court, however, did not make a determination with respect to damages, or Weiss and Goldman's liability related to the Debtor's guaranty claims. (Motion ¶ 22; *see generally* Partial SJ Decision.)

### B. The Revised Settlement Agreement[4]

Following extensive, arms-length negotiations, the Parties arrived at the Revised Settlement Agreement. The primary terms of the Revised Settlement Agreement are as follows:

| Term | Description |
|---|---|
| **Cash Settlement Payment** | WB shall pay to the Debtor an amount equal to not less than $8,512,152 (the "Cash Settlement Payment") in three installments: The initial installment shall be made on the Effective Date, on which date WB shall pay to the Debtor an amount equal to $7,705,076, which payment shall be in the form of (i) cash in the amount of $4,220,731 and (ii) the retention by the Debtor of a portion of the [$7.5 million payment from WB to Debtor made on or about August 2, 2023 (the "August U&O Payment"] in the amount of $3,484,346 (such amount equal to $3.75 million minus all transition reconciliation amounts aggregating $265,654 that are credited to the Debtor pursuant to the Cash Collateral Stipulation) in lieu of |

---

[4]    Capitalized but undefined terms shall have the meaning ascribed to such terms in the Revised Settlement Agreement.

| | |
|---|---|
| | reimbursing such amount to WB pursuant to the Cash Collateral Stipulation.  (For the avoidance of doubt, the transition reconciliation amounts aggregating $265,654 deducted from the August U&O Payment shall be retained by the Debtor and shall not be part of the Cash Settlement Payment described herein.)  The second installment shall be made in the form of the transfer by [WV Hospitality LLC "Hospitality"] to the Debtor of the full amount of the ERTC in an amount not less than $726,000, provided that, to the extent the ERTC received by Debtor exceeds $726,000, such excess amount shall be transferred to Espresso in accordance with section 4(b) [of the Revised Settlement Agreement].  In the event that, notwithstanding the Direction Letter (as defined below), Hospitality transfers any portion of the ERTC to WV FNB rather than to the Debtor, WV FNB shall transfer such portion of the ERTC to the Debtor promptly upon receipt of the ERTC from Hospitality.  The third installment shall be made in the form of a transfer by WV Hotel of the refund of a portion of prepaid Workers' Compensation Insurance in the amount of $81,075 (the "WC Refund Payment"), which transfer shall be made promptly upon WV Hotel's receipt of the WC Refund Payment. |
| **Employee Retention Tax Credit ("ERTC")** | WV FNB has advised the Debtor that, pursuant to that certain Award dated March 11, 2024 in the Hospitality Arbitration[5], Hospitality is obligated to pay WV FNB the ERTC that will be paid by the Internal Revenue Service to Hospitality.  On the Effective Date, WV FNB shall send Hospitality an executed version of the Direction Letter in the form annexed [to the Revised Settlement Agreement] as Exhibit B, pursuant to which WV FNB shall direct Hospitality (i) to notify WV FNB, Espresso and the Debtor promptly when Hospitality receives payment of the ERTC and which form shall include a confirmation by Hospitality of such direction, and (ii) to promptly transfer directly to the Debtor the full amount of the ERTC received by Hospitality; provided however that to the extent the ERTC received by the Debtor exceeds $726,000 (the "Excess ERTC Amount"), the Debtor shall promptly transfer to Espresso, in full and final satisfaction of the Arbitration Success Fee, the Excess ERTC Amount.. |
| **Non-Cash Settlement Payment** | On the Effective Date, WV Hotel shall irrevocably surrender, assign and transfer, and Hotel Sub shall irrevocably assume and accept, all right, title and interest in and to the following social media accounts associated with the William Vale Hotel: (i) Instagram "@thewilliamvale"; (ii) YouTube "@thewilliamvale9284"; (iii) TikTok "thewilliamvale"; (iv) X f/k/a Twitter: "@thewilliamvale"; (v) Facebook "The William Vale"; and |

---

[5]     The Hospitality Arbitration refers to that certain arbitration proceeding pending between WV FNB and Hospitality, captioned *In the Matter of the Arbitration between The William Vale FNB LLC v. WV Hospitality LLC*, AAA No. 01-23-000-3943.

|  | (vi) Pinterest "The William Vale" (collectively, the "Social Media Accounts").  WV Hotel acknowledges and agrees that all usernames, administrator accounts, and passwords associated with the foregoing Social Media Accounts have been provided to Hotel Sub and are currently in the possession of the William Vale Hotel's Director of Marketing.  WV Hotel further acknowledges and agrees that on and after the Effective Date, WV Hotel shall not make any use, either for its own benefit or for the benefit of any other person or entity, of the Social Media Accounts, including but not limited to all content created and posted thereon and/or thereunder, and that Hotel Sub shall have the exclusive right to use and/or to otherwise transfer the Social Media Accounts.  The value attributable to the Social Media Accounts is $45,000. |
|---|---|
| **Internet Domain** | On the Effective Date, the Debtor shall purchase from WV Hotel all right, title and interest in and to the internet domain for the William Vale Hotel, "www.thewilliamvale.com," and any goodwill associated therewith (collectively, the "Domain Name") for the purchase price of $1.3 million (the "Domain Purchase Price") by entering into that certain Domain Name Purchase and Transfer Agreement in the agreed form annexed [to the Revised Settlement Agreement] as Exhibit C. As directed jointly by the members of WV Hotel, the Debtor shall distribute the Domain Purchase Price as follows: 50% shall be paid to Weiss (or as otherwise directed by Weiss) and 50% shall be paid to Yoel Goldman (or as otherwise directed by Yoel Goldman).  For the avoidance of doubt, each of WB, WV Hotel, WV FNB, Parking, Espresso and Staffing represent and warrant that, to the extent, if any, it has, had or ever had any rights, title and interest in or to the existing content on the website associated with the Domain Name, it waives all rights, title and interest in and to the existing content on the website associated with the Domain Name. |
| **Consulting Services Payment** | On the Effective Date, the Debtor shall pay Espresso $200,000 in consideration for consulting services that have been rendered by Espresso to the Debtor in implementing the transition of the operation, direction, management, and supervision of the William Vale Hotel for the period that commenced as of September 30, 2023 through the Execution Date of the Consulting Services Agreement between the Debtor and Espresso in the agreed form annexed [to the Revised Settlement Agreement] as Exhibit D. |
| **Mechanics' Lien Claims** | Notwithstanding anything to the contrary in the Cash Collateral Stipulation, the Debtor shall be responsible to pay 100% of all amounts paid to settle, extinguish and/or satisfy the claims, including without limitation, all legal fees and expenses incurred by the Debtor in connection with such claims (collectively, the "Mechanic Lien Claims" and each individually a "Mechanic Lien Claim") of: (i) D and J Industries LLC (Claim No. 2); (ii) JSP Electrical Contracting |

| | |
|---|---|
| | Corp (Claim No. 5); (iii) Schimenti Construction Company LLC (Claim No. 6); and (iv) Ziba Construction Inc. dba 212Carpet (Claim No. 7) in the Chapter 11 Case. The aggregate amounts set forth in each of the proofs of claim evidencing the Mechanic Liens is referred to [in the Revised Settlement Agreement] as the "ML Aggregate Proof of Claim Amount." The Debtor further agrees that it shall not settle or compromise any Mechanic Lien Claim without the unanimous written consent of the members of Member, which consent shall not be unreasonably withheld, conditioned or delayed. To the extent the Mechanic Lien Claims are not settled, extinguished and/or satisfied prior to the effective date of the First Amended Plan (the "Plan Effective Date"), the Debtor will retain in escrow the amounts necessary to satisfy such Mechanic Lien Claims and all remaining Lien Defense Funds (collectively, the "ML Escrow"). |
| **Unfair Labor Practice Claim** | The Debtor shall be responsible to pay 100% of all amounts paid to settle, extinguish and/or satisfy the claims, including without limitation, all legal fees and expenses incurred by the Debtor in connection with such claims, pending before the National Labor Relations Board as follows: (i) The William Vale Staffing, LLC and Hotel And Gaming Trades Council, AFL-CIO, Case No. 29-RC-200927, commenced August 5, 2022 which seeks to certify a unit of employees including all full-time and regular part-time housekeeping employees for collective bargaining purposes; and (ii) The William Vale Staffing, LLC and Hotel and Gaming Trades Council, AFL-CIO, Case No. 29-CA-31397, commenced November 9, 2023, which asserts unfair labor practices in violation of the National Labor Relations Act (together, the "Unfair Labor Claim"). The Debtor further agrees that it shall not settle or compromise any Unfair Labor Claim without the unanimous written consent of the members of Member, which consent shall not be unreasonably withheld, conditioned or delayed. To the extent the Unfair Labor Claim is not settled, extinguished and/or satisfied prior to the Plan Effective Date, the Debtor will retain in escrow the amounts necessary to satisfy such Unfair Labor Claim (the "UL Escrow" and, together with the ML Escrow, the "Debtor Contingent Liabilities Escrow"). |
| **Liquor License Transfer** | On and after the Effective Date, Weiss, in his capacity as Managing Member of WV Hotel and WV FNB, shall cause WV Hotel and/or WV FNB, as applicable to cooperate with all commercially reasonable requests of FNB Sub and take such commercially reasonable actions as are necessary to (i) submit a liquor license transfer application on behalf of FNB Sub to the New York State Liquor Authority (the "SLA") and (ii) effectuate the transfer of the liquor license for the WV Complex from WV FNB to FNB Sub. Such cooperation shall include, but not be limited to: |

1. <u>FF&E Agreement.</u>  The Parties acknowledge that on February 8, 2024, WV FNB as Seller and FNB Sub as Buyer entered into that certain FF&E Purchase and Sale Agreement (the "FF&E Agreement"), and the Parties agree that such FF&E Agreement is and shall be considered part of the good and valuable consideration exchanged by the Parties under this Agreement.

2. <u>Deposit Accounts.</u>  On the Effective Date, (i) WV FNB shall open bank account in its name at Flagstar Bank and (ii) WV Hotel shall open a bank account in its name at Flagstar Bank (collectively, the "Deposit Accounts").  Each of the Deposit Accounts shall be subject to a deposit account control agreement (each, a "DACA") in a form reasonably acceptable to each of Debtor, Trustee, WV FNB, FNB Sub, WV Hotel, Hotel Sub and Op Sub.  On April 22, 2024, the Debtor filed a motion with the Bankruptcy Court to approve the Second Cash Collateral Stipulation, to further modify certain provisions of the Initial Cash Collateral Order and reflect certain agreements among the Debtor, FNB Sub, Hotel Sub, WV FNB, WV Hotel and the Trustee with respect to all revenues generated by the Debtor's operation of the WV Complex during the period from the Petition Date through the date on which the SLA issues a temporary liquor license to FNB Sub (the "DACA Funds").  The Parties agree that, pursuant to the DACAs, from and after the Effective Date, the Debtor shall be entitled to direct Flagstar Bank to administer the DACA Funds in the Deposit Accounts for any purpose in the Debtor's sole discretion, including without limitation, (a) from and after the Effective Date, to direct Flagstar Bank to transfer all or any portion of the DACA Funds to fund or satisfy its obligations with respect to the payment described in Section 4(c) herein and the payment described in Section 4(d) [in the Revised Settlement Agreement]; and (b) on the Plan Effective Date, to direct Flagstar Bank to transfer all or any portion of the DACA Funds to fund or satisfy its obligations with respect to the payment of the equity distribution described in Sections 3(b) and its obligations under sections 4(b), 4(d), 4(e), 4(f) and 4(g) [in the Revised Settlement Agreement].  Notwithstanding the foregoing, the Parties agree that neither WV FNB nor WV Hotel, nor their respective Managing Members and/or Members, shall be liable for any damages, losses, penalties or fees arising in connection with the DACA Funds, including the deposit of the DACA Funds into the Deposit Accounts or the distribution of the DACA Funds from the Deposit Accounts.  The Debtor shall indemnify each of WV FNB, WV Hotel, and their respective Managing Members and Members for any such damages, losses, penalties or fees.

| | |
|---|---|
| | 3. Liquidator's Permit.  On the Effective Date, WV Hotel and WV FNB shall deliver a completed Application for Liquidator's Permit to FNB Sub.

4. Liquor License Surrender.  On the date that the SLA issues a temporary liquor license to FNB Sub, WV Hotel and WV FNB shall complete the petition for surrender found on the reverse side of the liquor license certificate (the "Petition for Surrender"). |
| **Member Distribution** | . . . [T]he Debtor shall make an initial distribution to Member, in its capacity as the sole member of the Debtor, on the Plan Effective Date, in the amount of $2,127,107 (the "Initial Member Distribution"), and an additional distribution to Member (the "Contingent Member Distribution") in such amount, if any, equal to (i) (x) the positive difference, if any, between the [Mechanics Lien] Aggregate Proof of Claim Amount . . . and the aggregate amount of such claims ultimately Allowed by the Bankruptcy Court (the "Aggregate ML Allowed Amount"), plus (y) the positive difference, if any between the amount set aside by Debtor (as agreed by all Parties [in the Revised Settlement Agreement]) for legal fees and expenses (the "Lien Defense Funds") to defend the Mechanic Lien Claims . . .and the amount of such fees and expenses actually expended by the Debtor, plus (z) the positive difference, if any, between $700,000 and the settled, extinguished and/or satisfied Unfair Labor Claim . . .and/or (ii) if the Mechanic Lien Claims or the Unfair Labor Claim (collectively, referred to [in the Revised Settlement Agreement] as the "Contingent Liabilities") are not settled, resolved or Allowed on or before the Plan Effective Date, such amount as remains in the Debtor Contingent Liabilities Escrow (as defined below) after resolution and satisfaction in full of the Mechanic Lien Claims, including, for the avoidance of doubt, the Lien Defense Funds deposited in such escrow by Debtor remaining after payment of all legal fees and expenses incurred in connection therewith, which distribution shall be made promptly following resolution of the Contingent Liabilities. For the avoidance of doubt, other than the First Member Distribution and the Contingent Member Distribution, Member shall not be entitled to any other distributions under the First Amended Plan on account of its equity interest in the Debtor.  Notwithstanding anything to the contrary set forth [in the Revised Settlement Agreement], in the event the First Amended Plan is not consummated, (i) the Debtor (A) shall retain funds in the amount equal to the Initial Member Distribution, (B) shall preserve all and any funds remaining, if any, in the Debtor Contingent Liabilities Escrow, and (C) shall not use such funds for any purpose absent the unanimous consent of the members of Member, (ii) the distributions to Member set forth [in the Revised Settlement Agreement] (including the Initial Member Distribution and, to the extent funds remain in the Debtor Contingent Liabilities Escrow, the Contingent Member Distribution) |

| | |
|---|---|
| | shall be included in any future plan of reorganization filed by the Debtor in the Debtor's bankruptcy proceeding, and (iii) the Debtor shall not file or support any plan of reorganization that does not provide for the distributions to Member set forth herein. |
| **Distribution of Amounts Received by Member** | On the Plan Effective Date, YG WV shall cause Member to make an equity distribution to Weiss, in his capacity as 50% member of Member, of the Initial Member Distribution received by Member under paragraph 3(b) of [the Revised Settlement Agreement]. As to the Contingent Member Distribution, if any, whether made on or after the Plan Effective Date, YG WV shall cause Member to make an immediate equity distribution of such distribution to each member of Member, in accordance with their pro rata ownership percentages of Member. |
| **Termination of Lease Agreement** | On the Effective Date, the Debtor and WB shall execute the Memorandum of Termination of Lease retroactive to May 20, 2021 substantially in the form annexed [to the Revised Settlement Agreement] as Exhibit E and the Debtor shall record it in the ACRIS system for Kings County, New York. |
| **Releases** | [The Releases are summarized as below in the Settlement Agreement. The complete Releases can be found at section 5 of the Revised Settlement Agreement.] |
| | Subject to obligations imposed by the Settlement, the Settlement provides for various general releases, specifically: |
| | Weiss, in his individual capacity, along with any of his partners, agents, employees, heirs, counsel, financial advisors, representatives, successors, and assigns, and all persons acting through, under, or in concert with any of them, (the "Weiss Releasors/Releasees") release any claims against: each of the Debtor, Hotel Sub, Op Sub, FNB Sub, Member, and YG WV (the "Debtor Releasors/Releasees"); and the Trustee. |
| | Each of WB, WV Hotel, WV FNB, Parking, Espresso, Domain and Staffing (the "WB Releasors/Releasees") release any claims against the Debtor Releasees and the Trustee. |
| | The Debtor Releasors/Releasees release any claims against the Weiss Releasors/Releasees and the WB Releasees. |
| | The Trustee releases the Weiss Releasees, the WB Releasees. |
| | The Parties shall be exculpated from liability in connection with the Settlement under the Plan. |

### C.  The Motion

Through the Motion, the Debtor seeks entry of an order approving the Settlement. (Motion ¶ 27.)  The Debtor notes that since the start of the chapter 11 case, it has aimed to either "(i) negotiate a resolution of the Adversary Proceeding; or (ii) sell the WV Complex pursuant to a court supervised process."  (Motion ¶ 23.)  And after extensive, hard-fought negotiations, the Parties have arrived at a compromise.

The Debtor submits that the Settlement satisfies each of the *Iridium* Factors (defined below).  *See In re Iridium Operating LLC*, 478 F.3d at 462.  First, the Debtor emphasizes that the Settlement offers the Debtor "numerous tangible and intangible benefits" and is in the best interests of creditors.  (Motion ¶¶ 32, 37.)  Specifically, these benefits include (i) the $8 million settlement payment from WB; (ii) the needed cooperation to efficiently transfer the WV Complex, including, for example, the provision of certain transition services, the transfer of the liquor license, and the purchase of the internet domain and social media accounts; (iii) the avoidance of litigation and the mitigation of uncertainty and costs; and (iv) greater recoveries for creditors.  (*Id.* ¶¶ 33–36.)

*Second*, the Debtor emphasizes that the Settlement avoids continued litigation of the Adversary Proceeding, potential additional litigation relating to the Adversary Proceeding, and litigation over liability for mechanic's lien obligations that would otherwise be lengthy and expensive.  (*Id.* ¶ 38.)

*Third*, the Settlement has the support of the Debtor, the Trustee, WB, and the other settlement Parties.  (*Id.* ¶ 39.)

*Fourth*, the Debtor maintains that the "nature and breadth" of the releases in the Settlement are "fair and reasonable under the circumstances" as they were necessary to induce the Parties to enter into the Settlement and otherwise provide certainty and finality.  (*Id.* ¶ 40.)

Similarly, the Debtor states that the exculpation provision is also "reasonable, appropriate, and in the best interests of the estate." (*Id.*)

*Fifth*, the Debtor notes that the terms of the Settlement Agreement were "intensely negotiated" and were reached in good faith and following arms-length negotiations. (*Id.* ¶ 41.) The Parties were also represented by experienced and sophisticated counsel. (*Id.*)

### D.  The Goldman Objection

Goldman opposes the *Second Amended Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC* (the "Second Amended Plan," ECF Doc. # 306) and the Motion on several grounds.[6]

*First*, Goldman argues that the Settlement conveys his property without his consent in violation of orders issued by the American Arbitration Association ("AAA") panel that remain in effect and the operating agreements of WB, the WV Hotel, Parking, and the WV FNB (collectively, the "Operating Entities"). (Goldman Objection ¶¶ 34–44.)  The AAA panel orders relate to the arbitration (the "Arbitration") Goldman commenced against Weiss and the Operating Entities based on Weiss's alleged violations of his fiduciary and contractual duties.[7]  (*Id.* ¶ 21.) The Arbitration is currently stayed. (*Id.*)  Additionally, Goldman alleges that the Settlement allows Weiss to use property Goldman owns to pay for the Settlement and ultimately deprives him of any recourse for these actions. (*Id.* ¶ 44.)

Goldman believes that, as 50% owner of the Operating Entities, he is entitled to any proceeds stemming from operations or the sale of assets. (*Id.* ¶ 34.)  He indicates that entering

---

[6]    The Goldman Objection specifically objects to the Second Amended Plan and the Settlement Agreement. However, the Debtor has filed revised versions of each document.  *See Fourth Amended*; *see also* Revised Settlement Agreement.  Goldman has not filed a further objection to the Fourth Amended Plan or the Revised Settlement Agreement.  The Court nevertheless considers each of Goldman's objections as to the current operative Plan.

[7]    The Arbitration is captioned *Goldman v. Weiss*, AAA No. 01-23-0001-2090.

the Settlement involves "Major Decisions" that, under the operating agreements for the

Operating Entities, would require joint written approval by Goldman and Weiss. (*Id.* ¶ 36.)

However, Goldman maintains that Weiss is "engaging in unilateral Major Decisions" and making

impermissible transfers out of the Operating Entities' accounts in violation of the AAA panel's

standing injunctions. (*Id.* ¶ 37.) Therefore, Goldman concludes that the approval of the

Settlement along with the release of conduct via the Second Amended Plan's exculpation clause

would permit Weiss to enter into agreements with Weiss's affiliates with a disproportionate

impact to Goldman. (*Id.* ¶ 35.) Goldman also believes that Weiss is diverting value that belongs

equally to Goldman through the following means: (i) circumstances surrounding the domain

name and its ownership (*id.* ¶¶ 38–39); (ii) lack of disclosure over the agreement underlying the

transfer of the liquor license, furnishings, equipment and the related sale price (*id.* ¶ 40);

(iii) lack of details concerning the consulting services that justify the $200,000 payment to

Espresso (*id.* ¶ 41); and (iv) the Initial Member Distribution (*id.* ¶ 42).

    *Second*, Goldman argues that the Settlement Agreement and the exculpation provision in

the Second Amended Plan violate section 1129(a)(3) of the Bankruptcy Code as they were not

proposed in good faith and are otherwise unlawful for reasons already discussed. (*Id.* ¶ 47.)

Goldman indicates that the Debtor excluded him from any negotiations and only contacted him

after finalizing the agreement with Weiss. (*Id.* ¶ 50.)

    *Third*, Goldman claims that the Settlement Agreement and exculpation provision in the

Second Amended Plan are subject to heightened scrutiny because Weiss is a statutory insider.

(*Id.* ¶¶ 51–53.) Goldman believes that Weiss is a statutory insider of the Debtor under section

101(31)(E) of the Bankruptcy Code because he is (i) an affiliate of the Debtor's affiliate, WB

Member, and (ii) an affiliate and insider of Debtor affiliate, WB. (*Id.*)

*Fourth*, Goldman believes that the exculpations in the Second Amended Plan violate

sections 1123(b)(6), 1129(a)(1), and 1129(a)(3) of the Bankruptcy Code because they contain

non-consensual third-party releases that "cut off Goldman's claims and defenses against non-

debtor fiduciaries," including in the Arbitration and state court action[8] between the parties.  (*Id.*

¶ 57.)  Goldman asserts that the Court lacks constitutional authority to issue final judgment as to

the exculpation provision in section 10.7 of the Second Amended Plan because the releases "do

not stem from the bankruptcy itself" and are therefore, non-core under *Stern v. Marshall*, 564

U.S. 462 (2011).  (*Id.* ¶ 59 (quoting *In re Purdue Pharma L.P.*, 69 F.4th 45, 78–79 (2d Cir. 2023),

*cert. granted sub nom. Harrington v. Purdue Pharma L.P.*, No. (23A87), 2023 WL 5116031

(Aug. 10, 2023)).)  Additionally, Goldman argues that every *Purdue* factor weighs against

approval of section 10.7(b) of the Second Amended Plan and the majority of the *Purdue* factors

weight against approval of section 10.7(a).[9]  (Goldman Objection ¶¶ 60–63.)

---

[8]     The case is captioned *Goldman v. Weiss*, Index No. 653186 (N.Y. Cnty. 2022) (the "State Court Action").

[9]     Section 10.7 of the Second Amended Plan provides:

(a)  To the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and
each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment,
damage, demand, debt, right, cause of action, remedy, loss, and liability for any conduct occurring
on or after the Petition Date and up to and including the Effective Date in connection with or arising
out of the filing and administration of the Chapter 11 Case, the Sale process, the closing of the Sale;
the Disclosure Statement, the Plan Administration Agreement, including the formulation,
negotiation, preparation, dissemination, implementation, administration, confirmation, and
consummation thereof, the Plan, or the solicitation of votes for, or confirmation of, the Plan; the
funding or consummation of the Plan; the occurrence of the Effective Date; the administration of
the Plan or the property to be distributed under the Plan; or the transactions in furtherance of any of
the foregoing; or upon any other related act or omission, transaction, agreement, event, or other
occurrence taking place from the Petition Date through and including the Effective Date; except for
acts or omissions of an Exculpated Party that constitute gross negligence, fraud, or willful
misconduct, in each case as determined by a Final Order.  This exculpation shall be in addition to,
and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law
or rules protecting such Exculpated Parties from liability.

(b)  To the maximum extent permitted by applicable law, no Additional Exculpated Party will have or
incur, and each Additional Exculpated Party is hereby released and exculpated from, any claim,
obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability
for any conduct occurring on or after the Petition Date and up to and including the Effective Date
in connection with or arising out of the Settlement Agreement, including the formulation,

*Fifth*, Goldman argues that six of the seven *Iridium* Factors weigh against approval of the Settlement Agreement.  (*Id.* ¶¶ 64–70.)  Notably, Goldman states that he is the "only party-in-interest not a party to the Settlement Agreement."  (*Id.* ¶ 67.)  And Goldman emphasizes that, contrary to the Debtor's statements, the Operating Entities have "no authority to support the Settlement Agreement without [his] written consent."  (*Id.* at 32 n.10.)

*Sixth*, Goldman submits that he has standing to raise these objections since he possesses a "direct pecuniary interest in the Settlement Agreement and [Second Amended] Plan exculpation provisions which . . . together misappropriate his property and release his claims and defenses in ongoing and threatened litigation."  (*Id.* ¶ 71.)  Therefore, Goldman concludes that he is a "party in interest" under section 1109(b) of the Bankruptcy Code who "may object to a Rule 9019 motion to approve a settlement."  (*Id.*)

Goldman, nonetheless, proposes a resolution that he states, if incorporated, would resolve the Goldman Objection.  He indicates that if the Debtor incorporates his proposed modifications to the exculpation provisions as set forth in Exhibit 13 to the Moskowitz Declaration, his concerns would be allayed.  (*Id.* ¶ 72.)  Additionally, if the Settlement Agreement were to be revised to "place all money being paid to Weiss and/or any entities under his control into escrow until the Arbitration is completed and a final order is issued by the appropriate tribunal with jurisdiction to address each party's rights," his objection as to the Settlement Agreement would also be resolved.  (*Id.*)  Goldman argues that these "compromises" would allow the Second

---

negotiation, preparation, dissemination, implementation, administration, confirmation, and consummation thereof or the transactions in furtherance of any of the foregoing; except for acts or omissions of an Additional Exculpated Party that constitute gross negligence, fraud, or willful misconduct, in each case as determined by a Final Order.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Additional Exculpated Party from liability.

(Second Amended Plan § 10.7.)  As noted below, subsection (b) to the exculpation provision has since been removed.

Amended Plan to go effective while "respecting Goldman's legal and property rights."  (*Id.* ¶ 73.)  Lastly, Goldman welcomes any opportunity to negotiate with the Parties and "reach a consensual resolution."  (*Id.*)

### E.  Replies to the Goldman Objection

1. <u>Weiss Reply</u>

Weiss indicates that each of the Operating Entities are New York limited liability companies and, therefore, are governed under New York limited liability company laws ("NY LLCL").  (Weiss Reply ¶ 1.)  Weiss argues that neither he nor Goldman has any interest in any specific property of the Operating Entities in accordance with section 601 of the NY LLCL, which provides that a member of an LLC has "no interest in specific property."  (*Id.*)  Rather, Goldman is entitled solely to his "share of distributions, if any, made by the respective [Operating Entity]."  (*Id.* ¶ 2.)  This right is qualified by provisions reserving the right to such distributions to the Managing Member of the Operating Entities, which is undisputed to be Weiss.  (*Id.*)  Goldman does not argue that Weiss violated the waterfall set forth in the Operating Entities' respective operating agreements.  (*Id.*)

Weiss asserts that none of the terms of the Settlement disturb the Major Decisions provision in the governing operating agreements.  (*Id.* ¶ 4.)  Indeed, he rejects each of Goldman's contentions that:

- the Settlement implicates the "terms and conditions of any agreement between the Company and an Affiliate of any Member (*i.e.,* Development Agreement, Property Management Agreement, Hotel Management Agreement, Leasing Agreement, Food and Beverage Operations Agreement, or Lease) (*id.* ¶ 5);

- the cash and non-cash assets of the Operating Entities used to fund the Settlement are not being used for the exclusive benefit of the Operating Entities (*id.* ¶ 6); and

- that Goldman is being disproportionately impacted by the Settlement Agreement (compared to Weiss) because Goldman "receives nothing at all" (*id.* ¶¶ 7–9).

Furthermore, Weiss asserts that Goldman is mischaracterizing the Arbitration proceedings during which he raised the issue whether the Major Decisions provision prohibited Weiss, acting in his individual capacity, from entering a transaction with the Debtor to purchase the WV Complex. (*Id.* ¶¶ 10–11.) Notably, the Weiss Reply emphasizes that while the Emergency Arbitrator initially held that "Weiss '[was] enjoined from engaging in unilateral Major Decisions,'" the three-member arbitration panel reviewed and rejected that decision. (*Id.* ¶ 12.) Ultimately, the arbitration panel permitted Weiss, in his capacity as Managing Member, to proceed with the sale of the WV Complex. (*Id.*) Weiss further notes that the arbitration panel concluded in a separate decision that Goldman also failed to establish that the Major Decisions clause applies to Weiss's "personal conduct" as opposed to conduct on behalf of the company. (*Id.* ¶ 13.) As for the injunction issued in the Arbitration, it was "limited to Weiss in his individual capacity." (*Id.* ¶ 15.) Therefore, Weiss concludes that the injunction is inapplicable to the Second Amended Plan or the Settlement Agreement because neither involves Weiss "'purchas[ing], acquir[ing] or otherwise obtain[ing] an interest in' the [WV Complex] or its assets." (*Id.* ¶¶ 15, 18.)

## 2. Debtor Reply

At the outset, the Debtor indicates that the Revised Settlement Agreement reflects a further compromise with Goldman over his objection to the domain name transaction. (Debtor Reply ¶¶ 13–14.) The Debtor then presents responses to Goldman's arguments.

*First*, the Debtor argues that Weiss possessed the authority to enter into the Revised Settlement Agreement and convey the property to be transferred to the Debtor contemplated therein. (*Id.* ¶¶ 15–23.) Echoing the Weiss Reply, the Debtor, citing to section 601 of the NY

LLCL, states that Goldman is only entitled to his "share of distributions, if any, made by the [Operating Entities] subject to the terms of the operating agreements, which place limits on this right." (*Id.* ¶ 16.) The Debtor asserts that Goldman's arguments that the Major Decisions provision of the operating agreements prevents the Revised Settlement Agreements from moving forward is also without merit for the following reasons:

- the Settlement Agreement does not impact the "terms and conditions of any agreement between the Company and an Affiliate of any Member" and Goldman has not identified any (*id.* ¶ 18);

- Goldman's argument that the Operating Entities' cash and non-cash assets are not being used for the exclusive benefit of the Operating Entities fails to recognize the Court's ruling in the Partial SJ Decision and that, but for the Settlement, the Debtor could seek monetary recovery from the Operating Entities (*id.* ¶ 19);

- the Settlement impacts Goldman and Weiss equally as Class A Members of the Operating Entities (*id.* ¶ 20); and

- Goldman waived any claim that Weiss improperly settled the Rent Action as he did not participate in it while it was in State Court and did not oppose the motion for partial summary judgment or otherwise object to Weiss opposing the motion on behalf of WB (*id.* ¶ 23).

*Second*, the Debtor argues that the Arbitration decisions do not bar Weiss from entering the Revised Settlement Agreement since the Arbitration decisions only prevented Weiss, in his individual capacity, from pursuing and/or consummating a sale of the WV Complex. (*Id.* ¶¶ 25–27.) The Debtor, similar to Weiss, concludes that the Arbitration decisions are inapplicable to the Revised Settlement Agreement or the Third Amended Plan. (*Id.* ¶ 28.)

*Third*, the Plan Administrator for Wind Down supports the Settlement and believes it is in the best interests of Wind Down and the Debtor since it maximizes recoveries for the Series C Noteholders against the Debtor and resolves claims and threatened claims against Weiss and YG WV. (*Id.* ¶¶ 29, 31.) Specifically, the Settlement resolves claims or causes of action that Weiss could assert against YG WV or Wind Down. (*Id.* ¶ 30.) Therefore, the Debtor maintains that the

payment YG WV is directing Member to pay to Weiss is reasonable when accounting for costs relating to litigating. (*Id.*)

*Fourth*, the Debtor argues that Goldman's issues with the Revised Settlement Agreement are without merit since the Debtor acted on reasonable information in agreeing to these provisions and its business judgment cannot be second-guessed. (*Id.* ¶ 41.) With respect to the domain name and social media accounts, the Debtor maintains that it "already had the right to sell the Domain Name and Social Media Accounts as assets owned by the Debtor as a matter of intellectual property law" despite settling with Goldman on this issue. (*Id.* ¶ 33.) Additionally, the Debtor asserts that its decision to purchase the domain name and social media accounts "was a business judgement entered into in the context of the Settlement Agreement." (*Id.* ¶ 36.) The Debtor considered its litigation position, the need to resolve the issue outside of the Settlement in an adversary proceeding, and the purchaser's willingness to close on the WV Complex sale. (*Id.*) The Debtor reserves the right to commence and adversary proceeding if the Court declines to approve the terms of the Revised Settlement Agreement that convey the social media accounts to the Debtor. (*Id.*) The Debtor consulted with its hospitality consultant and interim hotel management company, Performance Interim Advisory LLC d/b/a LW Hospitality Advisors ("LWHA"), and the William Vale Hotel's Director of Marketing to arrive at the $45,000.00 valuation ascribed to the social media accounts in the Revised Settlement Agreement. (*Id.* ¶ 37.)

With respect to the Debtor's agreement regarding its furniture, fixtures, and equipment ("FF&E") as well as consulting services, the Debtor indicates first that it was not required to disclose support for the consideration to be paid to FNB Sub. and Espresso. (*Id.* ¶ 38.) In any event, the Debtor reached a $5,000 payment for the transfer of the FF&E, if any, at the WV Complex because the transfer of the liquor license was "invaluable" to the Purchaser and the sale

generally.  (*Id.*)  The Debtor also emphasizes that the consideration paid to Espresso is warranted

for its assistance in the smooth transition of the management and direction of the WV Complex,

which was essential both to the Debtor's assumption and control of the WV Complex and to the

sale contract.  (*Id.* ¶ 39.)

As for the initial member distribution issue, the Debtor contends that Goldman has no

standing to raise this issue since he is "not aggrieved in any way by this distribution."  (*Id.* ¶ 40.)

*Fifth*, the Debtor maintains that there is no basis for the assertion that the Revised

Settlement Agreement was a product of collusion.  The Settlement is a multi-party agreement

where Parties made concessions and obtained benefits, was negotiated in good faith and at

arm's-length, and Weiss is not an "insider" since he lacks the ability to control or influence the

Debtor.  (*Id.* ¶¶ 42–44.)  Therefore, the Debtor concludes that heightened scrutiny is

unwarranted.  (*Id.* ¶ 45.)

*Sixth*, the Debtor argues that the exculpation provisions comply with Second Circuit law.

(*Id.* ¶ 46.)  The Debtor Reply emphasizes that the exculpation provision is essential to the Third

Amended Plan, the sale contract, and the Revised Settlement Agreement and all voting classes

voted to approve the provision.  (*Id.* ¶ 46.)  In any event, the Debtor claims that the exculpation

provision meets the relevant factors set out by the Second Circuit in *Deutsche Bank AG, London

Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d

136, 141–43 (2d Cir. 2005).  (*Id.* ¶¶ 47–49.)  Notably, the Debtor states that Goldman is not a

creditor of the estate and possesses no standing to object and is only seeking the ability to pursue

his claims twice—once here and again before the arbitral panel.[10]  (*Id.* ¶¶ 50–51.)

---

[10]    At the conclusion of the May 25 Hearing, counsel for the Debtor agreed to remove Weiss from the
exculpation provision.  *See* Section III.B.6, *infra*.

*Seventh*, the Debtor also notes that Goldman lacks standing to object to the Revised

Settlement Agreement since he is not a creditor in this chapter 11 case and does not have a

"direct economic stake." (*Id.* ¶ 53.) In any event, the Debtor Reply argues that any harm

Goldman may suffer is too remote to convey standing. (*Id.*)

*Seventh*, the Debtor claims that the *Iridium* Factors "strongly" support approval of the

Revised Settlement Agreement and Goldman relies on flawed premises to rebut the argument

that the *Iridium* Factors are satisfied. (*Id.* ¶ 55.)

## II.    <u>LEGAL STANDARD</u>

Rule 9019(a) of the Bankruptcy Rules governs the approval of compromises and

settlements, and provides as follows:

> On motion by the trustee and after notice and a hearing, the court may approve a
> compromise or settlement. Notice shall be given to creditors, the United States
> Trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other
> entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

Generally, "settlements or compromises are favored in bankruptcy and, in fact,

encouraged." *In re Chemtura Corp.*, 439 B.R. 561, 595 (Bankr. S.D.N.Y. 2010). This approach

stems from the idea that settlements and compromises "minimize litigation and expedite the

administration of the bankruptcy estate." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d

Cir. 1996).

However, before approving a settlement, a court must first determine that the proposed

settlement "is fair and equitable and in the best interests of the estate." *In re Drexel Burnham

Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (internal quotation marks

omitted) (citing *TMT Trailer Ferry*, 390 U.S. at 424 (1968)); *see also In re Lehman Bros.

Holdings*, 435 B.R. 122, 134 (S.D.N.Y. 2010).

Courts have developed standards to analyze settlements based on the original framework

announced in *TMT Trailer Ferry*.  The Second Circuit has set forth seven interrelated factors (the

"*Iridium* Factors") to be considered by a court in deciding whether to approve a compromise or

settlement:

> (1) [T]he balance between the litigation's possibility of success and the settlement's
> future benefits; (2) the likelihood of complex and protracted litigation, "with its
> attendant expense, inconvenience, and delay," including the difficulty in collecting
> on the judgment; (3) "the paramount interests of the creditors," including each
> affected class's relative benefits "and the degree to which creditors either do not
> object to or affirmatively support the proposed settlement;" (4) whether other
> parties in interest support the settlement; (5) the "competency and experience of
> counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court
> judge" reviewing, the settlement; (6) "the nature and breadth of releases to be
> obtained by officers and directors;" and (7) "the extent to which the settlement is
> the product of arm's length bargaining."

*In re Iridium Operating*, 478 F.3d at 462.  A court "need not conduct an independent

investigation into the reasonableness of the settlement but must only canvass the issues and see

whether the settlement falls below the lowest point in the range of reasonableness." *Chemtura*,

439 B.R. at 594 (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (internal

quotation marks omitted)).

In passing upon a proposed settlement, "the bankruptcy court does not substitute its

judgment for that of the trustee." *Depo v. Chase Lincoln First Bank, N.A.*, 77 B.R. 381, 384

(N.D.N.Y. 1987), *aff'd sub nom. Depo v. Lincoln Bank*, 863 F.2d 45 (2d Cir. 1988) (citations

omitted).  Nonetheless, "while the 'approval of a settlement rests in the Court's sound discretion,

the debtor's business judgment should not be ignored.'" *JPMorgan Chase Bank, N.A. v. Charter

Communs. Operating, LLC (In re Charter Communs.)*, 419 B.R. 221, 252 (Bankr. S.D.N.Y.

2009) (quoting *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y 2009)).  In

addition, the court may "give weight to the informed judgments of the trustee or debtor-in-

possession and their counsel that a compromise is fair and equitable." *In re Kerner*, 599 B.R.

751, 756 (Bankr. S.D.N.Y. 2019) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. at 505).

## III.    DISCUSSION

Goldman objects to the Settlement, arguing that (i) Weiss did not have authority to enter into the Settlement on behalf of the Operating Entities, and (ii) the *Iridium* Factors weigh against approving the Settlement.  The Court disagrees.

### A.  Weiss Had Authority to Bind the Operating Entities to the Settlement

As a threshold matter, the Court must determine whether Weiss possessed the necessary authority to enter into the Settlement on behalf of the Operating Entities, and, if so, whether this action was a Major Decision that required Goldman's written approval.

The Operating Entities are all New York limited liability companies, and therefore, the NY LLCL is applicable.  (Weiss Reply ¶ 1; Debtor Reply ¶ 15.)  As aptly stated by the Supreme Court of the State of New York, Appellate Division, First Judicial Department:

> It is often said that LLCs are "creatures of contract," and that "[o]ne attraction of the LLC form of entity is the statutory freedom granted to members to shape, by contract, their own approach to common business relationship problems."  Article IV of the [NY LLCL] makes clear that the operating agreement of an LLC governs the relationships among members and the powers and authority of the members and manager.

*In re KG Winddown, LLC*, 632 B.R. 448, 492 (Bankr. S.D.N.Y. 2021) (quoting *LNYC Loft, LLC v. Hudson Opportunity Fund I, LLC*, 57 N.Y.S.3d 479, 483 (1st Dep't 2017) (citations omitted)); *see also In re E. End Dev., LLC*, 491 B.R. 633, 638 (Bankr. E.D.N.Y. 2013) ("Under [NY LLCL], the LLC's operating agreement governs the parties' conduct.  To the extent the agreement is silent, there are default provisions in the New York Limited Liability Company laws that apply.")

Therefore, the Operating Entities' respective operating agreements define the scope of authority its members have and whether actions taken by a member is binding on that entity.

Under New York law, a court's review of an LLC operating agreement is governed by the rules and constructs of contract interpretation.  In *Coudert Bros.*, Judge Engelmayer described these rules and constructs as follows:

> 'It is the primary rule of construction of contracts that when the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations.'  *Howard v. Howard*, 292 A.D.2d 345, 345, 740 N.Y.S.2d 71 (2d Dep't 2002).  'Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing.'  W.*W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990).  That said, in analyzing contractual text, a court need not turn a blind eye to context.  Rather, 'a court should accord [contractual] language its plain meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.'  *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir.1990) (quoting *William C. Atwater & Co. v. Panama R.R. Co.*, 246 N.Y. 519, 524, 159 N.E. 418 (1927) (second alteration in original)).  'A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties.'  *Acumen Re Mgmt. Corp. v. Gen. Sec. Nat'l Ins. Co.*, No. 09 Civ. 1796 (GBD), 2012 WL 3890128, at *5 (S.D.N.Y. Sept. 7, 2012) (citation omitted).

*In re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y. 2013).

Lastly, under New York Law, an agent has actual authority to act on behalf of the principal if the principal has granted the agent "the power to enter into contracts on the principal's behalf," subject to any explicit or implicit limitations the principal may place on this power.  *See Highland Cap. Mgmt. LP v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010); *see also Ford v. Unity Hosp.*, 299 N.E.2d 659, 664 (1973) ("An agent's power to bind his principal is coextensive with the principal's grant of authority.")  Therefore, an LLC may grant actual authority to a member to bind the LLC to contracts and other agreements through the LLC operating agreement.

1.  <u>Weiss Had Actual Authority Under the Operating Agreements to Enter into
    the Settlement on Behalf of the Operating Entities</u>

The Operating Entities are each governed by the terms of their respective operating

agreements.  These agreements are the Parking operating agreement (the "Parking Operating

Agreement," ECF Doc. # 331-3), the WB Operating Agreement, the WV Hotel operating

agreement (the "WV Hotel Operating Agreement," ECF Doc. # 331-1), and the WV FNB

operating agreement (the "WV FNB Operating Agreement," ECF Doc. # 331-2, and together

with the Parking Operating Agreement, the WB Operating Agreement, and the WV Hotel

Operating Agreement, the "Operating Agreements").

The Operating Agreements establish the division of roles and authority between Goldman

and Weiss, who each hold 50% membership interest in the Operating Entities.  With respect to

management of the Operating Entities, the Parking Operating Agreement, the WV FNB

Operating Agreement, and the WV Hotel Operating Agreement all share identical language,

which states:

> ***Zelig Weiss shall be the Managing Member responsible for the management of
> the business and affairs of the Company and the Space.***  Goldman shall be
> responsible for overseeing matters relating to the funding, financing and
> refinancing of the Space.  If Weiss or Goldman shall at any time be unable or
> unwilling to serve, the holders of a majority of Percentage Interests, including his
> successors in interest, shall designate a successor.

(Parking Operating Agreement § 11; WV FNB Operating Agreement § 11; WV Hotel Operating

Agreement § 11) (emphasis added).

The WB Operating Agreement includes the following operative language:

> ***Weiss shall be the "Managing Member" responsible for the management of the
> business and affairs of the Company and the day to day operation and
> functioning of the Property***, and Goldman shall be responsible for overseeing
> matters relating to the funding, financing and refinancing of Property.

(WB Operating Agreement § 7(a)) (emphasis added).

The express, unambiguous language in the Operating Agreements grant Weiss the actual authority to serve as the "Managing Member" of the Operating Entities and take the actions necessary to "manage[] the business and affairs" of these entities.  (*See* Parking Operating Agreement § 11; WV FNB Operating Agreement § 11; WV Hotel Operating Agreement § 11; WB Operating Agreement § 7(a).)  These provisions establish that the Managing Member is expected and authorized to take the actions necessary to run the Operating Entities.  In fact, there is a clear bifurcation of the Operating Entities' leadership structure with Weiss leading the management of the business and Goldman overseeing the finances.  Under this management structure, entering the Settlement is a business decision that falls under Weiss's authority as the Managing Member.  As a result, the Operating Agreements show that Weiss, in his capacity as Managing Member, had the express power to bind the Operating Entities.

Notably, the Goldman Objection does not challenge Weiss's authority as the Managing Member to bind the Operating Entities to the Settlement.  Instead, Goldman acknowledges that the "[Operating Agreements] identify Weiss as Managing Member, responsible for day-to-day management . . . ."  (Goldman Objection ¶ 12.)

Accordingly, Weiss has the power to exercise his business judgment and enter into the Settlement on behalf of the Operating Entities under the actual authority granted to him by the Operating Agreements.

> 2.  The Settlement Does Not Trigger the Major Decisions Provision in the Operating Agreements

The authority granted to Weiss by the Operating Agreements is broad, but comes with limits.  Most notably, Weiss is prohibited from taking actions as the Managing Member that fall under the contractually defined Major Decisions.  Each of the Operating Agreements contain a schedule establishing the Major Decisions ("Major Decisions Schedule") that require written

approval from both Goldman and Weiss.  The Parking Operating Agreement, the WV FNB

Operating Agreement, and the WV Hotel Operating Agreement state as follows:

> Notwithstanding the grants of authority above or anything contained in this Agreement, in no event will the Company take any of the actions listed on Schedule 1 annexed hereto (each, a "Major Decision") ***without the prior written approval of both Members*** [*i.e.*, Weiss and Goldman].  If a Member fails to respond to a request for approval of a Major Decision within fifteen (15) days after the Member has received a written request for approval then the Member shall be deemed to have approved the request.

(Parking Operating Agreement § 11; WV FNB Operating Agreement § 11; WV Hotel Operating

Agreement § 11) (emphasis added).  Meanwhile, the WB Operating Agreement includes similar

language, which states:

> Notwithstanding the grants of authority under Section 11(a) of the Original Agreement or anything contained in this Agreement, ***in no event will the Company take any of the actions listed on Schedule 1 annexed hereto (each, a "Major Decision") without the prior written approval of both Class A Members*** [*i.e.*, Weiss and Goldman].  If a Class A Member fails to respond to a request for approval of a Major Decision within fifteen (15) days after the Class A Member has received a written request for approval then the Class A Member shall be deemed to have approved the request.

(WB Operating Agreement § 7(e)) (emphasis added).

The Goldman Objection claims that Weiss's decision to enter into the Settlement on

behalf of the Operating Entities contravenes the Major Decisions provisions, and therefore,

Weiss acted without proper authority.  However, none of the enumerated Major Decisions apply

to the Settlement or Weiss's decision to enter into the Settlement.

### a.  The Major Decisions Schedule

The Court will outline the actions listed in the Major Decisions Schedule,[11] which require

approval from both Weiss and Goldman, and explain why each is inapplicable to the Settlement:

---

[11]    The list of actions under the Major Decisions Schedule are substantially similar across the Operating Agreements.  The differences between the Operating Agreements, if any, are noted for convenience.

(i) *The decision to make any permitted calls or requests for additional capital contributions from the Members*;

The Settlement does not "make any permitted calls or requests for additional capital contributions from the Members." Accordingly, this provision is not implicated.

(ii) *the terms and conditions of any agreement between the Company and an Affiliate of any Member (i.e., Development Agreement, Property Management Agreement, Hotel Management Agreement, Leasing Agreement, Food and Beverage Operations Agreement, or Lease* [(the "Covered Agreements")][12];

Goldman argues that Weiss has *impacted* the terms and conditions of an agreement between the Operating Entities and "an Affiliate of [Weiss/Goldman]" by binding the Operating Entities to the Settlement. (Goldman Objection ¶ 36.) In response, Weiss and the Debtor each argue that Goldman misapplies the provision. Weiss notes that the provision was meant to apply to the Covered Agreements and does not extend to any other agreement. (Weiss Reply ¶ 5.) Weiss clarifies that "lease," as used in this provision, does not refer to Lease between the Debtor and WB, but rather to the lease between WB and WV Hotel before the WV Complex was conveyed to the Debtor. (*Id.* at 3 n.2; *see also* WB Operating Agreement § 7(d)(i).) Weiss concludes that the Settlement does not change the terms of any of the Covered Agreements and "impact" is not relevant to the Major Decisions analysis. (Weiss Reply ¶ 5.)

The Court agrees that Goldman's reliance on this provision is misplaced. First, Goldman fails to identify which specific agreement between an Operating Entity and an Affiliate of a Member is modified by the Settlement. It is clear from the operative language that Weiss and Goldman intended for this provision to protect the Covered Agreements from unilateral change. And the fact that the Major Decisions Schedules in the Parking Operating Agreement, WV FNB Operating Agreement, and the WV Hotel Operating Agreement do not have the parenthetical language regarding the Covered Agreements does not change the analysis. Ultimately, the alleged "impact" of the Settlement on an unspecified agreement is insufficient to invoke the Major Decisions provision and require Goldman's written approval. And, in any event, the Covered Agreements were terminated and inoperative when the Debtor properly terminated the Lease on May 20, 2021, as this Court recognized in the Partial SJ Decision.

---

[12] The Operating Agreements, except for the WB Operating Agreement have the following language, which omits the parenthetical: "the terms and conditions of any agreement between the Company and an Affiliate of any Member . . . ." (Parking Operating Agreement at 13; WV FNB Operating Agreement at 13; WV Hotel Operating Agreement at 13.)

(iii) *to change the character of the Company's business or any material change to the physical components of the Property or to the branding of the hotel located on the Property*[13];

The Settlement does not purport to "change the character of the Company's business or [make] any material change to the physical components of the Property or to the branding of the hotel located on the Property." Accordingly, this provision is not implicated.

(iv) *the decision to obtain, and the terms and conditions of, any mortgage or other financing or refinancing of the Property*;

The Settlement does not involve any financing, refinancing, or mortgage transaction. Accordingly, this provision is not implicated.

(v) *the budgets for any substantial future development or construction projects*;

The Settlement does not establish any budgets for future development or construction projects. Accordingly, this provision is not implicated.

(vi) *the decision whether to repair, rebuild or restore substantially all or any portion of the Property then owned by the Company affected by a casualty or condemnation, where the estimated cost exceeds $500,000*;

The Settlement does not involve a decision to repair, rebuild or restore any property. Accordingly, this provision is not implicated.

(vii) *the commencement, defense or discontinuance of any actions in the nature of legal proceeding in any court, before any governmental agency, of in arbitration, where the amount in dispute is in excess of $500,000, other than actions arising out of the ordinary course of leasing or operating the Property, such as eviction and unlawful detainer actions against defaulting tenants, except that all decisions involving criminal matters (other than code violations) shall be Major Decisions*;

As the Debtor concedes, the Settlement involves a dispute in excess of $500,000. (*See* May 15, 2024 Hr'g Tr. at 131:9–22.) However, the Debtor maintains, and the Court agrees, that with respect to WB and the Debtor, the Settlement involves a dispute which arose in the ordinary course of leasing or operating the Property. Accordingly, this provision is not implicated.

---

[13]     The Operating Agreements, except for the WB Operating Agreement, have the following language in their Major Decisions Schedule: "to change the character of the Company's business or any material change to the physical components of the Space." (Parking Operating Agreement at 13; WV FNB Operating Agreement at 13; WV Hotel Operating Agreement at 13.)

(viii) *the approval of the Company tax returns (provided that approval of such returns by the regular accountants for the Company shall be presumed to be correct) or making any change in the depreciation or accounting methods, or making other decisions with respect to the treatment of various transactions for accounting or Federal or state income tax purposes (except as advised by the regular accountants for the Company to be required to be in compliance with law), which would have a material adverse effect on any Member or the Company, or conducting any other actions, litigation or other activities with Federal or state taxing authorities; provided that the Managing Member may respond to normal audit requests of governmental authorities to which the Company is obligated to respond without Member approval but shall keep the Members informed regarding such requests;*

The Settlement does not involve any decision related to tax returns. Accordingly, this provision is not implicated.

(ix) *the approval of the admission to the Company of any successor or additional Member or the issuance of any new membership or other class of interests in the Company;*

The Settlement does not involve any decision related to the membership of the Operating Entities.  Accordingly, this provision is not implicated.

(x) *the acquisition of any real property or any option or interest therein, or the exchange of any part of the Land for any other real property*[14];

The Settlement does not involve a sale or exchange as contemplated by this provision.  Accordingly, this provision is not implicated.

---

[14]     The Operating Agreements, except for the WB Operating Agreement, have the following language in their Major Decisions Schedule: "the acquisition of any real property or any option or interest therein, or the exchange of any part of the Space for any other real property."  (Parking Operating Agreement at 13; WV FNB Operating Agreement at 13; WV Hotel Operating Agreement at 13.)

(xi) *the sale, assignment, transfer, exchange or other disposition of the Property or any improvements thereon or any portion thereof or interest therein, subject to Paragraph 8 (d)* [15,16];

At the hearing, Goldman raised the argument that the Settlement constituted a "disposition of an interest in the Property insofar as [Weiss had] giv[en] releases." (*See* May 15, 2024 Hr'g Tr. at 161:13–20.) However, this purported prohibition on the Managing Member's ability to provide releases or otherwise settle disputes is a significant qualifier on his authority, and it is not explicitly established in the Operating Agreements. The expansion of this provision to cover releases does not have support from the Operating Agreements or from case law. As a result, the Court disagrees with Goldman's framing of the issue. Instead, the Settlement does not involve a sale, assignment, transfer, exchange or other disposition as contemplated by this provision. Accordingly, this provision is not implicated.

(xii) *the entry into a lease or other occupancy agreement for all or a portion of the Space* [17];

The Settlement does not involve any decision related to a lease or occupancy agreement. Accordingly, this provision is not implicated.

---

[15]    Paragraph 8(d) of the WB Operating Agreement reads as follows:

If the Major Decision is for a sale of the entire Property or of so much of the entire Property as is then owned by the Company, and if the other Class A Member declines to approve such sale, then the Class A Member desiring to make such sale may give notice to the other Class A Member requiring the other Class A Member to approve such sale and to cooperate in effectuating such sale or to purchase the interest in the Company of the Member desiring to sell at a purchase price equal to an amount which the Offering Member would receive in the event of a sale on the terms theretofore presented by it to the other Member after payment of all expenses, including, but not limited to, brokerage, but excluding transfer taxes, and the liquidation of the Company and the distribution of remaining cash to the Members under Section 6. The Member receiving such notice shall have 15 days within which to either reverse his position and approve the proposed sale or to elect to purchase the interest of the Member desiring to sell in which latter event the purchase will be conducted in the same manner as a purchase under the provisions of paragraph 9(c). Failure to elect within such 15 day period to make such purchase shall be deemed an election to approve the sale as proposed, in which event, the Class A Members shall proceed together in an orderly fashion to consummate such sale.

(WB Operating Agreement § 8(d)).

[16]    The Operating Agreements, except for the WB Operating Agreement, have the following language in their Major Decisions Schedule: "the sale, assignment, transfer, exchange, lease or other disposition of the Space or any improvements thereon or any portion thereof or interest therein, except pursuant to a transfer of the Property made in accordance with the Operating Agreement of Wythe Berry LLC." (Parking Operating Agreement at 14; WV FNB Operating Agreement at 14; WV Hotel Operating Agreement at 14.)

[17]    The WB Operating Agreement does not include this provision.

36

(xiii) *the decision to enter into, terminate or accept the surrender of, as applicable, any Property Management Agreement; Hotel Management Agreement; Food and Beverage Operations Agreement; Development Agreement*[18];

The Settlement does not involve a decision with respect to the Covered Agreements, and therefore, this provision is not implicated.

(xiv) *the approval of any material proposals submitted to, or agreements entered into with, government officials relating to zoning, subdivision or environmental matters or other land use matters applicable to the Property*;

The Settlement does not involve any proposals or agreements with government officials related to the enumerated matters. Accordingly, this provision is not implicated.

(xv) *take any action under applicable bankruptcy, insolvency or similar laws with respect to the Company*;

The Debtor submits, and the Court agrees, that this provision contemplates taking unanimous action under applicable bankruptcy, insolvency or similar laws where an Operating Entity is the debtor. Here, the debtor is not an Operating Entity. Accordingly, this provision is not implicated.

(xvi) *amend, modify or terminate this Agreement or any of the organizational documents and organizational instruments of the Company*;

The Settlement does not purport to amend, modify, or terminate any of the Operating Agreements or other organizational documents. Accordingly, this provision is not implicated.

(xvii) *do any act in contravention of [the Operating Agreements]*;

This is a catch-all provision that purports to require Weiss and Goldman to have unanimous agreement before the Managing Member takes any action in "contravention of the [Operating Agreements]. Goldman does not expressly invoke this provision; however, his various objections to the Settlement necessarily involve alleged violations of the Operating Agreements. Nevertheless, the Court finds that neither the Settlement nor Weiss's decision to sign the Settlement violate any part of the Operating Agreements. Weiss had the authority to bind the Operating Entities to the Settlement, and the decision to sign the Settlement was not a Major Decision that required Goldman's input. Moreover, as discussed in more detail below, Weiss has not used "Goldman's

---

[18]    The Operating Agreements, except for the WB Operating Agreement, have the following language in their Major Decisions Schedule: "the decision to enter into, terminate or accept the surrender of, as applicable, any Property Management Agreement." (Parking Operating Agreement at 14; WV FNB Operating Agreement at 14; WV Hotel Operating Agreement at 14.)

property" to pay for the Settlement.  (Goldman Objection ¶ 44.)  Instead, the funds and assets of the Operating Entities have been used for the exclusive benefit of the Entities, in accordance with the Operating Agreements. Similarly, and as detailed below, the Settlement does not treat Weiss and Goldman disproportionately in their capacities as Members.  Any difference in treatment between Weiss and Goldman in the Settlement is unrelated to their Member status.

(xviii) *employ, or permit the Company to employ, the funds or assets of the Company in any manner except for the exclusive benefit of the Company*;

Goldman claims that Weiss has employed the funds or assets of the Operating Entities in a manner that is not for the Operating Entities' exclusive benefit by "terminating the Lease, releasing claims on behalf of the [] Operating Entities against the Debtor Releasors/Releasees and Trustee, and selling assets including those co-owned by the [] Operating Entities from the Hotel venture operation—the Domain Name, the Social Media Accounts, FNB's liquor license, and the furniture, fixtures, and equipment referenced in the FF&E Agreement." (Goldman Objection ¶ 36.)  The Goldman Objection argues that Weiss receives "more than $4 million" through the Settlement, but the benefit to the Operating Entities is not apparent.  (*Id.*)  Additionally, at the Hearing, Goldman alleged that Weiss had diverted the money coming in from the Settlement from the Operating Entities' accounts thereby preventing such funds from being distributed according to the waterfall structure established in the Operating Agreements.  (*See* May 15, 2024 Hr'g Tr. at 166:1–25.)

The Court finds that Goldman's argument overlooks the benefits that accrue to the Operating Entities from the Settlement.  First, the Operating Entities would face significant legal exposure to the Debtor because of the Lease termination but for the Settlement.  As this court recognized in the Partial SJ Decision, the Debtor had properly terminated the Lease.  *See generally* Partial SJ Decision. However, to date, there has been no determination of the damages.  As a result, it is highly likely that the Debtor could pursue a judgment against WB to recover damages.  (Weiss Reply ¶ 6; Debtor Reply ¶ 19.)  The Debtor could also attach the funds the other Operating Entities may owe to WB under various inter-party contracts. (Debtor Reply ¶ 19.) Second, the Settlement also benefits the Operating Entities by resolving the legal uncertainty with respect to them arising from the Lease termination.  As a result, the Settlement allows the Operating Entities to reduce their legal spending and other related expenses.

Furthermore, the Court does not find that Weiss improperly diverted funds that would otherwise go to the Operating Entities.  At the hearing, Goldman specifically referenced the funds Weiss will receive through the Excess ERTC Amount and the Member Distribution as problematic. (*See* May 15, 2024 Hr'g Tr. at 166:10–12.) However, these payments are not improper.  The Excess ERTC Payment is made to Espresso (and to Weiss, as a Member of Espresso)

as a result of Espresso's "support and services" to the Debtor during the Hospitality Arbitration[19]. (Revised Settlement Agreement at 4.) Similarly, the Debtor is making the Initial Member Distribution and the potential Contingent Member Distribution to Member (and, therefore, to Weiss in his capacity as a Member of Member) for "provid[ing] objectively valuable services to Debtor since the Petition Date and/or during the transition of management of the WV Complex." (Weiss Reply at 4 n.3.) Accordingly, Weiss has not diverted such funds from the Operating Entities in contravention of his duties as Managing Member.

Taken together, Weiss did not violate the provision when he entered into the Settlement on behalf of the Operating Entities and employed the funds and assets of the Operating Entities to arrive at a compromise with the Parties.

(xix) *enter into any lease covering at least 5,000 square feet of space*[20];

The Settlement does not involve entry into a new lease. Accordingly, this provision is not implicated.

(xx) *take action which has a disproportionate effect on any Class A Member, or take any action with the intent to discriminate in a prejudicial manner with respect to the rights of any Member under this Agreement*[21];

Goldman claims that Weiss's actions (*i.e.*, binding the Operating Entities to the Settlement) have a "'disproportionate effect' on Goldman—who receives nothing at all—while prejudicing his rights and claims under the [] Operating Entities' respective operating agreements." (Goldman Objection ¶ 36.) Relatedly, Goldman argues that Weiss has used "property owned by Goldman to pay for the settlement, in violation of multiple operating agreements." (*Id.* ¶ 44.)

Goldman's objection is misplaced for several reasons. First, the Settlement does not treat Weiss and Goldman differently in their capacities as Members of the Operating Entities. As stated in the Weiss Reply, "(i) neither receives a distribution; (ii) both derive the same benefit from the releases issued to the [Operating Entities]; and (iii) both give up the same rights through the releases

---

[19]    The Hospitality Arbitration involved proceedings between FNB and WV Hospitality LLC ("Hospitality"), styled In *the Matter of the Arbitration between The William Vale FNB LLC v. WV Hospitality LLC*, AAA No. 01-23-000-3943. (*See* Revised Settlement Agreement at 4.)

[20]    This provision is only included in the WB Operating Agreement.

[21]    The Operating Agreements, except for the WB Operating Agreement, have the following language in their Major Decisions Schedule: "take action which has a disproportionate effect on any Member or take any action with the intent to discriminate in a prejudicial manner with respect to the rights of any Member under this Agreement." (Parking Operating Agreement at 14; WV FNB Operating Agreement at 14; WV Hotel Operating Agreement at 14.)

issued by the [Operating Entities]." (Debtor Reply ¶ 20.) Notably, the benefits that Weiss receives under the Settlement, which Goldman does not, are unrelated to his status as Member of the Operating Entities. Instead, Weiss derives these benefits in his capacities as a Member of Member and as a Member of Espresso. (*See* Revised Settlement Agreement at 4; *see also* Weiss Reply at 4 n.3.) Goldman, however, does not hold such interests. Accordingly, Weiss has not taken an action that has disproportionate effect on any Member of an Operating Entity.

Furthermore, Weiss has not used "property owned by Goldman to pay for the [S]ettlement." (Goldman Objection ¶ 44.) To the extent Goldman asserts an interest of any specific Operating Entity property, that argument fails as a matter of law. Under NY LLCL section 601, "[a] member has no interest in specific property of the limited liability company." NY LLCL § 601. However, at the Hearing, the Court clarified that Goldman position is better understood as an objection against the violation and trading of his rights under the Operating Agreements without his consent. (*See* May 15, 2024 Hr'g Tr. at 112:21–25.) Nevertheless, the Court disagrees. The Settlement does not improperly take away Goldman's rights under the Operating Agreements. There is no improper distribution that goes against the waterfall structure established in the Operating Agreements, Weiss acted within his authority to bind the Operating Entities to the Settlement, and Weiss's actions did not implicate the Major Decisions provision. As a result, Goldman's consent was not required under this provision.

(xxi) *take any other decision or action which, by any provision of the LLC Act or this Agreement, is specifically required to be approved by the Members*;

This provision is not applicable to the Settlement Agreement.

(xxii) *take any of the foregoing actions with respect to the Company's subsidiaries or affiliates in which both Weiss and Goldman own substantial interests.*

The Operating Entities all have the Major Decisions Schedule as analyzed by the Court herein. Therefore, this catch-all provision is not relevant to Settlement Agreement.

Clearly, Weiss had actual authority to enter into the Settlement on behalf of the Operating Entities, and this specific grant of power was not limited by the Major Decisions provision in the Operating Agreements because Weiss's decision to bind the Operating Entities to the Settlement did not implicate any of the items on the Major Decisions Schedule. Accordingly, the Court finds that Weiss acted properly pursuant to his authority.

### B.  The Iridium Factors Weigh in Favor of Approving the Settlement

An analysis of the nonexclusive *Iridium* Factors confirms that the Settlement should be approved.

### 1.  The Balance Between the Litigation's Possibility of Success and the Settlement's Future Benefits

The Settlement's future benefits are clear and evident—it provides an immediate and certain resolution of the Adversary Proceeding, any potential related litigation among the Parties, and litigation concerning the Debtor's, Weiss's, or WB's liability for mechanic's lien obligations.  (*See* Motion ¶ 38; *id.* ¶ 2 (indicating that the Settlement resolves potential protracted litigation relating to the Adversary Proceeding and among WB, Weiss, Member and YG WV relating to the Series C Notes, the Lease and the subsequent bankruptcy proceedings).) The Debtor submits that without the Settlement, proceeding with the foregoing litigation would be protracted, lengthy, expensive, and uncertain.  (*Id.* ¶¶ 3, 38.)  Additionally, the Parties believe that the Settlement is the "only path to avoiding piecemeal resolution (via litigation) of the many issues resolved by the Settlement."  (*Id.* ¶ 4.)

Goldman contends that this factor should not be given much weight because the U&O Order and the Partial SJ Decision have already "effectively concluded the Rent Action against WB."  (Goldman Objection ¶ 69.)  And Goldman further states that any additional litigation related to the Adversary Proceeding or related to mechanic's lien obligations are "purely hypothetical."  (*Id.* ¶ 69.)  However, Goldman overlooks several live issues that remain even after these decisions, specifically related to damages and liability, among others.  As a result, the Court finds that this factor is relevant to the overall *Iridium* analysis and in favor of approval of the Settlement.

41

### 2.    The Likelihood of Complex and Protracted Litigation

Absent the Settlement, litigation on the remaining issues between the Parties would likely be protracted, significant, and costly.  (Motion ¶ 38; *see also id.* ¶ 2 (indicating that the "alternative to the Settlement is significant litigation among all Parties on various contested matters").)  The Settlement addresses not only current litigation but also anticipated litigation as well.  (*Id.* ¶ 2.)  Notably, the mitigation of legal uncertainty and legal expenses will likely contribute to greater creditor recovery.  (*Id.*)  Based on the Debtor's representations, the second *Iridium* Factor favors approval of the Settlement.

### 3.    The Paramount Interests of Creditors

The Settlement serves the interest of creditors as it offers a clear and definitive resolution of pending and anticipated litigation thereby conserving estate resources and offers a cash infusion of $8 million into the Debtor's estate.  (*Id.* ¶¶ 2, 33, 35–36.)  Additionally, the Settlement provides for arrangements that assist the Debtor in the sale of the WV Complex and "positions [the] estate to confirm a chapter 11 plan and thereafter maximize recoveries for all creditors."  (*Id.* ¶¶ 2, 34.)  The Debtor submits that the Settlement allows creditors to receive "significantly greater recoveries" than they could otherwise have expected to receive.  (*Id.* ¶ 36.)

Goldman rejects the Debtor's analysis, arguing that the Debtor is obtaining his property without paying him and the Settlement is "patently unfair and inequitable" to him as a party-in-interest.  (Goldman Objection ¶ 70.)  The Court disagrees.  The Court has discussed and rejected Goldman's position regarding his alleged property interest.  Goldman has no interest in any specific property of the Operating Entities, and Goldman's rights, in his capacity as Member of the Operating Entities, were not violated through the Settlement.  Instead, the Settlement serves the interests of the creditors.

Accordingly, the third *Iridium* Factor favors approval as well.

### 4. Whether Other Parties in Interest Support the Settlement

All parties were apprised of the Motion and only Goldman objected. (*See* Affidavit of Service, ECF Doc. # 322.) However, as analyzed above, the Goldman Objection has no merit. Goldman acknowledges that the Operating Agreements identify Weiss as the Managing Member who was responsible for the day-to-day operations of the Operating Entities. (Goldman Objection ¶¶ 7, 12.) Weiss, in his capacity as Managing Member, had actual authority to enter into the Settlement on behalf of the Operating Entities.

Additionally, Goldman's assertion that each of the following "Major Decisions" applies to the Settlement is inaccurate:

- "(ii) the terms and conditions of any agreement between the Company and an Affiliate of any Member;"

- "(xvii) employ[ing], or permit[ting] the Company to employ, the funds or assets of the Company in any manner except for the exclusive benefit of the Company;"

- "(xix) tak[ing] action which has a disproportionate effect on any Class A Member, or take any action with the intent to discriminate in a prejudicial manner with respect to the rights of any Member under this Agreement;" and

- "(xxi) tak[ing] any of the foregoing actions with respect to the Company's subsidiaries or affiliates in which both Weiss and Goldman own substantial interests."

(Goldman Objection ¶ 10; *see also id.* ¶ 36.)

Each of these assertions is without merit.

*First*, none of the Covered Agreements between the Company and an Affiliate of a Member are impacted by the Settlement. In any event, the Debtor indicates and the Court concludes that the Covered Agreements were "either terminated or negated as a matter of law upon the termination of the Lease between Debtor and WB." (Debtor Reply ¶ 18.)

*Second*, the Operating Entities' assets are being used for their exclusive benefit as, absent the Settlement, the Debtor would likely expend more funds to litigate outstanding disputes. The Settlement offers a clear and clean resolution of pending and potential litigation for the benefit of all parties.

*Third*, there is no disproportionate impact on Goldman under the Settlement in his capacity as Member of the Operating Entities. The Settlement impacts Goldman and Weiss equally as Members since "(i) neither receives a distribution; (ii) both derive the same benefits of releases to the Operating Entities; and (iii) both release the same rights via the releases issued by the Operating Entities." (*Id.* ¶ 20.) The compensation Weiss individually receives is on account of claims he individually holds, which is separate from the issues that Goldman raises. (*Id.*)

Accordingly, while Goldman has opposed the Motion, his objection has no merit. In light of such and against the backdrop of all other Parties, including the Trustee, supporting the Settlement, this factor weighs in favor of approval.

5. <u>The Competency and Experience of Counsel Supporting, Experience and Knowledge of the Bankruptcy Court Judge Reviewing, the Settlement</u>

The competency and experience of Debtor's counsel and the presiding judge in this proceeding was not questioned by any party. Thus, the fifth *Iridium* Factor favors approval of the Settlement.

6. <u>The Nature and Breadth of the Releases of Officers and Directors</u>

The nature and breadth of the releases contained in the Settlement Agreement are fair and reasonable under the circumstances as (i) they provide certainty and finality to the Parties with respect to matters the Settlement Agreement resolves and (ii) were necessary to induce the Parties to enter into the Settlement.

Specifically, the Settlement provides for the release of:

Weiss Releasors/Releasees and the WB Releasors/Releasees from all claims and causes of action that could be asserted by the Debtor Releasors/Releasees and/or the Trustee Releasors/Releasees arising from, under, in connection with or relating to (a) the Series C Notes; (b) the Deed of Trust; (c) the Guaranty; (d) the Note; (e) the Mortgage; (f) the Lease; (g) the acquisition, development and operation of the WV Complex; (h) that certain Limited Liability Company Agreement of Wythe Berry Fee Owner LLC dated as of February 28, 2017 (the "Fee Owner LLC Agreement"); (i) that certain Limited Liability Company Agreement of Wythe Berry Member LLC dated as of February 28, 2017 (the "Member LLC Agreement"); (j) the Adversary Proceeding; and (k) the chapter 11 Case.

(Motion ¶ 40.)

The Settlement also bars the Parties as follows:

Weiss Releasors/Releasees and the WB Releasors/Releasees [are barred] from asserting claims against the Debtor, its ownership entities, and the current hotel operating entities and the Trustee Releasors/Releasees arising from, under, in connection with or relating to: (a) the Series C Notes; (b) the Deed of Trust; (c) the Guaranty; (d) the Note; (e) the Mortgage; (f) the Lease; (g) the acquisition, development and operation of the WV Complex; (h) the Fee Owner LLC Agreement; and (i) the Member LLC Agreement (subsections (h) and (i) being applicable only to the Debtor, its ownership entities, and the current hotel operating entities).

(*Id.*)

Goldman takes issues with the releases set forth under the Settlement Agreement and, relatedly, the exculpation provision in the Second Amended Plan. (Goldman Objection ¶ 68.) In support, Goldman contends that the exculpation provided in the Second Amended Plan § 10.7(b) infringes on his claims and defenses in the Arbitration and State Court Action. (Goldman ¶¶ 54–63.) At the hearing, the U.S. Trustee also voiced concerns regarding the exculpation provided under § 10.7(b). (*See* May 15, 2024 Hr'g Tr. at 181:3–24.) In response, the Debtor has removed § 10.7(b) from the Fourth Amended Plan, which resolves the exculpation issue as it relates to Weiss. (Fourth Amended Plan § 10.7.) Ultimately, the Debtor submits, and the Court agrees, that the other releases under the Settlement are essential because the Settlement cannot "be effected" without them. (Debtor Reply ¶ 49.)

45

Therefore, the sixth *Iridium* Factor weighs in favor of approval as well.

       7.   <u>The Extent to Which the Settlement is the Product of Arm's-Length Bargaining</u>

Finally, the Debtor submits that the terms of the Settlement were reached in good faith after intense but arm's-length negotiations. (*Id.* ¶¶ 25, 41.) The Parties have been on opposing sides of protracted, hard-fought litigation before the Settlement. Therefore, it is highly unlikely that the negotiations leading up to the Settlement have been nothing short of true arm's-length bargaining.

Goldman objects to the Settlement on these grounds as he is not a participant to the Settlement. However, the record at the Hearing reflects that Goldman was kept "informed as the settlement negotiations progressed, provided him with a copy of the proposed agreement before it was filed with the Court, and invited Goldman to participate in the Settlement," which he ultimately declined. (Debtor Reply ¶¶ 5, 19.) There is no reason to doubt that the negotiations leading up to the Settlement Agreement were arm's-length among the Parties. Accordingly, this *Iridium* Factor favors approval of the Settlement.

## IV.   <u>CONCLUSION</u>

For the reasons explained above, the Court **GRANTS** the relief requested in the Motion and approves the Settlement.

**IT IS SO ORDERED.**

Dated:    May 29, 2024
          New York, New York

                              *Martin Glenn*
                                   MARTIN GLENN
              Chief United States Bankruptcy Judge

**Exhibit B**

Memorandum Opinion Approving the Disclosure Statement and Confirming the Fourth
Amended Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC
(Dkt. #370)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
In re:                                                     **NOT FOR PUBLICATION**

      WYTHE BERRY FEE OWNER LLC,                    Chapter 11

                                                     Case No. 22-11340 (MG)

                        Debtor.
------------------------------------------------------------x

## MEMORANDUM OPINION APPROVING THE DISCLOSURE STATEMENT AND CONFIRMING THE FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION OF WYTHE BERRY FEE OWNER LLC

*A P P E A R A N C E S:*

HERRICK, FEINSTEIN LLP
*Attorneys for the Debtor*
2 Park Avenue
New York, NY 10016
By:    Stephen B. Selbst, Esq
           Janice Goldberg, Esq.
           Steven B. Smith, Esq.
           Rodger T. Quigley, Esq.
           Roya Imani, Esq.
           Avery S. Mehlman, Esq.
           Meaghan Roe, Esq.

ABRAMSON BROOKS LLP
*Attorney for Wythe Berry LLC*
1051 Port Washington Boulevard
Suite 322
Port Washington, NY 11050
By:    Jon Schuyler Brooks, Esq.

PAUL HASTINGS LLP
*Attorney for Zelig Weiss*
2050 M Street NW
Washington, DC 20036
By:    Nicholas A. Bassett, Esq.

GORNITZKY & CO.
*Attorneys for Notes Trustee*
20 Haharash Street
Tel Aviv, Israel 6761310
By:    Maya Ben Meir, Esq.
       Amnon Biss, Esq.

CHAPMAN AND CUTLER LLP
*Attorneys for Notes Trustee/Plan Administrator for Wind Down Co.*
320 South Canal Street
27th Floor
Chicago, IL 60606
By:    Eric Silvestri, Esq.

1270 Avenue of the Americas
New York, NY 10020
By:    Michael Friedman, Esq.
       Helena Honig, Esq.

GORDON REES SCULLY MANSUKHANI, LLP
*Attorney for Schimenti Construction*
One Battery Park Plaza
28th Floor
New York, NY 10004
By:    Jacob C. Cohn, Esq.

GIBSON, DUNN & CRUTCHER LLP
*Attorneys for William Vale Owner LLC*
333 South Grand Avenue
Los Angeles, CA 90071
By:    Michael G. Farag, Esq.

200 Park Avenue
New York, NY 10166
By:    Keith R. Martorana, Esq.
       Harry R. Silvera, Esq.

DAVIS POLK & WARDWELL LLP
*Attorneys for Yoel Goldman*
450 Lexington Avenue
New York, NY 10017
By:    Elliot Moskowitz, Esq.
       Chase McReynolds, Esq.

OFFICE OF THE NYS ATTORNEY GENERAL
*Attorney for NYS Department of Taxation and Finance*
28 Liberty Street
New York, NY 10005
By:    Leo V. Gagion, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Wythe Berry Fee Owner LLC (the "Debtor") is the owner of a commercial real property complex located at 55 Wythe Avenue, Brooklyn, NY (the "WV Complex") that is comprised of the William Vale Hotel, office and retail space, and parking.  Over a year and a half ago, an involuntary Chapter 11 petition was filed and, after an unsuccessful motion to dismiss, an order for relief was entered.  (*See* ECF Doc. # 57.)

Despite the challenges the Debtor faced when it entered chapter 11, the Debtor has worked throughout the pendency of this case with its constituencies to resolve issues material to its emergence from bankruptcy.  The product of its efforts is encapsulated in the sale of the WV Complex (the "WV Complex Sale") and a global settlement (as amended, the "Settlement") with the Mishmeret Trust Company Ltd. ("Mishmeret" or the "Trustee"), Zelig Weiss ("Weiss"), and number of other entities.[1]  Each of these is incorporated in the Debtor's *Fourth Amended Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC* (ECF Doc. # 364 and, together with the plan supplement (the "Plan Supplement," ECF Doc. # 335), the "Plan") and its related disclosure statement (the "Disclosure Statement," ECF Doc. # 363) that are before the Court for its consideration.

---

[1]    The entities are comprised of WB Hotel LLC ("Hotel Sub"), WB Operations LLC ("Op Sub"), WB FNB LLC ("FNB Sub"), YG WV LLC ("YG WV"), Wythe Berry Member LLC ("Member"), AYH Wind Down LLC ("Wind Down"), Wythe Berry LLC ("WB"), The William Vale Hotel LLC ("WV Hotel"), The William Vale FNB LLC ("WV FNB"), North 12 Parking LLC ("Parking"), Espresso Hospitality Management LLC ("Espresso"), TWV Domain LLC ("Domain"), and The William Vale Staffing LLC ("Staffing").

Pending before the Court is the (A) motion (the "Motion," ECF Doc. # 246) of Wythe

Berry Fee Owner LLC (the "Debtor"), seeking entry of an order (i) approving the Disclosure

Statement; (ii) approving solicitation, voting, and tabulation procedures; (iii) approving the form

of ballots and notices; (iv) scheduling a confirmation hearing; (v) establishing procedures for

filing confirmation objections; (vi) approving form and manner of notice of confirmation

hearing; and (vii) granting related relief and (B) confirmation of the Plan.  Annexed to the

Motion, as Exhibit A, is a proposed order granting the relief sought with respect to the

Disclosure Statement (the "Proposed Order").

While the Motion sought approval of the Disclosure Statement, with a hearing on

confirmation to follow, with the Court's permission, the case proceeded with a combined

Disclosure Statement and Plan Confirmation hearing.[2]  The Disclosure Statement and Plan

before the Court represent the sixth iteration of the Debtor's proposed Disclosure Statement and

Plan.  (*See* ECF Doc. # 242 (initial disclosure statement); ECF Doc. # 243 (initial plan); ECF

Doc. # 280 (first amended disclosure statement); ECF Doc. # 281 (first amended plan); ECF

Doc. # 302 (second amended disclosure statement); ECF Doc. # 303 (second amended plan);

ECF Doc. # 305 (third amended disclosure statement); ECF Doc. # 306 (third amended plan);

ECF Doc. # 339 (fourth amended disclosure statement); ECF Doc. # 340 (fourth amended plan);

ECF Doc. # 363 (the Disclosure Statement); ECF Doc. # 364 (the Plan).)

---

[2]     The Debtor initially solicited acceptances of the *Amended Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC* (ECF Doc. #281), the second iteration of the Plan.  After entering into the Settlement, the Debtor resolicited acceptances of the *Second Amended Plan of Reorganization of Wythe Berry Fee Owner LLC* (ECF Doc. # 306), the fourth iteration of the Plan, which has since been further amended.  The Debtor did not resolicit acceptances and rests on the voting tabulation results with respect to the fourth iteration of the Plan.  (*See Declaration of Daniel Sasson Regarding the Solicitation and Tabulation of Votes on the Second Amended Plan of Reorganization of Wythe Berry Fee Owner LLC*, ECF Doc. # 333 (the "Voting Declaration") ¶ 10 (indicating that the Debtor did not, and does not intend to, resolicit votes to accept or reject the Plan "because the changes in the Third Amended Plan of Reorganization do not affect the distributions to creditors in Classes 1 and 3" so "votes solicited for the Second Amended Plan of Reorganization remain valid").)

In support of confirmation, the Debtor filed the *Debtor's Opening Brief in Support of Confirmation of Third Amended Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC* (the "Confirmation Brief," ECF Doc. # 337) along with the declaration of Assaf Ravid, plan administrator of AYH Wind Down LLC (the "AYH Wind Down Plan Administrator" and his declaration, the "Ravid Declaration," ECF Doc. # 336). The Debtor also filed the Voting Declaration concerning the solicitation and tabulation of votes on the Plan.

The Debtor received two formal responses: on March 3, 2024, creditor and mechanic's lienholder, Schimenti Construction Company LLC ("Schimenti"), filed a limited objection (the "Schimenti Limited DS Objection," ECF Doc. # 262); on May 8, 2024, Yoel Goldman ("Goldman") filed an objection (the "Goldman Objection," ECF Doc. # 330) to confirmation of the Plan as well as the Settlement as it was memorialized at the time in the Initial Settlement Agreement (defined below). In support of the Goldman Objection, Goldman filed the declaration of Elliot Moskowitz, an attorney at Davis Polk & Wardwell LLP (the "Moskowitz Declaration," ECF Doc. # 331).

On May 13, 2024, Weiss and the Debtor each filed a reply to the Goldman Objection (the "Weiss Reply," ECF Doc. # 351 and the "Debtor Reply," ECF Doc. # 352, respectively). The Debtor Reply is supported by the declaration of Assaf Ravid (the "Ravid Reply Declaration," ECF Doc. # 354).[3]

On May 15, 2024, the Court held a combined hearing (the "Combined Hearing") on approval of the Disclosure Statement and confirmation of the Plan.

Concurrent with the entry of this Opinion, the Court is separately entering the *Memorandum Opinion and Order Approving the Settlement* (the "Settlement Opinion") that

---

[3]    A prior version of the Ravid Reply Declaration was filed at ECF Doc. # 353 but omitted copies of the exhibits referenced.

5

concludes that Weiss possessed the authority to enter into and bind the Operating Entities to the

Settlement and approves the Settlement.  In addition, the Court is also entering the *Findings of*

*Fact, Conclusions of Law, and Order Approving the Modified Disclosure Statement and*

*Confirming the Modified Chapter 11 Plan of Wythe Berry Fee Owner LLC* (the "Disclosure

Statement and Confirmation Order").  The Court's findings and conclusions set forth in the

Settlement Opinion and the Disclosure Statement and Confirmation Order are incorporated

herein by reference.

The Court writes here separately to explain its reasoning in support of the Disclosure

Statement and Confirmation Order.

## I.   BACKGROUND

### A.  Relevant Case History

#### 1.   The Debtor and the Lease Agreement

On or about February 28, 2017, the Debtor and Wythe Berry LLC entered into a lease

agreement (the "Lease"), pursuant to which the Debtor leased the WV Complex to Wythe Berry

LLC ("Lessee").  (Motion ¶ 10.)  Weiss and Goldman serve as guarantors under the Lease.  (*Id.*)

The Debtor terminated the Lease, effective as of May 20, 2021, based upon Lessee's failure to

pay rent due under the Lease and other defaults.  (*Id.*; *see also Memorandum Opinion and Order*

*Granting Plaintiff's Motion for Partial Summary Judgment Against Wythe Berry LLC*, Adv. Pro.

No. 23-01012 ("Partial SJ Decision," ECF Doc. # 45) (granting partial summary judgment,

including a declaration that the Lease was cancelled and terminated, effective May 20, 2021).)

The Lessee did not vacate or surrender the WV Complex.  (Motion ¶ 10.)

2.   The State Court Action

On June 11, 2021, the Debtor filed a complaint in the Supreme Court of the State of New York, Kings County (the "State Court") in the case captioned *Wythe Berry Fee Owner LLC v. Wythe Berry LLC*, Index No. 514152/2021 (the "State Court Action").  (*Id.* ¶ 11.)  The complaint alleged breaches of the Lease for, among other things, the Lessee's failure to pay rent and sought both judgment that the Lease had been terminated and the ejectment of the Lessee.  (*Id.*)

3.   The Involuntary Chapter 11 Filing and Removal of the State Court Action

On October 6, 2022 (the "Petition Date"), Mishmeret, solely in its capacity as Trustee of the Series C Notes, Yelin Lapidot Provident Funds Management Ltd., the Phoenix Insurance Company Limited, and Klirmark Opportunity Fund III L.P. (collectively, the "Petitioning Creditors") filed an involuntary chapter 11 petition against the Debtor.  (*See* ECF Doc. # 1).  Following a trial on January 17, 2023, the Court denied the motion to dismiss and entered an Order for Relief against the Debtor on January 18, 2023 (ECF Doc. # 57).  (*Id.*)

On February 14, 2023, the State Court Action was removed to this Court as an adversary proceeding under Adv. Pro. Case No. 23-01012 (the "Adversary Proceeding"), which remains pending.  (*Id.* ¶ 13.)  Thereafter, the Debtor filed a motion for partial summary judgment on August 23, 2023, as to liability against Lessee.  (*Id.* ¶ 14.)  On October 5, 2023, the Court entered the Partial SJ Decision, granting partial summary judgment to the Debtor in the Adversary Proceeding and finding, among other things, that the Lease was cancelled and terminated by the Notice of Cancellation served on May 20, 2021.  (*Id.* ¶ 16.)

4.   Sale of the WV Complex

After Lessee vacated the WV Complex, the Debtor began efforts to sell it.  (*Id.* ¶ 17.)  On October 26, 2023, the Debtor sought authorization to retain and employ Eastdil and A&G Realty

Partners, LLC (collectively, the "Brokers") as the Debtor's real estate brokers and filed a bid

procedures motion (ECF Doc. # 216).  (*Id.*)  On December 8, 2023, the Court entered an order

approving the Debtor's proposed bid procedures (ECF Doc. # 220) and, on December 20, 2023,

authorized the Debtor's retention of the Brokers.  (*Id.* ¶ 18.)  Additionally, on February 22, 2024,

the Court entered an order approving the Debtor's selection of William Vale Owner LLC as the

stalking horse bidder (the "Stalking Horse Bidder") for the sale as well as the Debtor's proposed

bid protections for the Stalking Horse Bidder.  (*See* ECF Doc. # 256.)

As set forth in the Executive Summary to the Disclosure Statement, the Debtor entered

into an agreement to sell the WV Complex to the Stalking Horse Bidder for a purchase price of

$177,000,000.00.  (Disclosure Statement at 1.)  At the Combined Hearing, the Court approved

the WV Complex Sale.  (*See* May 15, 2024 Hr'g Tr. at 106:5–8 ("I've reviewed this completely.

I agree . . . the sale is appropriate.  The process was conducted properly.  It's an arm's-length

transaction.  It's an independent buyer.  The sale is approved.").)

5. Settlement with Zelig Weiss and his Affiliated Entities

The Debtor, along with Weiss and the Trustee, among others, entered into the Settlement.

The Settlement (i) resolves potential litigation relating to (A) the Adversary Proceeding to

liquidate the Debtor's damages against Wythe Berry LLC and prosecute the Debtor's guaranty

claims against Weiss and (B) the Series C Notes, the Lease, and the bankruptcy proceedings; and

(ii) assists in the WV Complex Sale and confirmation of the Plan.  (*See Debtor's Motion for

Entry of an Order Approving Settlement Agreement Pursuant to Bankruptcy Rule 9019* (the

"9019 Motion"), ECF Doc. # 304 ¶ 2.)

On May 10, 2024, the Debtor amended the initial version of the settlement agreement

(the "Initial Settlement Agreement") and filed a revised version (the "Revised Settlement

Agreement," ECF Doc. # 341).  The Revised Settlement Agreement reflects the parties' entry

into, and the Court's approval of, a stipulation concerning the Debtor's use of cash collateral.

(*See Order Approving Stipulation, Agreement and Order Regarding Cash Collateral*, ECF Doc.

# 328; Revised Settlement Agreement at 5, 10.)  Moreover, the Revised Settlement Agreement

was further amended to reflect (i) the Debtor's purchase of the internet domain for the William

Vale Hotel and any associated goodwill from WV Hotel and not TWV Domain LLC and (ii) that

proceeds from the purchase will be distributed equally between Yoel and Goldman unless either

otherwise directs.  (Revised Settlement Agreement at 8.)  This Revised Settlement Agreement

resolves the Goldman Objection as to the domain name.  (*See* May 15, 2024 Hr'g Tr. at 17:21–

24 ("We have reached an agreement, as the Court has been advised, about the domain name.

The parties have agreed to settle the domain name and the proceeds allocated to that.").)

        The pending Plan and Disclosure Statement incorporate the terms of the Settlement,

which the Court has approved.

        **B.  Overview of the Plan**

            1.  Generally

        The Plan, which contemplates the ultimate dissolution of the Debtor, classifies holders of

claims and interests into 4 classes with Class 2 (Mechanics' Lien Claims) further divided into 4

subclasses.[4]  (Disclosure Statement at 15.)  Only Class 1 (Senior Secured Claims) and Class 3

(Unsecured Claims) are impaired and are entitled to vote on the Plan.  (*Id.*)  The Plan provides

for allowed claims to be paid in cash following the WV Complex Sale in accordance with the

priorities set forth in the Bankruptcy Code.  (Motion ¶ 19; *see also* Disclosure Statement at 1

(stating that sale proceeds payable to the Debtor, together with the Debtor's cash on hand, will

---

[4]        Defined terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan
and Disclosure Statement.

fund the Distribution Fund from which holders of allowed claims and interests will be paid in accordance with the Plan and priorities under the Bankruptcy Code).)

The Debtor submits that "[i]n developing the Plan, the Debtor gave due consideration to various exit alternatives and engaged in significant discussions and negotiations with representatives of the Noteholders, the Notes Trustee, and other parties in interest." (Disclosure Statement at 1.) Further, "[t]he Debtor believes that any alternative to confirmation of the Plan would result in significant delays, litigation, and additional costs, which would ultimately lower the recoveries for all holders of Allowed Claims." (*Id.*)

        2.   Proposed Classification of Claims and Interests

The Plan purposes to classify claims and interests in the following manner:

| Classes of Claims | Status & Voting Rights | Proposed Treatment |
|---|---|---|
| **Class 1** – **Senior Secured Claims** | Impaired; Entitled to vote. | Each holder of an Allowed Senior Secured Claim shall receive its Pro Rata Share of the remaining proceeds in the Distribution Fund promptly after the payment in full in Cash or adequate reserve being made by the Debtor of all of the following (i) all regular closing costs and adjustments; (ii) Allowed Fee Claims; (iii) Allowed Administrative Claims (subject to the provisions of Section 2.1); and (iv) Allowed Priority Claims (subject to the provisions of Section 2.3); provided, however, that any deficiency Claim of a holder of Series C Notes shall be treated as a Class 3 Unsecured Claim. |
| **Class 2A** – **Mechanic's Lien Claim of D and J** | Unimpaired; Not entitled to vote. | Each holder of an Allowed Mechanic's Lien Claim shall receive payment in full in Cash. To the extent that any Mechanic's Lien Claim has not been Allowed as of the Confirmation Date, the Debtor will seek an estimation order from the Bankruptcy Court as to the amount to be reserved on account of such Mechanic's Lien Claim.<br><br>The same treatment applies to claims falling in Classes 2A through 2D. |
| **Class 2B** – **Mechanic's Lien Claim of JSP** | Unimpaired; Not entitled to vote. | (Same as Class 2A.) |
| **Class 2C** – **Mechanic's** | Unimpaired; Not entitled to vote. | (Same as Class 2A.) |

| Classes of Claims | Status & Voting Rights | Proposed Treatment |
|---|---|---|
| **Lien Claim of Schimenti** | | |
| **Class 2D** – **Mechanic's Lien Claim of Ziba** | Unimpaired; Not entitled to vote. | (Same as Class 2A.) |
| **Class 3** – **Unsecured Claims** | Impaired; Entitled to vote. | Each holder of an Allowed Unsecured Claim shall receive its Pro Rata Share of the remaining proceeds in the Distribution Fund promptly after the payment in full in Cash or adequate reserve being made by the Debtor of all of the following (i) all regular closing costs and adjustments; (ii) Allowed Fee Claims; (iii) Allowed Administrative Claims (subject to the provisions of Section 2.1); (iv) Allowed Priority Claims (subject to the provisions of Section 2.3); (v) Allowed Senior Secured Claims; and (vi) Allowed Mechanic's Lien Claims Class 3 is impaired. Holders of Allowed Unsecured Claims are entitled to vote to accept or reject the Plan. |
| **Class 4** – **Interests** | Unimpaired; Not entitled to vote. | Member, as the sole holder of a Class 4 Interest shall receive an initial distribution on the Effective Date in the amount of $2,127,107, which it shall distribute to Weiss. If (A) (i) the aggregate Mechanic Lien Claims is Allowed in an amount less than full amount asserted in the proofs of claim filed by Mechanic Lien Claims, or (ii) the Unfair Labor Claim is Allowed in amount less than $700,000, or (iii) the legal fees expended to settle or resolve the Mechanic Lien Claims were less than the amount set aside by the Debtor, or (B), if the Mechanic Lien Claims and the Unfair Labor Claim are not Allowed prior to the Plan Effective Date, and any amounts remain in the Debtor Contingent Liabilities Escrow after resolution and satisfaction in full of the Mechanic's Lien Claims and the Unfair Labor Claim, the Debtor shall distribute such amounts to Member, who shall make an immediate equity distribution of such distribution to each member of Member, in accordance with their pro rata ownership percentages of Member.<br><br>"Member" refers to Wythe Berry Member LLC. |

(Disclosure Statement at 16–17.) The Disclosure Statement also details the treatment of administrative expenses and other unclassified claims, including claims for professional fees and priority tax claims. (*Id.* at 13–15.).

3. <u>Means for Implementation</u>

   *a. Sale of the WV Complex*

The Plan provides for recoveries to allowed claim holders in the form of cash from the

WV Complex Sale.  Specifically, sale proceeds—net of sale commissions, purchase price

adjustments, and contingency reserves—will be used "solely to fund the Distribution Fund" for

distributions to creditors and to satisfy payments in accordance with the Plan.  (Disclosure

Statement at 17.)  The Debtor indicates that the sale will be "in accordance with the priorities set

forth in the Bankruptcy Code."  (Motion ¶ 19.)  As a condition precedent to confirmation of the

Plan, the Bankruptcy Court must approve the WV Complex Sale, the closing of which serves as

a condition precedent to the Effective Date of the Plan.  (Disclosure Statement at 36.)

   *b. The Global Settlement*

In addition to the WV Complex Sale, the Debtor has also entered into the Settlement that

provides for, among other things:

- a cash payment of $8,512,152.00 from Wythe Berry LLC to the Debtor in three
  installments in settlement of the Adversary Proceeding;

- a transfer to the Debtor of the entirety of the Employee Retention Tax Credit from the
  Internal Revenue Service (with any excess above $726,000.00 to be transferred to
  Espresso);

- the surrender, assignment, and transfer of all social media accounts of The William
  Vale Hotel LLC to WB Hotel LLC;

- the Debtor's purchase of an internet domain from WV Hotel for a purchase price of
  $1.3 million in order to maintain The William Vale Hotel as a going concern with
  proceeds to be distributed equally between Weiss and Goldman unless either
  otherwise directs;[5]

---

[5]    A copy of the domain name purchase and transfer agreement is annexed to the Revised Settlement
Agreement as Exhibit C.

- the Debtor's payment of $200,000.00 to Espresso for rendered consulting services in connection with the transition of operations and management of The William Vale Hotel;

- the Debtor's payment of 100% of any costs or liabilities incurred in connection with settling, extinguishing, and/or satisfying the Mechanic's Lien Claims and the unfair labor practice claim pending before the National Labor Relations Board;

- the transfer of the liquor license utilized in the food and beverage service at The William Vale Hotel to an affiliate of the Purchaser;

- cash distributions to Wythe Berry Member LLC, the sole member of the Debtor, and an equity distribution from Wythe Berry Member LLC to Weiss and each member of Wythe Berry Member LLC in accordance with their *pro rata* ownership percentages;

- Wythe Berry LLC's execution of a Memorandum of Termination of Lease, retroactive to May 20, 2021, to be publicly filed in the chain of title of the WV Complex; and

- certain releases of the parties to the Settlement.

(*See generally* Revised Settlement Agreement.)

In connection with the cash distributions contemplated under the Settlement, the Plan provides for an initial distribution of $2,127,107.00 to Wythe Berry Member LLC, the holder of Interests in the Debtor, and an additional distribution to Wythe Berry Member LLC of any amounts remaining in escrow after resolution and satisfaction in full of certain contingent liabilities. (Disclosure Statement at 11.)

Lastly, as with the WV Complex Sale, entry of an order approving the Settlement also serves as a condition precedent to confirmation. (*Id.* at 36.)

> c.  *Administration and Liquidation of the Debtor*

In consultation with the Trustee, the Debtor will select a Plan Administrator who will administer and implement the Plan and the wind down, dissolution, and liquidation of the Debtor and distribution of any remaining assets in accordance with the Plan (the "Wind Down").

(Disclosure Statement at 26–27.)  Upon the conclusion of the Wind Down, the Plan

Administrator will dissolve the Debtor.  (*Id.* at 27.)

      3.  <u>Exculpation Clause</u>

Section 10.7 of the Plan sets forth the exculpation clause (the "Exculpation Provision").

As initially set forth in the fourth and fifth iterations of the Plan, the Exculpation Provision

provides:

(a) To the maximum extent permitted by applicable law, no Exculpated
Party will have or incur, and each Exculpated Party is hereby released
and exculpated from, any claim, obligation, suit, judgment, damage,
demand, debt, right, cause of action, remedy, loss, and liability for any
conduct occurring on or after the Petition Date and up to and including
the Effective Date in connection with or arising out of the filing and
administration of the Chapter 11 Case, the Sale process, the closing of
the Sale; the Disclosure Statement, the Plan Administration Agreement,
including the formulation, negotiation, preparation, dissemination,
implementation, administration, confirmation, and consummation
thereof, the Plan, or the solicitation of votes for, or confirmation of, the
Plan; the funding or consummation of the Plan; the occurrence of the
Effective Date; the administration of the Plan or the property to be
distributed under the Plan; or the transactions in furtherance of any of
the foregoing; or upon any other related act or omission, transaction,
agreement, event, or other occurrence taking place from the Petition
Date through and including the Effective Date; except for acts or
omissions of an Exculpated Party that constitute gross negligence,
fraud, or willful misconduct, in each case as determined by a Final
Order.  This exculpation shall be in addition to, and not in limitation of,
all other releases, indemnities, exculpations, and any other applicable
law or rules protecting such Exculpated Parties from liability.

(b) To the maximum extent permitted by applicable law, no Additional
Exculpated Party will have or incur, and each Additional Exculpated
Party is hereby released and exculpated from, any claim, obligation,
suit, judgment, damage, demand, debt, right, cause of action, remedy,
loss, and liability for any conduct occurring on or after the Petition Date
and up to and including the Effective Date in connection with or arising
out of the Settlement Agreement, including the formulation,
negotiation, preparation, dissemination, implementation,
administration, confirmation, and consummation thereof or the
transactions in furtherance of any of the foregoing; except for acts or
omissions of an Additional Exculpated Party that constitute gross
negligence, fraud, or willful misconduct, in each case as determined by

14

> a Final Order. This exculpation shall be in addition to, and not in
> limitation of, all other releases, indemnities, exculpations, and any other
> applicable law or rules protecting such Additional Exculpated Party
> from liability.

(ECF Doc. # 306 § 10.7; ECF Doc. # 340 § 10.7)

At the Combined Hearing, the Debtor indicated that, if the Court issued a determination

that Weiss possessed authority to bind the Operating Entities and enter into the Settlement, the

Debtor would agree that the "exculpation provision . . . in favor of [Weiss] and the entities could

come out of the settlement agreement." (May 15, 2024 Hr'g Tr. at 186:1–7.) Accordingly, as

the Court has approved the Settlement, subsection (b) is excluded from the Exculpation

Provision as reflected in the Plan that is presently before this Court.[6]

### 4. Voting Results

On May 10, 2024, the Debtor filed the Voting Declaration, which indicates that all voting

classes—Classes 1 and 3—unanimously voted to accept the fourth iteration of the Plan (ECF

Doc. # 306) and opted into the releases set forth in section 10.6 therein by voting deadline of

May 3, 2024 at 5:00 p.m. (the "Voting Deadline"). (Voting Declaration ¶¶ 17–18.) These

results, the Debtor indicates, remain valid with respect to the current version of the Plan. (*Id.* ¶

10.) The Debtor indicates that modifications made to the Plan since solicitation do not impact

the treatment of impaired creditors and therefore, resolicitation is unnecessary. (*Id.*; *see also* 11

U.S.C. § 1127(d) ("Any holder of a claim or interest that has accepted or rejected a plan is

deemed to have accepted or rejected, as the case may be, *such plan as modified*, unless, within

the time fixed by the court, such holder changes such holder's previous acceptance or rejection.")

(emphasis added); 7 COLLIER ON BANKR. ¶ 1127.03[1][b] ("If a modification is nonmaterial, no

---

[6]    The removal of Weiss from the Exculpation Provision also addresses and resolves the informal objection
raised by the U.S. Trustee at the Combined Hearing. (*See* May 15, 2024 Hr'g Tr. at 182:13–16 ("It would be an
objection of ours, Your Honor, that [Weiss is] included as [an] exculpated part[y].").)

resolicitation is required.  Otherwise, the court should order a resolicitation.").)  The Court

agrees.

### C.  Objections Received

#### 1.  Schimenti Limited Disclosure Statement Objection

The Schimenti Limited DS Objection, which was filed in opposition to the first iteration

of the Disclosure Statement (ECF Doc. # 242), asserts that the Disclosure Statement lacks

adequate information with respect to holders of Class 2 claims.[7]  Schimenti seeks modification

of the Disclosure Statement to include additional disclosures concerning the following:

- amount of expected proceeds from the WV Complex Sale to be paid into the
  Distribution Fund;

- an estimated amount of the Distribution Fund generally;

- details regarding the purchase price and the nature and amount of "certain liabilities"
  to be assumed by the Stalking Horse Bidder;

- expected amounts payable from the Distribution Fund to (i) closing costs and
  adjustments; (ii) Allowed Fee, Administrative, Priority, and Senior Secured Claims;
  and

- anticipated distributions or range of distributions to holder of Allowed Class 2 claims.

(Schimenti Limited DS Objection ¶¶ 6–13.)

Schimenti is now an unimpaired creditor under the Plan whose claim fall in Class 2C.  He

was, therefore, not entitled to vote on the Plan.

Nonetheless, the Court finds that the Disclosure Statement is comprehensive and

information and contains sufficient information necessary for impaired creditors to make an

"informed judgment" about the Plan.  *See* 11 U.S.C. § 1125 (requiring a chapter 11 plan

---

[7]    The first iteration of the Disclosure Statement and Plan initially grouped all mechanic's lien claims together
into a single Class 2.  In the Disclosure Statement and Plan that are presently before the Court, each mechanic's lien
claim is separately classified into its own sub-class.  (*See* Disclosure Statement at 2.)  Schimenti's mechanic's lien
claim, in particular, is classified under Class 2C.

proponent to provide "adequate information" regarding a plan to holders of impaired claims and

interests entitled to vote). Only creditors falling in classes 1 and 3 are impaired, and the Court

concludes that the Disclosure Statement contains adequate information for such creditors and

satisfies the requirements of section 1125 of the Bankruptcy Code. (*See generally* Disclosure

Statement and Confirmation Order.)

           2.   <u>Goldman Objection to Confirmation and the Settlement</u>

Goldman opposes confirmation of the Plan as well as the Settlement on several grounds.[8]

*First*, he argues that the Settlement conveys his property without his consent in violation

of orders issued by the American Arbitration Association ("AAA") panel that remain in effect

and the operating agreements of WB, the William Vale Hotel LLC (operator of the space used

for traditional guest accommodations), and the William Vale FNB LLC (food and beverage

space operator) (collectively, the "Operating Entities"). (Goldman Objection ¶¶ 34–44.) The

AAA panel orders relate to the arbitration (the "Arbitration") Goldman commenced against

Weiss and the Operating Entities based on Weiss's alleged violations of his fiduciary and

contractual duties. (*Id.* ¶ 21.) The arbitration is currently stayed. (*Id.*) Additionally, he alleges

that the Settlement allows Weiss to use property Goldman owns to pay for the Settlement and

ultimately deprives him of any recourse for these actions. (*Id.* ¶ 44.)

Goldman believes that, as 50% owner of these Operating Entities, he is entitled to any

proceeds stemming from operations or the sale of assets. (*Id.* ¶ 34.) He indicates that Settlement

involves "Major Decisions" that, under the operating agreements for the Operating Entities,

would require joint written approval by Goldman and Weiss. (*Id.* ¶ 36.) Moreover, Weiss is

"engaging in unilateral Major Decisions" and making impermissible transfers out of the

---

[8]      The Goldman Objection is with respect to the fourth iteration of the Plan (ECF Doc. # 306) and the Initial
Settlement Agreement (ECF Doc. # 304), both of which have since been amended.

Operating Entities' accounts in violation of the AAA panel's standing injunctions.  (*Id.* ¶ 37.)
Therefore, approval of the Settlement along with the release of conduct via the Plan's
Exculpation Provision would permit Weiss to enter into agreements with Weiss's affiliates with
a disproportionate impact to Goldman.  (*Id.* ¶ 35.)  Goldman also details a number of other
issues, which he believes go to the idea that value is being delivered to Weiss that should equally
belong to Goldman: (i) circumstances surrounding the domain name and its ownership (*id.* ¶¶
38–39); (ii) lack of disclosure over the agreement underlying the transfer of a liquor license,
furnishings, equipment, and the related sale price (*id.* ¶ 40); (iii) lack of details concerning the
consulting services (*id.* ¶ 41); and (iv) the Initial Member Distribution (*id.* ¶ 42).

     *Second*, Goldman argues the Settlement and the Exculpation Provision violate section
1129(a)(3) of the Bankruptcy Code as they were not proposed in good faith and are otherwise
unlawful for reasons already discussed.  (*Id.* ¶ 47.)  Goldman indicates that the Debtor excluded
him from any negotiations and only contacted him after finalizing the agreement with Weiss.
(*Id.* ¶ 50.)

     *Third*, the Settlement and Exculpation Provision are subject to heightened scrutiny
because Weiss is a statutory insider.  (*Id.* ¶¶ 51–53.)  Goldman believes that Weiss is a statutory
insider of the Debtor as he is (i) an affiliate of its affiliate Wythe Berry Member LLC and (ii) an
affiliate and insider of Debtor affiliate Wythe Berry LLC.  (*Id.*)

     *Fourth*, the exculpation provision in the Plan violates sections 1123(b)(6), 1129(a)(1),
and 1129(a)(3) because it contains non-consensual third-party releases that "cut off Goldman's
claims and defenses against non-debtor fiduciaries," including the Arbitration and State Court
Action.  (*Id.* ¶ 57.)  Goldman asserts that the court lacks constitutional authority to issue final
judgment as to the exculpation provision in section 10.7 of the Plan because the releases "do not

stem from the bankruptcy itself" and are therefore, non-core under *Stern v. Marshall*, 564 U.S.

462 (2011).  (*Id.* ¶ 59 (quoting *In re Purdue Pharma L.P.*, 69 F.4th 45, 78–79 (2d Cir. 2023),

*cert. granted sub nom. Harrington v. Purdue Pharma L.P.,* No. (23A87), 2023 WL 5116031

(Aug. 10, 2023) [hereinafter "*Purdue*"]).)  Additionally, Goldman argues that every *Purdue*

factor weighs against approval of section 10.7(b) of the Plan and the majority of the *Purdue*

factors weigh against approval of section 10.7(a).  (Goldman Objection ¶¶ 61–63.)

Fifth, Goldman argues that six of the seven factors (collectively, the "*Iridium* Factors")

set forth in the Second Circuit's ruling in *Motorola, Inc. v. Official Comm. of Unsecured*

*Creditors (In re Iridium Operating LLC)*, 478 F.3d 452 (2d Cir. 2007) weigh against approval of

the Settlement.  (*Id.* ¶¶ 64–70.)  In support, Goldman argues that he is the "only party-in-interest

not a party to the Settlement Agreement."  (*Id.* ¶ 67.)

Sixth, Goldman argues he has standing to raise his objection since he possesses a "direct

pecuniary interest in the Settlement Agreement and Plan exculpation provisions which . . .

together misappropriate his property and release his claims and defenses in ongoing and

threatened litigation."  (*Id.* ¶ 71.)  Therefore, he is a "party in interest" under section 1109(b) of

the Bankruptcy Code who "may object to a Rule 9019 motion to approve a settlement."  (*Id.*)

Goldman, nonetheless, proposes a resolution that he states, if incorporated, would resolve

his objection.  He indicates that if the Debtor incorporates his proposed modifications to the

exculpation provisions as set forth in Exhibit 13 to the Moskowitz Declaration, his concerns

would be allayed.  (*Id.* ¶ 72.)  Additionally, if the Settlement were to be modified to "place all

money being paid to Weiss and/or any entities under his control into escrow until the Arbitration

is completed and a final order is issued by the appropriate tribunal with jurisdiction to address

each party's rights," his objection as to the Settlement would also be resolved.  (*Id.*)  Goldman

argues that these "compromises" would allow the Plan to go effective while "respecting Goldman's legal and property rights." (*Id.* ¶ 73.)

### D. Replies to the Goldman Objection

#### 1. Weiss Reply

Weiss indicates that each of the Operating Entitles are New York limited liability companies and are therefore, governed under New York limited liability company laws ("NY LLCL"). (Weiss Reply ¶ 1.) Weiss argues that neither him nor Goldman have any interest in any specific property of the Operating Entities in accordance with section 601 of the NY LLCL, which provides that a member has "no interest in specific property." (*Id.*) Rather, Goldman is entitled solely to his "share of distributions, if any, made by the respective [Operating Entities]." (*Id.* ¶ 2.) This right is qualified by provisions reserving the right to such distributions to the Managing Member of the Operating Entities, which is undisputed to be Weiss. (*Id.*) Goldman does not argue that Weiss violated the waterfall set forth in the Operating Entities' respective operating agreements. (*Id.*)

Weiss asserts that none of the terms of the Settlement Agreement run afoul of the Major Decisions provision in the governing operating agreements. (*Id.* ¶ 4.) Indeed, he rejects Goldman's contentions that:

- the Settlement constitutes an "agreement between the Company and an Affiliate of any Member" or alters the terms and conditions of any covered agreements (*id.* ¶ 5);

- the cash and non-cash assets of the Operating Entities used to fund the Settlement are not being used for the exclusive benefit of the Operating Entities (*id.* ¶ 6); and

- he is being disproportionately impacted since (i) the Settlement Agreement affects Goldman and Weiss equally (neither is getting a distribution, each is benefiting the same under the releases, and each is giving up the same rights), (ii) the benefits Weiss is receiving under the Settlement that Goldman will not receive are unrelated to Weiss's status as a Member of the Operating Entities, and (iii) Goldman receives "nothing at all" with or without the Settlement (*id.* ¶¶ 8–9).

Weiss asserts that Goldman is mischaracterizing the arbitration proceedings during which he raised the issue of whether the Major Decisions provision prohibited Weiss from entering into a transaction with the Debtor to purchase the WV Complex. (*Id.* ¶¶ 10–11.) The arbitration panel ultimately "rejected Goldman's argument" and permitted Weiss to proceed with the sale. (*Id.* ¶ 12.) Weiss further notes that the arbitration panel concluded that Goldman failed to establish that the Major Decisions clause applies to Weiss's "personal conduct" as opposed to conduct on behalf of the company. (*Id.* ¶ 13.) As for the injunction the arbitration panel issued, it was limited to Weiss in his individual capacity only and is, therefore, inapplicable to the Plan or Settlement Agreement. (*Id.* ¶¶ 15, 18.) Weiss suggests that the arbitration orders are inapplicable as no part of the Settlement or the Plan involves Weiss obtaining an interest in the William Vale Hotel or its assets and otherwise does not apply to the Operating Entities. (*Id.* ¶¶ 16–17.)

### 2. Debtor Reply

At the outset, the Debtor indicates that the Revised Settlement Agreement reflects a settlement with Goldman over his objection to the domain name. (Debtor Reply ¶¶ 13–14.) The Debtor then addresses each of Weiss's contentions.

*First*, the Debtor argues that Weiss possessed the authority to enter into the Settlement and convey the property to be transferred to the Debtor contemplated therein. (*Id.* ¶¶ 15–23.) Echoing the Weiss Reply, the Debtor, citing to section 601 of the NY LLCL, states that Goldman is only entitled to his "right to a share of distributions, if any, made by the [Operating Entities] subject to the terms of the operating agreements, which place limits on this right." (*Id.* ¶ 16.) The Debtor asserts that Weiss's arguments that the Major Decisions provision of the operating

agreements prevents the Settlement from moving forward is also without merit for the following

reasons:

- the Settlement does not impact the "terms and conditions of any agreement between the Company and an Affiliate of any Member" and Goldman has not identified any (*id.* ¶ 18);

- Goldman's argument that the Operating Entities' assets are not being used for the exclusive benefit of the Operating Entities fails to recognize the Court's ruling in the Partial SJ Decision and that, but for the Settlement, the Debtor would seek monetary recovery (*id.* ¶ 19);

- the Settlement impacts Goldman and Weiss equally (*id.* ¶ 20); and

- Goldman waived any claim that Weiss improperly settled State Court Action as he did not participate in it while it was in state court and did not oppose the motion for partial summary judgment or otherwise object to Weiss opposing the motion on behalf of Wythe Berry LLC (*id.* ¶ 23.)

*Second*, the arbitral panel decisions do not bar Weiss from entering into the Settlement

since the arbitration decisions only prevented Weiss, in his individual capacity, from pursuing

and/or consummating the WV Complex Sale.  (*Id.* ¶¶ 25–27.)  No part of the Settlement or Plan

implicates Weiss "purchas[ing], acquir[ing] or otherwise obtain[ing] an interest in" the WV

Complex or its assets and is therefore, inapplicable to the Settlement or the Plan.  (*Id.* ¶ 28.)

*Third*, the AYH Wind Down Plan Administrator supports the Settlement and believes it is

in the best interests of AYH Wind Down and the Debtor since it maximizes recoveries for the

Series C Noteholders against the Debtor and resolves claims and threatened claims against Weiss

and YG WV.  (*Id.* ¶¶ 29, 31.)  Specifically, Settlement resolves claims or causes of action that

Weiss could assert against YG WV or AYH Wind Down.  (*Id.* ¶ 30.)  Therefore, the payment

that YG WV is directing Member to pay Weiss is reasonable when accounting for litigation

costs.  (*Id.*)

*Fourth*, the Debtor argues that the Goldman's issues with the Settlement are without

merit since the Debtor acted on reasonable information in agreeing to these provisions and its

business judgment cannot be second-guessed.  (*Id.* ¶ 41.)  With respect to the domain name and social media accounts, the Debtor maintains that it "already had the right to sell the Domain Name and Social Media Accounts as assets owned by the Debtor as a matter of intellectual property law" despite settling with Goldman on the domain name.  (*Id.* ¶ 33.)  Additionally, the Debtor defends its decision to purchase the domain name and social media accounts as an exercise of its business judgment in connection with entering into the Settlement.  (*Id.* ¶ 36.)  The Debtor considered its litigation position, the need to resolve the issue outside of the Settlement in an adversary proceeding, and the purchaser's willingness to close on the WV Complex Sale. (*Id.*)  The Debtor reserves the right to commence an adversary proceeding if the Court declines to approve the terms of the Settlement that convey the social media accounts to the Debtor.  (*Id.*) The $45,000.00 valuation ascribed to the social media accounts in the Settlement was reached after consultation with the Debtor's hospitality consulting and interim hotel management company, Performance Interim Advisory LLC d/b/a LW Hospitality Advisors ("LWHA") and the William Vale Hotel's Director of Marketing.  (*Id.* ¶ 37.)

With respect to the Debtor's agreement regarding its furniture, fixtures, and equipment ("FF&E") as well as consulting services, the Debtor indicates that it was not required to disclose support for the consideration to be paid to WB FNB and Espresso.  (*Id.* ¶ 38.)  In any event, the Debtor reached a $5,000 payment for the transfer of the FF&E, if any, at the WV Complex because the transfer of the liquor license was "invaluable" to the Purchaser and the sale generally.  (*Id.*)  Transition of management and direction of the WV Complex was essential both to the Debtor's assumption and control of the WV Complex management and operations and to the sale contract.  (*Id.* ¶ 39.)  Therefore, the payment negotiated between the Debtor and Espresso was warranted.  (*Id.*)

As for the initial member distribution issue, the Debtor contends that Goldman has no standing to raise this issue since he is "not aggrieved in any way by this distribution." (*Id.* ¶ 40.)

*Fifth*, there is no basis for the assertion that the Settlement was a product of collusion. The Settlement is a multi-party agreement where parties made concessions and obtained benefits, was negotiated in good faith and at arm's-length, and Weiss is not an "insider" since he lacks the ability to control or influence the Debtor. (*Id.* ¶¶ 42–44.) Therefore, heightened scrutiny is unwarranted. (*Id.* ¶ 45.)

*Sixth*, the Exculpation Provision complies with Second Circuit law. It is essential to the Plan, the sale contract, and the Settlement and all voting classes voted to approve it. (*Id.* ¶ 46.) In any event, the Exculpation Provision meets the *Metromedia* factors and is integral to the Plan. (*Id.* ¶¶ 47–49.) Moreover, Goldman is not a creditor of the estate and possesses no standing to object and is seeking the ability to pursue his claims twice—once here and again before the arbitral panel. (*Id.* ¶¶ 50–51.)

*Seventh*, Goldman lacks standing to object to the Settlement since he is not a creditor and lacks a "direct economic stake." (*Id.* ¶ 53.) Any harm he may suffer is too remote. (*Id.*)

*Seventh*, the *Iridium* Factors support approval of the Settlement and Weiss relies on "flawed premises" to rebut the argument that the factors are satisfied. (*Id.* ¶ 55.)

## II.    <u>DISCUSSION</u>

### A.  The Exculpation Provision, as Modified, is Proper

"Exculpation provisions are designed to 'insulate court-supervised fiduciaries and some other parties from claims that are based on actions that relate to the restructuring.'" *In re Genesis Glob. HoldCo, LLC*, No. 23-10063 (SHL), 2024 WL 2264719, at *56 (Bankr. S.D.N.Y. May 17, 2024) (quoting *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 720

(Bankr. S.D.N.Y. 2019)).  Indeed, "[i]t is well settled that an exculpation clause approved at

confirmation may exculpate estate fiduciaries like a committee, its members, and estate

professionals for their actions in the bankruptcy case except where those actions amount to

willful misconduct or gross negligence." *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG),

2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June 18, 2022) (citations omitted).  Such provisions

in chapter 11 plans are "not uncommon" and are generally permissible "so long as they are

properly limited and not overly broad."  *Id.* at *49 (quoting *In re Nat'l Heritage Found., Inc.*,

478 B.R. 216, 233 (Bankr. E.D. Va. 2012)).

Generally, it has been recognized that:

> [A] proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions.  If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should be not be subject to claims that effectively seek to undermine or second-guess this Court's determinations. In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do.

*Aegean Marine Petroleum Network*, 599 B.R. at 721.

Here, the Exculpation Provision, as modified, provides that the Exculpated Parties are

exculpated for actions from the Petition Date through the Effective Date that stem from the (i)

filing and administration of the chapter 11 case; (ii) the WV Complex Sale; (iii) the Disclosure

Statement; (iv) the Plan; (v) transactions in furtherance of the foregoing; or (vi) "any other

related act, omission, transaction, agreement, event, or occurrence."  (Plan § 10.7(a).)  The Plan

defines "Exculpated Parties" to comprise of (a) the Debtor; (b) the Plan Administrator; (c) the

[Trustee] and its representatives and advisors; (d) the Series C Noteholders and their

representatives and advisors; (e) any current director, manager or officer of the Debtor; (f) any

advisors retained by the Debtor in connection with the Chapter 11 Case; and (g) with respect to

each of the foregoing Persons in clauses (a) through (f), only such Entity or Person's

representatives and advisors, in each case in their capacity as such, who served as estate

fiduciaries in the Chapter 11 Case."  (*Id.* § 1.49.)

*First*, the scope of Exculpated Parties is proper as it seeks to exculpate parties who have

"made substantial contributions to the reorganization process and whose inclusion in the

exculpation provision was a critical component in forming a plan."  *Genesis*, 2024 WL 2264719,

at *58.  In general, "[e]xculpated [p]arties who are not estate fiduciaries are entitled to benefit

from a broad exculpation provision" where they have been "actively involved in all aspects of

[the] Chapter 11 Cases and have made significant contributions to the success of [the] cases."

*LATAM*, 2022 WL 2206829, at *50.  Therefore, while Exculpated Parties includes non-

fiduciaries such as the Trustee, the Series C Noteholders, and their respective professionals, the

participation of such parties in these chapter 11 cases was instrumental to the Debtor formulating

a plan "on an expedited basis," and their support was "essential to the successful negotiation of

the Plan, the Stalking Horse Agreement and the Settlement Agreement."[9]  (Confirmation Brief ¶

42.; *see also* May 15, 2024 Hr'g Tr. at 178:2–6 (stating that the Court has no issue with the

Debtor's inclusion of the Trustee, the Series C Noteholders, and their professionals as the

exculpation is "in relation to their conduct during this case to get to where we are now"); *id.* at

181:19–24 (indicating that the U.S. Trustee has no issue with the inclusion of the Trustee and

Series C Noteholders despite their typical "strict" view that exculpation should be limited solely

to estate fiduciaries).)  Accordingly, absent gross negligence or intentional wrongdoing,

extension of the Exculpation Provision to such parties for matters relating to the bankruptcy case

---

[9]    Goldman objects to the Exculpation Provision for its inclusion of the Trustee and Series C Noteholders
(and their representatives and advisors), but "does not object to the exculpation of the Debtor and its fiduciaries such
as the Plan Administrator, 'any current director, manager, or officer of the Debtor,['] and 'any advisors retained by
the Debtor in connection with the Chapter 11 Case.'"  (Goldman Objection ¶ 56; *id* at 25 n.7.)

is appropriate. *Aegean Marine Petroleum Network*, 599 B.R. at 721 ("I think that a proper exculpation provision is protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions.").

*Second*, the scope of the exculpated conduct is also proper. The Exculpation Provision is limited to acts that occurred in connection with the bankruptcy case and includes a carve out for "acts or omissions . . . that constitute gross negligence, fraud, or willful misconduct, in each case as determined by Final Order." (Plan § 10.7(a).) This is sufficiently narrow and consistent with exculpation clauses approved in other cases before this Court. *See, e.g.*, *In re Granite Broad Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (concluding that an exculpation provision that was limited to actions "in connection, related to, or arising out of the Reorganization Cases" but carved out "gross negligence and intentional misconduct" generally corresponded with the "standard" in this district so as to be "unexceptionable"); *In re Stearns Holdings, LLC*, 607 B.R. 781, 790–91 (Bankr. S.D.N.Y. 2019) (approving an exculpation clause that sought to exculpate parties whose "contributions and concessions" had made the plan possible but carved out gross negligence, intentional fraud, and willful misconduct); *see also Aegean Marine Petroleum Network*, 599 B.R. at 720–21 (stating that proper exculpation provisions include court-supervised fiduciaries and transactions, and, in the absence of gross negligence or intentional wrongdoing, such parties should not be liable). Accordingly, the Court concludes that the Exculpation Provision, as modified, is appropriate and proper.

Also, given that the reach of the Exculpation Provision covers matters relating to this case from the Petition Date through the Effective Date, Goldman's contention that the Court lacks the authority to approve the Exculpation Provision is without merit. (*See* Goldman Objection ¶ 59 (arguing that the Court lacks "constitutional authority to finally approve Plan

27

§ 10.7 because the releases do not stem 'from the bankruptcy itself' . . . and are therefore 'non-core . . . .'").)  This is particularly so as the Exculpation Provision is part of the Debtor's proposed Plan.  Generally, "exculpation and injunction clauses 'derive[] from . . . bankruptcy law'—they are embedded within a confirmed reorganization plan, the 'operative proceeding' for constitutional purposes." *Lynch v. Lapidem Ltd. (In re Kirwan Offices S.á.r.l.)*, 592 B.R. 489, 511 (S.D.N.Y. 2018) (quoting *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 271 (Bankr. D. Del. 2017)) (alterations in original).  Indeed, "[a] reorganization plan is a creature solely of Bankruptcy law and must comply with all of the provisions of 11 U.S.C. § 1129(a) & (b)." *Kirwan Offices*, 592 B.R. at 511.  Therefore, the Court possesses the authority to approve the Exculpation Provision, as modified, and finds that it is proper.

### B.  The Goldman Objection as it Relates to Confirmation is Without Merit

Goldman objects to confirmation on the following grounds: (i) the Plan violates section 1129(a)(3) of the Bankruptcy Code as it was not proposed in good faith in light of the Settlement it incorporates, and (ii) the Exculpation Provision, as set forth in the fourth and fifth iterations of the Plan, violate sections 1123(b)(6), 1129(a)(1), and 1129(a)(3) of the Bankruptcy Code. (Goldman Objection ¶¶ 45–50, 54–57.)  Each is unpersuasive.

#### 1.  The Plan Generally Does Not Violate Section 1129(a)(3)

Section 1129(a)(3) requires the plan to be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  This means that the plan must have been "proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (quoting *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984)).  Courts have held that a plan is considered proposed in good faith "if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code." *In re The Leslie Fay*

28

*Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (quoting *In re Texaco Inc.*, 84 B.R. 893, 907

(Bankr. S.D.N.Y. 1988)).  "The requirement of good faith must be viewed in light of the totality

of the circumstances surrounding the establishment of a chapter 11 plan."  *Leslie Fay*, 207 B.R.

at 781 (citations omitted); *Greer v. Gaston & Snow (In re Gaston & Snow)*, 1996 WL 694421, at

*9 (S.D.N.Y. Dec. 4, 1996) ("[F]ailure to propose a plan in good faith occurs when the Plan is

not proposed with honesty, good intentions, and to effectuate the reorganization of the enterprise,

but rather for some other motive") (citing *Kane*, 843 F.2d at 649).

    In support of his contention that the Plan was not proposed in good faith, Goldman argues

that the Settlement, which the Plan incorporates, seeks to dispose of his property and release

claims without his consent and his rights in the pending arbitration proceeding against Weiss.

Specifically, he alleges that the Plan and Settlement "misappropriat[e] Goldman's property, and .

. . free Weiss from the claims he would otherwise face for doing so" since the "AAA panel's

orders and the operating agreements of all the [] Operating Entities bar Weiss from entering the

Settlement Agreement without Goldman's consent."  (Goldman Objection ¶¶ 47–48.)  This, in

his mind, renders both the Settlement and the Plan unlawful.  Goldman's argument is without

merit.

    As this Court has already established in the Settlement Opinion, Weiss possessed the

authority to enter into and bind the Operating Entities to the Settlement.  Additionally, the

arbitration orders that Goldman refers to are limited to Weiss in his individual capacity within a

specific context: the consummation of a sale of the WV Complex.  (*See* Debtor Reply ¶¶ 27–28;

Weiss Reply ¶ 12.)  Accordingly, the arbitration orders are inapplicable to the Settlement and

Plan as they do not involve Weiss's "purchase, acqui[sition] or . . . obtain[ing] [of] an interest in

the William Vale Hotel . . . or the Hotel's assets."  (Weiss Reply ¶ 12; Debtor Reply ¶ 28.)

Notably, Goldman did not object to the WV Complex Sale, which the Court ultimately approved at the Confirmation Hearing.  (*See* May 15, 2024 Hr'g Tr. at 106:2–3 (noting that the WV Complex Sale is uncontested and approving the same).)  Therefore, Goldman's assertion that the Plan and Settlement are unlawful is baseless.

Goldman also takes issue with the process leading up to the Settlement and Plan as being indicative of a lack of good faith.  He argues that he was excluded from "any negotiations" and alleges that the Debtor only contacted him after "finalizing the agreement with Weiss." (Goldman Objection ¶ 50.)  However, Goldman has acknowledged that the Debtor did, in fact, reach out to him with a "near-final draft" of the Initial Settlement Agreement on April 10th to initiate a discussion prior to the Debtor's filing of the 9019 Motion.  (*See* May 15, 2024 Hr'g Tr. at 27:11–13 (Goldman's counsel stating that "the evidence will show that when the debtor proposed a solution to us, when they first called us on April 10th, it wasn't much of a solution"); *id.* at 45:11–14 (receiving confirmation that Debtor's counsel circulated a "near-final draft" of the Settlement to Goldman's counsel); *see also* Debtor Reply ¶¶ 5, 19 (indicating that Goldman was kept "informed as the settlement negotiations progressed, [was] provided . . . with a copy of the proposed agreement before it was filed with the Court, and [was] invited . . . to participate in the Settlement," which he ultimately declined).)  Indeed, discussions as to the Settlement with Goldman continued through May 2, 2024.  (*See* Ravid Reply Declaration ¶¶ 8–10 (reflecting that discussions with Goldman began on April 10, 2024 and continued through May 2, 2024 when Debtor's counsel "conferred by phone with Goldman's counsel to continue to explore settlement," which ultimately proved to be "unsuccessful").)

While Goldman may be dissatisfied with the precise manner in which negotiations leading up to the Settlement was conducted, "[i]t is not necessary for the court to conduct a

30

'mini-trial' of the facts or the merits underlying the dispute" in evaluating a settlement. *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 225 (Bankr. S.D.N.Y. 2007). As discussed, the Settlement Opinion makes clear that Weiss possessed the authority, in his capacity as Managing Member of the Operating Entities, to enter into the Settlement on behalf of these entities, and the Settlement was the product of arm's-length bargaining.

In light of the foregoing, the Court has no reason to find that the Plan was not proposed with "honesty and good intentions and with a basis for expecting that a reorganization can be effected" and is unlawful. *Kane*, 843 F.2d at 649. Accordingly, the Plan (including the Exculpation Provision as discussed below) satisfies section 1129(a)(3) of the Bankruptcy Code.

## 2. The Exculpation Provision Does Not Violate Sections 1123(b)(6), 1129(a)(1), and 1129(a)(3)

In addition to the foregoing, Goldman also contends that the Exculpation Provision violates sections 1123(b)(6), 1129(a)(1), and 1129(a)(3) because it contains non-consensual third-party releases. (*See generally* Goldman Objection ¶¶ 54–63.) Section 1123(b)(6) provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6). Meanwhile, sections 1129(a)(1) and (a)(3) provide that a plan may be confirmed if "[t]he plan complies with the applicable provisions of this title" and was "proposed in good faith and not by any means forbidden by law." 11 U.S.C. §§ 1129(a)(1) and (a)(3).

In support of this, Goldman argues that the majority of the factors articulated in *Purdue* support a finding that subsection (a) of the Exculpation Provision, which now serves as the entirety of the Exculpation Provision for the Court's consideration, is improper since it "impairs

Goldman's defenses to claims the [Trustee] and Series C Noteholders have threatened to bring against him relating to [William Vale Hotel]."[10]  (Goldman Objection ¶¶ 60, 62.)

The Exculpation Provision, as modified, is proper in light of the Exculpated Parties' contributions to the chapter 11 case and the Debtor's reorganization efforts.  It is not lost on the Court that this case commenced because the Petitioning Creditors, comprised of the Trustee and certain Series C Noteholders whom the Debtor now seeks to exculpate, filed an involuntary chapter 11 petition against the Debtor.  (*See Statement on Involuntary Petition Against Wythe Berry Fee Owner LLC*, ECF Doc. # 2, Schedule A (listing each Petitioning Creditor and their holdings of Series C Notes as of October 6, 2022).)  And notwithstanding how this chapter 11 case began, the Trustee and Series C Noteholders have worked with the Debtor throughout this case, and their efforts have culminated into the WV Complex Sale and the Settlement that now collectively serve as the primary means for implementation of the Plan.  (*See* Disclosure Statement, Art. V.)  These efforts include, for example, (i) negotiating and increasing the stalking horse bidder's purchase price to $177 million in connection with the WV Complex Sale, which now funds the Distribution Fund and other payments under the Plan; (ii) developing the Plan and evaluating various exit alternatives; and (iii) engaging in arm's-length negotiations with the Debtor and other parties that culminated into the Settlement.  (*See Debtor's Motion for the Entry of an Order (I) Approving its Selection of a Stalking Horse Bidder, (II) Approving Bid Protections in Connection Therewith, and (III) Granting Related Relief*, ECF Doc. # 251 ¶ 4 (reflecting that the stalking horse bidder for the WV Complex Sale increased its proposed purchase price to $177  million "[f]ollowing extensive negotiations with the Debtor and

---

[10]    Goldman also takes issue with subsection (b) of the former Exculpation Provision.  As the Exculpation Provision no longer includes subsection (b) in light of the Court's Settlement Opinion, the Opinion will focus solely on the Goldman Objection as it relates to subsection (a).

representatives of [the Trustee]," which now serves as the stalking horse bid); Disclosure

Statement at 1 ("In developing the Plan, the Debtor gave due consideration to various exit

alternatives and engaged in significant discussions and negotiations with representatives of the

Series C Noteholders, the [] Trustee, and other parties in interest."); *id.* at 10 (discussing how the

Debtor, the Trustee, and Weiss and his affiliated entities commenced arm's-length negotiations

that ultimately resulted in the Settlement).)  Therefore, the contributions of the Trustee and the

Series C Noteholders to this chapter 11 case are undeniable.

Exculpation clauses, while similar to third-party releases, are nonetheless different, and

the Second Circuit's ruling in *Purdue* centered solely on the propriety of the latter.  *See In re*

*Chemtura Corp.*, 439 B.R. 561, 610–11 (Bankr. S.D.N.Y. 2010) ("[E]xculpation provisions (and

their first cousins, so-called 'third party releases') are permissible under some circumstances but

not as a routine matter.")  Nonetheless, even if the Court were to consider and apply the *Purdue*

factors to the Exculpation Provision, certain of the factors would weigh in favor of its approval.

*See Purdue*, 69 F.4th at 79 ("Although consideration of each factor is required, it is not

necessarily sufficient—there may even be cases in which all factors are present, but the inclusion

of third-party releases in a plan of reorganization should not be approved.")  As already

discussed, the scope of the Exculpation Provision as to conduct is appropriate since its "breadth"

is limited to specific parties and their actions that relate to the chapter 11 case from the Petition

Date through the Effective Date.  Moreover, the Debtor has represented that, absent the inclusion

of the Exculpation Provision, "the Settlement . . . , an integral part of the Plan, could not be

effected."  (Debtor Reply ¶ 49.)  Additionally, all impaired creditors who were entitled to vote on

the Plan voted unanimously to accept the Plan, including subsection (a) to the Exculpation

Provision.  (*See* Voting Declaration ¶¶ 17–18.)

Regardless, against the backdrop of the substantial contributions of the Trustee and the Series C Noteholders and the Court's determination that the Exculpation Provision and the Exculpated Parties are both appropriate in scope, the Exculpation Provision is proper and does not violate sections 1123(b)(6), 1129(a)(1), and 1129(a)(3).

### C. Heightened Scrutiny is Not Required

Lastly, Goldman also contends that the Court should apply a "heightened scrutiny" standard to both the Settlement and Exculpation Provision because "Weiss is a statutory insider of the Debtor." (Goldman Objection ¶ 51.) In general, "[t]he business judgment rule is not applicable to transactions among a debtor and an insider of the debtor." *In re LATAM Airlines Grp. S.A.*, 2022 WL 272167, at *14 (Bankr. S.D.N.Y. Jan. 28, 2022). Rather, "courts apply a 'heightened scrutiny' test in assessing the *bona fides* of a transaction among a debtor and an insider of the debtor." *Id.* (quoting *In re Bidermann Indus. U.S.A. Inc.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997)). When applying heightened scrutiny, "courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).

However, application of heightened scrutiny here is unnecessary. The Court has already concluded that Weiss possessed the authority to enter into and bind the Operating Entities to the Settlement as set forth in the Settlement Opinion. (*See also* May 15, 2024 Hr'g Tr. at 119:25–120:3 (indicating that the Court did not think it was a "question of heightened scrutiny or the normal business judgment rule standard . . . [as] [t]he LLC agreements give Weiss rights against Goldman and Goldman rights against Weiss.").) Additionally, in light of the Court's finding that

Weiss had such authority, subsection (b) to the Exculpation Provision, which provided for the exculpation of Weiss in connection with the Settlement, has been removed. Therefore, the Court need not apply heightened scrutiny as Goldman contends.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that the Plan, including the Exculpation Provision, satisfy the requirements of 1123(b)(6), 1129(a)(1), and 1129(a)(3).

A separate Order confirming the Plan will be entered.

**IT IS SO ORDERED.**

Dated:   May 29, 2024
New York, New York

*Martin Glenn*
_____
MARTIN GLENN
Chief United States Bankruptcy Judge

## Exhibit C

Findings of Fact, Conclusions of Law, and Order Approving the Disclosure Statement
and Confirming the Fourth Amended Chapter 11 Plan of Reorganization of Wythe Berry
Fee Owner LLC
(Dkt. #371)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------X
                                     :

In re                                   :         Chapter 11

                                       :

WYTHE BERRY FEE OWNER LLC,        :         Case No. 22-11340 (MG)

                                       :

                Debtor.[1]             :

                                       :

                                       :
-------------------------------------------------------------X

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER APPROVING THE DISCLOSURE STATEMENT AND CONFIRMING THE FOURTH <u>AMENDED CHAPTER 11 PLAN OF WYTHE BERRY FEE OWNER LLC</u>

Wythe Berry Fee Owner LLC, as debtor and debtor in possession in the above-captioned

chapter 11 case (the "Debtor")[2] having:

     a.       continued to operate its business and manage its property during this case (the "Chapter 11 Case") as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

     b.       obtained, on December 8, 2023, the entry of the *Order (I) Approving the Bid Procedures in Connection With the Debtor's Sale of the WV Complex, (II) Scheduling Certain Dates, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* [Dkt. No. 220] (the "Bid Procedures Order"), approving the *Bid Procedures for the Sale of the WV Complex*, attached thereto as Exhibit 1 (the "Bid Procedures");

     c.       filed, on February 6, 2024, the *Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC* (as amended, modified, or supplemented from time to time, the "Plan") [Dkt. No. 243] and the disclosure statement with respect to the Plan (as amended, modified, or supplemented from time to time, the "Disclosure Statement") [Dkt. No. 242];

---

[1]       The Debtor's principal offices are located at The William Vale Hotel, 111 N. 12th Street, Brooklyn, NY 11249. The last four digits of the Debtor's Federal Tax Id. No. are 9776.

[2]       Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Fourth Amended Plan, the Fourth Amended Disclosure Statement, or the Bankruptcy Code (each as defined herein), as applicable. The rules of interpretation set forth in Article I.B. of the Plan apply.

d.    executed, on February 13, 2024, a purchase and sale agreement with William Vale Owner LLC (the "Stalking Horse Agreement");

e.    obtained, on February 22, 2024, the *Order (I) Approving the Debtor's Selection of a Stalking Horse Bidder, (II) Approving Bid Protections in Connection Therewith, and (III) Granting Related Relief* [Dkt. No. 256];

f.    announced, on March 8, 2024, William Vale Owner LLC as the Successful Bidder (as defined in the Bid Procedures) ("Successful Bidder") pursuant to the Bid Procedures [Dkt. No. 268];

g.    filed, on March 27, 2024, the *Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Dkt. No. 282] and filed an affidavit of service with the Court regarding the same on April 4, 2024 [Dkt. No. 288];

h.    filed, on March 22, 2024, an amended: (i) Plan [Dkt. No. 281]; and (ii) Disclosure Statement [Dkt. No. 280];

i.    caused a notice of a hearing on confirmation of the Plan and approval of the Disclosure Statement and the deadline for objecting to confirmation of the Plan and approval of the Disclosure Statement to be filed with the Bankruptcy Court on March 28 [Dkt. No. 284] and filed an affidavit of service with the Court regarding the same on March 29, 2024 [Dkt. No. 286];

j.    filed, on April 19, 2024, a further amended: (i) Plan [Dkt. No. 303]; and (ii) Disclosure Statement [Dkt. No. 302];

k.    filed, on April 21, 2024, a further amended: (i) Plan (the "Second Amended Plan") [Dkt. No. 306]; and (ii) Disclosure Statement (the "Second Amended Disclosure Statement") [Dkt. No. 305];

m.    caused the Ballots to be distributed on April 24, 2024, in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and filed an affidavit of service with the Court regarding the same on April 30, 2024 [Dkt. No. 323];

n.    caused an amended notice of the hearing on confirmation of the Second Amended Plan and approval of the Second Amended Disclosure Statement (the "Confirmation Hearing") and the deadline for objecting to confirmation of the Second Amended Plan and approval of the Second Amended Disclosure Statement to be filed with the Bankruptcy Court on April 30, 2024 [Dkt. No. 324] (the "Confirmation Hearing Notice") and filed an affidavit of service with the Court regarding the same on May 2, 2024 [Dkt. No. 327];

2

o.    filed, on May 10, 2024, a further amended: (i) Plan (the "Third Amended Plan"); and (ii) Disclosure Statement (the "Third Amended Disclosure Statement");

p.    filed, on May 10, 2024, (i) *the Debtor's Memorandum of Law in Support of Confirmation the Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC* [Dkt. No. 337] (the "Confirmation Brief"); and (ii) the *Declaration of Assaf Ravid, Chief Restructuring Officer of the Debtor, In Support of Confirmation of the Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC* [Dkt. No. 336] (the "Ravid Declaration");

q.    filed, on May 10, 2024, the *Declaration of Daniel Sasson Regarding the Solicitation and Tabulation of Votes on the Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC* (as modified, amended, or supplemented from time to time, the "Voting Report") [Dkt. No. 333];

r.    filed, on May 10, 2024, the Plan Supplement; and

s.    filed, on May 20, 2024, a further amended: (i) Plan (the "Fourth Amended Plan"); and (ii) Disclosure Statement (the "Fourth Amended Disclosure Statement").

The Bankruptcy Court having:

a.    set May 15, 2024, at 10:00 a.m. (prevailing Eastern Time), as the date and time to commence the Confirmation Hearing to consider confirmation of the Third Amended Plan and approval of the Third Amended Disclosure Statement pursuant to Bankruptcy Rules 3016, 3017 and 3018 and sections, 1125, 1126, 1128, and 1129 of the Bankruptcy Code;

b.    reviewed: (i) the Fourth Amended Plans; (ii) the Fourth Amended Disclosure Statements; (iii) the Plan Supplement; (iv) the Confirmation Brief; (v) the Ravid Declaration; (vi) the Voting Report; (vii) the Confirmation Hearing Notice; (xi) the affidavits of service relating to the Plan Supplement (the "Plan Supplement Affidavits"); and (xii) all filed pleadings, exhibits, statements, and comments regarding confirmation of the Fourth Amended Plan and approval of the Fourth Amended Disclosure Statement, including all objections, statements, letters, and reservations of rights;

c.    held the Confirmation Hearing on May 15, 2024, at 10:00 a.m., prevailing Eastern Time, considered the record of the Chapter 11 Case, and taken judicial notice of all necessary papers and pleadings filed in the Chapter 11 Case;

d.    considered all oral representations, documents, filings, and other evidence presented at the Confirmation Hearing;

e.    entered the *Memorandum Opinion and Order Approving the Settlement* [Dkt. No. 369] (the "Settlement Opinion"); and

3

f.    entered the *Memorandum Opinion Approving the Disclosure Statement and Confirming the Fourth Amended Chapter 11 Plan of Reorganization of Wythe Berry Fee Owner LLC* [Dkt. No. 370] (the "Confirmation Opinion").

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court makes and issues the following findings of fact and conclusions of law, and orders:

**FINDINGS OF FACT**

IT IS DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

1.    The findings of fact and conclusions of law set forth herein, in the Fourth Amended Plan and in the record of the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. All findings of fact and conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to confirmation of the Fourth Amended Plan and approval of the Fourth Amended Disclosure Statement, including any rulings made on the record at the Confirmation Hearing, are hereby incorporated in this order (the "Confirmation Order"). To the extent any of the following constitutes findings of fact or conclusions of law, they are adopted as such. To the extent any finding of fact or conclusion of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and incorporated herein) constitutes an order of the Bankruptcy Court, it is adopted as such.

2.    **Jurisdiction, Venue, and Core Proceeding**. The Bankruptcy Court has jurisdiction over the Chapter 11 Case pursuant to section 1334 of title 28 of the United States Code and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012. The Bankruptcy Court has exclusive

4

jurisdiction to determine whether the Fourth Amended Plan and Fourth Amended Disclosure Statement comply with the applicable provisions of the Bankruptcy Code and should be approved and confirmed, as applicable. Venue is proper in this district pursuant to sections 1408 and 1409 of title 28 of the United States Code. Confirmation of the Fourth Amended Plan is a core proceeding within the meaning of section 157(b)(2) of title 28 of the United States Code.

3.      **Notice**. The Debtor provided due, adequate, and sufficient notice of the Fourth Amended Plan, the Fourth Amended Disclosure Statement, the Plan Supplement, and all other materials distributed by the Debtor in connection with confirmation of the Fourth Amended Plan in compliance with the Bankruptcy Code, Bankruptcy Rules, and the Local Rules.

## A.      <u>The Fourth Amended Disclosure Statement; Adequate Information.</u>

4.      The Fourth Amended Disclosure Statement satisfies section 1125 of the Bankruptcy Code because it contains "adequate information" to allow holders of Allowed Claims to make informed decisions about whether to vote to accept or reject the Plan. Specifically, the Disclosure Statement contains a number of categories of information that courts consider "adequate information" including:

(a)      **Summary of Fourth Amended Plan**: A plain English summary of the Fourth Amended Plan terms and the proposed transaction contemplated by the Fourth Amended Plan, including the property each class of interests is expected to receive under the Plan, which is set forth in Article IV of the Fourth Amended Disclosure Statement.

(b)      **The Debtor's Business Operations**: An overview of the Debtor's business operations, prepetition ownership structure, and property, which is set forth in Article II.A of the Fourth Amended Disclosure Statement;

(c)      **Events Leading to the Chapter 11 Case**: A summary of events leading to the Chapter 11 Case, which is set forth in Article II.C of the Fourth Amended Disclosure Statement;

5

(d)     **Events of the Chapter 11 Case**: A summary of key events during the Chapter 11 Case, which is set forth in Article III.A of the Fourth Amended Disclosure Statement;

(e)     **Liquidation Analysis**: A liquidation analysis, which is set forth in Article VIII.B of the Fourth Amended Disclosure Statement;

(f)     **Risk Factors**: Certain risks associated with the Fourth Amended Plan not being confirmed and objections to confirmation of the Fourth Amended Plan, which are described in Article VI of the Fourth Amended Disclosure Statement;

(g)     **Notice of the Injunction, Exculpation, and Release Provisions of the Fourth Amended Plan**: A description of the entities subject to an injunction under the Plan and the acts that they are enjoined from pursuing, which are described in Article IV.I of the Fourth Amended Disclosure Statement;

(h)     **Voting Procedures**: A description of the procedures for voting on the Fourth Amended Plan, which are described in Article VII of the Fourth Amended Disclosure Statement;

(i)     **Confirmation of the Plan**: Confirmation procedures and statutory requirements for confirmation and consummation of the Fourth Amended Plan, which are set forth in Article VIII of the Disclosure Second Amended Statement;

(j)     **Certain United States Federal Tax Consequences of the Plan:** A description of certain U.S. federal income tax consequences to the Debtor and a hypothetical investor typical of the holders of Claims in the Debtor's estate, which are described in Article V of the Fourth Amended Disclosure Statement; and

(k)     **Recommendation of the Debtor**: A recommendation by the Debtor that holders of Claims in the Classes should vote to accept the Plan, stated in Article X of the Fourth Amended Disclosure Statement.

5.     Accordingly, the Disclosure Statement satisfies section 1125 of the Bankruptcy Code and addresses the information set forth above in a manner that provides adequate information to holders of Claims entitled to vote to accept or reject the Plan.

6

B.      **Solicitation of Acceptances and Voting.**

6.      **Ballots**. The Classes entitled to vote on the Second Amended Plan (collectively, the "Voting Classes") are set forth below[3]:

| **Class** | **Designation** |
|-----------|-----------------|
| **1**     | **Senior Secured Claims** |
| **3**     | **Unsecured Claims** |

7.      On April 24, 2024, a Ballot, together with the Second Amended Disclosure Statement and the Second Amended Plan, attached to the Second Amended Disclosure Statement as Exhibit A ("Solicitation Package"), was sent to Wind Down Co. as the holder of a Class 3 Claim under the Second Amended Plan. With respect to holders of Claims in Class 1, on April 24, 2024, the Debtor transmitted one Solicitation Package to the Notes Trustee on account of the Class 1 holders' Claims, which included a master Ballot ("Master Ballot") to aggregate votes for all such Claims, as well as opt-in elections for each Class 1 Claim holder to elect to opt-in to the release provisions in Article 10.6 of the Second Amended Plan. The Master Ballot specified that the Notes Trustee would submit the completed and executed Master Ballot to the Debtor by electronic or first-class mail.

8.      The Ballot and Master Ballot were appropriate for holders of Claims in the Voting Classes to vote to accept or reject the Second Amended Plan and comply with applicable provisions of the Bankruptcy Code. Bankruptcy Rule 3017(d) requires the Debtor to mail a form of ballot, which substantially conforms to Official Form No. 314, only to "creditors and interest

---

[3]      The Debtor will not resolicit votes on the Fourth Amended Plan because the changes made to the Second Amended Plan do not materially affect the Voting Classes.

holders entitled to vote on the plan. Fed. R. Bankr. P. 3017(d). The forms of Ballots are based on Official Form No. 14, but have been modified to address the particular circumstances of this Chapter 11 Case and to include additional information that is relevant and appropriate for creditors to vote to accept or reject the Second Amended Plan. *See id.*

9.      The Debtor designated Daniel Sasson, an associate at Wythe Berry Fee Owner LLC, to tabulate votes on the Second Amended Plan, and who certified the results of the voting on the Second Amended Plan in the Voting Report.

10.     As evidenced by the Ravid Declaration and the Voting Report, all parties required to be given notice of the Confirmation Hearing and the Objection Deadline have been given due, proper, adequate, timely, and sufficient notice in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and all other applicable non-bankruptcy rules, laws, and regulations, and such parties had an opportunity to appear and be heard with respect thereto.

11.     **Vote Tabulation**. As set forth in the Second Amended Plan and Second Amended Disclosure Statement, holders of Claims in Class 1 (Senior Secured Claims) and Class 3 (Unsecured Claims) were eligible to vote to accept or reject the Second Amended Plan in accordance with the instructions on the applicable Ballot. Holders of Claims or Interests in Class 2A (Mechanic's Lien Claim of D and J Industries LLC), Class 2B (Mechanic's Lien Claim of JSP Electrical Contracting Corp), Class 2C (Mechanic's Lien Claim of Schimenti Construction Company LLC), Class 2D (Mechanic's Lien Claim of Ziba Construction Inc.), and Class 4 (Interests) are Unimpaired and deemed to have accepted the Second Amended Plan and, therefore, are not entitled to vote to accept or reject the Second Amended Plan.

12.     As noted, on April 24, 2024, the Debtor, through its counsel, sent a Solicitation Package to Wind Down Co. as the holder of the Class 3 Claim under the Second Amended Plan,

8

and transmitted one Solicitation Package to the Notes Trustee on account of the Class 1 holders' Claims, which included the Master Ballot.

13.     On April 24, 2024, Mishmeret published the Second Amended Plan and Second Amended Disclosure Statement in Israel, and informed Class 1 Claim holders that they had until May 1, 2024 to vote to accept or reject the Second Amended Plan, including the settlement agreement attached thereto. On May 2, 2024, Mishmeret compiled all votes of Class 1 Claim holders and submitted the Master Ballot to the Debtor via electronic mail, which reflected votes in favor of the Second Amended Plan, as well as opt-in elections to the release provisions in Article 10.6 thereof, by all Class 1 Claim holders.

14.     On May 3, 2024, the Debtor received a completed Ballot from Assaf Ravid on behalf of Wind Down Co. for its Class 3 Claim. Therefore, the Debtor received two completed Ballots by the May 3, 2024, voting deadline. *See* Voting Report ¶ 16. As described in the Voting Report, the holders of Claims in Classes 1 and 3 voted to accept the Second Amended Plan in the numbers and amounts required by section 1126 of the Bankruptcy Code.

15.     Based on the foregoing, and as evidenced by the Voting Report, at least one Impaired Class of Claims has voted to accept the Second Amended Plan.

16.     All procedures used to tabulate the Ballot and Master Ballot were fair, reasonable, and conducted in good faith in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and all other applicable non-bankruptcy rules, laws, and regulations.

**C.    Sale of the WV Complex.**

17.     **Notice of the Sale and Stalking Horse Agreement**. Proper, timely, adequate, and sufficient notice of the Sale and Stalking Horse Agreement has been provided in accordance with

9

sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9024. The Debtor complied with all obligations to provide notice of the Sale and Stalking Horse Agreement as required by the Bid Procedures Order. The foregoing notice was good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale and Stalking Horse Agreement is required.

18.     **Good Faith of Successful Bidder**. The Stalking Horse Agreement and the Sale contemplated thereunder were proposed, negotiated, and entered into by the Debtor and the Successful Bidder without collusion, in good faith, and at arm's-length, and there is no evidence that the sale price was controlled by Potential Bidders (as defined in the Bid Procedures).

19.     **Validity of Sale**. Asaf Ravid, as the Debtor's Chief Restructuring Officer, authorized the execution, delivery, and approval of the Stalking Horse Agreement and the Sale of the WV Complex and the Acquired Assets (as defined in the Stalking Horse Agreement, the "Acquired Assets") to the Successful Bidder. Mr. Ravid: (i) has full corporate power and authority to execute and deliver the Stalking Horse Agreement and all other documents contemplated thereby, as applicable; (ii) has all of the power and authority necessary to consummate the Sale; and (iii) has taken all actions necessary to consummate the Sale, and no further consents or approvals are required for the Debtor to consummate the transaction contemplated by the Stalking Horse Agreement, except as otherwise set forth therein.

20.     **Section 363(f) Is Satisfied**. The Sale of the WV Complex and the Acquired Assets to the Successful Bidder and the assumption and assignment to the Successful Bidder of the Assigned Contracts under the terms of the Stalking Horse Agreement meet the applicable provisions of section 363(f) of the Bankruptcy Code because any entity asserting an interest in such assets could be compelled, in a legal or equitable proceeding, to accept a money satisfaction

10

of such interest, and the interest will attach to the proceeds in the same order of priority that the

holder of the interest had prior to the sale, such that the Sale of the WV Complex and the Acquired

Assets will be free and clear of any and all liens, claims, interests, and encumbrances in the WV

Complex and the Acquired Assets, including any liens or claims arising out of the bulk transfer

laws except Permitted Encumbrances (as defined in the Stalking Horse Agreement) ("Permitted

Encumbrances").

**D.    Releases and Exculpations; Retention of Claims.**

21.    **Releases, Exculpation, Injunction, and Preservation of Claims and Causes of**

**Action**. Article 10 of the Fourth Amended Plan describes certain releases granted by the Debtor

(the "Debtor Release"). Such releases are a necessary, integrated, and integral element of the

Fourth Amended Plan, and are fair, reasonable, and in the best interests of the Debtor, the Estate,

and holders of Claims and Interests. The Debtor Release is: (a) in exchange for the good and

valuable consideration provided by the Released Parties; (b) in the best interests of the Debtor, the

Estate, and all holders of Claims and Interests; (c) fair, equitable, and reasonable; (d) appropriately

tailored under the facts and circumstances of the Chapter 11 Case; (e) given, and made, after

reasonable investigation by the Debtor and after due notice and opportunity for hearing; and (f) a

bar to the Debtor or its Estate asserting any Claim or Causes of Action released pursuant to the

Debtor Release.

22.    The exculpation provision in Article 10.7(a) of the Fourth Amended Plan (the

"Exculpation Provision"), is appropriate under applicable law because it was proposed in good

faith, formulated following extensive good faith, arm's-length negotiations with key constituents,

and is appropriately limited in scope. Under Article 10.7(a), each Exculpated Party has participated

in good faith in the Chapter 11 Case and is released and exculpated from any claim or cause of

11

action as described in the Exculpation Provision, and, therefore, is not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Fourth Amended Plan or such distributions made pursuant to the Fourth Amended Plan.

23.    The injunction provisions set forth in Article 10.5 of the Fourth Amended Plan (the "Injunction Provisions") are necessary to implement, preserve, and enforce the Debtor's discharge, the Debtor Release, and the Exculpation Provision, and are narrowly tailored to achieve these purposes.

24.    **Retention of Claims (11 U.S.C. § 1123(b)(3)(B))**. In accordance with section 1123(b)(3)(B) of the Bankruptcy Code, Article 10.8 of the Fourth Amended Plan provides that the Debtor and the Plan Administrator shall retain, and the Debtor may enforce, all rights to commence, prosecute, pursue, and settle all Causes of Action, whether arising before or after the Petition Date. The Debtor expressly reserves all rights to prosecute any Causes of Action, except as otherwise expressly released in the Fourth Amended Plan. All Causes of Action are expressly preserved for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to any Causes of Action prosecuted upon, after, or as a consequence of entry of the Confirmation Order or consummation of the Sale of the WV Complex.

25.    As consideration for the Debtor Release, the Debtor and its Estate will receive mutual releases from potential claims and causes of action of each Releasing Party.

26.    Each Released Party is a stakeholder and critical participant in the Fourth Amended Plan process and shares a common goal with the Debtor in seeking to confirm the Fourth Amended Plan and implement the restructuring transaction contemplated thereunder.

12

27.    The Released Parties played an integral role in the development of the Fourth Amended Plan and have expended significant time and resources resolving the issues in the Chapter 11 Case to enable the Debtor to emerge swiftly from chapter 11 and to maximize in-kind recoveries to creditors as quickly as possible.

28.    *The Exculpation Provision Is Necessary and Appropriate*. For the reasons set forth in the Confirmation Opinion, the Exculpation Provision was proposed in good faith and formulated following months of extensive good-faith, arm's-length negotiations with key constituents.

29.    The Exculpation Provision is also critical to ensuring that funds can be returned to creditors as promptly as possible through the Sale and any other transactions that are approved by the Bankruptcy Court and that parties are not subsequently held liable for taking actions that the Bankruptcy Court or the Bankruptcy Code authorized them to take.

30.    *The Injunction Provisions Are Necessary and Appropriate*. The Injunction Provisions implement the Fourth Amended Plan's release and exculpation provision and ensure that the releases and exculpation operate and are executed. Therefore, the Injunction Provisions are necessary and appropriate to effectuate the important goals of the Fourth Amended Plan's release and exculpation provision.

E.    **Proposal and Implementation of the Fourth Amended Plan.**

31.    **Good Faith Proposal of the Fourth Amended Plan**. The Debtor proposed the Fourth Amended Plan in good faith and not by any means forbidden by law. Based on the evidence presented to the Bankruptcy Court, including the Ravid Declaration, the Fourth Amended Plan, the Fourth Amended Disclosure Statement and the other motions and pleadings filed, and the record of the Confirmation Hearing, the Bankruptcy Court examined the totality of the circumstances surrounding the filing of the Chapter 11 Case, the Fourth Amended Plan, the Fourth

13

Amended Disclosure Statement, the process leading to the Confirmation Hearing, and the Sale of the WV Complex. The Chapter 11 Case was filed, and the Fourth Amended Plan was proposed, with the purpose of allowing the Debtor to maximize creditor recoveries and for no ulterior purpose. The Fourth Amended Plan is the product of good faith, arm's-length negotiations by the Debtor and the Notes Trustee, among other creditors and stakeholders. The Court's reasoning with respect to the Exculpation Provision is separately explained in the Confirmation Opinion.

32. **Plan Supplement**. The filing and notice of the documents included in the Plan Supplement, and any modifications or supplements thereto, were adequate and proper and in accordance with the Fourth Amended Plan, the Bankruptcy Code, and the Bankruptcy Rules, and no other or further notice is or shall be required. All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Fourth Amended Plan. Subject to the terms of the Fourth Amended Plan, the Debtor's right to alter, amend, update, or modify the Plan Supplement before the Effective Date is reserved.

33. **Implementation**. All documents necessary to implement the Fourth Amended Plan and all other relevant and necessary documents have been negotiated in good faith and at arm's-length and shall, upon completion and execution of documentation, be valid, binding, and enforceable agreements.

## F. <u>Compliance with the Bankruptcy Code.</u>

34. The Fourth Amended Plan complies with all applicable provisions of the Bankruptcy Code as required by sections 1123(a) and 1123(b) of the Bankruptcy Code.

35. The Debtor has complied with the applicable provisions of the Bankruptcy Code and satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code. Specifically, the Debtor:

(a) is an eligible debtor under section 109 of the Bankruptcy Code and a proper proponent of the Plan under section 1121(a) of the Bankruptcy Code; and

(b) complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy Rules, the Local Rules, any applicable nonbankruptcy law, rule, and regulation, and all other applicable law, in transmitting the Ballot and Master Ballot and related documents and notices, and in soliciting and tabulating the votes on the Plan.

36.     **Proper Classification (11 U.S.C. § 1129(a)(1))**. In accordance with sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article 3 of the Fourth Amended Plan provides for the separate classification of Claims and Interests into seven Classes. Valid business, factual, and legal reasons exist for the separate classification of such Classes of Claims and Interests. The classifications were not structured for any improper purpose and do not unfairly discriminate between, or among, holders of Claims or Interests. Each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class. Accordingly, the Fourth Amended Plan satisfies the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code.

37.     **Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2))**. Article 3 of the Fourth Amended Plan specifies that Claims or Interests in Class 2A (Mechanic's Lien Claim of D and J Industries LLC), Class 2B (Mechanic's Lien Claim of JSP Electrical Contracting Corp), Class 2C (Mechanic's Lien Claim of Schimenti Construction Company LLC), Class 2D (Mechanic's Lien Claim of Ziba Construction Inc.), and Class 4 (Interests) are Unimpaired under the Fourth Amended Plan. Article 2 of the Fourth Amended Plan specifies that: (i) Allowed Administrative Claims and Allowed Professional Fee Claims will be paid in full in accordance with the terms of the Fourth Amended Plan; or (ii) Priority Tax Claims shall be satisfied, disputed, pursued, or otherwise reconciled in the ordinary course by the Debtor or the Plan Administrator, as applicable,

15

although these Claims are not separately classified under the Fourth Amended Plan. Accordingly, the Fourth Amended Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

38.     **Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))**. Article 3 of the Fourth Amended Plan specifies that Claims and Interests, as applicable, in the following Classes (collectively, the "Impaired Classes") are Impaired under the Fourth Amended Plan within the meaning of section 1124 of the Bankruptcy Code, and describes the treatment of such Classes, in compliance with section 1123(a)(3) of the Bankruptcy Code:

| Class | Designation |
|-------|-------------|
| 1 | Senior Secured Claims |
| 3 | Unsecured Claims |

39.     **No Discrimination (11 U.S.C. § 1123(a)(4))**. The Fourth Amended Plan provides for the same rights and treatment by the Debtor for each Claim or Interest in each respective Class unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such Claim or Interest and complies with section 1123(a)(4) of the Bankruptcy Code.

40.     **Adequate Means for Implementation (11 U.S.C. § 1123(a)(5))**. Section 1123(a)(5) of the Bankruptcy Code requires that a chapter 11 Plan provide adequate means for a Plan's implementation. The Fourth Amended Plan provides adequate means for implementation as required under section 1123(a)(5) of the Bankruptcy Code. Among other things, Article 5 of the Fourth Amended Plan sets forth means of implementation for the Sale of the WV Complex.

41.     In addition to the Sale of the WV Complex, the Fourth Amended Plan sets forth other mechanics for the implementation of the Fourth Amended Plan, such as: (a) the appointment of the Plan Administrator and the authorization for the Plan Administrator to issue documents and

16

take such actions as may be necessary or appropriate to effectuate, implement, and further evidence

the Fourth Amended Plan and the documents described therein; (b) the cancellation of all

agreements, instruments, and other documents; (c) the authorization, approval, and ratification of

all actions contemplated by the Fourth Amended Plan without any further action by the equity

holders, members, directors, managers, or officers of the Debtor; and (d) the application of section

1146(a) of the Bankruptcy Code to the Sale and any other transfers of property under the Fourth

Amended Plan.

42.    **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6))**. Section 1123(a)(6) of the

Bankruptcy Code requires that a debtor's organizational documents prohibit the issuance of

nonvoting equity securities. The Fourth Amended Plan does not provide for the issuance of any

nonvoting equity securities.

43.    **Designation of Directors and Officers (11 U.S.C. § 1123(a)(7))**. Pursuant to

Section 5.3 of the Fourth Amended Plan, on the Effective Date, the Plan Administrator will be

appointed by the Debtor in consultation with the Notes Trustee, on behalf of the holders of Allowed

Claims, who have the greatest interest in the amounts recovered, if any, from the prosecution of

Causes of Action. Pursuant to Section 5.3 of the Fourth Amended Plan, the Plan Administrator

shall act as sole manager of the Debtor.

44.    **Modifications to Plan**. Pursuant to section 1127 of the Bankruptcy Code, the

modifications to the Fourth Amended Plan made after Solicitation of the Second Amended Plan

or in this Confirmation Order (including those modifications announced on the record of the

Confirmation Hearing) constitute technical or clarifying changes, changes with respect to

particular Claims by agreement with holders of such Claims or Interests, or modifications that do

not otherwise materially and adversely affect or change the treatment of any other Claim or Interest

17

under the Second Amended Plan or Fourth Amended Plan. Notice of these modifications was adequate and appropriate under the facts and circumstances of the Chapter 11 Case. In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, and such modifications do not require that holders of Claims or Interests be afforded any further opportunity to change previously cast acceptances or rejections of the Second Amended Plan. Accordingly, the Fourth Amended Plan is properly before the Bankruptcy Court and all votes cast with respect to the Second Amended Plan prior to such modification shall be binding and shall apply with respect to the Fourth Amended Plan. The Fourth Amended Plan as modified shall constitute the Fourth Amended Plan submitted for confirmation.

45.     **Assumption and Rejection of Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2))**. As permitted by section 1123(b)(2) of the Bankruptcy Code, Article 8 of the Fourth Amended Plan provides that, on the Effective Date, all executory contracts and unexpired leases to which the Debtor is a party shall be deemed rejected by the Debtor, unless such executory contract or unexpired lease: (i) is specifically designated by the Debtor; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) was previously assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court; or (iv) is the subject of a motion to assume, assume and assign, or reject filed by the Debtor on or before the date of confirmation of the Fourth Amended Plan (the "Confirmation Date").

46.     Subject to the occurrence of the Effective Date, entry of this Order shall constitute approval of the assumption, assumption and assignment, or rejection provided for in Article 8 the Fourth Amended Plan pursuant to sections 365(a) and 1123 and a determination by the Bankruptcy Court that the Debtor or the Successful Bidder, as applicable, has provided adequate assurance of

18

future performance under such assumed executory contracts and unexpired leases. Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Fourth Amended Plan shall vest in and be fully enforceable by the Debtor or Successful Bidder, as applicable, in accordance with its terms, except as modified by the provisions of the Fourth Amended Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

47.    **Compromise and Settlement (11 U.S.C. § 1123(b)(3)(A))**. In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Fourth Amended Plan, the provisions of the Fourth Amended Plan constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that all holders of Claims or Interests may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest. The compromise and settlement of such Claims and Interests embodied in the Fourth Amended Plan and reinstatement and unimpairment of other Classes identified in the Fourth Amended Plan are in the best interests of the Debtor, the Estate, and all holders of Claims and Interests, and are fair, equitable, and reasonable.

48.    **Other Appropriate Provisions (11 U.S.C. § 1123(b)(5)-(6))**. The Fourth Amended Plan's other provisions are appropriate and consistent with the applicable provisions of the Bankruptcy Code, including, without limitation, provisions for: (1) distributions to holders of Claims and Interests; (2) resolution of Disputed Claims and Interests; (3) allowance of certain Claims; (4) releases by the Debtor of certain parties; (5) releases by certain Fourth parties; (6) exculpation of certain parties; (7) the injunction of certain Claims and Causes of Action in order to implement the discharge, release, and exculpation provision; and (8) retention of this Court's

19

jurisdiction, thereby satisfying the requirements of sections 1123(b)(5) and (6) of the Bankruptcy

Code.

49.    The Fourth Amended Plan complies with sections 1125 and 1126 of the Bankruptcy

Code.

50.    As noted, the Fourth Amended Disclosure Statement contains "adequate

information" about the Debtor and the Fourth Amended Plan. This disclosure allows a holder of

Claims in each Class to make an informed decision whether to accept or reject the Fourth Amended

Plan.

51.    Any payment made or to be made by the Debtor for services or for costs and

expenses in or in connection with the Chapter 11 Case, or in connection with the Fourth Amended

Plan and incident to the Chapter 11 Case, shall be subject to the approval of the Bankruptcy Court

for reasonableness, in compliance with section 1129(a)(4) of the Bankruptcy Code.

52.    The Fourth Amended Plan satisfies section 1129(a)(5) of the Bankruptcy Code by

way of the disclosures described in paragraphs 40-41 above.

53.    Section 1129(a)(6) of the Bankruptcy Code is not applicable to the Chapter 11 Case.

The Fourth Amended Plan does not propose any rate change subject to the jurisdiction of any

governmental regulatory commission.

54.    The Fourth Amended Plan satisfies the requirements of section 1129(a)(7) of the

Bankruptcy Code, the best interests of creditors test. Based upon the liquidation analysis contained

in the Fourth Amended Disclosure Statement, with respect to each Impaired Class, each holder of

a Claim of such Class will receive or retain under the Fourth Amended Plan on account of such

Claim property of a value, as of the Effective Date, that is not less than the amount such holder

would receive or retain if the Debtor were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.

55.    The Fourth Amended Plan satisfies section 1129(a)(8) of the Bankruptcy Code because each class of claims or interests has accepted the Fourth Amended Plan.

56.    **Liquidation Analysis**. In the Disclosure Statement, the Debtor provided evidence that the Fourth Amended Plan satisfies the best interests test, because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available through a chapter 7 liquidation. Specifically, pursuing the Sale of the WV Complex as proposed in the Fourth Amended Plan will provide greater recoveries than pursuing the sale of the WV Complex through a chapter 7 liquidation for the following reasons:

(a)    *The Chapter 11 Transfer Tax Exemption is Available Only in Chapter 11*

57.    Section 1146(a) of the Bankruptcy Code allows debtors, in chapter 11 only, to avoid paying stamp taxes or similar taxes on assets transferred pursuant to a confirmed chapter 11 plan of reorganization. Here, this transfer tax exemption, unavailable in a sale in a chapter 7 case, will save the Successful Bidder millions of dollars.

(b)    *Conversion to Chapter 7 Will Cause Additional Costs and Delay*

58.    The hypothetical conversion of the Chapter 11 Case to one under chapter 7 would: (a) result in additional fees and expenses; (b) cause a significant delay before any distributions could be made to the holders of Allowed Claims or Interests; and (c) not maximize the value of the WV Complex—all of which would be avoided if the Chapter 11 Case remains in chapter 11 and the Fourth Amended Plan is confirmed.

21

59.     *First*, a conversion to chapter 7 would entail the appointment of a chapter 7 trustee who would retain his or her own professionals—attorneys, accountants or brokers—in order to properly discharge his or her duties and responsibilities. In other words, the automatic appointment of a chapter 7 trustee will result in an additional layer of cost not otherwise present in chapter 11.

60.     *Second*, in addition to increased fees and expenses, liquidating the Debtor's estate under chapter 7 will result in a significant delay considering: (i) the Bankruptcy Court has already approved the Bid Procedures which would not be applicable in chapter 7; (ii) the Debtor has already received bids from prospective purchasers who may not participate in a chapter 7 sale; and (iii) the chapter 7 trustee's newly retained professional(s) will need time to familiarize themselves with the Chapter 11 Case.

61.     *Fourth*, the Debtor and its brokers are running a comprehensive marketing and sale process pursuant to court-approved Bid Procedures designed to maximize estate value. And, as noted, the Debtor has already received bids from a number of prospective purchasers. In a chapter 7, the chapter 7 trustee would likely favor a fire-sale approach designed not to maximize value but to expeditiously liquidate the Debtor's assets.

62.     Thus, in light of the foregoing, the Debtor has demonstrated that the Fourth Amended Plan satisfies the best interests of creditors test.

63.     **Treatment of Administrative Claims and Other Priority Claims (11 U.S.C. § 1129(a)(9))**. The treatment of Allowed Administrative Claims, Allowed Professional Fee Claims, and Allowed Priority Tax Claims under Article 2 of the Fourth Amended Plan, and of Allowed Other Priority Claims under Article 3 of the Fourth Amended Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

64.    **Accepting Impaired Class (11 U.S.C. § 1129(a)(10))**. The Fourth Amended Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code. As evidenced by the Voting Report, holders of Claims in Class 1 and Class 3 voted to accept the Fourth Amended Plan by the requisite numbers and amounts of Claims, determined without including any acceptance of the Fourth Amended Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code), specified under the Bankruptcy Code.

65.    **Feasibility (11 U.S.C. § 1129(a)(11))**. The Fourth Amended Plan satisfies section 1129(a)(11) of the Bankruptcy Code. The evidence supporting the Fourth Amended Plan proffered or adduced by the Debtor at or before the Confirmation Hearing is reasonable, persuasive, and credible, has not been controverted by other persuasive evidence, and establishes that the Fourth Amended Plan is feasible and confirmation of the Fourth Amended Plan is not likely to be followed by liquidation or the need for further financial reorganization except as contemplated by the Fourth Amended Plan itself.

66.    **Payment of Applicable Fees (11 U.S.C. § 1129(a)(12))**. The Fourth Amended Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code. Article 2.1 of the Fourth Amended Plan provides for the payment of all fees due and payable under 28 U.S.C. § 1930 by the Debtor.

67.    **Retiree Benefits (11 U.S.C. § 1129(a)(13))**. The Debtor does not have any obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code). Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Chapter 11 Case or the Fourth Amended Plan.

68.    **Domestic Support Obligations, Individual Debtor, Nonprofit Corporations (11 U.S.C. §§ 1129(a)(14)-(16))**. Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the

23

Bankruptcy Code do not apply to the Chapter 11 Case. The Debtor owes no domestic support obligations, is not an individual, and is not a nonprofit corporation.

69.     **Requirements of 11 U.S.C. § 1129(b)**. Section 1129(b) is not triggered by the Fourth Amended Plan because all requirements of section 1129(a) are met under the Fourth Amended Plan.

70.     **Requirements of 11 U.S.C. § 1129(c)**. The Fourth Amended Plan satisfies the requirements of section 1129(c) of the Bankruptcy Code. The Fourth Amended Plan is the only chapter 11 plan filed the Chapter 11 Case.

71.     **Requirements of 11 U.S.C. § 1129(d)**. The Fourth Amended Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code. The principal purpose of the Fourth Amended Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

72.     **Requirements of 11 U.S.C. § 1129(e)**. The Chapter 11 Case is not a small business case and section 1129(e) of the Bankruptcy Code does not apply.

73.     **Requirements of 11 U.S.C. § 1125(e)**. The Exculpation Provision is reasonable in scope and consistent with applicable authority.

74.     **Bankruptcy Rule 3016**. The Fourth Amended Plan and all modifications thereto are dated and identify the entities submitting them, satisfying Bankruptcy Rule 3016(a). The Debtor appropriately filed the Fourth Amended Disclosure Statement and the Fourth Amended Plan with the Bankruptcy Court, satisfying Bankruptcy Rule 3016(b). The Injunction Provisions, Debtor Release, and Exculpation Provision and the related provisions in the Fourth Amended Disclosure Statement describe, in bold font and with specific and conspicuous language, all acts

24

to be enjoined and identify the entities that will be subject to the Injunction Provisions, thereby

satisfying Bankruptcy Rule 3016(c).

75.    **Satisfaction of Confirmation**. Based on the foregoing, the Debtor, as the

proponent of the Fourth Amended Plan, has met its burden of proving by a preponderance of the

evidence that the Fourth Amended Plan satisfies all applicable elements of section 1129 of the

Bankruptcy Code required for confirmation of the Fourth Amended Plan.

## ORDER

BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW,

IT IS ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

76.    **Approval of the Fourth Amended Disclosure Statement**. The Fourth Amended

Disclosure Statement is hereby approved as providing holders of Claims with adequate

information to make an informed decision as to whether to vote to accept or reject the Plan in

accordance with section 1125(a)(1) of the Bankruptcy Code.

77.    The Disclosure Statement (including all applicable exhibits thereto) provides

holders of Claims or Interests, and other parties in interest with sufficient notice of the Injunction

Provisions, Exculpation Provision, and release provisions contained in Article 10 of the Plan, in

satisfaction of the requirements of Bankruptcy Rule 3016(c).

78.    **Approval of the Confirmation Hearing Notice**. The Confirmation Hearing

Notice constituted adequate and sufficient notice of the Confirmation Hearing and the time fixed

for filing objections to the Fourth Amended Plan and Disclosure Statement, in satisfaction of the

requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the

Local Rules.

79.    Service of the Confirmation Hearing Notice by electronic and first-class mail constitutes adequate and sufficient notice of the Confirmation Hearing and was reasonably calculated to provide notice to holders of claims or interests of that hearing.

80.    **Approval of Materials for Soliciting Votes**. The Solicitation Packages are hereby approved.

81.    The Solicitation Packages provided holders of Allowed Claims with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the Local Rules.

82.    The Solicitation Packages were distributed to holders of Allowed Claims on April 24, 2024 via electronic and first-class mail. Such service satisfies the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and due process.

83.    **Confirmation of the Fourth Amended Plan**. For the reasons stated in the Settlement Opinion and Confirmation Opinion, the Fourth Amended Plan is confirmed pursuant to section 1129 of the Bankruptcy Code.

84.    **Incorporation by Reference**. The terms of the Fourth Amended Plan (including the Plan Supplement) are incorporated herein by reference and are an integral part of this Confirmation Order. The terms of the Fourth Amended Plan, the Plan Supplement, and all other relevant and necessary documents shall be effective and binding as of the Effective Date on all parties in interest, including the Debtor and all holders of Claims and Interests. The failure to specifically include or refer to any particular article, section, or provision of the Fourth Amended Plan, the Plan Supplement, or any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision.

26

85.     **Objections**. All objections to the Fourth Amended Plan that have not been withdrawn, settled, or resolved on the merits as of the entry of this Confirmation Order are overruled in their entirety on the merits.

86.     **Notices of Confirmation and Effective Date**. The Debtor shall serve notice of entry of this Confirmation Order, of the occurrence of the Effective Date, and of applicable deadlines (the "Notice of Confirmation") seven Business Days after the Effective Date on all parties served with the Confirmation Hearing Notice in the same manner as the Debtor served the Confirmation Hearing Notice, and such notice shall satisfy Bankruptcy Rules 2002 and 3020(c). For those parties receiving electronic service, filing on the docket is deemed sufficient to satisfy such service and notice requirements.

87.     **Plan Supplement**. All documents contained in the Plan Supplement are integral to the Fourth Amended Plan, in the best interests of the Debtor, its Estate, and holders of Claims and Interests, and are approved by the Bankruptcy Court. The Debtor is authorized to take all actions required under the Fourth Amended Plan (including the Plan Supplement as described) to effectuate the Fourth Amended Plan, including, for the avoidance of doubt: altering, amending, updating, or modifying the Plan Supplement before the Effective Date as necessary to effectuate the Fourth Amended Plan, subject to the terms of the Fourth Amended Plan.

88.     **Compromises and Settlements Approved**. For the reasons stated in the Settlement Opinion and the Confirmation Opinion, the compromises and settlements set forth in the Fourth Amended Plan and Confirmation Order are approved and will be immediately effective and binding on all parties in interest on the Effective Date to the extent not already effective pursuant to separate order of the Bankruptcy Court.

27

89.    **Modifications Deemed Accepted**. All modifications to the Fourth Amended Plan made after the Voting Deadline are hereby approved, pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all holders of Claims and Interests who voted to accept the Fourth Amended Plan or who were conclusively presumed to have accepted the Fourth Amended Plan are presumed to accept the Fourth Amended Plan as modified. No holder of a Claim or Interest shall be permitted to change its vote as a consequence of the Fourth Amended Plan modifications.

90.    Each federal, state, and local governmental agency or department is hereby authorized to accept all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Fourth Amended Plan and this Confirmation Order. A certified copy of this Confirmation Order may be filed with the appropriate clerk or recorded with the recorder of any state, county, or local authority to act to cancel any of the Liens, Claims, and other encumbrances of record.

91.    The Debtor is authorized to file a copy of this Confirmation Order, which, upon filing, shall be conclusive evidence of the release and termination of any Claim, Lien, or interest that is terminated under the terms of the Fourth Amended Plan.

92.    This Confirmation Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the

28

documents and instruments necessary and appropriate to consummate the transactions contemplated by the Fourth Amended Plan and this Confirmation Order.

93.     **Releases, Injunction, and Exculpation**. The Debtor Release, Exculpation Provision, Injunction Provisions, related provisions set forth in Article 10, and any other release, injunction, and exculpation provision of the Fourth Amended Plan are expressly incorporated herein in their entirety, are hereby approved and authorized in all respects, are so ordered, and shall be immediately effective on the Effective Date without further order or action on the part of this Court or any other party.

94.     **Approval of Stalking Horse Agreement**. No other person or entity or group of persons or entities has offered to purchase the Acquired Assets for an amount that would give equal or greater economic value to the Debtor in the aggregate than the value being provided by the Successful Bidder pursuant to the Stalking Horse Agreement.[4] Among other things, the Sale is the best alternative available to the Debtor to maximize the return to its Estate in respect of the Acquired Assets. The terms and conditions of the Stalking Horse Agreement, including the consideration to be realized by the Debtor, are fair and reasonable. Given all of the circumstances of this chapter 11 case and the adequacy and fair value of the consideration provided by the Successful Bidder under the Stalking Horse Agreement, approval of the Motion, the Stalking Horse Agreement, and the transactions contemplated thereby, including the Sale and the assumption and assignment of the Transferred Contracts and Leases, is in the best interests of the Debtor, its Estate and creditors and all other parties in interest.

---

[4]      Capitalized terms in paragraphs 94 through 113 not otherwise defined herein shall have the meanings given to them in the Stalking Horse Agreement.

29

95.     The Stalking Horse Agreement and Transaction Documents are approved, and all of the terms and conditions thereof, and all of the transactions contemplated therein, are approved in all respects. The Debtor is authorized and directed to perform under the Stalking Horse Agreement and all ancillary documents filed therewith or described therein (and each of the transactions contemplated thereby is hereby approved in its entirety and is incorporated herein by reference). The failure to specifically include any particular provision of the Stalking Horse Agreement or any other Transaction Document in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Stalking Horse Agreement and other Transaction Documents, and all of their respective provisions and the payments and transactions provided for therein, shall be authorized and approved in their entirety. Likewise, all of the provisions of this Confirmation Order that relate to the Sale are non-severable and mutually dependent.

96.     The Debtor is hereby authorized, empowered, and directed to, and shall, take any and all actions necessary or appropriate to (a) perform, consummate, implement, and close the Sale without further order of the Court, including the Sale to the Successful Bidder of the Acquired Assets, in accordance with the terms and conditions set forth in the Stalking Horse Agreement and other Transaction Documents and this Confirmation Order; (b) assume and assign any and all Transferred Contracts and Leases; (c) transfer and assign to the Successful Bidder all right, title and interest (including common law rights) to all property, licenses, and rights to be conveyed in accordance with and subject to the terms and conditions of the Stalking Horse Agreement and other Transaction Documents, in each case without further notice to or order of the Court; and (d) take all further actions and to execute and deliver the Stalking Horse Agreement and other Transaction Documents and any and all additional instruments and documents that may be (i)

30

reasonably requested by the Successful Bidder for the purpose of assigning, transferring, granting, conveying, and conferring to the Successful Bidder, or reducing to possession, the Acquired Assets, (ii) necessary, appropriate, or desirable to the performance of the obligations contemplated by the Stalking Horse Agreement, and (iii) as may be reasonably requested by the Successful Bidder to implement the Stalking Horse Agreement and consummate the Sale in accordance with the terms thereof, all without further order of the Court. Neither the Successful Bidder nor the Debtor shall have any obligation to proceed with consummating the Sale until all conditions precedent to their obligations to do so have been met, satisfied, or waived.

97. All persons and entities are hereby forever prohibited, enjoined, and barred from taking any action that would adversely affect or interfere with, or that would be inconsistent with (a) the ability of the Debtor to sell and transfer the Acquired Assets to the Successful Bidder in accordance with the terms of the Stalking Horse Agreement and other Transaction Documents and this Confirmation Order and (b) the ability of the Successful Bidder to acquire, take possession of, use and operate the Acquired Assets in accordance with the terms of the Stalking Horse Agreement and other Transaction Documents and this Confirmation Order.

98. The Debtor shall not modify the chapter 11 plan or request entry of an order in this case that conflicts with or derogates from the terms of this Confirmation Order. Nothing contained in the chapter 11 plan or any order to be entered in this case (including any order entered after conversion of this chapter 11 case under chapter 7 of the Bankruptcy Code) shall alter, conflict with or derogate from the provisions of the Stalking Horse Agreement or this Confirmation Order, and to the extent of any conflict or derogation between this Confirmation Order or the Stalking Horse Agreement (including the rights, benefits, protections and consideration provided to the

31

Successful Bidder hereunder) and such plan or order, the terms of this Confirmation Order and the

Stalking Horse Agreement shall control.

99.    **Sale and Transfer Free and Clear of Liens, Claims, Interests, and Encumbrances**. Except for liabilities specifically assumed by the Successful Bidder pursuant to the Stalking Horse Agreement, the sale and transfer of the Acquired Assets to the Successful Bidder shall be free and clear of liens, defenses (including rights of setoff and recoupment), claims, and interests, in each case, in, on or related to the Acquired Assets, including security interests of whatever kind or nature, mortgages, conditional sales or title retention agreements, pledges, deeds of trust, hypothecations, liens (including but not limited to mechanics' or materialman's liens), encumbrances, assignments, preferences, debts, easements, charges, suits, licenses, options, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, offsets, claims for reimbursement, contribution, indemnity or exoneration, causes of action, contract rights and claims, to the fullest extent of the law, in each case, of any kind or nature in, on or related to the Acquired Assets (including all "claims" as defined in Bankruptcy Code section 101(5)), known or unknown, whether prepetition or postpetition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable (collectively, "Encumbrances"). The foregoing is not intended, and shall not be construed, to limit the generality of the categories of liabilities, debts, commitments or obligations referred to as "Encumbrances" therein.

100.    At Closing, all of the Debtor's legal, equitable, and beneficial right, title, and interest in and to, and possession of, the Acquired Assets shall be immediately vested in the Successful Bidder pursuant to sections 105(a), 363(b), 363(f), 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code free and clear of all Encumbrances to the fullest extent permitted by law, provided, however, that all remaining Encumbrances shall attach to the proceeds of the Sale in the order of their priority, with the same validity, force and effect that they now have against the Acquired Assets. Unless the Successful Bidder has accepted an assignment of a specific lease relating to the Acquired Assets, all persons or entities, presently or on or after the Closing, in possession of some, all, or any portion of the Acquired Assets, are directed to surrender possession of the Acquired Assets to the Successful Bidder or its respective designees on the Closing or at such time thereafter as the Successful Bidder may request.

101.    This Confirmation Order: (a) shall be effective as a determination that, as of the Closing, (i) no claims other than Assumed Liabilities will be assertable against the Successful Bidder or any of its respective assets, (ii) the Acquired Assets shall have been transferred to the Successful Bidder free and clear of all Encumbrances, other than the Permitted Encumbrances, and (iii) the conveyances described herein have been effected; and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing

33

persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Stalking Horse Agreement provided that nothing herein shall relieve any entity of the obligation to pay any filing fees required under non-bankruptcy law. The Acquired Assets are sold free and clear of any reclamation rights. For the avoidance of doubt, all Encumbrances on the Acquired Assets attach to the proceeds of the Sale ultimately attributable to the property against which such Encumbrances applied or other specifically dedicated funds, in the same order of priority and with the same validity, force, and effect that such Encumbrances applied prior to the Sale, subject to any rights, claims, and defenses of the Debtor or its estate, as applicable, or as otherwise provided herein.

102.     Except as otherwise provided in the Stalking Horse Agreement, and with respect to the Assumed Liabilities, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors holding claims arising under or out of, in connection with, or in any way relating to, the Debtor, the Acquired Assets, and the ownership, Sale, or operation of the Acquired Assets prior to Closing or the transfer of the Acquired Assets to the Successful Bidder, are barred from asserting such claims against the Successful Bidder, its property or the Acquired Assets. Following the Closing, no holder of any claim shall interfere with the Successful Bidder's title to or use and enjoyment of the Acquired Assets based on or related to any such claim, or based on any action the Debtor may take in its Bankruptcy Case.

103.     If any person or entity that has filed financing statements, mortgages, mechanic's claims, lis pendens, or other documents or agreements evidencing claims against or in the Debtor

34

or the Acquired Assets shall not have delivered to the Debtor prior to the Closing of the Sale, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all claims that the person or entity has with respect to the Debtor or the Acquired Assets or otherwise, then only with regard to the Acquired Assets that are purchased by the Successful Bidder pursuant to the Stalking Horse Agreement and this Confirmation Order: (a) the Debtor is hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Acquired Assets; (b) the Successful Bidder is hereby authorized to file, register, or otherwise record a certified copy of this Confirmation Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances against the Successful Bidder and the Acquired Assets; and (c) upon consummation of the Sale, the Successful Bidder may seek in this Court or any other court to compel appropriate parties to execute termination statements, instruments of satisfaction, and releases of all Encumbrances that are extinguished or otherwise released pursuant to this Confirmation Order under section 363 of the Bankruptcy Code, and any other provisions of the Bankruptcy Code, with respect to the Acquired Assets. This Confirmation Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office. Notwithstanding the foregoing, the provisions of this Confirmation Order authorizing the Sale and assignment of the Acquired Assets free and clear of claims and liens shall be self-executing, and neither the Debtor nor Successful Bidder shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Confirmation Order.

35

104.    None of the Successful Bidder, any of its affiliates, present or contemplated members, officers, directors, shareholders, or any of their respective successors and assigns shall be deemed, as a result of any action taken in connection with the Stalking Horse Agreement, the Transaction Documents, the consummation of the Sale contemplated by the Stalking Horse Agreement, or the transfer, operation, or use of the Acquired Assets to: (a) be a legal successor, or otherwise be deemed a successor to the Debtor (other than, for the Successful Bidder, with respect to any obligations as an assignee under the Transferred Contracts and Leases arising after the Closing) to the fullest extent provided by law; (b) have, de facto or otherwise, merged with or into the Debtor; or (c) be an alter ego or a mere continuation or substantial continuation of the Debtor.

105.    The Successful Bidder shall not have any responsibility for (a) any liability or other obligation of the Debtor or related to the Acquired Assets other than as expressly set forth in the Stalking Horse Agreement (including the Assumed Liabilities) or (b) any claims against the Debtor or any of their predecessors or affiliates.

106.    Except with respect to the Assumed Liabilities, effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Successful Bidder, or its assets (including the Acquired Assets), with respect to any (a) claim or (b) successor or transferee liability including, without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Encumbrance; (iv) asserting any setoff, right of subrogation, or recoupment of any kind; (v) commencing or continuing any action, in any manner or place, that does not comply with,

36

or is inconsistent with, the provisions of this Confirmation Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating, or failing, or refusing to renew any license, permit, or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with such assets.

107.    Notwithstanding anything to the contrary herein, the Successful Bidder shall have any and all rights, defenses, or objections with regard to any Assumed Liabilities, including the Successful Bidder's rights hereunder and under the Stalking Horse Agreement.

108.    **Good Faith Purchaser**. The Successful Bidder is a good faith purchaser for value and, as such, is entitled to all the protections afforded under section 363(m) of the Bankruptcy Code and any other applicable or similar bankruptcy and nonbankruptcy law. The Sale contemplated by the Stalking Horse Agreement is undertaken by the Successful Bidder without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Transferred Contracts and Leases), unless such authorization and consummation of such Sale are duly and properly stayed pending such appeal.

109.    Neither the Debtor nor the Successful Bidder (including, but not limited to, their equity owners, officers, directors, employees, professionals and other agents thereof) has engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under Bankruptcy Code section 363(n). Entry into the Stalking Horse Agreement is undertaken by the parties thereto, without collusion and in good faith, as that term is used in Bankruptcy Code sections 363(m) and 364(e), and the Successful Bidder shall be entitled to all of the benefits of and protections under Bankruptcy sections 363(m) and 364(e). The Sale is not

subject to avoidance pursuant to Bankruptcy Code section 363(n) or chapter 5 of the Bankruptcy Code and the Successful Bidder is entitled to all the protections and immunities thereunder.

110.    **Assumption and Assignment of Transferred Contracts and Leases.** The Debtor is authorized and directed at the Closing to assume and assign each of the Transferred Contracts and Leases to the Successful Bidder, pursuant to the terms of the Stalking Horse Agreement and sections 105(a) and 365 of the Bankruptcy Code, and to execute and deliver to the Successful Bidder such documents or other instruments as may be necessary to assign and transfer the Transferred Contracts and Leases to the Successful Bidder. The payment of the applicable Cure Costs (if any) shall: (a) effect a cure of all defaults existing thereunder as of the Closing; (b) compensate for any actual pecuniary loss to such non-Debtor counterparty resulting from such default; and (c) together with the assumption of the Transferred Contracts and Leases by the Debtor and the assignment of the Transferred Contracts and Leases to the Successful Bidder, constitute adequate assurance of future performance thereof.

111.    Pursuant to section 365(f) of the Bankruptcy Code, subject to the payment of the applicable Cure Costs, the Transferred Contracts and Leases to be assumed and assigned under the Stalking Horse Agreement shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Successful Bidder notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer. Except as otherwise provided in section 365(c) of the Bankruptcy Code, any provisions in any Transferred Contract or Lease that prohibit or condition the assignment of such Transferred Contract or Lease to the Successful Bidder or allow the counterparty to such Transferred Contract or Lease to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Transferred Contract or Lease to the Successful Bidder, constitute unenforceable anti-assignment

38

provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to the Successful Bidder of the Transferred Contracts and Leases have been satisfied. Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Successful Bidder shall be fully and irrevocably vested with all right, title, and interest of the Debtor under the Transferred Contracts and Leases, and such Transferred Contracts and Leases shall remain in full force and effect for the benefit of the Successful Bidder. Each non-Debtor counterparty to the Transferred Contracts and Leases shall be forever barred, estopped, and permanently enjoined from: (a) asserting against the Debtor or the Successful Bidder or their respective property any assignment fee, acceleration, default, breach or claim or pecuniary loss, or condition to assignment existing, arising or accruing as of the Closing or arising by reason of the Closing, including any breach related to or arising out of change-in-control provisions in such Transferred Contracts or Leases, or any purported written or oral modification to the Transferred Contracts or Leases and (b) asserting against the Successful Bidder (or its property, including the Acquired Assets) any claim, counterclaim, defense, breach, condition, setoff asserted, or assertable against the Debtor existing as of the Closing or arising by reason of the Closing

112.    Upon the Closing and the payment of the relevant Cure Costs, if any, the Successful Bidder shall be deemed to be substituted for the Debtor as a party to the applicable Transferred Contracts and Leases, and the Debtor shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Transferred Contracts and Leases. There shall be no rent accelerations, assignment fees, increases, or any other fees charged to the Successful Bidder or Debtor as a result of the assumption and assignment of the Transferred Contracts or Leases. The failure of the Debtor or the Successful Bidder to enforce at any time one or more terms

39

or conditions of any Transferred Contract or Lease shall not be a waiver of such terms or conditions

or of the right of the Debtor or the Successful Bidder, as the case may be, to enforce every term

and condition of such Transferred Contract or Lease. The validity of the assumption and

assignment of any Transferred Contract or Lease to the Successful Bidder shall not be affected by

any existing dispute between the Debtor and any counterparty to such Transferred Contract or

Lease. Any party that may have had the right to consent to the assignment of any Transferred

Contract or Lease is deemed to have consented for the purposes of section 365(e)(2)(A)(ii) of the

Bankruptcy Code.

113.    **Excluded Liabilities and Excluded Assets**. All persons, governmental units, and

holders of Encumbrances, including those based upon or arising out of the Excluded Liabilities,

are hereby barred and estopped from taking any action against the Successful Bidder or the

Acquired Assets to recover property on account of any adverse interests or on account of any

liabilities of the Debtor other than Assumed Liabilities pursuant to the Stalking Horse Agreement.

All persons holding or asserting any Encumbrances with respect to the Excluded Assets are hereby

enjoined from asserting or prosecuting such Encumbrances against the Successful Bidder or the

Acquired Assets for any liability whatsoever associated with the Excluded Assets.

114.    **Actions by the Plan Administrator**. The Plan Administrator may take such

actions as the Plan Administrator may determine to be necessary or desirable to carry out the

purposes of the Fourth Amended Plan. Any certificate of dissolution or equivalent document may

be executed by the Plan Administrator on behalf of the Debtor without need for any action or

approval by the directors or officers of the Debtor. After the Effective Date, at the direction of the

Plan Administrator, the Debtor may be disposed of, dissolved, wound down, or liquidated without

40

supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy

Code or Bankruptcy Rules.

115.    **Binding Effect**. Upon the occurrence of the Effective Date, the terms of the Fourth

Amended Plan are immediately effective and enforceable and deemed binding on the Debtor any

and all holders of Claims or Interests (regardless of whether such holders of Claims or Interests

have, or are deemed to have, accepted the Fourth Amended Plan), all Persons and Entities that are

parties to or are subject to the settlements, compromises, releases, and injunctions described in the

Fourth Amended Plan, any Entity acquiring property under the Fourth Amended Plan or this

Confirmation Order, and any and all non-Debtor parties to executory contracts and unexpired

leases with the Debtor. All Claims and debts shall be as fixed, adjusted, or compromised, as

applicable, pursuant to the Fourth Amended Plan regardless of whether any Holder of a Claim or

debt has voted on the Fourth Amended Plan.

116.    Pursuant to section 1141 of the Bankruptcy Code, subject to the occurrence of the

Effective Date and subject to the terms of the Fourth Amended Plan and this Confirmation Order,

all prior orders entered in the Chapter 11 Case and all documents and agreements executed by the

Debtor as authorized and directed thereunder as of the Effective Date shall be binding upon and

shall inure to the benefit of the Debtor and its successors and assigns.

117.    **Vesting of Assets**. Except as otherwise provided in the Fourth Amended Plan, this

Confirmation Order, or in any agreement, instrument, or other document incorporated herein or

therein, or in any agreement, instrument, or other document incorporated in the Fourth Amended

Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law and

in accordance with section 1141 of the Bankruptcy Code, on the Effective Date, all property

constituting the Debtor's Assets shall vest in the Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.

118. **Plan Administrator**. The Plan Administrator may take such actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Fourth Amended Plan. The Plan Administrator shall have the authority to prosecute, settle, or otherwise resolve, without limitation, all Disputed Claims remaining as of the Effective Date (including any related Causes of Action that are not released, waived, settled, or compromised pursuant to the Fourth Amended Plan), the Recovery Causes of Action, and any other Causes of Action agreed to in writing by the Plan Administrator, in accordance with the Plan Administrator Agreement. The Plan Administrator shall serve as a representative of the Estate under section 1123(b) of the Bankruptcy Code for the purpose of collecting Recovery Causes of Action and enforcing Causes of Action belonging to the Estate related to Disputed Claims that are not released, waived, settled, compromised, or transferred pursuant to the Fourth Amended Plan (including, for the avoidance of doubt, the Recovery Causes of Action, objections to Claims, and any other Causes of Action agreed to by the Plan Administrator).

119. **Effectiveness of All Actions**. All actions required to implement the Fourth Amended Plan, including all actions in connection with the Sale of the WV Complex and the Acquired Assets, are hereby effective and authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to, or order of the Bankruptcy Court, or further action by the respective officers, directors, managers, members, or equity holders of the Debtor and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or equity holders.

120.    **Cancellation of Notes, Instruments, Certificates, and Other Documents**. On the later of the Effective Date and the date on which distributions are made pursuant to the Fourth Amended Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing holders of Claims to receive a distribution under the Fourth Amended Plan or to the extent otherwise specifically provided for in the Fourth Amended Plan, this Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Fourth Amended Plan or the Sale of the WV Complex, all notes, bonds, indentures, certificates, securities, shares, purchase rights, options, warrants, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtor, giving rise to any Claims against in the Debtor or to any rights or obligations relating to any Claims against in the Debtor shall be deemed cancelled without any need for a holder to take further action with respect thereto.

121.    **Distributions**. The procedures governing distributions contained in Article 6 of the Fourth Amended Plan shall be, and hereby are, approved in their entirety. Except as otherwise set forth in the Fourth Amended Plan or this Confirmation Order, the Debtor shall make all distributions required under the Fourth Amended Plan; *provided* that such preparations shall not affect any holder of a Claim or Interest's Claim, Interest, or right to a distribution. The distributions described in the Fourth Amended Plan and this Confirmation Order shall be made in accordance with and as set forth in the Fourth Amended Plan, this Confirmation Order, or the Plan Administrator Agreement, as applicable, and for the avoidance of doubt, any post-Effective Date claims or causes of actions arising from such distributions made in accordance with Article 6 of

the Fourth Amended Plan against the Debtor shall be subject to the jurisdiction of the Bankruptcy

Court.

122.    **Claims Register**. Any Claim or Interest that has been paid, satisfied, amended,

superseded, cancelled, or otherwise expunged (including pursuant to the Fourth Amended Plan)

may be adjusted or expunged, as applicable, on the claims register at the direction of the Debtor

without the Debtor having to file an application, motion, complaint, objection, or any other legal

proceeding seeking to object to such Claim or Interest and without any further notice to or action,

order, or approval of the Bankruptcy Court.

123.    **Preservation of Rights of Action**. In accordance with section 1123(b) of the

Bankruptcy Code, the Debtor shall preserve all rights to commence and pursue any and all Causes

of Action of the Debtor, other than Causes of Action released, waived, settled, compromised, or

transferred pursuant to the Fourth Amended Plan whether arising before or after the Petition Date.

Such rights shall be preserved by the Debtor; *provided* that the Causes of Action expressly

released, waived, settled, or compromised by the Debtor pursuant to the releases contained in the

Fourth Amended Plan, including in Article 10 of the Fourth Amended Plan, shall be deemed

released and waived by the Debtor as of the Effective Date.

124.    No Entity may rely on the absence of a specific reference to any Cause of Action

against it in the Schedules, the Fourth Amended Plan, the Fourth Amended Disclosure Statement

as any indication that the Debtor will not pursue any and all available Causes of Action against it.

The Debtor expressly reserves all rights to prosecute any and all Causes of Action against any

Entity, except as otherwise provided in the Fourth Amended Plan, including Article 10 of the

Fourth Amended Plan. Unless any Cause of Action of the Debtor is expressly waived, relinquished,

released, compromised, or settled in the Fourth Amended Plan or pursuant to a Final Order, the

44

Debtor expressly reserves all such Causes of Action for later adjudication in accordance with the Plan Administrator Agreement and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action as a consequence of confirmation of the Fourth Amended Plan.

125.    **Disputed Claim Reserve**. On or after the Effective Date, the Debtor or the Plan Administrator, as applicable, may establish one or more reserves or accounts or funds for Claims that are Disputed, contingent, have not yet been Allowed, or where the holder is or may be subject to an Avoidance Action, in an amount or amounts as reasonably determined by the Debtor, as applicable, in consultation with the Notes Trustee, consistent with the Proof of Claim filed by the applicable holder of such Disputed Claim. The provisions of Article 7 of the Fourth Amended Plan are incorporated herein by reference and approved.

126.    **Operations After Closing**. On and after the Effective Date, except as otherwise provided in the Fourth Amended Plan, the Debtor may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action in accordance with the Plan Administrator Agreement without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

127.    **Assumption and Rejection of Executory Contracts and Unexpired Leases.** On the Effective Date, all executory contracts and unexpired leases to which the Debtor is a party shall be deemed rejected by the Debtor, unless such executory contract or unexpired lease: (i) is specifically designated by the Debtor; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) was previously assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court; or (iv) is the subject of a motion to

assume, assume and assign, or reject filed by the Debtor on or before the Confirmation Date. Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Fourth Amended Plan shall vest in and be fully enforceable by the Debtor or Successful Bidder, as applicable, in accordance with its terms.

128.    Entry of this Confirmation Order constitutes approval of such assumptions, assignments, and rejections. Except as otherwise provided in this Confirmation Order, any and all objections or reservations of rights in connection with the rejection of an executory contract or unexpired lease under the Fourth Amended Plan, if any, are overruled on their merits.

129.    The amounts set forth in the Plan Supplement (the "Cure Amounts") are the sole amounts necessary to be paid upon assumption of the associated executory contracts and unexpired leases under section 365(b)(1)(A) and (B) of the Bankruptcy Code, and the payment of such amounts will effect a cure of all defaults existing under such executory contracts and unexpired leases and compensate the counterparties to such executory contracts and unexpired leases for any actual pecuniary loss resulting from all defaults existing under such executory contracts and unexpired leases as of the Effective Date.

130.    The Debtor has reserved the right to: (a) alter, amend, modify, or supplement the schedule of assumed executory contracts and unexpired leases and the schedule of rejected executory contracts and unexpired leases identified in the Fourth Amended Plan at any time through and including forty-five (45) days after the Effective Date; and (b) contest any Claim asserted in connection with rejection of any executory contract or unexpired lease.

131.    Nothing contained in the Fourth Amended Plan or this Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtor, nor shall the Plan or this Confirmation Order be deemed to have determined the federal

46

tax treatment of any item, distribution, or entity, including the federal tax consequences of the Fourth Amended Plan.

132.    With respect to any Governmental Unit, nothing in the Fourth Amended Plan or this Confirmation Order shall limit or expand the meaning or effect of section 1141(c) of the Bankruptcy Code with respect to the asset transfers set forth in the Fourth Amended Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Fourth Amended Plan. Accordingly, notwithstanding anything to the contrary in the Fourth Amended Plan or this Confirmation Order, including Article 6 of the Fourth Amended Plan, to the fullest extent permitted under section 1141(c) of the Bankruptcy Code, the WV Complex and the Acquired Assets are transferred free and clear of all Claims (including Administrative Claims, Priority Claims, Secured Claims, and Unsecured Claims) and Interests arising through the Effective Date.

133.    **Authorization to Consummate**. The Debtor is authorized to consummate the Fourth Amended Plan at any time after the entry of this Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to consummation as set forth in Article 9 of the Fourth Amended Plan.

134.    **Professional Compensation**. All final requests for payment of a Claim by an entity employed in the Chapter 11 Case in accordance with an order of the Bankruptcy Court ("Professional") for services rendered and reimbursement of expenses incurred prior to the Confirmation Date ("Professional Fee Claims") must be filed no later than thirty (30) calendar days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders. The Debtor

47

shall pay the Professional Fee Claims in Cash, including from the Professional Fees Escrow Account, in the amount the Bankruptcy Court Allows as soon as reasonably practicable after such Professional Fee Claims are Allowed. To the extent that funds held in the Professional Fees Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, any such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article 2.1 of the Fourth Amended Plan. Allowed Professional Fee Claims shall not be subject to disallowance, setoff, recoupment, subordination, recharacterization, or reduction of any kind, including pursuant to section 502(d) of the Bankruptcy Code.

135.    As soon as reasonably practicable after the Confirmation Date, and no later than ten days prior to the Effective Date, the Debtor (or Plan Administrator if applicable) shall establish and fund the Professional Fees Escrow Account with Cash equal to the Professional Fees Escrow Amount. The Professional Fees Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders. No Liens, claims, or interests shall encumber the Professional Fees Escrow Account or Cash held in the Professional Fees Escrow Account in any way. Such funds shall not be considered property of the Estate or the Debtor.

136.    The Professionals shall provide a reasonable and good-faith estimate of their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtor before and as of the Confirmation Date projected to be outstanding as of the anticipated Effective Date, and shall deliver such estimate to the Debtor no later than five (5) calendar days prior to the anticipated Effective Date; *provided* that such estimate shall not be deemed an admission or limitation with respect to the fees and expenses of such Professional and such

Professionals are not bound by such estimates in any way. If a Professional does not provide an estimate, the Debtor may estimate the unpaid and unbilled fees and expenses of such Professional, taking into account any prior payments. The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtor to determine the amount to be funded to the Professional Fees Escrow Account.

137.    From and after the Confirmation Date, the Debtor shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtor, including fees and expenses of the Debtor's professionals. After the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

138.    **Return of Deposits**. All utilities, including, but not limited to, any Person or Entity that received a deposit or other form of adequate assurance of performance under section 366 of the Bankruptcy Code during the Chapter 11 Case, must return such deposit or other form of adequate assurance of performance to the Debtor promptly following the occurrence of the Effective Date, if not returned or applied earlier.

139.    **Compliance with Tax Requirements**. In connection with the Fourth Amended Plan, to the extent applicable, the Debtor shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Fourth Amended Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Fourth Amended Plan to the contrary, the Debtor shall be

49

authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including winding down a portion of the distribution to be made under the Fourth Amended Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms that are reasonable and appropriate; *provided* that the Debtor, acting directly or through its professionals, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. The Debtor reserves the right to allocate all distributions made under the Fourth Amended Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

140.    **Exemption from Certain Taxes and Fees**. To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers of property under the Fourth Amended Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor; (b) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Fourth Amended Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Fourth Amended Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, sales or use tax, regulatory filing or recording fee, or other similar

50

tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

141.    **Documents, Mortgages, and Instruments**. Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Fourth Amended Plan, including the Sale of the WV Complex and the Acquired Assets, and this Confirmation Order.

142.    **Severability**. Each term and provision of the Fourth Amended Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable in accordance with its terms; (b) integral to the Fourth Amended Plan and may not be deleted or modified except in accordance with Article 11 of the Fourth Amended Plan; and (c) nonseverable and mutually dependent.

143.    **Local Rules 3021-1(b) and 3022-1**. Pursuant to Local Rule 3021-1(b), the timetable for achieving substantial consummation of the Fourth Amended Plan and entry of a final decree closing the Chapter 11 Case is as follows:

(a) *Substantial Consummation of the Fourth Amended Plan*. The Debtor currently anticipates that the Effective Date and substantial consummation of the Fourth Amended Plan will occur on or before August 1, 2024, or as soon as reasonably practicable thereafter.

(b) *Distributions*. On the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), the Debtor shall make initial distributions under the Fourth Amended Plan on account of each Holder of an Allowed Claim in the full amount of the distributions that the Fourth Amended Plan provides for Allowed Claims in each applicable Class, consistent with the provisions of Article 5 of the Fourth Amended Plan.

(c) *Resolution of Claims*. The Debtor and the Plan Administrator, as applicable, shall resolve Disputed Claims against the Estate consistent with the provisions of Article 7 of the Fourth Amended Plan.

(d) *Motion for Final Decree*. Consistent with Bankruptcy Rule 3022 and Local Bankruptcy Rule 3022-1, no later than fourteen (14) days following the full administration of the Estate, the Plan Administrator shall file, on notice to the U.S. Trustee, an application and a proposed order for a final decree.

144. **Limited Waiver of Fourteen-Day Stay**. Notwithstanding any Bankruptcy Rule (including, without limitation, Bankruptcy Rules 3020(e), 6004(h), 6006(d), and 7062) to the contrary, this Confirmation Order is effective immediately and not subject to any stay; *provided* that the Fourth Amended Plan shall not be substantially consummated for at least fourteen days following the Confirmation Date.

145. **Headings**. Headings utilized herein are for convenience and reference only, and do not constitute a part of the Fourth Amended Plan or this Confirmation Order for any other purpose.

146. **Effect of Confirmation Order on Other Orders**. This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order; *provided* that, unless expressly provided for herein, nothing in the Fourth Amended Plan or this Confirmation Order shall affect any orders entered in

52

the Chapter 11 Case pursuant to section 365 of the Bankruptcy Code or Bankruptcy Rule 9019 unless specifically stated otherwise.

147.    **Inconsistency**. In the event of an inconsistency between the Fourth Amended Plan and the Fourth Amended Disclosure Statement, the terms of the Fourth Amended Plan shall control in all respects. In the event of an inconsistency between the Fourth Amended Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control. In the event of an inconsistency between the Confirmation Order and the Fourth Amended Plan (including the Plan Supplement), this Confirmation Order shall control.

148.    **Injunctions and Automatic Stay**. Unless otherwise provided in the Fourth Amended Plan or in this Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Fourth Amended Plan or this Confirmation Order) shall remain in full force and effect until the Effective Date. Upon the effective date, all injunctions or stays contained in the Fourth Amended Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

149.    **Final, Appealable Order**. This Confirmation Order is a final judgment, order, or decree for purposes of 28 U.S.C. § 158(a), and the period in which an appeal must be filed shall commence upon the entry hereof.

150.    **Retention of Jurisdiction**. The Bankruptcy Court may properly, and upon the Effective Date shall, to the full extent set forth in the Fourth Amended Plan, retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Fourth Amended Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including the matters set forth in Article 11 of the Fourth Amended Plan.

53

**IT IS SO ORDERED.**

Dated:  May 29, 2024
          New York, New York

                                        _____**/s/ Martin Glenn**_____
                                              MARTIN GLENN
                                    Chief United States Bankruptcy Judge