**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>WYTHE BERRY FEE OWNER LLC,<br><br>                      Reorganized Debtor. | <u>NOT FOR PUBLICATION</u><br><br>Chapter 11<br><br>Case No. 22-11340 (MG) |

**MEMORANDUM OPINION AND ORDER SUSTAINING REORGANIZED DEBTOR'S**
**OBJECTION TO MECHANIC'S LIEN CLAIMS**

***A P P E A R A N C E S :***

CHAPMAN AND CUTLER LLP
*Attorneys for the Plan Administrator*
1270 Avenue of the Americas, 30th Floor
New York, NY 10020
By:    Michael Friedman, Esq.
          Eric Silvestri, Esq.

GORDON & REES
*Attorneys for Schimenti Construction Company LLC*
One Battery Park Plaza, 28th Floor
New York, NY 10005
By:    Peter E. Strniste, Jr., Esq.
          Robert Barrack, Esq.

CERMELE & WOOD LLP
*Attorneys for D and J Industries LLC*
2 Westchester Park Drive, Suite 110
White Plains, NY 10604
By:    Mark Cemele, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

       On April 23, 2025, this Court held an evidentiary hearing on Wythe Berry Fee Owner

LLC's ("Debtor" or "WBFO") objection to the claims of D and J Industries, LLC ("D&J," claim

# 2) and Schimenti Construction Company LLC ("Schimenti," claim # 6).  A transcript of the

hearing is available at ECF Doc. # 482 ("Hearing Transcript").  This Opinion includes the

Court's findings of fact and conclusions of law based on the evidence and arguments presented

by the parties.  To the extent that the evidence at the hearing is controverted, this Opinion

reflects the Court's resolution of the factual and legal disputes.  FED. R. BANKR. P. 7052.  Direct

evidence was presented by declarations and exhibits subject to live cross examination.[1]  The

Debtor's plan administrator ("Plan Administrator") filed a prehearing brief ("Debtor Prehearing

Brief," ECF Doc. # 468), as did Schimenti ("Schimenti Prehearing Brief," ECF Doc. # 467) and

D&J ("D&J Brief," ECF Doc. # 469)[2]; the Plan Administrator and Schimenti also filed post-

hearing briefs ("Debtor Posthearing Brief," ECF Doc. # 484, and "Schimenti Posthearing Brief,"

ECF Doc. # 485, respectively).  The Debtor's witnesses submitted written direct testimony (*see*

ECF Doc. ## 476 ("Ravid Decl."), 477 ("Weiss Decl.")) as did Schimenti's (ECF Doc. ## 478

("Holland Decl."), 479 ("Sparta Decl.")) and D&J's ("Reiss Decl.," ECF Doc. # 480).

For the following reasons, the Court **SUSTAINS** Wythe Berry Fee Owner's objection to

the mechanic's lien claims and **EXPUNGES** those claims.

---

[1]     Exhibits are cited according to the format used by the parties, with the Debtor's exhibits cited as "DX_"
and Schimenti's exhibits cited as "PX_."

[2]     D&J's arguments are almost entirely subsumed by Schimenti's arguments, and so are not addressed
separately in this Opinion.  For the reasons discussed herein, the Court finds that the Debtor did not consent to the
work performed by D&J, so its mechanic's lien did not attach to the fee simple interest in the Property.

# I. **BACKGROUND**

## A. **Corporate Structure**

The below chart sets out the parties to the dispute:



(ECF Doc. # 453 at 3.)  The Debtor, WBFO, is the fee owner of a commercial real property complex located at 55 Wythe Avenue, Brooklyn, New York 11249 that is comprised of the William Vale Hotel and office and retail space and parking (the "Property").  (*Id.*)  The Property was originally owned by Wythe Berry LLC ("WB LLC").  (ECF Doc. # 363 ("Disclosure Statement") at 3.)  In February of 2017, WB LLC refinanced its existing mortgage debt through a series of transactions, through which the Debtor (WBFO) was formed.  (*Id.* at 4.)  WB LLC

transferred title to the Property to the Debtor, and the Debtor leased the Property back to WB

LLC pursuant to a 15-year lease ("Lease," DX4).  (Disclosure Statement at 4.)

    1.  <u>WBFO (Debtor)</u>

WBFO is a Delaware LLC governed by a limited liability company agreement (PX11,

"WBFO LLC Agreement").  Its "sole purpose [is] acquiring, owning, holding, developing,

operating, leasing, managing, selling and/or transferring that certain property known as 55

Wythe Avenue, Brooklyn, New York . . . and entering into, as landlord, that certain triple net

lease of the Property to Wythe Berry LLC, a New York limited liability company."  (*Id.* § 2.1.)

WBFO's sole member is WB Member LLC ("Member LLC").  (*Id.* at 1, 12; *see also* ECF Doc. #

453 at 3.)  The WBFO LLC Agreement provides that Member LLC "shall have the sole power

and authority to (i) act for or on behalf of, or to bind, the Company [WBFO], (ii) control the day-

to-day management or the operation or control of the business and affairs of the Company, (iii)

be an agent of the Company, (iv) transact any business in the name of the Company including

sale of the assets of the company, finance and refinance the asset and the company's activity and

lease the asset, (v) act as manager of the Company, and (vi) delegate the foregoing rights to an

agent of the Member."  (WBFO LLC Agreement § 3.1.)

    2.  <u>Member LLC</u>

Member LLC is a Delaware LLC governed by a limited liability company agreement

(PX12, "Member LLC Agreement").  Its members are Zelig Weiss and YG WV LLC.  (*Id.* at 1.)

Its "primary purpose . . . is engaging in any lawful activity for which limited liability companies

may be formed under the [Delaware Limited Liability Company] Act, including without

limitation, the ownership of 100% of the membership interests in WYTHE BERRY FEE

OWNER LLC, a Delaware limited liability company."  (*Id.* § 2.10.)  It states that, "[e]xcept as

expressly provided by this Agreement . . . no Member shall (i) have the power to act for or on behalf of, or to bind, the Company, (ii) take part in the day-to-day management or the operation or control of the business and affairs of the Company or (iii) be an agent of the Company or have any right, power or authority to transact any business in the name of the Company." (*Id.* § 3.1(b).)  The Member LLC Agreement states that the LLC's members appointed "YG WV LLC as managing member of the Company," and thus granted it "the authority and responsibility, to manage the business of the Company and shall make all decisions affecting the business of the Company, including, without limitation, all decisions required under the Lease" between WBFO and WB LLC, "except if consent or approval of a Member is required elsewhere herein." (*Id.* § 5.1.)  Zelig Weiss, therefore, has *no* power to act for or on behalf of, or to bind, Member LLC, as such powers are expressly delegated to YG WV LLC.  Weiss testified in his deposition that, as a 50% nonmanaging member of Member LLC, he took no role in managing WBFO (Debtor), nor did he make any decisions with respect to the operations or business of the Debtor.  (Weiss Deposition, PX35, at 37:19–38:2.)

      3.  <u>YG WV LLC</u>

YG WV LLC is a New York LLC governed by a limited liability company agreement (DX9, "YG WV LLC Agreement").  The YG WV LLC Agreement states that All Year Holdings Limited ("AYH"), a British Virgin Islands company, is YG WV LLC's sole member.  (*Id.* at 1.) YG WV LLC's stated purpose is (among other lawful activities) to own 50% of the membership interests of Member LLC, which in turn owns 100% of Debtor (which owns the Property).  (*Id.* § 2.1.)  While AYH has the "sole power and authority to . . . act for or on behalf of, or to bind, the Company" and otherwise manage it (*id.* § 3.1), the YG WV LLC Agreement also provides that AYH appointed Yoel Goldman as the "Authorized Signatory of the Company with the power to

bind the Company, open bank accounts on behalf of the Company and manage the operations of

the Company and Propco member, all under the direction of and subject to the authority of"

AYH (*id.* § 3.2). Weiss testified that Goldman was the one with authority to make decisions for

YG WV LLC prior to the bankruptcy of AYH (*see infra*). (Weiss Deposition, PX35 at 38:13–

24.)

### 4. AYH (and AYH Wind Down)

AYH, formerly the sole member of YG WV LLC, was the debtor in a separate

bankruptcy proceeding, commenced in December of 2021; the corporate ownership statement

filed in that case states that Yoel Goldman owned 100% of the common equity interests of All

Year Holdings, and a single Class A voting share was issued to Assaf Ravid as Chief

Restructuring Officer and another to Ephraim Diamond as Associate Restructuring Officer.

(PX18.) The post-bankruptcy successor-in-interest to AYH is an entity called AYH Wind Down

LLC ("Wind Down," created by AYH's chapter 11 plan in 2023 (Ravid Decl. ¶ 7))., which now

serves as the sole member of YG WV LLC after AYH's bankruptcy. (PX25 at 4.)

To summarize, AYH (now Wind Down) served as the sole member of YG WV LLC,

which is the managing member of Member LLC, which in turn is the sole member of the Debtor.

(Ravid Decl. ¶¶ 3–4, 7). The power to manage the Debtor, therefore, was in the hands of

whoever controlled AYH.

Until its bankruptcy, AYH was controlled solely by Goldman. (Weiss Dep. Tr. 23:17–

24:3.) Assaf Ravid started acting on behalf of All Year Holdings (and through AYH, for YG

WV LLC) in 2021. (Ravid Deposition (PX36), 38:14–20; *see also* Ravid Decl. ¶ 1 ("On March

4, 2021, I was retained as the Chief Executive Officer and Chief Restructuring Officer . . . of All

Year Holdings Limited.").) Ravid was then appointed Plan Administrator of AYH Wind Down

LLC upon the confirmation of AYH's chapter 11 plan. (Ravid Decl. ¶ 7.) During and after

AYH's bankruptcy, Ravid was the only one authorized to act on AYH's behalf; according to

Ravid, this also meant he was the only one authorized to act with respect to the Property, given

the chain of authority running from AYH to the Debtor. (Ravid Dep. 48:25–49:9.)

5. <u>WB LLC</u>

Wythe Berry LLC (WB LLC, the lessee of the Property) is a New York law-governed

LLC, per its operating agreement (PX10, "WB LLC Agreement"). The LLC agreement

submitted as evidence provides that the "sole purpose[]" of the LLC is "to purchase the property

located at 94 North 13th Street, Brooklyn, New York" (*id.* § 3).[3] The LLC agreement provides

that Weiss and Goldman are 50% owners of WB LLC (*id.* § 8), but Weiss is "responsible for the

management of the business and affairs of the Company . . . and have sole control thereof. Zelig

Weiss is authorized to bind the Company . . . without further resolution and consent whatsoever"

(*id.* § 11).

**B. WBFO-WB LLC Lease**

In February of 2017, WBFO and Wythe Berry LLC entered into a ground lease for the

Property. (DX4.) The lease agreement defines the "Lessor" as WBFO and the "Lessee" as

Wythe Berry LLC. (*Id.* at 1.) The lease agreement contains the following relevant language:

- Section 3.1, "Use of Premises":
  - Lessee expressly agrees to use the Leased Premises, subject to the provisions of
    this Lease, for hotel use with food and beverage services and any other lawful
    uses permitted pursuant to the certificate of occupancy in existence on the date
    hereof (the "Permitted Use") and cannot, in any way and under any
    circumstances, alter the Permitted Use. Lessee shall operate the Leased Premises
    in accordance with industry standards and shall at all times operate the Leased
    Premises in a manner consistent with the current operations, the zoning laws then
    in effect and the certificate of occupancy. Notwithstanding the foregoing, Lessee

---

[3] The WB LLC Agreement dates to 2013, so it makes sense that the stated purpose of WB LLC is to "purchase" the Property – recall that the Property did originally belong to WB LLC, but WB LLC eventually transferred title to the Property to the Debtor. There is no contest that the Debtor is the fee owner of the Debtor.

shall not at any time use or occupy the Leased Premises, or suffer or permit anyone else to use or occupy the Leased Premises, (a) in any manner that violates the provisions of this Lease or the certificate of occupancy, if any, for the Leased Premises, (b) so as to cause waste, (c) so as to violate any insurance policy then issued in respect of the Leased Premises, or (d) so as to create a nuisance.  All employees of the Leased Premises shall be employees of Lessee and Lessor shall have no responsibility for any employees or staff at the Leased Premises.

- Section 3.6, "Liens":
  - o Lessee shall not permit any liens, charges or encumbrances ("Liens") upon the Leased Premises.

- Section 6.2, "Alterations":
  - o Lessee may, at its sole option and in accordance with the applicable Annual Operating Budget and as otherwise required by the terms of this Lease, make any additions, replacements, changes, alterations, installations, repairs or improvements to the Leased Properties (the "Alterations") that Lessee, in its sole discretion, deems necessary or appropriate; except that Lessee shall not, without Lessor's consent, which shall not be unreasonably withheld, conditioned or delayed, make any Material Alterations (as hereinafter defined) to the Leased Premises.  For purposes of this Lease, a "Material Alteration" shall mean any Alteration to the Leased Premises that (i) costs in excess of Five Hundred Thousand Dollars ($500,000) (as such amount shall be increased during the Lease Term by increases in the CPI) or (ii) which materially affects the structure of the Leased Premises.  Lessee shall not commence any Material Alterations until Lessee has met all of the following conditions:
    - ▪ a) the proposed Material Alterations are in accordance with a project drawn up by a competent technician, to the extent required by applicable Law;
    - ▪ b) Lessee has obtained all permits, approvals, and authorizations required by the Building Department of the City of New York (the "Building Department") and all other applicable governmental authorities for the Material Alterations;
    - ▪ c) the Material Alterations will be performed by Lessee from funds in the Hotel Reserve or otherwise with funds that Lessee makes available for that purpose as may be required by the terms of this Lease;
    - ▪ d) the Material Alterations will comply with all applicable laws and statutory regulations and the Building Department code;
    - ▪ e) Lessee has caused its general contractors, construction managers, architects, engineers, and subcontractors to obtain insurance reasonably satisfactory to Lessor and with such additional coverages as may be reasonably required by Lessor, and (ii) Lessee has delivered to Lessor certificates (in form reasonably acceptable to Lessor) evidencing such required insurance; and

8

- ▪ f) Lessor has reasonably consented to the final plans and specifications for proposed Material Alterations and the source and use of funds required therefor.

- Section 13.1, "Prohibition Against Liens":
  - o Lessee shall keep the Leased Premises and this Lease free from any Liens filed or recorded in favor of any mechanic, materialman, architect or engineer performing services by or through Lessee and free from any Lien with respect to work, material or services alleged to have been performed for Lessee.  If any such Lien is filed or recorded, Lessee shall discharge any such Lien by bond or otherwise within thirty (30) days after Lessee receives notice of such Lien.  If Lessee fails to discharge such Lien within such thirty (30) day period, Lessor may pay the amount reflected on such Lien (or any portion thereof) and any costs, interest, and/or penalties imposed in connection therewith or take such other action as Lessor deems necessary or desirable to remove such Lien, without being responsible for investigating the validity thereof and without regard to any objection by Lessee.  The amount so paid and costs incurred by Lessor shall be deemed Additional Rent under this Lease payable within thirty (30) days after Lessee is billed therefor.  Nothing in this Lease shall be deemed in any way to: (a) constitute the Lessor's consent or request, express or implied, that any contractor, subcontractor, laborer or materialman provide any labor or materials for any alteration, addition, improvement or repair of the Leased Premises; or (b) evidence Lessor's agreement to subject the Leased Premises to any such Lien.  Nothing contained in this Lease shall be deemed or construed to mean that Lessor has granted Lessee any right, power or permission to do any act or to make any agreement which may create, give rise to, or be the foundation for, any right, title, interest, easement or Lien upon the estate of Lessor in the Leased Premises.

- Section 13.2, "Permitted Liens":
  - o Notwithstanding any provision of this Lease to the contrary but without limiting Lessee's obligation to timely pay rent and other amounts due and payable by Lessee hereunder, Lessee may create or permit to be created the following liens or encumbrances with respect to Lessee's lease hold interest in the Leased Premises ("Permitted Liens"):
    - ▪ A. Liens granted in connection with any improvements, expansion, extension, additions or modifications of the Complex or any real property adjacent thereto.
    - ▪ B. Any liens, charges, encumbrances and restrictions which may be created or exist by reason of this Lease or loan from Lessor.
    - ▪ C. Liens, charges and encumbrances for taxes or assessments or other government charges or levies not then delinquent.
  - o Notwithstanding anything herein to the contrary, Lessee shall not do any of the following (each, a "Transfer"): mortgage, pledge, encumber, alienate, grant a lien on, grant and option with respect to or grant any other interest in the Complex or the Leased Premises, any part thereof or any interest therein (including any legal, beneficial or economic interest in Lessee), directly or indirectly, voluntarily or

9

involuntarily, by operation of law or otherwise, and whether or not for consideration or of record the Complex or the Leased Premises without the prior written consent of the Lessor (and mortgagee and collateral mortgagee thereof).

- Section 17.3, "Assignment and Subletting":
  - o Lessee shall not assign this Lease or any interest herein, whether by operation of law or otherwise, without the prior written consent of the Lessor (and mortgagee and collateral mortgagee thereof) . . . .  Lessor may freely assign this Lease with notice to Lessee . . . .  Lessee shall not assign this Lease without the prior consent of the Lessor, which may be given or withheld in the Lessor's sole and absolute discretion.  Any unauthorized assignment shall be deemed a Lessee Event of Default . . . .  Notwithstanding anything herein to the contrary, Lessee may sublease all or part of the Leased Premises for any Permitted Use.

- Section 17.9, "Relationship of Parties":
  - o Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership or joint venture or of any association between Lessor and Lessee, and no provision contained in this Lease or any acts of the parties hereto shall be deemed to create any relationship between Lessor and Lessee other than the relationship of Lessor and Lessee.  In addition, notwithstanding anything herein to the contrary, nothing herein is intended for the benefit of any third parties and no person or entity other than Lessor or Lessee or their successors or assigns shall have any rights of anything contained herein.  No person or entity shall have a right by virtue of this Lease Agreement to join Lessor as a party or otherwise bring the Lessor into a suit asking for damages from Lessee.  The Lessor has no obligation or duty for: governmental compliance; patient care; to protect the health, safety and welfare of any employee or third party; or to anyone for anything whatsoever relating to the operation of the business or condition of the Leased Premises such lease being triple net and all obligations relating to the foregoing belonging solely to the Lessee.

The lease is governed by New York law.  (*Id*. § 17.11.)  The lease was signed by Yoel Goldman on behalf of both the lessor (WBFO) and the lessee (Wythe Berry LLC).  (*Id.* at 28.) Zelig Weiss signed as a guarantor, along with Goldman, as to Article XVIII (concerning a guaranty) only.  (*Id.*)

### C.  WBFO-WB LLC Rent Payment Dispute

On February 1, 2021, WB LLC failed to pay rent on the Lease to WBFO.  (Ravid Decl. ¶ 17.)  On February 11, 2021, WBFO advised WB LLC that it was in default on the Lease.  (*Id.*;

*see also* PX14.)  In a further letter to WB LLC, the Debtor cited rent nonpayment, NYC

Department of Buildings violations, and a failure to provide the Debtor with financial records as

required by the Lease.  (PX14.)  According to Assaf Ravid, WB LLC (the lessee) was not

satisfying its financial reporting obligations and the Debtor "was without any insight into the

then-existing financial condition or operations" of the hotel on the Property.  (Ravid Decl. ¶ 18.)

On May 5, 2021, the Debtor served a Notice of Default on WB LLC, advising it that it was in

default of its obligations to (1) pay $7.5 million in rent due on February 1, 2021; and (2) provide

the Debtor with the financial reporting due under the Ground Lease.  (*Id.* ¶ 20.)  On May 20,

2021, the Debtor sent WB LLC a notice of cancellation and termination of the Lease, effective

May 20, 2021.  (PX15.)

On June 11, 2021, WBFO LLC filed a complaint in New York State court for breach of

contract and declaratory judgment, seeking, among other things, to eject WB LLC from the

Property.  (Disclosure Statement at 4.)  WBFO LLC also sought a preliminary injunction barring

WB LLC from advertising unleased commercial and/or retail space on the subleased property,

entering into any lease or sublease at the property, or making any alterations on then-vacant or

unleased space on the property.  (PX17.)  While, in December of 2021, the New York State court

granted the Debtor monetary relief, it denied the motion for a preliminary injunction insofar as

the Debtor sought to bar WB LLC from engaging in subleasing.  *Wythe Berry Fee Owner LLC v.*

*Wythe Berry LLC*, 73 Misc. 3d 1228(A) (N.Y. Sup. Ct. 2021) (available at PX8, *see* pp. 11–15).

Schimenti frames this decision as allowing "WB LLC to enter into subleases and improvements

without limitation."  (Schimenti Prehearing Brief ¶ 42.)  This does not capture the full picture:

the state court order merely denied a preliminary injunction and clearly states that WB LLC

might be liable for subleases in the future if the court ultimately ruled against it on the merits.

11

(PX8 at 14–15 (noting that the facts were in "sharp dispute" and that the state court therefore could not grant a preliminary injunction; noting also that the plaintiff had not demonstrated that the prospect of WB LLC's subleasing the property would cause *imminent* harm or harm not compensable by money damages).)

The state court litigation was removed to this Court in February of 2023.  (PX25 at 13.) On October 5, 2023, the Court determined that, due to WB LLC's nonpayment of rent and other breaches of the Lease, WB LLC was indeed in default, and that the Debtor was permitted to terminate the Lease when it did.  (*See generally id.*)  The notice of termination the Debtor sent on May 20, 2021 was therefore effective to terminate the lease in accordance with its terms—in other words, the lease terminated on May 20, 2021.  (*Id.* at 41.)  This Court also granted the Debtor damages in an unspecified amount due to the lessee's continued occupancy of the Property post-effective termination of the Lease (termination occurring on May 20, 2021).  (*Id.* at 40.)

### D.  WB LLC's Sublease

On March 21, 2022, after the state court issued its opinion but before this Court determined that the lease had been terminated in May of 2021, WB LLC subleased part of the Debtor's Property to HealthQuarters, Inc. ("HealthQuarters").  (PX5 ("HQ Sublease").)  The intended use of the property by HealthQuarters was for the creation of a "wellness, healthcare and medical facility."  (*Id.* § 4.1.)[4]  The HQ Lease identified WB LLC as the "Landlord" and HQ as the "Tenant," and there is no mention of the Debtor in the sublease.  (*Id.* at 1.)  (As noted below, Ravid testified that the Debtor was unaware of the sublease at the time it was signed.)

---

[4]    It is not clear whether this fell within the permitted use of the Property as set out in the Lease, which seems to provide that the sole permissible use of the Property is as a hotel.  *See* Lease § 3.1 ("Use of Premises": Lessee expressly agrees to use the Leased Premises . . . for hotel use . . . and cannot, in any way and under any circumstances, alter the Permitted Use.")  The parties do not argue this point.

12

The HQ Sublease provides that all "improvements, changes or alterations in or to the Demised

Premises [the Property], whether same are installed by Landlord or Tenant . . . shall, upon

installation, be and remain the property of Landlord," *i.e.,* of WB LLC.  (*Id.* § 3.12B; *see also* §

13.1 for a similar provision.)  Other provisions of the HQ Sublease also reference WB LLC as

the "Landlord," including but not limited to a provision requiring WB LLC's prior written

consent to renovations of the property (*id.* § 6.1), a provision concerning insurance procured by

HQ (*id.* § 10.3.C), and a provision granting WB LLC and its agents the right to walk through the

premises (*id.* § 17.3).  The HQ Sublease also has a subordination clause, which provides that the

"Lease, and all rights of Tenant [HealthQuarters] hereunder, are and shall be subject and

subordinate in all respects to all ground leases, overriding leases and underlying leases of the

Land and/or the Building now or hereafter existing."  (*Id.* § 12.1.)  It also required WB LLC to

"cause the then existing holder of a superior mortgage . . . and any then existing superior lessor .

. . to sign, acknowledge and deliver to Tenant [HealthQuarters] a subordination, nondisturbance,

and attornment agreements [sic]."  (*Id.* § 12.4)

Weiss signed the HQ Sublease on behalf of WB LLC.  (*Id.* at 67.)  Weiss explains in his

written direct testimony that he is the sole member of a company called Espresso Hospitality

Management LLC ("Espresso"), which entered into a management agreement with WB LLC

under which Espresso managed the operations of the Property on a day-to-day level (Weiss Decl.

¶ 6); while WB LLC leased the Property, it used Espresso as the main point of contact for

sublease activity at the Property (*id.* ¶ 7).

On April 4, 2022, HealthQuarters subcontracted with Schimenti for Schimenti to act as

HealthQuarters' general contractor to provide labor, materials, equipment and services for the

fitting-out of HealthQuarters' rental space.  (PX6; *see also* Holland Aff. ¶ 3.)  Oliver Holland,

13

vice president of construction at Schimenti, stated in his written direct testimony that

"Schimenti's work was structural and permanent in nature and added value" to the Property.

(Holland Aff. ¶ 4.)  The HealthQuarters-Schimenti contract provided for a lump sum payment to

Schimenti in the amount of $1,998,059.03 (broken down into itemized costs), subject to

additions and deductions as specified in the contract.[5]  (*Id.* at 2.)  All parties agree that

"Schimenti only ever worked for and contracted with HealthQuarters, and was never employed

by the Debtor."  (ECF Doc. # 475 ("Pre-Trial Order")  at 2.)

As early as March of 2022, Schimenti, HealthQuarters, and Zelig Weiss engaged in email

discussions about the building permits they needed from the NYC Department of Buildings.

(PX20.)  Weiss was designated as the registered Building Owner or Owner's designee on the

NYC DOB filing website, which meant that he would sign the building permits—which he did.

(PX22; Hearing Tr. 104:16–105:2.)    Schimenti also worked with Weiss and his associates to get

additional documents approved for the NYC DOB permitting process.  (*See* PX 20–22.)  Weiss

testified that this did *not* mean he held title to the Property, but rather meant only that he fell

under the definition of "owner" under Section 28-101.5 of the Administrative Code, and thus

could sign the documentation.  (Hearing Tr. 113:25–115:3.)

As Daniel Reiss, owner and president of D&J, testified, in the summer of 2022,

HealthQuarters hired D&J to furnish all the light fixtures it needed (Reiss Decl. ¶ 4–7).  Reiss

testified that the agreed value of these fixtures was $166,802.50.  (*Id.* ¶ 8.)  To date, D&J has

been paid $70,082.50, leaving an unpaid balance of $90,514.12.  (*Id.* ¶ 9.)  On November 30,

2022, D&J filed a notice of mechanic's lien pursuant to section 10 of the New York Lien Law

---

[5]    Holland testified that the agreed value of the labor and materials furnished by Schimenti was
$2,335,944.18, and to date, Schimenti had only been paid $929,147.46 for its work, leaving an unpaid balance of
$1,406,796.72—hence the amount of Schimenti's claim in this litigation.  (Holland Decl. ¶ 7–9.)

14

with the County Clerk of Kings County against the fee simple interest of the property owner and

against HealthQuarters' leasehold interest in the Property.  (*Id.* ¶ 10.)  Reiss testified that the lien

was properly filed and served.  (*Id.*)  All parties agree that D&J "only ever worked for and

contracted with HealthQuarters, and was never employed by the Debtor."  (Pre-Trial Order at 2.)

Since HealthQuarters stopped paying Schimenti at some point prior to September 2022,

on September 23, 2022, Schimenti filed a verified notice of mechanic's lien pursuant to section

10 of the New York Lien Law with the Country Clerk of Kings County, and Holland testified

that all statutory requirements for filing and service were met, including service on the Debtor.

(Holland Decl. ¶ 10–11.)

In November of 2022, HealthQuarters filed a voluntary petition for relief under chapter 7

of the Code with the United States Bankruptcy Court for the District of Delaware.  (ECF Doc. #

453 at 5.)

On or about March 6, 2023, D&J filed a claim in the Debtor's chapter 11 case, asserting a

claim in the amount of $90,514.12, purportedly secured by a mechanic's lien on real estate.

(DX2.)  On or about April 28, 2023, Schimenti Construction Company LLC ("Schimenti") filed

a claim for a "General Construction Contract" in the amount of $1,406,796.72.  (DX1.)

Ravid testified that these claims arose from work that the claimants had performed

pursuant to a contract with HealthQuarters that was completely unknown to the Debtor at the

time, and that the Debtor had no knowledge of any aspect of the Mechanic's Lien Claimants'

contracts or the work they allegedly performed until the mechanic's lien notices were filed.

(Ravid Decl. ¶¶ 34, 38; *see also* Ravid Dep. 49:23–50:12 (testifying that he had only heard of

HealthQuarters after WBFO filed for bankruptcy, in the fall of 2023).)  Ravid also testified that

Weiss never communicated with him regarding any subleases or mechanic's liens, nor was

15

WBFO contacted by HealthQuarters. (Ravid Decl. ¶¶ 43–45.) Weiss confirmed that WB LLC did not inform the Debtor about the sublease and did not discuss the building permits for the claimants' work on the Property with the debtor. (Hearing Tr. 119:24–120:1 ("Q: Wythe Berry LLC did not inform the Debtor that it was planning on entering into the sublease, correct? A: Correct."), 122:23–123:3 ("Q: Did you ever discuss the building permits contained in PX-22 with the Debtor? A: No. Q: Did you ever discuss the building permits . . . with Assaf Ravid? A: No.").) This is in part because WB LLC and the Debtor were in litigation during the time the claimants performed their services, so the Debtor was not receiving any information about the Property: "[n]either Weiss nor his affiliated entities ever produced documents responsive to the State Court's orders or the subpoenas the Debtor issued in the State Court litigation." (Ravid Decl. ¶ 40.) Ravid testified that he only visited the Property twice from 2021–2023 (but not after the HealthQuarters lease was signed on March 21, 2022, *see* Ravid Dep. 64:2–11, Hearing Transcript at 19:15–23), and that he had "no visibility" into how the Property was being managed (Ravid Dep. 39:21–41:22.) At trial, he explained that he avoided visiting the Property during this period so as "not to instigate any event in [the] hotly-disputed litigation" between WBFO and WB LLC, which was "very public." (Hearing Transcript at 19:15–20:21.) Neither Schimenti nor D&J ever contacted the Debtor or Assaf Ravid. (*Id.* 169:8–170:1, 174:9–13.)

The Debtor has moved to expunge all of the mechanic's lien claims.

### E.  Parties' Contentions

N.Y. LIEN LAW § 3 provides that a "contractor . . . who performs labor or furnishes materials for the improvement of real property with the consent or at the request of the owner thereof . . . shall have a lien . . . upon the real property improved." The New York Lien Law defines an "owner" of real property as: "the owner of a fee in real property, or of a lesser estate

16

therein, a lessee for a term of years, a vendee in possession under a contract for a purchase of

real property, and all persons having any right, title or interest in such real property."  NEW

YORK LIEN LAW § 2(3) (McKinney 1993).

The critical questions in this dispute are: (1) who was the "owner" of the Property (and

what does "owner" mean in the context of mechanic's liens asserted against a fee owner), and (2)

did the "owner" of the Property (or the owner's agent) consent to the work performed by

Schimenti *et al*.?  Each side's arguments are detailed in relevant part below.

Schimenti advances a slew of arguments in favor of its and D&J's claims.  Its theories are

discussed at more length below.  In sum, it argues that it had the requisite consent of the owner

of the Property which would justify the imposition of a mechanic's lien on the fee simple interest

in the Property under the NY Lien Law pursuant to a number of different theories, including that:

Weiss himself was the owner of part of the fee simple interest in the Property and provided

adequate consent, WB LLC was an "owner" under the NY Lien Law by dint of the operation of

the Lease and consented (through Weiss) to the work done on the Property, and Weiss was an

agent of Member LLC and the Debtor and consented on the Debtor's behalf.  (Schimenti

Posthearing Brief ¶ 65.)  Each of these contentions is discussed further below.

The Debtor's argument boils down to a few key points.  First, it is undisputed (or was,

until Schimenti floated the theory that Weiss actually owns 50% of the fee simple interest in the

Property) that WBFO was the fee simple owner of the Property.  (Debtor Posthearing Brief ¶ 8.)

It is also undisputed that the contracts underlying the mechanic's liens were not with the Debtor,

but with HealthQuarters.  (*Id.* ¶ 9.)  So, the Debtor and owner of the Property did not request any

of the work done on the Property by Schimenti and its subcontractors.  (*Id.* ¶ 10.)

Second, the Debtor argues that Schimenti failed to show that Weiss is the owner of the Property, because Weiss simply does not have a direct property interest in the Debtor, as he is merely an "owner[] of the owner of the Debtor" (i.e., part owner of Member LLC).  (*Id.* ¶¶ 11–13.)  Any interest that Weiss has in the Debtor is a personal property interest only, and not an interest in any real property held by the Debtor (i.e., not an interest in the Property).  (*Id.* ¶ 13.) Moreover, the Debtor claims that Schimenti "did no investigation into who actually owned the [P]roperty" and instead dealt solely with HealthQuarters.  (*Id.* ¶ 14.)

Third, the Debtor claims that Schimenti did not show that WB LLC was the "owner" of property.  Nor could Schimenti show this, as its (and the other claimants') contracts with HealthQuarters arose in 2022, after this Court declared the Lease invalid.  (*Id.* ¶ 15–16.)  The Debtor frames Schimenti's argument that WB LLC is the Property owner as a collateral attack on this Court's earlier judgment on the Lease termination.  (*Id.* ¶ 17.)

Fourth, the Debtor points to New York caselaw to argue that Weiss is not the Debtor's agent.  The Debtor's LLC agreement clearly empowers Member LLC and Member LLC *alone* to act as its agent, and the Debtor took steps in the Lease to limit the ability of Weiss or WB LLC to unilaterally alter the Property in major ways (pointing to the "Material Alteration" provision). (*Id.* ¶ 22.)  The Debtor points to trial testimony to support its claim that it never delegated authority to Weiss or WB LLC and that Weiss never understood himself to be an agent of the Debtor.  (*Id.* ¶ 23.)  Nor did the Debtor ever represent to the mechanic's lien claimants that Weiss had any authority on the Debtor's behalf—because the Debtor *never* interacted with the claimants.  (*Id.* ¶¶ 23–29.)

Fifth, again because the Debtor never communicated with the Claimants or with Weiss about the HealthQuarters sublease, the Debtor could not have affirmatively consented to the

claimants' work—and affirmative consent is required by the NY Lien Law.  (*Id.* ¶¶ 30–33.)

Indeed, the Debtor was not in touch with Weiss or WB LLC at all during the relevant period,

because of the ongoing rent dispute between WBFO and WB LLC, nor did the Debtor even have

visibility into the operations or condition of the Property.  (*Id.* ¶¶ 35–36.)  The Debtor insists that

"there is simply zero evidence that Debtor ever made any affirmative act to acquiesce to the

work done by Claimants," so Schimenti *et al.* did not meet their burden.  (*Id.* ¶¶ 37–38.)

## II.    <u>LEGAL STANDARD</u>

N.Y. LIEN LAW § 3 provides that a "contractor . . . who performs labor or furnishes

materials for the improvement of real property with the consent or at the request of the owner

thereof . . . shall have a lien . . . upon the real property improved."  (Emphasis added.)  "The

consent required by this section is not mere acquiescence and benefit, but some affirmative act or

course of conduct establishing confirmation . . . .  Such consent may be inferred from the terms

of the lease and the conduct of the owner."  *Harner v. Schecter*, 105 A.D.2d 932, 932 (1984); *see

also Dewees Mellor, Inc. v. Weise*, No. 91 CV 2518 (ERK), 1993 WL 591608, at *2 (E.D.N.Y.

Dec. 29, 1993) ("[N]o right of recovery against an interest in real property will lie unless the

owner of that particular interest consented to the improvements.  While the consent need not be

explicit, mere passive acquiescence is not consent.  Rather, consent will be found where an

owner is either an affirmative factor in procuring the improvement to be made, or having

possession and control of the premises assents to the improvement [in order] that he will reap the

benefits of it.") (cleaned up).  "Thus, generally, where a rental tenant authorizes the

improvements, mere benefit to the owner of the property, without some act of affirmative

consent (for example, a lease requirement to do the work, or an affirmative act claiming the work

for itself) will not suffice to allow the lien to run against the owner's (as opposed to the tenant's)

interest in the property." *Dewees Mellor, Inc.*, 1993 WL 591608,. at *3; *see also  National Wall–Paper Co. v. Sire*, 163 N.Y. 122, 122 (1900) (finding implied consent where owner was active in procuring work, was at the work site virtually on a daily basis, and work ultimately inured to owner's benefit); *Paul Mock, Inc. v. 118 E. 25th St. Realty Co*., 87 A.D.2d 756, 756 (1982) (finding no consent to work on property where work was done for the tenant's convenience and at tenant's request—consent of landlord was merely consent required under lease and did not constitute consent required by Lien Law; noting that the lienor never dealt with the owner with respect to these improvements); *M & B Plumbing & Heating Co., Inc. v. Cammarota,* 103 A.D.2d 879, 879–80 (3d Dep't 1984) (finding requisite consent where lease required improvements to be made, and improvements were permanent); *Beaudet v. Saleh,* 149 A.D.2d 772, 773 (3d Dep't 1989) (finding no consent where owners of premises who visited on a regular basis were fully aware of the work being performed and even credited tenant $1,000 for work done in the apartment, but there was no showing of any "affirmative act" sufficient to establish consent within meaning of statute)); *Eisenson Elec. Serv. Co. v. Wien*, 30 Misc. 2d 926, 929 (Sup. Ct. 1961) ("It should be noted, first, however, that there is a clear distinction between the 'consent' as set forth in section 3 of the Lien Law . . . and the mere passive acquiescence of an owner who has knowledge that repairs or improvements are being made by a lessee or sublessee, but does nothing about it.  To come within the intendment of the statute, the owner must either by an affirmative factor in procuring such work, or, having possession and control of the premises, assent to the improvements in the expectation that he will reap their benefit."). Whether the owner consented is a question of fact.

The New York Lien Law defines an "owner" of real property as: "the owner of a fee in real property, or of a lesser estate therein, a lessee for a term of years, a vendee in possession

20

under a contract for a purchase of real property, and all persons having any right, title or interest

in such real property." NEW YORK LIEN LAW § 2(3) (McKinney 1993). "Accordingly, it is well

established that a leasehold is a lienable interest, and that a tenant is an 'owner' of his leasehold

under the statute." *Dewees Mellor, Inc.*, 1993 WL 591608, at *4.

A mechanic's lien attaches when the lienor files the required notice of lien with the clerk

of the county where the property is located. There is no dispute concerning proper service in this

case.

### III.    DISCUSSION

This section walks through Schimenti's theories of the Debtor's liability and explains

why each one fails. [6]

### A.   Schimenti Theory 1: Weiss is an owner in fee of the Property, and his consent was sufficient to bind the fee simple interest in the Property

Schimenti claims that Weiss is "an owner in fee interest of the Property" due to his 50%

ownership both of Member LLC and of Debtor. Hence, Weiss is an "owner" under the NY Lien

---

[6]    In its Pre-Hearing Brief, Schimenti alleged an additional theory: that WB LLC itself was the "owner" of the Property because it is a lessee for a term of 15 years, bringing it within the NY Lien Law's definition of "owner," and Weiss consented on behalf of the Property's "owner" (WB LLC) to Schimenti's work on the Property. (Schimenti Prehearing Brief at 12–13.) Schimenti dropped this argument in its post-hearing brief. Regardless, it would have failed because WB LLC never held the *fee simple interest* in the Property. As discussed further elsewhere in this opinion, the only interest WB LLC ever held in the Property was a leasehold, and at most, it could bind the leasehold, not the fee simple interest (which was the property in the Debtor's estate). A party cannot bind or otherwise affect a property right which it does not hold, and it is undisputed that WB LLC never held a fee simple interest in the Property. *See, e.g.*, *Dewees Mellor, Inc.*, 1993 WL 591608, at *2– 3 ("No right of recovery against an interest in real property [under the NY Lien Law Section 3] will lie unless the owner of *that particular interest* consented to the improvements . . . . [W]here a rental tenant authorizes the improvements, mere benefit to the owner of the property, without some act of affirmative consent (for example, a lease requirement to do the work, or an affirmative act claiming the work for itself) will not suffice to allow the lien to run against the owner's (as opposed to the tenant's) interest in the property.") (emphasis added). (*See also* Lease §§ 13.1 ("Nothing contained in this Lease shall be deemed or construed to mean that Lessor has granted Lessee any right, power or permission to do any act or to make any agreement which may create, give rise to, or be the foundation for, any right, title, interest, easement or Lien upon the estate of Lessor in the Leased Premises."), 13.2 (listing permitted liens but noting that the Lessee could only "permit to be created" certain liens "with respect to *Lessee's leasehold interest* in" the Property (emphasis added)).)

The rest of the arguments Schimenti made in its prehearing brief are repeated in substance in its posthearing brief.

21

Law and can consent to the imposition of a mechanic's lien on the fee simple interest in the

Property. (Schimenti Post-hearing Brief ¶ 41.) Schimenti also claims that Weiss, by signing the

HQ Sublease and working with Schimenti to secure the necessary permits for their work,

consented to Schimenti's work on the property; hence, as "owner" of the Property, Weiss

consented to Schimenti's imposition of a mechanic's lien on the fee simple interest in the

Property. (*Id.* ¶ 41–42; *see also* Schimenti Prehearing Brief ¶¶ 54–55.) Schimenti also argues

that Weiss was deemed a fee owner of the Property by the District Court for the Southern

District of New York. (*Id.* ¶ 55.)

The argument fails as a matter of law. Weiss holds an economic (non-managerial)

interest in the member LLC of the LLC which owns the Property—the Property is twice

removed from Weiss himself, via two corporate structures. Delaware law (governing both

WBFO and Member LLC) clearly provides that a "limited liability company interest is personal

property. A member has *no interest* in specific limited liability company property." 6 Del. C. §

18-701 (emphasis added). Delaware courts have interpreted this statute to mean that LLC

members do not "own" the property of the LLC. *See, e.g., Credit Suisse Sec. (USA) LLC v. W.

Coast Opportunity Fund, LLC*, No. CIVA 4380-VCN, 2009 WL 2356881, at *3 (Del. Ch. July

30, 2009) ("Evans does not own the GreenHunter stock in question. It is entirely the property of

Investment Hunter, and Evans's status as a member does not alter this fact."); *In re Opus E.,

L.L.C.*, 480 B.R. 561, 575 (Bankr. D. Del. 2012) (explaining that just as a shareholder has no

personal or individual right of action against a third party for acts causing interest to a

corporation, a member (or the member's trustee) does not have a property interest in the limited

liability company's property). This basic principle of LLC law is also repeated in the Member

LLC operating agreement itself. (*See* Member LLC Agreement § 3.2(b) ("A Member's Interest

in the Company shall for all purposes be personal property.  A Member shall have no interest in specific Company property.").)  Delaware LLC law is clear—Weiss has *no interest* in Member LLC's shares of Debtor, let alone in Debtor's property, so is not the owner of the fee simple interest in the Property.[7]

In its Prehearing Brief, Schimenti argued that Weiss signed the HealthQuarters sublease as 50% fee owner of the Property, which constituted consent sufficient to bind the real property to Schimenti's mechanic's lien.  (Schimenti Prehearing Br. at 12.)  This is wrong on two levels: not only was Weiss *not* an owner of the fee simple interest in the property, but he also signed the HealthQuarters sublease in his capacity as managing member of WB LLC—*not* the Debtor, but the original lessee, which also does not own a fee simple interest in the Property.  (PX5 at 70.)

### B.  Schimenti Theory 2: WBFO delegated authority to WB LLC

Next, Schimenti argues that WB LLC is "an entity with a 'right' or 'interest' in the Property sufficient to enter into subleases and make improvements and manage the day to day affairs of the Property" and so "meets the definition of the term 'owner'" under the NY Lien Law.  (Schimenti Posthearing Brief ¶ 43.)  WB LLC was given such rights and interests by the Debtor through the Lease, in which the Debtor, according to Schimenti, delegated to WB LLC the power to enter into subleases with tenants.  (*Id*.)  This right was preserved until the time of this Court's ruling on the invalidity of the Lease, because the New York State court in the rent action authorized WB LLC to continue to enter into subleases of the Property.  (*Id.* ¶ 44.)

---

[7]      This holds despite Schimenti's claim that the District Court for the Southern District of New York "deemed" Weiss to be "a fee owner of the [P]roperty."  (Schimenti Posthearing Br. ¶ 55, citing *In re All Year Holdings Ltd*., 648 B.R. 434, 439 (S.D.N.Y. 2022).)  The District Court did not so hold.  The District Court stated that Weiss is "a 50% owner of the hotel" (the Property), "by virtue of his membership in an entity known as Wythe Berry member LLC," along with YG WV LLC.  *In re All Year Holdings Ltd*., 648 B.R. at 439.  The District Court did not differentiate between fee ownership and ownership in an entity which holds the Property, and this one short, vague excerpt of an opinion on an unrelated issue is not sufficient to contravene clear Delaware precedent and the language of the relevant operating agreement.

Schimenti claims that, because WB LLC had a right/interest in the Property and "total control

over the Property," WB LLC (or Weiss, as WB LLC's representative) provided consent to

Schimenti sufficient to bind the Property to the mechanic's lien. (*Id.* ¶¶ 43–44.)  The Lease

operated as the Debtor's *ex ante* consent (apparently to WB LLC binding the Property however

way it saw fit), according to Schimenti, and that "consent was extended by the state court." (*Id.*

¶ 44.)

     This argument fails on multiple levels.  First, it is undisputed WB LLC never had *any* fee

simple interest in the Property.  It is therefore impossible that WB LLC might have encumbered

that interest.  Absent explicit language in the Lease which could constitute consent[8] by the fee

simple interest holder to work on the Property (which language does not exist, *see infra*), the

lessee WB LLC cannot encumber a property right it does not hold with a lien.  *See Paul Mock,*

*Inc.*, 87 A.D.2d at 756 (1982) (discharging mechanic's lien when the work was done for the

convenience of a tenant (not the landlord) and at the tenant's request, and finding that the

landlord had not been an "affirmative factor in procuring the improvement to be made" nor had

assented to the improvement while in "possession or control of the premises" and in the

expectation of benefiting from the improvement, so the landlord had not consented to the work;

noting also that the lienor "never dealt with the owner" and "all the transactions relating to the

improvements occurred between the lienor and the tenant in possession," and the lienor could not

assert mechanic's lien against the owner of the real property); *Dewees Mellor, Inc.*, 1993 WL

591608, at *3 (holding that mechanic's lien did not "attach directly to the [property owner's]

---

[8]      *See, e.g.*, *M & B Plumbing & Heating Co.*, 103 A.D.2d 879 (3d Dep't 1984) (holding that when lease
expressly required certain work to be done, lease constituted consent under the NY Lien Law); *Ferrara v. Peaches
Cafe LLC*, 138 A.D.3d 1391, 1394 (2016), *aff'd*, 32 N.Y.3d 348 (2018) (finding landlord's consent when lease with
tenant (who hired lienor to improve property) expressly obligated tenant to "install electrical upgrades on the
premises in order to effectuate the purpose of the lease" and collecting cases).

ownership of the [property in question] in 'fee,'" but did operate against the tenants' property interests in the building (a proprietary lease and cooperative shares)).

Second and critically, even if the Lease delegated to WB LLC "*all* authority to enter into subleases" with *any* tenants[9] (Schimenti Posthearing Brief ¶ 43, emphasis added), this would still be ignoring a critical part of the lease: the provision which categorically bars WB LLC from imposing liens on the Property. The Lease expressly requires WB LLC to "keep the Leased Premises" (the Property) "free from any Liens filed or recorded in favor of any mechanic, materialman, architect or engineer performing services by or through Lessee and free from any Lien with respect to work, material or services alleged to have been performed for Lessee," and if one such lien happens to arise, WB LLC is required to discharge that lien within 30 days and remains liable for all payments on that lien. (Lease § 13.1.) And while the Lease does allow for the creation of *some* liens by WB LLC, it only allows for liens to be created *on WB LLC's leasehold interest* in the Property, *not* on the fee simple interest held by WBFO. (*See id.* § 13.2 ("Lessee may create or permit to be created the following liens . . . with respect to *Lessee's leasehold interest* in the Leased Premises . . . ") (emphasis added).) The Lease therefore cannot reasonably be read to be a "delegation" to WB LLC of WBFO's ability to encumber the fee simple interest in the Property.

Nor can the Lease be read as granting WBFO's *ex ante* consent to work on the Property, or to WB LLC's enabling the imposition of a mechanic's lien on the Property. The Lease states explicitly that "[n]othing in this Lease shall be deemed in any way to: (a) constitute the Lessor's

---

[9]     Which the Lease did not do. The Lease allowed WB LLC to use the Property only "for hotel use with food and beverage services and any other lawful uses permitted pursuant to the certificate of occupancy in existence on the date hereof," with these uses defined as "Permitted Use[s]." (Lease § 3.1.) The Lessee could only "sublease all or part of the Leased Premises for any *Permitted Use*." (*Id.* § 17.3 (emphasis added).) Without knowing what the certificate of occupancy provided at the time the Lease was signed, the Court cannot rule with certainty that the sublease with HealthQuarters violated this provision of the Lease, but it is clear from the plain language of the Lease that not all subleases were permissible.

[WBFO's] consent or request, express or implied, that any contractor, subcontractor, laborer or materialman provide any labor or materials for any alteration, addition, improvement or repair of the Leased Premise, or (b) evidence Lessor's agreement to subject the Leased Premises to any such Lien."  (Lease § 13.1; *see also id.* § 3.6 ("Lessee shall not permit any liens, charges or encumbrances ('Liens') upon the Leased Premises."); § 6.1 ("Lessee expressly acknowledges and agrees that Lessor has not made and is not making, and Lessee, in executing and delivering this Lease, is not relying upon, any warranties, representations, promises or statements, except to the extent that the same are expressly set forth in this Lease.").)  This is fatal to any argument Schimenti makes about the Lease somehow constituting the Debtor's consent to the claimants' work.[10]  (*See, e.g.*, Schimenti Posthearing Brief ¶¶ 43–44 (arguing that, "[b]y having a right or interest in the Property and total control over the Property, WB/Weiss provided consent to perform the work sufficient to bind the Property to the Schimenti's [sic] Lien," because "WB was acting with the consent of the Debtor through the Ground Lease" to sublease the property and have contractors perform work on it).)

       Schimenti cannot maneuver out from under the plain text of the Lease and black-letter property law.

---

[10]  Moreover, the Lease does set out a clear procedure by which WB LLC had to abide to make alterations to the property which cost over $500,000 or which "materially affects the structure of the Leased Premises" (such alterations defined as "Material Alterations," *see* Lease § 6.2); the alterations at issue fall within the definition of "Material Alterations."  This section expressly requires WBFO to "reasonably consent[]" to such proposed alterations.  (*See id.* § 6.2(f).)  This provision makes clear, again, that the Lease did not constitute WBFO's blanket consent to alterations: WBFO needed to take an additional step *beyond signing the Lease* to consent to Material Alterations.  Moreover, the record is clear in this case that WBFO not only did not consent to the claimants' work on the Property, but did not even know of the work taking place on the Property until recently.  (*See* Hearing Tr. 56:25–57:6 ("Q: Did the Debtor ever consent to any material alterations? A: [Assaf Ravid] Absolutely not.  And if I had been asked, I would not consent.  Q: Okay.  So my next question was going to be were you ever asked.  A: No, I was never asked."); 57:13–19 ("Q: Did the Debtor ever know about any work done on the property in 2022?  A: No.  Q: Did the Debtor ever know about any subleases before the petitioning creditors filed their application for an involuntary bankruptcy?  A: No.").)

### C. Schimenti Theory 3: Weiss was an agent of Member LLC and the Debtor, and therefore could consent on the Debtor's behalf

Schimenti asserts that Weiss was an agent of both Member LLC and the Debtor.  (*Id.* ¶ 45.)  It claims that the Debtor and Member LLC, through the Lease, expressly delegated to WB LLC "the right to enter into leases, operate, manage the property, and make or authorize improvements," which rights are otherwise reserved to the Debtor per its operating agreement.  (*Id.* ¶¶ 45–52.)  As discussed above, there was no "delegation" by WBFO to WB LLC sufficient to enable WB LLC (or Weiss acting on its behalf) to bind the fee simple interest in the Property.

Schimenti makes the same delegation argument about Member LLC, claiming that YG WV LLC, as managing member of Member LLC, delegated its obligations "including its ability . . . to perform all rights and obligations as landlord under the Ground Lease" to WB LLC and hence to Weiss, who, "as a member of Member LLC, and managing member of WB, was delegated the responsibility for making all decisions required under the Ground Lease." (*Id.* ¶ 48.)  With the "control" over the Property granted by the Lease, "WB LLC and Weiss were able to bind the Debtor when they entered into subleases," according to Schimenti.  (*Id.*)  (Schimenti also repeats its delegation argument concerning the Debtor's alleged delegation of power to WB LLC, backing it up with provisions of the Debtor's operating agreement which enable its managing member to delegate its authority.  (*Id.* ¶¶ 49–51.)  This identical argument fails for identical reasons: the Lease does not enable WB LLC to enable the imposition of a mechanic's lien on the fee simple interest in the Property, and in fact explicitly bars WB LLC from doing so.

Schimenti then claims that the Lease also created an agency relationship between the Debtor (or Member LLC) and WB LLC (and hence Weiss, as he ran WB LLC).  (*Id.* ¶¶ 53–55, 59–64.)  It argues that the Lease constituted actual authority from the Debtor to WB LLC (and Weiss) to operate on its behalf.  An agent's "[a]ctual authority exists when an agent has the

27

power 'to do an act or to conduct a transaction on account of the principal which, with respect to

the principal, he is privileged to do because of the principal's manifestation to him.'" *Hidden*

*Brook Air, Inc. v. Thabet Aviation Int'l Inc*., 241 F. Supp. 2d 246, 260 (S.D.N.Y. 2002) (internal

citation omitted).   Again, Schimenti's position falls flat in the face of the plain language of the

Lease, which explicitly states that "nothing contained in this Lease shall be deemed or construed

by the parties hereto *or by any third person* to create *the relationship of principal and agent . . .*

or of any association between Lessor and Lessee." (Lease § 17.9.)  While courts are not bound

by written disclaimers of agency relationships, *see Gulf Ins. Co. v. Transatlantic Reinsurance*

*Co*., 69 A.D.3d 71, 96 (2009), Schimenti was not able to identify any other "manifestation" from

the Debtor to WB LLC or Weiss authorizing WB LLC/Weiss to act on its behalf in any respect.

Weiss's uncontested testimony established that he never discussed any subleases with WBFO or

Member LLC.  (Weiss Dep. Tr. 77:10–13, 82:3–7, 141:9–16.)  Ravid also testified that "[n]either

Wythe Berry LLC nor Weiss was ever authorized to act on behalf of Debtor, or on behalf of

Wythe Berry Member LLC in its capacity as sole member of the Debtor.  That authority rests

with me as the Plan Administrator for AYH Wind Down LLC, which is the sole member of YG

WV, which is the managing member of Member LLC, which is in turn the sole member of the

Debtor." (Ravid Decl. ¶ 47; *see also* Hearing Tr. 58:3–5 ("Q: Did the Debtor ever delegate any

authority to Zelig Weiss to act on— A: [Assaf Ravid] Absolutely not.").)  The evidence before

the Court establishes that WBFO was not aware of the HealthQuarters Sublease, let alone the

contractors' presence and work on the property.  (*See* Trial Tr. 59:9–60:20 (Ravid testifying that

from 2021 through September of 2023, the Debtor had no insight into "what was going on at the

[P]roperty" because of ongoing litigation between WB LLC and WBFO, despite WBFO's efforts

to get information about operation of the Property; testifying that WBFO was never aware about

28

the sublease with HealthQuarters).)  Schimenti was unable to refute this testimony.  There is no

evidence of an actual agency relationship between WB LLC/Weiss and WBFO.

Schimenti next argues that there was an implied agency relationship between the Debtor

and WB LLC/Weiss, and claims that, "whether or not the Debtor and Weiss considered

themselves to be in an agency relationship is irrelevant, because their words and conduct

construed in the light of all the surrounding circumstances . . . establish at least an implied

agency." (Schimenti Posthearing Br. ¶ 67.)  To establish the existence of an express or implied

agency, Schimenti must show the following factual elements: "[1] the manifestation by the

principal that the agent shall act for him, [2] the agent's acceptance of the undertaking and [3]

the understanding of the parties that the principal is to be in control of the undertaking."

RESTATEMENT (SECOND) OF AGENCY § 1 cmt. b (1958) (quoted in *Paul T. Freund Corp. v.

Commonwealth Packing Co*., 288 F. Supp. 2d 357, 373 (W.D.N.Y. 2003)); *see also Flame Cut

Steel Prods. Co. v. Performance Foams & Coatings, Inc*., 46 F. Supp. 2d 222, 228 (E.D.N.Y.

1999) ("[Agency a]uthority that is express or implied arises from a manifestation of consent from

principal to agent.  Such consent can be either express or implied from the parties' words and

conduct as construed in light of the surrounding circumstances.") (cleaned up) (assessing New

York law).  The principal here is WBFO.  Schimenti's theory of an implied agency relationship

fails for the same reason its theory of actual authority fails: Schimenti has been unable to put

forth evidence that WBFO ever manifested, overtly or through its behavior, consent for WB LLC

to do just about *anything* from 2021 onward (i.e., during the relevant period).  Indeed, WBFO

sued WB LLC to try to enjoin it from subleasing the Property before the HealthQuarters lease

was executed—evidence of, if anything, a *denial* of authority to WB LLC to run the Property.

Schimenti has not been able to point to any evidence suggesting otherwise.

29

Schimenti also advances a theory of apparent authority to try to bind the Debtor. (Schimenti Posthearing Br. ¶ 76.)  Because Weiss never specified in his communications which company he was acting on behalf of, because he "was allowed to play multiple roles under the ownership structure of the Property," because there was "overlap in principals, officers, directors, and employees of the multiple entities that were involved in the ownership structure of the" Property, and because Weiss signed off on building permits as the "owner" of the Property, Schimenti reasonably believed Weiss had authority to bind the fee simple interest in the Property.  (*Id.* ¶¶ 77–80.)  Apparent authority can exist where "words or conduct *of the principal, communicated to a third party*, . . . give rise to the appearance and belief that the agent possesses authority to enter into a transaction."  *Flame Cut Steel Products,* 46 F. Supp. 2d at 228 (internal quotation marks and citation omitted, emphasis added); *see also Minskoff v. American Express Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir.1996) ("Apparent authority . . . arises from the 'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him' . . .  Apparent authority . . . cannot be established by the actions or representations of the agent.") (internal citation omitted); *Hallock v. State*, 64 N.Y.2d 224, 231 (1984) ("The agent cannot by his own acts imbue himself with apparent authority.").  In other words, for Schimenti's theory of apparent authority based on Weiss's representations to fly, Weiss would have had to *be the principal*—i.e., the Debtor.  This is simply not the case. Weiss's status as a 50% *non-managing* member of Member LLC does not make Weiss a representative or member of the Debtor, especially since Member LLC's operating agreement grants the *sole* power to manage the LLC to YG WV LLC, an entity in which Weiss had no stake.  There is ample evidence establishing the fact that Weiss could not speak on behalf of the

30

Debtor, whether as one of the Debtor's principals or as its agent.  It is also uncontested that

WBFO (acting through Ravid) did not interact with HealthQuarters, Schimenti, or any other

claimant, much less made representations concerning consent to work on the Property.

Elsewhere, Schimenti argues that the Debtor and WB LLC should be treated as one and

the same entity, because the two entities retained the same counsel and filed joint briefing in

response to Schimenti's lien foreclosure action and refer to "Wythe Berry" as the "owners and

ground leaseholders" of the Property in a particular filing.  (Schimenti Posthearing Br. ¶¶ 70–71,

citing PX27.)  Schimenti claims that WBFO and WB LLC are therefore judicially estopped from

claiming that they are really two distinct entities.  (*Id.* ¶¶ 72–73.)  Schimenti also advances

alternative arguments that this statement in a filing constitutes a judicial admission (*id.* ¶ 74) or

an evidentiary admission (*id.* ¶ 75).  These claims hold no water: they rely on a misinterpretation

of a single line in a brief which describes the "Wythe Berry" entities as "owners and ground

leaseholders."  But the very filing Schimenti cites treats "Wythe Berry" as a defined term

meaning *both* Wythe Berry Fee Owner LLC *and* Wythe Berry LLC.  (PX27 at 1.)  Defining

these two entities as "Wythe Berry" in a filing is *not* fatal to the corporate formalities which all

relevant parties studiously followed and which clearly separate the Debtor and WB LLC.

Schimenti pulled partial quotations from this filing in a misleading manner.  At no time did WB

LLC and WBFO hold themselves out to be *the same entity*; the hotly contested litigation between

them which started in 2021 and persisted throughout the relevant time period also shows that the

two were anything but identical.  The Debtor is not suddenly changing its stance.  As all of

Schimenti's arguments concerning this sentence fail due to this basic misinterpretation, the Court

will not walk through the elements of judicial estoppel, judicial admissions, and evidentiary

admissions.

Because the *principal* (the Debtor) never communicated with the claimants either directly or indirectly, Schimenti's apparent authority theory fails.[11]  Schimenti's mistaken belief that Weiss was the fee owner of the Property is irrelevant to the agency inquiry.  "One who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority."  *Ford v. Unity Hosp.*, 32 N.Y.2d 464, 472 (1973).[12]

### D.  Schimenti Theory 4: Weiss provided express or implied consent to the claimants' work

Whether Weiss was "acting in his role as an owner of the Property, or as the Managing member of WB [LLC], . . . or as an agent of Member LLC and Debtor with the ability to enter into [sub]leases on behalf of those entities," Schimenti argues that Weiss "provided express or implied consent and took affirmative steps to support" Schimenti's work.  (*Id.* ¶ 65.)  Schimenti points to the NYC DOB permits Weiss signed as an "owner" of the Property.  (*Id.* ¶¶ 68–69.)  The Court need not address this point: as discussed above, every theory of "ownership" which Schimenti asserts fails, so Weiss's consent to the claimants' work is irrelevant.

### E.  Schimenti Theory 5: Debtor's silence constituted consent

Schimenti argues that the Debtor had either actual or constructive knowledge of the work taking place on the Property, and consented to the work through silence (failing to object) in the face of improvements being made on its Property.  (*Id.* ¶¶ 57–58, 69.)  Schimenti alleges that the

---

[11]    This is regardless of Weiss's representations on NYC DOB filings, as Weiss could not speak on the Debtor's behalf.  As for this Court's earlier discovery order in which it stated that Weiss acted "with 'apparent authority' on behalf of the Debtor": the Court was ruling without the benefit of a full record or briefing on the agency questions, on an unrelated issue, and this order should not be treated as a binding finding of fact or law. (PX31; *see also* Schimenti Posthearing Br. ¶ 79.)

[12]    Schimenti's chief financial officer testified that he did not investigate the ownership of the Debtor and was unaware of anyone from Schimenti doing so.  (Hearing Tr. 134:14–135:1.)  He also testified that no one at Schimenti investigated the ownership of the Property.  (*Id.* 142:5–7 (confirming that "Schimenti did not perform public searches for records to determine the property owner").)  Nor did the CFO review the lease between the Debtor and WB LLC.  (*Id.* 142:12–15.)  The other claimant, D&J, similarly had no interaction with the Debtor or Assaf Ravid (*id.* 174:9–13), nor did it know who "had the authority to sign for the owner on the [P]roperty" (*id.* 175:3–6), nor did it "check any leases or subleases" (*id.* 175:7–9).

Debtor had constructive knowledge of the work because various work permits were publicly available. (*Id.* ¶ 57.) Assuming *arguendo* that the Debtor had constructive knowledge of the work done on its property (as there is no evidence of the Debtor's having actual knowledge), the Debtor's silence is not sufficient to constitute consent under Section 3 of the N.Y. Lien Law.

"To come within the intendment of the [Lien Law], the owner must either by an affirmative factor in procuring such work, or, having possession and control of the premises, assent to the improvements in the expectation that he will reap their benefit . . . . Mere knowledge that repairs and alterations are being made does not imply the consent set forth in the Lien Law, nor do expressions of satisfaction with such work, where . . . these defendants exercised no control or supervision over the performance of the contracts entered into." *Eisenson Elec. Serv. Co.*, 30 Misc. 2d at 929–32; *see also Rice v. Culver*, 172 N.Y. 60, 66 (1902) (holding that, "to fall within" Section 3 of the N.Y. Lien Law, "the owner must either be an affirmative factor in procuring the improvement to be made, or, having possession and control of the premises, assent to the improvement in the expectation that he will reap the benefit of it"); *see also Ferrara v. Peaches Cafe LLC*, 32 N.Y.3d 348, 356 (2018) (similar).. The Debtor had neither "possession and control" of the Property at the relevant time (as WB LLC had possession and control), nor was the Debtor an "affirmative factor" in procuring the services of the claimants (having had no interaction with HealthQuarters or the claimants). All Schimenti can plausibly allege is "mere acquiescence" to the work and "benefit" from it, which, New York caselaw makes clear, is not sufficient under the N.Y. Lien Law. *Harner*, 105 A.D. 2d at 932; *Ferrara*, 32 N.Y.3d at 354.

This case is a far cry from those which Schimenti relies upon in its brief. In the cases it cites, courts found that the landlord implicitly consented to work done on their property at the

request of a lessee when the lease expressly called upon the tenant to make improvements to the property, *but* the lease would not constitute consent to improvements or alterations beyond those specified in the contract. *See Jones v. Menke*, 168 N.Y. 61, 64 (1901) ("[A] requirement in a contract between vendor and vendee or between landlord and tenant, that the vendee or tenant shall make certain improvements on the premises is a sufficient consent of the owner to charge his property with claims which accrue in making those improvements, . . . though it would not render his property liable for improvements or alterations beyond those specified in the contract.") (collecting cases); Schimenti Br. ¶¶ 34–37 (collecting similar cases).  While a lease provision can constitute an "affirmative act" by a landowner consenting to work done on its property, *see Ferrara*, 32 N.Y.3d at 355, the lease has to be specific enough: "[a] mere general consent or requirement on the part of an owner that a lessee may or shall make alterations and repairs to the premises at his own expense does not constitute 'consent' within the meaning of the Lien Law." *Eisenson*, 30 Misc. 2d at 930.  Schimenti has been unable to point to a provision in the Lease which would suffice to operate as the Debtor's blanket *ex ante* consent to the claimants' work on the Property—and, indeed, there is ample evidence that the Lease in fact *did not* constitute the Debtor's consent.  *See supra*; *see also* Lease §§ 3.6, 6.2, 13.1.

## IV.    **CONCLUSION**

Because Schimenti has failed to establish that any of the claimants' mechanic's liens

attached to the fee simple interest in the Property, which fee simple interest was owned by the

Debtor, the Court **SUSTAINS** the Debtor's objections and **EXPUNGES** the claims of Schimenti

and D&J.

**IT IS SO ORDERED.**

Dated:        July 7, 2025
              New York, NY

_____
*Martin Glenn*
MARTIN GLENN
Chief United States Bankruptcy Judge